# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No: 25-12607 |
| Raymond Joseph Schneider, | : | Chapter 11 |
| | : | |
| Debtor and Debtor in Possession. | : | Judge Beth A. Buchanan |

## DEBTOR'S MOTION FOR AUTHORIZATION TO PAY PREPETITION CLAIMS OF EXPERT WITNESSES AS CRITICAL VENDORS

Raymond Joseph Schneider, the debtor and debtor in possession (the "Debtor"), moves the Court for authorization to pay all or a portion of the prepetition claims of two creditors whose continued services are vital to the Debtor's reorganization efforts. Those creditors are Bobby B. Winstead ("Mr. Winstead") and Steven D. Lindsey ("Mr. Lindsey" and together with Mr. Winstead, the "Critical Experts"). The Critical Experts have been engaged as expert witnesses in the Debtor's pending case against The Huntington National Bank ("Huntington"), *Schneider v. Huntington National Bank, et al.*, Case No. A2300849 (the "Lawsuit"), before the Hamilton County Court of Common Pleas (the "State Court"). They are owed for services provided to the Debtor on a prepetition basis. Without payment of the prepetition amounts, the Debtor will not be able to continue receiving their services, which will harm his valuable claims in the Lawsuit.

This motion is being filed in conjunction with the *Amended Application to Employ Cummins Law, LLC, as Special Counsel* (Doc. 71) (the "Amended Cummins Application") through which the Debtor seeks authority to hire Cummins Law, LLC ("Cummins Law"), as special counsel to continue litigating the State Court Lawsuit. The Amended Cummins Application further outlines the nature of the Lawsuit and the importance of the Lawsuit to the reorganization of the Debtor's affairs. The Debtor believes that the potential recovery from the Lawsuit is the most valuable asset of the Debtor's bankruptcy estate, and the ongoing reporting and testimony of

the Critical Experts is essential to obtaining success on the merits in the Lawsuit.

A proposed order granting this motion is attached as <u>Exhibit A</u>.

Respectfully submitted,

 /s/  James A. Coutinho
Thomas R. Allen        (0017513)
Richard K. Stovall      (0029978)
James A. Coutinho      (0082430)
Andrew D. Rebholz      (0102192)
Allen Stovall Neuman & Ashton LLP
10 West Broad Street, Suite 2400
Columbus, OH 43215
T: (614) 221-8500; F: (614) 221-5988
allen@asnalaw.com; stovall@asnalaw.com
coutinho@asnalaw.com; rebholz@asnalaw.com
*Counsel for Debtor / Debtor in Possession*

## MEMORANDUM IN SUPPORT

### I.    BACKGROUND

#### A.    Procedural Posture of Bankruptcy Case; Filing Circumstances

1.    This Court has jurisdiction over this application under 28 U.S.C. §§ 157 and 1334 and the General Order of Reference entered in this district.

2.    Venue is proper under 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding as defined in 28 U.S.C. § 157(b)(2).

3.    On October 17, 2025 (the "Petition Date"), the Debtor filed his voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to operate and manage his affairs as debtor in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108. No trustee, examiner, or statutory creditors' committee has been appointed in this case.

4.    This is the second Chapter 11 bankruptcy filing for the Debtor. The first case—Case No. 23-10337 (the "First Case")—was filed on March 2, 2023, and dismissed on February 27, 2024, after the Debtor moved for a voluntary dismissal. *See Memorandum Opinion Granting Debtor's Amended Motion to Voluntarily Dismiss Chapter 11 Case*, First Case Doc. 344 (the "Dismissal Opinion"), and *Order Dismissing Chapter 11 Case*, First Case Doc. 345.

5.    The Debtor's primary reason for dismissing the First Case was that the judgment in favor of Huntington had been overturned on appeal to the Ohio First District Court of Appeals. Dismissal Opinion at pg. 6. However, on August 20, 2025, the Ohio Supreme Court reversed, reinstating the judgment in favor of Huntington. *Huntington Natl. Bank v. Schneider*, 2025-Ohio-2920, *reconsideration denied sub nom. Huntington Natl. Bank v. Schneider*, 2025-Ohio-3266, 179 Ohio St. 3d 1478.

6.      After its judgment was revived, Huntington reinitiated its collection efforts, including filing over a dozen garnishments against the Debtor's accounts, filing for charging orders, instructing the local Sheriff to seize personal assets, filing a fraudulent transfer complaint, and seeking the appointment of a receiver. Like the First Case, this second chapter 11 filing was initiated to stop collection actions by Huntington and to provide the Debtor with an opportunity to submit a plan of reorganization to restructure his financial affairs under the protections offered by the Bankruptcy Code.

7.      The background of the Debtor is familiar to the Court and the parties to this case. The Court has heard testimony regarding the Debtor's background and financial affairs and has written opinions detailing those facts in the First Case. *See* Dismissal Opinion; *see also Order Denying Emergency Motion of The Huntington National Bank for the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)*, First Case Doc. 78.

8.      Since the dismissal of the First Case, there have been certain changes to the financial affairs of the Debtor, and the Debtor has advanced his interests in the State Court Lawsuit.

9.      Since the filing of this case, the Debtor has completed and filed his schedules, participated in the § 341 Meeting of Creditors, and begun efforts to formulate a plan. The Debtor intends to devise an appropriate manner for the liquidation of assets to pay his debts, and eventually propose a plan of reorganization for the Court's consideration.

**B.      The Lawsuit**

10.      The Lawsuit was brought in February 2023 against Huntington and twelve of its employees for the following claims: (1) Breach of Good Faith and Ordinary Care, (2) Breach of Ohio Civil Racketeering, and (3) Civil Liability for Criminal Acts.

11.     The Debtor's complaint alleges that Huntington and several of its employees missed eleven of the twelve red flags identified by the Office of the Comptroller of the Currency ("OCC")[1] as signs of check kiting by the Debtor's former partner, Harold Sosna, which kiting scheme led to the massive losses experienced by the bank. Additionally, the complaint alleges that Huntington and its employees purposely ignored these signs of check kiting and, at times, actively participated in the kiting scheme to meet personal compensation goals and generate fees for the bank. Since the filing of the Complaint, Huntington has challenged the validity of the claims in a motion to dismiss and motion for summary judgment (filed on June 20, 2023, and October 3, 2023, respectively). The Debtor defeated those motions; they were denied by the State Court on August 18, 2023, and February 12, 2024, respectively.

12.     Throughout the discovery phase of the Lawsuit, there have been twenty-seven depositions taken by the Debtor's counsel with twenty-one of the deponents being current or former Huntington employees. Four noticed depositions requested by the Debtor are pending. A deposition of Stephen Steinour was ordered to take place on December 1, 2025, and the Debtor's counsel is currently determining if a second session with Mr. Steinour will be necessary.

13.     Mr. Steinour is the Chief Executive Officer, President, and Chairman of the Board of Huntington. Huntington filed a motion seeking a protective order to prevent the deposition of Mr. Steinour. After motion practice and oral argument, the State Court denied that request and ordered that Mr. Steinour appear for his deposition.

---

[1] The OCC is a bureau of the U.S. Department of the Treasury that supervises national banks and federal savings associations.

14.     In addition to the depositions, extensive documentary discovery has been ongoing and is still being conducted by the Debtor's counsel and selected third-party resources. To date, the Debtor's counsel has received and reviewed over 77,000 documents throughout the discovery phase of the Lawsuit.

15.     For more than thirteen months, the Debtor's state court counsel has engaged and has been working with the Critical Experts who are experts in banking practices, accounting and regulatory agency policies. On September 25, 2025, the Debtor filed in the Lawsuit the expert report of Mr. Winstead—former bank examiner and regulator for the OCC. The expert report of Mr. Lindsey is being prepared. There is also a third expert report being prepared, but that expert was not owed anything from the Debtor as of the Petition Date. Huntington and its employees, according to their disclosures, have engaged three experts, but their reports have not been filed or provided to the Debtor yet.

16.     Pending in the Lawsuit is a motion by Huntington seeking summary judgment on the basis of *res judicata* allegedly arising from its own lawsuit against the Debtor. That motion is fully briefed and oral argument is set for December 17, 2025. Huntington's argument is that the Debtor's claims in the Lawsuit arise out of the same case and controversy as the first collection case by Huntington, and as a result the Debtor is barred from proceeding.

17.     The Debtor anticipates prevailing on the *res judicata* claims by Huntington. In the first place, Huntington twice previously raised the same argument in the Lawsuit and lost both times, and it has waived the ability to raise the issue a third time. But even on the merits of the argument, Huntington should lose. To prevail, Huntington must show that the Debtor had all of the facts necessary to plead the claims raised in the Lawsuit when he answered the original complaint. Nothing can be further from the truth.

18.     At the time that he responded to the original lawsuit by Huntington—and throughout the entire course of the first proceeding—the Debtor lacked critical information about Huntington's actions because such information was hidden from him. Discovery in the initial case was cut short, and Huntington did not adequately respond to discovery before the ruling. Because of that, the state court record lacked the evidence that has since been uncovered regarding Huntington's unsafe banking practices, failure to mitigate, wrongful acts, withholding of material information from the Debtor, violations of industry standards, and general bad faith.

19.     But in the Lawsuit, the Debtor has finally obtained substantial discovery from Huntington, including evidence that Huntington had internal warnings about the loan from the start and that it took action to protect itself from the check kiting scheme in violation of industry standards and in a way that resulted in further losses on the loan. Ultimately, the Debtor uncovered Huntington's enterprise and further uncovered evidence of Huntington's fraud and unlawfulness under various governmental regulations. It was this new information, only available to the Debtor after he answered the collection lawsuit, that is the basis for the pending Lawsuit, which is why the Debtor believes that he will prevail on the *res judicata* arguments again.

20.     More to the point, however, is that the substantial evidence against Huntington's actions requires review and interpretation by individuals that can testify to its meaning. The Critical Experts have been engaged in the Lawsuit to do just that: they are the bridge to show the state court that Huntington's actions led to massive damage to the Debtor.

21.     There is a status conference with the State Court set for the first week of February 2026. At this status conference, the Debtor expects to have all other deadlines for the Lawsuit (including the trial date) set by the State Court.

### C.       Background of the Critical Experts' Employment

22.      Both of the Critical Experts were engaged in late 2024 and have been working with the Debtor and his counsel for over a year.

23.      Attached as <u>Exhibit B</u> is the engagement letter for Mr. Lindsey dated September 5, 2024.

24.      Attached as <u>Exhibit C</u> is the engagement letter for Mr. Winstead dated October 14, 2024.

25.      As set forth in the Amended Cummins Application, Cummins Law arranged for the Critical Experts to provide services for the Debtor during the course of the Lawsuit and further acted as a conduit for the payment of the Critical Experts' fees. Cummins Law has set up with the Debtor a process whereby the Debtor would fund litigation expenses for the Lawsuit through a retainer, and out of that retainer the Critical Expert fees were paid. In the lead up to the Petition Date, the Debtor was behind on paying the fees, and there were fees incurred in invoicing periods that had not yet been invoiced.

26.      When the original application to employ Cummins Law was filed, the undersigned misunderstood the arrangement between Cummins Law and the Critical Experts and believed that Cummins Law had advanced funds to pay the Critical Experts' fees on the Debtor's behalf. However, as set forth in the Amended Cummins Application, the Critical Experts' fees were not paid, and though labeled as expense advances, the billing by Cummins Law of the Critical Experts' fees was just as a conduit for the Debtor to pay them.

27.      Attached as <u>Exhibit D</u> are copies of the prepetition invoices for the Critical Experts that were unpaid at the time of the Petition Date. As of the Petition Date, Mr. Winstead was owed $13,650.00 and Mr. Lindsey was owed $66,406.25.

### D.      Expert Credentials and Critical Nature of Engagements

28.      The Lawsuit relates to sophisticated banking matters and the Debtor's claims look at the requirements under which Huntington was to operate in extending and servicing the subject loan. These are not subjects that are common to find subject matter professionals, and the Debtor and his counsel have worked hard to find, engage, and establish a strong working relationship with the appropriate experts to advance the Debtor's case against Huntington.

29.      Mr. Lindsey is an expert in financial crime, consumer compliance regulations, Bank Secrecy and Anti Money Laundering, banking practices, and regulatory requirements related thereto. A copy of Mr. Lindsey's Curriculum Vitae is attached hereto as Exhibit E.

30.      Mr. Winstead is an expert in banking regulation, risk management, credit and lending practices, and requirements for banks. A copy of Mr. Winstead's Curriculum Vitae is attached hereto as Exhibit F.

31.      As an example of the extensive work that has been completed by the Critical Experts, the report written by Mr. Winstead is attached as Exhibit G (the "Winstead Report"). This report, spanning over 40 pages, offers key insights into the failures of Huntington that have been exposed in the Lawsuit. Mr. Winstead lays out in the report and concludes that Huntington engaged in unsafe and unsound banking practices, that it violated regulatory expectations and industry standards, and that its breach of duties caused significant harm.

32.      Although it is not yet complete, the anticipated report from Mr. Lindsey will mirror similar themes.

33.      In preparing the Winstead Report and the report, so far, from Mr. Lindsey, the Debtor and his counsel, along with the Critical Experts, have spent hundreds of hours reviewing documents and materials and preparing the expert findings. These Critical Experts have already

been paid large amounts and have developed substantial "institutional knowledge" regarding the Lawsuit and the Debtor's claims against Huntington. They have begun to apply those particular facts to their individual specialties to assist the Debtor in advancing his case against Huntington.

34.     Should the Critical Experts disengage from the Debtor and refuse to continue work, there will be substantial economic and practical effects on the Debtor's Lawsuit and reorganization efforts. First, from a financial perspective, the Debtor believes that it would cost more than what is currently due to the Critical Experts to find new expert witnesses, bring them up to speed, and have new reports generated. Not only would the new experts need to review all of the same materials over again, but the Debtor would also re-incur all of the fees that were paid to Cummins Law in working with the Critical Experts to date.

35.     That is assuming, of course, that the Debtor would be able to substitute new individuals for the Critical Experts at this stage of the Lawsuit. As set forth above, the Lawsuit is in advanced stage whereby expert disclosures have already been made and reports are being exchanged. The Debtor would likely need to obtain leave of court to substitute new experts and to issue new reports, and Huntington would likely object to such a request. Even if there were no objection, the State Court may not permit the Debtor to disclose new experts at this late stage.

36.     Specifically, counsel in the Lawsuit agreed to a proposed case schedule to have experts disclosed back in January 2025. Huntington has indicated in the case what it would need at least 8 weeks to prepare reports from its experts after submission of the Debtor's reports. While that timeline has not been officially adopted by the court, the court has indicated that a deadline for Huntington's expert reports will be entered after a ruling is issued on the pending *res judicata* motion. If the Debtor has to find new expert witnesses, it will delay the Lawsuit by many months, if the court even permits it at this point.

37.     That is also assuming that the Debtor can find suitable replacement experts. The Critical Experts have unique backgrounds and skillsets that make their opinions very valuable in the Lawsuit, and there is no guaranty that the Debtor would be able to find similarly-qualified replacements. Prior to engaging these experts, the Debtor and his counsel looked into several possible candidates and had extreme difficulty finding experts with background in the specific areas involved in the Lawsuit. The Debtor engaged Mr. Lindsey who introduced the Debtor's counsel to Mr. Winstead because of his specific expertise in banking regulation and credit/lending practices. The Debtor is not confident that there will be other suitable candidates for this unique case.

38.     The failure to keep qualified and engaged experts will substantially affect the Debtor's Lawsuit and handicap his ability to recover from Huntington. This Lawsuit, if the Debtor is successful, has the potential to be the Debtor's largest asset and perhaps wipe out the debt owed to Huntington. It is, therefore, essential that the efforts in the Lawsuit be advanced and not undercut.

39.     The Debtor's understanding is that the Critical Experts are unwilling to continue with their engagement if they are not paid for the prepetition amounts that are due and owing. Therefore, combined with the harm to the Debtor's Lawsuit that would be experienced if the Critical Experts are not engaged, and the cost that it would take to replace the Critical Experts, the Critical Experts squarely fall into the category of "critical vendors" that are routinely allowed to be paid in bankruptcy proceedings.

## II.    RELIEF REQUESTED

40.     The Debtor's restructuring efforts, while not entirely dependent on a successful outcome to the Lawsuit, will be enhanced by success in that litigation. It is one of the Debtor's

central goals in this case to continue with the multi-year effort that he has invested in to recover from Huntington based on its wrongful acts. The Critical Experts are essential to those efforts.

41.     Based on their unique credentials, the Critical Experts provide one-of-a-kind services that are critical for two reasons: The Debtor may not be able to find a suitable replacement and the Debtor does not have the ability to use other vendors without delay and significant cost, if the State Court even permits a replacement at this time in the Lawsuit. The failure to pay the Critical Experts could severely hamper the Debtor's efforts in the Lawsuit. Based on the Debtor's understanding, the Critical Experts are unwilling to do business with a "chapter 11 debtor" absent payment of their prepetition claims. The loss of the services provided by the Critical Experts would have an immediate impact on the Debtor's Lawsuit and may therefore have long term effects on the Debtor's ability to reorganize.

42.     As a result of the foregoing, and pursuant to 11 U.S.C. §§ 105(a) and 363(b), the Debtor seeks an order (a) authorizing the Debtor, in his sole discretion and at such time the Debtor deems appropriate, to pay all or a portion of the prepetition obligations of the Critical Experts.

43.     The Debtor proposes to pay, in his sole discretion, the prepetition claims of each of the Critical Experts only if they agree to continue to supply services to the Debtor in accordance with the pre-existing terms of their engagement or on other favorable terms as are acceptable to the Debtor. Notwithstanding the foregoing, if a Critical Expert is still willing to do business with the Debtor without payment on the prepetition debt, the Debtor will not pay that vendor as a critical vendor.

44.     The Debtor further requests that if a Critical Expert that receives payment refuses to continue to supply services to the Debtor, then the Debtor may, in his discretion and without

further order of the Court, exercise the following rights: (a) declare the payment of the Critical

Expert's prepetition claim a voidable postpetition transfer under 11 U.S.C. § 549(a) that the Debtor

may seek to avoid and recover in cash; and (b) return the parties to their original positions (i.e.,

immediately prior to the entry of the order approving the relief sought herein) by reinstating the

Critical Expert's claim and demanding the immediate return of the Debtor's payments (to the

extent that the amounts exceed post-petition amounts owed by the Debtor without giving effect to

setoff, recoupment, adjustments, etc.).

     45.    To ensure the Critical Experts transact business as set forth herein, the Debtor

proposes to implement the following procedures as a condition precedent to paying either of them:

(a) the Debtor shall determine whether the Critical Expert will provide services without payment;

(b) if services will not be provided, the Debtor shall deliver a letter agreement (the "Critical Vendor

Letter Agreement") to the Critical Expert, which must be executed and returned to the Debtor,

together with a copy of the order granting this Motion; and (c) payment of the prepetition claim is

accompanied by the following statement (which may be printed on the back of the check or on a

cover letter):

> By accepting this payment, the payee agrees to the terms of the Order of the
> U.S. Bankruptcy Court for the Southern District of Ohio, dated _____, 2026, in
> the chapter 11 case of *In re Schneider*, Case No. 25-12607, entitled "Order Granting
> Debtor's Motion for Authorization to Pay Prepetition Claims of Expert Witnesses
> as Critical Vendors" and submits to the jurisdiction of such Bankruptcy Court for
> enforcement thereof.

## III.    BASIS FOR RELIEF REQUESTED

     46.    The payment of the Critical Experts is necessary to advance the Debtor's Lawsuit

and help the Debtor successfully reorganize. If the relief sought in this motion is not granted, the

Critical Experts will likely deny the Debtor essential services going forward. As set forth above,

the loss of the services of the Critical Experts would substantially harm the Debtor's efforts in the

Lawsuit.

47.     Accordingly, upon the exercise of his business judgment, the Debtor believes that

the payment of the Critical Experts as set forth herein is necessary to a successful chapter 11

reorganization and in the best interests of the Debtor's estate and creditors.

A.     **Payment of prepetition Critical Experts is authorized under 11 U.S.C. § 363**

48.     The Court may authorize the Debtor to pay the prepetition claims of the Critical

Experts under 11 U.S.C. § 363. Section 363(b)(1) empowers the Court to allow a debtor to "use,

sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §

363(b)(1); *see also In re Murray Metallurgical Coal Holdings, LLC,* 613 B.R. 442 (Bankr. S.D.

Ohio 2020) ("Given that a transaction as significant as the pre-plan sale of substantially all assets

can be authorized under § 363(b)(1), there can be little doubt that the section also provides a

mechanism for debtors to obtain court authority to pay prepetition claims before confirmation if a

sound business purpose supports the payment."). Using the relief requested to advance the

Debtor's Lawsuit, which is potentially the Debtor's largest asset, is "consistent not only with §

363(b), but also with the primary purpose of the Bankruptcy Code." *Murray,* 613 B.R. at 456. In

addition, section 363(c) allows a debtor-in-possession to enter into transactions involving property

of the estate in the ordinary course of business without an order of the court. *See, e.g., Armstrong

World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 395 n.2

(S.D.N.Y. 1983) ("Insofar as transactions are actually in the ordinary course, they are authorized

automatically by § 363(c)(1) and § 1107(a), and do not require Bankruptcy Court approval.").

49.     To determine if a vendor is a critical vendor the debtor must prove (1) the favored

vendors will cease to do business with the debtor post-petition unless their prepetition debt is paid;

and (2) the debtor will gain enough from the continued transaction with the favored vendors to

provide some residual benefit to the remaining disfavored creditors. *In re GVM,* 606 B.R. 220, 227

(Bankr. M.D. Penn. 2019) *citing In re Kmart Corp.,* 359 F.3d 866 (7th Cir. 2004). "As long as the

protocol set forth in the critical vendor motion is sufficient, § 363 of the Bankruptcy Code allows

bankruptcy courts to authorize debtors to exercise their business judgment to pay critical vendor

claims." *Murray,* 613 B.R. at 455. To establish the first element, a debtor can identify each critical

vendor and establish that it will cease providing goods or services unless paid, or the debtor can

establish a protocol under which it will pay a creditor's claim only if the creditor refuses to provide

essential services until paid. *Id.* at 453. In the use of a protocol, "Courts have regularly approved

critical vendor motions in cases in which the debtors have used protocols…without identifying the

vendors or providing specific evidence as to each one." *Id.*

50.     In this instance, the Debtor is not using a protocol, but has instead specifically

identified the two Critical Experts who are expected to refuse to provide essential services until

receiving payment. *See supra* ¶¶ 14-16. These Critical Experts are creditors whose services are

vital to the Debtors.

51.     Additionally, the Debtor firmly believes that the uninterrupted services provided

by the Critical Experts are imperative to the Debtor's ongoing Lawsuit, and that the failure to pay

the Critical Experts may prejudice the Debtor's ability to pursue the Lawsuit. While the Debtor

does not anticipate submitting a plan of reorganization that is dependent on the success of the

Lawsuit, the ongoing pursuit of and recovery under the Lawsuit will benefit all creditors and the

estate at large. That is, success in the Lawsuit will let the Debtor avoid liquidation fire sales of

other assets with will benefit all creditors long-term (just as it was beneficial to them to dismiss

the first bankruptcy case when the Huntington judgment was overturned).

52.     As the foregoing authority amply supports, where the ability to pay prepetition claims of critical vendors is necessary to prevent harm to a debtor's estate, courts are fully empowered to authorize such payments. The Debtor's ability to continue unabated in the Lawsuit is in the best interest of all creditors because success in the Lawsuit may very well negate the need for a reorganization; it is, after all, only Huntington's debt and collection efforts that necessitated this filing. Without the requested relief, which is sought based on a rational exercise of the Debtor's business judgment, the interests of all creditors (except Huntington) and the Debtor's reorganization efforts could be jeopardized. Therefore, the Debtor respectfully submits that the relief sought herein is fully justified by sections 363 of the Bankruptcy Code.

## IV.     DEBTORS' RESERVATION OF RIGHTS

53.     Nothing contained herein is intended or should be construed as an admission of the validity of any claim against the Debtor; a waiver of the Debtor's rights to dispute any claim; or an approval, assumption or rejection of any agreement, contract, or lease under 11 U.S.C. § 365. The Debtor expressly reserves his rights to contest any invoice or claim with respect to Critical Experts in accordance with applicable non-bankruptcy law, and to assume or reject any agreements with Critical Experts in accordance with the applicable provisions of the Bankruptcy Code. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently.

## V.     CONCLUSION

For the foregoing reasons, granting the relief requested herein is appropriate and in the best interest of all parties-in-interest. The Debtor respectfully requests that the Court enter an order substantially in the form attached as Exhibit A.

Respectfully submitted,

 /s/  James A. Coutinho                    
Thomas R. Allen        (0017513)
Richard K. Stovall      (0029978)
James A. Coutinho      (0082430)
Andrew D. Rebholz    (0102192)
Allen Stovall Neuman & Ashton LLP
10 West Broad Street, Suite 2400
Columbus, OH 43215
T: (614) 221-8500; F: (614) 221-5988
allen@asnalaw.com; stovall@asnalaw.com
coutinho@asnalaw.com; rebholz@asnalaw.com
*Counsel for Debtor / Debtor in Possession*

# EXHIBIT A
# PROPOSED ORDER

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | : | Case No: 25-12607 |
| Raymond Joseph Schneider, | : | Chapter 11 |
| | : | |
| Debtor and Debtor in Possession. | : | Judge Beth A. Buchanan |

## ORDER GRANTING DEBTOR'S MOTION FOR AUTHORIZATION TO PAY PREPETITION CLAIMS OF EXPERT WITNESSES AS CRITICAL VENDORS (DOC. ___)

This matter came before the Court upon the *Debtor's Motion for Authorization to Pay Prepetition Claims of Expert Witnesses as Critical Vendors* (the "Motion") (Doc. ___) filed by Raymond Joseph Schneider, the debtor and debtor in possession (the "Debtor"). Through the Motion, the Debtors seek authorization, in his sole and absolute discretion, to pay all or a portion of the prepetition claims of two creditors whose continued services the Debtor believes are vital to his reorganization efforts. Those creditors are Bobby B. Winstead ("Mr. Winstead") and Steven D. Lindsey ("Mr. Lindsey," together, the "Critical Experts"). The Critical Experts have been

engaged as expert witnesses in the Debtor's pending case against The Huntington National Bank ("Huntington"), *Schneider v. Huntington National Bank, et al.*, Case No. A2300849 (the "Lawsuit"), before the Hamilton County Court of Common Pleas (the "State Court"). They are owed for services provided to the Debtor on a prepetition basis. The Debtor states that, without payment of the prepetition amounts, he will not be able to continue receiving their services, which will harm his claims in the Lawsuit.

The Court finds that it has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Further, this matter is a core proceeding pursuant to 28 U.S.C. §157(b) and the Court has the constitutional authority to issue an order as to the Motion.

Notice of the Motion has been given to the Debtor, the Office of the United States Trustee, the twenty largest unsecured creditors, the Critical Experts, and those parties requesting notice in the case. Notice of the Motion was adequate, and no further notice need be given. Upon review of the matters presented in the Motion, the Court is satisfied that the relief sought in the Motion is in the best interests of Debtor and his estate. The legal and factual bases set forth in the Motion establish just cause for the relief granted here. The Court finds the Motion to be well-taken and it is approved.

It is therefore ORDERED as follows:

1.      The Debtor is authorized, in his sole discretion and at such time the Debtor deems appropriate, to use funds to pay or to direct the payment of prepetition amounts owed to the Critical Experts, provided that the Critical Experts agree to supply services to the Debtor on an ongoing basis under the agreed prepetition terms or on other favorable terms as are acceptable to the Debtor.

2.      The Debtor is authorized to implement the following procedures as a condition precedent to paying any Critical Expert: (a) the Debtor shall determine whether the Critical Expert will provide services without payment; (b) if services will not be provided, the Debtor shall deliver a letter agreement (the "Critical Vendor Letter Agreement") to the Critical Expert, which must be executed and returned to the Debtor, together with a copy of the order granting this Motion; and (c) payment of the prepetition claim of a Critical Expert is accompanied by the following statement (which may be printed on the back of the check or on a cover letter):

> By accepting this payment, the payee agrees to the terms of the Order of the U.S. Bankruptcy Court for the Southern District of Ohio, dated _____, 2026, in the chapter 11 case of *In re Schneider*, Case No. 25-12607, entitled "Order Granting Debtor's Motion for Authorization to Pay Prepetition Claims of Expert Witnesses as Critical Vendors" and submits to the jurisdiction of such Bankruptcy Court for enforcement thereof.

3.      As set forth in the Motion, nothing in this order is intended or should be construed as an admission of the validity of any claim against the Debtor; a waiver of the Debtor's rights to dispute any claim; or an approval, assumption or rejection of any agreement, contract, or lease under 11 U.S.C. § 365.

IT IS SO ORDERED.

SUBMITTED BY:

 /s/  James A. Coutinho
Thomas R. Allen        (0017513)
Richard K. Stovall      (0029978)
James A. Coutinho      (0082430)
Andrew D. Rebholz      (0102192)
Allen Stovall Neuman & Ashton LLP
10 West Broad Street, Suite 2400
Columbus, OH 43215
T: (614) 221-8500; F: (614) 221-5988
allen@asnalaw.com; stovall@asnalaw.com
coutinho@asnalaw.com; rebholz@asnalaw.com
*Counsel for Debtor / Debtor in Possession*

Copies to Default List Plus Top 20 plus additional parties:

Bobby B. Winstead
10 Escondite Lane
Hot Springs Village, AR 71909

Steven D. Lindsey
3111 Scottsville Rd.
Glasglow, KY 42141

# Steven D. Lindsey

**3111 Scottsville Rd., Glasgow, Kentucky 42141 | (510) 410-6721 | linvz59@yahoo.com**

September 5, 2024

Cummins Law LLC
Attn: James R. Cummins, Esq.
312 Walnut Street, Suite 1530
Cincinnati, Ohio 45202

> Re: *Raymond Schneider, et al. v The Huntington National Bank, et al.,* Case No. A 2300849, Court of Common Pleas, Hamilton County, Ohio

Dear Mr. Cummins:

This letter will confirm our arrangement under which Steven D. Lindsey ("Mr. Lindsey") has been engaged by Cummins Law LLC as counsel ("Counsel") to provide the following services on behalf of Raymond Schneider ("Plaintiff") in the above referenced matter. The services to be provided, as requested, shall include, but not be limited to:

> Providing litigation consulting and services as a testifying expert on banking practices and procedures, compliance requirements and fulfillment, duty of care owed, and banks' obligations to act in good faith as it relates to matters in the above litigation. The specific tasks and assignments may include the writing of expert reports, rebuttal reports, affidavits, and/or participating in deposition(s) and tribunal testimony as Counsel shall request.

Mr. Lindsey will perform these services as an expert in financial crime, consumer compliance regulations, Bank Secrecy ("BSA"), and Anti Money Laundering ("AML"), banking practices and regulatory requirements related thereto.

For his services, Mr. Lindsey will be paid fees of $525 per hour as well as the cost of any direct expense such as reasonable travel time and expenses incurred, duplicating, telephone/facsimile charges, messenger service, and all similar charges that are customary for these types of services.

Remittance of the agreed fee will be made by check or electronic means to:

Steven D. Lindsey



For these services, Mr. Lindsey will bill monthly, and payment is due upon receipt. If an invoice remains unpaid for 90 days, Mr. Lindsey shall have the right to withdraw from services contemplated under this Agreement. If, however, Mr. Lindsey remains on the case after the invoice

**EXHIBIT B**
**Page 2 of 2**

remains unpaid for 30 days, a carrying charge of 15% per annum (1.25% per month) will be made on the unpaid balance and added to the invoice. If, in the unfortunate circumstance, that legal action is required for collection, Mr. Lindsey will be entitled to reasonable attorney's fees.

It is expressly understood and agreed that Mr. Lindsey assumes no responsibility for the validity or accuracy of any information provided by Plaintiff or Counsel. Except for liability of Mr. Lindsey arising from his negligence or willful or fraudulent misconduct, Plaintiff will indemnify and hold Mr. Lindsey harmless from any and all liability that may arise out of this engagement, including, but not limited to reports, recommendations, opinions, advice, negotiations, testimony, and consultation generally. Mr. Lindsey makes no promise or guarantee of success with respect to any undertaking under this agreement.

Mr. Lindsey recognizes that Counsel and its clients have business interests which require a confidential relationship, and the fullest protection and confidential treatment of all property, whether trade secrets, real or personal property, and intellectual property owned and provided by Counsel will be maintained. In that connection, Mr. Lindsey will sign, deliver, and abide by any Non-Disclosure Agreement, Court required Confidentiality Order, Protective Orders entered into between Plaintiff and third parties, or similar agreements as may be requested by Counsel in the above captioned case. Except as authorized by Plaintiff or Counsel, Mr. Lindsey agrees that he will not use or disclose any of the information to others, except in the furtherance of the objectives of this engagement.

No part of the work product of Mr. Lindsey may be relied upon by third parties without the knowledge, and express written authorization of Mr. Lindsey. Further, Mr. Lindsey shall not be liable for any losses, claims or damages to any third parties who may have business, contractual or financial relationships with Counsel and/or Plaintiff which are the subject matter of this agreement.

Please sign the enclosed copy of this letter to acknowledge concurrence with its terms and return a signed copy.

Signed,

Steven D. Lindsey     9/5/2024

AGREED TO AND ACCEPTED on behalf of Raymond Schneider on this 5th day of September 2024, by:

CUMMINS LAW LLC

James R. Cummins, Esq.

**EXHIBIT C**
**Page 1 of 2**

# Bobby B. Winstead

### 1154 Salido Ave The Villages, FL 32159 | (214) 435-1001 | Bobwinstead@gmail.com

October 14, 2024

Cummins Law LLC
Attn: James R. Cummins, Esq.
312 Walnut Street, Suite 1530
Cincinnati, Ohio 45202

      Re: *Raymond Schneider, et al. v The Huntington National Bank, et al.,* Case No. A
2300849, Court of Common Pleas, Hamilton County, Ohio

Dear Mr. Cummins:

This letter will confirm our arrangement under which Bobby B. Winstead ("Mr. Winstead") has
been engaged by Cummins Law LLC as counsel ("Counsel") to provide the following services on
behalf of Raymond Schneider ("Plaintiff") in the above referenced matter. The services to be
provided, as requested, shall include, but not be limited to:

      Providing litigation consulting and services as a testifying expert on banking
      practices and procedures, compliance requirements and fulfillment, duty of care
      owed, and banks' obligations to act in good faith as it relates to matters in the above
      litigation. The specific tasks and assignments may include the writing of expert
      reports, rebuttal reports, affidavits, and/or participating in deposition(s) and tribunal
      testimony as Counsel shall request.

Mr. Winstead will perform these services as an expert in banking regulation, risk management,
credit and lending practices and requirements for banks.

For his services, Mr. Winstead will be paid fees of $525 per hour as well as the cost of any direct
expense such as reasonable travel time and expenses incurred, duplicating, telephone/facsimile
charges, messenger service, and all similar charges that are customary for these types of services.

Remittance of the agreed fee will be made by check or electronic means to:

Bobby B. Winstead



For these services, Mr. Winstead will bill monthly, and payment is due upon receipt. If an invoice
remains unpaid for 90 days, Mr. Winstead shall have the right to withdraw from services
contemplated under this Agreement. If, however, Mr. Winstead remains on the case after the

invoice remains unpaid for 30 days, a carrying charge of 15% per annum (1.25% per month) will be made on the unpaid balance and added to the invoice. If, in the unfortunate circumstance, that legal action is required for collection, Mr. Winstead will be entitled to reasonable attorney's fees.

It is expressly understood and agreed that Mr. Winstead assumes no responsibility for the validity or accuracy of any information provided by Plaintiff or Counsel. Except for liability of Mr. Winstead arising from his negligence or willful or fraudulent misconduct, Plaintiff will indemnify and hold Mr. Winstead harmless from any and all liability that may arise out of this engagement, including, but not limited to reports, recommendations, opinions, advice, negotiations, testimony, and consultation generally. Mr. Winstead makes no promise or guarantee of success with respect to any undertaking under this agreement.

Mr. Winstead recognizes that Counsel and its clients have business interests which require a confidential relationship, and the fullest protection and confidential treatment of all property, whether trade secrets, real or personal property, and intellectual property owned and provided by Counsel will be maintained. In that connection, Mr. Winstead will sign, deliver, and abide by any Non-Disclosure Agreement, Court required Confidentiality Order, Protective Orders entered into between Plaintiff and third parties, or similar agreements as may be requested by Counsel in the above captioned case. Except as authorized by Plaintiff or Counsel, Mr. Winstead agrees that he will not use or disclose any of the information to others, except in the furtherance of the objectives of this engagement.

No part of the work product of Mr. Winstead may be relied upon by third parties without the knowledge, and express written authorization of Mr. Winstead. Further, Mr. Winstead shall not be liable for any losses, claims or damages to any third parties who may have business, contractual or financial relationships with Counsel and/or Plaintiff which are the subject matter of this agreement.

Please sign the enclosed copy of this letter to acknowledge your concurrence with its terms and return the signed copy to me at your next convenience.

Signed,

_Bobby B. Winstead_
Bobby B. Winstead

AGREED TO AND ACCEPTED on behalf of Raymond Schneider on this _22_ day of October 2024, by:

CUMMINS LAW LLC

_James R. Cummins_
James R. Cummins, Esq.

# August 2025 Cummins

**Date:** 10/2/25

**Employee Name:** Bobby Winstead

**Job Title:** Consultant

**Report Dates:** Aug 1, 2025 - Aug 30, 2025

**Reason for Expenditure:**

## Hours Worked Detail

| Date | Start | Stop | Task | Total Hours | Rate (per hr) | Amount |
|------|-------|------|------|-------------|---------------|--------|
| 8/6/25 | | | Client call | 2 h  0 m | 525 | $1,050.00 |
| 8/28/25 | | | Prepare client documents | 5 h  0 m | 525 | $2,625.00 |
| 8/29/25 | | | Review and comment on documents | 3 h  0 m | 525 | $1,575.00 |
| 8/30/25 | | | Prepare documents | 5 h  0 m | 525 | $2,625.00 |

| | | Total Hours: | 15 h 0 m | Total Earned: | $7,875.00 |
|---|---|---|---|---|---|

| Employee Signature | Date |
|---|---|
| | |
| Authorization Signature | Date |

## September 2025

**Employee Name:**
Bobby Winstead

**Date:**
9/2/25

**Reason for Expenditure:**

**Job Title:**
Consultant

**Report Dates:**
Sep 1, 2025 - Sep 30, 2025

### Hours Worked Detail

| Date | Start | Stop | Task | Total Hours | Rate (per hr) | Amount |
|------|-------|------|------|-------------|---------------|--------|
| 9/4/25 | | | Client call | 1 h 30 m | 525 | $787.50 |
| 9/9/25 | | | Prepare client documents | 6 h 0 m | 525 | $3,150.00 |
| 9/25/25 | | | Client call | 1 h 30 m | 525 | $787.50 |
| 9/27/25 | | | Expert Witness Report | 2 h 0 m | 525 | $1,050.00 |

| | | | **Total Hours:** | 11 h 0 m | **Total Earned:** | $5,775.00 |

| Employee Signature | Date |
|--------------------|------|
| Authorization Signature | Date |

*Steven D. Lindsey*
*3111 Scottsville Rd.*
*Glasgow, KY  42141*
*Linzv59@yahoo.com*
*September 9, 2025*

**EXHIBIT D**
**Page 3 of 4**

Schnieder vs HNB  -- Invoice from February – August 2025

| Date | Gibbons & Co Person | Hours | Services/Activities |
|------|--------------------|-------|---------------------|
| 06/24/2025 | Steven Lindsey | 4.5 | Review client provided documents |
| 06/25/2025 | Steven Lindsey | 4.5 | Review client provided depositions |
| 06/26/2025 | Steven Lindsey | 6.5 | Continue to review docs provided |
| 06/27/2025 | Steven Lindsey | 4.0 | Continue to review docs provided |
| 07/12/2025 | Steven Lindsey | 5.5 | Document review |
| 07/13/2025 | Steven Lindsey | 4.0 | Start report design and framework, begin drafting tables |
| 07/14/2025 | Steven Lindsey | 9.0 | Draft part of report |
| 07/15/2025 | Steven Lindsey | 4.5 | Draft part of report |
| 07/16/2025 | Steven Lindsey | 8.0 | Examine new docs provided and work on report |
| 07/17/2025 | Steven Lindsey | 5.0 | Review docs, incorporate into report outline and draft report |
| 07/18/2025 | Steven Lindsey | 3.0 | Continue to draft report and review docs |
| 07/20/2025 | Steven Lindsey | 5.0 | Continue to draft report and review docs |
| 07/21/2025 | Steven Lindsey | 6.0 | Continue to draft report and review docs |
| 07/22/2025 | Steven Lindsey | 9.0 | Client call and 7 hrs on report |
| 07/23/2025 | Steven Lindsey | 5.5 | Continue drafting report and working on report tables |
| 07/28/2025 | Steven Lindsey | 6.0 | Draft report tables |
| 07/29/2025 | Steven Lindsey | 5.5 | Drafting report |
| 07/30/2025 | Steven Lindsey | 9.0 | Drafting report |
| Total | | 104.5 | |

Invoice Calculation:
$525 x 104.5 = $54,862.50

By signing below, I certify that the above calculation is accurate and fairly represents time allotted to the above listed client.


_____

Steven D. Lindsey
September 9, 2025

1

**EXHIBIT D**
**Page 4 of 4**

*Steven D. Lindsey*
*3111 Scottsville Rd.*
*Glasgow, KY 42141*
*Linzv59@yahoo.com*
*November 12, 2025*

Schneider vs HNB  -- Invoice from September – October 2025

| Date | Gibbons & Co Person | Hours | Services/Activities |
|------|---------------------|-------|---------------------|
| 09/02/2025 | Steven Lindsey | 3.0 | Review client provided documents |
| 09/30/2025 | Steven Lindsey | 4.5 | Work on report and client call |
| 10/02/2025 | Steven Lindsey | 3.0 | Continue to review docs provided |
| 10/07/2025 | Steven Lindsey | 8.25 | Work on report |
| 10/08/2025 | Steven Lindsey | 3.5 | Edit report |
| Total | | 22.25 | |

Invoice Calculation:
Current Period:  $525 x 22.25 = $11,681.25
Previous Period:  $525 x 104.5 = $54,862.50 (February – July 2025, payment – 65 days past due*)

Total Outstanding:  $66,406.25 (Due Upon Receipt)

By signing below, I certify that the above calculation is accurate and fairly represents time allotted to the above listed client.

Steven D. Lindsey
September 9, 2025

1

# Steven D. Lindsey

Glasgow, Kentucky

Linzv59@yahoo.com   510-410-6721

_____

## Chief Compliance Officer/Risk Officer/Director of BSA

Extensive working knowledge (over 35 years) of financial regulatory requirements that impact corporate activities.  Dedicated over 30 years to demystifying anti-money laundering/bank secrecy, consumer, community and fair lending laws, and rules and regulations for US and foreign bankers, examiners, and law enforcement agencies.  Built measurable, sustainable, repeatable, risk-based compliance programs at banks and broker/dealers, eliminating the need for regulatory action, and saved companies millions of dollars in civil money penalties and negative impact to reputation.

---

## Professional Experience

**Independent Contractor**                                                                      **2014-Present**
Planned, led, and managed compliance risk assessment reviews at largest, complex domestic and foreign, banking institutions.  Compliance areas include the following:  anti-money laundering (AML)/Bank Secrecy Act (BSA), consumer protection, community reinvestment and fair lending laws rules and regulations.

- Provided expert subject matter assistance and guidance in enhancing, developing, and implementing compliance programs for the largest (top 10) and/or most complex financial institutions.
- Developed remedial action plans for institutions operating under AML/BSA and compliance regulatory enforcement actions.
- Consulted on a variety of regulatory matters, including new legislation, regulatory interpretations, revised Federal Financial Institution Examination Council's (FFIEC) examination procedures and guidelines and Dodd-Frank requirements
- Provided expert testimony

**Citigroup, Senior Director, Audit and Risk Review**                                **2011- 2014**
Planned, led, and managed the building and execution of a BSA/AML enterprise wide audit risk assessment from which audit plans will be designed.  Compliance areas include the following:  anti-money laundering (AML)/Bank Secrecy Act (BSA), compliance systems, governance, training, CIP/CDD/EDD, suspicious activity monitoring, OFAC, and non-US anti money laundering requirements and expectations.

- Provided expert subject matter assistance and guidance in enhancing, developing, and implementing global audit programs in a large and most complex financial service provider.
- Identified criteria needed to develop an enterprise wide internal audit risk assessment process for a global, large, complex company.  Ultimately the process will navigate to other audit teams
- Provided training to senior level audit team members on the three lines of defense and the ever-evolving audit expectations

**Independent Contractor**                                                                      **2010-2011**
Planned, led, and managed compliance risk assessment reviews at largest, complex domestic and foreign, banking institutions.  Compliance areas include the following:  anti-money laundering (AML)/Bank Secrecy Act (BSA), consumer protection, community reinvestment and fair lending laws rules and regulations.

- Provided expert subject matter assistance and guidance in enhancing, developing, and implementing compliance programs for the largest (top 10) and/or most complex financial institutions.
- Developed remedial action plans for institutions operating under AML/BSA and compliance regulatory enforcement actions.
- Consulted on a variety of regulatory matters, including new legislation, regulatory interpretations, revised Federal Financial Institution Examination Council's (FFIEC) examination procedures and guidelines and Dodd-Frank requirements

## SVB Financial Group, Santa Clara, CA                              *2007 – 2009*
### *Head of Compliance and Bank Secrecy Act (BSA)*
### *Director of BSA*

Appointed by the Board of Directors to lead the development of SVB Financial Group's first risk-based compliance program primarily focused on the bank, broker/dealer and higher risk affiliates. Created a 'best in class' compliance program that included anti-money laundering (AML)/bank secrecy, affiliate transactions, consumer protection, community reinvestment, insider/affiliate transactions and SEC laws, rules, regulations, and regulatory expectations.

- Appointed by Board of Directors as the official BSA Officer as required under regulatory requirements.
- Strengthened regulatory relationships and ongoing effectiveness of the compliance program. Feedback from Regulatory agencies and Internal Audit confirmed a "best in class" status.
- Directed all US regulatory applications and communications related to holding company expansion into foreign countries. Resulted in all applications being approved by the state of California and the Federal Reserve Bank of San Francisco.
- Identified over 100 applicable regulations and developed a risk-based ranking process to ensure Company was focused on the highest possible compliance risks. Established monitoring processes and templates to test highest risk areas.
- Analyzed complex needs of holding company and its subsidiaries and, as needed, partnered with the business units to create processes to achieve business line compliance with federal laws, rules and regulations, as well as the banking laws of the 26 states in which SVBFG operated.
- Built, from the ground up, a Regulatory and BSA Monitoring Compliance Team of 25 employees. Responsibilities included creating an organizational structure commensurate with business activity across the enterprise, identifying compliance staffing needs, sourcing internal and external candidates, and staffing with fully knowledgeable employees.
- Developed strong relationships with cross-functional risk managers to ensure compliance was an integral part of management's enterprise-wide risk assessment.

## Deloitte and Touché, LLP, Oakland CA                              *2003 – 2006*
### *Senior Manager, Regulatory Consulting Services*

Planned, led, and managed compliance risk assessment reviews at large, complex domestic and foreign, banking and broker/dealer institutions. Compliance areas include the following: anti-money laundering (AML)/Bank Secrecy Act (BSA), consumer protection, community reinvestment and fair lending laws rules and regulations.

- Built a sustainable regulatory compliance business line resulting in an approximate $10 million increase in revenue over two years. Brought in new clients that offered repeatable business resulting in a sustainable revenue stream.
- Provided expert subject matter assistance and guidance in enhancing, developing, and implementing compliance programs for a wide range of financial institutions.
- Developed remedial action plans for institutions operating under AML/BSA and compliance regulatory enforcement actions.
- Created and conducted dozens of compliance presentations for government agencies, professional associations, banks, insurance companies, broker/dealers, and other financial entities.
- Consulted on a variety of regulatory matters, including new legislation, regulatory interpretations, and revised Federal Financial Institution Examination Council's (FFIEC) examination procedures and guidelines.

**Office of the Comptroller of the Currency (OCC)** *1983 – 2003*
*Asst. Deputy Comptroller (ADC) for Compliance – Large Banks West (1999-2003)*
*National Bank Examiner (NBE), Compliance – Large Banks East (1994-1999)*
Managed a team of compliance bank examiners responsible for ensuring large banks were compliant and had sufficient audit programs in place.  Also led the examination of the largest national banks in New York and other northeastern states to ensure compliance with the spirit and intent of Anti-Money Laundering, Bank Secrecy, Community Reinvestment, Consumer Protection and Disclosure, and Fair Lending laws, rules and regulations

- Provided expert guidance and counsel on matters related to AML/BSA to US and foreign governments, bankers, and regulators.
- Led all large and complex banks' anti-laundering money regulatory examinations of US national banks operating in foreign locations, including the UK, the Russian Federation, Japan, Argentina, Brazil, and Uruguay.
- Worked with large and district bank compliance ADCs and bank examiners in charge to ensure adequate staffing for all national banks based on risk profile to the bank and risk to the industry.
- Led international anti-money laundering training sessions throughout the Russian Federation, Mexico, and Peru.  Also provided training to field leads throughout Asia, Europe, Africa, and the Americas.
- Frequent speaker at America Banker Association, Mortgage Banker Association and California Banking Association conferences in all consumer compliance and BSA related areas.

### OTHER RELATED EXPERIENCE - OCC

- Compliance Analyst/NBE, Community and Consumer Policy - Washington, DC
- NBE-Tulsa, Oklahoma Duty Station - Tulsa, OK
- Associate NBE I & II, Oklahoma Duty Station – Tulsa, OK
- *Assistant NBE I & II, Oklahoma Duty Station – Tulsa, OK*

### Systems
**Accuity, iComply KYC, Comply Wire, RDC (Risk Data Management), Fiserv, Patriot Officer, Banker's Tool Box, Oceans Systems, Actimize, NICE Actimize, MANTAS, Comply Advantage, OFAC-Accuity, Bridger, OFAC Analyzer, Atlas, Lexis/Nexis**

### EDUCATION

Western Kentucky University, Bachelor of Science-Finance

### PROFESSIONAL AFFILIATIONS

- Commissioned National Bank Examiner
- Served as a facility member for the ABA's Graduate School of Compliance (and instructed various courses covering regulatory compliance)
- Honorable Order of Kentucky Colonels

### AWARDS

- Albert Gallatin Award, U.S. Department of the Treasury
- Special Act Awards, U.S. Department of the Treasury
- Silver Eagle Awards, U.S Department of the Treasury, Office of the Comptroller of the Currency

# BOBBY BRYAN WINSTEAD

214-435-1001                                                            Bobwinstead@gmail.com

Hot Springs Village, AR                                         www.linkedin.com/in/bobwinstead

## PROFILE

Mr. Winstead is an independent consultant with significant experience in a broad range of financial services issues including enterprise risk management and risk assessments, credit risk processes, compliance, BSA/AML, and management and board assessments. As an independent consultant he has designed, planned and developed risk assessments for large organizations and provided litigation support. As a Senior Principal with Promontory Financial Group for 10 years he provided large financial institution clients with solutions to difficult regulator issues such as credit risk, BSA/AML, sanctions, and compliance. Prior to joining Promontory, he provided independent international consulting services to banking regulators in the Peoples Republic of China, the Philippines, Pakistan and Tanzania on risk management, regulatory reporting, IT and problem bank supervision. As a banking regulator with the OCC for 30 years he conducted examinations, supervised problem, credit card, multinational and regional banks and led internal IT development. As Deputy Comptroller for Supervisory Systems he was responsible for developing regulatory reporting and supervision systems. He served on numerous committees for supervisory policy and enforcement actions, IT and development of OCC's supervision by risk. Bobby holds a B.B.A. from Texas A&M, Commerce. He has participated in professional development programs at the Kennedy School of Government, University of Chicago Advanced Management Program and Stanford Graduate School of Business Financial Management Program.

- Skilled at developing and delivering numerous presentations to senior executives, bank directors and clients
- Expert knowledge of regulatory requirements
- Broad knowledge of financial institution practices for litigation support
- Ability to lead teams of experts engaged in various projects

- Ability to identify problems and develop policy, procedures and training responses

- Proven expertise in resolving unique and significant problem bank situations
- Communicating with other regulators, bank senior executives and Boards of Directors on banking issues and problems
- Possess extensive exposure to international banking
- Experience developing and implementing a quality improvement program
- Experience managing complex projects
- Effective communication skills addressing complex issues

## PROFESSIONAL EXPERIENCE

**Independent Consultant, Hot Springs Village, AR**                    **2016-Present**
Providing consulting services for risk management process development and execution, compliance risk management, and litigation support.

- Provided support for litigation involving financial institutions including credit review and recommendations on information requests to support the case and analysis of results
- Led team of consultants to develop risk management processes and execute risk assessments for a large financial institution
- Developed policies, procedures, and reporting processes to address regulator deficiencies
- Provided regulatory advisory services to senior management to address communications and resolve concerns

**PROMONTORY FINANCIAL GROUP,** Washington, DC                                      **2006-2016**
Leading strategy, risk management, and regulatory compliance consulting focusing primarily on the financial services industry.
**Senior Principal**
Provided engagement leadership and technical expertise to clients in resolving regulatory issues.

- Developed action plans for several organizations in conjunction with bank management and directors to successfully resolve serious regulatory concerns and restore the bank condition.
- Identified credit issues and solutions to address regulatory concerns and developed policies, procedures, training and ongoing analytical support to the client.
- Developed risk assessments of internal audit, credit risk, compliance, for clients to comply with regulatory expectations.
- Performed assessments of management and Boards of Directors as required by regulatory agencies.
- Performed independent credit risk reviews of lending portfolios including analysis, risk ratings, and summary reports for numerous clients.

**Independent Consultant,** Dallas, Texas                                          **2001-2006**
Banking Regulatory Consultant specializing in bank supervision processes, risk assessment, problem bank supervision and automated management information systems to support offsite surveillance.

- Successfully established the IT supervision unit for the Central Bank of the Philippines composed of 28 IT examiners and management. Worked with the BSP management to develop and implement a selection process, conducted team building, risk based supervision and IT training to the staff.  Developed policies and procedures for risk based supervision of IT.
- As Team Leader and Supervisory Statistical Systems specialist for the China Banking Regulatory Commission led in establishing the new supervisory statistical system by identifying weaknesses in current system, establishing objectives of statistical support for various supervisory activities, developing new financial reporting for financial institutions, recommending an analytical framework and training to implement the new system. Trained staff and bankers in analytical tools and financial reporting systems.
- Developed and recommended to the State Bank of Pakistan a risk assessment model which will allow the central bank to determine risks to the system and individual banks and provide the capability for stress testing and modeling.
- Developed and delivered a one-week training course in Problem Bank Management to the management and examiners of the Directorate for Banking, Central Bank of Tanzania. Topics included CAMELS, risk assessment, problem bank identification, problem solving, meetings with management and severe problem bank issues.

**Office of the Comptroller of the Currency,** Washington, DC                       **1970-2000**
The OCC charters, regulates, and supervises all national banks and federal savings associations as well as federal branches and agencies of foreign banks. The OCC is an independent bureau of the U.S. Department of the Treasury.

**Assistant Deputy Comptroller for Credit Card Banks (Eastern United States)**
Kansas City, Missouri                                                              **1999-2000**
Directed all aspects of the examination and supervision of credit card banks located in the eastern United Sates. Supervised staff and coordinated assignment of examiners with specialized skills including compliance, IT and credit risk.

- Developed and implemented a new supervisory regimen for credit card banks.

EXHIBIT F

Page 3 of 4

**Assistant Deputy Comptroller for Midsize and Credit Card Banks (Midwest District)**
Kansas City, Missouri                                                                         **1991-1999**
Directed all aspects of the examination and supervision of regional and credit card banks
located in the Midwestern District. Supervised staff and coordinated assignment of examiners
with specialized skills including compliance, IT, trust and credit risk.

- Part of the eight member working group which developed OCC's Supervision by Risk
  approach for large banks. Worked as part of the project team to test and modify risk
  definitions, develop user instructions for examiners and made presentations to agency staff
  and management on the implementation and use of the techniques. The program was later
  modified to accommodate community banks. Received formal recognition from the
  Comptroller for the work done.

**Acting Director, Systems Development,** Washington, D.C.                                **1998**
Recruited to temporarily manage system development for the OCC while a permanent
replacement was found.

- Reorganized project teams to develop the intranet and other internet applications

**Deputy Comptroller for Supervisory Systems,** Washington, D.C.                          **1983-1991**
Identified and implemented advanced, practical technology solutions to bank supervision
processes.

- Identified the potential benefits of developing an expert system to review bank financial
  statements and identify areas for investigation.
- Identified the need to develop a system to be used as an "Electronic File" which would house
  all relevant supervision information and oversaw the development and implementation.
- As chairman of the FFIEC Regulatory Reporting Committee led the development and
  implementation of an automated Call Report collection system.
- Oversaw the development and implementation of a quality improvement program for all
  OCC personnel.

**Director for Multinational Bank Analysis and Supervision**                             **1979-1983**
Managed financial analysis, monitoring and supervision of largest national banks.

- Developed financial analysis and liquidity and capital monitoring/modeling tools and
  techniques.
- Participated in developing board presentations and meeting with executive management to
  discuss regulator issues and findings on capital adequacy and financial performance.

**National Bank Examiner**                                                                **1970-1979**
Managed onsite examinations and presentation of findings to bank management and directors.
Examiner in charge and assisting examiner for National Banks in Wyoming, Colorado, New
Mexico, and Arizona.

### EDUCATION

#### Bachelor of Business Administration
Texas A&M University - Commerce, Commerce, Texas


### PROFESSIONAL DEVELOPMENT

Harvard University, John F. Kennedy School of Government,  Program for Senior Managers in
Government
University of Chicago Booth School of Business, Advanced Management Program

EXHIBIT F
Page 4 of 4

Stanford University Graduate School of Business, Financial Management Program

**ADDITIONAL RELEVANT INFORMATION**

**Countries of Work Experience**
Philippines, Peoples Republic of China, Pakistan, Tanzania, Great Britain, Switzerland, UAE,
Greece, Netherlands, Mexico, Brazil, Malaysia, Indonesia, Singapore, USA

# EXPERT WITNESS REPORT

**Case Name:** Raymond Schneider v. The Huntington National Bank, et al
**Court:** Court of Common Pleas, Hamilton County, Ohio
**Case Number:** A2300849
**Date:** September 25, 2025
**Expert Witness:** Bobby B. Winstead, Consultant

# I. EXECUTIVE SUMMARY

## A. Brief Overview of the Engagement

Cummins Law LLC has engaged Bobby B. Winstead in the above referenced litigation between Raymond Schneider and The Huntington National Bank et al ("Huntington", "Bank" or "HNB").

## B. Nature of the Engagement

I have been retained by Cummins Law LLC as counsel ("Counsel") to provide the following services on behalf of Raymond Schneider ("Plaintiff" or "Schneider") in the above referenced matter. I have been asked to provide expert opinions about the Bank's lending relationship and lending and credit risk administration and management practices as they relate to Raymond Schneider as well as industry standards and regulatory expectations for safe and sound lending.

I have also been asked to provide my opinion as to whether the Bank exercised good faith and fair dealing in administering the guarantee of Schneider and whether the loans and the lending officers involved were properly supervised by the Bank's board and senior management. In forming my opinions, I have considered the facts referenced in this report, the documents referenced in this report, and documents set forth in the list attached hereto.

In addition, I may be asked to provide expert testimony, if necessary, regarding my analyses and opinions.

## C. Key Opinion or Conclusion

Based on the information provided to me and the analyses performed to date, as described in this report, I have reached the following opinion:

**It is my opinion that The Huntington National Bank through its directors, officers and employees failed to exercise good faith, and the duty of care expected resulting in an unsafe and unsound condition. Deficiencies in compensation, credit risk management and policies and procedures also contributed to unsafe and unsound condition. These failures resulted in avoidable losses to the Bank and Mr. Schneider ("Plaintiff").**

Based on my review of the documentation and my professional expertise in banking regulation and credit management, I have identified a systematic pattern whereby Huntington National Bank expanded Mr. Schneider's guarantee liability by 124% (from $33.6MM to $75.2MM) while simultaneously withholding material adverse information about credit deterioration. This pattern represents a clear violation of the bank's duty of good faith and fair dealing, contravenes regulatory expectations for guarantor communications, and constitutes unsafe and unsound banking practices as defined in 12 CFR Part 30.[1]

Specifically, I have identified the following key areas of unsafe and unsound banking practices:

1. **Failure to Exercise Duty of Care Toward Guarantor** - The Bank failed to communicate material adverse information to Schneider and excluded him from remediation efforts
2. **Deficient Incentive Compensation Structure** - The Bank's compensation practices prioritized fee generation over prudent credit risk management
3. **Deficient Lending Policies and Procedures** - The Bank lacked adequate policies for guarantor communications and complex credit monitoring
4. **Failure to Implement Three Lines of Defense Model** - The Bank's risk management framework exhibited systematic failures across all three lines of defense
5. **Violations of Bank's Code of Conduct** - The Bank's actions violated its own ethical standards regarding honesty, integrity, and fairness
6. **Knowledge of Problems While Pursuing Guarantor** - The Bank pursued legal action against Schneider while withholding material information about credit structure problems

I hold this opinion to a reasonable degree of professional certainty. The specific bases for the opinion that I have formed as of the date of this report are detailed in Section VII of this report. I reserve the right to add, change or modify my opinions based on my review of any new information provided, if any.

### D. Information Considered

I have included a list of sources and documents considered in the preparation of this report as **Appendix A** to this report. It is my understanding that discovery in this matter is ongoing. To the extent that additional documents or information are made available to me, I will review such documents and information and may incorporate any such new information into my analyses, conclusions and/or opinions.

## II. BACKGROUND OF THE CASE

Huntington Bancshares Incorporated ("HBI") is a bank holding company headquartered in Columbus, Ohio. Its banking subsidiary, The Huntington National Bank ("HNB" "Huntington" or "Bank"), operates approximately 978 banking offices in 12 states, primarily in the Midwest.

---

[1] 12 CFR Part 30 contains safety and soundness standards for national banks, including Appendix D ("Heightened Standards") which applies specifically to large financial institutions like HNB.

The company is ranked 466th on the Fortune 500 as of 2024 and was the 20th largest U.S. bank with assets of $199 billion. HNB is considered a Large Financial Institution ("LFI") by regulators. LFI's are subject to additional requirements and expectations for management systems and controls as contained in 12 CFR Part 30. Huntington Bancshares Incorporated is supervised by the Federal Reserve Bank ("FRB") while its subsidiary, The Huntington National Bank is a national bank chartered and supervised by the Comptroller of the Currency ("OCC"). As a national bank it is also supervised, and deposits are insured by the Federal Deposit Insurance Corporation ("FDIC").

As one of the largest banking institutions in the U.S. and the Midwest it has a diversified loan portfolio of approximately $126 billion.

## Credit Relationship Chronology

The Premier Health Care ("Premier") credit transaction originated December 15, 2017, as a preliminary proposal to restructure and rewrite an existing participated credit of $75.2MM with HNB replacing Fifth Third Bank as lead bank. Premier Health Care operated nine nursing and rehabilitation care facilities with approximately 1,000 beds (with some additional construction in process at the time of restructure) in the southern Ohio market. Terms were essentially the same although fees and spreads were increased and the maximum LTV of 75% as-stabilized along with a full hedge of the term debt. The primary sponsors were Harold Sosna and Raymond Schneider. Mr. Sosna owned all but four of the facilities with Mr. Schneider owning part of the remainder. *Mr. Sosna operated all the facilities.*

The original proposal was structured with Mr. Schneider providing a guarantee on $33.6MM of the debt associated with the Keller Road Realty which he owned. The initial credit proposal dated December 15, 2017, explicitly stated that Raymond Schneider would "provide his guarantee on just the Keller Road Realty (Obligated Group #2) debt of $33.6MM, based on his ownership in those prop-Co's." This limitation aligned with Mr. Schneider's ownership stake in only four of the nine facilities. The proposal characterized the transaction as "Requesting to restructure and syndicate (best efforts) the existing bank group debt for Premier Health Care with the sponsors Harold Sosna and Raymond Schneider" and noted that HNB would be "replacing Fifth Third as lead bank" while maintaining "the same three obligated groups and nearly all of the same terms as the original deal."

On August 2, 2018, the Underwriting Analysis was revised to enhance the fees and combine borrowing entities along with adding the guarantee of Mr. Schneider for the entire obligation. Receivable controls were added with the borrowing base formula using Lending Linc monitoring system. Updated appraisals as of January 2018 indicated an LTV of 79.3% as stabilized and 76.8% after adding cash collateral. Underwriting Analysis indicates "This opportunity includes significant fees (syndication & loan fees), a higher spread, and significant swap revenue."[2]

On August 15, 2019, Premier was rated Special Mention. "A special mention asset has potential weaknesses that deserve management's close attention. If left uncorrected, these potential

---

[2] Revised Underwriting Analysis, August 2, 2018, p. 3.

weaknesses may result in deterioration of the repayment prospects for the asset or in the institution's credit position at some future date. Special mention assets are not adversely classified and do not expose an institution to sufficient risk to warrant adverse classification."[3]

On October 24, 2019, the Premier relationship was reviewed and downgraded to Substandard and transferred to the Special Assets Group. "A substandard asset is inadequately protected by the current sound worth and paying capacity of the obligor or of the collateral pledged, if any. Assets so classified must have a well-defined weakness, or weaknesses, that jeopardize the liquidation of the debt. They are characterized by the distinct possibility that the bank will sustain some loss if the deficiencies are not corrected."[4]

As is more fully discussed in this report, at the August Top 100 meeting, on Premier Health, SDS (Stephen D. Steinour) asked "how did we get this far out on the credit" and noted "it was a very large charge off for a secured credit".[5] A special review was done on September 9, 2020, at the request of CEO Stephen Steinour. The review cited several factors including a large number of projects with too few resources, project problems, commingled cash with related outside entities, complexity of the corporate structure and related entities allowed for manipulation of performance to cover up poor performance, borrowing base utilized LendingLinc, which arguably increases availability beyond collectability in a deteriorating credit and borrowing base was in and out of compliance due to 'recordkeeping inconsistencies' via LendingLinc data.[6]

**Nature of the Dispute**

The nature of the dispute centers on the claim that Huntington National Bank failed to inform Raymond Schneider, as a guarantor, of material adverse information regarding the financial condition of Premier and its entities, thereby breaching the bank's duty of good faith and fair dealing. Mr. Schneider, who jointly owned 4 of the facilities but had *no operational control*, was initially asked to guarantee only the portion related to his entities ($33.6MM) but was later required to guarantee the entire credit facility ($75.2MM). Mr. Schneider has significant entrepreneurial experience as well as having managed health care facilities for a few years.

# III. QUALIFICATIONS OF THE EXPERT WITNESS AND SPECIFIC EXPERTISE IN GUARANTOR RELATIONSHIPS

I received a Bachelor of Business Administration degree from Texas A&M University -- Commerce (formally East Texas State University), Commerce, Texas in May 1970. My dual majors were in Economics and Psychology.

---

[3] OCC Comptroller's Handbook, "Rating Credit Risk," June 2016, p. 16.
[4] Ibid., p. 17.
[5] Email from Gary Boyer to Dan Storer and Helen Ward, September 11, 2020.
[6] Special Review email, David Wechter to CEO Steinour, September 9, 2020.

I have over fifty-four years of public and private-sector experience in banking, bank regulation, bank supervision, and risk management relating thereto, including more than 30 years of government service as a bank examiner and regulator for the Office of the Comptroller of the Currency ("OCC") from 1970 to 2000.

## A. Banking Regulatory Experience

In September 1970, I began working at the OCC in Casper, Wyoming. In 1974, after nearly four years of formal and on-the-job training, and performing an array of bank safety and soundness and compliance examination activities as an Assistant National Bank Examiner, I was commissioned as a National Bank Examiner. The commissioning tests an examiner's knowledge of banking and bank regulation as well their judgment on matters of safety and soundness, bank accounting, applicable banking laws across many subjects to include, the assessment of the lending and investments, bank operations, liquidity and capital adequacy assessment, the assessment of management adequacy, and governance and oversight by the Board of Directors.

As a National Bank Examiner, I was responsible for leading significant portions of, examinations of community and regional banks ranging in size from $3 million to several billion dollars in assets across Wyoming, Colorado, New Mexico and Arizona. Many of the banks in my territory and those I examined banked agricultural and energy operations.

In 1975, I was assigned to the OCC's office in Tulsa, Oklahoma. In that capacity, I led significant parts of the examinations of larger regional banks including real estate and overall credit risk management. I developed and displayed significant expertise in and acumen for evaluating bank risk management activities for credit, liquidity, market, operational and compliance risks as well as risk management overall.

As a result, in 1978 I was asked to accept a position as a National Bank Examiner in Special Projects. The Special Projects Group was a small number of experienced examiners each having responsibility for overseeing problem banks in a geographic region of the U.S. This responsibility included attending board meetings, recommending supervisory actions and working with the Federal Reserve and FDIC on bank failures. I was responsible for overseeing problem banks in the northeastern and southeastern districts. Other special assignments included preparing Congressional testimony and briefings for the Comptroller on the overall condition of the banking system and monitoring the performance of larger regional banks.

In 1979 I was selected as Director for Multinational Bank Analysis and Supervision in the newly created Multinational Banking Group with responsibility for the 11 largest National Banks. In this position I supervised a small team of Examiners developing and performing advanced financial analysis on these banks. This included preparing material for board meetings and meetings with executive management on issues such as capital adequacy and risk management.

In 1983 I was appointed Deputy Comptroller for Supervisory Systems to recognize the importance of developing and implementing advanced financial analytical tools and technology for bank supervision. I chaired the Interagency FFIEC Regulatory Reporting Committee and was responsible for overseeing the development and implementation of online filing of call reports. I

managed three teams of examiners and analysts in the development of an automated recordkeeping system for examinations and monitoring, expert systems development for financial analysis and a program to identify and enhance the overall quality of supervision activities. I also served on the Supervisory Policy Committee which reviewed enforcement actions and major bank supervision policy changes.

From 1991 to 2000 I moved to Kansas City, Missouri as Assistant Deputy Comptroller for Midsize and Credit Card Banks (Midwestern District). In this position I oversaw the direct bank supervision for the Regional Banks and Credit Card Banks located in the district. This included managing resources for all aspects of bank supervision including Compliance, Trust, and Bank Information Systems. I met frequently with executive management and bank directors along with the examiner in charge to communicate findings and any concerns. As a member of the district management team, I served on the Enforcement Review Committee to review and consider enforcement actions for problem banks. During this period, I met regularly with my peers from other Districts and developed the "Supervision by Risk" approach to bank supervision. We were recognized by the Comptroller for this work.

## B. Specific Expertise in Guarantor Relationships and Credit Risk Management

Throughout my career, I have developed specialized expertise in evaluating and regulating credit and guarantor relationships in complex credit structures:

1.  **OCC Problem Bank Oversight (1978-1983)**: As a National Bank Examiner in Special Projects, I specialized in evaluating troubled credits with complex guarantor structures. This work involved directing bank remediation efforts that frequently included restructuring guarantor obligations and evaluating the adequacy of bank communication with guarantors. During this period, I participated in over 40 problem bank resolutions where guarantor relationships were critical to recovery efforts.
2.  **Multinational Bank Supervision (1979-1983)**: As Director for Multinational Bank Analysis and Supervision, I directly supervised the evaluation of large, complex credit relationships that often-involved sophisticated guarantor arrangements.
3.  **Credit Risk Management Policy Development (1983-1991)**: As Deputy Comptroller for Supervisory Systems, I contributed to the development of OCC policy and examination procedures for evaluating credit risk management, including specific protocols for assessing guarantor relationship management.
4.  **Problem Bank Remediation (1991-2000)**: As Assistant Deputy Comptroller, I oversaw numerous enforcement actions involving deficient practices in guarantor management. This included directing banks to develop and implement improved policies and procedures for guarantor communication, particularly in special asset situations.
5.  **Post-OCC Consulting Work (2000-Present)**: Since leaving the OCC, I have consulted with numerous financial institutions on credit and guarantor management best practices, including developing specific policies and procedures for guarantor communication in complex credit relationships. I have conducted numerous assessments of guarantor management practices for banks of various sizes.

My extensive experience with credit and the associated guarantor relationships provides me with specialized insight into industry standards, regulatory expectations, and best practices regarding how banks should communicate with guarantors, particularly in situations involving material adverse credit information.

After retirement from the OCC in 2000 I was an independent contractor specializing in bank supervision processes, risk assessment, problem bank supervision and automated management information systems for foreign bank supervisors. I successfully established the IT supervision unit for the Central Bank of the Philippines and worked with the BSP management to develop and implement a selection process, conducted team building, risk-based supervision and IT training to the staff of 28 examiners. I also developed policies and procedures for risk-based supervision of IT.

I served as the Team Leader and Supervisory Statistical Systems specialist for the China Banking Regulatory Commission to establish the new supervisory statistical system by identifying weaknesses in current system, establishing objectives of statistical support for various supervisory activities, developing new financial reporting for financial institutions, recommending an analytical framework and training to implement the new system. I trained staff and bankers in analytical tools and financial reporting systems.

I developed and recommended to the State Bank of Pakistan a risk assessment model which will allow the central bank to determine risks to the system and individual banks and provide the capability for stress testing and modeling.

I developed and delivered a one-week training course in Problem Bank Management to the management and examiners of the Directorate for Banking, Central Bank of Tanzania. Topics included CAMELS rating system, risk assessment, problem bank identification, problem solving, meetings with management and severe problem bank issues.

From 2006-2016, I was a Senior Principal for Promontory Financial Group ("Promontory"), a boutique consulting firm known for its work with troubled banks and other regulatory and risk matters. Promontory Financial Group was commonly known and referred to by some as a "shadow regulator," in that many of its employees and contractors were former senior bank regulators and supervisors. At Promontory, I advised numerous troubled institutions during the financial crisis, all of which were experiencing varying degrees (from moderate to fatal) of financial and regulatory stress due to risk management failures. I led the evaluation of their credit and enterprise risk management frameworks, cultures, appetites, programs, and processes, to include governance and oversight by their boards of directors and senior management and recommended needed corrective actions, which in some cases were complete rebuilds.

In 2017 I became an independent contractor providing bank and bank regulatory advisory, litigation support, and expert testimony services. I have continued to routinely advise banks, thrifts, and bank and thrift holding companies on risk management matters, as well as supervisory and enforcement matters relating thereto. In recent engagements I have reviewed credit processes and revised policies and procedures to comply with regulatory requirements. This has included evaluating individual commercial credits and problem credit workouts.

As an examiner, Examiner-in-Charge, Special Projects Examiner, Director for Multinational Bank Analysis and Supervision, Deputy Comptroller Supervisory Systems, and banking consultant, I was and have been routinely involved in the evaluation and remediation of bank credit and enterprise risk management activities and issues and the safety and soundness thereof.

# IV. SCOPE OF ENGAGEMENT

I have been retained to provide litigation consulting and services as a testifying expert on banking practices and procedures, compliance requirements and fulfillment, duty of care owed, and banks' obligations to act in good faith as it relates to matters in the above litigation. The specific tasks and assignments may include the writing of expert reports, rebuttal reports, affidavits, and/or participating in deposition(s) and tribunal testimony as Counsel shall request. I was not requested to and did not independently verify any bank analysis or calculations.

The specific issues I have been asked to address include:

1. Analysis of the duty of good faith and fair dealing in the banking context
2. Industry standards and practices for lender obligations to guarantors
3. HNB's compliance with applicable banking regulations
4. HNB's compliance with its own policies and procedures
5. The adequacy of HNB's risk management practices related to this credit facility

# V. METHODOLOGY AND APPROACH

In performing this assignment, I relied upon applicable banking regulatory requirements, standard banking practices, and my substantial experience in evaluating bank credit risk management practices which would be applicable in this case. I also considered the information provided in the depositions of bank personnel to determine how HNB policies, procedures and practices were implemented. I reviewed credit presentations and other documents provided as detailed in **Appendix A**.

HNB is chartered by the Comptroller of the Currency as a national bank and must comply with its regulations and policies as its primary regulator. In addition, as a member of the Federal Reserve System ("FRB") and with it deposits insured by the Federal Deposit Insurance Corporation ("FDIC") it must comply with their regulations. The parent of The Huntington National Bank, Huntington Bancshares is also subject to regulations of the Federal Reserve Bank Holding Company Act.

In this case, I relied upon the primary regulatory statute applicable 12 CFR Part 30 Safety and Soundness Standards with specific emphasis on Appendix D, previously known as "Heightened Standards", and the OCC's regulatory policies including bank examination policies and procedures contained in the *Comptroller's Handbook* used by National Bank Examiners to determine the condition of HNB and the safety and soundness of the bank.[7] Banking regulation

---

[7] 12 CFR Part 30 contains safety and soundness standards for national banks, including Appendix D ("Heightened Standards") which applies specifically to large financial institutions like HNB.

implements safety and soundness requirements through principles-based standards and detailed guidance. For large institutions like HNB, 12 CFR Part 30, Appendix D (Heightened Standards) establishes explicit requirements for comprehensive risk management systems, including proper risk communication to all stakeholders.

The OCC as well as the other banking regulators provide detailed guidance for the safe and sound operation of a bank with specific attention to the evaluation of the loan portfolio and credit risk processes. The bank regulators also provide specific regulations and guidance on high-risk issues such as bank employee incentive compensation. In the exercise of their regulatory responsibilities the agencies, such as OCC, may impose legal enforcement actions to cause banks, boards of directors and bank management to correct unsafe and unsound banking practices. The OCC also has the authority to assess civil money penalties against banks and their directors, officers or employees for failure to adhere to safe and sound banking practices.

Banks also have a fiduciary duty. "A fiduciary duty is a duty of great confidence and trust, which includes a high degree of good faith. Fiduciary duties owed by directors and officers of an institution include the duty of care and the duty of loyalty. The duty of care requires that directors and officers, in the performance of their official duties, exercise the care that an ordinarily prudent person would exercise under similar circumstances. The duty of loyalty requires that directors and officers place the bank's interests above their own or the interests of any third party. For example, the duty of care would be breached if a director failed to take action to prevent or correct a violation of 12 USC 84 [lending limits] after it had been brought to their attention. The duty of loyalty would be breached if a director conspired with a borrower to receive the proceeds of a nominee loan."[8]

## Three Lines of Defense Risk Management Framework

The OCC requires national banks to establish policies and procedures for most functions of the bank to ensure appropriate risk management and to establish a system of controls. The effective management of risk supports the larger goal of ensuring the safe and sound condition of the bank and fair treatment of its customers. For larger institutions such as HNB there is an expectation for more robust control processes. Such banks must implement a management process using "three lines of defense" ("3LOD"). While this management process is applicable to most bank activities, the regulators are most concerned with the appropriate implementation of the process in addressing credit risk or lending activities. Failure to establish and implement effective policies and procedures may be considered unsafe and unsound and subject the bank to possible enforcement action including Civil Money penalties against the bank, its directors and management responsible. An unsafe or unsound practice is generally any action or lack of action that is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the DIF ("Deposit Insurance Fund").[9]

---

[8] "OCC, Policies and Procedures Manual, PPM 5000-7 (Rev.), 'Civil Money Penalties,' January1, 2023, p. 25.
[9] 12 CFR Part 30, Appendix A, "Interagency Guidelines Establishing Standards for Safety and Soundness."

These documents promote the use of the "three lines of defense model" (3LOD). This model is a comprehensive risk management framework widely adopted in the banking industry and formally endorsed by banking regulators, including the OCC through its Heightened Standards (12 CFR Part 30, Appendix D) and the Comptroller's Handbook on Corporate and Risk Governance.[10]

The three lines of defense are structured as follows:

1. **First Line of Defense: Business Operations/Front Line**
   - o Comprises loan officers, relationship managers, and business unit managers
   - o Directly responsible for day-to-day risk management and control implementation
   - o Conducts credit analysis, assigns initial risk ratings, and monitors borrower performance
   - o Must follow established policies and procedures for credit origination and administration
   - o Accountable for identifying and reporting emerging credit risks
2. **Second Line of Defense: Risk Management and Compliance Functions**
   - o Independent from the first line, typically includes credit risk management, independent credit review, and compliance departments
   - o Develops and maintains risk policies, frameworks, and limits
   - o Provides oversight, monitoring, and reporting of credit risks
   - o Independently validates risk ratings assigned by the first line
   - o Responsible for effective challenge of first line decisions when appropriate
   - o Ensures concentration risks are properly identified and managed
   - o Reports to senior management and the board on the bank's credit risk profile
3. **Third Line of Defense: Internal Audit**
   - o Provides independent assurance to the board and senior management
   - o Tests the effectiveness of controls implemented by the first and second lines
   - o Evaluates compliance with policies, procedures, and regulatory requirements
   - o Assesses the effectiveness of the risk management framework
   - o Identifies systemic weaknesses in the credit risk management process

For large financial institutions like HNB, the OCC's Heightened Standards require a formal, documented risk governance framework with clear accountability for risk management, independent risk management functions, and effective challenge of frontline units and decisions. This framework should integrate the bank's risk appetite into strategic planning and establish appropriate risk-based concentration limits.[11]

In credit risk management specifically, regulatory expectations include:

- Clear separation between loan production and credit risk management
- Independent credit risk review function
- Timely and accurate risk rating processes
- Robust exception monitoring and reporting

[10] OCC Comptroller's Handbook, "Corporate and Risk Governance," July 2019, pp. 42-43.
[11] 12 CFR Part 30, Appendix D, Section II.C.

- Escalation of credit issues to senior management and board
- Effective management of problem loans

The 3LOD model is designed to prevent common failures in risk management, such as:

- Insufficient independence between lines of defense
- Compensation structures that incentivize risk-taking without accountability
- Weak credit culture where exceptions become the norm
- Failure to escalate emerging credit issues
- Second line becoming a "rubber stamp" for first line decisions

In this case, I evaluated how effectively each line of defense functioned in the Premier credit relationship. A properly functioning 3LOD model should have ensured that credit risks were promptly identified by the first line, independently assessed by the second line, and that control weaknesses were detected by internal audit. Additionally, when significant risk events occurred (such as downgrade to Special Mention or Substandard), the model should have triggered appropriate communication with all stakeholders, including the guarantor.[12]

## Incentive Compensation Analysis Methodology

Effective implementation of the 3LOD model for credit risk management relies upon the independent evaluation of individual credits or portfolios conducted by experts independent of line management. In addition to independent credit review the internal audit function evaluates the policies, procedures and effectiveness of controls implemented by line management to control credit risk.

Longstanding regulatory guidance and prudent industry practice identifies the need to balance risk appetite and incentives with loan growth and revenue objectives. As such OCC examination guidance to examiners alerts them to critical concerns surrounding incentive compensation plans such as:

"Compensation programs that fail to reinforce lenders and management's responsibility to properly administer, analyze, and report the risk in their portfolios. Worse yet, compensation programs that encourage lenders and management to understate risk to boost risk-adjusted returns or to generate incremental business by lowering risk-based pricing. Relationship management structures that may encourage lenders and management to "hide" problems for fear of losing control over a customer relationship (e.g., having to transfer management responsibilities to a workout division or specialist). Inexperience, incompetence, or unfounded optimism among lenders and management. Some account officers and managers have lent money only when the economy is favorable and may not be adept at recognizing or handling problems. Others may be unduly optimistic and may overlook obvious signs of increased risk. Whatever the cause, it can be relatively easy for loan officers and line managers to rate credits a

---

[12] This analysis is consistent with the "Three Lines of Defense" model described in OCC Comptroller's Handbook, "Corporate and Risk Governance," July 2019.

step, or more, above what they deserve. When examiners encounter such practices, they must
ensure that required corrective actions address the root cause of the problem."[13]

In cases where the regulators identify compensation practices which inordinately increase credit
risk, they may take enforcement action to require correction. The OCC uses enforcement actions
against banks to require a bank's board of directors and management to take timely actions to
correct a bank's deficient practices or violations (collectively, deficiencies). Enforcement actions
against banks are more severe than matters requiring attention ("MRA"). Violations, concerns in
MRAs, or unsafe or unsound practices *may* serve as the basis for an enforcement action against a
bank. The OCC has taken such action against national banks for failure to properly control or
implement compensation policies and programs which adequately control such risks.

To illustrate the seriousness with which the regulators view aggressive incentive compensation
systems I am providing the following three examples of regulatory actions to address such
systems.

**Borrego Springs Bank, N.A.**

The regulatory agreement between Borrego Springs Bank, N.A. and the OCC dated January 13,
2012, reveals significant deficiencies in the bank's compensation governance framework,
indicating that current practices have created supervisory concerns about both the safety and
soundness of compensation levels and the alignment of incentives with prudent risk
management. The 30-day mandate for comprehensive reform signals the urgency and severity of
these issues from a regulatory perspective.

**Inadequate Compensation Governance**

The requirement for a board-level compensation program suggests the bank has been operating
without adequate oversight of its compensation practices. This represents a fundamental
governance failure, as compensation decisions appear to have been made without systematic
market benchmarking, peer comparison, or consideration of the institution's financial condition.
The lack of such a program indicates that compensation may have grown organically without
strategic oversight or regulatory alignment.

**Potentially Excessive Senior Leadership Compensation**

The specific focus on business development officers and senior vice-presidents and above
indicates regulatory concern that these key positions may be overcompensated relative to market
standards and the bank's performance. This concern is particularly significant because these roles
directly impact the bank's risk profile through lending decisions and strategic direction. The
requirement for detailed market analysis suggests current compensation may be out of line with
comparable institutions or inappropriate given the bank's circumstances.

---

[13] OCC Comptroller's Handbook, "Rating Credit Risk," June 2016, p. 13.

## Misaligned Incentive Structures

The extensive requirements for reforming commission-based compensation reveal that the bank's current incentive system likely promotes quantity over quality in loan origination. This misalignment creates several risks: loans may be originated without proper due diligence, underwriting standards may be compromised for short-term gains, and the institution's long-term credit quality may be sacrificed for immediate revenue generation.

## Credit Quality Concerns

The emphasis on quality-based incentives and claw-back provisions strongly suggests that the bank's current compensation structure has contributed to credit quality problems. When loan officers are paid primarily on volume without regard to long-term performance, they have little incentive to ensure borrowers can sustain their debt service obligations. This dynamic can lead to a deteriorating loan portfolio and increased charge-offs.

## Documentation and Accountability Gaps

The extensive documentation requirements suggest the bank has been making compensation decisions without adequate written justification or ongoing monitoring. This lack of documentation makes it difficult to assess whether compensation is reasonable, creates potential compliance issues, and indicates poor internal controls over compensation practices.

## USAA Federal Savings Bank

Another example of regulatory action to address incentive compensation can be observed in the regulatory Consent Order imposed on USAA Federal Savings Bank dated December 18, 2024, represents a comprehensive overhaul of a bank's incentive compensation framework, revealing a story of institutional accountability, regulatory intervention, and risk management reform.

The document opens with an immediate and sweeping prohibition: effective April 1, 2025, the bank is stripped of its autonomy to distribute performance-based compensation. This suggests the bank has experienced significant regulatory concerns—likely related to excessive risk-taking or poor risk management that regulators believe was incentivized by the previous compensation structure.

The timing and definitiveness of this ban indicate this is not a routine regulatory adjustment but rather a corrective measure imposed after problematic conduct. The regulatory authority has essentially declared the bank's existing compensation practices unsafe and unsound.

The definition of "incentive-based compensation" in section (2) of the Consent Order reveals the significance of regulatory concern. By capturing "any variable compensation that serves as an incentive or reward for performance," regulators are targeting the fundamental mechanisms banks use to motivate employees. The exception for Long-Term Bonus Plans suggests regulators may view longer-term incentives as less likely to encourage short-term risk-taking behavior.

The focus on "covered individuals" throughout the document indicates this order targets key personnel whose decisions significantly impact the bank's risk profile— senior executives, traders, loan officers, and other risk-taking roles.

The 90-day implementation deadline indicates regulators want immediate control over upcoming compensation cycles. The annual renewal requirement creates ongoing supervisory leverage, ensuring the bank cannot drift back to problematic practices.

The central innovation lies in requiring that compensation "reflect any adverse risk outcomes." This creates a direct linkage between individual performance measurement and risk consequences—essentially mandating that compensation decrease when decisions generate losses or regulatory violations, even if those consequences emerge later.

The requirement for written certifications 30 days before payments create multiple checkpoints. This isn't just oversight; it's a system designed to make bank management personally accountable for compensation decisions through documented attestations to regulators.

This order demonstrates incentivized excessive risk-taking through its compensation structure, lead to losses or violations that triggered regulatory intervention. By requiring that adverse outcomes reduce compensation retroactively, regulators are attempting to realign individual incentives with institutional safety and soundness. The bank's compensation practices posed sufficient risk to warrant extraordinary regulatory intervention, and restoration of normal operations depends on demonstrating sustained compliance with risk-focused compensation principles.

**Wells Fargo Bank, N.A.**

The OCC's 'Lessons Learned: Review of Supervision of Sales Practices at Wells Fargo' provides instructive parallels to the Huntington case. In the Wells Fargo matter, the OCC identified how improper incentive structures led to widespread unsafe banking practices, ultimately resulting in significant enforcement actions. The Wells Fargo situation illustrates several critical failures that are also evident in Huntington's handling of the Premier relationship:

1. **Incentive-Driven Risk Culture**: Like Wells Fargo, where employees opened unauthorized accounts to meet sales targets, the Premier credit file demonstrates how Huntington's fee-based incentives (including the documented '$784M for bank fees' and 'significant swap revenue') motivated credit decisions that prioritized transaction completion over sound risk assessment. The aggressive expansion of Mr. Schneider's guarantee obligation from $33.6MM to $75.2MM without corresponding risk disclosure exemplifies how revenue goals superseded prudent risk management.

2. **Three Lines of Defense Failures**: The OCC's review of Wells Fargo identified critical breakdowns in all three lines of defense, particularly noting how 'The first line of defense failed to identify and escalate significant risk issues, the second line provided ineffective oversight, and the third line conducted insufficient risk-based audit coverage.' This pattern is strikingly like Huntington's systematic failures across all three lines in the Premier relationship, where relationship managers failed to communicate material issues,

credit risk management did not provide effective challenge, and internal audit failed to identify compliance gaps in guarantor communication protocols.

3. **Siloed Information Management**: The Wells Fargo case highlighted how critical information about risky practices remained compartmentalized within the organization, preventing comprehensive risk assessment. Similarly, Huntington's internal communications demonstrate awareness of credit deterioration and systemic problems (e.g., the September 9, 2020, special review findings) that remained siloed within the bank while the guarantor was kept uninformed.

4. **Management Knowledge Without Action**: In the Wells Fargo matter, the OCC found that 'management was aware of sales practice problems at the bank dating back to at least 2002 but failed to address the issues adequately.' Similarly, Huntington's internal documentation shows early awareness of problems, with a March 7, 2019, email explicitly noting 'concerns with this credit with the possibility of a downgrade and covenant violation,' yet management failed to adequately address these issues or inform the guarantor.

The OCC's enforcement response to Wells Fargo—which included significant civil money penalties, business restrictions, and mandated remediation—demonstrates the seriousness with which regulators view incentive structures that subordinate risk management to revenue generation. The OCC specifically required Wells Fargo to revise its incentive compensation program to ensure that it: (1) appropriately balances risk and reward; (2) is compatible with effective controls and risk management; and (3) is supported by effective corporate governance. Huntington's incentive structure in the Premier relationship fails on all three of these dimensions, constituting an unsafe and unsound banking practice consistent with the standards established in the Wells Fargo matter.[14]

Statutory Requirements

In addition to supervisory guidance there are statutory requirements establishing expectations for such compensation programs.

- The Act also requires that any compensation standards adopted under section 956 be comparable to the safety and soundness standards applicable to insured depository institutions ("IDIs") under section 39 of the FDIA and that the appropriate Federal regulators take the compensation standards described in section 39 of the FDIA into consideration in establishing compensation standards under section 956.[15]

In analyzing the role of compensation structures in this case, I also reviewed Huntington's incentive compensation plans including the Recognizing Exceptional Performance Program (REP), Management Incentive Plan (MIP), and Commercial Incentive Compensation Plan. I compared these plans to industry standards at both large financial institutions (LFIs) and comparable regional banks to determine whether Huntington's approach to incentive

---

[14] Lessons Learned: Review of Supervision of Sales Practices at Wells Fargo. OCC.
[15] Section 956 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.

compensation adequately balanced risk management with revenue generation, particularly regarding the treatment of early loan deterioration.

# VI. FACTUAL BASIS OF OPINIONS

## Credit Relationship and Financial Context

The credit arrangement is governed by a Credit Agreement dated November 30, 2018 ("Agreement"), between The Huntington National Bank and PREMIER HEALTH CARE MANAGEMENT, INC, EUCLID HEALTH CARE, INC., PLEASANT RIDGE CARE CENTER, INC, KENWOOD TERRACE HEALTH CARE CENTER, INC, SOUTHBROOK HEALTH CARE CENTER, INC., BEECHWOOD TERRACE CARE CENTER, INC., IVY HEALTH CARE, INC., JZB IVY HEALTH REALTY LLC, KELLER ROAD REALTY Co., LLC, STEIGER ROAD REALTY, LLC, SEMINOLE AVENUE REALTY, LLC, 54 REALTY, LTD. The Agreement provides for the extension of credit to the borrowers supported by the "unconditional and absolute" guarantees of Raymond Schneider, Harold Sosna, and Faye Sosna.

The previous credit did not have the guarantee of Schneider for the entire credit but rather the portion related to the 4 entities he jointly owned. The original credit proposals mirrored this approach. However, the decision was made to request Schneider guarantee of the full amount with the September 4, 2018, proposal.

The purpose of the credit was to support the current and expanding health care facilities of the Premier group. The extension of credit arose from a previous credit relationship led by Fifth Third Bank where Huntington was a significant participant. During 2018 Huntington and Harold Sosna desired to restructure the credit and establish Huntington as the lead bank in the relationship along with significant changes in the terms of the loan. The new credit provided for increased fees to the banks and extensions of credit to the borrowers. The total extension was a term loan of $71 million and revolving line of credit for $5 million to support the expansion and upgrade of various nursing home and rehabilitation facilities. In addition, transaction costs were estimated at $784M for bank fees and $500M for legal, title and other real estate costs.

## Principals and Ownership Structure

Premier Healthcare Management ("Premier") was owned by Harold Sosna and operated 9 facilities with approximately 1,000 beds providing a broad range of services from rehabilitation to hospice care. As documented in the original December 15, 2017, credit proposal, Mr. Sosna owned all but 4 of the facilities, with Mr. Schneider owning a portion of the remainder. The proposal recognized this ownership structure by initially limiting Mr. Schneider's guarantee to only the portion of debt related to his owned facilities.

*Day-to-day operations were managed by Sosna while Schneider had no management responsibilities, control over the operations, access to credit or banking account information.*[16]

## Detailed Chronology with Financial Context

A comprehensive timeline of events reveals a systematic pattern of expanding Mr. Schneider's liability while simultaneously withholding critical information about credit deterioration:

- **December 15, 2017**: Initial credit proposal explicitly limiting Mr. Schneider's guarantee to only the $33.6MM related to his owned facilities (Keller Road Realty, Obligated Group #2). The proposal stated: "Raymond Schneider will provide his guarantee on just the Keller Road Realty (Obligated Group #2) debt of $33.6MM, based on his ownership in those prop-Co's."
- **January 25, 2018**: Financial assessment shows significant disparity between guarantors:
  - Raymond Schneider: $4,940,000 in reported liquidity (which included $4.59MM in marketable securities, the net value between pledged assets); Net Worth of $56,960,000
  - Harold Sosna: $10,000,000 in liquidity; Net Worth of $58,936,000
- **August 2, 2018**: Revised proposal dramatically expanding Mr. Schneider's guarantee to cover the entire $75.2MM obligation
- **November 30, 2018**: Credit Agreement executed with Mr. Schneider as guarantor for the full amount
- **March 2019**: Internal bank discussions regarding "questions regarding lending against unbilled receivables and our overall experience of Lending Linc" *(no communication to Schneider)*
- **March 7, 2019**: Internal bank email from Suzanne Myers notes "concerns with this credit with the possibility of a downgrade and covenant violation" *(no communication to Schneider)*[17]
- **July 17, 2019**: Internal Bank relationship update documents significant credit deterioration:
  - EBITDA tracking to $7.428MM vs projected $10.195MM for 2019
  - Bad debt reserve reduced to $228M from $628M, "considered below an industry norm level at 0.5% of nursing revenues"
  - Aged receivables over 120 days at $2.5MM (35% of total A/R); over 1 year at $1.7MM
  - "Downward occupancy trends through 6/30/19" noted, declining from 81.0% (3/31/2018) to 75.4% (3/31/2019)
  - Payor mix shifting from Medicare to Managed Care, creating "margin compression"
  - Bank developed an action plan addressing credit concerns but included no notification to Schneider despite his guarantee exposure, *(no communication to Schneider)*
- **September 2019**: Credit downgraded to Special Mention *(no notification to Schneider)*

---

[16] Special Review email, David Wechter to CEO Steinour, September 9, 2020.
[17] Email from Suzanne Myers, March 7, 2019.

- **September 9, 2020**: Special review at CEO's request identifies serious deficiencies including commingled cash, corporate structure manipulation, and borrowing base problems. *(no communication to Schneider)* [18]
- **October 24, 2019**: Credit further downgraded to Substandard and transferred to Special Assets Group (*no notification to Schneider*) The Rapid Downgrade Review memo (October 2019) provides detailed documentation of the bank's internal assessment that led to this downgrade.
  - The memo explicitly states that 'Due to liquidity concerns within the OG the relationship meets the definition of Substandard.'
  - The document further confirms that the 'OG cash flow is negatively impacted by the outflow of funds via large distributions and affiliate transactions to support operations outside of the OG.' (Page 9)
  - *Despite identifying these serious issues, there is no evidence that Mr. Schneider was notified of this material adverse change in the credit's condition.*
- **October 25, 2019**: First MCA contract was signed by Sosna and receivables were sold out of trust. This occurred while the credit was rated Substandard and should have received additional scrutiny.
- **October 29, 2019**: Internal Rapid Downgrade Review documents serious credit deficiencies including: 'EBITDA Overstatement - The company stopped the bad debt allowance accrual due to changing to an outside billing company. As of 6/30/19 they have started to expense $75M per quarter which could still be below a reasonable level based on the current aged A/R level.' (Page 9)
  - *This critical information was not communicated to Mr. Schneider.*

This timeline demonstrates that despite having early concerns about credit deterioration and specifically noting Mr. Schneider's limited financial resources compared to Mr. Sosna, the Bank expanded his guarantee liability while systematically withholding critical information at each stage of credit deterioration. The rapid credit deterioration timeline strongly indicates pre-existing issues during underwriting. Credit deterioration sufficient to warrant a Special Mention rating within ten months of closing or earlier suggests underlying problems that were developing during the approval process. The special review's identification of 'questionable accounting policies' that created 'a large, aged A/R balance' further confirms these were progressive issues rather than sudden developments. Given banking industry standards for receivables analysis, the 35% of receivables over 120 days documented by July 2019 represents a collection problem that would have been detectable during proper underwriting analysis.

## Underwriting and Credit Analysis

The initial underwriting analysis dated December 15, 2017, identified the transaction as a restructuring of an existing participated credit with HNB replacing Fifth Third Bank as the lead bank. At this stage, the plan was for Mr. Schneider to guarantee only the $33.6MM portion of debt associated with the Keller Road Realty which he owned. This aligned with his ownership stake and knowledge of the business.

---

[18] Special Review email, David Wechter to CEO Steinour, September 9, 2020.

The revised underwriting analysis on August 2, 2018, eight months later, substantially changed the risk profile by requiring Mr. Schneider to guarantee the entire obligation of approximately $75.2MM. The eight-month delay in approving the proposal suggests that HNB lenders had concerns about the strength of the credit without additional support such as the expanded guarantee from Ray Schneider. In addition, there were apparent concerns about completion delays in facility expansion and adequacy of cash flow. This revision also noted the addition of receivable controls through a borrowing base formula using the LendingLinc monitoring system. However, as later revealed in the September 9, 2020, special review, this system "arguably increases availability beyond collectability in a deteriorating credit."[19]

The August 2018 credit proposal explicitly states the transaction rationale as: "Opportunity to replace the lead bank and syndicate a deal we had previously approved to be a participant in a year ago," and emphasizes that "This opportunity includes significant fees (syndication & loan fees), a higher spread, and significant swap revenue." The document makes no mention of assessing Mr. Schneider's capacity to monitor or influence operations at facilities he didn't own, despite expanding his guarantee to cover all facilities.

Transaction costs were specifically identified at "$784M for bank fees and $500M for legal, title and other real estate costs." This fee-driven motivation created incentives to complete the transaction regardless of long-term credit quality or guarantor risk considerations.

Financial statements in the credit proposal revealed declining occupancy rates and a shifting payor mix at several facilities, yet these deteriorating financial performance indicators were not specifically communicated to Mr. Schneider when his guarantee was expanded or after.

The underwriting failed to adequately consider:

1. The potential for commingling of cash with related outside entities
2. The complexity of the corporate structure that could allow manipulation of performance
3. The capacity of Mr. Schneider to monitor or influence operations given his lack of operational control
4. The adequacy of the Lending Linc system for monitoring this complex relationship
5. Failure to leverage knowledge of previous participation in the credit and recognize possible pitfalls

## Credit Deterioration and Remediation Process

As early as February 28, 2019, just three months after the credit agreement was signed on November 30,2018 there were questions about whether Premier was in compliance with the loan covenants for the 12/31/18 quarter end.[20] Shortly thereafter on March 7, 2019, there were signs that the credit was underperforming as evidenced by discussions with Harold Sosna on March 5, 2019 regarding loan covenant compliance and year-end 2018 performance versus projections. "We were able to work through the 12/31/18 covenants and they passed all tests. The minimum

---

[19] Special Review email, David Wechter to CEO Steinour, September 9, 2020.
[20] Email from Garret Vetter to Troy Jones and Amy Becker February 27, 2019.

EBITDA of $2.025MM was a breakeven ($293.00 cushion) which does give us some concern when compared to the projections. It is important to note the minimum EBITDA tests were set at 75% of the projected Op-CO EBITDA."[21]

Also on March 7, 2019, less than 98 days after the loan closed, an email from Suzanne Myers to Amy Becker stated that "It has been brought to Dan Storer's attention that there are concerns with this credit with the possibility of a downgrade and covenant violation. Please summarize the concerns, bank group concerns, discussions with client and course of action to improve EBITDA." [22] This indicates that the concerns had been elevated to senior management as Mr. Storer was the head of the Health Care department.

The credit was rated "Special Mention" in September 2019, less than one year after the restructuring was finalized. This rapid deterioration indicates potential weaknesses in the initial underwriting analysis.

The Rapid Downgrade Review from October 2019 provides detailed documentation of the factors that led to the credit's rapid deterioration and subsequent downgrade to "Substandard." The review explicitly identifies multiple concerning issues including: 'significant delay in construction project at Forest Hills,' 'failure to stabilize Madeira and Kenwood locations,' 'doubtful allowance reserve level,' 'liquidity issues,' and 'stretching of payables.' The review specifically states that 'Due to liquidity concerns within the OG the relationship meets the definition of Substandard' and confirms that the 'OG cash flow is negatively impacted by the outflow of funds via large distributions and affiliate transactions to support operations outside of the OG.' Despite these serious concerns being documented in detail, *there is no evidence that Mr. Schneider was notified of these material adverse changes in the credit's condition.* These findings support the initial concerns raised that resulted in the delay in loan approval and the expansion of the Ray Schneider guarantee. The failure to address the credit and management problems early in their formative stage allowed them to proceed unchecked. They proceeded to liquidate the credit by sale instead of initiating an active "workout" of the credit. During the same time, they ignored the fact that Sosna had turned to using the MCA funding to sell their receivables out of trust. This further exacerbated the cash flow problems and increased the potential losses.

By October 24, 2019, the relationship was downgraded to "Substandard" and transferred to the Special Assets Group, signaling well-defined weaknesses that jeopardized the liquidation of the debt with a distinct possibility of loss.

Despite these significant downgrades, there is no evidence that internal audit or credit review procedures triggered any notification to the Plaintiff as guarantor, nor that the bank fulfilled its obligation to disclose material adverse information that could impact his liability.

The Rapid Downgrade Review also documents a comprehensive timeline of deterioration with 'Key Events since Origination' spanning from the initial client origination through the eventual downgrade. This timeline reveals that as early as July 19, 2019, the relationship was subject to a

---

[21] James R Gentry deposition and email March 7,2019. Exhibit K5.
[22] Email from Suzanne Myers to Amy Becker March 7, 2019.

'Turnaround/Restricted Credit Review discussion' - the first month the healthcare relationship held this type of meeting. The review further notes that by August 15, 2019, the credit was downgraded with the completion of 'CRRS at ORR 13, FRR B, and ISO-7.' This detailed chronology of credit deterioration, combined with the Bank's failure to notify Mr. Schneider at any point during this process, represents a systematic pattern of withholding material information from a guarantor with substantial financial exposure.

The special review conducted on September 9, 2020, at the request of CEO Steinour identified several critical weaknesses in the credit management:

1. Large number of projects with too few resources
2. Project problems
3. Commingled cash with related outside entities
4. Complex corporate structure allowing manipulation of performance
5. Issues with the Lending Linc system potentially increasing availability beyond collectability
6. Borrowing base compliance issues due to "recordkeeping inconsistencies"

The September 9, 2020, special review email from David Wechter specifically quantified the cash commingling issue, noting "$9.4MM cash outflow from our obligated group to related entities within a 3-month period." The email explicitly stated that the "Complexity of the corporate structure and related entities allowed for manipulation of performance to cover up poor performance," and confirmed that the "Borrowing base was in and out of compliance due to 'record keeping inconsistencies' via LendingLinc data."[23] The special review failed to highlight the damage done by Sosna's use of MCAs and the loss of control of the receivables pledged to HNB and subject to borrowing base certifications. The lack of oversight and control of the primary source of repayment of a substandard credit is a major shortcoming of the credit supervision.

A September 11, 2020, email from SVP Dan Storer to Garry Boyer and Helen Ward summarized the credit deterioration. "What we have determined is the client was burning cash outside our SNF portfolio in other businesses (restaurants, theater, land purchases and new developments) and personal spending (expanding resident to $20MM, airplane & helicopter). He began covering his losses by floating checks between banks."[24]

Despite having this specific knowledge of serious problems that directly impacted Mr. Schneider's liability as guarantor, the Bank not only failed to share this information with him but simultaneously pursued legal action against him, noting in internal communications that "Schneider is using frivolous legal tactics to delay judgment although we have filed a motion for summary judgment." This approach of aggressively pursuing the guarantor while withholding material information about fundamental problems with the credit represents a clear breach of the duty of good faith and fair dealing and a violation of the HNB Code of Conduct.[25]

---

[23] Special Review email, David Wechter to CEO Steinour, September 9, 2020.
[24] HNB_SCH_0015145.pdf Emails
[25] Code of Conduct and Ethics. Huntington Bancshares Incorporated.

Despite this internal recognition of serious problems, there is no evidence the bank engaged the Plaintiff in remediation efforts or informed him of these material adverse findings that directly impacted his guaranteed exposure. The bank could have used his expertise in addressing the credit issues early rather than ignoring his capabilities which were known to bank management.

# VII. ANALYSIS OF UNSAFE AND UNSOUND BANKING PRACTICES

## A. Regulatory Definition of Unsafe and Unsound Practices

An unsafe or unsound practice is generally defined as "any action or lack of action that is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the Deposit Insurance Fund (DIF)." This definition is established in 12 CFR Part 30, Appendix A "Interagency Guidelines Establishing Standards for Safety and Soundness," which establishes operational and managerial standards for banks.[26]

In the context of credit risk management, unsafe and unsound practices typically include:

- Deficient credit underwriting
- Inadequate credit documentation
- Ineffective credit monitoring and control over collateral (including failure to enforce terms and conditions)
- Inappropriate compensation structures that encourage excessive risk-taking
- Ineffective internal audit and credit review functions

## B. HNB's Three Lines of Defense Implementation Failures

HNB's implementation of the Three Lines of Defense (3LOD) model exhibited significant deficiencies:

**First Line Defense Failures:**

- Loan officers failed to properly identify and escalate emerging credit risks, as evidenced by the rapid deterioration from Pass to Substandard within one year
- First-line monitoring failed to detect or address the commingling of cash with related outside entities
- Borrowing base monitoring was inadequate, with the Lending Linc system proving ineffective for properly monitoring this complex relationship
- Failure to control collateral in the form of accounts receivable which were the primary source of cash flow and allow MCA's to immediately draw against deposit accounts

---

[26] 12 CFR Part 30, Appendix A, "Interagency Guidelines Establishing Standards for Safety and Soundness."

- Failed to communicate with the guarantor who possessed numerous years of successful management of such facilities and had a significant ownership stake in the credit

**Second Line Defense Failures:**

- Independent credit risk management did not provide effective challenge to the first line's assessment, which was oriented toward fee generation
- The credit risk management function failed to properly evaluate the Lending Linc monitoring system's adequacy for a complex healthcare relationship
- The second line failed to ensure appropriate risk-based policies for guarantor communications

**Third Line Defense (Internal Audit) Failures:**

- Failed to detect serious borrowing base deficiencies and cash commingling issues
- Did not identify the absence of clear policies regarding guarantor notification requirements
- Once the credit was transferred to Special Assets, Internal Audit should have conducted targeted testing of workout strategies, including evaluating whether all stakeholders (including guarantors) were appropriately engaged

These systematic failures across all three lines of defense created an environment where significant risks went undetected and unaddressed, leading to unnecessary losses.

## C. Deficient Fee-Driven Decision Making and Incentive Compensation

- The documented focus on "significant fees (syndication & loan fees), a higher spread, and significant swap revenue" suggests that revenue generation was prioritized over prudent credit risk management. This is precisely the type of misaligned incentive structure that banking regulators have identified as contributing to unsafe and unsound lending practices. The OCC has taken enforcement actions and assessed civil money penalties against banks for such practices such as Borrego Springs Bank, USAA Savings Bank, and Wells Fargo Bank.[27]

The OCC's *Comptroller's Handbook on Rating Credit Risk* (April 2001) specifically directs examiners and bankers: "Whether reviewing individual credit ratings or the risk rating process, examiners should be alert for impediments or disincentives that may prevent the system from functioning properly. Such situations may include:

- Compensation programs that fail to reinforce lenders' and management's responsibility to properly administer, analyze, and report the risk in their portfolios. Worse yet, compensation programs that encourage lenders and management to understate risk to boost risk adjusted returns or to generate incremental business by lowering risk-based pricing.

---

[27] Lessons Learned: Review of Supervision of Sales Practices at Wells Fargo. OCC.

- Relationship management structures that may encourage lenders and management to "hide" problems for fear of losing control over a customer relationship (e.g., having to transfer management responsibilities to a workout division or specialist).
- Inexperience, incompetence, or unfounded optimism among lenders and management. Some account officers and managers have lent money only when the economy is favorable and may not be adept at recognizing or handling problems. Others may be unduly optimistic and may overlook obvious signs of increased risk. Whatever the cause, it can be relatively easy for loan officers and line managers to rate credits a step, or more, above what they deserve. When examiners encounter such practices, they must ensure that required corrective actions address the root cause of the problem."[28]

The fee-driven motivation can be directly quantified from transaction documentation:

- Transaction costs of "$784M for bank fees" represented approximately 1.04% of the total credit facility
- Additional "significant swap revenue" would typically range from 0.75-1.25% of the notional amount, potentially representing an additional $500,000-1,000,000 in fee income
- Combined, these fees created an immediate financial incentive of approximately $1.3MM to complete the transaction
- Individual officers involved in the credit received substantial additional compensation which in some cases were equal to their annual salary.

This fee structure created a significant timing mismatch between compensation and risk:

- Syndication and loan fees were collected immediately upon closing
- Swap revenue was recognized upfront while the risk extended over the life of the transaction
- Credit deterioration occurred after the fee income was already recognized and likely paid out in incentive compensation

**Analysis of Huntington's Compensation Structure**

My detailed review of Huntington's incentive compensation plans reveals significant deficiencies that likely contributed to the unsafe and unsound banking practices observed in this case:

**1. Production-Heavy Metrics with Inadequate Risk Counterbalance**

Huntington's incentive plans place strong emphasis on growth and production metrics without equal weight on risk management:

- Growth targets such as "6.12% Loan Revenue Growth" were prominent in incentive calculations[29]

---

[28] OCC Comptroller's Handbook, "Rating Credit Risk," April 2001, p.13.
[29] HNB 2018 Commercial Inceptive Compensation Plan p.3

- Risk metrics functioned primarily as modifiers rather than core components of performance assessment
- Early loan deterioration penalties were modest (5-30% reduction) compared to industry peers (25-50% or greater)[30]

## 2. Specific Weaknesses in Huntington's Approach

Several critical weaknesses in Huntington's compensation framework increased the risk of unsafe and unsound lending practices:

- **Timing Mismatch**: Short-term rewards for risks that materialize longer-term
- **Subjective Application**: High reliance on management discretion for adjustments
- **Modest Penalties**: Lower financial impact for risk issues compared to peers
- **Limited Forward-Looking Assessment**: Primarily backward-looking metrics
- **Short Memory**: Limited multi-year impact of credit problems
- **Complexity**: Multiple metrics being measured potentially diluting focus on key risk factors such as credit performance and risks

## 3. Impact on the Premier Healthcare Credit Decision

The compensation structure likely influenced the credit decision-making process that led to expanding Mr. Schneider's guarantee liability as well as the credit management process while simultaneously withholding critical information:

- The focus on fee generation created incentives to complete the transaction regardless of long-term credit quality
- The relatively modest penalties for early credit deterioration reduced the deterrent effect for risky lending practices
- The discretionary nature of risk adjustments meant consistent application was not guaranteed
- The emphasis on portfolio-level tracking rather than loan-specific attribution diminished individual accountability

The August 2018 credit proposal explicitly stated that 'This opportunity includes significant fees (syndication & loan fees), a higher spread, and significant swap revenue' as the primary transaction rationale, quantifying these fees at approximately $784,000 plus additional swap revenue. This direct documentary evidence establishes a clear connection between fee motivation and the transaction structure. These compensation deficiencies directly align with the OCC's warnings in the *Comptroller's Handbook on Rating Credit Risk* regarding compensation structures that "fail to reinforce lenders and management's responsibility to properly administer, analyze, and report the risk in their portfolios."

The interagency guidance on Sound Incentive Compensation Policies (75 FR 36395) requires institutions to balance risk and financial results, ensure compatibility with effective controls, and

---

[30] Ibid.

maintain strong governance of compensation programs. Huntington's approach fell short of these expectations, contributing to the unsafe and unsound banking practices observed in this case.[31]

A particularly notable deficiency in Huntington's compensation framework is the apparent absence of robust clawback provisions for compensation related to credits that rapidly deteriorate. The OCC's 'Lessons Learned' review of Wells Fargo emphasized the importance of compensation recovery mechanisms as a risk control measure. In the Wells Fargo case, the bank ultimately clawed back significant compensation—approximately $75 million—from senior executives after improper sales practices were discovered. This regulatory focus on compensation recovery aligns with sound banking principles outlined in the Interagency Guidance on Sound Incentive Compensation Policies, which states that compensation should be adjusted for all types of risk and that incentive compensation arrangements should be compatible with effective controls and risk management.

Huntington's approach to the Premier credit relationship exhibited *no evidence of clawback mechanisms being utilized despite the credit's rapid deterioration from Pass to Substandard within twelve months of closing*. An incentive compensation system which lacks the discipline to at least consider clawbacks under these circumstances is incentivizing excessive risk-taking. In addition, it raises the question if HNB has a history of failing to use clawbacks. The failure to use clawbacks in the past potentially renders the policy ineffective.

The immediate recognition of approximately $784,000 in bank fees plus additional swap revenue created a temporal disconnect between compensation and risk materialization. Once these fees were collected and presumably incorporated into employee incentive payments, there appears to have been no mechanism to recover this compensation when the credit quickly deteriorated, thereby undermining accountability. Industry best practices and regulatory expectations following the Wells Fargo matter would require that when credits experiencing such rapid deterioration—particularly those with evidence of fundamental underwriting failures—the institution should recover a proportionate amount of the incentive compensation paid to the involved loan officers, credit approvers, and managers. The absence of such recovery mechanisms at Huntington represents another dimension of unsafe and unsound banking practice in its incentive compensation framework.

In addition to the lack of financial compensation discipline the employees responsible for handling the Premier credit relationship all received at least "Fully Meets" or in some cases "Exceeds" evaluation ratings. This indicates there were apparently no penalties imposed on them for the failure of Premier credit underwriting and management.

It is my opinion that the incentive compensation program performance management system as implemented failed to give sufficient weight to the credit risk and incentivized the lenders and credit function to grant to loan despite the known risks.

## D. Inadequate Underwriting and Due Diligence

---

[31] Interagency Guidance on Sound Incentive Compensation Policies, 75 FR 36395, June 25, 2010.

The underwriting process exhibited serious deficiencies that contributed to unsafe and unsound lending practices:

- **Failure to Properly Assess Guarantor Risk:** The Bank expanded Mr. Schneider's guarantee from $33.6MM to cover the entire $75.2MM credit without adequate assessment of his capacity to monitor or influence the entities he was guaranteeing
- **Inadequate Evaluation of Corporate Structure:** The complexity of the corporate structure and potential for performance manipulation was not properly identified during underwriting
- **Insufficient Collateral Controls:** The borrowing base formula using the LendingLinc system was later found to "arguably increase availability beyond collectability in a deteriorating credit"
- **Rapid Credit Deterioration:** The downgrade to Special Mention within 10 months of closing indicates fundamental underwriting weaknesses and Substandard within one year of closing

These underwriting failures violated the OCC's guidance on credit underwriting standards, which require banks to establish prudent underwriting standards, including thorough evaluation of guarantors and appropriate collateral monitoring systems.[32]

## E. Failure to Monitor and Control Credit Risk

The Bank's inadequate credit monitoring and control mechanisms constituted unsafe and unsound practices:

- **Inadequate Borrowing Base Monitoring:** The Bank allowed "recordkeeping inconsistencies" in the borrowing base calculations
- **Cash Commingling:** The Bank permitted "commingled cash with related outside entities," undermining segregation of collateral
- **Insufficient Resources:** The special review identified "a large number of projects with too few resources" to properly monitor the complex relationship
- **Failure to Enforce Loan Terms:** The Bank did not effectively enforce compliance with borrowing base calculations and other loan covenants
- **Failure to Control Account Receivable Collateral:** These monitoring failures directly contradict the OCC's *Comptroller's Handbook on Accounts Receivable and Inventory Finance Loans*, which emphasizes that "covenants enable a bank to exercise control over those situations that pose heightened risk. They allow the bank to take certain defined and decisive steps to protect itself when certain performance levels are not achieved. Covenants do not exist simply to provide an early warning that the borrower's credit quality is deteriorating." Effective loan administration includes enforcing loan terms and monitoring compliance with covenants."[33]

---

[32] OCC Comptroller's Handbook, "Accounts Receivable and Inventory Financing". March 2000. pp. 27.
[33] Ibid. pp. 25.

A critical element in the failure to supervise the Sosna credit relationship was the proliferation of merchant cash advances ("MCA") that created an unsustainable financial death spiral. These predatory financing arrangements, operating in regulatory gray areas, ultimately drove Sosna to commit fraud as the only means of servicing impossible debt obligations.

Merchant cash advances represent a sophisticated form of predatory lending that exploits legal loopholes to charge borrowers effective interest rates that would be illegal under traditional lending frameworks. MCA companies provide lump sum payments to businesses in exchange for portions of future receivables but structure these transactions as "purchases" rather than loans to circumvent state usury laws and federal lending regulations.

This semantic distinction proves crucial to the industry's business model. By avoiding classification as loans, MCA providers operate without banking licenses, escape state interest rate caps, and sidestep traditional consumer protection regulations. The result is a shadow banking system that can legally charge effective annual percentage rates exceeding 400% while maintaining the veneer of legitimate commercial transactions.

The mechanics of MCA collection used in the Premier relationship demonstrate the industry's predatory nature. Rather than waiting for borrowers to make periodic payments, MCA companies typically demand daily remittances through automated systems that provide them with real-time access to business bank accounts and credit card processing systems. This constant drain on cash flow creates immediate operational pressure that traditional loans, with their monthly or quarterly payment schedules, do not impose.

MCA providers obscure their true costs through "factor rate" pricing that disguises the actual interest burden. A factor rate of 1.3, for example, requires a business that receives $10,000 to repay $13,000 regardless of the time required for repayment. While this may appear to represent a 30% cost, the effective annual percentage rate depends entirely on the repayment timeline.

When combined with daily payment requirements, these factor rates translate into devastating effective interest rates. A six-month repayment schedule on a 1.3 factor rate produces an effective APR of approximately 100%. Shorter repayment periods, which are increasingly common as businesses struggle to service existing obligations, can drive effective rates above 400% annually.

The industry compounds these costs through extensive fee structures that include origination fees ranging from 3% to 8% of advance amounts, processing fees for each payment, NSF charges for failed ACH attempts, and penalties for early payoff or contract modifications. These additional charges often add tens of thousands of dollars to the total cost of financing.

MCA companies maintain levels of operational control over borrowers that exceed those of traditional secured lenders. They routinely require real-time access to business bank accounts, continuous monitoring of credit card processing systems, and detailed financial reporting that can include daily revenue updates and transaction-level analysis.

The extensive control mechanisms serve multiple purposes for MCA providers. They provide early warning systems for potential defaults while creating switching costs that make it difficult for borrowers to escape MCA relationships. The daily monitoring also enables MCA companies to identify when borrowers receive additional financing, allowing them to either demand immediate repayment or adjust collection amounts to capture increased cash flows.

The structure of MCA financing creates powerful incentives for borrowers to enter unsustainable debt spirals. Daily payment requirements immediately reduce available working capital, forcing businesses to seek additional financing to maintain operations. The high cost of MCA advances means that businesses rarely generate sufficient cash flow to fully repay advances through normal operations.

Instead, borrowers typically use new MCA advances to service existing obligations, creating a pattern known as "stacking" where businesses simultaneously maintain relationships with multiple MCA providers. Each new advance compounds the daily payment burden while providing only temporary relief from cash flow pressures.

The mathematical impossibility of this structure becomes apparent when examining aggregate payment obligations. Sosna's MCA relationships ultimately required daily payments exceeding 100% of possible business revenue when combined across all providers. This created a situation where fraud became the only mechanism for meeting payment obligations.

MCA providers operate through sophisticated regulatory arbitrage that exploits gaps in state and federal oversight. The "receivables purchase" structure allows them to avoid classification under most lending regulations, while the business-to-business nature of transactions removes them from consumer protection jurisdiction.

State usury laws, which typically cap interest rates at 18% to 36% annually, do not apply to receivables purchases. Federal agencies like the Consumer Financial Protection Bureau have limited authority over commercial transactions, creating enforcement gaps that MCA providers actively exploit.

The industry has also developed contract terms designed to limit borrower protections and accelerate collection remedies. Personal guarantees make business owners personally liable for MCA obligations, while confession of judgment clauses allow MCA providers to obtain court judgments without traditional legal proceedings in states where such provisions are permitted.

Harold Sosna's progression through the MCA ecosystem illustrates the industry's predatory dynamics. Initial advances with 15 to 18-month terms gradually shortened to two or three months as his financial condition deteriorated. Factor rates increased while advance amounts grew, creating an escalating cycle of desperation financing.

Sosna's MCA activities read like a case study in predatory lending escalation. Terms that began as aggressive but potentially serviceable became increasingly impossible as providers competed to extract maximum value from a deteriorating borrower. By 2020, Sosna was allegedly

simultaneously servicing advances from over 60 different MCA companies with daily payment obligations that exceeded any conceivable business cash flow.

The MCA industry's response to obvious borrower distress demonstrates its predatory nature. Rather than recognizing Sosna's mathematical inability to service existing obligations, additional providers continued offering new advances at even more aggressive terms. This behavior suggests coordination among providers to maximize extraction from distressed borrowers rather than genuine assessment of repayment capacity.

The Sosna case demonstrates how predatory MCA lending can create systemic risks that extend beyond individual borrowers to impact legitimate financial institutions. The unsustainable debt structure created by MCA obligations ultimately forced Sosna into check kiting fraud.

By allowing Sosna to use MCAs represents a fundamental breakdown in regulatory compliance that directly enabled substantial losses to HNB. This case demonstrates clear violations of the Office of the Comptroller of the Currency's "Accounts Receivable and Inventory Financing" (ARIF) handbook requirements, which specifically address situations where banks maintain security interests in receivables that borrowers subsequently claim to sell to third parties. The structure of merchant cash advance transactions falls precisely within this regulatory framework, yet HNB failed to implement the mandatory monitoring and control procedures that would have prevented Sosna from pledging the receivables as collateral for bank loans while simultaneously "selling" them to MCA companies.

The OCC's ARIF handbook applies directly to the Sosna case through several interconnected principles. HNB held perfected security interests in Sosna's accounts receivable through properly filed UCC financing statements, giving the bank priority over subsequent MCA "purchases" of the same receivables. The merchant cash advance companies structured their transactions as "purchases of future receivables" rather than traditional loans, but the ARIF handbook specifically addresses bank oversight responsibilities when borrowers attempt to sell receivables that serve as loan collateral. HNB failed to provide this oversight.

Under established regulatory standards, banks with security interests in receivables must monitor and control those assets regardless of whether borrowers attempt to sell interests to third parties. The ARIF handbook establishes that banks must maintain "ongoing supervision of the collateral and the relationship" when receivables secure loans, and this supervision requirement applies whether the receivables remain with the borrower or are sold to third parties.

HNB's most fundamental violation involved the complete breakdown of collateral monitoring systems. The ARIF handbook requires banks to exercise "varying degrees of control over collateral to manage the credit risk in the transaction" and maintain "ongoing supervision of the collateral and the relationship." Despite these clear requirements, HNB failed to monitor that Sosna was simultaneously "selling" receivables to numerous MCA companies while those same

receivables served as collateral for the bank's loans. These activities are ongoing while the Premier relationship was rated Substandard and should have received additional scrutiny.

The handbook advises that banks maintain systems to "continually update how much collateral exists and what its value is." HNB's monitoring systems should have detected that receivables were being systematically diverted to MCA companies rather than collected to repay bank debt. This represents a fundamental breakdown in the basic oversight functions that form the cornerstone of secured lending practices.

The ARIF handbook places particular emphasis on fraud prevention, noting that "fraud is a leading cause of loss in both secured lending and ABL" and requiring that "regular collateral monitoring and timely field audits are the best deterrent to fraud-related losses." The handbook specifically warns that "a fraudulent borrower can use the same receivables as collateral to obtain financing from more than one lender," which precisely describes Sosna's methodology of using receivables to secure both HNB loans and MCA advances.

HNB's systems failed to detect the systematic cash diversion that occurred when Sosna used receivables to fund MCA payments rather than repay bank debt. The bank also failed to verify that it was not advancing funds against collateral that effectively no longer existed due to the MCA "sales" structure. These violations demonstrate a complete breakdown in the fraud prevention protocols specifically designed to address exactly this type of scheme.

Perhaps the most glaring violation involves HNB's complete failure to conduct timely and adequate field audits of Sosna's operations. The ARIF handbook mandates that "field audits are integral to controlling and monitoring ARIF" and should be conducted "at least annually and, if risk dictates, quarterly or monthly." Despite maintaining significant revolving credit facilities secured by receivables and inventory, HNB conducted only one field audit at the inception of the loan.

Had the bank conducted the required field audits, they would have immediately discovered the extensive MCA relationships requiring daily payments, the systematic diversion of receivables to MCA companies, and the mathematical impossibility of servicing both bank debt and MCA obligations simultaneously. The handbook specifically advises field audits to "confirm the quality of the borrower's financial data, receivables and inventory, and internal controls" and to "help detect fraud and financial weakness." HNB's failure to conduct these audits eliminated the primary detection mechanism for exactly the type of fraud that occurred.

The ARIF handbook advises banks to "ensure that collateral liens are properly perfected and maintained" and to "conduct periodic lien searches, particularly for higher risk borrowers." HNB failed to detect that MCA companies were claiming interests in the same receivables that secured

the bank's loans. While MCAs typically don't file UCC statements, their claimed purchases represented competing interests that required investigation and monitoring.

The handbook warns that banks must maintain "tickler systems" and monitoring procedures to protect their security interests, yet HNB's systems completely failed to identify threats to their collateral priority. This failure allowed the systematic erosion of collateral value without any detection or intervention by the bank's risk management systems.

When loans are secured by receivables, the ARIF handbook advises strict adherence to borrowing base formulas that limit the amount of funds that can be advanced under revolving credit facilities. HNB violated these requirements by failing to verify that receivables remained "eligible collateral" after being sold to MCA companies. The bank should have excluded these receivables from borrowing base calculations, which would have immediately reduced available credit and triggered investigation into the borrower's activities.

The handbook advises daily or weekly updates to borrowing base availability, yet HNB's systems failed to reflect the reduction in available collateral as receivables were sold to MCAs. This failure allowed Sosna to maintain access to bank credit even as the underlying collateral was being systematically diverted to other parties.

The ARIF handbook advises banks to verify that "sources of repayment will produce sufficient cash flow to service the debt as structured" and that "cash flows should be adequate to meet operating needs." HNB failed to conduct the mathematical analysis that would have revealed the impossibility of Sosna's financial structure. The aggregate MCA payment obligations, which required 20-25% of daily revenues to each of multiple providers, exceeded 100% of possible business cash flow.

The bank failed to understand how the MCA payment structure disrupted Sosna's natural operating cycle, where businesses purchase goods, convert them to inventory, sell the inventory, and collect accounts receivable to repay financing. The MCA payments prevented this natural repayment flow by diverting receivables collections away from debt service.

The ARIF handbook identifies "transaction risk" as a primary concern, specifically including "the potential for fraud on the part of the borrower" and issues with "internal operations of the borrower." The handbook requires enhanced oversight for complex transactions and borrowers with "constantly changing collateral pools whose value can fall quickly." The extensive MCA relationships represented exactly this type of complexity, yet HNB provided no enhanced monitoring.

The bank failed to monitor Sosna's internal operations, which would have revealed that the business had become focused on servicing MCA obligations rather than conducting legitimate

commercial activities. This operational shift should have triggered immediate intervention and enhanced oversight procedures.

The ARIF handbook establishes specific daily monitoring requirements that would have detected the fraud within weeks of its commencement. Banks must "adjust the maximum amount of credit available based on the amount of eligible receivables and cash receipts" on a daily or weekly basis. HNB should have detected that receivables were being diverted to MCA payments rather than collected to support bank credit availability.

The handbook also advises regular borrowing base certifications that verify collateral availability and compliance with loan terms. These certifications should have revealed the mathematical impossibility of maintaining adequate collateral while servicing extensive MCA obligations. For high-risk borrowers like Sosna, who exhibited high leverage ratios, erratic cash flows, and dependence on external financing, the handbook requires enhanced controls that HNB never implemented.

The ARIF handbook establishes clear supervisory expectations that banks will maintain effective collateral monitoring systems, conduct regular field audits of secured borrowers, verify the continued existence and availability of pledged receivables, and detect and prevent fraudulent diversion of collateral. OCC examiners are specifically directed to evaluate whether banks have implemented adequate ARIF monitoring and control procedures, and HNB's failures would constitute clear examination findings requiring immediate corrective action.

HNB's failures to implement OCC ARIF handbook advice were not technical oversights but fundamental breakdowns in the basic risk management systems that form the foundation of secured lending.

The bank failed to follow specific procedures designed to monitor and control receivables that serve as loan collateral. The ARIF handbook provided clear guidance for detecting exactly the type of fraud scheme Sosna perpetrated, yet HNB failed to implement any of the safeguards.

Each identified deficiency constitutes a weakness that, if the proper procedures had been implemented, would have detected and prevented the fraudulent activity within weeks of its commencement. The case demonstrates that implementation of readily available standards would have substantially reduced risk and loss exposure to the bank and Mr. Schneider. HNB's failure to maintain basic collateral monitoring procedures outlined in the ARIF handbook represents a comprehensive failure.[34]

---

[34] Comptrollers Handbook Accounts Receivable and Inventory Financing. March 2000.

## H. HNB's Failures in Guarantor Communication

In the Premier Healthcare credit relationship, HNB systematically failed to meet regulatory expectations and industry standards for guarantor communication in several critical ways:

- **No Notification of Credit Downgrade:** The Bank failed to inform Mr. Schneider when the credit was downgraded to Special Mention in September 2019 and subsequently to Substandard in October 2019, despite these being material adverse changes that significantly increased his risk exposure.
- **No Communication About Special Assets Transfer:** When the credit was transferred to the Special Assets Group---a significant event indicating severe credit deterioration---no notification was provided to Mr. Schneider.
- **No Disclosure of Special Review Findings:** The September 9, 2020, special review identified serious operational and financial issues, including commingled cash, recordkeeping inconsistencies, and borrowing base problems. Despite these findings directly affecting Mr. Schneider's guarantor liability, the Bank did not share this information with him.
- **No Engagement in Problem Resolution:** Despite regulatory guidance emphasizing the importance of engaging guarantors in workout strategies, HNB made no effort to involve Mr. Schneider in developing remediation plans or exploring loss mitigation alternatives.
- **No Key Personnel Contact:** According to deposition testimony, key bank personnel responsible for the credit relationship (Suzanne Myers, Helen Ward, and Amy Becker) never met with Mr. Schneider despite his substantial $75.2MM guarantee exposure.
- **Continued Overdrafts Without Notification:** The Bank provided extensions of credit to the borrower without the knowledge of the Guarantor by providing excessive overdrafts, further increasing risk exposure.
- **Absence of Communication During Liquidation:** During the critical period when the credit was deteriorating, the Bank downgraded the credit, moved management to the workout area, and proceeded to liquidate collateral without consulting the guarantor at any stage of this process.

Internal bank emails provide direct evidence that the Bank was aware of deteriorating conditions long before formal downgrades occurred. A March 7, 2019, email from Suzanne Myers explicitly noted "concerns with this credit with the possibility of a downgrade and covenant violation" and requested "monthly updates and progress reports... to keep all in the loop with no surprises." This contemporaneous acknowledgment of the need to "keep all in the loop" starkly contrasts with the Bank's failure to include Mr. Schneider, who had the largest financial exposure as guarantor, in these communications.[35]

The same March 2019 email chain references "questions regarding lending against unbilled receivables and our overall experience of LendingLinc" and notes that "Troy is coordinating a meeting to discuss their questions on this." This demonstrates that the Bank was aware of potential issues with the LendingLinc system well before the credit deteriorated to Special

---

[35] Email from Suzanne Myers, March 7, 2019.

Mention status yet failed to disclose these concerns to Mr. Schneider despite having expanded his guaranteed obligation to cover the entire facility.

It is particularly striking that the bank continued to fail in recognizing the need for communications with Mr. Schneider. A twenty-three-page October 2019 Rapid Downgrade Review assessed the original underwriting and outlined a strategy and next actions steps but made no mention of the failure to communicate with Mr. Schneider or propose communications as part of the next action steps.[36]

Mr. Schneider possesses a strong management and problem-solving background as well as several years' experience operating such facilities and is the owner of four of the facilities. He also possesses substantial experience in construction as a developer and could have been helpful in resolving the facilities construction issues.[37] HNB failure to engage a knowledgeable manager with a significant stake in the successful operation of the facilities is puzzling and a significant missed opportunity to correct or at least mitigate the credit problems, up to and not limited to minimizing financial loss. Early engagement with Mr. Schneider might have allowed him to identify undisclosed credit problems earlier.

The October 2019 Rapid Downgrade Review memo provides contemporaneous evidence of the Bank's awareness of serious problems, including specific documentation that 'Questionable accounting policies... have created a large, aged A/R balance with a need for write-downs which would trip covenants' (Page 10). The memo's detailed timeline (Pages 2-3) documents multiple internal calls, meetings and discussions about credit deterioration occurring between March and October 2019, including a July 19, 2019 'Turnaround/Restricted Credit Review discussion' - the first month the healthcare relationship held this type of meeting. Despite these extensive internal discussions, the Bank made no effort to communicate these material concerns to Mr. Schneider, depriving him of the opportunity to protect his interests as guarantor.

The Wells Fargo enforcement actions provide important context for evaluating Huntington's failures in guarantor communication. The OCC's 'Lessons Learned' document emphasized that inadequate risk disclosure to stakeholders constitutes a significant regulatory concern. In the Wells Fargo case, the OCC required enhanced stakeholder communication protocols and transparent reporting of risk information. Applied to guarantor relationships, this regulatory standard would require banks to promptly communicate material adverse information that affects guarantor risk exposure—precisely what Huntington failed to do with Mr. Schneider.

## I. Importance of Guarantor Communication in Problem Loan Workouts

The regulatory emphasis on guarantor communication is not merely a procedural formality but a critical component of sound risk management. As stated in the Loan Workout Plan document provided in evidence:

"Effective problem loan management is a critical component of sound risk management and regulatory compliance. A key aspect of this process is **proactive engagement with guarantors**

---

[36] HNB_SCH_0025934.pdf. October 2019 Rapid Downgrade Review.
[37] Resume for Ray Schneider.

when a borrower experiences financial distress. The failure to communicate with guarantors until after collateral liquidation can lead to **regulatory scrutiny, increased credit losses, legal challenges, and reputational risk**."[38]

The document further emphasizes that:

**"Failing to involve a guarantor prior to liquidation constitutes an unsafe and unsound banking practice**, exposing lenders to unnecessary risk."

The Interagency Policy Statement on Prudent Commercial Real Estate Loan Accommodations and Workouts states "When entering into an accommodation with a borrower, it is prudent for a financial institution to provide clear, accurate, and timely information about the arrangement to the borrower and any guarantor."[39] By failing to engage Mr. Schneider, HNB deprived itself of potentially valuable input and resources that could have mitigated losses to HNB and Mr. Schneider.

**Quantifiable Impact of Failed Guarantor Communication**

The Bank's failure to implement appropriate guarantor communication practices had quantifiable impacts:

- **Expanded Risk Without Disclosure:** The Bank increased Mr. Schneider's guarantee liability from $33.6MM to $75.2MM (a 124% increase) without ensuring he had complete information about the associated risks
- **Lost Remediation Window:** By not engaging Mr. Schneider when the credit was downgraded to Special Mention (September 2019), the Bank forfeited approximately 13 months of potential remediation efforts before the special review in September 2020

## J. HNB's Violations of Legal and Regulatory Standards

HNB systematically violated both legal standards of good faith and fair dealing and regulatory expectations for guarantor management:

- **Withholding Material Adverse Information:** The Bank concealed crucial information about credit deterioration, transfer to Special Assets, and findings from the special review that directly affected Mr. Schneider's liability
- **Exploitation of Information Asymmetry:** The Bank knew Mr. Schneider lacked operational control and access to financial information about most entities he was guaranteeing, yet failed to provide him with information about their deteriorating performance
- **No Opportunity for Remediation:** By not informing Mr. Schneider of credit problems until after significant deterioration, the Bank deprived him of any opportunity to take protective action or contribute to remediation efforts

---

[38] Loan Workout Plan document, p. 1. Attached as Exhibit A.
[39] Policy Statement on Prudent Commercial Real Estate Loan Accommodations and Workouts. June 29,2023.
https://www.occ.gov/news-issuances/bulletins/2023/bulletin-2023-23.html

- **No Guarantor Involvement in Workout Strategy:** Despite regulatory expectations that guarantors should be involved in problem resolution, the Bank excluded Mr. Schneider from all workout planning and execution

The bank's special review quantified specific recoverable losses resulting from lack of proper oversight, including '$9.4MM cash outflow from our obligated group to related entities within a 3-month period' that proper guarantor engagement could have prevented. Similarly, the reduction in bad debt reserves from $628M to $228M represents a quantifiable operational issue that Mr. Schneider, with his healthcare management expertise, could have addressed. Industry studies consistently find that early guarantor intervention in credits with operational problems—rather than market-driven failures—typically results in 30-40% loss reduction.

## K. Deficiencies in HNB's Guarantor Management Policies

Based on my review of the evidence requested and provided, I identified the following specific policy and procedural gaps in HNB's guarantor relationship management:

- **No Clear Guarantor Communication Policy:** The Bank lacked a well-defined policy requiring communication with guarantors when credits are downgraded or transferred to Special Assets
- **Inadequate Borrowing Base Controls:** Policies governing borrowing base monitoring failed to address the risks associated with the Lending Linc system
- **No Guarantor Risk Assessment Framework:** The Bank's credit underwriting procedures failed to properly assess guarantor-specific risks, particularly the risk that Mr. Schneider had no operational control over most of the entities he was guaranteeing
- **Missing Escalation Procedures:** No clear procedures existed for escalating material adverse information to guarantors, even when that information directly affected their financial exposure
- **Lack of Special Assets Engagement Protocol:** The Bank's workout procedures apparently did not require engagement with guarantors as part of the remediation strategy

HNB's policy framework contained none of these essential elements, representing a significant departure from industry standards. This policy gap is particularly concerning for an institution subject to the OCC's Heightened Standards, which require robust risk management frameworks and clear accountability for risk management.[40]  The October 2019 Rapid Downgrade Review memo illustrates these policy deficiencies in action. Despite documenting detailed 'Overview of Factors that Led to Rapid Downgrade' (Page 2), including 'significant delay in construction,' 'failure to stabilize,' 'doubtful allowance reserve level,' 'liquidity issues,' and 'stretching of payables,' the memo contains no reference to notifying or engaging the guarantor. The memo's comprehensive 'Timeline with Key Events since Origination' (Pages 2-3) and detailed 'Strategy and Next Action Steps' (Page 3) similarly make no mention of guarantor communication, demonstrating the systematic absence of guarantor engagement protocols in the Bank's problem credit management process.

---

[40] 12 CFR Part 30, Appendix D, Section II.

**Industry Standard Policy Framework Comparison**

My assessment of policy deficiencies is based on a systematic comparison with industry standard frameworks:

- Analysis of risk governance frameworks with emphasis on third-party risk management
- Methodology: Benchmarking against the "Three Lines of Defense" model implementation
- Finding: Effective frameworks explicitly address guarantor communication requirements within each line of defense
- HNB's framework lacked integration of guarantor management across all three lines of defense

The October 2019 Rapid Downgrade Review further confirms these policy deficiencies. The document lays out a detailed 'Strategy and Next Action Steps' including 'Complete analysis on liquidity needs and funding options,' 'Follow for SNF & AL licensure at Forest Hills,' 'Continue to obtain weekly occupancy reports,' and 'Explore alternative financing options' - yet makes no mention of notifying or engaging guarantors despite their significant financial exposure. This absence of guarantor engagement in a formal remediation strategy directly contradicts regulatory expectations for problem loan management.

## L. Violations of HNB's Code of Conduct

The Huntington National Bank's Code of Conduct establishes clear ethical standards and commitments to customers:

**"We look out for people."**

**To our customers, this means:**

- I trust Huntington to do the right thing for me, not just sell me products or services.
- Huntington acts with honesty, integrity and fairness as they assist me in achieving my financial goals.

**To us, this means:**

- We are motivated by living up to higher standards.
- We do what we should do, not just what we have to do.
- And because we are trusted to do the right thing, we are also empowered to take action.[41]

The Bank's actions in the Premier Healthcare credit relationship systematically violated these core principles:

---

[41] Huntington National Bank Code of Conduct, p. 5.

### a) Violation of Trust and "Doing the Right Thing"

- The Bank possessed material information that significantly increased Mr. Schneider's risk exposure yet deliberately withheld this information
- When the credit was downgraded and transferred to Special Assets, the Bank had multiple opportunities to inform Mr. Schneider but chose not to do so
- The Bank knew Mr. Schneider had no operational control over the entities he was guaranteeing, yet withheld critical financial information

### b) Breach of "Honesty, Integrity and Fairness"

- Concealing serious problems with the borrowing base formula and monitoring systems
- Permitting "commingling of cash with related outside entities" and "recordkeeping inconsistencies" without informing the guarantor

### c) Failure to Live Up to "Higher Standards"

- The Bank prioritized fee generation over prudent credit risk management and transparent communication
- The failure to notify Mr. Schneider when the credit was transferred to Special Assets demonstrated a prioritization of the Bank's interests over fair treatment of the guarantor

### d) Failing to Do "What We Should Do"

- Key bank personnel responsible for the credit never met with Mr. Schneider despite his significant guarantee exposure
- The Bank did not engage Mr. Schneider in loss mitigation efforts when problems emerged
- When problematic financial practices were discovered, the Bank failed to inform the guarantor who had the most to lose

These violations of the Bank's own ethical standards directly contributed to the unsafe and unsound condition in this case and the resulting avoidable losses.

## VIII. SUMMARY OF KEY FINDINGS

Based on my analysis of the evidence and my extensive experience in banking regulation and supervision, it is my professional opinion that:

1. **The Huntington National Bank engaged in unsafe and unsound banking practices** in its handling of the Premier Healthcare credit relationship and its treatment of Raymond Schneider as guarantor. Banking regulators have explicitly rejected the notion that withholding information from guarantors to prevent their reaction is appropriate. The OCC specifically instructs banks to engage guarantors when credit problems emerge because early intervention typically improves recovery outcomes. Mr. Schneider's healthcare facility management expertise was directly relevant to the identified problems

and could have addressed issues like inadequate bad debt reserves, aged receivables, and cash management problems before they became critical. Sound guarantor management requires transparency and early engagement, not concealment.

2. **These unsafe and unsound practices included**:
   o Failure to communicate material adverse information to the guarantor
   o Inadequate credit underwriting and due diligence
   o Deficient credit monitoring and control
   o Misaligned incentive compensation that encouraged excessive risk-taking
   o Inadequate clawback provisions for incentive compensation related to rapidly deteriorating credits, allowing fee-based compensation to be retained despite evident underwriting failures
   o Ineffective implementation of the Three Lines of Defense risk management model

3. **The Bank breached its duty of good faith and fair dealing toward Mr. Schneider** by:
   o Expanding his guarantee liability from $33.6MM to $75.2MM without full disclosure of risks
   o Withholding information about significant credit deterioration
   o Failing to engage him in workout strategies when problems emerged
   o Proceeding with asset liquidation without his input or knowledge

4. **These failures resulted in quantifiable, avoidable losses** for both the Bank and Mr. Schneider

5. **The Bank's conduct violated both regulatory expectations and industry standards** for guarantor management, particularly:
   o OCC Heightened Standards (12 CFR Part 30, Appendix D) requiring comprehensive risk management
   o OCC's Problem Asset Management guidance requiring guarantor engagement in workouts
   o Interagency Guidance on Credit Risk Review Systems requiring proactive risk management with all stakeholders
   o Industry best practices for guarantor communication in distressed credits

I hold these opinions to a reasonable degree of professional certainty based on my extensive experience in banking regulation, supervision, and guarantor relationship management.

# IX. SIGNATURE AND CERTIFICATION

I certify that the opinions expressed in this report are my own and are based on my professional experience, knowledge of banking regulations and industry standards, and careful review of the available evidence. My analysis and conclusions are provided to a reasonable degree of professional certainty.

This report is furnished solely for use in connection with the litigation of Raymond Schneider v. The Huntington National Bank, et al (Case Number: A2300849) and is not to be distributed to anyone else or used for any other purpose.

Bobby B. Winstead's services on this engagement are billed at an hourly rate of $525, plus out-of-pocket expenses. This engagement has not been completed, so a disclosure of total

compensation is not possible at this time. Bobby B. Winstead's compensation is not dependent on the opinions or conclusions reached during this engagement and it is not dependent on the outcome of this litigation.

_Bobby B. Winstead_                    9/25/2025

Bobby B. Winstead

# APPENDIX A: DOCUMENTS REVIEWED

- Credit Agreement dated November 30, 2018
- Guaranty executed by Raymond Schneider
- Underwriting Analysis dated December 15, 2017. HNB004335
- Underwriting Analysis dated August 28, 2018. HNB0005407
- Revised Underwriting Analysis dated August 2, 2018. HNB005494
- Underwriting Analysis and Approval dated September 4, 2018. HNB0006971
- Special review documentation dated September 9, 2020
- Huntington Bancshares Incorporated Policy Healthcare CPSC-300. HNB_SCH_0071782
- Huntington Bancshares Incorporated Healthcare Underwriting & Portfolio Management Guidelines October 2018 CPSC 1200-45. HNB_SCH_0071879
- Risk Rating System Package Summary December 31,2018. HNB_SCH_0071773
- Deposition transcripts of bank officers
- HNB Code of Conduct https://www.huntington.com/-/media/pdf/corporate-governance/HUN-055-
- Credit rating change documentation (Special Mention and Substandard)
- Email communication from Suzanne Myers regarding Premier Healthcare credit concerns, dated March 7, 2019. HNB_SCH_0013022
- Internal bank email regarding LendingLinc system questions, March 2019 HNB_SCH_0015120
- Special review email from David Wechter documenting cash commingling and corporate structure issues, September 9, 2020. HNB_SCH_0015122
- Credit proposal dated December 15, 2017, including financial summaries of guarantors. HNB0004338
- 12 CFR Part 30 Safety and Soundness Standards (including Appendix A and Appendix D "Heightened Standards")
- OCC Comptroller's Handbook, "Rating Credit Risk" (June 2016)
- OCC Comptroller's Handbook, "Commercial Loans" (Section 214)
- OCC Comptroller's Handbook, "Corporate and Risk Governance"
- OCC Comptroller's Handbook, "Problem Bank Identification, Rehabilitation, and Resolution"
- OCC Comptroller's Handbook, "Internal and External Audits"
- OCC Comptroller's Handbook, "Loan Portfolio Management"
- OCC Comptroller's Handbook, "Accounts Receivable and Inventory Financing"
- Interagency Guidance on Sound Incentive Compensation Policies (75 FR 36395, June 25, 2010)
- Federal Reserve, FDIC, OCC, "Policy Statement on Prudent Commercial Real Estate Loan Workouts"
- OCC PPM 5000-7 rev. Civil Money Penalties
- Three Lines of Defense risk management model implementation guidelines
- Huntington Bank's 2018 compensation plans including:
  - Recognizing Exceptional Performance Program (REP) HNB_SCH_0063304
  - Management Incentive Plan (MIP) HNB_SCH_0063303
  - Commercial Incentive Compensation Plan HNB_SCH_0063302

- Interagency Guidance on Sound Incentive Compensation Policies (75 FR 36395, June 25, 2010)
- Huntington National Bank – Rapid Downgrade Review, Premier Health Care Management Inc (OG), October 2019 (HNB_SCH_0007081) Email
- Email from Dan Storer October 15, 2020, to Davod Wechter. HNB_SCH_004211

# Key Regulatory Documents

1. **12 CFR Part 30** (Safety and Soundness Standards): https://www.ecfr.gov/current/title-12/chapter-I/part-30
2. **12 CFR Part 30, Appendix D** ("Heightened Standards"): https://www.ecfr.gov/current/title-12/chapter-I/part-30/appendix-Appendix%20D%20to%20Part%2030
3. **Interagency Guidance on Sound Incentive Compensation Policies** (75 FR 36395): https://www.occ.gov/news-issuances/bulletins/2010/bulletin-2010-24.html
4. **Policy Statement on Prudent Commercial Real Estate Loan Accommodations and Workouts. June 29,2023**. https://www.occ.gov/news-issuances/bulletins/2023/bulletin-2023-23.html

# OCC Comptroller's Handbook Sections

4. **OCC Comptroller's Handbook, "Rating Credit Risk"**: https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/rating-credit-risk/index-rating-credit-risk.html
5. **OCC Comptroller's Handbook, "Commercial Loans"**: https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/commercial-loans/index-commercial-loans.html
6. **OCC Comptroller's Handbook, "Corporate and Risk Governance"**: https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/corporate-risk-governance/index-corporate-and-risk-governance.html
7. **OCC Comptroller's Handbook, "Accounts Receivable and Inventory Financing"**: https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/accts-rec-inventory-financing/index-accs-rec-inventory-financing.html
8. **OCC Comptroller's Handbook, "Loan Portfolio Management"**: https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/loan-portfolio-management/index-loan-portfolio-management.html
9. **OCC Comptroller's Handbook, "Internal and External Audits"**: https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/internal-external-audits/index-internal-external-audits.html

# Other Key References

10. **OCC Policies and Procedures Manual, PPM 5000-7 (Civil Money Penalties)**: https://www.occ.gov/news-issuances/bulletins/2022/ppm-5000-7-rev.pdf
11. **Uniform Commercial Code (UCC) §1-304**: https://www.law.cornell.edu/ucc/1/1-304

12. **12 USC §24** (Corporate Powers of Associations):
    https://www.law.cornell.edu/uscode/text/12/24
13. **Federal Deposit Insurance Act, Section 39** (referenced in footnote 13):
    https://www.fdic.gov/regulations/laws/rules/1000-4100.html#fdic1000sec.39
14. **Borrego Springs Bank, N.A., Borrego Springs, California Agreement June 15, 2012.**
    https://occ.gov/static/enforcement-actions/ea2012-134.pdf
15. **USAA Federal Savings Bank, Phoenix, Arizona Consent Order December 18, 2024.**
    https://www.occ.gov/static/enforcement-actions/eaAA-ENF-2024-96.pdf

## Depositions Reviewed

16. Helen Marie Ward
17. Suzanne Myers
18. Mike Viren
19. Garret Vetter
20. Amy Becker
21. Jill McGrail
22. James Gentry
23. Jon Pheneger
24. Lisa Jones
25. Harold Sosna
26. Melissa Smart
27. David Wechter
28. Lisa McElwain
29. David Emig
30. Keith Nuzum
31. Dennis Packer
32. Andrea Lee Quattrone

**The Importance of Communicating with Guarantors in Problem Loan Workouts**

**Executive Summary**

Effective problem loan management is a critical component of sound risk management and regulatory compliance. A key aspect of this process is **proactive engagement with guarantors** when a borrower experiences financial distress. The failure to communicate with guarantors until after collateral liquidation can lead to **regulatory scrutiny, increased credit losses, legal challenges, and reputational risk**.

This report outlines the importance of early and ongoing guarantor engagement, citing **regulatory expectations, legal considerations, and risk management best practices**. The report further emphasizes that failing to involve a guarantor prior to liquidation constitutes an **unsafe and unsound banking practice**, exposing lenders to unnecessary risk.

**I. Regulatory Expectations for Guarantor Engagement**

**A. OCC and Interagency Guidance on Loan Workouts**

Federal banking regulators, including the **Office of the Comptroller of the Currency (OCC), the Federal Deposit Insurance Corporation (FDIC), and the Federal Reserve**, have consistently emphasized the importance of **early risk identification and comprehensive problem loan management strategies**.

The **Interagency Guidance on Credit Risk Review Systems (FIL-22-2006)** explicitly requires lenders to:

• Establish **proactive risk management** practices that involve all relevant parties, including guarantors.

• Assess **all sources of repayment**, including guarantees, before resorting to collateral liquidation.

• Ensure thorough **documentation of communication efforts** with borrowers and guarantors to support credit decisions.

Similarly, the **OCC's Comptroller's Handbook on Loan Portfolio Management** and **Banking Circular 255 (Loan Workouts and Restructuring)** emphasize that banks must evaluate **all available recovery options**, including **guarantor contributions**, before determining that a loan loss is inevitable.

**B. Heightened Standards for Large Banks**

For financial institutions with assets exceeding **$50 billion**, the **OCC's Heightened Standards (12 CFR Part 30, Appendix D)** require an independent risk management function that oversees **problem loan resolution efforts**. These standards dictate that banks must:

• Evaluate **all repayment sources**—including guarantors—**before liquidating collateral**.

• Maintain a documented **guarantor communication strategy**.

• Avoid actions that could **undermine loan recovery efforts**.

Failure to **engage the guarantor early** could be interpreted as poor risk management, increasing the likelihood of regulatory criticism, **Matters Requiring Attention (MRAs)**, or enforcement actions.

## II. Legal and Contractual Considerations

### A. Enforceability of Guarantees

Many loan guarantees contain **notice provisions** requiring the lender to provide the guarantor with written notification before taking adverse actions. If the lender fails to provide proper notice, the **guarantor may challenge the enforceability** of the guarantee in court.

Additionally, courts have ruled in favor of guarantors when lenders failed to provide a **reasonable opportunity for payment or settlement before collateral disposal**. For example:

• **If a lender liquidates collateral at below-market value without first engaging the guarantor, the guarantor may argue that the lender impaired their ability to mitigate losses.**

• **A guarantor can claim "failure to mitigate damages," limiting the lender's ability to collect any remaining balance.**

### B. Defenses Available to Guarantors

Guarantors may also assert **several legal defenses** if they were not properly engaged before collateral liquidation:

1. **Lender's Failure to Act in Good Faith** – A lender's failure to communicate with a guarantor may be seen as a violation of the implied duty of **good faith and fair dealing**.

2. **Impairment of Collateral** – If a lender disposes of collateral without first offering the guarantor the opportunity to contribute to a loan workout, the guarantor may argue that their obligations should be **reduced or voided**.

3. **Economic Duress or Unfair Practices** – If the guarantor believes they were intentionally excluded from negotiations, they could challenge the **validity of the guarantee**.

To avoid these risks, **best practices dictate that lenders should notify and engage the guarantor as soon as the borrower experiences distress**.

### III. Risk Management and Credit Recovery Considerations

#### A. Maximizing Recovery Potential

Guarantors often have the financial ability and incentive to contribute to loan resolutions, whether through:

• **Direct repayment** of the outstanding balance.

• **Providing additional collateral** or liquidity.

• **Refinancing or restructuring the debt**.

Failing to involve a guarantor early reduces the likelihood of **full repayment** and may result in:

• **Lower recovery values** from collateral sales.

• **Higher charge-offs and increased loss provisions** under **CECL (Current Expected Credit Loss)** accounting standards.

• **Missed opportunities to negotiate a favorable settlement**.

#### B. Loan Loss Reserves and Capital Impact

Under **CECL**, banks must recognize expected losses based on **all reasonably available information**. If a guarantor has the financial ability to cover part of the debt but was not approached, the bank's **loan loss reserve calculations may not accurately reflect potential recoveries**. This can lead to:

• **Higher-than-necessary loan loss provisions**.

• **Capital inefficiencies**, impacting regulatory capital ratios.

By engaging guarantors **early and thoroughly**, banks can more accurately assess potential recoveries, leading to **lower reserves and better financial performance**.

### IV. Regulatory and Examiner Scrutiny

Regulatory examiners focus on whether banks have taken all reasonable steps to **minimize losses and maximize recovery** in problem loans. During reviews, examiners will assess:

1. **Whether the lender documented guarantor engagement efforts**.

2. **The thoroughness of the lender's financial analysis of the guarantor**.

3. **Whether the lender pursued all available recovery sources before recognizing a charge-off**.

Failure to communicate with a guarantor **until after collateral liquidation** may be criticized as:

• **A failure to implement sound credit risk management**.

• **An inadequate workout strategy**.

• **A violation of safe and sound banking practices**, leading to **regulatory downgrades, MRAs, or enforcement actions**.


**V. Best Practices for Guarantor Communication in Problem Loans**

To align with regulatory expectations and **enhance recovery efforts**, lenders should implement a structured **guarantor engagement plan**, including:

1. **Early Notification and Demand**

• Issue a **formal demand letter** at the first sign of borrower distress.

• Ensure the guarantor is aware of **potential workout options** before collateral liquidation.

2. **Financial Evaluation of the Guarantor**

• Obtain updated **personal financial statements, tax returns, and liquidity assessments**.

• Assess the guarantor's ability to contribute to **loan repayment or restructuring**.

3. **Negotiation Before Liquidation**

• Offer **forbearance, structured settlements, or refinancing** opportunities.

• Evaluate the **guarantor's willingness to provide additional collateral**.

4. **Thorough Documentation**

• Maintain records of all **guarantor communications, financial reviews, and settlement efforts**.

• This documentation **demonstrates compliance with regulatory expectations**.

5. **Legal Review Before Enforcement Actions**

• Consult legal counsel before liquidating collateral or enforcing a guarantee.

• Ensure compliance with **all notice requirements and contractual obligations**.

**Conclusion**

Failing to communicate with a guarantor until **after collateral liquidation** is an **unsafe and unsound banking practice** that increases legal, regulatory, and financial risks. **Proactive engagement with guarantors is essential** for:

• **Maximizing loan recovery**.

• **Minimizing charge-offs and capital reserve requirements**.

• **Maintaining regulatory compliance and avoiding examiner criticism**.

By implementing **best practices for guarantor engagement**, lenders can strengthen their risk management framework, improve loan workout outcomes, and ensure alignment with **OCC, FDIC, and Federal Reserve expectations**.

## **NOTICE OF DEBTOR'S MOTION FOR AUTHORIZATION TO PAY PREPETITION CLAIMS OF EXPERT WITNESSES AS CRITICAL VENDORS AND CERTIFICATE OF SERVICE**

The Debtor has filed a motion seeking Court authority to pay the prepetition claims of certain expert witnesses engaged by the Debtor.

**Your rights may be affected.** You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. If you do not have an attorney, you may wish to consult one.

If you do not want the court to grant the relief sought in the Motion, **then on or before twenty-one (21) days from the date set forth in the certificate of service for the Motion**, you must file with the court a response explaining your position by mailing your response by regular U.S. Mail to Clerk, United States Bankruptcy Court, Atrium Two, Suite 800, 221 E. Fourth St., Cincinnati, OH 45202, OR your attorney must file a response using the court's ECF system.

The court must **receive** your response on or before the date set forth above.

You must also send a copy of your response either by 1) the court's ECF System, or by 2) regular U.S. Mail to:

Office of The United States Trustee        James A. Coutinho, Esq.
550 Main Street                           Allen Stovall Neuman & Ashton, LLP
Suite 4-812                               10 West Broad Street, Suite 2400
Cincinnati, OH 45202                      Columbus, Ohio 43215

If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the Motion and may enter an order granting that relief without further notice or hearing.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing *Debtor's Motion for Authorization to Pay Prepetition Claims of Expert Witnesses as Critical Vendors* was served (i) electronically on the date of filing through the court's ECF System on all ECF participants registered in this case at the email address registered with the court and (ii) by ordinary U.S. Mail on December 12, 2025, addressed to the following:

See attached mailing matrix containing the Debtor, Office of the United States Trustee, Top 20 Unsecured Creditors, and those parties requesting notice.

Also mailed to:

Bobby B. Winstead
10 Escondite Lane
Hot Springs Village, AR 71909

Steven D. Lindsey
3111 Scottsville Rd.
Glasglow, KY 42141

   /s/  James A. Coutinho
James A. Coutinho     (0082430)

**Asst US Trustee**
Office of the US Trustee
J.W. Peck Federal Building
550 Main Street, Suite 4-812
Cincinnati, OH 45202-5212
*United States Trustee*

**Austin Z. Baurichter, Esq.**
Bricker Graydon LLP
312 Walnut Street, Suite 1800
Cincinnati, OH 45202
*Counsel for Park National Bank*

**Branden P. Moore, Esq.**
McGuireWoods LLP
260 Forbes Ave., Suite 1800
Pittsburgh, PA 15222
*Counsel for Merrill Lynch, Pierce, Fenner & Smith Inc.*

**Brian Green, Esq.**
Shapero & Green, LLC
25101 Chagrin Boulevard
Beechwood, OH 44122
*Counsel for First Federal Savings & Loan Association of Lakewood*

**Christopher P. Schueller, Esq.**
Buchanan Ingersoll & Rooney PC
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219
*Counsel for The Huntington National Bank*

**David Mullen, Esq.**
McGlinchey Stafford, PLLC
3401 Tuttle Rd, Ste 200
Cleveland, OH 44122
*Counsel for Bank of America, N.A.*

**Donald W. Mallory, Esq.**
WOOD + LAMPING LLP
600 Vine Street, Suite 2500
Cincinnati, OH 45202
*Counsel for General Electric Credit Union*

**First Federal Savings Bank**
PO Box 250
Washington Court House, OH 43160
*Top 20*

**Jon J. Lieberman, Esq.**
Sottile & Barile, Attorneys at Law
394 Wards Corner Road, Suite 180
Loveland, OH 45140
*Counsel for Heritage Bank*

**Kelly M. Neal, Esq.**
Buchanan Ingersoll & Rooney PC
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219
*Counsel for The Huntington National Bank*

**Partick Hruby, Esq.**
Brock & Scott, PLLC
3825 Forrestgate Drive
Winston Salem, NC 27103
*Counsel for First Merchants Bank*

**Patricia B. Fugée, Esq.**
FisherBroyles, LLP
27100 Oakmead Drive, #306
Perrysburg, OH 43551
*Counsel for Civista Bank*

**Paul T. Saba, Esq.**
SSP Law Co., L.P.A.
2623 Erie Avenue
Cincinnati, OH 45208
*Counsel for Stock Yards Bank & Trust Company*

**Raymond Joseph Schneider**
3515 Tiffany Ridge Lane
Cincinnati, OH 45241
*Debtor*

**Richard Boydston, Esq.**
Dentons Bingham Greenebaum LLP
312 Walnut Street #2450
Cincinnati, OH 45202
*Counsel for First Merchants Bank*

**Rockland Trust Company**
288 Union Street
Rockland, MA 02370
*Top 20*

**Rudy J. Cerone, Esq.**
McGlinchey Stafford, PLLC
601 Poydras Street, 12th Floor
New Orleans, LA 70130
*Counsel for Bank of America, N.A.*

**Stefanie L. Deka, Esq.**
McGlinchey Stafford, PLLC
3401 Tuttle Rd, Ste 200
Cleveland, OH 44122
*Counsel for Bank of America, N.A.*

**Steven M. Hartmann, Esq.**
Smith, Gambrell & Russell, LLP
155 North Wacker Drive, Stuite 3000
Chicago, IL 60606
*Counsel for Transamerica Life Insurance Company*

**Susan M. Argo, Esq.**
Bricker Graydon LLP
312 Walnut Street, Suite 1800
Cincinnati, OH 45202
*Counsel for Three Notes, LLC & Park National Bank*

**Timothy P. Palmer, Esq.**
Buchanan Ingersoll & Rooney PC
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219
*Counsel for The Huntington National Bank*

**Tricia Morra, Esq.**
ALDRIDGE PITE, LLP
3333 Camino del Rio South, Suite 225
San Diego, CA 92108
*Counsel for Nationstar Mortgage, LLC*

**Truist Bank**
Bankruptcy Department
306-40-04-95
PO Box 27767
Richmond, VA 23261
*Secured Creditor - PoC Notice Address*

**Whitney L. Mosby, Esq.**
Dentons Bingham Greenebaum LLP
2700 Market Tower
10 West Market Street
Indianapolis, IN 46204
*Counsel for First Merchants Bank*