UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No. 25-12607 |
| Raymond Joseph Schneider, | : | Chapter 11 |
| | : | |
| Debtor and Debtor in Possession. | : | Judge Beth A. Buchanan |

## REPLY IN SUPPORT OF DEBTOR'S MOTION FOR AUTHORIZATION TO PAY PREPETITION CLAIMS OF EXPERT WITNESSES AS CRITICAL VENDORS
### (Related to Doc. Nos. 72 & 85)

## I.     INTRODUCTION

In its Objection[1], Huntington fails to acknowledge or address the current state of the law on critical vendor treatment. It attempts to reduce the Debtor's arguments to one non-statutory rationale: the doctrine of necessity. But the Debtor is not seeking approval under the old doctrine of necessity. Through his Motion, the Debtor proposes to utilize section 363(b)(1) of the Bankruptcy Code, implemented by section 105(a), to pay the Critical Experts, because failing to pay the Critical Experts could lead to tremendous additional cost and delay in his Lawsuit before the State Court, potentially the most valuable asset of his bankruptcy estate.

Although Huntington wants to convince this Court that necessity is a threshold to relief under section 363, *see* Objection, p. 8, or that the Debtor is urging the Court to "adopt" some new analysis, *see id.*, these efforts cannot be squared with the current state of critical vendor treatment, most recently detailed in the decision by Judge Hoffman in the matter of *Murray Metallurgical Coal Holdings, LLC*, 613 B.R. 442 (Bankr. S.D. Ohio 2020), which is perhaps the leading opinion (and certainly the most thorough) on critical vendor motions in this District. It is clear after reviewing *Murray* that it is actually Huntington—not the Debtor—that is encouraging this Court

---

[1] The "Motion" is the *Debtor's Motion for Authorization to Pay Prepetition Claims of Expert Witnesses as Critical Vendors* filed December 12, 2025 (Doc. 72), and the "Objection" is the objection to that Motion filed by Huntington on January 2, 2026 (Doc. 85). All other capitalized terms not defined have the same meaning as set forth in the Motion.

to deviate from what it is empowered to do under the Bankruptcy Code by reading a threshold of necessity into the language of section 363.

The reality is that the Debtor's request to pay the Critical Experts is based on a sound business purpose: he wants to pay a lower amount of money now to help ensure success in the Lawsuit, which success would be a tremendous boost for every creditor in this case (besides Huntington) and guarantee the Debtor's ability to reorganize. His request meets the requirements of section 363 and establishes a protocol under which he will only pay a Critical Expert if they refuse to provide their services until paid. His request is appropriate. The Court should accordingly grant the requested relief.

## II.    ARGUMENT

### A.    The Motion satisfies the elements required under section 363(b)(1) of the Bankruptcy Code and detailed in the *Murray* case.

Huntington encourages this Court to limit itself to the dated "doctrine of necessity" or "necessity of payment" rule. *See* Objection, ¶¶ 29-30. This rule "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims" where such payment "is needed to facilitate the rehabilitation of the debtor". *In re Murray Metallurgical Coal Holdings, LLC*, 613 B.R. 442, 451 (Bankr. S.D. Ohio 2020), citing *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175-177 (Bankr. S.D. N.Y. 1989). This old doctrine predates the Bankruptcy Code and has been referred to as "just a fancy name for a power to depart from the Code" when departure is necessary in a case and within a bankruptcy court's equitable powers and discretion. *See In re Kmart Corp.*, 359 F.3d 866, 871 (7th Cir. 2004).

Although there is an aged body of caselaw where the doctrine of necessity was used to permit the payment of prepetition debts, the analysis of critical vendor treatment has advanced in recent years. The Debtor proposes that this Court base its decision on the statutory predicates laid

out in the Bankruptcy Code, as detailed in *Murray*. Although courts "in the days before bankruptcy law was codified wielded power to reorder priorities and pay particular creditors in the name of 'necessity'—**today it is the Code, rather than the norms of nineteenth century railroad reorganizations[,] that must prevail.**" *Murray*, 613 B.R. at 451, citing *Kmart*, 359 F.3d at 871 (emphasis added).

In the *Murray* case, the court found that section 363(b)(1) of the Bankruptcy Code, as implemented by section 105(a), permits bankruptcy courts to authorize debtors in possession to use property of the estate outside the ordinary course of business after notice and opportunity for a hearing. *See Murray*, 613 B.R. at 450, citing *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986). If a bankruptcy court in the Sixth Circuit is able to authorize a debtor's sale of substantially all its assets through § 363(b)(1), then "there can be little doubt" that the section "also provides a mechanism for debtors to obtain court authority to pay prepetition claims before confirmation if a sound business purpose supports the payment." *Id*.; *see also In re Goodrich Quality Theaters, Inc.*, 2020 WL 1068147, at *5 (Bankr. W.D. Mich. Mar. 4, 2020) (in a decision issued 14 days before *Murray*, court found that the statutory predicate for authorizing payment to critical vendors is § 363); *In re Tropical Sportswear Int'l. Corp.*, 320 B.R. 15, 20 (Bankr. S.D. Fla. 2005) ("…bankruptcy court may utilize sections 105(a) and 363…to justify the grant of critical vendor status under appropriate circumstances."). The *Murray* court even bemoans circumstances "where cases literally died because judges didn't believe they had" this authority under § 363. 613 B.R. at 454 (quoting a transcript from the *Windstream* case).

The relevant test, then, under *Murray* is simply to prove that a sound business purpose exists for paying the critical vendor, which can be proven if two circumstances are present. 613 B.R. at 451. First, the critical vendor must be in a position to cease providing goods or services to

the debtor, and must refuse to provide goods and services unless prepetition claims are paid. *Id*.
Second, the payments to critical vendors should leave the debtor's other creditors "at least as well
off as they were before." *Id*. at 452.

After describing these elements, the *Murray* court goes even further to discuss how debtors
can prove that a vendor would cease doing business with them. *Id*. at 453. Such proof does not
require the debtor to present evidence on a vendor-by-vendor basis, which is not required by the
Bankruptcy Code and would likely be detrimental to the debtor's interests. *Id*. at 453-454. For
example, if a debtor had to list all of the vendors it considered critical, and ask each if they would
cease doing business if their prepetition claims go unpaid, then the debtor is deprived of any
leverage it may have in negotiations with the vendor, increasing the costs incurred by the debtor's
estate and potentially increasing the risk of harm to the debtor's operations. *Id*. On the other hand,
if the debtor is not authorized to deal with these critical vendors, then each time a vendor threatens
to cut off essential goods or services, the debtor will be forced to file motions on an emergency
basis and seek relief from the court. *Id*. It is clear that both these options are clunky and inefficient
alternatives, which would be burdensome to both the debtor and the court.[2]

Recognizing this, the *Murray* court determined that a debtor can establish a protocol under
which the debtor will pay particular creditors' prepetition claims "only if, among other things, the
creditor refuses to provide essential products or services…if its prepetition balance is not paid."
*Id*. at 453. So long as the protocol set forth in the critical vendor motion is sufficient, "§ 363 of the

---

[2] This sort of inexpediency is exactly what Huntington is pushing for. *See* Objection, ¶ 30 ("The Debtor does not even
know whether the existing experts would cease future work without payment of their pre-petition claims."). The
Motion expresses the Debtor's belief that the Critical Experts are unwilling to continue with their engagement without
payment, *see* ¶¶ 40-41, but the Debtor also states that, should they be willing to continue without payment, the Debtor
will not pay them as a critical vendor. *See* Motion, ¶ 43. Why would the Debtor make a payment now if he does not
have to? The protocol set forth in the Motion, if authorized by the Court, would allow the Debtor to make these
payments solely if he has to and is meant to avoid the hamstringing realities of expedited motions and vendor leverage
forewarned in *Murray*.

Bankruptcy Code allows bankruptcy courts to authorize debtors to exercise their business judgment to pay critical vendor claims." *Id*. at 455. While described at length in *Murray*, it is important to note that this practice has long been typical in the critical vendor context, both in this District and across the country. *See id.* (listing cases).[3]

Through the Motion, the Debtor describes how the Critical Experts might cease providing services to the Debtor that will maximize his estate and provides a protocol for dealing with these Critical Experts going forward. *See* Motion, ¶¶ 40-45. Even after seeking authority to implement this protocol, the Debtor goes further to actually identify the Critical Experts, providing transparency for the Court and other parties to the case and identifying precisely how payment of their prepetition claims will assist in pursuit of the State Court Lawsuit. *See id.* at ¶¶ 50-51. The Motion then describes how paying the Critical Experts will leave other creditors at least as well off as they would be otherwise. *See id.* at ¶ 51. Based on the Debtor's latest monthly operating report (Doc. 84), there is an estimated $146,830,676 of unsecured debt in this case; the Motion requests authority to pay $80,056.25, only **0.0545%** of that total amount.[4] Paying this amount now will eliminate duplicative expenses in having to engage new experts (if that is even possible), and advance the possibility of success in the Lawsuit. Success in the Lawsuit will, in turn, substantially reduce Huntington's claim and increase the distribution made to every other creditor.

---

[3] *See also In re Ramos Roofing & Remodeling Co.*, Case No. 25-54299, Doc. 36 (MNK) (Bankr. S.D. Ohio Oct. 9, 2025) (order approving debtor's protocol for critical vendors); *In re The Bellevue Hospital*, Case No. 25-30191, Doc. 151 (MAW) (Bankr. N.D. Ohio Feb. 26, 2025) (final order granting same); *In re Windstream Holdings, Inc.*, Case No. 19-22312, Doc. 377 (RDD) (Bankr. S.D. N.Y. Apr. 22, 2019) (same); *In re ATD Corp., et al.*, Case No. 18-12221, Doc. 235 (KJC) (Bankr. D. Del. Oct. 24, 2018) (same); *In re FirstEnergy Solutions Corp., et al.*, Case No. 18-50757, Doc. 487 (AMK) (Bankr. N.D. Ohio May 8, 2018) (same); *In re Patriot Coal Corp., et al.*, Case No. 12-12900, Doc. 255 (SCC) (Bankr. S.D. N.Y. Dec. 4, 2012) (same).

[4] The claim register for the Court shows unsecured debts of $106,698,175.20, but that number does not include undisputed scheduled claims for unsecured creditors that are not required to file proofs of claim. Even so, if you use the claim amount from the claim register, the amount to be paid is only 0.075% of unsecured claims.

If the Debtor is unable to pay the Critical Experts, that does not mean the Debtor will not have an expert witness expense in the Lawsuit. Rather, it will just make him have to pay more for experts. If the Debtor cannot continue working with the Critical Experts, the Lawsuit will be delayed by many months, and the Debtor will be subject to the additional costs and legal fees of finding new experts, bringing them up to speed with counsel's assistance, and having them prepare new expert reports. That work is duplicative and pointless when the current Critical Experts have finished their reports and are preparing for trial. Huntington encourages this result. It would have the Debtor expend more than the requested $80,000 to get new experts rather than pay 0.0545% of unsecured claims right now. Overall, as further set forth below, granting the Motion will leave the Debtor's creditor base in a ***better*** position than they would be otherwise.

Given that the Debtor's Motion satisfies the analysis set forth in *Murray*, the Court should grant the Motion as a valid exercise of its authority under §§ 363(b)(1) and 105(a).

**B.     The sound business purpose for retaining the Critical Experts is success in the Lawsuit, the Debtor's largest and most valuable asset in this case.**

A sound business purpose exists if the two criteria specified in *Murray* are met. *See Murray*, 613 B.R. at 451-452. Those criteria are met in the Motion, which is described above. *See* Section II.A.

It is worthwhile, however, to rebut some of the comments made in the Objection. Huntington argues that the Debtor "failed to demonstrate a business purpose" in his Motion, since the Lawsuit "may be over as soon as this month". *See* Objection, ¶ 31. This seems to rely on Huntington's contention that the Lawsuit is "at best speculative and at worst a drain on the Debtor's time and resources." *Id*. at ¶ 2. This contextualization really underestimates the value of the Lawsuit, and does so intentionally. Calling the Lawsuit "speculative" is contrary to several decisions of the State Court, which denied Huntington's motion to dismiss on August 18, 2023,

and denied Huntington's motion for summary judgment on February 12, 2024. *See* Motion, ¶ 11.

This Lawsuit is in its advanced stages and is soon to be scheduled for trial. *See id.* at ¶¶ 14-21. If

it was "speculative," then surely Huntington would have succeeded in its attempts to have the

Lawsuit thrown out. Instead, just the opposite has happened: the Debtor has outlasted Huntington

at every turn and has even been granted the extraordinary relief to depose and personally pose

questions to Huntington's president. The Debtor has further overcome Huntington's efforts to

delay and obfuscate, finally obtaining massive amounts of discovery that Huntington failed to

produce in its original lawsuit against the Debtor (the production of which may have changed the

outcome). While there is another motion pending to eliminate the Lawsuit on the basis of *res

judicata*, Huntington may not be successful there either. The Debtor's ongoing progress

underscores that the Lawsuit is a viable asset warranting preservation through prudent

expenditures, as permitted under § 363.

Instead, Huntington is advancing a transparent attempt to gain a litigation advantage. At

worst it would deprive the Debtor of his chosen experts, increase the cost to the Debtor, and

substantially delay the Lawsuit. At best, Huntington's efforts would completely cripple the

Debtor's State Court claims, relieving Huntington of potentially massive liability.

Compare that to the Debtor's possible outcomes. If the Motion is granted, at best, the

Debtor will succeed on his claims against Huntington, substantially reducing or fully eliminating

its claim and leading to increased distributions for all other creditors. At worst, the Debtor would

have saved money by paying the Critical Experts instead of replacing them at a massive expense.

The Debtor has articulated a sound business purpose for paying the prepetition claims of Critical

Experts if the result could be the complete (or even partial) reduction of Huntington's over $30

million claim in this case.

**C.     Creditors would benefit from the Debtor's payment of the Critical Experts, as opposed to being prejudiced.**

As described above, continued retention of the Critical Experts will be a net benefit to the Debtor's other creditors, far from prejudicing their interests. The Debtor is going to continue to pursue the Lawsuit if the Motion is denied. In that case, the Debtor expects that he will need to replace one or more of the Critical Experts. He will need to seek leave of the State Court to disclose new experts and obtain a new case schedule, which relief is not a given. The Debtor will need to find new experts, a process that will involve substantial expense of his State Court counsel due to the extremely specialized nature of their experience. The new experts will need to be brought up to speed by reviewing tens of thousands of pages of documents, including over 77,000 pages of production from Huntington and 25 deposition transcripts. The new experts will need to then create new reports, the prior ones being a combined 124 pages. All the while, the Debtor will be expending attorney fees and the process will be delayed. This will certainly cost more than the current bills, and creditors will benefit from saving on the fees.

Then, if the Lawsuit is all for nought, the Debtor has only paid 0.0545% of his prepetition unsecured claims, hardly a substantial detriment to his creditor base. But, if the Debtor is successful in the Lawsuit, Huntington's claim will be diminished or eliminated and the position of all the Debtor's unsecured creditors will be substantially improved.

**D.     Even under the doctrine of necessity, approving the Motion is appropriate because the Critical Experts are necessary to avert serious threats to the chapter 11 process.**

Huntington insists that there is a "threshold question" of necessity when considering the *Murray* factors, but this approach goes against the actual language of the Bankruptcy Code. Maybe there was a threshold question of "necessity" when bankruptcy courts approved critical vendor payments based solely on their equitable authority, prior to the codification of bankruptcy law, but

8

that is no longer the case. Section 105(a) expressly ***does not*** limit its application to questions of necessity, instead reading that a "court may issue any order, process, or judgment that is necessary ***or appropriate***…" (emphasis added). Section 363, similarly, is not premised on any question of necessity. *See* 11 U.S.C. § 363(b)(1); *see also Tropical Sportswear*, 320 B.R. at 20 ("…bankruptcy court may utilize sections 105(a) and 363…to justify the grant of critical vendor status under ***appropriate*** circumstances.") (emphasis added). Huntington's argument depends on re-writing these sections by removing the Court's authority to issue orders it finds appropriate to administration of the case or adding terms to § 363 that are simply not in the statute. Textually, Huntington's argument fails.

But, to the extent this Court reads any threshold of necessity into these provisions, Huntington's preferred definition of "necessity" is easily met by the Debtor under these circumstances. The Lawsuit has been pending for years and is at a late stage of litigation. At this stage, is it possible for the Debtor to find new experts in a limited field, convince the State Court to delay the Lawsuit for the replacement process, have the new experts review over 77,000 documents produced by Huntington, have the new experts review over 25 deposition transcripts, and then have the new experts re-work the hundreds of hours already expended by the Critical Experts (and by Debtor's counsel, in working with the Critical Experts) to create new expert reports[5] and participate at trial? Maybe. There is no guarantee the State Court would allow the Debtor to start the process over at this stage, but it is possible. However, it would be at gigantic expense to the Debtor's estate that would be well in excess of the amount the Debtor is seeking to

---

[5] The first report prepared by the Critical Experts—the Winstead Report attached as Exhibit G to the Motion—is 49 pages long. The second report, which was incomplete at the time of filing the Motion but is now complete, and is attached as <u>Exhibit H</u> to this reply, is 75 pages long. The cumulative 124 pages demonstrates the sheer amount of knowledge and expertise required to formulate the Debtor's claims in the Lawsuit, knowledge and expertise the Debtor requires to continue pursuing the case.

pay in the Motion. It would further cause considerable delay, pushing any resolution of the Lawsuit many months further along. And given the Lawsuit's proximity to trial, such a replacement could jeopardize the entire claim, not just delay it. So, is it ***necessary*** to retain the Critical Experts, when there is a remote possible alternative? Huntington would say no, because the alternative exists, even if it is extremely costly, difficult, and uncertain.

That is why the Bankruptcy Code allows the Court to do whatever is "necessary ***or appropriate***", and why Huntington's proposed reading of the standard is wrong. Even under Huntington's proposed standard, the real question is: Necessary for what? Huntington quotes the *Corner Home Care* case for the notion that "the vendor must be necessary for the successful reorganization of the debtor." *In re Corner Home Care Inc.*, 438 B.R. 122, 127 (Bankr. W.D. Ky. 2010), citing *In re United American, Inc.*, 327 B.R. 776, 782 (Bankr. E.D. Va. 2005). That case goes on to describe this, while "more than mere convenience", as requiring just a "showing of substantial necessity." *Corner Home*, 438 B.R. at 122. This has been characterized, in this District, as "necessary to avert a serious threat to the Chapter 11 process." *Id.*, citing *In re Eagle-Pitcher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991).

While simply being more cost-effective does not a "necessary" critical vendor make, practical considerations and realities have to be taken into account when certain alternatives are so inexpedient, wasteful, uncertain, and remote that they would have a negative impact on the bankruptcy estate.

Consider the *Ramos Roofing & Remodeling* case, a recent example of what "necessary" and "appropriate" truly means in this context. The debtor in the *Ramos* case offered roofing and siding services to its clients, and sought court authority to pay the prepetition claims of two subcontractors who were working on active jobs. *See In re Ramos Roofing & Remodeling Co.*,

Case No. 25-54299, Doc. 17 (MNK) (Bankr. S.D. Ohio Oct. 3, 2025) (critical vendor motion). While it would have been possible to replace those subcontractors with alternative companies, that would mean that the current workers would walk off their jobs, those jobs would be delayed, and this would negatively impact the debtor's reputation with its customers and with other subcontractors. *Id*. The court determined that such an alternative would pose a serious threat to the debtor's chapter 11 case, and found that the subcontractors were properly considered critical vendors. *See In re Ramos Roofing & Remodeling Co.*, Case No. 25-54299, Doc. 36 (MNK) (Bankr. S.D. Ohio Oct. 9, 2025) (order granting critical vendor motion).

Here, the Debtor, as debtor in possession, has a duty to continue pursuing the Lawsuit which is potentially the most valuable asset of his estate. *See* 11 U.S.C. § 1107(a). If the Debtor does not pursue the Lawsuit, he would be failing in his duties and acting not in the best interests of his creditors and estate. And failing to pay the Critical Experts puts the Lawsuit at extreme risk. Not only from a cost perspective: the State Court may not allow the Debtor to replace the Critical Experts at this time. Even if the Court adopts the standard espoused by Huntington, paying the Critical Experts is still necessary and appropriate.

## III.   CONCLUSION

Huntington forced this second bankruptcy filing through aggressive collection efforts, including seeking to appoint a receiver, trying to liquidate stock that would create a multi-million dollar tax liability, and sending a sheriff to the Debtor's home to tag and sell all of his personal property. Those actions required a quick filing, leaving this one affair of the Debtor out of order: payment of the Critical Experts. Now Huntington wants to leverage the situation it created into a litigation advantage by hurting the Debtor's chances in the Lawsuit. It does so by advancing a dated standard and unfairly discounting the Debtor's chances of success. But the Debtor's estate

will not be better off if Huntington's arguments are accepted. In fact, it suggests that the Debtor must take the most expensive and riskiest option instead of letting the Court approve the common sense approach.

Pursuant to 11 U.S.C. §§ 105(a) and 363(b)(1), it is necessary and appropriate for this Court to grant the Motion and authorize the protocol requested by the Debtor for paying prepetition claims of the Critical Experts.

<div style="margin-left: 40%;">

Respectfully submitted,

 /s/ James A. Coutinho
Thomas R. Allen      (0017513)
Richard K. Stovall    (0029978)
James A. Coutinho    (0082430)
Andrew D. Rebholz    (0102192)
Allen Stovall Neuman & Ashton LLP
10 West Broad Street, Suite 2400
Columbus, Ohio 43215
allen@asnalaw.com; stovall@asnalaw.com
coutinho@asnalaw.com; rebholz@asnalaw.com
*Counsel for Debtor / Debtor in Possession*

</div>

**EXPERT WITNESS REPORT**
**Case Name:** Raymond Schneider v. The Huntington National Bank, et al
**Court:** Court of Common Pleas, Hamilton County, Ohio
**Case Number:** A2300849
**Date:**  December 16, 2025
**Expert Witness:** Steven Lindsey

# I. EXECUTIVE SUMMARY

## A. Brief Overview of the Engagement

1. Cummins Law LLC has engaged Steven D. Lindsey in the above referenced litigation between Raymond Schneider and The Huntington National Bank ("HNB") at an hourly rate of $525.00.

## B. Nature of the Engagement

2. I have been retained by Cummins Law LLC as counsel ("Counsel") to provide the following services on behalf of Raymond Schneider ("Plaintiff" or "Schneider") in the above referenced matter.

3. Counsel has asked me to provide my opinion on how HNB executed its duties and responsibilities to prevent and detect financial crime through deposit accounts consistent with safe and sound banking, industry standards and regulatory expectations.

4. In forming my opinions, I have examined a body of facts and considered the documents and facts referenced in this report.

5. In addition, I may be asked to provide expert testimony, if necessary, regarding my analyses and opinions. I have been retained to provide litigation consulting and services as a testifying expert on banking practices and procedures, compliance requirements and fulfillment, duty of care owed, and banks' obligations to act in good faith as it relates to matters in the above litigation. The specific tasks and assignments may include the writing of expert reports, rebuttal reports, affidavits, and/or participating in deposition(s) and tribunal testimony as Counsel shall request. I was not requested to and did not independently verify any bank analysis or calculations.

# II. QUALIFICATIONS OF THE EXPERT WITNESS

1. I have been in the financial services industry for over 40 years, am a recognized expert on a broad range of compliance laws, rules and regulations that affect the financial services industry and have extensive working knowledge of financial regulatory and compliance requirements. I have dedicated over 35 years to demystifying financial crime prevention, detection and reporting, Bank Secrecy Act/Anti Money Laundering/("BSA/AML") requirements, Office of Foreign Assets Control ("OFAC") sanctions, consumer, and community and fair lending laws, rules and regulations applicable to U.S. and foreign bankers, examiners, and law enforcement agencies. My resume is attached hereto as **Exhibit 1.**

2. From 1992-2003 I served as OCC lead policy and supervision BSA/AML/OFAC expert establishing examination guidance and procedures designed to prevent and detect financial crime across all national banks regardless of size and complexity.  This and other guidance became the framework of the FFIEC BSA/AML Examination Handbook.

3. As a banker and consultant, I have designed and built sustainable, repeatable, risk-based compliance programs at banks and broker/dealers, reducing the risk of regulatory actions, civil money penalties and negative impact to institutions' reputations.

4. I served as Assistant Deputy Comptroller for Compliance-Large Banks West at the Office of the Comptroller of the Currency (OCC) where I managed a team of compliance examiners responsible for examinations of the largest national banks in that region. Before that I was the senior compliance examiner for the largest and/or most complex national banks in New York and other northeastern states. I provided oversight of all large bank BSA/AML and OFAC examinations from 1994-2003.

5. At the OCC, I served in several capacities, including: a national bank examiner (safety and soundness), compliance examiner for OCC's Large Bank Supervision, OCC's liaison with the Financial Crimes Enforcement Network (FinCEN), an Examiner-In-Charge (EIC) of compliance and BSA/AML and OFAC examinations of the largest national banks, EIC of departmental safety and soundness examinations of regional banks, and a field examiner in the Southwestern District, Tulsa, Oklahoma Duty Station.

6. Finally, I was responsible for establishing OCC policy surrounding the Anti-Money Laundering/Bank Secrecy Act, OFAC, the Right to Financial Privacy Act and the Flood Disaster Protection Act at OCC's Headquarters in Washington, D.C. Additionally, I served as a charter member of OCC's National Anti-Money Laundering Working Group, was a member of The Community Reinvestment and Home Mortgage Disclosure Federal Financial Institution Examination Counsel Interagency Tasks Forces and was a member of the U.S. Treasury Department's Money Laundering Task Force, which identified ways to reduce the regulatory burden associated with Bank Secrecy Act compliance without compromising law enforcement's access to needed financial records.

## III. KEY OPINIONS

Based on my 35 years of experience in financial crime prevention and detection, I have formed these opinions:

1. **HNB had clear indicators that the Premier  relationship was engaged in money laundering/financial crime activity as early as September 2019.**

1.1 The healthcare sector has been recognized by regulators and law enforcement agencies as particularly vulnerable to financial crime.

1.2 Bank records reflect a pattern of abnormal, large- even dollar transactions occurring through certain Premier related business checking accounts as early as 201l. This was unacceptable and indicative of a systemic failure at HNB relating to its oversight of the Premier relationship. This resulted in significant harm to Mr. Schneider. HNB did nothing to protect the interest of Mr. Schneider, HNB, HNB shareholders and clients, and the FDIC insurance fund.

1.3 In summary, these transactions were suspicious at origin and HNB had knowledge of these transactions since they were captured in bank statements, in official records and would have been identified as high risk for financial crime as part of a minimally acceptable transaction surveillance system.

1.4 This report details numerous examples of financial crime in the Premier related  business checking accounts.  Most striking are the check kiting fraud; the evidence of funds being

used to facilitate the illegal sale of collateral out of trust and the significant number and dollar volume of transactions that are high risk for money laundering.

2. **HNB failed in its most basic duty of care[1] by permitting Premier to make unusually large, round-dollar transactions across multiple entity accounts, allowing Premier access to funds not yet cleared (uncollected), most commonly known as a "kiting scheme", thereby giving Premier unchecked access to the US banking system, inconsistent with safe and sound banking and financial crime prevention laws, rules, regulations and regulatory guidance.**

3. **HNB's failure to take action to mitigate the evidenced financial crime[2] activity through multiple Premier business checking accounts adversely impacted Mr. Schneider. HNB specifically permitted Premier access to millions of dollars in uncollected funds (transaction kiting) and to sell collateral[3] used to secure the Premier loans. In my opinion based on the facts presented HNB could have acted to stop the vast majority of the fraudulent activity at inception that would have substantially reduced or eliminated losses to HNB and Mr. Schneider.**

   3.1 These transactions were funded through business deposit accounts at HNB and three other financial institutions and resulted in potential loss to HNB and other partner banks in an amount exceeding $80 million.

   3.2 These large, even-dollar transactions are well known to present heightened risk for financial crime/money laundering, yet HNB did nothing to mitigate the high-risk transactions flowing through the Premier accounts. Their inaction and failure to monitor the accounts is inconsistent with sound banking practices and money laundering (financial crime) prevention and detection laws, rules, regulations and regulatory guidance which has existed since the mid-1990s.

   3.3 In my 35 years working in financial crime prevention and detection I have never observed such disregard for safe and sound banking practices. This activity was occurring openly without any effort by Premier to conceal the activity.

4. **Because HNB did not exert proper fiduciary[4] oversight of Premier related accounts Mr. Sosna was easily permitted to conduct transactions that are high risk for financial crime and HNB ultimately partnered with Premier in this illegal scheme to sell HNB's collateral out of trust to multiple third party entities (Merchant cash advances or**

---

[1] Per the OCC  duty of care requires that directors and officers, in the performance of their official duties, exercise the care that an ordinarily prudent person would exercise under similar circumstances. The duty of loyalty requires that directors and officers place the bank's interests above their own or the interests of any third party.  (OCC, PPM. 5000-7; https://www.occ.gov/news-issuances/bulletins/2018/ppm-5000-7.pdf ).

[2] Per the OCC, Financial crime threatens the safety and soundness of financial systems world-wide. In some cases, these crimes threaten the security and safety of the nation. These crimes range from simple operations carried out by individuals or small groups to highly sophisticated rings seeking funding for criminal enterprises or terrorism. Financial Crime | OCC (treas.gov). Financial crime refers to illegal financial activities like tax evasion, money laundering, embezzlement, bribery, insider trading, and counterfeiting. These crimes can be committed by individuals, businesses, or institutions, causing both financial loss and emotional distress to victims. Financial crimes are serious offenses with severe consequences and require legal intervention, so awareness is essential for protection. Understanding Types of Financial Crime: A Comprehensive Guide (lexisnexis.com)

[3] Collateral is a valuable asset that a borrower pledges as security for a loan, serving thus as a guarantee for the lender. (https://www.investopedia.com/terms/c/collateral.asp)

[4] Per the OCC, A **fiduciary duty** is a duty of great confidence and trust, which includes a high degree of good faith. Fiduciary duties owed by directors and officers of an institution include the duty of care and the duty of loyalty.  https://www.occ.gov/news-issuances/bulletins/2018/ppm-5000-7.pdf

"MCAs") that, on a daily basis, took possession of payments on receivables that were
legally collateral for the HNB loan.

4.1 These third parties were given access to Premier HNB deposit accounts and would transfer
funds from certain Premier related HNB checking accounts into an account of the third
parties held at other non-related financial institutions.

4.2 Of this activity, HNB's official monthly bank statements, clearly documented in excess of
$4.4 million dollars sent to the MCA organizations.[5] (See Exhibit 3 in this Report for de-
tails.  These transactions are in response to HNB allowing Premier to sell the collateral
(future receivables) pledged to protect the bank from loan losses.

4.3 HNB recognized but did nothing to stop the egregious client behavior and failed to exer-
cise enhanced due diligence[6] over the accounts of a high-risk client.

**5.  HNB system, process, and control failures permitted Premier related enterprises,
which were business clients of the bank that operated Healthcare facilities, to conduct
fraudulent activity in the face of substantial evidence that some of those enterprises
were engaged in financial fraud.**

5.1 HNB may have had sufficient controls in place to **recognize** the unusual and suspicious
activity in Premier and related accounts but **failed** to take appropriate and required ac-
tions, up to and including exiting the Premier relationship in a timely manner to reduce
loss exposure to HNB.

5.2 HNB operated its ongoing transaction surveillance monitoring program in such a way that
it did not provide an effective second line of defense to act on fraud that was facilitated by
HNB bankers.

5.3 HNB operated and managed its internal controls, processes, people, and systems in a
manner that inappropriately allowed the Premier and related enterprises to conduct signifi-
cant number and volume of unusual transactions through some of its deposit relationships
indicative of financial crime.

5.4 This allowed Mr. Sosna to misappropriate funds from his companies via certain HNB de-
posit accounts in a successful effort to sell collateral (future accounts receivables pro-
ceeds) out of trust.

5.5 HNB allowed Mr. Sosna to conduct multiple suspicious transactions that financially bene-
fited Mr. Sosna personally at a high financial cost to HNB and Mr. Schneider.

5.6 HNB either lacked adequate procedures for account opening, fraud detection, and AML
controls, or disregarded them and permitted Mr. Sosna to allow the MCAs to commandeer
control of HNB checking accounts.

---

[5] "I took out numerous loans at usurious rates of interest and gave the predatory lenders direct access to my business accounts to take the extreme-
ly high interest payments directly from the accounts. Of course, this led to a dramatic worsening of the fundamental fiscal health of the business,
and the downward financial spiral accelerated. I borrowed what ultimately became many millions of dollars from approximately forty different
Merchant Cash Advance lenders who charged over 500% interest." ( HNB v. Harold Sosna, US Bankruptcy Court For The Southern District of
Ohio, Chapter 7,Case No:  1:23-bk12371, Paragraph 19).

[6] Customers that pose higher money laundering or terrorist financing risks, (*i.e.*, higher risk profile customers), present increased risk exposure to
banks. As a result, due diligence policies, procedures, and processes should define both when and what additional customer information will be
collected based on the customer risk profile and the specific risks posed. Collecting additional information about customers that pose heightened
risk, referred to as **enhanced due diligence (EDD)**, for example, in the private and foreign correspondent banking context, is part of an effective
due diligence program. Even within categories of customers with a higher risk profile, there can be a spectrum of risks and the extent to which
additional ongoing due diligence measures are necessary may vary on a case-by-case basis. FFIEC BSA/AML Assessing Compliance with BSA
Regulatory Requirements - Customer Due Diligence  Also see Pg 56-58 of this report for details.

6. I have included a list of sources and documents considered in the preparation of this report as **Exhibit 2** in this report. It is my understanding that discovery in this matter is ongoing. To the extent that additional documents or information are made available to me, I will review such documents and information and may incorporate any such new information into my analyses, conclusions and/or opinions.

7. I hold these opinions to a reasonable degree of professional certainty. The specific bases for the opinions that I have formed as of the date of this report are detailed in Section VIII of this report. I reserve the right to add, change or modify my opinions based on my review of any new information provided, if any.[7]

## IV. BACKGROUND OF THE CASE[8]

1. Huntington Bancshares Incorporated ("HBI") is a bank holding company headquartered in Columbus, Ohio. Its banking subsidiary, The Huntington National Bank ("HNB"), operates approximately 978 banking offices in 12 states, primarily in the Midwest.

2. The company is ranked 466th on the Fortune 500 as of 2024 and was the 20 largest U.S. bank with assets of $199 billion. HNB is considered a Large Financial Institution ("LFI") by regulators. LFI's are subject to additional requirements and expectations for management systems and controls as contained in 12 CFR Part 30. The Federal Reserve Bank ("FRB") supervises Huntington Bancshares Incorporated while its subsidiary, The Huntington National Bank is a national bank chartered and supervised by the Comptroller of the Currency ("OCC"). As a national bank it is also supervised, and deposits are insured by the Federal Deposit Insurance Corporation ("FDIC").

3. The Premier Health Care ("Premier") loan originated in December 2017, as a preliminary proposal to restructure and rewrite an existing participated credit of $75.2MM with HNB replacing Fifth Third Bank as lead bank. Premier Health Care operated nine nursing and rehabilitation care facilities with approximately 1,000 beds, at that time.   The primary beneficial owners of the health care facilities were Harold Sosna and Raymond Schneider. Mr. Sosna owned all but four of the facilities with Mr. Schneider and Mr. Sosna jointly owning the remainder. Mr. Sosna operated all the facilities.

4. HNB was aware that Mr. Schneider was not a signer of any deposit relationship.  Mr. Schneider did not have the authority to transact business through any of these business checking accounts.  As such, Mr. Schneider placed a reasonable level of trust on HNB's fiduciary duty, duty of care and duty of loyalty to HNB, its board, the FDIC insurance fund. He relied, in good faith, upon the sophistication and effectiveness of HNB's continuous transactional surveillance systems which all banks are mandated to put in place to mitigate financial crime and banking fraud.

## V. METHODOLOGY AND APPROACH

1. In order to form the basis of my opinions, I performed a forensic review of activity in, through, and out of Premier related business checking accounts using the same approach I would use when examining the largest and most complex national banks, providing con-

---

[7] The analysis is based on documented provided through November 30, 2025 and may be revised if new information, if any, emerges.

[8] See Expert Report of Bobby Winstead (Additionally, Mr. Winstead assisted in proofing, designing, formatting and creating visuals for this report).

sulting services and providing training to bankers, law enforcement and examiners (across the globe).

2. Based on bank statements provided to me, I conducted a manual review of monthly account statements and looked for transactions that pose heightened risk for financial crime. The criteria used are detailed later in this report but generally include the following:

   - Significant increase or decrease in the dollar volume of transactions listed on HNB's monthly business deposit account statements for accounts owned by Premier
   - Large, even dollar, hundred-dollar, thousand-dollar incoming transactions (deposits) and outgoing transactions (withdrawals)
   - Incoming and Outgoing transactions to or from the same entity on a frequent basis each month.

3. The findings here are not intended to illustrate all at risk transactions over the life of the Premier relationship. Based on my 35 years' experience in financial crime prevention, detection and reporting, a complete forensic review would reveal many more such transactions.

4. This report provides details of transactions that clearly indicate that HNB allowed Premier free and unfettered access to uncollected funds and are indicative of check-kiting/transaction-kiting and other fraudulent activity. The check kiting scheme is a direct result of HNB permitting Premier to sell the collateral to merchant cash advance (MCA) businesses. Financial crime transactional behavior was evidenced since at least September 2019. Although HNB had all of the necessary information to have identified the kiting scheme dating back to at least September 2019, HNB's decision to not act until early 2020 was "too little; too late".

## VI. RELEVANT REGULATORY BACKGROUND AND SUMMARY

### A.  Definition of Kiting and the Use of Uncollected Funds Evidence Kiting Schemes

1. Kiting[9] refers to a fraudulent financial practice where account holders manipulate bank accounts to create artificial balances in order to cover short-term financial needs. This is often done by issuing checks without sufficient funds, exploiting transaction delays to create an illusion of available funds, or transferring bad checks between accounts to cover deficits. Kiting is illegal. This case presents a blatant example of transaction kiting assisted by HNB. In this case, HNB facilitated the kiting by allowing checks to be processed despite insufficient collected funds, thereby enabling fraudulent activity.

2. Check kiting is a type of bank fraud that exploits the delay between the time the check is deposited, and funds are actually received by the bank. It involves using multiple accounts at different banks to write checks without sufficient funds, temporarily covering deficits by moving money back and forth. When the scheme collapses, banks incur losses because the deposited checks were not backed by actual money.

---

[9]OCC Advisory Letter 96-6 Check-Kiting, Funds Availability, Wire Transfer Activity, dated August 6, 1996 (https://www.occ.gov/news-issuances/advisory-letters/1996/advisory-letter-1996-6.pdf)

3. Uncollected funds[10] refer to money that has been deposited into an account but hasn't yet been cleared through the banking system. For example, when you deposit a check, your bank may show the deposit as part of your balance, but it takes a day or more for the check to move through the Federal Reserve system and for your bank to actually receive the money from the issuing bank. During that time, those dollars are "uncollected." If you spend or transfer that money before it clears, and the check turns out to be bad, your account will be overdrawn. In a check-kiting scheme, the fraudster relies on these uncollected funds to create the illusion of a larger account balance than actually exists.

## B.  Relevant Banking Regulations

1. HNB is required to abide by federal and state banking laws, regulations, and guidelines, including the USA Patriot Act, the Bank Secrecy Act ("BSA") and related anti-money laundering regulations ("AML").  BSA/AML provisions require financial institutions[11], among other things, to develop: (a) effective compliance programs to detect and prevent money laundering and kiting activity, (b) effective customer due diligence systems and ongoing transaction surveillance monitoring programs, and (c) an effective suspicious activity monitoring and reporting process. If suspicious activity that might signal criminal activity is detected, financial institutions are obligated to file suspicious activity reports ("SARS") with the U.S. Treasury's Office of Financial Crimes Enforcement Network ("FinCEN").

2. In addition to these regulatory requirements, HNB must ensure that its internal controls and employee training are robust enough to support ongoing compliance and foster a culture of vigilance against financial crimes. The implementation of comprehensive internal policies and controls, strong monitoring systems, regular audits, and continuous staff education are essential elements to ensure that the organization can recognize and respond appropriately to suspicious indicators, thereby reinforcing the bank's commitment to compliance and public trust. If HNB had adhered to these standards, HNB could have met its legal obligations, upheld the integrity of the financial system and contributed to the prevention of illicit activities that could undermine the public's confidence in banking institutions. But HNB failed to do so.

3. A purpose of these regulations is to ensure that banks, which are often in the best position to identify potentially illegal activity, will closely observe the transactions taking place in their clients' accounts. BSA/AML guidance instructs banks and other financial institutions regarding how best to achieve that goal, and what actions to take once suspicious activity is identified. Moreover, under federal and state law, HNB has a duty to operate in a manner that protects the public interest, maintains public confidence in its business, and maintains sound conduct of its business.

4. In fulfilling these obligations, banks are required to implement thorough Know Your Customer ("KYC") procedures at the onset of each customer relationship, establishing a foundation to identify potentially suspicious activity as transactions occur. By understanding the nature of each customer's business and monitoring ongoing account behavior, banks can better recognize deviations from expected patterns, thereby strengthening their capacity to

---

[10] Understanding Uncollected Funds: Process, Benefits, and Examples, Investopedia

[11] Federal Financial Examination Counsel, Bank Secrecy Act/Anti Money Laundering Examination Handbook (FFIEC BSA/AML Examination Manual)

detect financial crimes. This proactive approach not only aids in distinguishing legitimate transactions from those that may indicate illegal conduct but also enhances the effectiveness of alert management, investigations, and the reporting of suspicious activity to regulatory authorities. Ultimately, this diligence is vital to safeguarding the integrity of the banking system and upholding public trust.

5. Banks, including HNB, are required to have in place systems and processes that trigger alerts when suspicious activity or "red flags" exist. Regulators have identified common "red flags" which include, but are not limited to, unexplainable, repetitive and unusual transactions in bank accounts, high-volume payments without logical explanation, transfers sent and received by the same person using different accounts, immediate withdrawal of deposited funds, and payments from accounts with insufficient funds.

# VII. FACTUAL BASIS OF OPINIONS[12]

## A. HNB Knew Premier Was in a Higher-Risk for Financial Crime Industry

1. Healthcare is considered to be inherently at a higher risk for financial crime as documented in Department of the Treasury National Money Laundering Risk Assessment (NMLRA).[13] In part the NMLRA states "Healthcare fraud continues to generate significant proceeds and victimize government programs as well as private entities. In fiscal year 2022, health care fraud remained a leading source of False Claims Act settlements and judgments. Accordingly, the DOJ and federal law enforcement agencies devote significant resources to combating this type of fraud, including through the development of a "strike force" model of investigative and prosecutorial resources. In Fiscal Year (FY) 2022, the U.S. Sentencing Commission received 431 cases of healthcare fraud, and 90 percent of all healthcare offenders were U.S. citizens. Schemes often involve hundreds of millions, if not billions, of dollars generated through fraudulent activity and run the gamut from corporate fraud, bribery, and kickbacks, to activity resulting in the illicit distribution and diversion of narcotics. These large-scale fraud schemes increase healthcare costs, waste limited resources, and cause an increased risk of mortality. Investigators and prosecutors have employed innovative methods to target particularly egregious activity, given the complexity of these schemes." As such, Healthcare fraud is inherently high risk.

2. On June 30, 2024, the US Department of Justice "announced the results of its 2025 National Health Care Fraud Takedown, which resulted in criminal charges against 324 defendants, including 96 doctors, nurse practitioners, pharmacists, and other licensed medical professionals, in 50 federal districts and 12 State Attorneys General's Offices across the United States, for their alleged participation in various health care **fraud schemes involving over $14.6 billion** in intended loss."[14]

---

[12] See Exhibit 2 for a list of items reviewed.

[13] Healthcare Fraud (pgs. 9-12 2024 National Money Laundering Risk Assessment (NMLRA) (treasury.gov))

[14] National Heath Care Fraud Takedown Results in 324 Dependents Charged in Connection with over $14.6 Billion in Alleged Fraud. (Office of Public Affairs | National Health Care Fraud Takedown Results in 324 Defendants Charged in Connection with Over $14.6 Billion in Alleged Fraud | United States Department of Justice)

**B. HNB Failed to Timely Terminate Its Relationship with Premier (Or Take Any Other Mitigating Action) Despite Having Substantial Evidence That Premier Was Continually Engaging in A Pattern of High Risk Financial Crime Activity.**

1. Sound banking practice and regulatory legal requirements and guidance required HNB to "know its customer" and understand Premier's healthcare business operations in order to maintain a robust customer due diligence program. This knowledge would allow HNB to predict the types and volume of transactions Premier related entities would conduct so that HNB could identify any abnormal/unusual/suspicious activity. However, HNB did not recognize the inherently high risk nature of the Premier business line and as such, failed to timely identify Premier's high risk for financial crime transactions.

2. To achieve this goal HNB created a Healthcare business unit with employees that are experts in understanding the associated credit risk and other units responsible for understanding the financial crime, operational, compliance and other risks associated with such entities. However, it is obvious individually and collectively, through these units, HNB failed to monitor this relationship across multiple risk profiles that would have effectively identified abnormalities within some of the deposit accounts.

3. Under any effectively operating controls environment, the Premier entities would have been considered high risk for financial crime and subject to enhanced due diligence (EDD), including scheduled, routine periodic review, from the inception of the relationship. However, there is no evidence that HNB ever conducted EDD during the life of the Premier relationship.

4. Normal practice would require HNB to use information provided at account opening and/or because of continuous enhanced due diligence and surveillance monitoring, HNB would assign a Financial Crime risk rating to the Premier related accounts based on a full understanding of the Premier Relationship. This risk rating and review would allow HNB to monitor the Premier family of entities at the transaction, account and relationship level[15][16] for abnormal, unusual and/or suspicious behavior. When HNB saw such behavior, it was required to assess the reasonableness of continuing the relationship and, at a minimum, perform enhanced monitoring if it chose to continue offering banking services to clients exhibiting such high risk for financial crime behavior. HNB does not appear to have done this.

5. While in certain instances, the result of any such assessment could be remedial measures to enable the high risk for financial crimes relationship to continue. Sufficient analysis of the Premier relationship should have resulted in HNB developing an immediate relationship

---

[15] Evaluation of the Bank's current methodology for quantifying the level of BSA/AML risk associated with specific customers. This evaluation shall result in the development of a comprehensive approach to quantifying BSA/AML risk for new and existing customers. The quantification of risk shall encompass a customer's entire relationship with the Bank, include the purpose of the account, actual or anticipated activity in the account (e.g., type and volume (number and dollar) of transaction activity engaged in), nature of the customer's business or occupation, customer location (e.g., customers' geographic location and where they transact business), types of products and services used by the customer, material changes in the customer's relationship with the Bank, as well as other factors discussed within the FFIEC BSA/AML (pg. 9, OCC 2012 Cease and Desist Order--Citibank, NA *nr-occ-2012-57a.pdf)

[16] Evaluation of the Bank's current methodology for identifying and quantifying the level of BSA/AML risk associated with categories of customers and for specific customers. The methodology should ensure that the relationships are reviewed holistically, across lines of business, taking into consideration the risk within the Bank. This evaluation shall result in the development of a comprehensive approach to quantifying BSA/AML risk for new and existing customers. The quantification of risk shall encompass a customer's entire relationship with the Bank, include the purpose of the account, actual or anticipated activity in the account (e.g., type, volume, and value (number and dollar) of transaction activity engaged in), nature of the customer's business or occupation, customer location (e.g., customers' geographic location, where they transact business, and have significant operations), types of products and services used by the customer, material changes in the customer's relationship with the Bank, as well as other factors discussed within the FFIEC BSA/AML Examination Manual, (pg. 10, OCC 2013 Cease and Desist Order---JP Morgan/Chase *nr-occ-2013-8a.pdf)

exit strategy/escape plan at least as far back as September 2019.  Instead of doing this, HNB initiated and continued its business relationship with Premier in the face of strong and continuing evidence that the customer was utilizing the bank accounts for fraud.

6. To comply with industry standards, HNB and its personnel were also required to take appropriate action once indicators of money laundering/financial crime were identified (examples of money laundering "red flags" are listed in the 2007 FFIEC BSA/AML Examination Manual and future editions).

7. Based on information provided for my review and analysis, the following "red flag" indicators of money laundering/financial crime activity were applicable to the Premier relationship. This list is not intended to be exhaustive, but sufficient to illustrate the obvious and problematic activity in the Premier related accounts.

   a) Many funds transfers are sent in large, round dollar, hundred dollar, or thousand-dollar amounts.

   b) Funds transfer activity is unexplained, repetitive.

   c) Unusual transfers of funds occur between related accounts or among accounts that involve the same or related principals.

   d) Transactions inconsistent with the accountholder's business.

   e) Transfers of funds among related accounts.

   f) Depositing funds from various entities into one account that are later consolidated into a single transfer to a master account. Large fund transfers sent in round dollar amounts.

8. Customers who present these "red flags" clearly possess elevated risks of money laundering or terrorist financing (i.e., higher risk profile customers) and increase a bank's exposure to increased risk. Accordingly, due diligence policies, procedures, and processes should specify both the circumstances under which additional customer information is required and the nature of that information, based on each customer's risk profile and the particular risks involved. Gathering supplementary data about higher-risk customers—known as enhanced due diligence (EDD)—constitutes an essential component of a robust due diligence framework.  Although HNB's policy does require this, HNB failed to follow its own policy.

9. In line with a risk-based approach, banks should take extra steps when facing higher risks and work to reduce risks overall. For customers with higher risk profiles, both their information and transactions need to be checked more carefully when accounts are opened and reviewed more often during their relationship with the bank. Banks should also set clear policies and procedures to decide if and when it is necessary to gather and review additional customer information—such as using negative media searches—based on the level of risk involved. There is no evidence that HNB took these extra measures for the Premier Relationship.

10. The bank's risk-based customer due diligence and enhanced due diligence procedures must comply with existing regulations and fulfill supervisory expectations. Updating customer information is an event-driven process that typically arises from ongoing monitoring. A common indication of a significant change in the customer's risk profile includes transactions or activities that do not align with the bank's understanding of the customer's relationship or risk profile.

11. Bank procedures should clearly define the criteria for reviewing customer relationships, specifying when and by whom updates to customer information and reassessments of risk profiles should be conducted. The procedures must also clarify which individuals within the organization have the authority to modify a customer's risk profile.

12. HNB's Customer Due Diligence Policy (HNB_SCH_0063341) does mention the need to conduct EDD on high-risk clients.  The policy limits discussion on EDD to the following:

13. (HNB_SCH_0063341, page 6)
**Enhanced Due Diligence (EDD) on High Risk Customers (HRC)**

Huntington business units have established procedures to perform due diligence on high risk customers as defined by this Policy. These procedures include a referral process to the Customer Risk Management (CRM) Team, as well as a process to obtain approval for High Risk Customers, when warranted.  The BSA/AML Customer Due Diligence group (CDD group) is responsible for conducting and coordinating EDD reviews and conducting periodic reviews of high-risk accounts and relationships commensurate with the level of risk.

14. (HNB_SCH_0063341, page 15)
**Enhanced Due Diligence (EDD):**  Certain customers either by their business activity, ownership structure, or because they conduct high risk transactions or do business in or with high risk geographic locations may pose a higher AML Risk to Huntington. EDD policy, procedures and processes require Huntington to perform EDD on these customers to mitigate the risk – such as but not limited to, the purpose of the account, source of funds and wealth, beneficial owners of the accounts, description of the business operations, anticipated volume of currency, total sales and the customer's primary trade area including if international transactions are expected.

15. As outlined in this report, health care is considered as high risk for money laundering. Accordingly, HNB's policy, in alignment with regulatory standards and guidance, would designate Premier as a high-risk client whose inherent profile requires enhanced due diligence (EDD). We requested copies of all EDD monitoring events connected to the Premier group of health care facilities during the life of the Premier relationship.  HNB advised that no EDD documentation was available. If EDD had been conducted on an ongoing basis as required, record retention regulations would necessitate the preservation of such documentation.

16. The lack of EDD events illustrates either a lack of understanding of the high-risk nature for money laundering in the health care industry or an improper execution of the policy expectations.  Either way, HNB did not follow its own policy and as such failed to recognize the many indicators of fraud discussed throughout this Report.  Such failure had a negative impact on Mr. Schneider.

**C. Unusual Banking Activity in Premier Related Accounts Was Inappropriately Ignored By HNB (within three different categories of transactions that are high risk for financial crime).**

1. Based on HNB bank records, HNB identified 576 deposit transactions in the amount of $202,557,879.22 consistent with check kiting (HNB_SCH_0067117, HNB_SCH_0067118) in a period of less than three months December 2, 2019-February 20, 2020).  The vast majority of these transactions that were cleared through HNB were even dollar transactions with some individual transactions in excess of $500,000 drawn against uncollected funds (a clear indicator of a check and transaction kiting scheme).

2. Furthermore based on my review of four business checking accounts between September 2019 through April 2020,  I identified 1,035 business checking account transactions total-

ing $126,003,272.58 that fit the attributes of criminal behavior.  Based on HNB records, HNB took no action (HNB_SCH_0074349) on these transactions.

3.  Thirdly, of the 1,035 high risk transactions through these four business checking accounts, there were over 360 payments totaling over $4.4 million dollars paid to MCAs to help facilitate Premier's sale of HNB collateral out of trust in excess of $80 million (HNB_SCH_0034173).

4.  Although HNB had all of the necessary information to have identified the kiting scheme dating back to at least September 2019, HNB's decision to not act until early 2020  was "too little; too late".  Based on a review of bank statements for Premier Health Care Management, Inc (xxx7783), HNB permitted Premier access to uncollected funds for a fee dating back to at least December 2018.  This behavior continued through February 2020 in amounts that exceeded $1 million dollars in uncollected funds for each month January ($1,782,001.53) and February 2020 ($1,315,805.08).  The table below reflects the average float, negative uncollected funds, and the revenue generated over this period with substantial increase in December 2019.

**Premier Health Care Management, Inc. xxx7783**

| SCH Bate number | Statement Date | Average Float | Average Negative Collected Balance | Use of Uncollected Funds (Revenue) | Service Charge (Revenue) |
|---|---|---|---|---|---|
| HNB_SCH_0068672 | Oct-18 | $          0.00 | $          0.00 | $    0.00 | $    752.92 |
| HNB_SCH_0068628 | Nov-18 | $        (10.00) | $          0.00 | $    0.00 | $    756.83 |
| HNB_SCH_0068633 | Dec-18 | $     (3,255.07) | $     (4,322.79) | $   33.04 | $    984.54 |
| HNB_SCH_0068437 | Apr-19 | $  (119,156.30) | $    (21,241.77) | $  161.47 | $    776.88 |
| HNB_SCH_0068485 | May-19 | $   (98,830.09) | $     (6,588.41) | $   51.75 | $    735.56 |
| HNB_SCH_0068532 | Jun-19 | $   (67,498.32) | $     (2,485.46) | $   10.12 | $    945.63 |
| HNB_SCH_0068579 | Jul-19 | $   (61,110.42) | $          0.00 | $    0.00 | $ 1,087.70 |
| HNB_SCH_0068579 | Aug-19 | $   (87,103.21) | $    (34,427.01) | $  263.15 | $ 1,503.44 |
| HNB_SCH_0064266 | Sep-19 | $  (134,921.54) | $    (41,657.77) | $  308.07 | $ 1,672.56 |
| HNB_SCH_0064243 | Oct-19 | $  (255,583.65) | $   (133,817.90) | $  994.46 | $ 2,544.91 |
| HNB_SCH_0064266 | Nov-19 | $  (620,148.20) | $   (185,088.33) | $ 1,293.07 | $ 2,854.43 |
| HNB_SCH_0064112 | Dec-19 | $(1,603,251.43) | $   (878,253.05) | $ 6,340.24 | $ 8,076.00 |
| HNB_SCH_0068468 | Jan-20 | $(2,360,510.51) | $(1,782,001.53) | $12,829.43 | $14,618.98 |
| HNB_SCH_0064136 | Feb-20 | $(2,333,893.13) | $(1,315,805.08) | $ 8,861.90 | $10,448.52 |
| HNB_SCH_0064192 | Mar-20 | $   (54,234.96) | $    (10,897.18) | $   64.60 | $ 2,069.44 |
| **Total Fees** | | | | **$31,211.30\*** | **$49,828.34** |

\*HNB stated "Charge for use of funds that have been deposited for which Huntington has not received credit from the paying bank…Rate is Prime +3.75%." (HNB_SCH_0006844).

5.  The table above shows that HNB prioritized increasing revenue over protecting the bank from fraudulent activities by allowing Premier access to uncollected funds. This indicates that HNB was aware of the high-risk nature of these transactions but still chose revenue at the expense of safe banking practices. HNB identified 576 deposit transactions totaling $202,557,879.22 that were consistent with check kiting (HNB_SCH_0067117,

HNB_SCH_0067118). Allowing Premier access to uncollected funds resulted in significant financial harm to Mr. Schneider—a consequence that arose only because HNB prioritized revenue over prudent banking standards.

6. In addition to the above evidence of fraud, I selected additional Premier related business checking accounts for analysis.  My first step in selecting these accounts as those indicative of high risk for financial crime transactions was to review Premier related bank statements in order to gain an understanding of the type and volume of transactions going through accounts on a monthly basis.  Based on that review, I noticed many transactions through several accounts that would be consistent with operating health care facilities, specifically incoming transactions from health care insurance providers including, but not limited to, well-known nationwide insurance companies, Medicare and Medicaid.

7. However, the deposit accounts identified and discussed below were not consistent with normal and expected transactions identified in many of the accounts.  I identified the following abnormal activity consistent with the Red Flags that reflects a high risk of financial crime, including money laundering and fraud.  In order to determine if there was evidence of unusual transactions I analyzed HNB Account deposit account statements for the following Premier related accounts:

| Account Name | Time Period |
| --- | --- |
| Premier Health Care Mgmt. Concentration (xxx8435) | September 2019-April 2020 |
| Moran Road Realty LLC (xxx8668) | September 2019-March 2020 |
| Beechwood Terrace dba Forest Hills (xxx0489) | March 2020-June 2020 |
| Beechwood Terrace Care Center, INC dba Forest Hills Care Center (xxx8587) | September 2019-April 2020 |
| Keller Road Realty Co. LLC (xxx8749) | February 2020-June 2020 |
| Pleasant Ridge Care Center, Inc. (xxx8529) | September 2019-April 2020 |
| Ivy Health Care, Inc. (xxx8480) | September 2019-April 2020 |

8. The tables below demonstrate the significant change, over a relatively short period in time where:
   - the dollar amount and the number of monthly transactions,
   - the high number of even dollar, hundred-dollar and thousand-dollar transactions; and,
   - additional transactions with MCA constituting to the illegal sale of Premier collateral (accounts receivables) out of trust.[17] Such disregard for banking laws, regulations and regulatory expectation placed the safety and soundness of the HNB's operations at risk. (see tables below).

9. As of the date of this report, I have not been provided with any evidence that HNB identified any of these transactions as suspicious as mandated under the USA Patriot Act.  As such, I conclude these transactions were suspicious at the time and that HNB had knowledge of these transactions (based simply on the fact that these transactions were

---

[17] An "out-of-trust" sale occurs when a borrower sells the asset used as collateral for a loan but does not immediately use the proceeds to repay the corresponding debt.

captured in bank statements, in official records and would be captured as high risk for financial crime as part of a minimally acceptable transaction surveillance system)

10. The decision to do nothing reflects badly on HNB and its commitment to comply with US anti-money laws resulting in an increase in the loss that could have been avoided by providing minimally acceptable proper care. Had HNB executed a proper and effective account management program for Premier the loss to HNB, if any, would have been much less and therefore Mr. Schneider's exposure, if any, would be greatly reduced.

**D. Business Checking Accounts That Exhibit Significant Growth in Dollar Volume of Transactions Are considered High Risk for Financial Crime Unless There Is a Business Necessity.**

1. Accounts exhibiting significant growth (in the number and dollar volume of transactions month over month and are inconsistent with the legitimate business activity) is indicative of behavior that a minimally acceptable transactions surveillance system would be mandated to identify and review. The tables that follow illustrate significant growth month over month from September 2019 – May 2020, in some cases.

Premier Health Care Management, Inc Concentration

| Bank Statements | Opening Balance | Incoming Transactions | Outgong Transactions | Ending Balance |
|---|---|---|---|---|
| Premier Health Care Mgnt | | | | |
| Concentration  xxx8435 | | | | |
| January 1-31, 2020 | $ 719,812.84 | $ 20,801,827.71 | $ 19,901,934.39 | $ 1,619,706.26 |
| February 1-29, 2020 | $ 1,619,706.26 | $ 17,279,950.69 | $ 18,874,656.93 | $ 25,000.00 |
| March 1-31, 2020 | $ 25,000.00 | $ - | $ - | $ 25,000.00 |
| April 1-30, 2020 | $ 25,000.00 | $ 25,000.00 | $ 50,000.00 | $ - |

2. I captured the Premier Health Care Management, Inc Concentration account (above) due to the significant volume of incoming and external transactions. The exceptionally large quantity and amount of these transactions in and of itself is overwhelming and sufficient that any minimally acceptable, legally mandated, transaction surveillance system would have identified the relationship for review in order to determine its legitimacy. As of the date of this report, I have not been provided any evidence that HNB identified this behavior as abnormal.

Moran Road Realty, LLC

| Bank Statements | Opening Balance | Incoming Transactions | Outgong Transactions | Ending Balance |
|---|---|---|---|---|
| Moran Road Realty, LLC xxx8668 | | | | |
| September 1-30, 2019 | $ 530.67 | $ 11,000.00 | $ 11,337.00 | $ 193.67 |
| October 1-31, 2019 | $ 193.67 | $ 11,500.00 | $ 11,337.00 | $ 356.67 |
| November 1-30, 2019 | $ 356.67 | $ 328,000.00 | $ 318,500.00 | $ 9,856.67 |
| December 1-31, 2019 | $ 9,856.67 | $ 1,034,700.00 | $ 969,797.00 | $ 75,759.67 |
| January 1-31, 2020 | $ 74,759.67 | $ 1,407,500.00 | $ 1,423,485.85 | $ 60,773.82 |
| February 1-29, 2020 | $ 60,773.82 | $ 1,618,158.99 | $ 1,618,015.79 | $ 60,917.02 |
| March 1-31, 2020 | $ 60,917.02 | $ 999,900.00 | $ 1,037,922.92 | $ 22,894.10 |

3. The above table illustrates that significant growth in dollar value of transactions in, through and out of the Moran Road Realty, LLC increased significantly in November 2019, compared to September and October 2019 dollar volume of transactions and then incoming transactions and outgoing transactions grew over three times December 2019 to January

2020. Such substantial growth month after month is abnormal/unusual/suspicious because mature businesses do not typically grow at such volume.

4.  Later in the report, I will show that transaction volumes rose sharply, and many amounts were even-dollar, hundred-dollar, or thousand-dollar transactions—unlike other activity in this account.  Such abnormal transactions should have been identified under a minimally acceptable transactional surveillance system.  As of the date of this report,  I have not been provided with any evidence of any review of transactions through this account that could provide a reasonable assurance that these transactions were consistent with normal and expected business practices.

### Beechwood Terrace dba Forest Hills

| Bank Statements | Opening Balance | Incoming Transactions | Outgong Transactions | Ending Balance |
|---|---|---|---|---|
| Forest Hills Opp Acct  Beechwood | | | | |
| Terrance Care Center  xxx8587 | | | | |
| December 1-30, 2019 | $            - | $    7,233,268.08 | $    7,233,268.08 | $            - |
| January 1-31, 2020 | $            - | $    7,233,268.08 | $    7,233,268.08 | $            - |
| February 2-29, 2020 | $            - | $    8,203,297.44 | $    8,147,563.36 | $     55,734.08 |
| March 1-31, 2020 | $     55,734.08 | $    1,382,826.17 | $    1,417,733.80 | $     20,826.45 |
| April 1-30, 2020 | $     20,826.45 | $    1,293,369.99 | $    1,314,196.44 | $            - |

5.  The above table illustrates that significant "churn" (transaction turnover, where incoming transactions equal outgoing transactions) in a manner inconsistent with traditional legitimate business transactions.  This is evidenced in both December 2019 and January 2020 deposit bank statements for Beechwood Terrace dba Forest Hills monthly bank statement provided and analyzed.  This activity alone is of sufficient volume that any minimally acceptable, legally mandated, transaction surveillance system would identify for review to determine its legitimacy.

6.  As of the date of this report, I have not been provided any evidence that HNB identified this behavior as abnormal.  As such, I must conclude these transactions were not captured or assessed.

### Pleasant Ridge Care Center, Inc.

| Bank Statements | Opening Balance | Incoming Transactions | Outgong Transactions | Ending Balance |
|---|---|---|---|---|
| Pleasant Ridge Care Center xxx8520 | | | | |
| November 1-30, 2019 | $            - | $    1,996,779.22 | $    1,996,779.22 | $            - |
| December 1-31, 2019 | $            - | $    8,520,910.00 | $    8,520,910.96 | $            - |
| January 1-31, 2020 | $            - | $   11,911,786.81 | $   11,911,786.81 | $            - |
| February 1-29, 2020 | $            - | $   10,832,202.01 | $   10,408,023.23 | $    424,178.48 |
| March 1-31, 2029 | $    424,178.48 | $      648,993.18 | $    1,065,976.23 | $      7,195.44 |
| April 1-30, 2020 | $      7,195.44 | $      388,257.16 | $      395,452.60 | $            - |

7.  The above table illustrates that significant growth in dollar value of transactions in, through and out of the Pleasant Ridge Care Center, Inc.  increased over four times November to December 2019.  That alone is abnormal/unusual/suspicious because mature businesses do not typically grow at such volume.  Later in the report, I will illustrate that not only did the dollar volume significantly increase but that the transitions themselves were in even-dollar, hundred-dollar or thousand-dollars amounts, which were inconsistent with the other transactions through these accounts.

### Ivy Health Care, Inc

| Bank Statements | Opening Balance | Incoming Transactions | Outgong Transactions | Ending Balance |
|---|---|---|---|---|
| Ivy Woods Health Center xxx8749 | | | | |
| September 1-30, 2019 | $          - | $          64,571.75 | $          64,571.75 | $          - |
| October 1-30, 2019 | $          - | $        120,542.94 | $        120,542.96 | $          - |
| November 1-30, 2019 | $          - | $     2,615,317.90 | $     2,615,317.90 | $          - |
| December 1-31, 2019 | $          - | $     7,686,027.57 | $     7,686,027.57 | $          - |
| January 1-31,  2020 | $          - | $     7,786,169.18 | $     7,786,169.18 | $          - |
| February 1-29,  2020 | $          - | $     6,851,065.27 | $     6,812,908.10 | $     38,157.17 |
| March 1-31,  2020 | $     38,157.17 | $        490,271.86 | $        513,899.31 | $     14,529.72 |
| April 1-30,  2020 | $     14,529.72 | $        667,848.47 | $        682,414.19 | $          - |

8. The above tables illustrate that significant growth in dollar value of transactions in, through and out of the Ivy Health Care, Inc deposit account almost doubled from September 2019 to October 2019. After which the volume of transactions increased 20 times from October 2019 to November 2019 and then nearly tripled from November 2019 to December 2019. This behavior is abnormal/unusual/suspicious because mature businesses do not typically grow at such volume. Additionally, I note the significant churn in a manner inconsistent with traditional legitimate business transactions. This is evidenced in each monthly deposit account statement from September to December 2019.

**E. HNB Failed to Execute a Minimally Acceptable Transactions Surveillance Monitoring System Designed to Timely Identify and Assess Suspicious Activity In, Through, and Out of Premier Related Business Checking Accounts.**

1. Money launderers are known to send funds to internal or related accounts in even dollar amounts because it is an uncomplicated way to move funds and easy to track. Often criminals will then continue to wire funds to other related accounts to give the appearance of legitimacy.  Finally, there is no business necessity or reason for so many even-dollar transactions with related accounts.  Like individuals, business transactions do not routinely end in even-, hundred- and thousand-dollar increments, thus making such transactions unusual.

2. In the absence of any specific regulatory guidance specifying how banks should monitor, banks generally rely on existing processes and systems designed to comply with the BSA regarding the prevention, detection, recordkeeping, and reporting (internally and to the U.S. Government) of financial crimes.

3. The most obvious, most routine, well known and well-established scenario used by banks, for over 30 years, to identify suspicious activity captures transactions that are large (relative to other transactions in an account) round-dollar, hundred-dollar, or thousand-dollar amounts.

4. Since the mid 1990's, regulatory agencies, law enforcement and banker training events have warned banks of such suspicious activity, expecting covered entities such as HNB to build the recognition of such obvious, abnormal client behavior into a minimally acceptable transaction surveillance system that will identify, assess, and determine if transactions are suspicious in nature.

5. All banks are expected to take remedial action up to and including exiting the relationship to mitigate the risk of being used knowingly or unknowingly to help a client profit from criminal activity at, in, through and out of the bank.

6. During the review periods these Premier deposit accounts reflected a substantially increasing number and dollar volume of transactions that on the surface would not have a legiti-

mate business purpose and therefore evidence suspicious activity (see Tables below for details).

Premier Health Care Mgmt. Concentration (xxx8435)

| January 1-31, 2020 | Source/Destination | Incoming Transaction | Outgoing Transactions |
|---|---|---|---|
| 9-Jan | BUS ONL TFR TO CK xxx8668 | | $ 36,000.00 |
| 13-Jan | BUS ONL TFR TO CK xxx8668 | | $ 57,000.00 |
| 14-Jan | BUS ONL TFR TO CK xxx8668 | | $ 10,000.00 |
| 15-Jan | BUS ONL TFR TO CK xxx8668 | | $ 33,000.00 |
| 16-Jan | BUS ONL TFR TO CK xxx8668 | | $ 30,000.00 |
| 17-Jan | BUS ONL TFR TO CK xxx8668 | | $ 40,000.00 |
| 17-Jan | BUS ONL TFR TO CK xxx8668 | | $ 5,000.00 |
| 21-Jan | BUS ONL TFR TO CK xxx8668 | | $ 72,500.00 |
| 22-Jan | BUS ONL TFR TO CK xxx8668 | | $ 39,000.00 |
| 22-Jan | BUS ONL TFR TO CK xxx8697 | | $ 18,000.00 |
| 22-Jan | BUS ONL TFR TO CK xxx8736 | | $ 12,000.00 |
| 22-Jan | BUS ONL TFR TO CK xxx8684 | | $ 10,000.00 |
| 22-Jan | BUS ONL TFR TO CK xxx8710 | | $ 10,000.00 |
| 22-Jan | BUS ONL TFR TO CK xxx8707 | | $ 10,000.00 |

| February 1-29, 2020 | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 26-Feb | MISCELLANEOUS DEBIT | | $ 50,000.00 |
| 26-Feb | BUS ONL TFR TO CK xxx8668 | | $ 50,000.00 |
| 27-Feb | BUS ONL TFR TO CK xxx8590 | | $ 155,000.00 |
| 27-Feb | BUS ONL TFR TO CK xxx8532 | | $ 112,000.00 |
| 27-Feb | BUS ONL TFR TO CK xxx8558 | | $ 110,000.00 |

7.  The table below evidences HNB's failure to protect the bank against illegal activity in, through and out of various HNB business checking accounts. HNB knew these transactions occurred and that these transactions were not typical or normal because the bulk of these transactions were even- dollar amounts; and they represented a significant change in transactional activity compared to prior periods. As mentioned earlier in this report, even dollar transactions are higher risk for financial crime.

| Acct Name | Date | Total Transactions | Total Incoming | Total Outgoing | |
|---|---|---|---|---|---|
| Moran Road Realty LLC (xxx8668) | Nov-19 | 46 | $328,000.00 | $ 318,500.00 | |
| | Dec-19 | 69 | $ 1,035,600.00 | $ 957,798.00 | |
| | Jan-20 | 103 | $ 1,049,500.00 | $ 941,827.86 | |
| | Feb-20 | 125 | $ 1,618,158.00 | $ 1,417,514.80 | |
| | Mar-20 | 125 | $ 999,900.00 | $ 1,026,303.92 | |
| **Total** | | **468** | **$ 5,031,158.00** | **$ 4,661,944.58** | |
| | | | | | |
| Pleasant Ridge Care Center, INC (xxx8529) | Nov-19 | 9 | $ 1,010,000.00 | $ 870,000.00 | |

| | | | | | |
|---|---|---|---|---|---|
| | Dec-19 | 39 | $ 4,203,101.00 | $ 7,843,605.00 | |
| | Jan-20 | 50 | $ 9,435,157.00 | $10,521,310.00 | |
| | Feb-20 | 41 | $ 6,447,504.00 | $ 9,065,669.00 | |
| | Mar-20 | 24 | $ 243,000.00 | $ 921,000.00 | |
| | Apr-20 | 11 | $ 136,654.00 | $ 349,500.00 | |
| **Total** | | **174** | **$21,475,416.00** | **$29,571,084.00** | |
| | | | | | |
| Ivy Woods Health Care OP (xxx8480) | Nov-19 | 11 | $ 1,125,470.00 | $ 1,317,660.00 | |
| | Dec-19 | 30 | $ 7,394,325.00 | $ 1,849,419.00 | |
| | Jan-20 | 45 | $ 5,112,680.00 | $ 2,969,850.00 | |
| | Feb-20 | 49 | $ 4,675,821.00 | $ 3,366,587.00 | |
| | Mar-20 | 33 | $ 195,397.00 | $ 295,088.00 | |
| | Apr-20 | 21 | $ 309,837.00 | $ 632,736.00 | |
| **Total** | | **189** | **$18,813,530.00** | **$10,431,340.00** | |
| | | | | | |
| Forest Hill Op Acct (xxx8587) | Nov-19 | 10 | $ 1,415,000.00 | $ 1,112,000.00 | |
| | Dec-19 | 32 | $ 6,606,090.00 | $ 2,013,727.00 | |
| | Jan-20 | 31 | $ 6,523,220.00 | $ 3,092,931.00 | |
| | Feb-20 | 51 | $ 6,321,687.00 | $ 5,336,440.00 | |
| | Mar-20 | 60 | $ 509,801.00 | $ 1,112,666.00 | |
| | Apr-20 | 20 | $ 792,758.00 | $ 1,182,480.00 | |
| **Total** | | **204** | **$22,168,556.00** | **$13,850,244.00** | |
| | | | | | |
| *Grand Totals:* | | *1035* | *$67,488,660.00* | *$58,514,612.58* | |
| *Total Suspicious Transactions through HNB (four accounts over 6 months* | | | | | *$126,003,272.58* |

**F.  HNB Failed to Identify in excess of $4.4 million Even Dollar Transactions Through Premier's  Business Checking Accounts used to fund the Merchant Cash Advances**

1)  Over a six-month period, HNB allowed Premier, on a daily basis, to move funds from another Premier account (see Incoming Transactions column below) that were to fund the illegal transactions (see Outgoing Transactions column below). Some of these transactions, which were sent to fund merchant cash advances (MCAs), represent only a portion of the volume of dollars (across various financial institutions) that Premier used illegally to fund the criminal behavior of Mr. Sosna (see Mr. Bobby Winstead Report, pgs. 28-30, September  25, 2025). These payments from these accounts exceeded $4.4 million that HNB knew were occurring and they did nothing as Premier was selling HNB collateral out of trust. This activity was clearly detrimental to Mr. Schneider as well as HNB's collateral position.

2) Based on bank records available and reviewed in the official HNB business checking accounts, HNB permitted Premier to steal collateral by selling future receivables to the following MCA organizations, as detailed in the tables below: Avanza Capital ADVANCEPYMT, PROSPERM, E Advance, EOM Advance, and Yes Capital Group. I have never observed such disregard for safe and sound practices. By choosing not to act HNB created obvious significant loss to the bank and to Mr. Schneider. Only HNB, through a minimally acceptable transaction surveillance system designed to identify criminal behavior, had knowledge of these transactions. Such critical information was not available to Mr. Schneider. (see summary of specific MCA numbers below; for a list of individual higher risk for financial crime transactions see Exhibit 3)



3) I was provided with a document (HNB SCH 0034173) that illustrated such activity occurring at the following banks as well: S&T Bank, First Financial and Fifth Third National Bank. Based on my understanding of this document, Premier sold future receivables out of trust in a total amount in excess of $80 million dollars to these predatory organizations and received only $43 million dollars, at a loss of $38 million dollars.

4) Had HNB followed minimal procedures and controls, HNB could have protected the collateral, stopped the illegal activity as early as January 2020. Instead, HNB chose to become a willing participant in the criminal scheme while HNB permitted the collateral to "walk out the door" as evidenced by my review of the monthly business checking account bank statement, which represent official bank records.

5) By choosing not to perform minimal investigation into these voluminous (in number and total dollar volume) transactions, HNB was left with a wholly deficient collateral base that ultimately resulted in significant loss to the bank and was adverse to Mr. Schneider's interest. Had HNB properly monitored this relationship and the receivables they held as collateral, the loss to the bank would have been insignificant. Mr. Schneider's actual exposure as a guarantor would be equally insignificant.  HNB chose to participate in this scheme and knowingly put its collateral at risk without the knowledge of Mr. Schneider.

6) In addition to the MCA transactions discussed above, there were other indicators of heightened risk for financial crime across each account analyzed. Specifically, there were a significant number of even-dollar, even hundred-dollar and even thousand-dollar Incoming Transactions (Deposits) that on the same day were captured as Outgoing Transactions (Withdrawals). On occasion there were large even thousand-dollar Incoming Transactions from a related account that were sent back to the same or another Premier related account (Outgoing Transactions).

---

[18] Regarding the "preventable losses" HNB counsel stated, "Had Plaintiff been aware of Defendant's fraudulent kiting and the Borrower's true financial condition, Plaintiff would have terminated the lending relationship with the Borrowers at an earlier point and would have taken earlier steps to enforce the Loan Documents and would have been able to recover more of Plaintiff's Collateral before the factoring to the merchant cash advance providers." ( HNB v. Harold Sosna, US Bankruptcy Court For The Southern District Of Ohio, Chapter 7, Case No:  1:23-bk12371, Paragraph 36)

7) Such transactions are reflective of the layering phase of money laundering.[19] These transactions reflect a client in trouble that knew, based on the ongoing failure to stop the activity, HNB would not act as evidenced by the fact that so many suspicious transactions, many consistent with criminal behavior, existed back to at least September 2019 and detailed in the tables (see Exhibit 3).

8) Criminals seek out financial service providers that have weak controls, including those intended to protect the bank collateral interest as well as banks that choose not to take any action against bad players using the bank for personal and illegal gain.

9) HNB's actions indicate it either improperly executed a minimally acceptable transactions surveillance system that would have illustrated criminal activity or chose to ignore the warning signs at its own peril. HNB is responsible for the holistic failures resulting in a significant loss to the bank and financial harm to Mr. Schneider.

10) By allowing Premier access to the US banking system, HNB knowingly permitted Premier to initially profit from the illegal actions by failing to properly monitor its collateral base and contributed to a future loss. By a simple review of certain Premier related bank statement, I immediately identified the actual transitions that illustrated Premier was conducting illegal transactions in, through and out of its HNB deposit accounts.

11) Based on the materials I reviewed, including HNB bank documents, HNB had numerous indications of suspicious and abnormal activity in the Premier-related accounts, but chose to not take proper actions up to and including initiating a relationship exit strategy/escape plan at least back to September 2019.

12) HNB chose to continue business as usual, allowed Premier to obtain unfettered access to the U.S. banking system which allowed him to continue to operate in manner that is unsafe and unsound placing HNB at financial risk and loss. The only reasonable conclusion is that HNB knew this relationship was rife with strong indicators of fraud yet chose to maintain the business relationship and do nothing.

## VIII. CONCLUSIONS

1. For 35 of my 42-year banking career, I actively helped the U.S. Government and domestic/foreign financial institutions ferret out financial crimes in, at, or through financial institutions, both domestically and internationally. It is obvious that fraudsters open accounts at

---

[19] Money laundering is the criminal practice of processing ill-gotten gains, or "dirty" money, through a series of transactions; in this way the funds are "cleaned" so that they appear to be proceeds from legal activities. Money laundering generally does not involve currency at every stage of the laundering process. Although money laundering is a diverse and often complex process, it basically involves three independent steps that can occur simultaneously. **Placement**. The first and most vulnerable stage of laundering money is placement. The goal is to introduce the unlawful proceeds into the financial system without attracting the attention of financial institutions or law enforcement. Placement techniques include structuring currency deposits in amounts to evade reporting requirements or commingling currency deposits of legal and illegal enterprises. An example may include: dividing large amounts of currency into less-conspicuous smaller sums that are deposited directly into a bank account, depositing a refund check from a canceled vacation package or insurance policy, or purchasing a series of monetary instruments (e.g., cashier's checks or money orders) that are then collected and deposited into accounts at another location or financial institution. Refer to Appendix G ("Structuring") for additional guidance. **Layering. The second stage of the money laundering process is layering, which involves moving funds around the financial system, often in a complex series of transactions to create confusion and complicate the paper trail. Examples of layering include exchanging monetary instruments for larger or smaller amounts or wiring or transferring funds to and through numerous accounts in one or more financial institutions. Integration**. The ultimate goal of the money laundering process is integration. Once the funds are in the financial system and insulated through the layering stage, the integration stage is used to create the appearance of legality through additional transactions. These transactions further shield the criminal from a recorded connection to the funds by providing a plausible explanation for the source of the funds. Examples include the purchase and resale of real estate, investment securities, foreign trusts, or other assets. (FFIEC BSA/AML Manual FFIEC BSA/AML Introduction - Introduction).

financial institutions with lax prevention and detection controls, which coupled with HNB's revenue-based culture created a welcoming environment for fraudsters, such as Premier, in need of unfettered access to the US banking system.

2. From the perspective of someone who worked for decades to prevent banks from being used by people to commit fraud, it is clear to me that the particular combination at HNB of a deficient BSA/AML program and controls on the one hand, and an overly-aggressive and unchecked revenue based culture (which prioritized revenue) created a perfect banking environment to allow fraudsters to freely commit financial crimes through a covered institution. The failure of risk controls and lack of open communication between business functions compromised compliance with financial crime prevention, detection and reporting legal and regulatory requirements.

3. Such lax controls and programs place any institution at the risk of actively and willfully promoting financial crime. Once the fraudsters know they can get by with operating their fraud at an institution, they will continue, and increase, the volume of illegal transactions at the institution. As such, fraud goes unprevented and is not reported to law enforcement and regulators. Such actions not only put the bank at risk by operating in an unsafe and unsound manner but also limit law enforcement's ability to conduct financial crime investigations.

4. As mentioned above, the regulatory expectations and legal requirements mandate covered financial institutions to perform routine, risk-based, due diligence on customers to ensure their understanding and the existence of a business client and that the client's activity is reasonable in volume, frequency and in amount equal with expectations. Healthcare businesses are considered higher risk by the financial service industry, prudential bank regulatory agencies, and law enforcement. HNB knew enough to recognize the risks and had information that would lead reasonable bankers to conclude that the Premier enterprises were engaged in financial crime and credit fraud. A financial institution exercising reasonable care at account opening and throughout the lifecycle of the banking relationship and monitoring of the accounts owned by/affiliated with Premier would have terminated these customer relationships and taken timely steps to minimize the financial loss to HNB.

5. Reasonable banking practices require assessments of the transactions at the account and relationship level. HNB was well aware that these accounts were all related. This is the case based upon several data points: change in number and volume of the large number and dollar value of wires and the change in the number of low dollar transactions (microlaundering) that appeared legitimate but when combined over a statement period were excessive in the dollar volume and number of transactions through certain Premier deposit accounts at HNB.

6. Obviously, I can only conduct my review based on the evidence available. The information provided revealed obvious indicators of financial crime. Based on this information, HNB should have exited the entirety of the relationship. Instead, HNB chose to ignore this information at many junctures to maintain and expand the Premier relationship with emphasis on revenue over operating a safe, sound, complaint banking organization.

7. Under any minimally acceptable designed BSA/AML compliance program such as those at HNB's peer financial institutions, the indications of fraud presented by Premier would have led that financial institution to terminate the relationship at the first indication of fraud.

8. HNB official documents and records clearly illustrated the Premier's related Healthcare operation, an obviously high-risk for financial crime customer, was engaged in deceptive/fraudulent conduct indicative of financial crime discussed in this report including sub-

stantial increase in the number and dollar volume of transactions, check kiting, a large number and volume of even thousand-dollar transactions and allowing Premier to sell its receivables to multiple third parties, at significant discount while the receivables were securing the substantial loans to Sosna enterprises.

9. HNB knew the most significant indicators of transaction based suspicious activity, through accounts reviewed and detailed here, were the inordinate growth in the number and dollar value of incoming funds and the corresponding value of outgoing funds, and multiple suspicious large, round dollar, hundred dollar, or thousand dollar amounts of incoming transactions from related or other companies. Finally, the increase in the number of low dollar funds transfers (micro laundering) collectively resulted in a large volume of suspicious transactions in each bank account for entities reviewed at, in or through HNB. HNB had access to all this information, all of which must be integrated into a minimally acceptable financial crime prevention, detection and reporting program as mandated, by law, for all US banks. HNB failed to act.

10. As a federally insured bank, HNB had and has an affirmative obligation to comply with the financial crimes laws, demonstrate a strong "Tone-From-The-Top"[20] and illustrate a voice of professional conscience through appropriately complying with the duty of care it owes to the U.S. Banking System and U.S. customers/consumers as well as the reputation and sustainability of HNB.

11. In my 35 years examining the largest national banks (domestically and internationally) and as consultant skilled in helping banks build successful financial crime prevention and detection programs, processes and systems, HNB egregious behavior is in a "class of its own" for its failure to execute a minimally acceptable due diligence and transactional surveillance programs to protect the collateral and as such, participated in such bad client behavior.

## X. SIGNATURE AND CERTIFICATION

1. I certify that the opinions expressed in this report are true, my own and are based on decades of experiences in ferreting out financial crime and knowledge of US banking laws, rules, regulations and regulatory guidelines, industry standards and review of relevant documents provided. I reserve the right to enhance and/or modify my opinions based on any new evidence provided.

_____           12/16/2025
Steven D. Lindsey                        Date

---

[20] "Strong governance is of paramount importance to controlling the bank's exposure to fraud, and a strong corporate culture against fraud is crucial regardless of a bank's size or complexity. The tone at the top sets the foundation on which the bank operates. The board and senior management have a responsibility to lead by example and demonstrate that the bank is serious about promoting ethical behavior to deter and prevent fraud. The board-adopted code of ethics (or code of conduct) should encourage the timely communication and escalation of suspected fraud through the appropriate oversight channel." (Operational Risk: Fraud Risk Management Principles, Governance, OCC Bulletin 2019-37, July 24, 2019).

Exhibit 1

Resume of Steven D. Lindsey

Steven D. Lindsey

Glasgow, Kentucky

---

**Chief Compliance Officer/Risk Officer/Director of BSA**

Extensive working knowledge (over 40 years) of financial regulatory requirements that affect corporate activities. Dedicated over 35 years demystifying financial crime/money laundering/bank secrecy, Office of Foreign Assets Control (OFAC) sanctions, consumer protection, community and fair lending laws, and rules and regulations for US and foreign bankers, examiners, and law enforcement agencies. Built measurable, sustainable, repeatable, risk-based compliance programs at banks and broker/dealers, eliminating the need for regulatory action, saving companies millions of dollars in civil money penalties and negative impact to reputation.

### Professional Experience

**Independent Contractor**                                                      **2014-Present**

1. Planned, led, and managed compliance risk assessment reviews at largest, complex domestic and foreign, banking institutions. Compliance areas include the following: financial crime/anti money laundering (AML)/Bank Secrecy Act (BSA), OFAC consumer protection, community reinvestment and fair lending laws rules and regulations.
2. Provided expert subject matter aid and guidance in enhancing, developing, and implementing compliance programs for the largest (top 10) and/or most complex financial institutions.
3. Developed remedial action plans for institutions subject to AML/BSA and compliance regulatory enforcement actions.
4. Consulted on a variety of regulatory matters, including new legislation, regulatory interpretations, revised Federal Financial Institution Examination Council's (FFIEC) examination procedures and guidelines and Dodd-Frank requirements
5. Supplied expert testimony

**Citigroup, Senior Director, Audit and Risk Review**                          **2011-2014**

1. Planned, led, and managed the building and execution of a BSA/AML enterprise-wide audit risk assessment from which audit plans will be designed. Compliance areas include the following: financial crime/anti-money laundering (AML)/Bank Secrecy Act (BSA), compliance systems, governance, training, CIP/CDD/EDD, suspicious activity monitoring, and OFAC as well as non-US anti money laundering requirements and expectations.

2. Supplied expert subject matter aid and guidance in enhancing, developing, and implementing global audit programs in a large and most complex financial service provider.
3. Identified criteria needed to develop an enterprise-wide internal audit risk assessment process for a global, large, complex company. Ultimately the process will navigate to other audit teams
4. Provided training to senior level audit team members on the three lines of defense and the ever-evolving audit expectations

**Independent Contractor**                                                                    **2010-2011**

1. Planned, led, and managed compliance risk assessment reviews at largest, complex domestic and foreign, banking institutions. Compliance areas include the following: financial crime/anti-money laundering (AML)/Bank Secrecy Act (BSA), consumer protection, community reinvestment and fair lending laws rules and regulations.
2. Supplied expert subject matter knowledge and guidance in enhancing, developing, and implementing compliance programs for the largest (top 10) and/or most complex financial institutions.
3. Developed remedial action plans for institutions operating under AML/BSA and compliance regulatory enforcement actions.
4. Consulted on a variety of regulatory matters, including new legislation, regulatory interpretations, revised Federal Financial Institution Examination Council's (FFIEC) examination procedures and guidelines and Dodd-Frank requirements

**SVB Financial Group, Santa Clara, CA**                                                    **2007–2009**
*Head of Compliance and Bank Secrecy Act (BSA)*
*Director of BSA*

1. Appointed by the Board of Directors to lead the development of SVB Financial Group's first risk-based compliance program primarily focused on the bank, broker/dealer and higher risk affiliates. Created a 'best in class compliance program that included financial crime/anti-money laundering (AML)/bank secrecy, affiliate transactions, consumer protection, community reinvestment, insider/affiliate transactions and SEC laws, rules, regulations, and regulatory expectations.
2. Appointed by Board of Directors as the official BSA Officer as required under regulatory requirements.
3. Strengthened regulatory relationships and ongoing effectiveness of the compliance program. Feedback from Regulatory agencies and Internal Audit confirmed a "best in class" status.
4. Directed all US regulatory applications and communications related to holding company expansion into foreign countries. Resulted in all applications being approved by the state of California and the Federal Reserve Bank of San Francisco.
5. Identified over 100 applicable regulations and developed a risk-based ranking process to ensure the Company was focused on the highest possible compliance risks. Established monitoring processes and templates to test highest risk areas.
6. Analyzed complex needs of holding company and its subsidiaries and as needed, partnered with the business units to create processes to achieve business line compliance with

federal laws, rules and regulations, as well as the banking laws of the 26 states in which
SVBFG operated.

7. Built, from the ground up, a Regulatory and BSA Monitoring Compliance Team of 25
employees. Responsibilities included creating an organizational structure commensurate
with business activity across the enterprise, finding compliance staffing needs, sourcing
internal and external candidates, and staffing with fully knowledgeable employees.

8. Developed strong relationships with cross-functional risk managers to ensure compliance
was an integral part of management's enterprise-wide risk assessment.

## Deloitte and Touché, LLP, Oakland CA                                    2003–2006
### *Senior Manager, Regulatory Consulting Services*

1. Planned, led, and managed compliance risk assessment reviews at large, complex domes-
tic and foreign, banking and broker/dealer institutions. Compliance areas include the fol-
lowing: financial crime/anti-money laundering (AML)/Bank Secrecy Act (BSA), con-
sumer protection, community reinvestment and fair lending laws rules and regulations.

2. Built a sustainable regulatory compliance business line resulting in an approximate $10
million increase in revenue over two years. Brought in new clients that offered repeatable
business resulting in a sustainable revenue stream.

3. Supplied expert subject matter knowledge and guidance in enhancing, developing, and
implementing compliance programs for a wide range of financial institutions.

4. Developed remedial action plans for institutions subject to AML/BSA and compliance
regulatory enforcement actions.

5. Created and conducted dozens of compliance presentations for government agencies, pro-
fessional associations, banks, insurance companies, broker/dealers, and other financial
entities.

6. Consulted on a variety of regulatory matters, including new legislation, regulatory inter-
pretations, and revised Federal Financial Institution Examination Council's (FFIEC) ex-
amination procedures and guidelines.

## Office of the Comptroller of the Currency (OCC)                        1983-2003
### *Asst. Deputy Comptroller for Compliance – Large Banks West (1999-2003)*
### *National Bank Examiner, Compliance – Large Banks East (1994-1999)*

1. Managed a team of compliance bank examiners responsible for ensuring large banks
were compliant and had sufficient audit programs in place. Also led the examination of
the largest national banks in New York and other northeastern states to ensure compliance
with the spirit and intent of Financial Crime/Anti-Money Laundering, Bank Secrecy, Of-
fice of Foreign Asset Control, Community Reinvestment, Consumer Protection and Dis-
closure, and Fair Lending laws, rules, and regulations

2. Supplied expert guidance and counsel on matters related to AML/BSA to US and foreign
governments, bankers, and regulators.

3. Led all large and complex banks' anti-laundering money regulatory examinations of US
national banks operating in foreign locations, including the UK, the Russian Federation,
Japan, Argentina, Brazil, and Uruguay.

4. Worked with large and district bank compliance ADCs and bank examiners in charge to ensure adequate staffing for all national banks based on risk profile to the bank and risk to the industry.
5. Led international anti-money laundering training sessions throughout the Russian Federation, Mexico, Ecuador and Peru.
6. Supplied training to field leads throughout North America, South America, Asia, Europe, Africa, and Australia.
7. Frequent speaker at America Banker Association, Mortgage Banker Association and California Banking Association conferences in all consumer compliance and BSA related areas.

***Other Related Experience- OCC (1983-1994)***

- Compliance Analyst/NBE, Community and Consumer Policy - Washington, DC
- NBE-Tulsa, Oklahoma Duty Station - Tulsa, OK
- Associate NBE I & II, Oklahoma Duty Station – Tulsa, OK
- Assistant NBE I & II, Oklahoma Duty Station – Tulsa, OK

### SYSTEMS

Accuity, iComply KYC, Comply Wire, RDC (Risk Data Management), Fiserv, Patriot Officer, Banker's Toolbox, Oceans Systems, Actimize, NICE Actimize, MANTAS, Comply Advantage, OFAC-Accuity, Bridger, OFAC Analyzer, Atlas, Lexis/Nexis, EDUCATION

### EDUCTION

Western Kentucky University, Bachelor of Science-Finance

**PROFESSIONAL AFFILIATIONS**

- Commissioned National Bank Examiner
- Served as a facility member for the ABA's Graduate School of Compliance (and instructed various courses covering regulatory compliance, including financial crime prevention, detection and reporting regulatory expectations)
- Honorable Order of Kentucky Colonels

**AWARDS**

- Albert Gallatin Award, U.S. Department of the Treasury
- Special Act Awards, U.S. Department of the Treasury
- Silver Eagle Awards, U.S Department of the Treasury, Office of the Comptroller of the Currency

Exhibit 2
List of Items Considered

- Federal Financial Institutions Examination Council (FFIEC) Bank Secrecy Act (BSA)/Anti-Money Laundering (AML) Examination Manual (2007 and revisions) FFIEC BSA/AML Examination Manual
- Financial Crimes Enforcement Network, U.S. Department of Treasury, Number of Filings by Type of Suspicious Activity by Depository Institutions (Section 2)
- Office of the Comptroller of the Currency, Civil Money Penalties https://www.occ.gov/news-issuances/bulletins/2018/ppm-5000-7.pdf
- Bobby Winstead, Expert Report (dated September 25, 2025)
- The USA PATRIOT Act:  A Legal Analysis, Congressional Research Service, April 15, 2002 (The USA PATRIOT Act: A Legal Analysis (congress.gov)); www.justice.gov/archive/ll/what_is_the_patriot_act.pdf at ¶1
- OCC 2012 Cease and Desist Order--Citibank, NA *nr-occ-2012-57a.pdf
- OCC 2013 Cease and Desist Order---JP Morgan/Chase  *nr-occ-2013-8a.pdf
- OCC Advisory Letter 96-6 Check-Kiting, Funds Availability, Wire Transfer Activity, dated August 6, 1996 (https://www.occ.gov/news-issuances/advisory-letters/1996/advisory-letter-1996-6.pdf)
- National Money Laundering Risk Assessment (NMLRA), Department of the Treasury, February 2024 (2024 National Money Laundering Risk Assessment (NMLRA) (treasury.gov))
- National Heath Care Fraud Takedown Results in 324 Dependents Charged in Connection with over $14.6 Billion in Alleged Fraud. (Office of Public Affairs | National Health Care Fraud Takedown Results in 324 Defendants Charged in Connection with Over $14.6 Billion in Alleged Fraud | United States Department of Justice)

| HNB_SCH_0008881 | Kenwood Terrace Health |
| HNB_SCH_0008888 | Premier Health Care |
| HNB_SCH_0010888 | JZB Realty Holding co |
| HNB_SCH_0010889 | Premier Health Care |
| HNB_SCH_0010890 | Keller Road Realty Co |
| HNB_SCH_0010974 | Premier Health Care |
| HNB_SCH_0010980 | Beechwood Terrace |
| HNB_SCH_0010981 | Euclid Health Car |
| HNB_SCH_0010982 | IVY |
| HNB_SCH_0010983 | Terrace |
| HNB_SCH_0010984 | P Construction |

| | |
|---|---|
| HNB_SCH_0010985 | Pleasant Ridge |
| HNB_SCH_0010987 | south brook |
| HNB_SCH_0011002 | premier |
| HNB_SCH_0011003 | kenwood terrace |
| HNB_SCH_0011004 | IVY |
| HNB_SCH_0011005 | PH CM construction |
| HNB_SCH_0011006 | pleasant ridge |
| HNB_SCH_0048642 | Wexford |
| HNB_SCH_0048735 | Wexford |
| HNB_SCH_0048754 | Wexford |
| HNB0002705 | PH CASH |
| HNB0005641 | Premier Health  KY |
| HNB0005643 | kenwood |
| HNB0005659 | Social Row Transitional care inc |
| HNB0005928 | JZB Realty Holding co |
| HNB0005929 | Premier Health Care Mgmt |
| HNB0005930 | Keller Road Realty Co |
| HNB0008135 | JZB Realty Holding co |
| HNB0008136 | Premier Health Care Mgmt |
| HNB0008137 | Keller Road Realty Co |
| HNB_SCH_0006432 | |
| HNB_SCH_0008897 | |
| HNB0008271 | |
| Amy Becker v2 Deposition Summary | |
| Becker Deposition Summary | |
| Emig Deposition Summary | |
| Gentry Deposition Summary v2 | |
| Gentry I deposition Summary | |
| Griffin Deposition Summary | |
| Hofmann Deposition Summary | |
| lannitti Deposition Summary | |
| Jo Pheneger Deposition Summary | |
| Jones Deposition Summary | |
| Kirby Deposition Summary | |

| | |
|---|---|
| Krivenko Deposition Summary | |
| Lisa Jones Deposition Summary | |
| Lund Deposition Summary | |
| McElwain Deposition Summary | |
| McGrail Deposition Summary | |
| Myers Deposition Summary | |
| Nuzum Deposition Summary | |
| Packer Deposition Summary | |
| Quattrone Deposition Summary | |
| Randy Gentry v3 Deposition Summary | |
| Sams Deposition Summary | |
| Smart Deposition Summary | |
| Sosna Deposition Summary | |
| Steiner Deposition Summary | |
| Suzanne Myers v2 Deposition Summary | |
| Vetter Deposition Summary | |
| Viren Deposition summary | |
| Ward Deposition Summary | |
| HNB_SCH_0063320 | |
| HNB_SCH_0063341 | |
| HNB-SCH-0063384 | |
| HNB_SCH_0063386 | |
| HNB_SCH_0063395 | |
| HNB_SCH_0063398 | |
| HNB_SCH_0063404 | |
| HNB_SCH_0063413 | |
| HNB_SCH_0063421 | |
| HNB_SCH_0063428 | |
| HNB_SCH_0063434 | |
| HNB_SCH_0063438 | |
| Andrea Lee Quattrone Deposition Notes | |

| | |
|---|---|
| CH071124ap_fulltranscript_ex | |
| DaveEmig_linkPDF | |
| DP080124ap_fulltranscript_ex | |
| DX Binder _ lannitti | |
| GL08124ap_fulltranscript_ex | |
| Helen Marie Ward 08-30-2024_fill_ex | |
| HS073124ap_fulltranscript_ex | |
| James Gentry Depo Notes RG091724 | |
| JamesGentry_linkPDF | |
| JK082024ap_fulltranscript_ex | |
| JM073024ap_fulltranscript_ex | |
| MarinaKrivenko_linkPDF | |
| MelissaSmart_linkPDF | |
| PX Binder - Lannitti | |
| Quattrone Andrea lee 082924 exhibits | |
| Quattrone Andrea lee 082924 full size | |
| RG091724ap_fulltranscript_ex | |
| Suzanne Griffin Link dpf items | |
| Suzanne Griffin_linkPDF | |
| Transcript-full | |
| 2.21.20 Email | |
| colored Account Sheet | |
| Lesson Learned Email | |
| Lessons Learned PPT | |
| Sample Mca Agreement | |
| Spreadsheet attached to 2.21.20 email-- HNB-SCH-0067118 | |
| HNB_SCH_0044505 | |
| HNB_SCH_0044607 | |
| HNB_SCH_0044755 | |
| HNB_SCH_0044811 | |
| HNB_SCH_0052670 | |

| | |
|---|---|
| RS07055 | |
| HNB_SCH_0052820 | |
| HNB_SCH_0061290 | |
| HNB_SCH_0061378 | |
| HNB_SCH_0065852 | |
| Slide Deck | |
| 08.02.18 Underwriting Analysis | |
| 08.28.18 Underwriting Analysis | |
| 09.04.18 underwriting Analysis | |
| 12.15.17 Transaction Preview | |
| 2018 CIP | |
| 2018 CMI | |
| 2018 MIP | |
| 2018 REP | |
| HNB_SCH_0061290 | |
| HNB_SCH_061309 | |
| HNB_SCH_0061378 | |
| HNB_SCH_0063320 | |
| HNB_SCH_0063341 | |
| HNB_SCH_0063362 | |
| HNB_SCH_0063373 | |
| HNB_SCH_0063384 | |
| HNB_SCH_0063386 | |
| HNB_SCH_0063395 | |
| HNB_SCH_0063398 | |
| HNB_SCH_0063404 | |
| HNB_SCH_0063413 | |
| HNB_SCH_0063421 | |
| HNB_SCH_0063428 | |
| HNB_SCH_0063434 | |
| HNB_SCH_0063438 | |
| HNB_SCH_0069365 | |
| HNB_SCH_0069385 | |
| HMB_SCH_0069412 | |
| HNB_SCH_0069432 | |

| | |
|---|---|
| HNB_SCH_0069459 | |
| HNB_SCH_0069483 | |
| HNB_SCH_0069509 | |
| HNB_SCH_0069535 | |
| HNB_SCH_0069566 | |
| HNB_SCH_0069585 | |
| HNB_SCH_0069604 | |
| HNB_SCH_0069698 | |
| HNB_SCH_0069788 | |
| HNB_SCH_0069891 | |
| HNB_SCH_0069996 | |
| HNB_SCH_0070101 | |
| HNB_SCH_0070205 | |
| HNB_SCH_0070309 | |
| HNB_SCH_0070421 | |
| HNB_SCH_0070536 | |
| HNB_SCH_0070651 | |
| HNB_SCH_0070741 | |
| HNB_SCH_0070838 | |
| HNB_SCH_0070943 | |
| HNB_SCH_0071055 | |
| HNB_SCH_0071154 | |
| HNB_SCH_0071257 | |
| HNB_SCH_0071360 | |
| HNB_SCH_0071563 | |
| HNB_SCH_0071463 | |
| HNB_SCH_0071675 | |
| HNB_SCH_0071704 | |
| HNB_SCH_0062313 April 2020 Account 8435 Main Account | Premier Main Account |
| HNB_SCH_0062316 December 2019 Account 8435 Main Account | |
| HNB_SCH_0062328 February 2020 Account 8435 Main Account | |
| HNB_SCH_0062337 January 2020 Account 8435 Main Account | |
| HNB_SCH_0062349 March 2020 Account 8435 Main Account | |
| HNB_SCH_0062350 November 2019 Account 8435 Main Account | |
| HNB_SCH_0062361 October 2019 Account 8435 Main Account | |

| | |
|---|---|
| HNB_SCH_0062373 September 2019 Account 8435 Main Account | |
| HNB_SCH_0062839 December 2019 Account 8587 | Forest Hills Opp Account |
| HNB_SCH_0062844 September 2019 Account 8587 | |
| HNB_SCH_0062847 October 2019 Account 8587 | |
| HNB_SCH_0062852 November 2019 Account 8587 | |
| HNB-SCH-0062856 January 2020 Account 8587 | |
| HNB_SCH_0062861 February 2020 Account 8587 | |
| HNB_SCH_0062866 March 2020 Account 8587 | |
| HNB_SCH_0062871 April 2020 Account 8587 | |
| HNB_SCH_0062495 April 2020 Account 8480 Ivy Woods | Pleasant Ridge |
| HNB_SCH_0062501 December 2019 Account 8480 Ivy Woods | |
| HNB_SCH_0062506 February 2020 Account 8480 Ivy Woods | |
| HNB_SCH_0062513 January 2020 Account 8480 Ivy Woods | |
| HNB_SCH_0062519 March 2020 Account 8480 Ivy Woods | |
| HNB_SCH_0062523 November 2019 Account 8480 Ivy Woods | |
| HNB_SCH_0062527 October 2019 Account 8480 Ivy Woods | |
| HNB_SCH_0062531 September 2019 Account 8480 Ivy Woods | |
| HNB_SCH_0061597 March 2020 Keller Road Account 8749 | Keller Road Account |
| HNB_SCH_0061764 May 2020 Keller Road Account 8749 | |
| HNB_SCH_0061828 June 2020 Keller Road Account 8749 | |
| HNB_SCH_0061990 February 2020 Keller Road Account 8749 | |
| HNB_SCH_0062185 April | |

| | |
|---|---|
| 2020 Keller Road Account 8749 | |
| HNB_SCH_0062988 December 2019 | Moran 8668 |
| HNB_SCH_0062993 September 2019 | |
| HNB_SCH_0062995 October 2019 | |
| HNB_SCH_0062998 November 2019 | |
| HNB_SCH_0063001 January 2020 | |
| HNB_SCH_0063006 February 2020 | |
| HNB_SCH_0063012 March 2020 | |
| HNB_SCH_0061532 March 2020 Forest hills Account 0489 | Forest hills Account 0489 |
| HNB_SCH_0061717 May 2020 Forest hills Account 0489 | |
| HNB_SCH_0061813 June 2020 Forest hills Account 0489 | |
| HNB_SCH_0062193 April 2020 Forest hills Account 0489 | |
| HNB_SCH_0008274 | 54 Reality |
| HNB_SCH_0008434 | |
| HNB_SCH_0008468 | |
| HNB_SCH_0008633 | |
| HNB_SCH_0044815 | |
| HNB_SCH_0061536 | |
| HNB_SCH_0062040 | |
| HNB_SCH_0062183 | |
| HNB_SCH_0063019 | |
| HNB_SCH_0063021 | |
| HNB_SCH_0063022 | |
| HNB_SCH_0063024 | |

| | |
|---|---|
| HNB_SCH_0063025 | |
| HNB_SCH_0063027 | |
| HNB_SCH_0063029 | |
| HNB_SCH_0064112 | |
| HNB_SCH_0064136 | |
| HNB_SCH_0064163 | |
| HNB_SCH_0064192 | |
| HNB_SCH_0064218 | |
| HNB_SCH_0064243 | |
| HNB_SCH_0064266 | |
| HNB_SCH_0068437 | |
| HNB_SCH_0068485 | |
| HNB_SCH_0068532 | |
| HNB_SCH_0068579 | |
| HNB_SCH_0068628 | |
| HNB_SCH_0068672 | |
| HNB_SCH_0068689 | |
| HNB_SCH_0068708 | |
| HNB_SCH_0061529 | Beechwood Terrace |
| HBN_SCH_0061532 | |
| HNB_SCH_0061540 | |
| HNB_SCH_0061595 | |
| HNB_SCH_0061601 | |
| HNB_SCH_0061672 | |
| HNB_SCH_0061702 | |
| HNB_SCH_0061717 | |
| HNB_SCH_0061720 | |
| HNB_SCH_0061745 | |
| HNB_SCH_0061784 | |
| HNB_SCH_0061813 | |
| HNB_SCH_0061822 | |
| HNB_SCH_0061868 | |
| HNB_SCH_0061922 | |
| HNB_ACH_0061930 | |
| HNB_SCH_0061951 | |
| HNB_SCH_0061977 | |
| HNB_SCH_0062046 | |

| | |
|---|---|
| HNB_SCH_0062077 | |
| HNB_SCH_0062167 | |
| HNB_SCH_0062839 | |
| HNB_SCH_0062844 | |
| HNB_SCH_0062847 | |
| HNB_SCH_0062852 | |
| HNB_SCH_0062856 | |
| HNB_SCH_0062861 | |
| HNB_SCH_0062866 | |
| HNB_SCH_0062671 | |
| HNB_SCH_0062883 | |
| HNB_SCH_0062887 | |
| HNB_SCH_0062890 | |
| HNB_SCH_0062894 | |
| HNB_SCH_0062897 | |
| HNB_SCH_0062901 | |
| HNB_SCH_0062905 | |
| HNB_SCH_0063092 | |
| HNB_SCH_0063095 | |
| HNB_SCH_0063098 | |
| HNB_SCH_0063101 | |
| HNB_SCH_0063103 | |
| HNB_SCH_0063105 | |
| HNB_SCH_0062839 | |
| HNB_SCH_0062844 | |
| HNB_SCH_0062847 | |
| HNB_SCH_0062852 | |
| HNB_SCH_0062856 | |
| HNB_SCH_0062861 | |
| HNB_SCH_0062866 | |
| HNB_SCH_0062871 | |
| HNB_SCH_0062883 | |
| HNB_SCH_0062887 | |
| HNB_SCH_0062890 | |
| HNB_SCH_0062894 | |
| HNB_SCH_0062897 | |
| HNB_SCH_0062901 | |

| | |
|---|---|
| HNB_SCH_0062905 | |
| HNB_SCH_0063092 | |
| HNB_SCH_0063095 | |
| HNB_SCH_0063098 | |
| HNB_SCH_0063101 | |
| HNB_SCH_0063103 | |
| HNB_SCH_0063105 | |
| HNB_SCH_0068414 | |
| HNB_SCH_0068461 | |
| HNB_SCH_0068508 | |
| HNB_SCH_0068555 | |
| HNB_SCH_0068602 | |
| HNB_SCH_0068650 | |
| HNB_SCH_0061548 A6169_ | EUCLID MADEIRA |
| HNB_SCH_0061578 OPERATING 8545 MAR 2020 | |
| HNB_SCH-0061592 A8558 | |
| HNB_SCH_0061656 A0450 | |
| HNB_SCH_0061704 A6169 | |
| HNB_SCH_0061708 A8558 | |
| HNB_SCH_0061712 A0450 INS PYMTS | |
| HNB_SCH_0061762 A8545 | |
| HNB_SCH_0061788 A6169 | |
| HNB_SCH_0061817 A0450 | |
| HNB_SCH_0061891 A6169 | |
| HNB_SCH_0061938 A0450 | |
| HNB_SCH_ 0061967 OPERATING 8545 FEB 2020 | |
| HNB_SCH_0062032 A8558 | |
| HNB_SCH_0062055 A0450 | |
| HNB_SCH_0062132 A6169 | |
| HNB_SCH_0062189 A8558 | |
| HNB_SCH_0062228 OPERATING 8545 APR 2020 | |
| HNB_SCH_0062702 OPERATING 8545 DEC 2019 | |

| | |
|---|---|
| HNB_SCH_0062706 OPERATING 8545 SEPT 2019 | |
| HNB_SCH_0062710 OPERATING 8545 OCTOBER 2019 | |
| HNB_SCH_0062714 OPERATING 8545 NOV 2019 | |
| HNB_SCH_0062718 OPERATING 8545 JAN 2020 | |
| HNB_SCH_0062723 OPERATING 8545 FEB 2020 C1967 | |
| HNB_SCH_0062728 OPERATING 8545 MARCH 2020 C1578 | |
| HNB_SCH_0062732 OPWEATING 8545 APR 2020 C2228 | |
| HNB_SCH_0062740 OPERATING 8545 DEC 2019 C2702 | |
| HNB_SCH_0062744 A8558 | |
| HNB_SCH_0062747 A8558 | |
| HNB_SCH_0062751 A8558 | |
| HNB_SCH_0062754 A8558 | |
| HNB_SCH_0062762 A8558 | |
| HNB_SCH_0063573 A8397 | |
| HNB_SCH_0063575 A8397 | |
| HNB_SCH_0063577 A8397 | |
| HNB_SCH_0063578 A8397 | |
| HNB_SCH_0063580 A8397 | |
| HNB_SCH_0063582 A8397 | |
| HNB_SCH_0063584 A8397 | |
| HNB_SCH_0063586 A3897 | |
| HNB_SCH_0067920 OPERATING 8545 APR 2019 | |
| HNB_SCH_0067932 OPERATING 8545 AUG 2019 | |

| | |
|---|---|
| HNB_SCH_0067944 OPERATING 8545 DEC 2018 | |
| HNB_SCH_0067954 OPERATING 8454 FEB 2019 | |
| HNB_SCH_0067966 OPERATING 8545 JAN 2019 | |
| HNB_SCH_0067988 OPERATING 8545 JUNE 2019 | |
| HNB_SCH_0066800 OPERATING 8545 MAR 2019 | |
| HNB_SCH_0063024 OPERATING 8545 NOV 2018 | |
| HNB_SCH_0068034 OPERATING 8545 OCT 2018 | |
| HNB_SCH_0068301 A7783 | |
| HNB_SCH_0068375 | |
| HNB_SCH_0068414 | |
| HNB_SCH_0068461 | |
| HNB_SCH_0068508 A7783 | |
| HNB_SCH_0068555 | |
| HNB_SCH_0068602 | |
| HNB_SCH_0068650 | |
| RS06169 OPERATING 8545 AUG 2019 | |
| RS06182 A8858 | |
| RS06185 | |
| RS06272 A0450 | |
| RS06280 A0450 | |
| RS06284 | |
| RS06286 A8558 | |
| RS06291 OPERATING 8545 SEPT 2019 | |
| RS06299 A8558 | |
| RS06302 A0450 | |
| RS06308 A8558 | |
| RS06313 A6169 | |

EXHIBIT H

Page 42 of 75

| | |
|---|---|
| RS06314 A0450 | |
| RS06321 A8558 | |
| RS06325 | |
| RS06327 A0450 | |
| RS06333 A0450 | |
| RS06337 A6169 | |
| RS06344 A8558 | |
| RS09493 A0450 | |
| RS09496 A0450 | |
| RS09500 A0450 | |
| RS09504 A0450 | |
| RS509510 A0450 | |
| RS09514  A450 | |
| RS09517 A0450 | |
| RS09521 A0450 | |
| RS09525 A0450 | |
| RS09528 A0450 | |
| RS09550 OPERATING 8545 AUG 2019 | |
| RS09679 A6169 | |
| RS09639 A6169 | |
| RS09641 A6169 | |
| RS09643 A6169 | |
| RS09647 A4169 | |
| RS09649 A6169 | |
| RS09650 A6169 | |
| RS09651 A6169 | |
| RS09706 A8558 | |
| RS09709 A8558 | |
| RS09711 A8558 | |
| RS09712 A8558 | |
| RS09713 A8558 | |
| RS09716 A8558 | |
| RS09718 A8558 | |
| RS09721 A8558 | |
| RS09723 A8558 | |
| RS09725 A8558 | |

| | |
|---|---|
| HNB_SCH_0008274 | KELLER RD |
| HNB_SCH_0008434 | |
| HNB_SCH_0008468 | |
| HNB_SCH_0008633 | |
| HNB_SCH_0044815 | |
| HNB_SCH_0061560 | |
| HNB_SCH_0061597 | |
| HNB_SCH_0061764 | |
| HNB_SCH_0061828 | |
| HNB_SCH_0061990 | |
| HNB_SCH_0062024 | |
| HNB_SCH_0062086 | |
| HNB_SCH_0062185 | |
| HNB_SCH_0063031 | |
| HNB_SCH_0063034 | |
| HNB_SCH_0063036 | |
| HNB_SCH_0063039 | |
| HNB_SCH_0063041 | |
| HNB_SCH_0063044 | |
| HNB_SCH_0063047 | |
| HNB_SCH_0064112 | |
| HNB_SCH_0064136 | |
| HNB_SCH_0064163 | |
| HNB_SCH_0064136 | |
| HNB_SCH_0064192 | |
| HNB_SCH_0064218 | |
| HNB_SCH_0064243 | |
| HNB_SCH_0064266 | |
| HNB_SCH_0068323 | |
| HNB_SCH_0068361 | |
| HNB_SCH_0068399 | |
| HNB_SCH_0068437 | |
| HNB_SCH_0068485 | |
| HNB_SCH_0068532 | |
| HNB_SCH_0068579 | |
| HNB_SCH_0068628 | |
| HNB_SCH_0068672 | |

| | |
|---|---|
| HNB_SCH_0068689 | |
| HNB_SCH_0068708 | |
| HNB_SCH_0008274 | MORAN |
| HNB_SCH_0008434 | |
| HNB_SCH_0008468 | |
| HNB_SCH_0008633 | |
| HNB_SCH_0044815 | |
| HNB_SCH_0062167 | |
| HNB_SCH_0062988 | |
| HNB_SCH_0062993 | |
| HNB_SCH_0062995 | |
| HNB_SCH_0062998 | |
| HNB_SCH_0063001 | |
| HNB_SCH_0063006 | |
| HNB_SCH_0063012 | |
| HNB_SCH_0064112 | |
| HNB_SCH_0064136 | |
| HNB_SCH_0064163 | |
| HNB_SCH_0064192 | |
| HNB_SCH_0064218 | |
| HNB_SCH_0064243 | |
| HNB_SCH_0064266 | |
| HNB_SCH_0068485 | |
| HNB_SCH_0068532 | |
| HNB_SCH_0068579 | |
| HNB_SCH_0068628 | |
| HNB_SCH_0068672 | |
| HNB_SCH_0068689 OPERATING 7783 PREMEIR | |
| HNB_SCH_0068708 8736 | |
| HNB_SCH_0008274 | SEMINOLE |
| HNB_SCH_0008434 | |
| HNB_SCH_0008468 | |
| HNB_SCH_0008633 | |
| HNB_SCH_0044815 | |
| HNB_SCH_0061552 | |
| HNB_SCH_0062042 | |

| | |
|---|---|
| HNB_SCH_0062050 | |
| HNB_SCH_0064112 | |
| HNB_SCH_0064136 | |
| HNB_SCH_0064163 | |
| HNB_SCH_0064192 | |
| HNB_SCH_0064218 | |
| HNB_SCH_0064243 | |
| HNB_SCH_0064266 | |
| HNB_SCH_0068437 | |
| HNB_SCH_0068485 | |
| HNB_SCH_0068532 | |
| HNB_SCH_0068579 | |
| HNB_SCH_0068628 | |
| HNB_SCH_0068672 | |
| HNB_SCH_0068689 | |
| HNB_SCH_0068708 | |
| HNB_SCH_0061557 | SOUTHBROOK |
| HNB_SCH_0061616 | |
| HNB_SCH_0061620 | |
| HNB_SCH_0061637 | |
| HNB_SCH_0061651 | |
| HNB_SCH_0061676 | |
| HNB_SCH_0061722 | |
| HNB_SCH_0061741 | |
| HNB_SCH_0061743 | |
| HNB_SCH_0061766 | |
| HNB_SCH_0061796 | |
| HNB_SCH_0061824 | |
| HNB_SCH-0061830 | |
| HNB_SCH_0061857 | |
| HNB_SCH_0061914 | |
| HNB_SCH_0061935 | |
| HNB_SCH_0061986 | |
| HNB_SCH_0062070 | |
| HNB_SCH_0062143 | |
| HNB_SCH_0062177 | |
| HNB_SCH_0062234 | |

| | |
|---|---|
| HNB_SCH_0062770 | |
| HNB_SCH_0062775 | |
| HNB_SCH_0062778 | |
| HNB_SCH_0062782 | |
| HNB_SCH_0062786 | |
| HNB_SCH_0062791 | |
| HNB_SCH_0062796 | |
| HNB_SCH_0062800 | |
| HNB_SCH_0062808 | |
| HNB_SCH_0062812 | |
| HNB_SCH_0062812 | |
| HNB_SCH_0062815 | |
| HNB_SCH_0062819 | |
| HNB_SCH_0062822 | |
| HNB_SCH_0062826 | |
| HNB_SCH_0062830 | |
| HNB_SCH_0062932 | |
| HNB_SCH_0062935 | |
| HNB_SCH_0062937 | |
| HNB_SCH_0062940 | |
| HNB_SCH_0063242 | |
| HNB_SCH_0063244 | |
| HNB_SCH_0063246 | |
| HNB_SCH_0063247 | |
| HNB_SCH_0063248 | |
| HNB_SCH_0064289 | |
| HNB_SCH_0064302 | |
| HNB_SCH_0064314 | |
| HNB_SCH_0064327 | |
| HNB_SCH_0064339 | |
| HNB_SCH_0064352 | |
| HNB_SCH_0064365 | |
| HNB_SCH_0068043 | |
| HNB_SCH_0068056 | |
| HNB_SCH_0068069 | |
| HNB_SCH_0068078 | |
| HNB_SCH_0068091 | |

| | |
|---|---|
| HNB_SCH_0068099 | |
| HNB_SCH_0068112 | |
| HNB_SCH_0068126 | |
| HNB_SCH_0068140 | |
| HNB_SCH_0068154 | |
| HNB_SCH_0068163 | |
| HNB_SCH_0068172 | |
| HNB_SCH_0068301 | |
| HNB_SCH_0068336 | |
| HNB_SCH_0068375 | |
| HNB_SCH_0068414 | |
| HNB_SCH_0068461 | |
| HNB_SCH_0068508 | |
| HNB_SCH_0068555 | |
| HNB_SCH_0068602 | |
| HNB_SCH_0068650 | |
| HNB_SOSNA_0009087 | |
| HNB_SOSNA_0009080 | |
| HNB_SOSNA_0009082 | |
| HNB_SOSNA_0009084 | |
| HNB_SOSNA_0009096 | |
| HNB_SOSNA_0009098 | |
| HNB_SOSNA_0009110 | |
| HNB_SOSNA_0009112 | |
| HNB_SOSNA_0009114 | |
| HNB_SOSNA_0009126 | |
| HNB_SOSNA_0009128 | |
| HNB_SOSNA_0009130 | |
| HNB_SOSNA_0009142 | |
| HNB_SOSNA_0009144 | |
| HNB_SOSNA_0009146 | |
| HNB_SOSNA_0009158 | |
| HNB_SOSNA_0009160 | |
| HNB_SOSNA_0009162 | |
| RS06122 | |
| RS06353 | |
| RS06359 | |

| | |
|---|---|
| RS06369 | |
| RS06377 | |
| RS09443 | |
| RS09742 | |
| RS09746 | |
| RS09752 | |
| RS09756 | |
| HNB_SCH_0008274 | STEIGLER ROAD |
| HNB_SCH_0008434 | |
| HNB_SCH_0008468 | |
| HNB_SCH_0008633 | |
| HNB_SCH_0044815 | |
| HNB_SCH_0061664 | |
| HNB_SCH-0061972 | |
| HNB_SCH_0062184 | |
| HNB_SCH_0064112 | |
| HNB_SCH_0064136 | |
| HNB_SCH_0064163 | |
| HNB_SCH_0064192 | |
| HNB_SCH_0064218 | |
| HNB_SCH_0064243 | |
| HNB_SCH_0064266 | |
| HNB_SCH_0068437 | |
| HNB_SCH_0068485 | |
| HNB_SCH_0068532 | |
| HNB_SCH_0068579 | |
| HNB_SCH_0068628 | |
| HNB_SCH_0068672 | |
| HNB_SCH_0068689 | |
| HNB_SCH_0068708 | |

Exhibit 3
Deposit Transactions Indicative of Financial Crime

## Moran Road Realty LLC (xxx8668)

| November 1-30, 2019 | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 8-Nov | Incoming Fed wire | $ 88,000.00 | |
| 8-Nov | Incoming Fed wire | $ 88,000.00 | |
| 8-Nov | BUS ONL TFR to xxx7783 | | $ 176,000.00 |
| 12-Nov | Bus online tnr from xxx7783 | $ 19,000.00 | |
| 12-Nov | APEX Funding Sou xxx1520 | | $ 4,750.00 |
| 12-Nov | APEX Funding Sou xxx1520 | | $ 4,750.00 |
| 12-Nov | YES Capital Grou AA285602 | | $ 4,750.00 |
| 12-Nov | YES Capital Grou AA285602 | | $ 4,750.00 |
| 12-Nov | Bus online tnr from xxx7783 | $ 9,500.00 | |
| 13-Nov | Bus online tnr from xxx7783 | $ 9,500.00 | |
| 13-Nov | APEX Funding Sou xxx1520 | | $ 4,750.00 |
| 13-Nov | YES Capital Grou AA285602 | | $ 4,750.00 |
| 14-Nov | Bus online tnr from xxx7783 | $ 9,500.00 | |
| 14-Nov | APEX Funding Sou xxx1520 | | $ 4,750.00 |
| 14-Nov | YES Capital Grou AA285602 | | $ 4,750.00 |
| 15-Nov | Bus online tnr from xxx7783 | $ 9,500.00 | |
| 15-Nov | APEX Funding Sou xxx1520 | | $ 4,750.00 |
| 15-Nov | YES Capital Grou AA285602 | | $ 4,750.00 |
| 18-Nov | Bus online tnr from xxx7783 | $ 9,500.00 | |
| 18-Nov | APEX Funding Sou xxx1520 | | $ 4,750.00 |
| 18-Nov | YES Capital Grou AA285602 | | $ 4,750.00 |
| 19-Nov | Bus online tnr from xxx7783 | $ 9,500.00 | |
| 19-Nov | APEX Funding Sou xxx1520 | | $ 4,750.00 |
| 19-Nov | YES Capital Grou AA285602 | | $ 4,750.00 |
| 20-Nov | Bus online tnr from xxx7783 | $ 9,500.00 | |
| 20-Nov | APEX Funding Sou xxx1520 | | $ 4,750.00 |
| 20-Nov | YES Capital Grou AA285602 | | $ 4,750.00 |
| 21-Nov | Bus online tnr from xxx7783 | $ 9,500.00 | |
| 21-Nov | APEX Funding Sou xxx1520 | | $ 4,750.00 |
| 21-Nov | YES Capital Grou AA285602 | | $ 4,750.00 |
| 22-Nov | Bus online tnr from xxx7783 | $ 9,500.00 | |
| 22-Nov | APEX Funding Sou xxx1520 | | $ 4,750.00 |
| 22-Nov | YES Capital Grou AA285602 | | $ 4,750.00 |
| 25-Nov | Bus online tnr from xxx7783 | $ 9,500.00 | |
| 25-Nov | APEX Funding Sou xxx1520 | | $ 4,750.00 |
| 25-Nov | YES Capital Grou AA285602 | | $ 4,750.00 |
| 26-Nov | Bus online tnr from xxx7783 | $ 9,500.00 | |
| 26-Nov | APEX Funding Sou xxx1520 | | $ 4,750.00 |
| 26-Nov | YES Capital Grou AA285602 | | $ 4,750.00 |
| 27-Nov | Bus online tnr from xxx7783 | $ 9,500.00 | |
| 27-Nov | APEX Funding Sou xxx1520 | | $ 4,750.00 |
| 27-Nov | YES Capital Grou AA285602 | | $ 4,750.00 |

| 29-Nov | Bus online tnr from xxx7783 | $   19,000.00 | |
| 29-Nov | APEX Funding Sou xxx1520 | | $    4,750.00 |
| 29-Nov | YES Capital Grou AA285602 | | $    4,750.00 |
| 29-Nov | APEX Funding Sou xxx1520 | | $    4,750.00 |
| 29-Nov | YES Capital Grou AA285602 | | $    4,750.00 |
| total | | $  328,000.00 | $  318,500.00 |

## Total Number of Transactions:  46

| December 1-31, 2019 | | | |
|---|---|---|---|
| 2-Dec | Bus online tnr from xxx7783 | $9,500.00 | |
| 2-Dec | YES Capital Grou AA285602 | | $4,750.00 |
| 2-Dec | APEX Funding Sou xxx1520 | | $4,750.00 |
| 3-Dec | Bus online tnr from xxx7783 | $9,500.00 | |
| 3-Dec | YES Capital Grou AA285602 | | $11,999.00 |
| 3-Dec | YES Capital Grou AA285602 | | $4,750.00 |
| 4-Dec | Incoming Fed Wire | $ 62,350.00 | |
| 4-Dec | Bus online tnr from xxx7783 | $22,000.00 | |
| 4-Dec | APEX Funding Sou xxx1520 | | $4,750.00 |
| 4-Dec | YES Capital Grou AA285602 | | $ 4,750.00 |
| 4-Dec | APEX Funding Sou xxx1520 | | $ 4,750.00 |
| 5-Dec | Incoming Fed Wire | $63,250.00 | |
| 5-Dec | Bus online tnr TO xxx7783 | | $85,000.00 |
| 5-Dec | APEX Funding Sou xxx1520 | | $11,999.00 |
| 5-Dec | YES Capital Grou AA285602 | | $11,999.00 |
| 6-Dec | Bus online tnr from xxx7783 | $ 24,000.00 | |
| 6-Dec | APEX Funding Sou xxx1520 | | $11,999.00 |
| 9-Dec | YES Capital Grou AA285602 | | $11,999.00 |
| 9-Dec | Bus online tnr from xxx7783 | $ 35,000.00 | |
| 9-Dec | APEX Funding Sou xxx1520 | | $11,999.00 |
| 9-Dec | YES Capital Grou AA285602 | | $11,999.00 |
| 10-Dec | Bus online tnr from xxx7783 | $ 24,000.00 | |
| 10-Dec | APEX Funding Sou xxx1520 | | $11,999.00 |
| 10-Dec | YES Capital Grou AA285602 | | $11,999.00 |
| 11-Dec | Bus online tnr from xxx7783 | $24,000.00 | |
| 11-Dec | APEX Funding Sou xxx1520 | | $11,999.00 |
| 11-Dec | YES Capital Grou AA285602 | | $11,999.00 |
| 11-Dec | Ck 2309 | | $11,337.00 |
| 12-Dec | Bus online tnr from xxx7783 | $24,000.00 | |
| 12-Dec | APEX Funding Sou xxx1520 | | 11,999.00 |
| 12-Dec | YES Capital Grou AA285602 | | 11,999.00 |
| 13-Dec | Bus online tnr from xxx7783 | $24,000.00 | |
| 13-Dec | APEX Funding Sou xxx1520 | | $11,999.00 |
| 13-Dec | YES Capital Grou AA285602 | | $11,999.00 |
| 16-Dec | Bus online tnr from xxx7783 | $24,000.00 | |
| 16-Dec | APEX Funding Sou xxx1520 | | $11,999.00 |
| 16-Dec | YES Capital Grou AA285602 | | $ 11,999.00 |
| 17-Dec | Bus online tnr from xxx7783 | $24,000.00 | |
| 17-Dec | APEX Funding Sou xxx1520 | | $11,999.00 |
| 17-Dec | YES Capital Grou AA285602 | | $11,999.00 |
| *18-Dec | Bus online tnr from xxx7783 | $24,000.00 | |
| 18-Dec | APEX Funding Sou xxx1520 | | $11,999.00 |
| 18-Dec | YES Capital Grou AA285602 | | $11,999.00 |
| 19-Dec | Bus online tnr from xxx7783 | $24,000.00 | |
| 19-Dec | APEX Funding Sou xxx1520 | | $11,999.00 |
| 19-Dec | YES Capital Grou AA285602 | | $11,999.00 |
| 20-Dec | Bus online tnr from xxx7783 | $24,000.00 | |
| 20-Dec | APEX Funding Sou xxx1520 | | $11,999.00 |
| 20-Dec | YES Capital Grou AA285602 | | $11,999.00 |

| Date | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 23-Dec | Bus online tnr from xxx7783 | $24,000.00 | |
| 23-Dec | APEX Funding Sou xxx1520 | | $11,999.00 |
| 23-Dec | YES Capital Grou AA285602 | | 11,999.00 |
| 24-Dec | Bus online tnr from xxx7783 | $24,000.00 | |
| 24-Dec | APEX Funding Sou xxx1520 | | $11,999.00 |
| 24-Dec | YES Capital Grou AA285602 | | $11,999.00 |
| 24-Dec | YES Capital Grou AA285602 | | $11,999.00 |
| 26-Dec | Bus online tnr from xxx7783 | $48,000.00 | |
| 26-Dec | APEX Funding Sou xxx1520 | | $11,999.00 |
| 26-Dec | YES Capital Grou AA285602 | | $11,999.00 |
| 27-Dec | Bus online tnr from xxx7783 | $24,000.00 | |
| 27-Dec | APEX Funding Sou xxx1520 | | $11,999.00 |
| 27-Dec | YES Capital Grou AA285602 | | $11,999.00 |
| 30-Dec | Bus online tnr from xxx7783 | $24,000.00 | |
| 30-Dec | APEX Funding Sou xxx1520 | | $11,999.00 |
| 30-Dec | YES Capital Grou AA285602 | | $11,999.00 |
| 31-Dec | Incoming Fed Wire | $450,000.00 | |
| 31-Dec | BUS ONL TFR TO CK XXX7783 | | $365,000.00 |
| 31-Dec | APEX Funding Sou xxx1520 | | $11,999.00 |
| 31-Dec | YES Capital Grou AA285602 | | $11,999.00 |
| 31-Dec | YES Capital Grou AA285602 | | $11,999.00 |
| **TOTAL** | | **$1,035,600.00** | **$ 957,798.00** |

## Total Number of Transactions:  69

| January 1-31, 2020 | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 2-Jan | BUS ONL TRS CK xxx7783 | $36,000.00 | |
| 2-Jan | APEX Funding Sou xxx1520 | | $ 11,999.00 |
| 2-Jan | YES Capital Grou AA285602 | | $ 11,999.00 |
| 2-Jan | E Advance Service | | $ 11,659.00 |
| 2-Jan | E Advance Service | | $ 11,659.00 |
| 3-Jan | BUS ONL TRS CK xxx7783 | $36,000.00 | |
| 3-Jan | APEX Funding Sou xxx1520 | | $ 11,999.00 |
| 3-Jan | YES Capital Grou AA285602 | | $ 11,999.00 |
| 3-Jan | E Advance Service | | $ 11,659.00 |
| 6-Jan | BUS ONL TRS CK xxx7783 | $36,000.00 | |
| 6-Jan | APEX Funding Sou xxx1520 | | $ 11,999.00 |
| 6-Jan | YES Capital Grou AA285602 | | $ 11,999.00 |
| 6-Jan | E Advance Service | | $ 11,659.00 |
| 7-Jan | BUS ONL TRS CK xxx7783 | $36,000.00 | |
| 7-Jan | APEX Funding Sou xxx1520 | | $ 11,999.00 |
| 7-Jan | YES Capital Grou AA285602 | | $ 11,999.00 |
| 7-Jan | E Advance Service | | $ 11,659.00 |
| 8-Jan | BUS ONL TRS CK xxx7783 | $36,000.00 | |
| 8-Jan | APEX Funding Sou xxx1520 | | $ 11,999.00 |
| 8-Jan | YES Capital Grou AA285602 | | $ 11,999.00 |
| 8-Jan | E Advance Service | | $ 11,659.00 |
| 9-Jan | Incoming Fedwire transfer | $490,000.00 | |
| 9-Jan | BUS ONL TRS CK xxx8435 | $36,000.00 | |
| 9-Jan | CK PD (# not listed) | | $ 11,337.00 |
| 9-Jan | APEX Funding Sou xxx1520 | | $ 11,999.00 |
| 9-Jan | YES Capital Grou AA285602 | | $ 11,999.00 |
| 9-Jan | E Advance Service | | $ 11,659.00 |
| 13-Jan | BUS ONL TRS CK xxx8435 | $ 57,000.00 | |
| 13-Jan | APEX Funding Sou xxx1520 | | $ 11,999.00 |
| 13-Jan | YES Capital Grou AA285602 | | $ 11,999.00 |
| 13-Jan | E Advance Service | | $ 11,659.00 |

| Date | Description | | |
|---|---|---|---|
| 13-Jan | EOM ADVANCE AA285640 | | $ 10,500.99 |
| 13-Jan | EOM ADVANCE AA285640 | | $ 10,500.00 |
| 14-Jan | BUS ONL TRS CK xxx8435 | $10,000.00 | |
| 14-Jan | E Advance Service | | $ 11,659.00 |
| 14-Jan | EOM ADVANCE AA285640 | | $ 10,500.99 |
| 14-Jan | EOM ADVANCE AA285640 | | $ 10,500.00 |
| 15-Jan | BUS ONL TRS CK xxx8435 | $ 33,000.00 | |
| 15-Jan | E Advance Service | | $ 11,659.00 |
| 15-Jan | EOM ADVANCE AA285640 | | $ 10,500.99 |
| 15-Jan | EOM ADVANCE AA285640 | | $ 10,500.00 |
| 16-Jan | BUS ONL TRS CK xxx8435 | $ 30,000.00 | |
| 16-Jan | E Advance Service | | $ 11,659.00 |
| 16-Jan | EOM ADVANCE AA285640 | | $ 10,500.99 |
| 16-Jan | EOM ADVANCE AA285640 | | $ 10,500.00 |
| 17-Jan | BUS ONL TRS CK xxx8435 | $40,000.00 | |
| 17-Jan | BUS ONL TRS CK xxx8435 | $ 5,000.00 | |
| 17-Jan | EOM ADVANCE AA285640 | | $ 13,500.99 |
| 17-Jan | EOM ADVANCE AA285640 | | $ 13,500.00 |
| 17-Jan | EOM ADVANCE AA285640 | | $ 13,500.00 |
| 17-Jan | EOM ADVANCE AA285640 | | $ 13,500.00 |
| 17-Jan | E Advance Service | | $ 11,659.00 |
| 21-Jan | BUS ONL TRS CK xxx8435 | $72,500.00 | |
| 21-Jan | EOM ADVANCE AA285640 | | $ 13,500.99 |
| 21-Jan | EOM ADVANCE AA285640 | | $ 13,500.00 |
| 21-Jan | E Advance Service | | $ 11,659.00 |
| 21-Jan | E Advance Service | | $ 11,659.00 |
| 22-Jan | BUS ONL TRS CK xxx8435 | $39,000.00 | |
| 22-Jan | EOM ADVANCE AA285640 | | $ 13,500.99 |
| 22-Jan | EOM ADVANCE AA285640 | | $ 13,500.00 |
| 22-Jan | E Advance Service | | $ 11,659.00 |
| 23-Jan | BUS ONL TRS CK xxx7783 | $39,000.00 | |
| 23-Jan | EOM ADVANCE AA285640 | | $ 13,500.99 |
| 23-Jan | EOM ADVANCE AA285640 | | $ 13,500.00 |
| 23-Jan | E Advance Service | | $ 11,659.00 |
| 23-Jan | YES Capital Grou AA285650 | | $  8,500.00 |
| 23-Jan | YES Capital Grou AA285650 | | $  8,499.00 |
| 24-Jan | BUS ONL TRS CK xxx7783 | $74,000.00 | |
| 24-Jan | BUS ONL TRS CK xxx7783 | $17,000.00 | |
| 24-Jan | EOM ADVANCE AA285640 | | $ 13,500.99 |
| 24-Jan | EOM ADVANCE AA285640 | | $ 13,500.00 |
| 24-Jan | E Advance Service | | $ 11,659.00 |
| 24-Jan | YES Capital Grou AA285650 | | $  8,500.00 |
| 24-Jan | YES Capital Grou AA285650 | | $  8,499.00 |
| 27-Jan | BUS ONL TRS CK xxx7783 | $57,000.00 | |
| 27-Jan | EOM ADVANCE AA285640 | | $ 13,500.99 |
| 27-Jan | EOM ADVANCE AA285640 | | $ 13,500.00 |
| 27-Jan | E Advance Service | | $ 11,659.00 |
| 27-Jan | YES Capital Grou AA285650 | | $  8,500.00 |
| 27-Jan | YES Capital Grou AA285650 | | $  8,499.00 |
| 28-Jan | BUS ONL TRS CK xxx7783 | $57,000.00 | |
| 28-Jan | EOM ADVANCE AA285640 | | $ 13,500.99 |
| 28-Jan | EOM ADVANCE AA285640 | | $ 13,500.00 |
| 28-Jan | E Advance Service | | $ 11,659.00 |
| 28-Jan | YES Capital Grou AA285650 | | $  8,500.00 |
| 28-Jan | YES Capital Grou AA285650 | | $  8,499.00 |

| Date | Source/Destination | Incoming | Outgoing |
|---|---|---|---|
| 29-Jan | BUS ONL TRS CK xxx7783 | $55,000.00 | |
| 29-Jan | EOM ADVANCE AA285640 | | $ 13,500.99 |
| 29-Jan | EOM ADVANCE AA285640 | | $ 13,500.00 |
| 29-Jan | E Advance Service | | $ 11,659.00 |
| 29-Jan | YES Capital Grou AA285650 | | $  8,500.00 |
| 29-Jan | YES Capital Grou AA285650 | | $  8,499.00 |
| 30-Jan | BUS ONL TRS CK xxx7783 | $59,000.00 | |
| 30-Jan | EOM ADVANCE AA285640 | | $ 13,500.99 |
| 30-Jan | EOM ADVANCE AA285640 | | $ 13,500.00 |
| 30-Jan | E Advance Service | | $ 11,659.00 |
| 30-Jan | YES Capital Grou AA285650 | | $ 11,499.00 |
| 30-Jan | YES Capital Grou AA285650 | | $  8,500.00 |
| 31-Jan | BUS ONL TRS CK xxx7783 | $59,000.00 | |
| 31-Jan | EOM ADVANCE AA285640 | | $ 13,500.99 |
| 31-Jan | EOM ADVANCE AA285640 | | $ 13,500.00 |
| 31-Jan | E Advance Service | | $ 11,659.00 |
| 31-Jan | YES Capital Grou AA285650 | | $ 11,499.00 |
| 31-Jan | YES Capital Grou AA285650 | | $  8,500.00 |
| **total** | | **$1,049,500.00** | **$941,827.86** |

Total Number of Transactions: 103

| Feb 1-29, 2020 | Source/Destination | Incoming Trans-actions | Outgoing Transactions |
|---|---|---|---|
| 3-Feb | EOM ADVANCE AA285640 | | $13,500.00 |
| 3-Feb | E Advance Service | | $11,659.00 |
| 3-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 3-Feb | YES Capital Grou AA285650 | | $8,499.00 |
| 4-Feb | BUS ONL TFR FRM CK XXX7783 | $ 56,000.00 | |
| 4-Feb | EOM ADVANCE AA285640 | | $13,500.99 |
| 4-Feb | EOM ADVANCE AA285640 | | $13,500.00 |
| 4-Feb | E Advance Service | | $ 11,659.00 |
| 4-Feb | YES Capital Grou AA285650 | | $ 8,500.00 |
| 4-Feb | YES Capital Grou AA285650 | | $8,499.00 |
| 5-Feb | BUS ONL TFR FRM CK XXX7783 | $ 56,000.00 | |
| 5-Feb | EOM ADVANCE AA285640 | | $ 13,500.99 |
| 5-Feb | EOM ADVANCE AA285640 | | $13,500.00 |
| 5-Feb | E Advance Service | | $11,659.00 |
| 5-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 5-Feb | YES Capital Grou AA285650 | | $8,499.00 |
| 6-Feb | BUS ONL TFR FRM CK XXX7783 | $75,000.00 | |
| 6-Feb | EOM ADVANCE AA285640 | | $ 13,500.99 |
| 6-Feb | EOM ADVANCE AA285640 | | $13,500.00 |
| 6-Feb | E Advance Service | | $11,659.00 |
| 6-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 6-Feb | YES Capital Grou AA285650 | | $8,499.00 |
| 7-Feb | INCOING FEDWIRE TRANSFER | $ 350,000.00 | |

| Date | Description | Debit | Credit |
|---|---|---|---|
| 7-Feb | BUS ONL TFR FRM CK XXX7783 | $ 70,000.00 | |
| 7-Feb | BUS ONL TFR TO CK XXX7783 | | $ 350,000.00 |
| 7-Feb | EOM ADVANCE AA285640 | | $13,500.99 |
| 7-Feb | EOM ADVANCE AA285640 | | $13,500.00 |
| 7-Feb | E Advance Service | | $11,659.00 |
| 7-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 7-Feb | YES Capital Grou AA285650 | | $8,499.00 |
| 10-Feb | BUS ONL TFR FRM CK XXX7783 | $30,000.00 | |
| 10-Feb | Check 2311 | | $ 11,337.00 |
| 10-Feb | EOM ADVANCE AA285640 | | $13,500.99 |
| 10-Feb | EOM ADVANCE AA285640 | | $13,500.00 |
| 10-Feb | E Advance Service | | $11,659.00 |
| 10-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 10-Feb | YES Capital Grou AA285650 | | $ 8,499.00 |
| 11-Feb | BUS ONL TFR FRM CK XXX7783 | $60,000.00 | |
| 11-Feb | EOM ADVANCE AA285640 | | $10,500.99 |
| 11-Feb | EOM ADVANCE AA285640 | | $10,500.00 |
| 11-Feb | E Advance Service | | $11,659.00 |
| 11-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 11-Feb | YES Capital Grou AA285650 | | $8,499.00 |
| 12-Feb | BUS ONL TFR FRM CK XXX7783 | $50,000.00 | |
| 12-Feb | EOM ADVANCE AA285640 | | $10,500.99 |
| 12-Feb | EOM ADVANCE AA285640 | | $10,500.00 |
| 12-Feb | E Advance Service | | $11,659.00 |
| 12-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 12-Feb | YES Capital Grou AA285650 | | $ 8,499.00 |
| 13-Feb | BUS ONL TFR FRM CK XXX7783 | $50,000.00 | |
| 13-Feb | EOM ADVANCE AA285640 | | $10,500.99 |
| 13-Feb | EOM ADVANCE AA285640 | | $10,500.00 |
| 13-Feb | E Advance Service | | $11,659.00 |
| 13-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 13-Feb | YES Capital Grou AA285650 | | $ 8,499.00 |
| 14-Feb | BUS ONL TFR FRM CK XXX7783 | $ 50,000.00 | |
| 14-Feb | EOM ADVANCE AA285640 | | $10,500.99 |
| 14-Feb | EOM ADVANCE AA285640 | | $ 10,500.00 |
| 14-Feb | E Advance Service | | $11,659.00 |
| 14-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 14-Feb | YES Capital Grou AA285650 | | $8,499.00 |
| 18-Feb | BUS ONL TFR FRM CK XXX7783 | $100,000.00 | |
| 18-Feb | E Advance Servic TRN DEBIT | | $11,659.00 |
| 18-Feb | E Advance Service TRN  HAAW | | $ 11,659.00 |
| 18-Feb | EOM ADVANCE AA285640 | | $10,500.99 |

| | | | |
|---|---|---|---|
| 18-Feb | EOM ADVANCE AA285640 | | $10,500.99 |
| 18-Feb | EOM ADVANCE AA285640 | | $10,500.00 |
| 18-Feb | EOM ADVANCE AA285640 | | $10,500.00 |
| 18-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 18-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 18-Feb | YES Capital Grou AA285650 | | $8,499.00 |
| 18-Feb | YES Capital Grou AA285650 | | $8,499.00 |
| 19-Feb | BUS ONL TFR FRM CK XXX7783 | $40,000.00 | |
| 19-Feb | E Advance Servic | | $11,659.00 |
| 19-Feb | EOM ADVANCE AA285640 | | $10,500.99 |
| 19-Feb | EOM ADVANCE AA285640 | | $10,500.00 |
| 19-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 19-Feb | YES Capital Grou AA285650 | | $8,499.00 |
| 20-Feb | BUS ONL TFR FRM CK XXX7783 | $50,000.00 | |
| 20-Feb | E Advance Servic | | $11,659.00 |
| 20-Feb | EOM ADVANCE AA285640 | | $10,500.99 |
| 20-Feb | EOM ADVANCE AA285640 | | $10,500.00 |
| 20-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 20-Feb | YES Capital Grou AA285650 | | $8,499.00 |
| 21-Feb | BUS ONL TFR FRM CK XXX7783 | $50,000.00 | |
| 21-Feb | E Advance Servic | | $11,659.00 |
| 21-Feb | EOM ADVANCE AA285640 | | $10,500.99 |
| 21-Feb | EOM ADVANCE AA285640 | | $10,500.00 |
| 21-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 21-Feb | YES Capital Grou AA285650 | | $8,499.00 |
| 24-Feb | BUS ONL TFR FRM CK XXX7783 | $ 50,000.00 | |
| 24-Feb | E Advance Servic | | $11,659.00 |
| 24-Feb | EOM ADVANCE AA285640 | | $10,500.99 |
| 24-Feb | EOM ADVANCE AA285640 | | $10,500.00 |
| 24-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 24-Feb | YES Capital Grou AA285650 | | $8,499.00 |
| 25-Feb | BUS ONL TFR FRM CK XXX7783 | $ 50,000.00 | |
| 26-Feb | BUS ONL TFR FRM CK XXX8535 | $50,000.00 | |
| 26-Feb | Misc Credit | $49,658.00 | |
| 26-Feb | E Advance Servic | | $11,659.00 |
| 26-Feb | EOM ADVANCE AA285640 | | $ 10,500.99 |
| 26-Feb | EOM ADVANCE AA285640 | | $ 10,500.00 |
| 26-Feb | YES Capital Grou AA285650 | | $ 8,500.00 |
| 26-Feb | YES Capital Grou AA285650 | | $8,499.00 |
| 26-Feb | E Advance Servic | | $11,659.00 |
| 26-Feb | EOM ADVANCE AA285640 | | $10,500.99 |

| | | | |
|---|---|---|---|
| 26-Feb | EOM ADVANCE AA285640 | | $10,500.00 |
| 26-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 26-Feb | YES Capital Grou AA285650 | | $ 8,499.00 |
| 27-Feb | BUS ONL TFR FRM CK XXX7783 | $50,000.00 | |
| 27-Feb | E Advance Servic | | $11,659.00 |
| 27-Feb | EOM ADVANCE AA285640 | | $10,500.99 |
| 27-Feb | EOM ADVANCE AA285640 | | $10,500.00 |
| 27-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 27-Feb | YES Capital Grou AA285650 | | $8,499.00 |
| 27-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 27-Feb | YES Capital Grou AA285650 | | $ 8,499.00 |
| 28-Feb | INCOING FEDWIRE TRANSFER | $222,500.00 | |
| 28-Feb | E Advance Servic | | $11,659.00 |
| 28-Feb | EOM ADVANCE AA285640 | | $ 10,500.99 |
| 28-Feb | EOM ADVANCE AA285640 | | $9,999.00 |
| 28-Feb | EOM ADVANCE AA285640 | | $10,500.00 |
| 28-Feb | YES Capital Grou AA285650 | | $8,500.00 |
| 28-Feb | YES Capital Grou AA285650 | | $8,499.00 |
| **total** | | **$1,618,158.00** | **$1,417,514.80** |

Total Number of Transactions:  125

| March 1-31, 2020 | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 2-Mar | BUS ONL TFR RMM CK XXX7783 | $60,000.00 | |
| 2-Mar | E Advance Servic TRN | | $11,659.00 |
| 2-Mar | EOM ADVANCE AA285640 | | $10,500.99 |
| 2-Mar | EOM ADVANCE AA285640 | | $10,500.00 |
| 2-Mar | EOM ADVANCE AA285663 | | $9,999.00 |
| 2-Mar | YES CAPITAL GROU AA285640 | | $8,500.00 |
| 2-Mar | YES CAPITAL GROU AA285640 | | $8,499.00 |
| 3-Mar | BUS ONL TFR RMM CK XXX7783 | $ 132,000.00 | |
| 3-Mar | YES CAPITAL GRP PREMIER HE | | $36,500.00 |
| 3-Mar | E Advance Servic TRN | | $11,659.00 |
| 3-Mar | EOM ADVANCE AA285640 | | $ 10,500.99 |
| 3-Mar | EOM ADVANCE AA285640 | | $10,500.00 |
| 3-Mar | EOM ADVANCE AA285663 | | $9,999.00 |
| 3-Mar | YES CAPITAL GROU AA285640 | | $ 8,500.00 |
| 3-Mar | YES CAPITAL GROU AA285640 | | $ 8,499.00 |
| 4-Mar | BUS ONL TFR RMM CK XXX7783 | $25,000.00 | |
| 4-Mar | E Advance Servic TRN | | $11,659.00 |
| 4-Mar | EOM ADVANCE AA285640 | | $10,500.99 |
| 4-Mar | EOM ADVANCE AA285640 | | $10,500.00 |
| 4-Mar | EOM ADVANCE AA285663 | | $ 9,999.00 |
| 4-Mar | YES CAPITAL GROU AA285640 | | $8,500.00 |

| Date | Description | Debit | Credit |
|---|---|---|---|
| 4-Mar | YES CAPITAL GROU AA285640 | | $8,499.00 |
| 5-Mar | BUS ONL TFR RMM CK XXX7783 | $60,000.00 | |
| 5-Mar | E Advance Servic TRN | | $11,659.00 |
| 5-Mar | EOM ADVANCE AA285640 | | $10,500.99 |
| 5-Mar | EOM ADVANCE AA285640 | | $10,500.00 |
| 5-Mar | EOM ADVANCE AA285663 | | $9,999.00 |
| 5-Mar | YES CAPITAL GROU AA285640 | | $8,500.00 |
| 5-Mar | YES CAPITAL GROU AA285640 | | $8,499.00 |
| 6-Mar | BUS ONL TFR RMM CK XXX7783 | $53,000.00 | |
| 6-Mar | INCOMING FEDWIRE TFR | $6,900.00 | |
| 6-Mar | E Advance Servic TRN | | $ 11,659.00 |
| 6-Mar | EOM ADVANCE AA285640 | | $10,500.99 |
| 6-Mar | EOM ADVANCE AA285640 | | $ 10,500.00 |
| 6-Mar | EOM ADVANCE AA285663 | | $ 9,999.00 |
| 6-Mar | YES CAPITAL GROU AA285640 | | $ 8,500.00 |
| 6-Mar | YES CAPITAL GROU AA285640 | | $ 8,499.00 |
| 9-Mar | BUS ONL TFR RMM CK XXX7783 | $ 60,000.00 | |
| 9-Mar | E Advance Servic TRN | | $11,659.00 |
| 9-Mar | EOM ADVANCE AA285640 | | $ 10,500.99 |
| 9-Mar | EOM ADVANCE AA285640 | | $ 10,500.00 |
| 9-Mar | EOM ADVANCE AA285663 | | $9,999.00 |
| 9-Mar | YES CAPITAL GROU AA285640 | | $ 8,500.00 |
| 9-Mar | YES CAPITAL GROU AA285640 | | $8,499.00 |
| 10-Mar | BUS ONL TFR RMM CK XXX7783 | $60,000.00 | |
| 10-Mar | E Advance Servic TRN | | $11,659.00 |
| 10-Mar | EOM ADVANCE AA285640 | | $10,500.99 |
| 10-Mar | EOM ADVANCE AA285640 | | $10,500.00 |
| 10-Mar | EOM ADVANCE AA285663 | | $9,999.00 |
| 10-Mar | YES CAPITAL GROU AA285640 | | $8,500.00 |
| 10-Mar | YES CAPITAL GROU AA285640 | | $8,499.00 |
| 11-Mar | BUS ONL TFR RMM CK XXX7783 | $ 58,000.00 | |
| 11-Mar | E Advance Servic TRN | | $11,659.00 |
| 11-Mar | EOM ADVANCE AA285640 | | $ 10,500.99 |
| 11-Mar | EOM ADVANCE AA285640 | | $10,500.00 |
| 11-Mar | EOM ADVANCE AA285663 | | $9,999.00 |
| 11-Mar | YES CAPITAL GROU AA285640 | | $8,500.00 |
| 11-Mar | YES CAPITAL GROU AA285640 | | $ 8,499.00 |
| 12-Mar | BUS ONL TFR RMM CK XXX7783 | $20,000.00 | |
| 12-Mar | E Advance Servic TRN | | $11,659.00 |
| 12-Mar | EOM ADVANCE AA285663 | | $9,999.00 |
| 12-Mar | YES CAPITAL GROU AA285640 | | $8,500.00 |
| 12-Mar | YES CAPITAL GROU AA285640 | | $ 8,499.00 |

EXHIBIT H
Page 58 of 75

| | | | |
|---|---|---|---|
| 13-Mar | BUS ONL TFR RMM CK XXX7783 | $38,000.00 | |
| 13-Mar | E Advance Servic TRN | | $11,659.00 |
| 13-Mar | EOM ADVANCE AA285663 | | $ 9,999.00 |
| 13-Mar | YES CAPITAL GROU AA285640 | | $ 8,500.00 |
| 13-Mar | YES CAPITAL GROU AA285640 | | $8,499.00 |
| 16-Mar | BUS ONL TFR RMM CK XXX7783 | $ 36,000.00 | |
| 16-Mar | E Advance Servic TRN | | $11,659.00 |
| 16-Mar | EOM ADVANCE AA285663 | | $9,999.00 |
| 16-Mar | YES CAPITAL GROU AA285640 | | $8,500.00 |
| 16-Mar | YES CAPITAL GROU AA285640 | | $8,499.00 |
| 17-Mar | BUS ONL TFR RMM CK XXX7783 | $39,000.00 | |
| 17-Mar | E Advance Servic TRN | | $ 11,659.00 |
| 17-Mar | EOM ADVANCE AA285663 | | $9,999.00 |
| 17-Mar | YES CAPITAL GROU AA285640 | | $ 8,500.00 |
| 17-Mar | YES CAPITAL GROU AA285640 | | $8,499.00 |
| 18-Mar | BUS ONL TFR RMM CK XXX7783 | $39,000.00 | |
| 18-Mar | E Advance Servic TRN | | $11,659.00 |
| 18-Mar | EOM ADVANCE AA285663 | | $9,999.00 |
| 18-Mar | YES CAPITAL GROU AA285640 | | $8,500.00 |
| 18-Mar | YES CAPITAL GROU AA285640 | | $ 8,499.00 |
| 19-Mar | BUS ONL TFR RMM CK XXX7783 | $38,000.00 | |
| 19-Mar | E Advance Servic TRN | | $11,659.00 |
| 19-Mar | EOM ADVANCE AA285663 | | $9,999.00 |
| 19-Mar | YES CAPITAL GROU AA285640 | | $8,500.00 |
| 19-Mar | YES CAPITAL GROU AA285640 | | $ 8,499.00 |
| 20-Mar | BUS ONL TFR RMM CK XXX7783 | $38,000.00 | |
| 20-Mar | E Advance Servic TRN | | $ 11,659.00 |
| 20-Mar | EOM ADVANCE AA285663 | | $9,999.00 |
| 20-Mar | YES CAPITAL GROU AA285640 | | $8,500.00 |
| 20-Mar | YES CAPITAL GROU AA285640 | | $8,499.00 |
| 23-Mar | BUS ONL TFR RMM CK XXX7783 | $ 39,000.00 | |
| 23-Mar | E Advance Servic TRN | | $11,659.00 |
| 23-Mar | EOM ADVANCE AA285663 | | $ 9,999.00 |
| 23-Mar | YES CAPITAL GROU AA285640 | | $8,500.00 |
| 23-Mar | YES CAPITAL GROU AA285640 | | $ 8,499.00 |
| 24-Mar | BUS ONL TFR RMM CK XXX7783 | $38,000.00 | |
| 24-Mar | E Advance Servic TRN | | $11,659.00 |
| 24-Mar | EOM ADVANCE AA285663 | | $9,999.00 |
| 24-Mar | YES CAPITAL GROU AA285640 | | $8,500.00 |
| 24-Mar | YES CAPITAL GROU AA285640 | | $8,499.00 |
| 25-Mar | BUS ONL TFR RMM CK XXX7783 | $39,000.00 | |

| | | | |
|---|---|---|---|
| 25-Mar | E Advance Servic TRN | | $ 11,659.00 |
| 25-Mar | EOM ADVANCE AA285663 | | $9,999.00 |
| 25-Mar | YES CAPITAL GROU AA285640 | | $8,500.00 |
| 25-Mar | YES CAPITAL GROU AA285640 | | $8,499.00 |
| 26-Mar | BUS ONL TFR RMM CK XXX7783 | $ 39,000.00 | |
| 26-Mar | E Advance Servic TRN | | $ 11,659.00 |
| 26-Mar | EOM ADVANCE AA285663 | | $9,999.00 |
| 26-Mar | YES CAPITAL GROU AA285640 | | $8,500.00 |
| 26-Mar | YES CAPITAL GROU AA285640 | | $ 8,499.00 |
| 27-Mar | BUS ONL TFR RMM CK XXX7783 | $38,000.00 | |
| 27-Mar | E Advance Servic TRN | | $11,659.00 |
| 27-Mar | EOM ADVANCE AA285663 | | $9,999.00 |
| 27-Mar | YES CAPITAL GROU AA285640 | | $8,500.00 |
| 27-Mar | YES CAPITAL GROU AA285640 | | $8,499.00 |
| 30-Mar | BUS ONL TFR RMM CK XXX7783 | $39,000.00 | |
| 30-Mar | E Advance Servic TRN | | $11,659.00 |
| 30-Mar | EOM ADVANCE AA285663 | | $ 9,999.00 |
| 30-Mar | YES CAPITAL GROU AA285640 | | $ 8,500.00 |
| 30-Mar | YES CAPITAL GROU AA285640 | | $ 8,499.00 |
| 31-Mar | BUS ONL TFR RMM CK XXX7783 | $5,000.00 | |
| 31-Mar | E Advance Servic TRN | | $11,659.00 |
| 31-Mar | EOM ADVANCE AA285663 | | $9,999.00 |
| **TOTAL $** | | **$999,900.00** | **$1,026,303.92** |

Total Number of Transactions:  125

## Pleasant Ridge Care Center, INC 8529

| November 1-30, 2019 | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 14-Nov | Remote | $ 400,000.00 | |
| 18-Nov | ck22513 | | $125,000.00 |
| 19-Nov | ck22514 | | $395,000.00 |
| 21-Nov | Remote | $295,000.00 | |
| 22-Nov | ck22515 | | $50,000.00 |
| 22-Nov | ck22516 | | $120,000.00 |
| 25-Nov | Remote | $ 315,000.00 | |
| 25-Nov | BUS ONL TR to xxx1656 | | $15,000.00 |
| 29-Nov | ck22541 | | $165,000.00 |
| **Total** | | **$1,010,000.00** | **$870,000.00** |

Total Number of Transactions:  9

| December 1-31, 2019 | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 2-Dec | ck 22542 | | $ 265,000.00 |
| 3-Dec | Remote | $285,000.00 | |
| 3-Dec | ck22543 | | $345,000.00 |

| 4-Dec | ck 22444 | | $250,000.00 |
|---|---|---|---|
| 5-Dec | Remote | $355,000.00 | $290,000.00 |
| 5-Dec | ck 22545 | | |
| 6-Dec | Remote | $295,000.00 | |
| 6-Dec | ck 22546 | | $260,000.00 |
| 6-Dec | ck22547 | | $235,000.00 |
| 9-Dec | ck22562 | | $290,000.00 |
| 10-Dec | Remote | $285,000.00 | |
| 10-Dec | ck22563 | | $290,000.00 |
| 11-Dec | Remote | $ 295,000.00 | |
| 11-Dec | ck22564 | | $310,000.00 |
| 11-Dec | ck22565 | | $230,000.00 |
| 12-Dec | Remote | $455,000.00 | |
| 12-Dec | ck22566 | | $270,000.00 |
| 16-Dec | Remote | $315,000.00 | |
| 16-Dec | ck22569 | | $325,000.00 |
| 16-Dec | ck22580 | | $305,000.00 |
| 17-Dec | ck22581 | | $305,000.00 |
| 17-Dec | ck22582 | | $390,000.00 |
| 18-Dec | ck22583 | | $402,100.00 |
| 18-Dec | ck22584 | | $301,050.00 |
| 19-Dec | Remote | $363,600.00 | |
| 19-Dec | ck22585 | | $289,530.00 |
| 20-Dec | Remote | $270,000.00 | |
| 20-Dec | ck22586 | | $334,640.00 |
| 24-Dec | Remote | $312,075.00 | |
| 24-Dec | ck22597 | | $331,890.00 |
| 26-Dec | Remote | $423,000.00 | |
| 26-Dec | ck22598 | | $333,970.00 |
| 26-Dec | ck22599 | | $394,830.00 |
| 27-Dec | Remote | $243,750.00 | |
| 27-Dec | ck22604 | | $ 9,000.00 |
| 27-Dec | ck22610 | | $343,675.00 |
| 30-Dec | Remote | $305,585.00 | |
| 30-Dec | ck22611 | | $213,760.00 |
| 30-Dec | ck22612 | | $213,760.00 |
| 31-Dec | ck22613 | | $ 315,400.00 |
| Total | | $4,203,101.00 | $7,843,605.00 |

Total Number of Transactions:  39

| January 1-31, 2020 | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 2-Jan | ck22614 | | $281,760.00 |
| 2-Jan | ck22615 | | $336,355.00 |
| 3-Jan | Remote | $310,480.00 | |
| 3-Jan | ck22618 | | $ 285,865.00 |
| 6-Jan | Remote | $ 356,890.00 | |
| 6-Jan | ck22629 | | $301,520.00 |
| 7-Jan | Remote | $279,460.00 | |
| 7-Jan | ck22630 | | $324,830.00 |
| 7-Jan | ck22631 | | $ 332,740.00 |
| 8-Jan | Remote | $341,360.00 | |
| 8-Jan | Remote | $262,460.00 | |
| 8-Jan | ck22632 | | $332,890.00 |
| 9-Jan | ck22633 | | $326,240.00 |
| 10-Jan | Remote | $476,052.00 | |
| 10-Jan | ck22634 | | $297,150.00 |
| 13-Jan | Remote | $264,117.00 | |
| 13-Jan | ck22635 | | $361,530.00 |
| 13-Jan | ck22636 | | $298,720.00 |

EXHIBIT H
Page 61 of 75

| 14-Jan | Remote | $463,720.00 | |
|--------|--------|-------------|---|
| 14-Jan | ck22654 | | $417,520.00 |
| 15-Jan | Remote | $479,847.00 | |
| 15-Jan | INCOMING FEDWIRE TRANS | $180,000.00 | |
| 15-Jan | ck22656 | | $360,564.00 |
| 15-Jan | ck22655 | | $363,280.00 |
| 16-Jan | Remote**** | $695,453.00 | |
| 16-Jan | ck22657 | | $301,068.00 |
| 16-Jan | ck22658 | | $293,811.00 |
| 17-Jan | Remote | $624,511.00 | |
| 17-Jan | ck22659 | | $381,504.00 |
| 21-Jan | Remote | $349,045.00 | |
| 21-Jan | ck22673 | | $401,690.00 |
| 22-Jan | Remote | $369,125.00 | |
| 22-Jan | ck22674 | | $386,510.00 |
| 22-Jan | ck22675 | | $280,480.00 |
| 23-Jan | Remote | $499,731.00 | |
| 23-Jan | ck22676 | | $402,637.00 |
| 23-Jan | ck22677 | | $337,425.00 |
| 24-Jan | Remote | $334,752.00 | |
| 24-Jan | ck22678 | | $400,657.00 |
| 27-Jan | Remote | $330,760.00 | |
| 27-Jan | ck22695 | | $398,654.00 |
| 28-Jan | Remote | $398,843.00 | |
| 28-Jan | ck22696 | | $397,541.00 |
| 28-Jan | ck22697 | | $335,058.00 |
| 29-Jan | Remote | $331,227.00 | |
| 29-Jan | ck22698 | | $400,834.00 |
| 30-Jan | Remote | $402,641.00 | |
| 30-Jan | Remote | $348,235.00 | |
| 30-Jan | ck22699 | | $397,723.00 |
| 31-Jan | Remote | $336,448.00 | |
| 31-Jan | ck22708 | | $399,749.00 |
| 31-Jan | ck22609 | | $325,005.00 |
| 15-Jan | Avanza Capital advancepmt | | $7,500.00 |
| 16-Jan | Avanza Capital advancepmt | | $7,500.00 |
| 17-Jan | Avanza Capital advancepmt | | $7,500.00 |
| 21-Jan | Avanza Capital advancepmt | | $7,500.00 |
| 22-Jan | Avanza Capital advancepmt | | $7,500.00 |
| 22-Jan | Avanza Capital advancepmt | | $7,500.00 |
| 23-Jan | Avanza Capital advancepmt | | $7,500.00 |
| 24-Jan | Avanza Capital advancepmt | | $7,500.00 |
| total | | $9,435,157.00 | $10,521,310.00 |

Total Number of Transactions:  50

| February 1-29, 2020 | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---------------------|--------------------|-----------------------|-----------------------|
| 3-Feb | Remote | $390,213.00 | |
| 3-Feb | ck22710 | | $332,266.00 |
| 4-Feb | Remote | $281,326.00 | |
| 4-Feb | ck22711 | | $432,557.00 |
| 5-Feb | Remote | $373,326.00 | |
| 5-Feb | ck22712 | | $433,668.00 |
| 6-Feb | Remote | $370,415.00 | |
| 6-Feb | ck22713 | | $432,557.00 |
| 7-Feb | Remote | $499,563.00 | |
| 7-Feb | Remote | $360,439.00 | |
| 7-Feb | ck22716 | | $468,264.00 |
| 10-Feb | ck22717 | | $467,153.00 |

EXHIBIT H
Page 62 of 75

| Date | Source/Destination | Incoming | Outgoing |
|---|---|---|---|
| 10-Feb | ck22718 | | $498,377.00 |
| 11-Feb | Remote | $339,217.00 | |
| 11-Feb | ck22719 | | $501,227.00 |
| 12-Feb | Remote | $374,668.00 | |
| 12-Feb | ck22720 | | $499,331.00 |
| 13-Feb | Remote | $374,206.00 | |
| 14-Feb | Remote | $374,508.00 | |
| 14-Feb | ck22721 | | $426,334.00 |
| 14-Feb | ck22722 | | $425,446.00 |
| 14-Feb | ck22723 | | $598,537.00 |
| 18-Feb | Remote | $397,924.00 | |
| 18-Feb | ck22743 | | $501,943.00 |
| 19-Feb | Remote | $ 458,381.00 | |
| 19-Feb | ck22744 | | $ 502,832.00 |
| 19-Feb | ck22745 | | $ 651,852.00 |
| 20-Feb | Remote | $467,704.00 | |
| 20-Feb | Remote | $467,053.00 | |
| 20-Feb | ck22747 | | $ 501,721.00 |
| 20-Feb | BUS ONL TFR TO  xxx0421 | | $10,000.00 |
| 21-Feb | Remote | $399,884.00 | |
| 21-Feb | ck22748 | | $502,613.00 |
| 21-Feb | ck22749 | | $748,991.00 |
| 27-Feb | Remote | $501,999.00 | |
| 27-Feb | BUS ONL TFR FROM xxx0421 | $8,678.00 | |
| 27-Feb | BUS ONL TFR FROM xxx7783 | $8,000.00 | |
| 27-Feb | BUS ONL TFR TO  xxx7783 | | $100,000.00 |
| 3-Feb | Avanza Capital ADVANCEPMT | | $7,500.00 |
| 4-Feb | Avanza Capital ADVANCEPMT | | $7,500.00 |
| 5-Feb | Avanza Capital ADVANCEPMT | | $7,500.00 |
| 6-Feb | Avanza Capital ADVANCEPMT | | $7,500.00 |
| total | | $ 6,447,504.00 | $9,065,669.00 |

Total Number of Transactions:  41

| March 1-31, 2020 | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 2-Mar | BUS ONL TFR CK TO xxx7783 | | $355,000.00 |
| 2-Mar | BUS ONL TFR CK TO xxx7783 | | $ 52,000.00 |
| 3-Mar | BUS ONL TFR CK xxx7783 | $30,000.00 | |
| 3-Mar | ck22766 | | $ 2,000.00 |
| 4-Mar | BUS ONL TFR CK xxx7783 | $ 20,000.00 | |
| 4-Mar | BUS ONL TFR CK xxx7783 | $ 15,000.00 | |
| 9-Mar | BUS ONL TFR CK TOxxx7783 | | $125,000.00 |
| 11-Mar | BUS ONL TFR CK xxx7783 | $38,000.00 | |
| 11-Mar | BUS ONL TFR CK TO xxx8532 | | $ 68,000.00 |
| 12-Mar | BUS ONL TFR CK to xxx8532 | | $29,000.00 |
| 13-Mar | BUS ONL TFR CK TO xxx8532 | | $6,000.00 |
| 16-Mar | BUS ONL TFR CK TO xxx7783 | | $30,000.00 |
| 16-Mar | BUS ONL TFR CK TO xxx8532 | | $1,000.00 |
| 17-Mar | BUS ONL TFR CK xxx7783 | $10,000.00 | |
| 18-Mar | BUS ONL TFR CK TO xxx7783 | | $10,000.00 |
| 19-Mar | BUS ONL TFR CK TO xxx7783 | | $ 80,000.00 |
| 20-Mar | BUS ONL TFR CK TO xxx7783 | | $11,000.00 |
| 20-Mar | BUS ONL TFR CK TO xxx1656 | | $ 5,000.00 |
| 23-Mar | BUS ONL TFR CK xxx7783 | $45,000.00 | |
| 23-Mar | BUS ONL TFR CK TO xxx1656 | | $35,000.00 |
| 26-Mar | BUS ONL TFR CK xxx7783 | $85,000.00 | |
| 26-Mar | BUS ONL TFR CK TO xxx8532 | | $96,000.00 |
| 27-Mar | BUS ONL TFR CK TO xxx8532 | | $2,000.00 |
| 31-Mar | BUS ONL TFR CK TOxxx7783 | | $12,500.00 |
| 31-Mar | BUS ONL TFR CK TOxxx8532 | | $1,500.00 |

| total | | $243,000.00 | $921,000.00 |
|---|---|---|---|

Total Number of Transactions:  24

| April 1-30, 2020 | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 1-Apr | BUS ONL TFR TO XXX7783 | | $9,500.00 |
| 2-Apr | BUS ONL TFR FROM XXX8532 | $22,000.00 | |
| 6-Apr | BUS ONL TFR TO XXX7783 | | $20,000.00 |
| 7-Apr | BUS ONL TFR FROM XXX6130 | $105,654.00 | |
| 7-Apr | BUS ONL TFR TO XXX7783 | | $90,000.00 |
| 8-Apr | BUS ONL TFR TO XXX8532 | | $115,000.00 |
| 8-Apr | BUS ONL TFR TO XXX7783 | | $40,000.00 |
| 10-Apr | BUS ONL TFR FROM XXX8521 | $9,000.00 | |
| 10-Apr | BUS ONL TFR TO XXX7783 | | $40,000.00 |
| 15-Apr | BUS ONL TFR TO XXX7783 | | $32,500.00 |
| 15-Apr | BUS ONL TFR TO XXX7783 | | $2,500.00 |
| 16-Apr | ACCT CLOSED | | |
| **Total** | | **$136,654.00** | **$349,500** |

Total Number of Transactions:  11

## Ivy Woods Health Care OP (xxx8480)

| November 1-30, 2019 | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 7-Nov | ck 32513 | | $ 3,170.00 |
| 7-Nov | ck 32527 | | $ 1,490.00 |
| 8-Nov | BUS ONL TFR FR xxx0434 | | $ 400,000.00 |
| 12-Nov | ck 32569 | | $ 376,000.00 |
| 14-Nov | Remote | $ 1,470.00 | |
| 15-Nov | Remote | $ 340,000.00 | |
| 19-Nov | Remote | $ 310,000.00 | |
| 20-Nov | Remote | $ 109,000.00 | |
| 22-Nov | Remote | $ 365,000.00 | |
| 25-Nov | ck 32544 | | $ 2,000.00 |
| 26-Nov | ck 32597 | | $ 100,000.00 |
| 26-Nov | ck 32598 | | $ 280,000.00 |
| 29-Nov | ck 32599 | | $ 155,000.00 |
| **Total** | | **$ 1,125,470.00** | **$ 1,317,660.00** |

Total Number of Transactions:  11

| December 1-31, 2019 | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 2-Dec | Remote | $ 210,000.00 | |
| 3-Dec | Remote | $ 310,000.00 | |
| 4-Dec | Remote | $ 375,000.00 | |
| 5-Dec | Remote | $ 315,000.00 | |
| 6-Dec | Remote | $ 230,000.00 | |
| 5-Dec | ck 32615 | | $ 145,000.00 |
| 9-Dec | Remote | $ 285,000.00 | |
| 10-Dec | Remote | $ 385,000.00 | |

| 11-Dec | ck 32629 | | $ 145,000.00 |
|---|---|---|---|
| 12-Dec | Remote | $ 435,000.00 | |
| 13-Dec | Remote | $ 375,000.00 | |
| 16-Dec | Remote | $ 355,000.00 | |
| 16-Dec | Remote | $ 315,000.00 | |
| 16-Dec | ck 32630 | | $ 2,150.00 |
| 17-Dec | Remote | $ 385,000.00 | |
| 17-Dec | ck 32641 | | $ 245,000.00 |
| 18-Dec | Remote | $ 372,200.00 | |
| 18-Dec | ck 32642 | | $ 248,950.00 |
| 19-Dec | Remote | $ 357,240.00 | |
| 20-Dec | Remote | $ 297,420.00 | |
| 23-Dec | Remote | $ 301,155.00 | |
| 23-Dec | ck 32650 | | $ 359,490.00 |
| 24-Dec | Remote | $ 332,090.00 | |
| 24-Dec | Substitute check reversal | $ 359,490.00 | |
| 26-Dec | Remote | $ 283,490.00 | |
| 26-Dec | ck 32651 | | $ 359,490.00 |
| 27-Dec | Remote | $ 407,485.00 | |
| 27-Dec | ck 32671 | | $ 25,250.00 |
| 30-Dec | Remote | $ 329,415.00 | |
| 30-Dec | ck 32674 | | $ 319,080.00 |
| 31-Dec | Remote | $ 379,340.00 | |
| **Total** | | **$ 7,394,325.00** | **$ 1,849,410.00** |

Total Number of Transactions:  30

| January 1-31, 2020 | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 2-Jan | Remote | $ 316,835.00 | |
| 2-Jan | Remote | $ 253,410.00 | |
| 2-Jan | ck 32666 | | $ 7,000.00 |
| 3-Jan | Remote | $ 332,870.00 | |
| 6-Jan | Remote | $ 351,495.00 | |
| 6-Jan | ck 32683 | | $ 327,310.00 |
| 7-Jan | Remote | $ 279,070.00 | |
| 7-Jan | ck 32670 | | $ 2,000.00 |
| 7-Jan | ck 32684 | | $ 334,085.00 |
| 8-Jan | Remote | $ 257,090.00 | |
| 8-Jan | ck 32685 | | $ 336,010.00 |
| 10-Jan | ck 32686 | | $ 295,670.00 |
| 13-Jan | Remote | $ 475,312.00 | |
| 14-Jan | ck 32704 | | $ 259,084.00 |
| 15-Jan | Remote | $211,150.00 | |

EXHIBIT H
Page 65 of 75

| 15-Jan | INC FEDWIRE Transfer | $ 180,000.00 | |
| 15-Jan | ck 32678 | | $      1,399.00 |
| 21-Jan | Remote | $ 522,390.00 | |
| 21-Jan | ck 32725 | | $   342,180.00 |
| 24-Jan | Remote | $ 397,291.00 | |
| 24-Jan | ck 32726 | | $   336,642.00 |
| 27-Jan | Remote | $ 403,159.00 | |
| 27-Jan | ck 32744 | | $   335,531.00 |
| 29-Jan | Remote | $ 730,784.00 | |
| 30-Jan | Remote | $ 401,824.00 | |
| 30-Jan | ck 32745 | | $   301,449.00 |
| 30-Jan | ck 32713 | | $      1,490.00 |
| 30-Jan | Avanza Capital ADVANCEPMT | | $      7,500.00 |
| 17-Jan | Avanza Capital ADVANCEPMT | | $      7,500.00 |
| 21-Jan | Avanza Capital ADVANCEPMT | | $      7,500.00 |
| 22-Jan | Avanza Capital ADVANCEPMT | | $      7,500.00 |
| 22-Jan | Avanza Capital ADVANCEPMT | | $      7,500.00 |
| 23-Jan | Avanza Capital ADVANCEPMT | | $      7,500.00 |
| 24-Jan | Avanza Capital ADVANCEPMT | | $      7,500.00 |
| 27-Jan | Avanza Capital ADVANCEPMT | | $      7,500.00 |
| 28-Jan | Avanza Capital ADVANCEPMT | | $      7,500.00 |
| 29-Jan | Avanza Capital ADVANCEPMT | | $      7,500.00 |
| 30-Jan | Avanza Capital ADVANCEPMT | | $      7,500.00 |
| 31-Jan | Avanza Capital ADVANCEPMT | | $      7,500.00 |
| **Total** | | **$5,112,680.00** | **$ 2,969,850.00** |

Total Number of Transactions:  45

| February 1-29,  2020 | Source/Destination | Incoming Transac-tions | Outgoing  Trans-actions |
| --- | --- | --- | --- |
| 3-Feb | Remote | $      393,117.00 | |
| 3-Feb | ck 32750 | | $   497,138.00 |
| 4-Feb | Remote | $      279,852.00 | |
| 5-Feb | Remote | $      379,741.00 | |
| 6-Feb | Remote | $      499,773.00 | |
| 7-Feb | ck 32768 | | $   500,643.00 |
| 10-Feb | Remote | $      337,549.00 | |
| 10-Feb | ck 32742 | | $      2,000.00 |
| 11-Feb | Remote | $      335,485.00 | |
| 12-Feb | Remote | $      373,115.00 | |
| 12-Feb | ck 32763 | | $     14,000.00 |
| 12-Feb | ck 32769 | | $   501,238.00 |

| Date | Source/Destination | Incoming | Outgoing |
|---|---|---|---|
| 13-Feb | Remote | $ 342,779.00 | |
| 14-Feb | Remote | $ 375,692.00 | |
| 14-Feb | ck 32777 | | $ 422,585.00 |
| 18-Feb | Remote | $ 399,646.00 | |
| 19-Feb | Remote | $ 459,813.00 | |
| 20-Feb | Remote | $ 449,492.00 | |
| 20-Feb | ck 32779 | | $ 501,042.00 |
| 20-Feb | ck 32780 | | $ 751,941.00 |
| 20-Feb | BUS ONL TFR TO xxx8697 | | $ 18,000.00 |
| 26-Feb | MISC Credit | $ 7,500.00 | |
| 27-Feb | BUS ONL TFR FR xxx0434 | $ 12,267.00 | |
| 27-Feb | BUS ONL TFR TO xxx8493 | | $ 3,000.00 |
| 28-Feb | BUS ONL TFR FR xxx7783 | $ 30,000.00 | |
| 28-Feb | BUS ONL TFR TO xxx8493 | | $ 5,000.00 |
| 3-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 4-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 5-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 6-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 7-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 10-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 11-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 12-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 13-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 14-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 18-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 19-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 19-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 20-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 21-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 24-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 26-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 27-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 27-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| 28-Feb | Avanza Capital, ADVANCEPMT | | $ 7,500.00 |
| **Total** | | $ 4,675,821.00 | $ 3,366,587.00 |

Total Number of Transactions:  49

| March 1-31, 2020 | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 2-Mar | BUS ONL TFR FR xxx7783 | $ 70,000.00 | |
| 3-Mar | ck 32800 | | $ 2,000.00 |

| | | | |
|---|---|---|---|
| 4-Mar | BUS ONL TFR FR xxx0434 | $ 47,557.00 | |
| 4-Mar | BUS ONL TFR TO xxx8493 | | $ 15,888.00 |
| 4-Mar | BUS ONL TFR TO xxx7783 | | $ 20,000.00 |
| 6-Mar | BUS ONL TFR TO xxx8493 | | $ 1,000.00 |
| 6-Mar | BUS ONL TFR TO xxx8493 | | $ 1,000.00 |
| 9-Mar | BUS ONL TFR FR xxx7783 | $ 15,000.00 | |
| 9-Mar | BUS ONL TFR FR xxx0434 | $ 1,740.00 | |
| 9-Mar | ck 32737 | | $ 1,200.00 |
| 11-Mar | BUS ONL TFR TO xxx7783 | | $ 60,000.00 |
| 11-Mar | BUS ONL TFR TO xxx7783 | | $ 50,000.00 |
| 12-Mar | BUS ONL TFR FR xxx7783 | $ 10,000.00 | |
| 12-Mar | BUS ONL TFR FR xxx0434 | $ 2,600.00 | |
| 13-Mar | BUS ONL TFR TO xxx8493 | | $ 20,000.00 |
| 16-Mar | BUS ONL TFR FR xxx8493 | $ 18,000.00 | |
| 16-Mar | BUS ONL TFR TO xxx7783 | | $ 15,000.00 |
| 17-Mar | BUS ONL TFR TO xxx7783 | | $ 5,000.00 |
| 19-Mar | BUS ONL TFR TO xxx8493 | | $ 6,000.00 |
| 23-Mar | BUS ONL TFR FR xxx7783 | $ 10,000.00 | |
| 23-Mar | BUS ONL TFR TO xxx8493 | | $ 3,000.00 |
| 24-Mar | BUS ONL TFR TO xxx7783 | | $ 20,000.00 |
| 26-Mar | BUS ONL TFR TO xxx7783 | | $ 10,000.00 |
| 27-Mar | BUS ONL TFR FR xxx7783 | $ 15,500.00 | |
| 30-Mar | BUS ONL TFR FR xxx7783 | $ 5,000.00 | |
| 31-Mar | BUS ONL TFR TO xxx7783 | | $ 5,000.00 |
| 2-Mar | Avanza Capital ADVANCEPMT | | $ 7,500.00 |
| 3-Mar | Avanza Capital ADVANCEPMT | | $ 7,500.00 |
| 4-Mar | Avanza Capital ADVANCEPMT | | $ 7,500.00 |
| 5-Mar | Avanza Capital ADVANCEPMT | | $ 7,500.00 |
| 6-Mar | Avanza Capital ADVANCEPMT | | $ 7,500.00 |
| 9-Mar | Avanza Capital ADVANCEPMT | | $ 7,500.00 |
| 10-Mar | Avanza Capital ADVANCEPMT | | $ 7,500.00 |
| 11-Mar | Avanza Capital ADVANCEPMT | | $ 7,500.00 |
| **Total** | | **$ 195,397.00** | **$ 295,088.00** |

Total Number of Transactions:  33

| April 1-30, 2020 | Source/Destination | Incoming Transac-tions | Outgoing Trans-actions |
|---|---|---|---|
| 1-Apr | BUS ONL TFR FR xxx0434 | $ 4,011.00 | |
| 1-Apr | BUS ONL TFR TO xxx8493 | | $ 4,000.00 |
| 1-Apr | BUS ONL TFR TO xxx8355 | | $ 2,736.00 |
| 2-Apr | ck 32859 | | $ 2,000.00 |
| 2-Apr | BUS ONL TFR TO xxx7783 | | $ 68,000.00 |
| 2-Apr | BUS ONL TFR FR xxx0434 | $ 84,051.00 | |
| 3-Apr | BUS ONL TFR FR xxx0434 | $ 33,083.00 | |
| 3-Apr | BUS ONL TFR TO xxx7783 | | $ 33,000.00 |

| 3-Apr | BUS ONL TFR TO xxx8493 | | $ 2,000.00 |
| 3-Apr | BUS ONL TFR TO xxx7783 | | $ 2,000.00 |
| 6-Apr | BUS ONL TFR TO xxx7783 | | $ 30,000.00 |
| 7-Apr | BUS ONL TFR FR xxx8600 | $ 78,692.00 | |
| 7-Apr | BUS ONL TFR TO xxx7783 | | $ 70,000.00 |
| 7-Apr | BUS ONL TFR TO xxx8493 | | $ 1,000.00 |
| 8-Apr | BUS ONL TFR TO xxx7783 | | $ 10,000.00 |
| 8-Apr | BUS ONL TFR TO xxx7783 | | $ 140,000.00 |
| 10-Apr | BUS ONL TFR TO xxx7783 | | $ 20,000.00 |
| 13-Apr | ck 32875 | | $ 10,500.00 |
| 13-Apr | BUS ONL TFR TO xxx7783 | | $ 100,000.00 |
| 15-Apr | BUS ONL TFR FR xxx7783 | $ 110,000.00 | |
| 15-Apr | BUS ONL TFR TO xxx8493 | | $ 135,000.00 |
| 15-Apr | BUS ONL TFR TO xxx7783 | | $ 2,500.00 |
| **Total** | | **$ 309,837.00** | **$ 632,736.00** |

Total Number of Transactions: 21

## Forest Hills Op Acct (xxx8587)

| November 1-30, 2019 | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 13-Nov | ck12610 | | $ 475,000.00 |
| 19-Nov | Remote | $ 390,000.00 | |
| 20-Nov | Remote | $ 210,000.00 | |
| 21-Nov | ck12630 | | $ 250,000.00 |
| 22-Nov | ck12646 | | $ 50,000.00 |
| 22-Nov | ck12630 | | $ 210,000.00 |
| 25-Nov | Remote | $ 385,000.00 | |
| 25-Nov | ck12577 | | $ 3,000.00 |
| 25-Nov | ck12584 | | $ 4,000.00 |
| 26-Nov | Remote | $ 430,000.00 | |
| 29-Nov | ck12647 | | $ 120,000.00 |
| **Total** | | **$ 1,415,000.00** | **$ 1,112,000.00** |

Total Number of Transactions: 10

| December 1-30, 2019 | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 2-Dec | Remote | $ 235,000.00 | |
| 3-Dec | Remote | $ 205,000.00 | |
| 3-Dec | ck12662 | | $ 215,000.00 |
| 4-Dec | Remote | $ 210,000.00 | |
| 5-Dec | Remote | $ 285,000.00 | |
| 6-Dec | Remote | $ 315,000.00 | |

| | | | |
|---|---|---|---|
| 9-Dec | Remote | $   285,000.00 | |
| 9-Dec | ck12677 | | $   145,000.00 |
| 10-Dec | Remote | $   415,000.00 | |
| 10-Dec | ck12678 | | $   200,000.00 |
| 11-Dec | Remote | $   440,000.00 | |
| 12-Dec | Remote | $   340,000.00 | |
| 12-Dec | ck12679 | | $   2,950.00 |
| 13-Dec | Remote | $   290,000.00 | |
| 16-Dec | Remote | $   280,000.00 | |
| 16-Dec | Remote | $   265,000.00 | |
| 18-Dec | Remote | $   318,900.00 | |
| 19-Dec | Remote | $   329,660.00 | |
| 20-Dec | Remote | $   221,890.00 | |
| 20-Dec | ck12649 | | $   2,000.00 |
| 20-Dec | ck12653 | | $   3,000.00 |
| 20-Dec | ck12703 | | $   329,370.00 |
| 23-Dec | ck12704 | | $   387,390.00 |
| 23-Dec | ck12705 | | $   334,240.00 |
| 24-Dec | Remote | $   309,275.00 | |
| 26-Dec | Remote | $   268,870.00 | |
| 27-Dec | Remote | $   387,515.00 | |
| 27-Dec | ck12660 | | $   4,000.00 |
| 27-Dec | ck12718 | | $   387,290.00 |
| 30-Dec | Remote | $   349,865.00 | |
| 30-Dec | ck12663 | | $   3,487.00 |
| 31-Dec | Remote | $   386,270.00 | |
| 31-Dec | Remote | $   150,000.00 | |
| **Total** | | **$ 6,606,090.00** | **$ 2,013,727.00** |

Total Number of Transactions: 32

| January 1-31, 2020 | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 2-Jan | Remote | $   317,610.00 | |
| 2-Jan | ck12712 | | $   7,000.00 |
| 2-Jan | ck12719 | | $   327,965.00 |
| 3-Jan | Remote | $   560,290.00 | |
| 3-Jan | ck12569 | | $   2,500.00 |
| 6-Jan | ck12733 | | $   329,610.00 |
| 7-Jan | Remote | $   295,135.00 | |
| 7-Jan | ck12716 | | $   4,000.00 |

| Date | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 8-Jan | Remote | $ 259,730.00 | |
| 9-Jan | Remote | $ 625,085.00 | |
| 9-Jan | ck12709 | | $ 2,000.00 |
| 9-Jan | ck12710 | | $ 3,000.00 |
| 9-Jan | ck12743 | | $ 342,901.00 |
| 10-Jan | Remote | $ 262,515.00 | |
| 14-Jan | Remote | $ 662,285.00 | |
| 14-Jan | ck12755 | | $ 362,400.00 |
| 15-Jan | ck12688 | | $ 3,776.00 |
| 17-Jan | ck12756 | | $ 372,430.00 |
| 21-Jan | Remote | $ 543,245.00 | |
| 21-Jan | ck12778 | | $ 328,755.00 |
| 22-Jan | Remote | $ 233,210.00 | |
| 23-Jan | Remote | $ 335,862.00 | |
| 24-Jan | Remote | $ 402,847.00 | |
| 24-Jan | ck12779 | | $ 333,967.00 |
| 27-Jan | Remote | $ 399,090.00 | |
| 27-Jan | ck12797 | | $ 334,076.00 |
| 28-Jan | Remote | $ 732,339.00 | |
| 29-Jan | Remote | $ 402,722.00 | |
| 30-Jan | Remote | $ 399,045.00 | |
| 30-Jan | ck12799 | | $ 298,551.00 |
| 31-Jan | Remote | $ 399,090.00 | |
| **Total** | | **$ 6,523,220.00** | **$ 3,092,931.00** |

Total Number of Transactions: 31

| February 2-29, 2020 | Source/Destination | Incoming Transactions | Outgoing Transactions |
|---|---|---|---|
| 3-Feb | Remote | $ 683,618.00 | |
| 3-Feb | ck12809 | | $ 502,862.00 |
| 4-Feb | ck12788 | | $ 3,000.00 |
| 5-Feb | Remote | $ 375,407.00 | |
| 5-Feb | ck12785 | | $ 2,000.00 |
| 5-Feb | ck12810 | | $ 502,346.00 |
| 6-Feb | Remote | $ 366,679.00 | |
| 7-Feb | Remote | $ 358,266.00 | |
| 7-Feb | INCOMING FEDWIRE | $ 183,965.00 | |
| 7-Feb | ck12821 | | $ 499,357.00 |
| 10-Feb | Remote | $ 331,470.00 | |
| 10-Feb | ck12795 | | $ 4,000.00 |
| 11-Feb | Remote | $ 325,764.00 | |

| Date | Description | Amount | Amount |
|------|-------------|--------|--------|
| 11-Feb | ADJUSTMENT DR | | $ 399,090.00 |
| 12-Feb | Remote | $ 375,904.00 | |
| 12-Feb | ck12816 | | $ 3,500.00 |
| 12-Feb | ck12818 | | $ 10,500.00 |
| 12-Feb | TAXOCAT OH RTN | | $ 6,500.00 |
| 13-Feb | Remote | $ 346,741.00 | |
| 13-Feb | ck12823 | | $ 498,241.00 |
| 14-Feb | Remote | $ 780,829.00 | |
| 14-Feb | ck12822 | | $ 425,895.00 |
| 18-Feb | Remote | $ 400,156.00 | |
| 18-Feb | ck12848 | | $ 498,818.00 |
| 18-Feb | ck12849 | | $ 600,743.00 |
| 19-Feb | Remote | $ 457,443.00 | |
| 19-Feb | Remote | $ 433,959.00 | |
| 19-Feb | ck12851 | | $ 499,931.00 |
| 20-Feb | Remote | $ 463,984.00 | |
| 20-Feb | ck12852 | | $ 748,059.00 |
| 20-Feb | BUS ONL TFR TO CK xxx8736 | | $ 12,000.00 |
| 21-Feb | Remote | $ 398,007.00 | |
| 21-Feb | ck12853 | | $ 499,849.00 |
| 24-Feb | ck12815 | | $ 6,981.00 |
| 26-Feb | Misc Credit | $ 7,495.00 | |
| 28-Feb | BUS ONL TFR FR CK xxx7783 | $ 32,000.00 | |
| 28-Feb | BUS ONL TFR TO CK xxx1630 | | $ 8,700.00 |
| 28-Feb | BUS ONL TFR TO CK xxx8590 | | $ 2,000.00 |
| 10-Feb | PROSPERUM Capita* | | $ 7,495.00 |
| 11-Feb | PROSPERUM Capita | | $ 7,495.00 |
| 12-Feb | PROSPERUM Capita | | $ 7,495.00 |
| 13-Feb | PROSPERUM Capita | | $ 7,495.00 |
| 14-Feb | PROSPERUM Capita | | $ 7,495.00 |
| 18-Feb | PROSPERUM Capita | | $ 7,495.00 |
| 19-Feb | PROSPERUM Capita | | $ 7,495.00 |
| 20-Feb | PROSPERUM Capita | | $ 7,495.00 |
| 21-Feb | PROSPERUM Capita | | $ 7,495.00 |
| 24-Feb | PROSPERUM Capita | | $ 7,495.00 |
| 26-Feb | PROSPERUM Capita | | $ 7,495.00 |
| 27-Feb | PROSPERUM Capita | | $ 7,495.00 |
| 27-Feb | PROSPERUM Capita | | $ 7,495.00 |
| 28-Feb | PROSPERUM Capita | | $ 7,495.00 |
| Total | | $ 6,321,687.00 | $ 5,336,440.00 |

Total Number of Transactions: 51
*MCA related payments total $104,930 (example)

EXHIBIT H
Page 72 of 75

| March 1-31, 2020 | Source/Destination | Incoming Trans-actions | Outgoing Trans-actions |
|---|---|---|---|
| 2-Mar | BUS ONL TFR FROM xxx7783 | $ 180,000.00 | |
| 2-Mar | BUS ONL TFR FROM xxx0489 | $ 8,939.00 | |
| 2-Mar | BUS ONL TFR TO  xxx8590 | | $ 2,000.00 |
| 3-Mar | ck12868 | | $ 3,000.00 |
| 3-Mar | ck12878 | | $ 4,000.00 |
| 4-Mar | BUS ONL TFR FROM xxx0489 | $ 4,656.00 | |
| 4-Mar | ck12863 | | $ 2,000.00 |
| 4-Mar | BUS ONL TFR TO  xxx7783 | | $ 40,000.00 |
| 5-Mar | BUS ONL TFR TO  xxx7783 | | $ 125,000.00 |
| 6-Mar | BUS ONL TFR FROM xxx0489 | $ 55,993.00 | |
| 6-Mar | BUS ONL TFR TO  xxx7783 | | $ 60,000.00 |
| 9-Mar | ck12814 | | $ 7,676.00 |
| 9-Mar | BUS ONL TFR TO  xxx7783 | | $ 45,000.00 |
| 10-Mar | BUS ONL TFR TO  xxx7783 | | $ 70,000.00 |
| 11-Mar | BUS ONL TFR FROM xxx7783 | $ 64,000.00 | |
| 11-Mar | BUS ONL TFR TO  xxx8590 | | $ 104,000.00 |
| 12-Mar | BUS ONL TFR FROM xxx7783 | $ 35,000.00 | |
| 12-Mar | BUS ONL TFR FROM xxx0489 | $ 25,308.00 | |
| 12-Mar | ck12867 | | $ 2,100.00 |
| 12-Mar | BUS ONL TFR TO  xxx8590 | | $ 32,000.00 |
| 13-Mar | BUS ONL TFR FROM xxx7783 | $ 20,000.00 | |
| 13-Mar | BUS ONL TFR TO  xxx8590 | | $ 10,000.00 |
| 16-Mar | BUS ONL TFR TO  xxx7783 | | $ 25,000.00 |
| 17-Mar | BUS ONL TFR TO  xxx7783 | | $ 35,000.00 |
| 18-Mar | BUS ONL TFR TO  xxx7783 | | $ 30,000.00 |
| 19-Mar | BUS ONL TFR TO  xxx7783 | | $ 15,000.00 |
| 20-Mar | BUS ONL TFR FROM xxx0489 | $ 13,700.00 | |
| 20-Mar | BUS ONL TFR TO  xxx7783 | | $ 1,000.00 |
| 23-Mar | BUS ONL TFR TO  xxx7783 | | $ 80,000.00 |
| 24-Mar | BUS ONL TFR TO  xxx7783 | | $ 95,000.00 |
| 25-Mar | BUS ONL TFR FROM xxx7783 | $ 10,000.00 | |
| 26-Mar | BUS ONL TFR FROM xxx7783 | $ 62,000.00 | |
| 26-Mar | BUS ONL TFR TO  xxx8590 | | $ 142,000.00 |
| 27-Mar | BUS ONL TFR FROM xxx7783 | $ 11,500.00 | |
| 27-Mar | BUS ONL TFR FROM xxx0489 | $ 1,300.00 | |
| 30-Mar | BUS ONL TFR FROM xxx7783 | $ 15,000.00 | |
| 30-Mar | BUS ONL TFR FROM xxx0489 | $ 1,685.00 | |
| 31-Mar | BUS ONL TFR TO  xxx7783 | | $ 17,000.00 |

| | | | |
|---|---|---|---|
| 31-Mar | BUS ONL TFR TO  xxx8590 | | $ 1,000.00 |
| 2-Mar | PROSPERUM | | $ 7,495.00 |
| 3-Mar | PROSPERUM | | $ 7,495.00 |
| 4-Mar | PROSPERUM | | $ 7,495.00 |
| 5-Mar | PROSPERUM | | $ 7,495.00 |
| 6-Mar | PROSPERUM | | $ 7,495.00 |
| 9-Mar | PROSPERUM | | $ 7,495.00 |
| 10-Mar | PROSPERUM | | $ 7,495.00 |
| 11-Mar | PROSPERUM | | $ 7,495.00 |
| 12-Mar | PROSPERUM | | $ 7,495.00 |
| 13-Mar | PROSPERUM | | $ 7,495.00 |
| 16-Mar | PROSPERUM | | $ 7,495.00 |
| 17-Mar | PROSPERUM | | $ 7,495.00 |
| 18-Mar | PROSPERUM | | $ 7,495.00 |
| 19-Mar | PROSPERUM | | $ 7,495.00 |
| 20-Mar | PROSPERUM | | $ 7,495.00 |
| 23-Mar | PROSPERUM | | $ 7,495.00 |
| 24-Mar | PROSPERUM | | $ 7,495.00 |
| 25-Mar | PROSPERUM | | $ 7,495.00 |
| 26-Mar | PROSPERUM | | $ 7,495.00 |
| 27-Mar | PROSPERUM | | $ 7,495.00 |
| 30-Mar | PROSPERUM | | $ 7,495.00 |
| 31-Mar | PROSPERUM | | $ 7,495.00 |
| **Total** | | $ 509,801.00 | $ 1,112,666.00 |

Total Number of Transactions:  60

| April 1-30, 2020 | Source/Destination | Incoming Transac-tions | Outgoing Trans-actions |
|---|---|---|---|
| 1-Apr | BUS ONL TFR TO xxx7783 | | $ 8,500.00 |
| 2-Apr | BUS ONL TFR TO xxx7783 | | $ 1,000.00 |
| 3-Apr | BUS ONL TFR FRM xxx7783 | $ 94,000.00 | |
| 6-Apr | BUS ONL TFR FRM xxx7783 | $ 20,000.00 | |
| 7-Apr | BUS ONL TFR FRM xxx6198 | $ 537,758.00 | |
| 7-Apr | BUS ONL TFR TO xxx7783 | | $ 570,000.00 |
| 8-Apr | BUS ONL TFR FRM xxx7783 | $ 125,000.00 | |
| 8-Apr | BUS ONL TFR TO xxx8590 | | $ 165,000.00 |
| 9-Apr | ck12936 | | $ 2,000.00 |
| 9-Apr | BUS ONL TFR TO xxx7883 | | $ 60,000.00 |

EXHIBIT H
Page 74 of 75

| | | | |
|---|---|---|---|
| 10-Apr | BUS ONL TFR FRM xxx8590 | $ 16,000.00 | |
| 10-Apr | ck12937 | | $ 3,000.00 |
| 10-Apr | BUS ONL TFR TO xxx7883 | | $ 240,000.00 |
| 13-Apr | ck12947 | | $ 10,500.00 |
| 14-Apr | ck12950 | | $ 4,000.00 |
| 14-Apr | BUS ONL TFR TO xxx7883 | | $ 35,000.00 |
| 15-Apr | BUS ONL TFR TO xxx7883 | | $ 53,500.00 |
| 1-Apr | PROSPERUM* | | $ 7,495.00 |
| 2-Apr | PROSPERUM | | $ 7,495.00 |
| 3-Apr | PROSPERUM | | $ 7,495.00 |
| 6-Apr | PROSPERUM | | $ 7,495.00 |
| **Total** | | $ 792,758.00 | $ 1,182,480.00 |

Total Number of Transactions:  20
Total MCA:  $29,980

| Acct Name | Date | Total Transactions | Total Incoming | Total Outgoing | |
|---|---|---|---|---|---|
| Moran Road Realty LLC (xxx8668) | Nov-19 | 46 | $328,000.00 | $ 318,500.00 | |
| | Dec-19 | 69 | $ 1,035,600.00 | $ 957,798.00 | |
| | Jan-20 | 103 | $ 1,049,500.00 | $ 941,827.86 | |
| | Feb-20 | 125 | $ 1,618,158.00 | $ 1,417,514.80 | |
| | Mar-20 | 125 | $ 999,900.00 | $ 1,026,303.92 | |
| **Total** | | **468** | **$ 5,031,158.00** | **$ 4,661,944.58** | |
| | | | | | |
| Pleasant Ridge Care Center, INC (xxx8529) | Nov-19 | 9 | $ 1,010,000.00 | $ 870,000.00 | |
| | Dec-19 | 39 | $ 4,203,101.00 | $ 7,843,605.00 | |
| | Jan-20 | 50 | $ 9,435,157.00 | $10,521,310.00 | |
| | Feb-20 | 41 | $ 6,447,504.00 | $ 9,065,669.00 | |
| | Mar-20 | 24 | $ 243,000.00 | $ 921,000.00 | |
| | Apr-20 | 11 | $ 136,654.00 | $ 349,500.00 | |
| **Total** | | **174** | **$21,475,416.00** | **$29,571,084.00** | |
| | | | | | |
| Ivy Woods Health Care OP (xxx8480) | Nov-19 | 11 | $ 1,125,470.00 | $ 1,317,660.00 | |
| | Dec-19 | 30 | $ 7,394,325.00 | $ 1,849,419.00 | |
| | Jan-20 | 45 | $ 5,112,680.00 | $ 2,969,850.00 | |
| | Feb-20 | 49 | $ 4,675,821.00 | $ 3,366,587.00 | |

| | | | | | |
|---|---|---|---|---|---|
| | Mar-20 | 33 | $  195,397.00 | $   295,088.00 | |
| | Apr-20 | 21 | $  309,837.00 | $   632,736.00 | |
| **Total** | | **189** | **$18,813,530.00** | **$10,431,340.00** | |
| | | | | | |
| Forest Hill Op Acct (xxx8587) | Nov-19 | 10 | $ 1,415,000.00 | $ 1,112,000.00 | |
| | Dec-19 | 32 | $ 6,606,090.00 | $ 2,013,727.00 | |
| | Jan-20 | 31 | $ 6,523,220.00 | $ 3,092,931.00 | |
| | Feb-20 | 51 | $ 6,321,687.00 | $ 5,336,440.00 | |
| | Mar-20 | 60 | $   509,801.00 | $ 1,112,666.00 | |
| | Apr-20 | 20 | $   792,758.00 | $ 1,182,480.00 | |
| **Total** | | **204** | **$22,168,556.00** | **$13,850,244.00** | |
| | | | | | |
| *Grand Totals:* | | *1035* | *$67,488,660.00* | *$58,514,612.58* | |
| *Total Suspicious Trans-actions through HNB (four accounts over 6 months)* | | | | | *$126,003,272.58* |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing *Reply in Support of Debtor's Motion for Authorization to Pay Prepetition Claims of Expert Witnesses as Critical Vendors* was served electronically on the date of filing through the Court's ECF system on all ECF participants registered in this case at the email address registered with the Court.


       /s/ James A. Coutinho          

James A. Coutinho    (0082430)

13