**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | : | Case No: 25-12607 |
| Raymond Joseph Schneider, | : | Chapter 11 |
| | : | |
| Debtor and Debtor in Possession. | : | Judge Beth A. Buchanan |

## PLAN OF REORGANIZATION

May 15, 2026

James A. Coutinho     (0082430)
Thomas R. Allen     (0017513)
Richard K. Stovall     (0029978)
Andrew D. Rebholz     (0102192)
Allen Stovall Neuman & Ashton LLP
10 W. Broad St., Ste. 2400
Columbus, Ohio 43215
T: (614) 221-8500     F: (614) 221-5988
allen@asnalaw.com; stovall@asnalaw.com
coutinho@asnalaw.com; rebholz@asnalaw.com
*Counsel for Debtor / Debtor in Possession*

**Table of Contents**

**Article 1:** **Summary of the Plan** ................................................................................................ 5

**Article 2:** **Definitions** ............................................................................................................ 6

**Article 3:** **Classification of Claims** ........................................................................................ 14
    3.1.   Classification, generally ................................................................................... 14
    3.2.   Summary of Classification of classified Claims ................................................ 14
    3.3.   Unclassified Claims ........................................................................................ 15
    3.4.   Confirmation pursuant to 11 U.S.C. §§ 1129(a)(10) and 1129(b) ................................ 15

**Article 4:** **Treatment of Claims** ............................................................................................ 16
    4.1.   Administrative Expense Claims ......................................................................... 16
    4.2.   Priority Tax Claims .......................................................................................... 16
    4.3.   Statutory and U.S. Trustee Fees ........................................................................ 17
    4.4.   Treatment of Classified Claims ......................................................................... 17
        4.4.1.   Class 1 – Classified Priority Claims ................................................. 17
        4.4.2.   Class 2 – Truist Mortgage Claim ..................................................... 17
        4.4.3.   Class 3 – First Merchants Mortgage Claim ...................................... 18
        4.4.4.   Class 4 – Nationstar Mortgage Claim .............................................. 19
        4.4.5.   Class 5 – Bank of America Secured Claim ........................................ 19
        4.4.6.   Class 6 – Huntington Secured Claim ................................................ 20
        4.4.7.   Class 7 – Civista Claims .................................................................. 21
        4.4.8.   Class 8 – First Federal Claim ........................................................... 22
        4.4.9.   Class 9 – First Merchants Business Loan Claim ................................. 24
        4.4.10.  Class 10 – GECU Claim ................................................................... 25
        4.4.11.  Class 11 – Heritage Claim ............................................................... 26
        4.4.12.  Class 12 – Kemba Claim ................................................................. 27
        4.4.13.  Class 13 – Rockland Claim ............................................................... 28
        4.4.14.  Class 14 – Stock Yards Claim .......................................................... 30
        4.4.15.  Class 15 – Transamerica Claim ........................................................ 31
        4.4.16.  Class 16 – Huntington General Unsecured Claim .............................. 32
        4.4.17.  Class 17 – General Unsecured Claims ............................................... 33

**Article 5:** **Means of Implementation** ..................................................................................... 34
    5.1.   Vesting of Assets ............................................................................................. 34
    5.2.   Operations between Confirmation and Effective Date ........................................ 34
    5.3.   Post-Effective Date operations .......................................................................... 34
    5.4.   Contribution of Income for Five Years .............................................................. 34
        5.4.1.   Generally - Compliance with 1129(a)(15) ......................................... 34
        5.4.2.   Determining Projected Disposable Income and payment of personal expenses .. 35
        5.4.3.   Company Draws ............................................................................... 35
        5.4.4.   Contribution of Social Security Income in exchange for retention of personal
                Assets .............................................................................................. 35
        5.4.5.   Net Income included in Plan Proceeds for quarterly distributions .............. 36
    5.5.   Disposition of Assets ........................................................................................ 36
        5.5.1.   Sale of Ohio Property ....................................................................... 36
        5.5.2.   Sale of Maine Property ..................................................................... 36
        5.5.3.   Sale of Colorado Property .................................................................. 37
        5.5.4.   Disposition of interests in Operating Companies (or their assets) ............. 37

5.5.5.   Disposition of interests in Investment Companies...................................................38
5.5.6.   Closure of Inactive Companies..................................................................................38
5.5.7.   Liquidation of Merrill Lynch Accounts......................................................................39
5.5.8.   Collection of The Blue Promissory Note.....................................................................39
5.5.9.   Collection of Entity Loans..........................................................................................39
5.5.10. Draws from Excess Collateral Value in Merrill Lynch Accounts .......................40
5.6.   Appointment and role of Retained Actions Representative..........................................40
5.6.1.   Appointment of Retained Actions Representative........................................................40
5.6.2.   Powers and Duties of Retained Actions Representative......................................40
5.6.3.   Prosecution of Retained Actions..............................................................................41
5.6.4.   Retained Actions Proceeds .........................................................................................41
5.6.5.   No Assignment of Huntington Litigation and Huntington Retained Actions......41
5.7.   Huntington Litigation and Huntington Retained Actions ............................................41
5.8.   Tax Provisions on Sales ...............................................................................................42
5.9.   Plan Distributions .........................................................................................................43
5.9.1.   Determination of Net Plan Proceeds.........................................................................43
5.9.2.   Timing of distributions ..............................................................................................43
5.9.3.   Method of payment and delivery of distributions...............................................43
5.9.4.   Record Date for distributions.....................................................................................43
5.9.5.   Unclaimed or undeliverable distributions..................................................................43
5.9.6.   *De minimis* distributions ............................................................................................43
5.10.  Actions necessary to facilitate Plan implementation ..................................................44
5.11.  Settlement .....................................................................................................................44
5.12.  Quarterly Reporting ......................................................................................................44

**Article 6:   Allowance and Disallowance of Claims**...............................................................45
6.1.   Objections to Claims.....................................................................................................45
6.2.   No distributions pending Allowance ............................................................................45
6.3.   Disputed Claims Reserve ..............................................................................................45

**Article 7:   Executory Contracts and Unexpired Leases** .......................................................46
7.1.   Assumption of Executory Contracts and Unexpired Leases.........................................46
7.2.   Cure of defaults for assumed Executory Contracts and Unexpired Leases ...................46
7.2.1.   List of assumed Executory Contracts and Unexpired Leases .............................46
7.2.2.   Cure amounts ..............................................................................................................46
7.2.3.   Dispute of cure amounts .............................................................................................47
7.3.   Rejection of Executory Contracts and Unexpired Leases.............................................47
7.4.   Rejection damages Claims ............................................................................................47
7.5.   Operating Agreements ..................................................................................................47
7.6.   Post-petition contracts and agreements........................................................................47
7.7.   No other Executory Contracts or Unexpired Leases.....................................................47

**Article 8:   Discharge, Injunction and Related Provisions** ...................................................48
8.1.   Discharge ......................................................................................................................48
8.2.   Exculpation ...................................................................................................................48
8.3.   Injunction ......................................................................................................................48
8.4.   Timing of Final Decree.................................................................................................49

**Article 9:   Confirmation and Retention of Jurisdiction** .....................................................49
9.1.   Plan contingent upon Confirmation..............................................................................49
9.2.   Modification of Plan .....................................................................................................49

9.3.    Retention of Jurisdiction ................................................................................................ 50

**Article 10:    Miscellaneous Provisions** ........................................................................................... 51
   10.1.   Defined terms ............................................................................................................. 51
   10.2.   Governing law ............................................................................................................. 51
   10.3.   Section 1145 exemption from Securities Laws ........................................................... 51
   10.4.   Successors and assigns ................................................................................................ 51
   10.5.   Captions ...................................................................................................................... 51
   10.6.   Severability ................................................................................................................. 51
   10.7.   Conflicts ...................................................................................................................... 52
   10.8.   No Third-Party Releases ............................................................................................. 52

# Plan of Reorganization

## Article 1:          Summary of the Plan

This is the Plan of Reorganization submitted by the Debtor.[1] The goal of the Debtor through this Plan is to provide for the orderly reorganization of the Debtor's financial affairs through the monetization and disposition of certain business interests and Non-Exempt personal Assets. The Debtor will retain Exempt Assets and those Assets not disposed of under the Plan.

The Debtor will fund payments under the Plan through the sales of his interests in the Ohio Property, Colorado Property and Maine Property; the orderly sale or monetization of business assets and interests in the Operating Companies and the Investment Companies; the contribution of Income, including Company Draws, Social Security Income, and Colorado Rental Income; Retained Actions Proceeds, proceeds from the Huntington Retained Actions, and disposition of Assets residing in the Merrill Lynch Accounts. The Debtor will make quarterly payments to Allowed Claims of priority, secured, and unsecured creditors from these sources after payment of ordinary-course living expenses.

The Plan provides, among other things, for the following:

- Commitment of the Debtor's projected disposable income for the required time period;

- Orderly disposition of the Debtor's Non-Exempt Assets until all Allowed Claims are paid in full or until there are no further Non-Exempt Assets, whichever occurs first;

- Payment in full of Allowed Administrative Expense Claims and Priority Claims;

- Separate Classes for each of the Debtor's three mortgage Claims and provisions for the liquidation of real estate;

- A Class for the Bank of America Claim secured by the Merrill Lynch Accounts and provisions for the orderly monetization of the Non-Exempt Merrill Lynch Accounts;

- Separate Classes for Claims of creditors that are based on business guaranty or co-obligor debts whereby the business assets are valued in excess of the debt, and each of which has treatment requiring the affected creditor to pursue its Claims against Company Collateral prior to seeking payment as an Allowed unsecured creditor under this Plan;

- Two Classes for the Huntington Claim, with the first anticipating disallowance of any secured Claim as a preference and the second permitting Huntington to share *pro rata* with other Allowed unsecured creditors in distributions of Net Plan Proceeds;

---

[1] Capitalized terms are defined in Article 2.

- A Class of General Unsecured Claims that will receive *pro rata* distributions of Net Plan Proceeds; and

- The appointment of a Retained Actions Representative to pursue Retained Actions.

All parties in interest should refer to Article 4 of this Plan for information regarding the precise treatment of their Claim. A Disclosure Statement that provides more detailed information regarding this Plan and the rights of parties in interest has been circulated with this Plan. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

## Article 2:      Definitions

The following terms have the meanings set forth in this Article.

- "**Administrative Expense Claim**" means a Claim arising under 11 U.S.C. §§ 503(b) or 507(b), including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the estate and operating the Business of the Debtor; (b) Professional Claims; and (c) all fees and charges assessed against the estate under 28 U.S.C. §§ 1911 and 1930.

- "**Administrative Expense Claim Bar Date**" means the date by which all Administrative Expense Claims need to be filed with the Court or else be forever barred. The Administrative Expense Claim Bar Date is 60 days after the Effective Date.

- "**Administrative Expense Claim Objection Deadline**" means the deadline for filing objections to Administrative Expense Claims. The Administrative Expense Claim Objection Deadline is the later of 60 days after the Administrative Expense Claim Bar Date or 60 days after the filing of the request for payment of such Administrative Expense Claim.

- "**Allowed**" means, with respect to any Claim, that

  a. the Claim has been allowed by the Plan or an order of the Bankruptcy Court;

  b. the Claim has been allowed, compromised or settled in writing

      i.    prior to the Effective Date by the Debtor in accordance with authority granted by an order of the Bankruptcy Court, or

      ii.   on or after the Effective Date by the Debtor;

  c. the Claim is listed in the Schedules as not disputed, not contingent and not unliquidated and

      i.    no Proof of Claim has been filed,

      ii.   no objection to allowance, request for estimation, motion to deem the Schedules amended or other challenge has been filed prior to the Claims Objection Bar Date, and

iii.   the Claim is not otherwise subject to disallowance under 11 U.S.C. § 502(d); or

d.   the Claim is evidenced by a valid and timely filed Proof of Claim or request for payment of an Administrative Expense Claim, as applicable, and

i.   as to which no objection to allowance, request for estimation, or other challenge has been filed prior to the Claims Objection Bar Date, and

ii.   that is not otherwise subject to disallowance under 11 U.S.C. § 502(d).

- "**Appraised Value**" means the appraised value of any Asset as determined by an appraiser selected by the Debtor or determined by the Court pursuant to 11 U.S.C. § 506(a).

- "**Assets**" means all property of the Debtor's estate as defined in 11 U.S.C. § 541, including any property acquired by the Debtor after the Petition Date that is property of the estate pursuant to 11 U.S.C. § 1115(a).

- "**Bank of America**" means Bank of America, N.A.

- "**Bank of America Claim**" means the Claim of Bank of America secured by certain of the Merrill Lynch Accounts (specifically those ending in -4923 and -3597). The Bank of America Claim is documented at Claim No. 21.

- "**Business Asset Sale Proceeds**" means, collectively, the Investment Companies Sale Proceeds and the Operating Companies Sale Proceeds.

- "**Business Day**" means any day other than a Saturday, Sunday, or legal holiday under the laws of the State of Ohio or federal law.

- "**Case**" means the Chapter 11 case of the Debtor pending in the Court as Case No. 25-12607.

- "**Civista**" means Civista Bank, an Ohio banking corporation.

- "**Civista Claims**" means the Claims of Civista secured by the assets of the following Operating Entities: Mason RD, LLC, Northern Kentucky Assisted Living, LLC, The Red Corner, LLC, The Blue Development Company, LLC, and Techwoods Circle, LLC. These Claims consist of five separate loans. The Civista Claims are documented at Claim Nos. 13, 14, 15, 16, and 17.

- "**Claim**" means any claim against the Debtor as defined in 11 U.S.C. § 101(5).

- "**Claim Objection Deadline**" means the date by which objections to Claims must be filed. The Claim Objection Deadline is 120 days after the Effective Date or such later date as the Court may order.

- "**Class**" means a class of Claims as set forth in the Plan pursuant to 11 U.S.C. § 1122(a).

- "**Code**" means the Bankruptcy Reform Act of 1978, effective October 1, 1979, as set forth in Title 11 of the United States Code, as amended.

- "**Colorado Property**" means the real property owned by the Debtor located at 2409 Chamonix Road, Vail, CO 81657.

- "**Colorado Rental Income**" means the approximately $2,100 per month in rental income the Debtor receives from the Chamonix Road Property.

- "**Company Collateral**" means the assets of the Debtor's Operating Companies securing any Company Debt Claim.

- "**Company Debt Claim**" means any Claim against the Debtor based upon a co-obligor or guaranty obligation of the Debtor with respect to debt of one or more of the Debtor's Operating Companies.

- "**Company Debt Claim Deficiency**" means the deficiency amount, if any, of a Company Debt Claim after liquidation of Company Collateral.

- "**Company Draws**" means draws or other distributions from the Operating Companies received by the Debtor after the Effective Date.

- "**Confirmation**" means the entry of the Confirmation Order by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

- "**Court**" means the United States Bankruptcy Court for the Southern District of Ohio.

- "**Debtor**" means Raymond Joseph Schneider, debtor and debtor in possession, or, to the extent the context dictates, the reorganized debtor after confirmation of this Plan.

- "**Disputed Claim**" means any Claim that is not an Allowed Claim and has not been disallowed by a Final Order, including any Claim that is the subject of an objection, request for estimation, motion to deem the Schedules amended, or other challenge that has not been resolved by a Final Order.

- "**Disputed Claim Reserve**" means the reserve of cash (or such other Assets as the Debtor may determine) established and maintained by the Debtor for the payment of Disputed Claims in accordance with the terms of the Plan.

- "**Effective Date**" means the first day of the first calendar month following the date the Confirmation Order becomes a Final Order.

- "**Entity Loan**" means any loan, advance, receivable, or other obligation owed to the Debtor by any Operating Company, Investment Company, Inactive Company, or any other entity in which the Debtor holds a direct or indirect ownership interest, whether or not the

obligation is evidenced by a promissory note or other writing and whether or not the Debtor also owes amounts to that same entity.

- "**Exempt Assets**" means those Assets of the Debtor that are exempt under applicable provisions of the Bankruptcy Code and the Ohio Revised Code, including any property or income received by the Debtor after the Petition Date that is Exempt, as listed on the Debtor's Schedule C, as amended from time to time.

- "**Exempt Income**" means Income of the Debtor that is Exempt under applicable law.

- "**Final Decree**" means the order or orders entered by the Bankruptcy Court pursuant to section 350 of the Bankruptcy Code closing the Case.

- "**Final Order**" means an order or judgment as to which the time to appeal, petition for certiorari, or move for rehearing, reargument, or new trial has expired and as to which no appeal, petition for certiorari, or motion for rehearing, reargument, or new trial is pending.

- "**First Federal**" means First Federal Savings & Loan Association of Lakewood.

- "**First Federal Claim**" means the Claim of First Federal which is secured by the assets of Circle Development of Cincinnati, LLC. The First Federal Claim is documented at Claim No. 20.

- "**First Merchants**" means First Merchants Bank.

- "**First Merchants Business Loan Claim**" means the Claim of First Merchants secured by the assets of Circle Storage Operating Company I, LLC. The First Merchants Business Loan Claim is documented at Claim No. 8.

- "**First Merchants Mortgage Claim**" means the Claim of First Merchants secured by the Maine Property. The First Merchants Mortgage Claim is documented at Claim No. 7.

- "**Fully Secured Company Debt Claim**" means any Company Debt Claim in which the Company Collateral is of sufficient value that the Claim of the Holder of a Company Debt Claim is fully secured with no anticipated deficiency upon liquidation of the Company Collateral.

- "**GECU**" means General Electric Credit Union.

- "**GECU Claim**" means the Claim of GECU secured by the assets of Hyde Park Circle, LLC. The GECU Claim is documented at Claim No. 23.

- "**General Unsecured Creditor Class**" means Class 17 and any Holders of Claims in other classes that may be entitled to participate in the Class 17 distributions.

- "**Governmental Unit**" means a governmental unit as defined in 11 U.S.C. § 101(27).

- "**Heritage**" means Heritage Bank

- "**Heritage Claim**" means the Claim of Heritage secured by the assets of Madison Warehouse, LLC. The Heritage Claim is documented at Claim No. 2.

- "**Holder**" means the beneficial owner of a Claim, or the person or entity that is the record Holder of such Claim as of the applicable record date under the Plan, including any successor or assign of such person or entity.

- "**Huntington**" means The Huntington National Bank.

- "**Huntington Claim**" means the Claim of Huntington. The Huntington Claim is documented at Claim No. 11, as amended.

- "**Huntington General Unsecured Claim**" means the Huntington Claim to the extent it is unsecured.

- "**Huntington Litigation**" means the lawsuit filed by the Debtor against Huntington for RICO violations and related claims pending in the Hamilton County Court of Common Pleas as Case No. A2300849.

- "**Huntington Retained Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law.

- "**Huntington Secured Claim**" means the Huntington Claim to the extent it is secured by any judgment lien or other pre-petition attachment action. The Huntington Secured Claim is documented at Claim No. 11, as amended.

- "**Impaired Claim**" means a Claim that is impaired within the meaning of section 1124 of the Bankruptcy Code.

- "**Inactive Companies**" means any of the entities owned in whole or part by the Debtor that are not Investment Companies or Operating Companies. These entities, more fully described in the Disclosure Statement, are, generally, inactive, have no or *de minimis* assets, and are without any liquidation value.

- "**Income**" means in its broadest sense any money earned by the Debtor during the term of the Plan, including but not limited to the Debtor's Company Draws, Social Security Income, Colorado Rental Income, Investment Income, and any W-2 or 1099 income the Debtor receives during the term of the Plan.

- "**Initial Distribution Date**" means the first calendar day of the calendar quarter immediately following the calendar quarter in which the Effective Date falls.

- "**Investment Companies**" means the closely held entities in which the Debtor has an interest for investment purposes but does not have a majority interest. The Investment Companies are the following entities:

  - 5150 East Galbraith Road, LLC
  - Corporate Park Investors, Ltd
  - Executive Park Investors, Ltd
  - Glidden House Partners, Ltd
  - Grasshopper Investments, LLC
  - Hamilton II, LLC
  - HRM Realty Holdings, Ltd
  - KPT7 Holding Company, LLC
  - Montclair Investors, Ltd
  - TheCard, LLC
  - To Life, Ltd
  - Topco America, LLC dba Range USA
  - Waldorf Partners, LP

- "**Investment Companies Sale Proceeds**" means proceeds received by the Debtor from the sale of his interests in any of the Investment Companies.

- "**Investment Income**" means any money paid to the Debtor from any of the Investment Companies on account of the Debtor's ownership in that Company or any distribution from that Company to the Debtor.

- "**Kemba**" means Kemba Credit Union, Inc.

- "**Kemba Claim**" means the Claim of Kemba, secured by the assets of Hyde Park Circle, LLC. The Kemba Claim is documented at Claim No. 4.

- "**Maine Property**" means the real property located at 2 Fort Lane, Kennebunk, Maine 04043 that the Debtor owns jointly with his Spouse.

- "**Merrill Lynch**" means Merrill Lynch, Pierce, Fenner & Smith Incorporated.

- "**Merrill Lynch Accounts**" means the Debtor's brokerage accounts at Merrill Lynch ending in -4923, -3597, -3598, -4655, -4683, -8142, -5252, and the Roth IRA and IRA accounts ending in -9663 and -9664.

- "**Nationstar**" means Nationstar Mortgage, LLC.

- "**Nationstar Mortgage Claim**" means the Claim of Nationstar secured by the Ohio Property. The Nationstar Mortgage Claim is documented at Claim No. 25.

- "**Net Plan Proceeds**" means the amount of the Plan Proceeds available to pay to General Unsecured Creditors after payment of other Plan and operating expenses.

- "**Non-Exempt Asset**" means any Asset owned by the Debtor that is not Exempt.

- "**Non-Exempt Personal Assets**" means the Debtor's Non-Exempt Assets consisting of personal property that is not Exempt Assets, including motor vehicles, household goods and furnishings, clothing, and other personal items to the extent not exempt under applicable law.

- "**Ohio Property**" means the real property located at 3515 Tiffany Ridge Lane, Blue Ash, Ohio 45241 that the Debtor owns jointly with his Spouse and which is subject to the Ohio homestead exemption.

- "**Operating Companies**" means the entities owned by the Debtor in which he is the sole or majority owner and manager of the company. The Operating Companies are the following entities:

    o Boston RD, LLC
    o Circle Development of Cincinnati, LLC
    o Grasshopper Investments II, LLC
    o Hyde Park Circle, LLC
    o Madison Warehouse, LLC
    o Mason Rd, LLC
    o North Shore RD, LLC
    o Northern Kentucky Assisted Living, LLC
    o Northern Kentucky Retirement Community, LLC
    o Schneider-Grasshopper, Inc.
    o The Red Corner, LLC
    o To Life III, LLC

- "**Operating Companies Sale Proceeds**" means proceeds received by the Debtor from the sale of any of his interests in the Operating Companies.

- "**Ordinary Course General Administrative Expense Claim**" means an Administrative Expense Claim incurred in the ordinary course of the Debtor's personal and business affairs after the Petition Date.

- "**Petition Date**" means October 17, 2025.

- "**Plan**" means this Plan of Reorganization, as amended or modified from time to time.

- "**Plan Proceeds**" means the aggregate of all money received by or on behalf of the Debtor after the Effective Date and prior to entry of a Final Decree herein as Business Asset Sale Proceeds, Investment Company Sale Proceeds, Income (to the extent not Exempt Income), Retained Action Proceeds, all payments of principal and interest received by or on behalf of the Debtor under the Blue Promissory Note, and all net collections received by or on behalf of the Debtor on account of any Entity Loan after the Effective Date.

- "**Priority Claim**" means a Claim entitled to priority under 11 U.S.C. § 507(a).

- "**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind specified in 11 U.S.C. § 507(a)(8).

- "**Projected Disposable Income**" means Income less the amount of all reasonable and necessary ordinary-course personal expenses of the Debtor's household, payments to secured creditors, payments on Administrative Expense Claims, and payments to other Plan obligations that are higher in priority than General Unsecured Claims.

- "**Quarterly Distribution Date**" means the first calendar day of each calendar quarter after the Initial Distribution Date.

- "**Retained Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law, other than the Huntington Litigation and the Huntington Retained Actions.

- "**Retained Actions Proceeds**" means any consideration received as a result of the settlement or prosecution of any of the Retained Actions less all costs and expenses incurred by or on behalf of the Debtor in realizing that consideration.

- "**Retained Actions Representative**" means the individual nominated by the Debtor and approved by the Court to represent the estate in determining, pursuing, collecting on, or settling, the Retained Actions.

- "**Rockland**" means Rockland Trust Company, successor to Blue Hills Bank.

- "**Rockland Claim**" means the Claim of Rockland secured by the assets of Boston RD, LLC and North Shore RD, LLC. The Rockland Claim is documented at Claim No. 24.

- "**Schedules**" means the Debtor's schedules and statement of financial affairs and related documents filed in the Case, as amended from time to time.

- "**Stock Yards**" means Stock Yards Bank & Trust Company.

- "**Stock Yards Claim**" means the Claim of Stock Yards secured by the assets of 5150 East Galbraith Road, LLC. The Stock Yards Claim is documented at Claim No. 22.

- "**Spouse**" means Patricia B. Schneider, the Spouse of the Debtor.

- "**The Blue Promissory Note**" means the *Promissory Note* made by the Raymond Schneider 2019 Gift Trust and granted to the Debtor on September 1, 2024. The Blue Promissory Note was for a face amount of $1,485,000.00 plus interest at five percent (5%) per annum with the full balance due on The Blue Promissory Note Maturity Date in the amount of $1,633,500.00 if no payments are made in the interim. The Blue Promissory

Note was granted in exchange for the Debtor's 100% interest in The Blue Development Company, LLC.

- "**The Blue Promissory Note Maturity Date**" means September 1, 2026, which is the date that The Blue Promissory Note matures and is due for payment in full.

- "**Transamerica**" means Transamerica Life Insurance Company.

- "**Transamerica Claim**" means the Claim of Transamerica secured by the assets of To Life, Ltd. The Transamerica Claim arises under a springing recourse guaranty.

- "**Truist**" means Truist Bank.

- "**Truist Mortgage Claim**" means the Claim of Truist secured by the real property located at Chamonix Road, Vail, Colorado. The Truist Claim is documented at Claim No. 6.

- "**U.S. Trustee Fees**" means fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6).

- "**Unimpaired Claim**" means a Claim that is not Impaired.

## Article 3:      Classification of Claims

### 3.1.   Classification, generally

In accordance with 11 U.S.C. § 1122, the Plan classifies all Claims, other than Administrative Expense Claims, Priority Tax Claims, and U.S. Trustee Fees, which are unclassified. A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and is classified in a different Class to the extent that the Claim qualifies within the description of that different Class. A Claim is classified in a particular Class only to the extent that such Claim is Allowed in that Class. Any Holder of a Claim is entitled to agree to a less favorable treatment in writing should it so elect.

### 3.2.   Summary of Classification of classified Claims

Claims are classified as follows:

| Class | Description | Impaired / Unimpaired | Voting Status |
|-------|-------------|----------------------|---------------|
| 1 | Classified Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Truist Mortgage Claim | Unimpaired | Deemed to Accept |
| 3 | First Merchants Mortgage Claim | Impaired | Entitled to Vote |
| 4 | Nationstar Mortgage Claim | Impaired | Entitled to Vote |

| Class | Description | Impaired / Unimpaired | Voting Status |
|:---:|---|:---:|:---:|
| 5 | Bank of America Claim | Unimpaired | Deemed to Accept |
| 6 | Huntington Secured Claim | Impaired | Deemed to Reject |
| 7 | Civista Claims | Impaired | Entitled to Vote |
| 8 | First Federal Claim | Impaired | Entitled to Vote |
| 9 | First Merchants Business Loan Claim | Impaired | Entitled to Vote |
| 10 | GECU Claim | Impaired | Entitled to Vote |
| 11 | Heritage Claim | Impaired | Entitled to Vote |
| 12 | Kemba Claim | Impaired | Entitled to Vote |
| 13 | Rockland Claim | Impaired | Entitled to Vote |
| 14 | Stock Yards Claim | Impaired | Entitled to Vote |
| 15 | Transamerica Claim | Impaired | Entitled to Vote |
| 16 | Huntington General Unsecured Claim | Impaired | Entitled to Vote |
| 17 | General Unsecured Claims | Impaired | Entitled to Vote |

### 3.3.    Unclassified Claims

In accordance with 11 U.S.C. § 1123(a)(1), the Plan does not classify Claims arising under 11 U.S.C. §§ 507(a)(2), 507(a)(3), or 507(a)(8), including Administrative Expense Claims, Priority Tax Claims, and U.S. Trustee Fees. The treatment of unclassified Claims is set forth separately in Article 4.

### 3.4.    Confirmation pursuant to 11 U.S.C. §§ 1129(a)(10) and 1129(b)

For the purposes of confirmation, 11 U.S.C. § 1129(a)(10) will be satisfied if any Class of the Impaired Claims accepts the Plan. The Debtor seeks confirmation of the Plan under 11 U.S.C. § 1129(b) with respect to any non-accepting Class or Classes of Impaired Claims.

## Article 4:        Treatment of Claims

### 4.1.    Administrative Expense Claims

Any request for payment of an Administrative Expense Claim must be filed and served on the Debtor on or prior to the Administrative Expense Claim Bar Date. However, no request for payment is required to be filed and served with respect to any (i) Administrative Expense Claim that has previously been allowed; (ii) Ordinary Course General Administrative Expense Claim; (iii) Claim of a Governmental Unit not required to be filed under 11 U.S.C. § 503(b)(1)(D); or (iv) statutory or U.S. Trustee Fees.

Any Holder of an Administrative Expense Claim who is required to but does not file and serve a request for payment of its Administrative Expense Claim on or prior to the Administrative Expense Claim Bar Date will be forever barred from asserting that Administrative Expense Claim against the Debtor or his property.

In accordance with 11 U.S.C. § 1129(a)(9), except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, the Holder of each Allowed Administrative Expense Claim will receive cash in an amount equal to the full unpaid amount of its Allowed Administrative Expense Claim on the later of:

   a.    the Effective Date or as soon as reasonably practicable thereafter;

   b.    the date on which the Claim is Allowed or as soon as reasonably practicable thereafter, if an objection has been filed as to the Claim;

   c.    such date and on such other terms as may be agreed upon by the Holder of the Claim; or

   d.    with respect to Ordinary Course General Administrative Expense Claims, the date the amount is due in accordance with applicable non-bankruptcy law and the terms and conditions of any applicable agreement or instrument.

### 4.2.    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, the Holder of each Allowed Priority Tax Claim due and payable on or prior to the Effective Date will receive:

   a. Cash on the Effective Date or as soon as reasonably practicable thereafter in an amount equal to the full unpaid amount of such Allowed Priority Tax Claim; or

   b. deferred cash payments over a period not exceeding five years from the Petition Date in accordance with sections 1129(a)(9)(C) and (D) of the Code.

The deferred cash payments will total an amount equal to the net present value as of the Effective Date of all expected payments. As required under sections 511(a) and (b) of the Code, an interest

rate equal to the rate determined, as of the calendar month of the Effective Date, under applicable non-bankruptcy law will be used to determine the value of such Claims as of the Effective Date. Any deferred cash payments will be made in equal quarterly installments according to the regular quarterly distribution timeline set forth in this Plan.

### 4.3. Statutory and U.S. Trustee Fees

All fees payable pursuant to 28 U.S.C. § 1930 or any other statutory fees will be paid in full in cash on the Effective Date or as soon as practicable thereafter. The Debtor will continue to pay all such fees as and when due until the Case is closed, converted, or dismissed.

### 4.4. Treatment of Classified Claims

#### 4.4.1. Class 1 – Classified Priority Claims

a. *Classification*: Class 1 (Classified Priority Claims) consists of any Claim accorded priority in right of payment under §507(a) of the Code, other than Administrative Expense Claims, Priority Tax Claims, or other unclassified Claims.

b. *Brief Overview*: The Debtor does not believe there are any Claims in this class.

c. *Treatment*: Each Holder of an Allowed Classified Priority Claim will be paid in full in cash on or as soon as reasonably practicable after the latest of:

    i.    the Effective Date,

    ii.    the date on which such Classified Priority Claim becomes Allowed, and

    iii.    such other date as may be ordered by the Bankruptcy Court.

d. *Impairment and Voting*: Class 1 is unimpaired. Each Class 1 claimant is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Code. Therefore, Class 1 claimants are not entitled to vote on the Plan.

#### 4.4.2. Class 2 – Truist Mortgage Claim

a. *Classification*: Class 2 (Truist Mortgage Claim) consists of the Truist Mortgage Claim.

b. *Overview*:

    *Claimant*: Truist

    *Collateral*: First Mortgage on the Colorado Property

    *Collateral Value*: $2,180,000.00

    *Priority of Lien*: First mortgage lien, junior only to any claim for real property taxes.

*Claim Amount*: $414,350.77

*Proof of Claim Reference*: Claim No. 6

*Secured / Unsecured Status*: Fully Secured

c.     *Treatment*: The Holder of the Allowed Truist Mortgage Claim will retain its lien on the Colorado Property and will receive payment in accordance with the contractual terms of the mortgage, including application of escrow in accordance with the loan documents. The Plan provides for the Debtor to potentially sell the Colorado Property, in which event Truist will be paid in full upon the sale in accordance with applicable law, or will receive such other treatment as may be agreeable to Truist Bank.

d.     *Impairment and Voting*: Class 2 is unimpaired. The Holder of the Class 2 Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Code. Therefore, the Class 2 claimant is not entitled to vote on the Plan.

### 4.4.3.     Class 3 – First Merchants Mortgage Claim

a.     *Classification*: Class 3 consists of the First Merchants Mortgage Claim.

b.     *Overview*:

*Claimant*: First Merchants

*Collateral*: First Mortgage on the Maine Property

*Collateral Value*: $2,323,000.00

*Priority of Lien*: First mortgage lien, junior only to any claim for real property taxes.

*Claim Amount*: $2,117,006.19

*Proof of Claim Reference*: Claim No. 7

*Secured / Unsecured Status*: Fully Secured

c.     *Treatment*: The Holder of the Allowed First Merchants Mortgage Claim will retain its lien on the Maine Property and will receive payment in accordance with the contractual terms of the mortgage, including application of escrow in accordance with the loan documents. The Plan provides for the Debtor to potentially sell the Maine Property, in which event First Merchants will be paid in full upon the sale in accordance with applicable law, or will receive such other treatment as may be agreeable to First Merchants. If the Maine Property is sold to the Spouse under the terms of this Plan and the Spouse does not refinance the Maine Property to acquire

the Debtor's interest, the Debtor will at closing on that sale be released from all further obligations under the Allowed First Merchants Mortgage Claim.

d. *Impairment and Voting*: Class 3 is impaired. The Holder of Allowed Claims in Class 3 is entitled to vote on the Plan.

### 4.4.4. Class 4 – Nationstar Mortgage Claim

a. *Classification*: Class 4 consists of the Nationstar Mortgage Claim.

b. *Overview*:

    *Claimant*: Nationstar

    *Collateral*: First Mortgage on the Ohio Property

    *Collateral Value*: $788,050.00

    *Priority of Lien*: First mortgage lien, junior only to any claim for real property taxes.

    *Claim Amount*: $88,700.79

    *Proof of Claim Reference*: Claim No. 25

    *Secured / Unsecured Status*: Fully Secured

c. *Treatment*: The Holder of the Allowed Nationstar Mortgage Claim will retain its lien on the Ohio Property and will receive payment in accordance with the contractual terms of the mortgage, including application of escrow in accordance with the loan documents. The Plan provides for the Debtor to potentially sell the Ohio Property, in which event Nationstar will be paid in full upon the sale in accordance with applicable law, or will receive such other treatment as may be agreeable to Nationstar. If the Ohio Property is sold to the Spouse under the terms of this Plan and the Spouse does not refinance the Ohio Property to acquire the Debtor's interest, the Debtor will at closing on that sale be released from all further obligations under the Allowed Nationstar Mortgage Claim.

d. *Impairment and Voting*: Class 4 is impaired. The Holder of Allowed Claims in Class 4 is entitled to vote on the Plan.

### 4.4.5. Class 5 – Bank of America Secured Claim

a. *Classification*: Class 5 consists of the Bank of America Secured Claim.

b. *Overview*:

    *Claimant*: Bank of America

*Collateral*: Security interest in certain Merrill Lynch Accounts (specifically ending in -4923 and -3597)

*Collateral Value*: $29,363,160.00

*Priority of Lien*: First priority security interest perfected by pledge and control

*Claim Amount*: $18,115,776.59

*Proof of Claim Reference*: Claim No. 21

*Secured / Unsecured Status*: Fully Secured

c.    *Treatment*: The Holder of the Allowed Bank of America Secured Claim will retain its lien on the pledged Merrill Lynch Accounts. In the event of the sale or other disposition of securities held in the pledged Merrill Lynch Accounts, proceed thereof will first be applied toward payment of the Bank of America Secured Claim.. The Claim will otherwise be paid in accordance with the contractual terms of the loan documents. Because Bank of America is fully secured it will not participate in any unsecured creditor distribution under the Plan.

d.    *Impairment and Voting*: Class 5 is unimpaired. The Holder of the Class 5 Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Code. Therefore, the Class 5 claimant is not entitled to vote on the Plan.

### 4.4.6.    Class 6 – Huntington Secured Claim

a.    *Classification*: Class 6 consists of the Huntington Secured Claim.

b.    *Overview*:

*Claimant*: Huntington

*Collateral*: Huntington asserts an alleged lien through attachment via garnishment on the Merrill Lynch Accounts and judgment liens on the Ohio Property and Colorado Property. The judgment lien on the Ohio Property was filed on August 22, 2025. The judgment lien on the Colorado Property was filed on September 18, 2025. The garnishment on the Merrill Lynch Accounts was entered on September 17, 2025 and served on September 25, 2025. All such actions occurred within the 90-day period preceding the Petition Date.

*Collateral Value*: $32,331,210.00 (Ohio Property $788,050; Colorado Property $2,180,000; Merrill Lynch Accounts $29,363,160)

*Priority of Lien*: The lien is junior to mortgage interests on the real property and to Bank of America in relation to the Merrill Lynch Accounts.

*Claim Amount*: $36,131,393.30

*Proof of Claim Reference*: Claim No. 11

*Secured / Unsecured Status*: Asserted as fully secured

c.   *Treatment*: The Holder of the Allowed Huntington Secured Claim will receive no distribution or payment of any kind on account of the secured Claim. The liens and security interests asserted by Huntington are avoidable as preferences under 11 U.S.C. § 547. The Debtor will prosecute any and all Huntington Retained Actions against Huntington, including preference actions, directly. Huntington will be paid only through the Huntington General Unsecured Claim.

d.   *Impairment and Voting*: Class 6 is impaired. Because the Class 6 Claim receives no distribution, the Holder is deemed to reject the Plan pursuant to section 1126(g) of the Code.

### 4.4.7.   Class 7 – Civista Claims

a.   *Classification*: Class 7 consists of the Civista Claims.

b.   *Overview*:

*Claimant*: Civista

*Type of Obligation*: Debtor is a guarantor of these debts.

*Primary Obligors*: Mason RD, LLC; Northern Kentucky Assisted Living, LLC; The Red Corner, LLC; The Blue Development Company, LLC; and Techwoods Circle, LLC in relation to their respective loans.

*Claim Amount*: $16,914,651.76 (combined for the five loans).

*Collateral*: Assets of the respective companies (Mason RD, LLC; Northern Kentucky Assisted Living, LLC; The Red Corner, LLC; The Blue Development Company, LLC; and Techwoods Circle, LLC), with an estimated combined value in excess of the Allowed Claim amount.

*Priority of Lien*: Civista holds first priority liens on the assets of each respective company. It does not have a lien on any Assets of the Debtor.

*Proof of Claim Reference*: Claim Nos. 13, 14, 15, 16, and 17

*Secured / Unsecured Status*: Unsecured as to any Claim against the Debtor but fully secured by company assets.

c. *Treatment*:

 i. *Fully Secured Company Debt Claims*: The Civista Claims will be treated as Fully Secured Company Debt Claims because the value of the Company Collateral that secures the Civista Claims is estimated to be in excess of the aggregate Claims amount. As such, for so long as the primary obligor companies continue to make all payments in accordance with the contractual loan terms, the Holder of the Allowed Civista Claims will not receive any payments from the Debtor personally during the term of the Plan. However, if Civista establishes that it is entitled to collect on a Company Debt Claim Deficiency, its Company Debt Claim Deficiency will be paid *pro rata* within the General Unsecured Creditor Class

 ii. *Modification to Guaranty*: The guarantees provided by the Debtor to Civista provide that Civista, upon an event of default, may seek payment from the Debtor directly and immediately without first liquidating the applicable Company Collateral. During the term of this Plan and until the entry of a Final Decree closing the Case, the rights of Civista against the Debtor under his guarantees will be modified so that (i) Civista may not seek to collect from the Debtor upon a default unless and until Civista has fully liquidated the Company Collateral, and (ii) Civista's recourse against the Debtor under his guarantees relative to any resulting Company Debt Claim Deficiency will be limited to sharing *pro rata* within the General Unsecured Creditor Class. Upon entry of a Final Decree, and absent any other default, the modification to such guarantees will terminate and the guarantees will revert to their original contractual terms.

 iii. *Effect of Discharge*. The discharge received by the Debtor will not apply to the guarantees of the Debtor to Civista.

d. *Impairment and Voting*: Class 7 is impaired. The Holder of Allowed Claims in Class 7 is entitled to vote on the Plan.

### 4.4.8. Class 8 – First Federal Claim

a. *Classification*: Class 8 consists of the First Federal Claim.

b. *Overview*:

*Claimant*: First Federal

*Type of Obligation*: Debtor is a co-obligor of this debt.

*Co-Obligors*: Circle Development of Cincinnati, LLC and the Debtor in relation to Loan #5923042238

*Claim Amount*: $937,500.00

Page 22 of 52

*Collateral*: Assets of Circle Development of Cincinnati, LLC, with an estimated value of $1,500,000.00.

*Priority of Lien*: First Federal holds first priority liens on the assets of Circle Development of Cincinnati, LLC. It does not have a lien on any Assets of the Debtor.

*Proof of Claim Reference*: Claim No. 20

*Secured / Unsecured Status*: Unsecured as to any Claim against the Debtor but fully Secured by company assets.

c.　　*Treatment*:

    i.　　*Fully Secured Company Debt Claim*: The First Federal Claim will be treated as a Fully Secured Company Debt Claim because the value of the Company Collateral that secures the First Federal Claim is estimated to be in excess of the Claim amount. As such, for so long as the co-obligor company continues to make all payments in accordance with the contractual loan terms, the Holder of the Allowed First Federal Claim will not receive any payments from the Debtor personally during the term of the Plan. However, if First Federal establishes that it is entitled to collect on a Company Debt Claim Deficiency, its Company Debt Claim Deficiency will be paid *pro rata* within the General Unsecured Creditor Class

    ii.　　*Modification to Debtor's Obligations*: The loan documents provide that the creditor, upon an event of default, may seek payment from the Debtor, as a co-obligor, directly and immediately without first liquidating the applicable Company Collateral or otherwise seeking payment from the Company co-obligor. During the term of this Plan and until the entry of a Final Decree closing the Case, the rights of First Federal against the Debtor as a co-obligor will be modified so that (i) First Federal may not seek to collect from the Debtor upon a default unless and until First Federal has exhausted collection efforts against the Company co-obligor and has fully liquidated the Company Collateral, and (ii) First Federal's recourse against the Debtor as a co-obligor relative to any resulting Company Debt Claim Deficiency will be limited to sharing *pro rata* within the General Unsecured Creditor Class. Upon entry of a Final Decree, and absent any other default, the modification to the Debtor's obligations as a co-obligor will terminate and will revert to their original contractual terms.

    iii.　　*Effect of Discharge*. The discharge received by the Debtor will not apply to the Debtor's obligations to First Federal.

d.　　*Impairment and Voting*: Class 8 is impaired. The Holder of the Allowed Claim in Class 8 is entitled to vote on the Plan.

**4.4.9.       Class 9 – First Merchants Business Loan Claim**

a.       *Classification*: Class 9 consists of the First Merchants Business Loan Claim.

b.       *Overview*:

> *Claimant*: First Merchants
>
> *Type of Obligation*: Debtor is a guarantor of this debt.
>
> *Primary Obligors*: Circle Storage Operating Company I, LLC in relation to the business loan.
>
> *Claim Amount*: $37,725,186.13
>
> *Collateral*: Assets of Circle Storage Operating Company I, LLC, with an estimated value of $40,000,000.00.
>
> *Priority of Lien*: First Merchants holds first priority liens on the assets of Circle Storage Operating Company I, LLC. It does not have a lien on any Assets of the Debtor.
>
> *Proof of Claim Reference*: Claim No. 8
>
> *Secured / Unsecured Status*: Unsecured as to any Claim against the Debtor but fully Secured by company assets.

c.       *Treatment*:

> i.       *Fully Secured Company Debt Claim:* The First Merchants Claim will be treated as Fully Secured Company Debt Claim because the value of the Company Collateral that secures the First Merchants Claim is estimated to be in excess of the aggregate Claim amount. As such, for so long as the primary obligor companies continue to make all payments in accordance with the contractual loan terms, the Holder of the Allowed First Merchants Claim will not receive any payments from the Debtor personally during the term of the Plan. However, if First Merchants establishes that it is entitled to collect on a Company Debt Claim Deficiency, its Company Debt Claim Deficiency will be paid *pro rata* within the General Unsecured Creditor Class
>
> ii.       *Modification to Guaranty*: The guaranty provided by the Debtor to First Merchants provided that First Merchants, upon an event of default, could seek payment from the Debtor directly and immediately without first liquidating the applicable Company Collateral. During the term of this Plan and until the entry of a Final Decree closing the Case, the rights of First Merchants against the Debtor under his guaranty will be modified so that (i) First Merchants may not seek to collect from the Debtor upon a default

unless and until First Merchants has fully liquidated the Company Collateral, and (ii) First Merchants' recourse against the Debtor under his guaranty relative to any resulting Company Debt Claim Deficiency will be limited to sharing *pro rata* within the General Unsecured Creditor Class. Upon entry of a Final Decree, and absent any other default, the modification to the guaranty will terminate and the guaranty will revert to its original contractual terms.

iii.      *Effect of Discharge*. The discharge received by the Debtor will not apply to the guaranty of the Debtor to First Merchants.

d.      *Impairment and Voting*: Class 9 is impaired. The Holder of the Allowed Claim in Class 9 is entitled to vote on the Plan.

### 4.4.10.      Class 10 – GECU Claim

a.      *Classification*: Class 10 consists of the GECU Claim.

b.      *Overview*:

> *Claimant*: GECU
>
> *Type of Obligation*: Debtor is a guarantor of this debt.
>
> *Primary Obligors*: Hyde Park Circle, LLC
>
> *Claim Amount*: $3,389,027.89
>
> *Collateral*: Assets of Hyde Park Circle, with an estimated value of $6,300,000.00.
>
> *Priority of Lien*: GECU holds first priority liens on the assets of Hyde Park Circle. It does not have a lien on any Assets of the Debtor.
>
> *Proof of Claim Reference*: Claim No. 23
>
> *Secured / Unsecured Status*: Unsecured as to any Claim against the Debtor but fully Secured by company assets.

c.      *Treatment*:

i.      *Fully Secured Company Debt Claim*: The GECU Claim will be treated as Fully Secured Company Debt Claim because the value of the Company Collateral that secures the GECU Claim is estimated to be in excess of the aggregate Claim amount. As such, for so long as the primary obligor companies continue to make all payments in accordance with the contractual loan terms, the Holder of the Allowed GECU Claim will not receive any payments from the Debtor personally during the term of the

Plan. However, if GECU establishes that it is entitled to collect on a Company Debt Claim Deficiency, its Company Debt Claim Deficiency will be paid *pro rata* within the General Unsecured Creditor Class

ii. *Modification to Guaranty*: The guaranty provided by the Debtor to GECU provided that GECU, upon an event of default, could seek payment from the Debtor directly and immediately without first liquidating the applicable Company Collateral. During the term of this Plan and until the entry of a Final Decree closing the Case, the rights of GECU against the Debtor under his guaranty will be modified so that (i) GECU may not seek to collect from the Debtor upon a default unless and until GECU has fully liquidated the Company Collateral, and (ii) GECU's recourse against the Debtor under his guaranty relative to any resulting Company Debt Claim Deficiency will be limited to sharing *pro rata* within the General Unsecured Creditor Class. Upon entry of a Final Decree, and absent any other default, the modification to the guaranty will terminate and the guaranty will revert to its original contractual terms.

iii. *Effect of Discharge*: The discharge received by the Debtor will not apply to the guaranty of the Debtor to GECU.

d. *Impairment and Voting*: Class 10 is impaired. The Holder of the Allowed Claim in Class 10 is entitled to vote on the Plan.

### 4.4.11. Class 11 – Heritage Claim

a. *Classification*: Class 11 consists of the Heritage Claim.

b. *Overview*:

*Claimant*: Heritage

*Type of Obligation*: Debtor is a guarantor of this debt.

*Primary Obligors*: Madison Warehouse, LLC

*Claim Amount*: $1,899,926.42

*Collateral*: Assets of Madison Warehouse, LLC, with an estimated value of $3,500,000.00.

*Priority of Lien*: Heritage holds first priority liens on the assets of Madison Warehouse, LLC. It does not have a lien on any Assets of the Debtor.

*Proof of Claim Reference*: Claim No. 2 (Madison Warehouse portion)

*Secured / Unsecured Status*: Unsecured as to any Claim against the Debtor but fully Secured by company assets.

c. *Treatment*:

    i. *Fully Secured Company Debt Claim*: The Heritage Claim will be treated as Fully Secured Company Debt Claim because the value of the Company Collateral that secures the Heritage Claim is estimated to be in excess of the aggregate Claim amount. As such, for so long as the primary obligor companies continue to make all payments in accordance with the contractual loan terms, the Holder of the Allowed Heritage Claim will not receive any payments from the Debtor personally during the term of the Plan. However, if Heritage establishes that it is entitled to collect on a Company Debt Claim Deficiency, its Company Debt Claim Deficiency will be paid *pro rata* within the General Unsecured Creditor Class

    ii. *Modification to Guaranty*: The guaranty provided by the Debtor to Heritage provided that Heritage, upon an event of default, could seek payment from the Debtor directly and immediately without first liquidating the applicable Company Collateral. During the term of this Plan and until the entry of a Final Decree closing the Case, the rights of Heritage against the Debtor under his guaranty will be modified so that (i) Heritage may not seek to collect from the Debtor upon a default unless and until Heritage has fully liquidated the Company Collateral, and (ii) Heritage's recourse against the Debtor under his guaranty relative to any resulting Company Debt Claim Deficiency will be limited to sharing *pro rata* within the General Unsecured Creditor Class. Upon entry of a Final Decree, and absent any other default, the modification to the guaranty will terminate and the guaranty will revert to its original contractual terms.

    iii. *Effect of Discharge*: The discharge received by the Debtor will not apply to the guaranty of the Debtor to Heritage.

d. *Impairment and Voting*: Class 11 is impaired. The Holder of the Allowed Claim in Class 11 is entitled to vote on the Plan.

### 4.4.12. Class 12 – Kemba Claim

a. *Classification*: Class 12 consists of the Kemba Claim.

b. *Overview*:

    *Claimant*: Kemba

    *Type of Obligation*: Debtor is a guarantor of this debt.

    *Primary Obligors*: Hyde Park Circle, LLC

    *Claim Amount*: $136,901.38

*Collateral*: Assets of Hyde Park Circle, with an estimated value of $6,300,000.00.

*Priority of Lien*: Kemba holds first priority liens on the assets of Hyde Park Circle. It does not have a lien on any Assets of the Debtor.

*Proof of Claim Reference*: Claim No. 4

*Secured / Unsecured Status*: Unsecured as to any Claim against the Debtor but fully Secured by company assets.

c.  *Treatment*:

 i.  *Fully Secured Company Debt Claim*: The Kemba Claim will be treated as Fully Secured Company Debt Claim because the value of the Company Collateral that secures the Kemba Claim is estimated to be in excess of the aggregate Claim amount. As such, for so long as the primary obligor companies continue to make all payments in accordance with the contractual loan terms, the Holder of the Allowed Kemba Claim will not receive any payments from the Debtor personally during the term of the Plan. However, if Kemba establishes that it is entitled to collect on a Company Debt Claim Deficiency, its Company Debt Claim Deficiency will be paid *pro rata* within the General Unsecured Creditor Class

 ii.  *Modification to Guaranty*: The guaranty provided by the Debtor to Kemba provided that Kemba, upon an event of default, could seek payment from the Debtor directly and immediately without first liquidating the applicable Company Collateral. During the term of this Plan and until the entry of a Final Decree closing the Case, the rights of Kemba against the Debtor under his guaranty will be modified so that (i) Kemba may not seek to collect from the Debtor upon a default unless and until Kemba has fully liquidated the Company Collateral, and (ii) Kemba's recourse against the Debtor under his guaranty relative to any resulting Company Debt Claim Deficiency will be limited to sharing *pro rata* within the General Unsecured Creditor Class. Upon entry of a Final Decree, and absent any other default, the modification to the guaranty will terminate and the guaranty will revert to its original contractual terms.

 iii.  *Effect of Discharge*: The discharge received by the Debtor will not apply to the guaranty of the Debtor to Kemba.

d.  *Impairment and Voting:* Class 12 is impaired. The Holder of the Allowed Claim in Class 12 is entitled to vote on the Plan.

### 4.4.13.   Class 13 – Rockland Claim

a.  *Classification*: Class 13 consists of the Rockland Claim.

b.  *Overview*:

> *Claimant*: Rockland
>
> *Type of Obligation*: Debtor is a guarantor of this debt.
>
> *Primary Obligors*: Boston RD, LLC in relation to Loan #0015; and North Shore RD, LLC in relation to Loan #0018
>
> *Claim Amount*: $8,970,342.54 (Boston RD, LLC loan and North Shore RD, LLC loan).
>
> *Collateral*: Assets of Boston RD, LLC, with an estimated value of $9,600,000.00; and assets of North Shore RD, LLC, with an estimated value of $8,000,000.00.
>
> *Priority of Lien*: Rockland holds first priority liens on the assets of Boston RD, LLC, and North Shore RD, LLC. It does not have a lien on any Assets of the Debtor.
>
> *Proof of Claim Reference*: Claim No. 24
>
> *Secured / Unsecured Status*: Unsecured as to any Claim against the Debtor but fully Secured by company assets.

c.  *Treatment*:

i.  *Fully Secured Company Debt Claim*: The Rockland Claim will be treated as Fully Secured Company Debt Claim because the value of the Company Collateral that secures the Rockland Claim is estimated to be in excess of the aggregate Claim amount. As such, for so long as the primary obligor companies continue to make all payments in accordance with the contractual loan terms, the Holder of the Allowed Rockland Claim will not receive any payments from the Debtor personally during the term of the Plan. However, if Rockland establishes that it is entitled to collect on a Company Debt Claim Deficiency, its Company Debt Claim Deficiency will be paid *pro rata* within the General Unsecured Creditor Class

ii.  *Modification to Guaranty*: The guaranty provided by the Debtor to Rockland provided that Rockland, upon an event of default, could seek payment from the Debtor directly and immediately without first liquidating the applicable Company Collateral. During the term of this Plan and until the entry of a Final Decree closing the Case, the rights of Rockland against the Debtor under his guaranty will be modified so that (i) Rockland may not seek to collect from the Debtor upon a default unless and until Rockland has fully liquidated the Company Collateral, and (ii) Rockland's recourse against the Debtor under his guaranty relative to any resulting Company Debt Claim Deficiency will be limited to sharing *pro rata* within the

General Unsecured Creditor Class. Upon entry of a Final Decree, and absent any other default, the modification to the guaranty will terminate and the guaranty will revert to its original contractual terms.

    iii.    *Effect of Discharge*: The discharge received by the Debtor will not apply to the guaranty of the Debtor to Rockland.

d.    *Impairment and Voting*: Class 13 is impaired. The Holder of the Allowed Claim in Class 13 is entitled to vote on the Plan.

### 4.4.14.    Class 14 – Stock Yards Claim

a.    *Classification*: Class 14 consists of the Stock Yards Claim.

b.    *Overview*:

*Claimant*: Stock Yards

*Type of Obligation*: Debtor is a guarantor of this debt.

*Primary Obligors*: 5150 East Galbraith Road, LLC in relation to the loan.

*Claim Amount*: $1,201,222.30

*Collateral*: Assets of 5150 East Galbraith Road, LLC, with an estimated value of $2,200,000.00.

*Priority of Lien*: Stock Yards holds first priority liens on the assets of 5150 East Galbraith Road, LLC. It does not have a lien on any Assets of the Debtor.

*Proof of Claim Reference*: Claim No. 22

*Secured / Unsecured Status*: Unsecured as to any Claim against the Debtor but fully Secured by company assets.

c.    *Treatment*:

    i.    *Fully Secured Company Debt Claim*: The Stock Yards Claim will be treated as Fully Secured Company Debt Claim because the value of the Company Collateral that secures the Stock Yards Claim is estimated to be in excess of the aggregate Claim amount. As such, for so long as the primary obligor companies continue to make all payments in accordance with the contractual loan terms, the Holder of the Allowed Stock Yards Claim will not receive any payments from the Debtor personally during the term of the Plan. However, if Stock Yards establishes that it is entitled to collect on a Company Debt Claim Deficiency, its Company Debt Claim Deficiency will be paid *pro rata* within the General Unsecured Creditor Class

ii.   *Modification to Guaranty*: The guaranty provided by the Debtor to Stock Yards provided that Stock Yards, upon an event of default, could seek payment from the Debtor directly and immediately without first liquidating the applicable Company Collateral. During the term of this Plan and until the entry of a Final Decree closing the Case, the rights of Stock Yards against the Debtor under his guaranty will be modified so that (i) Stock Yards may not seek to collect from the Debtor upon a default unless and until Stock Yards has fully liquidated the Company Collateral, and (ii) Stock Yards's recourse against the Debtor under his guaranty relative to any resulting Company Debt Claim Deficiency will be limited to sharing *pro rata* within the General Unsecured Creditor Class. Upon entry of a Final Decree, and absent any other default, the modification to the guaranty will terminate and the guaranty will revert to its original contractual terms.

iii.   *Effect of Discharge*: The discharge received by the Debtor will not apply to the guaranty of the Debtor to Stock Yards.

d.   *Impairment and Voting:* Class 14 is impaired. The Holder of the Allowed Claim in Class 14 is entitled to vote on the Plan.

### 4.4.15.   Class 15 – Transamerica Claim

a.   *Classification*: Class 15 consists of the Transamerica Claim.

b.   *Overview*:

*Claimant*: Transamerica

*Type of Obligation*: Debtor is a guarantor of this debt (springing recourse guaranty).

*Primary Obligors*: To Life, Ltd. in relation to the loan on The Red Apartments.

*Claim Amount*: $47,091,720.47 (payoff amount as of August 3, 2026)

*Collateral*: Assets of To Life, Ltd., with an estimated value in excess of the Claim amount.

*Priority of Lien*: Transamerica holds first priority liens on the assets of To Life, Ltd. It does not have a lien on any Assets of the Debtor.

*Proof of Claim Reference*: None filed

Secured / Unsecured Status: Unsecured as to any Claim against the Debtor but fully Secured by company assets.

c. *Treatment*:

    i. *Fully Secured Company Debt Claim*: The Transamerica Claim will be treated as a Fully Secured Company Debt Claim because the value of the Company Collateral that secures the Transamerica Claim is estimated to be in excess of the Claim amount. As such, for so long as the primary obligor Company continues to make all payments in accordance with the contractual loan terms, the Holder of the Allowed Transamerica Claim will not receive any payments from the Debtor personally during the term of the Plan. However, if Transamerica establishes that it is entitled to collect on a Company Debt Claim Deficiency, its Company Debt Claim Deficiency will be paid *pro rata* within the General Unsecured Creditor Class

    ii. *Modification to Guaranty*: The springing recourse guaranty provided by the Debtor to Transamerica provides that Transamerica, upon an event of default, may seek, on a limited basis, payment from the Debtor directly and immediately without first liquidating the applicable Company Collateral. During the term of this Plan and until the entry of a Final Decree closing the Case, the rights of Transamerica against the Debtor under his springing recourse guaranty will be modified so that (i) Transamerica may not seek to collect from the Debtor upon a default unless and until Transamerica has fully liquidated the Company Collateral, and (ii) Transamerica's recourse against the Debtor under his guaranty relative to any resulting Company Debt Claim Deficiency will be limited to sharing *pro rata* within the General Unsecured Creditor Class. Upon entry of a Final Decree, and absent any other default, the modification to such guaranty will terminate and the guaranty will revert to its original contractual terms.

    iii. *Effect of Discharge*. The discharge received by the Debtor will not apply to the springing recourse guaranty of the Debtor to Transamerica.

d. *Impairment and Voting*: Class 15 is impaired. The Holder of the Allowed Claim in Class 15 is entitled to vote on the Plan.

### 4.4.16. Class 16 – Huntington General Unsecured Claim

a. *Classification*: Class 16 consists of the Huntington General Unsecured Claim (the unsecured portion of the Huntington Claim after avoidance of its asserted liens and security interests).

b. *Overview*:

    *Claimant*: Huntington

    *Claim Amount*: $36,131,393.30 (subject to allowance and any preference avoidance)

*Collateral*: None (after avoidance of the asserted judgment liens and garnishments)

*Proof of Claim Reference*: Claim No. 11

*Secured / Unsecured Status*: General unsecured

c.  *Treatment*: Until the conclusion by a Final Order of the Huntington Litigation and any Huntington Retained Actions, the *pro rata* share of the Net Plan Proceeds distributed to General Unsecured Creditors that otherwise would have been paid to Huntington as the Holder of the Allowed Huntington General Unsecured Claim will be held in a Disputed Claim Reserve. Upon the conclusion by a Final Order of the Huntington Litigation and any Huntington Retained Action, any amount of such judgment in favor of the Debtor will act as a setoff against the Huntington General Unsecured Claim, whether in whole or in part. Thereupon, to the extent any amount of the Allowed Huntington General Unsecured Claim remains unsatisfied through such setoff, distribution will be made to Huntington of any *pro rata* share of the Net Plan Proceeds due Huntington under this Plan.

d.  *Impairment and Voting*: Class 16 is impaired. The Holder of the Class 16 Claim is entitled to vote on the Plan.

### 4.4.17. Class 17 – General Unsecured Claims

a.  *Classification*: Class 17 consists of all General Unsecured Claims other than the Huntington General Unsecured Claim, including any Company Debt Claim Deficiencies determined pursuant to the procedures in this Plan.

b.  *Overview*:

  *Claimant*: Various Holders of General Unsecured Claims

  *Claim Amount*: Varies

  *Collateral*: None

  *Proof of Claim Reference*: Various

  *Secured / Unsecured Status*: General unsecured

c.  *Treatment*: The Holders of Allowed General Unsecured Claims will receive their *pro rata* share of the Net Plan Proceeds distributed to the General Unsecured Creditor Class in accordance with the distribution provisions of this Plan.

d.  *Impairment and Voting*: Class 17 is impaired. The Holders of Allowed Claims in Class 17 are entitled to vote on the Plan.

## Article 5: Means of Implementation

### 5.1. Vesting of Assets

On the Effective Date, except as otherwise provided in the Plan, all property of the Debtor's estate, including all Assets, will vest in the reorganized Debtor free and clear of all Claims, Liens, Interests, and other encumbrances, except as specifically retained under this Plan. Notwithstanding the foregoing, the Retained Actions will remain property of the Debtor's estate to be administered as specified in this Plan. The Debtor's Case will remain open until all Retained Actions, the Huntington Litigation and the Huntington Retained Actions are fully resolved and administered in accordance with the terms of the Plan.

### 5.2. Operations between Confirmation and Effective Date

During the period from the date of confirmation of the Plan through and until the Effective Date, the Debtor will continue to operate in the ordinary course as debtor in possession, subject to all applicable orders of the Court.

### 5.3. Post-Effective Date operations

Confirmation of the Plan constitutes authorization by the Court for the Debtor's use of funds of the estate to meet any cash requirements of the Case and the Plan. The Debtor will use his cash on hand as of the Effective Date and all Plan Proceeds to pay the following:

a. ongoing personal living expenses of the Debtor;

b. Allowed Administrative Claims, Priority Tax Claims and U.S. Trustee Fees;

c. cure payments related to any assumed Executory Contract or Unexpired Lease; and

d. all other amounts to be distributed under the terms of the Plan.

### 5.4. Contribution of Income for Five Years

#### 5.4.1. Generally - Compliance with 1129(a)(15)

The Debtor will contribute all his Projected Disposable Income for the period beginning on the Effective Date and ending on the earlier of (i) five years after the Effective Date, in accordance with 11 U.S.C. § 1129(a)(15), or (ii) the date on which all Allowed Claims are paid in full. After the five-year period, the Debtor will continue to contribute only Company Draws and Investment Income (but not Social Security Income or other personal income) until all Allowed Claims are paid in full or the entities generating such Company Draws and Investment Income have been fully disposed of pursuant to the Plan.

### 5.4.2. Determining Projected Disposable Income and payment of personal expenses

As set forth in Article 2, this Plan defines Income in its broadest sense as any money earned by the Debtor during the term of the Plan, including but not limited to the Debtor's Company Draws, Social Security Income, Colorado Rental Income, Investment Income, and any W-2 or 1099 income the Debtor receives during the term of the Plan. Projected Disposable Income means Income less the amount of all reasonable and necessary ordinary-course personal expenses of the Debtor's household, including food, transportation, housing, utilities, insurance, medical expenses, and other allowed living expenses. The Debtor will pay all such personal expenses before any contribution is made to the Plan. Projected Disposable Income will be included in Plan Proceeds and distributed to Holders of Allowed Claims in accordance with Article 4.

### 5.4.3. Company Draws

The Debtor will take from each of his operating companies Company Draws of any profits that those companies experience over and above their regular operating expenses and net of the retention of sufficient reserves to ensure working capital for continued operations. The Debtor will exercise his business judgment as to the needs of each entity and the amount of any reserves required. The Debtor will contribute those Company Draws to the Plan after payment of the Debtor's ordinary-course personal expenses. The anticipated minimum Company Draws from each operating company will be set forth in the Disclosure Statement. Certain operating companies will be disposed of during the term of the Plan, at which point the Company Draws from those companies will be eliminated and Projected Disposable Income will be reduced accordingly.

### 5.4.4. Contribution of Social Security Income in exchange for retention of personal Assets

The Debtor's Social Security income is Exempt Income. In exchange for the Debtor's commitment to contribute $3,636.70 per month of his Social Security income to the Plan for the five-year period described in Section 5.4.1, the Debtor will retain all Non-Exempt Personal Assets free and clear of any Claims of creditors. The projected total contribution over the five-year period is $218,202.00, plus any cost-of-living adjustments that increase the monthly Social Security benefit during the term of the Plan. The value of the Non-Exempt Personal Assets to be retained in exchange for this contribution is $78,499.00 according to the Debtor's Schedules.

Any Holder of an Allowed Claim in Class 16 (Huntington General Unsecured Claim) or Class 17 (General Unsecured Claims) may file a motion with the Bankruptcy Court within sixty (60) days after the Effective Date seeking a determination of the value of the Non-Exempt Personal Assets, including by appraisal if the movant so requests. If the Court determines that the value of the Non-Exempt Personal Assets exceeds the net present value of the Social Security income contributions over the five-year period (calculated using the interest rate determined under 11 U.S.C. § 511), the Debtor will have the option to contribute funds from his exempt IRA in an amount sufficient to cover the excess value. If no such motion is filed, or if the Court determines that the value of the Non-Exempt Personal Assets does not exceed the net present value of the Social Security income contributions, the commitment of the Social Security income to the Plan will be deemed sufficient new value to cover the value of the Non-Exempt Personal Assets, and the Debtor will retain the

Non-Exempt Personal Assets free and clear of any Claims of creditors without any contribution from the exempt IRA.

### 5.4.5.        Net Income included in Plan Proceeds for quarterly distributions

All Projected Disposable Income contributed to the Plan under this Section 5.4 will constitute Plan Proceeds and will be distributed to Holders of Allowed Claims on the Quarterly Distribution Dates in accordance with the treatment provisions set forth in Article 4.

### 5.5.      Disposition of Assets

The Debtor will use commercially reasonable efforts to sell or monetize the Assets required to be disposed of under the Plan in a manner and at a time that the Debtor, in his business judgment, determines will maximize value for the benefit of creditors, taking into account tax consequences, market conditions, and the need to preserve liquidity for ongoing Plan payments.

### 5.5.1.        Sale of Ohio Property

The Debtor will obtain an appraisal of the Ohio Property by a qualified appraiser selected by the Debtor within sixty (60) days after the Effective Date. Within thirty (30) days after the Debtor obtains the appraisal, the Spouse will have the opportunity to elect to purchase the Debtor's one-half interest in the Ohio Property for one-half of the Appraised Value. If the Spouse elects to purchase, the closing will occur within sixty (60) days after the election, and the Spouse may (i) assume the existing mortgage with the consent of Nationstar or (ii) refinance the mortgage in full. If the Spouse assumes the existing mortgage, the Debtor will be released at closing from any and all obligations to Nationstar arising from the Nationstar Mortgage Claim.

The Debtor believes that a sale to the Spouse is the best outcome for the estate. If the Debtor were required to employ a real-estate broker and sell the property on the open market, the resulting broker commissions (typically five to six percent), closing costs, and carrying expenses during the marketing period would leave little or no net equity for the estate after satisfaction of the mortgage and any real-estate taxes—particularly in light of the Ohio homestead exemption applicable to the Ohio Property. If the Spouse does not elect to purchase, the Debtor may elect to contribute an amount equal to the net equity value (Debtor's one-half interest in the equity above the Nationstar mortgage balance) from his exempt IRA to the Plan within sixty (60) days after the Spouse's election period expires. In that event, the Debtor will retain his interest in the Ohio Property free and clear of any Claims of creditors, but subject to the Nationstar mortgage. If the Debtor does not make the IRA contribution election, the Debtor will list the Ohio Property for sale with a qualified real-estate broker and will use commercially reasonable efforts to sell the property within twelve (12) months after the expiration of the Spouse's election period (subject to extension for market conditions). Proceeds from any sale will be included in Plan Proceeds.

### 5.5.2.        Sale of Maine Property

The Debtor will obtain an appraisal of the Maine Property by a qualified appraiser selected by the Debtor within sixty (60) days after the Effective Date. Within thirty (30) days after the Debtor obtains the appraisal, the Spouse will have the opportunity to elect to purchase the Debtor's one-half interest in the Maine Property for one-half of the Appraised Value. If the Spouse elects to

purchase, the closing will occur within sixty (60) days after the election, and the Spouse may (i) assume the existing mortgage with the consent of First Merchants or (ii) refinance the mortgage in full. If the Spouse assumes the existing mortgage, the Debtor will be released at closing from any and all obligations to First Merchants arising from the First Merchants Mortgage Claim.

The Debtor believes that a sale to the Spouse is the best outcome for the estate. Although there is substantial equity in the Maine Property, if the Debtor were required to employ a real-estate broker and sell the property on the open market, the resulting broker commissions (typically five to six percent), closing costs, and carrying expenses during the marketing period would drastically reduce the net equity available to the estate after satisfaction of the mortgage and any real-estate taxes. If the Spouse does not elect to purchase, the Debtor may elect to contribute an amount equal to the net equity value (Debtor's one-half interest in the equity above the First Merchants mortgage) from his exempt IRA to the Plan within sixty (60) days after the Spouse's election period expires. In that event, the Debtor will retain his interest in the Maine Property free and clear of any Claims of creditors, but subject to the First Merchants mortgage. If the Debtor does not make the IRA contribution election, the Debtor will list the Maine Property for sale with a qualified real-estate broker and will use commercially reasonable efforts to sell the property within twelve (12) months after the expiration of the Spouse's election period (subject to extension for market conditions). Proceeds from any sale will be included in Plan Proceeds.

### 5.5.3. Sale of Colorado Property

The Debtor will obtain an appraisal of the Colorado Property by a qualified appraiser selected by the Debtor within sixty (60) days after the Effective Date. Within thirty (30) days after the Debtor obtains the appraisal, the Spouse will have the opportunity to elect to purchase the Debtor's interest in the Colorado Property at the Appraised Value. If the Spouse elects to purchase, the closing will occur within sixty (60) days after the election, and the Spouse may (i) assume the existing mortgage with the consent of Truist or (ii) refinance the mortgage in full.

The Debtor believes that a sale to the Spouse is the best outcome for the estate. If the Debtor were required to employ a real-estate broker and sell the property on the open market, the resulting broker commissions (typically five to six percent), closing costs, and carrying expenses during the marketing period would leave little or no net equity for the estate after satisfaction of the mortgage and any real-estate taxes. If the Spouse does not elect to purchase, the Debtor may elect to contribute an amount equal to the net equity value (after the mortgage) from his exempt IRA to the Plan within sixty (60) days after the Spouse's election period expires. In that event, the Debtor will retain his interest in the Colorado Property free and clear of any Claims of creditors, but subject to the Truist mortgage. If the Debtor does not make the IRA contribution election, the Debtor will list the Colorado Property for sale with a qualified real-estate broker and will use commercially reasonable efforts to sell the property within twelve (12) months after the expiration of the Spouse's election period (subject to extension for market conditions). Proceeds from any sale will be included in Plan Proceeds.

### 5.5.4. Disposition of interests in Operating Companies (or their assets)

The Debtor will sell and otherwise monetize his interests in, or the assets of, the Operating Companies (at the entity level where appropriate) in a commercially reasonable manner. Because

the sale or monetization of the Operating Companies as going concerns requires substantial time investment from the Debtor and his employees—including the preparation of due-diligence materials, management presentations, negotiation of purchase agreements, and ongoing cooperation with prospective buyers—the Debtor will use his business judgment to stagger the sales over the life of the Plan rather than attempting to dispose of all Operating Companies, or their assets, simultaneously.

A carefully planned staggering of the sales is necessary to ensure that Operating Companies continue to generate profits from which Company Draws can be made to fund the Debtor's Projected Disposable Income obligations and other Plan payments, including anticipated tax liabilities on both the business sales and the Merrill Lynch Account liquidations. Immediate sale of all Operating Companies, or their assets, would eliminate the Debtor's ability to make those ongoing contributions and could impair the feasibility of the Plan. In addition, the Debtor requires flexibility to time each sale to minimize tax consequences where possible, taking into account the structure of each transaction, available tax attributes, and prevailing market conditions.

The Debtor will exercise his full business judgment regarding the timing, marketing strategy, and method of each sale or liquidation to preserve going-concern value for as long as practicable while satisfying the requirements of this Plan. Proceeds from any such liquidation will constitute Business Asset Sale Proceeds and will be included in Plan Proceeds.

### 5.5.5. Disposition of interests in Investment Companies

The Debtor will, to the best of his ability, sell or otherwise monetize his interests in the Investment Companies in a commercially reasonable manner. These Investment Companies interests are typically small minority interests in closely held entities in which the Debtor has no management control or operational authority. Because of the Debtor's lack of control, the sale process may require substantial time and cooperation from the controlling owners or managers of those entities.

Certain of the Investment Companies are subject to governance provisions, operating agreements, shareholder agreements, or other contractual restrictions that may grant other owners a right of first refusal, impose transfer restrictions, or otherwise make liquidation more difficult. The Debtor will work diligently with the other owners to obtain any required consents or waivers. To the extent any such governance provision is asserted to restrict or prohibit a sale after the Petition Date, the Debtor may seek declaratory relief from the Bankruptcy Court to determine the applicability and enforceability of those restrictions in light of the filing of this Chapter 11 case. The Debtor will exercise his full business judgment regarding the timing, marketing strategy, and method of each sale or monetization to maximize value for the benefit of creditors while preserving liquidity for ongoing Plan payments. Proceeds from any such sale or monetization will constitute Business Asset Sale Proceeds and will be included in Plan Proceeds.

### 5.5.6. Closure of Inactive Companies

As further described in the Disclosure Statement, the Debtor does not believe that there is any value to the Inactive Companies. Therefore, the Debtor will take necessary actions over time, to the extent that the Debtor has the authority to do so, to dissolve or otherwise terminate the Inactive Companies. If it turns out that one of the Inactive Companies holds any sort of asset that can be

monetized for the benefit of creditors (such as several that hold potential interest in lawsuits), any proceeds therefrom will be treated in the same way as liquidated Investment Companies or Operating Companies. Nothing in this Plan or provision is meant to indicate that the Debtor would not contribute any money received from Inactive Companies to the Plan.

### 5.5.7. Liquidation of Merrill Lynch Accounts

As determined in his business judgment, and in consultation with his investment advisors, the Debtor will liquidate the Merrill Lynch Accounts in phases rather than all at once. Immediate full liquidation would trigger substantial capital-gains tax liabilities on substantial unrealized gains in the accounts and could disrupt market pricing and the Debtor's ongoing liquidity needs for Plan payments and living expenses. The Debtor will rely on his professional advisors at Bank of America to assist in determining the appropriate phased liquidation strategy. The Debtor will therefore liquidate the Merrill Lynch Accounts over time in a commercially reasonable manner, with the entire liquidation process to be completed no later than twenty-four (24) months after entry of a Final Order in the Huntington Litigation, subject to a possible one-year extension if the Bankruptcy Court approves such extension for cause shown. This phased approach is necessary to avoid massive tax bills that would otherwise come due in a single tax year and to preserve cash that may be required to pay taxes not only on the brokerage liquidation but also on the anticipated dispositions of the operating companies. Proceeds from any liquidation of the Merrill Lynch Accounts will first be applied to pay the Bank of America Secured Claim in full. Any remaining proceeds will be included in Plan Proceeds.

### 5.5.8. Collection of The Blue Promissory Note

The Blue Promissory Note is a Non-Exempt Asset. The Debtor will use commercially reasonable efforts to collect all amounts due under The Blue Promissory Note, including demanding and receiving payment in full on The Blue Promissory Note Maturity Date if the note has not been paid earlier. All amounts collected under The Blue Promissory Note—whether paid in installments, in a lump sum at maturity, or otherwise—will constitute Plan Proceeds and will be distributed to Holders of Allowed Claims under this Plan. The Debtor will report the status of the Blue Promissory Note, including any collections received, in the Quarterly Reports required by this Plan. Nothing in this provision will be construed to remove from the Retained Actions any possible claim to be pursued by the Retained Actions Representative in relation to the transactions that gave rise to the issuance of The Blue Promissory Note.

### 5.5.9. Collection of Entity Loans

The Debtor will use commercially reasonable efforts to collect all net amounts due on any Entity Loan after taking into account any amounts the Debtor owes to the same entity. If the disposition of an entity's assets under this Plan would result in the Debtor receiving the amounts owed on an Entity Loan—whether through direct repayment or as part of a final equity distribution—the Debtor is not required to take separate collection action on that Entity Loan.

If the Debtor has not taken commercially reasonable collection action on any Entity Loan within twenty-four (24) months after the Effective Date, any party in interest may move the Bankruptcy Court for an order transferring to the Retained Actions Representative all rights to collect that

Entity Loan. All net amounts collected on Entity Loans will constitute Plan Proceeds and will be distributed in accordance with this Plan. The status of Entity Loan collections will be included in the Quarterly Reports required under this Plan.

### 5.5.10.    Draws from Excess Collateral Value in Merrill Lynch Accounts

To the extent permitted by the Bank of America loan agreement, the Debtor may draw or withdraw funds from the excess collateral value in the Merrill Lynch Accounts. For purposes of this Section, "excess collateral value" means the fair market value of the securities held in the pledged Merrill Lynch Accounts (those ending in -4923 and -3597) that exceeds the outstanding balance of the Bank of America Claim at the time of the draw. The Debtor may use any amounts drawn under this Section solely to pay Allowed Administrative Expense Claims and other amounts the Debtor is authorized to pay under this Plan. Any funds drawn under this Section will constitute Plan Proceeds. The Debtor will provide Bank of America with reasonable advance notice of any material draw and will remain in full compliance with the phased liquidation requirements and timeline set forth in Section 5.5.7.

### 5.6.    Appointment and role of Retained Actions Representative

### 5.6.1.    Appointment of Retained Actions Representative

The Debtor will identify the proposed Retained Actions Representative either by supplement to the Disclosure Statement prior to the Confirmation Hearing or, if not determined prior to Confirmation, by motion filed with the Bankruptcy Court no later than thirty (30) days after the Effective Date. The Retained Actions Representative will be an independent third party selected for experience in the prosecution or settlement of avoidance actions and other claims under chapter 5 of the Bankruptcy Code. The Bankruptcy Court will appoint the Retained Actions Representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code upon approval of the supplement or motion, or in the Confirmation Order if the identity is determined in time for inclusion. If the Debtor fails to file such a motion within thirty (30) days after the Effective Date, the United States Trustee may appoint the Retained Actions Representative. The Retained Actions Representative will be a disinterested person within the meaning of section 101(14) of the Bankruptcy Code and will serve in a fiduciary capacity solely for the benefit of the estate. The Retained Actions Representative will not be affiliated with the Debtor, any creditor, or any party in interest. The appointment of the Retained Actions Representative promotes neutrality and efficiency in the prosecution of the Retained Actions while allowing the Debtor to retain exclusive control over the Huntington Litigation and the Huntington Retained Actions.

### 5.6.2.    Powers and Duties of Retained Actions Representative

The Retained Actions Representative will have all powers and authority necessary to investigate, prosecute, settle, and compromise the Retained Actions, including the power to (i) commence and prosecute any Retained Actions; (ii) retain professionals (subject to Court approval where required); (iii) conduct discovery; and (iv) take any other action necessary or appropriate to maximize the value of the Retained Actions for the benefit of creditors. The Retained Actions Representative will have sole discretion to compromise and settle any Retained Action on such terms as the Retained Actions Representative deems reasonable and appropriate, with no further

notice to Holders of Allowed Claims or Court approval being necessary. The Retained Actions Representative will exercise reasonable business judgment in all matters and will act in the best interest of the estate.

### 5.6.3.   Prosecution of Retained Actions

If commenced, the Retained Actions Representative will diligently prosecute the Retained Actions. All costs and expenses of the Retained Actions Representative, including professional fees, will be paid from the proceeds of the Retained Actions or, if insufficient, from Plan Proceeds as an Administrative Expense Claim. The Retained Actions Representative will provide quarterly reports to the Debtor and the Top 20 Creditors summarizing the status of the Retained Actions.

### 5.6.4.   Retained Actions Proceeds

Retained Actions Proceeds will constitute Plan Proceeds to be distributed to Holders of Allowed Claims in accordance with Article 4. The Retained Actions Representative will distribute such Proceeds directly to the Holders of Allowed Claims on the Quarterly Distribution Dates in a manner and to the extent consistent with the Plan.

### 5.6.5.   No Assignment of Huntington Litigation and Huntington Retained Actions

Notwithstanding any other provision of this Plan, neither the Huntington Litigation nor the Huntington Retained Actions are or will be assigned to the Retained Actions Representative. The Debtor will retain full and exclusive control over the investigation, prosecution, settlement, and disposition of the Huntington Litigation and Huntington Retained Actions at all times. Any recovery arising from the Huntington Litigation and the Huntington Retained Actions will first be setoff against the Huntington General Unsecured Claim (Class 16) in satisfaction thereof, to the extent any remains thereafter, will be included in Plan Proceeds and distributed otherwise in accordance with Article 4.

## 5.7.   Huntington Litigation and Huntington Retained Actions

The Debtor will retain full and exclusive control over the Huntington Litigation and the Huntington Retained Actions at all times, and the Huntington Litigation and the Huntington Retained Actions will not be assigned to the Retained Actions Representative. The Huntington Litigation is the pending state court lawsuit filed by the Debtor against Huntington alleging RICO violations and related claims. The Debtor will diligently prosecute the Huntington Litigation using commercially reasonable efforts to maximize its value for the benefit of the estate. The Huntington Retained Actions consist of any and all actual or potential claims and causes of action against Huntington to avoid a transfer of property or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law.

Because the outcome of the Huntington Litigation and Huntington Retained Actions may substantially affect the amount, if any, that is ultimately payable to Huntington under the Plan, the Debtor will keep the Top 20 Creditors reasonably informed of material developments through the quarterly reports required under Section 5.12. If the Debtor obtains a judgment in the Huntington

Litigation or with respect to the Huntington Retained Actions, no further distributions will be made to Huntington on account of its Allowed Claim while any appeal of that judgment remains pending. During that period, any amounts that would otherwise have been distributed to Huntington will instead be held in the Disputed Claim Reserve. Upon entry of a Final Order in the Huntington Litigation or the Huntington Retained Actions in favor of the Debtor, if any, the Debtor will be entitled to assert a right of set-off (in whole or in part) against Huntington's Allowed Claim.

Additionally, if the Debtor is awarded a judgment in the Huntington Litigation or the Huntington Retained Actions that would result in a set-off of Huntington's Allowed Claim in full or in substantial part, then all deadlines and obligations under this Plan requiring the Debtor to liquidate or sell any Assets within a specified period of time will be tolled for the duration of any appeal of that judgment. Upon entry of a Final Order in the Huntington Litigation or the Huntington Retained Actions, the Debtor's obligations under this Plan to liquidate Assets will be modified to require the Debtor to liquidate only such Assets as may be necessary to satisfy any remaining net amount owed to Huntington after full application of the Debtor's set-off rights. If the set-off rights exceed the amount of Huntington's Allowed Claim, the Debtor will have no further obligation to liquidate any Assets under the Plan.

Any net proceeds ultimately recovered from the Huntington Litigation or the Huntington Retained Actions (after any set-off) will be included in Plan Proceeds and distributed to Holders of Allowed Claims in accordance with Article 4.

### 5.8.   Tax Provisions on Sales

The Debtor is authorized, without further order of the Bankruptcy Court, to pay or set aside from the gross proceeds of any sale or disposition of Assets (whether at the entity level or the individual level) such amounts as the Debtor, in consultation with his tax professionals, reasonably estimates will be required to satisfy the federal, state, and local tax liabilities arising from such sale or liquidation. This authority is necessary because the sales contemplated under the Plan involve substantial unrealized gains and complex tax attributes. Immediate payment of all taxes in a single tax year could create liquidity issues that impair the Debtor's ability to fund ongoing Plan payments, living expenses, and other obligations under the Plan.

Any tax refunds, credits, or overpayments received by the Debtor or any of the operating companies that relate to taxes paid or reserved from the proceeds of sales or liquidations under the Plan will be promptly contributed to the Plan and will constitute Plan Proceeds. Such refunds or credits will not be applied to offset future tax obligations of the Debtor or the operating companies but will instead be used for distributions to Holders of Allowed Claims in accordance with Article 4.

The Debtor is authorized to engage any tax professional or advisor of his choosing, without further order of the Bankruptcy Court, to assist in determining the tax consequences of any sale or liquidation under the Plan, to prepare any necessary tax returns or elections, and to advise on tax minimization strategies.

**5.9.    Plan Distributions**

### 5.9.1.    Determination of Net Plan Proceeds

On each Quarterly Distribution Date, the Debtor will determine the total amount of Plan Proceeds then held by the Debtor. The Debtor will set aside a reasonable reserve for any unpaid Administrative Expense Claims and Priority Claims then due or reasonably expected to become due, as well as a reasonable reserve for the Debtor's anticipated future ordinary-course living and operating expenses (after taking into account anticipated future Income). The remaining amount will constitute Net Plan Proceeds available for distribution to Holders of Allowed Claims on that Quarterly Distribution Date.

### 5.9.2.    Timing of distributions

Distributions of Net Plan Proceeds to Holders of Allowed Claims will be made on each Quarterly Distribution Date. The first distribution will occur on the Initial Distribution Date.

### 5.9.3.    Method of payment and delivery of distributions

All distributions under the Plan will be made in Cash by wire transfer or check, at the Debtor's election. Distributions will be delivered to the record Holder of the Allowed Claim as it appears on the Schedules or on the register maintained by the Clerk of the Court as of the Record Date. The Debtor may adopt reasonable procedures for electronic or other efficient delivery of distributions.

### 5.9.4.    Record Date for distributions

The Record Date for purposes of determining the Holders entitled to receive distributions on any Quarterly Distribution Date will be the last Business Day of the calendar quarter immediately preceding that Quarterly Distribution Date.

### 5.9.5.    Unclaimed or undeliverable distributions

Any distribution that remains unclaimed or undeliverable for ninety (90) days after the date it is first made will be deemed unclaimed. The Debtor will hold any unclaimed distribution for an additional thirty (30) days and will make reasonable efforts to locate the Holder. After that period, the unclaimed distribution will automatically revert to the Debtor and will be included in Plan Proceeds for distribution to other Holders of Allowed Claims on the next Quarterly Distribution Date. No further distributions under the Plan will be made to an original Holder whose distribution is returned as undeliverable or is unclaimed.

### 5.9.6.    *De minimis* distributions

If the amount of any distribution to a Holder of an Allowed Claim on any Quarterly Distribution Date is less than $100.00, the Debtor may, in his sole discretion, accumulate that distribution and pay it only when the accumulated amount exceeds $100.00 or on the final distribution date under the Plan, whichever occurs first. Any *de minimis* distribution that is never paid because it remains below the threshold will revert to the Debtor and be included in Plan Proceeds.

**5.10.   Actions necessary to facilitate Plan implementation**

The Debtor may generally take any other actions that he deems necessary to complete and consummate its responsibilities under the Plan, including the execution of any related document, turnover of surrendered collateral, and modifications to operations as required.

**5.11.   Settlement**

After the Effective Date, the Debtor will have the authority to settle and compromise any Claim or Disputed vested in him, including the Huntington Litigation and the Huntington Retained Actions, without Court approval or compliance with Bankruptcy Rule 9019.

**5.12.   Quarterly Reporting**

Commencing with the first full calendar quarter after the Effective Date, and continuing on a quarterly basis until the entry of a Final Decree closing the Case, the Debtor will prepare and file with the Bankruptcy Court, and serve on the United States Trustee and the Top 20 Creditors, a Quarterly Report in compliance with LBR 3020-2 of the Local Bankruptcy Rules for the Southern District of Ohio and the United States Trustee Program's quarterly Post-Confirmation Report requirements. Each Quarterly Report will be filed and served no later than the twenty-first (21st) day of the month following the end of the calendar quarter to which it relates.

Each Quarterly Report will provide a detailed summary of the following:

a.   the status of the sale process for the Ohio Property, the Maine Property, and the Colorado Property, including any appraisals obtained, the Spouse's election decision (if any), any IRA contributions made, broker listings, marketing efforts, and any closings completed;

b.   the status of the disposition of Business Assets and Operating Companies, including which entities have been sold or are under contract, the amount of Company Draws received during the quarter, and any reserves maintained by the operating companies;

c.   the status of efforts to sell or monetize the Debtor's interests in any Investment Company, including any governance or right-of-first-refusal issues encountered and any declaratory relief sought from the Court;

d.   the amount of Projected Disposable Income contributed to the Plan during the quarter, the calculation of Net Plan Proceeds (including reserves set aside for Administrative Expense Claims, Priority Claims, and anticipated future living and operating expenses), and the amount of any distributions made on the most recent Quarterly Distribution Date;

e.   the status of the Retained Actions Representative's prosecution of the Retained Actions, including any actions commenced, settlements reached, costs incurred, and net proceeds received;

f.      the status of the Huntington Litigation and the Huntington Retained Actions, including material developments, any judgments obtained, the status of any appeals, any set-off amounts applied, and any tolling of liquidation deadlines under Section 5.5;

g.      the status of the Merrill Lynch Accounts, including whether any liquidation has occurred, the reasons for any deferral, tax planning considerations, and the remaining balance;

h.      after The Blue Promissory Note Maturity Date, the status of collecting on the balance due of The Blue Promissory Note;

i.      the status of Entity Loan collections;

j.      the amount of any taxes paid or reserved from sale proceeds, any tax refunds or credits received, and the engagement of any tax professionals; and

k.      any other material events affecting the implementation of the Plan or the Debtor's ability to make distributions to creditors.

Each Quarterly Report will also include a narrative description of the actions taken during the quarter, the progress made toward consummation of the Plan, and the anticipated timeline for completion of all remaining Plan obligations and the filing of a final report and motion for final decree.

## Article 6:      Allowance and Disallowance of Claims

### 6.1.    Objections to Claims

Any objections to Claims (other than Administrative Claims) will be filed on or before the Claims Objection Bar Date or be forever barred. All Claims that were marked as contingent, unliquidated or disputed on the Schedules for which no Proof of Claim was filed are disallowed as of the Effective Date without the need for the Debtor to file an objection to the Claim.

### 6.2.    No distributions pending Allowance

No payment or distribution provided under the Plan will be made on account of any Disputed Claim until the Disputed Claim becomes an Allowed Claim. To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) will be made to the Holder of that Allowed Claim in accordance with the applicable provisions of the Plan.

### 6.3.    Disputed Claims Reserve

For each distribution, the Debtor will set aside in a Disputed Claims Reserve the amount of cash that the Debtor determines would likely have been distributed to the Holders of all Disputed Claims as if those Disputed Claims had been Allowed as of the date of the distribution and had the Holders participated in the distribution on a *pro rata* basis. For the purposes of calculating the amount to

set aside for the Disputed Claims Reserve, the Debtor will assume an amount for the Disputed Claim that is the greater of:

a.  the asserted amount of the Disputed Claim filed with the Court as set forth in the Proof of Claim, or, if no proof of such Claim was filed listed by the Debtor in the Schedules;

b.  the amount, if any, estimated by the Court pursuant to §502(c) of the Code or ordered by other order of the Court; or

c.  the amount otherwise agreed to by the Debtor and the Holder of such Disputed Claim for distribution purposes.

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the Debtor will, out of the Disputed Claims Reserve, distribute to the Holder thereof the distribution, if any, to which such Holder is entitled in accordance with this Plan. In the event a Disputed Claim is disallowed, the amount of money set aside in the Disputed Claims Reserve will be on the next quarterly distribution date as if the Disputed Claim had never been factored into the distributions.

If at any time the amount of money in the Disputed Claims Reserve exceeds the amount deemed necessary by the Debtor, the excess amounts will be released to the Debtor for the next distribution under the Plan.

## Article 7:    Executory Contracts and Unexpired Leases

### 7.1.   Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, the Debtor assumes all executory contracts and unexpired leases to which the Debtor is a party, except those that have been previously rejected or that are specifically rejected under this Plan.

### 7.2.   Cure of defaults for assumed Executory Contracts and Unexpired Leases

#### 7.2.1.    List of assumed Executory Contracts and Unexpired Leases

The executory contracts and unexpired leases assumed under this Plan consist solely of the operating agreements of the Debtor's various business entities. No other executory contracts or unexpired leases exist as of the Petition Date, as confirmed by the Schedules.

#### 7.2.2.    Cure amounts

The Debtor has no monetary defaults under any assumed executory contract or unexpired lease that require cure under section 365(b) of the Bankruptcy Code. If any non-monetary defaults exist, they will be cured by performance in the ordinary course after the Effective Date.

### 7.2.3. Dispute of cure amounts

By the Effective Date, the Debtor will serve notice on the counterparty to each assumed executory contract or unexpired lease stating that the contract or lease is assumed and that the Debtor has determined there is no cure amount due. Any counterparty that disputes the cure amount will have thirty (30) days after the Effective Date to file a motion with the Bankruptcy Court seeking a determination of the actual cure amount. The Bankruptcy Court will thereafter determine the actual cure amount, if any, required under section 365(b) of the Bankruptcy Code.

## 7.3. Rejection of Executory Contracts and Unexpired Leases

Any executory contract or unexpired lease that is not assumed under this Plan is deemed rejected on the Effective Date.

## 7.4. Rejection damages Claims

Any Claim arising from the rejection of an executory contract or unexpired lease will be treated as a General Unsecured Claim and will be paid in accordance with the treatment provided in Article 4. Any Claim arising from the rejection of an executory contract or unexpired lease must be filed with the Bankruptcy Court on or before the later of (i) the Claim Objection Deadline or (ii) thirty (30) days after the date the Debtor provides written notice of rejection. Any such Claim not timely filed will be forever barred and will not be entitled to any distribution under the Plan.

## 7.5. Operating Agreements

The operating agreements of the Debtor's business entities are executory contracts that are assumed under this Plan. Assumption of these agreements is necessary to permit the continued operation of the entities until their assets are sold or liquidated in accordance with Section 5.3. The assumption of these agreements does not alter any rights or obligations of the non-debtor parties to those agreements except as modified by the Plan.

## 7.6. Post-petition contracts and agreements

Any contract or agreement entered into by the Debtor after the Petition Date is not subject to assumption or rejection under this Article 7 and remains in full force and effect according to its terms.

## 7.7. No other Executory Contracts or Unexpired Leases

Except as expressly provided in this Article 7, the Debtor has no other executory contracts or unexpired leases. The Schedules and any supplements thereto confirm that no additional executory contracts or unexpired leases exist.

## Article 8: Discharge, Injunction and Related Provisions

### 8.1. Discharge

Effective upon the completion of all payments under the Plan and the entry of a Final Decree, pursuant to and to the fullest extent permitted by the Code, except as otherwise specifically provided in the Plan or the Confirmation Order, the treatment of Claims under the Plan will be in full and final satisfaction, settlement, release, discharge, and termination, as of the Effective Date, of all Claims of any nature whatsoever, whether known or unknown, against the Debtor, any Property of the estate, including all Claims of the kind specified in sections 502(g), 502(h), or 502(i) of the Code. Such Claims will be released and treated in accordance with the Plan whether or not (i) a Proof of Claim based upon such Claim is filed or deemed filed pursuant to section 501 of the Code; (ii) a Claim based upon such Claim, liability, or obligation is Allowed pursuant to section 502 of the Code; or (iii) the Holder of such a Claim, liability, or obligation has accepted the Plan. Except as otherwise provided herein, any default by the Debtor with respect to any Claim that existed immediately prior to or on account of the filing of the Chapter 11 Case will be deemed cured on the Effective Date.

Notwithstanding the foregoing, the discharge provided in this Section 8.1 will not apply to the temporarily modified Company Debt Claims during the term of the Plan. The obligations with respect to those Claims will revert to their original contractual terms upon completion of all Plan payments and entry of a Final Decree.

### 8.2. Exculpation

Except as otherwise specifically provided in the Plan, the Debtor, the Retained Actions Representative, and their respective professionals, officers, directors, employees, agents, and representatives will be exculpated from any liability for any act or omission taken or not taken in connection with the Case, the preparation and filing of the Plan, the Disclosure Statement, or any matter related to the prosecution or confirmation of the Plan, to the fullest extent permitted by section 1123(b)(3)(A) of the Code and applicable law.

### 8.3. Injunction

Except as otherwise expressly provided in the Plan or Confirmation Order, the discharge pursuant to this Article also acts as a permanent injunction against any Person who has held, holds or may hold Claims against commencing or continuing any action, employment of process or act to collect, enforce, offset, recoup or recover any Claim or Cause of Action satisfied, released, or discharged under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Code, including to the extent provided for or authorized by sections 524 and 1141 of the Code.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Case pursuant to sections 105 or 362 of the Code or any order of the Court remain in full force and effect until the Effective Date.

**8.4.  Timing of Final Decree**

The Debtor will file a motion for entry of a Final Decree at the earliest of (i) payment in full of all Allowed Claims of general unsecured creditors, secured creditors, and priority creditors or (ii) liquidation of all Non-Exempt Personal Assets and distribution of all Plan Proceeds such that there are no remaining distributions to be completed under the Plan, including through any proceeds of the Retained Actions.

## Article 9:  Confirmation and Retention of Jurisdiction

**9.1.  Plan contingent upon Confirmation**

All obligations of the Debtor in the Plan are expressly contingent upon Confirmation. Consequently, the Debtor may, for any reason, at any time prior to the Confirmation, withdraw as the proponent of this Plan by filing a notice of withdrawal with the Court. In that event, this Plan will immediately be withdrawn from consideration for Confirmation, and the Debtor nor any of his successors, or assigns will have any further obligations under the Plan.

Neither the filing of this Plan, nor any statement or provision contained herein or within the accompanying Disclosure Statement, nor the taking by the Debtor or any other party of any action with respect to this Plan will

a.  be deemed to be an admission against interest;

b.  until the Effective Date, be or be deemed a waiver of any rights which any party might have against the Debtor or any of their property or against any other party; or

c.  until the Effective Date, be or be deemed to be a waiver of any rights to which the Debtor, as debtor or as debtor in possession under the Code, might have against any Holder of an Allowed Claim, against any other party, or against the property thereof. Until the Effective Date, all rights are specifically reserved.

In the event that the Effective Date does not occur, neither this Plan nor any statement contained herein, may be used or relied upon in any manner in any suit, action, proceeding or controversy within or outside of this case.

**9.2.  Modification of Plan**

The Debtor reserves the right, in accordance with the Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of a confirmation order, including amendments or modifications to satisfy 11 U.S.C. § 1129(b). After the entry of a confirmation order, the Debtor may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with 11 U.S.C. § 1127(b), or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. Entry of a confirmation order means that all modifications and amendments to the Plan since the solicitation thereof are

approved pursuant to section 11 U.S.C. § 1127(a) and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### 9.3.    Retention of Jurisdiction

Notwithstanding the entry of the confirmation order and the occurrence of the Effective Date, the Court retains its existing exclusive jurisdiction over all matters arising in or out of or related to the Case or the Plan pursuant to 11 U.S.C. §§ 105(a) and 1142, including jurisdiction for the following purposes:

a. Determining the allowance of any Claim, including requests for allowance of administrative expenses under section 503 of the Code incurred prior to or subsequent to Confirmation;

b. Determining the classification, validity, and amount of Claims, including re-examining any Claim that has been allowed as of the Confirmation Date and estimating the amount of any Allowed Claim;

c. Hearing and determining the extent, priority and validity of any lien or interest asserted by any party against the Property of the estate;

d. Determining all questions and disputes regarding title to Property of the estate;

e. Determining all questions and disputes regarding any assumption of an Executory Contract or Unexpired Lease proposed hereunder, and determining any damages suffered by any party to an Executory Contract or Unexpired Lease rejection;

f. Hearing and determining questions of valuation, including valuation hearings for Company Debt Claim Deficiencies;

g. Hearing and determining any and all motions, applications, adversary proceedings, and contested or litigated matters arising out of or in any way related to the Retained Actions or the Huntington Retained Actions, including without limitation, in relation to the Huntington Litigation, any right of setoff asserted by the Debtor against the Huntington General Unsecured Claim, and any estimation or allowance issues related to the Huntington Claims;

h. Confirming a modified Plan pursuant to 11 U.S.C. § 1127(b);

i. Hearing and determining any dispute relating to the terms or implementation of this or any modified Plan, Confirmation Order, or any other matters arising out of or in way related to the Case;

j. Issuing any order necessary to aid in the implementation of the Plan or Confirmation Order, including without limitation such declaratory or injunctive orders as are appropriate to protect any party in interest;

k.  Hearing and determining any tax disputes arising from sales or liquidations under the Plan;

l.  Hearing and determining any matters arising in connection with the Final Report and Account of the Debtor or the entry of a Final Decree; or

m.  Entering any orders concluding and terminating the Case.

## Article 10:      Miscellaneous Provisions

### 10.1.   Defined terms

Except as expressly provided for in this Plan or unless the context otherwise requires, each capitalized term used in this Plan has either (a) the meaning set forth in Article 2; or, (b) if the term is not defined in Article 2, the meaning, if any, given to the term in the Code or Bankruptcy Rules.

### 10.2.   Governing law

The Code and Bankruptcy Rules govern where applicable. To the extent that the Code or Bankruptcy Rules are not applicable, and subject to the provisions of any instrument entered into in connection with the Plan, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with the laws of the State of Ohio, without giving effect to the principles of conflict of laws thereof.

### 10.3.   Section 1145 exemption from Securities Laws

All rights to receive payments and distributions arising pursuant hereto are exempt from all applicable securities laws, if any, as provided 11 U.S.C. § 1145 to the fullest extent permitted by law.

### 10.4.   Successors and assigns

The rights, benefits and obligations of any entity named or referred to herein is binding on, and inures to the benefit of, any heir, executor, administrator, successor or assign of that Entity.

### 10.5.   Captions

Captions and headings are inserted for the convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.

### 10.6.   Severability

If any provision of this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provisions of the Plan.

### 10.7.  Conflicts

Except as set forth in the Plan, to the extent that any provisions of the Disclosure Statement or any order of the Court (other than the Confirmation Order) referenced in the Plan (or any exhibits, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, the Plan governs and controls.

### 10.8.  No Third-Party Releases

The Plan does not provide for any releases of liabilities in favor of any non-Debtor third parties.

Respectfully submitted,


 /s/ Raymond Joseph Schneider
Raymond Joseph Schneider
*Debtor and Debtor in Possession*


Counsel for Debtor:
James A. Coutinho      (0082430)
Thomas R. Allen        (0017513)
Richard K. Stovall      (0029978)
Andrew D. Rebholz    (0102192)
Allen Stovall Neuman & Ashton LLP
10 W. Broad St., Ste. 2400
Columbus, Ohio 43215
T: (614) 221-8500     F: (614) 221-5988
allen@asnalaw.com; stovall@asnalaw.com
coutinho@asnalaw.com; rebholz@asnalaw.com
*Counsel for Debtor / Debtor in Possession*