**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | : | Case No: 25-12607 |
| Raymond Joseph Schneider, | : | Chapter 11 |
| | : | |
| Debtor and Debtor in Possession. | : | Judge Beth A. Buchanan |

# Disclosure Statement for Plan of Reorganization

Dated: May 15, 2026

## Table of Contents

I.   **Introduction** ................................................................................................**5**
    A.   Purpose of This Document ................................................................5
    B.   Deadlines for Voting and Objecting; Date of Confirmation Hearing ...........................5
    C.   Identity of Person to Contact for More Information ...........................6
    D.   Disclaimer ................................................................6

II.  **Background of the Debtor and Events Leading to Chapter 11** .......................................**7**
    A.   Description and History of the Debtor ...........................7
    B.   The Debtor's relationship with Huntington and events leading to the First Case ...........9
        1.   Huntington failed to disclose information to entice the Debtor to sign a guaranty ...........9
        2.   Huntington's state court collection case and aggressive collection ...........10
    C.   Description of the Huntington Litigation ...........11
    D.   The First Case and its dismissal; Supreme Court reversal and second Chapter 11 filing ...........13
    E.   The Debtor's business portfolio and entity structure ...........13
    F.   Summary of Pre-Petition Indebtedness ...........14
        1.   Secured Claims Against the Debtor Individually ...........14
        2.   Secured Claims against Operating Companies (Guarantor or Co-Obligor) ...........15
        3.   Unsecured Claims ...........17
    G.   Current Financial Conditions ...........18
    H.   Significant events during this Case ...........18

III. **Summary of the Plan and Treatment of Claims** ...........................................................**20**
    A.   Introduction ................................................................20
    B.   Unclassified Claims ...........20
        1.   Administrative Expenses ...........20
        2.   Unclassified Priority Claims ...........22
        3.   U.S. Trustee Fees ...........23
    C.   Classes of Claims and Interests ...........23
    D.   Treatment of Classified Claims ...........25
        1.   Class 1 – Classified Priority Claims ...........25
        2.   Class 2 – Truist Mortgage Claim ...........25
        3.   Class 3 – First Merchants Mortgage Claim ...........26

4.     Class 4 – Nationstar Mortgage Claim ................................................................ 26
5.     Class 5 – Bank of America, N.A. Claim ........................................................... 27
6.     Class 6 – Huntington Secured Claim ................................................................ 28
7.     Class 7 – Civista Claims ................................................................................... 29
8.     Class 8 – First Federal Claim ........................................................................... 30
9.     Class 9 – First Merchants Business Loan Claim .............................................. 30
10.    Class 10 – GECU Claim .................................................................................... 31
11.    Class 11 – Heritage Claim ................................................................................. 32
12.    Class 12 – Kemba Claim ................................................................................... 33
13.    Class 13 – Rockland Claim ................................................................................ 34
14.    Class 14 – Stock Yards Bank Claim ................................................................. 34
15.    Class 15 – Transamerica Claim ......................................................................... 35
16.    Class 16 – Huntington General Unsecured Claim ............................................ 36
17.    Class 17 – General Unsecured Claims .............................................................. 37

**IV.     Means of Implementation – General ........................................................................ 37**
A.     Overview ............................................................................................................ 37
B.     Vesting of Assets .............................................................................................. 38
C.     Authority to Sell Assets and Enter into Transactions ....................................... 38
D.     Plan Proceeds and Application of Net Plan Proceeds ....................................... 38
E.     Payment of Administrative Expenses ............................................................... 39
F.     Ordinary-Course Operations and Living Expenses ........................................... 40
G.     Five-Year Implementation Period ..................................................................... 40
H.     Quarterly Reporting .......................................................................................... 40
I.     Settlement Authority ......................................................................................... 42
J.     Post-Effective Date Professional Engagement and Compensation ................... 42
K.     Cross-References ............................................................................................... 42

**V.     Description of Assets and Proposed Disposition Process ........................................ 42**
A.     Overview ............................................................................................................ 42
B.     Real Property ..................................................................................................... 43
    1.     Ohio Property ........................................................................................ 43
    2.     Maine Property ..................................................................................... 43
    3.     Colorado Property ................................................................................. 44
    4.     Sale Process, Spouse's Option to Purchase, and IRA Contribution Option .................... 44
C.     Liquid Assets – Merrill Lynch Brokerage Accounts ......................................... 45
    1.     Non-Retirement Merrill Lynch Accounts (Pledged to Bank of America) ........................ 45
    2.     Retirement Account (IRA – Fully Exempt) ......................................... 46
    3.     Orderly Sale Process and Professional Advice ..................................... 46
D.     Operating Companies ........................................................................................ 47
    1.     Boston RD, LLC ................................................................................... 47
    2.     Circle Development of Cincinnati, LLC ............................................... 48
    3.     Grasshopper Investments II, LLC ........................................................ 48
    4.     Hyde Park Circle, LLC ......................................................................... 49
    5.     Madison Warehouse, LLC .................................................................... 50
    6.     Mason Rd, LLC .................................................................................... 50
    7.     North Shore RD, LLC ........................................................................... 51
    8.     Northern Kentucky Assisted Living, LLC & Northern Kentucky Retirement Community, LLC ................................................................ 52
    9.     Schneider-Grasshopper, Inc. ................................................................ 52
    10.    The Red Corner, LLC ........................................................................... 53
    11.    To Life III, LLC .................................................................................... 53
E.     Investment Company Interests .......................................................................... 54
    1.     5150 East Galbraith Road, LLC ........................................................... 54
    2.     Corporate Park Investors, Ltd .............................................................. 55

3.   Executive Park Investors, Ltd ................................................................ 55
4.   Glidden House Partners, Ltd ................................................................. 56
5.   Grasshopper Investments, LLC ............................................................. 56
6.   Hamilton II, LLC .................................................................................. 57
7.   HRM Realty Holdings, Ltd .................................................................. 58
8.   KPT7 Holding Company, LLC .............................................................. 58
9.   Montclair Investors, Ltd ...................................................................... 59
10.   TheCard, LLC ...................................................................................... 60
11.   To Life, Ltd .......................................................................................... 60
12.   Topco America, LLC dba Range USA .................................................. 61
13.   Waldorf Partners, LP ........................................................................... 61
F.   Closed or Inactive Entities ............................................................................ 62
G.   Other Personal Property and Exemptions ..................................................... 64
H.   Valuation and Retention of Personal Property .............................................. 65
I.   Social Security Contribution vs. Net Estate Value ........................................ 66
J.   Co-Ownership with Spouse ........................................................................... 66
K.   Entity Loans .................................................................................................. 66
L.   Method of Valuation ..................................................................................... 67

VI.   **The Huntington Litigation and Its Impact on the Plan** ....................................**68**
A.   Withholding of Distributions to Huntington Pending Final Resolution ......... 68
B.   Ongoing Administrative Expenses Related to the Litigation ......................... 69
C.   Anticipated Objection to Huntington Claim .................................................. 69

VII.   **Retained Actions and Potential Chapter 5 Claims** ........................................**70**
A.   Appointment of Retained Actions Representative .......................................... 70
B.   Scope of Authority ........................................................................................ 70
C.   Retention of Rights by the Debtor Until Effective Date ............................... 71
D.   Identification of Certain Alleged Retained Actions and Debtor's Initial Analysis ........................ 71
1.   Establishment of Raymond J. Schneider 2019 Gift Trust. .................... 71
2.   2020 Spousal Transfers and Establishment of Patricia B Schneider 2020 Gift Trust. ...... 72
3.   Other Claims by Huntington ................................................................ 72
4.   2024 sale of Red Dog Operations Holding Company, LLC ................... 72
5.   2024 Sale of Blue Development Company LLC; ................................... 73
6.   2025 Sale of Techwood Circle RD LLC; ............................................. 73
7.   Other potential Retained Actions ......................................................... 73
E.   Proceeds and Interaction with the Plan ........................................................ 74

VIII.   **Financial Information, Liquidation Analysis, and Best-Interests Test** ....................**74**
A.   Projected Disposable Income and Compliance with 11 U.S.C. § 1129(a)(15) ............... 74
B.   Liquidation Analysis ..................................................................................... 77
1.   Overview .............................................................................................. 77
2.   The Plan Provides Materially Superior Recoveries .............................. 78
C.   Best-Interests Test Compliance ..................................................................... 80
1.   Mortgage Claims on Real Property ...................................................... 80
2.   Bank of America Secured Claim .......................................................... 80
3.   Company Debt Claims (Guaranty and Co-Obligor Obligations) ........... 81
4.   Huntington Claim ................................................................................. 81
5.   General Unsecured Claims ................................................................... 81
6.   Retained Actions .................................................................................. 82

IX.   **Distributions, Claim Allowance, and Feasibility** .........................................**82**
A.   Sources of Plan Distributions ....................................................................... 82
B.   Timing and Method of Distributions ............................................................. 83
C.   Unclaimed or Undeliverable Distributions and De Minimis Distributions .... 83

D.  Overall Feasibility ................................................................................................83
E.  Objections to Claims .............................................................................................84
F.  No Distributions Pending Allowance ....................................................................84
G.  Disputed Claims Reserve ......................................................................................84

**X.   Risk Factors and Alternatives to Confirmation ........................................................85**
A.  Risks Related to the Huntington Litigation ..........................................................85
B.  Asset Sale Timing, Market, and Tax Risks ..........................................................85
C.  Operational Risk to Business Entities ...................................................................86
D.  Personal Risk – Debtor's Age and Health .............................................................86
E.  Alternatives to Confirmation ................................................................................86

**XI.  Executory Contracts and Unexpired Leases ...........................................................87**
A.  Assumption of Executory Contracts and Unexpired Leases .................................87
B.  Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ..................87
C.  Rejection of Executory Contracts and Unexpired Leases .....................................87
D.  Rejection Damages Claims ...................................................................................88
E.  Operating Agreements ...........................................................................................88
F.  Post-Petition Contracts and Agreements ...............................................................88
G.  No Other Executory Contracts or Unexpired Leases ............................................88

**XII.  Tax Consequences of the Plan ................................................................................88**

**XIII. Voting and Confirmation Procedures ....................................................................90**
A.  Who May Vote or Object ......................................................................................90
1.  What Is an Allowed Claim? ......................................................................90
2.  What Is an Impaired Claim? ......................................................................90
3.  Who is Not Entitled to Vote? ....................................................................90
B.  Votes Necessary to Confirm the Plan ...................................................................91
1.  Votes Necessary for a Class to Accept the Plan ........................................91
2.  Treatment of Non-accepting Classes .........................................................91

**XIV.  EFFECT OF CONFIRMATION OF PLAN ..........................................................91**
A.  Discharge of Debtor ..............................................................................................91
B.  Modification of Plan .............................................................................................92
C.  Plan Contingent on Confirmation .........................................................................92
D.  Final Decree and Closing of Case .........................................................................92
E.  Exculpation ...........................................................................................................92
F.  Retention of Jurisdiction .......................................................................................92

**XV.   Good Faith & Conclusion.........................................................................................93**

**EXHIBITS**

Exhibit A       Plan of Reorganization
Exhibit B       Liquidation Analysis

# I.     Introduction

This Disclosure Statement is being provided to Holders of Claims against the Debtor and Debtor in Possession Raymond Joseph Schneider in connection with the Plan of Reorganization dated May 15, 2026 (the "Plan"). A copy of the Plan is attached as <u>Exhibit A</u>. Defined terms used in this Disclosure Statement have the same meaning as set forth in the Plan or as otherwise defined within this Disclosure Statement.

***Your rights may be affected. You should read the Plan and Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one. The Plan itself, if confirmed, will establish your rights***.

## A.     Purpose of This Document

This Disclosure Statement provides information about the Debtor and the Plan to help you decide how to vote on the Plan. It describes:

- The Debtor's background, business operations, and the events leading to this Chapter 11 Case;

- The treatment of Claims under the Plan;

- The means of implementing the Plan, including the five-year contribution of Projected Disposable Income and the orderly disposition of valuable Non-Exempt Assets;

- The risks associated with the Plan;

- Who can vote on or object to the Plan;

- The factors the Court will consider when deciding whether to confirm the Plan;

- Why the Debtor believes the Plan is feasible and how the treatment of your Claim under the Plan compares to what you would receive in a Chapter 7 case; and

- The effect of Confirmation of the Plan.

## B.     Deadlines for Voting and Objecting; Date of Confirmation Hearing

The Court has not yet confirmed the Plan. A scheduling order has been or will be entered setting the following:

- Deadline to vote to accept or reject the Plan;

- Deadline to object to Confirmation of the Plan; and

- Date and time of the Confirmation Hearing.

You will be served a copy of the scheduling order and should review it carefully. Ballots and instructions for voting will be distributed to Holders of Allowed Claims entitled to vote. Any party wishing to object to Confirmation must file a written objection with the Court and serve it on the parties identified in the scheduling order.

**C.  Identity of Person to Contact for More Information**

If you want additional information about this Disclosure Statement, the Plan, or voting procedures you may contact counsel for the Debtor:

> James A. Coutinho, Esq.
> Allen Stovall Neuman & Ashton LLP
> 10 West Broad Street, Suite 2400
> Columbus, Ohio 43215
> Telephone: (614) 221-8500
> Facsimile: (614) 221-5988
> Email: coutinho@asnalaw.com

**D.  Disclaimer**

This Disclosure Statement has been prepared by the Debtor and his professionals. While the Debtor has made reasonable efforts to ensure the accuracy of the information contained in this Disclosure Statement, the Schedules and Statement of Financial Affairs, Periodic Reports filed under Bankruptcy Rule 2015.3, and other filings in this Case are the primary sources of financial information. The information in this Disclosure Statement is subject to change as additional information becomes available, including from the report of the Examiner recently ordered by the Court to review the Debtor's financial affairs over the preceding eight years. The Debtor reserves the right to supplement or amend this Disclosure Statement as necessary.

This Disclosure Statement may not be relied on for any purpose other than to determine how to vote on the Plan, and nothing contained in it constitutes, or is deemed conclusive, advice on the tax or other legal effects of any reorganization on Holders of Claims or interests in connection with the reorganization. Since the filing of this Disclosure Statement, the circumstances of the Debtor may have changed.

No reliance should be placed on prior correspondence or discussions with the Debtor or counsel regarding this Disclosure Statement or the Plan. Creditors should rely only upon the information contained in this Disclosure Statement and in the Plan. Except as set forth in this Disclosure Statement and its exhibits, no representations concerning the Debtor, the Assets of the Debtor, or the Plan are authorized, nor should any representations be relied upon in arriving at a decision with respect to the Plan. Any representations made to secure acceptance or rejection of the Plan other than as contained in this Disclosure Statement should be reported to counsel for the Debtor.

There has been no independent audit of the financial information contained in this Disclosure Statement. Although the Debtor believes all information in this Disclosure Statement is accurate, the Debtor cannot warrant or represent that the information contained in this Disclosure Statement

is without any inaccuracy. The information contained in this Disclosure Statement has been submitted by the Debtor based upon his records and projections.

ASNA, counsel to the Debtor, is unable to warrant or represent that the information contained in this Disclosure Statement is without inaccuracy. Although great effort has been made to be accurate, ASNA has not verified the information contained in this Disclosure Statement, although they have no actual knowledge of any inaccuracies.

The Debtor has not obtained independent appraisals of all Assets for purposes of this Disclosure Statement. Values reflect the Debtor's best efforts and business judgment. Creditors should not rely on this Disclosure Statement as audited financial statements or tax advice.

## II.      Background of the Debtor and Events Leading to Chapter 11

### A.      Key issues and summary

This Disclosure Statement and the accompanying Plan of Reorganization are being filed in this Chapter 11 Case out of necessity due to the actions of one disputed creditor. Years of intense litigation between the Debtor and Huntington remain ongoing, and this Case was predicated by Huntington resuming aggressive collection efforts following the Ohio Supreme Court's decision reinstating its judgment. The Debtor is confident he possesses sufficient Assets to pay all his creditors and has developed a structured process for doing so under the Plan if necessary. If the Debtor ultimately prevails in the Huntington Litigation—as he fully expects to do based on the strength of the claims and the evidence developed to date—the Debtor anticipates satisfying all obligations to his regular creditors in the ordinary course and continuing his business operations without further disruption as he has for five decades of business experience.

This Disclosure Statement provides detailed information about the following matters, all of which demonstrate the Debtor's substantial chances of prevailing against Huntington and successfully reorganizing under the Bankruptcy Code:

- The Huntington Litigation has survived multiple dispositive motions and the Debtor has been granted uncommon access to depose Huntington's top executives, as described more fully in Article II, Section C.

- In the original state court proceedings in 2022, the trial was conducted on approximately 18,000 pages of discovery and due diligence materials due to limitations placed by the court at Huntington's request; the evidentiary record has since expanded to approximately 100,000 pages of produced records, although the record remains incomplete. The Debtor is confident that had these additional records been available in the first place, no judgment would have been granted in the first place, but the Ohio Supreme Court had a limited record. Recently, Huntington produced approximately 1,869 newly discovered documents dating back as far as 2017 after the Debtor developed evidence that Huntington failed to produce its credit file for years despite repeated requests.

- Twenty-seven depositions have been completed, including the deposition of Huntington's Chief Executive Officer, President, and Chairman of the Board, Stephen D. Steinour.

- The Debtor is developing evidence that Huntington did not act in a commercially reasonable manner in liquidating collateral and applying proceeds, which will be presented as a part of the Debtor's objection to Huntington's Claim.

- Discovery in the Huntington Litigation is now on track for completion, with summary judgment proceedings scheduled for the fall of 2026 and a trial anticipated in early 2027, all as set forth in greater detail in Article VI.

Notwithstanding the fact that the Debtor is submitting this Plan and has developed a comprehensive course of action that would result in the disposition of assets sufficient to pay creditors if he does not prevail in the Huntington Litigation, the Debtor remains fully confident that he will prevail in the Huntington Litigation and that this Plan will ultimately prove unnecessary.

**B.      Description and history of the Debtor**

Raymond Joseph Schneider is a 76-year-old entrepreneur who owns or is a business partner in a variety of businesses including storage, pet care, senior living homes, rental real estate, and real estate development. Born and raised in Cincinnati, he is the son of immigrants. After World War II, his parents arrived in the United States speaking very little English and with only a small savings. They settled in Roselawn, Ohio, and his father opened a butcher shop. The Debtor attended primary school and high school near the inner city of Cincinnati. Hard work throughout high school paved the way for the Debtor to attend The Ohio State University and then the University of Cincinnati, where he received a BA in Business.

After college, the Debtor chose to help his parents with their family butcher/grocery store. Wanting to give back to the community, his mother started a small nursing home in Cincinnati, which eventually grew to house approximately 264 residents. Their reputation for quality care and first-class homes allowed them to expand in the nursing home business. By 2007, the Debtor was responsible for the care and well-being of over 1,800 senior citizens.

His knowledge and experience in building development, management, and operations acquired during the expansion of senior living facilities gave the Debtor the confidence to pursue other possibilities. Over the past 20 years, he started multiple companies including pet care resorts, self-storage facilities, a senior living facility, and multiple multi-family housing projects. He opened one of the first luxury pet resorts in Cincinnati in 2007 and developed it into over six locations in Ohio and Boston, Massachusetts. He has employed hundreds of employees in multiple states in connection with his businesses. His development company is well respected and has a reputation for being creative, in addition to carrying on the family tradition of giving back to the community.

The Debtor has been married for 45 years and has lived in his Blue Ash home for 36 years. He has three children and eight grandchildren with whom he spends as much time as possible. The Debtor's honesty, hard work, and dedication have been cultivated both in business and in family. The Debtor has been in business for over 58 years and, until he recently became enmeshed in a business partner's check kiting scheme, he had a very successful and solvent operation.

The Debtor's business affairs are complex. The accumulation of dozens of entities over five decades is simply the result of a successful developer who repeatedly identified new opportunities and created the appropriate corporate structure for each one. Over more than five decades, Mr. Schneider has developed, owned, managed, or held interests in healthcare communities, assisted living facilities, multifamily housing, commercial properties, and storage operations. His career has been conducted within heavily regulated industries that require structured disclosure, early problem identification, and proactive mitigation with regulators, lenders, and other institutional counterparties.

This long and successful career forms the foundation for the current Chapter 11 Case. The Debtor is not a newcomer to financial challenges or complex restructuring. He has the experience, the business acumen, and the personal commitment to see this reorganization through in a way that maximizes value for all stakeholders while preserving the upside of the pending Huntington Litigation.

**C.      The Debtor's relationship with Huntington and events leading to the First Case**

> **1.      Huntington failed to disclose information to entice the Debtor to sign a guaranty**

In 2018, Huntington refinanced a large portfolio of senior skilled nursing facilities known as the "Premier" portfolio. The Premier portfolio consisted of two groups: the JZB Group (three operating companies and three real estate companies owned 100% by Harold Sosna) and the Keller Group (three operating companies and four real estate companies in which Sosna and the Debtor each held a 50% interest). The Debtor was a silent partner in the Keller Group and had no ownership interest in the JZB Group or in Premier itself.

Huntington was very familiar with the Premier portfolio because it had been a 38.45% participant in the prior Fifth Third Bank syndication. Under that prior financing, the Debtor was only required to provide a limited guaranty consistent with his 50% ownership in the Keller Group. He did not guarantee any portion of the loan attributable to the JZB Group owned solely by Sosna.

When Huntington took over as lead agent in 2018, it initially proposed financing structured the same way as the Fifth Third deal—with the Debtor only guaranteeing the Keller Group portion. However, after Huntington discovered significant red flags about Sosna's and the JZB Group's deteriorating financial condition, it changed the terms and required the Debtor to sign an unlimited, 100% joint and several guaranty of the entire $71 million Premier Loan—including the portion attributable to the JZB Group in which he had no ownership interest and received no benefit.

Documentary evidence developed in the state court litigation shows that Huntington knew the following material adverse facts at or immediately after closing, yet never disclosed any of them to the Debtor:

- Sosna's personal debt was rapidly increasing and he had a "significant cash flow problem."

- Sosna had $8 million invested in his personal residence with a $4 million mortgage, but the property was only appraised at approximately $2 million.

- The JZB Group experienced a significant decline in quarterly performance in early 2018.

- Premier was not covering the payment of its current bills or paying vendors and was "holding checks" totaling hundreds of thousands of dollars because of cash flow issues.

- Sosna was drawing significant sums of money from the Keller Group to pay down Premier's line of credit at Fifth Third.

- MainSource Bank had removed Premier's line availability in May 2018 because Premier was overdrawn and out of compliance.

- Sosna was not properly disclosing where revenue was coming from.

Huntington also knew that the properties in the Keller Group (in which the Debtor had a 50% interest) appraised higher than the properties in the JZB Group owned solely by Sosna, yet it used the Debtor's performing Keller Group assets to cross-collateralize and support the non-performing JZB Group assets.

Despite these red flags, Huntington never met with the Debtor, never contacted him, and never disclosed any of these material adverse facts before requiring him to sign an unlimited guaranty of the entire loan. Huntington instead relied on Sosna—who had every incentive to conceal the truth—to communicate the terms to the Debtor, a silent partner who had no involvement in the day-to-day operations or financial oversight of the Keller Group.

The Debtor reasonably believed the Keller Group was financially strong and secure. He had no reason to suspect otherwise because neither Huntington nor Sosna provided him with any information suggesting weakness in either the Keller Group or the JZB Group. Sosna falsely represented to the Debtor that the Keller Group did not have sufficient value to support its portion of the loan and that Huntington would not approve the financing unless the Debtor signed an unlimited guaranty for the entire $71 million.

The Debtor signed the unlimited guaranty on November 30, 2018—the same day Huntington closed the Premier Loan—because he believed he had no other viable alternative to protect his personal equity interest in the Keller Group. He would not have signed the guaranty had Huntington disclosed the adverse facts relating to Sosna's and the JZB Group's eroding financial condition.

### 2.    Huntington's state court collection case and aggressive collection

After the loan defaulted only eleven months after closing, Huntington filed suit against the Debtor in the Hamilton County Court of Common Pleas, Case No. A2002093, seeking to enforce the unlimited guaranty. Huntington quickly moved for summary judgment, and the Court only provided limited time for the Debtor to conduct discovery. The Debtor opposed the summary judgment motion and presented evidence that Huntington had concealed material adverse facts and fraudulently induced him to sign the unlimited guaranty. During the course of that case, the Debtor was not provided with substantial amounts of discoverable documents which Huntington failed or refused to produce. Had the Debtor been able to see the 100,000+ pages of documents that

Huntington failed to produce, it may have changed the outcome. But the Debtor's discovery was limited.

Despite finding it likely that Huntington knew and failed to disclose to the Debtor facts that materially altered the risk of signing the guaranty, the trial court granted summary judgment to Huntington. The Debtor appealed. While the appeal was pending, Huntington engaged in aggressive collection efforts against the Debtor. These efforts included attempts to sell assets held in the Debtor's Merrill Lynch Accounts. Had Huntington been permitted to proceed with that sale, it would have triggered a massive taxable event and enormous tax liability for the Debtor. Huntington further sought appointment of a receiver over the Debtor and his Assets. Faced with the imminent sale of his personal retirement assets and the resulting catastrophic tax consequences, the Debtor had no choice but to file the original Chapter 11 case (Case No. 23-10337) (the "First Case") on February 27, 2023, to obtain the automatic stay and protect his Assets while he continued to litigate the validity of the guaranty.

While the First Case was pending, the First District Court of Appeals unanimously reversed the trial court, holding that the Debtor was a "surety" under the agreement and that genuine issues of material fact existed regarding Huntington's duty to disclose under the Doctrine of Increased Risk. Huntington then appealed to the Supreme Court of Ohio (Case No. 2024-0208). On August 20, 2025, the Supreme Court reversed the First District and reinstated the trial court's grant of summary judgment in favor of Huntington.

## D.      Description of the Huntington Litigation

A creditor should not be able to recover losses it created or allowed. Therefore, in February 2023, the Debtor commenced a separate civil action in the Hamilton County Court of Common Pleas, Case No. A2300849, against Huntington and twelve of its current and former employees. The complaint asserts three primary causes of action: (1) Breach of Good Faith and Ordinary Care, (2) Breach of Ohio Civil Racketeering (RICO), and (3) Civil Liability for Criminal Acts.

The core allegations center on Huntington's handling of the Premier Loan relationship with Sosna and the JZB Group. The complaint alleges that Huntington and certain of its employees missed eleven of the twelve red flags identified by the Office of the Comptroller of the Currency (OCC) as classic signs of check kiting. It further alleges that Huntington not only ignored these red flags but, at times, actively participated in the kiting scheme in order for its employees to meet personal compensation goals and generate substantial fees for the Bank.

The Huntington Litigation has already cleared early and significant hurdles. On August 18, 2023, the Court denied Huntington's motion to dismiss in its entirety, finding that the claims were sufficiently pled and that the Debtor had stated plausible causes of action under the applicable standards. The Court rejected Huntington's arguments for dismissal at the pleading stage, including its *in pari delicto* and release defenses. This ruling allowed the case to proceed to discovery on all three counts.

Huntington also filed a motion for summary judgment on October 3, 2023. On February 12, 2024, the Court denied that motion in full, finding genuine issues of material fact on the Debtor's claims that precluded summary judgment and required the Huntington Litigation to proceed through

discovery. This ruling confirmed that the evidence developed to date, including Huntington's handling of the Premier Loan and the red flags it allegedly knew but did not disclose, raised triable issues that could not be resolved without a full evidentiary record.

To date, the Debtor's counsel has taken twenty-seven depositions. Over the objection of Huntington, which filed a motion for protective order asserting an apex objection[1] and arguing that he lacked unique personal knowledge, the state court permitted the Debtor the ability to depose Stephen Steinour, Huntington's Chief Executive Officer, President, and Chairman of the Board.

During the course of the deposition of Huntington's President, it was discovered that Huntington had not produced its "credit file" despite years of the Debtor asking for all loan documents and records related to this matter. After initially claiming the credit file had already been produced in its entirety, Huntington finally produced approximately 1,390 documents that Debtor had not seen in any previous production, years after all of this litigation began. The Debtor continues to review discovery matters and is working to depose three separate 30(B)(5) witnesses designated by Huntington related to risk management within the bank.

The Debtor is relying on experts of substantial experience, including Bobby Winstead and Steven Lindsey. Both are former OCC employees. Mr. Winstead is a former bank examiner and regulator with the OCC, and is an expert in banking regulation and lending practices. Mr. Lindsey is an expert in financial crimes, consumer compliance regulations, bank secrecy, and anti-money laundering practices. These experts are assisting the Debtor with detailed analysis of the regulatory implications of Huntington's conduct, the identification of check-kiting patterns under OCC guidelines, and the Bank's compliance with anti-money laundering and bank secrecy requirements.

In the fall of 2025, Huntington filed another motion for summary judgment, this time based on *res judicata*. The motion has been fully briefed and is pending before the Court. The Debtor's opposition relies on substantial new evidence obtained after the conclusion of the prior litigation that was not available to Debtor during the prior litigation, including the credit file production and testimony obtained during the Steinour deposition. A status conference was held in March 2026, during which the Court set a case schedule for the remainder of discovery to be completed and for summary judgment briefing and arguments to be conducted in the fall. A trial is expected in early 2027. Huntington had anticipated a quick ruling in its favor on *res judicata*; instead, the Court set the case on a path to trial.

The Huntington Litigation represents the most significant Asset of this estate. If successful, the claims could result in a substantial recovery that would materially increase the value available for distribution to creditors. The Debtor believes the claims are meritorious and intends to prosecute them vigorously. The Plan preserves all rights in the Huntington Litigation for the benefit of the estate and creditors.

---

[1] An "apex objection" is a legal argument used in litigation to block or limit the deposition of a high-ranking corporate executive or government official (the "apex" of the organization). It protects top leaders from harassing, repetitive, or burdensome depositions when they have little to no unique, personal knowledge of the facts at issue. Here, the state court rightly held that the Debtor had the right to depose and rejected the apex argument.

**E.      The First Case and its dismissal; Supreme Court reversal and second Chapter 11
          filing**

On March 2, 2023, the Debtor filed his First Case. Within days of the filing, Huntington moved
for the appointment of a Chapter 11 trustee, seeking to deny the Debtor any breathing room to
reorganize and forcing him into a quick trial posture. After briefing and argument, the Court denied
Huntington's motion.

Throughout the case, Huntington demanded substantial discovery from the Debtor and attempted
to file its own plan of liquidation, which was opposed by the Debtor and multiple creditors. The
Debtor filed his own plan and disclosure statement, which Huntington opposed. Before any
confirmation hearing could be held on either plan, the First District Court of Appeals reversed
Huntington's underlying state court judgment.

Given that the judgment had been reversed, the Debtor determined there was no longer any purpose
in remaining in bankruptcy during the pendency of the Supreme Court appellate process, which
was expected to take approximately one year. The Debtor therefore moved to dismiss the First
Case. Huntington objected, arguing, among other things, that dismissal might affect its ability to
pursue certain avoidance actions. The Court addressed the applicable statutes of limitations in its
dismissal order, noting that Huntington still had time to file any such actions before the statutes
expired. On February 27, 2024, the Court granted the Debtor's motion and dismissed the case.

In August 2025, the Supreme Court of Ohio reversed the First District Court of Appeals and
reinstated Huntington's judgment. Immediately upon reinstatement, Huntington resumed
aggressive collection efforts against the Debtor. The Debtor attempted in good faith to resolve the
debt without filing another chapter 11 case but was unable to reach a resolution. Prior to
Huntington being able to sell the Debtor's financial accounts or attach other Assets, the Debtor
was compelled to file this Case. Through this Case, the Debtor intends to reorganize his affairs
and dispose of sufficient Assets to pay creditors in full or nearly in full on their Claims.

**F.      The Debtor's business portfolio and entity structure**

The Debtor is a sophisticated real estate developer and investor with over fifty years of experience
operating and developing a diverse group of businesses. His portfolio includes self-storage
facilities, assisted living and skilled nursing facilities, pet care resorts, rental real estate, and
various real estate development projects.

The Debtor's current business portfolio consists of three primary categories of companies:

- **Operating Companies**: These are active businesses in which the Debtor holds 100%
  ownership or has a substantial interest with management control. Almost all of these
  entities continue to generate operating income.

- **Investment Companies**: These are entities in which the Debtor holds minority or passive
  investment interests. These companies are generally not under the Debtor's day-to-day
  control and are being addressed through orderly disposition or monetization as part of the
  Plan.

- **Inactive Companies**: These are entities that have no ongoing operations or have never operated. Many of these were created in connection with the Debtor's historical practice of opening paired operating and holding companies for new ventures. The Debtor has already taken substantial steps to dissolve many inactive entities. The remaining inactive entities will be addressed in an orderly fashion in due course.

The Debtor's Statement of Financial Affairs indicates that a number of entities were dissolved between the dismissal of the First Case and the filing of this Case. These were inactive entities that have either discontinued operations long ago or never operated. When the Debtor had an idea for a new business, he would routinely open two new entities. One as an operating company and one as a real estate holding company. It wasn't until Huntington started asserting the Debtor was hiding assets within these entities that the Debtor determined it was appropriate to dissolve them.

Each of the Operating Companies and Investment Companies is discussed within this Plan to describe basic historical information, its current assets and operations, and expected income generation through operations and asset disposition.

## G.     Summary of pre-petition indebtedness

Prior to the Petition Date, the Debtor had incurred substantial secured and unsecured indebtedness. The major secured Claims consist of (1) direct mortgages on the Debtor's individually owned real properties, and (2) company-level secured debt for which the Debtor is a guarantor or co-obligor on the applicable note. The major unsecured Claim is the Huntington Claim. The Plan provides specific treatment for each creditor in dedicated classes and one general unsecured class. This section provides a general overview of the creditors that are treated in this Plan and specific details about each class is set forth further below in this Disclosure Statement.

1.     **Secured Claims Against the Debtor Individually**

a.     **Truist Mortgage Claim (Class 2)** – Proof of Claim No. 6. Truist holds a fully secured mortgage Claim in the amount of $414,350.77. This Claim is secured by a first-priority mortgage on the Colorado Property. The mortgage was granted by the Debtor individually and encumbers the Colorado Property and its related improvements. According to the Debtor's Schedules, the Colorado Property has a value of $2,180,000.00. The Plan treats this Claim in Class 2 and provides for ongoing payment of the mortgage obligation in the ordinary course until the property is sold through the process set forth in the Plan.

b.     **First Merchants Mortgage Claim (Class 3)** – Proof of Claim No. 7. First Merchants holds a fully secured mortgage Claim in the amount of $2,117,006.19. This Claim is secured by a first-priority mortgage on the Maine Property, which is co-owned with the Debtor's Spouse. The mortgage was granted by the Debtor individually and encumbers the Maine Property and its related improvements. According to the Debtor's Schedules, the Maine Property has a value of $2,323,000.00. The Plan treats this Claim in Class 3 and provides for ongoing payment of the mortgage obligation in the ordinary course until the property is sold through the process set forth in the Plan.

**c.** **Nationstar Mortgage Claim (Class 4)** – Proof of Claim No. 25. Nationstar holds a fully secured mortgage Claim in the amount of $88,700.79. This Claim is secured by a first-priority mortgage on the Ohio Property, which is co-owned with the Debtor's Spouse. The mortgage was granted by the Debtor individually and encumbers the Ohio Property and its related improvements. According to the Debtor's Schedules, the Ohio Property has a value of $788,050.00. The Plan treats this Claim in Class 4 and provides for ongoing payment of the mortgage obligation in the ordinary course until the property is sold through the process set forth in the Plan.

**d.** **Bank of America Claim (Class 5)** – Proof of Claim No. 21. Bank of America holds a secured Claim in the amount of $18,115,776.59. This Claim is secured by a security interest granted by the Debtor individually in two specific Merrill Lynch Accounts (account numbers ending in -4923 and -3597). According to the Debtor's Schedules, the collateral value of those specific Merrill Lynch Accounts is $29,363,160.00. The Plan treats this Claim in Class 5 and provides for payment in full through the orderly sale process set forth in the Plan. That process will be managed by the Debtor in consultation with his professionals to maximize value of the brokerage assets and limit tax exposure for the bankruptcy estate.

**e.** **Huntington Secured Claim (Class 6)** – Proof of Claim No. 11. Huntington asserts a secured Claim in the amount of $36,131,393.30. Huntington asserts liens on certain real property of the Debtor and the Merrill Lynch Accounts; however, the Debtor disputes the validity, extent, and priority of these asserted liens because they are all avoidable as preferences under 11 U.S.C. § 547. The Plan treats this Claim in Class 6 and provides that nothing will be paid on the secured portion of the Huntington Claim because the Debtor retains the right to pursue the avoidance of Huntington's secured Claim as a preference.

**2.** **Secured Claims against Operating Companies (guarantor or co-obligor)**

The Debtor is a guarantor or co-obligor on substantial debt incurred at the Operating Company level. Each of the following creditors holds a secured Claim against one or more of the Debtor's Operating Companies and the applicable loan documents or guarantees permit these creditors to immediately pursue the Debtor for collection even before pursuing Company Collateral. The Plan provides that these creditors, where applicable, will be paid through the sale of Company Collateral, and unless there is a Company Debt Claim Deficiency related to any of these Claims, then the creditor will not participate in the General Unsecured Creditor Class.

**a.** **Civista Claims (Class 7)** – Proofs of Claim Nos. 13-17. Civista holds secured Claims totaling $16,914,651.76 across five separate Operating Companies: Mason RD, LLC; Northern Kentucky Assisted Living, LLC; The Red Corner, LLC; The Blue Development Company, LLC; and Techwoods Circle, LLC. These Claims are secured by first-priority liens on the assets of the respective Operating Companies. The Debtor is a guarantor on these obligations. The Plan treats these Claims in Class 7 and provides that they will be paid through the sale of Company Collateral, and unless there is a Company Debt Claim Deficiency related to any of

these Claims, then Civista will not participate in the General Unsecured Creditor Class.

**b.** **First Federal Claim (Class 8)** – Proof of Claim No. 20. First Federal holds a secured Claim in the amount of $937,500 against Circle Development of Cincinnati, LLC. The Claim is secured by first-priority liens on the assets of Circle Development of Cincinnati, LLC. The Debtor is a co-obligor on this obligation. The Plan treats this Claim in Class 8 and provides that it will be paid through the sale of Company Collateral, and unless there is a Company Debt Claim Deficiency related to this Claim, then First Federal will not participate in the General Unsecured Creditor Class.

**c.** **First Merchants Business Loan Claim (Class 9)** – Proof of Claim No. 8. First Merchants holds a secured business loan Claim in the amount of $37,725,186.13 against Circle Storage Operating Company I, LLC. The Claim is secured by first-priority liens on the assets of Circle Storage Operating Company I, LLC. The Debtor is a guarantor on this obligation. The Plan treats this Claim in Class 9 and provides that will only be able to proceed against Company Collateral unless there is a Company Debt Claim Deficiency related to this Claim, and only in such case will First Merchants participate in the General Unsecured Creditor Class.

**d.** **GECU Claim (Class 10)** – Proof of Claim No. 23. GECU holds a secured Claim in the amount of $3,389,027.89 against Hyde Park Circle, LLC. The Claim is secured by first-priority liens on the assets of Hyde Park Circle, LLC. The Debtor is a guarantor on this obligation. The Plan treats this Claim in Class 10 and provides that it will be paid through the sale of Company Collateral, and unless there is a Company Debt Claim Deficiency related to this Claim, then GECU will not participate in the General Unsecured Creditor Class.

**e.** **Heritage Claim (Class 11)** – Proof of Claim No. 2. Heritage holds a secured Claim in the amount of $1,899,926.42 against Madison Warehouse, LLC. The Claim is secured by a first-priority lien on the assets of Madison Warehouse, LLC. The Debtor is a guarantor on this obligation. The Plan treats this Claim in Class 11 and provides that it will be paid through the sale of Company Collateral, and unless there is a Company Debt Claim Deficiency related to this Claim, then Heritage will not participate in the General Unsecured Creditor Class.

**f.** **Kemba Claim (Class 12)** – Proof of Claim No. 4. Kemba holds a secured Claim in the amount of $136,901.38 against Hyde Park Circle, LLC. The Claim is secured by a lien on the assets of Hyde Park Circle, LLC. The Debtor is a guarantor on this obligation. The Plan treats this Claim in Class 12 and provides that it will be paid through the sale of Company Collateral, and unless there is a Company Debt Claim Deficiency related to this Claim, then Kemba will not participate in the General Unsecured Creditor Class.

**g.** **Rockland Claim (Class 13)** – Proof of Claim No. 24. Rockland holds a secured Claim in the amount of $8,970,342.54 against Boston RD, LLC and North Shore RD, LLC. The Claim is secured by first-priority liens on the assets of Boston RD, LLC and North Shore RD, LLC. The Debtor is a guarantor on this obligation. The Plan treats this Claim in Class 13 and provides that it will be paid through the sale of Company Collateral, and unless there is a Company Debt Claim Deficiency related to this Claim, then Rockland will not participate in the General Unsecured Creditor Class.

**h.** **Stock Yards Claim (Class 14)** – Proof of Claim No. 22. Stock Yards holds a secured Claim in the amount of $1,200,000 against 5150 East Galbraith Road, LLC. The Claim is secured by a first-priority lien on the assets of 5150 East Galbraith Road, LLC. The Debtor is a guarantor on this obligation. The Plan treats this Claim in Class 14 and provides that it will be paid through the sale of Company Collateral, and unless there is a Company Debt Claim Deficiency related to this Claim, then Stock Yards will not participate in the General Unsecured Creditor Class.

**i.** **Transamerica Claim (Class 15)** – (No separate Proof of Claim filed; amount taken from Schedules). Transamerica holds a secured Claim in the amount of approximately $42,000,000.00 against To Life, Ltd. The Claim is secured by first-priority liens on the assets of To Life, Ltd. The Debtor owns an 8.45% interest in To Life, Ltd. but retains operating control of the company. The Debtor is a guarantor on this obligation (including a springing recourse guaranty). The Plan treats this Claim in Class 15 and provides that Transamerica will not participate in a Class 17 distribution because it has adequate Company Collateral (unless there is a Company Debt Claim Deficiency related to this Claim).

3.      **Unsecured Claims**

a.      **Huntington General Unsecured Claim (Class 16)** – Proof of Claim No. 11. Huntington holds the largest unsecured Claim in the case in the amount of $36,131,393.30. This Claim arises from Huntington's judgment against the Debtor. The Plan treats this Claim in Class 16 and provides for pro-rata payment of the Huntington Claim out of Net Plan Proceeds. The Debtor anticipates, but has not guaranteed, that the Huntington Claim will be paid in full. The Plan also indicates that the Debtor may have a right of set-off arising out of the Huntington Litigation and addresses the potential outcomes of that litigation.

b.      **General Unsecured Claims (Class 17) –** In addition to the Huntington General Unsecured Claim, the Debtor has other general unsecured Claims consisting of ordinary trade debt, credit card obligations, utilities, and miscellaneous liabilities incurred in the ordinary course of business and personal affairs. These general unsecured Claims (Class 17) are relatively modest in comparison to the overall estate value and will be paid in full under the Plan.

c.  **Priority Claims** – There are two types of priority Claims: unclassified Claims and Classified Priority Claims. The unclassified Claims generally consist of any tax obligation of the Debtor and will be paid in full when due or within five years of the Effective Date. In addition, the Plan contains Class 1 to treat any Classified Priority Claims but the Debtor does not believe that any exist.

## H.  Current financial conditions

Since the Petition Date, the Debtor has continued to operate both his personal affairs and his businesses in the ordinary course without material interruption. The Debtor has multiple, stable sources of Income that together provide the cash flow necessary to fund all post-petition obligations while preserving estate value for creditors. Those sources include Company Draws received from the Operating Companies, Social Security Income, Colorado Rental Income from the Colorado Property (when rented again), and Investment Income from the Investment Companies. The Debtor is managing his business entities in a way that keeps them current on all their operating and debt obligations and is managing their affairs to maximize their value. All ordinary-course expenses are being paid as they become due.

The Debtor is using the foregoing Income to fund the regular administrative expenses of the Case. Those administrative expenses include the Debtor's reasonable and necessary ordinary-course living expenses for himself and his household (with contributions to those expenses from his Spouse) as well as the professional fees and expenses incurred in connection with both the Huntington Litigation and the general administration of this Case.

In addition to managing the cash-flow and administrative aspects of the Case, the Debtor continues to devote full-time effort to the active management of his multiple companies. On a day-to-day basis this consists of overseeing regular operations at each entity, reviewing financial reports and budgets, approving major expenditures, negotiating with vendors and lenders, ensuring compliance with all regulatory and licensing requirements, directing maintenance and capital-improvement projects at the storage and real-estate development properties, supervising key employees, and making strategic decisions necessary to maintain and enhance the value of the companies pending their orderly sale or monetization under the Plan. The Debtor also attends to his personal life in the same disciplined manner (paying household bills, coordinating family matters, and maintaining the three real properties) so that all personal and business obligations remain current. These combined responsibilities allow the Debtor to keep his companies functioning smoothly, generate the Income necessary to service the Case, and position the estate to achieve the creditor-friendly recoveries contemplated by the Plan.

## I.  Significant events during this Case

This Case was commenced on the Petition Date of October 17, 2025, when the Debtor filed his voluntary petition for relief under Chapter 11 of the Code. The filing was necessitated by Huntington's reinstatement of its state-court judgment and the immediate resumption of aggressive collection efforts against the Debtor's personal Assets.

Significant events during the Case include the following:

a.        **Filing of Schedules and Statement of Financial Affairs.** On November 14, 2025, the Debtor filed his Schedules and Statement of Financial Affairs (Doc. 50). These filings provided a comprehensive snapshot of the Debtor's Assets, liabilities, Operating Companies, Investment Companies, and Inactive Companies. The Schedules detailed the Debtor's three pieces of real property (the Ohio Property, Maine Property, and Colorado Property), the Merrill Lynch Accounts, and the list of entities in which the Debtor holds interests. The Statement of Financial Affairs disclosed recent business sales, transfers, and other pre-petition transactions. These documents have served as the foundation for all subsequent proceedings in the Case and have been supplemented as necessary to reflect accurate information. The Debtor anticipates filing amendments to the Schedules after completing preparation of this Disclosure Statement.

b.        **Filing of Rule 2015.3 Periodic Reports.** The Debtor filed his initial Rule 2015.3 Periodic Report (Doc. 75) on December 15, 2025. This report provided a detailed update on the post-petition operations of the Operating Companies, cash receipts and disbursements, and the status of ongoing business activities. The Periodic Report demonstrated that the Debtor has continued to manage the entities in the ordinary course, generating sufficient income to meet all post-petition obligations while preserving value for the estate. A second set of Rule 2015.3 reports will be filed in May 2026.

c.        **Retention and coordination of multiple professional firms.** The Debtor has retained and coordinated multiple professional firms to assist with the complex issues presented by the Case. Allen Stovall Neuman & Ashton LLP ("ASNA") was retained as lead bankruptcy counsel to handle the overall reorganization. Goering & Goering has continued to provide continuity from the First Case. The Cummins Law Firm and Robinson Law Firm were retained as special counsel for the Huntington Litigation. In addition, the Debtor retained a qualified appraiser with respect to To Life, Ltd. The retention applications were filed, noticed, and approved by the Court, allowing these professionals to begin work immediately on discovery, Plan preparation, and litigation strategy.

d.        **Extensive discovery production.** The Debtor has engaged in extensive discovery production in this Case in response to Huntington's Rule 2004 motion. This has included responding to document requests, producing thousands of pages of financial records and entity documents. This effort is ongoing as the Debtor further prepares to provide documents and information to the Court-appointed Examiner.

e.        **Motion to extend the exclusive periods.** The Debtor filed a motion to extend the exclusive periods for filing and soliciting acceptances of a plan. The motion highlighted the substantial work already completed and the need for additional time given the complexity of the Case. The Court granted the requested extensions.

f.        **Huntington's motion for appointment of an examiner.** Huntington filed a motion for the appointment of an examiner to conduct a comprehensive review of the Debtor's affairs over the last eight years (the "Examiner"). The Debtor engaged in negotiations with Huntington regarding the scope, timing, and cost of the examiner's engagement. The motion was granted through an agreed order and the United States Trustee has nominated an Examiner, but the Examiner has not been appointed yet. The

Debtor intends to cooperate fully with the Examiner once appointed. The Debtor notes that the Examiner's report (once the Examiner is appointed) may identify additional information requiring supplementation or amendment of this Disclosure Statement before voting or confirmation. Upon completion of the Examiner's report, the Debtor will be supplementing or amending this Disclosure Statement to incorporate any needed findings from the examination.

g.     **Huntington's motion seeking authority to pursue avoidance actions.** Huntington filed a motion seeking authority to pursue certain avoidance actions on behalf of the estate. The Debtor filed a detailed objection to that motion, arguing that the Debtor, as debtor in possession, is best positioned to evaluate and pursue any Retained Actions, that Huntington's request was an attempt to control the estate's litigation strategy, and that the motion was premature given the ongoing proceedings. The Court has scheduled a hearing on Huntington's motion for July 2026. The outcome of that hearing will be addressed in any necessary supplementation or amendment to this Disclosure Statement.

## III.   Summary of the Plan and Treatment of Claims

### A.     Introduction

The following is a summary of the Debtor's Plan. You should carefully read the Plan itself, as well as the following summary, to make a voting decision on the Plan. If there is a discrepancy between the Plan and the Summary contained in this Disclosure Statement, the terms of the Plan govern. As required by the Code, the Plan places Claims in various classes and describes the treatment each class will receive. The Plan also states whether each class of Claims is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

### B.     Unclassified Claims

Certain types of Claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and Holders of such Claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Debtor has not placed the following Claims in any class:

#### 1.     Administrative Expense Claims

Administrative Expense Claims are costs or expenses of administering the Debtor's Chapter 11 Case which are allowed under § 507(a)(2) of the Code. The Code requires that all Administrative Expense Claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment or unless the expenses are not approved until a later date. The primary Administrative Expense Claims are expected to be professional fees and expenses, and ongoing Ordinary Course General Administrative Expense Claims.

### a.      Professional fees and expenses

Professionals asserting a Claim for services rendered before the Effective Date must file and serve an application for final allowance of their professional fees by the Administrative Expense Claim Bar Date. The Administrative Expense Claim Bar Date is the 60th calendar day after the Effective Date of the Plan. Objections to any professional Claim application must be filed and served on the Debtor and the requesting party by 21 days after the filing of the application.

In accordance with the *Order Granting Motion to Establish Procedures for Interim Compensation and Reimbursement of Expenses of Professionals on a Monthly Basis* (Doc. 93) (the "Professional Fee Order"), the Debtor was permitted to provisionally pay professionals ninety percent (90%) of all professional fees and one hundred percent (100%) of expenses incurred by the professional and invoiced on a monthly basis. The additional holdback amount would be paid upon interim and final applications to the Court for allowance of the fees. Each professional will seek final approval of the provisionally paid fees and expense reimbursement and the unpaid portion of any fees and expense through the filing of additional applications with the Court, and the final amount of the professionals' allowed compensation and expense reimbursement will be determined by this Court after notice and hearing. The allowed compensation and expense reimbursement to any professional will be paid in full on the later of (i) as soon as reasonably practicable after the date of the determination of the allowed amount of the Claim, (ii) the Effective Date, or (iii) upon other terms as may be agreed upon by the professional and the Debtor. It is presently anticipated that the amount of compensation and expense reimbursement the Debtor's professionals that is ultimately allowed by the Court will be paid from funds of the Debtor in existence on the Effective Date, and thereafter from post Effective Date Income of the Debtor.

After the Effective Date, any fees of professionals incurred by the Debtor will be paid in the ordinary course of business on the terms and conditions agreed upon between the Debtor and his professionals, without the need for any application to the Bankruptcy Court for approval.

The following is a summary of the anticipated Professional Claims:

### i.      ASNA Fees and Expenses

ASNA represents the Debtor as its primary bankruptcy counsel and was employed under section 327 of the Code. As of the filing of this Disclosure Statement, ASNA had not yet filed a fee application. Through March 31, ASNA has earned $214,867.09 combined for fees and expenses, of which, $87,432.70 is outstanding. ASNA is holding a retainer in the amount of $42,565.61.

### ii.   Goering & Goering Fees and Expenses

Goering & Goering has continued to assist the Debtor from the First Case and was retained in this Case to provide continuity and specialized assistance. Goering & Goering has not yet filed a fee application.

### iii.   Cummins Law Firm Fees and Expenses

Cummins Law Firm was retained as special counsel for the Huntington Litigation. Cummins Law Firm filed its initial fee application on March 31, 2026 (Doc. 151), which was approved on May 11, 2026 (Doc. 185). Through March 31, 2026, Cummins Law Firm had earned $241,351.25 for services and was reimbursed $6,772.77 for expenses.

### iv.   Robinson Law Firm Fees and Expenses

Robinson Law Firm was retained as special counsel for the Huntington Litigation. Robinson Law Firm filed its initial fee application on March 31, 2026 (Doc. 152), which was approved on May 11, 2026 (Doc. 186). Through March 31, 2026, Robinson Law Firm had earned $25,320.00 for services and was reimbursed $139.39 for expenses.

### v.   GBQ Fees and Expenses (Appraiser)

GBQ was retained as the appraiser with respect to To Life, Ltd. GBQ has not yet filed a fee application. The Court approved the payment of a $15,000.00 retainer to GBQ which will be applied to any approved fees and expenses.

## 2.   Unclassified Priority Claims

Unclassified Priority Claims are those unsecured Claims which are allowed under sections 507(a)(2), (a)(3), or (a)(8) of the Code. See, §1123(a)(1). The unclassified Priority Claims include the Priority Tax Claims. Only one Priority Tax Claim has been filed: The Internal Revenue Service, Claim No. 12, in the amount of $109,098.75.

The Plan provides that, except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, the Holder of each Allowed Priority Tax Claim due and payable on or prior to the Effective Date will receive:

i.   Cash on the Effective Date or as soon as reasonably practicable thereafter in an amount equal to the full unpaid amount of such Allowed Priority Tax Claim; or

ii.   deferred cash payments over a period not exceeding five years in accordance with sections 1129(a)(9)(C) and (D) of the Code. The deferred cash payments will total an amount equal to the net present value as of the Effective Date of all expected payments. As required under sections 511(a)

and (b) of the Code, an interest rate equal to the rate determined, as of the calendar month of the Effective Date, under applicable non-bankruptcy law will be used to determine the value of such Claims as of the Effective Date.

The Plan further provides, in accordance with the Code, that all deferred cash payments to Holders of Allowed Priority Tax Claims will be completed no later than five years from the Effective Date, provided, however, that the duration of such payments will not exceed the duration of the payment of the General Unsecured Creditor distributions provided for in the Plan.

The Debtor would commence quarterly payments to Holders of Allowed Priority Tax Claims on the Initial Distribution Date and continue quarterly payments thereafter. The anticipated cumulative sum of the monthly payments is as follows on account of such priority Claims:

| Priority Tax Claimant | Interest Rate | Anticipated Quarterly Payment | Sum of All Quarterly Payments |
|---|---|---|---|
| IRS | 6% Federal Underpayment Rate, I.R.C. § 6621 | $   6,354.54 | $ 127,090.74 |

**3.      U.S. Trustee Fees**

The Plan provides that all fees required to be paid by 28 U.S.C. § 1930(a)(6), namely the U.S. Trustee Fees, owed on or before the Effective Date of the Plan will be paid on the Effective Date or within thirty days of when such fees are invoiced. Thereafter such Fees will accrue and be calculated and be timely paid until the Case is closed, dismissed, or converted to another chapter of the Code. The Debtor is current on all payments for U.S. Trustee Fees.

**C.      Classes of Claims**

Section 1123 of the Code provides that a plan of reorganization shall classify the Claims of the Debtor's creditors[2]. The Plan divides Claims into Classes and sets forth the treatment afforded to each Class. Holders of Claims should note that only Allowed Claims in each Class will be paid in accordance with the provisions of the Plan. No payments will be made except as set forth in the Plan. Claims that are not Allowed will not be paid. Until allowance, the Plan has specific procedures for the treatment of Disputed Claims.

The categories of Claims listed below reflect classification for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and sections 1122 and 1123(a)(1) of the Code. The Plan deems a Claim to be classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such different Class.

---

[2] The Code also requires classification of "interests" in a debtor, but because the Debtor is an individual, this is inapplicable.

A Claim is in a particular Class only to the extent that such Claim is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

The following table contains a summary of classification and treatment of classified Claims against the Debtor:

| Class | Description | Impaired / Unimpaired | Voting Status |
|---|---|---|---|
| 1 | Classified Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Truist Mortgage Claim | Unimpaired | Deemed to Accept |
| 3 | First Merchants Mortgage Claim | Impaired | Entitled to Vote |
| 4 | Nationstar Mortgage Claim | Impaired | Entitled to Vote |
| 5 | Bank of America Claim | Unimpaired | Deemed to Accept |
| 6 | Huntington Secured Claim | Impaired | Deemed to Reject |
| 7 | Civista Claims | Impaired | Entitled to Vote |
| 8 | First Federal Claim | Impaired | Entitled to Vote |
| 9 | First Merchants Business Loan Claim | Impaired | Entitled to Vote |
| 10 | GECU Claim | Impaired | Entitled to Vote |
| 11 | Heritage Claim | Impaired | Entitled to Vote |
| 12 | Kemba Claim | Impaired | Entitled to Vote |
| 13 | Rockland Claim | Impaired | Entitled to Vote |
| 14 | Stock Yards Claim | Impaired | Entitled to Vote |
| 15 | Transamerica Claim | Impaired | Entitled to Vote |
| 16 | Huntington General Unsecured Claim | Impaired | Entitled to Vote |
| 17 | General Unsecured Claims | Impaired | Entitled to Vote |

Details of the classification and treatment of Claims against the Debtor pursuant to the Plan are as follows:

**D.      Treatment of classified Claims**

**1.      Class 1 – Classified Priority Claims**

Classification: Class 1 consists of any Claim accorded priority in right of payment under section 507(a) of the Code, other than Administrative Expense Claims, Priority Tax Claims, or other unclassified Priority Claims.

Treatment: Each Holder of an Allowed Classified Priority Claim will be paid in full in cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Classified Priority Claim becomes Allowed, or (iii) such other date as may be ordered by the Bankruptcy Court.

Voting: Class 1 is unimpaired. Each Class 1 claimant is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Code. Therefore, Class 1 claimants are not entitled to vote on the Plan.

Additional Information: The Debtor does not believe there are any Claims in this Class.

**2.      Class 2 – Truist Mortgage Claim**

Classification: Class 2 consists of the Truist Mortgage Claim. Truist's Proof of Claim is located at Claim No. 6 and is in the amount of $414,350.77. The Claim is fully secured by a first mortgage lien on the Colorado Property junior only to any Claim for real property taxes. The collateral value is estimated to be $2,180,000.00. Because the Truist Mortgage Claim is fully secured, Truist will not participate in the General Unsecured Creditor Class.

Treatment: The Holder of the Allowed Truist Mortgage Claim will retain its lien on the Colorado Property and will receive payment in accordance with the contractual terms of the mortgage, including application of escrow in accordance with the loan documents. The Plan provides for the Debtor to potentially sell the Colorado Property, in which event Truist will be paid in full upon the sale in accordance with applicable law, or will receive such other treatment as may be agreeable to Truist Bank.

Voting: Class 2 is unimpaired. The Holder of the Class 2 Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Code. Therefore, the Class 2 claimant is not entitled to vote on the Plan.

Additional Information: The Colorado Property was occupied by renters who paid monthly rent for a portion of the property, but they left at the end of April 2026. The Debtor has not relet the Colorado Property yet. The value of the Colorado Property is the tax value attributed by the local taxing authority. Under the Plan, the Debtor is required to obtain an appraisal of the Colorado Property as part of the sale process.

The current monthly mortgage payment is $3,025.74, consisting of principal and interest of $2,543.59 and escrow of $482.15. The interest rate is 4.125% fixed. As of the Petition Date, the loan was current with no pre-petition arrears.

**3.      Class 3 – First Merchants Mortgage Claim**

Classification: Class 3 consists of the First Merchants Mortgage Claim. First Merchants' Proof of Claim is located at Claim No. 7 and is in the amount of $2,117,006.19. The Claim is fully secured by a first mortgage lien on the Maine Property junior only to any Claim for real property taxes. The collateral value is estimated to be $2,323,000.00. Because the First Merchants Mortgage Claim is fully secured, First Merchants will not participate in the General Unsecured Creditor Class.

Treatment: The Holder of the Allowed First Merchants Mortgage Claim will retain its lien on the Maine Property and will receive payment in accordance with the contractual terms of the mortgage, including application of any escrow in accordance with the loan documents. The Plan provides for the Debtor to potentially sell the Maine Property, in which event First Merchants will be paid in full upon the sale in accordance with applicable law, or will receive such other treatment as may be agreeable to First Merchants. If the Maine Property is sold to the Spouse under the terms of the Plan and the Spouse does not refinance the Maine Property to acquire the Debtor's interest, the Debtor will at closing on that sale be released from all further obligations under the Allowed First Merchants Mortgage Claim.

Voting: Class 3 is impaired. The Holder of the Class 3 Claim is entitled to vote on the Plan.

Additional Information: The Maine Property is the Debtor's second home and is co-owned with the Spouse. The Debtor is entitled only to one-half of the equity value in the Maine Property. The Plan provides the Spouse an opportunity to purchase the Debtor's one-half interest in the Maine Property; parties should refer to the sale process for the Maine Property described in Article 5 of the Plan for further details. The Spouse has the ability to purchase the Maine Property without refinancing the First Merchants Mortgage Claim. If that occurs—the Spouse acquiring the Debtor's interest but not paying First Merchants at that time—the Debtor will be released from all further obligations on the First Merchants Mortgage Claim.

First Merchants also filed Proof of Claim No. 8, which relates to a separate business loan for Circle Storage Operating Company I, LLC; that Claim is treated separately under Class 9.

The current monthly mortgage payment is $9,133.34 (principal and interest). The interest rate is 2.375% adjustable (with rate caps), subject to adjustment beginning October 1, 2031. As of the Petition Date, the loan was current with no pre-petition arrears.

**4.      Class 4 – Nationstar Mortgage Claim**

Classification: Class 4 consists of the Nationstar Mortgage Claim. Nationstar's Proof of Claim is located at Claim No. 25 and is in the amount of $88,700.79. The Claim is fully

secured by a first mortgage lien on the Ohio Property junior only to any Claim for real property taxes. The collateral value is estimated to be $788,050.00. Because the Nationstar Mortgage Claim is fully secured, Nationstar will not participate in the General Unsecured Creditor Class.

Treatment: The Holder of the Allowed Nationstar Mortgage Claim will retain its lien on the Ohio Property and will receive payment in accordance with the contractual terms of the mortgage, including application of escrow in accordance with the loan documents. The Plan provides for the Debtor to potentially sell the Ohio Property, in which event Nationstar will be paid in full upon the sale in accordance with applicable law, or will receive such other treatment as may be agreeable to Nationstar. If the Ohio Property is sold to the Spouse under the terms of this Plan and the Spouse does not refinance the Ohio Property to acquire the Debtor's interest, the Debtor will at closing on that sale be released from all further obligations under the Allowed Nationstar Mortgage Claim.

Voting: Class 4 is impaired. The Holder of the Class 4 Claim is entitled to vote on the Plan.

Additional Information: The Ohio Property is the Debtor's principal residence. The Debtor has claimed Ohio's homestead exemption in the Ohio Property. The Ohio Property is co-owned with the Spouse. The Debtor is entitled only to one-half of the equity value in the Ohio Property. The Plan provides the Spouse an opportunity to purchase the Debtor's one-half interest in the Ohio Property; parties should refer to the sale process for the Ohio Property described in Article 5 of the Plan for further details. The Spouse has the ability to purchase the Ohio Property without refinancing the Nationstar Mortgage Claim. If that occurs—the Spouse acquiring the Debtor's interest but not paying Nationstar at that time— the Debtor will be released from all further obligations on the Nationstar Mortgage Claim.

The current monthly mortgage payment is $3,321.00, consisting of principal and interest of $2,349.54 and escrow of $971.46. The interest rate is 3.375% fixed. As of the Petition Date, the loan was current with no pre-petition arrears.

**5.      Class 5 – Bank of America Claim**

Classification: Class 5 consists of the Bank of America Claim. Bank of America's Proof of Claim is located at Claim No. 21 and is in the amount of $18,115,776.59. The Claim is fully secured by a first priority security interest in certain securities accounts at Merrill Lynch. The collateral value is estimated to be $29,390,858.42 as of the Petition Date. Because the Bank of America Claim is fully secured, Bank of America will not participate in the General Unsecured Creditor Class.

Treatment: The Holder of the Allowed Bank of America Claim will retain its lien on the securities accounts and will receive payment in accordance with the contractual terms of the LMA Agreement. The Plan provides for the Debtor to potentially sell the securities in the accounts, in which event Bank of America will be paid in full upon the sale in accordance with applicable law, or will receive such other treatment as may be agreeable to Bank of America.

Voting: Class 5 is unimpaired. The Holder of the Class 5 Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Code. Therefore, the Class 5 claimant is not entitled to vote on the Plan.

Additional Information: The Bank of America Claim arises under a Loan Management Account Agreement dated May 19, 2011, as subsequently amended and supplemented (the "LMA Agreement"). The LMA Agreement is a demand line of credit secured by a first priority security interest in the Debtor's securities accounts at Merrill Lynch, Pierce, Fenner & Smith Incorporated. The maximum line amount under the LMA Agreement is $18,500,000.00. The security interest is perfected by control pursuant to the Uniform Commercial Code.

As of the Petition Date, the pledged accounts had the following balances: Account #4923 in the amount of $26,263,641.85 and Account #3597 in the amount of $3,127,216.57, for a total collateral value of $29,390,858.42. Bank of America also asserts rights of setoff and recoupment with respect to the accounts. The Claim is a demand obligation with no fixed maturity date.

## 6.      Class 6 – Huntington Secured Claim

Classification: Class 6 consists of the Huntington Secured Claim. Huntington's Proof of Claim is located at Claim No. 11, as amended, and is in the amount of $36,131,393.30. The Claim is alleged to be secured by various assets, including pledged Merrill Lynch accounts, the Colorado Property, and the Ohio Property. The collateral value is alleged to exceed $10,000,000.00. The Debtor disputes both the extent of Huntington's secured status and the validity of its alleged liens.

Treatment: The Holder of the Allowed Huntington Secured Claim will receive treatment as a General Unsecured Creditor to the extent the Claim is not Allowed as secured. The Plan provides for the Debtor to sell assets subject to Huntington's alleged liens, in which event Huntington will be paid in accordance with applicable law if determined to be secured.

Voting: Class 6 is impaired. Because the Class 6 Claim receives no distribution, the Holder is deemed to reject the Plan pursuant to section 1126(g) of the Code.

Additional Information: The background of the Huntington Claim is described in detail above. According to the Proof of Claim, Huntington allegedly perfected liens against the Debtor's assets as follows: (i) Certificate of Judgment against the Ohio Property filed with the Hamilton County Clerk of Courts on August 22, 2025; (ii) Order of Garnishment against the Debtor's Merrill Lynch Accounts served on September 17, 2025; and (iii) Transcript of Judgment against the Colorado Property filed in Eagle County, Colorado on September 18, 2025. All of these alleged lien perfection dates occurred within 90 days of the Petition Date (October 17, 2025). The Debtor alleges that these liens are avoidable as preferences under section 547 of the Code. The Debtor has retained all rights under the Plan to pursue an avoidance action against Huntington. By separately classifying

Huntington's alleged secured status, the Debtor in no way waives the right to challenge any alleged security interest or attachment of such security interest by Huntington.

### 7.        Class 7 – Civista Claims

Classification: Class 7 consists of the Civista Claims. Civista's Proofs of Claim are located at Claim Nos. 13, 14, 15, 16, and 17 and aggregate $16,914,651.76. The Claims arise from the Debtor's guaranties of loans made to certain of the Debtor's Operating Companies. Civista holds first priority liens on the assets of those companies but has no lien on any assets of the Debtor personally. The Debtor is a guarantor only.

Treatment: The Civista Claims are treated as Fully Secured Company Debt Claims because the value of the Company Collateral securing the Claims is estimated to exceed the aggregate Claim amount. For so long as the primary obligor companies continue to make all payments in accordance with the contractual loan terms, Civista will not receive any payments from the Debtor personally during the term of the Plan. If Civista establishes that it is entitled to collect on a Company Debt Claim Deficiency, that deficiency will be paid *pro rata* within the General Unsecured Creditor Class. During the term of the Plan and until entry of a Final Decree, Civista's rights against the Debtor under his guarantees are modified so that Civista may not seek to collect from the Debtor upon a default unless and until Civista has fully liquidated the applicable Company Collateral, and Civista's recourse relative to any resulting Company Debt Claim Deficiency is limited to sharing *pro rata* in the General Unsecured Creditor Class. Upon entry of a Final Decree (absent any other default), the modification terminates and the guarantees revert to their original contractual terms. The discharge received by the Debtor will not apply to the guarantees to Civista.

Voting: Class 7 is impaired. The Holder of Allowed Claims in Class 7 is entitled to vote on the Plan.

Additional Information: The Civista Claims relate to five separate loans made to four of the Debtor's Operating Companies. All of the obligations are unsecured as to the Debtor personally but are secured by first priority mortgages on real property and fixtures owned by the respective companies. The following are the companies against which Civista holds Claims, and more detailed descriptions are set forth later in this Disclosure Statement:

- Mason RD, LLC (Claims 13 and 14-1);

- The Red Corner, LLC (Claim 16-1);

- Northern Kentucky Assisted Living, LLC and Northern Kentucky Retirement Community, LLC (Claim 17-1);

- The Blue Development Company, LLC (Claim 15-1) (sold by the Debtor in September 2024 to The Rayment J. Schneider 2019 Gift Trust), *See* SOFA No. 18; and

- Techwoods Circle RD, LLC (Claims 13 and 14-1) (sold by the Debtor in February 2025 to KPT7 Holding Company, LLC). *See* SOFA No. 18.

**8.      Class 8 – First Federal Claim**

Classification: Class 8 consists of the First Federal Claim. First Federal's Proof of Claim is located at Claim No. 20 and is in the amount of $937,500.00. The Claim arises from the Debtor's co-obligor obligations on a loan made to Circle Development of Cincinnati, LLC. First Federal holds a first priority mortgage on the assets of Circle Development of Cincinnati, LLC but has no lien on any Assets of the Debtor personally. The Debtor is a co-obligor only.

Treatment: The First Federal Claim is treated as a Fully Secured Company Debt Claim because the value of the Company Collateral that secures the Claim is estimated to exceed the Claim amount. For so long as the co-obligor company continues to make all payments in accordance with the contractual loan terms, First Federal will not receive any payments from the Debtor personally during the term of the Plan. If First Federal establishes that it is entitled to collect on a Company Debt Claim Deficiency, that deficiency will be paid *pro rata* within the General Unsecured Creditor Class. The loan documents provide that the creditor, upon an event of default, may seek payment from the Debtor, as a co-obligor, directly and immediately without first liquidating the applicable Company Collateral or otherwise seeking payment from the Company co-obligor. During the term of this Plan and until the entry of a Final Decree closing the Case, the rights of First Federal against the Debtor as a co-obligor are modified so that (i) First Federal may not seek to collect from the Debtor upon a default unless and until First Federal has exhausted collection efforts against the Company co-obligor and has fully liquidated the Company Collateral, and (ii) First Federal's recourse against the Debtor as a co-obligor relative to any resulting Company Debt Claim Deficiency is limited to sharing *pro rata* within the General Unsecured Creditor Class. Upon entry of a Final Decree (absent any other default), the modification to the Debtor's obligations as a co-obligor will terminate and will revert to the original contractual terms. The discharge received by the Debtor will not apply to the Debtor's obligations to First Federal.

Voting: Class 8 is impaired. The Holder of the Allowed Claim in Class 8 is entitled to vote on the Plan.

Additional Information: The First Federal Claim relates to a single loan made to Circle Development of Cincinnati, LLC, one of the Debtor's Operating Companies. The obligation is unsecured as to the Debtor personally but is secured by a first priority mortgage on real property and fixtures owned by the company. A more detailed description of Circle Development of Cincinnati, LLC, is set forth later in this Disclosure Statement.

**9.      Class 9 – First Merchants Business Loan Claim**

Classification: Class 9 consists of the First Merchants Business Loan Claim. First Merchants' Proof of Claim is located at Claim No. 8 and is in the amount of $37,725,186.13. The Claim arises from the Debtor's guaranty of a business loan made to Circle Storage Operating Company I, LLC. First Merchants holds first priority liens on the assets of Circle Storage Operating Company I, LLC but has no lien on any Assets of the Debtor personally. The Debtor is a guarantor only.

Treatment: The First Merchants Business Loan Claim is treated as a Fully Secured Company Debt Claim because the value of the Company Collateral that secures the Claim is estimated to exceed the Claim amount. For so long as the primary obligor company continues to make all payments in accordance with the contractual loan terms, First Merchants will not receive any payments from the Debtor personally during the term of the Plan. If First Merchants establishes that it is entitled to collect on a Company Debt Claim Deficiency, that deficiency will be paid *pro rata* within the General Unsecured Creditor Class. The guaranty provided by the Debtor to First Merchants provided that First Merchants, upon an event of default, could seek payment from the Debtor directly and immediately without first liquidating the applicable Company Collateral. During the term of this Plan and until the entry of a Final Decree closing the Case, the rights of First Merchants against the Debtor under his guaranty are modified so that (i) First Merchants may not seek to collect from the Debtor upon a default unless and until First Merchants has fully liquidated the Company Collateral, and (ii) First Merchants' recourse against the Debtor under his guaranty relative to any resulting Company Debt Claim Deficiency is limited to sharing *pro rata* within the General Unsecured Creditor Class. Upon entry of a Final Decree (absent any other default), the modification to the guaranty will terminate and the guaranty will revert to its original contractual terms. The discharge received by the Debtor will not apply to the guaranty of the Debtor to First Merchants.

Voting: Class 9 is impaired. The Holder of the Allowed Claim in Class 9 is entitled to vote on the Plan.

Additional Information: The First Merchants Business Loan Claim relates to a single business loan made to Circle Storage Operating Company I, LLC. The obligation is unsecured as to the Debtor personally but is secured by first priority mortgages on multiple parcels of real property and security interests in personal property and fixtures owned by the company. Circle Storage Operating Company I, LLC, is owned by Grasshopper Investments, LLC, in which the Debtor owns a 0.5% interest. A more detailed description of Grasshopper Investments, LLC, is set forth later in this Disclosure Statement

**10.    Class 10 – GECU Claim**

Classification: Class 10 consists of the GECU Claim. GECU's Proof of Claim is located at Claim No. 23 and is in the amount of $3,389,027.89. The Claim arises from the Debtor's guaranty of a business loan made to Hyde Park Circle, LLC. GECU holds a first priority mortgage on the assets of Hyde Park Circle, LLC but has no lien on any Assets of the Debtor personally. The Debtor is a guarantor only.

Treatment: The GECU Claim is treated as a Fully Secured Company Debt Claim because the value of the Company Collateral that secures the Claim is estimated to exceed the Claim amount. For so long as the primary obligor company continues to make all payments in accordance with the contractual loan terms, GECU will not receive any payments from the Debtor personally during the term of the Plan. If GECU establishes that it is entitled to collect on a Company Debt Claim Deficiency, that deficiency will be paid *pro rata* within the General Unsecured Creditor Class. The guaranty provided by the Debtor to GECU provided that GECU, upon an event of default, could seek payment from the Debtor

directly and immediately without first liquidating the applicable Company Collateral. During the term of this Plan and until the entry of a Final Decree closing the Case, the rights of GECU against the Debtor under his guaranty are modified so that (i) GECU may not seek to collect from the Debtor upon a default unless and until GECU has fully liquidated the Company Collateral, and (ii) GECU's recourse against the Debtor under his guaranty relative to any resulting Company Debt Claim Deficiency is limited to sharing *pro rata* within the General Unsecured Creditor Class. Upon entry of a Final Decree (absent any other default), the modification to the guaranty will terminate and the guaranty will revert to its original contractual terms. The discharge received by the Debtor will not apply to the guaranty of the Debtor to GECU.

Voting: Class 10 is impaired. The Holder of the Allowed Claim in Class 10 is entitled to vote on the Plan.

Additional Information: The GECU Claim relates to a single business loan made to Hyde Park Circle, LLC, one of the Debtor's Operating Companies. The obligation is unsecured as to the Debtor personally but is secured by a first priority mortgage on real property owned by the company. A more detailed description of Hyde Park Circle, LLC, is set forth later in this Disclosure Statement.

**11.    Class 11 – Heritage Claim**

Classification: Class 11 consists of the Heritage Claim. Heritage's Proof of Claim is located at Claim No. 2 and is in the amount of $1,899,926.42. The Claim arises from the Debtor's guaranty of a loan made to Madison Warehouse, LLC. Heritage holds first priority liens on the assets of Madison Warehouse, LLC but has no lien on any Assets of the Debtor personally. The Debtor is a guarantor only.

Treatment: The Heritage Claim is treated as a Fully Secured Company Debt Claim because the value of the Company Collateral that secures the Claim is estimated to exceed the Claim amount. For so long as the primary obligor company continues to make all payments in accordance with the contractual loan terms, Heritage will not receive any payments from the Debtor personally during the term of the Plan. If Heritage establishes that it is entitled to collect on a Company Debt Claim Deficiency, that deficiency will be paid *pro rata* within the General Unsecured Creditor Class. The guaranty provided by the Debtor to Heritage provided that Heritage, upon an event of default, could seek payment from the Debtor directly and immediately without first liquidating the applicable Company Collateral. During the term of this Plan and until the entry of a Final Decree closing the Case, the rights of Heritage against the Debtor under his guaranty are modified so that (i) Heritage may not seek to collect from the Debtor upon a default unless and until Heritage has fully liquidated the Company Collateral, and (ii) Heritage's recourse against the Debtor under his guaranty relative to any resulting Company Debt Claim Deficiency is limited to sharing *pro rata* within the General Unsecured Creditor Class. Upon entry of a Final Decree (absent any other default), the modification to the guaranty will terminate and the guaranty will revert to its original contractual terms. The discharge received by the Debtor will not apply to the guaranty of the Debtor to Heritage.

Voting: Class 11 is impaired. The Holder of the Allowed Claim in Class 11 is entitled to vote on the Plan.

Additional Information: The Heritage Claim relates to a single loan made to Madison Warehouse, LLC, one of the Debtor's Operating Companies. The obligation is unsecured as to the Debtor personally but is secured by a first priority mortgage on real property owned by the company. A more detailed description of Madison Warehouse, LLC is set forth later in this Disclosure Statement.

Heritage Bank previously filed a separate proof of claim (Claim No. 3) relating to a loan owed by The Gatherings of Blue Ash, LLC. During the course of the Case, The Gathering of Blue Ash, LLC, sold its only real estate asset and paid that Claim in full. As a result, Heritage Bank now holds only the single remaining Claim in this Class.

**12.     Class 12 – Kemba Claim**

Classification: Class 12 consists of the Kemba Claim. Kemba's Proof of Claim is located at Claim No. 4 and is in the amount of $136,901.38. The Claim arises from the Debtor's guaranty of a mortgage loan made to Hyde Park Circle, LLC. Kemba holds first priority liens on the assets of Hyde Park Circle, LLC but has no lien on any Assets of the Debtor personally. The Debtor is a guarantor only.

Treatment: The Kemba Claim is treated as a Fully Secured Company Debt Claim because the value of the Company Collateral that secures the Claim is estimated to exceed the Claim amount. For so long as the primary obligor company continues to make all payments in accordance with the contractual loan terms, Kemba will not receive any payments from the Debtor personally during the term of the Plan. If Kemba establishes that it is entitled to collect on a Company Debt Claim Deficiency, that deficiency will be paid *pro rata* within the General Unsecured Creditor Class. The guaranty provided by the Debtor to Kemba provided that Kemba, upon an event of default, could seek payment from the Debtor directly and immediately without first liquidating the applicable Company Collateral. During the term of this Plan and until the entry of a Final Decree closing the Case, the rights of Kemba against the Debtor under his guaranty are modified so that (i) Kemba may not seek to collect from the Debtor upon a default unless and until Kemba has fully liquidated the Company Collateral, and (ii) Kemba's recourse against the Debtor under his guaranty relative to any resulting Company Debt Claim Deficiency is limited to sharing *pro rata* within the General Unsecured Creditor Class. Upon entry of a Final Decree (absent any other default), the modification to the guaranty will terminate and the guaranty will revert to its original contractual terms. The discharge received by the Debtor will not apply to the guaranty of the Debtor to Kemba.

Voting: Class 12 is impaired. The Holder of the Allowed Claim in Class 12 is entitled to vote on the Plan.

Additional Information: The Kemba Claim relates to a single mortgage loan made to Hyde Park Circle, LLC, one of the Debtor's Operating Companies. The obligation is unsecured as to the Debtor personally but is secured by a first priority mortgage on real property

owned by the company. A more detailed description of Hyde Park Circle, LLC, is set forth later in this Disclosure Statement.

### 13.      Class 13 – Rockland Claim

Classification: Class 13 consists of the Rockland Claim. Rockland's Proof of Claim is located at Claim No. 24 and is in the amount of $8,970,342.54. The Claim arises from the Debtor's two guaranties of loans made to Boston RD, LLC (under the $7MM Credit Agreement) and North Shore RD, LLC (under the $4.045MM Credit Agreement). Rockland holds first priority liens on the assets of Boston RD, LLC, and North Shore RD, LLC but has no lien on any Assets of the Debtor personally. The Debtor is a guarantor only.

Treatment: The Rockland Claim is treated as a Fully Secured Company Debt Claim because the value of the Company Collateral that secures the Claim is estimated to exceed the Claim amount. For so long as the primary obligor companies continue to make all payments in accordance with the contractual loan terms, Rockland will not receive any payments from the Debtor personally during the term of the Plan. If Rockland establishes that it is entitled to collect on a Company Debt Claim Deficiency, that deficiency will be paid *pro rata* within the General Unsecured Creditor Class. The guaranties provided by the Debtor to Rockland provided that Rockland, upon an event of default, could seek payment from the Debtor directly and immediately without first liquidating the applicable Company Collateral. During the term of this Plan and until the entry of a Final Decree closing the Case, the rights of Rockland against the Debtor under his guaranties are modified so that (i) Rockland may not seek to collect from the Debtor upon a default unless and until Rockland has fully liquidated the Company Collateral, and (ii) Rockland's recourse against the Debtor under his guaranties relative to any resulting Company Debt Claim Deficiency is limited to sharing *pro rata* within the General Unsecured Creditor Class. Upon entry of a Final Decree (absent any other default), the modifications to the guaranties will terminate and the guaranties will revert to their original contractual terms. The discharge received by the Debtor will not apply to the guaranties of the Debtor to Rockland.

Voting: Class 13 is impaired. The Holder of the Allowed Claim in Class 13 is entitled to vote on the Plan.

Additional Information: The Rockland Claim relates to two loans: one made to Boston RD, LLC and one made to North Shore RD, LLC, all of which are among the Debtor's Operating Companies. The obligations are unsecured as to the Debtor personally but are secured by first priority mortgages on real property owned by the respective companies. A more detailed description of Boston RD, LLC and North Shore RD, LLC, is set forth later in this Disclosure Statement.

### 14.      Class 14 – Stock Yards Bank Claim

Classification: Class 14 consists of the Stock Yards Bank Claim. Stock Yards Bank's Proof of Claim is located at Claim No. 22 and is in the amount of $1,201,222.30. The Claim arises from the Debtor's guaranty of a loan made to 5150 East Galbraith Road, LLC. Stock

Yards Bank holds first priority liens on the assets of 5150 East Galbraith Road, LLC but has no lien on any Assets of the Debtor personally. The Debtor is a guarantor only.

Treatment: The Stock Yards Bank Claim is treated as a Fully Secured Company Debt Claim because the value of the Company Collateral that secures the Claim is estimated to exceed the Claim amount. For so long as the primary obligor company continues to make all payments in accordance with the contractual loan terms, Stock Yards Bank will not receive any payments from the Debtor personally during the term of the Plan. If Stock Yards Bank establishes that it is entitled to collect on a Company Debt Claim Deficiency, that deficiency will be paid *pro rata* within the General Unsecured Creditor Class. The guaranty provided by the Debtor to Stock Yards Bank provided that Stock Yards Bank, upon an event of default, could seek payment from the Debtor directly and immediately without first liquidating the applicable Company Collateral. During the term of this Plan and until the entry of a Final Decree closing the Case, the rights of Stock Yards Bank against the Debtor under his guaranty are modified so that (i) Stock Yards Bank may not seek to collect from the Debtor upon a default unless and until Stock Yards Bank has fully liquidated the Company Collateral, and (ii) Stock Yards Bank's recourse against the Debtor under his guaranty relative to any resulting Company Debt Claim Deficiency is limited to sharing *pro rata* within the General Unsecured Creditor Class. Upon entry of a Final Decree (absent any other default), the modification to the guaranty will terminate and the guaranty will revert to its original contractual terms. The discharge received by the Debtor will not apply to the guaranty of the Debtor to Stock Yards Bank.

Voting: Class 14 is impaired. The Holder of the Allowed Claim in Class 14 is entitled to vote on the Plan.

Additional Information: The Stock Yards Bank Claim relates to a single loan made to 5150 East Galbraith Road, LLC, one of the Debtor's Investment Companies. The obligation is unsecured as to the Debtor personally but is secured by a first priority mortgage on real property owned by the company. 5150 East Galbraith Road, LLC is an Ohio limited liability company in which the Debtor holds a 33.33% interest. The Debtor does not manage this entity. A more detailed description of 5150 East Galbraith Road, LLC, is set forth later in this Disclosure Statement.

**15. Class 15 – Transamerica Claim**

Classification: Class 15 consists of the Transamerica Claim. No Proof of Claim has been filed for this Claim. The Claim arises from the Debtor's guaranty of a loan made to To Life Ltd. Transamerica Life Insurance Company holds a first priority mortgage on the assets of To Life Ltd but has no lien on any Assets of the Debtor personally. The Debtor is a guarantor only.

Treatment: The Transamerica Claim is treated as a Fully Secured Company Debt Claim because the value of the Company Collateral that secures the Claim is estimated to exceed the Claim amount. For so long as the primary obligor company continues to make all payments in accordance with the contractual loan terms, Transamerica Life Insurance Company will not receive any payments from the Debtor personally during the term of the

Plan. If Transamerica Life Insurance Company establishes that it is entitled to collect on a Company Debt Claim Deficiency, that deficiency will be paid *pro rata* within the General Unsecured Creditor Class. The guaranty provided by the Debtor to Transamerica Life Insurance Company provided that Transamerica Life Insurance Company, upon an event of default, could seek payment from the Debtor directly and immediately without first liquidating the applicable Company Collateral. During the term of this Plan and until the entry of a Final Decree closing the Case, the rights of Transamerica Life Insurance Company against the Debtor under his guaranty are modified so that (i) Transamerica Life Insurance Company may not seek to collect from the Debtor upon a default unless and until Transamerica Life Insurance Company has fully liquidated the Company Collateral, and (ii) Transamerica Life Insurance Company's recourse against the Debtor under his guaranty relative to any resulting Company Debt Claim Deficiency is limited to sharing *pro rata* within the General Unsecured Creditor Class. Upon entry of a Final Decree (absent any other default), the modification to the guaranty will terminate and the guaranty will revert to its original contractual terms. The discharge received by the Debtor will not apply to the guaranty of the Debtor to Transamerica Life Insurance Company.

Voting: Class 15 is impaired. The Holder of the Allowed Claim in Class 15 is entitled to vote on the Plan.

Additional Information: The Transamerica Claim relates to a $45,000,000 construction and permanent loan made to To Life Ltd, one of the Debtor's Investment Companies. The obligation is unsecured as to the Debtor personally but is secured by a first priority mortgage on The Red Apartments located at 5110 Herringbone Drive, Cincinnati, Ohio 45227. A more detailed description of To Life Ltd, is set forth later in this Disclosure Statement.

**16.    Class 16 – Huntington General Unsecured Claim**

Classification: Class 16 consists of the Huntington General Unsecured Claim (the unsecured portion of the Huntington Claim after avoidance of its asserted liens and security interests). The Claimant is Huntington. The Claim Amount is $36,131,393.30 (subject to allowance and any preference avoidance). There is no Collateral after avoidance of the asserted judgment liens and garnishments. The Proof of Claim Reference is Claim No. 11. The Claim is general unsecured.

Treatment: Until the conclusion by a Final Order of the Huntington Litigation and any Huntington Retained Actions, the *pro rata* share of the Net Plan Proceeds distributed to General Unsecured Creditors that otherwise would have been paid to Huntington as the Holder of the Allowed Huntington General Unsecured Claim will be held in a Disputed Claim Reserve. Upon the conclusion by a Final Order of the Huntington Litigation and any Huntington Retained Action, any amount of a judgment in favor of the Debtor will act as a setoff against the Huntington General Unsecured Claim, whether in whole or in part. Thereupon, to the extent any amount of the Allowed Huntington General Unsecured Claim remains unsatisfied through a setoff, distribution will be made to Huntington of any *pro rata* share of the Net Plan Proceeds due Huntington under the Plan.

Voting: Class 16 is impaired. The Holder of the Class 16 Claim is entitled to vote on the Plan.

**17.      Class 17 – General Unsecured Claims**

Classification: Class 17 consists of all General Unsecured Claims against the Debtor, other than the Huntington General Unsecured Claim treated in Class 16.

Treatment: The Holders of Allowed General Unsecured Claims will receive their *pro rata* share of the Net Plan Proceeds distributed to the General Unsecured Creditor Class and any Allowed Huntington General Unsecured Claim in accordance with the distribution provisions of this Plan.

Voting: Class 17 is impaired. Holders of Allowed Claims in Class 17 are entitled to vote on the Plan.

Additional Information: The General Unsecured Claims Class includes all unsecured Claims against the Debtor that are not otherwise classified under the Plan, including any deficiency Claims that may arise from the secured Claims treated in Classes 2 through 15 (other than the Huntington General Unsecured Claim, which is separately classified and treated in Class 16). The exact amount of distributions to General Unsecured Creditors will depend on the Net Plan Proceeds realized from the sale of the Debtor's Assets during the term of the Plan. The Debtor anticipates that there will be meaningful distributions to General Unsecured Creditors, but the timing and amount of such distributions cannot be determined with certainty at this time. A more detailed description of the Assets available for distribution and the anticipated timeline for Asset sales is set forth in the descriptions of the Debtor's operating and investment companies later in this Disclosure Statement.

## IV.   Means of Implementation

**A.      Overview**

This article provides a general description of the means by which the Plan will be implemented. The Plan is a reorganization plan designed to give the Debtor the time and breathing room necessary to realize the full value of his Assets for the benefit of creditors while protecting against immediate collection efforts on personal guarantees and preserving the significant upside potential from the ongoing Huntington Litigation.

Under the Plan, the Debtor's Assets will be sold or otherwise monetized in an orderly fashion over an approximately five-year period. The net proceeds from these sales (together with the Debtor's Income, including Social Security contributions, and any recoveries from non-Huntington Retained Actions) will be distributed to creditors in accordance with the priority scheme established by the Code and set forth in the Plan. The Huntington Litigation will continue to be prosecuted by the Debtor for the benefit of the estate, with distributions on the Huntington General Unsecured Claims withheld in a Disputed Claim Reserve until that litigation is finally resolved by a Final Order. A Retained Actions Representative will be appointed to pursue all non-Huntington Chapter 5 Claims on behalf of the estate.

The Plan also authorizes the Debtor to retain and use ordinary-course living expenses as Administrative Expense Claims so that he can maintain his personal obligations during the implementation period. All property of the estate will vest in the reorganized Debtor on the Effective Date, and the Debtor will receive a discharge of all dischargeable debts upon completion of all payments under the Plan and the entry of a Final Decree, subject to the specific exceptions set forth in the Plan.

The overall goal of the Plan is to maximize creditor recoveries by allowing the Debtor to sell Assets at full market value rather than in a forced Chapter 7 case, while ensuring that every impaired class receives at least as much as it would have received in a hypothetical Chapter 7 case. Additional detail regarding the specific Assets, the Huntington Litigation, and the Retained Actions is provided below.

## B.      Vesting of Assets

On the Effective Date, all property of the estate will vest in the reorganized Debtor, free and clear of all Claims, liens, encumbrances, and other interests, except as expressly provided in the Plan or the Confirmation Order. This vesting is a central component of the Plan's means of implementation. It allows the reorganized Debtor to proceed immediately with the orderly sale and monetization of Assets for the benefit of creditors, without the encumbrance of pre-Confirmation liens or Claims (other than those expressly preserved or created under the Plan).

## C.      Authority to sell Assets and enter into transactions

The reorganized Debtor is authorized under the Plan to sell, transfer, assign, or otherwise dispose of any Asset of the estate without the need for further order of the Court, except to the extent that the Plan imposes specific procedures, notice requirements, or approvals for particular Assets or transactions. This broad authority is a key means-of-implementation provision that allows the Debtor to move efficiently through the five-year monetization process while still providing appropriate safeguards and transparency for creditors.

## D.      Plan Proceeds and application of Net Plan Proceeds

Under the Plan, "Plan Proceeds" means the aggregate of all money received by or on behalf of the Debtor after the Effective Date and prior to entry of a Final Decree including Business Asset Sale Proceeds, Investment Company Sale Proceeds, Income (to the extent not Exempt Income), Retained Action Proceeds, and proceeds from Huntington Retained Actions.

- Business Asset Sale Proceeds are the net proceeds realized from the sale or other disposition of the Debtor's real property, operating companies, and other business-related Assets.

- Investment Company Sale Proceeds are the net proceeds realized from the sale or other monetization of the Debtor's minority and passive investment interests.

- Income includes all money received by the Debtor during the implementation period (including Social Security benefits to the extent they are not Exempt Income).

- Retained Action Proceeds are any recoveries obtained from the pursuit of non-Huntington Chapter 5 claims by the Retained Actions Representative.

- Huntington Retained Actions may also generate money that will be distributed as Plan Proceeds to the extent not credited as a set off against the Huntington Claim.

All of the foregoing amounts are aggregated into Plan Proceeds. Plan Proceeds are first applied to pay in full all Administrative Expense Claims, Priority Claims, Secured Claims, and Ordinary Course General Administrative Expense Claims, as well as any other obligations entitled to priority under the Plan. After payment of all senior obligations, the remaining amount constitutes Net Plan Proceeds. Net Plan Proceeds are then distributed *pro rata* to the Holders of Allowed General Unsecured Claims in accordance with the distribution provisions of the Plan. This structure creates a clear and transparent waterfall that ensures all senior Claims are satisfied before any value reaches the General Unsecured Creditor Class.

The Plan authorizes the Debtor, to the extent permitted by the Bank of America loan agreement, to draw or withdraw funds from the excess collateral value in the pledged Merrill Lynch Accounts (specifically those ending in -4923 and -3597). "Excess collateral value" means the fair market value of the securities held in those accounts that exceeds the outstanding balance of the Bank of America Claim at the time of the draw. The Debtor may use any amounts drawn solely to pay Allowed Administrative Expense Claims and other amounts the Debtor is authorized to pay under the Plan. The Debtor must provide Bank of America with reasonable advance notice of any material draw and must remain in full compliance with the phased liquidation requirements and timeline set forth in Section 5.5.7 of the Plan. All funds drawn under this provision are Plan Proceeds and will be distributed in accordance with the Plan.

### E.      Payment of Administrative Expenses

Administrative Expense Claims have priority under the Bankruptcy Code. This means they must be paid in full before any value can be distributed to creditors holding lower-priority Claims, such as General Unsecured Claims. The Plan implements this priority scheme by requiring that, except to the extent a Holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each such Holder will receive payment in full on the later of the following dates:

i.    the Effective Date, or as soon as reasonably practicable after the Effective Date;

ii.   the date the Claim becomes Allowed, or as soon as reasonably practicable after that date, if an objection to the Claim has been filed; or

iii.  any date and on any terms agreed to by the Holder of the Claim.

This treatment ensures that professionals, vendors, and other parties who provide goods or services to the estate during the Chapter 11 Case are paid in full, which is essential to the successful implementation of the Plan and the orderly administration of the estate.

**F.      Ordinary-course operations and living expenses**

The Plan authorizes the Debtor to continue ordinary-course operations and to pay his ordinary living expenses as Ordinary Course General Administrative Expense Claims. These Claims are paid when due in accordance with applicable non-bankruptcy law and the terms of any applicable agreement, rather than on the Effective Date. This treatment is a key means-of-implementation feature that allows the Debtor to meet his personal obligations during the five-year implementation period without having to wait for the Effective Date or for Court approval of each expense, while still ensuring that these Claims retain their administrative priority under the Bankruptcy Code.

**G.      Five-year implementation period**

Because the Debtor is an individual, the Bankruptcy Code requires that he commit his Projected Disposable Income for a period ending on the earlier of five years after the Effective Date or the date on which all Allowed Claims are paid in full in order for the Plan to be confirmable under section 1129(a)(15). The Plan satisfies this requirement by providing for the Debtor's Projected Disposable Income to be paid into Plan Proceeds over that period. After the five-year period, the Debtor will continue to contribute only Company Draws and Investment Income (but not Social Security or other personal income) until all Allowed Claims are paid in full or the entities generating such income have been fully disposed of pursuant to the Plan.

The timelines in the Plan are not intended to delay for the sake of delay. Rather, they are deliberate to protect value for creditors. A rushed or forced sale of the Debtor's real estate, Operating Companies, and Investment Company interests—particularly in the current market environment and while the Huntington Litigation remains pending—would almost certainly result in significantly lower recoveries than could be achieved through a measured, professionally managed sale process. By taking the time to prepare each Asset for sale, obtain appropriate professional advice, and market the Assets to the right buyers, the Debtor expects to realize substantially higher net proceeds than would be possible in a Chapter 7 case, where Assets are typically sold quickly and at distressed prices under the pressure of a trustee's administration.

The Debtor will proceed with each sale in conjunction with his professionals' advice, ensuring that adequate time and attention are devoted to each transaction. This approach protects the upside for all creditors, including General Unsecured Creditors, by allowing the estate to capture the full market value of the Assets rather than accepting fire-sale discounts. In short, the five-year period gives the Debtor the runway necessary to implement the Plan in a way that is designed to pay creditors more—not less—than they would receive in any alternative scenario.

**H.      Quarterly reporting**

Commencing with the first full calendar quarter after the Effective Date and continuing on a quarterly basis until entry of a Final Decree, the Debtor will prepare and file with the Bankruptcy Court, and serve on the United States Trustee and the Top 20 Creditors, a Quarterly Report in compliance with LBR 3020-2 and the United States Trustee Program's quarterly Post-Confirmation Report requirements. Each Quarterly Report will be filed and served no later than the twenty-first (21st) day of the month following the end of the calendar quarter to which it relates unless the United States Trustee stipulates to an extension.

In addition to the required content of the report from the Local Rules, each Quarterly Report will provide a detailed summary of the following:

1.      the status of the monetization of the Merrill Lynch Accounts, including the amount monetized during the quarter, the tax consequences considered, and the remaining balance;

2.      the status of the sale process for the Ohio Property, the Maine Property, and the Colorado Property, including any appraisals obtained, the Spouse's election decision (if any), any IRA contributions made, broker listings, marketing efforts, and any closings completed;

3.      the status of the disposition of Business Assets and Operating Companies, including which entities have been sold or are under contract, the amount of Company Draws received during the quarter, and any reserves maintained by the operating companies;

4.      the status of efforts to sell or monetize the Debtor's interests in any Investment Company, including any governance or right-of-first-refusal issues encountered and any declaratory relief sought from the Court;

5.      the amount of Projected Disposable Income contributed to the Plan during the quarter, the calculation of Net Plan Proceeds (including reserves set aside for Administrative Expense Claims, Priority Claims, and anticipated future living and operating expenses), and the amount of any distributions made on the most recent Quarterly Distribution Date;

6.      the status of the Retained Actions Representative's prosecution of the Retained Actions, including any actions commenced, settlements reached, costs incurred, and net proceeds received;

7.      the status of the Huntington Litigation and the Huntington Retained Actions, including material developments, any judgments obtained, the status of any appeals, any set-off amounts applied, and any tolling of monetization deadlines under the Plan;

8.      the amount of any taxes paid or reserved from sale proceeds, any tax refunds or credits received, and the engagement of any tax professionals; and

9.      any other material events affecting the implementation of the Plan or the Debtor's ability to make distributions to creditors.

Each Quarterly Report will include a narrative description of the actions taken during the quarter, the progress made toward consummation of the Plan, and the anticipated timeline for completion of all remaining Plan obligations and the filing of a final report and motion for final decree.

## I.      Settlement authority

After the Effective Date, the Debtor will have the authority to settle and compromise any Claim or Disputed Claim vested in the Debtor, including the Huntington Litigation and the Huntington Retained Actions, without further Court approval or compliance with Bankruptcy Rule 9019. This authority allows the Debtor to resolve matters efficiently for the benefit of the estate and all creditors while the Plan is being implemented.

## J.      Post-effective date professional engagement and compensation

After the Effective Date, the Debtor is authorized to retain and compensate professionals, including attorneys, accountants, appraisers, and tax advisors, in the ordinary course of business without the need for further application to or approval by the Bankruptcy Court. This authority includes the engagement of tax professionals to advise on tax minimization strategies in connection with all Asset dispositions under the Plan, as expressly provided in the Plan. All such post-Effective Date professional fees and expenses will be paid as Ordinary Course General Administrative Expense Claims when due, subject to the terms of any applicable engagement agreements.

## K.      Cross-references

This Article IV should be read in conjunction with Article V (Description of Assets and Proposed Disposition Process), Article VI (The Huntington Litigation and Its Impact on the Plan), and Article VII (Retained Actions and Potential Chapter 5 Claims). Together, these articles provide a complete picture of how the Plan will be implemented and how the Debtor's Assets will be monetized for the benefit of creditors.

# V.      Description of Assets and Proposed Disposition Process

## A.      Overview

This article provides a transparent and organized overview of the Debtor's various Asset categories. It is intended to give creditors and other parties in interest a clear picture of the Assets that will be monetized under the Plan, along with the proposed method of disposition for each category. The Asset categories covered in this article include real property, liquid Assets, Operating Companies, Investment Company interests, and other personal property.

For each of the entities of the Debtor, the Debtor is providing the following basic information: formation details, ownership percentages, current Assets and approximate values, current debts, a summary of operations, and the proposed disposition.

Certain Assets described in this article are owned by non-Debtor entities. Some of these entities are controlled by the Debtor, while others are not. The Debtor does not claim that the assets of these non-Debtor entities are his personal property. Instead, the information is provided so that creditors can understand the value of the Debtor's ownership interest in each entity. Where the Debtor does not hold 100% ownership, the sale of any underlying asset will require the Debtor to follow appropriate corporate formalities, including obtaining any necessary approvals from other owners or managers. This article therefore focuses on the value of the Debtor's equity interests,

and the Debtor does not mean for these disclosures to be an assertion that he has a direct ownership of the underlying assets themselves.

## B. Real property

The Debtor owns three parcels of real property that will be sold or otherwise monetized under the Plan: the Ohio Property, the Maine Property, and the Colorado Property. Each property is discussed below, followed by a description of the proposed sale process, including the Spouse's option to purchase and the Debtor's ability to contribute exempt retirement funds.

### 1. Ohio Property

The Ohio Property is located at 3515 Tiffany Ridge Lane, Blue Ash, Ohio 45241. The Debtor owns this property jointly with his Spouse, and the Debtor has claimed the Ohio homestead exemption in his one-half interest. As of the Petition Date, Ohio's homestead exemption for an individual was $182,625.00. Real estate taxes are annual amounts.

| Description | Amount |
|---|---|
| Estimated Value | $ 788,050.00 |
| Real Estate Taxes | $ 11,970.00 |
| First Mortgage (Nationstar) | $ 88,700.79 |
| Gross Equity | $ 699,349.21 |
| Less: Spouse's ½ Interest | $ 349,674.61 |
| Debtor's Net Equity (before homestead) | $ 349,674.60 |
| Less: Ohio Homestead Exemption | $ 182,625.00 |
| **Equity Available to Estate** | **$ 167,049.60** |

### 2. Maine Property

The Maine Property is located at 2 Fort Lane, Kennebunk, Maine 04043. The Debtor owns this property jointly with his Spouse.

| Description | Amount |
|---|---|
| Estimated Value | $ 2,323,000.00 |
| Real Estate Taxes | $ 22,881.55 |
| First Mortgage (First Merchants) | $ 2,117,006.19 |
| Gross Equity | $ 183,112.26 |
| Less: Spouse's ½ Interest | $ 91,556.13 |
| **Equity Available to Estate** | **$ 91,556.13** |

3.    **Colorado Property**

The Colorado Property is located at 2409 Chamonix Road, Vail, Colorado 81657. The Debtor owns this property individually. The property is was previously leased to tenants who paid approximately $2,100 per month in rental income, but the property is not leased as of the end of April 2026.

| Description | Amount |
|---|---|
| Estimated Value | $ 2,180,000.00 |
| Real Estate Taxes | $      7,145.00 |
| First Mortgage (Truist) | $   414,350.77 |
| **Equity Available to Estate** | **$ 1,758,504.23** |

4.    **Sale Process, Spouse's option to purchase, and IRA contribution option**

The Plan provides for the orderly sale or other monetization of all three real properties during the five-year implementation period. The Debtor will obtain an appraisal of each property by a qualified appraiser selected by the Debtor within sixty (60) days after the Effective Date. The net proceeds from any sale (after payment of the secured mortgage, closing costs, and any real estate taxes) will be included in Plan Proceeds and distributed in accordance with the Plan.

a.    **Spouse's option to purchase**

The Plan grants the Spouse a right of first refusal and purchase option on all three properties:

- Ohio Property: Within thirty (30) days after the Debtor obtains the appraisal, the Spouse may elect to purchase the Debtor's one-half interest for one-half of the Appraised Value. If the Spouse elects to purchase, closing will occur within sixty (60) days, and the Spouse may assume the Nationstar mortgage (with consent) or refinance.

- Maine Property: The same process applies. The Spouse may elect to purchase the Debtor's one-half interest for one-half of the Appraised Value within thirty (30) days after the appraisal, with closing within sixty (60) days thereafter.

- Colorado Property: The Spouse may elect to purchase the Debtor's entire interest at the full Appraised Value within thirty (30) days after the appraisal, with closing within sixty (60) days thereafter.

The Debtor believes these options are in the best interest of the estate and all creditors for several reasons. First, they avoid the need to file an adversary proceeding under section 363(h) of the Bankruptcy Code to sell the Spouse's co-

ownership interest in the Ohio Property and Maine Property. Such litigation would be expensive, time-consuming, and uncertain, and would almost certainly reduce the net recovery to the estate. Second, a sale to the Spouse avoids substantial transactional costs that would be incurred in a public sale, including real estate broker commissions (typically 5–6%), marketing expenses, staging costs, and carrying costs during the marketing period. Third, this approach furthers the Bankruptcy Code's fresh-start policy by allowing the Debtor to retain his primary residence where doing so does not materially harm creditors. Finally, for the Ohio and Maine properties, the costs of a forced public sale (including broker fees, holding costs, and the Debtor's homestead exemption on the Ohio Property) would likely consume nearly all the equity that would otherwise be available to the estate after payment of the mortgages. In short, the Spouse's option to purchase is a practical, cost-effective mechanism that maximizes value for creditors while avoiding unnecessary litigation and expense.

### b.       IRA contribution option (Ohio Property and Maine Property Only)

If the Spouse does not elect to purchase the Ohio Property or the Maine Property, the Debtor may elect, within sixty (60) days after the Spouse's election period expires, to contribute an amount equal to the net equity value of his interest in that property (i.e., one-half of the equity above the mortgage balance) from his exempt IRA to the Plan. If the Debtor makes this contribution, he will retain his interest in the property free and clear of any Claims of creditors (subject only to the existing mortgage). If the Debtor does not make the IRA contribution, he will list the property for sale with a qualified real estate broker and use commercially reasonable efforts to sell it within twelve (12) months (subject to extension for market conditions). Proceeds from any such sale will be included in Plan Proceeds.

This combination of the Spouse's purchase option and the Debtor's IRA contribution right provides maximum flexibility while ensuring that the estate receives fair value for the Debtor's interests in the properties.

## C.       Liquid Assets – Merrill Lynch Accounts

The Debtor maintains several brokerage accounts at Merrill Lynch. These accounts are divided into two categories for purposes of the Plan: (1) non-retirement accounts that are pledged as collateral for the Bank of America Claim, and (2) the Debtor's individual retirement account (IRA), which is fully exempt and not property of the bankruptcy estate.

### 1.       Non-retirement Merrill Lynch Accounts (pledged to Bank of America)

The Debtor's primary non-retirement Merrill Lynch accounts (Account Nos. 636-14923, 636-23597, 636-24655, and 636-24683) had a combined value of approximately $29,522,265 as of March 31, 2026. These accounts are pledged as collateral for the Bank of America Claim. The Bank of America Claim (Class 5) is secured by a first-priority security interest in the accounts ending in -4923 and -3597 (part of Account No. 636-

14923). As of the Petition Date, the Bank of America Claim was approximately $18,115,776.59.

Under the Plan, the Debtor will monetize these non-retirement accounts in phases rather than all at once. Immediate full monetization would trigger substantial capital-gains tax liabilities on significant unrealized gains and could disrupt market pricing and the Debtor's liquidity needs for ongoing Plan payments and living expenses. The Debtor will rely on his professional advisors at Bank of America to assist in determining the appropriate phased monetization strategy, taking into account market conditions, tax consequences, and the need to preserve liquidity.

The Debtor will monetize these accounts over time in a commercially reasonable manner, with the entire monetization process to be completed no later than twenty-four (24) months after entry of a Final Order in the Huntington Litigation (subject to a possible one-year extension if approved by the Court for cause). Proceeds from any monetization will first be applied to pay the Bank of America Claim in full. Any remaining proceeds will be included in Plan Proceeds.

The Debtor may withdraw funds from these pledged accounts only to the extent permitted under the applicable loan documents with Bank of America. To the extent the loan documents allow, the Debtor may withdraw funds to cover obligations that must be paid under the Plan, including Administrative Expense Claims, Priority Claims, and other Plan obligations.

## 2.      Retirement account (IRA – fully Exempt)

The Debtor maintains an individual retirement account at Merrill Lynch (Account No. 636-39663) with a value of approximately $903,387.49 as of March 31, 2026. This IRA is fully Exempt under applicable law and is not property of the bankruptcy estate. Unless the Debtor voluntarily contributes a portion of the IRA to Plan Proceeds as part of a new-value contribution in exchange for retention of Non-Exempt Personal Assets, the IRA is not available for distribution to creditors and will not be used for that purpose.

## 3.      Orderly sale process and professional advice

The phased monetization of the Merrill Lynch accounts is a critical component of the Plan's means of implementation. The Debtor will proceed with the sale process in conjunction with advice from his investment advisors and tax professionals. This measured approach allows the Debtor to:

- Time sales to minimize capital-gains tax liabilities that would otherwise come due in a single tax year;

- Avoid disrupting market pricing for the large positions held in the accounts;

- Preserve liquidity necessary to fund ongoing Plan payments, living expenses, and anticipated tax obligations from other Asset sales; and

- Maximize net proceeds for the benefit of creditors by avoiding the need for a forced, rapid monetization that would likely result in lower realized values.

This orderly, professionally managed process stands in contrast to the rushed monetization that would occur in a Chapter 7 case, where a trustee would likely sell the accounts quickly and at distressed prices to satisfy immediate creditor demands. By taking the time to plan each monetization tranche with the benefit of professional advice, the Debtor expects to generate substantially higher net proceeds for the estate.

## D.    Operating Companies

The Debtor's Operating Companies are the entities in which he holds a 100% or majority ownership interest and exercises day-to-day management control. Many of these companies generate ongoing Company Draws that support the Debtor's Projected Disposable Income obligations under the Plan. The Operating Companies are being marketed and sold (or otherwise monetized) in a commercially reasonable, staggered manner pursuant to the Plan. This approach preserves going-concern value, maintains the flow of Company Draws during the five-year contribution period, and allows the Debtor to time dispositions to minimize tax consequences.

Several of the Operating Companies are subject to Company Debt Claims (guaranty or co-obligor obligations) that are treated in Classes 7 through 15 of the Plan as Fully Secured Company Debt Claims. Under the Plan's treatment, the Holders of those Claims must first liquidate the Company Collateral before seeking any deficiency from the Debtor personally, and any resulting deficiency is paid *pro rata* in the General Unsecured Creditor Class (Class 17). The Debtor expects these Claims to be satisfied in full from the Company Collateral.

The following subsections describe each Operating Company, its assets, operations, associated liens or Claims, and the Plan's disposition plans.

### 1.    Boston RD, LLC

**State of Formation**    MA

**Formation Date**    9/5/2008

**Ownership**    Debtor – 100%

**Assets and Liabilities**    Real estate located at 274 Southampton Street, Boston, Massachusetts 02118, leased under a ten-year triple-net lease entered in November 2024 to Boston Red Dog Pet Resort & Spa, LLC at an annual rent of $500,000, with a smaller portion leased to Boston Animal Hospital, LLC. The entity generates stable lease income and supports Company Draws to the Debtor. The real estate is worth approximately $9,600,000.00.

The real estate is subject to a mortgage to Rocklan in the amount of $6,160,681.00. *See* Claim No. 24

If the real estate is sold, after costs of sale estimated at 5%, the Debtor estimates that he would be entitled to approximately $2,959,319.00 before taxes.

**Other Information**  The Debtor has already explored the possibilities for sale of this building with a local broker (to be hired by the company) and continues to advance those efforts.

## 2.   Circle Development of Cincinnati, LLC

**State of Formation**  OH

**Formation Date**  6/29/2004

**Ownership**  Debtor – 100%

**Assets and Liabilities**  Real estate located at 5211 Madison Road, Cincinnati, Ohio 45227, which is presently vacant. The entity owns and operates the real estate but currently generates no lease income. The real estate is worth approximately $1,400,000.00.

The real estate is subject to a mortgage to First Federal Savings Bank in the amount of $937,500.00. See Claim No. 20.

If the real estate is sold, after costs of sale estimated at 5%, the Debtor estimates that he would be entitled to approximately $392,500.00 before taxes.

## 3.   Grasshopper Investments II, LLC

**State of Formation**  OH

**Formation Date**  4/12/2005

**Ownership**  Debtor – 100%

**Assets and Liabilities**  The entity owns real estate at 3220 & 3226 Omni Drive, Cincinnati, OH 45245 (operating Circle Storage of Eastgate, valued at $3,000,000) and vacant land at 9972 Reading Road, Cincinnati, OH 45241 (3 parcels with bad zoning). The Omni Drive property is subject to a first mortgage to First Merchants Bank. See Claim No. 8 ($37,725,186.13). The Debtor expects that if Grasshopper Investments II, LLC were liquidated, the First Merchants Claim would be paid in full from the Circle

Storage collateral (including this property), clearing any guaranty exposure consistent with the Fully Secured Company Debt Claim treatment in Class 9. If the real estate is sold, after costs of sale estimated at 5%, the Debtor estimates that he would be entitled to approximately $2,600,000 before taxes on the Omni Drive property (after mortgage). The Debtor does not have an estimate at this time for the value of the Reading Road property.

### 4.      Hyde Park Circle, LLC

**State of Formation**      OH

**Formation Date**      3/16/2005

**Ownership**      Debtor – 100%

**Assets and Liabilities**      The entity owns multiple parcels of real estate:

5207 Madison Road (3 parcels improved with a small retail center and the Red Dog pet resort, valued at $6,000,000), subject to a first mortgage to General Electric Credit Union in the amount of $2,900,000 (Claim No. 23). Leased to the acquirer of the Red Dog operating businesses under a 10-year lease entered November 15, 2024. Net equity after the mortgage and costs of sale estimated at 5% is approximately $2,800,000 before taxes.

4989 and 4991 Madison Road (valued at $1,100,000), with net equity of approximately $1,000,000 after costs of sale estimated at 5%.

4986 Oaklawn Drive (improved with a single-family home, valued at $350,000), subject to a first mortgage to Kemba Credit Union in the amount of $160,000 (Claim No. 4). Net equity after the mortgage and costs of sale estimated at 5% is approximately $175,000 before taxes.

Both the GECU and Kemba Claims are treated as Fully Secured Company Debt Claims in Classes 10 and 12, respectively. The Debtor expects these Claims to be paid in full from the Company Collateral, with any deficiency (if any) paid *pro rata* in Class 17.

**Other Information**      RD Realty I, LLC (formed January 8, 2007) is a wholly-owned subsidiary that was originally formed to develop the

Red Dog pet resort on property owned by Hyde Park Circle, LLC. No ground lease was ever entered into, and Hyde Park Circle, LLC developed the property and entered into the lease directly. As a result, RD Realty I, LLC has no assets. The Debtor contributed his 100% membership interest in RD Realty I, LLC to Hyde Park Circle, LLC in September 2025 to simplify accounting.

**5.  Madison Warehouse, LLC**

| | |
|---|---|
| **State of Formation** | OH |
| **Formation Date** | 3/1/2021 |
| **Ownership** | Debtor – 100% |
| **Assets and Liabilities** | The entity owns 100% of its subsidiary, 5027 and 5055 Madison Road, LLC, which owns and operates the real estate located at 5021 & 5055 Madison Road, Cincinnati, OH 45227 (valued at $3,500,000). The property generates lease income from two tenants (one lease expired April 2026; the other expires April 2027). The property is subject to a first mortgage to Heritage Bank in the amount of $2,152,000 (Claim No. 2). If the real estate is sold, after costs of sale estimated at 5%, the Debtor estimates that he would be entitled to approximately $1,173,000 before taxes (after mortgage). The Heritage Claim (Class 11) is treated as a Fully Secured Company Debt Claim. The Debtor expects the Heritage Claim to be paid in full from the Company Collateral, with any deficiency (if any) paid *pro rata* in Class 17. |
| **Other Information** | 5027 and 5055 Madison Road, LLC is a wholly-owned subsidiary that owns and operates the real estate at 5021 & 5055 Madison Road (the only operating asset). Madison Warehouse, LLC was formed on March 1, 2021, solely to hold the membership interest in the subsidiary. |

**6.  Mason Rd, LLC**

| | |
|---|---|
| **State of Formation** | OH |
| **Formation Date** | 1/31/2014 |
| **Ownership** | Debtor – 100% |

| | |
|---|---|
| **Assets and Liabilities** | The entity owns and operates the real estate located at 7036 Columbia Road, Maineville, OH 45039 (valued at $3,300,000). The property is leased to Mason Red Dog Pet Resort & Spa, LLC under a 10-year lease commencing November 15, 2024 (with one 3-year renewal option). The property is subject to a first mortgage to Civista Bank in the amount of $2,300,000 (Claim Nos. 13-17). If the real estate is sold, after costs of sale estimated at 5%, the Debtor estimates that he would be entitled to approximately $835,000 before taxes (after mortgage), assuming that Civista does not pursue this property under a cross-collateralization clause. The Civista Claims (Class 7) are treated as Fully Secured Company Debt Claims because the combined collateral value across all Civista properties exceeds the aggregate Claim amount. The Debtor expects these Claims to be paid in full from the Company Collateral, with any deficiency (if any) paid *pro rata* in Class 17. |

### 7.    North Shore RD, LLC

| | |
|---|---|
| **State of Formation** | MA |
| **Formation Date** | 10/28/2015 |
| **Ownership** | Debtor – 100% |
| **Assets and Liabilities** | The entity owns and operates the real estate located at 190 and 192 Walnut Street, Saugus, MA 01906 (valued at $8,000,000). The property is leased to North Shore Red Dog Pet Resort & Spa, LLC under a 10-year lease commencing November 15, 2024 (with one 3-year renewal option). The property is subject to a first mortgage to Rockland Trust in the amount of $3,100,000 (Claim No. 24), cross-collateralized with the Rockland loan on the Boston RD, LLC property. If the real estate is sold, after costs of sale estimated at 5%, the Debtor estimates that he would be entitled to approximately $4,500,000 before taxes (after mortgage), assuming that Rockland does not pursue this property under a cross-collateralization clause. The Rockland Claim (Class 13) is treated as a Fully Secured Company Debt Claim. The Debtor expects the Claim to be paid in full from the Company Collateral, with any deficiency (if any) paid *pro rata* in Class 17. |

**8.      Northern Kentucky Assisted Living, LLC & Northern Kentucky Retirement Community, LLC**

| | |
|---|---|
| **State of Formation** | KY |
| **Formation Date** | 1/12/2015 - Northern Kentucky Assisted Living, LLC<br>2/2/2015 - Northern Kentucky Retirement Community, LLC |
| **Ownership** | Northern Kentucky Assisted Living, LLC<br>Debtor – 100%<br><br>Northern Kentucky Retirement Community, LLC<br>Debtor – 85%<br>DSES, LLC – 15% (owned by two of the Debtor's children) |
| **Assets and Liabilities** | Northern Kentucky Assisted Living, LLC (NKAL) owns the real estate located at 800 Highland Avenue, Covington, KY 41011 (96 units), which is leased to its affiliate Northern Kentucky Retirement Community, LLC (NKRC). NKRC operates an independent living facility and personal care home on the property. The assets and operations combined have an approximate value of $8,500,000.00. The property is subject to a first mortgage to Civista Bank in the amount of $3,291,303 (Claim Nos. 13-17). Net equity after the mortgage and costs of sale estimated at 5% is $4,783,697 (85% to the Debtor: $4,066,142). The Civista Claims (Class 7) are treated as Fully Secured Company Debt Claims because the combined collateral value across all Civista properties exceeds the aggregate Claim amount. The Debtor expects these Claims to be paid in full from the Company Collateral, with any deficiency (if any) paid *pro rata* in Class 17. |
| **Other Information** | NKAL and NKRC are co-borrowers on the Civista loan, with Civista holding a lien on all tangible and intangible assets of NKRC. |

**9.      Schneider-Grasshopper, Inc.**

| | |
|---|---|
| **State of Formation** | OH |
| **Formation Date** | 10/6/2020 |
| **Ownership** | Debtor – 100%<br>Schneider-Grasshopper Inc. - 0.5% (2/400 shares)<br>Patricia B Schneider 2020 Gift Trust - 99% (396 shares) |

| | |
|---|---|
| **Assets and Liabilities** | This entity owns a 0.5% (2/400 shares) interest in Grasshopper Investments, LLC, which is further discussed below. The Debtor does not anticipate that his 1% interest in Grasshopper Investments, LLC (0.5% directly—see below—and 0.5% through Schnieder-Grasshopper, Inc.) holds much value based on a liquidation of the real estate. |

### 10.   The Red Corner, LLC

| | |
|---|---|
| **State of Formation** | OH |
| **Formation Date** | 5/3/2019 |
| **Ownership** | Debtor – 100% |
| **Assets and Liabilities** | The entity owns and operates the real estate located at 3500 Madison Park Ave in Cincinnati, a condominium development comprised of 19 townhome units (valued at $11,200,000). Construction was completed in 2022 and the units were leased until recently. As unit leases expires, the entity prepared to sell the individual units. The property is subject to a first mortgage to Civista Bank in the amount of $7,200,000 (Claim Nos. 13-17). Net equity after the mortgage and costs of sale estimated at 5% is approximately $3,440,000 before taxes, assuming there is no impact from cross collateralization. The Civista Claims (Class 7) are treated as Fully Secured Company Debt Claims because the combined collateral value across all Civista properties exceeds the aggregate Claim amount. The Debtor expects these Claims to be paid in full from the Company Collateral, with any deficiency (if any) paid *pro rata* in Class 17. |
| **Other Information** | In order to maximize the value of this asset, the Debtor undertook an effort to convert the units into condominium units, but has been unable to sell those units due to local conditions. It is now in the process of re-renting those units as apartments, so this building can be sold as an apartment/townhome complex as opposed to separate condominiums. |

### 11.   To Life III, LLC

| | |
|---|---|
| **State of Formation** | OH |
| **Formation Date** | 9/10/2009 |

| | |
|---|---|
| **Ownership** | Debtor – 100% |
| **Assets and Liabilities** | The entity owns two parcels of vacant land in Cincinnati, Ohio: Parcel No. 117-0003-0320-00 (auditor value $98,110) and Parcel No. 117-0004-0014-00 (auditor value $22,540). Previous attempts to liquidate the real estate have not been successful. Net equity is the full combined auditor value of approximately $120,650 (no mortgage or other liens). |

## E.      Investment Company Interests

The Debtor holds interests in a number of Investment Companies that fall into three primary categories. The first category consists of companies in which the Debtor has invested alongside his siblings; in these entities the Debtor holds only a minority interest and exercises no management control or day-to-day oversight. The second category consists of various companies in which the Debtor acquired small minority interests over the years as opportunities arose; these entities generate annual K-1 income but the Debtor has no ability to manage their operations or unilaterally cause a liquidation or sale. The final category are companies that the Debtor owns a small percentage of but holds management authority. For all of these companies, the Debtor will use his best efforts to monetize these interests through an orderly sale or other disposition that maximizes value for the estate. The net proceeds from these transactions will constitute Investment Company Sale Proceeds under the Plan. Additional information about these Investment Companies is as follows:

### 1.      5150 East Galbraith Road, LLC

| | |
|---|---|
| **State of Formation** | OH |
| **Formation Date** | 3/16/2005 |
| **Ownership** | Debtor - 1/3<br>Henry Schneider - 1/3<br>Thomas Zemboch - 1/3 |
| **Assets and Liabilities** | Real estate located at 5150 East Galbraith Road, Cincinnati, Ohio 45236, which is an office building with an approximate value of $2,500,000.00.<br><br>The real estate is subject to a mortgage to Stock Yards in the amount of $1,201,222.30. *See* Claim No. 22<br><br>If the real estate is sold, after costs of sale estimated at 6%, the Debtor estimates that he would be entitled to approximately $380,000.00. |

| | |
|---|---|
| **Other Information** | This entity is managed by the Debtor's brother, Henry Schneider. If the entity is not interested in selling the real estate, the Debtor will use best efforts to sell his minority interest on commercially reasonable terms, subject to any applicable right-of-first-refusal or governance restrictions. |

### 2.   Corporate Park Investors, Ltd

| | |
|---|---|
| **State of Formation** | OH |
| **Formation Date** | 1/28/1997 |
| **Ownership** | Debtor - 5.5%<br>Multiple other owners |
| **Assets and Liabilities** | This entity owns and manages two office buildings. The Debtor does not have information at present regarding the value of assets and liabilities of this entity. |
| **Other Information** | The Debtor does not manage this entity. In 2023 and 2024 the Debtor reported K-1 income in the amount of $5,393.00 and $14,406.00, respectively. The Debtor will continue to receive distributions from this company that is treated as Investment Income under the Plan. The Debtor will use best efforts to sell his minority interest on commercially reasonable terms, subject to any applicable right-of-first-refusal or governance restrictions. The Debtor will obtain current valuation information as part of the orderly sale process under the Plan. |

### 3.   Executive Park Investors, Ltd

| | |
|---|---|
| **State of Formation** | OH |
| **Formation Date** | 8/30/1994 |
| **Ownership** | Debtor – 5.0%<br>Multiple other owners |
| **Assets and Liabilities** | This entity owns and manages an office building. The Debtor does not have information at present regarding the value of assets and liabilities of this entity. |
| **Other Information** | The Debtor does not manage this entity. In 2023 and 2024 the Debtor reported K-1 income in the amount of $29,580.00 and $21,774.00, respectively. The Debtor will continue to receive |

distributions from this company that is treated as Investment Income under the Plan. The Debtor will use best efforts to sell his minority interest on commercially reasonable terms, subject to any applicable right-of-first-refusal or governance restrictions. The Debtor will obtain current valuation information as part of the orderly sale process under the Plan.

**4.    Glidden House Partners, Ltd**

| | |
|---|---|
| **State of Formation** | OH |
| **Formation Date** | 6/21/1995 |
| **Ownership** | Debtor – 3.5634%<br>Multiple other owners |
| **Assets and Liabilities** | This entity owns and manages real estate. The Debtor does not have information at present regarding the value of assets and liabilities of this entity. |
| **Other Information** | The Debtor does not manage this entity. In 2024 the Debtor reported K-1 income in the amount of $19,764.00. The Debtor will continue to receive distributions from this company that is treated as Investment Income under the Plan. The Debtor will use best efforts to sell his minority interest on commercially reasonable terms, subject to any applicable right-of-first-refusal or governance restrictions. The Debtor will obtain current valuation information as part of the orderly sale process under the Plan. |

**5.    Grasshopper Investments, LLC**

| | |
|---|---|
| **State of Formation** | OH |
| **Formation Date** | 4/3/2021 |
| **Ownership** | Ray Schneider - 0.5% (2/400 shares)<br>Schneider-Grasshopper Inc. - 0.5% (2/400 shares)<br>Patricia B Schneider 2020 Gift Trust - 99% (396 shares) |
| **Assets and Liabilities** | This entity owns a 100% interest in Circle Storage Operating Company I, LLC. That subsidiary, in turn, owns nine storage facility locations with an approximate value of $40,000,000.00. |

The real estate is subject to multiple mortgages to First Merchants in relation to the First Merchants Business Loan Claim in the total amount of $37,725,186.13. *See* Claim No. 8.

At a $40M valuation, the Debtor does not anticipate that his 1% interest in this entity (0.5% directly and 0.5% through Schnieder-Grasshopper, Inc.) holds much value based on a liquidation of the real estate. At a higher valuation, there may be a small value to liquidation to the Debtor. The interest of the Debtor also has management authority, which may be more valuable in a co-owner sale of the interests. The transfer of the majority of the interests in this entity from the Debtor to his Spouse, who then transferred it to the Patricia B. Schneider 2020 Gift Trust may be the subject of an avoidance action as described elsewhere in this Disclosure Statement. Notwithstanding the foregoing, the liquidation of this company to pay the full amount of the First Merchants Business Loan Claim would also release collateral that First Merchants holds in Grasshopper Investments II, LLC, and create value for the Debtor's estate in that company.

| | |
|---|---|
| **Other Information** | The Debtor will use best efforts to sell his minority interest on commercially reasonable terms. It is not anticipated that the entity will sell its assets. The Debtor will obtain current valuation information as part of the orderly sale process under the Plan. |

### 6.     Hamilton II, LLC

| | |
|---|---|
| **State of Formation** | OH |
| **Formation Date** | 11/9/1999 |
| **Ownership** | Debtor – 6.0%<br>Multiple other owners |
| **Assets and Liabilities** | This entity owns and manages a shopping center. The Debtor does not have information at present regarding the value of assets and liabilities of this entity. |
| **Other Information** | The Debtor does not manage this entity. In 2023 and 2024 the Debtor reported K-1 income in the amount of $29,731.00 and $32,080.00, respectively. The Debtor will continue to receive distributions from this company that is treated as Investment Income under the Plan. The Debtor will use best efforts to sell |

his minority interest on commercially reasonable terms, subject to any applicable right-of-first-refusal or governance restrictions. The Debtor will obtain current valuation information as part of the orderly sale process under the Plan.

**7.      HRM Realty Holdings, Ltd**

| | |
|---|---|
| **State of Formation** | OH |
| **Formation Date** | 1/15/1998 |
| **Ownership** | Debtor - 1/3<br>Henry Schneider - 1/3<br>Marilyn Zembach - 1/3 |
| **Assets and Liabilities** | This entity only owns the membership interests in Horizon Health Management, LLC, and Horizon Health Management II, LLC, both Ohio limited liability companies. Those entities are involved in one or more lawsuits and have not been closed for that reason. The Debtor does not anticipate any recovery from this entity. |
| **Other Information** | This entity is managed by the Debtor's brother, Henry Schneider. |

**8.      KPT7 Holding Company, LLC**

| | |
|---|---|
| **State of Formation** | OH |
| **Formation Date** | 10/22/2024 |
| **Ownership** | Ray Schneider – 0.01%<br>Patricia B. Schneider 2020 Gift Trust – 64.99%<br>Eric Schneider – 35% |
| **Assets and Liabilities** | This entity was formed during a reorganization of certain entities in 2024 at the time of the sale of the various Red Dog operating entities. *See* SOFA No. 18. In addition, the entity purchased a 100% interest from the Debtor in Techwoods Circle RD, LLC on February 6, 2025 for $324,771.99. The entity owns 100% interests in Boston Animal Hospital, LLC, and North Station Animal Hospital, LLC, two entities that the Debtor does not believe have any value due to operational difficulties. Finally, as a part of the Red Dog transactions, this entity became a 31.6% owner in Kindred Pet Services, LLC, |

which now owns 100% of Red Dog Operations Holding Company, LLC.

Due to his interest being so small, the Debtor has not undertaken a valuation of this entity. He does not believe that there is value to his interest other than to a co-owner due to the management authority that accompanies the Debtor's interest. The 2020 transfers of the Red Dog companies to the Debtor's Spouse, who then transferred it to the Patricia B. Schneider 2020 Gift Trust, and then the sale of the Techwoods Circle RD, LLC, entity may be the subject of avoidance actions as described elsewhere in this Disclosure Statement.

**Other Information**   The Debtor will use best efforts to sell his minority interest on commercially reasonable terms or to have the entity liquidate its assets if the Debtor would receive a benefit from it. The Debtor will obtain current valuation information as part of the orderly sale process under the Plan.

## 9.      Montclair Investors, Ltd

**State of Formation**   OH

**Formation Date**   1/9/1996

**Ownership**   Debtor – 5.0%
Multiple other owners

**Assets and Liabilities**   This entity owns and manages three parcels of real estate with an approximate value of $3 million, but subject to approximately $2.5 million in liens. After accounting for costs of sale, the Debtor believes his interest may be worth $15,000–$20,000.00 at a liquidation value. A sale to another co-owner may bring more value based on annual distributions.

**Other Information**   The Debtor does not manage this entity. In 2023 and 2024 the Debtor reported K-1 income in the amount of $15,210.00 and $24,772.00, respectively. The Debtor will continue to receive distributions from this company that is treated as Investment Income under the Plan. The Debtor will use best efforts to sell his minority interest on commercially reasonable terms, subject to any applicable right-of-first-refusal or governance restrictions. The Debtor will obtain current valuation information as part of the orderly sale process under the Plan.

**10.     TheCard, LLC**

**State of Formation**     DE

**Formation Date**     7/2/2013

**Ownership**     Debtor – 2.32%
Multiple other owners

**Assets,  Liabilities  &
Other Information**     The Debtor does not have any current information about this
company's assets and liabilities. He invested in the company
in 2015 and does not believe the company has had any activity
in the last three years. The Debtor has received K-1s showing
losses. This interest has no value.

**11.     To Life, Ltd**

**State of Formation**     OH

**Formation Date**     6/23/1996

**Ownership**     Debtor - 80 Class A (8.42%)
Raymond Schneider 2019 Gift Trust - 720 Class B shares
Eric Schneider - 45 Class B shares + 5 Class A
Justin Schneider - 45 Class B shares + 5 Class A
Danielle Schneider - 45 Class B shares + 5 Class A

**Assets and Liabilities**     This entity owns The Red Apartments located at 5110
Herringbone Drive, Cincinnati, Ohio 45227. The property is
valued at approximately $65,000,000 and is subject to the
mortgage in favor of Transamerica Life Insurance Company
with a balance of approximately $42,000,000.00. The Debtor
has hired an appraiser to value his 8.42% membership interest
and will supplement this Disclosure Statement with that
information when available.

This entity was originally capitalized with a single class of
membership interest, 80% of which was owned by the Debtor
with remaining 20% owned by his wife and three children. In
2019, as part of a process recommended by estate planning
counsel, To Life Ltd was recapitalized into two classes of
membership interest, with most of the value of the company
allocated to the Class-B interest. Each of the members owns
the same relative proportions of Class-A and Class-B
interests. On December 31, 2019, the Debtor, as part of his
estate plan, gifted his Class-B membership interest to the

Raymond Schneider 2019 Gift Trust. The 2019 transfers of the this company to the Debtor's trust may be the subject of an avoidance action as described elsewhere in this Disclosure Statement.

| | |
|---|---|
| **Other Information** | The Debtor will use best efforts to sell his minority interest on commercially reasonable terms; it is not anticipated that the entity will sell its assets. The Debtor will obtain current valuation information as part of the orderly sale process under the Plan. |

### 12. Topco America, LLC dba Range USA

| | |
|---|---|
| **State of Formation** | DE |
| **Formation Date** | 4/2/2014 |
| **Ownership** | Debtor – 0.48% Multiple other owners |
| **Assets and Liabilities** | This entity owns and manages various shooting ranges throughout the country. The Debtor was an early investor but only holds a small interest. Based on information available to the Debtor, there would likely be a market to sell the Debtor's interest to a co-owner or back to the company for approximately $250,000.00. |
| **Other Information** | The Debtor will use best efforts to sell his minority interest on commercially reasonable terms, subject to any applicable right-of-first-refusal or governance restrictions. The Debtor will obtain current valuation information as part of the orderly sale process under the Plan. |

### 13. Waldorf Partners, LP

| | |
|---|---|
| **State of Formation** | OH |
| **Formation Date** | 6/21/1995 |
| **Ownership** | Debtor – 6.25% Multiple other owners |
| **Assets and Liabilities** | This entity owns and manages real estate. The Debtor does not have information at present regarding the value of assets and liabilities of this entity. |

| | |
|---|---|
| **Other Information** | The Debtor does not manage this entity. In 2024 the Debtor reported K-1 income in the amount of $5,075.00. The Debtor will continue to receive distributions from this company that is treated as Investment Income under the Plan. The Debtor will use best efforts to sell his minority interest on commercially reasonable terms, subject to any applicable right-of-first-refusal or governance restrictions. The Debtor will obtain current valuation information as part of the orderly sale process under the Plan. |

## F.    Closed or Inactive Entities

The Debtor previously formed or acquired interests in a number of entities that are now closed or inactive. The entities listed below fall into three categories: (1) entities that were dissolved after their business purpose ended and they no longer held any assets; (2) entities that remain inactive because they are no longer used for any purpose and therefore hold no assets and have no liquidation value; and (3) certain entities that were previously owned jointly by the Debtor and Sosna. The Debtor does not fully control the Sosna-related entities, and some may remain open because of implications arising from the Huntington Litigation, including potential derivative claims.

To the best of the Debtor's knowledge, none of the entities listed in this section have any ongoing operations or any liquidation value available to the estate. After the dismissal of the First Case, the Debtor undertook an effort to dissolve most inactive and unused entities, which is reflected in the more recent dissolution dates listed below. Even if not dissolved, these entities are inactive.

The following table sets forth the relevant information for each closed or inactive entity, including the state of formation, dates of formation and dissolution (where applicable), and the Debtor's ownership interest at the time of closure or as of the Petition Date. Entities that have been closed for more than six years have not been included.

| Company Name | State of Formation | Formation Date | Dissolution Date | Ownership |
|---|---|---|---|---|
| 54 Realty, Ltd | OH | 11/25/1997 | | Debtor - 50%<br>Sosna - 50% |
| 72 Ventures, Ltd | OH | 11/25/1997 | | Debtor - 50%<br>Sosna - 50% |
| Atlanta RDPR, LLC | GA | 6/4/2019 | 2/20/2023 | Debtor - 100% |
| Atlanta Red Dog Pet Resort & Spa, LLC | GA | 6/4/2019 | 7/15/2024 | Debtor - 100% |
| Boston Pet Rehabilitation Center, LLC | MA | 4/11/2022 | 12/31/2024 | Debtor - 100% |
| Boston Self Storage, LLC | MA | 5/13/2015 | 6/30/2021 | Debtor - 100% |
| Circle Health Care Operating Co. I, LLC | OH | 3/28/2021 | 3/15/2024 | Debtor - 100% |

| Company Name | State of Formation | Formation Date | Dissolution Date | Ownership |
|---|---|---|---|---|
| Circle Health Care Operating Co. II, LLC | OH | 3/28/2021 | 3/15/2024 | Debtor - 100% |
| Circle Health Care Operating Co. III, LLC | OH | 3/28/2021 | 3/15/2024 | Debtor - 100% |
| Circle Health Care Operating Co. IV, LLC | OH | 3/28/2021 | 3/15/2024 | Debtor - 100% |
| Circle Health Care Operating Co. V, LLC | OH | 3/28/2021 | 3/15/2024 | Debtor - 100% |
| Circle Health Care Operating Co. VI, LLC | OH | 3/28/2021 | 3/15/2024 | Debtor - 100% |
| Circle Health Care Real Estate Acquisition Co., LLC | OH | 3/29/2021 | 3/15/2024 | Debtor - 100% |
| Circle Home Theater, LLC | OH | 2/26/2004 | | Debtor - 100% |
| Dana Ventures, Ltd | OH | 3/29/1998 | 6/19/2024 | Debtor - 100% |
| East Galbraith Health Care Center, Inc. | OH | 3/30/1997 | | Debtor - 1/3 Henry Schneider - 1/3 Marilyn Zamboch - 1/3 |
| Euclid Health Care, Inc. | OH | 11/26/2003 | | Debtor - 50% Sosna - 50% |
| Framingham RD, LLC | MA | 2/12/2020 | 12/29/2023 | Debtor - 100% |
| Framingham Red Dog Pet Resort & Spa, LLC | MA | 2/12/2020 | 12/29/2023 | Debtor - 100% |
| Harmony Health Care, Inc. | OH | 12/23/1996 | 10/17/2003 | Debtor - 100% |
| IF2, Ltd | OH | 4/27/1998 | | Debtor - 100% |
| JDE Holdings, LLC | OH | 6/26/2014 | 9/4/2025 | Debtor - 100% |
| Keller Road Realty Co., LLC | OH | 9/24/1998 | | Debtor - 50% Sosna - 50% |
| Kenwood Terrace Health Care Center, Inc. | OH | 4/24/2002 | | Debtor - 50% Sosna - 50% |
| Loveland Rd Realty, LLC | OH | 10/17/2018 | | Debtor - 100% |
| Loveland Rd, LLC | OH | 9/10/2012 | | Debtor - 100% |
| Loveland Red Dog Pet Resort & Spa, LLC | OH | 9/10/2012 | 3/31/2025 | Debtor - 100% |
| Monarch Rd, LLC | OH | 1/31/2016 | 4/7/2025 | Debtor - 100% |
| R & T Development, LLC | OH | 2/18/1987 | | Debtor - 100% |
| Red Cup Espresso, LLC | OH | 2/20/2020 | 3/31/2025 | Debtor - 100% |
| RH Real Estate Investments, LLC | OH | 5/22/2008 | | Debtor - 50% Henry Schneider Trust - 50% |

| Company Name | State of Formation | Formation Date | Dissolution Date | Ownership |
|---|---|---|---|---|
| Seminole Avenue Realty, LLC | OH | 8/18/2016 | | Debtor - 50% Sosna - 50% |
| Shaya B, LLC | OH | 12/30/2020 | 3/31/2025 | Debtor - 100% |
| Skipton Kennel and Pet Center | MA | 5/1/1989 | 12/31/2024 | Debtor - 100% |
| Soft Pouch Equipment, LLC | OH | 5/12/1999 | 3/31/2025 | Debtor - 100% |
| Southbrook Health Care Center, Inc. | OH | 5/1/2002 | | Debtor - 50% Sosna - 50% |
| Steigler Road Realty, LLC | OH | 8/18/2003 | | Debtor - 50% Sosna - 50% |
| Sterling Glen Health Center, Ltd | OH | 8/12/1996 | 3/31/2025 | Debtor - 100% |
| Sterling Manor, Ltd | OH | 8/11/1996 | 3/31/2025 | Debtor - 100% |
| The Blue Development Company, LLC (Original)[3] | OH | 10/18/2023 | 7/3/2024 | Debtor - 100% |
| The Cambridge Health Care Center, Ltd | OH | 6/23/1996 | 3/31/2025 | Debtor - 100% |
| The Gatherings of Blue Ash, LLC | OH | 6/7/2021 | | Debtor - 100% |
| The Red at Madison Circle, LLC | OH | 7/14/2016 | | Debtor - 100% |
| The Red Kitchen, LLC | OH | 5/21/2018 | 3/31/2025 | Debtor - 100% |

As to The Gatherings of Blue Ash, LLC, it was previously one of the Debtor's Operating Companies. On April 15, 2026, it sold its sole remaining asset—the real property located at 10627 Techwood Circle, Cincinnati, Ohio 45242—to unrelated third-party Crossroads East, LLC, for a total purchase price of $1,900,000 (allocated $1,750,000 to the real estate and $150,000 to the contents). At closing, Heritage Bank received $1,271,717.33 in full satisfaction of its Claim (Claim No. 3). The Debtor will provide additional details regarding this transaction in the upcoming monthly operating report.

**G.     Other personal property and exemptions**

The Debtor owns various items of personal property. These Assets are modest in comparison to the Debtor's other holdings and consist primarily of vehicles, household goods, collectibles, clothing, and personal effects. The table below summarizes these Assets, their scheduled values, the exemptions claimed on Schedule C, and the resulting net value available to the estate.

---

[3] Despite the similar name, this is a different entity from The Blue Development Company, LLC fka 9617 Kenwood Road Development, LLC

**Personal Property Summary**

| Asset Description | Asset Value | Exemption Amount | Net Value to Estate |
|---|---|---|---|
| Vehicles (Airstream, BMWs, Ford T-Bird, Tesla, VW Kitcar, VW Kombi, Wolf scooter) | $ 74,374.00 | $    5,025.00 (Tesla only) | $  69,349.00 |
| Household Goods – Tiffany Ridge | $ 10,000.00 | $ 10,000.00 | $         0.00 |
| Household Goods – Chamonix | $   5,000.00 | $   5,000.00 | $         0.00 |
| Household Goods – Fort Lane | $ 25,000.00 | $ 25,000.00 | $         0.00 |
| Collectibles (pictures, CDs, books, paintings, wall hangings) | $ 10,000.00 | $       850.00 | $    9,150.00 |
| Wearing Apparel | $   1,000.00 | $   1,000.00 | $         0.00 |
| Misc. Men's Accessories | $   1,500.00 | $   1,500.00 | $         0.00 |
| 2 Domestic Dogs | $         0.00 | $         0.00 | $         0.00 |
| **Total** | **$ 126,874.00** | **$  48,375.00** | **$  78,499.00** |

The values above are taken from the Debtor's Schedules of Assets and Liabilities (Official Form 106A/B) filed in this Case. The exemption amounts are taken from Schedule C. The Debtor has claimed the maximum available exemptions under Ohio law for household goods, clothing, and certain other personal property. This does not include the Debtor's checking and savings accounts as of the Petition Date; all cash was moved into the Debtor's DIP accounts.

**H.     Valuation and Retention of Personal Property**

The Plan provides that, to the extent any dispute arises regarding the value of the Debtor's Non-Exempt Personal Assets, the Court may determine such value upon motion by any Holder of an Allowed Claim in Class 16 (Huntington General Unsecured Claim) or Class 17 (General Unsecured Claims). Any such motion must be filed within sixty (60) days after the Effective Date.

In addition, the Plan permits the Debtor to contribute value from his Exempt Social Security Income or IRA to the Plan in exchange for retaining his Non-Exempt Personal Assets. Specifically, in exchange for the Debtor's commitment to contribute $3,636.70 per month of his Social Security Income to the Plan for the five-year period, the Debtor will retain all Non-Exempt Personal Assets free and clear of any Claims of creditors. To the extent the Court determines that the value of those Non-Exempt Personal Assets exceeds the value of the Social Security Income to be contributed, the Debtor may contribute additional funds from his Exempt IRA. This mechanism allows the Debtor to retain modest personal property that has sentimental or practical value without forcing a sale that would generate little net benefit to creditors after exemptions and costs.

### I.     Social Security contribution vs. Net Estate Value

The Debtor's Projected Disposable Income includes a commitment to contribute $3,636.70 per month of his Social Security income to the Plan for five years. This totals $218,202.00 over the life of the Plan. The Debtor anticipates regular cost-of-living increases (COLA) on his Social Security benefit, which will also be contributed to the Plan over time, further increasing the total contribution.

| Description | Amount | |
|---|---|---|
| Monthly Social Security Contribution | $ | 3,636.70 |
| Total over 5 Years (60 months) | $ | 218,202.00 |
| Net Estate Value of All Personal Property | $ | 78,499.00 |
| Excess Exempt Contributions | $ | 139,703.00 |

The total Social Security Income contribution far exceeds the net estate value of the Debtor's personal property after exemptions. This demonstrates that the Debtor is providing substantial new value to the estate in exchange for retaining these modest personal Assets, consistent with the fresh-start policy of the Bankruptcy Code.

### J.     Co-ownership with Spouse

Certain of the Debtor's personal property items (including household goods located at the various properties) are co-owned with the Debtor's Spouse. Any valuation of these Assets for purposes of the Plan or any dispute regarding value must take into account the Spouse's ownership interest. The Debtor does not claim sole ownership of these co-owned Assets, and the net value to the estate reflected in the table above already reflects only the Debtor's interest after accounting for the Spouse's co-ownership, where applicable.

### K.     Entity Loans

The Plan defines "Entity Loan" to mean any loan, advance, receivable, or other obligation owed to the Debtor by any Operating Company, Investment Company, Inactive Company, or other entity in which the Debtor holds a direct or indirect ownership interest, whether or not evidenced by a promissory note. As of the Effective Date, the Debtor is owed two Entity Loans: $952,542.09 owed by The Blue Development Company, LLC (which is separate from The Blue Promissory Note) and $250,000 owed by Circle Development of Cincinnati, LLC.[4] Since the filing of this Case, the Debtor has directed the company controller for his various entities to conduct a comprehensive review of all intercompany records to confirm the completeness of the Debtor's receivables from these entities. Based on that review, the Debtor believes these are the only Entity Loans currently outstanding. Under the Plan, the Debtor must use commercially reasonable efforts

---

[4] As stated in the Global Notes preceding the Debtor's Schedules, the Debtor's companies were completing a bookkeeping and accounting review of transactions with the Debtor at the time the case was filed, which was made necessary as a result of prior controllers not correctly classifying certain transactions. The current controller has recently completed that analysis and there will be amendments to the Schedules to correspond with those findings.

to collect all net amounts due on any Entity Loan after taking into account any amounts the Debtor owes to the same entity. If the disposition of an entity's assets under the Plan would result in the Debtor receiving the amounts owed on an Entity Loan (whether through direct repayment or as part of a final equity distribution), the Debtor is not required to take separate collection action. If the Debtor has not taken commercially reasonable collection action on any Entity Loan within twenty-four (24) months after the Effective Date, any party in interest may move the Bankruptcy Court for an order transferring all rights to collect that Entity Loan to the Retained Actions Representative. All net amounts collected on Entity Loans will constitute Plan Proceeds and will be distributed to Holders of Allowed Claims in accordance with Article 4 of the Plan.

**L.      Collection of The Blue Promissory Note**

The Blue Promissory Note was made by the Raymond Schneider 2019 Gift Trust and granted to the Debtor on September 1, 2024. The Blue Promissory Note was for a face amount of $1,485,000.00 plus interest at five percent (5%) per annum with the full balance due on The Blue Promissory Note Maturity Date in the amount of $1,633,500.00 if no payments are made in the interim. The Blue Promissory Note was granted in exchange for the Debtor's 100% interest in The Blue Development Company, LLC. The Blue Promissory Note is a Non-Exempt Asset. The Plan provides that the Debtor will use commercially reasonable efforts to collect all amounts due under The Blue Promissory Note, including demanding and receiving payment in full on The Blue Promissory Note Maturity Date if the note has not been paid earlier. All amounts collected under The Blue Promissory Note—whether paid in installments, in a lump sum at maturity, or otherwise—will constitute Plan Proceeds and will be distributed to holders of Allowed Claims under the Plan. The Debtor will report the status of the Blue Promissory Note, including any collections received, in the Quarterly Reports required by this Plan. Nothing in the Plan removes from the Retained Actions any possible claim to be pursued by the Retained Actions Representative in relation to the transactions that gave rise to the issuance of The Blue Promissory Note.

**M.      Method of valuation**

The values set forth in this Disclosure Statement for the Debtor's Assets are based on the Debtor's best efforts and professional judgment, developed over decades of experience in real estate, business ownership, and investment management. Except where specifically noted, the Debtor has not obtained independent professional appraisals of his Assets for purposes of this Disclosure Statement.

For real property, the Debtor has used tax-assessed values from the applicable county auditors which the Debtor believes reflect accurate market values. For personal property, values are based on the Debtor's best estimate of current market value given the age, quality, and condition of the Assets (for example, using kbb.com for vehicles where available). For the Debtor's interests in Operating Companies and Investment Companies where he has management control, values are estimated based on the approximate value of each company's assets minus its known liabilities. For entities in which the Debtor is a passive investor without management control, values have been listed only where the Debtor has direct knowledge or was able to obtain reliable information in time for inclusion in the Schedules and this Disclosure Statement. Many of these interests remain listed as "unknown" pending further information.

The Debtor has made every reasonable effort to provide accurate and good-faith estimates of value. However, the actual net proceeds ultimately realized from the sale or monetization of these Assets will depend on prevailing market conditions, the timing of each sale, the quality of marketing and professional advice obtained, and the specific terms negotiated with buyers. Because of these variables, it is not possible at this time to predict with certainty the final amount that will be available for distribution to creditors under the Plan. That is precisely why the Plan provides that all Net Plan Proceeds—whatever amount is actually recovered from the orderly disposition of the Debtor's assets—will be distributed to creditors in accordance with the priorities and treatment set forth in the Plan.

In addition, the estimates of value set forth in this Disclosure Statement do not take into account the costs of sale that will be incurred in connection with the disposition of various Assets. These costs may include real estate broker commissions, investment account advisor fees, appraisal fees, title company charges, legal fees, marketing expenses, and other transaction-related costs. The actual net recovery to the estate will be reduced by these expenses, which will be paid in the ordinary course as part of the implementation of the Plan.

The Debtor believes that the phased, professionally managed sale process contemplated by the Plan—rather than a rushed or forced disposition—will maximize the net value ultimately delivered to creditors, even after accounting for these costs and market variables.

## VI.    The Huntington Litigation and Its Impact on the Plan

The Huntington Litigation represents the most significant potential Assets of the estate. As described more fully at the start of this Disclosure Statement, the Debtor commenced the Huntington Litigation in 2023 against Huntington and certain of its current and former employees. The action asserts claims for breach of good faith and ordinary care, Ohio civil RICO, and civil liability for criminal acts arising from Huntington's conduct in connection with the Premier loan transaction. The claims have survived motions to dismiss and for summary judgment and are proceeding through discovery toward trial, currently anticipated in early 2027. The Debtor believes the claims are meritorious and intends to prosecute them vigorously for the benefit of the estate and all creditors.

### A.    Withholding of distributions to Huntington pending final resolution

The Plan creates separate classes for the Huntington Claim: Class 6 (Huntington Secured Claim) and Class 16 (Huntington General Unsecured Claim). Under the Plan, the Debtor will make no distributions to Huntington on account of either the Huntington Secured Claim or the Huntington General Unsecured Claim until the Huntington Litigation is finally resolved. The Debtor anticipates asserting a massive set-off against the Huntington Claim based on the claims asserted in the Huntington Litigation. If the Debtor is successful in the Huntington Litigation, Debtor would not owe Huntington anything and it is entirely possible that Huntington would owe Debtor. In these circumstances, it would serve no useful purpose—and would actually harm the estate and other creditors—to begin making distributions to Huntington from Net Plan Proceeds only to have those payments subject to being clawed back or offset within the first Plan year once the Huntington Litigation concludes with finality. While withholding distributions may result in the accrual of some additional interest on the Huntington Claim during the pendency of the Litigation,

this approach is appropriate and in the best interests of all stakeholders. In addition, withholding distributions avoids the need to monetize additional Assets while the question of whether Huntington is owed any net amount remains undetermined. The Plan therefore preserves the Huntington Litigation for the benefit of the estate and defers any distributions to Huntington until the outcome is known with finality.

## B.      Ongoing Administrative Expenses related to the Huntington Litigation

The Debtor will continue to incur, and the estate will continue to pay as Administrative Expense Claims in the ordinary course, the professional fees and expenses associated with the prosecution of the Huntington Litigation and the defense of any related claims. These professionals include litigation counsel (Cummins, Robinson) and bankruptcy counsel (ASNA). The continued prosecution of the Huntington Litigation is a critical component of the Plan's means of implementation. The value of the potential recovery in the Huntington Litigation far exceeds the amount of the fees and expenses that will be incurred in pursuing it. These expenditures are necessary and reasonable to preserve and realize the substantial upside potential that the Huntington Litigation represents for the estate and all creditors. The vigorous prosecution of these claims therefore represents a sound investment of estate resources that is expected to generate a significant net benefit to creditors after payment of the associated costs. Payment of these Administrative Expense Claims in the ordinary course will not impair the Debtor's ability to make the distributions contemplated under the Plan or to complete the orderly disposition of Non-Exempt Assets.

## C.      Anticipated objection to Huntington Claim

The Debtor anticipates filing an objection to the Huntington Claim after conducting appropriate discovery under Rule 2004. The Debtor believes that the Huntington Claim may be, at least in part, objectionable based on the commercially unreasonable manner in which Huntington liquidated collateral securing its loan and on Huntington's failure to apply the liquidation proceeds to reduce the outstanding loan balance. Despite six years of litigation and numerous discovery requests from the Debtor, Huntington has not yet been required to provide a full accounting of its judgment and the application of liquidation proceeds to its debt. Based on information currently available to the Debtor, it appears that Huntington's actions in acting in a commercially unreasonable manner have grossly inflated its damages.

Recent discovery reinforces the need for further investigation. After the deposition of Huntington's president, Huntington produced nearly 1,400 documents that had never been produced despite multiple earlier requests. The Debtor believes additional relevant records remain outstanding. The Debtor will therefore conduct targeted discovery against Huntington on the current loan balance, Huntington's accounting for the loan and all collateral, the full disposition of every piece of collateral, and the reasonableness of the more than $5 million in attorneys' fees Huntington has included in its Claim.

The Debtor will file and prosecute the Claim objection in due course. This will allow the Court to determine the allowed amount of Huntington's Claim for distribution purposes under the Plan and will protect the estate from paying any portion of a Claim that rests on losses Huntington itself created or allowed. The objection will complement the existing treatment of the Huntington Claim

in Classes 6 and 16 and the rights preserved in the Huntington Litigation and Huntington Retained Actions.

## VII.   Retained Actions and Potential Chapter 5 Claims

The Plan provides for the appointment of a Retained Actions Representative to handle the prosecution or settlement of certain potential avoidance and Chapter 5 claims that may exist against insiders or other parties. Huntington has repeatedly raised the concept that the Debtor will not pursue claims against insiders that may be the subject of fraudulent transfer actions. The appointment of an independent Retained Actions Representative ensures that the insider status of any potential target of a Chapter 5 action does not affect the impartial and vigorous disposition or resolution of that claim for the benefit of all creditors. At the same time, the Huntington Litigation and the Huntington Retained Actions remain with the Debtor. This structure ensures those actions are properly pursued given the Debtor's ongoing expertise in the Huntington Litigation developed over many years of working on that case. Allowing the Debtor to maintain control over those claims will also prevent Huntington from attempting to settle with somebody who is not the Debtor for a reduced price when the Debtor sees a massive potential upside in the Huntington Litigation. In the First Case, Huntington submitted its own competing plan of liquidation in which it proposed to settle the Huntington Litigation for a meager $100,000.00. The Debtor believes his claims in the Huntington Litigation may exceed $200 million. Having the Debtor maintain control of the Huntington Litigation ensures that Huntington cannot seek to settle at a massive discount.

The provisions below detail the appointment, scope, and mechanics of the Retained Actions Representative and preserve the Debtor's rights until the Effective Date.

### A.      Appointment of Retained Actions Representative

The Debtor will seek Court approval of the appointment of a Retained Actions Representative to represent the estate with respect to the Retained Actions. The name of the proposed Retained Actions Representative will be supplied by supplement to this Disclosure Statement prior to the Confirmation Hearing or, if not determined prior to Confirmation, by motion filed within thirty (30) days after the Effective Date. If the Debtor fails to file such a motion within that time, the United States Trustee may appoint the Retained Actions Representative. The Retained Actions Representative will be an independent third party selected for his or her experience in the prosecution or settlement of avoidance actions and other Chapter 5 claims. The appointment of the Retained Actions Representative is an important safeguard that ensures any potential claims against insiders or other parties are evaluated and pursued (or settled) without regard to any personal or insider relationships that the Debtor might have. This mechanism directly addresses the concerns that have been raised about the Debtor's willingness to pursue such claims and provides creditors with an independent fiduciary focused solely on maximizing recoveries for the estate.

### B.      Scope of authority

The Retained Actions Representative's authority is strictly limited to the Retained Actions as defined in the Plan—i.e., any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtor pursuant to any applicable section of

the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law, other than the Huntington Litigation and the Huntington Retained Actions. The Retained Actions Representative will have the full powers and duties set forth in Section 5.6.2 of the Plan, including the power to investigate, prosecute, compromise, and settle the Retained Actions without the need for further Court approval under Bankruptcy Rule 9019 except as otherwise provided in the Plan or Confirmation Order. The Debtor retains all rights with respect to the Huntington Litigation and the Huntington Retained Actions, as expressly provided in Section 5.6.5 of the Plan ("No Assignment of Huntington Litigation"). This clear division of authority ensures that the Retained Actions Representative can act independently and impartially on any non-Huntington Chapter 5 claims while the Debtor continues to control the Huntington-related matters in which he possesses unique institutional knowledge and a strong incentive to maximize recovery.

## C.      Retention of rights by the Debtor until Effective Date

Until the Effective Date, the Debtor retains all rights to pursue or resolve any Retained Actions. The Debtor is currently working to potentially resolve one or more of the Retained Actions, which will require the filing of a motion for approval of the compromise under Bankruptcy Rule 9019. If any such matters are compromised prior to the Effective Date, the Debtor will either supplement or file an amendment to this Disclosure Statement in relation to those matters. This retention of rights until the Effective Date allows the Debtor to continue his ongoing review and evaluation of potential avoidance actions (including those that may be identified in the Examiner's report) without interruption. Once the Effective Date occurs and the Retained Actions Representative is appointed, the authority over the Retained Actions (other than the Huntington Litigation and Huntington Retained Actions) will transfer to the Representative. This phased approach preserves maximum flexibility and value for the estate while ensuring a smooth transition to independent oversight where appropriate.

## D.      Identification of certain alleged Retained Actions and Debtor's initial analysis

Since the filing of the Case, the Debtor has been analyzing potential avoidance actions. The information in this section provides the Debtor's initial review and analysis of those actions. Unless any such action is resolved by the Debtor prior to the Effective Date through a compromise approved under Bankruptcy Rule 9019, all potential Retained Actions will transfer to the control of the Retained Actions Representative, who will conduct an independent review. Nothing in this discussion constitutes a refusal by the Debtor to pursue any Retained Action; it is merely an indication of the Debtor's current review.

### 1.      Establishment of Raymond J. Schneider 2019 Gift Trust.

The Debtor established the Raymond J. Schneider 2019 Gift Trust and transferred certain business interests into the trust. Huntington has claimed that these transfers are avoidable as fraudulent conveyances under 11 U.S.C. § 548(e) because they involved a self-settled trust. However, the trust is not a self-settled trust in which the Debtor is a beneficiary. 11 U.S.C. § 548(e) therefore does not apply on the face of the statutory elements because it requires the Debtor to be a beneficiary of the trust transferee. In addition, the Debtor had no intent to hinder, delay, or defraud any creditor at the time of the transfers, which is another element of a 11 U.S.C. § 548(e) claim.

The transfers were made for legitimate estate planning purposes at a time when the Debtor was fully solvent. Specifically, the Debtor and his tax advisors sought to take advantage of the then-available $10 million per-person gift tax exemption before any potential reduction following the 2020 presidential election.[5] This approach allowed the family to lock in the value of the transferred interests for gift tax purposes rather than face a significantly higher (and potentially taxable) value at the time of the Debtor's or his Spouse's death.

### 2. 2020 Spouse transfers and establishment of Patricia B Schneider 2020 Gift Trust.

In 2020, the Debtor transferred certain business interests to his Spouse, who then transferred those interests into the newly-established Patricia B. Schneider 2020 Gift Trust. The transfers were made to allow the spouse to utilize her available gift tax exemption in connection with estate planning. The Debtor engaged tax professionals and legal advisors to affect the transfers for legitimate estate planning purposes and not to defraud any creditor, including Huntington. Moreover, at the time of the transfers, the Debtor was likely solvent. Prior to the expiration of the applicable four-year statute of limitations, there may have been a potential avoidance claim under applicable law. However, that claim appears to be barred by the four-year statute of limitations under Ohio's Uniform Fraudulent Transfer Act. Huntington filed its state court avoidance action many months after the limitations period had expired. The Court in the First Case noted that Huntington would have time after dismissal of the First Case to file within the limitations period, but no timely filing occurred. The Debtor and his advisors have conducted significant research into various legal theories that might overcome a statute of limitations defense but have not identified any that would permit the claim to proceed. The Retained Actions Representative will independently evaluate whether any avoidance claim exists with respect to these transfers.

### 3. Other allegations by Huntington

Huntington has asserted in a state court complaint (that has now been removed to the Bankruptcy Court) that the trusts constitute sham transactions and has sought to set aside the transfers or pursue claims against family members for alleged fraudulent transfers. As of the date of this Disclosure Statement, those allegations do not have legal or factual support in the current record. The Debtor continues to review these matters, and they are also subject to the review of the Court-appointed Examiner.

### 4. 2024 sale of Red Dog Operations Holding Company, LLC

In 2024, the assets of Red Dog Operations Holding Company, LLC were sold to a third-party buyer pursuant to a membership interest purchase and contribution agreement. Prior to the transaction, the Debtor held a single unit out of 10,000 total units in Red Dog Operations Holding Company, LLC—a 0.01% minority interest. As part of the transaction, all ownership was rolled into the newly formed KPT7 Holding Company, LLC to facilitate the sale, and the Debtor received a 0.1% interest in KPT7 Holding Company, LLC. Given the Debtor's extremely small minority

---

[5] During the 2020 election campaign, then-candidate Joe Biden was promising to reverse tax cuts placed into law during the first Donald Trump administration. Had the Trump tax cuts been reversed, it would have reduced the estate tax gift exemption from $10 million to $5 million. Therefore, it was common in the lead up to the end of 2020 for tax advisors to push clients to take advantage of the higher exemption or else risk losing it.

ownership interest, the value held in Red Dog Operations Holding Company, LLC at the time of the transfer was minimal. The Debtor retained an ongoing interest in the restructured entity. In addition, several of the Debtor's other companies entered into long-term leases with the new Red Dog operator for the use of real estate owned by those companies. Because of these substantial intertwined benefits and the Debtor's minimal pre-transaction ownership, the transaction does not present a straightforward fraudulent transfer analysis. The Retained Actions Representative will independently evaluate whether any avoidance claim exists with respect to this transaction.

5.      **2024 Sale of Blue Development Company LLC;**

On September 1, 2024, the Debtor sold all of his membership interest in The Blue Development Company, LLC to the Raymond Schneider 2019 Gift Trust in exchange for a promissory note in the principal amount of $1,485,000, which matures on September 1, 2026. The sale was undertaken to facilitate investment in a development of a mixed-use project on the real property owned by The Blue Development Company, LLC in conjunction with the City of Blue Ash, Ohio. Given the Debtor's financial issues with Huntington, it was determined that the project could not proceed if the property remained in a company owned solely by the Debtor. The sale was made for the value of the equity in the real estate after taking into account existing liens against the property. Whether the transaction constitutes a fraudulent transfer under the Bankruptcy Code or Ohio law will depend on the valuation of the entity and the risks associated with the project at the time of the transfer. The Debtor has not yet completed any further analysis of that value. The Retained Actions Representative will independently evaluate whether any avoidance claim exists with respect to this transaction.

6.      **2025 Sale of Techwood Circle RD LLC;**

On February 6, 2025, the Debtor sold all of his membership interest in Techwoods Circle RD, LLC to KPT7 Holding Company, LLC, and received cash consideration in the amount of $324,771.99. The sale was undertaken to facilitate development of the real property owned by Techwoods Circle RD, LLC, which could not proceed if the property remained in a company owned solely by the Debtor due to the Debtor's financial issues with Huntington. The sale was made for the value of the equity in the real estate after taking into account existing liens against the property. Whether the transaction constitutes a fraudulent transfer under the Bankruptcy Code or Ohio law will depend on the valuation of the entity and the risks associated with the project at the time of the transfer. The Debtor has not yet completed any further analysis of that value. The Retained Actions Representative will independently evaluate whether any avoidance claim exists with respect to this transaction.

7.      **Other potential Retained Actions**

The Debtor continues to review potential avoidance actions and will supplement or amend this Disclosure Statement with any additional information, including information obtained from the Examiner's report. The Debtor is in ongoing settlement discussions with several parties related to these matters and reserves the right to file a motion to compromise claims prior to the Effective Date of the Plan. The lack of identification of any potential claim by the Debtor in this Disclosure Statement is in no way a waiver of any such claim.

**E.        Proceeds and interaction with the Plan**

Any consideration received as a result of the settlement or prosecution of any of the Retained Actions will constitute Retained Actions Proceeds. As defined in the Plan, "Retained Actions Proceeds" means any consideration received as a result of the settlement or prosecution of any of the Retained Actions less all costs and expenses incurred by or on behalf of the Debtor (or, after the Effective Date, the Retained Actions Representative) in realizing that consideration. The Retained Actions Representative will promptly turn over all such Retained Actions Proceeds to the Debtor. Those proceeds then become part of Plan Proceeds.

The Plan defines "Plan Proceeds" to include the aggregate of all money received by or on behalf of the Debtor after the Effective Date and prior to entry of a Final Decree as Business Asset Sale Proceeds, Investment Companies Sale Proceeds, Income (to the extent not Exempt Income), Retained Action Proceeds, and proceeds from Huntington Retained Actions. On each Quarterly Distribution Date, the Debtor will determine the total amount of Plan Proceeds then held by the Debtor. The Debtor will set aside a reasonable reserve for any unpaid Administrative Expense Claims and Priority Claims then due or reasonably expected to become due, as well as a reasonable reserve for the Debtor's anticipated future ordinary-course living and operating expenses (after taking into account anticipated future Income). The remaining amount will constitute Net Plan Proceeds available for distribution to Holders of Allowed Claims on that Quarterly Distribution Date in accordance with Article 4 of the Plan.

In this manner, every dollar of net recovery from the Retained Actions—after payment of the associated costs—flows directly into the Net Plan Proceeds available for quarterly distributions to Allowed Claims, including the *pro rata* distributions to Class 16 (Huntington General Unsecured Claim) and Class 17 (General Unsecured Claims). This structure ensures that creditors receive the full benefit of any successful prosecution or settlement of these potential avoidance or Chapter 5 claims without any diversion or diminution of those proceeds. The independent role of the Retained Actions Representative further protects the integrity of the process by ensuring that any recoveries are pursued solely for the benefit of the estate and its creditors.

## VIII.  Financial Information, Liquidation Analysis, and Best-Interests Test

**A.        Projected Disposable Income and compliance with 11 U.S.C. § 1129(a)(15)**

The Debtor will contribute all his Projected Disposable Income for the period beginning on the Effective Date and ending on the earlier of (i) five years after the Effective Date, in accordance with section 1129(a)(15) of the Bankruptcy Code, or (ii) the date on which all Allowed Claims are paid in full. After the five-year period, the Debtor will continue to contribute only Company Draws and Investment Income (but not Social Security or other personal income) until all Allowed Claims are paid in full or the entities generating such Company Draws and Investment Income have been fully disposed of pursuant to the Plan.

The Debtor has prepared the following projection of income and expenses for the five-year term of the Plan. This projection is based on the amounts set forth in the Debtor's Schedules and the Debtor's reasonable expectations regarding ongoing Company Draws and other income. The Debtor reasonably expects the annual amounts shown below to continue throughout the five-year

period of the Plan, subject to reduction as Company Draws from any entity ceasing operations or as rental income from any real property ceases upon the sale or other disposition of that property in accordance with Article 5 of the Plan.

The following table summarizes the projected monthly and annual amounts:

| Description | Monthly Amount | Annual Amount |
| --- | --- | --- |
| Company Draw – Boston RD, LLC | $ 19,500.00 | $ 234,000.00 |
| Company Draw – RD Realty, LLC | $ 10,000.00 | $ 120,000.00 |
| Company Draw – Hyde Park Circle, LLC | $ 10,000.00 | $ 120,000.00 |
| Company Draw – To Life, Ltd | $ 8,000.00 | $ 96,000.00 |
| Company Draw – Grasshopper Investments II, LLC | $ 6,000.00 | $ 72,000.00 |
| Company Draw – North Shore RD, LLC | $ 6,000.00 | $ 72,000.00 |
| Company Draw – Madison Warehouse, LLC | $ 5,000.00 | $ 60,000.00 |
| Company Draw – Northern Kentucky Assisted Living, LLC | $ 4,000.00 | $ 48,000.00 |
| Company Draw – Mason RD, LLC | $ 2,000.00 | $ 24,000.00 |
| **Subtotal – Projected Company Draws** | **$ 70,500.00** | **$ 846,000.00** |
| Investment Income (average monthly dividends from Investment Companies) | $ 7,217.61 | $ 86,611.32 |
| Social Security Income | $ 3,636.70 | $ 43,640.40 |
| Spouse's Contributions to Household Expenses | $ 6,064.40 | $ 72,772.80 |
| **Total Projected Income** | **$ 87,418.71** | **$ 1,049,024.52** |
| **Less: Projected Personal and Household Expenses** | | |
| Primary Residence Mortgage and Related Costs | $ 3,322.41 | $ 39,868.92 |
| Primary Residence – Property/Homeowner's Insurance | $ 1,892.75 | $ 22,713.00 |
| Utilities (electricity, heat, natural gas, water, sewer, garbage, telephone, internet, landscaping, security) | $ 1,230.00 | $ 14,760.00 |
| Food and Housekeeping Supplies | $ 1,500.00 | $ 18,000.00 |
| Clothing, Laundry, and Dry Cleaning | $ 500.00 | $ 6,000.00 |
| Personal Care Products and Services | $ 250.00 | $ 3,000.00 |
| Transportation (including Spouse's vehicle payment) | $ 1,767.28 | $ 21,207.36 |
| Entertainment, Clubs, Recreation, Newspapers, Magazines, and Books | $ 2,250.00 | $ 27,000.00 |
| Health Insurance | $ 511.14 | $ 6,133.68 |

| Description | Monthly Amount | Annual Amount |
|---|---:|---:|
| Mortgages on Other Real Property | $ 11,997.30 | $ 143,967.60 |
| Real Estate Taxes on Other Real Property | $ 8,741.63 | $ 104,899.56 |
| Property/Homeowner's Insurance on Other Real Property | $ 1,620.00 | $ 19,440.00 |
| Maintenance, Repair, and Upkeep on Real Property | $ 3,066.00 | $ 36,792.00 |
| **Total Projected Personal and Household Expenses** | **$ 38,648.51** | **$ 463,782.12** |
| Estimated Quarterly Federal Tax Payments (35% marginal federal rate on projected taxable income, net of available NOL carryforwards) | $ 17,070.00 | $ 204,835.00 |
| Estimated Quarterly State and Local Income Tax Payments (estimated 4.5% combined effective rate for Ohio state and local taxes) | $ 2,200.00 | $ 26,400.00 |
| **Projected Amount Available for Plan Obligations and Distributions** | **$ 29,500.00** | **$ 354,007.00** |

The amounts set forth above for Company Draws and Investment Income are illustrations of what the Debtor anticipates may be possible based on current entity performance and historical dividend activity. These amounts are not guaranteed and will not necessarily equal actual results. Each Operating Company and Investment Company must retain sufficient working capital and reserves to meet its own operational needs. As to the Operating Companies and the Investment Companies where the Debtor has management control, the Debtor will exercise business judgment in determining the amount and timing of any Company Draw or distribution in accordance with Section 5.4.3 of the Plan. As to the Investment Companies where the Debtor does not have management control, the amounts received are determined by third parties and the Debtor does not control those distributions. Actual results may be higher or lower depending on entity performance, market conditions, working capital requirements, and other factors. The Debtor will report actual income received each quarter in the Quarterly Reports required under the Plan.

The Spouse has been voluntarily contributing her personal income and assets to cover certain household and real property expenses, including the mortgages on the Colorado Property and the Maine Property, and she has indicated she will continue to do so during the term of the Plan. However, the availability of any funds from the Spouse to cover expenses should not be depended upon. The Spouse is not a debtor in this Case and is not required to contribute to the Plan or to the Debtor's personal expenses. The Debtor remains solely responsible for all of his own personal and household expenses under the Plan.

To the extent any of the Debtor's real properties are sold during the term of the Plan, the associated mortgage payments, real estate taxes, insurance, and maintenance expenses for those properties will be eliminated.

The Debtor previously received approximately $2,100.00 per month in rental income from the Colorado Property. That rental income ceased as of April 30, 2026. The Debtor has not yet located

a replacement renter but may do so in the future. Any future rental income from the Colorado Property will be reported in the Quarterly Reports and included in Plan Proceeds to the extent it constitutes Non-Exempt Income.

The income reflected in this projection is subject to federal, state, and local income taxes. For illustration purposes, the estimated tax line applies a 35% marginal rate to the net amount available after all projected personal and household expenses (the closest proxy in the table to taxable income). The Debtor anticipates being in the highest marginal tax bracket on ordinary income. The Debtor will engage tax professionals to calculate and pay quarterly estimated taxes as required, taking into account available net operating loss carryforwards from prior years as reflected in the Debtor's most recent tax returns. Tax liabilities will be paid from Plan Proceeds as authorized in Section 5.8 of the Plan. Actual tax liability will depend on the Debtor's overall tax position, available deductions, credits, and timing of income recognition. Any savings obtained on taxes will accrue to the benefit of creditors.

The Debtor has not included any projection of proceeds from the sale or other disposition of Non-Exempt Assets in the table above. Any such projection would require complete speculation regarding sale timing, market conditions, buyer interest, tax liabilities, and other variables that are inherently uncertain and outside the Debtor's control. It would be inappropriate for any party in interest to rely on speculative Asset-sale projections. This is precisely why the Plan requires the Debtor to file detailed Quarterly Reports that disclose actual Asset sale activity, proceeds received, and remaining timelines. Creditors and the Court will receive transparent, real-time information through those reports rather than through unreliable forward-looking estimates.

The Debtor reserves the right to supplement or amend this projection as additional information becomes available, including from the report of the Examiner recently ordered by the Court or from actual operating results during the Case. Any material changes will be disclosed in the Quarterly Reports required under Section 5.12 of the Plan.

**B.      Liquidation Analysis**

**1.      Overview**

To assist creditors in evaluating the treatment they will receive under the Plan, the Debtor has prepared a detailed liquidation analysis that can be used to compare the recoveries creditors would receive in a hypothetical Chapter 7 disposition with the recoveries provided under the Plan. The liquidation analysis is attached to this Disclosure Statement as Exhibit B.

The liquidation analysis was developed with the assistant of counsel using the values and information set forth in the Debtor's Schedules and Statement of Financial Affairs, as supplemented by the Debtor's best efforts and professional judgment. It incorporates the Debtor's estimates of the value of his real property interests, the personal property, the balances in the various financial accounts (including the Merrill Lynch Accounts), and the anticipated disposition value of the business assets of the Operating Companies and Investment Companies after satisfaction of any Company Collateral. These figures represent the Debtor's best ability to determine the value of his own Assets based on decades of experience owning, operating, and developing the businesses and properties in question.

The analysis applies conservative recovery percentages that a Chapter 7 trustee would likely achieve in a forced liquidation. For example, the non-retirement Merrill Lynch Accounts are assigned a 90% recovery to account for rapid liquidation and market impact; real estate is assigned an 80% recovery to reflect forced-sale discounts, broker commissions, and closing costs; vehicles are assigned a 60% recovery; and personal property is assigned a 25% recovery. Minority and passive Investment Company interests with limited or unknown value are assigned a $0 recovery, as a Chapter 7 trustee would lack both the information and practical ability to realize meaningful value from those interests. A Chapter 7 tax obligation of approximately $5.556 million is also included to reflect the substantial capital gains and other tax liabilities that would arise from a trustee's forced sales.

Under these conservative assumptions, the liquidation analysis shows that a Chapter 7 trustee would generate approximately $28.88 million in gross proceeds available for distribution. After payment of Chapter 7 trustee fees, administrative expenses[6], and taxes, net proceeds available for distribution to creditors would be approximately $19.28 million. General Unsecured Creditors (including Huntington) would receive a recovery of approximately 43.47% on their Allowed Claims.

The Debtor emphasizes that all values in the liquidation analysis are estimates only. The Plan provides for the orderly sale or other monetization of the Non-Exempt Assets at market value, which is the ultimate and most reliable method for determining true realizable value. These are not guaranteed results. The Debtor makes no representation or warranty that he will actually be able to sell or dispose of any Asset for the estimated amounts shown in the analysis. Actual sale prices will depend on market conditions at the time of disposition, the quality of marketing and professional advice obtained, and numerous other variables that cannot be known with certainty today. Moreover, it is in the Debtor's own best interest to maximize realizable value from the Non-Exempt Assets so that he can pay all Allowed Claims in full and, to the extent possible, retain any remaining Assets free and clear after creditors are paid.

### 2.      The Plan provides materially superior recoveries

The liquidation analysis demonstrates that the Plan provides creditors with recoveries that are materially better than those that would be available in a Chapter 7 disposition. The difference arises from several fundamental advantages the Debtor can achieve under the Plan that a Chapter 7 trustee cannot replicate.

First, the Debtor will conduct an orderly, phased sale process over the five-year implementation period. This measured approach allows the Debtor, working with professional advisors, to properly market each Asset, obtain current appraisals and valuations, and time dispositions to maximize value. In contrast, a Chapter 7 trustee would be under pressure to liquidate Assets quickly to satisfy immediate creditor demands, resulting in forced-sale discounts, lower realized prices, and the loss of any going-concern or marketing premium. The orderly process under the Plan is expected to

---

[6] The Debtor did not include anticipated fees of the Examiner at this time because those have yet to be determined, and the Debtor expects that if there is a conversion, by that point any fees of the Examiner would have been paid. Regardless, the fees of the Examiner—a process requested by Huntington—would just further reduce an unsecured creditor distribution.

generate substantially higher net proceeds across the real properties, the Merrill Lynch Accounts, the Operating Companies, and the Investment Company interests.

Second, the orderly process under the Plan will eliminate or substantially reduce the unsecured deficiency Claims that would arise in a Chapter 7 case. In a forced liquidation, several of the Company Debt Claims would likely produce deficiencies because the trustee would sell the underlying collateral at depressed prices or the secured creditors would execute on the collateral with reduced recoveries. Those deficiencies would then be asserted against the estate and would dilute the recovery available to all General Unsecured Creditors, including Huntington. Under the Plan, the Debtor's phased, professionally managed sales are expected to produce sufficient value to satisfy the Company Debt Claims in full from the Company Collateral, thereby preventing those deficiencies from ever arising and protecting the general unsecured class from dilution.

Third, the Plan avoids the substantial Chapter 7 transactional costs and trustee fees that would be incurred in a liquidation. A Chapter 7 trustee would be entitled to statutory fees under 11 U.S.C. § 326 (approximately 3% of gross proceeds in this example) plus the costs of engaging multiple professionals, initiating ancillary proceedings in other districts (some of the Operating Companies are in other states), and navigating the complexities of liquidating interests in approximately two dozen separate companies. The liquidation analysis already includes approximately $2.86 million in trustee legal and accounting administrative expenses and $5.556 million in estimated taxes. The Plan avoids these costs entirely by allowing the Debtor to retain control and manage the disposition process efficiently.

Fourth, conversion to Chapter 7 would result in the complete loss of the five-year commitment of Projected Disposable Income. Under the Plan, the Debtor is committing all his Projected Disposable Income for the period ending on the earlier of five years after the Effective Date or the date on which all Allowed Claims are paid in full. This commitment is estimated to exceed at least $1 million over the life of the Plan (including Social Security contributions, Company Draws, and Investment Income). A Chapter 7 trustee would have no ability to compel the Debtor to contribute this income stream. The loss of this substantial source of value would materially reduce the funds available for distribution to creditors.

Fifth, the Debtor's conservative valuation of potential avoidance actions in the liquidation analysis is not material to the comparison between a Chapter 7 conversion and the Plan. The Plan already assigns all non-Huntington avoidance claims to a neutral Retained Actions Representative who will act in a manner substantially similar to a Chapter 7 trustee in investigating, prosecuting, and settling those claims. Accordingly, any recovery that a Chapter 7 trustee could realistically achieve on these claims would be matched dollar-for-dollar by the Retained Actions Representative under the Plan. The treatment of these claims is therefore essentially identical in both scenarios.

Finally, the treatment of the Huntington Litigation represents one of the most significant differences between the two scenarios. In a Chapter 7 liquidation, the Debtor believes the Huntington Litigation would produce little or no value to the estate. A Chapter 7 trustee would almost certainly abandon the claims due to their complexity, the enormous cost of continued prosecution, and the lack of any immediate benefit to the trustee's administration of the estate. If not abandoned, a Chapter 7 trustee would likely accept a *de minimis* settlement from Huntington. Under the Plan, by contrast, the Debtor will continue to vigorously prosecute the Huntington

Litigation for the benefit of the estate. The Debtor believes the claims are meritorious and may ultimately obtain a judgment large enough to eliminate Huntington's claim entirely through setoff. This potential outcome—which is preserved and actively pursued only under the Plan—represents substantial additional value that would be lost in a Chapter 7 case.

Taken together, these advantages mean that the Plan is expected to deliver significantly higher recoveries to general unsecured creditors than a Chapter 7 disposition, while simultaneously preserving the substantial upside potential of the Huntington Litigation. The liquidation analysis confirms that every impaired class will receive at least as much—and in most cases materially more—under the Plan than it would receive in a hypothetical Chapter 7 case.

## C.      Best-Interests Test Compliance, Class by Class

The Plan satisfies the best-interests-of-creditors test under 11 U.S.C. § 1129(a)(7) because every Holder of an impaired Claim will receive property of a value, as of the Effective Date, that is not less than the amount such Holder would receive if the Debtor's estate were liquidated under Chapter 7 of the Code on the Effective Date. The Debtor has prepared the detailed liquidation analysis attached as Exhibit B to demonstrate this comparison.

As shown in Exhibit B, a Chapter 7 trustee would generate approximately $28.88 million in gross proceeds. After payment of trustee fees, administrative expenses, and estimated taxes of $5.556 million, net proceeds available for distribution to creditors would be approximately $19.28 million, resulting in a recovery of approximately 43.47% for General Unsecured Creditors (including Huntington).

The Plan provides materially superior recoveries for the following reasons:

### 1.      Mortgage Claims on Real Property

The three mortgage Claims secured by the Debtor's real properties—Class 2 (Truist Claim), Class 3 (First Merchants Mortgage Claim), and Class 4 (Nationstar Mortgage Claim)—are fully secured. In a Chapter 7 disposition these creditors may realize full recovery from the sale of their collateral. The Plan provides the same treatment by preserving the creditors' rights to their collateral while permitting an orderly sale process that maximizes net proceeds. The best-interests test is therefore satisfied for these classes.

### 2.      Bank of America Secured Claim

Class 5 holds the Bank of America Secured Claim, which is secured by the Non-Exempt Merrill Lynch Accounts. Those accounts contain equity far in excess of the amount of the Claim. In a Chapter 7 disposition Bank of America would receive full payment from its collateral. The Plan provides identical treatment through the phased monetization of the accounts, with proceeds first applied to pay the Claim in full. The best-interests test is therefore satisfied for this class.

### 3. Company Debt Claims

The Plan creates separate classes for each Company Debt Claim (Classes 7 through 15). The Debtor anticipates that the Company Collateral securing each of these Claims is sufficient to pay the Claim in full upon an orderly disposition of the collateral. In a hypothetical Chapter 7 disposition the result would be the same if the collateral were sold at market value. However, the appointment of a Chapter 7 trustee and the resulting loss of the Debtor's day-to-day management would likely produce catastrophic consequences at the entity level, including an exodus of essential employees and the inability of the Debtor to continue operating the companies in the ordinary course. In that event the disposition value of the business assets would lose any going-concern premium, and the raw asset and real-estate values would become the more realistic measure. Any resulting unsecured deficiencies on the Company Debt Claims (called Company Debt Claim Deficiencies under the Plan) would then be asserted against the estate and would dilute the recovery available to other general unsecured creditors and to Huntington.

The Plan addresses this exact scenario by permitting these creditors to participate in the General Unsecured Creditor Class (Class 17) on account of any Company Debt Claim Deficiency that remains after disposition of the Company Collateral. Thus, whether the case proceeds under Chapter 7 or under the Plan, these creditors have the maximum opportunity to recover both from their collateral and, if necessary, from the unsecured pool. The Debtor believes, however, that confirmation of the Plan is clearly in their best interest because the orderly, Debtor-managed sale process will maximize value, avoid operational disruption, and increase the likelihood that they will be paid in full from their collateral without any dilution of the unsecured class.

### 4. Huntington Claim

In a Chapter 7 disposition, all of the Debtor's Non-Exempt Assets would be sold and Huntington would receive its pro-rata share of the resulting distribution on account of the Huntington General Unsecured Claim (after any allowed secured portion). The Debtor anticipates, however, that the disruption caused by a trustee's disposition of the Operating Companies would substantially reduce overall recoveries. In addition, the various Company Debt Claim Holders would be free to assert their deficiencies directly against the estate immediately, thereby diluting the pool available to Huntington and other general unsecured creditors. The structure of the Plan, by contrast, requires those creditors to pursue their Company Collateral first before asserting any deficiency. This sequencing protects the unsecured classes and preserves greater value for distribution. The Plan therefore affords Huntington (and all other unsecured creditors) a recovery that is at least as favorable as—and likely materially better than—the recovery it would receive in a Chapter 7 disposition.

### 5. General Unsecured Claims

The analysis for Holders of Allowed General Unsecured Claims (Class 17) is the same as for the Huntington General Unsecured Claim. The Plan's orderly disposition process, combined with the five-year commitment of Projected Disposable Income and any

recoveries from the Retained Actions, produces a distribution pool that is at least equal to (and in most scenarios greater than) the pool that would exist in a Chapter 7 disposition after accounting for the operational damage and dilution described above.

### 6.    Retained Actions

The treatment of Retained Actions is essentially identical under the Plan and in a Chapter 7 disposition. The Plan appoints an independent Retained Actions Representative to pursue or settle those claims, and the net proceeds are paid into the pool of Plan Proceeds for distribution to unsecured creditors. In a Chapter 7 case a trustee would perform the same function. In either scenario, therefore, the full net benefit of any recoveries flows to the benefit of unsecured creditors.

Taken as a whole, the Plan satisfies the best-interest test under 11 U.S.C. § 1129(a)(7) for every impaired class. The Debtor therefore respectfully submits that the Plan is in the best interests of creditors and should be confirmed.

## IX.    Distributions, Claim Allowance, and Feasibility

### A.    Sources of Plan distributions

The Plan provides that all distributions to Holders of Allowed Claims will be funded from Net Plan Proceeds. "Plan Proceeds" are defined in the Plan as the aggregate of all money received by or on behalf of the Debtor after the Effective Date and prior to entry of a Final Decree as Business Asset Sale Proceeds, Investment Companies Sale Proceeds, Income (to the extent not Exempt Income), Retained Actions Proceeds, and proceeds from Huntington Retained Actions. The Debtor will hold all such Plan Proceeds in the Debtor-in-Possession account maintained in this Case for use in making quarterly distributions.

On each Quarterly Distribution Date, the Debtor will determine the total amount of Plan Proceeds then held. The Debtor will set aside a reasonable reserve for any unpaid Administrative Expense Claims and Priority Claims then due or reasonably expected to become due, as well as a reasonable reserve for the Debtor's anticipated future ordinary-course living and operating expenses (after taking into account anticipated future Income). The Debtor will determine the appropriate reserve amount by reasonably projecting the Administrative Expense Claims and other Plan obligations that will come due in the following quarter and comparing those needs to the anticipated Plan Proceeds expected to be received during that same period. In addition, the Debtor must remain cognizant of the potential loss of Company Draws that may occur when a Business Asset is sold or otherwise monetized. The Debtor therefore retains the necessary authority and flexibility to determine how much of the Plan Proceeds should be withheld from any given quarterly distribution in order to maintain sufficient liquidity for ongoing operations and living expenses. At the end of the day, however, during the entire term of the Plan all Plan Proceeds will ultimately be distributed to Allowed Claims in accordance with the treatment provisions of Article 4.

B.    **Timing and method of distributions**

Distributions of Net Plan Proceeds to Holders of Allowed Claims will be made on each Quarterly Distribution Date. The first distribution will occur on the Initial Distribution Date, which is defined in the Plan as the first calendar day of the calendar quarter immediately following the calendar quarter in which the Effective Date falls. No distributions will be made, however, until the Confirmation Order becomes a Final Order. Any appeal of the Confirmation Order will therefore delay the commencement of distributions under the Plan.

All distributions under the Plan will be made in cash by wire transfer or check, at the Debtor's election. Distributions will be delivered to the record holder of the Allowed Claim as it appears on the Schedules or on the register maintained by the Clerk of the Court as of the Record Date. The Record Date for purposes of determining the Holders entitled to receive distributions on any Quarterly Distribution Date will be the last business day of the calendar quarter immediately preceding that Quarterly Distribution Date.

C.    **Unclaimed or undeliverable distributions and *de minimis* distributions**

Any distribution that remains unclaimed or undeliverable for ninety (90) days after the date it is first made will be deemed unclaimed. The Debtor will hold any unclaimed distribution for an additional thirty (30) days and will make reasonable efforts to locate the Holder. After that period, the unclaimed distribution will automatically revert to the Debtor and will be included in Plan Proceeds for use under the Plan (including distribution to other Holders of Allowed Claims on the next Quarterly Distribution Date). No further distributions under the Plan will be made to an original Holder whose distribution is returned as undeliverable or is unclaimed on account of the undeliverable or unclaimed distribution.

If the amount of any distribution to a Holder of an Allowed Claim on any Quarterly Distribution Date is less than $100.00, the Debtor may, in his sole discretion, accumulate that distribution and pay it only when the accumulated amount exceeds $100.00 or on the final distribution date under the Plan, whichever occurs first.

D.    **Overall feasibility**

Based on the projections the Debtor has provided above and the anticipated orderly sale schedule of his Non-Exempt Assets, the Debtor believes that completing the orderly disposition of Assets and making all required distributions over the course of the Plan is feasible.

The feasibility requirement of 11 U.S.C. § 1129(a)(11) is satisfied when the Plan offers a reasonable assurance of success. In this Case, the Debtor's obligations under the Plan are straightforward and limited in scope: he must monetize the Non-Exempt Assets in an orderly fashion, contribute his Projected Disposable Income for the period ending on the earlier of five years after the Effective Date or the date on which all Allowed Claims are paid in full, and distribute Net Plan Proceeds quarterly in accordance with the treatment provisions of Article 4. The only thing the Debtor ultimately needs to do is sell or otherwise monetize the Non-Exempt Assets for their maximum realizable value. Given enough time and the professional assistance the Debtor will retain, he is confident he can accomplish exactly that.

The phased, Debtor-controlled sale process contemplated by the Plan—rather than a forced disposition by a Chapter 7 trustee—affords the necessary time to market the real properties, the Merrill Lynch Accounts, the Operating Companies, and the Investment Companies in a manner that will maximize net proceeds. The five-year commitment of Projected Disposable Income provides a stable baseline of funding independent of Asset-sale timing. Any additional recoveries from the Retained Actions or the Huntington Retained Actions represent upside that will only increase the funds available for distribution. Because the Plan contains no speculative assumptions, no new financing, and no reliance on unproven future operations, the Debtor submits that it is not only feasible but highly likely to succeed. Confirmation of the Plan therefore satisfies the feasibility standard of 11 U.S.C. § 1129(a)(11).

**E.     Objections to Claims**

Any objections to Claims (other than Administrative Expense Claims) will be filed on or before the Claim Objection Deadline or be forever barred. All Claims that were marked as contingent, unliquidated, or disputed on the Schedules for which no Proof of Claim was filed are disallowed as of the Effective Date without the need for the Debtor to file an objection to the Claim.

**F.     No distributions pending allowance**

No payment or distribution provided under the Plan will be made on account of any Disputed Claim until the Disputed Claim becomes an Allowed Claim. To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) will be made to the Holder of that Allowed Claim in accordance with the applicable provisions of the Plan.

**G.     Disputed Claims Reserve**

For each distribution, the Debtor will set aside in a Disputed Claim Reserve the amount of cash that the Debtor determines would likely have been distributed to the Holders of all Disputed Claims as if those Disputed Claims had been Allowed as of the date of the distribution and had the Holders participated in the distribution on a *pro rata* basis. For purposes of calculating the amount to set aside for the Disputed Claim Reserve, the Debtor will assume an amount for the Disputed Claim that is the greater of: (a) the asserted amount of the Disputed Claim filed with the Court as set forth in the Proof of Claim, or, if no proof of such Claim was filed, the amount listed by the Debtor in the Schedules; (b) the amount, if any, estimated by the Court pursuant to § 502(c) of the Code or ordered by other order of the Court; or (c) the amount otherwise agreed to by the Debtor and the Holder of such Disputed Claim for distribution purposes.

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the Debtor will, out of the Disputed Claim Reserve, distribute to the Holder thereof the distribution, if any, to which such Holder is entitled in accordance with this Plan. In the event a Disputed Claim is disallowed, the amount of money set aside in the Disputed Claim Reserve will be released on the next Quarterly Distribution Date as if the Disputed Claim had never been factored into the distributions.

If at any time the amount of money in the Disputed Claim Reserve exceeds the amount deemed necessary by the Debtor, the excess amounts will be released to the Debtor for the next distribution under the Plan.

## X.  Risk Factors and Alternatives to Confirmation

Although the Debtor believes the Plan is feasible and in the best interests of all creditors, confirmation and consummation of any Chapter 11 plan necessarily involve certain risks. The following discussion identifies the principal risks associated with the Plan. Creditors should carefully consider these risks, together with the other information contained in this Disclosure Statement and the Plan, before deciding whether to vote to accept or reject the Plan.

### A.  Risks related to the Huntington Litigation

The Huntington Litigation is a significant potential Asset of the estate, but it also carries material uncertainty. The outcome of the litigation cannot be guaranteed. The Debtor may ultimately prevail and obtain a substantial recovery that would materially increase the funds available for distribution to all creditors. Conversely, there is a risk that the Debtor will expend significant additional time and incur substantial legal fees in prosecuting the case only to receive no recovery at the end of the day. Even if the Debtor prevails on some but not all claims, the net benefit to the estate could be less than anticipated after payment of ongoing professional fees.

In addition, the Plan withholds distributions to Huntington pending final resolution of the Huntington Litigation. While this approach protects the estate from making payments that may later be subject to set-off, it also means that additional interest may continue to accrue on the Huntington Claim during the pendency of the litigation. Huntington may also assert additional legal fee claims that could be allowed as part of its overall recovery. These factors could reduce the net amount ultimately available to other creditors.

Timing uncertainty is another material risk. The Debtor has been engaged in litigation with Huntington for more than five years. The court system has moved slowly on these claims. Although the case is currently on track for trial in the first half of 2027, the Debtor cannot predict with certainty when the Huntington Litigation will be finally resolved. Any delay in resolution will extend the period during which distributions to Huntington are withheld and will prolong the overall implementation of the Plan.

### B.  Asset sale timing, market, and tax risks

The Plan depends heavily on the orderly sale or monetization of the Debtor's Non-Exempt Assets over the five-year term. The timing, market conditions, and ultimate proceeds from those sales are inherently uncertain and outside the Debtor's complete control. The Debtor cannot guarantee the valuation or sale price of any business Asset, real property interest, or Investment Company interest. While the Debtor believes the Operating Companies and Investment Companies are quality Assets with strong underlying financial metrics, the general health of the economy, interest-rate movements, industry-specific trends, buyer demand, and other macroeconomic or external factors are simply beyond the Debtor's control. Any deterioration in market conditions could delay sales, reduce realizable values, or require the Debtor to accept offers below current estimates.

The Debtor has made every reasonable effort to estimate values based on his decades of experience, but these remain estimates only. Actual proceeds will depend on the quality of marketing, the engagement of professional advisors, prevailing market conditions at the precise

time of each disposition, and numerous other variables that cannot be known today. There is therefore a material risk that the aggregate Plan Proceeds ultimately realized will be lower than projected, which would reduce the Net Plan Proceeds available for quarterly distributions to Allowed Claims.

Tax risks add another layer of complexity. Many of the Debtor's Assets—particularly the Merrill Lynch Accounts and certain Business Assets—represent positions that the Debtor has held for decades. Significant unrealized capital gains have accumulated. The sale or monetization of these Assets will trigger substantial tax liabilities that must be paid from the gross proceeds before any net amount is included in Plan Proceeds. The exact amount of those taxes will depend on the timing of each disposition, the Debtor's overall tax position in the year of sale, applicable tax rates, and any available offsets or elections. The Debtor will work diligently with tax professionals to minimize these liabilities through phased sales and other lawful strategies, but the tax burden cannot be eliminated and will necessarily reduce Net Plan Proceeds available for distribution.

## C. Operational risk to Operating Companies

The Debtor's Operating Companies are active businesses that generate Company Draws and other Income that will help fund the Plan. Certain of these assets were anticipated to be part of ongoing development efforts by the Debtor's various entities. The filing of this Chapter 11 Case and the continuing litigation with Huntington have already prevented the Debtor from maximizing the value of those assets by pursuing new development opportunities. This has harmed the estate by limiting growth and has created an ongoing risk factor because it continues to burden the Debtor's corporate interests, including through the loss of important employees. If market conditions or operational disruptions worsen, the ability of the Operating Companies to generate Company Draws could be impaired. The Debtor will continue to operate these entities in the ordinary course to maximize value, but the unknowns inherent in running active businesses remain a material risk to the Plan's success.

## D. Personal risk – Debtor's age and health

The Plan is dependent on the Debtor's continued involvement in the day-to-day management of his affairs and the orderly disposition of Assets. The Debtor is 76 years old. Although he is currently in good health and anticipates no issues that would prevent him from fulfilling his obligations under the Plan, his age necessarily introduces a personal risk factor. Any unforeseen health issue could delay Asset sales, impair his ability to generate Company Draws, or otherwise disrupt implementation of the Plan.

## E. Alternatives to Confirmation

If the Plan is not confirmed, the Debtor and creditors face two primary alternatives: conversion to Chapter 7 or dismissal of the Case.

In a Chapter 7 disposition, a trustee would take control of the Non-Exempt Assets and sell them on a more accelerated and less coordinated basis. As discussed in the liquidation analysis (Exhibit B), this would result in lower overall recoveries for most creditors due to the loss of going-concern value in the Operating Companies, higher transactional costs, and the immediate assertion of

Company Debt Claim deficiencies that would dilute the unsecured pool. Creditors would lose the upside of the Huntington Litigation and the commitment of Projected Disposable Income.

Dismissal would return the Debtor to the pre-petition status quo. Huntington would immediately resume aggressive collection efforts, and the estate would lose the protections of the automatic stay and the ability to pursue the Huntington Litigation in an orderly fashion. Creditors would forgo the structured distributions and the potential for full payment contemplated by the Plan.

The Debtor submits that confirmation of the Plan is the superior alternative for all stakeholders.

## XI.    Executory Contracts and Unexpired Leases

The Plan addresses the treatment of executory contracts and unexpired leases in Article 7.

### A.    Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, the Debtor assumes all executory contracts and unexpired leases to which the Debtor is a party, except those that have been previously rejected or that are specifically rejected under the Plan. The executory contracts and unexpired leases assumed under the Plan consist solely of the operating agreements (and other governance documents) of the Debtor's various Operating Companies and Investment Companies. As confirmed by the Schedules, the Debtor has no other executory contracts or unexpired leases as of the Petition Date.

The assumption of these operating agreements and governance documents is necessary to permit the continued operation of the entities until their assets are sold or otherwise monetized in accordance with the Plan. Assumption does not alter any rights or obligations of the non-debtor parties to those agreements except as modified by the Plan.

### B.    Cure of defaults for assumed Executory Contracts and Unexpired Leases

The Debtor has no monetary defaults under any assumed executory contract or unexpired lease that require cure under section 365(b) of the Bankruptcy Code. If any non-monetary defaults exist, they will be cured by performance in the ordinary course after the Effective Date. The Debtor is unaware of any cure obligations and does not anticipate needing to pay any cure costs.

By the Effective Date, the Debtor will serve notice on the counterparty to each assumed executory contract or unexpired lease stating that the contract or lease is assumed and that the Debtor has determined there is no cure amount due. Any counterparty that disputes the cure amount will have thirty (30) days after the Effective Date to file a motion with the Bankruptcy Court seeking a determination of the actual cure amount, if any, required under section 365(b) of the Bankruptcy Code. The Bankruptcy Court will thereafter determine the actual cure amount.

### C.    Rejection of Executory Contracts and Unexpired Leases

Any executory contract or unexpired lease that is not assumed under the Plan is deemed rejected on the Effective Date. Given that the only executory contracts and unexpired leases are the operating agreements and governance documents being assumed, the Debtor does not anticipate rejecting any contracts or leases.

**D.      Rejection damages Claims**

Any Claim arising from the rejection of an executory contract or unexpired lease will be treated as a General Unsecured Claim and will be paid in accordance with the treatment provided in Article 4 of the Plan. Any Claim arising from the rejection of an executory contract or unexpired lease must be filed with the Bankruptcy Court on or before the later of (i) the Claim Objection Deadline or (ii) thirty (30) days after the date the Debtor provides written notice of rejection. Any such Claim not timely filed will be forever barred and will not be entitled to any distribution under the Plan.

**E.      Operating Agreements**

The operating agreements of the Debtor's business entities are executory contracts that are assumed under the Plan. Assumption of these agreements is necessary to permit the continued operation of the entities until their assets are sold or monetized in accordance with Section 5.5 of the Plan. The assumption of these agreements does not alter any rights or obligations of the non-debtor parties to those agreements except as modified by the Plan.

**F.      Post-petition contracts and agreements**

Any contract or agreement entered into by the Debtor after the Petition Date is not subject to assumption or rejection under this Article and remains in full force and effect according to its terms.

**G.      No other Executory Contracts or Unexpired Leases**

Except as expressly provided in this Article 11, the Debtor has no other executory contracts or unexpired leases. The Schedules and any supplements thereto confirm that no additional executory contracts or unexpired leases exist.

This Article ensures continuity for the Debtor's business entities while providing clear, transparent procedures for any potential issues. The Debtor believes the assumption of the operating agreements and governance documents, together with the absence of any other contracts or leases, will not have a material adverse effect on the implementation of the Plan or on distributions to creditors.

## XII.   Tax Consequences of the Plan

Under the Bankruptcy Code, as a component of the "adequate information" that must be included in this Disclosure Statement, the Debtor must provide a discussion of the potential material Federal tax consequences of the Plan to the Debtor and a hypothetical investor typical of the Holders of Claims in the Case. This summary is based upon the Internal Revenue Code of 1986, as amended, Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rulings and pronouncements of the Internal Revenue Service currently in effect. These authorities are subject to change, possibly with retroactive effect, and any such change could alter or modify the federal income tax consequences described below.

The Plan, and its tax consequences, are complex. The tax consequences of the Plan will depend on factual determinations with respect to each creditor. No ruling has been or will be requested from the Internal Revenue Service prior to the Effective Date regarding the tax consequences of the Plan. Because the tax consequences of the Plan are complex and may vary based upon individual circumstances, this Disclosure Statement renders no advice on the tax consequences of the implementation of the Plan to any particular creditor, to the Debtor, or to interest Holders. Each such party is urged to consult his or her tax adviser as to the consequences of the Plan under applicable federal, state, and local tax laws.

The Debtor is an individual. One of the most significant tax implications of the Plan is the realization of gain (including long-term capital gain) upon the sale or other disposition of the Non-Exempt Assets. Many of the Debtor's Assets—particularly positions in the Merrill Lynch Accounts and certain Business Assets—have been held for decades and carry substantial unrealized capital gains. The phased monetization contemplated by the Plan (Section 5.5) is designed to allow the Debtor, working with professional tax advisors, to time dispositions in a manner that minimizes the overall tax burden while satisfying liquidity needs, reserve requirements, and ordinary-course living and operating expenses. Nevertheless, taxes attributable to these dispositions will be paid from gross proceeds before any net amount is included in Plan Proceeds. The exact tax liability in any given year will depend on the timing of each sale, the Debtor's overall tax position, applicable rates, and any available offsets or elections. Section 5.8 of the Plan expressly authorizes the Debtor to engage tax professionals to advise on tax minimization strategies in connection with all Asset dispositions.

Creditors may also face tax consequences from distributions received under the Plan. The character of any distribution—whether ordinary income, capital gain, return of capital, or otherwise—will depend on factors specific to each creditor, including (i) the amount of distributions received, (ii) the extent to which a creditor's Claim constitutes principal and interest, (iii) the origin of the creditor's Claim, (iv) the type of consideration received by the creditor in exchange for its Claim, (v) whether the creditor is a United States person or a foreign person for tax purposes, (vi) whether the creditor reports income on a cash or accrual basis, and (vii) whether the creditor has taken a bad debt deduction or otherwise recognized a loss with respect to its Claim.

Creditors concerned with how the Plan may affect their tax liability should consult with their own accountants, attorneys, and/or advisors.

The Debtor believes that the structure of the Plan, including the phased and professionally managed sale process, the commitment of Projected Disposable Income for the period ending on the earlier of five years after the Effective Date or the date on which all Allowed Claims are paid in full, and the express tax provisions in Section 5.8, provides a reasonable and tax-efficient framework for implementation while maximizing net recoveries for creditors. However, because tax rules are complex and highly fact-specific, no assurance can be given that the tax consequences described above will apply to any particular creditor or that the IRS or any other taxing authority will not take a contrary position.

## XIII.  Voting and Confirmation Procedures

To be confirmable, the Plan must meet the requirements listed in sections 1129(a) or (b) of the Code. These sections include the requirements that: the Plan must be proposed in good faith; at least one impaired Class of Claims must accept the Plan, without counting votes of insiders; the Plan must distribute to each creditor at least as much as the creditor would receive in a Chapter 7 liquidation case, unless the creditor votes to accept the Plan; and the Plan must be feasible. These requirements are not the only requirements listed in section 1129, and they are not the only requirements for confirmation.

### A.      Who may vote or object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor has a right to vote for or against the Plan only if that creditor has a Claim that is both (1) allowed or allowed for voting purposes, and (2) impaired.

A list of the Classes and the impaired/voting status of each class is set forth above.

#### 1.      What is an Allowed Claim?

Only a creditor with an Allowed Claim has the right to vote on the Plan. Generally, a Claim is Allowed if either (1) the Debtor has scheduled the Claim on the Debtor's Schedules, unless the Claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a Proof of Claim, unless an objection has been filed to such Proof of Claim. When a Claim is not allowed, the creditor holding the Claim cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the Claim for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

The deadline for filing a proof of claim in this Case, known as the General Claims Bar Date, was December 29, 2025. Under the Plan, the deadline for objecting to Claims is 120 days after the Effective Date.

#### 2.      What is an Impaired Claim?

As noted above, the Holder of an Allowed Claim has the right to vote only if it is in a Class that is Impaired under the Plan. As provided in 11 U.S.C. § 1124, a Class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class.

#### 3.      Who is not entitled to vote?

The Holders of the following five types of Claims are not entitled to vote:

- Holders of Claims that have been disallowed by an order of the Court;

- Holders of other Claims that are not Allowed Claims, unless they have been Allowed for voting purposes;

- Holders of Claims in Unimpaired Classes;

- Holders of Claims in Classes that do not receive or retain any value under the Plan; and

- Unclassified Claims and Priority Tax Claims.

**B.      Votes Necessary to Confirm the Plan**

If Impaired classes exist, the Court cannot confirm the Plan unless (1) at least one Impaired Class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired Classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed later in subsection 2 below.

**1.      Votes necessary for a Class to accept the Plan**

A class of Claims accepts the Plan if both of the following occur: (1) the Holders of more than one-half (1/2) of the allowed Claims in the class, who vote, cast their votes to accept the Plan, and (2) the Holders of at least two-thirds (2/3) in dollar amount of the allowed Claims in the Class, who vote, cast their votes to accept the Plan.

**2.      Treatment of non-accepting Classes**

Even if one or more Impaired Classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner prescribed by 11 U.S.C. § 1129(b). A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind nonaccepting classes if it meets all the requirements for consensual confirmation except the voting requirements of 11 U.S.C. § 1129(a)(8), does not "discriminate unfairly," and is "fair and equitable" toward each Impaired Class that has not voted to accept the Plan.

You should consult your own attorney if a "cramdown" confirmation will affect your Claim, as the variations on this general rule are numerous and complex.

## XIV.  EFFECT OF CONFIRMATION OF PLAN

**A.      Discharge of Debtor**

The Plan provides that upon completion of all Plan distributions and entry of a Final Decree, all Claims against the Debtor will be discharged to the extent permitted by 11 U.S.C. § 1141, both as Claims against the Debtor and as against any successor or assign, to the fullest extent and in the manner provided by law and the Code. The payments, distributions, and other treatments provided for in the Plan with respect to each class of Allowed Claims will be deemed, under the Plan, to constitute the full and complete satisfaction, discharge, and release of all such Allowed Claims.

Notwithstanding the foregoing, the discharge provided in the Plan do not apply to the temporarily modified Company Debt Claims. The obligations with respect to those Company Debt Claims will revert to their original contractual terms upon completion of all Plan payments and entry of a Final Decree. That is, after discharge, the Debtor's guarantees of the Company Debt Claims will remain.

**B.      Modification of Plan**

The Debtor may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or re-voting on the Plan. The Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

**C.      Plan contingent on Confirmation**

All obligations of the Debtor in the Plan are expressly contingent upon Confirmation. Consequently, the Debtor may, for any reason, at any time prior to the Confirmation, withdraw as the proponent of this Plan by filing a notice of withdrawal with the Court. In that event, this Plan will immediately be withdrawn from consideration for Confirmation, and the Debtor nor any of his successors, or assigns will have any further obligations under the Plan.

**D.      Final Decree and closing of Case**

Once the estate has been substantially administered, as provided in Bankruptcy Rule 3022, the Debtor, or such other party as the Court designates in the Confirmation Order, will file a motion with the Court to obtain a Final Decree to close the Case. Alternatively, the Court may enter a Final Decree on its own motion.

**E.      Exculpation**

Except as otherwise specifically provided in the Plan or the Confirmation Order, the Debtor, the Retained Actions Representative, and their respective professionals, officers, directors, employees, agents, and representatives shall be exculpated from any liability for any act or omission taken or not taken in connection with the Case, the preparation and filing of the Plan, the Disclosure Statement, or any matter related to the prosecution or confirmation of the Plan, to the fullest extent permitted by section 1123(b)(3)(A) of the Code and applicable law.

This provision protects those parties who have acted in good faith during the reorganization process from post-confirmation claims or liability related to their efforts in this Case. Consistent with Section 10.8 of the Plan, the Plan does not provide for any third-party releases in favor of non-Debtor third parties.

**F.      Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Court retains its existing exclusive jurisdiction over all matters arising in or out of or related to the Case or the Plan pursuant to 11 U.S.C. §§ 105(a) and 1142. The specific grants of jurisdiction are set forth in Section 9.3 of the Plan and include the authority to determine the allowance of any

Claim, resolve disputes regarding the interpretation or implementation of the Plan, and enter any orders necessary to aid in the consummation of the Plan.

## XV. Good Faith & Conclusion

The Debtor has proposed this Plan in good faith after years of intense litigation, exhaustive review of his financial affairs, and careful consideration of every available path forward. The Plan is the product of the Debtor's decades of business experience and his sincere desire to resolve his obligations in a manner that is both fair to creditors and consistent with the fresh-start policy embodied in the Bankruptcy Code.

Through the Plan the Debtor commits to an orderly, phased monetization of all Non-Exempt Assets at market value rather than a forced disposition. He will contribute all of his Projected Disposable Income for the period ending on the earlier of five years after the Effective Date or the date on which all Allowed Claims are paid in full, as required by 11 U.S.C. § 1129(a)(15), and will continue contributing Company Draws and Investment Income thereafter until all Allowed Claims are paid in full or the entities generating such income have been fully disposed of pursuant to the Plan. He preserves and will vigorously prosecute the Huntington Litigation for the benefit of the estate. He requires each Company Debt Claim Holder to exhaust its Company Collateral before asserting any deficiency, thereby protecting the General Unsecured Creditor Class from premature dilution. He appoints an independent Retained Actions Representative to pursue any Chapter 5 claims impartially. Every dollar of net recovery—whether from Asset sales, Income contributions, or litigation—will flow directly into the pool of Plan Proceeds for quarterly distributions to Allowed Claims. Administrative Expense Claims and Priority Claims will be paid in full. The structure therefore maximizes the aggregate recovery available to creditors while avoiding the operational damage, loss of going-concern value, and higher transactional costs that would accompany a Chapter 7 disposition.

At the same time, the Plan affords the Debtor the opportunity for a true fresh start. Once all Allowed Claims are paid in full or the Non-Exempt Assets are exhausted, the Debtor will emerge from bankruptcy free of pre-petition liabilities, able to retain his Exempt Assets, and positioned to continue contributing to the economy through his ongoing business activities. The Debtor believes this balanced approach—full payment where possible, maximum value realization for unsecured creditors, and a fresh start for the individual debtor—best serves the interests of all parties in interest and fulfills both the letter and the spirit of the Bankruptcy Code.

The Debtor respectfully submits that the Plan is feasible, fair, equitable, and in the best interests of creditors. He therefore urges all Holders of Allowed Claims to vote in favor of confirmation.

Respectfully submitted,


 /s/ Raymond Joseph Schneider
Raymond Joseph Schneider
*Debtor and Debtor in Possession*

Counsel for Debtor:

James A. Coutinho      (0082430)
Thomas R. Allen       (0017513)
Richard K. Stovall    (0029978)
Andrew D. Rebholz     (0102192)
Allen Stovall Neuman & Ashton LLP
10 W. Broad St., Ste. 2400
Columbus, Ohio 43215
T: (614) 221-8500     F: (614) 221-5988
allen@asnalaw.com; stovall@asnalaw.com
coutinho@asnalaw.com; rebholz@asnalaw.com
*Counsel for Debtor / Debtor in Possession*

# EXHIBIT A

## Plan of Reorganization

[To be added at time of service of Disclosure Statement]

# EXHIBIT B

## Liquidation Analysis

**Raymond Schneider - Liquidation Analysis**
Projected Ch 7 Unsecured Creditor Distribution:   $ 19,281,118.73      43.47%

| Assets to be Liquidated by Trustee | | | | | | | |
|---|---|---|---|---|---|---|---|
| Asset | Gross Value | Expected % Recovery | Liens | Net Value after Liens | Ownership % | Exemptions | Liquidation Value |
| Accounts & Cash on Hand (Estimated as of Effective Date) | $ 100,000.00 | 100% | $ - | $ 100,000.00 | 100% | $ 625.00 | $ 99,375.00 |
| **Real Estate** (See Note 1) | | | | | | | |
| Ohio Property | $ 788,050.00 | 80% | $ 100,670.79 | $ 529,769.21 | 50% | $ 182,625.00 | $ 82,259.61 |
| Maine Property (See Note 2) | $ 2,323,000.00 | 80% | $ 2,139,887.74 | $ (281,487.74) | 50% | $ - | $ - |
| Colorado Property | $ 2,180,000.00 | 80% | $ 421,495.77 | $ 1,322,504.23 | 100% | $ - | $ 1,322,504.23 |
| **Vehicles** (See Note 3) | | | | | | | |
| 1968 Airstream Camper | $ 1,000.00 | 60% | $ - | $ 600.00 | 100% | $ - | $ 600.00 |
| 2011 BMW 128 | $ 7,147.00 | 60% | $ - | $ 4,288.20 | 100% | $ - | $ 4,288.20 |
| 2014 BMW 750i | $ 5,000.00 | 60% | $ - | $ 3,000.00 | 100% | $ - | $ 3,000.00 |
| 1957 Ford Thunderbird | $ 10,000.00 | 60% | $ - | $ 6,000.00 | 100% | $ - | $ 6,000.00 |
| 2020 Tesla Model S | $ 22,227.00 | 60% | $ - | $ 13,336.20 | 100% | $ 5,025.00 | $ 8,311.20 |
| 1959 VW Kitcar | $ 25,000.00 | 60% | $ - | $ 15,000.00 | 100% | $ - | $ 15,000.00 |
| 1966 VW Kombi | $ 2,000.00 | 60% | $ - | $ 1,200.00 | 100% | $ - | $ 1,200.00 |
| 2022 Wolf Lucky Scooter | $ 1,000.00 | 60% | $ - | $ 600.00 | 100% | $ - | $ 600.00 |
| **Personal Property** (See Note 4) | | | | | | | |
| Household goods at Colorado Property | $ 5,000.00 | 25% | $ - | $ 1,250.00 | 100% | $ 5,000.00 | $ - |
| Household goods at Ohio Property | $ 10,000.00 | 25% | $ - | $ 2,500.00 | 100% | $ 10,000.00 | $ - |
| Household goods at Maine Property | $ 25,000.00 | 25% | $ - | $ 6,250.00 | 100% | $ - | $ 6,250.00 |
| Electronics | $ 5,000.00 | 25% | $ - | $ 1,250.00 | 100% | $ - | $ 1,250.00 |
| Misc. Pictures, CDs, Books, Paintings & Wall Hangings | $ 10,000.00 | 25% | $ - | $ 2,500.00 | 100% | $ 850.00 | $ 1,650.00 |
| Wearing Apparel | $ 1,000.00 | 25% | $ - | $ 250.00 | 100% | $ - | $ 250.00 |
| Misc. Men's Accessories | $ 1,500.00 | 25% | $ - | $ 375.00 | 100% | $ - | $ 375.00 |
| 2 domestic dogs | $ - | 0% | $ - | $ - | 100% | $ - | $ - |
| **Merrill Lynch Accounts** (See Note 5) | | | | | | | |
| Acct x3597 | $ 3,261,447.08 | 90% | $ - | $ 2,935,302.37 | 100% | $ - | $ 2,935,302.37 |
| Acct x4923 | $ 30,678,040.23 | 90% | $ 18,115,776.59 | $ 9,494,459.62 | 100% | $ - | $ 9,494,459.62 |
| Roth IRA | $ 921,134.75 | 100% | $ - | $ 921,134.75 | 100% | $ 921,134.75 | $ - |
| **Claims** | | | | $ - | | | |
| The Blue Promissory Note (See Note 6) | $ 1,568,600.68 | 0% | $ - | $ - | 100% | $ - | $ - |
| Claims against Harold Sosna | Unknown | 0% | $ - | $ - | 100% | $ - | $ - |
| Claims against Huntington (See Note 7) | Unknown | 0% | $ - | $ - | 100% | $ - | $ - |
| **Operating Companies** (See Note 8) | | | | | | | |
| Boston RD, LLC | $ 9,600,000.00 | 80% | $ 5,584,532.78 | $ 2,095,467.22 | 100% | $ - | $ 2,095,467.22 |
| Circle Development of Cincinnati, LLC | $ 1,400,000.00 | 80% | $ 937,500.00 | $ 182,500.00 | 100% | $ - | $ 182,500.00 |
| Grasshopper Investments II, LLC (See Note 9) | $ 3,000,000.00 | 80% | $ 2,400,000.00 | $ | 100% | $ - | $ - |
| Hyde Park Circle, LLC | $ 7,450,000.00 | 75% | $ 3,525,929.27 | $ 2,061,570.73 | 100% | $ - | $ 2,061,570.73 |
| Madison Warehouse, LLC | $ 3,500,000.00 | 80% | $ 1,900,519.97 | $ 899,480.03 | 100% | $ - | $ 899,480.03 |
| Mason Rd, LLC | $ 3,300,000.00 | 80% | $ 2,128,837.66 | $ 511,162.34 | 100% | $ - | $ 511,162.34 |
| North Shore RD, LLC | $ 8,500,000.00 | 80% | $ 3,385,809.76 | $ 3,414,190.24 | 100% | $ - | $ 3,414,190.24 |
| Northern Kentucky Assisted Living, LLC (Operating Co) | $ 3,000,000.00 | 60% | $ - | $ 1,800,000.00 | 100% | $ - | $ 1,800,000.00 |
| Northern Kentucky Retirement Community, LLC (RE Co) | $ 5,500,000.00 | 80% | $ 3,104,364.20 | $ 1,295,635.80 | 85% | $ - | $ 1,101,290.43 |
| Schneider-Grasshopper, Inc. | $ - | 0% | $ - | $ - | 100% | $ - | $ - |
| The Red Corner, LLC | $ 11,200,000.00 | 75% | $ 6,723,850.61 | $ 1,676,149.39 | 100% | $ - | $ 1,676,149.39 |
| To Life III, LLC | $ 120,650.00 | 60% | | $ 72,390.00 | 100% | $ - | $ 72,390.00 |
| **Investment Companies** (See Note 10) | | | | | | | |
| 5150 East Galbraith Road, LLC | $ 2,500,000.00 | 80% | $ 1,201,222.00 | $ 798,778.00 | 33% | $ - | $ 266,232.71 |
| Corporate Park Investors, Ltd | $ - | 0% | $ - | $ - | 5.50% | $ - | $ - |
| Executive Park Investors, Ltd | $ - | 0% | $ - | $ - | 5.00% | $ - | $ - |
| Glidden House Partners, Ltd | $ - | 0% | $ - | $ - | 3.56% | $ - | $ - |
| Grasshopper Investments, LLC (See Note 9) | $ 40,000,000.00 | 70% | $ 35,325,186.00 | $ (7,325,186.00) | 0.05% | $ - | $ - |
| Hamilton II, LLC | $ - | 0% | $ - | $ - | 6.00% | $ - | $ - |

EXHIBIT B
Page 2 of 5

| Asset | Gross Value | Expected % Recovery | Liens | Net Value after Liens | Ownership % | Exemptions | Liquidation Value |
|---|---|---|---|---|---|---|---|
| HRM Realty Holdings, Ltd | $ - | 0% | $ - | $ - | 33.33% | $ - | $ - |
| KPT7 Holding Company, LLC | $ - | 0% | $ - | $ - | 0.01% | $ - | $ - |
| Montclair Investors, Ltd | $ - | 0% | $ - | $ - | 5.00% | $ - | $ - |
| TheCard, LLC | $ - | 0% | $ - | $ - | 2.32% | $ - | $ - |
| To Life, Ltd (See Note 11) | $ 65,000,000.00 | 75% | $ 42,000,000.00 | $ 6,750,000.00 | 8.42% | $ - | $ 568,350.00 |
| Topco America, LLC dba Range USA (See Note 12) | $ 250,000.00 | 100% | $ - | $ 250,000.00 | 0.48% | $ - | $ 250,000.00 |
| Waldorf Partners, LP | $ - | 0% | $ - | $ - | 6.25% | $ - | $ - |
| **Inactive Companies** | | | | | | | |
| All entities listed in Section V.F of the Disclosure Statement | $ - | 0% | $ - | $ - | Various | $ - | $ - |
| **Avoidance Actions** (See Note 13) | | | | | | | |
| Huntington Preference Claims (Lien avoidance) (See Note 14) | $ - | 100% | $ - | $ - | 100% | $ - | $ - |
| Unwind The Blue Development Company Transaction | $ 1,600,000.00 | 100% | $ - | $ 1,600,000.00 | 100% | $ - | $ 1,600,000.00 |
| Patricia Schneider Trust Avoidance (Barred by SoL) | $ - | 100% | $ - | $ - | 100% | $ - | $ - |
| 1999 Raymond Schneider Gift Trust Avoidance (No basis) | $ - | 100% | $ - | $ - | 100% | $ - | $ - |
| Other Schneider Family Claims (Nuisance Recovery) | $ 100,000.00 | 100% | $ - | $ 100,000.00 | 100% | $ - | $ 100,000.00 |
| **Entity Loans** (See Note 15) | | | | | | | |
| The Blue Development Company, LLC | $ 952,542.09 | 0% | $ - | $ - | 100% | $ - | $ - |
| Circle Development of Cincinnati, LLC | $ 250,000.00 | 0% | $ - | $ - | 100% | $ - | $ - |
| Totals: | $ 41,951,146.74 | | $ 128,995,583.14 | $ 29,562,219.59 | | | $ 28,881,458.31 |

**Gross Proceeds Available for Chapter 7 Distribution (See Page 2 for Analysis):**        $   **28,881,458.31**

| Chapter 7 & Administrative Expenses | | |
|---|---|---|
| **Gross Proceeds Available for Chapter 7 Distribution** | **$** | **28,881,458.31** |
| **Less: Bankruptcy Expenses** | **Amount of Expenses** | |
| Chapter 7 Trustee Fees, 11 U.S.C. § 326 | $ | 889,693.75 |
| Chapter 7 Trustee Legal & Accounting Administrative Expenses (See Note 16) | $ | 2,888,145.83 |
| Chapter 7 Tax Obligations (See Note 17) | $ | 5,556,000.00 |
| Chapter 11 Administrative Expenses (Estimated) (See Note 18) | | |
| Final UST Fees | $ | 1,500.00 |
| ASNA (~2 months average) | $ | 100,000.00 |
| Cummins Law (~2 months average) | $ | 120,000.00 |
| Robinson Law (~2 months average) | $ | 20,000.00 |
| Final Chapter 11 Operating Expenses | $ | 25,000.00 |
| **Total: Bankruptcy Expenses** | **$** | **9,600,339.58** |
| **Net Proceeds Available for Distribution** | **$** | **19,281,118.73** |

| Unsecured Creditor Recovery | | | |
|---|---|---|---|
| Net Proceeds Available for Distribution: | $  19,281,118.73 | | |
| **Creditor Type** | **Claim Amount** | **Distribution Amount** | **Distribution %** |
| Priority Unsecured Creditors | | | |
| IRS | $          109,098.75 | $          109,098.75 | 100.00% |
| Subtotal: Priority Unsecured Creditors | $          109,098.75 | $          109,098.75 | 100.00% |
| | | | |
| Non-Priority Unsecured Creditors | | | |
| Claim 1 - Xcel Energy | $                 20.99 | $                 9.09 | 43.33% |
| Claim 5 - US Bank | $              3,931.18 | $              1,703.29 | 43.33% |
| Claim 7 - First Merchant Mortgage Deficiency | $          281,487.74 | $          121,962.24 | 43.33% |
| Claim 8 - Civista Deficiency | $       7,325,186.00 | $       3,173,836.55 | 43.33% |
| Claim 9 - American Express | $                207.90 | $                 90.08 | 43.33% |
| Claim 10 - American Express | $          306,109.00 | $          132,630.07 | 43.33% |
| Claim 11 - Huntington National Bank | $     36,131,939.30 | $     15,655,147.82 | 43.33% |
| Claim 18 - Vorys | $            61,802.97 | $            26,777.82 | 43.33% |
| Claim 26 - Greater Cincinnati Water Works | $                260.57 | $                112.90 | 43.33% |
| Schedule E/F 3.1 - ADT | $                 85.88 | $                 37.21 | 43.33% |
| Schedule E/F 3.5 - Bannister Landscape Services | $                455.00 | $                197.14 | 43.33% |
| Schedule E/F 3.16 - Design Rite Sprinkler | $                160.00 | $                 69.32 | 43.33% |
| Schedule E/F 3.19 - Eagle Eye Property Watch | $                195.00 | $                 84.49 | 43.33% |
| Schedule E/F 3.33 - Kenwood Country Club | $              2,675.62 | $              1,159.29 | 43.33% |
| Schedule E/F 3.36 - Poseidon Irrigation | $                162.00 | $                 70.19 | 43.33% |
| Schedule E/F 3.43 - Three Notes, LLC | $          133,704.51 | $            57,931.12 | 43.33% |
| Schedule E/F 3.46 - TruGreen | $                179.62 | $                 77.83 | 43.33% |
| Schedule E/F 3.50 - Webannet Golf Club | $                285.09 | $                123.52 | 43.33% |
| Subtotal: Non-Priority Unsecured Creditors | $     44,248,848.37 | $     19,172,019.98 | 43.33% |
| **Total: General Unsecured Creditor Claims** | **$     44,357,947.12** | **$     19,281,118.73** | **43.47%** |

| No. | Notes & Assumptions: |
|---|---|

1    **Real Estate Values** - The gross values shown for the Ohio, Maine, and Colorado Properties reflect the current tax-assessed values from the applicable county auditors. The Debtor believes these values are reasonable and appropriate for purposes of this analysis. In a Chapter 7 liquidation, the trustee would be required to sell these properties on an expedited basis without the benefit of the Debtor's ongoing management or the orderly marketing process contemplated by the Plan. Accordingly, an 80% recovery rate has been applied to reflect the anticipated discount from forced-sale conditions, broker commissions, and closing costs.

2    **Maine Property** - The negative net value after liens on the Maine Property represents the anticipated deficiency that would remain after a forced sale in Chapter 7. Because the property would be underwater in a Chapter 7 liquidation scenario, no recovery is expected for the estate on this asset. The resulting deficiency is carried forward as an unsecured claim in the anticipated distribution to general unsecured creditors.

3    **Vehicles** - A 60% recovery rate has been applied to all vehicles. This rate reflects the typical discount realized in a Chapter 7 trustee's forced liquidation of used vehicles, including auction fees, transportation costs, and storage. Some of the vehicles have de minimis value and would likely be abandoned by the trustee. For purposes of this analysis, the Debtor has assumed that all vehicles would be sold.

4    **Personal Property** - A 25% recovery rate has been applied to household goods, electronics, collectibles, and miscellaneous personal property. This conservative rate accounts for the high costs of storage, transportation, and auction or estate-sale liquidation, as well as the limited market value typically realized for used household furnishings and personal effects in a bankruptcy context. Some items have de minimis value and would likely be abandoned by the trustee. For purposes of this analysis, the Debtor has assumed that all personal property would be sold.

5    **Merrill Lynch Accounts (Non-IRA)** - The 90% recovery rate applied to the non-retirement Merrill Lynch accounts reflects the fact that these are highly liquid securities that can be sold relatively quickly. However, the accounts contain large concentrated positions. A Chapter 7 trustee would be forced to liquidate these positions rapidly, which would likely cause some downward price pressure and result in a modest discount from current market value. The 90% rate therefore represents a realistic but conservative estimate of net proceeds after transaction costs. The approximate 10% discount also accounts for the professional fees the trustee would incur to engage investment advisors and brokers to assist with the orderly liquidation of the accounts.

6    **The Blue Promissory Note** - The Blue Promissory Note is anticipated to have no recovery in a Chapter 7 case. If the case converts, development of The Blue would cease, and the obligor would likely be unable to repay the note. A Chapter 7 trustee would have the ability to unwind the September 2024 transfer of The Blue Development Company, LLC as a potential constructive fraudulent transfer under 11 U.S.C. § 548 and recover the Debtor's interest in The Blue Development Company, LLC, and thereafter proceed to liquidate the real estate for the benefit of the estate.

7    **Claims Against Huntington** - The Debtor does not believe a Chapter 7 trustee would pursue the Huntington Litigation. The claims are extraordinarily complex, document-intensive, and expensive to litigate. For purposes of this liquidation analysis, assigning any value to the Huntington claims creates a circular math problem that would not accurately reflect potential recoveries to Huntington as the largest general unsecured creditor. It is far more likely that Huntington would attempt to settle the litigation or that a Chapter 7 trustee would simply abandon it. The amount of the claims is currently unknown, but the Debtor recently testified that he expects the damages caused by Huntington and the possible range of recovery could exceed $200 million.

8    **Operating Companies** – The gross values for the Operating Companies are based on the Debtor's best reasonable judgment and knowledge of the underlying real estate and business operations. For each Operating Company, the value of the assets is expected to exceed the amount of the liens against the property. The recovery percentages applied (generally 75–80%, with a lower rate for Northern Kentucky Assisted Living due to its operating nature) reflect the anticipated loss of going-concern value, employee exodus, and forced-sale discounts that would occur in a Chapter 7 trustee's liquidation.

9    **Grasshopper Investments II, LLC** - This entity's real estate is cross-collateralized with the First Merchants loan on Grasshopper Investments, LLC. For purposes of this liquidation analysis, the Debtor has assumed that First Merchants would be paid in full from the collateral of Grasshopper Investments II, LLC, resulting in a deficiency on the remaining collateral in Grasshopper Investments, LLC. This produces a negative net value after liens, which correctly results in $0 recovery to the estate on this asset.

10    **Investment Companies** - For the Investment Companies in which the Debtor holds only a minority or passive interest and for which current valuation information is limited or unavailable, the Debtor has assigned a liquidation value of $0 in a Chapter 7 scenario. A Chapter 7 trustee would lack both the information and the practical ability to force a sale or compel distributions from these entities, which are controlled by unrelated third parties. Even if some nominal recovery were possible, the amount a trustee would likely realize would be de minimis in comparison to the overall claims in the Chapter 7 estate. The zero-percent assumption is therefore agressive but not material to the overall analysis.

11    **To Life, Ltd** - The Debtor's 8.42% interest in To Life, Ltd. carries managerial control and other rights under the company's governance documents that may provide a premium to the value of that interest. A Chapter 7 trustee, however, would not be able to capitalize on that premium in the same manner the Debtor could, and would likely realize a lower recovery on the interest that is just based on the value of the underlying real estate.

12    **Topco America, LLC dba Range USA** - The $250,000 value listed for the Debtor's 0.48% interest represents the amount the Debtor believes would be offered for his interest based on conversations with company management.

13  **Avoidance Actions** – See the discussion of Retained Actions and potential Chapter 5 claims in the Disclosure Statement. The Debtor believes that many of the potential avoidance claims identified in this analysis lack merit or would be subject to significant defenses. For purposes of this liquidation analysis, only those claims the Debtor believes have a reasonable possibility of recovery have been assigned value.

14  **Huntington Preference Claims (Lien Avoidance)** - The Debtor anticipates that a Chapter 7 trustee would successfully avoid the preferential liens granted to Huntington but would not recover any dollar amount from Huntington on account of those avoided liens.

15  **Entity Loans** - The Debtor has assumed that if there is a chapter 7 conversion in the liquidation of the various assets of the entities they will ultimately be unable to repay any entity loans to him. As a result, he has attributed zero value to the Entity Loans.

16  **Chapter 7 Trustee Legal & Accounting Administrative Expenses** - The $2,863,229.83 figure (10% of gross proceeds) reflects the substantial workload a Chapter 7 trustee would face in this case. Unlike a typical individual Chapter 7, the trustee would not be liquidating assets the Debtor owns directly. Instead, the trustee would have to navigate and liquidate interests in more than a dozen separate limited liability companies and partnerships, many of which hold real estate or operating businesses. The trustee would likely need to initiate ancillary Chapter 7 proceedings in other districts, retain multiple professionals, and potentially litigate issues of substantive consolidation or veil piercing to maximize recoveries. The 10% estimate is therefore conservative and appropriate given the complexity and multi-entity nature of the estate.

17  **Chapter 7 Tax Obligations** - The $5,556,000 tax estimate includes long-term capital gains tax on the sale of the non-retirement Merrill Lynch accounts (assuming approximately $12 million in taxable gain at the 23.8% rate), capital gains tax on the Colorado Property, tax on the gain from the unwinding and sale of the Blue Development Company real estate, and a blended estimate of ordinary income and capital gains taxes arising from the forced sale of the Operating Companies and Investment Companies. The Debtor, and thus the bankruptcy estate, would be taxed at the highest federal rate. No material tax has been assumed on vehicles, personal property, or cash on hand. The Ohio Property is protected by the homestead exemption and produces no taxable gain.

18  **Final Chapter 11 Administrative Expenses** - The amounts shown for ASNA, Cummins Law, and Robinson Law represent an approximate two-month average of the professional fees these firms have been incurring. The Debtor has assumed these fees would not be paid prior to conversion because none of the firms currently hold retainers. These amounts are therefore included as Chapter 7 administrative expenses that would have to be paid before any distribution to unsecured creditors.

19  **Additional Assumptions** - All values are estimates based on the Debtor's best knowledge and judgment as of the date of this analysis. Actual results in a Chapter 7 case would depend on market conditions at the time of sale, the identity and aggressiveness of the trustee, and numerous other variables that cannot be known with certainty. The Debtor has not obtained independent appraisals for all assets for purposes of this liquidation analysis.