**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | : | Case No: 25-12607 |
| Raymond Joseph Schneider, | : | Chapter 11 |
| | : | |
| Debtor and Debtor in Possession. | : | Judge Beth A. Buchanan |

**DEBTOR'S LIMITED OBJECTION TO THE PRELIMINARY WORK PLAN OF**
**WILLIAM G. KRIEGER, EXAMINER (DOC. 198)**

**I.      INTRODUCTION**

Raymond Joseph Schneider, the debtor and debtor in possession (the "Debtor"), respectfully submits this limited objection to the *Preliminary Work Plan of William G. Krieger, Examiner* (the "Work Plan") (Doc. 198) pursuant to the process outlined in the *Agreed Order Directing the Appointment of Examiner* (Doc. 165) (the "Agreed Order"). The Agreed Order contemplated that the appointed examiner would submit a preliminary work plan and budget for review by the parties, and that any party could object if necessary. Agreed Order ¶ 18. Because of the unique nature of the Investigation (as defined in the Agreed Order), the Agreed Order reserved the right for parties to "seek relief from the Court, including modification of the scope of the Investigation." *Id.* at ¶ 23.

Through this objection, the Debtor is not looking to revisit the bargain struck in the Agreed Order. Rather, the Debtor seeks to ensure that the Agreed Order is being interpreted correctly by the Examiner and that the Investigation stays within the proportionality requirements of the Agreed Order. *Id.* at ¶ 5. As demonstrated by the Examiner's projected cost of $310,000 plus unknown legal fees, the Work Plan as it stands matches neither the intended scope nor the required proportionality constraints. Ultimately, the purpose of requiring a work plan and budget is to ensure that the Court, the Examiner, and the parties are aligned on the scope and the cost of the

1

work *before* that cost is incurred. While the Debtor fully expects to fund the Investigation, he also has a fiduciary obligation to conserve the resources of the estate and to avoid unnecessary expenses. Both duties point in the same direction: get the scope right before the money is spent.

The Examiner was handed a difficult task. The Agreed Order required him to prepare a work plan and budget within fifteen business days of his appointment before he could meet with the Debtor and his personnel or fully absorb the substantial record already in this case. The Examiner approached this task conscientiously and in good faith. But in hindsight, the Agreed Order (which was negotiated before the United States Trustee selected an examiner with so extensive a forensic-accounting background), did not capture the parties' expectations with the precision this situation now requires. In particular, the Work Plan as proposed contemplates a full forensic reconstruction of the finances of the Debtor and his companies that the Agreed Order never contemplated and the Debtor never agreed to.

The Debtor does not ask the Court to halt the Examiner's work. Instead, through this objection, the Debtor seeks the following: First, that the Court order the Examiner to proceed with the first phase of his work, subject to the caveats stated below. This would entail gathering and reviewing the information already produced and meeting with the Debtor and his company personnel to learn the actual scope of what later phases of the Investigation will require. Second, that the Court direct the Examiner, upon completing that initial assessment, to submit a revised work plan and budget for the remaining phases, subject to the same notice and opportunity to object. Third, that the Court direct the Examiner to conduct the Investigation proportionally and consistent with the Agreed Order—by verifying and testing the Debtor's financial reporting rather than undertaking a full forensic reconstruction of every entity's cash flows—and to submit a revised work plan and budget for Phases II through IV once the Phase I assessment is complete.

## II.    BACKGROUND

1.    This case and the one before it have been defined by dueling narratives. On the one hand is the Debtor's: a businessman of more than fifty years who has worked to disclose his affairs in compliance with the Bankruptcy Code and to reorganize for the benefit of all his creditors. On the other is Huntington's: a single, well-resourced creditor that has used its considerable means to improperly brand the Debtor and to doggedly press unfounded accusations against him. The Debtor has repeatedly fought back these allegations, both before this court and others, and has worked incredibly hard to manage and grow his business affairs while engaged in extensive litigation. All the way through, Huntington's narrative omits the fact most salient of all, which is that Huntington's own conduct at the time of loan origination lies at the root of this dispute, giving the Debtor massive claims against it that are pending in state court.

2.    It was against that backdrop that the Debtor welcomed the appointment of an examiner. Rather than continue litigating Huntington's characterizations and unsupported laundry lists of allegations, the Debtor saw the value in a neutral, disinterested factfinder: an honest broker who could give the Court and all creditors an unbiased account of the Debtor's financial affairs, free of Huntington's spin. The Debtor agreed to the examination in that spirit, and he supports it now. What the Debtor did not agree to, and what the Agreed Order does not direct, is for that neutral examination to be turned into the very kind of open-ended financial excavation that is being proposed.

3.    On April 23, 2026, the Court entered the Agreed Order. The Debtor consented to the appointment of an examiner and to the scope set forth in the Agreed Order. As relevant here, paragraph 5 directs the Examiner to conduct the investigation "in a manner that is proportional to the needs of the case and that does not inordinately interfere with the Debtor's ongoing business

3

operations or reorganization efforts." Paragraph 23 provides that the Agreed Order is "without prejudice to the right of any party-in-interest to seek relief from the Court, including modification of the scope of the Investigation."

4.      Paragraph 18 of the Agreed Order required the Examiner, within fifteen business days after entry of the order approving his appointment, to propose a work plan and an estimated budget. Those materials would be approved by the Court absent an objection filed within ten calendar days of service. The Court approved the appointment of William G. Krieger as Examiner on May 19, 2026 (Doc. 191). On June 9, 2026, the Examiner filed and served his Work Plan.

5.      The Work Plan proposes a four-phase forensic investigation and estimates total Examiner fees "of approximately $310,000, reflecting approximately 1,000 hours" of time. Work Plan ¶ 21. By its own terms, that estimate does not include professional fees to be incurred by the Examiner's counsel, which cost may also be extensive. *Id*. The all-in cost of the investigation as currently presented is therefore materially higher than $310,000 and is, as a practical matter, open-ended. The estimate rests expressly on the premise that the investigation must address "over 100 entities associated with the Debtor." Work Plan ¶¶ 5, 7. It also arises from a concept that the Examiner must recreate a record that has already been created through many months of discovery in this case.

6.      The Debtor has already made an extensive production of documents and disclosures to Huntington. In response to a wide-ranging Rule 2004 request by Huntington, the Debtor produced approximately 2,900 files consisting of nearly 42,000 pages and 3.88 GB of records, including business and personal bank statements, financial statements, corporate governance and transactional documents, asset documentation, and available tax returns. *See, e.g., Report to Court Regarding Debtor's Discovery Production* (Doc. 161), ¶ 1.

7.     The Debtor has also prepared and filed a detailed Schedule of Companies that identifies, for each entity, its state and date of formation, any date of closure, its ownership, and its tax status, with explanatory notes. See Doc. 161, Schedule of Companies. In addition, the Debtor has filed an approximately ninety-page Disclosure Statement that describes his operating and investment companies in detail—their history, current assets and operations, and expected income through operations and asset disposition. *See* Doc. 190. This is all in addition to the Debtor's Schedules and Statement of Financial Affairs. *See* Doc. 50. The Examiner has reviewed both the proposed Plan and the Disclosure Statement, *see* Work Plan ¶ 6, and, in accordance with the Agreed Order, all of the documents and discovery correspondence between the Debtor and Huntington have been provided to the Examiner. The Examiner thus begins with a substantial, organized record, not a blank slate.

8.     Moreover, the assumption appears to be that the financial controls of the Debtor and his entities are so mishandled that nothing but a full reconstruction will provide for an accurate picture. Nothing could be further from the truth. For fifty years, the Debtor has been operating businesses that are in heavily regulated industries, including skilled nursing and assisted living, that require ongoing, accurate financial reporting to government agencies. For decades, he has provided timely and accurate financial statements to numerous commercial lending institutions. His companies maintain strict compliance with financial covenants of multi-million dollar loans. Even Huntington's dispute with the Debtor does not concern the financial controls or reporting within the Debtor's entities; it's just a collection on a guaranty. While the Debtor's business affairs are large in size and scope, the fact that they derive from his individual efforts does not mean that the business affairs are unsophisticated or loosely-run.

9.      Further, the Debtor has consistently disclosed his asset transfers in this case and in his prior proceeding, including the transactions identified in his Statement of Financial Affairs, and has produced the records underlying them. Huntington, for instance, has known about the Debtor's estate planning actions back in 2019 and 2020 for years, and has had the corresponding documents for those transactions. While the Examiner will undoubtedly have questions about certain deals that the Debtor has entered into over the years, the Debtor is prepared to fully and accurately provide that information so the relevant business purposes can be derived. The Examiner is going to find a debtor who, during a period in which he had every opportunity to dissipate or shield assets, instead worked to preserve and increase their value for the benefit of his creditors. And the Debtor has presented a Plan that in good faith proposes to liquidate assets and should pay creditors in full.

10.      That is why, when Huntington filed the motion seeking an examiner, the Debtor responded that (a) an examiner should be appointed, but (b) the Court should use its discretion to limit the scope to what was needed in this case. The parties engaged in negotiations of the Agreed Order, and the Debtor consented to the scope it sets forth. But the Debtor never expected or agreed to spend a third of a million dollars on a forensic reconstruction of a decade's worth of financials from the ground up.

11.      To be fair, the Debtor does not believe that the Investigation will ultimately require as much work as has been budgeted. When the Examiner visits with the Debtor and his team, he will see that he can rely on the financials and production, and he will understand that there are not 100 companies to review, but instead only a few dozen.[1] The Examiner, rightly so, has provided

---

[1] The Work Plan's hours seem to scale from this incorrect assumption that the investigation must analyze more than one hundred entities. Work Plan ¶¶ 5, 7. As set forth in the Debtor's discovery report and the Disclosure Statement, there are numerous entities that are dissolved, dormant, never operated, hold no assets, or merely flow through to the Debtor's personal return, which do not require forensic analysis. Most of this information can be confirmed in a brief

what is likely a worst-case scenario. But that scenario is so out of line with the Debtor's expectations that the Debtor cannot in good conscience allow the current Work Plan to be approved without seeking the Court's guidance on these important issues.

12.     Moreover, the Debtor funds the administration of this case, including professional fees payable under the Court-approved interim compensation procedures, primarily from operating draws and investment income. An administrative obligation of the magnitude the Work Plan proposes cannot be absorbed from ordinary cash flow. To pay it, the Debtor would be forced to liquidate a portion of his Merrill Lynch investment holdings, the very assets the estate is otherwise marshaling for the benefit of creditors, and to do so on an accelerated basis as fees come due each month. Every dollar spent on investigation that proves duplicative or unnecessary is a dollar that does not reach creditors, precisely the harm paragraph 5 of the Agreed Order was meant to prevent when it directed that the investigation be "proportional to the needs of the case."

## III.     ARGUMENT

The Agreed Order, the Bankruptcy Code, and controlling precedent all vest this Court with broad discretion to direct the "nature, extent, and duration" of the Examiner's Investigation. *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 501 (6th Cir. 1990). The Debtor does not ask the Court to alter the topics the parties agreed the Examiner may investigate, especially in light of the fact that they are derived from 11 U.S.C. § 1106. Rather, the Debtor asks primarily that the Court direct the Examiner to conduct the Investigation proportionally and consistent with the Agreed Order—by verifying and testing the Debtor's financial reporting rather than undertaking a full forensic reconstruction of every entity's cash flows—and to submit a revised work plan and budget for Phases II through IV once the Phase I review is completed.

---

interview with the Debtor and his staff. The set of entities that could conceivably warrant transactional analysis is far smaller.

**A.      The Work Plan's forensic reconstruction of the Debtor's and his companies' finances exceeds the scope of the Agreed Order.**

The largest time and financial component of the Work Plan is a forensic reconstruction of the finances of the Debtor and his "over 100" companies. The Work Plan describes this as completing a "reconstructed cash flow analysis," a reconciliation of "reported income, assets, and liabilities to underlying documentation," and a transaction-by-transaction tracing of the "flow of funds" among the Debtor, related parties, and affiliated entities. Work Plan ¶ 12. That undertaking is the single largest driver of cost for the Investigation. The work for Phase II alone is budgeted at approximately 324 hours and nearly $100,000, and Phases II and III together (the forensic reconstruction and tracing phases) project to consume roughly 572 hours and approximately $178,000, more than half of the entire estimated budget. Work Plan, Ex. A. This is a staggering expense.

Nothing in the Agreed Order calls for the forensic reconstruction of financials for the Debtor, let alone any of his entities. The Agreed Order directs the Examiner to investigate the Debtor's "acts, conduct, assets, liabilities, and financial condition" and the operation of his businesses, *see* 11 U.S.C. § 1106(a)(3); Agreed Order ¶ 2, and to report on any fraud, dishonesty, or irregularity and on any cause of action available to the estate, *see* 11 U.S.C. § 1106(a)(4); Agreed Order ¶ 2. Those are duties of investigation and verification. The order says nothing about reconstructing the books of the Debtor's operating companies, performing a forensic audit, or independently rebuilding the Debtor's cash flows from the ground up. "Reconstruction" appears nowhere in the Agreed Order. It is the Examiner's chosen methodology, not the parties' agreed mandate. Moreover, the Examiner has gone well beyond the breadth of who he is to be examining: this is an examination of the Debtor, not an examination of each non-debtor entity that the Debtor is affiliated with, except to the extent that there are specific transactions with the Debtor. No part

of the Agreed Order expanded the Investigation, for instance, to permit the Examiner to reconstruct the financials of companies where the Debtor is a minority or non-controlling investor.

Rather than a forensic *audit* of every transaction over nearly a decade, the Agreed Order calls for the Examiner, in accordance with the Bankruptcy Code, to *investigate*. In this way, the nature of an examiner's role under § 1106(a)(3) is similar to the duties a chapter 7 trustee performs under § 704(a)(4), which directs the trustee to "investigate the financial affairs of the debtor." A chapter 7 trustee administering even a complex individual estate verifies the accuracy of the debtor's schedules and reporting and identifies causes of action for the estate; he does not engage a forensic-accounting team to reconstruct the internal cash flows when there is no basis for doing so. The Code charges the Examiner with that same investigative function—verification—not a heightened forensic-audit function, and the Agreed Order does not expand it into one.

To be sure, Huntington itself did not ask for a full forensic audit in its original request for an examiner. It asked for broad investigative *authority*, not an audit, not a reconstruction, and not the transaction-level forensic analysis the Examiner is now proposing. *See* Examiner Motion ¶ 5. Throughout its motion, Huntington frames the purpose as truth-finding and verification. *Id.* at ¶ 4 ("The true facts must be ascertained by an independent examiner. If the Debtor has explanations for the irregularities, the Debtor will have the opportunity to present those explanations to the examiner who will have the ability to probe the veracity of the explanations."). Huntington asked for verification of the Debtor's reporting and resolution of specific discrepancies, exactly what the Debtor seeks here.[2] And the Agreed Order narrowed Huntington's request even further, turning an open-ended investigation into one with enumerated subjects.

---

[2] Conspicuously absent from both the Agreed Order *and* the Examiner Motion are the words "audit," "forensic accounting," "reconstruction," "reconstruct," "tracing," "cash flow analysis," "line-by-line," or "transaction-by-transaction."

An investigation with verification is all the more workable here because the Debtor's financial records are reliable. As noted above, the Debtor has operated for decades in heavily regulated industries that demand accurate reporting to government agencies and has furnished timely, accurate financial statements to numerous commercial lenders without tripping strict financial covenants. The company financial statements the Debtor has already produced are therefore a sound starting point that the Examiner can test; this is not a suspect record he must rebuild.

The solution is easy: rather than reconstruct each entity's cash flows transaction by transaction, the Examiner can select a representative sample of figures from the company financial statements the Debtor has produced and reconcile that sample against the underlying bank records. If the tested financial records match, the Examiner can reasonably rely on the Debtor's financial record generally (and can report to the Court that they are reliable) without auditing every transaction of every entity. Targeted, deeper work can then be reserved for any item that does not reconcile. That is the proportional, testing-based approach that § 1106 and paragraph 5 of the Agreed Order contemplate, and it can be accomplished at a fraction of the hours the Work Plan now projects. The Court should direct that the Examiner verify and test the Debtor's financial reporting rather than reconstruct it.

### B. Prior to proceeding with deeper analysis, the Examiner's initial assessment should be completed and an updated Work Plan submitted.

The Agreed Order required a budget within fifteen business days of the Examiner's appointment. In hindsight, this put the Examiner in a position where he had to make hard assumptions about the work before he could meet with the Debtor's personnel or absorb the

existing record.[3] The Examiner candidly acknowledges that his estimate is preliminary and may change: "the inherent nature of forensic investigation is that initial observations and analysis oftentimes result in the expansion of scope," and at "this nascent stage" he "has not fully reviewed, mapped, or otherwise documented the available financial information." Work Plan ¶¶ 9, 21.[4] The opposite is also true: an initial assessment will substantially *contract* the scope.

The Debtor proposes the sensible course: The Court should approve Phase I of the Examiner's Work Plan now (subject to the caveats below), to allow the Examiner to begin reviewing the existing record, gathering information, and completing in-person meetings with the Debtor and his accounting and finance staff. Then, the Examiner should submit a revised work plan and budget for the remaining phases once that assessment is complete, subject to renewed notice and an opportunity to object.

This path will allow the Examiner to obtain a crucial understanding of the Debtor's financial affairs before making any recommendations to the Court about deep forensic analysis or further extensive review. The Examiner's own plan already contemplates these initial reviews and meetings in Phase I. The Debtor is simply requesting an opportunity to pause and regroup after that phase is completed.

The only caveat is that the Debtor asks the Court to have the Examiner mind the provisions of paragraphs 5 and 6 of the Agreed Order. Those paragraphs direct the work to be proportional to the needs of the case and further permit the Examiner to use work product that has already been

---

[3] *See e.g.* Work Plan ¶ 5 ("The Examiner further understands that the Debtor's financial affairs involve more than 100 entities and that certain information in the record has been described as incomplete, omitted, or not yet characterized, which may increase the complexity of the Investigation."). There is little in that sentence that accurately portrays the Debtor's financial affairs, and those inaccurate assumptions have bled into an overloaded budget.

[4] *See also* Work Plan ¶ 13 ("Given the current unknown nature of Phase II findings, the time required to conduct a more detailed investigation into specific issues, such as related-party transactions, loans, disclosure issues, and other matters that may be identified during the Investigation, makes it difficult to estimate the full scope and extent of Phase III at this time.") That is, the Phase III budget is just a guess at this moment.

created by the Debtor. The concern here arises from the language of paragraph 8 of the Work Plan that says "[a]t the conclusion of Phase I, the Examiner expects to (i) prepare a comprehensive index of documents produced to date, (ii) develop an initial mapping of all identified entities and relationships associated with the Debtor, (iii) identify key gaps in the available financial information to inform targeted follow-up requests…" The vast majority of this work, however, is already done. Huntington has maintained and provided incredibly detailed spreadsheets to the Court of bank statements, financial statements, and tax returns produced by entity, and has allegedly paid a substantial sum to financial advisors to index documents (which purportedly it expects to add to its claim). The Debtor and Huntington have worked for months to fill gaps in the financial data, and copies of those communications have been provided to the Examiner. And the Debtor has already "mapped" each entity and its relationship to the Debtor in multiple formats: in the Schedules and Statement of Financial Affairs, in the Disclosure Statement, and in the spreadsheet of companies that the Debtor provided with his discovery report.

That is to say, this work that has already been completed by the Debtor and Huntington needs to be reviewed and tested for accuracy, but it is not proportional to the needs of this case that the Examiner prepare or develop anything from scratch.

C.      **Detailed analysis should be reserved for the most relevant years.**

The Agreed Order sets the investigation period at January 1, 2018 through the present (¶ 4), and the Debtor does not seek to disturb that period. However, the Debtor has maintained throughout this case that his financial affairs dating back nearly a decade lack relevance. Consistent with the proportionality requirements of the Agreed Order, to the extent that detailed analysis is required, the Examiner should concentrate his detailed transactional work on the periods most probative of the accuracy of the Debtor's current schedules and more recent, potentially actionable

12

transfers (i.e. within the 4-year lookback period on most transfers). The Examiner should review the earlier portion of the period at a higher level unless and until a specific issue warrants closer examination. Where a defined statutory purpose calls for a longer view—for example, transfers potentially subject to the ten-year reach-back under 11 U.S.C. § 548(e)[5]—a deeper historical review is appropriate, and the Debtor does not object to it. That targeted exception, however, should not become the template for a decade-wide reconstruction of every account and every entity.

## IV.   CONCLUSION

The Debtor supports the Examiner's investigation and wants it to succeed, and he appreciates the conscientious effort of the Examiner to comply with the Agreed Order's planning provisions. But it was a mistake to have the Examiner estimate cost before he could fully assess scope. Moreover, it was never anticipated by anyone that this would turn into a full audit of the Debtor, and especially not of his entities.

Based on the foregoing, the Debtor requests that the Court (1) order the Examiner to proceed with the first phase of his work, subject to the cost-saving caveats stated above, (2) direct the Examiner, upon completing that initial assessment, to submit a revised work plan and budget for the remaining phases, subject to the same notice and opportunity to object, and (3) direct the Examiner to conduct the Investigation proportionally and consistent with the Agreed Order—by verifying and testing the Debtor's financial reporting rather than undertaking a full forensic

---

[5] As stated in other filings, the Debtor does not concede that section 548(e) reaches the trust transfers at issue. Section 548(e) applies only to transfers to a self-settled trust or similar device in which the Debtor is a beneficiary. As the Debtor has previously explained, one of the trusts was settled by the Debtor's spouse and is therefore not self-settled by the Debtor, and the other, although settled by the Debtor, does not name the Debtor as a beneficiary. *See* Limited Objection to Examiner (Doc. 134). The reference to section 548(e) here is offered only to define the outer bound of any extended look-back, not as a concession that the statute applies.

reconstruction of every entity's cash flows. The Debtor further requests such other and further

relief as the Court deems just and proper.

Respectfully submitted,

/s/ James A. Coutinho

Thomas R. Allen        (0017513)
Richard K. Stovall      (0029978)
James A. Coutinho      (0082430)
Andrew D. Rebholz    (0102192)
Allen Stovall Neuman & Ashton LLP
10 West Broad Street, Suite 2400
Columbus, OH 43215
T: (614) 221-8500; F: (614) 221-5988
allen@asnalaw.com; stovall@asnalaw.com
coutinho@asnalaw.com; rebholz@asnalaw.com
*Counsel for Debtor / Debtor in Possession*

14

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing *Debtor's Limited Objection to the Preliminary Work Plan of William G. Krieger, Examiner* was served (i) electronically on the date of filing through the Court's ECF system on all ECF participants registered in this case at the email address registered with the Court, and (ii) by ordinary U.S. Mail on June 19, 2026, addressed to the following:

None.

 /s/ James A. Coutinho
James A. Coutinho     (0082430)