**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | : | Case No: 25-12607 |
| Raymond Joseph Schneider, | : | Chapter 11 |
| | : | |
| Debtor and Debtor in Possession. | : | Judge Beth A. Buchanan |

**DEBTOR'S OMNIBUS OBJECTION TO THE EMERGENCY MOTIONS OF THE HUNTINGTON NATIONAL BANK FOR AUTHORIZATION TO CONDUCT RULE 2004 DISCOVERY WITH RESPECT TO THIRD PARTIES (DOCS. 220-227)**

Raymond Joseph Schneider, the debtor and debtor in possession (the "Debtor"), objects to

the eight *Emergency Motions of The Huntington National Bank for Authorization to Conduct Rule*

*2004 Discovery* filed on July 20, 2026, with respect to Jennifer Burris-Whitaker, Matthew J. Hay,

David C. Kennedy, Gregg Lund, John Murley, Dennis Packer, Abigail Smith, and Kathleen Tanner

(Docs. 220-227) (the "Motions"), and to the proposed subpoenas attached to each as Exhibit A

(the "Subpoenas"). The Motions are identical except for the name of the proposed examinee. This

omnibus objection responds to all eight within the response periods set by the Court's orders

shortening time (Docs. 231, 233).

## I.      INTRODUCTION

On July 14, 2026, as required by the Agreed Scheduling Order (Doc. 217), the Debtor

served a 61-page response to Huntington's interrogatories. In answer to Interrogatory 1, he

identified his employees who contributed information used in the discovery responses: Dennis

Packer, general corporate counsel; Abigail Smith, the Debtor's personal assistant; Jennifer Burris-

Whitaker, controller; and Gregg Lund, a former financial advisor. In answer to Interrogatory 2,

subject to a preserved overbreadth objection, the Debtor identified the prior controllers (Matthew

J. Hay, David C. Kennedy, Kathleen Tanner, and John Murley), along with his outside accountants.

1

Six days later, Huntington filed eight identical "emergency" motions seeking leave to serve every one of those individuals with a subpoena.

Each Subpoena demands the same nine categories of documents for the Debtor and 107 scheduled entities. The time period covers eight and one-half years and Huntington demands responses in fourteen days with a deposition to follow. However, Huntington already has the vast majority of what the Subpoenas seek. In this case, the Debtor has produced approximately 42,000 pages of financial statements, bank statements, tax returns, and governance and transaction documents, organized by entity. His outside accountant has produced more than 35,000 pages under a prior Rule 2004 order. Huntington has also received other discovery responses over the years, including over 20,000 pages in a prior production from the Debtor and over 17,000 pages from Merrill Lynch. The balance outstanding for production in this case, principally consisting of emails, is set on the schedule that Huntington agreed to four days before filing its Motions. The Debtor objected to the breadth of Huntington's discovery from the start of this case, yet he has produced the requested information anyway. This negotiated process has been supervised by the Court since January.

The Debtor does not oppose reasonable discovery.[1] Huntington may, of course, conduct depositions in due course. But Huntington filed these Motions as though none of the past six months happened: the same requests, the same defective entity schedule, the same disregard of what it has already received, now aimed at the Debtor's current and former staff, some being the very people that are already working on production responses to Huntington of these very same documents. With these requests, none of which are bound by any proportionality constraints, Huntington has gone too far.

---

[1] The Debtor did not oppose Huntington's 2004 exam motions of two accounting firms, Merrill Lynch, or the two gift trusts. See Orders at Docs. 162, 163, 164, and 236.

## II.   BACKGROUND

### A.   Huntington's Rule 2004 motion and the January Order.

Early in this case, Huntington filed its *Motion for Authorization to Conduct Rule 2004 Discovery with Respect to the Debtor and Third Parties* (the "2004 Motion") (Doc. 41). The Debtor objected to its unwieldy breadth and scope, among other grounds (Doc. 69). He has never conceded those objections, even while providing documents. After a preliminary hearing on January 8, 2026, the Court entered its *Order: 1) Making Determination as to Third Parties; 2) Setting Deadlines; and 3) Scheduling a Discovery Conference with Respect to Huntington National Bank's Motion for 2004 Exam* (Doc. 87) (the "January Order"). The January Order denied the 2004 Motion as to third-party discovery because the third parties were neither named nor served: "If Huntington wishes to conduct discovery with third parties, Huntington must file a motion addressed to and served upon the specific parties affected." January Order at ¶ 1. Recognizing that duplicative production is a waste of resources, the Court's January Order also required Huntington to identify the discovery it had already received from other sources "so that the Debtor does not need to duplicate this production." *Id.* at ¶ 3. That is how the Debtor knows, for example, that Huntington already has tens of thousands of pages from Merrill Lynch and his accountants.

### B.   The Debtor's production and the Court's assistance.

The Debtor made a voluntary preliminary production in January without waiving his objections. It included substantial tax returns, bank statements, and financial statements. On February 18, the Court entered the parties' *Stipulated Confidentiality and Protective Order* (Doc. 106) (the "Protective Order"), to which Huntington agreed. Through the Protective Order, the parties agreed that discovery in this case would likely involve confidential, sensitive, or private

information warranting protection from public disclosure and from use for any purpose other than this case.

A February discovery conference was converted to a status conference at Huntington's request. The Court then entered its *Order: 1) Setting Discovery Deadline; 2) Deadline for Filing Reports and 3) Scheduling a Discovery Conference with Respect to Huntington National Bank's Motion for 2004 Exam* (Doc. 135), setting an April 17 supplemental production deadline, an April 22 reporting deadline, and an in-person discovery conference for April 27. The Debtor met each deadline and filed the required report identifying anything not produced and why (Doc. 161). The parties later held two follow-up Zoom conferences with the Court concerning the email production and other remaining issues. To date, the Debtor has produced approximately 42,000 pages of documents organized by entity. His outside accountant has produced more than 35,000 additional pages, including tax returns and financial statements, under a separate Rule 2004 order obtained by Huntington. The Debtor has not received copies of other recent productions, but anticipates that Huntington has also obtained documents in response to its new 2004 motions to the second accountant and to Merrill Lynch, in addition to the thousands of pages it obtained in the first bankruptcy case.

> **C.** **The email production and the Agreed Scheduling Order.**

Aside from responding to the overbroad and burdensome written discovery, email has been the largest undertaking. Huntington's original search terms returned more than 430,000 documents for review, an amount that would have been impossible to review. The Debtor ran alternative search term sets through his discovery vendor and proposed a reduced set on May 11, shortly before the second Zoom follow up to the April discovery conference. Huntington did not respond with its approval of those terms until June 15. The parties then agreed on terms with only slight

modifications. The first review batch alone, due the day after this brief is filed, comprises more than 41,000 documents from the Debtor's emails from 2018 to present. The second wave, which includes the mailboxes of Mr. Packer, Ms. Smith, and Ms. Burris-Whitaker, is more than double that number.

On July 10, counsel met and conferred and agreed to the deadlines the Court entered as the Agreed Scheduling Order (Doc. 217). Based on that agreement, the Debtor's interrogatories were served on July 14, and on July 22 the Debtor provided Huntington with information about unidentified older (and generally closed) bank accounts. Pursuant to his agreement with Huntington, the Debtor will produce documents from his mailbox based on the agreed-upon search terms, and then all remaining e-discovery under the agreed terms by August 24.[2] By the same date, supplemental production is due for bank statements for older, closed accounts, together with re-production of certain checks that were not legible in the original production. The Debtor and his employees are gathering those items now. Any distraction from that process will affect whether the Debtor and his team are able to meet the agreed upon deadlines.

### D.    The Examiner.

At Huntington's request and based on a three-way negotiation between it, the Debtor, and the United States Trustee, the Court entered the parties' *Agreed Order Directing the Appointment of Examiner* (Doc. 165) (the "Examiner Order") and approved the appointment of William G. Krieger as examiner (the "Examiner"). The Examiner's investigation covers the exact same subject matter of the Motions: the Debtor's assets, liabilities, and financial affairs; his transactions with family members, trusts, and businesses from January 1, 2018 forward; and his tax returns and

---

[2] Of course, when the Debtor agreed to this production schedule, it was under the assumption that Huntington would let his counsel work on the production. These Motions are taking valuable time and effort to respond to, which is necessary to review tens of thousands of documents. The Debtor reserves the right to seek appropriate extensions caused by Huntington's ongoing efforts to steer this process awry.

financial statements. Examiner Order at ¶ 3. The Debtor negotiated (and Huntington agreed to) protections in the Examiner Order because of the investigation's potential effect on his employees and his operating businesses. The investigation must be proportional to the needs of the case and must not "inordinately interfere with the Debtor's ongoing business operations or reorganization efforts." *Id.* at ¶ 5. The Examiner was further permitted to seek discovery from third parties through 2004 examinations and subpoenas. Yet before serving any third-party subpoena or filing any Rule 2004 motion the Examiner must confer in good faith with the Debtor and give five business days' notice, "for the purpose of avoiding cost, delay, and unnecessary burden on third parties." *Id.* at ¶ 11.

The Examiner filed the *Notice of Preliminary Work Plan of William G. Krieger, Examiner* (Doc. 198) (the "Work Plan") on June 9, estimating professional fees of approximately $310,000 and approximately 1,000 hours for the investigation, before the fees of the Examiner's own counsel. The Debtor filed a limited objection to the Work Plan and budget, seeking to have the Examiner conduct a preliminary review before committing to the Work Plan as written (Doc. 199). Under the parties' *Agreed Order Regarding Examiner's Preliminary Work Plan* (Doc. 208) (the "Phase I Order"), Phase I is proceeding. Phase I of the Examiner's investigation includes "meeting with the Debtor's accounting and finance staff" and "mapping and identification of transactions." Phase I Order at p. 2. The Debtor facilitated, and the Examiner conducted, that meeting on site on July 16 with Ms. Burris-Whitaker, Ms. Smith, and Mr. Packer. A hearing was scheduled for August 12, 2026, to hear the objection to the Work Plan. However, the hearing is no longer necessary because the Debtor has elected to withdraw his objection to the Work Plan. *See* Withdrawal, Doc. 242.

### E.    The Motions and the Subpoenas.

On July 20, Huntington filed the eight Motions and a motion to shorten the normal 21-day response time to 7 days. Each Motion is identical except for the examinee's name. The basis for the discovery requests is also identical: on information and belief, the individual possesses information "fundamental to perform a thorough analysis of the Debtor's financial affairs." Then, each proposed Subpoena commands the individual to produce, within fourteen days, for the period January 1, 2018 through the present, and for the Debtor and all 107 entities on the attached schedule: (1) all financial statements; (2) all appraisals, valuations, or opinions of value; (3) all bank account statements and other bank information; (4) all tax returns and supporting documents; (5) all governing documents and agreements; (6) all documents connected with transfers of assets among the Debtor, his family, and the entities; (7) all documents and communications related to disbursements to or for the benefit of the Debtor, his family, or the trusts; (8) all tax returns and supporting documents (a second time, in a request identical to Request 4); and (9) the "entire accounting file" for the Debtor and all 107 entities, including internal and external communications, reports, drafts, and financial reporting. A deposition is to follow the production. The requests are the same whether the recipient is a lawyer, a personal assistant, a controller, or a financial advisor who left years ago. And if these requests look familiar, it is because these are literally the same items that the Debtor has been working to collect and produce over the last several months. Yet, lacking is any indication in the subpoenas of what Huntington already has in its possession, or the fact that over a multi-month period the Debtor and Huntington have painstakingly agreed to a reduced production scope, in particular as to the massive universe of emails. As shown below, Huntington has not met its burden to proceed with these Subpoenas, and the Motions should be denied.

### III.    THE DEBTOR HAS STANDING TO OBJECT

The Motions directly affect the Debtor and his estate. The Debtor is a party in interest under 11 U.S.C. § 1109(b) with standing to object to the Motions. There are at least five independent reasons why the Debtor can be heard on the Motions.

First, Huntington's discovery to the Debtor defined his obligations so as to demand production of information not only for himself, but also for the same scheduled entities the Subpoenas now target, and for all of the Debtor's agents or persons acting on his behalf (aka, his employees). The individuals Huntington seeks to examine are the very people that assisted in preparing discovery responses and collecting the thousands of documents the Debtor has produced. Discovery aimed at them is discovery aimed at the Debtor's own court-ordered production.

Second, the estate bears the cost. The Debtor has spent tens of thousands of dollars in professional fees responding to Huntington's discovery requests; by the time emails are produced it will exceed $100,000 in fees and costs. At Huntington's demand, the Debtor is also funding the Examiner's investigation, which is budgeted at approximately $310,000 before counsel fees. The Debtor will continue to accrue costs, even without the Motions, as Huntington begins to conduct depositions, which will certainly lead to this discovery bill exceeding half a million dollars. Every dollar spent producing the same documents a second time comes out of the recoveries of the creditors that this case exists to pay.

Third, the Debtor's companies are closely-held operating businesses whose revenues fund the proposed plan. The three current employees run their finances, administration, and legal affairs. The Examiner Order itself recognizes that this investigation must not inordinately interfere with the Debtor's business operations and reorganization efforts. Examiner Order at ¶ 5. The extreme burden that Huntington carelessly places on these employees risks not only the ongoing operations

of the Debtor's businesses but also imposes financial and legal strains on the employees themselves. If any were to leave the Debtor's employment due to this abuse, it would severely affect the bankruptcy estate and the Debtor's ability to reorganize.

Fourth, the Motions are an end run around the discovery agreements the parties have reached in this case (with the Court's assistance), including the Agreed Scheduling Order and the Examiner Order. The Debtor negotiated in good faith with Huntington in a manner that helped control the timing and costs of discovery, yet now Huntington pummels third parties with duplicative and overbroad requests instead of waiting for the Debtor to produce the same documents on a negotiated timeline. The Debtor has standing to hold Huntington to what it agreed.

Finally, the Subpoenas (in particular the one to in-house counsel Dennis Packer) demand communications over which the Debtor and his controlled companies hold the attorney-client privilege. The Debtor may assert and protect that privilege, yet Huntington seeks to bypass it by demanding production of hundreds of thousands of emails in 14 days from third parties before the Debtor can review. The undersigned can say without any doubt: based on the experience in reviewing just the Debtor's emails on the timeline agreed to with Huntington, doing that kind of review in 14 days is not possible.

In short, in this unique circumstance, when Huntington and the Debtor have been engaged in a multi-month, Court-supervised and carefully negotiated discovery and Examiner investigation process, when the Debtor has and will be bearing the costs, and when Huntington has threatened to thoughtlessly upend that process, Huntington has handed the Debtor his standing to be heard.

9

## IV.   ARGUMENT

### A.   This Court has already established the process for this discovery, and the Motions try to circumvent it.

Huntington's proposed Subpoenas are an attempt to circumvent the discovery process that has been established in this case. There are three main orders that establish the discovery process: the January Order, the Agreed Scheduling Order, and the Examiner Order.

When Huntington first sought third-party discovery, it attempted to do so without providing due process to anyone, and that omnibus process was denied by the Court in the January Order. The Court directed that any third-party discovery had to proceed by motion addressed to and served upon the specific parties affected (that is, Huntington had to follow the Local Rules). Recognizing the waste that would occur by duplicate production, the Court also required Huntington to identify what it had already received, so that the Debtor would not duplicate production. January Order at ¶¶ 1, 3. Huntington has forgotten that mandate.

Independent of the Court's January Order, Rule 45 imposes a duty that a party issuing a subpoena "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1), made applicable by Fed. R. Bankr. P. 9016. That language is printed on the subpoena form Huntington attached to each Motion. Yet Huntington took none of those steps. The Motions identify nothing Huntington has already received. They acknowledge none of the approximately 100,000 pages produced by the Debtor, his accountant, or any other party. They serve the identical nine requests on all eight individuals regardless of the factual circumstances of those individuals' involvements. In fact, the cut-and-paste job by Huntington was careless enough that each Subpoena demands the same tax returns in two separate requests. *Compare* Subpoenas Request 4 *with* Request 8. This is the opposite of taking

reasonable steps, and Huntington has done nothing to cut down on or reasonably reduce the production requests to the Subpoena targets.

Turning to the Agreed Scheduling Order, it was agreed to by Huntington and was entered four days before Huntington filed the Motions. That order sets the deadlines for completing a discovery production by the Debtor, which is already substantially complete.[3] What remains to be produced is the email review, the supplemental statements for the older, closed accounts, and the re-production of certain illegible checks. The second wave of the email production already includes the mailboxes of Mr. Packer, Ms. Smith, and Ms. Burris-Whitaker. Through the Subpoenas, Huntington seeks to sidestep the Agreed Scheduling Order by compelling a second, unfiltered production of those same custodians' files, outside the search terms Huntington negotiated, outside the schedule it signed, and outside of the view of the Debtor's professionals who are screening for privilege.

As to the Examiner Order, Huntington asked for the Examiner. The Court appointed the Examiner to conduct the investigation into these exact subject matters and over this exact time period. Through a negotiated term in the Examiner Order (which was suggested by the Debtor), the Examiner himself was provided with Rule 2004 examination and subpoena powers. Examiner Order at ¶¶ 3, 11. The Debtor negotiated the Examiner Order's protective terms because he was concerned about the examination's effect on his employees and his operating businesses. Huntington agreed that the investigation would be proportional to the needs of the case and would not inordinately interfere with the Debtor's operations. *Id.* at ¶ 5. Huntington also agreed that even the Examiner, a neutral party appointed by the Court, must confer with the Debtor and give five

---

[3] The Court will recall that Huntington had multiple spreadsheets showing small gaps in the production of tax returns, bank statements, and financial statements. To the best of the Debtor's knowledge, currently there are no outstanding gaps in production other than the old bank account statements from the Agreed Scheduling Order. To the extent Huntington has updated its spreadsheets, it has not communicated any missing information to the Debtor.

business days' notice before serving any third-party subpoena, "for the purpose of avoiding cost, delay, and unnecessary burden on third parties." *Id.* at ¶ 11.[4]

Huntington now claims for itself (an adverse creditor) freedom from those restraints that the parties denied to the Court's own appointee. That appointee submitted a budget of approximately $310,000. Yet while the Examiner is going through his expensive investigation, Huntington seeks a parallel, unsupervised version of the same investigation: no work plan, no budget, no coordination, no privilege review, no proportionality, eight custodians, fourteen days. What, then, is the point of the Examiner, if Huntington was just going to duplicate every effort, and every expense?

**B.      The claimed emergency is one of Huntington's own making.**

In January, the Debtor argued that third parties are entitled to notice of Rule 2004 discovery directed at them. The Court agreed. It denied Huntington's omnibus approach and directed it to file motions addressed to and served upon the specific parties affected. January Order at ¶ 1. Huntington then let six months pass. Across the February conference, the April 27 conference, the two follow-up Zoom conferences, and the July 10 meet and confer, Huntington previewed its intention to serve discovery to the trusts, to lenders, and to companies the Debtor does not control. But it never mentioned discovery to the Debtor's employees, and it could have filed these Motions at any time.

Huntington will try to pin the blame on the Debtor by saying it was waiting for the Debtor's discovery responses to determine the names of the Debtor's employees. That is as if Huntington could not send an email, pick up the phone, or turn to counsel during the in-person discovery conference and raise the issue by asking for that interrogatory to be answered sooner. Instead,

---

[4] Huntington did not confer with the Debtor, and gave the Debtor no notice, before filing the Motions.

Huntington never informally asked the Debtor to identify or locate any employees. Had it asked, the Debtor would have answered, as his conduct shows.[5] As it were, the Debtor did not believe Huntington would be issuing subpoenas to the employees because Huntington's overbroad discovery requests to the Debtor already covered any production the employees could provide.

And it would not be accurate to pin all delay on the Debtor. When the Debtor proposed reduced email search terms on May 11, Huntington waited until June 15 to respond. A party that spends half a year not acting on the Court's January instruction, and five weeks sitting on a search-term proposal, cannot claim an emergency exists that would unduly burden innocent third parties.

Huntington's *Omnibus Reply of The Huntington National Bank in Response to Objections to Rule 2004 Discovery Filed at ECF 229 and 230 by Certain Debtor Related Entities and Banks* (Doc. 241) (the "Reply"), filed the day before this objection, extends the same theme. The Reply complains that the Debtor "has still not produced any electronic discovery. Not even one e-mail." Reply at ¶ 26. The first email deadline under the Agreed Scheduling Order that Huntington signed is July 29.[6] Huntington's complaint is that the Debtor is complying with Huntington's own agreed schedule, on schedule. And that is a schedule made to accommodate the massive undertaking that Huntington demanded.

Further, discovery delays Huntington will cite are largely the product of its own litigation choices. Instead of pursuing ordinary Rule 2004 discovery, Huntington first sought an omnibus process that the Court rejected for lack of due process. It then delayed the February discovery conference to await a state-court summary-judgment ruling that it was confident was coming soon

---

[5] The Motions could be served on Ms. Smith and Ms. Tanner by overnight mail only because the Debtor provided their addresses the same day Huntington asked for them.

[6] The parties finalized the search terms for the emails on July 10. Over 41,000 emails and related documents are being reviewed for production within a matter of weeks, with more to follow next month. Frankly, the Debtor's team is moving incredibly quickly on that production based on when the parties agreed to the search terms.

(and which the parties are still waiting for). Once discovery was underway, Huntington filed an early derivative-standing motion before it had developed a factual record, sought appointment of an Examiner, and simultaneously opposed any further extension of exclusivity, forcing the Debtor to prepare and file a massive plan and disclosure statement while the examination remained incomplete. Most recently, when the July 13 hearing on the derivative-standing motion arrived, Huntington failed to file an exhibit or witness list and attributed its lack of preparation (or, more likely, its oversight that it carries the evidentiary burden) to alleged discovery delays. Each of these steps required the Debtor's professionals to divert time from discovery responses and document production to motion practice, hearing preparation, and plan development. The resulting lag is therefore of Huntington's own creation, not a sudden emergency that justifies imposing fourteen-day subpoenas on current and former employees.[7]

Finally, as to the reason for the rush, Huntington claims that it must conduct depositions before the Examiner prepares his final report. But that is not the Examiner's position, and it's the Examiner's report, not Huntington's. The undersigned counsel has conferred with the Examiner's counsel about the Motions. The Examiner did not request these examinations and was not consulted before the Motions were filed. His July 16 on-site meeting with Ms. Burris-Whitaker, Ms. Smith, and Mr. Packer was the Court-approved Phase I work that required meeting with the Debtor's team. The Examiner is preparing his own informal supplemental document requests based on that meeting, and he has the power to seek formal discovery in accordance with the Examiner Order if he needs it. Simply put, it is no longer Huntington's job to supply the Examiner with information that Huntington believes the Examiner needs. The Examiner is there to conduct his own investigation and Huntington should not be directing it in any way. In fact, allowing

---

[7] As this brief is being written, there are in excess of 30,000 email production decisions that require partner-level confirmation before the looming discovery deadline. This time could be better spent.

14

Huntington to conduct discovery and depose parties for the "benefit" of the Examiner will do nothing but taint the examination process.

        **C.**      **Huntington has not carried its burden as to any examinee, and the burden of compliance falls on the estate.**

Huntington has the burden of showing that good cause exists for these proposed examinations, and the Court must weigh the importance of the information against the cost and burden of production. *In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 393 (Bankr. W.D. Pa. 2008); *In re Fearn*, 96 B.R. 135, 138 (Bankr. S.D. Ohio 1989). To be clear: there is no value in getting the same documents a second, third, or eighth time. That is what Huntington is asking for. Yet Huntington barely attempts to even make a good cause showing: it just repeats the same argument eight times, that it has "information and belief" that the third party has information. It identifies no document that these individuals hold which the Debtor has not already produced or is producing. It identifies no gap in the existing production or any missing document that the Debtor has not attempted to obtain. Huntington should have more than just an "information and belief" about these third parties, since it has received tens of thousands of documents already in this case. If there are specific gaps in that production, Huntington bears the burden of identifying them.

Huntington's Reply previews its fallback argument: it wants the Court to authorize the Subpoenas now and defer all scope objections to a later Rule 45 meet and confer process (or, more accurately, either a motion for protective order or a motion to compel). Reply at ¶¶ 19-20 (citing *In re Sheetz*, 452 B.R. 746, 750 (Bankr. N.D. Ind. 2011)). That approach is not appropriate here for three reasons. First, the *Sheetz* case is entirely distinguishable in that it dealt with an *ex parte* 2004 examination order and the examinee's motion to reconsider its entry. That court found that in those particular circumstances with the *ex parte* order, the creditor still had discovery rule

protections. Here, however, Local Rule 9013-3 requires that parties affected by relief sought be served, and this Court already rejected proposed authorize-first-and-fix-it-later for third parties in the January Order. Second, Huntington's own cited case authority places the good cause burden on the movant at the motion objection stage, before any subpoena issues. *Countrywide*, 384 B.R. at 393. Third, deferral of objections is patently unfair to the targets. Making them object to the subpoenas would shift the cost of contesting scope onto eight individuals, five of them no longer affiliated with the Debtor, each left to retain counsel and move to quash on a fourteen-day production clock.

Huntington further fails to meet its burden by using identical subpoenas for documents already being produced. The Subpoenas track the existing production request for request. Subpoena Requests 1, 3, 4, 5, and 8 seek financial statements, bank statements, tax returns, and governing documents. The Debtor has produced those categories of documents and organized them by entity. His accountant has produced more than 35,000 pages of tax and financial records. The Debtor has further filled in some production gaps based on spreadsheets provided by Huntington, including pointing out to Huntington which entities do not file separate tax returns because they are passthroughs. The supplemental statements for the older, closed accounts are being gathered now pursuant to the Agreed Scheduling Order.[8] Request 2 seeks appraisals and valuations which the Debtor has and is producing. Requests 6 and 7 seek transfer and disbursement documents; those have been and are being produced and are the central part of the Examiner's Phase I mapping and identification of transactions. *See* Work Plan. Request 9 seeks the "entire accounting file," including communications. Those communications are the email production, proceeding under the

---

[8] Of the 35 unidentified accounts that Huntington asked about, seven did not belong to the Debtor or his entities, eight were not even deposit accounts (some were loan numbers of other creditors), and one was the Debtor's DIP account, the statements for which are filed each month on the docket.

negotiated search terms on the agreed schedule, with the three current employees' mailboxes already in the second wave. Relevance alone is not good cause for requiring production of what has already been provided or is already in the pipeline.

The Reply also previews the theory that the Debtor's Global Notes to his Schedules (Doc. 50) admit that his records are incomplete, so Huntington must reconstruct his finances through third parties. Reply at ¶¶ 8-11. This line of argument (and Huntington's repeated mischaracterization of the Global Notes) has already been thoroughly rebutted by the Debtor. *See Limited Objection to Motion of The Huntington National Bank for The Appointment of An Examiner Pursuant to 11 U.S.C. § 1104* (Doc. 134). The global notes say what such notes say in any complex individual case: the Debtor's income flows through many entities, he tracks it through tax filings and bank statements, and he reserves the right to amend. Those tax filings and bank statements are what have been produced. Perhaps Huntington's 2004 exams of the banks could produce some new piece of information, but the Debtor's controller, his assistant, and his in-house counsel are not independent sources of anything. Their files are the company records the Debtor is already producing, gathered by those very same people. Subpoenaing them tests nothing and collects the same documents multiple times. To the extent the Debtor's personal recordkeeping is imperfect, the remedy Huntington sought and obtained is a forensic examiner whose Phase II work is the cash flow analysis and income reconciliation Huntington says it needs. *See* Work Plan.

Huntington's Reply concedes the duplication point in another way. Huntington states that it has spent hundreds of thousands of dollars on its own financial advisor to compile the information received to date, in organized format, and that it has shared that compilation with the Examiner. Reply at ¶ 16. A creditor whose advisor has already compiled and organized the production cannot credibly claim that it needs the same categories again from eight more

custodians. And it is not Huntington's job anymore to collect documents for the Examiner that the Examiner himself can ask for.

As to the four prior controllers and Mr. Lund, the requests fail on their own terms. These are private individuals, unrepresented in this case. Most have been gone from the companies for years (for example, Ms. Tanner left in October 2021). Only Mr. Lund was still employed when this case was filed, and his employment ended months ago. The Debtor's interrogatory answers stated that the prior controllers' present employment and contact information are unknown to him. Each is nonetheless commanded to produce, in fourteen days, eight and one-half years of records, including company records and company email they have no right to access. The actual custodian of that material (the Debtor and his entities) is already producing it.

As to the three current employees, the burden lands on the estate. Ms. Burris-Whitaker, Ms. Smith, and Mr. Packer are the people already helping to assemble the Debtor's Court-ordered production. At this moment, in addition to the numerous other information demands the Debtor's counsel has placed on them, they are gathering the closed-account statements Huntington requested on July 22. Serving each with a subpoena demanding a fourteen-day production and a deposition would pull the finance, administrative, and legal staff of closely-held operating companies off the production that Huntington itself negotiated, not to mention their every-day tasks of running the Debtor's businesses and the additional burdens that will be placed on them by the Examiner. There is no one behind them to absorb the work. A Rule 2004 examination "should not be so broad as to be more disruptive and costly to the party sought to be examined than beneficial to the party seeking discovery." *Fearn*, 96 B.R. at 138; *accord Official Comm. of Unsecured Creditors v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.)*, 169 B.R. 130, 134 (Bankr. S.D. Ohio 1994).

18

Attached to this memorandum as <u>Exhibits 1 and 2</u> are declarations from Ms. Smith and Ms. Burris-Whitaker. The declarations state their roles and confirm that they are already working on these exact production requests for the Debtor. They each also explain the burden this will place on them as individuals and employees: substantial cost and an inability to do their every day jobs. This burden is the exact type that the Debtor negotiated protections from in the Examiner Order. The Court should not require the Examiner to be held to a higher standard than the party that requested it.

The Motions are also part of a pattern. Huntington has demanded the same universe of documents from the Debtor, from the trusts, from the Debtor's family members, from his accountants, from over a dozen banks, and now from his employees and former employees, without adjusting for what each source actually holds or for what Huntington has already received. *See* Docs. 229, 230 (objections of the third-party banks and the affected entities to Huntington's bank subpoenas). Every version recycles the same 107-entity schedule. That entity schedule carries the same errors the Debtor has corrected repeatedly, including entities that are defunct or never operated, entities the Debtor never owned or controlled, entities that went to Huntington's court-appointed receiver in 2020 that the Debtor never controlled, and entities that have since been renamed or never even existed. Despite the Debtor's repeated corrections, Huntington has never fixed the list, simply attaching it to its next set of requests and demanding that third parties find their way through it all.

> **D.    The Subpoenas provide no protection for privileged or confidential information.**

Huntington stipulated to the Protective Order, and the Court entered it, on a finding that discovery in this case would involve confidential, sensitive, and private financial information warranting protection from public disclosure and from use outside this case. *See* Doc. 106. The

Subpoenas operate outside that structure. Eight non-parties, none of whom has been given notice of the Protective Order, would deliver financial records, tax returns, and communications directly to Huntington within fourteen days. There is no designation mechanism and no opportunity for the Debtor or his companies to review the material for privilege or confidentiality before it leaves the custodians' hands.

The Subpoena directed to Mr. Packer is the clearest example of this problem. The subpoenas demand that Mr. Packer, the in-house general corporate counsel to the Debtor's entities, provide all internal and external communications without any limit or scope. Even asking for such production is drastically inappropriate given the privilege issues, made worse by the fact that those emails are already being reviewed for privilege and produced by the Debtor.

## V.    CONCLUSION

The Motions should be denied. If these exams are permitted at all, they should be deferred until the Examiner files his report, consistent with the Court's treatment of the other substantive matters in this case. If the Court permits any examination, it should be coordinated with the Examiner under the Examiner Order, limited to specific gaps identified in the existing production, made subject to the Protective Order, with an opportunity for the Debtor and his companies to review for privilege before production, and placed on a reasonable production schedule.

Respectfully submitted,

/s/ James A. Coutinho
James A. Coutinho     (0082430)
Andrew D. Rebholz    (0102192)
Allen Stovall Neuman & Ashton LLP
10 West Broad Street, Suite 2400
Columbus, OH 43215
T: (614) 221-8500; F: (614) 221-5988
coutinho@asnalaw.com; rebholz@asnalaw.com
*Counsel for Debtor / Debtor in Possession*

20

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | : | Case No: 25-12607 |
| Raymond Joseph Schneider, | : | Chapter 11 |
| | : | |
| Debtor and Debtor in Possession. | : | Judge Beth A. Buchanan |

**DECLARATION OF ABIGAIL SMITH IN SUPPORT OF DEBTOR'S OMNIBUS OBJECTION TO THE EMERGENCY MOTIONS OF THE HUNTINGTON NATIONAL BANK FOR AUTHORIZATION TO CONDUCT RULE 2004 DISCOVERY WITH RESPECT TO THIRD PARTIES (DOCS. 220-227)**

I, Abigail Smith, declare as follows:

1. I am the executive assistant to Raymond Joseph Schneider (the "Debtor"), employed through Grasshopper Investments, LLC. I make this declaration in support of the Debtor's omnibus objection to the emergency Rule 2004 motions filed by The Huntington National Bank ("Huntington"). The facts stated below are within my personal knowledge.

2. I assist the Debtor in all aspects of his business affairs, taking on numerous administrative roles in the operation of his many businesses. In addition to my role as the Debtor's assistant, I am also the Payroll and Benefits Manager and handle those matters for multiple entities.

3. I do not maintain accounting records, financial statements, tax returns, or loan files of my own in relation to the Debtor and his companies. The documents I handle in my work belong to the Debtor and his companies.

4. Throughout the course of this case, I have assisted the Debtor and his professionals in the collection and production of documents and information. Each of the hundreds of bank statements, tax returns, and financial statements that have been produced were obtained by me and the Debtor's controller and provided to the Debtor's counsel for production. I have worked with the Debtor to respond when additional production has been requested, and I have helped the Debtor

explain what records are available. I have already spent dozens of hours collecting and producing records.

5.　　I am currently assisting with the Debtor's court-ordered discovery production in gathering bank statements for primarily the older, closed accounts identified to Huntington on July 22, 2026 and locating legible copies of checks for re-production. I also participated in the Examiner's on-site meeting on July 16, 2026 and am assisting with his follow-up requests. I understand that my mailbox is within the email population being reviewed and produced by the Debtor under the search terms negotiated by counsel.

6.　　I have reviewed the subpoena attached to the motion directed to me. It demands nine categories of documents, including the "entire accounting file," for the Debtor and the 107 entities listed on its schedule, for the period January 1, 2018 to the present, within fourteen days. I do not possess these categories of documents independently of the Debtor and his companies. Moreover, even if I were in possession of those documents on my own, it would not be possible for me to respond in that timeline. If I were forced to respond in that timeline, I would not be able to do both my regular job and produce the requested documents, and the ongoing business operations require constant attention.

7.　　Further responding to the subpoena will also require me to obtain independent legal counsel at a substantial financial burden. I am privy to the amount that the Debtor spends in legal fees in responding to Huntington, and I do not have the personal resources to expend to defend myself from this large and burdensome request.

**EXHIBIT 1**

**Page 3 of 3**

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.

Executed on July 28, 2026.

_Abigail Smith_
Abigail Smith

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | : | Case No: 25-12607 |
| Raymond Joseph Schneider, | : | Chapter 11 |
| | : | |
| Debtor and Debtor in Possession. | : | Judge Beth A. Buchanan |

**DECLARATION OF JENNIFER BURRIS- WHITAKER IN SUPPORT OF DEBTOR'S OMNIBUS OBJECTION TO THE EMERGENCY MOTIONS OF THE HUNTINGTON NATIONAL BANK FOR AUTHORIZATION TO CONDUCT RULE 2004 DISCOVERY WITH RESPECT TO THIRD PARTIES (DOCS. 220-227)**

I, Jennifer Burris-Whitaker, declare as follows:

1.     I am the controller for the business entities owned or controlled by Raymond Joseph Schneider (the "Debtor"), employed through Grasshopper Investments, LLC. I make this declaration in support of the Debtor's omnibus objection to the emergency Rule 2004 motions filed by The Huntington National Bank ("Huntington"). The facts stated below are within my personal knowledge.

2.     As controller, I oversee the day-to-day accounting for the Debtor's companies. My duties include maintaining the general ledger and books of account, processing accounts payable and receivable, reconciling bank accounts, preparing financial statements and transaction reports, supporting payroll and the monthly close, and preparing financial reporting for the companies' lenders.

3.     The accounting records, financial statements, tax records, and loan files I work with belong to the Debtor and his companies. I do not maintain any of those records of my own in relation to the Debtor and his companies.

4.     Throughout the course of this case, I have assisted the Debtor and his professionals in the collection and production of documents and information. I primarily assisted with the

production of the financial statements and transaction reports, which were prepared or assembled by me and provided to the Debtor's counsel for production. I also worked with the Debtor's assistant to obtain the bank statements that have been produced and to identify accounts and transactions that have been questioned. I have worked with the Debtor to respond when additional production has been requested, and I have already spent dozens of hours collecting and producing records, and answering questions about accounting matters by the Debtor's professionals.

5.    I am currently assisting with the Debtor's court-ordered discovery production, including gathering bank statements for the older, closed accounts identified to Huntington on July 22, 2026. I have ongoing work that I am performing at the Debtor's request to summarize transactions in response to discovery requests and to further identify intercompany activity. I also participated in the Examiner's on-site meeting on July 16, 2026 and am assisting with his follow-up requests. I understand that my mailbox is within the email population being reviewed and produced by the Debtor under the search terms negotiated by counsel.

6.    I have reviewed the subpoena attached to the motion directed to me. It demands nine categories of documents, including the "entire accounting file," for the Debtor and the 107 entities listed on its schedule, for the period January 1, 2018 to the present, within fourteen days. The accounting files I maintain are the companies' files, the same records the Debtor and his companies have produced or are producing in this case. I do not possess these categories of documents independently of the Debtor and his companies. Moreover, even if I were in possession of those documents on my own, it would not be possible for me to respond in that timeline. If I were forced to respond in that timeline, I would not be able to do both my regular job and produce the requested documents, and the companies' accounting operations require constant attention.

7.      Further, responding to the subpoena will also require me to obtain independent legal counsel at a substantial financial burden. I do not have the personal resources to expend to defend myself from this large and burdensome request.

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.

Executed on July 28, 2026.

Jennifer Burris-Whitaker

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing *Debtor's Omnibus Objection to the Emergency Motions of The Huntington National Bank for Authorization to Conduct Rule 2004 Discovery with Respect to Third Parties* was served (i) electronically on the date of filing through the Court's ECF system on all ECF participants registered in this case at the email address registered with the Court, and (ii) by ordinary U.S. Mail on July 28, 2026, addressed to the following:

Jennifer Burris-Whitaker
10988 Deerfield Road
Cincinnati, OH 45242

Matthew J. Hay
543 Babbling Brooke Drive
Monroe, OH 45050

David C. Kennedy
329 Shepherds Way
Morrow, OH 45152

Gregg Lund
2512 Salem St
Cincinnati OH 45208

John Murley
1560 Tonopah Dr.
Cincinnati, OH 45255

Dennis Packer
10988 Deerfield Road
Cincinnati, OH 45242

Abigail Smith
10988 Deerfield Road
Cincinnati, OH 45242

Kathleen Tanner
5616 Brooks Holding
Milford, OH 45150

/s/  James A. Coutinho
James A. Coutinho     (0082430)

21