6.01, the Board shall have the power, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company, including, without limitation·

(a) enter into contracts for the business,

(b) incur any indebtedness, pledge, mortgage or grant liens on any or all of the Company's assets,

(c) invest and reinvest the Company's funds,

(d) employ persons, firms or corporations for the operation and management of the Company business, including but not limited to contractors, advisors, supervisory and managing agents, accountants, attorneys and financial agents on such terms and for such compensation as the Board may determine; and

(e) to perform any and all other acts or activities customary or incidental to the business purposes of the Company and to execute on behalf of the Company any and all instruments or documents which have been determined by the Manger to be necessary to effectuate the business purposes of the Company and the foregoing policies except as expressly prohibited herein

Section 6 03 **Acts Reserved to Members.** The sale of substantially all of the assets of the Company requires a unanimous vote of Members holding all of the voting power of the Units entitled to vote on the action

Section 6.04 **Manager's Compensation.** A Manager shall not be entitled to compensation unless otherwise agreed by the unanimous consent of the Members holding all of the voting power of the Units entitled to vote on the action A Manager shall be entitled to reimbursement for direct out of pocket expenses incurred by him on behalf of the Company

Section 6.05 **Indemnification of a Manager.** Except for gross negligence or intentional misconduct by a Manager, fraud, recklessness, or breach of this Company Agreement, the Company shall indemnify and hold harmless each Manager against any claims, demands, liabilities, costs or expenses, including reasonable attorneys' fees incurred by him in connection with his management of the business of the Company. Neither the Company nor any Member shall have any claims against a Manager by reason of any act or omission of a Manager, provided that such acts or omissions were performed in good faith and that such Manager was not grossly negligent or guilty of willful misconduct with respect to such actions or omissions

## Article VII. CONTRIBUTIONS AND CAPITAL ACCOUNTS

Section 7 01 **Capital Contributions.** As of the date of this Company Agreement, each Member has contributed to the Company capital in return for their respective Units. No interest shall accrue on any Capital Contribution and no Member shall have the right to withdraw or be repaid any Capital Contribution except as provided in this Company Agreement

Section 7 02 **Capital Calls.** The aggregate capital of the Company shall be increased, from time to time, as may be determined to be necessary by the unanimous consent of the Members holding all of the voting power of the Units entitled to vote on the action to satisfy on a timely basis the financial obligations and carry on the current business of the Company (such increase being hereafter referred to as a "Capital Call"). In the event of a Capital Call, the Members shall make additional Capital Contributions to the Company in proportion to their respective Sharing Ratios

Section 7.03 **Adjustment of Units.** In the event that any Member fails to contribute to the Company its initial Capital Contribution or its share of any Capital Contribution pursuant to a Capital Call, then the other Members shall be permitted (but not required) to make such contribution to the capital of the Company and the Units of the Members shall be adjusted to be equal to the proportionate Units of each Member in the capital of the Company taking into account their respective Capital Accounts In the event that Units are adjusted, Capital Accounts shall first be "booked up" according to the method set forth in Section 7 04

Section 7 04 **Capital Account Restatement.** The Capital Accounts of the Members shall be restated in the event that (a) additional contributions are made to the Company, (b) Company Property is distributed to a Member, (c) a new or existing Member is granted Units in the Company as consideration for the provision of services to or for the benefit of the Company in a Member capacity or in anticipation of becoming a new Member, or (d) the Company is dissolved, provided, however, that restatements pursuant to clauses (a), (b) and (c) of this Section 7.04 (i) shall not be made if the contribution, distribution or grant is only a *de minimis* amount and (ii) need not be made if the Board reasonably determines that a revaluation is not necessary or appropriate to reflect the relative economic interests of the Members in the Company Any such restatement shall be effected in such a manner and at such time as required by the Regulations, (A) valuing the Company Property based on fair market value as determined by the Board (taking §7701(g) of the Code into account) as of the date of such restatement and (B) allocating any unrealized income, gain, loss or deduction inherent in such Company Property (that has not been reflected previously in the Capital Accounts) among the Members as if there were a taxable disposition of such Company Property for its fair market value as of the date of such restatement. The Capital Accounts shall be adjusted in accordance with §1 704-1(b)(2)(iv)(g) of the Regulations for allocations to the Members of depreciation, depletion, amortization and gain or loss, as computed for book purposes with respect to such revalued Company Property Additionally, the Members' distributive shares of depreciation, amortization, and gain or loss, as computed for tax purposes with respect to such Company Property shall be determined so as to take into account the variation between the adjusted tax basis and the book value of such Company Property in the same manner as required by §704(c) of the Code

Section 7 05 **Maintenance of Capital Accounts.**

(a) As of the date of this Agreement, the Units of each Member were divided into Class A and Class B Units With respect to each Member, the aggregate Capital Account of the Member as of the date of this Agreement shall be allocated equally among the Class A Units and Class B Units held by the Member as of the date of this Agreement, such that the percentage of the Member's Capital Account allocated to Class A Units and Class B Units, respectively, equals the number of Class A Units and Class B Units, respectively, over the total number of Units held by the Member

(b) The Company shall establish and maintain a single Capital Account for each Member and each Assignee, as applicable, regardless of the class of such Person's Units, in accordance with the Regulations An Assignee's initial Capital Account shall be that amount as determined in Section 7.06 As applicable, each Capital Account shall be (a) increased by (i) the amount of money actually contributed by the Member to the capital of the Company (and the amount of any Company liabilities assumed by such Member, other than liabilities described in the parenthetical language of clause (a)(ii) of this Section 7.05), (ii) the fair market value of Property contributed, as unanimously determined by the Members at arm's length at the time of contribution (net of liabilities assumed by the Company or subject to which the Company takes such Property, within the meaning of §752 of the Code); and (iii) the Member's or Assignee's share of Net Profits and of any separately allocated items of income or gain, and (b) decreased by (i) the Member's or Assignee's share of Net Losses and of any Company deductions, (ii) the amount of money actually distributed to such Member or Assignee by the Company, and (iii) the fair market value of

any Property distributed by the Company, as unanimously determined by the Members at arm's length at the time of distribution (net of any liabilities securing such Property assumed by such Member or Assignee).

Section 7 06 **Sale or Exchange of Units.** In the event of a sale or exchange of some or all of a Member's Units, the Capital Account of the transferring Member shall become the Capital Account of the transferee to the extent it relates to the portion of the Units transferred.

Section 7.07 **Compliance with Section 704(b) of the Code.** The provisions of this Article VII as they relate to the maintenance of Capital Accounts are intended, and shall be construed and, if necessary, modified to cause the allocations of profits, losses, income, gain and credit pursuant to Article VIII to have substantial economic effect under the Regulations promulgated under §704(b) of the Code, in light of the distributions made pursuant to Article VIII and Article XII and of the Capital Contributions made pursuant to this Article VII Nothing contained in this Agreement shall be construed to require any Member to restore any deficit in such Member's Capital Account

## Article VIII. ALLOCATIONS AND DISTRIBUTIONS

Section 8.01 **Allocations of Net Profits and Net Losses from Operations.** Except as may be required by §704(c) of the Code, and Section 8.02, 3 and 4 of this Article VIII, Net Profits, Net Losses and other items of income, gain, loss, deduction and credit shall be apportioned among the Members and Assignees in proportion to their Sharing Ratios

Section 8.02 **Regulatory Allocations**

(a) **Company Minimum Gain Chargeback.** If there is a net decrease in Company Minimum Gain for a Taxable Year, each Member and Assignee must be allocated items of income and gain for that Taxable Year equal to that Member's or Assignee's share of the net decrease in Company Minimum Gain A Member's or Assignee's share of the net decrease in Company Minimum Gain is the amount of the total net decrease multiplied by the Member's or Assignee's percentage share of the Company Minimum Gain at the end of the immediately preceding Taxable Year A Member's or Assignee's share of any decrease in Company Minimum Gain resulting from a revaluation of Company Property equals the increase in the Member's or Assignee's Capital Account attributable to the revaluation to the extent the reduction in minimum gain is caused by the revaluation A Member or Assignee is not subject to the Company Minimum Gain chargeback requirement to the extent the Member's or Assignee's share of the net decrease in Company Minimum Gain is caused by a guarantee, refinancing or other change in the debt instrument causing it to become partially or wholly recourse liability or a Member Nonrecourse Liability, and the Member or Assignee bears the economic risk of loss (within the meaning of §1 752-2 of the Regulations) for the newly guaranteed, refinanced or otherwise changed liability This Section 8.02(a) is intended to comply with the minimum gain chargeback requirement in Regulations §1.704-2(f) and shall be interpreted consistently therewith

(b) **Member Minimum Gain Chargeback.** If during a Taxable Year there is a net decrease in Member Minimum Gain, any Member or Assignee with a share of that Member Minimum Gain (as determined under §1.704-2(i)(5) of the Regulations) as of the beginning of that Taxable Year must be allocated items of income and gain for that Taxable Year (and, if necessary, for succeeding Taxable Years) equal to that Member's or Assignee's share of the net decrease in the Company Minimum Gain. A Member's or Assignee's share of the net decrease in the Member Minimum Gain is determined in a manner consistent with the provisions of §1.704-2(g)(2) A Member or Assignee is not subject to this Member Minimum Gain chargeback, however, to the extent the net decrease in Member Minimum Gain arises because the liability ceases to be Member Nonrecourse Liability due to a conversion, refinancing or other

change in the debt instrument that causes it to become partially or wholly a Company Nonrecourse Liability. The amount that would otherwise be subject to the Member Minimum Gain chargeback is added to the Member's or Assignee's share of Company Minimum Gain. In addition, rules consistent with those applicable to Company Minimum Gain shall be applied to determine the shares of Member Minimum Gain and Member Minimum Gain chargeback to the extent provided under the Regulations issued pursuant to §704(b) of the Code. This Section 8 02(b) is intended to comply with the minimum gain chargeback requirement in Regulations §1 704-2(i)(4) and shall be interpreted consistently therewith.

(c) **Qualified Income Offset.** In the event any Member which is not obligated to fully restore a deficit balance in its Capital Account upon liquidation unexpectedly receives any adjustments, allocations or distributions described in Regulations §§1 704-1(b)(2)(ii)(d)(4)-(6), then items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit balance in the Capital Account of such Member as quickly as possible, provided that an allocation pursuant to this Section 8 02(c) shall be made if an only to the extent that such Member would have a deficit in its Capital Account after all other allocations provided for in Section 8.01 and Section 8 02 have been tentatively made as if this Section 8.02(c) were not in the Agreement. This Section 8.02(c) is intended to comply with the qualified income offset requirement in Regulations §1 704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith

(d) **Gross Income Allocation.** In the event that any Member has a deficit Capital Account at the end of any Taxable Year that is in excess of the amount of any deficit balance in such Member's Capital Account that such Member is treated as obligated to restore pursuant to (i) §1 704-1(b)(2)(ii)(c) of the Regulations and (ii) the penultimate sentences of §§1.704-2(g)(1) and 1 704-2(i)(5) of the Regulations ("Member's Restoration Obligation"), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4 2(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such amount after all other allocations provided for in Section 8 01 and 8 02 have been tentatively made as if Section 8 02(c) and (d) were not in this Agreement

(e) **No Impermissible Deficits.** Notwithstanding any other provision of this Agreement, Net Losses shall not be allocated pursuant to Section 8.01 if such an allocation would create or increase the deficit balance in a Member's Capital Account at the time in question, after (i) reducing the amount of such deficit by the amount, if any, of such Member's Restoration Obligation and (ii) increasing the amount of such deficit by the amount, if any, of the items described in paragraphs (4), (5) and (6) of §1.704-1(b)(2)(ii)(d) of the Regulations ("Adjusted Capital Account Deficit") All Net Losses that, if allocated to a Member, would create or increase an Adjusted Capital Account Deficit shall be allocated to the other Members, to the extent such allocations do not create or increase an Adjusted Capital Account Deficit

Section 8 03 **Curative Allocations** The allocations set forth in Section 8.02 (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations It is the intent of the Members that, to the extent possible, all Regulatory Allocations will be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 8.03. Therefore, notwithstanding Section 8.01 and Section 8.02, the Board shall make such offsetting special allocations in whatever manner the Board determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 8 01

Section 8 04 **Interim Distributions.** From time to time, the Board shall determine in his reasonable judgment to what extent, if any, the Company's cash on hand exceeds the current and anticipated

needs, including, without limitation, needs for operating expenses, debt service, acquisitions, reserves and mandatory distributions, if any To the extent such excess exists and subject to Section 8 05, the Board may, from time to time, make Distributions to Members Distributions shall be made proportionately to the Members in accordance with their respective Sharing Ratios

Section 8.05 **Tax Distributions.** Notwithstanding anything to the contrary in Section 8 04, but subject to Section 8.06, if and to the extent that the Company is earning income which is allocated to the Members, minimum distributions shall be made to each Member in such amounts and at such times (but no later than March 31 of each year) as shall be sufficient to enable the Members to meet the federal, state and local income tax liability arising or incurred as a result of their participation in the Company for the Taxable Year, based on the amount of income that is allocated to the Member For the purposes of such distributions, it shall be assumed that each of the Members is taxable at the highest combined effective federal, state and local individual income tax rate then applicable to any Member with respect to such income. Each tax distribution shall be made on a nondiscriminatory basis to all Members pro rata in accordance with their respective Sharing Ratios It is specifically recognized that in making an assumption as to tax liabilities of a Member, some Members may receive a distribution which is in excess of their actual tax liabilities, and some Members may receive a distribution which is less

Section 8 06 **Limitations on Distributions.** No Distribution shall be declared and paid unless, after the Distribution is made, the assets of the Company are in excess of all liabilities of the Company, except liabilities to Members and Assignees on account of their Capital Accounts.

Section 8 07 **Form of Distributions.** No Member, regardless of the nature of the Member's Capital Contribution, has any right to demand and receive any distribution from the Company in any form other than money

## Article IX. TAXES

Section 9.01 **Elections.** The Board may make any tax elections for the Company allowed under the Code or the tax laws of any state or other jurisdiction having taxing jurisdiction over the Company, provided, however that an election under Section 754 of the Code shall require the unanimous consent of the Members holding all of the voting power of the Units entitled to vote on the action

Section 9.02 **Taxes of Taxing Jurisdictions.** To the extent that the law of any Taxing Jurisdiction requires, each Member requested to do so by the Board will execute an agreement in form and substance satisfactory to the Board, indicating that the Member will make timely income tax payments to the Taxing Jurisdiction and that the Member accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Member's income and interest, and penalties assessed on such income. If the Member fails to provide such an agreement, the Company may (but shall not be obligated to) withhold and pay over to such Taxing Jurisdiction the amount of tax due with respect to such income. Any such payments with respect to the income of a Member shall be treated as a Distribution for purposes of Article VIII The Company may, where permitted by the rules of any Taxing Jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the Taxing Jurisdiction, in which case the Company shall inform the Members of the amount of such tax, interest and penalties so paid

Section 9.03 **Tax Proceedings.**

(a) Raymond Schneider shall be (i) with respect to Company tax returns filed for Taxable Years of the Company beginning on or before December 31, 2017, the tax matters partner, pursuant to §6231(a)(7) of the Code (as effective for such tax returns) (the "Tax Matters Member") and (ii) with respect to Company tax returns filed for fiscal years of the Company beginning after December 31, 2017, the partnership representative, pursuant to §6223 of the Partnership Audit Procedures (the "Company Representative"); provided that the Board may change the Tax Matters Member and Company Representative (each, a "Tax Representative") from time to time by designating in writing a new Tax Matters Member or Company Representative, as the case may be, for any tax return in accordance with applicable law, and provided further that the Company may elect out of Company-level audit proceedings in any Taxable Year that it is eligible to do so under §6221(b) The Tax Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by any federal, state or local tax authorities and any resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member (and each Person who was a Member during the reviewed Taxable Year) shall provide such information to the Company as the Tax Representative may reasonably request to reduce the amount of any imputed underpayment, penalty, addition to tax, or additional adjustment amount imposed by a taxing authority and shall take such actions as the Tax Representative may reasonably request in order to assist the Tax Representative in complying with the Partnership Audit Procedures or applicable law of other taxing authorities.

(b) The Tax Representative may cause the Company to make any election available to it under the Partnership Audit Procedures, including without limitation and election under §6225 of the Partnership Audit Procedures to have the Members in respect of the reviewed Taxable Year take tax adjustments on their own tax returns In the event that the Company is required to pay any imputed underpayment, penalty, addition to tax, or other amount pursuant to the Partnership Audit Procedures, then (subject to any valid election of the Company under §6226 of the Partnership Audit Procedures) each Person that was a Member in the applicable reviewed Taxable Year, within the meaning of §6225(d)(1) of the Partnership Audit Procedures, shall make a payment to the Company in an amount equal to the portion of such adjustment amount allocable to such Person, taking into account any modifications of the adjustment amount under §6225(c) of the Partnership Audit Procedures; provided, however, that if such Person is also a Member at the time the Company pays such adjustment amount, the Company may instead withhold from amounts due to such Member from the Company such Member's allocable share of the adjustment amount and any such amount withheld shall be treated as having been distributed by the Company to such Member and then paid by such Member to the Company, and provided further that no payment by or withholding from a Person shall be required if such Person complied with the provisions of §6225(c)(2)(A) or (B) of the Partnership Audit Procedures. For the avoidance of doubt, no payment made to the Company pursuant to this Section 9 03(b) shall be treated as a Capital Contribution Notwithstanding anything in this Agreement to the contrary, all rights and obligations of a Member under this Section 9 03(b) shall survive both the Member's ceasing to be a partner of the Company for federal income tax purposes and the dissolution of the Company. Each Person's obligation to repay the Company under this Section 9 03(b) shall apply to such Person's successors in interest.

(c) - None of the Tax Matters Member or the Company Representative shall be liable to the Company, the Members, former Members or their successors in interest for any action such Person takes or fails to take in connection with any judicial or administrative proceeding, including the agreement to or failure to agree to a settlement or the extension of or failure to extend the relevant statutes of limitations, unless such action or failure constitutes gross negligence or intentional misconduct

Section 9.04 **Method of Accounting.** The records of the Company shall be maintained on the method of accounting determined by the Board after consultation with the Company's accountant

**Article X. TRANSFER OF UNITS**

Section 10 01 **General Restrictions on Transfer.** No Member shall Transfer all or any portion of its Units, except.

(a) a Member who is a natural person may Transfer all or any portion of such Member's Units to a Trust,

(b) any Member may Transfer all or any portion of such Member's Units to the Company or another Member, or

(c) any Member may Transfer all or any portion of such Member's Units with the unanimous written consent of the Members holding all of the voting power of the Units entitled to vote on the action

No Transfer Units to a Person not already a Member of the Company shall be deemed completed until the prospective Transferee has signed this Company Agreement Any Transfer or attempted Transfer of any Units in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue be treated) as the owner of such Units for all purposes of this Agreement.

Section 10 02 **Triggering Events for Option to Buy Units.**

(a) **Voluntary Transfers.** When a Member (the "Offering Member") desires to Transfer any or all of his or her Units (the "Offered Units"), the Offering Member shall give prompt, written, unconditional and irrevocable notice to the Company providing that the Company shall have the option to purchase all (but not less than all) of the Offered Units pursuant to the terms of Section 10 02(c).

(b) **Involuntary Transfer.** Prior to any Involuntary Transfer of Units during the life of a Member (the "Transferring Member") for any reason, the Transferring Member or the Transferring Member's representative shall give prompt written notice to the Company and the other Members disclosing in full the nature and details of the Involuntary Transfer, and the Company, *first*, and each remaining Member, *second*, shall have the option to purchase all (but not less than all) of the Units owned by the Transferring Member at the effective date of the Involuntary Transfer pursuant to the terms of ARTICLE VI and ARTICLE VII of this Agreement For the purposes hereof, an "Involuntary Transfer" includes, but is not limited to, a potential Transfer of Units that occurs in connection with any of the following: (a) a sale upon execution or in foreclosure of any pledge, hypothecation, lien or charge, (b) a voluntary or involuntary petition under any federal or state bankruptcy, insolvency or related law, (c) the appointment of a receiver, (d) an assignment for the benefit of creditors, (e) attachment, assignment or other collection action; (f) the appointment of a guardian or conservator for a Member and (g) termination of the Marital Relationship of a Member by death of the Member's Spouse or by Divorce

(c) **Exercise of Option.** Whenever the Company and the remaining Members have the option to purchase (x) the Offered Units of an Offering Member pursuant to the terms of Section 10 02(a) or Section 10.02(b).

(i) The initial right of the Company to purchase all (but not less than all) of the Offered Units shall be exercisable with the delivery of a written notice by the Company to the Offering Member and the remaining Members within ten (10) days of (i) in the case of a voluntary Transfer pursuant

to Section 10.02(a), the receipt of the Offering Member's written notice regarding the Offered Units or (ii) in the case of an Involuntary Transfer pursuant to Section 10.02(b), the receipt of the Transferring Member's written notice of Involuntary Transfer, provided, however, that if a Book Value has to be determined by a Valuation Firm pursuant to Section 7 05, the time period in this Section 10 02(c)(i) shall not commence until the Valuation Firm has delivered its written determination of Book Value to the Stockholders (or the executor, administrator, surviving Spouse or other legal representative of any deceased Stockholder) The Company's written notice of exercise shall be binding upon delivery and irrevocable by the Company

(ii) If the Company does not elect to purchase all of the Offered Units, the remaining Members, in the aggregate, shall have the right to purchase all (but not less than all) of the Offered Units For a period of ten (10) days following the earlier of the expiration of the Company's option period set forth in Section 10.02(c)(i) or receipt of written notice from the Company that it does not elect to purchase the Offered Units, each remaining Member shall have the right to elect to purchase all (but not less than all) of his or her pro rata portion of the Offered Units by delivering written notice to the Company and the Offering Member or the Transferring Member, as the case may be The pro rata portion of each remaining Member for purposes of this Section 10.02(c)(ii) shall be determined by dividing (i) the percentage of Units owned by a remaining Member by (ii) the total Units owned by all of the remaining Members Each remaining Member's exercise notice shall be binding upon delivery and irrevocable by the remaining Member

(iii) If the remaining Members pursuant to Section 10 02(c)(ii) do not, in the aggregate, elect to purchase all of the Offered Units, each remaining Member electing to purchase his or her pro rata portion of the Offered Units in accordance with Section 10 02(c)(ii) (each, an "Exercising Member") shall have the right to purchase all (but not less than all) of any remaining Offered Units not elected to be purchased by the other remaining Members. As promptly as practicable following the expiration of the remaining Members' option period set out in Section 10 02(c)(ii), the Offering Member or Transferring Member, as the case may be, shall deliver a written notice to each Exercising Member stating the remaining Offered Units available for purchase For a period of ten (10) days following the receipt of such written notice, each Exercising Membership shall have the right to elect to purchase all (but not less than all) of the remaining Option Shares by delivering a written notice to the Company and the Offering Membership or the Transferring Membership, as the case may be If more than one Exercising Member delivers an exercise notice pursuant to this Section 10.02(c)(iii) (each, an "Over-Allotment Participating Member"), the remaining Option Membership shall be allocated pro rata among the Over-Allotment Participating Membership based on a fraction determined by dividing (i) the percentage of Units owned by such Over-Allotment Participating Membership by (ii) the Units owned by all Over-Allotment Participating Members; unless within ten (10) days following receipt of written notice to that effect, the Over-Allotment Participating Members deliver a joint written notice to the Company and the Offering Member or Transferring Member, as the case may be, agreeing to a different allocation for all (but not less than all) of the remaining Offered Units Each Over-Allotment Participating Member's exercise notice shall be binding upon delivery and irrevocable by the Over-Allotment Participating Member

Section 10.03 **Purchase Price; Stipulated Value.**

(a) The purchase price of any Offered Units shall be based on the Stipulated Value of the Company (as defined below)

(b) As of the date of this Agreement, the value of one (1) Class A Unit in the Company is agreed to be $11,166.12. As of the date of this Agreement, the value of one (1) Class B Unit in the Company is agreed to be $10,607.81. The values set forth in this Section 10.03(b) shall remain effective until a new stipulation is agreed to in accordance with Section 10 03(c) (such value, as updated from time to time, the "Stipulated Value")

(c) Within 120 days after the end of each fiscal year of the Company, the Members shall agree upon the Stipulated Value, to be computed as of the end of such fiscal year The Stipulated Value shall be set by unanimous written consent of the Members holding all of the voting power of the Units entitled to vote on the action

## Article XI. ADMISSION OF ASSIGNEES AND SUBSTITUTE MEMBERS

Section 11 01 **Rights of Assignees and Assigning Members.** The Assignee of a Unit has no right to participate in the management of the business and affairs of the Company or to become a Member, unless the Assignee is admitted as a Substitute Member The Assignee is only entitled to receive, to the extent assigned, the Distributions of cash and other property and the allocations of profits, losses, income, gains, deductions, credits or similar items to which the assigning Member would have been entitled The assigning Member remains a Member and retains those rights the Assignee is not entitled to receive

Section 11.02 **Admission of Substitute Members.** An Assignee of a Unit shall be admitted as a Substitute Member and admitted to all the rights of the Member who initially assigned the Units only with the unanimous consent of the Members holding all of the voting power of the Units entitled to vote on the action The Members may grant or withhold the approval of such admission for any reason in their and absolute discretion If so admitted, the Substitute Member has all the rights and powers and is subject to all the restrictions and liabilities of the Member originally assigning the Units The admission of a Substitute Member, without more, shall not release the Member originally assigning the Units from any liability to the Company that may have existed prior to the approval.

## Article XII. DISSOLUTION AND WINDING UP

Section 12.01 **Dissolution.** The Company shall be dissolved and its affairs wound up upon the unanimous written consent of the Members holding all of the voting power of the Units entitled to vote on the action

Section 12.02 **Withdrawal; Continuation of Business Upon Withdrawal.** A Member shall be permitted to withdraw from the Company only upon the unanimous consent of the Members holding all of the voting power of the Units entitled to vote on the action Upon the withdrawal of a Member, the business of the Company shall continue unless all of the remaining the Members holding all of the voting power of the Units entitled to vote on the action vote otherwise. In the event of an unauthorized withdrawal from the Company by a Member, the Member shall be treated as if the Member were an Assignee of all of the Member's Units as of the date of such withdrawal, and the Member shall not have any right to receive the fair value of the Member's Units

Section 12.03 **Effect of Dissolution.** Upon dissolution, the Company shall cease carrying on (as distinguished from the winding up of) the Company's business, but the Company is not terminated and continues until the winding up of the affairs of the Company is completed and the certificate of dissolution has been issued by the Secretary of State of Ohio

Section 12.04 **Distribution of Assets on Dissolution.** Upon the winding up of the Company, the Company Property shall be distributed in the following order of priority.

(a) to creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of Company liabilities,

(b) to establish reserves to cover contingent liabilities approved by all of the Members, and

(c) to Members and Assignees in accordance with positive Capital Account balances taking into account all Capital Account adjustments for the Company's Taxable Year in which the liquidation occurs. Liquidation proceeds shall be paid within sixty (60) days of the end of the Company's Taxable Year or, if later, within ninety (90) days after the date of liquidation Such distributions shall be in cash or Property as unanimously determined by the Members (which need not be distributed proportionately) or partly in both

Section 12.05 **Winding Up and Certificate of Dissolution.** The winding up of the Company shall be completed when all debts, liabilities and obligation of the Company have been paid and discharged or reasonably adequate provision therefore has been made, and all of the remaining property and assets of the Company have been distributed to the Members and Assignees. Upon the completion of the winding up of the Company, a certificate of dissolution shall be delivered to the Secretary of State for filing The certificate of dissolution shall set forth the information required by the Act

## Article XIII. AMENDMENT

Section 13 01 **Company Agreement May be Modified.** This Agreement may be modified as provided in this Article XIII (as the same may be amended from time to time) No Member or Manager shall have any vested rights in this Agreement which may not be modified through an amendment to this Agreement

Section 13 02 **Amendment or Modification of Company Agreement.** This Agreement may be amended or modified from time to time only by a written instrument adopted and executed by the unanimous consent of the Members holding all of the voting power of the Units entitled to vote on the action.

## Article XIV. MISCELLANEOUS PROVISIONS

Section 14.01 **Entire Agreement.** This Agreement represents the entire agreement among all of the Members and between the Members and the Company with respect to the subject matter hereof

Section 14 02 **Rights of Creditors and Third Parties under Company Agreement.** This Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members and their successors and permitted assigns This Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under this Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise

Section 14.03 **Dispute Resolution.**

(a) In the event of any dispute between the parties to this Agreement concerning or arising out of this Agreement, it shall be a condition precedent to the commencement of any litigation proceeding that the aggrieved party or parties shall first meet with the Board, face-to-face (with or without counsel present), in good faith, within ten (10) days after the date on which either party demands such a meeting, in order to address, identify and resolve all disputes and disagreements between or among them ("Good Faith Meeting") Unless otherwise agreed in writing, the Good Faith Meeting shall be held in Cincinnati, Ohio, and no action or proceeding may be commenced until the Board and the aggrieved party or parties have had the Good Faith Meeting If the responding party deliberately and without reasonable cause either fails to meet with the other party within said ten (10) day period or delays the Good Faith Meeting beyond said ten (10) day period, litigation can be commenced notwithstanding the fact that there is no Good Faith Meeting

(b) This Section 14.03 provides the sole and exclusive means by which the parties may assert claims or bring actions out of any rights of the parties under this Agreement or in connection with the transactions contemplated hereby, and the parties shall not resort to any other remedy.

(c) This Agreement shall be governed by the laws of the State of Ohio

(d) Any legal suit, action, or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby shall be instituted in any United States federal court or state court located in the state of Ohio in the City of Cincinnati and County of Hamilton, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum.

(e) EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY

(f) This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the parties have entered into this THIRD AMENDED AND RESTATED OPERATING AGREEMENT of TO LIFE, LTD as of the date first above written.

**COMPANY:**

TO LIFE, LTD.

By: ______________________

Name: Raymond Schneider

Title: Sole Manager

**MEMBERS:**

______________________

Raymond Schneider

______________________

Patricia B. Schneider

______________________

Justin F. Schneider

______________________

Eric P Schneider

## GLOSSARY

For purposes of this Agreement, unless the context clearly indicates otherwise, the following terms shall have the following means

**Act.** Chapter 1705 of the Ohio Revised Code and any amendments thereto

**Articles.** The Articles of Organization of the Company as adopted and amended from time to time by the Members and filed with the Secretary of State of Ohio.

**Assignee.** A transferee of a Unit who is only entitled to receive, to the extent assigned, the Distribution of case and other Property and the allocation of profits, losses, income, gains, deductions, credits or similar items and who has not been admitted as a Substitute Member An Assignee has no right to participate in the management of the business and affairs of the Company or to become a Member, unless the Assignee is admitted as a Substitute Member.

**Capital Account.** The account maintained for a Member or Assignee determined in accordance with Article VII

**Capital Contribution.** The gross amount of investment by a Member or all Members, as the case may be, which may consist of cash, Property or performance of services.

**Class A Member.** A Member holding Class A Units.

**Class B Member.** A Member holding Class B Units.

**Code.** The Internal Revenue Code of 1986, as amended from time to time.

**Company Liability.** Any enforceable debt or obligation for which the Company is liable or which is secured by any Company Property

**Company Minimum Gain.** An amount determined by first computing for each Company Nonrecourse Liability any gain the Company would realize if it disposed of the Company Property subject to that liability for no consideration other than the full satisfaction of the liability, and then aggregating the separately compute gains The amount of Company Minimum Gain includes such minimum gain arising from a conversion, refinancing or other change to a debt instrument only to the extent a Member is allocated a share of that minimum gain. For any Taxable Year, the net increase of decrease in Company Minimum Gain is determined by comparing the Company Minimum Gain on the last day of the immediately preceding Taxable Year with the Minimum Gain on the last day of the current Taxable Year. Notwithstanding any provision to the contrary contained herein, Company Minimum Gain and increases and decreases in Company Minimum Gain are intended to be computed in accordance with §704 of the Code and the Regulations issued thereunder, as the same may be issued and interpreted from time to time. A Member's or Assignee's share of Company Minimum Gain at the end of any Taxable Year equals. the sum of Nonrecourse Deductions allocated to that Member or Assignee (and to that Member's or Assignee's predecessors in interest) up to that time and distributions made to that Member or Assignee (and to that Member's or Assignee's predecessors in interest) up to that time of proceeds of a nonrecourse liability allocable to an increase in Company Minimum Gain minus the sum of that Member's or Assignee's (and that Member's or Assignee's predecessors in interest) aggregate share of the net decreases in Company Minimum Gain plus their aggregate share of the net decreases in Company Minimum Gain plus their aggregate share of decreases resulting from revaluations of Company Property subject to one or more Company Nonrecourse Liabilities.

**Company Nonrecourse Liability.** A Company Liability to the extent that no Member or Related

Person bears the economic risk of loss (as defined in §1.752-2 of the Regulations) with respect to the liability.

**Company Property.** Any property owned by the Company, including but not limited to, the Property, as defined below

**Distribution.** A transfer of Property to a Member or Assignee on account of a Unit as described in Article VIII

**Family** The spouse, issue (whether natural or adopted), sibling or parent of such Member.

**Initial Capital Contributions.** The Capital Contribution agreed to be made by the Initial Members as described in Article VII.

**Initial Members.** Raymond Schneider, Patricia B Schneider, Justin F Schneider, and Eric P Schneider.

**Member.** An Initial Member or Substitute Member

**Member Minimum Gain.** An amount determined by first computing for each Member Nonrecourse Liability any gain the Company would realize if it disposed of the Company Property subject to that liability for no consideration other than the full satisfaction of the liability and then aggregating the separately computed gains The amount of Member Minimum Gain includes such minimum gain arising from a conversion, refinancing or other charge to a debt instrument only to the extent a Member or Assignee is allocated a share of that minimum gain. For any Taxable Year, the net increase or decrease in Member Minimum Gain is determined by comparing the Member Minimum Gain on the last day of the immediately preceding Taxable Year with the Minimum Gain on the last day of the current Taxable Year. Notwithstanding any provision to the contrary contained herein, Member Minimum Gain and increases and decreases in Member Minimum Gain are intended to be computed in accordance with §704 of the Code or the Regulations issued thereunder, as the same may be issued and interpreted from time to time.

**Member Nonrecourse Liability.** Any Company Liability to the extent the liability is nonrecourse under applicable law, and on which a Member or Related Person bears the economic risk of loss under §1 752-2 of the Regulations because, for example, the Member or Related Person is the creditor or a guarantor.

**Net Losses and Net Profits.** For each Taxable Year, an amount equal to the Company's taxable income or loss, respectively, for such Taxable Year determined in accordance with §703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to §703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments

(i) any income of the Company that is exempt from federal income tax shall be added,

(ii) any expenditures of the Company described in §705(a)(2)(B) of the Code or required by the Treasury Regulations to be treated as so described shall be subtracted;

(iii) if the Company Property is revalued on the books of the Company pursuant to Section 7.04, the amount of such adjustment shall be taken into account, immediately prior to the event giving rise to such adjustment, as gain or loss from the disposition of such property for purposes of computing Net Losses and Net Profits,

(iv) gain or loss resulting from the disposition of an asset shall be computed by reference to the book value of such asset,

Case 1:23-bk-10337 Doc 28 Filed 08/10/23 Entered 08/10/23 18:58:31 Desc
Document Page 15 of 20

(v) a deduction for depreciation, amortization or cost recovery with respect to an asset shall be computed by reference to the book value of such asset in accordance with applicable Regulations;

(vi) to the extent an adjustment to the adjusted tax basis of any Company Property pursuant to §734(b) of the Code is required pursuant to §1 704-1(b)(2)(iv)(m)(4) of the Regulations to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Units, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Losses and Net Profits; and

(vii) any items that are specially allocated pursuant to Sections 8.02 and 8.03 shall not be taken into account in computing Net Losses and Net Profits, but the amounts of those items are to be determined by applying rules comparable to those provided in subparagraphs (i) through (vi) above

**Nonrecourse Liabilities.** Nonrecourse Liabilities include Company Nonrecourse Liabilities and Member Nonrecourse Liabilities

**Notice.** A writing addressed to the parties at the addresses set forth in Exhibit A. All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), facsimile or email (with confirmation of transmission), or certified or registered mail (in each case, return receipt requested, postage pre-paid). Except as otherwise provided in this Agreement, a Notice is effective only (a) upon receipt by the receiving party, and (b) if the party giving the Notice has complied with the requirements of this section.

**Partnership Audit Procedures.** Means Subchapter C of Chapter 63 of Subtitle F of the Code (as amended by the Bipartisan Budget Act of 2015, P.L 114-74, the Protecting Americans from Tax Hikes Act of 2015, P L. 114-13 and Sections 201 through 207 of the Tax Technical Corrections Act of 2019, contained in Title II of Division U of the Consolidated Appropriations Act of 2018, P.L. 115-141), and the Regulations promulgated thereunder, as amended from time to time.

**Person.** An individual, trust, estate or any incorporated or unincorporated organization permitted to be a member of a limited liability company under the laws of the State of Ohio.

**Principal Office.** The principal office of the Company as described in Article II

**Property.** The real property and improvements located at 5110 Herringbone Drive & 4851 Red Bank Road, Cincinnati, Ohio 45227, popularly known as "The Red"

**Regulations.** Except where the context indicates otherwise, the permanent, temporary, proposed or proposed and temporary regulations of the Department of the Treasury under the Code as such regulations may be lawfully changed from time to time

**Related Person.** A person having a relationship to a Member or Assignee that is described in §1 752-4(b) of the Regulations

**Sharing Ratio.** With respect to any Member, the Sharing Ratio in the Company set forth on Exhibit A attached hereto With respect to an Assignee, the Sharing Ratio in the Company of the Assigning Member as set forth on Exhibit A to the extent assigned

**Substitute Member.** An Assignee who has been admitted to all of the rights of membership pursuant to this Agreement

**Taxable Year.** The taxable year of the Company as determined pursuant to §706 of the Code.

**Taxing Jurisdiction.** Any state or foreign government that collects tax, interest or penalties, however designated, on any Member's or Assignee's share of the income or gain attributable to the Company

**Transfer.** To sell, transfer, assign, gift, pledge, encumber, hypothecate, or similarly dispose of, directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option, or other arrangement or understanding with respect to the sale, transfer, assignment, gift, pledge, encumbrance, hypothecation, or similar disposition of, any Units or any interest therein.

**Trust.** A trust created by a Member solely for the benefit of the Member and/or one or more members of the Member's Family.

**Unit** The representation of the rights of a Member or, in the case of an Assignee, the rights of the assigning Member in Distributions (liquidating or otherwise) and allocations of the profits, losses, income, gains, deductions and credits of the Company

EXHIBIT A

| Member | Sharing Ratio | Class A Units | Class B Units |
|---|---|---|---|
| Raymond Schneider | 84 2104% | 80 | 720 |
| Patricia B Schneider | 5.2632% | 5 | 45 |
| Justin F Schneider | 5.2632% | 5 | 45 |
| Eric P Schneider | 5 2632% | 5 | 45 |
| **TOTALS:** | **100%** | **95** | **855** |

Case 23-12607 Doc 37-1 Filed 08/16/23 Entered 08/16/23 18:10:38 Desc Document Page 18 of 20

**JOINDER TO**

**OPERATING AGREEMENT**

THIS JOINDER TO OPERATING AGREEMENT (this "Joinder Agreement") is dated as of 11:59pm on December 31, 2019, between *TO LIFE, LTD.*, an Ohio limited liability company (the "Company"), and Patricia B. Schneider, Trustee of the Raymond Schneider 2019 Gift Trust dated December 20, 2019 ("New Member")

STATEMENT OF PURPOSE

The Company has entered into a Third Amended and Restated Operating Agreement of To Life, Ltd., an Ohio limited liability company, dated as of December 31, 2019, among the Company and its Members (as amended or supplemented, the "LLC Agreement")

Effective 11:59 p m on December 31, 2019, New Member became the owner of 720 Class B Units in the Company following an Assignment of Class B Units Pursuant to the Assignment of Class B Units, New Member has agreed to execute this Joinder Agreement in consideration of the receipt of the New Member's Class B Units.

NOW, THEREFORE, the Company and New Member agree as follows:

New Member hereby agrees to become a party to the LLC Agreement with all right, title and interest as Member thereunder and subject to all of the terms and conditions thereof

[Executed on following page]

Case 1:23-bk-10737 Doc 28 Filed 09/28/23 Entered 09/28/23 15:23:37 Desc Main Document Page 19 of 20

IN WITNESS WHEREOF, the Company and New Member have executed this Joinder Agreement effective as of 11:59 p.m. on December 31, 2019.

COMPANY:

To Life, Ltd.

By: [signature]
Raymond Schneider, Manager

NEW MEMBER:

[signature]
Patricia B Schneider, Trustee of the Raymond Schneider 2019 Gift Trust dated December 20, 2019



3562501

**THIRD AMENDED AND RESTATED
OPERATING AGREEMENT
OF
TO LIFE, LTD.**

**EXHIBIT A**

**Effective as of December 31, 2019, 11:59pm.**

| Member | Sharing Ratio | Class A Units | Class B Units |
|---|---|---|---|
| Raymond Schneider | 8.4210 | 80 | 0 |
| Raymond Schneider 2019 Gift Trust | 75.7894 | 0 | 720 |
| Patricia B. Schneider | 5.2632% | 5 | 45 |
| Justin F. Schneider | 5.2632% | 5 | 45 |
| Eric P. Schneider | 5.2632% | 5 | 45 |
| **TOTALS:** | **100%** | **95** | **855** |