# “EXHIBIT P”

EXECUTION VERSION

# OPERATING AGREEMENT

**of**

# RED DOG OPERATIONS HOLDING COMPANY LLC

**an Ohio Limited**

**Liability Company**

**JANUARY 1, 2020**

**TABLE OF CONTENTS**

**Page**

SECTION 1. THE COMPANY ..... 1
1.1 **Formation** ..... 1
1.2 **Company Name** ..... 1
1.3 **Purposes** ..... 1
1.4 **Partnership Status** ..... 1
1.5 **Principal Place of Business** ..... 2
1.6 **Term** ..... 2
1.7 **Filings; Registered Office, Agent for Service of Process** ..... 2
1.8 **Partition** ..... 2
1.9 **Fiscal Year** ..... 2
1.10 **Title to Company Property** ..... 2
SECTION 2. MEMBERS AND UNITS ..... 3
2.1 **Units; Names, Addresses and Units of Members** ..... 3
2.2 **Certificates for Membership Units; Initial Classes of Units** ..... 3
2.3 **Initial Issuances of Units** ..... 5
2.4 **Additional Units and Members** ..... 6
2.5 **Business Transactions with the Company** ..... 6
SECTION 3. CAPITAL CONTRIBUTIONS ..... 6
3.1 **Capital Contributions** ..... 6
3.2 **Other Matters** ..... 6
SECTION 4. CAPITAL ACCOUNTS AND ALLOCATIONS ..... 7
4.1 **Capital Accounts** ..... 7
4.2 **Profits and Losses** ..... 7
SECTION 5. DISTRIBUTIONS TO MEMBERS ..... 7
5.1 **Distributions** ..... 7
5.2 **Tax Distributions** ..... 9
5.3 **Treatment of Taxes Withheld** ..... 9
5.4 **Distributions from Subsidiaries** ..... 9
5.5 **Limit on Distributions**. ..... 10
5.6 **Liquidating Distributions** ..... 10
SECTION 6. MANAGEMENT AND CONTROL ..... 10

**TABLE OF CONTENTS**
(continued)

**Page**


6.1 **Management** .......... 10
6.2 **Board of Managers** .......... 10
6.3 **Officers** .......... 12
6.4 **Duties of a Manager** .......... 12
6.5 **Non-Exclusivity** .......... 12
6.6 **Related Party Transactions** .......... 12
6.7 **Exculpation of Covered Persons** .......... 12
6.8 **Indemnification** .......... 13
6.9 **Reliance on Acts of Board** .......... 14
6.10 **Rights of Members** .......... 14
SECTION 7. BOOKS AND RECORDS; AFFIRMATIVE COVENANTS; NON-DISCLOSURE .......... 15
7.1 **Books and Records** .......... 15
7.2 **Tax Proceedings** .......... 15
7.3 **Non-Disclosure** .......... 16
SECTION 8. TRANSFERS OF UNITS; REDEMPTIONS .......... 17
8.1 **Restriction on Transfers** .......... 17
8.2 **Permitted Transfers of Units** .......... 17
8.3 **Conditions to Permitted Transfers** .......... 17
8.4 **Substitute Member** .......... 18
8.5 **Drag-Along Rights** .......... 18
8.6 **Additional Provisions for Drag-Along Sales.** .......... 19
8.7 **Prohibited Transfers** .......... 20
8.8 **Distributions and Allocations with Respect to Transferred Units** .......... 20
SECTION 9. WITHDRAWAL OF A MEMBER .......... 21
9.1 **Withdrawal of a Member** .......... 21
9.2 **Rights of a Withdrawing Member** .......... 22
9.3 **Company to Continue Upon Withdrawal** .......... 23
SECTION 10. DISSOLUTION OF THE COMPANY .......... 23
10.1 **Dissolution Events** .......... 23
10.2 **Winding Up** .......... 23

**TABLE OF CONTENTS**
(continued)

**Page**


10.3 **Distributions in Kind on Liquidation** ........ 24
10.4 **Compliance With Timing Requirements of the Regulations** ........ 24
10.5 **Rights of Members** ........ 24
10.6 **Prohibition on Withdrawal** ........ 24
SECTION 11. MEETINGS OF MEMBERS ........ 25
11.1 **Meetings** ........ 25
11.2 **Place of Meetings** ........ 25
11.3 **Notice of Meetings** ........ 25
11.4 **Meeting of all Members** ........ 25
11.5 **Record Date** ........ 25
11.6 **Quorum** ........ 25
11.7 **Manner of Acting** ........ 26
11.8 **Proxies** ........ 26
11.9 **Action by Members Without a Meeting** ........ 26
11.10 **Waiver of Notice** ........ 26
SECTION 12. AMENDMENTS ........ 26
12.1 **Authority to Amend** ........ 26
12.2 **Notice of Amendments** ........ 26
SECTION 13. ACKNOWLEDGMENTS ........ 27
13.1 **Representations and Warranties of Members** ........ 27
13.2 **Acknowledgments and Agreements of Each Member** ........ 28
SECTION 14. MISCELLANEOUS ........ 29
14.1 **Notices** ........ 29
14.2 **Binding Effect** ........ 29
14.3 **Construction** ........ 29
14.4 **Waiver of Appraisal** ........ 29
14.5 **Headings** ........ 29
14.6 **Severability** ........ 29
14.7 **Incorporation by Reference** ........ 30
14.8 **Further Action** ........ 30
14.9 **Variation of Pronouns** ........ 30

**TABLE OF CONTENTS**
(continued)

**Page**

14.10 **Governing Law, Consent to Jurisdiction and Service of Process** .................. 30
14.11 **WAIVER OF JURY TRIAL** .................. 30
14.12 **Specific Performance** .................. 30
14.13 **Individual Members; Community Property** .................. 30
14.14 **Legal Representation** .................. 31
14.15 **Entire Agreement** .................. 31
14.16 **Counterpart Execution** .................. 31

APPENDIX A TAX MATTERS

APPENDIX B DEFINITIONS

EXHIBIT A MEMBERS

EXHIBIT B LIST OF CONTRIBUTED SUBSIDIARIES

# OPERATING AGREEMENT OF RED DOG OPERATIONS HOLDING COMPANY LLC

THIS OPERATING AGREEMENT ("**Agreement**") is made effective as of January 1, 2020 (the "**Effective Date**"), among Red Dog Operations Holding Company LLC, an Ohio limited liability company (the "**Company**"), and the persons listed on Exhibit A attached hereto and made a part hereof, as may be amended from time to time (each a "**Member**" and collectively, the "**Members**"). Unless the context otherwise requires or unless otherwise provided in this Agreement, capitalized terms used in this Agreement shall have the meanings ascribed to them as set forth in Appendix B.

## SECTION 1.

## THE COMPANY

1.1 **Formation**. The Company will be a limited liability company formed pursuant to the Act, and the Members will cause Articles of Organization of the Company (the "**Articles**") to be filed with the Ohio Secretary of State as provided in the Act promptly after the Effective Date. For all periods prior to the filing of the Articles of Organization, the Company will be a general partnership but the Members agree that the Company shall be treated during such period as a limited liability company in process of being formed pursuant to the Act and that the Members and Company shall have all rights and obligations as provided in this Agreement and the Act (except as otherwise provided in this Agreement). As of the date of the filing of the Articles of Organization, the Company will be deemed to have approved and ratified all actions taken on its behalf by the Members prior to such date and shall fully indemnify the Members acting on its behalf in accordance with Section 6.8.

1.2 **Company Name**. The name of the Company is "Red Dog Operations Holding Company LLC."

1.3 **Purposes**. The purposes of the Company shall be to engage, directly or through its Subsidiaries, in any other operations, businesses or activities as determined by the Board and permitted under the Act and any other applicable law or regulation. The Company is empowered to do any and all acts and things necessary, appropriate, proper, advisable, incidental to or convenient for the furtherance and accomplishment of the purposes and business described herein and for the protection and benefit of the Company.

1.4 **Partnership Status.** The Members intend that the Company be treated, and irrevocably consent to the treatment of the Company, as a new partnership formed on the Effective Date for federal and, to the extent permitted by applicable state and local law, state and local income tax purposes (but not for any other purpose), in accordance with, among other legal authorities, Regulations Sections 301.7701-1, 301.7701-2 and 301.7701-3 and the applicable income tax provisions of any applicable state or local law (the "**Tax Partnership**"). As of the Effective Date, and prior to the filing of Articles and the contribution of the Contributed Subsidiaries to the Company, the Tax Partnership shall consist of the Contributed Subsidiaries

(including all of the assets, activities and liabilities thereof). This Agreement shall be construed in a manner that ensures the Company's classification as a partnership for federal, state and local income tax purposes at all times, and any provision of this Agreement that would have the effect of preventing the Company from being classified as a partnership for federal, state and local income tax purposes shall be null and void. The Board shall take all actions, and execute, acknowledge and deliver all documents, which in the judgment of the Board, or in the opinion of counsel satisfactory to the Board, are necessary or desirable to obtain and/or maintain the Company's classification as a partnership for such purposes at all times.

1.5 **Principal Place of Business**. The principal place of business of the Company will be such place as the Board may determine from time to time. The Company will maintain, at its principal office, all records pertaining to the Company as required by the Act.

1.6 **Term**. Unless earlier terminated or dissolved pursuant to this Agreement, the Company shall have a perpetual existence (the "**Term**").

1.7 **Filings; Registered Office, Agent for Service of Process**.

(a) The Articles will promptly be filed in the office of the Secretary of State of the State of Ohio in accordance with the provisions of the Act.

(b) The Company, the Members and/or the Managers shall execute or cause to be executed all necessary certificates and documents, and shall make all such filings and recordings, and shall take any and all reasonable actions necessary or appropriate to (i) perfect and maintain the status of the Company as a limited liability company under the laws of Ohio; and (ii) perfect, operate and maintain the status of the Company as a limited liability company or similar type of entity under the laws of Ohio and any States or jurisdictions other than Ohio in which the Company engages in business and is required by applicable laws to be foreign registered or qualified.

(c) The Company's agent for service of process in Ohio will be named in the Articles. The Board may change, at any time and from time to time, the agent for service of process and the location of such registered office.

1.8 **Partition**. No Member, nor any successor-in-interest to any Member, shall have the right, while this Agreement remains in effect, to have the property of the Company partitioned, or to file a complaint or institute any proceeding at law or in equity to have the property of the Company partitioned, and each of the Members, on behalf of itself and its successors, representatives and assigns, hereby irrevocably waives any such right.

1.9 **Fiscal Year**. The fiscal year of the Company ("**Fiscal Year**") shall begin on January 1st and end on December 31st of each calendar year unless a different year is determined by the Board.

1.10 **Title to Company Property**. All property owned by the Company, whether real or personal, tangible or intangible, shall be deemed to be owned by the Company, and no Member individually shall have any interest in such property. Title to all such property may be held in the

name of the Company or a designee as determined by the Board, which designee may be a Member or an Affiliate of a Member.

## SECTION 2.

## MEMBERS AND UNITS

2.1 **Units; Names, Addresses and Units of Members**. The Members' ownership interest in the Company shall be represented by issued and outstanding Units, which may be divided into one or more types, classes or series. Each type, class or series of Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class or series. The Board shall maintain a schedule of all Members on Exhibit A, their respective mailing addresses and the amount and series of Units held by them. The Board is authorized and empowered to cause Exhibit A to be amended, updated, supplemented or modified from time to time to reflect the admission or withdrawal of Members to the extent permitted hereunder; a change in a Member's address; the sale, grant, issuance or redemption of Units or other event that results in a change in the information on Exhibit A; and any such amendment, which shall not require the consent, approval or vote of the Members, shall be effective as of the date of the event necessitating such amendment.

2.2 **Certificates for Membership Units; Initial Classes of Units**.

(a) If designated by the Board in its sole discretion, the Units may be represented by a certificate (a "**Certificate of Membership**"). The exact contents of a Certificate of Membership will be determined by the Board; provided, however, that the contents of a Certificate of Membership may not modify or expand any rights or obligations of any Member as provided for in this Agreement. Each Member hereby agrees that the following legend may be placed upon any counterpart of this Agreement, the certificate, or any other document or instrument evidencing ownership of a Unit:

> The Units represented by this certificate have not been registered under any securities laws and the transferability of such Units is restricted. A Unit may not be sold, assigned or Transferred, nor will any assignee, vendee, transferee or endorsee thereof be recognized as having acquired any such Unit by the issuer for any purposes, unless (1) a registration statement under the Securities Act of 1933, as amended, with respect to such Unit will then be in effect and such Transfer has been qualified under all applicable state securities laws, or (2) the availability of an exemption from such registration and qualification will be established to the reasonable satisfaction of the Company.
>
> The Units represented by this certificate are subject to restrictions contained in an operating agreement among the company and its members, as amended, and may be sold, assigned, pledged, encumbered, or otherwise transferred only in accordance with said agreement. A copy of said agreement has been deposited with the secretary of the company, who will mail to the holder of this certificate a copy of said agreement without charge within five (5) days after receiving written request therefore. By acceptance of

this certificate, the holder agrees to be bound by the terms of said agreement, and acknowledges that he, she, or it has executed said agreement.

(b) The Company is hereby authorized to issue classes of Units designated in separate classes as follows: Class A Units, Class B Units, Class C Units and Class D Units. The relative rights, powers, preferences and obligations of each class of Units shall be as set forth with respect to such class in this Agreement. The rights, privileges or preferences of or with respect to any particular outstanding Compensatory Units may be further restricted, reduced or eliminated, as determined by the Board in its sole discretion, as set forth in a Restricted Unit Agreement entered into by and among the Company and any holder of such Compensatory Units, and applicable to such Compensatory Units.

(c) The Company and each Member agrees that, to the extent designated by the Board, any issuance of Compensatory Units shall be treated by all parties to this Agreement for all United States federal and applicable state and local tax purposes as "profits interests" within the meaning of Rev. Proc. 93-27, 1993-2 C.B. 343, and to such extent, no amount will be credited to the Capital Account of any holder of such Compensatory Units upon the issuance of any such Compensatory Units. With respect to any such Compensatory Units which are so intended to be treated as profits interests for United States federal and applicable state and local tax purposes: (i) the Company will treat holders of such Compensatory Units as the owners of such Compensatory Units from the date they are granted, and will file its Internal Revenue Service Form 1065 and issue appropriate Schedule K-1s to such holders of Compensatory Units (at the same time as such Schedule K-1s are provided to the Class A Members and Class B Members), allocating to each of them its distributive share of all items of income, gain, loss, deduction and credit associated with such Compensatory Units as if such Compensatory Units were fully vested, (ii) each holder of such Compensatory Units agrees to take into account such distributive share in computing its federal income tax liability for the entire period during which it holds such Compensatory Units, and (iii) subject to a "determination" (as such term is defined in Section 1313(a) of the Code) to the contrary, the Company agrees not to claim a deduction for United States federal or applicable state and local tax purposes (as wages, compensation or otherwise) for the fair market value of such Compensatory Units issued to a Member either at the time of grant of such Compensatory Units or at the time such Compensatory Units become substantially vested in accordance with their respective terms. The undertakings contained in this Section 2.2(c) will be construed in accordance with Section 4 of Rev. Proc. 2001-43, 2001-2 C.B. 191.

(d) The following additional provisions apply with respect to the issuance of Compensatory Units:

(i) The Board is hereby authorized to and may, in the Board's reasonable discretion, cause the Company to make an election to value any Compensatory Units at liquidation value (the "**Safe Harbor Election**"), as the same may be permitted pursuant to or in accordance with the finally promulgated successor rules to Section 1.83-3(l) of the Regulations and Internal Revenue Service Notice 2005-43 (collectively, the "**Proposed Rules**"). A Safe Harbor Election, once made, may be revoked by the Board as permitted by the Proposed Rules or any applicable successor rule.

(ii) The Board shall cause the Company to make allocations of items of

income, gain, deduction, loss or credit (including forfeiture allocations and elections as to allocation periods) as necessary and appropriate to (x) conform to the treatment prescribed by the proposed Regulations concerning "Partnership Equity for Services" as published in the Federal Register at 70 Fed. Reg. 29675 (2005) and (y) effectuate and maintain the Safe Harbor Election, in the event such election is made.

(iii) The Board shall file or cause the Company to file all returns, reports and other documentation as may be required to perfect and maintain the Safe Harbor Election with respect to Transfers of Compensatory Units covered by such Safe Harbor Election, in the event such election is made.

(iv) Each Member (including any Person to whom Compensatory Units are transferred in connection with the performance of services), by signing this Agreement or by accepting the Transfer of Compensatory Units, hereby agrees to cooperate with the Board to perfect and maintain any Safe Harbor Election, and to comply with all requirements of the Safe Harbor Election with respect to all Compensatory Units transferred while the Safe Harbor Election remains effective.

(v) The Board is hereby authorized and empowered, without further vote or action of the Members, to amend this Agreement as necessary to comply with the Proposed Rules or any applicable successor rule, in order to provide for a Safe Harbor Election and the ability to maintain or revoke the same, and shall have the authority to execute any such amendment by and on behalf of each Member; provided that such amendment does not result in disproportionately adverse treatment of any other Member as compared to the treatment of a Member holding a similar Interest.

(vi) No Transfer of any Interest by a Member shall be effective unless prior to such Transfer, the transferee, assignee or intended recipient of such Interest shall have agreed in writing to be bound by the provisions of this Section 2.2(d), in a form satisfactory to the Manager.

(vii) It is expected that each Person who receives substantially nonvested Compensatory Units will file with the Internal Revenue Service a protective election under Section 83(b) of the Code within thirty (30) calendar days of the grant of such Compensatory Units, reflecting in each case a value of zero.

(e) **There are 10,000 Units issued as of the Effective Date. The Company shall have only one (1) Class A Unit, which shall be entitled to 8,000 votes (provided, however, that upon the earlier of the death of Raymond Schneider or Company's (or other Members') repurchase of all Units held by him or his Permitted Transferees, each Class A Unit shall be entitled to one (1) vote). Each Class C Unit shall be entitled to one (1) vote. The Class B Units and the Class D Units shall be non-voting**.

2.3 **Initial Issuances of Units**. On the Effective Date (a) Raymond Schneider contributed to the capital of the Company the entire membership interest of each of the limited liability companies listed on Exhibit B (the "**Contributed Subsidiaries**") and (b) Eric Schneider and the Company executed a Restricted Unit Agreement. In consideration of the Capital Contribution of Raymond Schneider and the Restricted Unit Agreement of Eric Schneider, each

of Raymond Schneider and Eric Schneider is hereby admitted to the Company as a Member and is hereby each issued that number and class of Units as is set forth opposite each of their respective names on Exhibit A. Each of the parties to this Agreement acknowledges and agrees that the initial Capital Account balances of each of the Members of the Company as of the Effective Date shall be as set forth opposite each such Member's name on Exhibit A, it being acknowledged and agreed that the initial Capital Account balance of Raymond Schneider is the aggregate agreed-upon net fair market value of the Contributed Subsidiaries, which represents the agreed-upon net fair market value of the Company's assets as of the Effective Date (the "**Initial Company Value**"), and the initial Capital Account balance of Eric Schneider is zero.

2.4 **Additional Units and Members**. The Board may authorize the issuance of additional Units, including the creation of additional classes of Units, on such terms as the Board may determine, and the Board may, in connection with any such issuance, admit additional Members.

2.5 **Business Transactions with the Company**. A Member or Manager (or any of their Affiliates) may lend money to, act as a surety, guarantor or endorser for, guarantee or assume one or more obligations of, provide collateral for, and transact other business with the Company or any Subsidiary and, subject to other applicable law, has the same rights and obligations with respect to any such matter as a Person who is not a Member or Manager.

## SECTION 3.

## CAPITAL CONTRIBUTIONS

3.1 **Capital Contributions**. The Capital Contributions that each Member has made to the Company as of the Effective Date are as set forth opposite each such Member's name on Exhibit A. The parties acknowledge and agree that, (a) immediately prior to the Effective Date, each Contributed Subsidiary was disregarded as an entity separate from its sole owner, Raymond Schneider, for U.S. federal income tax purposes pursuant to Section 301.7701-3 of the Regulations and (b) as a result of the issuance of Compensatory Units to Eric Schneider on the date hereof (i) the Company is treated as a newly formed partnership as of the date hereof for federal income tax purposes (and applicable state and local income and franchise tax purposes) pursuant to Rev. Rul. 99-5, 1999-1 C.B. 434, and (ii) Raymond Schneider is treated for U.S. federal income tax purposes as making a Capital Contribution to the Company pursuant to Section 721 of the Code, of each of the assets of the Contributed Subsidiaries, subject to the liabilities of the Contributed Subsidiaries, including liabilities of the Contributed Subsidiaries that are owed to entities (other than any Contributed Subsidiary or the Company) that are wholly owned by Ray Schneider as of the Effective Date (the "**Affiliate Creditors**"). Except as set forth in this Agreement, no Member will be required to make any additional Capital Contributions to the Company.

3.2 **Other Matters**.

(a) Except as otherwise expressly set forth in this Agreement, no Member may demand a return of its Capital Contribution from the Company.

(b) Except as otherwise expressly set forth in this Agreement, no Member will receive any interest, salary or draw with respect to its Capital Contribution or its Capital Account or otherwise solely in its capacity as a Member.

(c) No Member, in its capacity as a Member, will be liable for the debts, liabilities, contracts or any other obligations of the Company.

(d) The parties acknowledge and agree that, in the 24-month period prior to the Effective Date, Raymond Schneider incurred (or is treated as having incurred for federal income tax purposes) (i) partnership organization and syndication costs with respect to the Company, described in Section 1.707-4(d)(1)(ii)(A) of the Treasury Regulations, and (ii) capital expenditures with respect to the Contributed Subsidiaries, within the meaning of Section 1.707-4(d)(1)(ii)(B) of the Treasury Regulations (collectively, the "**Preformation Costs**"). The parties agree to treat the Company's deemed assumption of liabilities owed to the Affiliate Creditors pursuant to Rev. Rul. 99-5, *supra*, as described in Section 3.1, (x) *first*, entirely as reimbursement for the Preformation Costs and (y) *to the extent of any excess*, entirely as made in exchange for the cash and cash equivalents held by the Contributed Subsidiaries as of the Effective Date.

## SECTION 4.

## CAPITAL ACCOUNTS AND ALLOCATIONS

4.1 **Capital Accounts**. A Capital Account shall be maintained for each Member in the manner set forth in Appendix A.

4.2 **Profits and Losses**. The Profits and Losses and other items of income, gain, loss, deduction and credit, of the Company shall be allocated among the Members as set forth in Appendix A.

## SECTION 5.

## DISTRIBUTIONS TO MEMBERS

5.1 **Distributions**.

(a) Except as otherwise provided in Section 5.2 (with respect to certain tax distributions), Section 5.5 (with respect to negative Capital Account balances) and Section 5.6 (with respect to distributions upon a liquidation of the Company), the Board shall have sole discretion to determine the timing and amounts of distributions of Distributable Assets, which, to the extent made, shall be distributed to the Members pro rata in proportion to their respective Ownership Percentages (subject to the terms and conditions of any Restricted Unit Agreement).

(b) Notwithstanding any other provision of this Agreement to the contrary, any amounts otherwise distributable to a Class D Member in respect of any Class D Units pursuant to Section 5.1(a) or 5.6 shall not be distributed to such Member in respect of such Class D Units until the Threshold Amount with respect to such Class D Units has been reduced to zero.

(i) The term "**Threshold Amount**" means, with respect to any particular Class D Units granted by the Company, as of any given point in time, the positive excess of: (1) the amount determined by the Board and set forth on Exhibit A with respect to such Class D Units as of the date of issuance of such Class D Units (such amount being the amount which is determined by the Board as an amount which is not less than the aggregate net fair market value of the Company as of such date of issuance), over (2) the aggregate amount of distributions made by the Company after the date of issuance of such Class D Units with respect to any Units that were outstanding immediately prior to such date. For example, if as of a particular date upon which Class D Units are issued, the Board determines that the net fair market value of the Company does not exceed $1,000, then the Board may designate such amount as the initial Threshold Amount with respect to such Class D Units as of such time, and no distributions shall be made with respect to such Class D Units pursuant to Section 5.1(a) or 5.6 until such Threshold Amount with respect to such Class D Units is reduced to zero.

(ii) For the avoidance of doubt, the purpose of the Threshold Amount is, to the extent applicable, to ensure that the Class D Units shall be treated for United States federal and applicable state and local tax purposes as a "profits interest" within the meaning of Internal Revenue Service Revenue Procedure 93-27.

(c) Notwithstanding the provisions of Section 5.1(a), amounts distributable under the preceding provisions of Section 5.1 with respect to any Restricted Unit (after application of Section 5.1(b)) shall be held by the Company for the benefit of the holder of such Compensatory Unit until such Restricted Unit is no longer a Restricted Unit. Upon such vesting, such amounts, if any, shall be distributed to the holder of such Compensatory Unit. In the event that such Restricted Unit is forfeited (or repurchased by the Company), such amounts shall be treated as cash available for distribution to the Members (except with respect to any such forfeited or repurchased Restricted Unit).

(d) In the event of a distribution of Distributable Assets in kind pursuant to Section 5.1(a), the assets so distributed will be distributed among the Members in the same proportion as cash equal to the fair market value, which shall be reasonably determined by the Board, of such assets would be distributed among the Members pursuant to Section 5.1(a), each Member taking an undivided interest in such assets as tenants in common.

5.2 **Tax Distributions**.

(a) Notwithstanding Section 5.1 and to the extent that: (i) the Company has sufficient cash available, after making provision for all Company expenses required to be paid and for all reserves that are considered necessary or appropriate by the Board, (ii) such distributions would not violate the Act or other applicable laws and (iii) such distributions would not violate Section 5.5 or any agreements between the Company and any of its Lenders or other third parties (nor would violate any agreements between any of its Subsidiaries and any Lenders or other third parties), the Company will make distributions to the Members to the extent necessary so that for each Taxable Year of the Company, each Member to whom cumulative items of income and gain (net of cumulative items of loss and deduction), as determined in accordance with Section 703(a) of the Code, for such Taxable Year and all prior Taxable Years ("**Net Income**"), have been allocated under Section 4.2 and Appendix A to this Agreement shall receive, at a minimum, a cumulative amount of distributions under this SECTION 5 for such Taxable Year and all prior Taxable Years equal to the product of the Net Income so allocated to such Member and the Tax Rate. For the avoidance of doubt, Net Income shall take into account any Company items of deductible loss or expense with respect to such Taxable Year and the allocations (if any) under Section 704(c) of the Code, but shall not take into account any tax attributes or benefits of any Member, including pursuant to Section 743(a) or 199A of the Code, any deduction or loss of the Member unrelated to the Company, or any loss carryforwards of the Member.

(b) Any distribution to a Member under Section 5.2 is an advance of amounts otherwise distributable to such Member pursuant to Section 5.1(a) or Section 5.6, as applicable and shall be treated as made under, and shall reduce (dollar-for-dollar) the amounts otherwise distributable to such Member pursuant to, Section 5.1(a) or Section 5.6, as applicable. Notwithstanding anything herein to the contrary, any distributions pursuant to this Section 5.2 shall be made to all of the Members pro rata, in proportion to their respective Ownership Percentages.

5.3 **Treatment of Taxes Withheld**. All amounts withheld or paid by the Company pursuant to the Code or any provision of any federal, state, local or foreign tax law with respect to any payment, distribution or allocation to a Member (other than any amounts withheld pursuant to Section 3102 or 3402 of the Code), or any such amount that is paid by the Company solely by reason of the holding of an Interest by any Member, shall be treated as a distribution from the Company to the Member with respect to whom such tax is required to be withheld or paid under Section 5.1(a), and shall reduce dollar-for-dollar the amounts otherwise distributable to such Member pursuant to SECTION 5. Each Member agrees to furnish the Company with any information, representations or forms as shall reasonably be requested by the Company to assist it in determining the extent of, or in fulfilling, any withholding obligations it may have.

5.4 **Distributions from Subsidiaries**. Notwithstanding any other provision of this Agreement to the contrary, the Company shall cause its Subsidiaries to make distributions of cash to the Company to satisfy any distributions to be paid under SECTION 5; provided, however, that any distributions required by this Section 5.4 (except those necessary for the Company to make tax distributions under Section 5.2) may be deferred (in amounts and as to timing) to the extent necessary to avoid a default by the Company or its Subsidiaries under any covenants or other terms contained in any credit agreement, security agreement or any other agreement of the Company or

its Subsidiaries related to any indebtedness of the Company or its Subsidiaries, until such time as such distributions pursuant to this Section 5.4 would not cause a default under such agreement.

5.5 **Limit on Distributions.** No distributions shall be made to a Member under Section 5.1 or Section 5.2 to the extent that such distribution would create or increase a deficit Capital Account balance for such Member (unless every other Member has a zero, or deficit, Capital Account balance at such time).

5.6 **Liquidating Distributions.** Subject to Section 10.2, distributions to the Members upon liquidation of the Company pursuant to SECTION 10 shall be made:

(a) First, to the Class A Members and Class B Members, pro rata in proportion to their respective Class A Units and Class B Units, until aggregate distributions have been made pursuant to this Section 5.6(a) with respect to the Original Class A/B Units, in an aggregate amount equal to the excess of (i) the Initial Company Value, over (ii) the aggregate distributions previously made with respect to the Original Class A/B Units, with respect to which distributions the Class C Units did not receive corresponding distributions as a result of the application of Section 5.5; and

(b) Thereafter, to the Members pro rata in proportion to their respective Ownership Percentages (subject to the terms and conditions of any Restricted Unit Agreement); provided, however that any amounts otherwise distributable to a Member in respect of any Class D Units pursuant to Section 5.6(b) shall not be distributed to such Member in respect of such Class D Units until the Threshold Amount with respect to such Class D Units has been reduced to zero.

## SECTION 6.

## MANAGEMENT AND CONTROL

6.1 **Management**. Subject to the limitations imposed by the Act and this Agreement, the Board, in its full and exclusive discretion, will manage and control, have authority to obligate and bind, and make all decisions affecting the business and assets of the Company.

6.2 **Board of Managers**.

(a) The Company may have up to five (5) natural persons on its Board of Managers (individually, each a "**Manager**" and, collectively, "**Managers**"). Each of Raymond Schneider and Eric Schneider shall serve as a Manager until the earliest of the Company's (or other Members') repurchase of all Units held by him or his Permitted Transferees, his death, judicial adjudication of his incompetency, or his written resignation delivered to the Company. While Raymond and Eric are Managers, they must agree on changing the number of Managers and the election and removal of Managers. If only one is a Manager, he shall make such decisions. Thereafter the number of Managers and election/removal of Managers will be determined by Members holding a majority of the voting power of the Units of the Company.

(b) Each Manager, other than Raymond Schneider or Eric Schneider, shall serve until a successor is duly appointed, or until the earlier of the resignation, incapacity, removal or death of such Manager. A Manager may resign at any time by giving written notice to the

Members. The resignation of a Manager shall take effect upon receipt of notice thereof or at such later time as may be specified in such notice. A Manager vacancy will be filled by the written consent or approval of the Members who have the right to designate the resigned, incapacitated, removed or deceased Manager pursuant to Section 6.2(a).

(c) Any action under this Agreement requiring the consent of or determination or approval of the Board, will require the consent or approval of a majority of the Managers.

(d) Meetings of the Board may be called by the Chairman of the Board or any Manager on five (5) Business Days' notice to each, either delivered personally or electronic mail, electronically confirmed. Meetings may be held at such times and places as may be designated in the notices of their call, or they may be held at any time or place, without notice, by the presence of all Managers. The Company (together with its Subsidiaries) shall reimburse the Managers for all reasonable and necessary out of pocket expenses incurred in attending Board meetings upon the receipt of appropriate documentation of such expenses.

(e) At all meetings of the Board, a majority of the Managers in office shall be necessary to constitute a quorum for the transaction of business. Managers who have a personal or financial interest in a contract or transaction which is before the Board, or who are common managers or directors of the Company and another Person with respect to which a contract or transaction is before the Board, may be counted in determining the presence of a quorum at a meeting of the Managers, or a committee thereof. If a quorum shall not be present at any meeting of Managers, the Managers present thereat may adjourn the meeting from time to time, without notice other than announcement of the meeting, until a quorum shall be present.

(f) To the extent permitted by law, Managers may participate in a meeting of the Board or any committee thereof through the use of telephone conference or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this Section 6.2(f) shall constitute presence in person at such meeting.

(g) Any action required or permitted to be taken at a meeting of the Board may be taken without a meeting if such action is approved by an unanimous written consent of all of the Managers, and such approval is evidenced by one or more written consents describing the action taken, signed by all of the Managers and delivered to the Company for inclusion in the minutes of the Company or for filing with the Company records. Action taken under this Section 6.2(g) is effective when the consent is signed by all of the Managers, unless the consent specifies a different effective date.

(h) The Chairman of the Board may be designated by the holders of a majority of the voting power of the Units, who shall preside over all meetings of the Board. The initial Chairman of the Board shall be Raymond Schneider.

(i) The Board may from time to time establish committees. Any committee shall have and may exercise all of the powers and authority conferred on such committee by the Board.

6.3 **Officers**. The Board may appoint themselves or other individuals as officers of the Company which may include (a) a chairman; (b) a chief executive officer; (c) a president; (d) a chief operating officer; (e) a chief financial officer; (f) one or more vice presidents; (g) a secretary and/or one or more assistant secretaries; (h) a treasurer and/or one or more assistant treasurers; and (i) any other officer(s) as the Board from time to time appoints. The Board may delegate a portion of its day to day management responsibilities to any such officers, as determined by the Board from time to time, and such officers will have the authority to contract for, negotiate on behalf of and otherwise represent the interests of the Company as so authorized by the Board, provided that in no event will any officer have any rights, duties, powers or authority greater than those so delegated or those of the Board.

The following individual is hereby appointed to the offices set forth opposite his name below:

| | |
|---|---|
| President | Eric Schneider |

6.4 **Duties of a Manager**. A Manager shall perform his duties as a Manager in good faith, in a manner he or she reasonably believes to be in or not opposed to the best interests of the Company. A Manager cannot be found to have violated this Section 6.4 unless it is proved by clear and convincing evidence in an action brought against the Manager that he or she has not met the standard set forth in the first sentence of this Section 6.4.

6.5 **Non-Exclusivity**. Except as set forth in any other written agreement between the parties or as otherwise inferred by the employment relationship of any Member or Manager with the Company or any Subsidiary, the creation of the Company and the assumption by the Members or Managers of their duties under this Agreement will be without prejudice to the rights of the Members or Managers (or the rights of their Affiliates) to pursue or participate in other interests and activities including, without limitation, investments in and devotion of time to other businesses, and to receive and enjoy profits or compensation therefrom.

6.6 **Related Party Transactions**. No contract, action, or transaction is void or voidable because it is between or affects the Company or any Subsidiary and one or more of its Members, Managers or officers (or any of their Affiliates) or other Persons in which one or more of the Managers or officers (or any of their Affiliates) have a financial or personal interest (each, a "**Related Party Transaction**"), or because one or more interested Managers or Members participate in or vote at the meeting that authorizes the Related Party Transaction. The Company and each Member understands and acknowledges that the conduct of the Company's and the Subsidiaries' businesses may involve Related Party Transactions. The Managers shall be entitled to enter into any Related Party Transaction on behalf of the Company or any Subsidiary on terms that are no less favorable to the Company or such Subsidiary than those that would have been obtained in a comparable transaction entered into with an unaffiliated third party on an arm's-length basis, and any applicable fiduciary duty or other duty of the Managers (and to the extent any Member consent is provided, any applicable fiduciary duty or other duty of any Member giving such consent) to the Company, any Subsidiary or the Members shall be deemed satisfied.

6.7 **Exculpation of Covered Persons**.

(a) Each Manager and each officer (including any Affiliate thereof, a "**Covered Person**") serving on behalf of the Company or any Subsidiary, in the performance of such Covered Person's duties, shall be fully protected in relying in good faith on information, opinions, reports, or statements, including financial statements, books of account and other financial data, if prepared or presented by: (i) another Manager, officer, employee or agent of the Company; or (ii) legal counsel, public accountants, or other Persons which it reasonably believes to have professional or expert competence.

(b) Subject to the right to indemnification under Section 6.8, a Covered Person shall not be liable to the Company, any Subsidiary or any other Covered Person or Member for with respect to claims, losses or damages relating to such Covered Person's acts or omission if such conduct is taken (i) in good faith, in a manner such Covered Person reasonably believes to be in or not opposed to the best interests of the Company, so long as such action or omission does not constitute fraud or willful misconduct, or (ii) with respect to any criminal action, proceeding or investigation, such Covered Person had no reasonable cause to believe his, her, or its conduct was unlawful. A Covered Person cannot be found to have violated this Section 6.7(b) except to the extent that there is a final nonappealable judicial determination by a court of competent jurisdiction finding by clear and convincing evidence in an action brought against such Covered Person that the Covered Person has not met the standard set forth in this Section 6.7(b).

6.8 **Indemnification**.

(a) To the fullest extent permitted by the Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Manager, Member or officer of the Company or any Subsidiary (including any Affiliate thereof, an "**Indemnitee**") against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims, including any action by or in the right of the Company or any Subsidiary, to which such Indemnitee may become subject because such Person is or was a Manager, Member or officer of the Company or any Subsidiary; provided, that (x) such Indemnitee acted in good faith and in a manner believed by such Indemnitee to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Indemnitee's conduct did not constitute fraud or willful misconduct.

(b) An Indemnitee shall not be deemed to have violated any standard of conduct under Section 6.8 except to the extent that there is a final nonappealable judicial determination by a court of competent jurisdiction finding by clear and convincing evidence in an action brought against such Indemnitee that the Indemnitee has not met the standard set forth in Section 6.8; provided, however, that upon application by the Indemnitee, the court in which such action was brought may determine that despite the adjudication of liability but in view of all the circumstances of the case the, the Indemnitee is fairly and reasonably entitled to indemnification. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo*

*contendere* or its equivalent, shall not, of itself, create a presumption that the Indemnitee did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Indemnitee's conduct was unlawful, or that the Indemnitee's conduct constituted fraud or willful misconduct.

(c) The Company shall promptly reimburse and/or advance to each Indemnitee for reasonable legal or other expenses (as incurred) of such Indemnitee in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Claim for which such Indemnitee may be indemnified pursuant to Section 6.8; provided, that such reimbursement or advancement shall only be made upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amount if it shall be finally judicially determined that the Indemnitee is not entitled to be indemnified as authorized in Section 6.8.

(d) The indemnification and advancement of expenses provided by, or granted pursuant to, Section 6.8 shall not be exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under the Act, this Agreement, any other agreement with an Indemnitee, a policy of insurance or otherwise, and shall not limit in any way any right which the Company or any Subsidiary may or may have to make additional indemnifications with respect to the same or different Persons or classes of Persons. The right to indemnification under Section 6.8 shall be a contract right in favor of any Indemnitee. The indemnification and advancement of expenses provided by, or granted pursuant to, Section 6.8 shall continue as to a Person whether such Person remains in the position or capacity pursuant to which such Person became entitled to indemnification under Section 6.8.

(e) The Company may purchase and maintain insurance on behalf of any Indemnitee, against any liability asserted against them and incurred by them in such capacity, whether or not the Company or any Subsidiary would have the power to indemnify them against such liability under Section 6.8.

(f) If Section 6.8 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Indemnitee pursuant to Section 6.8 to the fullest extent permitted by any applicable portion of Section 6.8 that shall not have been invalidated and to the fullest extent permitted by applicable law.

6.9 **Reliance on Acts of Board**. No financial institution or any other person, firm or corporation dealing with the Board shall be required to ascertain whether the Board is acting in accordance with this Agreement, but such financial institution or such other person, firm or corporation shall be protected in relying solely upon the deed, transfer or assurance of, and the execution of such instrument or instruments by the Board.

6.10 **Rights of Members**. Except as otherwise expressly provided in this Agreement, no Member shall be entitled to participate in the control and management of the Company, nor shall any Member have the right to sign for or bind the Company except when acting as a duly designated Manager or when acting within the scope of powers properly delegated by the Board to a Member, officer, employee or agent of the Company.

## SECTION 7.

## BOOKS AND RECORDS; AFFIRMATIVE COVENANTS; NON-DISCLOSURE

7.1 **Books and Records**. The Company will keep adequate books and records at its principal place of business, setting forth a true and accurate account of all transactions and other matters arising out of and in connection with the conduct of the Company's business, which books and records will be otherwise kept in accordance with the provisions of the Act. Any Member or its designated representative will have the right, upon reasonable demand for any purpose reasonably related to such Member's interest as a Member of the Company, during normal business hours, to have access to and to inspect the contents of books or records of the Company as required to be provided by the Company to the Members pursuant to the Act, subject to reasonable restrictions on certain confidential or proprietary information as determined by the Board and the execution of such Member of an appropriate confidentiality agreement or similar agreement reasonably satisfactory to the Board. Notwithstanding anything to the contrary in this Section 7.1, if the Board determines in good faith that any Member or its Affiliate or Family is directly engaged in any Competitive Business Activity, the Board may limit such Member's access to the books and records of the Company to (i) an annual update on the Company's consolidated capital structure and (ii) any notices required to be made by the Company to such Member pursuant to any provision of this Agreement.

7.2 **Tax Proceedings**.

(a) The Company may take any steps necessary to make the election under Section 6221(b) of the Code not to be subject to Company-level audit proceedings. In the event that the Company does not make such election for any Taxable Year, Raymond Schneider is protectively designated as the partnership representative, pursuant to Section 6223 of the Partnership Audit Procedures (the "**Company Representative**") for such Taxable Year; provided that the Board may change the Company Representative from time to time by designating in writing a new Company Representative for any tax return to the extent permitted by the Partnership Audit Procedures. The Company Representative, with respect to applicable returns is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by any federal, state or local tax authorities and to expend Company funds for professional services and costs associated therewith. The Company Representative shall provide all notices and perform all acts required in such Person's role as the Company Representative. Each Member, and each Person that was a Member during the reviewed Taxable Year, shall provide such information to the Company as the Company Representative may reasonably request to reduce the amount of any adjustment and shall take such actions as the Company Representative may reasonably request (including the filing of an amended tax return) in order to assist the Company in complying with the Partnership Audit Procedures.

(b) The Company Representative may cause the Company to make any election available to it under the Partnership Audit Procedures, including without limitation an election under Section 6226 of the Partnership Audit Procedures to have Members in respect of the reviewed Taxable Year take tax adjustments on their own tax returns. In the event that the Company is required to pay any imputed underpayment, penalty, addition to tax, or additional adjustment amount pursuant to the Partnership Audit Procedures, then (subject to any valid

election of the Company under Section 6226 of the Code) each Person that was a Member in the applicable reviewed year, within the meaning of Section 6225(d)(1) of the Code, shall make a payment to the Company in an amount equal to the portion of such adjustment amount allocable to such Member, taking into account any modifications of the adjustment amount under Section 6225(c) of the Code; provided, however, that if such Person is also a Member at the time the Company pays such adjustment amount, the Company may instead withhold from amounts due to such Member from the Company such Member's allocable share of the adjustment amount and any such amount withheld shall be treated as having been distributed by the Company to such Member pursuant to Section 5.1(a) and then paid by such Member to the Company; and provided further that no payment by or withholding from a Person shall be required if such Person complied with the provisions of Section 6225(c)(2)(A) or (B) of the Code. For the avoidance of doubt, no payment made to the Company pursuant to Section 7.2(b) shall be treated as a Capital Contribution. Notwithstanding anything in this Agreement to the contrary, all rights and obligations of a Member under this Section 7.2 shall survive both the Member's ceasing to be a partner of the Company for federal income tax purposes and the dissolution of the Company.

(c) Neither the Company Representative (including the officers, agents, employees and designated individual of the Company Representative, as applicable) shall be liable to the Company, the Members, former Members or their successors in interest for any action such Person takes or fails to take in connection with any judicial or administrative proceeding, including, without limitation, the failure to agree to a settlement or the extension of or failure to extend the relevant statutes of limitations, unless such action or failure constitutes willful misconduct, fraud or gross negligence.

7.3 **Non-Disclosure**.

(a) Each Member, including their Permitted Transferees (individually and collectively, "**Recipient**") and the Affiliates of any of the foregoing will hold and keep confidential (and will not use, other than in connection with this Agreement and the transactions contemplated hereby) any information provided to it or any of its respective Affiliates or any of their representatives pursuant to or in connection with this Agreement by or on behalf of the Company, any Subsidiary or the other Members or any of their Affiliates (whether such information is regarding the Company, any Subsidiary or their business or otherwise relates to such other Members or any of their Affiliates) ("**Confidential Information**"), provided, that Section 7.3 shall not apply to the following:

(i) information which is publicly available at the time of disclosure (through no act of the Recipient receiving such information or any of its Affiliates in breach of this Agreement);

(ii) information which is disclosed to the Recipient receiving such information or an Affiliate of such Recipient by a third party which did not disclose it in violation of a duty of confidentiality;

(iii) disclosures which are required to be made by the Recipient receiving such information or any of its Affiliates under legal process by subpoena or other court order or other applicable laws or stock exchange or other regulations; provided, that such Recipient or

Affiliate makes reasonable efforts to provide notice of such required disclosure to the Company or the other Members, as appropriate, before disclosure and, other than in the case of disclosure required by stock exchange or regulations, takes reasonable efforts to assist the Company or the other Members, as appropriate, in reasonable attempts to prevent such disclosure.

(b) Notwithstanding anything to the contrary contained herein, each Recipient shall be permitted to share any such Confidential Information with its Affiliates, agents and contractors (including professional advisors); provided, however, that such Affiliates, agents and contractors (including professional advisors) hold and keep such information confidential in accordance with the provisions of Section 7.3 and such Recipient remains responsible for any failure by its Affiliates, agents and contractors (including professional advisors) to do so.

## SECTION 8.

## TRANSFERS OF UNITS; REDEMPTIONS

8.1 **Restriction on Transfers**. Except as otherwise permitted by this Agreement, no Member may Transfer all or any portion of its Units (provided, however, that the terms of this Section 8.1 shall not apply following an IPO).

8.2 **Permitted Transfers of Units**. Subject to the conditions and restrictions set forth in Section 8.3 and except as otherwise provided in a Restricted Unit Agreement or by unanimous written consent of the Managers, the Units of any Member may be Transferred to any party (referred to as a "**Permitted Transferee**" and collectively to any party as "**Permitted Transferees**" of such Member) solely in accordance with any of the following (each a "**Permitted Transfer**"):

(a) Raymond Schneider may Transfer all or any portion of his Class B Units to his spouse; or

(b) A Member who is a natural person may Transfer all or any portion of such Member's Units to a Trust.

Notwithstanding any provision of this Section 8.2 to the contrary, no Transfer shall be permitted under this Section 8.2 to or for the benefit of a separated or divorced spouse by agreement, court order or otherwise. Any Transfer or disposition of Units made pursuant to this Section 8.2 shall be made only in such manner as to provide control of such Units by a competent legal entity or adult, and so as not to vest control of any Units in any minor or other legally incompetent person.

8.3 **Conditions to Permitted Transfers**. A Transfer will not be treated as a Permitted Transfer unless and until the following conditions (a) through (e) are satisfied:

(a) The transferor and transferee shall execute and deliver to the Company such documents and instruments of conveyance as may be required by the Company to effect such Transfer and to confirm the agreement of the transferee to be bound by the provisions of this Agreement. In all cases, the Company will be reimbursed by the transferor and transferee for all costs and expenses that it reasonably incurs in connection with such Transfer.

(b) The transferor and transferee will furnish the Company with the transferee's taxpayer identification number, and any other documentation and information necessary to (i) permit the Company to file all required federal and state tax returns and other legally required information statements or returns and (ii) ensure that the Company will not be subject to withholding under Section 1446 of the Code as a result of the Transfer. Without limiting the generality of the foregoing, the Company will not be required to make any distribution otherwise provided for in this Agreement with respect to any Transferred Units until it has received such information.

(c) Either (i) such Units will be registered under the Securities Act, and any applicable state securities laws, or (ii) the transferor will provide, upon the Company's reasonable request, an opinion of counsel, which opinion and counsel will be reasonably satisfactory to the Company, to the effect that such Transfer will be exempt from all applicable registration requirements and that such Transfer will not violate any applicable laws regulating the transfer of securities.

(d) The transferor may grant to any transferee of Units pursuant to a Permitted Transfer, the right to become a Substitute Member, with respect to the Units Transferred; provided, however, that no transferee shall be admitted as a Substitute Member unless and until the admission of such transferee as a Substitute Member is approved by the Board, which approval shall not be unreasonably withheld.

(e) All transferees hereunder shall be bound by the terms of this Agreement in the same manner as the transferors, and any Units so Transferred shall continue to be subject to the restrictions, liabilities and benefits associated therewith.

8.4 **Substitute Member**. Notwithstanding anything to the contrary in this Agreement, no Permitted Transferee shall be admitted as a Substitute Member unless and until the admission of such transferee as a "Substitute Member" is approved by the Board, which approval shall not be unreasonably withheld. Unless and until admitted as a Substitute Member, the Permitted Transferee (and the transferor) will be bound by any and all obligations under this Agreement but will not be entitled to exercise any rights of a Member in the Company, including any management rights, the right to receive notice of meetings, the right to vote, grant approvals or give consents with respect to such Interest, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records, and shall only be entitled to receive, to the extent of the Units transferred to such transferee, any distribution as provided by this Agreement with respect to the transferred Units, which distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations or liabilities for damages that the transferor or transferee of such Units may have to the Company.

8.5 **Drag-Along Rights**. Notwithstanding the Transfer restrictions contained in Section 8.1, in the event that (i) the Board agrees to a Sale of the Company or (ii) any Member or group of Members (the "**Selling Members**"), with the approval of the Board, agree to sell to any unrelated third party purchaser (the "**Proposed Transferee**") in an arm's length transaction, in a single transaction or a series of related transactions, Units representing at least a majority of the total voting power of the Units (a "**Drag-Along Sale**"), the Board or such Selling Members (as applicable) shall have the right, subject to the terms of Section 8.6, to require all, but not less than

all, other Members of the Company (the "**Subject Members**") (i) to vote for, consent to and raise no objections against such Drag-Along Sale and (ii) to sell or transfer a portion of their Units to such purchaser on a *pro rata* basis.

8.6 **Additional Provisions for Drag-Along Sales.**

(a) In the event of a Drag-Along Sale, all of the Subject Members, shall (i) take such actions as may be reasonably requested by the Board or such Selling Members (as applicable) in connection with consummating the Drag-Along Sale, (ii) vote in favor of, consent to and raise no objections against the Drag-Along Sale or the process pursuant to which the Drag-Along Sale was arranged, (iii) waive any dissenter's, appraisal and other similar rights, (iv) if the Drag-Along Sale is structured as a sale of Units, agree to sell such Person's Units, as the case may be and on the terms and conditions of the Drag-Along Sale, (v) execute and deliver such documents as may be reasonably requested by the Board or such Selling Members (as applicable) in connection with the Drag-Along Sale including, without limitation, written consents of Members, proxies, letters of transmittal, purchase agreements and Unit transfer powers, in each case, except in accordance with a Drag-Along Sale as a result of a Sale of the Company, so long as the Selling Members have also has executed such documents on no more favorable a basis, (vi) except in accordance with a Drag-Along Sale as a result of a Sale of the Company, indemnify the transferee(s) upon the same terms as are applicable to the Selling Members but only so long as all indemnification obligations made to any party (including any seller representative, if any) are several, not joint and several, in proportion to the consideration paid to each and the maximum indemnification obligation of any Member shall not exceed the amount of the cash proceeds actually received by such Person in such Drag-Along Sale, excluding any indemnification obligations for breaches of representations and warranties or covenants that relate specifically to such party or such party's Units, and (vii) at the closing of the Drag-Along Sale, the participating Members shall deliver certificates for all Units to be sold, exchanged or otherwise Transferred by such Persons, duly endorsed for transfer or termination, to the purchaser against delivery of the appropriate purchase price.

(b) The obligations of the Members set forth in Section 8.5 and Section 8.6 with respect to any Drag-Along Sale are subject to the conditions that upon the consummation of the Drag-Along Sale, (a) each Member shall receive the amount of consideration (as separately and respectively determined for each class of Unit) from such sale or exchange that such Member would have received if such aggregate consideration been received and distributed by the Company in accordance with Section 5.1 and the rights and preferences as provided therein; (b) if any Members of a particular Class of Units are given an option as to the form and amount of consideration to be received, each Member of the same Class of Units will be given the same option, (c) each Member shall not be required to agree to a non-compete, non-solicitation or other restrictive covenant of any kind in connection with such Drag-Along Sale other than a customary covenant with respect to the protection of confidential or proprietary information, and (d) each Member may only be required to make representations, warranties, or covenants regarding such Member's authority to enter into and consummate such sale and providing the purchaser with valid title to the Units being sold by such Member, free and clear of all liens and encumbrances.

(c) The fees and expenses of the Selling Member incurred in connection with a sale under Section 8.5 and Section 8.6 and for the benefit of all Subject Members (it being understood that costs incurred by or on behalf of the Selling Member for its sole benefit will not be considered to be for the benefit of all Subject Members), to the extent not paid or reimbursed by the Company or such Proposed Transferee, shall be shared by all Members on a *pro rata basis*, based on the consideration received by each Member; provided, that no Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Drag-Along Sale.

8.7 **Prohibited Transfers**.

(a) Any purported Transfer of a Unit that is not made in accordance with the provisions of SECTION 8, will be null and void and of no effect whatsoever; provided, that, if the Company is required to recognize a Transfer that is not a Permitted Transfer, the Interest Transferred will be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the Transferred Interest, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations or liabilities for damages that the transferor or transferee of such Units may have to the Company and neither the transferee nor the transferor will have any rights as to the management of the Company with respect to such Transferred Units; provided, however, that the Company shall have the option to purchase such Transferred or purportedly Transferred Units from the transferee. The Company may assign all or part of its right to purchase such transferee's Units as provided in the foregoing sentence to the non-transferring Members on a pro rata basis or such other basis as such Members agree, provided that the entire Interest of such transferee is purchased by the Company or its Member assignees. The purchase price for all Units shall be an amount equal to the net book value of such Units as of the date of Transfer or purported Transfer as determined in good faith by the Board in accordance with generally accepted accounting principles, and the payment terms for such Units shall be determined by the Board.

(b) Notwithstanding anything to the contrary in the Agreement, no Transfer of a Unit will be permitted if such Transfer would cause the Company to be categorized as a "publicly traded partnership" within the meaning of Section 7704 of the Code.

(c) In the case of a Transfer or attempted Transfer of a Unit that is not in accordance with the provisions of SECTION 8, the parties engaging or attempting to engage in such Transfer will be liable to indemnify and hold harmless the Company and the other Members from all costs, liability, and damage that any of such indemnified Persons may incur (including, without limitation, incremental tax liability and attorneys' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

8.8 **Distributions and Allocations with Respect to Transferred Units**. If any Unit is Transferred during any accounting period in compliance with the provisions of SECTION 8, Profits, Losses, each item thereof, and all other items attributable to the Transferred Unit for such period will be divided and allocated between the transferor and the transferee, by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Company. All distributions on or before the date of such Transfer will be made to the transferor, and all distributions thereafter will be made

to the transferee. Solely for purposes of making such allocations and distributions, the Company will recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer, provided that if the Company does not receive a notice stating the date such Unit was Transferred and such other information as the Company may reasonably require within thirty (30) days after the end of the accounting period during which the Transfer occurs, then all of such items will be allocated, and all distributions will be made, to the Member who, according to the books and records of the Company, on the last day of the accounting period during which the Transfer occurs, was the owner of the Unit. Neither the Company nor any Member will incur any liability for making allocations and distributions in accordance with the provisions of this Section 8.8, whether or not the Company has knowledge of any Transfer of ownership of any Unit.

## SECTION 9.

## WITHDRAWAL OF A MEMBER

9.1 **Withdrawal of a Member**. Unless otherwise provided in this Agreement, a Member shall cease to be a Member upon the happening of any of the following events of "**Withdrawal**":

(a) In the case of a Member who is acting as a Member by virtue of being trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(b) In the case of a Member that is an entity, the dissolution and commencement of the winding up of such entity or the filing of a certificate of dissolution or its equivalent, as applicable;

(c) In the case of a Member that is an estate, the distribution by the fiduciary of the estate's entire interest in the Company;

(d) In the case of a Member that is an individual, the death of the Member (provided, however, that (i) with respect to any Permitted Transferee of Raymond Schneider's Units in accordance with Section 8.2(a) or (b), this event triggering the rights and obligations under Section 9.2 will also be deemed to occur upon the death of Raymond Schneider and (ii) with respect to any Permitted Transferee of Eric Schneider's Units in accordance with Section 8.2(b), this event triggering the rights and obligations under Section 9.2 will also be deemed to occur upon the death of Eric Schneider);

(e) Upon the Bankruptcy of a Member;

(f) A Member assigns or Transfers all of such Member's Interest in the Company; or

(g) The redemption of all of a Member's Units by the Company.

9.2 **Rights of a Withdrawing Member**. In the event of a Withdrawal (other than pursuant to Section 9.1(f) or Section 9.1(g)) by any Member from the Company prior to the expiration of the Term:

(a) The withdrawing Member, or its legal representative, will promptly provide the Company written notice of such event of Withdrawal and provide such information the Company may reasonably request, time being of the essence, and failure or delay in providing Company with written notice and information will not affect any rights or obligation hereunder. The Company shall have the option, but no obligation, to purchase the entire Interest of the withdrawing Member for an amount equal to the purchase price of such Interest determined in accordance with Section 9.2(b). The Company may assign all or part of its right to purchase such transferee's Units as provided in the foregoing sentence to the non-transferring Members holding voting Units on a pro rata basis of such voting Units or such other basis as such Members agree. The Company shall exercise said option to purchase by giving notice thereof to the withdrawing Member within ninety (90) days after the later of (i) the Company's receipt of notice of Withdrawal of the Member, and (ii) if applicable, the appointment of the legal representative of the deceased, bankrupt, insane or incompetent Member. The notice shall specify the closing date of the purchase which shall be no later than thirty (30) days after the date of such notice. Until such option is exercised and/or payment made thereunder, the withdrawing Member will be entitled to receive distributions applicable to the withdrawing Member's Interest but will not otherwise be entitled to participate in the Company as a Member.

(b) The purchase price of an Interest shall equal the Fair Market Value of such Interest (determined as of the date of the event of Withdrawal). Any net life insurance proceeds received by the Company upon the death of the Member, up to the amount of the purchase price, shall be paid in lump sum, with any balance paid under a promissory note. At the Company's option up to 100% of the total purchase price may be paid pursuant to a promissory note that accrues interest at the minimum annual rate necessary to avoid imputed interest under the Code and that provides for its balance to be paid in five (5) equal annual installments commencing on the first anniversary of the closing, provided that payment of any remaining balance will be accelerated in the event of a Sale of the Company. The obligation to make installment payments will be evidenced by one or more promissory notes of the Company, which promissory notes will be (i) subordinate and subject to the terms of any indebtedness of the Company for borrowed money (including guarantees of such indebtedness of its Subsidiaries), and (ii) subject to the Company's ability to obtain, through the receipt of a dividend or other distribution from any Subsidiary, funds sufficient to satisfy the Company's obligations under such notes. The notes may be prepaid in whole or in part at any time without premium or penalty. Any prepayment shall be applied first to accrued interest and then to the installments in the inverse order in which they are due.

(c) If the Company does not elect to purchase the Interest of such withdrawing Member in accordance with Section 9.2, then the successor in interest to such withdrawing Member ("**Successor in Interest**") will be an assignee of the Interest of the withdrawing Member that the Company did not elect to purchase. In such event, the Successor in Interest will not become a Member unless and until the admission of the Successor in Interest as a Member is consented to in writing by the Board, which consent may be withheld by the Board in its sole and

unreviewable discretion, with or without cause, and provided further that the Successor in Interest complies with the conditions of Transfer set forth in Section 8.3.

(d) If a Member withdraws from the Company in contravention of this Agreement (provided that withdrawal by a Member by reason of such Member's death shall not be deemed in contravention of this Agreement), in addition to any other remedies available to the Company under applicable law, the Company may recover from the withdrawing Member damages for breach of this Agreement and may offset the damages against the amount otherwise distributable to such Member on account of its Interest.

9.3 **Company to Continue Upon Withdrawal**. The Company shall not dissolve upon the withdrawal of a Member but shall continue until dissolved in accordance with SECTION 10.

## SECTION 10.

## DISSOLUTION OF THE COMPANY

10.1 **Dissolution Events**. The Company will dissolve and commence winding up and liquidation upon the first to occur of any of the following (each, a "**Dissolution Event**"):

(a) The sale or other Transfer of all or substantially all of the Company's assets;

(b) The decision of the Board to dissolve, wind up, and liquidate the Company;

(c) The happening of any other event that makes it unlawful, impossible or impractical to carry on the business of the Company; or

(d) Upon entry of a decree of judicial dissolution under Section 1705.47 of the Act.

The Members hereby agree that, notwithstanding any provision of the Act, the Company will not dissolve prior to the occurrence of a Dissolution Event.

10.2 **Winding Up**. Upon the occurrence of a Dissolution Event, the Company will continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members. The Members and/or the Board will promptly execute and cause to be filed a certificate of dissolution in accordance with the Act and the law of any other States or jurisdictions in which the Company has qualified to conduct business. No Member will take any action that is inconsistent with or not necessary to or appropriate for the winding up of the Company's business and affairs. The Company's assets will be liquidated as promptly as is consistent with obtaining the fair value thereof, and the proceeds therefrom, to the extent sufficient therefor, will be applied and distributed in the following order:

(a) First, to the payment and discharge of all of the Company's debts and liabilities; and

(b) The balance, if any, to the Members in accordance with Section 5.6.

Any distribution to a Member pursuant to Section 10.2(a) or Section 10.2 (b) will be net of any amounts owed to the Company by such Member.

No Member will receive any additional compensation for any services performed pursuant to SECTION 10 other than pursuant to a written agreement between the Company and such Member.

10.3 **Distributions in Kind on Liquidation**. To the extent that the Company's assets are not sold or otherwise disposed of, such assets (if any) may be distributed in kind to the Members as follows: the value of such assets shall be appraised (by an appraiser selected by the Board) to determine the Profits and Losses that would have resulted if such assets had been sold; and such assets shall be distributed in accordance with Section 5.6, each Member taking an undivided interest in such assets subject to a pro rata share of the Company's liabilities.

10.4 **Compliance With Timing Requirements of the Regulations**. If any Member has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all Taxable Years, including the year during which such liquidation occurs), such Member will have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit will not be considered a debt owed to the Company or to any other Person for any purpose whatsoever. In the discretion of the Board, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to SECTION 10 may be:

(a) Distributed to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company or of the Members arising out of or in connection with the Company. The assets of any such trust shall be distributed to the Members from time to time, in the discretion of the Board, in the same proportion as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement; and/or

(b) Withheld to provide a reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Members as soon as reasonably practicable.

10.5 **Rights of Members**. Each Member will look solely to the assets of the Company for the return of his Capital Contribution and will have no right to receive property other than cash from the Company. Except as otherwise specifically provided in this Agreement, no Member will have priority over any other Member as to the return of his Capital Contribution, distributions or allocations.

10.6 **Prohibition on Withdrawal**. Except as otherwise provided in SECTION 8 or SECTION 9, no Member is entitled to withdraw from the Company prior to the Company's dissolution pursuant to SECTION 10.

## SECTION 11.

## MEETINGS OF MEMBERS

11.1 **Meetings**. Meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by: (i) the Board, or (ii) the Members holding at least 20% of the voting power of the Units. The Chairman of the Board shall preside at all meetings of the Members.

11.2 **Place of Meetings**. The Board may designate the Company's principal place of business or any other place that is reasonably accessible, either within or outside the State of Ohio, as the place of meeting for any meeting of the Members. If no designation is made, or if a special meeting is otherwise called, the place of meeting shall be at the Company's principal place of business. To the extent permitted by law, Members may participate in a meeting through the use of telephone conference or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting in such manner shall constitute presence in person at such meeting.

11.3 **Notice of Meetings**. Except as provided in Section 11.4, the Board shall deliver or cause to be delivered a notice of such meeting to each Member entitled to vote at such meeting. Said notice shall be delivered not less than seven (7) days nor more than sixty (60) days before the date of such meeting and shall state the place, day and hour of the meeting and the purpose or purposes for which the meeting is called.

11.4 **Meeting of all Members**. If all of the Members shall meet at any time and place, either within or outside of the State of Ohio, and consent to or waive notice of the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

11.5 **Record Date**. For the purpose of determining Members entitled to notice of, or to vote at, any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in SECTION 11, such determination shall apply to any adjournment thereof.

11.6 **Quorum**. Members holding a majority of the voting power of the Units entitled to vote on the matters to be presented at a meeting of the Members, whether represented in person or by proxy, shall constitute a quorum at such meeting. In the absence of a quorum at any such meeting, the Members holding at least two thirds (2/3) of the voting Units so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice other than announcement of the meeting. However, if the adjournment is for more than sixty (60) days, or if after the adjournment a new record date is fixed for the adjourned meeting, then a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed.

The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Units whose absence would cause less than a quorum.

11.7 **Manner of Acting**. The affirmative vote of Members holding at least a majority of the voting power of the Units entitled to vote on the action shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Articles or this Agreement. For purposes of determining which Members can vote, transferees of Units that are not admitted as Members shall not be entitled to vote on any matter and that the Units held by such transferees shall not count as part of the calculation of the amount of Units outstanding.

11.8 **Proxies**. At all meetings of the Members, a Member may vote in person or by written proxy executed by the Member or by such Member's duly authorized attorney in fact. Such proxy shall be filed with the Company before or at the time of the meeting. No proxy shall be valid after eight (8) months from the date of its execution, unless otherwise provided in the proxy.

11.9 **Action by Members Without a Meeting**. Action required or permitted to be taken at a meeting of the Members may be taken without a meeting if such action is set forth in a written consent signed by all Members entitled to vote on such action and delivered to the Company for inclusion in the minutes of the Company or for filing with the Company records. Action taken under this Section 11.9 is effective when the requisite number of qualified Members have signed the consent, unless the consent specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent. Notice of any action taken under this Section 11.9 shall be given to each Member who did not sign a written consent with respect to such action (provided, however, that failure to deliver such copy shall not invalidate such action).

11.10 **Waiver of Notice**. When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at or after the time stated therein, shall be equivalent to the giving of such notice.

## SECTION 12.

## AMENDMENTS

12.1 **Authority to Amend**. Except as set forth in Section 2.1, Section 2.2(d), or SECTION 12, may be amended or modified from time to time only by a written instrument adopted and executed by the unanimous consent of the Members holding all of the voting power of Units; provided, however, that any amendment that would disproportionally effect a Member or class of Members, in its or their capacity as such, shall require the consent of such Member or class of Members (as applicable).

12.2 **Notice of Amendments**. A copy of any amendment approved by the Members pursuant to Section 12.1 shall be delivered to each Member (provided, however, that failure to deliver such copy shall not invalidate such amendment).

## SECTION 13.

## ACKNOWLEDGMENTS

13.1 **Representations and Warranties of Members**. Each Member represents and warrants to the Company and acknowledges that:

(a) The Units have not been registered under the Securities Act or the securities laws of any other jurisdiction and the offer and sale of the Units are being made in reliance on one or more exemptions for private offerings under Section 4(a)(2) of the Securities Act and applicable securities laws;

(b) Such Member is an "accredited investor" within the meaning of Rule 501 promulgated under the Securities Act, and agrees that it will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Rule 501 promulgated under the Securities Act with respect to the offer and sale of the Units;

(c) Such Member is acquiring its Units solely for investment purposes and not with a view to the distribution or resale thereof, and that its financial condition is such that it is not under any present necessity or constraint and does not foresee in the future any necessity or constraint to dispose of all or any part of its Units to satisfy any existing or contemplated debt or undertaking;

(d) Such Member has conducted its own independent investigation, review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and the Company's Subsidiaries, and the Company's management and related matters and such Member acknowledges that it has been provided adequate access to the personnel, properties, premises and records of the Company and the Company's Subsidiaries for such purpose;

(e) The determination of such Member to acquire Units has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and the Company's Subsidiaries that may have been made or given by any other Member or by any agent or employee of any other Member;

(f) Such Member has such knowledge, sophistication and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company, including the risk that the Member could lose the entire value of those securities, and has so evaluated the merits and risks of such purchase, and making an informed decision with respect thereto;

(g) Such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time;

(h) Each of the parties hereto and each of the Substitute Members hereinafter becoming a signatory hereto, acknowledge that each such party or Substitute Member has been

advised of and hereby approves of the application of Company funds to pay all expenses incurred in connection with the formation of the Company and admission of the Members, including, without limitation, legal fees, registration fees and filing and recording charges;

(i) Such Member either (i) is a natural person, or (ii) will be counted as a single beneficial owner of the outstanding securities of the Company for purposes of Section 3(c)(1) of the 1940 Act, and the related rules promulgated by the Securities and Exchange Commission, and agrees that the foregoing representation and warranty shall be true each time it makes a payment to the Company for Units under this Agreement; and

(j) The execution, delivery and performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default in any material respect under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound.

13.2 **Acknowledgments and Agreements of Each Member**. Each Member acknowledges and agrees that:

(a) No market for the Units exists, it is not likely that a market for the Units will develop, the further sale, transfer or other disposition of the Units is severely restricted under the terms of this Agreement, it must hold its Units indefinitely except as otherwise provided in this Agreement, and the Company is under no obligation, and has no intention, to either register the Units under the Securities Act or attempt to secure an exemption for any further sale, transfer or other disposition thereof;

(b) The Units have not been registered under the Securities Act or the securities laws of any other jurisdiction and the offer and sale of the Units are being made in reliance on one or more exemptions for private offerings under Section 4(a)(2) of the Securities Act and applicable securities laws

(c) Such Member has reviewed and understands all restrictions imposed upon further sale, transfer or other disposition of the Units, including the fact that any certificate representing the Units (if any is issued) will bear legends restricting such resale, transfer or disposition, and it has reviewed and understands all such restrictions imposed by this Agreement;

(d) Such Member is not subscribing for the Interest as a result of any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio, or presented at any seminar or meeting;

(e) Such Member is aware of the fact that no governmental or other agency has made any finding or determination as to the fairness for public or private investment, or any recommendation or endorsement, of a Unit for investment;

(f) Such Member is not relying on the Company or any of its agents or representatives with respect to any tax considerations relating to its investment; and

(g) Neither the Company nor any other Person makes any representation or warranty, express or implied, as to the accuracy or completeness of the information provided or to be provided to the Member in connection with the issuance of the Units, and nothing contained in any documents provided or statements made by or on behalf of the Company to the Member is, or shall be relied upon as, a promise or representation by the Company or any other Person that any such information is accurate or complete.

## SECTION 14.

## MISCELLANEOUS

14.1 **Notices**. All notices, requests, consents, demands and other communications under this Agreement must be in writing and will be deemed duly given, unless otherwise expressly indicated to the contrary in this Agreement, (a) when delivered by hand (with written confirmation of receipt), (b) on the third Business Day after the day mailed, by certified or registered mail, return receipt requested, postage prepaid, (c) on the next Business Day following the documented acceptance thereof for delivery by a nationally recognized overnight courier (receipt requested), or (d) on the date sent by e-mail transmission, (with confirmation of transmission). Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 14.1): if to (a) the Company, to the Company at the address set forth in Section 1.6, and (b) a Member, to the address set forth on Exhibit A to this Agreement.

14.2 **Binding Effect**. Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement will be binding upon and inure to the benefit of the Members and their respective heirs, legatees, legal representatives, successors, transferees and permitted assigns.

14.3 **Construction**. Every covenant, term and provision of this Agreement will be construed simply according to its fair meaning and not strictly for or against any Member.

14.4 **Waiver of Appraisal**. Notwithstanding any provision which may be contained in the will of a deceased Member, there shall be no inventory and appraisement of the Company assets or a sale of a deceased Member's Interest therein as a result of the death of a Member, and the Interest of a deceased Member shall be settled and disposed of exclusively in accordance with the terms of this Agreement.

14.5 **Headings**. Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope or extent of this Agreement or any provision hereof.

14.6 **Severability**. Every provision of this Agreement is intended to be severable. If any term or provision hereof is invalid for any reason whatsoever, such illegality or invalidity will not affect the validity or legality of the remainder of this Agreement.

14.7 **Incorporation by Reference**. Every appendix, exhibit, schedule, and other document attached to this Agreement and referred to herein is hereby incorporated into this Agreement by reference.

14.8 **Further Action**. Each Member agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary to carry out the provisions of this Agreement.

14.9 **Variation of Pronouns**. All pronouns and any variations will be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require.

14.10 **Governing Law, Consent to Jurisdiction and Service of Process**. The Company, and each Manager, officer and Member (on behalf of such Member and such Member's successors and assigns) irrevocably (a) agrees that this Agreement shall be governed by the laws of the State of Ohio, (b) consents to the exclusive jurisdiction of the state and federal courts located in Hamilton County, Ohio, (c) agrees that any action, suit or proceeding by or among the Company, Managers, officers or Members (or any of them) shall be brought exclusively in a court in Hamilton County, Ohio, (d) waives any objection which he, she or it may now or hereafter have to the choice of forum whether on personal jurisdiction, venue, forum non conveniens or on any other ground, (e) consents to the service of process outside of the territorial jurisdiction of said courts by mailing copies thereof by registered or certified United States mail, postage prepaid, to such Person's last known address as shown in the records of the Company with the same effect as if such Person was a resident of the State of Ohio and had been lawfully served in such state, and (f) agrees that final judgment against he, she or it in any such action or proceeding shall be conclusive and may be enforced in any other jurisdiction within or outside the State of Ohio by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and the amount of such judgment. Nothing in this Agreement shall affect the right to service of process in any other manner permitted by law.

14.11 **WAIVER OF JURY TRIAL**. THE COMPANY AND EACH MEMBER HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR SUCH MEMBER'S RIGHTS AS A MEMBER OF THE COMPANY OR INTEREST IN THE COMPANY.

14.12 **Specific Performance**. The parties acknowledge that it is impossible to measure, in money, the damages that would accrue to a party or to the personal representative of a decedent from a failure of a party to perform any of the obligations under this Agreement. Therefore, if any party or the personal representative or executor of any party enters into any action or proceeding to enforce the provisions of this Agreement, any Person (including the Company) against whom the action or proceeding is brought waives the claim or defense that the moving party or representative has or shall have an adequate remedy at law, and the Person shall not urge in the action or proceeding the claim or defense that an adequate remedy at law exists.

14.13 **Individual Members; Community Property**. Each individual Member or transferee required to become a party hereto whose Interests now are or become "community

property," shall at the later of the Effective Date or the time when his or her spouse first has a "community property" interest in any of such Interests, cause such spouse to execute a counterpart of this Agreement and any amendment hereto executed by such Member, or another writing in form and substance satisfactory to the Company, subjecting such spouse and the spouse's "community property" interest in such Interest to the applicable provisions of this Agreement and such amendment. No spouse executing this Agreement or any such writing solely by reason of his or her "community property" interest in Interests and the immediately preceding sentence, shall be considered to be a Member for any purposes whatsoever.

14.14 **Legal Representation**. THE PARTIES ACKNOWLEDGE THAT VORYS, SATER, SEYMOUR AND PEASE LLP ("**VORYS**") HAS BEEN ENGAGED FOR THE PURPOSE OF NEGOTIATING AND DRAFTING THIS AGREEMENT AND ANY OTHER AGREEMENTS AND DOCUMENTS RELATED TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN ON BEHALF OF THE COMPANY AND THAT VORYS DOES NOT REPRESENT ANY MEMBER. EACH MEMBER ACKNOWLEDGES THAT SUCH MEMBER HAS BEEN ADVISED TO SEEK ADVICE OF INDEPENDENT COUNSEL AND THAT SUCH MEMBER HAS HAD THE OPPORTUNITY TO SEEK ADVICE OF INDEPENDENT COUNSEL, AND FURTHER ACKNOWLEDGES THAT SUCH MEMBER HAS RECEIVED NO REPRESENTATIONS OR ADVICE FROM VORYS ABOUT THE CONSEQUENCES TO SUCH MEMBER UNDER THIS AGREEMENT OR ANY OTHER AGREEMENTS OR DOCUMENTS RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN, INCLUDING, WITHOUT LIMITATION, TAX CONSEQUENCES AS A RESULT OF THIS AGREEMENT OR ANY OTHER AGREEMENTS OR DOCUMENTS RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN AND SUCH MEMBER WAIVES ANY CONFLICT OF INTEREST IN CONNECTION WITH SUCH REPRESENTATION BY VORYS.

14.15 **Entire Agreement**. This Agreement, together with the Articles, as each of the foregoing may be amended in writing from time to time, and the Restricted Unit Agreements, contain the entire understanding among the parties and supersedes any prior understandings and agreements among them respecting the subject matter of this Agreement.

14.16 **Counterpart Execution**. This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document. All counterparts will be construed together and will constitute one agreement. A copy of a signature shall be deemed an original.

IN WITNESS WHEREOF, the parties have entered into this Operating Agreement of Red Dog Operations Holding Company LLC as of the date first above written.

**RED DOG OPERATIONS HOLDING COMPANY LLC**

By: ______________________
Name: Raymond Schneider
Title: Chairman

Address:

10988 Deerfield Rd
Attention: Raymond Schneider
Blue Ash, Ohio 45242
ray@circledev.com

With a copy to (for purposes of notice only):

Address:

Vorys, Sater, Seymour and Pease LLP
301 East Fourth Street, Suite 3500
Great American Tower
Cincinnati, Ohio 45202
Attention: Emily S. Pan
Email: espan@vorys.com

IN WITNESS WHEREOF, the parties have entered into this Operating Agreement of Red Dog Operations Holding Company LLC as of the Effective Date.

**MEMBER:**

Raymond Schneider

Address:

10988 Deerfield Rd
Blue Ash, Ohio 45242
ray@circledev.com

With a copy to (for purposes of notice only):

Address:

Vorys, Sater, Seymour and Pease LLP
301 East Fourth Street, Suite 3500
Great American Tower
Cincinnati, Ohio 45202
Attention: Emily S. Pan
Email: espan@vorys.com

IN WITNESS WHEREOF, the parties have entered into this Operating Agreement of Red Dog Operations Holding Company LLC as of the Effective Date.

**MEMBER:**

[signature] 1-30-20
Eric Schneider

Address:
2 W 6th Street
Unit 107
Boston, MA 02127
Email: eric@reddogpetresort.com

With a copy to (for purposes of notice only):

Address:
____________________________
____________________________
____________________________
Email:__________________________

# APPENDIX A

## TAX MATTERS

1.1 **Profits and Losses**. Subject to Section 1.2 of this Appendix A, for each Fiscal Year (or portion thereof), Profits or Losses (adjusted to reflect allocations under Section 1.3 of this Appendix A) shall be allocated among the Members so as to reduce, proportionately, the differences between their respective Partially Adjusted Capital Accounts and Target Accounts. To the extent the allocation of Profits or Losses does not cause each Member's Partially Adjusted Capital Account to equal such Member's Target Account, items of income or gain shall be reallocated to any Member with a Partially Adjusted Capital Account that is less than such Member's Target Account to the extent of the deficit, and items of loss or expense shall be reallocated to any Member with a Partially Adjusted Capital Account that is greater than such Member's Target Account to the extent of the excess.

1.2 **Special Allocations**. The following special allocations will be made in the following order:

(a) **Minimum Gain Chargeback**. Notwithstanding any other provision of this Appendix A and subject to the exceptions set forth in Sections 1.704-2(f)(2),(3),(4) and (5) of the Regulations, if there is a net decrease in Company Minimum Gain during any Taxable Year, each Member will be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-2(g) of the Regulations. Allocations pursuant to the previous sentence will be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated will be determined in accordance with Section 1.704-2(f) of the Regulations. This Section 1.2(a) is intended to comply with the minimum gain chargeback requirement in such section of the Regulations and will be interpreted consistently therewith.

(b) **Partner Minimum Gain Chargeback**. Notwithstanding any other provision of this Appendix A, except Section 1.2(a), and subject to the exception in Section 1.704-2(i)(4) of the Regulations, if there is a net decrease in Partner Minimum Gain attributable to Partner Nonrecourse Debt during any Company Taxable Year, each Member who has a share of the Partner Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Regulations, will be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to the portion of such Member's share of the net decrease in Partner Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Regulations. Allocations pursuant to the previous sentence will be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated will be determined in accordance with Section 1.704-2(i)(4) of the Regulations. This Section 1.2(b) is intended to comply with the minimum gain chargeback requirement in such section of the Regulations and will be interpreted consistently therewith.

(c) **Qualified Income Offset**. In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4),

1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations that results in an Adjusted Capital Account Deficit at the end of any Taxable Year, items of Company income and gain will be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, such Member's Adjusted Capital Account Deficit as quickly as possible, provided that an allocation pursuant to this Section 1.2(c) will be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in Section 1.2 of this Appendix A have been tentatively made as if this Section 1.2(c) of this Appendix A were not in this Appendix A.

(d) **Gross Income Allocation**. In the event any Member has a deficit Capital Account at the end of any Taxable Year that is in excess of the amount that such Member is treated as obligated to restore pursuant to (i) Section 1.704-1(b)(2)(ii)(c) of the Regulations and (ii) the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 1.2(d) will be made only if and to the extent that such Member would have a deficit Capital Account in excess of such amount after all other allocations provided for in this Section 1.2 have been made as if Section 1.2(c) hereof and this Section 1.2(d) were not in this Appendix A.

(e) **Nonrecourse Deductions**. Nonrecourse Deductions for any Taxable Year will be allocated as items of deduction included in Profits or Losses and allocated pursuant to Section 1.1 of this Appendix A.

(f) **Partner Nonrecourse Deductions**. Any Partner Nonrecourse Deductions for any Taxable Year will be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i) of the Regulations.

(g) **Section 754 Adjustments**. To the extent the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations, to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss will be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations.

(h) **Imputed Interest Income**. Any interest income imputed to the Company by reason of characterization of any payment of taxes by the Company as an interest-free loan to a Member pursuant to Section 5.2 shall be specially allocated to the Member who is treated as having received such interest-free loan.

(i) **No Impermissible Deficits**. Notwithstanding any other provision of this Agreement, Losses (or items of loss or deduction) shall not be allocated pursuant to Section 1.1 of this Appendix A if such an allocation would create or increase an Adjusted Capital Account Deficit with respect to a Member. All Losses (or items of loss or deduction) that, if allocated to a Member, would create or increase an Adjusted Capital Account Deficit shall be allocated to the



=

other Members, to the extent such allocations do not create or increase an Adjusted Capital Account Deficit.

(j) **Compensatory Units.** Items of income, gain, deduction, loss or credit with respect to Compensatory Units shall be allocated among the Members in accordance with Section 2.2(d)(ii).

(k) **Noncompensatory Options.** Notwithstanding anything in this Agreement to the contrary, the Company may take any such actions as it deems necessary in order to comply with the requirements of the Regulations relating to noncompensatory options, including (i) the special allocation of items of income, gain, loss or deduction, as well as Company capital, among the Members in connection with the exercise of a Company noncompensatory option and (ii) the corrective allocation for tax purposes of gross income, gain, loss or deduction in the event of a reallocation of Company capital.

1.3 **Other Allocation Rules.**

(a) For purposes of determining the Profits, Losses, or any other items allocable to any period of time, Profits, Losses, and any such other items will be determined on a daily, monthly, or other basis, as determined by the Board using any permissible method under Code Section 706 and the Regulations thereunder.

(b) Except as otherwise provided in this Appendix A, all items of Company income, gain, loss, deduction, and any other allocations (including allocations of credits) not otherwise provided for will be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the Taxable Year.

(c) The Members are aware of the income tax consequences of the allocations made by this Appendix A and hereby agree to be bound by the provisions of this Appendix A in reporting their shares of Company income and loss for income tax purposes.

(d) To the extent permitted by Sections 1.704-2(h) and 1.704-2(i)(6) of the Regulations, the Board will endeavor to treat distributions of Distributable Assets as having been made from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Member.

1.4 **Capital Accounts.**

(a) A single capital account (a "**Capital Account**") shall be established, determined and maintained for each Member on the books and records of the Company in accordance with the provisions of the Regulations governing the determination and maintenance of partnership capital accounts, including the following rules of determination and maintenance:

(i) Such account shall be credited with (A) the amounts of such Member's paid-in Capital Contribution and the amount of any other money contributed by such Member to the Company in accordance with the terms of this Agreement (and the amount of any Company



=

liabilities assumed by such Member, other than liabilities described in the parenthetical language of clause (ii)(B) of this Section 1.5(a)), (B) the Gross Asset Value of any property contributed by such Member to the Company in accordance with the terms of this Agreement (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code), (C) such Member's distributive share of Profits (or items thereof) and (D) except as otherwise set forth herein, any item of income or gain allocated to such Member pursuant to Sections 1.2(a)–(k) of this Appendix A; and

(ii) Such account shall be debited with (A) the amount of money distributed to such Member (including the amount of such Member's liabilities assumed by the Company, other than liabilities described in the parenthetical language of clause (i)(B) of this Section 1.5(a)), (B) the Gross Asset Value of any property distributed to such Member (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code), (C) such Member's distributive share of Losses (or items thereof) and (D) except as otherwise set forth herein, any item of loss or deduction allocated to such Member pursuant to Sections 1.2(a)–(k) of this Appendix A.

(b) Each such Capital Account shall reflect all Interests owned by such Member. Upon a Transfer of all or a part of an Interest, the transferee shall succeed to the Capital Account of the transferor to the extent that such Capital Account relates to the transferred Interest (or portion thereof). Any reference in this Agreement to a Capital Contribution of, or distribution or allocation to, a Member that has succeeded any other Member shall include any Capital Contribution, distributions or allocations previously made by or to the former Member on account of the Interest of such former Member transferred to such successor Member.

(c) If the Gross Asset Value of Company property is adjusted, the aggregate adjustment shall be taken into account in determining Profits and Losses in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment.

(d) The provisions of Section 1.4 of this Appendix A are intended to comply with the Regulations and shall be interpreted in a manner consistent with such regulations. If any of the provisions of this Agreement relating directly or indirectly to Capital Account determination and maintenance at any time conflict with the Regulations, such Regulations shall govern Capital Account determination and maintenance.



=

# APPENDIX B

## DEFINITIONS

**"1940 Act"** means the Investment Company Act of 1940, as amended, or any successor or similar statute.

**"Act"** means the Ohio Limited Liability Company Act, as amended from time to time (or any corresponding provisions of succeeding law).

**"Adjusted Capital Account"** means, as of the end of any Taxable Year, a Member's Capital Account balance as of the end of such Taxable Year (taking into account all contributions made by such Member and distributions made to such Member during such year or period and any special allocations required by Section 1.2 of Appendix A), increased by the sum of (i) such Member's share of Company Minimum Gain and (ii) such Member's share of Partner Minimum Gain, both determined after taking into account any such special allocations.

**"Adjusted Capital Account Deficit"** means, with respect to any Member, the amount, if any, by which the balance in such Member's Capital Account is negative as of the end of the relevant Taxable Year, after giving effect to the following adjustments:

(i) Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to Regulations Section 1.704-1(b)(2)(ii)(c) and the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(ii) Debit to such Capital Account the items described in Sections 1.704-1 (b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and will be interpreted consistently therewith.

**"Affiliate"** means, with respect to any Person: (i) any Person directly or indirectly controlling, controlled by or under common control with such Person; (ii) any person owning or controlling 10% or more of the outstanding voting securities of such Person; (iii) any officer, director, manager, trustee or general partner of such Person; or (iv) any Person who is an officer, director, manager, trustee or general partner or holder of 10% or more of the voting securities of any Person described in clauses (i) through (ii).

"**Affiliate Creditors**" is defined in Section 3.1.

**"Agreement"** means this Agreement, as originally executed and as amended from time to time. Terms such as "hereof," "hereto," "hereby," "hereunder" and "herein" refer to this Agreement as whole, unless the context otherwise requires.

**"Articles"** is defined in Section 1.1.

**"Bankruptcy"** means (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law ("Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in effect, (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv) the filing of the petition in any such involuntary bankruptcy case, which petition remains undismissed for a period of one hundred eighty (180) days or which is not dismissed or suspended pursuant to Section 305 of the United States Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Law for the Member or for any substantial part of its assets or property, or (vii) the making by a Member of any general assignment for the benefit of its creditors.

**"Board"** means the Board of Managers of the Company.

**"Business Day"** means a day on which banks are open for business in Cincinnati, Ohio but does not include any day that is a Saturday, Sunday or a statutory holiday in the State of Ohio.

**"Capital Account"** is defined in Section 1.5 of Appendix A.

**"Capital Contributions"** means, with respect to any Member, the amount of money and the Gross Asset Value at the time of the contribution of any assets (other than money) contributed to the Company with respect to the Interest held by such Person.

**"Certificate of Membership"** is defined in Section 2.2(a).

**"Class A Member"** means a Member holding Class A Units.

**"Class A Unit"** means a Unit designated as a voting Class A Unit by the Board upon issuance and/or issued to a Member as set forth on Exhibit A.

**"Class B Member"** means a Member holding Class B Units.

**"Class B Unit"** means a Unit designated as a non-voting Class B Unit by the Board upon issuance and/or issued to a Member as set forth on Exhibit A.

**"Class C Member"** means a Member holding Class C Units.

**"Class C Unit"** means a Unit designated as a voting Class C Unit by the Board upon issuance and/or issued to a Member as set forth on Exhibit A.

**"Class D Member"** means a Member holding Class D Units.

**"Class D Unit"** means a Unit designated as a non-voting Class D Unit by the Board upon issuance and/or issued to a Member as set forth on Exhibit A.

**"Code"** means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

**"Company"** is defined in the preamble.

**"Company Minimum Gain"** has the meaning set forth for "partnership minimum gain" in Section 1.704-2(b)(2) of the Regulations.

"**Company Representative**" is defined in Section 7.2(a).

"**Compensatory Unit**" means any Class C Unit or Class D Unit.

**"Competitive Business Activity"** means (i) any business (other than the business of the Company and the Subsidiaries) in any country that engages or proposes to engage in the design, development, manufacture, production, distribution, marketing, installation, sale or provision of any product or service which the Company and the Subsidiaries provides or intends to provide to its customers and potential customers or (ii) any other business activities that the Company or any Subsidiary may enter into after the Effective Date.

**"Confidential Information"** is defined in Section 7.3.

**"Contributed Subsidiaries"** is defined in Section 2.3.

**"Depreciation"** means, for each Taxable Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Taxable Year; provided that, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes as of the beginning of such Taxable Year, Depreciation will be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Taxable Year bears to such beginning adjusted tax basis, except that if the federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation will be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board; provided further, that with respect to any asset the Gross Asset Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Taxable Year and which difference is being eliminated by use of the "remedial allocation method" as defined by Section 1.704-3(d) of the Regulations, Depreciation for such Taxable Year will be the amount determined under Section 1.704-3(d)(2) of the Regulations.

**"Dissolution Event"** is defined in Section 10.1.

**"Distributable Assets"** means the cash, securities and other assets of the Company available to be distributed to the Members less any portion thereof used to establish or fund reserves to cover existing or potential costs, fees, expenses or liabilities of the Company, as determined by the Board in its sole discretion.

**"Drag-Along Sale"** is defined in Section 8.5.

**"Effective Date"** is defined in the preamble.

**"Fair Market Value"** means, as of any date of determination (i) after an IPO, the average closing price of a Unit (or share of common stock of the Company upon conversion of the Units) on the principal exchange on which such Units (or shares of common stock upon conversion of such Units) are then trading for the ten trading days immediately preceding such date, and (ii) prior to an IPO, the fair market value of the Units as of such date as determined in good faith by a nationally recognized investment banking, accounting or valuation firm, taking into account such factors as such firm deems appropriate, including the earnings and other financial information of the Company and its Subsidiaries for such time period as such firm deems is appropriate, the potential value of the Company and its Subsidiaries as a whole, the prospects of the Company and its Subsidiaries and the industries in which they compete, the general condition of the securities markets and the fair market value of securities of privately-held companies engaged in businesses similar to the Company and its Subsidiaries, but not taking into account the fact that such Units represent a minority interest.

**"Family"** means only the spouse, issue (whether natural or adopted), sibling or parent of such Member.

**"Fiscal Year"** is defined in Section 1.10.

**"Fully Diluted Units"** means, as of any date of determination, with respect to all Units, all issued and outstanding Units of the Company and all Units issuable as of such date, whether or not such Unit is at the time vested, or exercisable.

**"GAAP"** means generally accepted accounting principles as in effect in the United States from time to time, as consistently applied by the Company.

**"Gross Asset Value"** means, with respect to any asset, the asset's adjusted basis for federal income tax purposes except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Member to the Company will be the gross fair market value of such asset, as determined by the Board;

(ii) The Gross Asset Values of all Company assets will be adjusted to equal their respective gross fair market values, as determined by the Board, immediately prior to the following events: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of assets as consideration for an interest in the Company; (c) the grant or issuance of any Interest in the Company (other than a de minimis interest) as consideration for performance of services to or for the benefit of the Company or any Subsidiary by an existing Member acting in a Member capacity or by a new Member acting in a Member capacity in anticipation of being a Member; (d) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and (e) the issuance by the Company of a noncompensatory option (other than an option for a de minimis Interest); provided, however, that adjustments pursuant to clauses (a), (b), (c) and (e) above will be made only if the

Board reasonably determines that such adjustments are necessary to reflect the relative economic interests of the Members in the Company; and provided further that the property of the Company may be revalued on the books of the Company immediately after the exercise of a noncompensatory option in accordance with Regulations Section 1.704-1(b)(2)(iv)(s);

(iii) The Gross Asset Value of any Company asset distributed to any Member will be the gross fair market value of such asset as determined by the Board as of the date of distribution; and

(iv) The Gross Asset Values of Company assets will be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and Section 1.2(g) of Appendix A; provided, however, that Gross Asset Values will not be adjusted pursuant to this clause (iv) to the extent the Board determines that an adjustment pursuant to clause (ii) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to clauses (i), (ii), or (iv) above, such Gross Asset Value will thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

**"Indemnitee"** is defined in Section 6.8(a).

"**Initial Company Value"** is defined in Section 2.3.

**"Interest"** means a Member's entire ownership interest in the Company represented by one or more Units, including any and all benefits to which the holder of such an Interest may be entitled as provided in this Agreement, together with all obligations of such Person to comply with the terms and provisions of this Agreement.

**"Internal Revenue Service"** means the U.S. Internal Revenue Service and, as applicable, the U.S. Treasury Department.

**"IPO"** shall mean a firm underwritten initial public offering of equity securities in the Company or its successor in interest with a listing on a major exchange. For purposes of this Agreement, an IPO shall also include any transaction pursuant to which a newly formed or existing special purpose corporation or other similar entity issues securities in a firm underwritten initial public offering for the purpose of investing the net proceeds thereof in equity securities of the Company (or its successor in interest), or any similar transaction; provided, however, that any such transaction, on the whole, otherwise meets the requirements of an IPO pursuant to the immediately preceding sentence.

"**Lenders**" means any Person providing the Company and/or its Subsidiaries with credit facilities, senior indebtedness, mezzanine indebtedness, or any other similar type of indebtedness for borrowed money.

**"Manager"** is defined in Section 6.2(a).

**"Member"** means any Person who (i) is listed on Exhibit A as a Member or has become a Member or Substitute Member pursuant to the terms of this Agreement, and (ii) has not ceased to be a Member pursuant to the terms of this Agreement. Solely for purposes of the allocation, distribution and transfer provisions of Appendix A and SECTION 4, SECTION 5, SECTION 8 and SECTION 10 of the Agreement (and any definitions relating thereto), a Member shall also be deemed to include an assignee or transferee of a Unit who has not been admitted to the Company as a Substitute Member pursuant to the terms of the Agreement.

"**Net Income"** is defined in in Section 5.2(a).

**"Nonrecourse Deductions"** has the meaning set forth in Section 1.704-2(b)(1) of the Regulations. The amount of Nonrecourse Deductions for any Taxable Year equals the excess, if any, of the net increase, if any, in the amount of Company Minimum Gain during that Taxable Year over the aggregate amount of any distributions during that Fiscal Year of proceeds of a Nonrecourse Liability that are allocable to an increase in Company Minimum Gain, determined according to the provisions of Sections 1.704-2(c) and (d) of the Regulations.

**"Nonrecourse Liability"** has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

**"Original Class A/B Units"** means the Class A Units and Class B Units that were issued and outstanding on the Effective Date.

**"Ownership Percentages"** means, with respect to any Member, the amount, expressed as a percentage, that the number of Units owned by such Member at any given time as set forth in Exhibit A bears to the total number of Units owned by all Members as of such date, as set forth on Exhibit A.

**"Partially Adjusted Capital Account"** means, with respect to any Member for any Taxable Year, the Capital Account of such Member at the beginning of such Taxable Year, adjusted as set forth in Section 1.4 of Appendix A for all contributions to the capital of the Company and distributions by the Company during such Taxable Year and all special allocations made in accordance with Section 1.2 of Appendix A with respect to such Taxable Year, and assuming that amounts distributable for such Taxable Year under Section 5.1, 5.2 or 10.2 and distributed within thirty (30) calendar days of the end of such Taxable Year are distributed during such Taxable Year (and that such amounts are not taken into account again when they are actually distributed), but before giving effect to any allocations of Profits or Losses for such Taxable Year under Section 1.1 of Appendix A.

**"Partner Minimum Gain"** means an amount, with respect to each Partner Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

**"Partner Nonrecourse Debt"** has the meaning set forth in Section 1.704-2(b)(4) of the Regulations.

**"Partner Nonrecourse Deductions"** has the meaning set forth in Section 1.704-2(i)(2) of the Regulations. The amount of Partner Nonrecourse Deductions with respect to a Partner Nonrecourse Debt for any Taxable Year equals the excess, if any, of the net increase, if any, in the amount of Partner Minimum Gain attributable to such Partner Nonrecourse Debt during that Taxable Year over the aggregate amount of any distributions during that Taxable Year to the Member that bears the economic risk of loss for such Partner Nonrecourse Debt to the extent such distributions are from the proceeds of such Partner Nonrecourse Debt and are allocable to an increase in Partner Minimum Gain attributed to such Partner Nonrecourse Debt, determined in accordance with Sections 1.704-2(i)(2) and (3) of the Regulations.

"**Partnership Audit Procedures**" means Subchapter C of Chapter 63 of Subtitle F of the Code (as amended by the Bipartisan Budget Act of 2015, P.L. 114-74, the Protecting Americans from Tax Hikes Act of 2015, P.L. 114-13 and Sections 201 through 207 of the Tax Technical Corrections Act of 2019, contained in Title II of Division U of the Consolidated Appropriations Act of 2018, P.L. 115-141), and the Regulations promulgated and official guidance issued thereunder, as amended from time to time.

**"Permitted Transfer"** is defined in Section 8.2.

**"Permitted Transferees"** means any transferee of any Interest to the extent that the Transfer of such Interest is permitted under SECTION 8.

**"Person"** means any individual, partnership, corporation, trust, limited liability company, or other entity.

"**Preformation Costs**" is defined in Section 3.2(d).

**"Profits"** or **"Losses"** mean, for each Taxable Year, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss), with the following adjustments:

(i) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses will be added to such taxable income or loss;

(ii) Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses, will be subtracted from such taxable income or loss;

(iii) In the event the Gross Asset Value of any Company asset is adjusted, the amount of such adjustment will be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv) Gain or loss resulting from any disposition of assets with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the

Gross Asset Value of the assets disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(v) In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there will be taken into account Depreciation for such Taxable Year;

(vi) to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) of the Code is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits and Losses; and

(vii) Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 1.2 of Appendix A will not be taken into account in computing Profits or Losses, but the amounts of those items are to be determined by applying rules analogous to those set forth in subparagraphs (i) through (vi) above.

**"Proposed Rules"** is defined in Section 2.2(d).

"**Proposed Transferee**" is defined in Section 8.5.

**"Redemption Event"** means (a) an IPO; or (b) a Sale of the Company.

**"Regulations"** means regulations proposed or promulgated by the United States Department of the Treasury under the provisions of the Code.

**"Related Party Transaction"** is defined in Section 6.6.

**"Restricted Unit Agreement"** means any agreement between the Company and another Person pursuant to which the Company issues such Person Restricted Units.

**"Restricted Units"** means any Compensatory Unit that is subject to a vesting or risk of forfeiture condition.

**"Safe Harbor Election"** is defined in Section 2.2(d).

**"Sale of the Company"** means (i) a sale or exchange pursuant to a private sale, merger, recapitalization or other transaction, or a related series of private sales, mergers or other transactions, of a majority of the Units of the Company to one or more Persons other than the Company or Affiliates of the Company or seller(s) of such Units or (ii) the sale or exchange of all or substantially all of the assets of the Company or its Subsidiaries to a Person that is not an Affiliate of the Company or the holders of a majority of the voting Units of the Company.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Selling Member(s)**" is defined in Section 8.5.

**"Subject Members"** is defined in Section 8.5.

**"Subsidiary"** means each entity the majority of the ownership interests of which are owned or controlled, directly or indirectly, by the Company. "Subsidiaries" means all such entities.

**"Substitute Member"** means a Permitted Transferee whose admission as Member is approved by the Board.

**"Successor in Interest"** is defined in Section 9.2(c).

**"Target Account"** means, with respect to any Member for any Taxable Year, a balance (which may be either positive or negative) equal to (i) the hypothetical distribution that such Member would receive if all Company properties were transferred for cash equal to their Gross Asset Values, all Company liabilities became due and were satisfied according to their terms (limited, with respect to each nonrecourse liability, to the tax book value of the property securing such liability) and all net assets of the Company (including the proceeds from the hypothetical transfer and any cash balances of the Company) were distributed pursuant to Section 5.1 as of the last day of such Taxable Year, reduced by (ii) such Member's share of Company Minimum Gain and Partner Minimum Gain immediately prior to the hypothetical transfer.

**"Tax Rate"** means, with respect to each Taxable Year, the highest marginal combined effective federal, state, and local income tax rate for such calendar year applicable to an individual resident in Cincinnati, Ohio, and without taking into account the deductibility of state or local income taxes for federal or state income tax purposes.

**"Taxable Year"** means the Fiscal Year or any portion of the Fiscal Year for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to Section 4.2 and Appendix A.

**"Term"** is defined in Section 1.7.

**"Threshold Amount"** is defined in Section 5.1(b)(i).

**"Transfer"** (whether or not such term is capitalized) means, as a noun, any voluntary or involuntary transfer, sale, encumbrance, pledge, hypothecation, assignment or other disposition by a Member and, as a verb, voluntarily or involuntarily to transfer, sell, pledge, encumber, hypothecate, assign or otherwise dispose of a Member's Interest or Units.

**"Trust"** means a trust of a Member whereby the trust is solely for the benefit of the Member and/or one or more members of the Member's Family.

**"Unit"** means a unit of ownership interest in the Company of whatsoever classes are designated in this Agreement or as may be designated by the Board.

"**Vorys**" is defined in Section 14.14.

**"Withdrawal"** is defined in Section 9.1.

# EXHIBIT A

## MEMBERS' NAMES, INITIAL CAPITAL ACCOUNTS, NUMBERS AND CLASSES OF UNITS

**January 1, 2020**

| Names and Addresses of Members | Initial Capital Contribution for Units | Number of Class A Units | Number of Class B Units | Number of Class C Units | Capital Account Balance | Ownership Percentages |
|---|---|---|---|---|---|---|
| Raymond Schneider | The entire membership interest of each of the Contributed Subsidiaries, at an agreed net fair market value of $6,269,000 | 1 | 7,999 | | $6,269,000 | 80.00% |
| Eric Schneider | $530.87 | | | 2,000 | $0 | 20.00% |
| **Total** | | **1** | **7,999** | **2,000** | **$6,269,000** | **100.00%** |

# EXHIBIT B

## LIST OF CONTRIBUTED SUBSIDIARIES

- Boston Animal Hospital, LLC
- Boston Red Dog Pet Resort & Spa LLC
- West Chester Pet Resort & Spa LLC
- Red Dog Resort & Spa, LLC
- Mason Red Dog Pet Resort & Spa, LLC
- North Shore Red Dog Pet Resort & Spa, LLC
- Atlanta Red Dog Pet Resort & Spa, LLC
- Springdale Red Dog Pet Resort & Spa, LLC

**EXECUTION VERSION**

**AMENDMENT NO. 1 TO THE**
**OPERATING AGREEMENT OF**
**RED DOG OPERATIONS HOLDING COMPANY LLC**

THIS AMENDMENT NO. 1 TO THE OPERATING AGREEMENT OF RED DOG OPERATIONS HOLDING COMPANY LLC (this "Amendment"), entered into December 28, 2020 (the "Effective Date"), by Raymond Schneider (the "Raymond").

RECITALS

WHEREAS, Raymond is the sole Member holding Units with voting rights under the Operating Agreement of the Red Dog Operations Holding Company LLC, dated January 1, 2020 (the "Operating Agreement");

WHEREAS, Section 12.1 of the Operating Agreement provides that the Operating Agreement may be amended or modified by an instrument in writing executed by the unanimous consent of the Members holding all of the voting power of Units; provided, however, that any amendment that would disproportionally effect a Member or class of Members, in its or their capacity as such, shall require the consent of such Member or class of Members (as applicable);

WHEREAS, Raymond now desires to amend Section 8.2 of the Operating Agreement; and

WHEREAS, this Amendment does not disproportionally effect a Member or class of Members, in its or their capacity as such, and accordingly only requires the written consent of Raymond.

NOW, THEREFORE, for and in consideration of the mutual covenants herein contained, and intending to be legally bound hereby, the parties hereto do covenant, agree and certify as follows:

AGREEMENT

Section 1. Capitalized Terms. Capitalized Terms used but not defined in this agreement shall have the meanings ascribed to them in the Operating Agreement.

Section 2. Amendment to Operating Agreement. To be effective as of the Effective Date, Section 8.2 of the Operating Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

> "8.2 **Permitted Transfers of Units**. Subject to the conditions and restrictions set forth in Section 8.3 and except as otherwise provided in a Restricted Unit Agreement or by unanimous written consent of the Managers, the Units of any Member may be Transferred to any party (referred to as a "**Permitted Transferee**" and collectively to any party as "**Permitted Transferees**" of such Member) solely in accordance with any of the following (each a "**Permitted Transfer**"):

(a) Raymond Schneider may Transfer all or any portion of his Class B Units to his spouse; or

(b) A Member who is a natural person may Transfer all or any portion of such Member's Units to a Trust; or

(c) Raymond Schneider may Transfer all or any portion of his Class B Units to his Eric Schneider.

Notwithstanding any provision of this Section 8.2 to the contrary, no Transfer shall be permitted under this Section 8.2 to or for the benefit of a separated or divorced spouse by agreement, court order or otherwise. Any Transfer or disposition of Units made pursuant to this Section 8.2 shall be made only in such manner as to provide control of such Units by a competent legal entity or adult, and so as not to vest control of any Units in any minor or other legally incompetent person."

Section 3. No Other Amendment. Except as set forth in this Amendment, the Operating Agreement is and shall remain in full force and effect.

[*Remainder of page intentionally blank; signature page follows.*]

IN WITNESS WHEREOF, Raymond has executed and delivered this Amendment to be effective as of the Effective Date.

**RAYMOND:**

______________________________
Raymond Schneider