# "EXHIBIT DD"

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | : | Case No: 25-12607 |
| Raymond Joseph Schneider, | : | Chapter 11 |
| | : | |
| Debtor and Debtor in Possession. | : | Judge Beth A. Buchanan |

# LIMITED OBJECTION TO MOTION OF THE HUNTINGTON NATIONAL BANK FOR THE APPOINTMENT OF AN EXAMINER PURSUANT TO 11 U.S.C. § 1104 (DOC. 115)

Raymond Joseph Schneider, the debtor and debtor in possession (the "Debtor"), submits this limited objection to the *Motion of The Huntington National Bank for the Appointment of an Examiner Pursuant to 11 U.S.C. § 1104* (the "Motion") (Doc. 115). Through the Motion, Huntington seeks to have the Court order the appointment of an examiner, who, under 11 U.S.C. § 1104(d), will be a disinterested person selected by the United States Trustee after consultation with parties in interest, and ultimately subject to approval of the Court. The Debtor's objection to the Motion is limited insofar as the appointment of an examiner is mandatory because of the Debtor's fixed, liquidated, unsecured debts exceeding $5 million. *See* 11 U.S.C. § 1104(c); *Morgenstern v. Revco (In re Revco D.S., Inc.)*, 898 F.2d 498 (6th Cir. 1990).

Nonetheless, caselaw suggests that the Court retains wide latitude to shape the manner and scope of the examination. The Debtor urges the Court to exercise its discretion to ensure that any exam be focused on relevant and timely matters, completed within an appropriate timeline, and held within a reasonable budget. That is, the Court should ensure that the examiner conduct "an investigation of the debtor *as is appropriate*" to the needs of this case. 11 U.S.C. § 1104(c) (emphasis added). As discussed below, Huntington's pretextual justifications for an examiner are factually incorrect, mainly overstated, and largely irrelevant. The Debtor urges the Court not to let

Huntington's attempts to vilify the Debtor set the tone and tenor of any independent examination.[1] Instead, the Debtor asks that the Court give clear directives to the examiner to complete an investigation and review that actually advances the interests of all creditors and the bankruptcy estate, and to disavow the persistent "gotcha" tactics that Huntington continues to pursue.

**A. The appointment of an examiner and scope of the examination.**

**1. Under Sixth Circuit precedent, the appointment of an examiner appears mandatory.**

The leading case and only real circuit decision addressing whether section 1104(c)(2) mandatorily imposes an examiner is *Morgenstern v. Revco (In re Revco D.S., Inc.)*, 898 F.2d 498 (6th Cir. 1990). The *Revco* court held that "[w]hen the total fixed, liquidated, unsecured debt is greater than $5 million, the statute requires the court to appoint an examiner." *Id*. at 501 (cleaned up). The Sixth Circuit focused on the legislature's use of "shall" to conclude that an examiner in such context must be appointed. *Id*. at 500-501.

Importantly, however, the *Revco* court only spoke about the requirement to *appoint* an examiner but left broad discretion to the bankruptcy court regarding the examination's scope. It came to the following conclusion in relation to the language of § 1104(c) that the examination should be "as is appropriate":

> The debtors claim that such a construction of the statute [as the Sixth Circuit interprets it] invites abuse, and that the trustee or any other party in interest could needlessly prolong a case with last-minute demands for an examiner. That is not the case before us, of course, and we do not decide it except to note that **the bankruptcy court retains broad discretion** to direct the examiner's investigation,

[1] After all, there is a lot of "pot and kettle" finger-pointing going on here. The Debtor has a pending $100 million lawsuit progressing against Huntington for civil racketeering and civil liability for criminal acts. Regardless of whether the Ohio Supreme Court said there was no duty for Huntington to disclose it, Huntington possessed crucial information about its loan and its criminal borrower, Harold Sosna, that it withheld from the Debtor in order to induce him to sign a guaranty. And then, throughout the course of years of litigation, Huntington has concealed its own files to stifle the Debtor's litigation efforts, providing tens of thousands of additional pages only after its Chairman, President, and CEO admitted during deposition that the bank possessed a credit file for the loan that had never been produced. Huntington can accuse the Debtor of fraud all it wants, but it does not come to this case with anything approaching clean hands.

> including its nature, extent, and duration. Section 1104(b)[2] plainly states that the court shall appoint an examiner 'to conduct such an investigation **as is appropriate**.'

*Id*. at 501 (emphasis added).

This fully establishes the *Revco* paradigm that has been applied in a majority of cases: While the appointment of an examiner is mandatory, the bankruptcy court has full discretion to limit the scope of that examiner's investigation, even if that means appointing an examiner with no duties whatsoever. *See, e.g., In re Spansion, Inc.*, 426 B.R. 114, 127 (Bankr. D. Del. 2010), citing *In re Erickson Retirement Communities, LLC*, 2010 WL 881727, *6 (Bankr. N.D. Tex. Mar. 5, 2010) (discussing how court saw no other choice but to appoint an examiner with no duties when it "would be hard pressed to find any useful purposes for an examiner").

The Sixth Circuit's interpretation of the statute was premised on a certain logic, that "[u]nless § 1104[c](2) requires the appointment of an examiner in such a case, it becomes indistinguishable from § 1104[c](1)." *Revco*, 898 F.2d at 501. In other words, if § 1104(c)(2) does not require appointment when the $5 million threshold is met, then there is no distinction between it and § 1104(c)(1), which states that a court shall appoint an examiner if such "is in the interests of creditors". *Id*. While this makes sense from a matter of statutory construction, it does not always make sense practically. As the *Spansion* and *Erickson* courts noted, there is an absurdity inherent in the *Revco* paradigm in that a court may be forced to appoint an examiner—thereby burdening the debtor's estate with the requisite delay and costs—to investigate nothing.[3]

---

[2] The *Revco* decision came before the Bankruptcy Reform Act of 1994, which redesignated subsection (b) and (c) of § 1104 as subsections (c) and (d), respectively. *See* PL 103-394, 108 Stat 4106 (Oct. 22, 1994).

[3] It is worth noting that in the 36 years since *Revco* was decided, a growing minority of cases, particularly in Delaware and New York, have parted ways with its interpretation. *See, e.g., In re Residential Capital, LLC*, 474 B.R. 112, 117-118 (Bankr. S.D. N.Y. 2012) (listing cases); *Spansion*, 426 B.R. at 127-128; *In re Dewey & LeBoeuf LLP*, 478 B.R. 627 (Bankr. S.D. N.Y. 2012). These courts note how *Revco* overly focused on the word "shall" and neglected the phrase "as is appropriate", which applies to both sections of 1104(c) and would seem to insert court discretion into the analysis of both the appointment *and* scope. Nonetheless, *Revco* is binding.

In any event, under *Revco*, a bankruptcy court is empowered to achieve just and equitable results in complex cases, which was Congress's original purpose when designing § 1104(c)(2). *See In re UAL Corp.*, 307 B.R. 80, 86 (Bankr. N.D. Ill. 2004) (describing how the provision was intended as a "form of protection against corporate mismanagement").

**2. To assist in the confirmation process, the Debtor consents to the appointment of an examiner.**

The Debtor views Huntington's request as a welcomed opportunity for a fair and impartial fact finder to assist the Court, United States Trustee, and *all* creditors in developing an unbiased understanding of the Debtor's complex financial affairs. The Court should likewise appreciate this opportunity. This case and the Debtor's first bankruptcy case (the "First Case") have presented a war of dueling narratives. The first narrative, the Debtor's, focuses on his intent to reorganize his affairs based upon a full disclosure of his assets and in compliance with the dictates of the Bankruptcy Code. He is diligently working towards reorganization, but his financial affairs are complex and there is much work to do in preparing a confirmable plan and appropriate disclosure statement. *See Debtor's Motion For Extension Of His Exclusive Period To File A Plan And Solicit Acceptances* (Doc. 104) and *Debtor's Motion For Extension Of Time To File Financial Information Reports Under Bankruptcy Rule 2015.3(d)* (Doc. 54). The second narrative, offered by a litigious creditor with unclean hands, is replete with insinuations of stonewalling and obfuscation. And at the same time, that creditor, perhaps with a view of undermining the Debtor's state court litigation efforts, seeks to inundate the Debtor and his professionals with paperwork, agrees to a discovery process that it then demands to cut short, and conceals its own wrongdoings by hiding its central credit file from the Debtor for years. With these competing viewpoints, it might be said, with some understatement, that—at least at the current moment—Huntington and the Debtor are talking past one another, and the Court is left with too much to unwind.

With appropriate guidance relative to the scope and nature of any examination, the appointment of an examiner could be a perfect opportunity for this Court and all parties to obtain clarity and certainty in this case. Instead of relying on Huntington's self-interested efforts and motivations, the Court could be confident in a disinterested and neutral examination of the Debtor's information by an unbiased professional. The Debtor, instead of dealing with constant accusations and litigation tactics from Huntington, would be able to work constructively with the examiner as an honest broker, thereby streamlining the processing of information in this case to the benefit of all parties. Moreover, other creditors—whose claims are just as important as Huntington's—will be assured that one aggressive creditor will not derail a profitable business empire diligently constructed over a lifetime. It is the Debtor's hope that appointment of an examiner would go a long way toward reducing tensions in this case, and avoiding further disagreement and contention (to the extent possible) is certainly a goal worth pursuing.

**3. The nature, extent, and duration of the examiner's investigation should be structured to be reasonable and appropriate in the Debtor's case.**

As detailed above, the Court maintains broad discretion to tailor the scope of the examination by an examiner. The *Revco* court framed it as a bankruptcy court determining the "nature, extent, and duration" of the examiner's work. *Revco*, 898 F.2d at 501. The starting point for the Court's tailoring of the examiner's duties is 11 U.S.C. § 1106(b), which states that "[a]n examiner appointed under section 1104(d) of this title shall perform the duties specified in paragraphs (3) and (4) of subsection (a) of this section…" In turn, subsection (a)(3) directs an investigation of "the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan[.]" 11 U.S.C. § 1106(a)(3). Thereafter, subsection (a)(4) requires the examiner to file a report, including any finding related

to, among other things, fraud or misconduct and causes of action available to the estate. 11 U.S.C. § 1106(a)(4). These are, of course, incredibly broad categories and reference alone to them without direct guidance could set an examiner on a never-ending journey as opposed to a defined examination of a curated nature, extent, and duration.

The Debtor wholly disagrees with Huntington's characterization of this case and the Debtor's conduct. However, given the nature of this case, there may be some broad categories of investigation appropriate for an examiner, and for which resulting clarification could clear a path for confirmation of a plan, including the following:

i. The examiner should review the Debtor's affairs to determine the existence of causes of action available to the estate—or the lack thereof—as indicated by 11 U.S.C. § 1106(a)(4)(A). The Debtor is, of course, already engaged in this process in relation to his plan formulation, particularly in light of the Best Interest of Creditors Test, but having an independent examiner confirm the Debtor's disclosures and conclusions would be helpful in the confirmation process. This examination should, however, be limited to colorable causes of action that are within the applicable statutes of limitations under chapter 5 of the Bankruptcy Code.[4]

ii. The examiner should review the assets and business affairs of the Debtor to ensure that assets of the bankruptcy estate have been disclosed and are accounted for. This

[4] The Debtor has requested multiple times that Huntington explain its legal theory for bringing claims that clearly fall outside applicable statutes of limitation. Its only theory, it seems, is that a statute of limitations defense is an affirmative defense to be raised by a defendant, and it has no qualms about suing people on obviously time-barred claims. If this approach is not a *per se* violation of Rule 9011, it is certainly contrary to the spirit of the Bankruptcy Code. *See*, *e.g.,* 11 U.S.C. § 547(b) (requiring trustees to take into account "known or reasonably knowable affirmative defenses" prior to bringing a preference avoidance action. Nonetheless, there is no reason for an examiner to review time-barred allegations.

Case 1:25-bk-12607 Doc 234 Filed 08/27/25 Entered 08/27/25 13:29:41 Desc Main Document Page 7 of 37

area of investigation will go to the core of Huntington's assertion that the Debtor's assets have dissipated or have not been disclosed. Moreover, the examiner can report to the Court on the Debtor's business entities to confirm (a) which entities are and have been going concerns; (b) what the interest is of the Debtor in each entity; (c) the nature of the businesses and their assets; and (d) other matters that may assist in the valuation process leading into confirmation. The Debtor has already provided a great deal of information regarding these companies in his schedules and other filings, but for whatever reason an understanding of even basic ideas—like that the Debtor has formed but never used certain LLCs, or that some entities are long ago defunct—remain a puzzle to Huntington. An examiner can verify the accuracy and sufficiency of the Debtor's business disclosures.

iii. The examiner can review the Debtor's ongoing financial reporting in this case, and his income and expenses, especially with an eye towards feasibility of payments proposed to be made under any plan of reorganization.

At the same time, the Court should limit the duration and extent of the examiner's initial investigation to relevant matters. The scope could, of course, be modified by court order at a later time if the examiner believes additional review is appropriate, but there is nothing to be gained from an expensive and long running review of the Debtor's financial life back to 2016, as desired by Huntington. *See* Motion, ¶¶ 16-18 (referencing personal financial statements from a decade ago). Not only is much of that information wholly irrelevant because it cannot reveal estate causes of action or Debtor wrongdoing, such an expansive examination will be incredibly expensive and will not be delivered in time to be useful. That is, in order to be truly useful, the examiner's report

needs to be delivered in time for use in the confirmation process.[5] To make it useful, the examiner's report should be delivered within 90 days, should be based on a reasonable budget, and should focus on issues that actually matter.

Along those lines, the examiner need not revisit matters previously addressed in the First Case. Most, if not all, of the issues raised by Huntington in relation to the First Case were raised in that case in its attempt to have a chapter 11 trustee appointed and in its objection to the dismissal of the case. *See* Motion, ¶ 35 (admitting that the allegation that the failure to disclose American Express payments and certain utility and household expenses was "discussed at length at the hearing on the Debtor's motion to dismiss the First Case[.]"). The Court heard evidence and arguments on these matters, judged the best interest of the bankruptcy estate, and concluded that the case should be dismissed over Huntington's objection.[6] There is no reason to revisit those issues again when the Court has already heard them and ruled on them in the First Case, and when there is no clear relevance to this proceeding.

Finally, the statute clearly permits the appointment of an examiner to conduct "an investigation **of the debtor**" as is appropriate. 11 U.S.C. § 1104(c) (emphasis added). But Huntington seems to want the examiner to review not only the financial affairs of the Debtor, but also those of his wife, and his children, and any other entity that is remotely connected. Of course, to the extent that there are any transactions or transfers with insiders, those would be reviewed. But Huntington clearly believes the investigation should go beyond just the Debtor's financial

---

[5] Of course, while Huntington wants to have an examiner turn over every stone, it concurrently advises that it will oppose any further extension of the plan filing and solicitation exclusivity periods. Thus, consistent with its actions thus far to thwart the Debtor's ability to succeed in this case, it would have the Court appoint an examiner, only for the examiner's report to not be useful for any part of the Debtor's plan formulation.

[6] Specifically, this Court has already considered many of the factual matters in the Motion in its dismissal opinion (First Case Doc. 344) (the "Dismissal Opinion"), such as the alleged discrepancies between pre-First Case financial statements and the schedules (p. 12), the "gift trust" transfers prior to the First Case (pp. 5, 25, 32-34), and Debtor's use of the American Express card (pp. 10, 34).

affairs. This is an investigation of the Debtor's financial affairs which is permitted under the Bankruptcy Code, not of anyone else.

**B. Response to Huntington's misrepresentations.**

With the legal and practical implications of the Motion having been addressed, it is unfortunately necessary to refute many of the numerous misrepresentations made by Huntington in the Motion. The Debtor does not believe that each of the allegations requires a response—especially in relation to the First Case allegations that have already been litigated in the dismissal process—but certain statements by Huntington simply cannot go unaddressed.

**1. The Global Notes preceding Debtor's Schedules/SOFA are standard and helpful language, not abdications of the Debtor's duties.**

Huntington is very preoccupied[7] with the disclaimers (the "Global Notes") preceding the Debtor's Schedules and Statement of Financial Affairs (Doc. 50), a copy of which is attached as Exhibit 1. Huntington seeks to use these Global Notes as evidence that the Debtor has "improperly characterized" and "omitted" facts in his Schedules and SOFA. Leaning on two citations to California appellate courts, an incomplete citation to the *Cusano* case, and a comparison to a case previously filed by Debtor's counsel, it seeks to convince the Court that the Global Notes demonstrate that the Debtor has failed in his duty to "prepare schedules carefully, completely, and accurately." *See* Motion, ¶¶ 10-13.

Huntington mischaracterizes the Global Notes and what they were intended to do. Far from being an addition to the Schedules and SOFA to disclaim responsibility, the Global Notes were intended to *assist* parties in their review of a very complex set of disclosures to understand the method and assumptions of the Debtor and his professionals. An effort was made—especially with

[7] See ¶¶ 11-15 in the *Motion of the Huntington National Bank for Authorization to Prosecute Derivative Actions* (Doc. 132), where Huntington copies these arguments from the Motion almost exactly.

Huntington's litigiousness in mind—to review each and every disclosure, look for areas where the method and manner of disclosure needed explanation, and then provide detail about those methods and assumptions. The Debtor states in the Global Notes that there may be mistakes, that his review of matters continues, and that there will be amendments where necessary. In fact, there will be amendments filed soon based on reviews of business accounting matters that only recently concluded.

Huntington's strategy is to cherry-pick the Global Notes and use its choice of lines to call the Debtor a liar. But even the cases cited by Huntington, which state that debtors have "an affirmative duty" to schedule assets and liabilities, recognize that a debtor is only required to be "*as particular as is reasonable* under the circumstances." *M&M Foods, Inc. v. Pacific American Fish Co., Inc.*, 196 Cal.App.4th 554, 563-564 (2011) (emphasis in original), citing *In re Mohring*, 142 B.R. 389, 395 (Bankr. E.D. Cal. 1992); *Cusano v. Klein*, 264 F.3d 936, 946 (9th Cir. 2011). There is no bright-line rule for how much itemization or specificity is required, and a debtor is only required to provide information sufficient for other parties to determine whether to investigate further. *See Cusano*, 264 F.3d at 946 ("Cusano's listing was not so defective that it would forestall a proper investigation of the asset."); *see also In re Malin*, 652 B.R. 828, 833 (Bankr. N.D. Ga. 2023).

Huntington cited to California and Ninth Circuit cases, and the caselaw seems consistent in the Sixth Circuit that "reasonable particularization under the circumstances" allowing for parties to investigate further is all that is required from a debtor, as opposed to perfection. *See, e.g., In re Bonner*, 330 B.R. 880, *4 (B.A.P. 6th Cir. 2005); *Cadle Co. v. Kromer (In re Kromer)*, 202 F.3d 268, *2 (6th Cir. 2000), citing *Mohring*, 142 B.R. at 395. After all, courts note, "it would be silly to require a debtor to itemize every dish and fork". *Kromer*, 202 F.3d at *2, citing *Payne v. Wood*,

775 F.2d 202, 205 (7th Cir. 1985).

Despite Huntington's portrayal, the Global Notes begin with Debtor's assertion that he "has made a reasonable effort to ensure that the Schedules and Statement are accurate and complete based on information readily available". *See* Global Notes, p. 1. The Debtor submits that he has prepared the Schedules and SOFA reasonably under the circumstances with the assistance of his professionals. *Id*. Huntington quotes the line that "errors or omissions" may exist, but the line reads that "***inadvertent*** errors or omissions" may exist. *Id*. (emphasis added). The Global Notes continually refer to the Debtor's "best efforts", "reasonable efforts", or "reasonable best efforts". *See* ¶¶ 2, 3, 6, 8, and 12. In paragraph 12, titled "Recharacterization", the Debtor recognizes that items may have been "improperly characterized" despite his "best efforts" for the purpose of reserving his right to amend at a later time "as additional information becomes available." This is a far cry from an admission that Debtor has failed in his duties.[8]

Huntington also argues that the Debtor, and presumably his counsel, are employing "legal machinations designed to avoid the liability and sanctions which come with false bankruptcy reporting", all because disclosures like the Global Notes were not included in the First Case or—allegedly—in a different case recently filed by Debtor's counsel. *See* Motion, ¶ 13. To the first point: different law firms practice differently, and Debtor's lead counsel has changed from his First Case to this one. This is not a basis for any paranoia about "legal machinations." Not only that, but the new professionals come with an advantage over the Debtor's original bankruptcy counsel: they have been able to see from the First Case that Huntington's main litigation strategy

[8] In fact, the one $128,000.00 "loan" to KPT7, LLC, listed on the bank statements and discussed in the Motion, *see* ¶ 44, is one of the very transactions that was flagged for further review because the Debtor believed it was a capital contribution, not a loan. The Debtor's counsel is working with the corporate controller for the Debtor's entities to review all such transactions. Better progress would have been made but for the need to respond to Huntington at every turn.

Case 1:25-bk-12607 Doc 1248 Filed 09/23/25 Entered 09/23/25 16:29:14 Desc Main Document Page 12 of 37

is just a game of "gotcha" and that it would attack the presentations in the Schedules no matter how detailed.[9]

To the second point, Huntington cites the undersigned's filing of the *Legacy Beavercreek* case—a chapter 7 liquidation where the primary assets were accounts receivable. *See* Case No. 25-31552 (TAC), Doc. 39 (Bankr. S.D. Ohio Sept. 25, 2025). Huntington claims that disclaimers were not included in the *Legacy Beavercreek* schedules; that is, it claims the Global Notes were just used by the Debtor's professionals in *this* case to protect *this* Debtor. That is curious, though, because the schedules in the *Legacy Beavercreek* case begin with five pages of global notes, largely similar to those used in this Debtor's case. *Id*. A copy of the *Legacy Beavercreek* global notes, which comprise the first five pages of Doc. 39 in that case, is attached as Exhibit 2. But even if they were not similar, as Huntington argues, its point still falls flat. Obviously, the disclosures made in a relatively straightforward chapter 7 case should differ from those in a highly complex chapter 11 restructuring. Huntington could have compared the Global Notes to those from a case of comparable size and complexity and, if one were to look at the disclaimers prepared by Debtor's counsel in such a case, a copy of which is attached as Exhibit 3**,** it would start to appear that Huntington's assertion is incorrect: The disclaimers *are* a standard practice of the undersigned's firm in complex business cases. *See In re The Bellevue Hospital*, Case No. 25-30191 (MAW), Doc. 183 (Bankr. N.D. Ohio Mar. 7, 2025).

**2. The complexity of Debtor's business makes calculations of gross income difficult.**

The Global Notes state that the Debtor's income generation "is complex and comes from a multitude of business sources", such that, as an individual, the Debtor only maintains records of

[9] The Debtor's prior counsel also prepared the original schedules while defending the Debtor against an unsuccessful effort by Huntington to obtain the emergency appointment of a chapter 11 trustee. It's not hard to imagine that preparation of global notes was not the highest of priorities at the time.

Case 1:25-bk-12607 Doc 243 Filed 08/09/25 Entered 08/09/25 16:29:41 Desc Main Document Page 13 of 37

his personal income through tax filings and banking records. *See* Global Notes, p. 6. Huntington characterizes this as if it is either bad or unusual. But the Debtor is an individual. It would actually be unusual for him to maintain his own GAAP accounting records of food, shelter, and utility spending. Moreover, as the sole owner of numerous limited liability companies that are disregarded entities for tax purposes[10], the income and expenses of those companies flow through to the Debtor's personal returns. That makes it difficult to discern from tax records the gross income of the Debtor as requested by, for example, SOFA question #4. The Debtor "used his best efforts" to disclose his income, *see* Global Notes, Q. 4, p. 7, and completed Schedule I accordingly. *See* Doc. 50, Schedule I. This is not an "irregularity" as Huntington claims; it's a reality of a debtor with numerous and complex business interests.

**3. The Debtor has disclosed his assets.**

Huntington accuses the Debtor of hiding assets by pointing to perceived discrepancies between the Schedules and SOFA in this case and past financial statements provided to other third-parties. But the Debtor explicitly acknowledged that these documents were all prepared for different purposes, using different metrics. As stated in the Global Notes:

> The Schedules and Statement do not purport to represent financial matters in accordance with regular accounting principles, **nor are they intended to reconcile to the financial statements previously distributed** to lenders, major creditors, or other interested parties on an intermittent basis. The methodology for preparing bankruptcy paperwork is fundamentally different from regular accounting practices and is based on the practice and judgment of the Debtor's legal professionals.

Global Notes, ¶ 2 (emphasis added). Again, this appears to be an instance of Huntington pointing out something in the Global Notes as if it exposed some grand conspiracy. There is none: the Debtor has carefully disclosed and valued his assets in accordance with the requirements of the

---

[10] Huntington appears to not understand the concept of disregarded entities. The Debtor has turned over personal tax returns that clearly show the flow through activity from many limited liability companies. Despite that, Huntington has insisted that the Debtor still needs to turn over tax returns from entities that don't even file their own returns.

Case 1:25-bk-11607 Doc 324 Filed 08/20/25 Entered 08/20/25 16:29:14 Desc Main Document Page 14 of 37

Bankruptcy Code, instructions on the official forms, and judgment of his professionals. The method of valuation and how the schedules compute net worth is drastically different from how a personal financial statement might show the same.

As a prime example, the Schedules at question #19 require the Debtor to list his interest in non-publicly traded businesses. The Debtor was to list the name of the entity, the percentage of his ownership, and the *value of the entity*. That is, the Debtor was to list the net equity value of his membership interests in the *entity* as best judged by the Debtor. The Debtor is <u>not</u> to list the value of the assets owned by the company itself because the Debtor does not directly own the assets of the company. So, for example, the Debtor listed a value of $1,165,000.00 for his membership interest in Mason RD, LLC (*see* Schedules #19.35), which was the *net value* after the Debtor estimated that the building owned by that entity was worth approximately $3.295 million with a mortgage against it to Civista Bank of $2.13 million. However, on Schedule E/F, the Debtor is required to list the *entirety* of the debt owed to Civista Bank because he guaranteed the entirety of the debt. In other words, while Schedule A/B calls for listing the equity value of a membership interest, it is compared against the entire guaranteed debt of the company *even if there is collateral that could satisfy the debt*. By comparison, the financial statements that Huntington excitedly point to show the *gross asset value* of the entities as compared to their debts. It is not an apples to apples comparison. It's not even apples to oranges. It's bankruptcy schedules versus unaudited, self-prepared, various use, different requirement personal financial statements.[11]

That said, the reconciliation of financial statements by an examiner is something the Debtor would consent to, insofar as such is relevant and useful for promoting the interests of the Debtor's

[11] And the Court should be familiar with this tired line of argument from Huntington; the Debtor was questioned about these discrepancies at the dismissal hearing in the First Case, and his testimony about the difference between the full value of an asset compared to its net value was considered in the Dismissal Order. *See* pp. 11-12.

estate and moving this case closer to confirmation. The examiner can certainly verify if there is anything that is missing or that has been transferred.

**4. The Debtor only owns 1% of the entity that paid his wife.**

Huntington claims that "One of the Debtor's companies, Grasshopper Investments, LLC, paid the Debtor's spouse $418,654 in wages in 2023 during the First Case." Motion, ¶ 29. Calling this "one of the Debtor's companies" is Huntington's typical practice of failing to provide the Court with all the relevant information. The Debtor owns 1% of Grasshopper Investments, LLC (0.5% directly, and 0.5% through Schneider-Grasshopper, Inc.). The remaining 99% is owned by the Patricia B. Schneider 2020 Gift Trust which was settled by the Debtor's wife in 2020. It is unclear what prohibition was violated by a non-debtor obtaining income from a company in which the Debtor only owns a small fraction.

**5. The Trust and other sale transactions were disclosed.**

The Debtor had several transactions that were disclosed in the SOFA in question #18. Certainly, those transactions can be reviewed by an examiner and they will be explained in full. But Huntington's blanket insinuation of fraudulent wrongdoing by the Debtor lacks any factual support and is based on mere innuendo. The Debtor fully disclosed the transfers as required, they are subject to investigation, and, if there is an issue with any of them, it will be addressed as a part of the plan and confirmation process.[12]

Similarly, Huntington's allegation that the Debtor fraudulently failed to disclose trust transactions on question #19 of the SOFA is unsupportable. Question #19 asks "Within 10 years before you filed for bankruptcy, did you transfer any property to a **self-settled trust** or similar device **of which you are a beneficiary**?" (emphasis added). Huntington and its attorneys know

---

[12] The Debtor believes all listed sale transactions were supported by reasonably equivalent value and are not avoidable, but these can be reviewed by the examiner.

Case 1:25-bk-12607 Doc 1248 Filed 02/28/26 Entered 02/28/26 16:29:14 Desc Main Document Page 16 of 37

very well that neither of its referenced trusts is self-settled by the Debtor for which he is the beneficiary. In fact, Huntington filed a complaint pre-petition to try and set aside the trusts, and within that complaint it described the characteristics of the trusts. *See The Huntington National Bank v. Schneider, et al.*, Adv. Pro. No. 26-01003, Doc. 1 (Bankr. S.D. Ohio Jan. 15, 2026). First, the Raymond Schneider 2019 Gift Trust was settled by the Debtor, but the beneficiaries are his wife and children. Second, the Patricia B. Schneider 2020 Gift Trust was settled not by the Debtor, but by the Debtor's wife, and the Debtor is a beneficiary. In neither case do the transactions meet the disclosure criteria of Question #19, which asks about trusts that are self-settled by the Debtor and in which the Debtor is a beneficiary.

Huntington desperately wants it to be otherwise for two reasons: (a) unless it is a self-settled trust by the Debtor where the Debtor is a beneficiary, the 10-year lookback under 11 U.S.C. § 548(e) does not apply; and (b) Huntington filed its complaint to avoid the trust transfers long after the expiration of Ohio's 4-year statute of limitations.[13] It is going to attempt to argue some way around both of these issues—and the Debtor's attorneys have also spent substantial time researching this because it's relevant to the best interest of creditors test—but that doesn't make the answer to question #19 fraudulent.

**CONCLUSION**

An examiner can be helpful in this case if only to get an honest presentation of facts before the Court without unsupported insinuations and wildly emotional accusations. But the examiner needs to be directed in an appropriate manner by the Court; it cannot be akin to an agent of Huntington—just one of many creditors that are owed large sums—that takes on its unfair framing

[13] In the Dismissal Opinion, this Court informed Huntington that, after dismissal, the bank "would have at least several months" to file potential fraudulent conveyance claims under Ohio law. *See* p. 34. For whatever reason, Huntington waited, and now the statute of limitations has passed.

of the Debtor. Instead, the Court should exercise its discretion to make the examination targeted in a way that is maximally helpful to the Court, the *entire* creditor body, and even the Debtor as he proceeds towards reorganization.

Respectfully submitted,

/s/ James A. Coutinho
Thomas R. Allen (0017513)
Richard K. Stovall (0029978)
James A. Coutinho (0082430)
Andrew D. Rebholz (0102192)
Allen Stovall Neuman & Ashton LLP
10 West Broad Street, Suite 2400
Columbus, OH 43215
T: (614) 221-8500; F: (614) 221-5988
allen@asnalaw.com; stovall@asnalaw.com
coutinho@asnalaw.com; rebholz@asnalaw.com
*Counsel for Debtor / Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | : | Case No. 25-12607 |
| Raymond Joseph Schneider, | : | Chapter 11 |
| | : | |
| Debtor and Debtor in Possession. | : | Judge Beth A. Buchanan |

**GLOBAL NOTES REGARDING DEBTOR'S SCHEDULES OF ASSETS AND LIABILITIES AND STATEMENT OF FINANCIAL AFFAIRS**

Raymond Joseph Schneider, the debtor and debtor in possession (the "Debtor") submits his *Schedules of Assets and Liabilities* (the "Schedules") and *Statement of Financial Affairs* (the "Statement" and, together with the Schedules, the "Schedules and Statement") pursuant to 11 U.S.C. § 521 and Bankruptcy Rule 1007.

The Schedules and Statement were prepared with the assistance of the Debtor's professionals and are unaudited. While the Debtor has made a reasonable effort to ensure that the Schedules and Statement are accurate and complete based on information readily available to him at the time of preparation after reasonable inquiries, inadvertent errors or omissions may exist or the subsequent receipt of information may result in changes in financial and other data contained in the Schedules and Statement, in particular as it relates to the business interests of the Debtor. The Debtor's good-faith efforts to disclose all known information do not waive rights to amend based on newly discovered facts, including from filed creditor claims or court orders. Accordingly, the Debtor reserves his right to amend or supplement the Schedules and Statement from time to time as may be necessary or appropriate, but there can be no guarantees that the Debtor will do so.

These notes are intended to provide transparency; any inadvertent omission does not constitute bad faith or waiver, and the Debtor commits to prompt amendments as needed. Third parties should not rely on the Schedules and Statement as audited financials or tax advice but should consult their own professionals.

**GLOBAL NOTES AND OVERVIEW OF METHODOLOGY**

**1.** **Reservation of Rights**. The Debtor reserves the right to dispute, or to assert setoff or other defenses to, any claim reflected in the Schedules and Statement as to amount, liability, and classification. The Debtor also reserves all rights with respect to the values, amounts, and characterizations of the assets and liabilities listed in the Schedules and Statement. In particular, at the time of the filing of the Schedules and Statement, the Debtor has not obtained professional appraisals of his assets unless specifically noted on the Schedules and Statement. The Debtor reserves the right to obtain appraisals of his assets, including his business interests, for use in the formulation and confirmation of a Chapter 11 plan. Nothing contained in the Schedules and Statement constitutes a waiver of rights with respect to this chapter 11 case.

**2.** **<u>Basis of Presentation</u>**. The Schedules and Statement reflect the assets and liabilities of the Debtor, and, unless stated, not the assets and liabilities of any third party. The Debtor has used his best efforts to ensure that the information presented here does not include assets and liabilities that are solely owned or the responsibility of any entity owned by the Debtor.

The Schedules and Statement do not purport to represent financial matters in accordance with regular accounting principles, nor are they intended to reconcile to the financial statements previously distributed to lenders, major creditors, or other interested parties on an intermittent basis. The methodology for preparing bankruptcy paperwork is fundamentally different from regular accounting practices and is based on the practice and judgment of the Debtor's legal professionals.

In reviewing and signing the Schedules and Statement, the Debtor necessarily relied upon the efforts, statements, and representations of the accounting and non-accounting personnel that work for the various business entities owned by the Debtor. The Debtor has further relied upon various sources of information about his liabilities that were not generated by the Debtor, such as previously filed creditor claims. The Debtor has not, and could not have, personally verified the accuracy of each such statement and representation, including statements and representations concerning amounts owed to creditors.

**3.** **<u>Date of Valuations</u>**. Except as otherwise noted in the Schedules and Statement, all valuations of assets and the amounts of liabilities are valued as of the petition date to the best of the Debtor's ability. In certain instances, the Debtor used estimates where actual data as of the petition date was not available. The Debtor made a reasonable effort to allocate liabilities between the pre- and post-petition periods based on the information and research that was conducted in connection with the preparation of the Schedules and Statement. As additional information becomes available and further research is conducted, the Debtor may modify the allocation of liabilities between the pre- and post-petition periods and amend the Schedules and Statement accordingly.

**4.** **<u>Valuation Method</u>**. As previously indicated, the Debtor has not yet obtained appraisals of his personal property or business interests. Unless otherwise stated, the values for personal property set forth in the Schedules and Statement are based upon the Debtor's best estimate of the current market values of those assets given their age, quality and condition. It would be cost prohibitive and unduly burdensome to obtain current market valuations of the Debtor's property interests. As to the business interests of the Debtor in which the Debtor has management control, the values depicted in the Schedules and Statement are estimates based on the approximate value of those companies' assets minus the known liabilities of those companies. The business interests of the Debtor where he is a passive investor without management control have not been valued unless the Debtor himself has direct knowledge of the assets and liabilities of those companies or unless the Debtor was able to obtain valuation information in time for inclusion in the Schedules and Statement. The Debtor continues to seek needed information to value business interests in which he does not have control, and will amend as appropriate. The company valuations have not been verified by an independent third party.

5. **<u>No Tax Evaluation</u>**. Unless otherwise indicated, the Debtor has not reduced the values set forth for his assets in the Schedules and Statement for any potential tax obligation that will be owed upon the liquidation of any such asset. The Debtor anticipates that the sale of any of his investments or the sale of any of his companies' assets will trigger income tax obligations, including through recaptured depreciation, that will be paid in accordance with the priorities set forth in the Bankruptcy Code. The Debtor's tax situation is complex and offers no tax guidance to any third party through this filing.

6. **<u>Causes of Action</u>**. The Debtor has made his best effort to determine if he has any causes of action against third parties as assets in the Schedules and Statement but the Debtor is not an attorney and is unable to determine on his own whether certain legal claims exist. The Debtor reserves all of his rights with respect to causes of action he may have, whether disclosed or not disclosed, and neither these Global Notes nor the Schedules and Statement shall be deemed a waiver of any such causes of action. In particular, the identification of causes of action or pending lawsuits in the Schedules and Statement is meant to identify the existence of those causes of action or pending lawsuits in a general fashion, and the Debtor is unable without extensive professional assistance to identify each subset of any claim, each potential party against which the Debtor holds a claim, or the value of such claims.

7. **<u>Litigation</u>**. The Debtor made reasonable efforts to accurately record the litigation actions that he is a party to (collectively, the "Litigation Actions") in the Schedules and Statement. The inclusion of any Litigation Action in the Schedules and Statement does not constitute an admission by the Debtor of liability, the validity of any Litigation Action, or the amount of any potential claim that may result from any claims with respect to any Litigation Action, or the amount and treatment of any potential claim resulting from any Litigation Action currently pending or that may arise in the future.

8. **<u>Financial Transactions</u>**. The financial affairs and business of the Debtor are complex. Prior to the petition date, the Debtor operated as a business owner with the ability to transfer funds as needed to meet personal, business, and future business needs. The Debtor has used his best efforts to track the information from his financial transactions that is required to be included in the Schedules and Statement, and reserves the right to supplement and amend the disclosures should the need arise. In addition, the Debtor has had certain financial transactions with his business entities that may not yet have been characterized or may have been improperly characterized, including characterizations such as whether funds provided to a company were for capital contributions or loans, or whether funds paid to the Debtor were draws or loans. The Debtor continues to review all such transactions and will supplement and/or amend the Schedules and Statement as may be appropriate.

9. **<u>Codebtor Claims</u>**. Certain of the Debtor's obligations are obligations for which he is a codebtor with another individual or business. The Schedules list creditors and set forth the Debtor's estimate of the claims of creditors as of the Petition Date. However, certain codebtors may continue to pay obligations in the ordinary course of their business. As such, the actual unpaid claims of creditors that may be allowed in this case may differ from the amounts set forth in the Schedules and Statement. Codebtor payments post-petition may

reduce claims; the Debtor reserves rights to adjust accordingly without admission of liability.

**10.** **<u>Claim Disputes</u>**. Any failure to designate a claim listed on the Debtor's Schedules as "disputed," "contingent," or "unliquidated" does not constitute an admission by the Debtor that the claim is not "disputed," "contingent," or "unliquidated." The Debtor reserves the right to (i) object to or otherwise dispute or assert setoff rights, cross-claims, counterclaims or defenses to, any claim reflected on the Schedules as to amount, liability, classification or otherwise, or (ii) otherwise to designate subsequently any claim as "disputed," "contingent," or "unliquidated."

The Debtor has excluded potential rejection damage claims of counterparties to executory contracts and unexpired leases that may or may not be rejected, and to the extent such damage claims exist, the Debtor reserves all rights to contest such claims as asserted.

**11.** **<u>Totals</u>**. All totals that are included in the Schedules and Statement represent totals of all the known amounts included in the Schedules and Statement and exclude items identified as "unknown" or "undetermined." If there are unknown or undetermined amounts, the actual totals may be materially different from the listed totals.

**12.** **<u>Recharacterization</u>**. Notwithstanding the Debtor's reasonable best efforts to properly characterize, classify, categorize, or designate certain claims, assets, executory contracts, and other items reported in the Schedules and Statement, the Debtor may nevertheless have improperly characterized, classified, categorized, designated, or omitted certain items. Accordingly, the Debtor reserves all of his rights to recharacterize, reclassify, recategorize, redesignate, add, or delete items reported in the Schedules and Statement at a later time as is necessary and appropriate, as additional information becomes available.

**13.** **<u>Insiders</u>**. The Debtor reserves all rights with respect to the determination or status of a person as an "insider" as defined in section 101(31) of the Bankruptcy Code. Transactions with affiliates or insiders are disclosed based on available records; any omissions are inadvertent and are subject to amendment and supplementation, as appropriate.

**14.** **<u>Prior Schedules</u>**. This is the second bankruptcy case filed by the Debtor. The Debtor's financial affairs have changed since the filing and dismissal of his first bankruptcy case, which has resulted in changes reflected on the Schedules and Statement. Moreover, the Debtor is represented by different professionals in this case and has had a different timeframe for preparation of the Schedules and Statement. Although the Debtor has made efforts to be consistent with the prior case disclosures, any differences may reflect actual changes in the Debtor's financial affairs or may simply be stylistic.

**SPECIFIC NOTES WITH RESPECT TO THE SCHEDULES**

**Schedule A/B**

**Part 1 – Real Property:** The Debtor has provided the tax value for his three pieces of real estate. The market values of the properties will vary from the tax value based on market conditions, physical conditions of the properties, and sale timelines.

**Part 2 – Vehicles:** Vehicles have been valued using kbb.com and based on their current mileage. If a valuation was not available through kbb.com, the Debtor used his best estimate of the value based on the age and condition of the vehicle.

**Part 3 – Personal and Household Items:** The Debtor has not completed an inventory or valuation of his various household goods and furnishings. Moreover, the Debtor's non-filing spouse is a co-owner of marital assets and may also individually own assets located at the Debtor's various properties.

**Part 4 – Financial Assets:** The Debtor has attempted to list the actual value of various accounts as of the petition date. However, as to the brokerage accounts of the Debtor, due to the complexities of those accounts, the ongoing fluctuations in the stock market, and the lack of any daily balance tracking readily available to the Debtor, the valuations were as of the closest statement to the petition date as provided by the brokerage. Those values are, therefore, as of October 31, 2025. These values reflect the gross amounts in each account without netting out any setoff rights or liens against the accounts.

**Part 4 – Business Interests:** The Debtor has numerous business interests, some of which are managed by the Debtor, some of which are no longer operating, and some of which are managed by third parties and in which the Debtor is a passive investor. As set forth above, for the business interests of the Debtor in which the Debtor has management control, the values depicted in the Schedules are estimates based on the approximate value of those companies' assets minus the known liabilities of those companies without accounting for any tax obligations upon liquidation. The business interests of the Debtor where he is a passive investor without management control have not been valued unless the Debtor himself has direct knowledge of the assets and liabilities of those companies or unless the Debtor was able to obtain valuation information in time for inclusion in the Schedules. The Debtor continues to seek needed information to value business interests in which he does not have control, and will amend as appropriate. The company valuations have not been verified by an independent third party. The listing of a business on the Schedules is not an admission that the business is operating, has assets, or has any value. Since the end of the first case, the Debtor has made an effort to dissolve businesses that were either defunct or never used, but the Debtor did not have the authority to dissolve certain entities.

**Part 4, Item 30 – Other Amounts Owed to the Debtor:** The Debtor has begun a review of the financials of his various business entities to determine if any funds he has provided to those entities were properly characterized as loans, but that review has not been completed as of the time of the filing of the Schedules. The Debtor reserves the right to amend the Schedules to list any amounts owed to him, and the failure to list such items at this time is not a waiver.

**Schedule D**

The descriptions provided in Schedule D are intended only to be a summary. Reference to the applicable loan agreements and related documents is necessary for a complete description of the collateral and the nature, extent, and priority of any liens. Nothing in these Global Notes or the Schedules and Statement shall be deemed a modification or interpretation of the terms of such agreements.

**Schedule E/F**

Certain of the claims of taxing authorities set forth in the Schedules ultimately may be deemed to be secured claims pursuant to applicable laws. Certain of the claims owing to various taxing authorities to which the Debtor may be liable may be subject to audit. The Debtor reserves his right to dispute or challenge whether claims owing to various taxing authorities are entitled to priority.

Schedule E/F may not include in the various creditor amounts charges, fees, interest, or other costs that are payable under the applicable loan or credit documents. The Debtor reserves all rights under loan or credit documents, under the Bankruptcy Code, and under applicable non-bankruptcy law to challenge any such additions that may be set forth in a creditor's proof of claim. Creditor proofs of claim may differ from the Schedules; the Debtor reserves all objection rights, including to late-filed or amended claims.

**Schedule I/J**

The Debtor has prepared his budget in a manner that is as accurate as possible using both historical budget information as well as using the Debtor's best estimates for future income and expenses. Regarding the Debtor's income, the primary source of income for the Debtor is capital draws from the Debtor's various business entities, the amount and availability of which fluctuates based on the unique financial outcomes of each of the Debtor's businesses. Moreover, in the exercise of the ordinary course of business and in accordance with the Debtor's various fiduciary duties, the Debtor may choose not to draw capital from certain businesses at various times in order to allow those businesses to meet their unique needs. Therefore, the Debtor will experience regular fluctuations in income.

As to the expenses of the Debtor, the Debtor's non-filing spouse benefits from the Debtor's contributions to the household, and the Debtor also benefits from his spouse's contributions. Schedule J seeks a declaration of household expenses, and the Debtor and his spouse will determine the appropriate source of funds to pay such expenses in the ordinary course of their personal affairs.

**SPECIFIC DISCLOSURES WITH RESPECT TO STATEMENT**

**Question 4**: The Debtor's income generation is complex and comes from a multitude of business sources, including multiple business interests and investments. As an individual, the Debtor does not maintain regular financial records of his personal income other than through his tax filings, which are complex, and through his financial accounts, which are complicated by inter-account

transfers. The Debtor has used his best efforts to estimate his gross income for this response based on his tax filings and bank statements but continues to review these figures and will amend if appropriate upon a more accurate determination. The Debtor has not yet filed his 2024 tax returns, which further complicates the response to this question, and the 2024 and 2025 figures are based on bank statements after accounting, to the extent possible, for inter-account transfers.

**Question 6**: The Debtor has reviewed his financial transactions for the 90 days prior to the filing of this case to determine what payments to creditors were in excess of the applicable preference limit. The Debtor has not evaluated these payments for potential preference liability, including the evaluation of any applicable defense. The failure of the Debtor to identify a payment or series of payments in excess of the applicable statutory limit is not a waiver of any cause of action, and the Debtor reserves the right to amend this response.

**Question 18**: As detailed in the Statement, the Debtor has provided a summary of certain financial transactions that are required to be disclosed on the Statement. The summary is just that, a short recitation of the transaction. Each such transaction may have been supported by complex transactional documents and the summary should not be relied upon as a conclusive statement as to the complete nature and purpose of the transaction.

**Question 27**: The Debtor has used his best efforts to identify all business interests that have been active within the last four years. The Debtor has, over time, formed and operated numerous business entities, some of which were formed with the applicable Secretary of State but never used, some of which have ceased operations long ago but remain open, and others which are fully defunct and recently dissolved. The Debtor and his professionals continue to review the Debtor's historical business affiliations and information and the appropriate amendments will be made if additional information is determined to be appropriate for this response. The Debtor's description of the nature of the businesses is a mere summary and is not meant to describe the entirety of the business activities.

**Question 28**: From time to time, in his individual capacity as well as in his capacity as a manager or member of a business, the Debtor has provided financial statements in the ordinary course of business to certain parties for business, statutory, credit, financing, and other reasons. Recipients have included financial institutions, banks, vendors, debt holders, and their legal and financial advisors. The Debtor has worked to identify those to whom he provided financial statements, but it was not part of the Debtor's regular course of business to document those disclosures. The Debtor will amend this response should additional past disclosures be identified.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | : | Case No. 25-31552 |
| Legacy Beavercreek of Dayton | : | Chapter 7 |
| Operating Company, LLC, | : | |
| | : | |
| Debtor. | : | Judge Tyson A. Crist |

**GLOBAL NOTES AND STATEMENT OF LIMITATIONS, METHODOLOGY AND DISCLAIMERS REGARDING DEBTOR'S SCHEDULES OF ASSETS AND LIABILITIES AND STATEMENT OF FINANCIAL AFFAIRS**

Legacy Beavercreek of Dayton Operating Company, LLC, the above-captioned debtor (the "Debtor") submits its *Schedules of Assets and Liabilities* (the "***Schedules***") and *Statement of Financial Affairs* (the "Statement" and, together with the Schedules, the "Schedules and Statement") pursuant 11 U.S.C. § 521 and Bankruptcy Rule 1007.

On August 5, 2025 (the "Petition Date"), the Debtor commenced this chapter 7 case by filing a voluntary petition for relief under chapter 7 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Ohio (the "Bankruptcy Court"). The Debtor's filing was made in conjunction with the chapter 7 filings of its corporate parent, Buckeye Chai Holding Company, LLC ("Buckeye Chai") and 17 of its sibling entities (collectively, the "Related Operating Entities").

The Schedules and Statement were prepared, with the assistance of the Debtor's Liquidation Administrator, DMD Management, Inc. (the "Administrator"), and are unaudited. While the Administrator has made a reasonable effort to ensure that the Schedules and Statement are accurate and complete based on information known to it at the time of preparation after reasonable inquiries, inadvertent errors or omissions may exist or the subsequent receipt of information may result in material changes in financial and other data contained in the Schedules and Statement. Accordingly, the Debtor reserves its right to amend or supplement the Schedules and Statement from time to time as may be necessary or appropriate; but there can be no guarantees that the Debtor will do so.

The Debtor and its attorneys, and the Administrator do not guarantee or warrant the accuracy or completeness of the data that is provided herein and are not be liable for any loss or injury arising out of or caused in whole or in part by the acts, errors, or omissions, whether negligent or otherwise, in procuring, compiling, collecting, interpreting, reporting, communicating or delivering this information. While commercially reasonable efforts have been made to provide accurate and complete information, inadvertent errors or omissions may exist. Except as expressly required by the Bankruptcy Code, the Debtor and its attorneys, and the Administrator do not undertake any obligation to update, modify, revise, or re-categorize the information provided herein, or to notify any third party should the information be updated, modified, revised, or re-categorized. In no event shall the Debtor or its attorneys, and the Administrator be liable to any

third party for any direct, indirect, incidental, consequential, or special damages (including, but not limited to, damages arising from the disallowance of a potential claim against the Debtor or damages to business reputation, lost business or lost profits), whether foreseeable or not and however caused, even if the Debtor or its attorneys, and the Administrator are advised of the possibility of such damages. These *Global Notes and Statement of Limitations, Methodology and Disclaimers Regarding Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs* (these "Global Notes") are incorporated by reference in, and comprise an integral part of, the Schedules and Statement, and should be referred to and reviewed in connection with any review of the Schedules and Statement.

## GLOBAL NOTES AND OVERVIEW OF METHODOLOGY

1. **Reservation of Rights**. The Debtor reserves the right to dispute, or to assert setoff or other defenses to, any claim reflected in the Schedules and Statement as to amount, liability, and classification. The Debtor also reserves all rights with respect to the values, amounts, and characterizations of the assets and liabilities listed in the Schedules and Statement. Nothing contained in the Schedules and Statement shall constitute a waiver of rights with respect to this chapter 7 case, including, but not limited to, issues involving substantive consolidation, equitable subordination, and causes of action arising under the provisions of chapter 5 of the Bankruptcy Code and other relevant non-bankruptcy laws to recover assets or avoid transfers.

2. **Basis of Presentation**. The Schedules and Statement reflect the assets and liabilities of the Debtor. The Schedules and Statement do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), nor are they intended to reconcile to any financial statements previously distributed to lenders, major creditors, governmental authorities or various other parties on an intermittent basis.

   The Schedules and Statement have been signed by James Taylor in his capacity as the Authorized Representative for the Debtor. In reviewing and signing the Schedules and Statement, Mr. Taylor necessarily relied upon the efforts, statements, and representations of the accounting and non-accounting personnel located at the Administrator's offices who report to, or work with, Mr. Taylor, either directly or indirectly. Mr. Taylor has not, and could not have, personally verified the accuracy of each such statement and representation, including statements and representations concerning amounts owed to creditors.

3. **Date of Valuations**. Except as otherwise noted in the Schedules and Statement, all liabilities, as well as cash, inventory and vendor debit balances, are valued as of the Petition Date to the best of the Administrator's ability. All values are stated in United States currency. In certain instances, estimates or pro-rated amounts were used where actual data as of the aforementioned dates was not available. A reasonable effort was made to allocate liabilities between the pre- and post-petition periods based on the information and research that was conducted in connection with the preparation of the Schedules and Statement. As additional information becomes available and further research is conducted, the allocation of liabilities between the pre- and post-petition periods may be adjusted and the Schedules and Statement amended accordingly.

4. **Book Value**. Except as otherwise noted, each asset and liability of each Debtor is shown on the basis of net book value of the asset or liability in accordance with the Administrator's accounting books and records. Therefore, unless otherwise noted, the Schedules and Statement are not based upon any estimate of the current market values of the Debtor's assets and liabilities, which may not correspond to book values. It would be cost prohibitive and unduly burdensome to obtain current market valuations of the Debtor's property interests. Except as otherwise noted, the Debtor's assets are presented, in detail, as they appear on the accounting records maintained by the Administrator.

5. **Causes of Action**. The Administrator has made its best effort to determine if the Debtor has any causes of action against third parties as assets in the Schedules and Statement but has not identified any. The Debtor reserves all of its rights with respect to causes of action it may have, whether disclosed or not disclosed, and neither these Global Notes nor the Schedules and Statement shall be deemed a waiver of any such causes of action.

6. **Payments**. The financial affairs of the Debtor are complex. Historically, the Debtor was a participant in a cash management system that involved the sweep and consolidation of receivables collections into concentration accounts of Buckeye Chai, along with receivables collections on behalf of the Related Operating Entities. The Administrator has used its best efforts to obtain accurate information regarding receipts and disbursements from its system.

7. **Claims**. Certain of the Debtor's Schedules list creditors and set forth the Debtor's estimate of the claims of creditors as of the Petition Date.

   Any failure to designate a claim listed on the Debtor's Schedule as "disputed," "contingent," or "unliquidated" does not constitute an admission by the Debtor that the claim is not "disputed," "contingent," or "unliquidated." The Debtor reserves the right to (i) object to or otherwise dispute or assert setoff rights, cross-claims, counterclaims or defenses to, any claim reflected on the Schedules as to amount, liability, classification or otherwise, or (ii) otherwise to designate subsequently any claim as "disputed," "contingent" or "unliquidated."

   The Debtor has excluded potential rejection damage claims of counterparties to executory contracts and unexpired leases, if any, that may or may not be rejected, and to the extent such damage claims exist, the Debtor reserves all rights to contest such claims as asserted.

8. **Totals.** All totals that are included in the Schedules and Statement represent totals of all the known amounts included in the Schedules and Statement and exclude items identified as "unknown" or "undetermined." If there are unknown or undetermined amounts, the actual totals may be materially different from the listed totals.

9. **Recharacterization**. Notwithstanding the Administrator's reasonable best efforts to properly characterize, classify, categorize or designate certain claims, assets, executory contracts, unexpired leases and other items reported in the Schedules and Statement, certain items may nevertheless have been improperly characterized, classified, categorized, designated or omitted. Accordingly, the Debtor reserves all of its rights to recharacterize, reclassify, recategorize, redesignate, add or delete items reported in the Schedules and Statement at a

later time as is necessary and appropriate, as additional information becomes available, including whether contracts listed herein were deemed executory.

10. **Setoffs.** The Debtor may incur setoffs from governmental authorities, private payors, and suppliers in the ordinary course of business. These routine setoffs are consistent with the ordinary course of business in the Debtor's industry and, therefore, can be particularly voluminous, unduly burdensome, and costly for the Debtor to regularly document. Therefore, although such setoffs and other similar rights may have been accounted for when scheduling certain amounts, these ordinary course setoffs may not be independently accounted for, and, as such, may be excluded from the Schedules and Statement. Any setoff of a prepetition debt to be applied against the Debtor is subject to the automatic stay and must comply with section 553 of the Bankruptcy Code.

11. **Insiders.** The Debtors reserve all rights with respect to the determination or status of a person as an "insider" as defined in section 101(13) of the Bankruptcy Code.

## SPECIFIC NOTES WITH RESPECT TO THE SCHEDULES

### Schedule A/B

**Item 3:** Due to the timing of the issuance of bank statements, the bank account balances listed here reflect balances as of August 31, 2025, and may have changed since then due to the ongoing receipt of receivables collections, and the imposition of bank charges.

**Item 11**: The Debtor, by and through the Administrator, has used its best efforts to document its Accounts Receivable accurately, but the health care industry payment system is complex, and the Debtor's Accounts Receivable is likely systemically incapable of determination with complete certainty. In addition, this value represents the Accounts Receivable if paid to the Debtor as a going concern, and does not reflect any losses, setoffs, recoupment, or other reductions that could be experienced since the Debtor has discontinued operations. The balance shown is as of July 31, 2025.

### Schedule D

The descriptions provided in Schedule D are intended only to be a summary. Reference to the applicable agreements and related documents is necessary for a complete description of the collateral and the nature, extent and priority of any liens. Nothing in these Global Notes or the Schedules and Statement shall be deemed a modification or interpretation of the terms of such agreements.

### Schedule E/F

Certain of the claims of state and local taxing authorities set forth in the Schedules ultimately may be deemed to be secured claims pursuant to state or local laws. Certain of the claims owing to various taxing authorities to which the Debtor may be liable may be subject to audit. The Debtor

reserves its right to dispute or challenge whether claims owing to various taxing authorities are entitled to priority.

**Schedule G**

The business of the Debtor was complex and, while every effort has been made to ensure the accuracy of Schedule G, inadvertent errors or omissions may have occurred. The Debtor reserves all of its rights to (i) dispute the validity, status or enforceability of any contracts, agreements or leases set forth in Schedule G and (ii) amend or supplement such Schedule as necessary. Furthermore, the Debtor reserves all of its rights, claims, and causes of action with respect to the contracts and agreements listed on the Schedules, including the right to dispute or challenge the characterization or the structure of any transaction, document or instrument. The presence of a contract or agreement on Schedule G does not constitute an admission that such contract or agreement is an executory contract or an unexpired lease.

The contracts, agreements, and leases listed on Schedule G may have expired or may have been modified, amended or supplemented from time to time by various amendments, restatements, waivers, estoppel certificates, letter and other documents, instruments and agreements that may not be listed therein.

**SPECIFIC DISCLOSURES WITH RESPECT TO THE STATEMENT**

**Question 7**: The Administrator made reasonable efforts to accurately record the litigation actions that to which the Debtor is a party (collectively, the "Litigation Actions") in the Schedules and Statement. The inclusion of any Litigation Action in the Schedules and Statement does not constitute an admission by the Debtor of liability, the validity of any Litigation Action, or the amount of any potential claim that may result from any claims with respect to any Litigation Action.

**Question 13**: Listed in the response to this question are three transactions which, in the opinion of the Debtor, are incapable of a precise valuation. Notwithstanding, the Debtor believed that it was appropriate to include a disclosure of each to ensure a complete summary of prepetition transactions involving the Debtor and its assets.

**Question 15**: Since the Debtor transferred its operating assets in December of 2024, and thereafter no longer engaged in offering services and facilities for treatment or care, the Debtor answered this question in the negative.

**Question 26d**: From time to time, the Debtor provided financial statements in the ordinary course of business to certain parties for business, statutory, credit, financing, and other reasons. Recipients have included regulatory agencies, financial institutions, vendors, and their legal and financial advisors. The Debtor has worked to identify those to whom it provided financial statements, but it was not part of the Debtor's regular course of business to document those disclosures.

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | : | Case No. 25-30191 |
| The Bellevue Hospital | : | Chapter 11 |
| | : | |
| Debtor. | : | Judge Mary Ann Whipple |

## GLOBAL NOTES AND STATEMENT OF LIMITATIONS, METHODOLOGY AND DISCLAIMERS REGARDING DEBTOR'S SCHEDULES OF ASSETS AND LIABILITIES AND STATEMENT OF FINANCIAL AFFAIRS

The Bellevue Hospital, the above-captioned debtor and debtor in possession (the "Debtor") submits its *Schedules of Assets and Liabilities* (the "***Schedules***") and *Statement of Financial Affairs* (the "Statement" and, together with the Schedules, the "Schedules and Statement") pursuant 11 U.S.C. § 521 and Bankruptcy Rule 1007.

On February 5, 2025 (the "Petition Date"), the Debtor commenced this chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of Ohio (the "Bankruptcy Court"). The Debtor is operating its business as debtor in possession.

The Schedules and Statement were prepared, with the assistance of the Debtor's professionals, by the Debtor's management and are unaudited. While those members of management responsible for the preparation of the Schedules and Statement have made a reasonable effort to ensure that the Schedules and Statement are accurate and complete based on information known to them at the time of preparation after reasonable inquiries, inadvertent errors or omissions may exist or the subsequent receipt of information may result in material changes in financial and other data contained in the Schedules and Statement. Accordingly, the Debtor reserves its right to amend or supplement the Schedules and Statement from time to time as may be necessary or appropriate; but there can be no guarantees that the Debtor will do so.

The Debtor and its agents, attorneys, and financial advisors do not guarantee or warrant the accuracy or completeness of the data that is provided herein and are not be liable for any loss or injury arising out of or caused in whole or in part by the acts, errors, or omissions, whether negligent or otherwise, in procuring, compiling, collecting, interpreting, reporting, communicating or delivering this information. While commercially reasonable efforts have been made to provide accurate and complete information, inadvertent errors or omissions may exist. Except as expressly required by the Bankruptcy Code, the Debtor and its agents, attorneys, and financial advisors do not undertake any obligation to update, modify, revise, or re-categorize the information provided herein, or to notify any third party should the information be updated, modified, revised, or re-categorized. In no event shall the Debtor or its agents, attorneys, and financial advisors be liable to any third party for any direct, indirect, incidental, consequential, or special damages (including, but not limited to, damages arising from the disallowance of a potential claim against the Debtor or damages to business reputation, lost business or lost profits), whether foreseeable or not and however caused, even if the Debtor or its agents, attorneys, and financial advisors are advised of

the possibility of such damages. These *Global Notes and Statement of Limitations, Methodology and Disclaimers Regarding Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs* (these "Global Notes") are incorporated by reference in, and comprise an integral part of, the Schedules and Statement, and should be referred to and reviewed in connection with any review of the Schedules and Statement.

## GLOBAL NOTES AND OVERVIEW OF METHODOLOGY

**1.** **Reservation of Rights**. The Debtor reserves the right to dispute, or to assert setoff or other defenses to, any claim reflected in the Schedules and Statement as to amount, liability, and classification. The Debtor also reserves all rights with respect to the values, amounts, and characterizations of the assets and liabilities listed in the Schedules and Statement. Nothing contained in the Schedules and Statement shall constitute a waiver of rights with respect to this chapter 11 case, including, but not limited to, issues involving substantive consolidation, equitable subordination, and causes of action arising under the provisions of chapter 5 of the Bankruptcy Code and other relevant non-bankruptcy laws to recover assets or avoid transfers.

**2.** **Basis of Presentation**. The Schedules and Statement reflect the assets and liabilities of the Debtor. For financial reporting purposes, the Debtor historically prepared consolidated financial statements, which included financial information for all of its subsidiaries. The Debtor has used its best efforts to ensure that the information presented here does not include assets and liabilities that are solely owned or the responsibility of any subsidiaries.

The Schedules and Statement do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), nor are they intended to reconcile to the financial statements previously distributed to lenders, major creditors, or various equity holders on an intermittent basis.

The Schedules and Statement have been signed by Darrell M. Lentz in his capacity as Interim Chief Financial Officer for the Debtor. In reviewing and signing the Schedules and Statement, Mr. Lentz necessarily relied upon the efforts, statements, and representations of the accounting and non-accounting personnel located at the Debtor's offices who report to, or work with, Mr. Lentz, either directly or indirectly. Mr. Lentz has not, and could not have, personally verified the accuracy of each such statement and representation, including statements and representations concerning amounts owed to creditors.

**3.** **Date of Valuations**. Except as otherwise noted in the Schedules and Statement, all liabilities, as well as cash, inventory and vendor debit balances, are valued as of the Petition Date to the best of the Debtor's ability. All values are stated in United States currency. In certain instances, the Debtor used estimates or pro-rated amounts where actual data as of the aforementioned dates was not available. The Debtor made a reasonable effort to allocate liabilities between the pre- and post-petition periods based on the information and research that was conducted in connection with the preparation of the Schedules and Statement. As additional information becomes available and further research is conducted, the Debtor may modify the allocation of liabilities between the pre- and post-petition periods and amend the Schedules and Statement accordingly.

4. **Book Value**. Except as otherwise noted, each asset and liability of each Debtor is shown on the basis of net book value of the asset or liability in accordance with the Debtor's accounting books and records. Therefore, unless otherwise noted, the Schedules and Statement are not based upon any estimate of the current market values of the Debtor's assets and liabilities, which may not correspond to book values. It would be cost prohibitive and unduly burdensome to obtain current market valuations of the Debtor's property interests. Except as otherwise noted, the Debtor's assets are presented, in detail, as they appear on the Debtor's accounting sub-ledgers. As such, the detail may include error corrections and value adjustments. The Debtor believes that certain of their assets, including (i) goodwill, (ii) certain owned property, and (iii) intangibles may have been significantly impaired by, among other things, the events leading to, and the commencement of, the Debtor's chapter 11 cases. The Debtor has not yet formally evaluated the appropriateness of the carrying values ascribed to its assets prior to the Petition Date.

5. **Property and Equipment**. Unless otherwise indicated, owned property and equipment are recorded at cost and are shown net of depreciation.

6. **Causes of Action**. The Debtor has made its best effort to determine if it has any causes of action against third parties as assets in the Schedules and Statement but has not identified any. The Debtor reserves all of its rights with respect to causes of action it may have, whether disclosed or not disclosed, and neither these Global Notes nor the Schedules and Statement shall be deemed a waiver of any such causes of action.

7. **Litigation**. The Debtor made reasonable efforts to accurately record the litigation actions that it is a party to (collectively, the "Litigation Actions") in the Schedules and Statement. The inclusion of any Litigation Action in the Schedules and Statement does not constitute an admission by the Debtor of liability, the validity of any Litigation Action, or the amount of any potential claim that may result from any claims with respect to any Litigation Action, or the amount and treatment of any potential claim resulting from any Litigation Action currently pending or that may arise in the future.

8. **Payments**. The financial affairs and business of the Debtor are complex. Prior to the Petition Date, the Debtor used a cash management system and it has used its best efforts to obtain accurate information regarding payments from its system.

9. **Claims**. Certain of the Debtor's Schedules list creditors and set forth the Debtor's estimate of the claims of creditors as of the Petition Date.

   The Bankruptcy Court has authorized, but not directed, the Debtor to, among other things, (i) continue certain customer practices in the ordinary course of business, (ii) pay certain prepetition wages, salaries, employee benefits, and other related obligations up to the statutory cap, (iii) pay certain prepetition sales, use, and other taxes, and (iv) make certain payments to vendors, claimants, and lien holders. The actual unpaid claims of creditors that may be allowed in these cases may differ from the amounts set forth in the Schedules and Statement. Moreover, the Debtor has not attempted to reflect any possible recoupment rights.

Case 1:25-bk-11607 Doc 1286-1 Filed 08/28/25 Entered 08/28/25 18:54:37 Desc Exhibit D Page 33 of 37


Any failure to designate a claim listed on the Debtor's Schedule as "disputed," "contingent," or "unliquidated" does not constitute an admission by the Debtor that the claim is not "disputed," "contingent," or "unliquidated." The Debtor reserves the right to (i) object to or otherwise dispute or assert setoff rights, cross-claims, counterclaims or defenses to, any claim reflected on the Schedules as to amount, liability, classification or otherwise, or (ii) otherwise to designate subsequently any claim as "disputed," "contingent" or "unliquidated."

The claims listed in the Schedules do not reflect any analysis of claims under section 503(b)(9) of the Bankruptcy Code. Accordingly, the Debtor reserves all of its rights to dispute or challenge the validity of any asserted claims under section 503(b)(9) of the Bankruptcy Code or the characterization of the structure of any such transaction or any document or instrument related to any creditor's claim.

The Debtor has excluded potential rejection damage claims of counterparties to executory contracts and unexpired leases that may or may not be rejected, and to the extent such damage claims exist, the Debtor reserves all rights to contest such claims as asserted.

**10.** **<u>Totals</u>.** All totals that are included in the Schedules and Statement represent totals of all the known amounts included in the Schedules and Statement and exclude items identified as "unknown" or "undetermined." If there are unknown or undetermined amounts, the actual totals may be materially different from the listed totals.

**11**. **<u>Recharacterization</u>**. Notwithstanding the Debtor's reasonable best efforts to properly characterize, classify, categorize or designate certain claims, assets, executory contracts, unexpired leases and other items reported in the Schedules and Statement, the Debtor may nevertheless have improperly characterized, classified, categorized, designated or omitted certain items. Accordingly, the Debtor reserves all of its rights to recharacterize, reclassify, recategorize, redesignate, add or delete items reported in the Schedules and Statement at a later time as is necessary and appropriate, as additional information becomes available, including whether contracts listed herein were deemed executory as of the Petition Date and remain executory postpetition.

**12.** **<u>Setoffs</u>.** The Debtor may incur setoffs from governmental authorities, private payors, and suppliers in the ordinary course of business. These routine setoffs are consistent with the ordinary course of business in the Debtor's industry and, therefore, can be particularly voluminous, unduly burdensome, and costly for the Debtors to regularly document. Therefore, although such setoffs and other similar rights may have been accounted for when scheduling certain amounts, these ordinary course setoffs may not be independently accounted for, and, as such, may be excluded from the Schedules and Statement. Any setoff of a prepetition debt to be applied against the Debtor is subject to the automatic stay and must comply with section 553 of the Bankruptcy Code.

**13.** **<u>Insiders</u>.** The Debtors reserve all rights with respect to the determination or status of a person as an "insider" as defined in section 101(13) of the Bankruptcy Code.

**14.** **<u>Redaction</u>.** The Debtors have been permitted to redact certain names and addresses to protect patients and employees. Those redactions are reflected here.

## SPECIFIC NOTES WITH RESPECT TO THE SCHEDULES

### Schedule A/B

**Item 3:** The account balances listed here reflect balances as of the Petition Date and have changed since then. For additional information regarding these accounts, see the Debtor's first day motion pertaining to its cash management system.

**Item 8**: Prepaid services are reflective of the cost to the Debtor but do not represent any (a) value of an assignment of said service or (b) value of any potential refund if service is cancelled (if a refund could even be issued).

**Item 11**: The Debtor has used its best efforts to document its Accounts Receivable accurately, but the health care industry payment system is complex and the Debtor's Accounts Receivable is never able to be determined with certainty. In addition, this value represents the Accounts Receivable if paid to the Debtor as a going concern, and does not reflect any losses, setoffs, recoupment, or other reductions that would be experienced if the Debtor were to discontinue operations.

**Item 14:** Certain of the Debtor's investments listed here were in the process of being liquidated as of the Petition Date and transferred to an escrow account held by the Debtor's Senior Secured Creditor. The Debtor's figures represent balances as of the Petition Date.

**Item 15:** The Debtor has not taken any action, but may in the future, to obtain a valuation of its various subsidiaries. The Debtor has historically made capital contributions to subsidiaries that are not reflected in the Schedules.

**Items 21 and 22:** Inventory for sale or use by the Debtor is recorded at cost and does not reflect the actual resale value of the inventory either on a going concern basis or through a liquidation. Moreover, the Inventory cost figures do not reflect spoilage, expiration, or loss in the ordinary course of business.

**Items 39, 40, and 41**: Furniture, Fixtures, Equipment and Software are valued on a net book value basis and do not reflect the liquidation value of the assets. In particular, the Debtor does not believe that the value of the Computer Hardware or IT Software would carry the same value in a liquidation scenario, and does not, for example, account for costs of removal of personally identifiable information ("PII"), such as patient information, which would be necessary in a liquidation.

**Item 47:** Vehicles have been valued using kellybluebook.com and based on their current mileage.

**Item 55**: Certain real property listed is subject to mortgage or other liens of creditors listed on schedule D. These items are detailed in the Debtor's *Motion for an Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing from Firelands, (B) Use Cash Collateral, (C) Provide Adequate Assurance Protection to Senior Secured Creditor; and, (II) Granting Related Relief* (Doc. 34), which is incorporated by reference. The Debtor has listed real property based on the net book value in its records unless there is a recent appraisal held by the Debtor.

## Schedule D

Except as otherwise ordered by the Bankruptcy Court (including if found valid in any order entered by the Bankruptcy Court), the Debtor reserves its rights to dispute or challenge the validity, perfection or immunity from avoidance of any lien purported to be granted or perfected in any specific asset for the benefit of a secured creditor listed on a Debtor's Schedule D. Moreover, although the Debtor may have scheduled claims of various creditors as secured claims, the Debtor reserves all rights to dispute or challenge the secured nature of any such creditor's claim or the characterization of the structure of any such transaction or any document or instrument (including without limitation, any intercompany agreement) related to such creditor's claim.

Certain claims listed on Schedule D arose or were incurred on various dates; a determination of the date upon which each claim arose or was incurred would be unduly burdensome and cost prohibitive. Accordingly, not all such dates are included for each claim. All claims listed on Schedule D, however, have arisen or been incurred before the Petition Date.

The descriptions provided in Schedule D are intended only to be a summary. Reference to the applicable loan agreements and related documents is necessary for a complete description of the collateral and the nature, extent and priority of any liens. Nothing in these Global Notes or the Schedules and Statement shall be deemed a modification or interpretation of the terms of such agreements.

Except as specifically stated herein, parties which may hold security deposits have not been listed on Schedule D. Other than certain known claims, the Debtors have not included parties that may believe their Claims are secured through setoff rights or inchoate statutory lien rights.

## Schedule E/F

Certain of the claims of state and local taxing authorities set forth in the Schedules ultimately may be deemed to be secured claims pursuant to state or local laws. Certain of the claims owing to various taxing authorities to which the Debtor may be liable may be subject to audit. The Debtor reserves its right to dispute or challenge whether claims owing to various taxing authorities are entitled to priority.

Schedule E/F does not include certain deferred charges, deferred liabilities, accruals, or general reserves, including self-insured health insurance plan liabilities. Such amounts are, however, reflected on the Debtor's books and records as required in accordance with GAAP. Such accruals are general estimates of liabilities and do not represent specific Claims as of the Petition Date.

Employee claims satisfied pursuant to the Bankruptcy Court's orders authorizing, but not directing, the Debtors to pay certain prepetition employee wages, salaries, benefits and other related obligations have been listed in Schedule E/F but may have been subsequently satisfied.

## Schedule G

The business of the Debtor is complex and, while every effort has been made to ensure the accuracy of Schedule G, inadvertent errors or omissions may have occurred. The Debtor reserves all of its

rights to (i) dispute the validity, status or enforceability of any contracts, agreements or leases set forth in Schedule G and (ii) amend or supplement such Schedule as necessary. Furthermore, the Debtor reserves all of its rights, claims, and causes of action with respect to the contracts and agreements listed on the Schedules, including the right to dispute or challenge the characterization or the structure of any transaction, document or instrument. The presence of a contract or agreement on Schedule G does not constitute an admission that such contract or agreement is an executory contract or an unexpired lease.

The contracts, agreements, and leases listed on Schedule G may have expired or may have been modified, amended or supplemented from time to time by various amendments, restatements, waivers, estoppel certificates, letter and other documents, instruments and agreements that may not be listed therein. Any real property leases listed on Schedule G may contain renewal options, guarantees of payments, options to purchase, rights of first refusal, rights to lease additional space and other miscellaneous rights. Such rights, powers, duties, and obligations are not set forth on Schedule G. Additionally, the Debtor may be parties to various other agreements concerning real property, such as easements, rights of way, subordination, non-disturbance, supplemental agreements, amendments/letter agreements, title documents, consents, site plans, maps, and other miscellaneous agreements. Such agreements, if any, are not set forth in Schedule G. Certain of the agreements listed on Schedule G may be in the nature of conditional sales agreements or secured financings.

## **SPECIFIC DISCLOSURES WITH RESPECT TO STATEMENT**

**Question 3**: The Debtor reserves all rights related to any prepetition payments to creditors that may be recoverable under chapter 5 of the Bankruptcy Code. The Debtor has not undertaken any effort at this time to evaluate any chapter 5 actions or defenses thereto.

**Question 6**: The Debtor has not identified any setoffs made by creditors without permission; however, there may be instances where such a setoff has occurred without the Debtor's knowledge.

**Question 16**: The Debtor has patient lists containing personally identifiable information provided to the Debtor in connection with obtaining a service. Such personally identifiable information is protected by the Health Insurance Portability and Accountability Act.

**Question 26d**: From time to time, the Debtor provided financial statements in the ordinary course of business to certain parties for business, statutory, credit, financing, and other reasons. Recipients have included regulatory agencies, financial institutions, investment banks, vendors, debtholders and their legal and financial advisors. The Debtor has worked to identify those to whom it provided financial statements, but it was not part of the Debtor's regular course of business to document those disclosures. As a result, the turnover of personnel may have resulted in the inability to detail each of the disclosures.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing *Limited Objection to Motion of The Huntington National Bank for the Appointment of an Examiner Pursuant to 11 U.S.C. § 1104* was served (i) electronically on the date of filing through the Court's ECF system on all ECF participants registered in this case at the email address registered with the Court, and (ii) by ordinary U.S. Mail on March 20, 2026, addressed to the following:

None.

/s/ James A. Coutinho
James A. Coutinho (0082430)