# "EXHIBIT FF"

**In The Matter Of:**

*RAYMOND JOSEPH SCHNEIDER*

---

*TESTIMONY OF RAYMOND JOSEPH SCHNEIDER*

*March 15, 2023*

---

*LEGAL ELECTRONIC RECORDING, INC.*

*216-881-8000*

*www.lerinc.com*

Original File 100429A.prn

**Min-U-Script® with Word Index**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| IN RE: | * | Case No. 23-10337 |
| RAYMOND JOSEPH SCHNEIDER | * | March 15, 2023 |

* * * * * * * * * * * * * * * *

PARTIAL TRANSCRIPT OF HEARING
BEFORE THE HONORABLE BETH A. BUCHANAN
UNITED STATES BANKRUPTCY JUDGE

RAYMOND JOSEPH SCHNEIDER, WITNESS

DIRECT EXAMINATION BY ERIC W. GOERING, COUNSEL FOR DEBTOR (Page 2)

Transcribed by:
- - - - - - - - - - - - - -
Legal Electronic Recording, Inc.
5230 St. Clair Avenue
Cleveland, Ohio 44103
(216) 881-8000
www.lerinc.com

Proceeding recorded by electronic sound recording, transcript produced by transcription service.
Job #100429A

(2:01 p.m.)

MR. GOERING: All right. I'd like to call Ray Schneider to the stand.

THE COURT: Thank you.

RAYMOND JOSEPH SCHNEIDER, WITNESS, SWORN

DIRECT EXAMINATION OF RAYMOND JOSEPH SCHNEIDER

BY MR. GOERING:

Q Good afternoon, Mr. Schneider. Will you please state your full name and address for the record?

A Raymond Joseph Schneider, 3515 Tiffany Ridge, Cincinnati, Ohio.

Q 45?

A 45241.

Q And how long have you lived at that residence, sir?

A Thirty-seven years.

Q And what is your educational background?

A Bond Hill, Woodward High School. I started at Ohio State and ended up at UC with a bachelor's degree.

Q And are you the party that initiated the bankruptcy case titled Raymond Schneider Chapter 11 Case?

A Yes.

Q And did you sign the bankruptcy documents in my office prior to the filing of the case?

A Yes.

Q And did you complete your required credit counseling prior to the filing?

A I have.

Q Have you been working to put together a accurate copy of your assets and liabilities?

A Yes. I found a good challenge.

Q Are you prepared to file your schedules tomorrow to lay out the different assets and debts that you have in your possession?

A Yes.

Q So, what is your current employment now?

A Self-employed.

Q Did you have an opportunity to read the pleading that was filed by me on your behalf objecting to the motion of Huntington Bank today?

A I did.

Q So, let's just -- to shorten this, is your background that we provided in there a true and accurate depiction of your employment history?

A Yes, it is.

Q How many different companies do you have at least a ten percent interest or greater at this time?

A Somewhere close to 70.

Q And are those businesses currently successful?

A All of them are.
Q Are the businesses currently cash flowing positive?
A The ones that have been around, yes.
Q So, the -- let's understand that answer.
A I'm developing as a developer. You start off not cash flowing but as you move forward and finish your product or your project, you start to have -- and all of my projects that have had a year have been cash flowing.
Q And for those businesses that are in development, do you normally secure loans from banks in order to build the location and develop the property?
A Yes.
Q Do you also use some -- in the past, have you also used some of your margin account in order to help in the developments?
A Yes, I did.
Q Is the intent, then, that as you put money in these developments and then they're completed that you, in turn, make your money back plus more?
A Yes, I have.
Q And so is it safe to say over the years has your margin account fluctuated as you used some of the money in these developments?

A Yes.
Q Setting aside the judgment of Huntington Bank, are you current on your personal and business obligations?
A Yes, I am.
Q All right. I'd like to now focus on your business relationship with Mr. Sosna for a moment. When did you first meet him?
A 1999.
Q And when did you start your business relationship with him?
A 1999.
Q All right. In under five minutes, will you -- please try under five minutes.
A I'll try. Where's the clock?
Q Will you please explain your business relationship with Mr. Sosna that led you to file this Chapter 11 case?
A I went to Columbus to acquire a nursing home. He was bidding against me. I offered him that we could do it together. From there, over 18 years of a partnership and developed five facilities together. Things were fine. Come 2018 -- or, yeah. The end of '17, one of our tenants did something wrong and they had to close down the facility. Our loan was with

Fifth Third. Huntington and First Financial were right behind them in a syndicate. We needed to get a new loan. Fifth Third was upset with that.

Huntington picked up the relationship and took on the loan. Harold and his assistant or his attorney, Joe McGrail, did all of that and called me up a few days before a loan was committed. And I -- we had a loan that ended in -- or started in November 30 and from there I accepted, you know, my monthly check. I got my financials. Then they started to slow down in '19, within the year, and I was calling. Things were quiet and I'm hollering, I need to know the information.

And then on May 26, I got a notice from Joe McGrail, his attorney, that he got caught for kiting and been arrested for committing kiting amongst five banks. And then my world changed. The Huntington Bank took my assets and put them through the courts. There was a receiver who sold them. I tried, I tried and I tried to salvage them.

I'm a nursing home administrator since 1968. I've run a dozen nursing homes. I knew the business. I tried to talk to the bank and not once in four years did they ever talk to me. I was the person who could have run those facilities, and they avoided to deal

with me. And that brought up an issue. They took it to the courts and I reached out to the receiver and I wanted to let her know I wanted to buy it.

Huntington wouldn't discuss that purchase at all. They wasted millions and millions of dollars. They sold it for whatever they could. And in the end, they brought me here to this Court because they want something that got misappropriated.

I'm a nursing home administrator. They could have let me run the business. I cashed out $3 million of my assets, gave it to Huntington to be a bidder against my own properties. I could have run them. They weren't at this big of a loss. It was only because there were a lot of people that grabbed money out of it and now they're holding me accountable.

The assets are great. I can run a nursing home. I've done it since I was a little kid. I was there before administration had a license. I'm a successful administrator. I've been able to manage 70 businesses now. I'm very multi-tasking. The bank did not reach out to me for whatever reason, but now they're holding me accountable.

I'm here in the court to ask to get the time to show the Court that I'm honest. I've never committed fraud. Not many people can create 70 businesses and

get to the finish line that I am today. And I would show you anytime you want that all my businesses are successful in Cincinnati. I'm in Boston. I've grown five businesses there. I'm a small company. I'm the individual that makes it run. I'm the individual that guides everybody. I take care of 300 families, and I would appreciate understanding why I'm here.

Q So, let's focus on a couple things. You threw a date out there, May, when you became aware of the issue between Mr. Sosna and Huntington Bank. May of what year was that?

A May 26, 2020.

Q So, up until May 26 of 2020, were you aware of Mr. Sosna's default with the bank or the check kiting scheme or any of the collection actions against Huntington?

A I knew absolutely nothing.

Q And so the exhibits that are here today reflect that there were meetings and communications between Mr. Sosna and Huntington Bank regarding the loan and what they call "manipulation of funds." Were you involved in those meetings?

A Like I said, the bank has never talked to me in four years.

Q Did the bank notify you that the loan was in

default?
A I'll repeat myself. They never talked to me in four years.
Q And so the bank is having multiple meetings, according to the emails, with Mr. Sosna and their counsel, who I believe was Mr. Statman. Was he your lawyer or was he Mr. Sosna's lawyer?
A He was Mr. Sosna's.
Q Do you know if he was representing the companies or Mr. Sosna individually?
A From all the lawsuits, I found out that he represented both sides.
Q So, was the bank in communication with you that there were the -- that since you're a surety, that there are these meetings with that regarding this loan and did they invite you to participate?
A I'll say it again. I've never had a conversation with the bank.
Q After the judgment was secured by Huntington, did they commence collection action against you?
A Could you repeat that?
Q After Huntington Bank secured a judgment against you, did they start their collection action against your assets?
A Yes, they did.

Q Did they freeze your bank account at Stock Yards Bank?
A Yes, they did.
Q Did they attach your Merrill Lynch account?
A Yes, they did.
MR. GOERING: Pardon me one moment, Judge.
BY MR. GOERING:
Q So, Exhibit 76 is in front of you. But let's see. Okay. So, we have two exhibits. So, Exhibit 76. The first one, does this appear to be a summary of your accounts?
A At some point in time, yes.
Q Did I -- did you help me prepare this?
A Yes.
Q Okay. So, let's go to the actual statements. Are these accurate copies of your Merrill Lynch statements?
A Yes, they are.
Q I tried to black out as many account numbers and names as possible. But let's just look at the one in front of you. I don't know how to rotate, so, please read sideways.
THE COURT: I think it's just that.
MR. GOERING: Yeah.
THE COURT: With the arrow.

MR. GOERING: I think you have to pay for that now, Judge.

THE COURT: Oh.

MR. GOERING: I tried to do that the other --

THE WITNESS: May I borrow that?

MR. GOERING: -- day.

THE COURT: I was going to say, it's -- I'm looking at mine. On my screen we can do it.

THE WITNESS: Is there a device here I can use?

THE COURT: I guess we can't do it on --

MR. GOERING: All right. Well -- oh, wait, wait. Look at that.

BY MR. GOERING:

Q So, let's start in the beginning. Does this reflect two different accounts?

A Yes.

Q First one with $137,000, the second with $2.7 million?

A Yep.

Q All right.

A Sorry.

Q Next account, balance of about $1,502,000, correct?

A Yes.

Q Final account, about $21 million?
A Yes.
Q These were the value of your accounts around the beginning of the year. Is that correct?
A I believe they're correct.
Q They've gone down a little bit?
A Yes, they have.
Q All right. Now, did Huntington try to attach these accounts?
A They did.
Q And as you were analyzing their attachment, did you cause -- strike that. As you were analyzing your accounts and their seizure, was the issue of potential capital gains brought up?
A Yeah. I brought it up, because I knew that this has been around for a long time and I've grown it and if you sell it, you have to pay the capital gains.
Q All right. So, over what time did you accumulate these funds?
A Probably somewhere over 40 years.
Q And approximately what is your margin balance now? Do you know?
A Something close to $17 million.
Q Do you have a general understanding of your basis in this account?

A Generally. Forty years is a long time.
Q Approximately what is the tax basis in the Merrill account?
A They were talking somewhere between $3.5 and $4.5 million.
Q Of a basis or of a tax liability?
A Oh, that was the tax liability. The basis is somewhere near $10 million.
Q Okay. And so is it your understanding that -- strike that. Was this bankruptcy case filed prior to the bank executing on this account?
A No.
Q Let me ask again. Was your bankruptcy case filed before they were successful in liquidating your account?
A No.
Q No?
A They didn't liquidate it. They were able to lock it up.
Q Okay. They locked it up. But by the filing of your bankruptcy, did that stop them from completing their garnishment hearing in order to seize the funds?
A I can't get to them right now.
Q Are the funds still at Merrill?
A They still are.

Q If Huntington liquidates that account, would it trigger a substantial capital gain in which you will be liable?
A Yes.
Q And based upon your conversations with your financial professionals, approximately how much would that tax liability be?
A Between $3.5 and $4.5 million.
Q The bankruptcy was filed on the same day as the garnishment hearing, correct?
A Yeah. Yes.
Q All right. And that was only after settlement discussions failed, correct?
A Over ten, yes.
Q So, I would now like to talk about the other assets that you have accumulated over your life. So, I am going to direct you to what has been marked Exhibit 4 on your screen.
A Yes.
Q Do you want me to scroll through it? Are you familiar with this document?
A Very much.
Q Who prepared it?
A You and me.
Q And what is the title of this document?

A Asset Analysis of Raymond Schneider.
Q Now, let's start in the beginning. How many pieces of real estate do you personally own or have an interest in?
A Three.
Q Okay. It looks like the first one is Tiffany Ridge. Is this your personal residence?
A It is.
Q Is it titled in the name of Raymond Schneider?
A It is.
Q And is there a mortgage against that?
A Yes, there is.
Q And are you current on that mortgage?
A I am.
Q On here you -- the value of this property, according to this asset analysis, is $710,000. Have we had it appraised?
A No.
Q When is the last time it appraised?
A I don't know. I've been there for 37 years. I didn't need appraisal.
Q Do you think that's a fair value?
A Yes, I -- just from the neighbors and everything, yes.
Q Do you have a second piece of property in Vail,

Colorado?
A I do.
Q Have we had that property appraised yet?
A No.
Q Frankly, we haven't had time to get it appraised yet. Is that correct?
A Correct.
Q All right. You value it on this at 1.5 million. Vail's hot property right now. What do you think this property's worth?
A The value I put on it. It's just a -- it's a 50-year-old piece of property that we've had for 29 years.
Q Do you think the 1.5 is a fair value for it?
A I think so.
Q And it has a mortgage against it, correct?
A It does.
Q And is that with -- who's the lender?
A They've been selling it every year. Truist, I think.
Q And this analysis reflects approximately a $365,000 mortgage, correct?
A Yeah. Give or take, yeah.
Q Is that close?
A Yeah.

Q Okay. So, you think that property has at least $1 million of equity in it?
A Probably.
Q I mean, I added in some cost to sale and, you know, I added in some exemptions and some other things. Maine property. You value it at 2.7. How did you come up with that number?
A Just the neighborhood and what the cost to put it together.
Q And is there -- did you build that or did you buy it?
A I took an old house and remodeled it.
Q Okay. And you have a mortgage on that property?
A I do.
Q And you're current on that mortgage?
A Yes, sir.
Q And is that one piece of real estate owned jointly with your wife?
A Yes.
Q Okay. But you think the analysis of 2.7 is pretty close to value?
A Yeah. The economy's changing, but yes.
Q How many cars do you have titled in your name?
A I don't think any of them.
Q Do you have a kit car in your name?

A Oh, I do have a kit car. Yeah. That's probably in my name.
Q Okay. What kind of vehicle is that?
A It's a Volkswagen that looks like a '59 Porsche. It looks cute.
Q All right. Value? You estimated the value?
A Probably.
Q On this asset analysis sheet, does it reflect an IRA that you have?
A Yes.
Q Okay. How much money is in that IRA?
A $483,000.
Q Has it had more?
A Yes.
Q At its high point, approximately how much was in your IRA?
A Somewhere close to $2.5 million.
Q Okay. So, that's gone down by $2 million?
A No. It's part of my Merrill Lynch account. It's just I was able to offset taxes for a loss I had and I changed it into my Merrill Lynch account.
Q So, you rolled it out of your IRA into your Merrill account?
A Correct.
Q Okay. Did you give the money away to a third

party?
A No.
Q Okay. I'm now showing four different Merrill accounts totaling $25,741. Does that sound accurate to you?
A Yes.
Q All right. And at the time there was a margin of about $17 million on it?
A What is -- the end of the year? Yes.
Q And so, therefore, your Merrill account on a liquidation was, at the time this was prepared, approximately 8 million bucks plus?
A Two months ago, yes.
Q And so the tax number is a capital gain number. So, that wouldn't be paid if you liquidated your Merrill account. That would be an obligation at the end of the year when you file your taxes, correct?
A Yes.
Q And so had Huntington seized this account as they were trying to do and refused to stop, they would have been able to receive all of the funds and not have to pay the taxes. Is that correct?
A Yes.
Q All right. So, I have over 70 LLCs now. I mean, I'm positive the Court would not appreciate if I

went through every single different entity. So, let's focus on a couple of them in order to understand values and how they're being used on this asset analysis versus them being sold as ongoing entities, okay?
A Mm-hmm.
Q And so let's start with the one that's currently for sale. Is one of your properties on the market?
A Yes, it is.
Q And what is that property?
A It's a property I have in Northern Kentucky.
Q Okay. And so if I tell you -- all right. So, if I told you that there is a Kentucky LLC by the name of Northern Kentucky Assisted Living, LLC, does that sound accurate to you?
A Yes.
Q Okay. Now, you have a different name for this property, correct? What do you call this property?
A I prefer not to put it in the public domain, but it's called Ivy Knoll.
Q Okay. And so that is a nursing home. Is that correct? Or assisted living home.
A It's an independent assisted living for seniors.
Q Okay. And so as you were preparing your financial analysis, you and I were valuing things on a liquidation basis. Is that correct?

A Yes.
Q And so I was asking you at the time if you just had to sell the building, what was it worth? Is that the correct number that you used?
A It is.
Q Okay. And so what did you and I value this property at for a liquidation purpose?
A About $4.5 million.
Q Is that property on the market now?
A It is.
Q How long has it been on the market?
A Six months.
Q Do you have any offers at this time?
A No.
Q Is it a good market to sell these type of properties now?
A I had an offer and I put it back on the market back then. I had a half a dozen people looking. Right now I don't.
Q Okay. What was your -- when did you last have an offer?
A Back in -- last -- the -- somewhere in the summer of last year.
Q And how much was that for?
A $7.2 million.

Q Okay. So, were they just buying the property or were they also buying the operating entity?
A They were buying both.
Q They were buying both?
A Yes.
Q And so if this is sold as an operating entity, does it have a higher value than if the building is just sold empty?
A Yes.
Q So, I'm not a real estate developer. So, tell me a little bit about how the market is right now for these type of assets.
A Interest rates, if you're not aware, is hitting over 7 percent. They do it by a cap rate. It talks about value is really how the numbers work. It's a great property. I took it five years ago and turned it into a first class property. That's what I do. And I'm very proud of it. When I took it over, I had 36 residents. Today, I have just under 90. It's producing. If the times weren't today with the high interest rate, the cap rate would work and I would be able to get this thing off the -- you know, as a sale that I've been trying to do. And the purpose of the sale is to help some of my future expenses.
Q And to pay back -- and we have talked about

raising funds in order to pay back Huntington Bank. Is that correct?
A Correct.
Q All right. So, now. Okay. So, let's see. How do I go here? Let's go --
THE COURT: And just for the record, you were referring to Exhibit 48.
MR. GOERING: Oh. I'm so sorry, Judge.
THE COURT: Correct?
MR. GOERING: That was Exhibit 48.
THE COURT: Okay. Thank you.
BY MR. GOERING:
Q So, let's take -- so, you have a large portfolio of holdings. Is that correct?
A Yes.
Q Everyone has a favorite, except a parent. Which of your projects would be your -- and forgive the pun -- your pet project?
A They all are, but taking ones that are pretty hard to do are the more exciting ones. This particular one, if you want me to talk about it, I can.
Q Okay. And so I'd like to -- in front of you is what I call Exhibit 55. Is this a summary that you and I prepared together?
A Yes, it is.

Q And is this a liquidation analysis of the assets of an entity called Red Corner, LLC?
A I believe it is.
Q Okay. And so tell me where this is located and what you have at that location.
A So, it's on the corner of Ridge and Madison Road across from Crossroads Church. It used to be the Masonic Lodge. It sits on less than one acre. I was able to buy it in one day. Put it under contract and I had no idea what I was going to do with it and I wound up building 19 town homes on that property and they are 1,800 to 2,200 square feet. I can park 43 cars. It's right across from Oakley. And it was a fun project, because everybody said, you can't do it.
Q Now, one of your other assets is also Red Dog. Is that correct?
A Yes.
Q And so I alluded to this in my opening that you have built assets made up of different pet resorts. Is that correct?
A Yes.
Q Will you please tell the Court a little bit about the first one you opened, where it's located, and what you've grown this into?
A So, we've always had goldens. I had a trainer

who sold us our dog and she lived out in Mason and it was 18 miles to drive to her house and 18 miles back. Went on vacation, came back. It was 18 miles to her house and 18 miles back. I wound up buying the Oakley Drive-In. I thought, this is no different than the healthcare field. I take care of the resident. This one happens to have four legs.

We feed them, train them, educate them, do all kinds of things to keep them happy and using it for the family. I built this up and we opened Red Dog on the old Oakley Drive-In property. And since then, I have six Red Dogs, three in Cincinnati and three in Boston. And I've grown it to two animal hospitals in Boston and currently opening a new one in Blue Ash. It's fun because I've taken care of over three million guests and I love to see the person with the dog come in and walk out with a smile.

Q And so you have taken this concept and moved it to other states. Is that correct?

A Yes.

Q So, included in this multitude of LLCs you have interest in, there are similar locations in other states, correct?

A Yes.

Q Okay. So, where else are they located?

A Well, I had one in Atlanta, but unfortunately COVID shut us down. We survived COVID. Not so easy. Tried to keep our employees. We're in Boston. We have three locations currently and two animal hospitals, so.
Q In Boston?
A In Boston.
Q Okay. And how many in Cincinnati at this time?
A Three today and one's in the startup position and we're -- you want me to tell you where they're at?
Q That's okay.
A Okay.
Q Are you still in the process of developing more?
A We are. We just got approval or we're about to finish approval in Blue Ash for an additional one.
Q And as you develop these projects, does their value grow?
A In time they do because I oversee them and I'm very particular. I make sure that the operation is what someone would want if I was walking through the door.
Q Do you believe that if you had to sell all your assets and you were given an extended period of time to maximize their value that you would be able to secure over $30 million?
A I believe if I get the time. This is not the

right time. But over time I believe I've done that and I can do it again.
Q Is it your opinion today that you are currently solvent, i.e., that you have sufficient funds to pay all your debts in -- sufficient assets to pay all your debts in full?
A I do.
Q As I scroll through this list, there are multiple assets with zero value. Is that correct?
A Yes.
Q Are some of those zero values because they don't own any assets?
A Right.
Q Do you have multiple LLCs that counsel has advised you need do dissolve?
A I do.
Q Approximately how many current bank loans do you have outstanding for these LLCs?
A I'm going to guess, because I don't -- I think I have somewhere close to 35 to 40.
Q So, one of the documents that you have been drafting with me are bankruptcy schedules to be filed tomorrow, correct?
A Yes.
Q And in those bankruptcy schedules, we -- I've

advised that you need to truthfully and accurately list all of your assets as well as all your liabilities. Is that correct?
A Yes.
Q And is that a work in progress but will be completed by tomorrow?
A I'm hoping so.
Q All right. So, I want to talk to you now about the debts that are outstanding against your assets. So, let's start with Civista. So, we just had that one up. This is on Red Corner, correct?
A Correct.
Q And --
THE COURT: Exhibit?
MR. GOERING: 55.
THE COURT: 55. Thank you.
BY MR. GOERING:
Q Exhibit 55. This is a $7,200,000 loan, approximately, correct?
A Correct.
Q If I tell you your schedules actually say $7,208,000, does that sound correct?
A I'll take your word.
Q Okay. And if the loan has a -- the schedules list a date that you have incurred that debt on

February of 2021, does that sound accurate?
A Yes.
Q Okay. And so did you have this development in 2019?
A No, I don't think so.
Q Okay. But since the loan was in 2021 you had this entity, correct?
A It got finished in the summer of '21.
Q Okay.
A Actually, the summer of '22.
Q All right. I'd now like to direct you to -- oh, boy. All right. Okay. So, now I would like to direct your attention to Exhibit 44. Do you recognize this document?
A Yes.
Q Okay. What is the name of this entity?
A The real estate is Mason RD, LLC.
Q And who owns this entity?
A Mason RD, LLC.
Q Okay. And is there a loan against that?
A There is.
Q And is it with Civista?
A Yes.
Q And was this mortgage filed on May 9 of 2019, to the best of your knowledge?

A Pretty close, yes.
Q All right. And do you owe Civista about $2.3 million?
A Somewhere close to that.
Q What is this?
A It's Red Dog Mason near Kings Island.
Q Is it an operating entity?
A Yes, it is.
Q Does it have a long-term tenant in it?
A Yes.
Q The value of $2.5 million on this asset, is that the liquidation value of the property?
A Yes.
Q Would the value of this property be substantially higher if the tenant is still in there operating and paying monthly rent?
A It would.
Q Did you personally guarantee this loan to Civista?
A I did.
Q Did you personally guarantee the loan to Civista on Red Corner?
A I did.
Q All right. So, since we're doing Civista, let's go to what I have marked as Exhibit 10. Do you

recognize this document?
A I do.
Q Which entity is this?
A It's the land in Blue Ash that used to be Ringo Lanes.
Q And what is the name of the entity, for the record?
A 9617 Kenwood Road Development.
Q And that's Exhibit 10. Correct?
A Yes.
Q And what is your ownership interest in this entity?
A 9617 owns it and I guaranteed it.
Q Okay. And does Civista have the loan on this?
A They do.
Q How many loans does Civista have?
A With me? Oh, on that property. There's an adjacent piece. And I think there might have been a different parcel, but it's two or three.
Q Okay. And when did you -- do you recall when you purchased this property?
A Yeah. Two and a half years ago.
Q Okay. And so did you own this property in 2019, to the best of your recollection?
A I don't think so. No, I didn't.

Q Okay.
A I can tell you by my wife's birthday.
Q All right.
A Because that's how --
Q All right. Well, we'll hold that off. When -- have you developed this property yet?
A No, I haven't.
Q Okay. Did you take down any buildings on it or you just purchased it?
A There were 24 bowling lanes that were active when I bought it and I took it down about four months ago.
Q Did you sell the bowling lanes?
A I sold a couple parts, but it never even had a computer. It was that old.
Q So, last bowling alley that I shut down, they sold the bowling lanes for bar counters just so you know of in the future.
A Just to let you know, I put them in my storage so that I can do it later.
Q All right. So, Civista. Those are your loans with Civista, correct?
A Correct, yes.
Q And where is Civista located?
A They have branches here, but they're in a small

town north of Cincinnati.
Q And prior to the filing of your Chapter 11 and after the filing of your Chapter 11, did I advise you to contact your lenders regarding the potential filing and the ramifications of your personal Chapter 11 if it was necessary?
A I went to all my lenders beforehand. I told them about what was going on with Huntington two years ago and I told them things were going to change. I told them that I got a summary judgment against me and then I informed them when I did the Chapter 11. Civista wrote me a letter yesterday. They have no interest in having me be managed by someone else.
MR. SCHUELLER: Objection. Hearsay.
THE COURT: Thoughts, Mr. Goering?
MR. GOERING: I have a letter, Judge, that I can present to the Debtor at this time if that's --
THE COURT: Do we have the -- I mean, how are you going to authenticate the letter?
MR. GOERING: I'll withdraw the question, Judge.
THE COURT: Thank you.
THE WITNESS: They all had to hire lawyers and he couldn't get a lawyer in time, but he wrote me the letter because he's the guy I work with. And the

other banks that I've had --

BY MR. GOERING:

Q All right. Well, we'll get to there, Mr. Schneider.

A Okay.

Q So, that covers Civista, correct?

A Yes.

Q All right. So, you've also had --

MR. GOERING: And I'm not going to go through each of these, Judge. We'll be here for -- until tomorrow. So, let me try to hit the highlights. And the highlights I'm going to make over a $5 million loan.

BY MR. GOERING:

Q So, do you have a loan with First Merchants Bank?

A I do.

Q Okay. And what is the name of that entity?

A Circle Storage.

Q Okay. And how much do you owe them?

A $38 million.

Q All right. And is that entity owned by Grasshopper?

A The owner is Grasshopper Investments.

Q Okay. And how many different properties are

owned by Circle Storage?
A Eight addresses, but there's probably 13 or 14 properties.
Q Okay. And just to be clear, we're going to spend some time on this. You have testified that it's owned by a company called Grasshopper?
A Correct.
THE COURT: And we're referring to Exhibit?
MR. GOERING: Oh, Judge. So, so, sorry.
THE COURT: Okay.
BY MR. GOERING:
Q So, I'm sorry, in front of you is Exhibit 30. Do you recognize this document?
A I do.
Q Is this a summary of the assets of Circle Storage Operating Company?
A They are.
Q And is that entity owned by -- is the only member of that LLC a different LLC?
A Besides Grasshopper?
Q No, Grasshopper.
A Yeah. Grasshopper.
Q That -- Grasshopper is the owner of this entity.
A Correct.
Q Correct?

A Yeah.
Q And we're going to get to your estate planning here in a minute. So, let's just clarify. Was this part of some estate planning work?
A Yes, it was.
Q Okay. And so -- and the debt in that entity is with First Merchants, correct?
A Correct.
Q All right. GE Credit Union is here today. In front of you is Exhibit 37, what's titled Hyde Park Circle, LLC. Will you tell us a little bit about this asset?
A It's located in Madisonville. It's my first Red Dog. And it's seven acres and a 28,000 square foot pet resort called Red Dog Pet Resort and Spa.
Q Okay. And so my wife and I like to eat at Mazunte. Is that the -- is that --
A That's also ours. Yes. We own the building. I don't --
Q Okay.
A I don't -- sorry.
Q Okay. We. Who is we?
A Actually, it's not we. It's -- I forget the title, who owns that.
Q Does Hyde Park Circle own that or does Hyde Park

Circle only own the Red Dog building?
A I'm going to apologize. I don't remember.
Q Okay.
A The title. I don't own it personally.
Q Is the loan to Kemba on the strip?
A Kemba is down the street, yes. It's a small house.
Q That's a different property.
A That's a different property.
Q All right. But those -- Exhibit 37, Hyde Park Circle in front. It owns multiple properties.
A Correct.
Q Is that correct?
A Yes.
Q And are you 100 percent owner of this LLC?
A The LLC owns it. I'm a guarantor.
Q Are you 100 percent owner of the LLC?
A Yes.
Q Okay. And the $4.5 million value, is that just the building, empty?
A Pretty much.
Q Okay. But you have a tenant in there, correct?
A Yes.
Q And the tenant is Red Dog?
A Correct.

Q Is Red Dog cash flowing?
A Absolutely.
Q Okay. It's --
A Yes.
Q -- doing very well. Am I correct?
A I'm very happy with it.
Q Okay. And so the value of this property would actually be substantially more than $4.5 million, wouldn't it?
A Yep.
Q Do you have any idea what it's worth or would I need to use cap rates with the tenant in order to come up with an estimated value?
A You would have to do cap rates and then find the right person who can deal with the problems that are there.
Q Well, you always have to -- it's worth what someone will pay for you.
A Exactly.
Q Correct?
A Yep.
Q Do you have any idea of what this is worth with Red Dog located in it?
A I have to look at the bottom line, because that's -- you know, that's the value.

Q Now, if we weren't here on an expedited basis, we would have had time to do these things, correct?
A Yes.
Q Okay.
A We just didn't have time.
Q All right. And are you current on your payments with GE Credit Union?
A Yes.
Q And that loan was dated 2016, is that correct?
A Yes.
Q Heritage was here today. They have three different business loans. Is that correct?
A Yes.
Q One on Teakwood Circle, Exhibit -- I put them in alphabetical order for a reason. Teakwood Circle, Exhibit 69. This represents a property on Teakwood. I'm sorry. In front of you, Mr. Schneider, is Exhibit 69. Will you please identify this exhibit?
A It's an old Applebee's and the owner is Teakwood Circle.
Q And is there anything located in there at this time?
A An abandoned Applebee's.
Q Is it being developed?
A If I get permission from Blue Ash next week, it

will become a Red Dog.
Q Okay. And do you recall when you bought this land?
A Two years ago? Yeah.
Q Okay.
A I don't know the date, but I did.
Q Prior to 2019 or after 2019?
A After 2019.
Q All right. I'd like to direct your attention to Exhibit 71. Is this a summary of an entity called The Gatherings of Blue Ash?
A Yes, it is.
Q And is there a debt to Heritage on that, too?
A Correct.
Q Do you recall when you purchased that building?
A Two and a half, three years ago, I think. Somewhere in there.
Q All right. And what -- so, did you own it in 2019?
A No.
Q But you own it now?
A Correct.
Q All right. Did you personally guarantee this loan?
A Yes.

Q I'd like to direct your attention to Exhibit 12, Boston Red Dog, LLC. This owns the location in Boston. Is that correct?
A Yes.
Q There's a loan to Rockland Trust.
A Yes.
Q Is the $8.1 million value based upon a liquidation of the property vacant?
A Yes.
Q Is it worth substantially more with a operating company inside?
A Yes.
Q And so, let's talk about 2 Life LTD, Exhibit 73. Do you recognize this document?
A Yes.
Q Okay. What is the building on Herringbone Drive?
A It's a three building with parking structure of apartments called the RED.
Q Okay. And is the RED mostly full?
A I'd say 100 percent is full.
Q All right.
A That's what it is.
Q And do you currently own 80 Class A shares of this entity?

A I do.
Q And so this leads me now into my next area of questioning. At any point in time did you retain counsel to help you with estate planning?
A I did.
Q If I advised that you retained a law firm of -- what is the name? Strike that. What is the name of the law firm that you retained?
A Vorys Sater.
Q And when did you first retain them in order to start working on your estate planning?
A 4/16 of '18, 2018.
Q Okay. And you seemed to come up with that date pretty quickly. Have you gone back to confirm when they started billing you?
A There's a lot to collect. I went and called the attorney and got my billing and I found it today, so that's how I know the exact date.
Q Okay. And so what was going on in your world in 2018 that would bring you to retain estate planning counsel?
A All my friends are retiring. I'm hitting 70 years old. And I realized that it's time to do estate planning and I reached out to the law firm with Emily Pan, who's an expert. And we spent the next two years,

two and a half years, putting my estate, which is pretty complicated and took a lot of time. And we completed it in 2020.
Q And as part of the estate planning, was -- or did it involve multiple gift trusts?
A I gave in my gift trust to my children and my wife and my grandchildren the opportunity.
Q And were there appraisals conducted during this time period of these business entities?
A In 2019, they all got appraised and was part of the estate planning.
Q Do you recall how much it cost in order to value your entities?
A Unfortunately, yes. It was about $300,000.
Q So, I need to understand that. As part of the estate planning, you need valuations for the IRS. Is that correct? And so starting in 2018, you were working on your estate planning and in order to move assets throughout different trusts, you had to have a formal appraisal. Is that correct?
A That was part of the process.
Q Okay. And how much did it cost?
A Too much. $300,000.
Q Per?
A No. For everything between all the experts.

Q Okay. And so --

MR. GOERING: Bear with me, Judge. I'm --

THE COURT: That's fine.

MR. GOERING: You didn't file it as an exhibit, did you, Chris? It was attached to your pleading and not your --

MR. SCHUELLER: No. It was an exhibit.

MR. GOERING: Is it?

MR. SCHUELLER: J.

MR. GOERING: Here it is. Sorry, Judge.

BY MR. GOERING:

Q Okay. Mr. Schneider, to shorten this up, I'd like to present to you what is titled Creditor Exhibit J. Okay? Do you recognize this document?

A Yes.

Q Did you and I happen to have a meeting with your estate planning lawyer prior to me flying to DC to meet with creditor counsel?

A You did.

Q Did we spend a substantial amount of time with her trying to understand the complexities of estate planning?

A I know you walked out confused, but yes.

Q Okay. And so I would like to -- so, I'd like you to look through this summary, okay? Now, this is a

document I prepared, correct?
A Yes.
Q Okay. Is this a fair reflection to the best of your knowledge of the estate planning in which you retained Vorys for in 2018 to complete?
A Yes.
Q Okay. And do you still maintain an interest in some of these entities?
A I do.
Q And, in fact, if I go back to Exhibit 73, 2 Life, it reflects that you own 80 Class A shares. Is that correct?
A Yes.
Q Okay. And do you -- is that a majority of the voting shares on that entity still?
A Yes.
Q Now, what do you think the building is worth in this case? If I asked you the value of just the real estate, what would you tell me?
A Somewhere close to the $45, $50 million dollar range.
Q Okay. That's what is -- does Transamerica have a mortgage on that?
A They do.
Q Okay. And what was the date of that mortgage?

A 1/2/19.
Q And were you developing this property at the time?
A I was.
Q Okay. And so in 2019, was it complete and full and operating or you were just starting development?
A I got the first building completed the end of '18. And so there was really fill up going on at the time, so it didn't have its true value yet. And then we finished the second building on March of 2020 in the middle of COVID and we finished the third building November of 2020 and COVID was not our friend.
Q And so if I tried to take a picture in time of your financial situation in 2018, 2019, 2021, it's constantly changing. Is that correct?
A Yep.
Q And so values are going up and down depending where you are in your development.
A Yes.
Q And where you are in securing loans for these projects.
A Correct.
Q Was there a time that this project was worth less than the $45 million you owed on it?
A Absolutely.

Q Okay. But now do you think it's worth substantially more?
A It is, because it's put together right.
Q Now, you just testified you think the building alone is worth about $50 million. Is that correct?
A Yes.
Q Okay. The entity that you retained to value this company for estate planning purposes seemed to think that it had a lot more equity than you did on a liquidation. Is that correct?
A Yes.
Q And so is it correct that for estate planning purposes, a valuation was done on this property saying that it was worth approximately $10 million?
A Yes.
Q And so if we equate that analysis to all your other real estate holdings, they are worth substantially more than just the liquidation value, correct?
A Yes.
Q And so, is it with that analysis that we have reached the conclusion that your assets aren't just worth $26 million, but your assets are worth substantially more than that?
A Correct.

Q Okay. Because if we just set aside the corporations --
(Alarm ringing)
MR. GOERING: Am I done?
THE COURT: It wasn't me.
MR. GOERING: You shut me up. Is that the buzzer, Judge?
THE COURT: I will point out that clock is still on the wrong time.
MR. GOERING: Yeah, unfortunately, I noticed that.
THE COURT: So, don't use that as our guide.
BY MR. GOERING:
Q All right. So, let's go back here. And so if we run your asset value, we say $8.7 million in Merrill, correct?
A Yes.
THE COURT: Okay. And we're going back to --
MR. GOERING: We're going --
THE COURT: Sorry.
BY MR. GOERING:
Q I'd like you to look at Exhibit 4 please, again.
A Yes.
Q Your assets, if we look at $1 million in Vail and if we remove -- you know, we can just remove your

exemption on the house. That's 320, so we're at $1.3. And then your brokerage account of $8.6. Your assets, without accounting for any of the entities, are worth at least $10 million. Is that correct?
A Yes.
Q And with all the other assets that we've now been reviewing, are you comfortable that you're worth in excess of $26 million?
A Yes.
Q When you started your estate planning in 2018, had you heard from Huntington Bank?
A No.
Q To the best of your knowledge, was their loan performing?
A I don't know. They never talk to me.
Q As you -- as 2019 progressed when you were securing valuations and working on your estate planning, did you hear from Huntington Bank during that time?
A Same answer. They never talk to me.
Q To the best of your knowledge, was their loan performing at the time?
A No one said anything. My partner would send me my checks and I saw the accounting and it seemed okay.
Q So, to the best of your knowledge, was the

estate planning done in 2018 and 2019 with 2020 just being where certain transfers were effectuated based upon a complex estate plan where they had to wait some time to do transfers?
A That, and it's a lot of paperwork and it took till that much time to do it.
Q Did you transfer these assets into these trusts in order to avoid payment to Huntington Bank?
A Absolutely not.
Q Did you even know Huntington Bank was hanging out there?
A No.
Q And no time in 2019 as they're battling with Mr. Sosna did they bring you in and up to speed?
A I knew nothing.
Q What other assets have you transferred out of your name, Mr. Schneider?
A Two assets that weren't in my name, but I was the guarantor. One was in Atlanta, and that was due to COVID putting the business out. And we had it up for sale and a buyer for two years and it finally closed. And then I had a -- the RED Corner had the house near it. Was the construction trailer. And I had no more use for it, so I sold that about six to eight months ago.

Q I'd like to direct your attention to what is marked Exhibit 1. Do you recognize this document?
A Seen so many. Yes.
Q Is this a copy of an affidavit that was filed in the litigation titled S&T Bank v. Social Row?
A Yes.
Q What was Social Row?
A It was a property that my partner had outside of Columbus.
Q Did you own an interest in that?
A I never knew anything about it until I read it here.
Q What was the basis -- have you had an opportunity to read this affidavit?
A I've read them all now.
Q Okay.
A Yes.
Q And so give me a quick one minute summary of what this affidavit says, in your opinion.
A I can do it hopefully in a minute. As I read all these documents, apparently, my partner got involved in a bad kiting scheme, and five banks were involved. S&T had lent, for this Social Row, some money to purchase it and when he was hurting he started kiting. Huntington was the first to be observant of

it. After five months, they kicked him out of the bank.

Had they stopped it, there would be -- $110 million right now wouldn't be fighting between four banks. This bank lent Harold money during the kiting and then in May he took out $58 million and they're suing the local banks and some MCAs, which are money launderers or my version of the mafia.

Q Merchant Cash Advances, correct?

A Right. There's 49 of them. And so S&T has done some forensic and now I understand where the money is. I can understand what happened. And Huntington had the obligation to cancel this and they didn't. They knew about it and instead of stopping the kiting, they sent it off to someone else.

Q All right. Let me stop you there. Look at the affidavit. When does it say Mr. Sosna started his check kiting scheme?

A It's October of 2019.

Q Okay. Read the first sentence of number 18 of this affidavit?

A "Both Huntington and First Financial Bank gave me access to a one-day float." This is not me. This is Harold. "On my accounts, meaning that I could deposit money into my accounts and then immediately

access those deposited funds. Both Huntington and First Financial charged me a fee for the use of this float. S&T --"
Q That -- that's enough for now.
A All right.
Q Is it your understanding that Mr. Sosna was using multiple bank accounts, including Huntington Bank, as part of his check kiting scheme?
A As I read, there's probably 16 to 18 accounts he did this with.
Q Okay. And were you aware of any of this?
A Absolutely not.
Q Okay. So, let's go to February of 2020. Will you read line 26 under the heading, Huntington Discovers the Kite.
A "On February 25, 2020, I met with Huntington and its attorneys. During that meeting, Huntington told me they knew I was creating float in my accounts and told me they were declaring me in default and freezing my Premier accounts." Do you want me to go on?
Q The next sentence.
A "That same day, Huntington sent me a letter memorializing the meeting."
Q All right. We will get to that letter. And then, I'm sorry, go ahead with the next sentence.

A "A true and accurate copy of this letter is attached to this affidavit as Exhibit A. In the letter, Huntington explained that it was freezing," his accounts, "due to manipulation of funds availability by Premier. Huntington also required that I move all of my accounts to another financial institution by no later than April 15 of 2020 and threatened to close all these accounts if I failed to do so."

Q All right. Line 28.

A "On March 24, 2020, Huntington sent another letter accusing me of improper manipulation of funds availability or involvement of millions of dollars over a period of months. A true and accurate copy of this letter is attached to this affidavit, Exhibit B." You want me to keep going?

Q Please.

A At the time, Huntington declared his loan in default. The balance was more than $70 million. Huntington and First Financial were a syndication of co-lenders on this loan. When Huntington declared this loan in default, it froze the accounts I held -- he held at the bank, forcing him to begin to use other accounts to keep the kiting going.

Q All right. So, let's just go -- so, after Huntington asked him to take his crime to other banks,

is it your understanding that Huntington -- that Mr. Sosna moved the accounts to GE Credit Union?
A Not at first. It was another letter.
Q Okay.
A He moved it the following month, because they reminded him with another letter. Their workout guy wrote another letter to him that says, if you don't get it out by April 15, we're going to seize all your accounts. And so they wiped their hands of their problem, gave it to someone else, and now the courts are fighting over $110 million.
Q Will you read line 32, please?
A "In mid-May, 2020, I began," he began, "to use the accounts at GE Credit Union in the kite for the first time. The kite continued for only a few more days until it finally collapsed. However, even in that short period of time, I was able," he was able "to create an overdraft of more than $9 million in my" in his "various GE Credit Union accounts. Further" --
Q Nope.
A Oh.
Q That's enough.
A Sorry.
Q Is it your understanding that after he left Huntington Bank, he moved his scheme to GE Credit Union

and they suffered a loss?
A GE --
Q Credit Union.
A First Financial, S&T and I'm not sure when Fifth Third got out of the picture.
Q So, I would like to direct your attention now to what is marked Exhibit 74. Have you seen this document?
A Not really.
Q Okay. What is the title of this cause of action?
A Oh, I think I know this document. The Huntington National Bank, Plaintiff v. General Electric Credit Union, Defendant.
Q So, is this a case where Huntington Bank is suing GE Credit Union for some reason?
A If this is correct, this is the $17 million. Because when he moved his kiting scheme and all of his money and assets, he moved it over to GE and then when the kiting got stopped, Huntington wanted more of their money that they lost and so they sued GE for $17 million.
Q All right. And is this a copy of the response of GE Credit Union to the claims of Huntington Bank? It's an answer and counterclaim, correct?

A So, I have not read the answer, but I know there's a problem. That it was a $17 million lawsuit. GE took money to cover Harold's loans that I had nothing to do with and then they had a handshake on a settlement that I know nothing about, because it was kept silent.
Q Is Mr. Sosna still in jail?
A He is. Well, I don't know. I don't know. I haven't talked to him or seen him in four years.
Q All right. Did -- is it your understanding that in this litigation that GE Credit Union and Huntington Bank were litigating their issues as to funds owed to each other?
A That was my understanding what it was about.
Q All right. So, I would like to just direct you to -- and this cites same letters as before, so we'll get to those here in a minute. Would you read line 171, please.
A "The same day, Huntington sent a letter memorializing the meeting, a true and accurate copy of which is attached Exhibit A. In the letter, Huntington explained that it was freezing the accounts due to manipulation of funds' availability, which means kiting checks. Huntington also required that Sosna move his deposit accounts to another financial institution by

April 15 and threatened to close all the accounts if he failed to do so."
Q And then line 173 has an actual quote in it with an exhibit attached talking about how Huntington sent Sosna that letter saying they had knowledge of improper manipulation of funds available involving millions of dollars over a couple of months. Is that correct?
A Yes.
Q So, this is now two different lawsuits in places where both the affidavit which was part of that lawsuit and a lawsuit when Huntington is suing GE Credit Union where the parties have brought up two exhibits from Huntington Bank talking about manipulation of funds. Is that correct?
A Yes.
Q So, let's take a look at those exhibits. So, Exhibit 2 is -- and will you please identify Exhibit 2?
A It's the letter, I believe, that Huntington sent to him to acknowledge the kiting.
Q Who is him?
A Mr. Sosna, Harold Sosna.
Q All right. And who signed this letter?
A David Wechter.
Q What's his title?
A Senior Vice President.

Q Have you ever met Mr. Wechter?
A Absolutely not.
Q Is your name cc'd on the bottom of this letter?
A I don't see it.
Q Do you -- did you -- were you aware at the time of any of these issues transpiring between Mr. Sosna and Huntington Bank?
A I found out about all this about the last three months. None of this was presented to me and through all the lawsuits, that's how I've seen this.
Q And just so we don't have to sit and read the whole letter, is this letter talking about funds in his bank account and issues that had come up between the parties?
A It referred to not having enough money in the funds, and that's the basis of kiting.
Q And does this talk about a manipulation of funds available to the company?
A It does reference that.
Q I would now like to refer you to Exhibit 3. Is this a letter from Huntington Bank? Please identify this document.
A Oh. This is the follow up when Huntington couldn't get his attention and said, you got to get the heck out of here. And they wrote that they're stopping

the float and that he needs to get out of there or in April they will abscond all of his assets in the bank.
Q And what is the date of this letter?
A March 24, 2020.
Q Are you copied on the bottom of this letter?
A I still don't see my name.
Q Were you made aware of this letter?
A Only in the last two months.
Q And there's some interesting language used in this that is quoted throughout my pleadings and, surprisingly, also throughout GE Credit Union's pleadings. And so will you just read the paragraph starting, "As I advised."
A "As I advised you at our meeting on February 26, 2020 and by follow-up letter the same day, the bank had ceased providing the company with ZBA services due to the improper manipulation of funds availability by the company. The improper conduct involving millions of dollars over a period of months. On February 26, 2020, I further advised you that because of this activity, the bank was requiring that the company move all of its deposit accounts to another institution no later than April 15, 2020. This letter is a reminder of this requirement. Should the accounts not be moved by this date, the bank reserves the right to close all deposit

accounts, services for the various related companies as of April 15, 2020."
Q So, is it your understanding pursuant to this letter that Mr. Sosna had funds on deposit at Huntington Bank?
A I knew he had them there when he got the loan, yes.
Q All right. Have you ever heard of what's called a setoff?
A I've heard of it.
Q Is it a bank's right to seize money in an account for a client who owes them money?
A I believe they have the right in their documents.
Q Okay. And so if I told you that if Sosna was in default on loans to Huntington Bank, they could have just seized all of his money and applied it to the account. Correct?
A Yeah. That's what they usually do.
Q Okay. Is that what this says they're doing?
A I think they were wiping their hands of a problem that they had and gave it to somebody else.
Q And so in other words, they're saying, take the money that's in our bank that we could setoff to decrease the liability and just take it somewhere else.

Is that correct?
A Absolutely.
Q Did they ask you your opinion?
A Never talked to them in four years.
Q But they're trying to hold you liable for the debt?
A Absolutely.
Q So, Mr. Sosna took his scheme to other banks, correct?
A Yep.
Q Okay. So, you brought up a term earlier, MCAs. Do you know what that stands for?
A Not until I read this.
Q Okay. Well, so, as a bankruptcy lawyer, couple years ago when individuals were having financial problems, they would go to check cashing places and they would take an advance on a check before they came so that they had the money and then that just caused a domino effect and then they come see the bankruptcy lawyers, okay? I wouldn't call that job security, but it certainly does -- has been an unbelievable amount of issues for my clients. So, over the last few years, if I told you these merchant cash advances have started to grow, does that -- do you understand that term?
A I do.

Q Okay. And to the best of your knowledge, is a merchant cash advance a business loan where they lend you money and then do daily ACHs to take the funds out of the account to pay on the loan?
A I learned all this from all the pleadings in the court cases. I did not know that.
Q You're a successful businessman. Do you get these checks in the mail all the time?
A I wouldn't want to touch them.
Q Okay. But you've seen the solicitations from Kabbage and these other entities, correct?
A Yeah. But I'm smart enough not to get there.
Q And so, I'd like you to take a look at what I've marked Exhibit 75. And so, just to remind you where we are at a point in time, okay? That 2019 has passed. You've done your estate planning. We are now in the beginning of 2020. Huntington has identified the fraud but has done nothing about it except kicked him out of the bank and Mr. Sosna is looking to raise money elsewhere. Does that sound correct?
A Correct.
Q Okay. And so, I have taken pages out of this, because this is a 90 page document.
MR. GOERING: And, Judge, I'm happy to supplement the record if you really want to read 90

more pages.

BY MR. GOERING:

Q But I took out the pertinent parts to reflect Mr. Sosna's action. And if you look on the screen, I'm just scrolling through. Can you even count how many MCA lenders that Mr. Sosna went to to secure money?

A I counted them. There's 49.

Q Okay. And let's take a look at the dates on these. So, he started a few in 2019. Date of loan. Do you see that on the right column?

A Yep.

Q 2019, 2020 there's some -- a lot -- starts to get busier. 2020, then we're in February of 2020. Now, what does the letter from Huntington -- well, that was dated February of 2020, correct? And March of 2020.

A On the 25th and the 24th.

Q Okay. And so what I'm trying to understand is how many MCA loans did he take out and pay back excessive amounts on after Huntington was aware of the problem and failed to protect you in calling the scheme a check kiting. So, let's just look. February, February. So, you can just scroll through. What's the one on March 5? How much did he borrow?

A $1,050,000.

Q And the next column, what is that number?
A It's what they took back.
Q How much is it?
A That one's $1,680,000.
Q So, in other words, because Mr. Sosna was able to take his scheme elsewhere, just on this one loan, are you saying that he spent $680,000 that could have been potentially used to pay down Huntington's debt?
A That's what I found to be the case.
Q Do you have -- oh, here's a $2 million one. And how much did he pay? March 25. Is that the same date? Let's see. Let's go back.
A No. It was March 24.
Q Oh, March 24.

MR. GOERING: I'm back on Exhibit 3, Judge.

BY MR. GOERING:
Q So, let's go back to Exhibit 75. So, on Exhibit 3, the bank said, you're manipulating funds. Take your scheme elsewhere. And on March 25, the next day, how much did he borrow?
A He borrowed $2 million and took back $3.2.
Q An excessive amount of money went in and out of Mr. Sosna's account over a short period of time. Correct?
A Absolutely.

Q And instead of those funds being used to repay Huntington Bank on a loan that you guaranteed, it went elsewhere. Is that correct?
A Yes.
Q Did the bank notify you of any of this?
A Absolutely not.
Q So, now I would like to talk about your personal financial statements. The bank has and they're about to ask you a lot of questions regarding these statements and the information that's in them and so I would like to address those now. So, let's start in time.

MR. GOERING: If you'll bear with me, Judge, and give me a moment. I've got about 80 things open here.

BY MR. GOERING:
Q All right. I would like to direct your attention to what is marked Exhibit L, Creditor Exhibit L. Do you recognize this document?
A I do.
Q What is the date of this document?
A 1/25/2018.
Q And what is the title of this document?
A It's my personal financial. I gave it to Capital Point.

Q Is that who it says confidential to?
A It does.
Q And who is Capital Point? Do you recall?
A Harold hired a broker out of Cleveland and I think that's their name.
Q Did you have an accountant prepare this?
A I did not.
Q Did you prepare this yourself?
A I did.
Q And so, this -- all three of these documents are -- look very similar. So, did you have a program that did this or you had an Excel spreadsheet? Tell -- how did you prepare this?
A I've been doing this for 30 years. It's the exact same program and personal financial and I update it according to the date that I put on it.
Q Okay. So, let's talk through this. How much cash on hand at the time?
A I think that's $650.
Q And how many more -- how much --
A Or $850, whatever.
Q -- in marketable securities? Would that be your Merrill Lynch account?
A No. It was assets totaling that. It's on another page and it all comes to the front.

Q All right. So, all of the summaries on this sheet are broken down in the following pages, correct?
A Yes.
Q And so in 2018, what was the total of your assets according to this document?
A Approximately $121 million.
Q And what were your liabilities at the time?
A Approximately $65.
Q Okay. Now, as -- let's go to page two, marketable securities in the name of RBS. Is that you?
A It is.
Q Okay. And, description. What did you write here?
A They're various stocks and bonds.
Q Okay. And what does this show your stock was worth at the time?
A $16.8.
Q And below, it says, "Merrill Lynch loan."
A But it says, "liquidity beyond pledge," so, that --
Q Understand.
A Yes.
Q But underneath that is something called, "Merrill Lynch loan." Does that represent your --
A It's my --

Q -- margin?
A -- LMA, yes.
Q Okay. So, at the time, your brokerage account was worth $6 million. Is that correct?
A Pretty much.
Q Okay. And that's reflected back on page one under "marketable securities," correct?
A Correct.
Q Now, on this document, it now says, "non-marketable securities." What is that in your -- how did you -- what does that term mean to you, Mr. Schneider?
A My securities would be sold in a day or two. Non-marketable, it's got a value down the road.
Q Okay. And there's a term, "are these pledged?" Some say yes, some said no. Do you know what that means, or?
A They usually have a loan against them.
Q Okay. And so the first asset on this list. So, it says, "description." Now, right, to make my life easier, when it asked for a description, you could have put the name of the LLC, okay?
A Sorry.
Q But I understand this isn't about me, so, when you put "description," what are you referring to?

A I'm looking at what I referred to and if it's got a question, I'll get a banker to ask me, but it's a piece of land near the RED but, you know, that's the value of that.
Q Okay, well --
A Well, no, this one's Eastgate. Yep.
Q Okay. Do you know because that's EG? Is that correct?
A Oh, yeah. That's why I figured it out.
Q Okay. Do you know what name that property is in?
A It's Eastgate. It used to be Circle Storage, and the state took it and it's called -- it's basically a residual of Circle Storage.
Q Okay. So, what happened to that property?
A It's still there. It just happens to be land and a leftover storage unit.
Q Okay. You said something about the state took.
A It used to be a full-service self-storage, and by eminent domain, the state took it. It's on the corner of 32 and 275 and so all they've got left is a piece of land value.
Q And so back in 2018, what did you value this property at?
A It says $1.5 or $1.6. I can't read it.

Q Okay. Was it paid off? Is there any debt against it?
A At that time, no. I don't think so.
Q Okay. And so you just said that the state took it by eminent domain. Did they take the whole property or a good portion of it?
A They took half the property and all my real estate.
Q Okay.
A My buildings.
Q How much did they pay you?
A Not what they wanted to. I think they paid me $1.4, $1.5.
Q Okay. And do you recall what you did with the money?
A I reinvested in the business.
Q Okay. So, when the bank is up here saying, you committed fraud, it appears on one and doesn't appear on the other, that's because you didn't have it anymore. Is that correct?
A Yes.
Q Okay. And so all the way down, "market value." Are you putting in here what you think the entity is worth at the time?
A I believe so, yes.

Q Okay. And even -- and so is it your -- now, I could equate some of these with other entities such as you have listed on here Ivy Knoll. Okay. You own 100 percent of that you claim, correct? Now, if I go back to Exhibit -- I go back to --
A When before that?
Q I go back and refer you to what is marked Exhibit 48. Is that Ivy Knoll?
A It is.
Q Okay. And so on Exhibit 48, you own the building and it has debt against it, correct?
A Yes.
Q And that's the one that is currently for sale, correct?
A Correct.
Q And how much is it for sale for?
A I've asked $7 to see if I can get it.
Q And so on this financial statement when you value your assets at $5 million, you believe that that is the value of the property as it sits, correct?
A I believe this was in '18.
Q In '18. That's what you thought it was worth at the time, correct?
A It was. I was still fixing it up.
Q Okay. And so now let's go to the second part,

Schedule C. What does this reflect?
A These are partial interest in some of the real estate I'm involved in.
Q Okay. And once again, title in the name of?
A Each of the entities.
Q So, let's just pick one, HRM Realty. Do you know what is that entity?
A It's -- I'm a third partner and that one --
Q All right. I'd refer you to Exhibit 36. Will you please --
A It's a four-family.
Q Will you please describe for the Court what the name of this entity is?
A HRM Realty Holdings.
Q And are you one of three owners?
A I am.
Q Is there a right of first refusal in the operating agreement?
A There is.
Q Is that a piece of property on Galbraith Road?
A Correct.
Q Do you think it's worth a couple hundred thousand dollars?
A I think that was '18. It might not be that much more today.

Q Okay. And so -- I mean, I could go through all of these with you but when you filled out this financial statement in 2018, did you do it to the best of your knowledge and ability?
A I did.
Q And did you make full effort to disclose all of your complex assets and all of your complex debts?
A I did.
Q Schedule D only shows two pieces of real estate. I thought you owned three pieces, Ray.
A Not at that time.
Q Okay. That's because you didn't own the Maine property at that time, correct?
A I did not. I did not.
Q Okay. And you had some life insurance at the time, correct?
A I did.
Q Okay. And, you know, just -- and so, then you list the banks who you owe money to. Is that correct?
A Correct.
Q 2018, you show -- I don't see Huntington Bank on here. Did you owe a Huntington Bank in 2018?
A I did. But if you go up one more, the assets's right -- where is the asset. I did on there, 54 various.

Q Uh-huh.
A That's Huntington.
Q I thought you didn't have a loan with Huntington.
A Oh, that's -- what's -- '18?
Q Yes.
A That was Fifth Third.
Q Okay. So, you give an accurate depiction here of your debt to Fifth Third on this.
A In '18.
Q Do you believe that this financial statement was true and accurate?
A To the best of my ability.
Q All right. Let's move on to June of '19 titled "Personal Financial Statement," Ray.
A It is.
Q What's the date?
A 6/1/2019.
THE COURT: And which exhibit is this?
BY MR. GOERING:
Q I am directing your attention to what is called Creditor Exhibit E, Mr. Schneider. Do you recognize this document?
A Yes.
Q What is it?

A It's a personal financial statement I gave.
Q And what is the date on this document?
A 6/1/2019.
Q Is this in the same form of your 2018 --
A I believe it is.
Q -- personal financial statement?
A Yep.
Q What are the total of assets?
A $151.
Q
Q Okay. Now, if I told -- so, is it similar to your assets that you had back in 2018?
A I think there's a variance of $2 million or something.
Q Okay. So -- and so here is your 2018. So, in 2018, you're showing your total assets of?
A It's $30 million difference.
Q How much are your assets in 2018?
A $121 million.
Q And how much are your liabilities at that time?
A $65 million.
Q All right. Which gave you a net value of over $50 million, correct?
A Yes.
Q Okay. So, let's take a look at 2019. What are your assets worth?

A $151 million.
Q And your liabilities?
A $74 million.
Q So, the time period between the two from '18 to '19, your value didn't change much in these financial statements, correct?
A Right.
Q Okay. And so in 2019, how was business?
A I was growing my other side, the stuff that I did personally and I built the apartments and I did some pet resort stuff.
Q Okay. And who did you provide this to?
A I think it was Joe McGrail who gave it to Huntington.
Q Okay. And it says, confidential to?
A Huntington Bank.
Q Okay. And so did you take a loan out from Huntington in June of '19?
A Nope.
Q Why would you have provided this to the bank?
A I had a feeling they had some concerns.
Q So, does -- do you believe that the loan documents with Huntington allow them to request financials and information from you over time?
A Yes. They are allowed.

Q Do you believe that perhaps they requested this information and you needed to provide it?
A Right.
Q Okay. How much was the loan to Huntington Bank?
A $73 million.
Q Okay. And so let's talk about your thought process in preparing these personal financial statements. If you look on page three of Exhibit E, this is the 2019 financial statement. What does it show you owe Huntington?
A $17.5 million.
Q Is that accurate?
A It's accurate what I owed them, but there was a guarantee that happened the day before we closed.
Q How much was the debt to Huntington?
A It was $73 million.
Q Okay. Does this say $73 million?
A No. Because I was under the impression I only owed what I owed, which is half of my four properties.
Q Okay. So, is it your -- was it your belief at the time that you only owed a quarter of the balance?
A Yes.
Q This was given to Huntington Bank, correct?
A Absolutely.
Q Did they call and ask you about it?

A Never.
Q Did -- and you're sure it went to the bank?
A I'm not sure about them at all.
Q Okay. So --
A It's their exhibit, isn't it?
Q All right. Let's continue on this. '18 and '19 show some life insurance policies, correct?
A Yes.
Q You had some life insurance, correct?
A Correct.
Q And does this reflect who the beneficiary is?
A Yes.
Q Okay. Who was the beneficiary of those policies?
A My young wife.
Q Okay. And so under bankruptcy law, I've advised -- or under collection law, those are exempt from collection, correct. Okay. Did you take an opportunity at some point to change these into different insurance policies?
A I did.
Q Do you remember when you did that?
A I don't remember when, but it was probably two years ago.
Q Like, 2018, 2019?

A Yeah.
Q Was it part of your estate planning done with --
A I believe it was part of the plan.
Q Okay. And you -- do you remember what you purchased with it?
A I -- there was a lot of cash value. I turned that into -- there were two plans. One is a $10 million policy and the other one got turned into -- I didn't have to put up any money. They did a -- and I don't know the term for it, but you pay for it and you don't have to pay for it again.
Q So, you took an exempt and protected asset and just moved it into something else. Is that correct?
A Correct.
Q Okay. And somewhere in the stack of papers on your estate planning in my office is all the information that we've offered to the bank, correct?
A Absolutely.
Q Okay. Just clarifying. All right. So, your changes from '18 to '19 weren't that severe, correct?
A Correct.
Q All right. So, that was 2019. So, you've heard the bank screaming you committed fraud. You're hiding assets. You're moving them out of your name. And they want to say that this Exhibit F is a reflection of a

depletion of your value. Okay. So, we're jumping from June of '19. June 1 of '19 to September 1 of '21. Who was this personal financial given to?
A This was to Capital Partners.
Q Okay. Why would you be giving something to Capital Partners in September of '21?
A I actually gave this to my lawyer and I think they gave it to Huntington.
Q Does Capital Partners appear on there just because it was a form you used and it probably was still on there? Is that right?
A Yes.
Q Okay. But we need to understand the timing of this. This is September of '21. So, Sosna's been kiting checks. Sosna --
A I think he's in jail by then.
Q -- took his money, took the MCAs, self-reported, by the way, after they had already indicted him. And then he's in jail. Is that correct?
A Yes.
Q And you're being sued.
A Correct.
Q Or had you already -- you had been sued.
A Correct.
Q Did they have a judgment against you? Do you

know?
A They filed it as soon as they went to take the asset and put it in the courts and then we were trying to fight their issue and --
Q All right. And so was this provided to litigation counsel at the time?
A Yes, it was.
Q And who was litigation counsel at the time?
A It was Huntington's.
Q No, who was your --
A Oh.
Q -- litigation counsel?
A Mine was Rick -- Richard Wayne
Q Over at Strauss and Troy, correct?
A At Strauss and Troy.
Q Okay. And they had requested -- and did they request it from you or had Huntington asked for some information regarding your assets?
A They were concerned about my assets and Rick wanted to work with them.
Q Okay. So, your cash on hand was pretty low at the time, is that right, Ray?
A Yep.
Q Okay. So, marketable securities. So, back in 2019, they were $13.6. What does it say they're worth

now?
A $8.2 -- $18.2.
Q Okay. So, the market, the securities had gone up in value?
A Stayed.
Q Okay. Non-marketable securities. What's that say?
A $124 million.
Q Okay. And in your 2019, it was $96 million, correct?
A Yes.
Q Okay. So, that's up about $30 million. Partial interest in real estate, okay. Now, that is down to $2 million from 13. So, there's an $11 million change there, correct?
A Yes.
Q At the bottom line of this, what is your total asset value according to this September 1, 2021 statement?
A $148 million.
Q And back in June of '19, it was $151 million. Is that correct?
A Yes.
Q Okay. So, your asset value's down about $2 million. Sound right?

A That's pretty good, yeah.
Q All right. So, 2019 to 2021, COVID came.
A COVID hit me.
Q What did COVID do to your business?
A One of them, it almost shut it down. It cut it in half. Cash flow was terrible. You couldn't get anybody to come to work. Everything you could think of. I was building in that period. It was just horrible. There was nothing good about it, and I got hit with -- from the employees to construction to operations, everything was bad.
Q All right. And so during this time, how were you funding your business developments and the shortfalls in your pet daycare business?
A At some point, we had to lay some of them off. Later on, some PPP money just kept them to stay on for a little bit. When there were shortfalls, I had to step up and took it out of my LMA, because that's where my assets were at the time. And then I prayed that we'd get out of this and things have turned around.
Q Okay. So, I want to focus on your LMA account, okay? So, I'm going to have to jump back and forth exhibits. So, I want you to look at -- so, Exhibit F is in front of you. So, let's remember these numbers, Ray. This is your 2021 financial statement, okay?

A Yeah.
Q What does it show your securities are worth?
A $18 million.
Q And what is the margin against it?
A $14.9 million.
Q Okay. And for the record, this is Exhibit F. So, let's jump to Exhibit L. What were your securities worth at the time?
A Almost 17 and ten and a half.
Q Sorry. This is '18. Sorry, Ray.
A Oh.
MR. GOERING: Strike that, Judge. Please. I want '19 to '21. So -- oh, I think it's all on the same. Here we go. Let's just do this. Can I use double things, or is that not possible? That's not possible?
THE COURT: We're not going to do that, no.
MR. GOERING: Ah, come on. I'm trying to technology this.
BY MR. GOERING:
Q All right. So, we are now looking at Exhibit E, which is your 2019 financial statement.
A Correct.
Q Okay?
A Mm-hmm.

Q And so, what were your securities worth in June 1 of 2019?
A $19.5.
Q Okay. And so -- sorry. Exhibit E is in front of you. What are your securities worth as of June 1 of '19 on Exhibit E?
A Close to $19.5.
Q Okay. So, now, let's scroll to Exhibit F. What are your securities worth?
A $18.2.
Q Okay. So, they go from -- value of your portfolio goes from $19 million to $18 million, correct?
A Yes.
Q Okay. COVID. How was -- do you recall how the market was doing during that year and a half?
A It was not pretty.
Q Okay. So, let's now take a look at the loan against it. So, here in 2018, how much was your margin account on June 1 of -- I direct your attention back to Exhibit E. What was the Merrill Lynch loan balance as of June 1 of '19?
A Oh, it was at $6.8 or $5.8.
Q Oh.
A Oh, how much it was worth was $19.5, but.

Q Oh, I think it's a 5 if you do the math. I think that comes out about right.
A Yeah, that does.
Q $5,849,000?
A Yep.
Q Does that sound close?
A Yep.
Q Okay. So, June of '19, your margin was $5.8. And so, September 1 of 2021, how much is your margin at?
A $14.
Q Is that a change of about $10 million?
A Yes.
Q Okay. Why would your margin increase $10 million?
A To keep my businesses alive, I funded shortfalls and I needed what it took to keep the businesses alive.
Q And so $10 million of the change from your '19 to your '21 financial statement is a result of your Merrill accounts growing because you used the funds to operate your businesses?
A Mm-hmm.
Q Is that correct?
A Yep.
Q What else did you use the money for?

A Some growth. And I didn't have any more income coming from my property that Huntington took from me. So, I had to deal with my own companies at the time.
Q Okay. Also, the difference from '19 to '21, what happened to your businesses you owned with Mr. Sosna?
A When he got caught, Huntington took the assets, went to the court, got a receiver, and they spent like no other. They sold the asset. I begged, I begged to take my asset back. I worked hard for that. I put a lot of money in it. And they decided that the court would sell it and whatever they got they were happy with and then they used me as the backstop. There was almost $2 million of legal fees in that. There was $1 million for a realtor. They --
Q All right. Well, let me stop you there, because I want to get to that. Was it scorched earth with the bank when they took over Sosna's holdings? My definition of scorched earth, which we've talked about.
A I never heard it until this whole thing happened, and it's loud and clear. They scorched earth no matter what they could do.
Q They brought a receiver in.
A They did it all.
Q Correct? The receiver liquidated to try to get

as much money as possible.
A And I liquidated my assets at this point and I tried to buy it back and I put a deposit in so I could be one of the bidders. They made it so it was impossible to buy it back. You had to have $70 million in cash to buy my own asset back, and I could have taken it over for three, run the food, run the employees, run the business that I've been in since 1968. I'm a nursing home administrator from the very start. Never had a conversation with them. They took my assets.
Q Okay. And, you know, if we weren't here on an expedited basis, we could bring all this in and flesh it out. But do you recall how much they sold the nursing home, the main nursing home for?
A They sold all the assets together for $70 million and then they got to peel off whatever they wanted and they left it with $54 million they show in cash. But there's still money out there that they identified recently.
Q Okay. And so do you know -- so, $54 to how much? $70?
A Yes.
Q So, they sold -- you said they -- you think they sold it for $70?

A They sold it for $70 and then they peeled off stuff. The decided to get rid of the PACE loan.
Q That $26 million is how much they say you owe them, right?
A Well, that's what the loan documents can play. They put default interest, they put money they never got. You know, they did a lot of things. And, you know, they threw mud against the wall and that's what they came up with.
Q Do you recall how much their fees were in that litigation?
A They sold one of my assets for $4 million more than it was on the books and it was $9 million and I got the documents a couple weeks ago and they only gave the bank $6.2 million. The lawyers got $1.25 million, the receiver took $1 million, and nobody said anything and now they're here trying to get the money from me.
Q All right. So, let's go back now to Exhibit F, because this is where Huntington says you're -- fraud, fraud, fraud. So, we've now accounted for $10 million and change, correct? Because if you look back on the first page of Exhibit F, your marketable securities are on one side and the debt against it are on the other, correct?
A Yes.

Q So, that makes up for $10 million of this. Is that correct?
A Yes.
Q Okay. And so now we need to look at the other debt against these entities, okay? And so the 2019 Exhibit E shows a big debt of $31 million on the RED. Okay? And so back to --
MR. GOERING: I wish we had two screens here, Judge.
BY MR. GOERING:
Q We need to go back to Exhibit F, 2021. Why is that debt up to $44 million?
A I was in the middle of construction.
Q So, on a financial statement that shows a debt of $31.5 is now $10 million higher. Is that correct?
A Yes.
Q Were you in development at the time?
A Yes.
Q Okay. So, during development, your debt goes up. Does the property appreciate with -- as the debt goes up as you're in construction?
A No.
Q Or are you at a situation the value is what it is and then you spend the money, but once it gets completed, then that's really when you realize your

step up in value? Is that accurate?
A Correct.
Q Okay. So, that debt is up $10 million, not due to any fraud, but actually because you're trying to appreciate the value of your assets, correct?
A Correct.
Q All right. So, Westchester is $31.7 on Exhibit F and on Exhibit E I don't see Westchester on here. Oh. Well, there I do. Westchester, $3.5. Ray? $3.5 million is the debt on Westchester. $3.5 -- I'm sorry.
A Is the value.
Q Is the marketing value. What was the debt against that? Do you know?
A Pretty close to the same.
Q So, who was that?
A It was Civista. Oh, what the entity was?
Q Yeah.
A It was a Red Dog.
Q All right. So, we have a mortgage balance on Westchester of $31 million on Exhibit F. And on Exhibit E, it was $750,000. Is that -- or $560,000. Is that correct?
A At the time, that was -- that was '19. I think I was in the remodeling stage.
Q So, it's not unusual that your statements would

fluctuate as developments go on, correct?
A Absolutely.
Q All right. And so when you -- your -- Exhibit F, 2021, has your debt at $130,000.
A $130 million.
Q $130 million. And so we've accounted for the marketable securities change and with the non-marketable securities is -- you know, just Westchester alone is about a $25 million change. So, I guess I need more -- better explanation. What is Westchester?
A This time was part of the storage business.
Q Okay. And so the loan balance on Exhibit -- on Exhibit F of $31 million reflects changes in the business. Is that correct?
A Yes. And can I add something? That $10 million that was extra in the loan package?
Q Please.
A That was in the middle of building the RED and the first building, I got a loan from the insurance company. The second one, I had to put equity in. And that's what is the cause of that to go up, to get -- you usually have to put in -- in this case, I had to put in 35 percent of the build-out purchase.
Q All right. So, I want to reference something to you on Exhibit F. If you look down, there's a line

down here about partial interest in real estate. And unfortunately, I can't read this. But it says five --

A It's 5472. That was the name of our assets at Huntington.

Q Okay. So, on Schedule F, what do you value 5472?

A Non applicable, because it's gone.

Q Okay. And so, then, on Exhibit E, which is your 2019 financial statement, what is -- what are you using on here for that entity?

A The half that I owned and had responsibility for of the four assets.

Q Okay. So, basically, $20 million fell off. Is that right?

A Disappeared.

Q Did you get anything out of that?

A I'm sitting here now.

Q Do you recall when you bought Maine?

A June 30, 2020. It was my granddaughter's birthday. She was born that day.

Q What -- on your 2021 financial statement, do you list the debt to Huntington Bank on here?

A Yeah. Well, that's -- Fifth Third was the lender at the time.

Q 2021?

A They -- oh. Yeah, that's in there. Go --
Q So --
A Go up a little.
Q If you look at -- on the screen in front of you, Ray, is --
A In 2021 I don't list it. It's a non-applicable asset.
Q In 2021.
A It's gone.
Q In front of you, Exhibit F, does that say Fifth Third, Huntington Bank, GE Credit something?
A Those are where I got credit from. Fifth Third, I got credit from back in the original loan. It was for $17.5 million. And now that loan's -- was taken over by Huntington and somehow or another they're holding me accountable for the whole loan.
Q And so is the -- the Aegon is --
A It's Aegon.
Q Aegon, that is the insurance, Transamerica, that's that property.
A Correct.
Q Correct?
A Yes.
Q First Merchants is the --
A Circle Storage.

Q Circle Storage Units. Those are the big ones. Blue Hills, I've never heard of. That's RD.
A That got sold to another bank, and now it's called Rockland.
Q Okay. So, on your 2021 statement, you show your business balances of $101,000 on your --
A It's $101 million.
Q $101 million on Exhibit F for 2021. And in -- on Exhibit E in 2019, you've kind of put it together a little different, haven't you, in terms of breaking out the securities?
A Correct.
Q Is that right? Your businesses. Because this shows current balances of $34 million as of Exhibit E in 2018. In 2021, it's substantially higher. Where is the difference, Ray? We've identified a majority of them. Is it really just the changes in the business and the loans? Have you decreased your -- if your interest decreased in it, did you reflect it on your personal financial statement?
A I believe I did.
Q Did you?
A Which one are you asking? Which asset?
Q So, I'm looking at your -- at the 2021 statement, which is Exhibit F, where the bank is

accusing you of you decreasing your value to $17 million. But your assets stay similar value. Correct?
A Correct.
Q Okay. $148, and we identified back on Exhibit E and F, it was $151. So, your asset value has stayed the same. Why are your debts so much higher in 2021, Ray? The marketable securities, we've said, are up $10 million, correct?
A Right.
Q And so what else are we missing? Do you know?
A Well, I've added some expenses. I built the RED. I've built a Red Dog in Boston. I built an animal hospital there. Built -- finished up -- '21, I was just finishing up the RED. That's when I did the RED Corner. And then, you know, each one of those loans took more. And then I wait until I can, you know, get the cash flow.
Q All right. So, your marketable securities went up. We identified several of the debts have gone up. But you were doing a -- you were still developing in 2021. And so did your debt go up because of business loans?
A Yes.
Q Okay. Not because of assets that were transferred out of your name, because when -- it

appears if you look at the screen, here, Ray, on 2021, Exhibit F, while on the side it shows that your percentage value, you value the whole entity throughout this. Is that correct?
A Yes.
Q Okay. And so your debt has gone up as you have developed more?
A Yes.
Q Correct?
A Yes.
Q And even from 2021, your debt has gone up a little bit from now to then because you continue to develop projects, is that correct?
A I do that.
Q When are you going to stop?
A Never. I'm --
Q Are you still developing today?
A I am.
Q How many projects do you have in place?
A One, two, three. I think four.
Q Is your -- are your current developments going to provide sufficient funds for you to pay Huntington Bank in full?
A If I get the time, I think I can do that. I -- you know, right now, the economy is not showing -- and

I think it will change, so. If the Court allows me to take the time to do it, they'll see that they'll have it in the time it takes for a plan. Can I get a water?

Q Are you -- yeah.

THE COURT: Mr. Goering, this might be an appropriate time for us -- we had originally scheduled this in the morning, because I feared this was going to be a lengthy --

MR. GOERING: I know, Judge.

THE COURT: -- presentation of evidence. What is counsel's plan as we near the 5:00 bewitching hour here at the court? You want to take a moment and confer on how we're going to have an opportunity for cross-examination?

MR. SCHUELLER: Your Honor, could we -- as Judge Flatley in West Virginia would say, could we take a comfort break?

THE COURT: Absolutely.

MR. SCHUELLER: And then we can confer and --

THE COURT: That would be wonderful.

MR. SCHUELLER: -- talk this through. Thank you.

THE COURT: Take a ten minute recess?

MR. GOERING: Yeah.

THE COURT: All right. Thank you.

COURTROOM DEPUTY: All rise. This Court stands in recess until 4:20.

(Recess from 4:11 p.m. until 4:28 p.m., followed by discussion of plans for continuing the hearing.)

MR. GOERING: All right. We're ready, Judge.

THE COURT: All right.

MR. GOERING: Are we back on?

THE COURT: Yes.

BY MR. GOERING:

Q I have four more exhibits for you, Mr. Schneider, that I would like to chat with you about. So back to where we are. We were talking about Huntington Bank secured a judgment against you, correct?

A Yes.

Q Okay. And they secured a judgment out of the Hamilton County Court of Common Pleas based upon the surety that you signed, correct?

A Correct.

Q And so the judge ruled in their favor after only allowing very little evidence because you had signed that surety guarantee, correct?

A Correct.

Q And part of that waived certain defenses,

correct?
A The way it was written --
Q Okay.
A -- it sounds like it.
Q So, have you appealed that determination?
A Absolutely.
Q I direct your attention to Exhibit 77 on your screen. Have you seen this document?
A I believe I have.
Q Okay. Is this your Notice of Appeal?
A I believe it is.
Q Okay. And it's an appeal of an amended judgment entry against you, correct?
A Correct.
Q Okay. Now, this judgment doesn't properly account for all the money, since it says $75 million, correct?
A Yep.
Q Okay. It was just a judgment they took on a lawsuit from 2000 before they had credited all the proceeds from the liquidation of the facilities?
A 2020.
Q 2020. All right. So now I would like to take you to what is marked Exhibit 78. Now, do you recognize this document?

A Yes.
Q Okay. Is this a copy of your lawsuit against Huntington Bank?
A Yes.
Q And multiple other parties, correct?
A Correct.
Q And in this lawsuit -- strike that. You put on all kinds of testimony here today about Huntington Bank's action with Mr. Sosna and how it affected you and them not giving notice to you, correct?
A Yes.
Q Is this lawsuit where you are raising those issues against Huntington Bank?
A Can you ask that again?
Q Is this lawsuit a claim for negligence based upon the actions of Huntington Bank that you have been testifying about today?
A Yes.
Q Okay. And so in this lawsuit, you raised the check kiting scheme and the facts that Huntington didn't give you notice and the many other issues that we have discussed. Is that correct?
A Correct.
Q And is this action pending in court right now?
A Yes.

Q And so when in his opening Mr. -- counsel for Huntington said they were going to move to dismiss certain claims, he was talking about this lawsuit. Does that sound -- just for context, correct?
A Got it.
Q Okay. All right.
MR. GOERING: So, I have two more exhibits I'd just like to get in. Unfortunately, Judge, this is going to -- at the end, just like always, it causes me to jump around.
BY MR. GOERING:
Q But I'd like you to look at what's called exhibit -- marked Exhibit 79. Do you recognize this document?
A I do.
Q Okay. What is this?
A Looks like the closing statement that I got a couple weeks ago from my other attorney to see the closing of the loan originally back in 2018.
Q And what is the date of this? Here. I can -- I actually.
A No, I got it. 11/30/18. That --
Q Okay.
A I could have done that from memory.
Q And so is this the facility that was used to

refinance out Fifth Third Bank?
A I believe so.
Q Okay. How much in fees did Huntington take?
A $5,084,207.21.
Q All right. And finally, I need to go back to some more Sosna things. Exhibit 80. Do you recognize this document?
A I do.
Q Are these emails between Huntington Bank and Harold Sosna?
A I believe they are.
Q And what is the date of these emails?
A December 4, 2019.
Q Okay. And is this where the bank is talking about the overdraft accounts which were going on in Mr. Sosna's account?
A They were.
Q Okay. And so let's just look at the one main one, okay? And the issue I want to talk about is when was Huntington Bank aware of what was going on. Okay. We already established in February and March of 2020, they sent letters saying, we know what you're doing. What's the date of this email?
A This one's December 24.
Q And the big arrow, what's it say? Sorry. Don't

look at the arrow. The line. What does it say?
A It says they appear to be fraud.
Q Okay. So, is this email discussions talking about bad checks and overdrafts and problems that existed in his account?
A Yes.
Q Were you put on any notice that there were problems with Mr. Sosna's accounts?
A Didn't know any of this.
MR. GOERING: All right, Judge. I'm ready to stop for today.
THE COURT: All right. So, we are in recess until Friday at 9:00 a.m. unless the parties resolve it ahead of time. Anything further we should cover this afternoon while we're all here?
MR. GOERING: I don't think so.
THE COURT: You may step down. Thank you.
THE WITNESS: Thank you, Your Honor.
THE COURT: Anything, Mr. Schueller? All right. Have a good afternoon.
MR. GOERING: Thank you, Judge.
MR. SCHUELLER: Thank you.
COURTROOM DEPUTY: Please rise. This Court is in recess until Friday at 9:00 a.m.
(End of proceedings at 4:39 p.m.)

State of Ohio )

Cuyahoga County )

CERTIFICATE

I, Marc Eppler, a Notary Public, within and for the State of Ohio, do hereby certify that the above transcript is a true and accurate record of a portion of the hearing held before the HONORABLE BETH A. BUCHANAN. This record was prepared from an audio recording provided by the Court.

IN WITNESS WHEREOF, I have hereunto set my hand and seal of office in Cleveland, Ohio on this 4th day of May, A.D., 2023.

----------------------------
MARC EPPLER
Notary Public - State of Ohio
My Commission expires 9-14-2023

**$**

**$1 (4)** 17:2;48:24;88:14;90:16
**$1,050,000 (1)** 64:25
**$1,502,000 (1)** 11:23
**$1,680,000 (1)** 65:4
**$1.25 (1)** 90:15
**$1.3 (1)** 49:1
**$1.4 (1)** 71:13
**$1.5 (2)** 70:25;71:13
**$1.6 (1)** 70:25
**$10 (13)** 13:8;47:14;49:4;80:7;87:12,14,18;90:20;91:1,15;92:3;93:15;97:7
**$101 (2)** 96:7,8
**$101,000 (1)** 96:6
**$11 (1)** 83:14
**$110 (2)** 52:3;55:11
**$121 (2)** 68:6;76:18
**$124 (1)** 83:8
**$13.6 (1)** 82:25
**$130 (2)** 93:5,6
**$130,000 (1)** 93:4
**$137,000 (1)** 11:18
**$14 (1)** 87:11
**$14.9 (1)** 85:5
**$148 (2)** 83:20;97:4
**$151 (4)** 76:9;77:1;83:21;97:5
**$16.8 (1)** 68:17
**$17 (6)** 12:23;19:8;56:17,21;57:2;97:1
**$17.5 (2)** 78:11;95:14
**$18 (2)** 85:3;86:12
**$18.2 (2)** 83:2;86:10
**$19 (1)** 86:12
**$19.5 (3)** 86:3,7,25
**$2 (7)** 18:18;65:10,21;76:12;83:13,24;88:14
**$2.3 (1)** 30:2
**$2.5 (2)** 18:17;30:11
**$2.7 (1)** 11:18
**$20 (1)** 94:13
**$21 (1)** 12:1
**$25 (1)** 93:9
**$25,741 (1)** 19:4
**$26 (3)** 47:23;49:8;90:3
**$3 (1)** 7:10
**$3.2 (1)** 65:21
**$3.5 (5)** 13:4;14:8;92:9,9,10
**$30 (3)** 26:24;76:16;83:12
**$300,000 (2)** 43:14,23
**$31 (3)** 91:6;92:20;93:13
**$31.5 (1)** 91:15
**$31.7 (1)** 92:7
**$34 (1)** 96:14
**$365,000 (1)** 16:22
**$38 (1)** 34:21
**$4 (1)** 90:12
**$4.5 (5)** 13:5;14:8;21:8;37:19;38:8
**$44 (1)** 91:12
**$45 (2)** 45:20;46:24
**$483,000 (1)** 18:12
**$5 (2)** 34:12;72:19
**$5,084,207.21 (1)** 104:4
**$5,849,000 (1)** 87:4
**$5.8 (2)** 86:23;87:8
**$50 (3)** 45:20;47:5;76:22
**$54 (2)** 89:18,21
**$560,000 (1)** 92:21
**$58 (1)** 52:6
**$6 (1)** 69:4
**$6.2 (1)** 90:15
**$6.8 (1)** 86:23
**$65 (2)** 68:8;76:20
**$650 (1)** 67:19
**$680,000 (1)** 65:7
**$7 (1)** 72:17
**$7,200,000 (1)** 28:18
**$7,208,000 (1)** 28:22
**$7.2 (1)** 21:25
**$70 (6)** 54:18;89:5,16,22,25;90:1
**$710,000 (1)** 15:16
**$73 (3)** 78:5,16,17
**$74 (1)** 77:3
**$75 (1)** 101:16
**$750,000 (1)** 92:21
**$8.1 (1)** 41:7
**$8.2 (1)** 83:2
**$8.6 (1)** 49:2
**$8.7 (1)** 48:15
**$850 (1)** 67:21
**$9 (2)** 55:18;90:13
**$96 (1)** 83:9

**A**

**abandoned (1)** 39:23
**ability (2)** 74:4;75:13
**able (10)** 7:19;13:18;18:20;19:21;22:22;24:9;26:23;55:17,17;65:5
**abscond (1)** 60:2
**absolutely (15)** 8:17;38:2;46:25;50:9;53:12;59:2;62:2,7;65:25;66:6;78:24;80:18;93:2;99:18;101:6
**accepted (1)** 6:9
**access (2)** 52:23;53:1
**according (5)** 9:5;15:16;67:16;68:5;83:18
**account (31)** 4:16,24;10:1,4,19;11:23;12:1,25;13:3,11,15;14:1;18:19,21,23;19:10,16,19;49:2;59:13;61:12,18;63:4;65:23;67:23;69:3;84:21;86:20;101:16;104:16;105:5
**accountable (3)** 7:15,22;95:16
**accountant (1)** 67:6
**accounted (2)** 90:20;93:6
**accounting (2)** 49:3,24
**accounts (30)** 10:11;11:16;12:3,9,13;19:4;52:24,25;53:7,9,18,20;54:4,6,8,21,23;55:2,9,14,19;57:22,25;58:1;60:22,24;61:1;87:20;104:15;105:8
**accumulate (1)** 12:19
**accumulated (1)** 14:16
**accurate (14)** 3:5,20;10:16;19:4;20:14;29:1;54:1,13;57:20;75:8,12;78:12,13;92:1
**accurately (1)** 28:1
**accusing (2)** 54:11;97:1
**ACHs (1)** 63:3
**acknowledge (1)** 58:19
**acquire (1)** 5:19
**acre (1)** 24:8
**acres (1)** 36:14
**across (2)** 24:7,13
**action (6)** 9:20,23;56:11;64:4;102:9,24
**actions (2)** 8:15;102:16
**active (1)** 32:10
**activity (1)** 60:20
**actual (2)** 10:15;58:3
**actually (7)** 28:21;29:10;36:23;38:8;81:7;92:4;103:21
**add (1)** 93:15
**added (3)** 17:4,5;97:11
**additional (1)** 26:14
**address (2)** 2:9;66:11
**addresses (1)** 35:2
**adjacent (1)** 31:18
**administration (1)** 7:18
**administrator (4)** 6:21;7:9,19;89:9
**advance (2)** 62:17;63:2
**Advances (2)** 52:9;62:23
**advise (1)** 33:3
**advised (7)** 27:15;28:1;42:6;60:13,14,20;79:16
**Aegon (3)** 95:17,18,19
**affected (1)** 102:9
**affidavit (8)** 51:4,14,19;52:17,21;54:2,14;58:10
**afternoon (3)** 2:8;105:15,20
**again (7)** 9:17;13:13;27:2;48:22;73:4;80:11;102:14

**against (25)**
5:20;7:12;8:15;9:20,22,23;15:11;16:16;28:9;29:20;33:10;69:18;71:2;72:11;81:25;85:4;86:19;90:8,23;91:5;92:13;100:14;101:13;102:2,13
**ago (12)**
19:13;22:16;31:22;32:12;33:9;40:4,16;50:25;62:15;79:24;90:14;103:18
**agreement (1)**
73:18
**Ah (1)**
85:18
**ahead (2)**
53:25;105:14
**Alarm (1)**
48:3
**alive (2)**
87:16,17
**alley (1)**
32:16
**allow (1)**
77:23
**allowed (1)**
77:25
**allowing (1)**
100:22
**allows (1)**
99:1
**alluded (1)**
24:18
**almost (3)**
84:5;85:9;88:14
**alone (2)**
47:5;93:9
**alphabetical (1)**
39:15
**always (3)**
24:25;38:17;103:9
**amended (1)**
101:12
**amongst (1)**
6:16
**amount (3)**
44:20;62:21;65:22
**amounts (1)**
64:20
**Analysis (10)**
15:1,16;16:21;17:20;18:8;20:3,24;24:1;47:16,21
**analyzing (2)**
12:11,12
**animal (3)**
25:13;26:4;97:13
**anymore (1)**
71:20
**apartments (2)**
41:19;77:10
**apologize (1)**
37:2
**apparently (1)**
51:21
**Appeal (2)**
101:10,12
**appealed (1)**
101:5
**appear (4)**
10:10;71:18;81:9;105:2
**appears (2)**
71:18;98:1
**Applebee's (2)**
39:19,23
**applicable (1)**
94:7
**applied (1)**
61:17
**appraisal (2)**
15:21;43:20
**appraisals (1)**
43:8
**appraised (5)**
15:17,19;16:3,5;43:10
**appreciate (4)**
8:7;19:25;91:20;92:5
**appropriate (1)**
99:6
**approval (2)**
26:13,14
**approximately (11)**
12:21;13:2;14:6;16:21;18:15;19:12;27:17;28:19;47:14;68:6,8
**April (6)**
54:7;55:8;58:1;60:2,23;61:2
**area (1)**
42:2
**around (5)**
4:4;12:3,16;84:20;103:10
**arrested (1)**
6:16
**arrow (3)**
10:25;104:25;105:1
**Ash (5)**
25:14;26:14;31:4;39:25;40:11
**aside (2)**
5:2;48:1
**Asset (19)**
15:1,16;18:8;20:3;30:11;36:12;48:15;69:19;74:24;80:12;82:3;83:18,24;88:9,10;89:6;95:7;96:23;97:5
**assets (52)**
3:6,9;6:18;7:11,16;9:24;14:16;22:12;24:1,15,19;26:22;27:5,9,12;28:2,9;35:15;43:19;47:22,23;48:24;49:2,6;50:7,16,18;56:19;60:2;67:24;68:5;72:19;74:7;76:8,11,15,17,25;80:24;82:18,19;84:19;88:7;89:2,11,16;90:12;92:5;94:3,12;97:2,24
**assets's (1)**
74:23
**assistant (1)**
6:5
**Assisted (3)**
20:13,21,22
**Atlanta (2)**
26:1;50:19
**attach (2)**
10:4;12:8
**attached (5)**
44:5;54:2,14;57:21;58:4
**attachment (1)**
12:11
**attention (10)**
29:13;40:9;41:1;51:1;56:6;59:24;66:18;75:21;86:20;101:7
**attorney (4)**
6:5,15;42:17;103:18
**attorneys (1)**
53:17
**authenticate (1)**
33:19
**availability (4)**
54:4,12;57:23;60:17
**available (2)**
58:6;59:18
**avoid (1)**
50:8
**avoided (1)**
6:25
**aware (8)**
8:9,13;22:13;53:11;59:5;60:7;64:20;104:20
**away (1)**
18:25

**B**

**bachelor's (1)**
2:19
**back (43)**
4:21;21:17,18,22;22:25;23:1;25:2,3,4;42:14;45:10;48:14,18;64:19;65:2,12,15,17,21;69:6;70:23;72:4,5,7;76:11;82:24;83:21;84:22;86:20;88:10;89:3,5,6;90:18,21;91:7,11;95:13;97:4;100:8,13;103:19;104:5
**background (2)**
2:17;3:19
**backstop (1)**
88:13
**bad (3)**
51:22;84:11;105:4
**balance (7)**
11:23;12:21;54:18;78:21;86:21;92:19;93:12
**balances (2)**
96:6,14
**Bank (77)**
3:16;5:2;6:17,23;7:20;8:10,14,20,23,25;9:4,13,18,22;10:1,2;13:11;23:1;27:17;34:16;49:11,18;50:8,10;51:5;52:2,5,22;53:7,8;54:22;55:25;56:13,15,24;57:12;58:13;59:7,13,21;60:2,15,21,25;61:5,16,24;63:19;65:18;66:2,5,8;71:17;74:21,22;77:16,20;78:4,23;79:2;80:17,23;88:18;90:15;94:22;95:11;96:3,25;98:23;100:14;102:3,13,16;104:1,9,14,20
**banker (1)**
70:2
**bankruptcy (11)**
2:21,24;13:10,13,21;14:9;27:22,25;62:14,19;79:16
**banks (9)**
4:12;6:17;34:1;51:22;52:5,7;54:25;62:8;74:19
**bank's (2)**
61:11;102:9
**bar (1)**
32:17
**based (5)**
14:5;41:7;50:2;100:18;102:15
**basically (2)**
70:13;94:13
**basis (9)**
12:25;13:2,6,7;20:25;39:1;51:13;59:16;89:13
**battling (1)**
50:13
**Bear (2)**
44:2;66:13
**became (1)**
8:9
**become (1)**
40:1
**beforehand (1)**
33:7
**began (2)**
55:13,13
**begged (2)**
88:9,9
**begin (1)**
54:22
**beginning (4)**
11:15;12:4;15:2;63:17
**behalf (1)**
3:15
**behind (1)**
6:2
**belief (1)**
78:20
**below (1)**
68:18
**beneficiary (2)**
79:11,13
**Besides (1)**
35:20
**best (9)**
29:25;31:24;45:3;49:13,21,25;63:1;74:3;75:13
**better (1)**
93:10
**bewitching (1)**
99:11
**beyond (1)**
68:19
**bidder (1)**
7:11
**bidders (1)**
89:4
**bidding (1)**
5:20
**big (4)**
7:13;91:6;96:1;104:25
**billing (2)**
42:15,17
**birthday (2)**
32:2;94:20
**bit (6)**
12:6;22:11;24:22;36:11;84:17;98:12
**black (1)**
10:19
**Blue (6)**
25:14;26:14;31:4;39:25;40:11;96:2

**Bond (1)** 2:18
**bonds (1)** 68:14
**books (1)** 90:13
**born (1)** 94:20
**borrow (3)** 11:5;64:24;65:20
**borrowed (1)** 65:21
**Boston (9)** 8:3;25:12,13;26:3,5,6;41:2,2;97:12
**both (6)** 9:12;22:3,4;52:22;53:1;58:10
**bottom (4)** 38:24;59:3;60:5;83:17
**bought (3)** 32:11;40:2;94:18
**bowling (4)** 32:10,13,16,17
**boy (1)** 29:12
**branches (1)** 32:25
**break (1)** 99:17
**breaking (1)** 96:10
**bring (3)** 42:20;50:14;89:13
**broken (1)** 68:2
**broker (1)** 67:4
**brokerage (2)** 49:2;69:3
**brought (7)** 7:1,7;12:14,15;58:12;62:11;88:23
**bucks (1)** 19:12
**build (2)** 4:13;17:10
**building (18)** 21:3;22:7;24:11;36:18;37:1,20;40:15;41:16,18;45:17;46:7,10,11;47:4;72:11;84:8;93:18,19
**buildings (2)** 32:8;71:10
**build-out (1)** 93:23
**built (7)** 24:19;25:10;77:10;97:11,12,12,13
**busier (1)** 64:13
**business (21)** 5:3,7,10,16;6:22;7:10;39:12;43:9;50:20;63:2;71:16;77:8;84:4,13,14;89:8;93:11,14;96:6,17;97:21
**businesses (12)** 3:25;4:2,11;7:19,25;8:2,4;87:16,17,21;88:5;96:13
**businessman (1)** 63:7
**buy (6)** 7:3;17:11;24:9;89:3,5,6
**buyer (1)** 50:21
**buying (5)** 22:1,2,3,4;25:4
**buzzer (1)** 48:7

## C

**call (6)** 2:2;8:21;20:17;23:23;62:20;78:25
**called (14)** 6:6;20:19;24:2;35:6;36:15;40:10;41:19;42:16;61:8;68:23;70:13;75:21;96:4;103:12
**calling (2)** 6:11;64:21
**came (4)** 25:3;62:17;84:2;90:9
**can (26)** 7:16,25;11:8,9;23:21;24:12;27:2;32:2,20;33:17;38:15;48:25;51:20;52:12;64:5,23;72:17;85:14;90:5;93:15;97:16;98:24;99:3,19;102:14;103:20
**cancel (1)** 52:13
**cap (4)** 22:14,21;38:12,14
**capital (9)** 12:14,17;14:2;19:14;66:25;67:3;81:4,6,9
**car (2)** 17:25;18:1
**care (3)** 8:6;25:6,15
**cars (2)** 17:23;24:12
**case (10)** 2:21,22,25;5:18;13:10,13;45:18;56:15;65:9;93:22
**cases (1)** 63:6
**cash (14)** 4:2,7,9;38:1;52:9;62:23;63:2;67:18;80:6;82:21;84:6;89:6,19;97:17
**cashed (1)** 7:10
**cashing (1)** 62:16
**caught (2)** 6:15;88:7
**cause (3)** 12:12;56:10;93:21
**caused (1)** 62:18
**causes (1)** 103:9
**cc'd (1)** 59:3
**ceased (1)** 60:16
**certain (3)** 50:2;100:25;103:3
**certainly (1)** 62:21
**challenge (1)** 3:7
**change (10)** 33:9;77:5;79:19;83:14;87:12,18;90:21;93:7,9;99:1
**changed (2)** 6:17;18:21
**changes (3)** 80:20;93:13;96:17
**changing (2)** 17:22;46:15
**Chapter (6)** 2:21;5:18;33:2,3,5,11
**charged (1)** 53:2
**chat (1)** 100:12
**check (8)** 6:9;8:14;52:18;53:8;62:16,17;64:22;102:20
**checks (5)** 49:24;57:24;63:8;81:15;105:4
**children (1)** 43:6
**Chris (1)** 44:5
**Church (1)** 24:7
**Cincinnati (5)** 2:11;8:3;25:12;26:7;33:1
**Circle (14)** 34:19;35:1,15;36:11,25;37:1,11;39:14,15,20;70:12,14;95:25;96:1
**cites (1)** 57:16
**Civista (14)** 28:10;29:22;30:2,19,21,24;31:14,16;32:21,22,24;33:12;34:6;92:16
**claim (2)** 72:4;102:15
**claims (2)** 56:24;103:3
**clarify (1)** 36:3
**clarifying (1)** 80:19
**class (3)** 22:17;41:24;45:11
**clear (2)** 35:4;88:21
**Cleveland (1)** 67:4
**client (1)** 61:12
**clients (1)** 62:22
**clock (2)** 5:15;48:8
**close (16)** 3:24;5:25;12:23;16:24;17:21;18:17;27:20;30:1,4;45:20;54:7;58:1;60:25;86:7;87:6;92:14
**closed (2)** 50:21;78:14
**closing (2)** 103:17,19
**co-lenders (1)** 54:20
**collapsed (1)** 55:16
**collect (1)** 42:16
**collection (5)** 8:15;9:20,23;79:17,18
**Colorado (1)** 16:1
**Columbus (2)** 5:19;51:9
**column (2)** 64:10;65:1
**comfort (1)** 99:17
**comfortable (1)** 49:7
**coming (1)** 88:2
**commence (1)** 9:20
**committed (4)** 6:7;7:24;71:18;80:23
**committing (1)** 6:16
**Common (1)** 100:18
**communication (1)** 9:13
**communications (1)** 8:19
**companies (4)** 3:22;9:9;61:1;88:3
**company (10)** 8:4;35:6,16;41:11;47:8;59:18;60:16,18,21;93:20
**complete (3)** 3:2;45:5;46:5
**completed (5)** 4:20;28:6;43:3;46:7;91:25
**completing (1)** 13:21
**complex (3)** 50:3;74:7,7
**complexities (1)** 44:21
**complicated (1)** 43:2
**computer (1)** 32:15
**concept (1)** 25:18
**concerned (1)** 82:19
**concerns (1)** 77:21
**conclusion (1)** 47:22
**conduct (1)** 60:18
**conducted (1)** 43:8
**confer (2)** 99:13,19
**confidential (2)** 67:1;77:15
**confirm (1)** 42:14
**confused (1)** 44:23
**constantly (1)** 46:15
**construction (4)** 50:23;84:10;91:13,21
**contact (1)** 33:4

**context (1)** 103:4
**continue (2)** 79:6;98:12
**continued (1)** 55:15
**continuing (1)** 100:4
**contract (1)** 24:9
**conversation (2)** 9:18;89:10
**conversations (1)** 14:5
**copied (1)** 60:5
**copies (1)** 10:16
**copy (7)** 3:6;51:4;54:1,13;56:23;57:20;102:2
**Corner (7)** 24:2,6;28:11;30:22;50:22;70:21;97:15
**corporations (1)** 48:2
**cost (4)** 17:4,8;43:12,22
**counsel (9)** 9:6;27:14;42:4,21;44:18;82:6,8,12;103:1
**counseling (1)** 3:3
**counsel's (1)** 99:11
**count (1)** 64:5
**counted (1)** 64:7
**counterclaim (1)** 56:25
**counters (1)** 32:17
**County (1)** 100:18
**couple (8)** 8:8;20:2;32:14;58:7;62:14;73:22;90:14;103:18
**COURT (50)** 2:4;7:7,23,24;10:23,25;11:3,7,11;19:25;23:6,9,11;24:22;28:14,16;33:15,18,22;35:8,10;44:3;48:5,8,12,18,20;63:6;73:12;75:19;85:17;88:8,11;99:1,5,10,12,18,20,23,25;100:1,7,9,18;102:24;105:12,17,19,23
**COURTROOM (2)** 100:1;105:23
**courts (4)** 6:18;7:2;55:10;82:3
**cover (2)** 57:3;105:14
**covers (1)** 34:6
**COVID (9)** 26:2,2;46:11,12;50:20;84:2,3,4;86:15
**create (2)** 7:25;55:18
**creating (1)** 53:18
**credit (17)** 3:2;36:9;39:7;55:2,14,19,25;56:3,14,16,24;57:11;58:11;60:11;95:11,12,13
**credited (1)** 101:20
**Creditor (4)** 44:13,18;66:18;75:22
**crime (1)** 54:25
**cross-examination (1)** 99:14
**Crossroads (1)** 24:7
**current (8)** 3:12;5:3;15:13;17:15;27:17;39:6;96:14;98:21
**currently (8)** 3:25;4:2;20:6;25:14;26:4;27:3;41:24;72:13
**cut (1)** 84:5
**cute (1)** 18:5

**D**

**daily (1)** 63:3
**date (17)** 8:9;28:25;40:6;42:13,18;45:25;60:3,25;64:9;65:11;66:21;67:16;75:17;76:2;103:20;104:12,23
**dated (2)** 39:9;64:15
**dates (1)** 64:8
**David (1)** 58:23
**day (10)** 11:6;14:9;24:9;53:22;57:19;60:15;65:19;69:13;78:14;94:20
**daycare (1)** 84:14
**days (2)** 6:7;55:16
**DC (1)** 44:17
**deal (3)** 6:25;38:15;88:3
**debt (24)** 28:25;36:6;40:13;62:6;65:8;71:1;72:11;75:9;78:15;90:23;91:5,6,12,14,19,20;92:3,10,12;93:4;94:22;97:21;98:6,11
**Debtor (1)** 33:17
**debts (7)** 3:9;27:5,6;28:9;74:7;97:6,19
**December (2)** 104:13,24
**decided (2)** 88:11;90:2
**declared (2)** 54:17,20
**declaring (1)** 53:19
**decrease (1)** 61:25
**decreased (2)** 96:18,19
**decreasing (1)** 97:1
**default (7)** 8:14;9:1;53:19;54:18,21;61:16;90:6
**Defendant (1)** 56:14
**defenses (1)** 100:25
**definition (1)** 88:19
**degree (1)** 2:19
**depending (1)** 46:17
**depiction (2)** 3:20;75:8
**depletion (1)** 81:1
**deposit (6)** 52:25;57:25;60:22,25;61:4;89:3
**deposited (1)** 53:1
**DEPUTY (2)** 100:1;105:23
**describe (1)** 73:12
**description (4)** 68:12;69:20,21,25
**determination (1)** 101:5
**develop (3)** 4:13;26:15;98:13
**developed (4)** 5:22;32:6;39:24;98:7
**developer (2)** 4:6;22:10
**developing (5)** 4:6;26:12;46:2;97:20;98:17
**development (7)** 4:12;29:3;31:8;46:6,18;91:17,19
**developments (6)** 4:17,20,25;84:13;93:1;98:21
**device (1)** 11:9
**difference (3)** 76:16;88:4;96:16
**different (18)** 3:9,22;11:16;19:3;20:1,16;24:19;25:5;31:19;34:25;35:19;37:8,9;39:12;43:19;58:9;79:20;96:10
**DIRECT (12)** 2:6;14:17;29:11,12;40:9;41:1;51:1;56:6;57:15;66:17;86:20;101:7
**directing (1)** 75:21
**Disappeared (1)** 94:15
**disclose (1)** 74:6
**Discovers (1)** 53:15
**discuss (1)** 7:4
**discussed (1)** 102:22
**discussion (1)** 100:4
**discussions (2)** 14:13;105:3
**dismiss (1)** 103:2
**dissolve (1)** 27:15
**document (24)** 14:21,25;29:14;31:1;35:13;41:14;44:14;45:1;51:2;56:8,12;59:22;63:23;66:19,21,23;68:5;69:9;75:23;76:2;101:8,25;103:14;104:7
**documents (8)** 2:24;27:21;51:21;61:14;67:10;77:23;90:5,14
**Dog (15)** 24:15;25:1,10,16;30:6;36:14,15;37:1,24;38:1,23;40:1;41:2;92:18;97:12
**Dogs (1)** 25:12
**dollar (1)** 45:20
**dollars (5)** 7:5;54:12;58:7;60:19;73:23
**domain (3)** 20:18;70:20;71:5
**domino (1)** 62:19
**done (10)** 7:17;27:1;47:13;48:4;50:1;52:10;63:16,18;80:2;103:24
**door (1)** 26:20
**double (1)** 85:15
**down (20)** 5:25;6:10;12:6;18:18;26:2;32:8,11,16;37:6;46:17;65:8;68:2;69:14;71:22;83:13,24;84:5;93:25;94:1;105:17
**dozen (2)** 6:22;21:18
**drafting (1)** 27:22
**drive (2)** 25:2;41:17
**Drive-In (2)** 25:5,11
**due (5)** 50:19;54:4;57:22;60:16;92:3
**during (7)** 43:8;49:18;52:5;53:17;84:12;86:16;91:19

**E**

**earlier (1)** 62:11
**earth (3)** 88:17,19,21
**easier (1)** 69:21
**Eastgate (2)** 70:6,12
**easy (1)** 26:2

**eat (1)** 36:16
**economy (1)** 98:25
**economy's (1)** 17:22
**educate (1)** 25:8
**educational (1)** 2:17
**effect (1)** 62:19
**effectuated (1)** 50:2
**effort (1)** 74:6
**EG (1)** 70:7
**Eight (2)** 35:2;50:24
**Electric (1)** 56:13
**else (9)** 25:25;33:13;52:15;55:10;61:22,25;80:13;87:25;97:10
**elsewhere (4)** 63:20;65:6,19;66:3
**email (2)** 104:23;105:3
**emails (3)** 9:5;104:9,12
**Emily (1)** 42:24
**eminent (2)** 70:20;71:5
**employees (3)** 26:3;84:10;89:8
**employment (2)** 3:12,20
**empty (2)** 22:8;37:20
**end (7)** 5:23;7:6;19:9,17;46:7;103:9;105:25
**ended (2)** 2:19;6:8
**enough (4)** 53:4;55:22;59:15;63:12
**entities (9)** 20:4;43:9,13;45:8;49:3;63:11;72:2;73:5;91:5
**entity (26)** 20:1;22:2,6;24:2;29:7,16,18;30:7;31:3,6,12;34:18,22;35:18,23;36:6;40:10;41:25;45:15;47:7;71:23;73:7,13;92:16;94:10;98:3
**entry (1)** 101:13
**equate (2)** 47:16;72:2
**equity (3)** 17:2;47:9;93:20
**established (1)** 104:21
**estate (34)** 15:3;17:17;22:10;29:17;36:2,4;42:4,11,20,23;43:1,4,11,16,18;44:17,21;45:4,19;47:8,12,17;49:10,17;50:1,3;63:16;71:8;73:3;74:9;80:2,16;83:13;94:1
**estimated (2)** 18:6;38:13
**even (6)** 32:14;50:10;55:16;64:5;72:1;98:11
**everybody (2)** 8:6;24:14
**Everyone (1)** 23:16
**evidence (2)** 99:10;100:22
**exact (2)** 42:18;67:15
**Exactly (1)** 38:19
**EXAMINATION (1)** 2:6
**Excel (1)** 67:12
**except (2)** 23:16;63:18
**excess (1)** 49:8
**excessive (2)** 64:20;65:22
**exciting (1)** 23:20
**executing (1)** 13:11
**exempt (2)** 79:17;80:12
**exemption (1)** 49:1
**exemptions (1)** 17:5
**Exhibit (84)** 10:8,9;14:17;23:7,10,23;28:14,18;29:13;30:25;31:9;35:8,12;36:10;37:10;39:14,16,17,18;40:10;41:1,13;44:5,7,13;45:10;48:22;51:2;54:2,14;56:7;57:21;58:4,17,17;59:20;63:14;65:15,17,17;66:18,18;72:5,8,10;73:9;75:19,22;78:8;79:5;80:25;84:23;85:6,7,21;86:4,6,8,21;90:18,22;91:6,11;92:7,8,20,21;93:3,12,13,25;94:8;95:10;96:8,9,14,25;97:4;98:2;101:7,24;103:13,13;104:6
**exhibits (7)** 8:18;10:9;58:12,16;84:23;100:11;103:7
**existed (1)** 105:5
**expedited (2)** 39:1;89:13
**expenses (2)** 22:24;97:11
**expert (1)** 42:25
**experts (1)** 43:25
**explain (1)** 5:16
**explained (2)** 54:3;57:22
**explanation (1)** 93:10
**extended (1)** 26:22
**extra (1)** 93:16

**F**

**facilities (3)** 5:22;6:25;101:21
**facility (2)** 5:25;103:25
**fact (1)** 45:10
**facts (1)** 102:20
**failed (4)** 14:13;54:8;58:2;64:21
**fair (3)** 15:22;16:14;45:3
**familiar (1)** 14:21
**families (1)** 8:6
**family (1)** 25:10
**favor (1)** 100:21
**favorite (1)** 23:16
**feared (1)** 99:7
**February (10)** 29:1;53:13,16;60:14,19;64:13,15,22,23;104:21
**fee (1)** 53:2
**feed (1)** 25:8
**feeling (1)** 77:21
**fees (3)** 88:14;90:10;104:3
**feet (1)** 24:12
**fell (1)** 94:13
**few (4)** 6:6;55:15;62:22;64:9
**field (1)** 25:6
**Fifth (9)** 6:1,3;56:4;75:7,9;94:23;95:10,12;104:1
**fight (1)** 82:4
**fighting (2)** 52:4;55:11
**figured (1)** 70:9
**file (4)** 3:8;5:17;19:17;44:4
**filed (8)** 3:15;13:10,14;14:9;27:22;29:24;51:4;82:2
**filing (6)** 2:25;3:3;13:20;33:2,3,4
**fill (1)** 46:8
**filled (1)** 74:2
**Final (1)** 12:1
**finally (3)** 50:21;55:16;104:5
**Financial (31)** 6:1;14:6;20:24;46:14;52:22;53:2;54:6,19;56:4;57:25;62:15;66:8,24;67:15;72:18;74:3;75:11,15;76:1,6;77:5;78:7,9;81:3;84:25;85:22;87:19;91:14;94:9,21;96:20
**financials (2)** 6:10;77:24
**find (1)** 38:14
**fine (2)** 5:23;44:3
**finish (3)** 4:7;8:1;26:14
**finished (4)** 29:8;46:10,11;97:13
**finishing (1)** 97:14
**firm (3)** 42:6,8,24
**first (25)** 5:8;6:1;10:10;11:18;15:6;22:17;24:23;34:15;36:7,13;42:10;46:7;51:25;52:20,22;53:2;54:19;55:3,15;56:4;69:19;73:17;90:22;93:19;95:24
**five (9)** 5:13,14,22;6:16;8:4;22:16;51:22;52:1;94:2
**fixing (1)** 72:24
**Flatley (1)** 99:16
**flesh (1)** 89:13
**float (4)** 52:23;53:3,18;60:1
**flow (2)** 84:6;97:17
**flowing (4)** 4:2,7,10;38:1
**fluctuate (1)** 93:1
**fluctuated (1)** 4:24
**flying (1)** 44:17
**focus (4)** 5:6;8:8;20:2;84:21
**follow (1)** 59:23
**followed (1)** 100:4
**following (2)** 55:5;68:2
**follow-up (1)** 60:15
**food (1)** 89:7
**foot (1)** 36:14
**forcing (1)** 54:22
**forensic (1)** 52:11
**forget (1)** 36:23
**forgive (1)** 23:17
**form (2)** 76:4;81:10
**formal (1)**

43:20
**forth (1)** 84:22
**Forty (1)** 13:1
**forward (1)** 4:7
**found (5)** 3:7;9:11;42:17;59:8;65:9
**four (13)** 6:23;8:24;9:3;19:3;25:7;32:11;52:4;57:9;62:4;78:19;94:12;98:20;100:11
**four-family (1)** 73:11
**Frankly (1)** 16:5
**fraud (9)** 7:25;63:17;71:18;80:23;90:19,20,20;92:4;105:2
**freeze (1)** 10:1
**freezing (3)** 53:19;54:3;57:22
**Friday (2)** 105:13,24
**friend (1)** 46:12
**friends (1)** 42:22
**front (12)** 10:8,21;23:22;35:12;36:10;37:11;39:17;67:25;84:24;86:4;95:4,10
**froze (1)** 54:21
**full (7)** 2:9;27:6;41:20,21;46:5;74:6;98:23
**full-service (1)** 70:19
**fun (2)** 24:13;25:14
**funded (1)** 87:16
**funding (1)** 84:13
**funds (23)** 8:21;12:19;13:22,24;19:21;23:1;27:4;53:1;54:4,11;57:12;58:6,13;59:12,16,17;60:17;61:4;63:3;65:18;66:1;87:20;98:22
**funds' (1)** 57:23
**Further (3)** 55:19;60:20;105:14
**future (2)** 22:24;32:18

## G

**gain (2)** 14:2;19:14
**gains (2)** 12:14,17
**Galbraith (1)** 73:20
**garnishment (2)** 13:22;14:10
**Gatherings (1)** 40:11
**gave (12)** 7:11;43:6;52:22;55:10;61:22;66:24;76:1,21;77:13;81:7,8;90:14
**GE (16)** 36:9;39:7;55:2,14,19,25;56:2,16,19,21,24;57:3,11;58:11;60:11;95:11
**general (2)** 12:24;56:13
**Generally (1)** 13:1
**gets (1)** 91:24
**gift (2)** 43:5,6
**given (3)** 26:22;78:23;81:3
**giving (2)** 81:5;102:10
**GOERING (57)** 2:2,7;10:6,7,24;11:1,4,6,12,14;23:8,10,12;28:15,17;33:15,16,20;34:2,9,14;35:9,11;44:2,4,8,10,11;48:4,6,10,13,19,21;63:24;64:2;65:15,16;66:13,16;75:20;85:12,18,20;91:8,10;99:5,9,24;100:6,8,10;103:7,11;105:10,16,21
**goes (3)** 86:12;91:19,21
**goldens (1)** 24:25
**Good (7)** 2:8;3:7;21:15;71:6;84:1,9;105:20
**grabbed (1)** 7:14
**grandchildren (1)** 43:7
**granddaughter's (1)** 94:19
**Grasshopper (7)** 34:23,24;35:6,20,21,22,23
**great (2)** 7:16;22:16
**greater (1)** 3:23
**grow (2)** 26:16;62:24
**growing (2)** 77:9;87:20
**grown (4)** 8:3;12:16;24:24;25:13
**growth (1)** 88:1
**guarantee (5)** 30:18,21;40:23;78:14;100:23
**guaranteed (2)** 31:13;66:2
**guarantor (2)** 37:16;50:19
**guess (3)** 11:11;27:19;93:9
**guests (1)** 25:15
**guide (1)** 48:12
**guides (1)** 8:6
**guy (2)** 33:25;55:6

## H

**half (10)** 21:18;31:22;40:16;43:1;71:7;78:19;84:6;85:9;86:16;94:11
**Hamilton (1)** 100:18
**hand (2)** 67:18;82:21
**hands (2)** 55:9;61:21
**handshake (1)** 57:4
**hanging (1)** 50:10
**happen (1)** 44:16
**happened (5)** 52:12;70:15;78:14;88:5,21
**happens (2)** 25:7;70:16
**happy (4)** 25:9;38:6;63:24;88:12
**hard (2)** 23:20;88:10
**Harold (6)** 6:5;52:5,24;58:21;67:4;104:10
**Harold's (1)** 57:3
**heading (1)** 53:14
**healthcare (1)** 25:6
**hear (1)** 49:18
**heard (6)** 49:11;61:8,10;80:22;88:20;96:2
**hearing (3)** 13:22;14:10;100:5
**Hearsay (1)** 33:14
**heck (1)** 59:25
**held (2)** 54:21,22
**help (4)** 4:16;10:13;22:24;42:4
**here's (1)** 65:10
**Heritage (2)** 39:11;40:13
**Herringbone (1)** 41:16
**hiding (1)** 80:23
**High (3)** 2:18;18:15;22:20
**higher (5)** 22:7;30:15;91:15;96:15;97:6
**highlights (2)** 34:11,12
**Hill (1)** 2:18
**Hills (1)** 96:2
**hire (1)** 33:23
**hired (1)** 67:4
**history (1)** 3:20
**hit (3)** 34:11;84:3,10
**hitting (2)** 22:13;42:22
**hold (2)** 32:5;62:5
**holding (3)** 7:15,21;95:16
**holdings (4)** 23:14;47:17;73:14;88:18
**hollering (1)** 6:12
**home (9)** 5:19;6:21;7:9,16;20:20,21;89:9,15,15
**homes (2)** 6:22;24:11
**honest (1)** 7:24
**Honor (2)** 99:15;105:18
**hopefully (1)** 51:20
**hoping (1)** 28:7
**horrible (1)** 84:9
**hospital (1)** 97:13
**hospitals (2)** 25:13;26:4
**hot (1)** 16:9
**hour (1)** 99:12
**house (6)** 17:12;25:2,4;37:7;49:1;50:22
**HRM (2)** 73:6,14
**hundred (1)** 73:22
**Huntington (92)** 3:16;5:2;6:1,4,17;7:4,11;8:10,16,20;9:19,22;12:8;14:1;19:19;23:1;33:8;49:11,18;50:8,10;51:25;52:12,22;53:1,7,14,16,17,22;54:3,5,10,17,19,20,25;55:1,25;56:13,15,20,24;57:11,19,21,24;58:4,11,13,18;59:7,21,23;61:5,16;63:17;64:14,20;66:2;74:21,22;75:2,4;77:14,16,18,23;78:4,10,15,23;81:8;82:17;88:2,7;90:19;94:4,22;95:11,15;98:22;100:14;102:3,8,13,16,20;103:2;104:3,9,20
**Huntington's (2)** 65:8;82:9
**hurting (1)** 51:24
**Hyde (4)** 36:10,25,25;37:10

## I

**idea (3)** 24:10;38:11,22
**identified (5)** 63:17;89:20;96:16;

97:4,19
**identify (3)**
39:18;58:17;59:21
**ie (1)**
27:4
**immediately (1)**
52:25
**impossible (1)**
89:5
**impression (1)**
78:18
**improper (4)**
54:11;58:5;60:17,18
**included (1)**
25:21
**including (1)**
53:7
**income (1)**
88:1
**increase (1)**
87:14
**incurred (1)**
28:25
**independent (1)**
20:22
**indicted (1)**
81:18
**individual (2)**
8:5,5
**individually (1)**
9:10
**individuals (1)**
62:15
**information (6)**
6:13;66:10;77:24;78:2;80:17;82:18
**informed (1)**
33:11
**initiated (1)**
2:20
**inside (1)**
41:11
**instead (2)**
52:14;66:1
**institution (3)**
54:6;57:25;60:22
**insurance (6)**
74:15;79:7,9,20;93:19;95:19
**intent (1)**
4:19
**interest (14)**
3:23;15:4;22:13,21;25:22;31:11;33:13;45:7;51:10;73:2;83:13;90:6;94:1;96:19
**interesting (1)**
60:9
**into (11)**
18:21,22;22:17;24:24;42:2;50:7;52:25;79:19;80:7,8,13
**Investments (1)**
34:24
**invite (1)**
9:16
**involve (1)**
43:5
**involved (4)**
8:21;51:22,23;73:3
**involvement (1)**
54:12
**involving (2)**
58:6;60:18
**IRA (4)**
18:9,11,16,22
**IRS (1)**
43:16
**Island (1)**
30:6
**issue (5)**
7:1;8:9;12:13;82:4;104:19
**issues (6)**
57:12;59:6,13;62:22;102:13,21
**Ivy (3)**
20:19;72:3,8

**J**

**jail (3)**
57:7;81:16,19
**job (1)**
62:20
**Joe (3)**
6:6,14;77:13
**jointly (1)**
17:18
**JOSEPH (3)**
2:5,6,10
**Judge (22)**
10:6;11:2;23:8;33:16,21;34:10;35:9;44:2,10;48:7;63:24;65:15;66:13;85:12;91:9;99:9,16;100:6,21;103:8;105:10,21
**judgment (10)**
5:2;9:19,22;33:10;81:25;100:14,17;101:12,15,19
**jump (3)**
84:22;85:7;103:10
**jumping (1)**
81:1
**June (11)**
75:14;77:18;81:2,2;83:21;86:1,5,20,22;87:8;94:19

**K**

**Kabbage (1)**
63:11
**keep (6)**
25:9;26:3;54:15,23;87:16,17
**Kemba (2)**
37:5,6
**Kentucky (3)**
20:10,12,13
**Kenwood (1)**
31:8
**kept (2)**
57:6;84:16
**kicked (2)**
52:1;63:18
**kid (1)**
7:17
**kind (2)**
18:3;96:9
**kinds (2)**
25:9;102:8
**Kings (1)**
30:6
**kit (2)**
17:25;18:1
**Kite (3)**
53:15;55:14,15
**kiting (18)**
6:15,16;8:14;51:22,25;52:5,14,18;53:8;54:23;56:18,20;57:23;58:19;59:16;64:22;81:15;102:20
**knew (8)**
6:22;8:17;12:15;50:15;51:11;52:13;53:18;61:6
**Knoll (3)**
20:19;72:3,8
**knowledge (8)**
29:25;45:4;49:13,21,25;58:5;63:1;74:4

**L**

**land (5)**
31:4;40:3;70:3,16,22
**Lanes (4)**
31:5;32:10,13,17
**language (1)**
60:9
**large (1)**
23:13
**last (8)**
15:19;21:20,22,23;32:16;59:8;60:8;62:22
**later (4)**
32:20;54:7;60:22;84:16
**launderers (1)**
52:8
**law (5)**
42:6,8,24;79:16,17
**lawsuit (10)**
57:2;58:10,11;101:20;102:2,7,12,15,19;103:3
**lawsuits (3)**
9:11;58:9;59:10
**lawyer (6)**
9:7,7;33:24;44:17;62:14;81:7
**lawyers (3)**
33:23;62:20;90:15
**lay (2)**
3:9;84:15
**leads (1)**
42:2
**learned (1)**
63:5
**least (3)**
3:23;17:1;49:4
**led (1)**
5:17
**left (3)**
55:24;70:21;89:18
**leftover (1)**
70:17
**legal (1)**
88:14
**legs (1)**
25:7
**lend (1)**
63:2
**lender (2)**
16:18;94:24
**lenders (3)**
33:4,7;64:6
**lengthy (1)**
99:8
**lent (2)**
51:23;52:5
**less (2)**
24:8;46:24
**letter (29)**
33:12,16,19,25;53:22,24;54:1,3,11,14;55:3,6,7;57:19,21;58:5,18,22;59:3,12,12,21;60:3,5,7,15,23;61:4;64:14
**letters (2)**
57:16;104:22
**liabilities (5)**
3:6;28:2;68:7;76:19;77:2
**liability (4)**
13:6,7;14:7;61:25
**liable (2)**
14:3;62:5
**license (1)**
7:18
**life (7)**
14:16;41:13;45:11;69:20;74:15;79:7,9
**line (10)**
8:1;38:24;53:14;54:9;55:12;57:17;58:3;83:17;93:25;105:1
**liquidate (1)**
13:18
**liquidated (3)**
19:15;88:25;89:2
**liquidates (1)**
14:1
**liquidating (1)**
13:14
**liquidation (9)**
19:11;20:25;21:7;24:1;30:12;41:8;47:10,18;101:21
**liquidity (1)**
68:19
**list (7)**
27:8;28:1,25;69:19;74:19;94:22;95:6
**listed (1)**
72:3
**litigating (1)**
57:12
**litigation (6)**
51:5;57:11;82:6,8,12;90:11
**little (10)**
7:17;12:6;22:11;24:22;36:11;84:17;95:3;96:10;98:12;100:22
**lived (2)**
2:14;25:1
**Living (3)**
20:13,21,22
**LLC (13)**
20:12,13;24:2;29:17,19;35:19,19;36:11;37:15,16,17;41:2;69:22
**LLCs (4)**
19:24;25:21;27:14,18
**LMA (3)**
69:2;84:18,21
**loan (49)**
5:25;6:3,5,7,8;8:20,25;9:15;28:18,24;29:6,20;30:18,21;31:14;34:13,15;37:5;39:9;40:24;41:5;49:13,21;54:17,20,21;61:6;63:2,4;64:9;65:6;66:2;68:18,24;69:18;75:3;77:17,22;78:4;86:18,21;90:2,5;93:12,16,19;95:13,16;103:19
**loans (12)**

4:12;27:17;31:16;32:21;39:12;46:20;57:3;61:16;64:19;96:18;97:16,22
**loan's (1)** 95:14
**local (1)** 52:7
**located (7)** 24:4,23;25:25;32:24;36:13;38:23;39:21
**location (3)** 4:13;24:5;41:2
**locations (2)** 25:22;26:4
**lock (1)** 13:19
**locked (1)** 13:20
**Lodge (1)** 24:8
**long (4)** 2:14;12:16;13:1;21:11
**long-term (1)** 30:9
**look (25)** 10:20;11:13;38:24;44:25;48:22,24;52:16;58:16;63:13;64:4,8,22;67:11;76:24;78:8;84:23;86:18;90:21;91:4;93:25;95:4;98:1;103:12;104:18;105:1
**looking (6)** 11:8;21:18;63:19;70:1;85:21;96:24
**looks (4)** 15:6;18:4,5;103:17
**loss (3)** 7:13;18:20;56:1
**lost (1)** 56:21
**lot (10)** 7:14;42:16;43:2;47:9;50:5;64:12;66:9;80:6;88:11;90:7
**loud (1)** 88:21
**love (1)** 25:16
**low (1)** 82:21
**LTD (1)** 41:13
**Lynch (8)** 10:4,16;18:19,21;67:23;68:18,24;86:21

## M

**Madison (1)** 24:6
**Madisonville (1)** 36:13
**mafia (1)** 52:8
**mail (1)** 63:8
**main (2)** 89:15;104:18
**Maine (3)** 17:6;74:12;94:18
**maintain (1)** 45:7
**majority (2)** 45:14;96:16
**makes (2)** 8:5;91:1
**manage (1)** 7:19
**managed (1)** 33:13
**manipulating (1)** 65:18
**manipulation (8)** 8:21;54:4,11;57:23;58:6,13;59:17;60:17
**many (15)** 3:22;7:25;10:19;15:2;17:23;26:7;27:17;31:16;34:25;51:3;64:5,19;67:20;98:19;102:21
**March (10)** 46:10;54:10;60:4;64:15,24;65:11,13,14,19;104:21
**margin (10)** 4:16,24;12:21;19:7;69:1;85:4;86:19;87:8,9,14
**marked (9)** 14:17;30:25;51:2;56:7;63:14;66:18;72:7;101:24;103:13
**market (9)** 20:7;21:9,11,15,17;22:11;71:22;83:3;86:16
**marketable (10)** 67:22;68:10;69:7,10;82:24;90:22;93:7,8;97:7,18
**marketing (1)** 92:12
**Mason (4)** 25:1;29:17,19;30:6
**Masonic (1)** 24:8
**math (1)** 87:1
**matter (1)** 88:22
**maximize (1)** 26:23
**May (9)** 6:14;8:9,10,12,13;11:5;29:24;52:6;105:17
**Mazunte (1)** 36:17
**MCA (2)** 64:6,19
**MCAs (3)** 52:7;62:11;81:17
**McGrail (3)** 6:6,15;77:13
**mean (5)** 17:4;19:25;33:18;69:11;74:1
**meaning (1)** 52:24
**means (2)** 57:23;69:17
**meet (2)** 5:8;44:17
**meeting (5)** 44:16;53:17,23;57:20;60:14
**meetings (4)** 8:19,22;9:4,15
**member (1)** 35:19
**memorializing (2)** 53:23;57:20
**memory (1)** 103:24
**Merchant (3)** 52:9;62:23;63:2
**Merchants (3)** 34:15;36:7;95:24
**Merrill (16)** 10:4,16;13:3,24;18:19,21,23;19:3,10,16;48:16;67:23;68:18,24;86:21;87:20
**met (2)** 53:16;59:1
**middle (3)** 46:11;91:13;93:18
**mid-May (1)** 55:13
**might (3)** 31:18;73:24;99:5
**miles (4)** 25:2,2,3,4
**million (105)** 7:10;11:19;12:1,23;13:5,8;14:8;16:8;17:2;18:17,18;19:8,12;21:8,25;25:15;26:24;30:3,11;34:12,21;37:19;38:8;41:7;45:20;46:24;47:5,14,23;48:15,24;49:4,8;52:4,6;54:18;55:11,18;56:17,22;57:2;65:10,21;68:6;69:4;72:19;76:12,16,18,20,22;77:1,3;78:5,11,16,17;80:8;83:8,9,12,14,14,20,21,25;85:3,5;86:12,12;87:12,15,18;88:14,15;89:5,17,18;90:3,12,13,15,15,16,20;91:1,6,12,15;92:3,10,20;93:5,6,9,13,15;94:13;95:14;96:7,8,14;97:2,8;101:16
**millions (5)** 7:5,5;54:12;58:6;60:18
**mine (2)** 11:8;82:13
**minute (5)** 36:3;51:18,20;57:17;99:23
**minutes (2)** 5:13,14
**misappropriated (1)** 7:8
**missing (1)** 97:10
**Mm-hmm (3)** 20:5;85:25;87:22
**moment (4)** 5:7;10:6;66:14;99:12
**money (37)** 4:19,21,24;7:14;18:11,25;51:24;52:5,7,11,25;56:19,21;57:3;59:15;61:11,12,17,24;62:18;63:3,19;64:6;65:22;71:15;74:19;80:9;81:17;84:16;87:25;88:11;89:1,19;90:6,17;91:24;101:16
**month (1)** 55:5
**monthly (2)** 6:9;30:16
**months (10)** 19:13;21:12;32:11;50:24;52:1;54:13;58:7;59:9;60:8,19
**more (27)** 4:21;18:13;23:20;26:12;38:8;41:10;47:2,9,18,24;50:23;54:18;55:15,18;56:20;64:1;67:20;73:25;74:23;88:1;90:12;93:10;97:16;98:7;100:11;103:7;104:6
**morning (1)** 99:7
**mortgage (10)** 15:11,13;16:16,22;17:13,15;29:24;45:23,25;92:19
**mostly (1)** 41:20
**motion (1)** 3:16
**move (7)** 4:7;43:18;54:5;57:24;60:21;75:14;103:2
**moved (8)** 25:18;55:2,5,25;56:18,19;60:24;80:13
**moving (1)** 80:24
**much (36)** 14:6,22;18:11,15;21:24;34:20;37:21;43:12,22,23;50:6;64:24;65:3,11,20;67:17,20;69:5;71:11;72:16;73:24;76:17,19;77:5;78:4,15;86:19,25;87:9;89:1,14,22;90:3,10;97:6;104:3
**mud (1)** 90:8
**multiple (7)** 9:4;27:9,14;37:11;43:5;53:7;102:5
**multi-tasking (1)** 7:20
**multitude (1)** 25:21
**myself (1)** 9:2

## N

**name (25)** 2:9;15:9;17:23,25;18:2;20:12,16;29:16;31:6;34:18;42:7,7;50:17,18;59:3;60:6;67:5;68:10;69:22;70:10;73:4,13;80:24;94:3;97:25
**names (1)** 10:20
**National (1)** 56:13
**near (5)** 13:8;30:6;50:22;70:3;99:11
**necessary (1)** 33:6
**need (12)** 6:12;15:21;27:15;28:1;38:12;43:15,16;81:13;91:4,11;93:10;

104:5
**needed (3)**
6:2;78:2;87:17
**needs (1)**
60:1
**negligence (1)**
102:15
**neighborhood (1)**
17:8
**neighbors (1)**
15:23
**net (1)**
76:21
**new (2)**
6:2;25:14
**Next (8)**
11:23;39:25;42:2,25;53:21,25;65:1,19
**nobody (1)**
90:16
**Non (1)**
94:7
**non- (2)**
69:9;93:7
**non-applicable (1)**
95:6
**None (1)**
59:9
**Non-marketable (2)**
69:14;83:6
**Nope (2)**
55:20;77:19
**normally (1)**
4:12
**north (1)**
33:1
**Northern (2)**
20:10,13
**notice (5)**
6:14;101:10;102:10,21;105:7
**noticed (1)**
48:10
**notify (2)**
8:25;66:5
**November (2)**
6:8;46:12
**number (6)**
17:7;19:14,14;21:4;52:20;65:1
**numbers (3)**
10:19;22:15;84:24
**nursing (9)**
5:19;6:21,22;7:9,16;20:20;89:9,15,15

**O**

**Oakley (3)**
24:13;25:4,11
**objecting (1)**
3:15
**Objection (1)**
33:14
**obligation (2)**
19:16;52:13
**obligations (1)**
5:4
**observant (1)**
51:25
**October (1)**
52:19
**off (9)**
4:6;22:22;32:5;52:15;71:1;84:15;89:17;90:1;94:13
**offer (2)**
21:17,21
**offered (2)**
5:20;80:17
**offers (1)**
21:13
**office (2)**
2:25;80:16
**offset (1)**
18:20
**Ohio (2)**
2:11,19
**old (5)**
17:12;25:11;32:15;39:19;42:23
**once (3)**
6:23;73:4;91:24
**one (46)**
5:24;10:6,10,20;11:18;15:6;17:17;20:6,7;23:21;24:8,9,15,23;25:7,14;26:1,14;27:21;28:10;39:14;49:23;50:19;51:18;64:24;65:6,10;69:6;71:18;72:13;73:6,8,15;74:23;80:7,8;84:5;89:4;90:12,23;93:20;96:23;97:15;98:20;104:18,19
**one-day (1)**
52:23
**ones (4)**
4:4;23:19,20;96:1
**one's (4)**
26:8;65:4;70:6;104:24
**ongoing (1)**
20:4
**only (11)**
7:13;14:12;35:18;37:1;55:15;60:8;74:9;78:18,21;90:14;100:21
**open (1)**
66:14
**opened (2)**
24:23;25:10
**opening (3)**
24:18;25:14;103:1
**operate (1)**
87:21
**operating (8)**
22:2,6;30:7,16;35:16;41:10;46:6;73:18
**operation (1)**
26:18
**operations (1)**
84:11
**opinion (3)**
27:3;51:19;62:3
**opportunity (5)**
3:14;43:7;51:14;79:19;99:13
**order (11)**
4:13,16;13:22;20:2;23:1;38:12;39:15;42:10;43:12,18;50:8
**original (1)**
95:13
**originally (2)**
99:6;103:19
**ours (1)**
36:18
**out (45)**
3:9;7:2,10,15,21;8:9;9:11;10:19;18:22;25:1,17;42:24;44:23;48:8;50:11,16,20;52:1,6;55:8;56:5;59:8,25;60:1;63:3,18,22;64:3,19;65:22;67:4;70:9;74:2;77:17;80:24;84:18,20;87:2;89:14,19;94:16;96:10;97:25;100:17;104:1
**outside (1)**
51:8
**outstanding (2)**
27:18;28:9
**over (26)**
4:23;5:21;12:18,20;14:14,16;19:24;22:14,18;25:15;26:24;27:1;34:12;54:12;55:11;56:19;58:7;60:19;62:22;65:23;76:21;77:24;82:14;88:18;89:7;95:15
**overdraft (2)**
55:18;104:15
**overdrafts (1)**
105:4
**oversee (1)**
26:17
**owe (6)**
30:2;34:20;74:19,22;78:10;90:3
**owed (6)**
46:24;57:12;78:13,19,19,21
**owes (1)**
61:12
**own (18)**
7:12;15:3;27:12;31:23;36:18,25;37:1,4;40:18,21;41:24;45:11;51:10;72:3,10;74:12;88:3;89:6
**owned (8)**
17:17;34:22;35:1,6,18;74:10;88:5;94:11
**owner (5)**
34:24;35:23;37:15,17;39:19
**owners (1)**
73:15
**ownership (1)**
31:11
**owns (6)**
29:18;31:13;36:24;37:11,16;41:2

**P**

**PACE (1)**
90:2
**package (1)**
93:16
**page (6)**
63:23;67:25;68:9;69:6;78:8;90:22
**pages (3)**
63:22;64:1;68:2
**paid (3)**
19:15;71:1,12
**Pan (1)**
42:25
**papers (1)**
80:15
**paperwork (1)**
50:5
**paragraph (1)**
60:12
**parcel (1)**
31:19
**Pardon (1)**
10:6
**parent (1)**
23:16
**park (5)**
24:12;36:10,25,25;37:10
**parking (1)**
41:18
**part (13)**
18:19;36:4;43:4,10,15,21;53:8;58:10;72:25;80:2,3;93:11;100:25
**partial (3)**
73:2;83:12;94:1
**participate (1)**
9:16
**particular (2)**
23:20;26:18
**parties (4)**
58:12;59:14;102:5;105:13
**partner (4)**
49:23;51:8,21;73:8
**Partners (3)**
81:4,6,9
**partnership (1)**
5:22
**parts (2)**
32:14;64:3
**party (2)**
2:20;19:1
**passed (1)**
63:15
**past (1)**
4:15
**pay (16)**
11:1;12:17;19:22;22:25;23:1;27:4,5;38:18;63:4;64:19;65:8,11;71:11;80:10,11;98:22
**paying (1)**
30:16
**payment (1)**
50:8
**payments (1)**
39:6
**peel (1)**
89:17
**peeled (1)**
90:1
**pending (1)**
102:24
**people (3)**
7:14,25;21:18
**Per (1)**
43:24
**percent (7)**
3:23;22:14;37:15,17;41:21;72:4;93:23
**percentage (1)**
98:3
**performing (2)**
49:14,22
**perhaps (1)**
78:1
**period (8)**
26:22;43:9;54:13;55:17;60:19;65:23;77:4;84:8
**permission (1)**
39:25
**person (3)**
6:24;25:16;38:15
**personal (12)**
5:3;15:7;33:5;66:7,24;67:15;75:15;76:1,6;78:7;81:3;96:20

**personally (6)**
15:3;30:18,21;37:4;40:23;77:10
**pertinent (1)**
64:3
**pet (6)**
23:18;24:19;36:14,15;77:11;84:14
**pick (1)**
73:6
**picked (1)**
6:4
**picture (2)**
46:13;56:5
**piece (7)**
15:25;16:12;17:17;31:18;70:3,22;73:20
**pieces (3)**
15:3;74:9,10
**place (1)**
98:19
**places (2)**
58:9;62:16
**Plaintiff (1)**
56:13
**plan (4)**
50:3;80:3;99:3,11
**planning (21)**
36:2,4;42:4,11,20,24;43:4,11,16,18;44:17,22;45:4;47:8,12;49:10,18;50:1;63:16;80:2,16
**plans (2)**
80:7;100:4
**play (1)**
90:5
**pleading (2)**
3:14;44:6
**pleadings (3)**
60:10,12;63:5
**Pleas (1)**
100:18
**please (17)**
2:8;5:14,16;10:21;24:22;39:18;48:22;54:16;55:12;57:18;58:17;59:21;73:10,12;85:12;93:17;105:23
**pledge (1)**
68:19
**pledged (1)**
69:15
**plus (2)**
4:21;19:12
**pm (4)**
2:1;100:3,3;105:25
**point (10)**
10:12;18:15;42:3;48:8;63:15;66:25;67:3;79:19;84:15;89:2
**policies (3)**
79:7,14,20
**policy (1)**
80:8
**Porsche (1)**
18:4
**portfolio (2)**
23:13;86:12
**portion (1)**
71:6
**position (1)**
26:8
**positive (2)**
4:3;19:25
**possession (1)**
3:10
**possible (4)**
10:20;85:15,16;89:1
**potential (2)**
12:13;33:4
**potentially (1)**
65:8
**PPP (1)**
84:16
**prayed (1)**
84:19
**prefer (1)**
20:18
**Premier (2)**
53:20;54:5
**prepare (4)**
10:13;67:6,8,13
**prepared (5)**
3:8;14:23;19:11;23:24;45:1
**preparing (2)**
20:23;78:7
**present (2)**
33:17;44:13
**presentation (1)**
99:10
**presented (1)**
59:9
**President (1)**
58:25
**pretty (11)**
17:21;23:19;30:1;37:21;42:14;43:2;69:5;82:21;84:1;86:17;92:14
**prior (6)**
2:25;3:3;13:10;33:2;40:7;44:17
**Probably (8)**
12:20;17:3;18:1,7;35:2;53:9;79:23;81:10
**problem (4)**
55:10;57:2;61:22;64:21
**problems (4)**
38:15;62:16;105:4,8
**proceedings (1)**
105:25
**proceeds (1)**
101:21
**process (3)**
26:12;43:21;78:7
**producing (1)**
22:20
**product (1)**
4:8
**professionals (1)**
14:6
**program (2)**
67:11,15
**progress (1)**
28:5
**progressed (1)**
49:16
**project (4)**
4:8;23:18;24:13;46:23
**projects (6)**
4:9;23:17;26:15;46:21;98:13,19
**properly (1)**
101:15
**properties (7)**
7:12;20:7;21:16;34:25;35:3;37:11;78:19
**property (45)**
4:13;15:15,25;16:3,9,12;17:1,6,13;20:9,10,17,17;21:7,9;22:1,16,17;24:11;25:11;30:12,14;31:17,21,23;32:6;37:8,9;38:7;39:16;41:8;46:2;47:13;51:8;70:10,15,24;71:5,7;72:20;73:20;74:13;88:2;91:20;95:20
**property's (1)**
16:10
**protect (1)**
64:21
**protected (1)**
80:12
**proud (1)**
22:18
**provide (3)**
77:12;78:2;98:22
**provided (3)**
3:19;77:20;82:5
**providing (1)**
60:16
**public (1)**
20:18
**pun (1)**
23:17
**purchase (3)**
7:4;51:24;93:23
**purchased (4)**
31:21;32:9;40:15;80:5
**purpose (2)**
21:7;22:23
**purposes (2)**
47:8,13
**pursuant (1)**
61:3
**put (26)**
3:5;4:19;6:18;16:11;17:8;20:18;21:17;24:9;32:19;39:14;47:3;67:16;69:22,25;80:9;82:3;88:10;89:3;90:6,6;93:20,22,23;96:9;102:7;105:7
**putting (3)**
43:1;50:20;71:23

## Q

**quarter (1)**
78:21
**quick (1)**
51:18
**quickly (1)**
42:14
**quiet (1)**
6:12
**quote (1)**
58:3
**quoted (1)**
60:10

## R

**raise (1)**
63:19
**raised (1)**
102:19
**raising (2)**
23:1;102:12
**ramifications (1)**
33:5
**range (1)**
45:21
**rate (3)**
22:14,21,21
**rates (3)**
22:13;38:12,14
**Ray (11)**
2:3;74:10;75:15;82:22;84:25;85:10;92:9;95:5;96:16;97:7;98:1
**RAYMOND (6)**
2:5,6,10,21;15:1,9
**RBS (1)**
68:10
**RD (3)**
29:17,19;96:2
**reach (1)**
7:20
**reached (3)**
7:2;42:24;47:22
**read (18)**
3:14;10:22;51:11,14,15,20;52:20;53:9,14;55:12;57:1,17;59:11;60:12;62:13;63:25;70:25;94:2
**ready (2)**
100:6;105:10
**real (11)**
15:3;17:17;22:10;29:17;45:18;47:17;71:7;73:2;74:9;83:13;94:1
**realize (1)**
91:25
**realized (1)**
42:23
**really (6)**
22:15;46:8;56:9;63:25;91:25;96:17
**realtor (1)**
88:15
**Realty (2)**
73:6,14
**reason (3)**
7:21;39:15;56:16
**recall (10)**
31:20;40:2,15;43:12;67:3;71:14;86:15;89:14;90:10;94:18
**receive (1)**
19:21
**receiver (6)**
6:19;7:2;88:8,23,25;90:16
**recently (1)**
89:20
**recess (5)**
99:23;100:2,3;105:12,24
**recognize (11)**
29:13;31:1;35:13;41:14;44:14;51:2;66:19;75:22;101:25;103:13;104:6
**recollection (1)**
31:24
**record (5)**
2:9;23:6;31:7;63:25;85:6
**Red (26)**
24:2,15;25:10,12;28:11;30:6,22;36:13,15;37:1,24;38:1,23;40:1;41:2,19,20;50:22;70:3;91:6;92:18;93:18;97:12,12,14,15

**refer (3)**
59:20;72:7;73:9
**reference (2)**
59:19;93:24
**referred (2)**
59:15;70:1
**referring (3)**
23:7;35:8;69:25
**refinance (1)**
104:1
**reflect (7)**
8:18;11:16;18:8;64:3;73:1;79:11;96:19
**reflected (1)**
69:6
**reflection (2)**
45:3;80:25
**reflects (3)**
16:21;45:11;93:13
**refusal (1)**
73:17
**refused (1)**
19:20
**regarding (5)**
8:20;9:15;33:4;66:9;82:18
**reinvested (1)**
71:16
**related (1)**
61:1
**relationship (4)**
5:7,11,17;6:4
**remember (5)**
37:2;79:22,23;80:4;84:24
**remind (1)**
63:14
**reminded (1)**
55:6
**reminder (1)**
60:23
**remodeled (1)**
17:12
**remodeling (1)**
92:24
**remove (2)**
48:25,25
**rent (1)**
30:16
**repay (1)**
66:1
**repeat (2)**
9:2,21
**represent (1)**
68:24
**represented (1)**
9:12
**representing (1)**
9:9
**represents (1)**
39:16
**request (2)**
77:23;82:17
**requested (2)**
78:1;82:16
**required (3)**
3:2;54:5;57:24
**requirement (1)**
60:24
**requiring (1)**
60:21
**reserves (1)**
60:25
**residence (2)**
2:14;15:7
**resident (1)**
25:6
**residents (1)**
22:19
**residual (1)**
70:14
**resolve (1)**
105:13
**Resort (3)**
36:15,15;77:11
**resorts (1)**
24:19
**response (1)**
56:23
**responsibility (1)**
94:11
**result (1)**
87:19
**retain (3)**
42:3,10,20
**retained (4)**
42:6,8;45:5;47:7
**retiring (1)**
42:22
**reviewing (1)**
49:7
**Richard (1)**
82:13
**Rick (2)**
82:13,19
**rid (1)**
90:2
**Ridge (3)**
2:10;15:7;24:6
**right (102)**
2:2;5:6,13;6:1;11:12,21;12:8,18;13:23;14:12;16:8,9;18:6;19:7,24;20:11;21:18;22:11;23:4;24:13;27:1,13;28:8;29:11,12;30:2,24;32:3,5,21;34:3,8,22;36:9;37:10;38:15;39:6;40:9,18,23;41:22;47:3;48:14;52:4,10,16;53:5,24;54:9,24;56:23;57:10,15;58:22;60:25;61:8,11,13;64:10;66:17;68:1;69:20;73:9,17;74:24;75:14;76:21;77:7;78:3;79:6;80:19,22;81:11;82:5,22;83:25;84:2,12;85:21;87:2;88:16;90:4,18;92:7,19;93:3,24;94:14;96:13;97:9,18;98:25;99:25;100:6,7;101:23;102:24;103:6;104:5;105:10,12,20
**ringing (1)**
48:3
**Ringo (1)**
31:4
**rise (2)**
100:1;105:23
**Road (4)**
24:6;31:8;69:14;73:20
**Rockland (2)**
41:5;96:4
**rolled (1)**
18:22
**rotate (1)**
10:21
**Row (3)**
51:5,7,23
**ruled (1)**
100:21
**run (10)**
6:22,25;7:10,12,16;8:5;48:15;89:7,7,8

**S**

**S&T (5)**
51:5,23;52:10;53:3;56:4
**safe (1)**
4:23
**sale (7)**
17:4;20:7;22:22,24;50:21;72:13,16
**salvage (1)**
6:20
**same (12)**
14:9;49:20;53:22;57:16,19;60:15;65:11;67:15;76:4;85:14;92:14;97:6
**Sater (1)**
42:9
**saw (1)**
49:24
**saying (6)**
47:13;58:5;61:23;65:7;71:17;104:22
**Schedule (3)**
73:1;74:9;94:5
**scheduled (1)**
99:6
**schedules (5)**
3:8;27:22,25;28:21,24
**scheme (11)**
8:15;51:22;52:18;53:8;55:25;56:18;62:8;64:21;65:6,19;102:20
**Schneider (15)**
2:3,5,6,8,10,21;15:1,9;34:4;39:17;44:12;50:17;69:12;75:22;100:12
**School (1)**
2:18
**SCHUELLER (8)**
33:14;44:7,9;99:15,19,21;105:19,22
**scorched (3)**
88:17,19,21
**screaming (1)**
80:23
**screen (6)**
11:8;14:18;64:4;95:4;98:1;101:8
**screens (1)**
91:8
**scroll (4)**
14:20;27:8;64:23;86:8
**scrolling (1)**
64:5
**second (5)**
11:18;15:25;46:10;72:25;93:20
**secure (3)**
4:12;26:23;64:6
**secured (4)**
9:19,22;100:14,17
**securing (2)**
46:20;49:17
**securities (19)**
67:22;68:10;69:7,10,13;82:24;83:3,6;85:2,7;86:1,5,9;90:22;93:7,8;96:11;97:7,18
**security (1)**
62:20
**seemed (3)**
42:13;47:8;49:24
**seize (3)**
13:22;55:8;61:11
**seized (2)**
19:19;61:17
**seizure (1)**
12:13
**Self-employed (1)**
3:13
**self-reported (1)**
81:17
**self-storage (1)**
70:19
**sell (6)**
12:17;21:3,15;26:21;32:13;88:12
**selling (1)**
16:19
**send (1)**
49:23
**Senior (1)**
58:25
**seniors (1)**
20:22
**sent (7)**
52:14;53:22;54:10;57:19;58:4,18;104:22
**sentence (3)**
52:20;53:21,25
**September (5)**
81:2,6,14;83:18;87:9
**services (2)**
60:16;61:1
**set (1)**
48:1
**setoff (2)**
61:9,24
**Setting (1)**
5:2
**settlement (2)**
14:12;57:5
**seven (1)**
36:14
**several (1)**
97:19
**severe (1)**
80:20
**shares (3)**
41:24;45:11,15
**sheet (2)**
18:8;68:2
**short (2)**
55:17;65:23
**shorten (2)**
3:18;44:12
**shortfalls (3)**
84:14,17;87:16
**show (9)**
7:24;8:2;68:15;74:21;78:10;79:7;85:2;89:18;96:5
**showing (3)**
19:3;76:15;98:25
**shows (5)**
74:9;91:6,14;96:14;98:2
**shut (4)**
26:2;32:16;48:6;84:5
**side (3)**
77:9;90:23;98:2
**sides (1)**
9:12
**sideways (1)**
10:22
**sign (1)**

2:24
**signed (3)** 58:22;100:19,22
**silent (1)** 57:6
**similar (3)** 25:22;67:11;97:2
**single (1)** 20:1
**sit (1)** 59:11
**sits (2)** 24:8;72:20
**sitting (1)** 94:17
**situation (2)** 46:14;91:23
**Six (3)** 21:12;25:12;50:24
**slow (1)** 6:10
**small (3)** 8:4;32:25;37:6
**smart (1)** 63:12
**smile (1)** 25:17
**Social (3)** 51:5,7,23
**sold (18)** 6:19;7:6;20:4;22:6, 8;25:1;32:14,17; 50:24;69:13;88:9; 89:14,16,24,25;90:1, 12;96:3
**solicitations (1)** 63:10
**solvent (1)** 27:4
**somebody (1)** 61:22
**somehow (1)** 95:15
**someone (5)** 26:19;33:13;38:18; 52:15;55:10
**Somewhere (12)** 3:24;12:20;13:4,8; 18:17;21:22;27:20; 30:4;40:17;45:20; 61:25;80:15
**soon (1)** 82:2
**Sorry (16)** 11:22;23:8;35:9,12; 36:21;39:17;44:10; 48:20;53:25;55:23; 69:23;85:10,10;86:4; 92:10;104:25
**Sosna (27)** 5:7,17;8:10,20;9:5, 10;50:14;52:17;53:6; 55:2;57:7,24;58:5,21, 21;59:6;61:4,15;62:8; 63:19;64:6;65:5; 81:15;88:6;102:9; 104:6,10
**Sosna's (9)** 8:14;9:7,8;64:4; 65:23;81:14;88:18; 104:16;105:8
**sound (8)** 19:4;20:14;28:22; 29:1;63:20;83:25; 87:6;103:4
**sounds (1)** 101:4
**Spa (1)** 36:15
**speed (1)** 50:14
**spend (3)** 35:5;44:20;91:24
**spent (3)** 42:25;65:7;88:8
**spreadsheet (1)** 67:12
**square (2)** 24:12;36:14
**stack (1)** 80:15
**stage (1)** 92:24
**stand (1)** 2:3
**stands (2)** 62:12;100:2
**start (11)** 4:6,8;5:10;9:23; 11:15;15:2;20:6; 28:10;42:11;66:11; 89:10
**started (9)** 2:18;6:8,10;42:15; 49:10;51:24;52:17; 62:23;64:9
**starting (3)** 43:17;46:6;60:13
**starts (1)** 64:12
**startup (1)** 26:8
**state (6)** 2:9,19;70:13,18,20; 71:4
**statement (18)** 72:18;74:3;75:11, 15;76:1,6;78:9;83:19; 84:25;85:22;87:19; 91:14;94:9,21;96:5, 20,25;103:17
**statements (7)** 10:15,17;66:8,10; 77:6;78:8;92:25
**states (2)** 25:19,23
**Statman (1)** 9:6
**stay (2)** 84:16;97:2
**Stayed (2)** 83:5;97:5
**step (3)** 84:18;92:1;105:17
**still (15)** 13:24,25;26:12; 30:15;45:7,15;48:9; 57:7;60:6;70:16; 72:24;81:11;89:19; 97:20;98:17
**Stock (2)** 10:1;68:15
**stocks (1)** 68:14
**stop (6)** 13:21;19:20;52:16; 88:16;98:15;105:11
**stopped (2)** 52:3;56:20
**stopping (2)** 52:14;59:25
**storage (10)** 32:19;34:19;35:1, 16;70:12,14,17; 93:11;95:25;96:1
**Strauss (2)** 82:14,15
**street (1)** 37:6
**strike (5)** 12:12;13:10;42:7; 85:12;102:7
**strip (1)** 37:5
**structure (1)** 41:18
**stuff (3)** 77:9,11;90:2
**substantial (2)** 14:2;44:20
**substantially (7)** 30:15;38:8;41:10; 47:2,18,24;96:15
**successful (5)** 3:25;7:18;8:3; 13:14;63:7
**sued (3)** 56:21;81:21,23
**suffered (1)** 56:1
**sufficient (3)** 27:4,5;98:22
**suing (3)** 52:7;56:16;58:11
**summaries (1)** 68:1
**summary (7)** 10:10;23:23;33:10; 35:15;40:10;44:25; 51:18
**summer (3)** 21:23;29:8,10
**supplement (1)** 63:25
**sure (4)** 26:18;56:4;79:2,3
**surety (3)** 9:14;100:19,23
**surprisingly (1)** 60:11
**survived (1)** 26:2
**SWORN (1)** 2:5
**syndicate (1)** 6:2
**syndication (1)** 54:19

**T**

**talk (14)** 6:23,24;14:15; 23:21;28:8;41:13; 49:15,20;59:17;66:7; 67:17;78:6;99:21; 104:19
**talked (6)** 8:23;9:2;22:25; 57:9;62:4;88:19
**talking (8)** 13:4;58:4,13;59:12; 100:13;103:3;104:14; 105:3
**talks (1)** 22:14
**tax (5)** 13:2,6,7;14:7;19:14
**taxes (3)** 18:20;19:17,22
**Teakwood (4)** 39:14,15,16,19
**technology (1)** 85:19
**ten (4)** 3:23;14:14;85:9; 99:23
**tenant (5)** 30:9,15;37:22,24; 38:12
**tenants (1)** 5:24
**term (5)** 62:11,24;69:11,15; 80:10
**terms (1)** 96:10
**terrible (1)** 84:6
**testified (2)** 35:5;47:4
**testifying (1)** 102:17
**testimony (1)** 102:8
**therefore (1)** 19:10
**Third (12)** 6:1,3;18:25;46:11; 56:5;73:8;75:7,9; 94:23;95:11,12;104:1
**Thirty-seven (1)** 2:16
**thought (5)** 25:5;72:22;74:10; 75:3;78:6
**Thoughts (1)** 33:15
**thousand (1)** 73:23
**threatened (2)** 54:7;58:1
**Three (17)** 15:5;25:12,12,15; 26:4,8;31:19;39:11; 40:16;41:18;59:8; 67:10;73:15;74:10; 78:8;89:7;98:20
**threw (2)** 8:8;90:8
**throughout (4)** 43:19;60:10,11; 98:3
**Tiffany (2)** 2:10;15:6
**till (1)** 50:6
**times (1)** 22:20
**timing (1)** 81:13
**title (7)** 14:25;36:24;37:4; 56:10;58:24;66:23; 73:4
**titled (7)** 2:21;15:9;17:23; 36:10;44:13;51:5; 75:14
**today (15)** 3:16;8:1,18;22:19, 20;26:8;27:3;36:9; 39:11;42:17;73:25; 98:17;102:8,17; 105:11
**together (8)** 3:5;5:21,22;17:9; 23:24;47:3;89:16; 96:9
**told (8)** 20:12;33:7,9,10; 53:17,18;61:15;62:23
**tomorrow (4)** 3:8;27:23;28:6; 34:11

**took (32)**
6:4,18;7:1;17:12; 22:16,18;32:11;43:2; 50:5;52:6;57:3;62:8; 64:3;65:2,21;70:13, 18,20;71:4,7;80:12; 81:17,17;84:18; 87:17;88:2,7,18; 89:10;90:16;97:16; 101:19
**total (4)**
68:4;76:8,15;83:17
**totaling (2)**
19:4;67:24
**touch (1)**
63:9
**town (2)**
24:11;33:1
**trailer (1)**
50:23
**train (1)**
25:8
**trainer (1)**
24:25
**Transamerica (2)**
45:22;95:19
**transfer (1)**
50:7
**transferred (2)**
50:16;97:25
**transfers (2)**
50:2,4
**transpiring (1)**
59:6
**tried (9)**
6:19,19,20,23; 10:19;11:4;26:3; 46:13;89:3
**trigger (1)**
14:2
**Troy (2)**
82:14,15
**true (6)**
3:19;46:9;54:1,13; 57:20;75:12
**Truist (1)**
16:19
**Trust (2)**
41:5;43:6
**trusts (3)**
43:5,19;50:7
**truthfully (1)**
28:1
**try (5)**
5:14,15;12:8;34:11; 88:25
**trying (9)**
19:20;22:23;44:21; 62:5;64:18;82:3; 85:18;90:17;92:4
**turn (1)**
4:21
**turned (4)**
22:16;80:6,8;84:20
**two (26)**
10:9;11:16;19:13; 25:13;26:4;31:19,22; 33:8;40:4,16;42:25; 43:1;50:18,21;58:9, 12;60:8;68:9;69:13; 74:9;77:4;79:23;80:7; 91:8;98:20;103:7
**type (2)**
21:15;22:12

## U

**UC (1)**
2:19
**unbelievable (1)**
62:21
**under (9)**
5:13,14;22:19;24:9; 53:14;69:7;78:18; 79:16,17
**underneath (1)**
68:23
**unfortunately (5)**
26:1;43:14;48:10; 94:2;103:8
**Union (12)**
36:9;39:7;55:2,14, 19,25;56:3,14,16,24; 57:11;58:11
**Union's (1)**
60:11
**unit (1)**
70:17
**Units (1)**
96:1
**unless (1)**
105:13
**unusual (1)**
92:25
**up (51)**
2:19;6:4,6;7:1; 8:13;12:14,15;13:19, 20;17:7;24:11,19; 25:4,10;28:11;38:13; 42:13;44:12;46:8,17; 48:6;50:14,20;58:12; 59:13,23;62:11; 71:17;72:24;74:23; 80:9;83:4,12;84:18; 90:9;91:1,12,20,21; 92:1,3;93:21;95:3; 97:7,13,14,19,19,21; 98:6,11
**update (1)**
67:15
**upon (5)**
14:5;41:7;50:3; 100:18;102:16
**upset (1)**
6:3
**use (10)**
4:15;11:10;38:12; 48:12;50:24;53:2; 54:22;55:13;85:14; 87:25
**used (15)**
4:16,24;20:3;21:4; 24:7;31:4;60:9;65:8; 66:1;70:12,19;81:10; 87:20;88:13;103:25
**using (3)**
25:9;53:7;94:9
**usually (3)**
61:19;69:18;93:22

## V

**vacant (1)**
41:8
**vacation (1)**
25:3
**Vail (2)**
15:25;48:24
**Vail's (1)**
16:9
**valuation (1)**
47:13
**valuations (2)**
43:16;49:17
**value (55)**
12:3;15:15,22;16:8, 11,14;17:6,21;18:6,6; 21:6;22:7,15;26:16, 23;27:9;30:11,12,14; 37:19;38:7,13,25; 41:7;43:12;45:18; 46:9;47:7,18;48:15; 69:14;70:4,22,23; 71:22;72:19,20; 76:21;77:5;80:6;81:1; 83:4,18;86:11;91:23; 92:1,5,11,12;94:5; 97:1,2,5;98:3,3
**values (3)**
20:2;27:11;46:17
**value's (1)**
83:24
**valuing (1)**
20:24
**variance (1)**
76:12
**various (4)**
55:19;61:1;68:14; 74:25
**vehicle (1)**
18:3
**version (1)**
52:8
**versus (1)**
20:4
**Vice (1)**
58:25
**Virginia (1)**
99:16
**Volkswagen (1)**
18:4
**Vorys (2)**
42:9;45:5
**voting (1)**
45:15

## W

**wait (4)**
11:12,13;50:3; 97:16
**waived (1)**
100:25
**walk (1)**
25:17
**walked (1)**
44:23
**walking (1)**
26:19
**wall (1)**
90:8
**wasted (1)**
7:5
**water (1)**
99:3
**way (3)**
71:22;81:18;101:2
**Wayne (1)**
82:13
**Wechter (2)**
58:23;59:1
**week (1)**
39:25
**weeks (2)**
90:14;103:18
**weren't (6)**
7:13;22:20;39:1; 50:18;80:20;89:12
**West (1)**
99:16
**Westchester (7)**
92:7,8,9,10,20;93:8, 10
**what's (10)**
36:10;58:24;61:8; 64:23;75:5,17;83:6; 103:12;104:23,25
**Where's (1)**
5:15
**whole (5)**
59:12;71:5;88:20; 95:16;98:3
**who's (2)**
16:18;42:25
**wife (4)**
17:18;36:16;43:7; 79:15
**wife's (1)**
32:2
**wiped (1)**
55:9
**wiping (1)**
61:21
**wish (1)**
91:8
**withdraw (1)**
33:20
**within (1)**
6:11
**without (1)**
49:3
**WITNESS (5)**
2:5;11:5,9;33:23; 105:18
**wonderful (1)**
99:20
**Woodward (1)**
2:18
**word (1)**
28:23
**words (2)**
61:23;65:5
**work (7)**
22:15,21;28:5; 33:25;36:4;82:20; 84:7
**worked (1)**
88:10
**working (4)**
3:5;42:11;43:18; 49:17
**workout (1)**
55:6
**world (2)**
6:17;42:19
**worth (29)**
16:10;21:3;38:11, 17,22;41:10;45:17; 46:23;47:1,5,14,17, 23,23;49:3,7;68:16; 69:4;71:24;72:22; 73:22;76:25;82:25; 85:2,8;86:1,5,9,25
**wound (2)**
24:10;25:4
**write (1)**
68:12
**written (1)**
101:2
**wrong (2)**
5:24;48:9
**wrote (4)**
33:12,24;55:7; 59:25

## Y

**Yards (1)**
10:1
**year (9)**
4:9;6:11;8:11;12:4; 16:19;19:9,17;21:23; 86:16
**years (25)**
2:16;4:23;5:21;

6:23;8:24;9:3;12:20;13:1;15:20;16:13;22:16;31:22;33:8;40:4,16;42:23,25;43:1;50:21;57:9;62:4,15,22;67:14;79:24
**Yep (13)** 11:20;38:10,21;46:16;62:10;64:11;70:6;76:7;82:23;87:5,7,24;101:18
**yesterday (1)** 33:12
**young (1)** 79:15

**Z**

**ZBA (1)** 60:16
**zero (2)** 27:9,11

**1**

**1 (9)** 51:2;81:2,2;83:18;86:2,5,20,22;87:9
**1,800 (1)** 24:12
**1.5 (2)** 16:8,14
**1/2/19 (1)** 46:1
**1/25/2018 (1)** 66:22
**10 (2)** 30:25;31:9
**100 (4)** 37:15,17;41:21;72:3
**11 (6)** 2:21;5:18;33:2,3,5,11
**11/30/18 (1)** 103:22
**12 (1)** 41:1
**13 (2)** 35:2;83:14
**14 (1)** 35:2
**15 (5)** 54:7;55:8;58:1;60:23;61:2
**16 (1)** 53:9
**17 (2)** 5:24;85:9
**171 (1)** 57:18
**173 (1)** 58:3
**18 (18)** 5:21;25:2,2,3,4;42:12;46:8;52:20;53:9;72:21,22;73:24;75:5,10;77:4;79:6;80:20;85:10
**19 (17)** 6:11;24:11;75:14;77:5,18;79:6;80:20;81:2,2;83:21;85:13;86:6,22;87:8,18;88:4;92:23
**1968 (2)** 6:21;89:9
**1999 (2)** 5:9,12

**2**

**2 (4)** 41:13;45:10;58:17,17
**2,200 (1)** 24:12
**2.7 (2)** 17:6,20
**2:01 (1)** 2:1
**2000 (1)** 101:20
**2016 (1)** 39:9
**2018 (22)** 5:23;42:12,20;43:17;45:5;46:14;49:10;50:1;68:4;70:23;74:3,21,22;76:4,11,14,15,17;79:25;86:19;96:15;103:19
**2019 (31)** 29:4,24;31:23;40:7,7,8,19;43:10;46:5,14;49:16;50:1,13;52:19;63:15;64:9,12;76:24;77:8;78:9;79:25;80:22;82:25;83:9;84:2;85:22;86:2;91:5;94:9;96:9;104:13
**2020 (26)** 8:12,13;43:3;46:10,12;50:1;53:13,16;54:7,10;55:13;60:4,15,19,23;61:2;63:17;64:12,13,13,15,16;94:19;101:22,23;104:21
**2021 (21)** 29:1,6;46:14;83:18;84:2,25;87:9;91:11;93:4;94:21,25;95:6,8;96:5,8,15,24;97:6,21;98:1,11
**21 (8)** 29:8;81:2,6,14;85:13;87:19;88:4;97:13
**22 (1)** 29:10
**24 (6)** 32:10;54:10;60:4;65:13,14;104:24
**24th (1)** 64:17
**25 (3)** 53:16;65:11,19
**25th (1)** 64:17
**26 (6)** 6:14;8:12,13;53:14;60:14,19
**275 (1)** 70:21
**28 (1)** 54:9
**28,000 (1)** 36:14
**29 (1)** 16:12

**3**

**3 (3)** 59:20;65:15,18
**30 (4)** 6:8;35:12;67:14;94:19
**300 (1)** 8:6
**32 (2)** 55:12;70:21
**320 (1)** 49:1
**35 (2)** 27:20;93:23
**3515 (1)** 2:10
**36 (2)** 22:18;73:9
**37 (3)** 15:20;36:10;37:10

**4**

**4 (3)** 14:18;48:22;104:13
**4/16 (1)** 42:12
**4:11 (1)** 100:3
**4:20 (1)** 100:2
**4:28 (1)** 100:3
**4:39 (1)** 105:25
**40 (2)** 12:20;27:20
**43 (1)** 24:12
**44 (1)** 29:13
**45 (1)** 2:12
**45241 (1)** 2:13
**48 (4)** 23:7,10;72:8,10
**49 (2)** 52:10;64:7

**5**

**5 (2)** 64:24;87:1
**5:00 (1)** 99:11
**50-year-old (1)** 16:12
**54 (1)** 74:24
**5472 (2)** 94:3,6
**55 (4)** 23:23;28:15,16,18
**59 (1)** 18:4

**6**

**6/1/2019 (2)** 75:18;76:3
**69 (2)** 39:16,18

**7**

**7 (1)** 22:14
**70 (5)** 3:24;7:19,25;19:24;42:22
**71 (1)** 40:10
**73 (2)** 41:13;45:10
**74 (1)** 56:7
**75 (2)** 63:14;65:17
**76 (2)** 10:8,9
**77 (1)** 101:7
**78 (1)** 101:24
**79 (1)** 103:13

**8**

**8 (1)** 19:12
**80 (4)** 41:24;45:11;66:14;104:6

**9**

**9 (1)** 29:24
**9:00 (2)** 105:13,24
**90 (3)** 22:19;63:23,25
**9617 (2)** 31:8,13