# “EXHIBIT GG”

**In The Matter Of:**

*RAYMOND JOSEPH SCHNEIDER*

---

*TESTIMONY OF RAYMOND JOSEPH SCHNEIDER*

*March 17, 2023*

---

*LEGAL ELECTRONIC RECORDING, INC.*

*216-881-8000*

*www.lerinc.com*

Original File 100429B.prn

**Min-U-Script® with Word Index**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

IN RE: * Case No. 23-10337

RAYMOND JOSEPH SCHNEIDER * March 17, 2023

* * * * * * * * * * * * * * * *

PARTIAL TRANSCRIPT OF HEARING
BEFORE THE HONORABLE BETH A. BUCHANAN
UNITED STATES BANKRUPTCY JUDGE

RAYMOND JOSEPH SCHNEIDER, WITNESS

CROSS-EXAMINATION BY CHRISTOPHER SCHUELLER, COUNSEL FOR THE HUNTINGTON NATIONAL BANK (Page 3)

REDIRECT EXAMINATION BY ERIC W. GOERING, COUNSEL FOR DEBTOR (Page 92)

CROSS-EXAMINATION BY WILLIAM DOUGLAS HAMAN, COUNSEL FOR GENERAL ELECTRIC CREDIT UNION (Page 107)

Transcribed by:
- - - - - - - - - - - - - - -
Legal Electronic Recording, Inc.
5230 St. Clair Avenue
Cleveland, Ohio 44103
(216) 881-8000
www.lerinc.com

Proceeding recorded by electronic sound recording, transcript produced by transcription service.
Job #100429B

(9:09 a.m.)

MR. GOERING: So, when we left here on Wednesday, I had just finished my examination of Mr. Schneider, so, I think he needs to step back up to the stand.

THE COURT: Right.

MR. GOERING: And hopefully there's no cross-examination, but I understand.

THE COURT: Okay. Thank you. Mr. Schneider, if you would please take the stand. I'll just remind you that you are still under oath. Would just remind you that you're still under oath.

THE WITNESS: Oh, okay.

MR. SCHUELLER: Good morning, Your Honor. Just as a question of logistics, I'm not going to do well with the computer.

THE COURT: Okay.

MR. SCHUELLER: It will be cumbersome. And I understand we can use the overhead.

THE COURT: Yes.

MR. SCHUELLER: But I also presented your clerk yesterday a binder.

THE COURT: Mm-hmm.

MR. SCHUELLER: I would love, with the Court's permission, to give the witness a binder and

just go through it with the binder rather than the overhead. And I gave a binder to Mr. Goering. I just think it will go a lot smoother. However, if you want the overhead, I'll do the overhead.

THE COURT: No, that's -- if that's fine, Mr. Goering.

MR. GOERING: Yeah.

THE COURT: If you have a binder then I think that's fine.

MR. GOERING: That's fine.

THE COURT: We can all follow along.

MR. SCHUELLER: May I approach the witness and hand the binder over?

THE COURT: Yes.

MR. SCHUELLER: Thank you.

CROSS-EXAMINATION OF RAYMOND JOSEPH SCHNEIDER

BY MR. SCHUELLER:

Q Good morning, Mr. Schneider. Mr. Schneider, on Wednesday, you provided testimony about the 2018 personal financial statement, 2019 personal financial statement, and 2021 personal financial statement. Isn't that right?

A I answered those, yes.

Q And those, if you recall, are Huntington Exhibits L, E, and F. Do you remember those exhibits?

A Are they in the book as L, E, F?
Q Yes.
A Under what?
Q L, E, and F.
A Excuse me. It's my first time with this book. Okay, there's L. There's E, and then there's F. Okay.
Q And you testified that all of the information contained in those personal financial statements is true and accurate. Isn't that right?
A No.
Q All right. What in those personal financial statements is not true or accurate?
A As I went back, I looked at the statements and there's some additional errors in math.
Q All right. Well, let's go through those. The 2018 personal financial statement, which is Exhibit L, could you turn to that? Are there any errors in the 2018 personal financial statement?
A I don't believe so.
Q So, let's turn to Exhibit E. I have the same question for you. Are there any errors in the 2019 personal financial statement?
A As far as I know right now, no.
Q So, let's turn to Exhibit F. Are there any errors in the 2021 personal financial statement?

A I'm going to look. There's an error in one of them, and I'm -- you know, I'm being -- for the first time looking at your book, so. Can I put them together? Because one of them is missing about $35 million on an addition.

Q All right. Why don't you tell me what that addition was, and maybe I can help find it.

A I will show you. It's not that one.

MR. GOERING: Can I help the witness locate that, Your Honor?

THE WITNESS: It's --

MR. GOERING: I won't testify or anything, I'll just point out --

THE WITNESS: I got it now. I apologize. It's 619.

BY MR. SCHUELLER:

Q All right. So, Exhibit E.

A I got to look at the front of it. Yes.

Q All right. What is the error in that exhibit?

A If you look at line -- the second to the last line on the right of the "Banks Where Credit Has Been Obtained," if you look at those numbers, they don't add up.

Q All right.

A Do you see $34 million there?

Q Yes, sir.
A If you take $17 million and $3, that's $20. You take $11, that's $31. You take $17, that's $49. Another one is $50 and then $24 gives you $75. What does the number say there? Doesn't it say $34? They, unfortunately, don't add up. And I apologize.
Q All right. So, you're saying the actual number there is $70 million.
A It should be $77 million, I think, if you add it up.
Q $77. Okay.
A Yes. I apologize. Yes. That is what I'm looking at. But I did correct that last night.
Q Very good. Thank you. Any other errors that you're aware of in the three personal financial statements?
A I think these are a three-page dossier, who I am and what I've done. Sometimes I put things together and I'm more than happy to explain each one. This is my personal financial statement that I've used for 25 years, and I'm more than happy to give you an understanding where the numbers are and where they come from.
Q Right. But my question is -- and it sounds like you did a review of these personal financial statements

last night. Is that right?
A To the best of my ability, yes.
Q Okay. So, you identified one error. Did you identify any other errors in any of the personal financial statements?
A There were some minor stuff, but I also had to get clarity so I could understand it. There might be something that I didn't see and I will apologize, but I tried to do the best I could at the time.
Q Yeah. I'm not trying to trap you. I'm just trying to find out what's in your mind as to the accuracy of these statements. And you said there were some minor things. What were the minor things?
A I did not add them up, so, I'm, you know, trying to figure out the differences and I -- you know, when I put these together, it took me days and now I'm within two days to try to figure out back -- two years back or three years back. So --
Q But you've had more than two days to review these, correct? These have been at issue in the state court action since the beginning of the year. Isn't that right?
A I believe so.
Q Yeah. All right. So, can you identify for the Court and me any other errors that you're aware of in

these documents that you are aware of?
A That I -- I can't say I can identify that now. But I'll give you clarity, whatever you need.
Q Now, would you turn to me to Exhibit J in your binder. Do you recognize that document?
A I do.
Q And that's your estate planning analysis. Isn't that right?
A Part of it.
Q All right. And your attorney gave this to me a few weeks ago, correct?
A I believe so.
Q All right. Mr. Schneider, I'm going to ask you to turn to Exhibit A. This is the complaint Huntington filed against you, correct?
A I don't see my name on there.
Q All right. Why don't we turn the page from the first page. And then do you see the caption of that action on the second page?
A I do see my name on the second page.
Q All right. So, going back to the first page, this complaint says that it was filed June 5 of 2020. Isn't that correct?
A That's what I see.
Q And do you have any reason to believe that's not

accurate?
A No.
Q And is it fair to say that you were aware of this lawsuit before December of 2020?
A Could you say that again?
Q Is it fair to say that you were aware of this lawsuit before December of 2020?
A I believe I saw it, yes.
Q And you testified yesterday that -- I'm sorry, on Wednesday that you discovered the Sosna check kiting in May of 2020. Isn't that right?
A May 26, the day it was sent to me.
Q So, let's go back to Exhibit J, which is -- you have said is your estate planning analysis or part of it. Is it fair to say that after June 5 of 2020 you transferred these assets that are listed in Exhibit J to gift trusts?
A No. I started on April 6, 2018 putting together an estate plan just like most people my age do. And I spent time doing it according to my lawyers. And unfortunately my life is complicated in the sense that you can't just say, this is all you do. It took awhile and it might have ended in December of 2020, but the difference is that things were transferred way before that also.

Q So, I want to make sure I understand. You gifted assets to the trusts, correct?
A I did.
Q And the value date here in Exhibit J is December 19, 2020. Isn't that correct?
A That is the final of the whole planning process.
Q All right. When did the gift take place? When did the assets go out of your name and into the name of the trusts?
A When my lawyers finally finished the documentation.
Q And that was as of December 19, 2020. Correct?
A No. That was the final piece. It was all during the process.
Q All right. What is the first date that you transferred title to any asset out of your name and into the name of a trust?
A I don't know the exact date.
THE COURT: I'm going to ask you to pause for just a minute. If the listeners on the phones would mute their phones, please. We're picking up some static. Or, actually --
THE WITNESS: Some music, too.
THE COURT: -- music. Just for the listeners on the phone, we're going to mute all of you.

Apologies.
BY MR. SCHUELLER:
Q So, I'll give you that question again. So, Mr. Schneider, when was the first date when title in an asset that you owned transferred from your name into the name of a trust?
A I don't have my trust documents here, but it was before this date. This was the final completion date, but it transferred all along the way, because there's two basic trusts, one for myself and one for my wife.
Q Why were the assets valued as of December 19, 2020 if that wasn't the date of the transfer?
A That was the completion date. They were evaluated in '18 when I started this. They were evaluated in '19. Some of it was transferred in '19, some of it was transferred in '20.
Q So, you transferred assets into the name of a trust in 2019?
A I apologize. I didn't bring the trust here. I don't know the exact dates of everything. I can tell you I'm looking at something that shows a final date. There were plans in my mind and my attorney's that we started on April of '18. I can't tell you the exact dates of the rest.
Q Okay. I'm not talking about your plans, just to

be clear. I want to know when assets moved out of your name and into the name of a trust. Can you give me those dates?
A Not without looking at them, because I'm not going to speculate.
Q Was it in 2000?
A Before that.
Q Before the year 2000?
A Yes. 2000? I thought you meant 2020. No, not before 20 -- 2000.
Q Was it before 2015?
A It was between April of '18 when I started and the ending was 2020.
Q What assets did you transfer to the trust in 2018?
A I gifted three assets, the RED Apartments, Circle Storage, and Red Dog. But there's more than one item in each one, so, that's the title of --
Q And those are all the assets listed in Exhibit J?
A Yes. Those are my membership interests. Yes.
Q Have you ever at any time gifted any other assets to those trusts?
A Say that again.
Q Have you ever gifted any other assets to those

trusts?
A I don't believe so.
Q All right. And it's your testimony that these gifts took place in 2019?
A From the beginning to the end. Started in April of '18 and ended in 2020.
Q And, again, I'm not talking about the planning. I want to know when title transferred. Are you saying that title transferred in April of 2018 of these assets?
A No. I didn't say that.
Q Okay.
A I don't know. I don't have it in front of me. It's a trust that was done by a law firm along the way. I agreed these are the assets I'm moving. I don't know the specific dates and I apologize. I don't have it in front of me.
Q Is it possible, then, that the transfers took place after June of 2020?
A Like I said, I'm not going to be saying something I don't know.
Q So, you don't know one way or another if they were transferred after June of 2020?
A All I know is I transferred them in that period. That's all I can tell you, because unless I have it in

front of me, I don't want to be saying something I don't know.
Q Well, Mr. Schneider, what is the significance of December 19, 2020 for the valuation? Do you know?
A Eventually, I got my plan. Several pages long. That's the end of it and then that's the completion date. So, all I can tell you is along the way, I worked with my attorneys, the accountants, the IRS and everybody else involved. And if I had it in front of me, I could be more specific and I apologize.
Q Is there one document you could look at to figure out what the dates were?
A I have to call my attorney. I don't have it in front of me.
Q Okay.
A My wife's here and I -- you know, I'm telling you that -- what I know.
Q All right.
A I'm not trying to hide anything. I just did it as a normal course of events. And this is what you do at my age, and this is what you do when you have a complicated financial structure.
Q When were the appraisals completed?
A I don't have that in front of me. I know it was done in '18, it was done in '19 and possibly even done

in '20. I'm not trying to avoid your answer, but I'd rather be honest and tell the truth and I have.
Q So, you think there were appraisals done in 2018?
A It could have been.
Q And 2019?
A Could have been.
Q And 2020?
A Could have been.
Q Which were the appraisals ultimately used for tax purposes?
A Tied to the gifts that I gave away, they were done according to the rules of gifts.
Q What appraisals were used? Were they the 2020 appraisals, 2019, 2018?
A Again, if I had them in front of me I could be more specific. So, I'm not going to answer a question I don't have a good answer for.
Q Would you agree with me that when you state in Exhibit J the value as of December 19, 2020 is the date of the valuation for the appraisal? Would you agree with me that they were appraised as of that date?
A They had been appraised prior to that date. That is the final date when I received documents to tell me this is my estate.

Q All right. Now, you've reviewed a lot of appraisals in your life, correct?
A I have.
Q All right. And you know that an appraiser will value a property as of a specific date, correct?
A That's right.
Q All right. Was the specific date here December 19, 2020?
A In the documents, it would tell me when the appraisal was. This doesn't tell you that.
Q But why do you have December 19, 2020 in this exhibit?
A Because when it was done, it finalized the documents right here. If I get an appraisal like I did with Huntington, it was on December 5 of 2018 when the loan went through and it was used for the last -- the next two years and it was appraised from that particular date and when I got it was much later. I got it two years later. I didn't get it at the time. So, I used that as my date of reckoning what the value is.
Q So, are you saying, then, that the appraisal that was used for tax purposes was dated December 19, 2020?
A No. I'm saying that's when it was signed off.

Q What do you mean by that? Who signed off?
A Between my lawyers and my gift.
Q Your lawyers signed off on the appraisal? I'm not sure I follow that.
A No. They didn't sign off on the appraisal. They signed off on the gift package that I put together to gift to my gift trust.
Q All right. So, all approvals were in place as of December 19, 2020. Correct?
A They should have been, yes.
Q And all the required approvals were in place as of December 19, 2020. Correct?
A All the approved issues that I needed to do were done before that.
Q So, is it fair to say that until you had those approvals, you couldn't gift the assets into the trusts?
A I'm not going to say that. I gifted it when it went to the IRS, because I had to give them examples and the issues that were out there and I can't tell you the exact date.
Q Well, you said that certain steps had to take place and certain approvals had to take place to finalize the transaction, correct?
A Yes.

Q And that date is December 19, 2020, correct?
A No. That was the final date. That is not the date it all took place. That's the date that was in the final evaluation of the different gifts.
Q So, that's the date when everything was in place, correct?
A It could have been in place before that, but that's the documents. The appraisal was done before. All the documents for doing the gift tax were done prior to that, and that was the date I received my documents.
Q But you can't transfer the gifts until you complete all those steps, correct?
A That's what you need to do, right, for purposes of giving a gift. Yes. You're going to have a date.
Q All right. So, can we agree, then, it was impossible for you to gift these assets, transfer title of these assets, to these trusts before December 19, 2020?
A No. This is the final piece. This is everything together. I gifted before that. There's more than this. There's a gift trust that gifted before that. This is the final day of all of it in one place.
Q Did you pay taxes on the gifts?

A I believe there's a tax that I've taken care of.
Q And it was based on the valuation set forth in Exhibit J, correct?
A It was based on the documents I gave the IRS.
Q Which included the appraised values of the properties, correct?
A Absolutely.
Q All right. And the appraised values are set forth in Exhibit J, correct?
A Those are membership interests that I have.
Q That's not my question. My questions is, these are appraised values in Exhibit J, correct?
A The final values, yes.
Q And so you paid taxes based on these appraised values, correct?
A Yes.
Q So, why would you pay taxes on these properties with values as of December 19, 2020 if you had transferred the assets into the trusts earlier?
A Because this is when my documents were finalized to give to the IRS. If the appraisal was in '18, I used it for this. And at some point, because there's more than this in the trust -- and the trust is, like, 250 pages long. So, it did everything according to gift trust.

Q Mr. Schneider, would you agree with me that $16 million is a lot of money?
A Absolutely.
Q And would you agree with me that Huntington has questioned these transfers that went into the gift trusts?
A I believe you're doing that now, yes.
Q Okay. Do you -- would you agree with me that this is a very important issue for the proceedings that we're sitting here on today?
A I think giving clarity is why I'm sitting here, yes.
Q But you didn't bring the appraisals, did you?
A Why should I have?
Q And you don't know the dates the title transferred, do you?
A I have 70 LLCs. I do not know the exact date of everything I've done in my life. I can tell you that I can go get the documents.
Q I'm not --
A I apologize for not bringing my appraisal here. It was not part of the request.
Q I'm not asking for details of every part of your life. I'm not asking about the 70 entities. I'm asking you about the most important issue before this

Court today and you don't have the information, do you?
A I absolutely do.
Q Where is it?
A I have it in front of me. For the issue here, if I'm correct, is I'm a liar, cheater, fraud, whatever. There's an emergency need here. And I've got all of it in my head. If you have any questions, I can answer anything you got.
Q Mr. Schneider, I just asked you when title to your assets changed from you to the gift trusts and you don't have an answer, do you?
A I do have an answer. I just don't have it in front of me this second.
Q You don't have an answer right now, do you?
A No. I wasn't --
Q And you won't concede that the transfer took place on December 19, 2020. Correct?
A You're right. I won't concede that. Until I have the documents, I don't want to say something I don't know.
Q Even though you paid taxes on those amounts, you won't concede the point?
A I always pay my taxes, yes.
Q I know. But you won't concede the point even though you paid taxes on those amounts?

A There's no point I'm -- I'm a taxpayer. I paid taxes on my gift. I apologize for not having exact dates. But this is the final date that the gifts came to me -- or the gifts were allowed to be part of the gift.
Q Mr. Schneider, how many gift trusts are there?
A I believe there's two.
Q What are their names?
A One's for the benefit of my wife, and the other one's for the benefit of me.
Q Do they have names?
A My wife's name is Patricia Schneider and my name is Raymond Schneider.
Q No, the name -- do the trusts have names?
A I'm going to apologize. I don't have it in front of me. I don't know the initials or the letters on it. That's what I did with my professional help. That's what I did. I can't tell you that I have it in front of me. If I had been asked to bring it, I would have.
Q When were the trusts created?
A They started in April of '18 and they were created and finalized, I would guess, at 2020 when this statement was put out.
Q All right. So, they can't have two creation

dates. So, can you walk me through that?
A Creation was April 6, 2018 when I sat down with my lawyers and we discussed what it would take to do the gift trust. I have personal, I have business, and I have all the things that I work with to get to that finish line.
Q Okay. Let me just try to work through with you what I mean by created, okay. You've formed business entities in your life, correct?
A Plenty, yes.
Q Okay. And there's a date when that entity is formed, correct?
A It's formed in my head. I go out and start it somehow. Acquire the property. Put my team together and at the end that's what I do best. I finish it.
Q All right. But what I'm talking about is there's a legal document that says, this entity was formed on this date. Isn't that correct? When you form entities, there's a legal document?
A The -- yes. We form a document for the name and the asset. And that date I would never know until I looked it up in a book, because I have 70 of them to remember.
Q I understand. But there's a clear date when it is created. Would you agree with me?

A Yes. When my attorney finishes it, that's when it's done.
Q Okay. All right. Well, let's try this. I'm trying to figure out when these trusts were created, where there was a legal document that said, this trust now exists as of this date. Do you know what that date would be?
A If I have the time, I can go back to my office where the trusts are and I can bring it in and give you exactly what you're asking for.
Q Do you have any idea of what year?
A I have the beginning and the end. Again, April 6, '18, when I started. And I finished it on this date, most likely at 12/19/20, which is in front of me.
Q Who are the trustees for the trust?
A My wife, Patricia, and Raymond Schneider.
Q Now, are you the trustee of the trust in your name?
A The trust is complicated. I'm not going to say I know the exact answer to each of those.
Q All right. Well, you said that you're a trustee and your wife is a trustee, correct?
A Right. But there's many parts to the whole thing.
Q All right. Are there any other trustees?

A I believe my children.
Q They're trustees as well?
A I believe they are.
Q All right. And what are their names?
A Justin, same as mine, Schneider. Eric, same as mine, Schneider, and a daughter who's Danielle Senzer, S-E-N-Z-E-R.
Q So, between the two trusts, there's five trustees. Is that right?
A I don't know.
Q Who is in charge of running the trusts?
A My attorney.
Q Okay. Is your attorney a trustee?
A I believe she is.
Q All right. And what is her name?
A Emily Pan.
Q So, there's six trustees?
A I'm not sure.
Q Okay. Is there one -- is your attorney the one who signs legal documents on behalf of the trust?
A I just received some documents from her for my IRS to sign off and she's -- as the trustee, sent it to me the other day. So, I don't know. She handles it, yes.
Q All right. I understand she works for you, but

does she, like, sign her name, I am the trustee and I am executing this document on behalf of the trust?
A She sent me the tax and the gift documents the other day. So, she acts as the trustee.
Q But did she sign her name as the trustee? Somebody has to sign for the trust.
A I'm going to say yes.
Q Okay. Okay. So, the attorney is the trustee on the two trusts?
MR. GOERING: Your Honor, that's not his testimony. He says he doesn't know. He's throwing out a bunch of names. He says he really doesn't know who the trustee is. He said it three or four times. He's not sure about it. Counsel keeps pressing him for that. He doesn't know. It's unfortunate. He's not trying to hide anything. But he doesn't know.
MR. SCHUELLER: Your Honor, I am doing my best to get this information. He has testified all over the place, and I'm trying to get clarity. Now, at one point, we were up to six trustees. Now, I'm driving into this and there may only be one trustee. But I'm trying to figure out who runs these trusts because it's very important for my case.
THE COURT: I understand. And, Mr. Schneider, to the extent that you know the answer to

Mr. Schueller's question, please respond. I mean, I'm --

THE WITNESS: I apologize.

THE COURT: -- getting the same sense that Mr. Goering, that he just doesn't know.

THE WITNESS: I apologize. I'm not trying to avoid something. I just don't want to say something that's not in front of me because I've got a couple things in front of me all day long and I'd rather tell the truth and not just say something.

BY MR. SCHUELLER:

Q Does anyone have what I'll call voting rights for decisions on how the trust manages the assets?

A I'm sure it says it in there, yes.

Q Have you ever voted on a decision by the trust?

A I haven't dealt with the trusts lately.

Q So, these are called gift trusts. Is that right?

A Yes.

Q All right. And just so the record's clear, that means you gifted the assets and didn't receive any payment for the assets?

A I gifted what I'm allowed to gift under the rules of gifting.

Q Now, do you know who the beneficiaries are of

the trust? Like, who gets the benefit of these trusts?
A They're in front of you on page -- on J.
Q And so that would be your wife and your children?
A Yes.
Q Okay. Do you know if there are bylaws for the trust?
A There's 250 pages of a lot of legal stuff that I trusted my lawyers.
Q Okay. Is the trustee paid for his or her services?
A Just like everybody else.
Q Okay.
A Nobody does anything free anymore.
Q Do you know, sir, if it's a revocable trust or an irrevocable trust?
A I'd have to call her.
Q Okay. Do you know if at any point in time you can pull the assets back into your name?
A I don't, no. I don't believe so.
Q Okay. Now, back to Exhibit J, there are appraised values given in Exhibit J, correct?
A What I'm looking at, yes.
Q And what is your understanding as to what those values stand for? Are they fair market value, are they

liquidation value, do they consider the debt that's out there?
A You asked a lot of questions. What I know is, at the time in the appraisals that was the valuation.
Q But you don't know anything beyond that?
A I don't know what "beyond that" means.
Q Well, do you know if it's fair market value valuation?
A At the time.
Q What do you mean?
A At the time it was evaluated on the appraisal date.
Q Well, sir, you've seen a lot of appraisals in your life, correct?
A I have.
Q And you have -- do you have an understanding as to what the difference is between fair market value and liquidation value?
A There's three values, and I know all three of them. Yes.
Q Okay. What are they?
A There's asset value, there's liquid value and comparison of what's out in the marketplace.
Q And what is your understanding of the valuation that's called asset value? What does that mean?

A That means when an appraisal goes out and values it compared to other assets, that's the value.
Q What does liquid value mean to you?
A What you could sell it at the time.
Q Okay. Well, let's go to Exhibit J. The first entity there listed is To Life Ltd. Do you see that?
A I do.
Q And that entity owns and operates an apartment complex called RED?
A It's called the RED.
Q The RED.
A Small letters, the, and all caps.
Q Does it conduct any other businesses?
A Not at this time.
Q Does it own any assets other than the apartment complex?
A Not that I know of.
Q And these are apartments that are rented?
A There are renters in there. Yes.
Q Does To Life Ltd own any subsidiaries?
A I don't know at this point.
Q Well, let's track the market value of this asset over the years through your financial statements. Could you turn to Exhibit L for me. And in Schedule B, the value you placed on non-marketable securities,

would you agree that you valued the RED at -- your interest in the RED at $18,500,000?
A At the time on 1/25/18, yes.
Q All right. And that says "market value" at the top. Do you see that?
A I see that.
Q Now, what, to you, is the meaning of market value?
A This is my estimate on what I see is going on at the time and that's the value I thought it would be worth.
Q Now, you've, in your testimony on Wednesday, distinguished between liquidation and market value, correct?
A Correct.
Q So, what distinguishes those two definitions for you?
A Market value is what you can sell it for. Liquidation is what you're going to get for it.
Q But forgive me. Isn't market value what you're going to get for it?
A No.
Q Okay.
A Market value is what it is in the marketplace, but it doesn't mean that it's the value you're going to

get when you liquidate. And that's what happened in my case.
Q But why wouldn't you get that value, the market value, when you sell it? I don't understand. If that's what the market values it at --
A Well, let me share what I know.
Q Okay.
A My market value for my Huntington properties were $85 million. Your liquid value that you gave to me was $54 million. So, there's a difference between the actual asset that you took from me and now you only gave me back $54 million. That's the liquid value. The appraised value is the $85 million. That's the market value.
Q So, are you saying, like, the market value in your mind is, like, a hypothetical but the liquidation value is the actual?
A No. I'll give you an example. My Huntington properties were valued in an appraisal on December 4, 2018, right after I got the loan, for $85 million. You gave it back to me and I'm sitting here because of the liquid value is only $54 million. So, you're coming after me for the difference and there is a difference. Market is what it says from an appraisal. Liquid is what you get. And all I got is $54 -- you only got $54

million. I had nothing to do with this.
Q Okay. All right. Well, let's turn to Exhibit E. Let's see what the value of the RED was then. So, this is the 2019 personal financial statement. And again, in Schedule B, would you agree with me that you valued the asset at that time at $31,500,000?
A I agree.
Q And let's go to Exhibit F. With the same question, and would you agree with me that in Exhibit F you valued the RED at $41 million?
A So, the difference is the time we've all lived, which has been horrible. This was being built --
Q That's not my question. I just want to know, was your value $41 million?
A It is $41 million on this piece of paper, yes.
Q Okay. And is this company still in operation today?
A Yes, it is.
Q And the assets of the equity interest in this entity are largely held by your gift trust, correct?
A The membership interest owns it, yes.
Q All right. Do you have a valuation of what this -- the equity interests in To Life Ltd are worth today?
A A lot more.
Q Okay. Can you give us an idea?

A I'm -- it's a lot more. I don't know.
Q I -- you --
A When I do the valuation, I go out and see what the marketplace is. I don't have that here as I sit. And the market has dropped a lot because of the interest rates and availability of selling an asset. So, that's the value.
Q Well, on Wednesday, you said that the building alone is worth $50 million now. Do you recall that?
A No, I don't recall it. But if I said that, that's what I said.
Q Okay. Do you think that's accurate?
A I don't know. You know, that was my estimate when I was asked on Wednesday.
Q Well, has it changed since Wednesday?
A I don't know. I have -- that was my estimate. I'll say yes, just because, you know.
Q It's changed?
A It's changing every day. They're going to raise interest rates next week. It's going to go down in value.
Q What's the value today, then, if it's changed in two days?
A I don't know. I usually ask my realtor. He tells me.

Q Do you really think the value has changed in two days?
A Well, there's a lot of bank problems out there and the world has changed dramatically. And I have an asset for sale, and I can't sell it now because the interest rates have changed the value.
Q And when you testified Wednesday, you said the building alone is worth $50 million. What do you mean by building alone? What else could be part of the value?
A So, my value's going back to the '18 statement, the '19, and the '21, because I was in the process of building that. So, it didn't even have value until it had a chance to bring income in it. So, I am telling you the value. During COVID, we were building. And at this point, we're occupied and we moved on from that date.
Q Okay. All right. Let's now turn to -- back to Exhibit J, your estate planning analysis. And the next set of equity interests that you gifted were in Red Dog Operations Holding Company. Is that correct?
A Yes.
Q And that's a pet resort business?
A It is a business taking care of dogs and cats.
Q Does it conduct any other business?

A Yes.
Q Okay. What?
A Animal hospitals.
Q Okay. Anything else?
A Nope. It's a full service, so, it does a lot for that particular service.
Q And now the name of that entity, Hold Co., indicates to me that there are subsidiaries. So, are there subsidiaries?
A I don't see what you're saying.
Q Well, I'm sorry. It says, "Red Dog Operations Holding Company, LLC." Holding indicates to me that there are probably subsidiaries. So, are there subsidiaries?
A No. There's lots of different buildings included in the Red Dog. So, there's more than one. So, that would be considered a holding.
Q But who -- does the holding company own all those other Red Dog entities?
A That is the entity that, yes, oversees them. Yes.
Q Okay. And have all -- like, anytime I see a dog and a title of an entity, is that -- does that equity interest reside now with the trust?
A I don't know. I -- you know, you're putting the

word "dog" in something and everything we live by is dog, so, I can't tell you that -- I mean, the Red Dog stuff that I built and have LLCs, I think that's in there.

Q All right. Well, let's go through it. Let's, again, track the -- your value of these assets over the years. So, in Exhibit L, just as we did before, if you could go to Schedule B.

MR. GOERING: Excuse me, counsel. What -- are we on L or B?

MR. SCHUELLER: It's Exhibit L, Schedule B.

MR. GOERING: Oh, Schedule B.

MR. SCHUELLER: Yeah.

MR. GOERING: Thank you.

BY MR. SCHUELLER:

Q All right. Now, in that schedule, I see three entities that mention pet or dog. I see Pet Mall, Cinti Red Dog, and Mason Red Dog. Do you see those?

A Yes.

Q Are the equity interests in those entities all with the trusts at this point?

A All those three successful businesses in '18, yes.

Q And the values there are $12 million, $6.6 million, and $4.5 million.

A Yes.
Q All right. Let's go to Exhibit E. Now, here there's another entity that has the name dog in it. It's called -- it's a new one that wasn't in the 2018 personal financial statement. And that's Saugus Red Dog. Are the interests in Saugus Red Dog now held by the trust?
A I believe it is.
Q All right. And the other three entities that we discussed previously are there and their values are $12 million, $6.6 million, $4.5 million, and $5.5 million. Would you agree with me on that?
A Those are the entities and their operations, yes.
Q And let's hit Exhibit F with the same question. Now, here there's another new Red Dog entity called Atlanta. Are the equity interests in Atlanta now with the gift trusts?
A No.
Q Okay. They're outside of the gift trusts?
A They're not there anymore. COVID destroyed it.
Q Okay. So, that entity doesn't exist?
A Doesn't exist.
Q Thank you. So, as of today, there are still the four Red Dog entities whose equity interests are held

by the trust, correct?
A I believe so.
Q All right. And so here as we look at Exhibit F, the values you placed on these assets in 2021 was $8 million, $4,250,000, $4,650,000, and $2,750,000. Isn't that correct?
A This is September 1, 2021 in the middle of COVID. Yes.
Q And you said these are still successful businesses today, the four entities that are still in the trust?
A In 2021, they weren't because of COVID. They're getting better as we move forward.
Q No. I just mean today. As we sit here today, I thought you said they were successful businesses today.
A Now in 2023, yes.
Q Okay. And do you have an idea of the value you'd place on those assets today?
A No.
Q But do you think it's greater than what you had in 2021?
A Yeah. I lived through COVID and all my business was basically taken away because no one's coming to use my services. So, obviously, it was less because there was no income.

Q All right. Let's go back to Exhibit J. We've got one more entity to go through. And that's Grasshopper Investments, LLC. And that's a self storage business, correct?
A It is.
Q Any other businesses?
A It might hold the piece of land. I'm not sure.
Q Are there any subsidiaries?
A I don't know.
Q Well, let's turn to Exhibit L, the 2018 personal financial statement, and look at Schedule B again. And I see in the column that says "In Name Of," there's these initials GRHPR. Do you see those?
A I do.
Q And I assume that's shorthand for grasshopper?
A Yes.
Q And are -- I see five entities there in 2018. Would you agree with me on that?
A What I'm looking at, yes.
Q And would you agree that all of these -- the equity interests -- strike that. Would you agree with me that the trust now holds equity interests in all five of these entities today?
A I believe so.
Q All right. And I won't go through the values

with you, but they're there, as we discussed previously.
A The trust has them. The membership holds it in the trust.
Q Got it. All right. Now, let's go to Exhibit E. And there, there's a new Grasshopper entity called Horizontal Health Management -- or Horizon Health Management. Are the equity interests in Horizon held by the gift trust today?
A I apologize. Horizon Health shouldn't have been Grasshopper.
Q Okay.
A It's a lawsuit that's sitting out there and that was a one-third interest I had.
Q So, this is not an entity. It's a lawsuit?
A It's the lawsuit. Sorry.
Q And so you valued the lawsuit at $550,000?
A No. A million and a half. I'm one third of it.
Q I see. Okay. So, really, then, you're back to the five entities that we discussed in 2018, right? 2019 had the same number of entities?
A It could. Yeah, probably. Yeah.
Q Okay. Let's now turn to Exhibit F. Now, there's a new Grasshopper entity here called Springdale?

A Yes.
Q Is that an entity?
A It is.
Q All right. And are the equity interests in that entity held by the trust today?
A I believe the membership interest is.
Q Okay. And are these Grasshopper entities in business today?
A They are.
Q Do you believe they've gone up in value since 2021?
A I believe everything that's gotten out of COVID has done better.
Q All right. Including the Grasshopper investments?
A Yes.
Q Do you think the Grasshopper investments were depressed by COVID?
A Absolutely.
Q Now why is that? Because they're storage units, correct?
A Yes. People come in. People move out. Some people moved out and we didn't have people coming to move in because of fear of being near anybody and we closed early at times.

Q I'm not sure I follow that. What --
A It was a tough time. I don't know how to explain it, but COVID hit all of us and it was not a time that people came out. And so I had to piece the parts of the companies together to keep my employees operational and it was not the time that I would wish on anybody.
Q But are you saying you -- did you close your self storage units because of COVID?
A No. No. You asked me a question if I was doing better and I was doing worse in COVID, and --
Q No. But I've kind of switched. I'm just curious. Like, you've said your self storage business was hampered by COVID. I'm just trying to -- you said that people are afraid to be near each other. Did you mean that in the context of your self storage business or another business?
A No, I -- in referring contact with people.
Q In the context of your self storage business?
A In everything. I --
Q Even the self storage?
A Yeah. People didn't come in because we didn't -- you know, people weren't leaving their house.
Q All right. Let's turn to Exhibit E. Let's just summarize this for the Court. Let's go to Schedule B.

A We're in E now, you said?
Q So, we're in Exhibit E.
A Okay.
Q And Schedule B. There's 15 entities listed there. Would you agree with me?
A I didn't count them, but I'll say yes.
Q All right. And would you agree with me that you transferred 99 percent of your interests in Pet Mall to the trust?
A I don't know what the percentage is. I believe it's -- but it was on that page.
Q All right. Well, let's look at Exhibit F. And look at Pet Mall in Schedule B. And in 2021, you had one percent of the equity in Pet Mall. Do you see that?
A Yep.
Q All right. So, now we go back to Schedule E -- I'm sorry, Exhibit E, where you had 100 percent of the equity in Pet Mall. Do you see that?
A Yep. That was in the middle of my estate gifting.
Q So, is it fair to say that you transferred 99 percent of your equity in Pet Mall to the trust?
A 99 percent of my membership interest, yes.
Q Okay. Thank you. All right. And it's the same

with Amelia, correct? You transferred 99 percent to the trust?
A I'm not sure where you're looking at that, but if it said it on 2021, yes.
Q Well, let's just make sure. I'm in Exhibit E. It's Schedule B.
A E?
Q So, Exhibit --
A Now we're going back and forth.
Q -- E as in Eric. That's the exhibit. And we're going to look at Schedule B as in boy.
A So, you said E and what? B? Okay. And what were you asking?
Q Okay. So, we're going to roll down these in Schedule B. And I'm just going to confirm with you that you transferred 99 percent of your equity interests in the trust in certain of these entities. Do you follow?
A I do.
Q Okay. Great. So, we went through Pet Mall. Now, the next one below that is Amelia. Would you agree with me that you transferred 99 percent of your equity in that entity to the trust?
A I gave my membership interest, yes.
Q And the same for Self Storage, 99 percent?

A Yes.
Q Same for Blue Ash?
A Yes.
Q 99 percent?
A Yep.
Q Same for Circle Colerain?
A Yes.
Q Horizon, it's not an entity, so we'll skip that. Westchester. You transferred 99 percent of that to the trust?
A Yes.
Q Cinti Red Dog, 99 percent of the trust?
A Yes.
Q The RED, 99 percent of the trust?
A Yes.
Q Saugus Red Dog, 99 percent of the trust?
A Yes.
Q And Mason Red Dog, 99 percent of the trust?
A Yes.
Q All right. Now, I did the math on this. And if you add up all those entities that you -- where you transferred your interest to the trust, the market value for those entities in Exhibit E adds up to $96,100,000. Does that sound right to you?
A No. Because I didn't do it on that particular

date.
Q I'm not saying that that's the value at the time of the transfer. I'm saying these entities valued in 2019 all together, according to your own record, in the aggregate have a value of $96,100,000. Does that sound right to you?
A On that 19th appraisal -- PFS?
Q Yes.
A I can add that up, probably.
Q Well, does it sound right to you? I mean --
A Yes.
Q Okay. So, for 11 entities you transferred 99 percent of your equity interests into the trust. Correct?
A Say that again. I'm sorry.
Q So, we just went through 11 entities where you transferred 99 percent of your ownership interest into the trust. Is that correct?
A I'll say yes.
Q All right. Now, there's 15 entities on this list. So, there's four entities where you did not transfer your equities into the trust. Would you agree with me on that?
A I don't know. Which one are you referring to?
Q Sure. The first one at the top there says,

"land, office, warehouse, EG." That -- you didn't transfer those interests into the trust, did you?
A I don't believe so.
Q And the next one, "land," you didn't transfer that interest into the trust, did you?
A Nope.
Q And the same for Ivy Knoll. You didn't transfer that interest into the trust, did you?
A Right.
Q And the same for "retail."
A Right.
Q They're -- okay. So, those are four entities where you did not transfer equity interests into the trust, correct?
A Yes.
Q All right. Now, I did the math on that. I added those up. And those are -- that totals, according to your values, $8,750,000 in assets, which you valued as of June 1, 2019. Would you agree with me on that?
A I'm sorry. What was the numbers again?
Q So, I added together from Schedule B the four entities where you did not transfer your interests into the trust.
A Correct.

Q All right. And so I took the market value for each of those four entities from your document and I added them together. Do you follow me?
A I did.
Q All right. And I came up with $8,750,000. Does that sound right to you?
A That does.
Q Okay. So, now let's just give the Court the math.
A Before you do that, can I add something?
Q Yeah.
A On Red Dog, I did not give the real estate, I gave the operations to the trust.
Q Did you say that was for Red Dog?
A Yes.
Q Okay. Who owns the real estate?
A Each of the entities.
Q And the equity interest in those entities are in the trust?
A Only the operations.
Q Okay. All right. So, let's assume for a moment that on June 1, 2019, you had transferred your 99 percent interest in all these entities to your gift trust.
A I'm not going to assume that.

Q I'm going to ask you to assume it.
A Okay.
Q Okay? Now, that would mean the value of those assets as of that date, according to you, the market value was $96,100,000, correct? With that assumption. Isn't that correct?
A I put numbers down there, yes, because --
Q All right. And then I take out the four entities that are not included in the transfers, and I arrive at a figure of $87,350,000. That would be the market value of those assets if you transferred them to the trust on June 1, 2019. Would you agree with me?
A No. I corrected that. I told you that the Red Dogs' operations were one thing and the real estate was something else.
Q Would you agree with me that you transferred nearly all of your wealth in non-marketable securities to the trusts?
A No.
Q Now, I did the math and, again, as of June 1, 2019, 90 percent of the value that you attributed to all these entities were ultimately transferred to the trust. Would you agree with me that it's 90 percent?
A No.
Q Okay. Did you transfer any assets to the trusts

in 2020?
A I don't know.
Q Okay. Did any part of you at any time say, this might not be right for me to transfer these assets to the trusts because of the debt I owe Huntington?
A Not at all.
Q Not one scintilla?
A Not for what was going on.
Q Did any part of you say to yourself, boy, the timing of my transfers might be suspicious?
A No.
Q Not even one percent?
A I'm not going to answer that. Could be 10, could be 50 percent.
Q Oh. So --
A No. You're trying to say something I didn't say.
Q No. I'm just asking you, did any part of you say, wow, this could look suspicious?
A For what reason?
Q Well, you're transferring assets out of your name and out of the reach of creditors.
A I'm 72. I worked through this early on and I followed through until the end. There's a date of 2020 when the documents came to me. I went through COVID.

The bank sold my assets. They came and asked for a judgment and we were in the middle of an appeal. Not an appeal. We hadn't had a judgment yet. So, it wasn't like I did something wrong in anticipation of doing something wrong.

Q Did any part of you say, boy, this is really great, my family will have these assets rather than Huntington Bank?

A What I'm going through here is not really great, so I did not plan that. And I didn't say that. I did -- normal course of events. I'm 72 years old. I was 70 -- I was 69 at the time. And I did what everybody else would do. I had a complicated life and I wanted it to be managed properly.

Q Did any part of you say, I could be left insolvent after these transfers?

A No.

Q Did any part of you say, you know what, I might be left with an unreasonable amount of capital after these transfers?

A I have to go back to my diary and see if I wrote that down. I didn't.

Q Did any part of you say, I'm not going to be able to pay Huntington this debt when it falls due because of these transfers?

A Never knew what the debt was going to eventually be. I'm here to take care of that.
Q Now, you reported your net worth in 2021 as $17,725,000, correct?
A What was that again? I'm sorry.
Q So, you -- in Exhibit F, why don't we just look at the exhibit. You tell me, what did you report your net worth to be?
A My liquid value at the time in the follow-up of COVID was $17 million.
Q And the judgment that Huntington obtained against you in December of '22 has a $27 million balance on it. Correct?
A Say that again.
Q So, Huntington obtained a judgment against you, correct?
A I believe so.
Q And in December of 2022, correct?
A 2022, yes.
Q And on that there's a $27 million balance due and owing, correct?
A According to you, there's money hidden. You know, I know that I've got a $27 million, but there's a lot of money sitting around that you told me already is waiting to be accounted for. So, I don't know how much

money's out there.
Q Well, in state court and I believe in the pleading your attorney filed here, they all acknowledge that the debt is $27 million. So, are you saying it's not $27 million?
A No. I'm admitting to the judgments as $27 million.
Q Okay.
A But you've identified a lot of money that's being pulled back. So, I don't want to be held accountable for something that doesn't belong to me.
Q As you sit here today, you can't pay Huntington that $27 million, correct?
A No. I can't.
Q And that's in fact why you filed for bankruptcy, correct?
A No. I filed for bankruptcy to do the right thing.
Q Would you agree with me that your bankruptcy itself is evidence that you can't pay the $27 million to Huntington today?
A I totally disagree.
Q Would you agree with me that if all those assets you transferred into the trusts were still in your name today, it would be easier for you to pay off the

Huntington debt?
A I still can pay the Huntington debt with where I am today.
Q That's not my question. I said would you agree with me that it would be --
A I'm not --
Q -- easier --
A I'm not agreeing with you. I'm telling you the truth. I can take care of this as long as the Court allows me to have the time to do it.
Q That's not my question.
A Well, you wanted me to agree to something. I'm telling you I'm not agreeing with you.
Q Okay. Who are the officers and directors of the entities owned by the gift trusts?
A Could you say that again?
Q Who are the officers and directors?
A I need to get to the documents, and I don't have them in front of me.
Q Is it anyone outside of your family?
A I believe I said that my attorney is the trustee, but nobody else.
Q All right. I want to shift gears on you, okay? I want to -- so, I just want to be clear on what I'm asking, all right? There are entities owned by the

gift trusts today, correct?
A There's entities that own the membership interest.
Q But the gift trust owns equity in entities, correct?
A Say that again. I'm sorry.
Q The gift trusts own interests in entities, correct?
A They own interest in membership interest that has the assets.
Q All right. Now, I want to talk about those entities themselves. So, for example, To Life Ltd. I want to talk about that. Well, let's do it this way. Who are the officers and directors of To Life Ltd?
A The officers of To Life? There's -- the operating agreement says I am.
Q And who are the officers and directors of Red Dog Operations Holding Company?
A Eric Schneider.
Q And that is your son?
A It is.
Q Any other officers and directors?
A No.
Q All right. Who are the officers and directors of Grasshopper Investments, LLC?

A I am.
Q Now, those three entities are not in bankruptcy today, correct?
A They are not.
Q So, is it fair to say that you could transfer assets in those entities any time you want?
A No.
Q Is it fair to say that you could take liens out on the assets of those entities any time you want?
A Not while I'm in bankruptcy.
Q Have your gift trusts made any distributions to any person since December of 2020?
A I don't know. I'd have to go look at the accounting.
Q Are the trusts generating income?
A I believe so.
Q Who's getting paid that income?
A The trust and members of the trust.
Q And then what does the trust do with that income?
A Pays its bills and at some point it will pay out a distribution.
Q That's what I want to get to. Has that point happened? Have distributions been made from the trusts?

A Getting louder on me. Can you say that again?
Q That's what I'm trying to get to. Have distributions been made from the trust to anyone?
A I believe so.
Q All right. When?
A I told you, I don't know every minute of every day in my life. I have to go to the accounting department and give you an answer if you really need it right now.
Q You have an accounting department?
A Yeah. You need that to run what I do.
Q All right. Well, then, how much has been distributed?
A Like I said, if you want to know now I have to go to them. I don't keep everything. I have a company that operates my businesses.
Q Can you give us a ballpark?
A No.
Q Is it more than a dollar?
A I'm not going to give you an answer, because I'm not going to get trapped into something I don't know.
Q Is it less than $100 million?
A I just gave you my answer.
Q You can't even pinpoint it between one dollar and $100 million?

A To one cent. You're not going to get something out of me that I don't know. I'm not going to tell you something to get trapped.
Q Give me a range.
A From $1 to $10. I don't know.
Q Who received the distributions?
A I don't know.
Q Have you, at any point in time, received distributions from the gift trusts?
A I could have.
Q Have your family members at any time received distributions from the gift trusts?
A They could have.
Q Have the gift trusts paid any of your personal expenses at any time?
A They could have.
Q Have they paid any of the personal expenses of your wife at any time?
A They could have.
Q Have they paid any of the personal expenses of your children at any time?
A They could have.
Q All right. Let's talk about the Eastgate property. Are you familiar with that property?
A Yes.

Q All right. And it appears on -- well, let's go to Exhibit E. We'll turn to Schedule D.
A Schedule D in the E?
Q Yeah. Exhibit E and then Schedule D.
A Okay.
Q And that lists the real estate you own, correct?
A On 619?
Q Yes. Sorry. So, you value that property in 2019 at $1.4 million, correct?
A At that time.
Q With no mortgage balance?
A At that time.
Q All right. And then in Exhibit F that property is no longer there in 2021. Would you agree with me on that?
A I don't know yet. I have to go through this to make sure.
Q Sure.
A I'm not sure at this point, because they don't match up.
Q Well, I look at Schedule D in Exhibit F. Do you see that?
A Yep.
Q I do not see the Eastgate property. Do you?
A It could be that first one. It says, "Office

Eastgate."
Q In Schedule D?
A In Schedule B. I'm sorry. That says -- yep. It says without a debt. Now I've got a debt.
Q No. I'm just saying the Eastgate property is no longer in Schedule D, correct?
A Because that was when I had no debt on it. If you look at the page before, it's got debt on it and it says, "Office EG."
Q So, are you saying in Schedule B "Office EG" is the Eastgate property?
A I'm saying in COVID that EG property had gone down in value.
Q Okay. We'll get there. But Schedule B you're saying, "Office EG" stands for the Eastgate property.
A I believe that's what was in there, but.
Q And so you're saying that that property had a value of $400,000 as of September 1, 2021?
A I'm looking at my document. I can't tell you. I'm sorry.
Q Okay. I'm looking at Schedule B.
A I'm looking at Schedule B.
Q Okay. Now, the first entry says, "Office EG." Do you see that?
A And I'm saying I don't know because this is two

years ago. But I believe that's Eastgate.
Q Okay. That would make sense, the initials EG. Okay. Now, then, you put this in Schedule B instead of Schedule D, which I didn't catch. But that's -- it's the same asset, correct?
A Probably.
Q Okay. But now you list the value of that asset at $400,000 in 2021, correct?
A Because I had income prior to that.
Q Okay. I'm just --
A So, the value went down because it didn't have the asset on the property anymore.
Q All right. So, there was $1 million reduction in value in your opinion?
A In 2021 in the middle of COVID.
Q Okay.
A With no customers. Yeah.
Q And then you put a mortgage on that property in the amount of $250,000.
A Probably. I don't know.
Q All right. So, do you --
A Three years ago.
Q Do you own this property as we sit here today?
A Yes.
Q All right. What's the value of that property?

A I don't know.
Q Is it occupied now?
A It's got a couple tenants there.
Q Has it improved since September of 2021?
A I believe the world has improved and it has a chance to keep on improving.
Q Well, I know the world's improved, but I'm asking did this property improve?
A It's part of everything I have. It's all improving, because I take care of it.
Q All right. So, do you think the value today is more than $400,000?
A Good chance.
Q All right. Now, you've put values on a lot of different assets and entities so far, but you don't have a value to put on that entity, that asset today?
A I told you how I do values. I look at the marketplace. I talk to my realtor, my staff, and we come up with values and I attempt to put something that I think is reasonable.
Q So, after June of 2020 when Huntington commenced its collection action, did you transfer any other property out of your name other than gift trusts?
A Yes.
Q All right. What assets?

A The Atlanta property that got closed down because of COVID.
Q Okay.
A And a house that I used as a construction trailer for the property that I built in the middle of COVID on the corner of Ridge and Madison Road.
Q That's right. You testified about that Wednesday. Okay.
A I did.
Q Nothing else?
A Not that I know of, because life is complicated.
Q You owned a Tesla, didn't you?
A No. I still do own it.
Q You still do own it?
A Yes.
Q Okay.
A Something wrong?
Q I didn't see that in your exhibit.
A What does that have to do with my trustee?
MR. GOERING: It's a lease.
MR. SCHUELLER: Got it. Thank you.
THE WITNESS: It should be in there.
BY MR. SCHUELLER:
Q Okay. All right. So, let's go to Exhibit J.
A What happened to the Tesla?

Q Your counsel has clarified something for me.
A All right. What's next?
Q I'm sorry. Go to Exhibit K, please. And let's turn to the last page where it says your total equity is $9,370,087. Do you see that?
A What page is that?
Q The very last page of that exhibit.
A Yep.
Q All right. And then I did the math here and I just did a value. Excuse me. I didn't even do a value. I just added up the value of your non-marketable securities in this document. And it came out to $5,412,567. Does that sound right to you?
A I don't know.
Q Okay. Let's assume that's right.
A I don't want to say.
Q And that's certainly less than the $27 million owed to Huntington, correct?
A If I assume that, yes.
Q All right. But I found it very interesting, because on Wednesday you said, well, these are not market values. These are liquidation values. Do you recall that testimony?
A I do.
Q And then at that time you said, I think the

market value of these entities is higher. Is that right?
A Yes.
Q And then you said, I think it's worth $27 million. Correct?
A Now that we're moving into a better time, yes.
Q All right. Now, what methodology did you use to derive that market value?
A If I have the time and the opportunity through the Court to sell these or to get the income, I'll be --
MR. GOERING: Your Honor, I don't think he understood the question. Which value is counsel saying -- asking him to -- as to how he got the value? The $27 million that he's testified to if he sold it in time or the $9 million that's shown on here as liquidation value? He didn't clear up which number he's asking. I'm sorry, counselor, but I don't think he understood the question.
MR. SCHUELLER: Oh, no. I'd much rather have you say that.
THE WITNESS: Could you repeat that question?
BY MR. SCHUELLER:
Q So, you gave the opinion on Wednesday that your non-marketable securities, which are held in your name

today, have a market value of $27 million, correct?
A I would like you to repeat that if you could.
Q All right. So on Wednesday you testified about the market value of all these equity interests that you list here in Exhibit J, correct?
A No. I said my liquid value.
Q Okay. So, it's -- let's, then, turn to the last page of Exhibit J. Are you saying your liquid value is $27 million?
A No. I did not say that either.
Q All right.
A I said my liquid value is the -- what's on this document. I said the market value is what I get if I can get the time to get the income and take the time to do when the better economy shows up.
Q Got it. Okay. Let me try and be more clear with my questions. So, in Exhibit K, you state your total equity was $9.3 million, correct?
A I said my liquid value at that point.
Q All right. That's your liquid value at that point. What did you value as $27 million on Wednesday? I'm trying to figure out where that number came from and what you tied it to.
A I tied it to if I get the time with the Court's help in bankruptcy I will be able to pay you $27

million with the time and the timing for the economy to change. And that's why I'm here.
Q All right. Let's go to page two of Exhibit K. And let's go to the first entity that has some equity. That's 747, LLC. Do you see that?
A Yes.
Q And you have here that the equity is $117,500. Do you see that?
A Yes.
Q Is that liquidation value or market value?
A Liquidation.
Q All right. And if I went through all these other entities, you would say that the value you gave was liquidation value for all of those.
A That's what I said.
Q All right. But then on Wednesday you said, hey, if I didn't have to sell these at liquidation value and I could have some time, I could sell them at market value for $27 million. Correct?
A I just said that.
Q Okay. Got it. All right. Now it's clear in my head. All right. Now, what methodology did you use to increase your -- to -- strike that. What methodology did you use to develop that market value of $27 million?

A If I have a minute to tell you how I operate, you can understand. I bought a property on the corner of Ridge and Madison Road. I paid for the land and the old Masonic Lodge and I turned that into an asset that had value. As it matured, the value went up. And that's what I can do over time if the Court allows me and that's how I do my business. It takes time. It takes the economy to be in the right place and it takes my team to make it work.
Q All right. Let's assume you can increase value over time, okay?
A You don't have to assume it. I'll do it.
Q All right. Why $27 million and not $100 million or $10 million? Why did you end up at $27 million? Walk me through your analysis that got you to $27 million.
A If I'm allowed to tell you, you will understand. I was with a partner who's in prison and he kited, and the bank helped him kite. And during that kiting, the bank decided they didn't want to deal with it anymore and they passed it off to someone else. When they passed it off to someone else, they could have talked to me. I could have held the business together, because that's what I do. I'm a nursing home administrator since 1968. I've run over 1,500 beds at

a time.

Had they talked to me -- and I didn't sign a guarantee that I would have been able to have communication with the bank. The bank never knew me, never talked to me, and in the interim when they passed off the bad behavior, they didn't have clean hands. They sent it off to someone else. It's sitting over at GE and then all of a sudden he got caught kiting $1.6 billion. Went through five banks, four in Cincinnati, one ST in Pittsburgh.

When that got through the process, you guys decided to sell the asset instead of ever talking to me. I'm a nursing home administrator. You can see that I can develop and accomplish a goal. I wouldn't have this stuff if I didn't do it. There's 70 LLCs. How did I get there? Because I took my time. I did it right. I'm honest, fair, and I didn't fraud anybody, as you'll see today.

And I appreciate the fact that I got a chance to tell you that if Huntington would have done the right thing when they caught the kiting in December of '19 and not let him kite $209 million through the bank in three months, they could have stopped the kiting. They could have called me. I could have run the business and things wouldn't be where they are today.

Right now, there's $110 million in the courts with four banks running after it and trying to figure out who's going to get the biggest lawyer fee. Already, there's $8 million of lawyer fees. I got every document. This gentleman, I didn't know. He hasn't talked to me in four years. He's in prison. And he kited -- started off in December kiting $4.5 million a day and by the end of April, he did $45 million a day of kiting. There's $1.6 billion that went through.

The FBI in Pittsburgh said, this is the largest kiting in American history. There are so many kiters out there and with the banking system where it is today, there's a need to fix it. And somebody did something wrong and I think that you'll see that there was complicity in making money and letting him kite during this whole process.

Q All right. So, Mr. Schneider, I want to go back to your --

A That's why it's $27 million. Because that was the mud that was thrown against the wall and had the bank not done that, I wouldn't be here tody.

Q All right. Mr. Schneider, you gave valuation testimony on Wednesday, correct?

A At the time, yes.

Q And you valued these equity interests at $27 million as a market value. Correct?
A Now, say that again.
Q So, you gave testimony that the market value of these equities today is $27 million, correct?
A That's not what I said. I said liquid value. There's a difference between the two.
Q All right.
A Liquid is what you can get it under duress. If a trustee came in here and sold this, I'd be out of business. Lose 300 employees and those families would be on the street because the trustee's not going to work like I do. I work 80 hours a week. I put this together when I was a little kid and I'm still putting it together at my age. And I continue -- want to grow if I can.
Q Mr. Schneider, I just want to talk about that $27 million. How did you derive that figure?
A The courts listened to Huntington and said there was no laws within the banking world and they accepted that number because that was what was thrown out there.
Q All right. Now, Mr. Schneider, I just -- let's pause for a second, okay? What I'm trying to do is understand how you got to that $27 million in valuation. Can you walk me through how you got there?

A I will be able to pay the judgment that I'm currently appealing in the next five years if I get the opportunity to pay the bank. And in the interim, through my appeal, there might be some evaluation that I'm going to pay that $27 million or the --
Q Mr. Schneider, I don't want to -- I don't mean to interrupt you. But let me try it a different way.
A The 27 is -- what you're waiting for is a judgment.
Q Let me try and get where I'm going in a different way. Because this way is --
A All right. That would be helpful.
Q -- not productive for either of us. Let's go back to Exhibit K. And, for example, 54 Realty Ltd. What do you consider to be the liquidation value of that entity today?
A Zero.
Q Okay.
A Do you know what that is? That's the asset you sold for $9 million -- the bank sold for $9 million and the bank only took $6.2 million after everybody took their grabs at it. And that's part of why there's $16 million that the bank's looking for plus $8 million of defaulted interest.
Q Let me try this another way.

A Well, you asked me how I got to $27 million. That's where the judgment is. And that's how it got to be a deficiency and they're using me as the backstop.

Q All right. Let me try another way.

MR. GOERING: Your Honor, maybe it would help if counsel would --

MR. SCHUELLER: Well, this is my examination. I'd like to proceed.

MR. GOERING: I know, but you got to separate the debt from the asset. He's talking about $27 million worth of debt. You're talking about $27 million worth of asset. You aren't talking the same language. We'll be here all day.

MR. SCHUELLER: Your Honor, I'd like to run my examination. I'm doing the best I can, but I don't need coaching from opposing counsel on how to ask my questions.

THE COURT: And that's fine.

MR. SCHUELLER: I'm doing the best I can.

THE COURT: Well, let's back up. So, we started -- I'll have to look at my notes. The $27 million is the judgment. I'm trying to wind back to the testimony from -- which is what I think you're trying to get to, Mr. Schueller, is what you testified the value, the market value of those entities are

versus the liquidation value. And that number is -- I'm not grabbing it real quickly. The testimony from Wednesday was what, Mr. Schueller?

MR. SCHUELLER: $27 million.

THE COURT: 27. Okay. So, it matches the judgment amount is basically what -- the same thing. Okay. So, he's just trying to understand how you arrived at a market value, if that was the testimony and if that was your recollection of your testimony, how you arrived at that $27 million figure. Is it just because it matches the debt amount? Okay.

THE WITNESS: Yes, I've got to pay the $27 million, get out of bankruptcy, and move on with my life. And $27 million is in front of me because there's a judgment and I'm in the middle of an appeal and when I hopefully prevail I won't have this issue.

THE COURT: Okay. And, I mean, you can pick it up from there if -- I mean, I guess your question is really what do you think these -- is that what you think these properties are worth from a market standpoint.

MR. SCHUELLER: Yeah. That's --

THE WITNESS: No. I didn't say that. What I said is, this is the liquid value and if I have the time I will create enough market and cash flow to pay

the bank. Or pay the judgment.

MR. SCHUELLER: I think I've gotten as far as I'm going to get on that and so I think I'll move on.

BY MR. SCHUELLER:

Q Mr. Schneider, let's talk about the additional secured debt you incurred after 2019. Now, on Wednesday, you testified that you had increased your debt with Merrill Lynch on the marketable securities account by $5.8 million after 2019. Is that right?

A I don't know the number, but I did increase it.

Q All right. Does $5.8 million sound right?

A It's a number that I can't be specific on at this point.

Q All right.

A But I do show that, went from '19 to '21 I believe it was more than that.

Q All right. Let's assume it's $5.8 million, okay?

A Okay.

Q And then you testified Wednesday that you took those proceeds from those loans and you reinvested them in your businesses. Is that what happened?

A I borrowed the money from my account and I needed equity in the development of the RED and that's where that money went.

Q So, did all of that money go toward the RED?
A I can't answer that. That was two and a half years ago.
Q Do you think it could have gone to any other investment?
A I'm doing something on a regular basis. I know that it all went back into my business.
Q But you don't know which business for sure?
A As I sit here now, no.
Q Was it taken out in a lump sum or in installments?
A I'm sure it was installments. As it was needed, that's where it went.
Q And when you put that money into these entities, did you put it in as a loan or as a capital contribution?
A I don't know. I'd have to see what my accountant did.
Q But you don't have any books or records as you sit here today to answer any of these questions about the details of those transactions?
A I didn't know I needed to bring them.
Q All right. Next, after 2019, your testimony through your counsel on Wednesday was that you incurred additional secured debt in the amount of $66,340,000.

Is that correct?
A If that was the number then.
Q All right. Well, let's assume that is the number. And how many loans did that involve?
A It's a complicated question. I don't think I have the answer right here.
Q Why not? Why is it complicated?
A The same reason. I have 70 LLCs. It takes a long time to do everything and I use my accountant. I use my staff. And you're asking me to know everything out of what I've done. So, you're asking me specifically. I know I put it back into my business, and it might have been at different times, but I can go back and put my documents together. But I didn't take anything. I put it back in the business. That's how I grew $66 million.
Q Well, you realize that in the state court and in this court, Huntington has accused you of pulling that money out and diverting it. You're aware of that, correct?
A I'm aware that that's what they're trying to prove. I got that.
Q Right. But you don't have any documentation on where that money went, correct?
A I'm looking at the documents that we brought to

the court, which is what I gave the -- Huntington in '18. Well, I didn't give that Huntington in '18. I gave that to someone else. '19, '21, that was given to Huntington.
Q All right. And aside from records, you can't even give testimony on that subject because it's too complicated, in your words, correct?
A It's not that it's complicated. I don't want to say something that I don't have the answer for you.
Q Do you think the money went back into more than one business?
A I'm sure it did.
Q But you can't name the businesses?
A I can name some of them. I got 70 of them. I -- you know, I got seven grandchildren. I know them very well. Seventy businesses, I don't know what I did yesterday, but I know what I'm going to do tomorrow. I went into the RED, because I can show that easily. That was a apartment complex and I built it all during COVID. And then I built the RED Corner and then I added an animal hospital in Boston. I'm not saying I'm complicated. I just -- you know, I start something and I finish it well. And that's what I've done over time.
Q All right. So, between the Merrill Lynch account and your other secured debt, if we add 66 to

5.8, let's just call it 6, that's $72 million in new loans after 2019, correct?
A I can't say that.
Q You had a need to fund operating losses in the amount of $72 million after 2019.
A It was more than losses. Those were growth in my business.
Q Mr. Schneider, I want to ask you about a few entities, and I want to find out if these entities had projects which were in the process of construction after 2019. Do you follow?
A When you ask them, yes.
Q Okay. All right. The first entity is 9617 Kenwood Road Development, LLC. Did that entity have any projects in construction after 2019?
A That was an acquisition of Ringo Bowling Lanes and the old Blue Ash Chili in Blue Ash, Ohio. And that was purchased for a future development.
Q All right. And has it been developed at all since your purchase?
A No.
Q Let's talk about RED Corner, LLC. Again, same question. Were there any construction projects tied to that entity after 2019?
A It started -- and I don't know the date. I

acquired the land and developed a town home project.
Q And when was the development completed?
A In COVID, let's see. Last June.
Q All right. So, that was construction after 2019?
A I don't know when I acquired it. I apologize. I completed it then. I know that.
Q Was there a lengthy construction period? I'm just trying to figure out --
A Why '19? What does that have to do with --
Q Well, it's just my question.
A Well, I could probably look it up, but I don't know why -- I know I bought it. I tore it down. I got the community to support me. I built it out and it got completed at the end of COVID.
Q Okay. What about 5027 and 5055 Madison Road, LLC? Again, same question. Any construction projects after 2019?
A What are those projects? I'm sorry.
Q 5027 and 5055 Madison Road, LLC.
A Where is this? Is it at the end? Well, if I'm correct, one of them was a house I'm sitting on waiting to develop. And what was the other one?
Q There's 5027 and 5055.
A Oh. That's -- that was a purchase of Cat Tools.

Q All right. So, no construction after 2019?
A No. I don't believe so.
Q Same question for Gatherings of Blue Ash, LLC.
A I bought a bankrupt property and I remodeled it into a banquet hall.
Q But the question is, was there construction tied to that entity after 2019?
A Yes. I had to fix it.
Q Okay. What about 5150 East Galbraith Road, LLC?
A What's that? What's the address?
Q 5150 East Galbraith Road, LLC.
A So, what's the question?
Q Again, all of these are, were any construction projects tied to that entity after 2019?
A What does 2019 have to do with anything?
Q It's just a question I have, sir.
A Well, I got to think about what my life was like in 2019 and trying to remember the project that I was working on.
Q I agree, yeah. I want you to do that.
A I think this one -- I think this was an existing project.
Q Okay. And how about Techwoods Circle Road, LLC?
A That was acquired to develop down the road.
Q Not developed yet?

A Nope.
Q Circle Development of Cincinnati, LLC?
A Circle Development, which one is that? Circle Development, LLC. Well, that's the name of my development company, so, I presume it's a zero.
Q Boston Road, LLC?
A No construction.
Q Montclair Investors, LTD?
A I am a five percent owner.
Q Any construction?
A No. I've been there 20 years.
Q Northern Kentucky Assisted Living?
A No construction.
Q North Shore Road LLC?
A No -- you picked a date in '19. I can't tell you. I don't know.
Q So, it's possible there could have been construction?
A It's operating today. That's all I can probably give you as I sit here.
Q Was there a construction project in the past few years?
A Whenever I got it. I think I might have got it in '17 or '18 and then it's been operational for way before COVID, so.

Q Okay. Thank you.

MR. GOERING: Mr. Schueller, I need a break at some point.

MR. SCHUELLER: Absolutely.

MR. GOERING: You think we can take a five-minute break?

MR. SCHUELLER: Yeah.

MR. GOERING: Judge, can I request a --

THE COURT: Sure.

MR. GOERING: Just a four minute break is fine.

THE COURT: We'll take a five minute recess.

MR. GOERING: Thank you.

MR. SCHUELLER: Thank you.

COURTROOM DEPUTY: Please rise. This Court is in recess until 11:00 a.m.

(Recess from 10:57 a.m. until 11:09 a.m.)

COURTROOM DEPUTY: Please rise. This Court is now reconvened pursuant to recess. You may be seated.

THE COURT: All right. Before we recommence, I just wanted to remind parties that if we go past or up to 1:30, I need to take a recess from 1:30 to 3:00 for the naturalization ceremony, and then we can reconvene at 3:00 if that's necessary, so.

THE WITNESS: So, my parents were part of that naturalization.

THE COURT: Is that right?

THE WITNESS: So, they didn't speak English and came to America in '49 and I was born here. And it's perfect American dream. Give them a chance.

THE COURT: They're a wonderful event to preside over, so, we always enjoy it.

THE WITNESS: Well, we need more people who want to work, so.

THE COURT: All right. Mr. Schueller.

MR. SCHUELLER: Thank you.

BY MR. SCHUELLER:

Q Mr. Schneider, could you turn to Exhibit E? And this is your 2019 personal financial statement. And I'm going to direct your attention to the very end, to the last page where it talks about your sources of income. Do you see that?

A I do.

Q And it says that your total income in 2018 was $2,199,000, correct?

A Yes.

Q And then I see there were some deductions here for it looks to me like depreciation. Would -- is that correct?

A Yes.
Q And there's two deducts. Are they both for depreciation?
A One of them's a loss carried forward and the other one's a depreciation.
Q Okay. So, if I back those out, it appears to me that the cash income you received in 2018 was $3,684,000. Does that sound right to you?
A Sounds right.
Q Now, what about your cash income in 2019? Was it similar?
A I don't know.
Q What about 2020?
A Absolutely not.
Q Okay. Did it go up or down, your cash income?
A My recollection is it went down because of COVID.
Q And what about 2021 compared to 2018? Was it up or down?
A Well, if it's here, I'll look at it.
Q I don't have that information. It's not in -- I don't have any information on your 2021 income.
A Oh. My income. I know it was down. We lost half our business in the pet business. The storage business was stagnant and then I was in the

construction mode and then as I put money into the business, I didn't have a cash flow as good as I did before COVID.

Q And what about 2022 compared to 2019? Was it up or down?

A Well, we've come out of COVID and I re-energized what we're doing. And it's better than it was and it's getting close to 2019, but the two years prior, it's been in trouble.

Q So, it's getting close to the $3,684,000 level?

A No. I didn't say that. I said the business is getting better.

Q No, I'm talking about your income now, okay? Set aside the business for a moment. The cash to Ray Schneider in 2022, was it the same as 2018, higher, lower?

A It was lower.

Q Okay. How much lower?

A I don't know.

Q Would you agree with me that your income is lower in 2022 because you transferred assets into the gift trusts?

A I won't agree with you.

Q You will not?

A No. I won't agree with you.

Q Okay. Now, I see back in Exhibit E that your income doesn't show any salary. Is that correct?
A I've never taken a salary.
Q All right. So, you transferred, when we look at the 2018 personal financial statement, 90 percent of your equity interests. Doesn't that impact the income you receive in 2022?
A I didn't transfer. I gave a gift to my family.
Q All right. Yes, that's right. You gifted it, but doesn't that impact your income level in 2022?
A It's a variety of things. I can't tell you that it was up or down, but it's different because I keep on growing my assets.
Q Well, it has to be lower, correct?
A No.
Q If you had all those assets in your name in 2022, wouldn't your income be higher?
A I've added other assets in the last two years.
Q Okay. I'm not asking about replacements. I'm saying that would be another source of income for you, correct?
A It could have been.
Q All right. But it wasn't because you gifted it away, correct?
A Yes.

Q Now, you testified that you were going to propose a plan to pay all creditors 100 percent. Isn't that correct?
A Yes.
Q And that includes Huntington's $27 million claim?
A The judgment against me.
Q Is that a yes?
A Yes.
Q Okay. And -- but you're not going to do it in a lump sum in the immediate future, correct?
A I can't do it now. I'm asking the Court to work with me.
Q All right. How much time do you need?
A Most likely, four or five years. I want to continue my business and keep my employees and make things work.
Q And have you determined what amount of money you can pay creditors during that four to five year period? How does the payment stream look?
A It'll be together when I put my business plan with my attorneys.
Q So, you don't have that number as we sit here today?
A We're in an emergency here. I only had four or

five days, so, I don't have the answers you're asking this minute.
Q All right. But your counsel and you have provided information to the Court that you're going to propose a 100 percent plan, and I'm trying to find out if that's credible. So, my question to you is, what does the payment stream look like for that 100 percent plan?
A When I get it together, I'll be more than happy to share it with you and the Court.
Q All right. You don't have it right now?
A We're in an emergency. This only happened a week. You know, I've never been in bankruptcy. It's not the place to be. And I'm working with my lawyers and I want to work with the Court and I want to make this thing work out so that I can go back to work.
Q And I just want the record to be clear, though. You don't have the payment stream information now, correct?
A Nothing different than any of my businesses. I start with an idea and I get to the finish line. I don't have it right now, but I've got good attorneys who will help me get to the finish line, along with my staff.
Q Do you know if you're looking to conceptually

make a large balloon payment at the end of that four to five year period?
A If I had the answer, I'd give it to you right now.
Q Will you, as the Debtor, sue the gift trusts or your family members over the course of this bankruptcy case to recover any fraudulent conveyances?
A Why should I?
Q I'm not asking you why, I'm asking will you.
A I have no need to.
Q So, the answer is no?
A No.
Q Any part of you doubt that answer?
A I've got a clear mind, and the answer is no.
MR. SCHUELLER: If I could just have one moment, Your Honor. Nothing further at this time. Thank you, Mr. Schneider.
THE COURT: Thank you.
THE WITNESS: Thank you.
THE COURT: Mr. Goering, any redirect? Mr. Haman, I assumed you're not --
MR. HAMAN: Depends on what Mr. Goering – I mean, I might have one question and that will be it.
MR. GOERING: Let's see how I do.
THE COURT: All right.

MR. GOERING: Thank you, Judge.

REDIRECT EXAMINATION OF RAYMOND JOSEPH SCHNEIDER

BY MR. GOERING:

Q Mr. Schneider, I have eight areas I would like to bullet point regarding testimony that you've given this morning. So, you spent a lot of time testifying about your estate planning that started in 2018, correct?

A Yes.

Q And in order to better understand that estate planning, we had a meeting with your estate planning lawyer. Is that correct?

A That's correct.

Q And do you recall discussions of what was called a swag trust?

A I don't remember.

Q Do you remember conversations about creating multiple trusts and transferring assets over at a period of time in order to satisfy certain IRS regulations?

A Yes.

Q Okay. And so is it safe to say from that meeting that there wasn't just one transfer into the trust, it was several different transfers over a period of time?

A I believe that's the case.
Q And so when you were testifying and unable to say a specific date when all the assets went into the trust, is that because there were multiple transfers over an extended period of time and it only finished in 2020?
A I believe that's what I said.
Q All right. Do you believe that your gift trust is called the 2019 Raymond Schneider Gift Trust?
A Like I said, I don't have it. But I --
Q Okay.
A -- believe that's what it's called.
Q All right. And there is also a Patricia Schneider Gift Trust, correct?
A Yes.
Q Okay. So, you gave some testimony that even confused me. So, I just want some clarification.
A Sorry.
Q You were asked who is the trustees of the trust. And you listed off six different names. So, let's just talk definitions. You have a trustee who runs a trust and the beneficiaries who receive the funds from the trust based upon the trust documents.
A Right.
Q Do you understand the distinction?

A Yeah. Yeah. Yep.
Q So, when you're listing off all your kids and all these names, that was to a question of who was the trustee. Were you actually trying to explain who were the beneficiaries?
A I believe that's what I was getting to.
Q Okay. And so in conversations when we were seeking a solution to this hearing, was there some conversation that if the trust is going to commit to anything, we needed to get the trustee involved?
A Yes.
Q Okay. And so you're not the trustee, correct?
A Not at this point.
Q Who do you think is the trustee?
A Of my trust?
Q Correct.
A I believe Emily is the trustee of the trust.
Q And that would be why she has to sign off on trust actions, correct?
A Correct.
Q Okay. Thank you for clarifying that. I'd like to go to Exhibit J that is in front of you. Was this a document that I prepared, Mr. Schneider?
A J, yes.
Q And was this prepared for a settlement

discussion that I had with Huntington Bank?
A Yes.
Q And was it provided to Huntington Bank at that settlement discussion?
A Yes.
Q And these summaries -- strike that. Do you believe that the summaries of these three different entities disclose the current percentage ownership of the entity and not the beneficiary portion?
A Yes.
Q Do you understand that question?
A Say it again, just so --
Q Okay. I just want to make sure. Originally, To Life Ltd, you -- Ray Schneider was 80 percent owner of that. Is that correct?
A Yes.
Q Okay. And over time -- and then through this estate planning process over a couple years at the end of it you're 8.42 percent owner. Is that correct?
A Correct.
Q Okay. Now, that reflects the percentage ownership in the entity. It doesn't have anything to do with the beneficiaries of the trust. Is that correct?
A Right.

Q Do you still -- are you still a manager of To Life Ltd?
A Yes.
Q Do you still get some income from To Life Ltd?
A I did before this, yes.
Q Okay. I'm sorry?
A Before the bankruptcy.
Q Okay. Before the bankruptcy. So, when you were being asked questions about your income a few minutes ago, even though you might have transferred over time some interest in the entity, you're still helping to operate the entity in drawing some income from it?
A Correct.
Q Is that correct? All right. It was agonizing listening to you talk about market value versus liquidation value. So, let's spend a few minutes clarifying. If you go to Exhibit K. Sorry. Exhibit K. Do you have that in front of you?
A Yes.
Q Is this -- what's the title of this document?
A Asset Analysis for Raymond Schneider.
Q And who prepared this document?
A I believe you did.
Q And did you and I prepare this in an effort to discuss settlement?

A Yes.
Q It lists your house in there, correct?
A Yes.
Q It's missing several vehicles. Is that correct?
A Correct.
Q Okay. And we'll get to that in a minute. But what I want to talk about is the values that are listed on here for your entities. Liquidation value. Did I ask for you to include the quick sale liquidation value of your properties in preparation of this document?
A I did.
Q Okay. And you and I spent all day yesterday together for your IDI and finishing up your bankruptcy schedules until the late evening. Is that correct?
A Right.
Q And those schedules have now been filed with the Court. Correct?
A Correct.
Q Well, strike that.
A No. I -- yes.
Q Do you know?
A Yes. Sorry.
Q Then certain amendments were filed because ECF issues. But do you believe that you have now listed your assets for -- that you currently own or have an

interest to the best of your knowledge?
A To the best of my knowledge, yes.
Q Are we still struggling to identify more LLCs that may be out there?
A I'm sorry about that. Yes.
Q Okay. But it's your belief that -- strike that. Do you believe that your assets of value that have assets in them are included in these schedules?
A Yes.
Q So, Mr. Schneider, did you and I, in addition to all your bankruptcy schedules, also put together -- oh, boy.
A You need Andrew?
Q There's -- oh, here. Zoom. I got it. Now, look at that. All right. Does this look like the updated asset analysis that you and I put together when we put your schedules?
A Yes.
Q Okay. And so Tiffany Ridge is the same, correct? Vail is the same, correct?
A Correct.
Q There is a change on the Maine property, because the deed shows that -- I'm sorry. What does the deed show on the Maine property?
A My wife and I own that.

Q Okay. So, your equity went in half on that. Is that correct?
A Yes.
Q Okay. And then on the asset analysis, there are several other vehicles. Did we discover multiple vehicles that are in your name that you didn't really know about?
A They've been in storage for years. They're -- yes.
Q Okay. And we're working to secure the titles to clarify all this. But to the best of your knowledge, the vehicles we'd listed on Schedule B are correct.
A Correct.
Q All right. So, where I really want to go now is I want to take a look at the entities. So, let's keep Exhibit K next to you and then what I'm going to mark, I don't know, as Exhibit 90 is the amended asset analysis. So, Mr. Schneider, 747 LLC. What did you value that entity at on Exhibit K?
A $117,000.
Q Okay. What do you value it on Exhibit 90?
A $240,000.
Q Okay. So, Exhibit 91, what entity is this?
A 747.
Q Is that the entity we just talked about?

A Yes.
Q Okay. So, what is this property?
A My brother and I had a piece of land for, I don't know, I can't remember, 12, 15 years. And then they just donated it to the community.
Q All right. And so originally you thought it was worth -- on a liquidation, you said it was worth $250. Is that correct?
A Right. Yep.
Q But on a market, you say it's worth you think double that. Is that correct?
A They cut wetlands and we're -- I think he's made an offer to get a higher price than I thought it was worth.
Q Okay. And so I could go through all these multiple entities. When you prepared your bankruptcy schedules and filed them with the Court as amended, did you use market value?
A I used liquid value because if the Court puts a trustee there, they're going to take it all away.
Q All right. On Exhibit K, for the purpose of settlement, you said we use liquidation value earlier in your testimony, correct?
A Yes.
Q Okay. But now as we're valuing your assets, are

we using more of a market value as to what you think you could get for it if you took the time to sell it rather than on a fire sale?
A I agree.
Q Okay. And so is it safe to say that this Exhibit 91 has all the different entities in them and the values are higher on this than on Exhibit K? Is that because this is a market value now rather than the liquidation that was used for settlement purpose?
A Yes.
Q I could ask you to add them up, but I did, so. Is there a total on the bottom of Exhibit 90?
A Yes.
Q And what is the total equity number on this document?
A Just shy of $30 million.
Q It's hard to really know what you're worth, isn't it, Mr. Schneider?
A I surprise myself.
Q It's hard to analyze operating businesses that hold real estate and have multiple moving parts, correct?
A Definitely.
Q In your opinion, do you have sufficient assets to repay Huntington Bank in full?

A I will with time.
Q That wasn't an "I will" question, so.
A Oh. Yes.
Q Thank you. At the time you did your estate planning, were your assets in excess of your debts?
A Yes.
Q Up until the point that Huntington Bank took a judgment against you, did you believe that the assets that you owned with Mr. Sosna had a greater value than the debt to Huntington Bank?
A Yes.
Q Substantially more?
A There were appraisals when we closed, yes.
Q Had the Sosna property been sold in the ordinary course of business rather than through a forced receiver sale by Huntington, do you believe there would have been sufficient funds to pay Huntington in full?
A Absolutely.
Q So, up until the time that Huntington got a judgment against you, did you truly believe that the assets that were collateral for their loan provided enough cushion to pay them in full?
A More than enough.
Q Just to clarify a point from cross-examination. You were talking about a Horizon. And I think Mr.

Schueller asked you something saying, "That's not an entity." And you said, "It's not an entity." Is Horizon an entity?
A It's a lawsuit that's out in civil court.
Q Okay. So, Horizon can't be an entity. That's -- I just want to clarify for everyone. Horizon --
A It's not.
Q -- is a business, correct?
A It's what's left over from a business, yes.
Q And what is the name of that business? Do you recall?
A Used to be East Galbraith Healthcare Center.
Q Okay. And do you know which of your corporations that is held in?
A None of them.
Q Okay. Is there a lawsuit? It -- was your brother, Hank Schneider, your business partner on that deal?
A It was my brother and my sister.
Q Okay. Your brother and your sister. And there is a lawsuit on behalf of the entity against the party, but it's not Ray Schneider as the plaintiff against the party, correct?
A Correct.
Q Okay. So, Horizon is an LLC and the lawsuit is

that LLC against the party. And that's the one that's six years old.
A Correct.
Q So, there was some confusing questions regarding Eastgate and valuing it from '19 to '21. And Mr. Schueller was trying to get you to talk about why it went from a value in 2019 of $1.6 to $400,000 in 2021, correct?
A Correct.
Q And you didn't have a very good answer to that question. Is that correct?
A I had to remember what was going on at the time.
Q Okay. And this is the property called Office EG Eastgate on the financial statements, correct?
A Correct.
Q Okay. Can you clarify now for me why it went from a value of $1.6 in 2019 to $400 in 2021?
A State of Ohio eminent domained my property and they were building out 32 and 275. And they took the property for two years and tore out my actual business and left me four concrete pads and the piece of land, half of what I had originally. And I had to sue them to get the proper valuation and it -- and there's nothing there. You know, I get a few dollars.
Q And that was some of your testimony on

Wednesday, correct? Didn't we talk about that property?
A I don't remember.
Q Okay.
A But, yeah.
Q All right. I just wanted to --
A At least I clarified it. I'm happy to do that.
Q I wanted to clarify that. Just to clarify your testimony on cross-examination. At the time you were doing your estate planning, did you even know that Huntington -- that there was an issue with Huntington Bank?
A I wasn't even with Huntington Bank. I was with Fifth Third at the time.
Q Okay. And so as you were proceeding through your estate planning, did you ever think that Huntington Bank would not be covered by their -- that their debt would not be covered by the collateral?
A When they closed on November 30, there was an appraisal and there was plenty of equity and the collateral was good to make that loan.
Q Do you recall about how much equity was in that property when you closed on the $75 million?
A $85 million.
Q And the loan was $75 million. Is that correct?

A Somewhere around $73 plus.
Q So, you believe there was at least $10 million of equity in your investments with Mr. Sosna?
A Three days later, we got the final appraisals and they said $85 million.
Q So, therefore, when you went to do estate planning, it never occurred to you that you might owe Huntington Bank money, correct?
A I had assets and I didn't have to worry and I had a partnership for 18 years and I did what I normally do.
Q Great.

MR. GOERING: One moment, Judge. I have nothing further, Judge.

THE COURT: All right. And we have a new exhibit. Is it 90 or 91? You've referred to it both ways, so I wasn't sure if it was two exhibits or one exhibit.

MR. GOERING: So, I have the amended Exhibit 4 is 90.

THE COURT: Okay.

MR. GOERING: If I can -- do you want me to provide a copy of this to someone?

THE COURT: If you could just file it after --

MR. GOERING: Absolutely.

THE COURT: -- the hearing.

MR. GOERING: And then I only used 91 for 747.

THE COURT: Okay. And so, 91.

MR. GOERING: So, I'll file that also.

THE COURT: Okay. That is what 91 was.

MR. GOERING: I didn't want to put you through the agony of going through --

THE COURT: And any objection to the admission of those exhibits?

MR. SCHUELLER: No, Your Honor.

THE COURT: All right. Thank you. Those are admitted, then.

MR. GOERING: Nothing further for this witness. Thank you.

THE COURT: All right. Mr. Haman, did you have any questions?

MR. HAMAN: Mr. Goering took care of most of it, but maybe one or two brief questions, Your Honor, if I may.

CROSS-EXAMINATION OF RAYMOND JOSEPH SCHNEIDER

BY MR. HAMAN:

Q Good morning, Mr. Schneider.

A Good morning.

Q Mr. Schneider, given -- well, you're the Debtor-in-Possession in this case. Do you know what that means?
A Yes.
Q Is it fair to state that that means that you generally get to remain in control of your businesses throughout the bankruptcy and your personal affairs, I would say?
A I pray to the Court I can.
Q Yes. Do you believe that a Chapter 7 Trustee or anyone could run your businesses and your personal affairs as well as you could?
A I hope you saw that today. I don't believe anybody.
Q Is it fair to say that you believe that your creditors and your stakeholders and your employees, your customers, the communities you have businesses in, would be better off if you remain in control of these proceedings as the Debtor-in-Possession?
A It would. I lost an employee because the word "bankruptcy" showed up.
Q Okay.
MR. HAMAN: Your Honor, I have nothing further.
THE COURT: Thank you. Any further

questioning?

MR. SCHUELLER: No, Your Honor.

THE COURT: All right. You may step down. Mr. Schneider, you may step down.

THE WITNESS: Oh. I'm sorry. Thank you, Your Honor.

THE COURT: Thank you.

(End of Mr. Schneider's testimony at 11:41 a.m.)

State of Ohio )

Cuyahoga County )

CERTIFICATE

I, Marc Eppler, a Notary Public, within and for the State of Ohio, do hereby certify that the above transcript is a true and accurate record of a portion of the hearing held before the HONORABLE BETH A. BUCHANAN. This record was prepared from an audio recording provided by the Court.

IN WITNESS WHEREOF, I have hereunto set my hand and seal of office in Cleveland, Ohio on this 4th day of May, A.D., 2023.

---------------------------
MARC EPPLER
Notary Public - State of Ohio
My Commission expires 9-14-2023

## _

**-- (1)**
66:14

## $

**$1 (2)**
59:5;62:13
**$1.4 (1)**
60:9
**$1.6 (4)**
70:8;71:9;104:7,17
**$10 (3)**
59:5;69:14;106:2
**$100 (3)**
58:22,25;69:13
**$11 (1)**
6:3
**$110 (1)**
71:1
**$117,000 (1)**
99:20
**$117,500 (1)**
68:7
**$12 (2)**
37:24;38:10
**$16 (2)**
20:1;73:22
**$17 (3)**
6:2,3;53:10
**$17,725,000 (1)**
53:4
**$18,500,000 (1)**
31:2
**$2,199,000 (1)**
85:21
**$2,750,000 (1)**
39:5
**$20 (1)**
6:2
**$209 (1)**
70:22
**$24 (1)**
6:4
**$240,000 (1)**
99:22
**$250 (1)**
100:7
**$250,000 (1)**
62:19
**$27 (35)**
53:12,20,23;54:4,5,6,13,20;65:17;66:4,15;67:1,9,21,25;68:19,24;69:13,14,15;71:20;72:1,5,18,24;73:5;74:1,10,11,21;75:4,10,12,14;89:5
**$3 (1)**
6:2
**$3,684,000 (2)**
86:8;87:10
**$30 (1)**
101:16
**$31 (1)**
6:3
**$31,500,000 (1)**
33:6
**$34 (2)**
5:25;6:5
**$35 (1)**
5:4
**$4,250,000 (1)**
39:5
**$4,650,000 (1)**
39:5
**$4.5 (3)**
37:25;38:11;71:7
**$400 (1)**
104:17
**$400,000 (4)**
61:18;62:8;63:12;104:7
**$41 (3)**
33:10,14,15
**$45 (1)**
71:8
**$49 (1)**
6:3
**$5,412,567 (1)**
65:13
**$5.5 (1)**
38:11
**$5.8 (3)**
76:9,11,17
**$50 (3)**
6:4;34:9;35:8
**$54 (5)**
32:10,12,22,25,25
**$550,000 (1)**
41:17
**$6.2 (1)**
73:21
**$6.6 (2)**
37:24;38:11
**$66 (1)**
78:16
**$66,340,000 (1)**
77:25
**$70 (1)**
6:8
**$72 (2)**
80:1,5
**$73 (1)**
106:1
**$75 (3)**
6:4;105:23,25
**$77 (2)**
6:9,11
**$8 (3)**
39:4;71:4;73:23
**$8,750,000 (2)**
48:18;49:5
**$85 (5)**
32:9,13,20;105:24;106:5
**$87,350,000 (1)**
50:10
**$9 (3)**
66:16;73:20,20
**$9,370,087 (1)**
65:5
**$9.3 (1)**
67:18
**$96,100,000 (3)**
46:24;47:5;50:5

## A

**ability (1)**
7:2
**able (4)**
52:24;67:25;70:3;73:1
**Absolutely (8)**
19:7;20:3;21:2;42:19;84:4;86:14;102:18;107:1
**accepted (1)**
72:20
**accomplish (1)**
70:14
**according (7)**
9:20;15:13;19:24;47:4;48:18;50:4;53:22
**account (3)**
76:9,23;79:25
**accountable (1)**
54:11
**accountant (2)**
77:18;78:9
**accountants (1)**
14:8
**accounted (1)**
53:25
**accounting (3)**
57:14;58:7,10
**accuracy (1)**
7:12
**accurate (4)**
4:9,12;9:1;34:12
**accused (1)**
78:18
**acknowledge (1)**
54:3
**Acquire (1)**
23:14
**acquired (3)**
81:1,6;82:24
**acquisition (1)**
80:16
**action (3)**
7:21;8:19;63:22
**actions (1)**
94:19
**acts (1)**
26:4
**actual (4)**
6:7;32:11,17;104:20
**actually (2)**
10:22;94:4
**add (9)**
5:22;6:6,9;7:14;46:21;47:9;49:10;79:25;101:11
**added (6)**
48:17,22;49:3;65:11;79:21;88:18
**addition (3)**
5:5,7;98:10
**additional (3)**
4:14;76:5;77:25
**address (1)**
82:10
**adds (1)**
46:23
**administrator (2)**
69:25;70:13
**admission (1)**
107:11
**admitted (1)**
107:14
**admitting (1)**
54:6
**affairs (2)**
108:7,12
**afraid (1)**
43:15
**again (22)**
9:5;11:3;12:24;13:7;15:16;24:12;33:5;37:6;40:11;47:15;48:21;50:20;53:5,14;55:16;56:6;58:1;72:3;80:22;81:17;82:13;95:12
**against (10)**
8:15;53:12,15;71:21;89:7;102:8,20;103:21,22;104:1
**age (3)**
9:19;14:21;72:15
**aggregate (1)**
47:5
**ago (5)**
8:11;62:1,22;77:3;96:10
**agonizing (1)**
96:14
**agony (1)**
107:9
**agree (33)**
15:19,21;18:16;20:1,4,8;23:25;31:1;33:5,7,9;38:12;40:18,20,21;44:5,7;45:22;47:22;48:19;50:12,16,23;54:19,23;55:4,12;60:14;82:20;87:20,23,25;101:4
**agreed (1)**
13:15
**agreeing (2)**
55:8,13
**agreement (1)**
56:16
**allowed (3)**
22:4;27:23;69:17
**allows (2)**
55:10;69:6
**alone (3)**
34:9;35:8,9
**along (5)**
3:11;11:9;13:14;14:7;90:23
**always (2)**
21:23;85:8
**Amelia (2)**
45:1,21
**amended (3)**
99:17;100:17;106:19
**amendments (1)**
97:23
**America (1)**
85:5
**American (2)**
71:12;85:6
**amount (7)**
52:19;62:19;75:6,11;77:25;80:5;89:18
**amounts (2)**
21:21,25
**analysis (8)**
8:7;9:14;35:19;69:15;96:21;98:16;99:4,18
**analyze (1)**
101:20
**Andrew (1)**
98:13
**Animal (2)**
36:3;79:21
**answered (1)**
3:23
**anticipation (1)**
52:4
**anymore (4)**
28:14;38:21;62:12;69:20
**apartment (3)**
30:8,15;79:19
**Apartments (2)**
12:16;30:18
**Apologies (1)**
11:1
**apologize (14)**
5:14;6:6,12;7:8;11:19;13:16;14:10;20:21;22:2,15;27:3,6;41:10;81:6

**appeal (4)**
52:2,3;73:4;75:15
**appealing (1)**
73:2
**appears (2)**
60:1;86:6
**appraisal (15)**
15:21;16:10,14,22;17:3,5;18:8;19:21;20:21;29:11;30:1;32:19,24;47:7;105:20
**appraisals (11)**
14:23;15:3,10,14,15;16:2;20:13;29:4,13;102:13;106:4
**appraised (9)**
15:22,23;16:17;19:5,8,12,14;28:22;32:13
**appraiser (1)**
16:4
**appreciate (1)**
70:19
**approach (1)**
3:12
**approvals (4)**
17:8,11,16,23
**approved (1)**
17:13
**April (9)**
9:18;11:23;12:12;13:5,9;22:22;23:2;24:12;71:8
**areas (1)**
92:4
**around (2)**
53:24;106:1
**arrive (1)**
50:10
**arrived (2)**
75:8,10
**Ash (4)**
46:2;80:17,17;82:3
**aside (2)**
79:5;87:14
**asset (23)**
10:16;11:5;23:21;29:22,25;30:22;32:11;33:6;34:6;35:5;62:5,7,12;63:16;69:4;70:12;73:19;74:10,12;96:21;98:16;99:4,17
**assets (57)**
9:16;10:2,8;11:11,17;12:1,14,16,19,23,25;13:10,15;17:16;18:17,18;19:19;21:10;27:13,21,22;28:19;30:2,15;33:19;37:6;39:4,18;48:18;50:4,11,25;51:4,21;52:1,7;54:23;56:10;57:6,9;63:15,25;87:21;88:13,16,18;92:18;93:3;97:25;98:7,8;100:25;101:24;102:5,8,21;106:9
**Assisted (1)**
83:12
**assume (10)**
40:15;49:21,25;50:1;65:15,19;69:10,12;76:17;78:3
**assumed (1)**
91:21
**assumption (1)**
50:5
**Atlanta (3)**
38:17,17;64:1
**attempt (1)**
63:19
**attention (1)**
85:16
**attorney (9)**
8:10;14:13;24:1;25:12,13,19;26:8;54:3;55:21
**attorneys (3)**
14:8;89:22;90:22
**attorney's (1)**
11:22
**attributed (1)**
50:21
**availability (1)**
34:6
**avoid (2)**
15:1;27:7
**aware (7)**
6:15;7:25;8:1;9:3,6;78:19,21
**away (4)**
15:12;39:23;88:24;100:20
**awhile (1)**
9:22

## B

**back (32)**
2:4;4:13;7:17,17,18;8:21;9:13;24:8;28:19,21;32:12,21;35:11,18;40:1;41:19;44:17;45:9;52:21;54:10;71:18;73:14;74:20,22;77:7;78:12,14,15;79:10;86:6;88:1;90:16
**backstop (1)**
74:3
**bad (1)**
70:6
**balance (3)**
53:13,20;60:11
**balloon (1)**
91:1
**ballpark (1)**
58:17
**bank (22)**
35:3;52:1,8;69:19,20;70:4,4,22;71:22;73:3,20,21;76:1;95:1,3;101:25;102:7,10;105:12,13,17;106:8
**banking (2)**
71:13;72:20
**bankrupt (1)**
82:4
**bankruptcy (16)**
54:15,17,19;57:2,10;67:25;75:13;90:13;91:6;96:7,8;97:13;98:11;100:16;108:7,21
**Banks (3)**
5:21;70:9;71:2
**bank's (1)**
73:23
**banquet (1)**
82:5
**based (4)**
19:2,4,14;93:23
**basic (1)**
11:10
**basically (2)**
39:23;75:6
**basis (1)**
77:6
**beds (1)**
69:25
**beginning (3)**
7:21;13:5;24:12
**behalf (3)**
25:20;26:2;103:21
**behavior (1)**
70:6
**belief (1)**
98:6
**belong (1)**
54:11
**below (1)**
45:21
**beneficiaries (4)**
27:25;93:22;94:5;95:23
**beneficiary (1)**
95:9
**benefit (3)**
22:9,10;28:1
**best (9)**
7:2,9;23:15;26:18;74:15,19;98:1,2;99:11
**better (9)**
39:13;42:13;43:11;66:6;67:15;87:7,12;92:10;108:18
**beyond (2)**
29:5,6
**biggest (1)**
71:3
**billion (2)**
70:9;71:9
**bills (1)**
57:21
**binder (7)**
2:22,25;3:1,2,8,13;8:5
**Blue (4)**
46:2;80:17,17;82:3
**book (4)**
4:1,5;5:3;23:22
**books (1)**
77:19
**born (1)**
85:5
**borrowed (1)**
76:23
**Boston (2)**
79:21;83:6
**both (2)**
86:2;106:16
**bottom (1)**
101:12
**bought (3)**
69:2;81:13;82:4
**Bowling (1)**
80:16
**boy (4)**
45:11;51:9;52:6;98:12
**break (3)**
84:2,6,10
**brief (1)**
107:20
**bring (6)**
11:19;20:13;22:19;24:9;35:14;77:22
**bringing (1)**
20:21
**brother (4)**
100:3;103:17,19,20
**brought (1)**
78:25
**building (6)**
34:8;35:8,9,13,15;104:19
**buildings (1)**
36:15
**built (6)**
33:12;37:3;64:5;79:19,20;81:14
**bullet (1)**
92:5
**bunch (1)**
26:12
**business (36)**
23:4,8;35:23,24,25;39:22;40:4;42:8;43:13,16,17,19;69:7,23;70:24;72:11;77:7,8;78:12,15;79:11;80:7;86:24,24,25;87:2,11,14;89:16,21;102:15;103:8,9,10,17;104:20
**businesses (14)**
30:13;37:22;39:10,15;40:6;58:16;76:22;79:13,16;90:20;101:20;108:6,11,17
**bylaws (1)**
28:6

## C

**call (4)**
14:13;27:12;28:17;80:1
**called (13)**
27:17;29:25;30:9,10;38:4,16;41:6,24;70:24;92:14;93:9,12;104:13
**came (9)**
22:3;43:4;49:5;51:25;52:1;65:12;67:22;72:10;85:5
**can (51)**
2:19;3:11;5:3,7,9;7:24;8:2;11:20;12:2;13:25;14:7;18:16;20:18,19;21:8;23:1;24:8,9;28:19;31:18;33:25;47:9;49:10;55:2,9;58:1,17;67:14;69:2,6,10;70:13,14;72:9,16,25;74:15,19;75:17;78:13;79:14,18;83:19;84:5,8,24;89:19;90:16;104:16;106:22;108:9
**capital (2)**
52:19;77:15
**caps (1)**
30:12
**caption (1)**
8:18
**care (6)**
19:1;35:24;53:2;55:9;63:10;107:19
**carried (1)**
86:4
**case (5)**
26:23;32:2;91:7;93:1;108:2
**cash (6)**
75:25;86:7,10,15;87:2,14
**Cat (1)**
81:25
**catch (1)**
62:4

**cats (1)**
35:24
**caught (2)**
70:8,21
**cent (1)**
59:1
**Center (1)**
103:12
**ceremony (1)**
84:24
**certain (5)**
17:22,23;45:17;
92:19;97:23
**certainly (1)**
65:17
**chance (5)**
35:14;63:6,13;
70:19;85:6
**change (2)**
68:2;98:22
**changed (7)**
21:10;34:15,18,22;
35:1,4,6
**changing (1)**
34:19
**Chapter (1)**
108:10
**charge (1)**
25:11
**cheater (1)**
21:5
**check (1)**
9:10
**children (3)**
25:1;28:4;59:21
**Chili (1)**
80:17
**Cincinnati (2)**
70:9;83:2
**Cinti (2)**
37:18;46:12
**Circle (6)**
12:17;46:6;82:23;
83:2,3,3
**civil (1)**
103:4
**claim (1)**
89:6
**clarification (1)**
93:17
**clarified (2)**
65:1;105:7
**clarify (6)**
99:11;102:24;
103:6;104:16;105:8,8
**clarifying (2)**
94:21;96:17
**clarity (4)**
7:7;8:3;20:11;
26:19
**clean (1)**
70:6
**clear (9)**
12:1;23:24;27:20;
55:24;66:17;67:16;
68:21;90:17;91:14
**clerk (1)**
2:22
**close (3)**
43:8;87:8,10
**closed (5)**
42:25;64:1;102:13;
105:19,23
**Co (1)**
36:7
**coaching (1)**
74:16
**Colerain (1)**
46:6
**collateral (3)**
102:21;105:18,21
**collection (1)**
63:22
**column (1)**
40:12
**coming (3)**
32:22;39:23;42:23
**commenced (1)**
63:21
**commit (1)**
94:9
**communication (1)**
70:4
**communities (1)**
108:17
**community (2)**
81:14;100:5
**companies (1)**
43:5
**company (7)**
33:16;35:21;36:12,
18;56:18;58:15;83:5
**compared (3)**
30:2;86:18;87:4
**comparison (1)**
29:23
**complaint (2)**
8:14,22
**complete (1)**
18:13
**completed (4)**
14:23;81:2,7,15
**completion (3)**
11:8,13;14:6
**complex (3)**
30:9,16;79:19
**complicated (10)**
9:21;14:22;24:19;
52:13;64:11;78:5,7;
79:7,8,22
**complicity (1)**
71:16
**computer (1)**
2:16
**concede (4)**
21:16,18,22,24
**conceptually (1)**
90:25
**concrete (1)**
104:21
**conduct (2)**
30:13;35:25
**confirm (1)**
45:15
**confused (1)**
93:17
**confusing (1)**
104:4
**consider (2)**
29:1;73:15
**considered (1)**
36:17
**construction (16)**
64:4;80:10,15,23;
81:4,8,17;82:1,6,13;
83:7,10,13,18,21;87:1
**contact (1)**
43:18
**contained (1)**
4:8
**context (2)**
43:16,19
**continue (2)**
72:15;89:16
**contribution (1)**
77:16
**control (2)**
108:6,18
**conversation (1)**
94:9
**conversations (2)**
92:17;94:7
**conveyances (1)**
91:7
**copy (1)**
106:23
**corner (4)**
64:6;69:2;79:20;
80:22
**corporations (1)**
103:14
**corrected (1)**
50:13
**Counsel (8)**
26:14;37:9;65:1;
66:13;74:6,16;77:24;
90:3
**counselor (1)**
66:18
**count (1)**
44:6
**couple (3)**
27:8;63:3;95:18
**course (4)**
14:20;52:11;91:6;
102:15
**COURT (61)**
2:6,9,17,20,23;3:5,
8,11,14;7:21,25;
10:19,24;21:1;26:24;
27:4;43:25;49:8;54:2;
55:9;66:10;69:6;
74:18,20;75:5,17;
78:17,18;79:1;84:9,
12,15,18,21;85:3,7,
11;89:12;90:4,10,15;
91:18,20,25;97:17;
100:17,19;103:4;
106:15,21,24;107:2,5,
7,10,13,17;108:9,25;
109:3,7
**COURTROOM (2)**
84:15,18
**courts (2)**
71:1;72:19
**Court's (2)**
2:25;67:24
**covered (2)**
105:17,18
**COVID (24)**
35:15;38:21;39:8,
12,22;42:12,18;43:3,
9,11,14;51:25;53:10;
61:12;62:15;64:2,6;
79:20;81:3,15;83:25;
86:17;87:3,6
**create (1)**
75:25
**created (5)**
22:21,23;23:8,25;
24:4
**creating (1)**
92:17
**creation (2)**
22:25;23:2
**credible (1)**
90:6
**Credit (1)**
5:21
**creditors (4)**
51:22;89:2,19;
108:16
**cross- (1)**
2:7
**CROSS-EXAMINATION (4)**
3:16;102:24;105:9;
107:22
**cumbersome (1)**
2:18
**curious (1)**
43:13
**current (1)**
95:8
**currently (2)**
73:2;97:25
**cushion (1)**
102:22
**customers (2)**
62:17;108:17
**cut (1)**
100:12

**D**

**Danielle (1)**
25:6
**date (43)**
10:4,15,18;11:4,8,8,
12,13,21;14:7;15:20,
22,23,24;16:5,7,18,
20;17:21;18:1,2,3,3,5,
10,15;20:17;22:3;
23:11,18,21,24;24:6,
6,14;29:12;35:17;
47:1;50:4;51:24;
80:25;83:15;93:3
**dated (1)**
16:23
**dates (8)**
11:20,24;12:3;
13:16;14:12;20:15;
22:3;23:1
**daughter (1)**
25:6
**day (11)**
9:12;18:23;25:23;
26:4;27:9;34:19;58:7;
71:8,9;74:13;97:12
**days (7)**
7:16,17,19;34:23;
35:2;90:1;106:4
**deal (2)**
69:20;103:18
**dealt (1)**
27:16
**debt (20)**
29:1;51:5;52:24;
53:1;54:4;55:1,2;
61:4,4,7,8;74:10,11;
75:11;76:6,8;77:25;
79:25;102:10;105:18
**Debtor (1)**
91:5
**Debtor- (1)**
108:1
**Debtor-in-Possession (1)**
108:19
**debts (1)**
102:5
**December (24)**
9:4,7,23;10:4,12;
11:11;14:4;15:20;
16:7,11,15,23;17:9,
12;18:1,18;19:18;
21:17;32:19;53:12,
18;57:12;70:21;71:7
**decided (2)**
69:20;70:12
**decision (1)**
27:15
**decisions (1)**
27:13
**deductions (1)**
85:23

**deducts (1)** 86:2
**deed (2)** 98:23,23
**defaulted (1)** 73:24
**deficiency (1)** 74:3
**Definitely (1)** 101:23
**definitions (2)** 31:16;93:21
**department (2)** 58:8,10
**Depends (1)** 91:22
**depreciation (3)** 85:24;86:3,5
**depressed (1)** 42:18
**DEPUTY (2)** 84:15,18
**derive (2)** 66:8;72:18
**destroyed (1)** 38:21
**details (2)** 20:23;77:21
**determined (1)** 89:18
**develop (4)** 68:24;70:14;81:23;82:24
**developed (3)** 80:19;81:1;82:25
**development (8)** 76:24;80:14,18;81:2;83:2,3,4,5
**diary (1)** 52:21
**difference (7)** 9:24;29:17;32:10,23,23;33:11;72:7
**differences (1)** 7:15
**different (12)** 18:4;36:15;63:15;73:7,11;78:13;88:12;90:20;92:24;93:20;95:7;101:6
**direct (1)** 85:16
**directors (6)** 55:14,17;56:14,17,22,24
**disagree (1)** 54:22
**disclose (1)** 95:8
**discover (1)** 99:5
**discovered (1)** 9:10
**discuss (1)** 96:25
**discussed (4)** 23:3;38:10;41:1,20
**discussion (2)** 95:1,4
**discussions (1)** 92:14
**distinction (1)** 93:25
**distinguished (1)** 31:13
**distinguishes (1)** 31:16
**distributed (1)** 58:13
**distribution (1)** 57:22
**distributions (6)** 57:11,24;58:3;59:6,9,12
**diverting (1)** 78:19
**document (17)** 8:5;14:11;23:17,19,20;24:5;26:2;49:2;61:19;65:12;67:13;71:5;94:23;96:20,22;97:10;101:15
**documentation (2)** 10:11;78:23
**documents (20)** 8:1;11:7;15:24;16:9,14;18:8,9,11;19:4,20;20:19;21:19;25:20,21;26:3;51:25;55:18;78:14,25;93:23
**Dog (23)** 12:17;35:20;36:11,16,19,22;37:1,2,2,17,18,18;38:3,6,6,16,25;46:12,16,18;49:12,14;56:18
**dogs (1)** 35:24
**Dogs' (1)** 50:14
**dollar (2)** 58:19,24
**dollars (1)** 104:24
**domained (1)** 104:18
**donated (1)** 100:5
**done (18)** 6:18;13:14;14:25,25,25;15:3,13;16:13;17:14;18:8,9;20:18;24:2;42:13;70:20;71:22;78:11;79:23
**dossier (1)** 6:17
**double (1)** 100:11
**doubt (1)** 91:13
**down (18)** 23:2;34:20;45:14;50:7;52:22;61:13;62:11;64:1;81:13;82:24;86:15,16,19,23;87:5;88:12;109:3,4
**dramatically (1)** 35:4
**drawing (1)** 96:12
**dream (1)** 85:6
**driving (1)** 26:21
**dropped (1)** 34:5
**due (2)** 52:24;53:20
**duress (1)** 72:9
**during (6)** 10:14;35:15;69:19;71:17;79:19;89:19

**E**

**earlier (2)** 19:19;100:22
**early (2)** 42:25;51:23
**easier (2)** 54:25;55:7
**easily (1)** 79:18
**East (3)** 82:9,11;103:12
**Eastgate (9)** 59:23;60:24;61:1,5,11,15;62:1;104:5,14
**ECF (1)** 97:23
**economy (3)** 67:15;68:1;69:8
**effort (1)** 96:24
**EG (8)** 48:1;61:9,10,12,15,23;62:2;104:13
**eight (1)** 92:4
**either (2)** 67:10;73:13
**else (12)** 14:9;28:12;35:9;36:4;50:15;52:13;55:22;64:10;69:21,22;70:7;79:3
**emergency (3)** 21:6;89:25;90:12
**Emily (2)** 25:16;94:17
**eminent (1)** 104:18
**employee (1)** 108:20
**employees (4)** 43:5;72:11;89:16;108:16
**end (13)** 13:5;14:6;23:15;24:12;51:24;69:14;71:8;81:15,21;85:16;91:1;95:18;109:8
**ended (2)** 9:23;13:6
**ending (1)** 12:13
**English (1)** 85:4
**enjoy (1)** 85:8
**enough (3)** 75:25;102:22,23
**entities (53)** 20:24;23:9,19;36:19;37:17,20;38:9,13,25;39:10;40:17,23;41:20,21;42:7;44:4;45:17;46:21,23;47:3,12,16,20,21;48:12,23;49:2,17,18,23;50:9,22;55:15,25;56:2,4,7,12;57:2,6,9;63:15;66:1;68:13;74:25;77:14;80:9,9;95:8;97:8;99:15;100:16;101:6
**entity (39)** 23:11,17;30:6,8;33:20;36:7,20,23;38:3,16,22;40:2;41:6,15,24;42:2,5;45:23;46:8;63:16;68:4;73:16;80:13,14,24;82:7,14;95:9,22;96:11,12;99:19,23,25;103:2,2,3,5,21
**entry (1)** 61:23
**equities (2)** 47:22;72:5
**equity (33)** 33:19,23;35:20;36:23;37:20;38:17,25;40:21,22;41:8;42:4;44:14,19,23;45:16,23;47:13;48:13;49:18;56:4;65:4;67:4,18;68:4,7;72:1;76:24;88:6;99:1;101:14;105:20,22;106:3
**Eric (3)** 25:5;45:10;56:19
**error (3)** 5:1,19;7:3
**errors (7)** 4:14,17,21,25;6:14;7:4,25
**estate (19)** 8:7;9:14,19;15:25;35:19;44:20;49:12,16;50:14;60:6;92:7,10,11;95:18;101:21;102:4;105:10,16;106:6
**estimate (3)** 31:9;34:13,16
**evaluated (3)** 11:14,15;29:11
**evaluation (2)** 18:4;73:4
**even (13)** 14:25;21:21,24;35:13;43:21;51:12;58:24;65:10;79:6;93:16;96:10;105:10,13
**evening (1)** 97:14
**event (1)** 85:7
**events (2)** 14:20;52:11
**Eventually (2)** 14:5;53:1
**everybody (4)** 14:9;28:12;52:12;73:21
**everyone (1)** 103:6
**evidence (1)** 54:20
**exact (7)** 10:18;11:20,23;17:21;20:17;22:2;24:20
**exactly (1)** 24:10
**examination (5)** 2:3,8;74:7,15;92:2
**example (3)** 32:18;56:12;73:14
**examples (1)** 17:19
**excess (1)** 102:5
**Excuse (3)** 4:5;37:9;65:10
**executing (1)** 26:2
**Exhibit (73)** 4:16,20,24;5:17,19;8:4,14;9:13,16;10:4;12:19;15:20;16:12;

19:3,9,12;28:21,22;
30:5,24;33:2,8,9;
35:19;37:7,11;38:2,
15;39:3;40:1,10;41:5,
23;43:24;44:2,12,18;
45:5,8,10;46:23;53:6,
7;60:2,4,13,21;64:18,
24;65:3,7;67:5,8,17;
68:3;73:14;85:14;
88:1;94:22;96:17,17;
99:16,17,19,21,23;
100:21;101:6,7,12;
106:16,18,19
**exhibits (4)**
3:25,25;106:17;
107:11
**exist (2)**
38:22,23
**existing (1)**
82:21
**exists (1)**
24:6
**expenses (3)**
59:15,17,20
**explain (3)**
6:19;43:3;94:4
**extended (1)**
93:5
**extent (1)**
26:25

**F**

**fact (2)**
54:15;70:19
**fair (13)**
9:3,6,15;17:15;
28:25;29:7,17;44:22;
57:5,8;70:17;108:5,
15
**falls (1)**
52:24
**familiar (1)**
59:24
**families (1)**
72:11
**family (5)**
52:7;55:20;59:11;
88:8;91:6
**far (3)**
4:23;63:15;76:2
**FBI (1)**
71:11
**fear (1)**
42:24
**fee (1)**
71:3
**fees (1)**
71:4
**few (6)**
8:11;80:8;83:21;
96:9,16;104:24
**Fifth (1)**
105:14
**figure (11)**
7:15,17;14:12;24:4;
26:22;50:10;67:22;
71:2;72:18;75:10;
81:9
**file (2)**
106:24;107:6
**filed (8)**
8:15,22;54:3,15,17;
97:16,23;100:17
**final (12)**
10:6,13;11:8,21;
15:24;18:2,4,20,23;
19:13;22:3;106:4
**finalize (1)**
17:24
**finalized (3)**
16:13;19:20;22:23
**finally (1)**
10:10
**financial (21)**
3:20,20,21;4:8,11,
16,18,22,25;6:15,20,
25;7:5;14:22;30:23;
33:4;38:5;40:11;
85:15;88:5;104:14
**find (4)**
5:7;7:11;80:9;90:5
**fine (5)**
3:5,9,10;74:18;
84:11
**finish (5)**
23:6,15;79:23;
90:21,23
**finished (4)**
2:3;10:10;24:13;
93:5
**finishes (1)**
24:1
**finishing (1)**
97:13
**fire (1)**
101:3
**firm (1)**
13:14
**first (12)**
4:5;5:2;8:18,21;
10:15;11:4;30:5;
47:25;60:25;61:23;
68:4;80:13
**five (12)**
25:8;40:17,23;
41:20;70:9;73:2;83:9;
84:12;89:15,19;90:1;
91:2
**five- (1)**
84:5
**fix (2)**
71:14;82:8
**flow (2)**
75:25;87:2
**follow (6)**
3:11;17:4;43:1;
45:18;49:3;80:11
**followed (1)**
51:24
**follow-up (1)**
53:9
**forced (1)**
102:15
**forgive (1)**
31:20
**form (2)**
23:19,20
**formed (4)**
23:8,12,13,18
**forth (3)**
19:2,9;45:9
**forward (2)**
39:13;86:4
**found (1)**
65:20
**four (17)**
26:13;38:25;39:10;
47:21;48:12,22;49:2;
50:8;70:9;71:2,6;
84:10;89:15,19,25;
91:1;104:21
**fraud (2)**
21:5;70:17
**fraudulent (1)**
91:7
**free (1)**
28:14
**front (20)**
5:18;13:13,17;14:1,
9,14,24;15:16;21:4,
13;22:16,19;24:14;
27:8,9;28:2;55:19;
75:14;94:22;96:18
**full (4)**
36:5;101:25;
102:17,22
**fund (1)**
80:4
**funds (2)**
93:22;102:17
**further (5)**
91:16;106:14;
107:15;108:24,25
**future (2)**
80:18;89:11

**G**

**Galbraith (3)**
82:9,11;103:12
**Gatherings (1)**
82:3
**gave (18)**
3:2;8:10;15:12;
19:4;32:9,12,21;
45:24;49:13;58:23;
66:24;68:13;71:23;
72:4;79:1,3;88:8;
93:16
**GE (1)**
70:8
**gears (1)**
55:23
**generally (1)**
108:6
**generating (1)**
57:15
**gentleman (1)**
71:5
**gets (1)**
28:1
**gift (41)**
9:17;10:7;17:2,6,7,
7,16;18:9,15,17,22;
19:25;20:5;21:10;
22:2,5,6;23:4;26:3;
27:17,23;33:20;
38:18,20;41:9;49:23;
55:15;56:1,4,7;57:11;
59:9,12,14;63:23;
87:22;88:8;91:5;93:8,
9,14
**gifted (12)**
10:2;12:16,22,25;
17:18;18:21,22;
27:21,23;35:20;88:9,
23
**gifting (2)**
27:24;44:21
**gifts (8)**
13:4;15:12,13;18:4,
12,25;22:3,4
**given (4)**
28:22;79:3;92:5;
108:1
**gives (1)**
6:4
**giving (2)**
18:15;20:11
**goal (1)**
70:14
**GOERING (36)**
2:2,7;3:2,6,7,10;
5:9,12;26:10;27:5;
37:9,12,14;64:20;
66:12;74:5,9;84:2,5,8,
10,13;91:20,22,24;
92:1,3;106:13,19,22;
107:1,3,6,8,15,19
**goes (1)**
30:1
**Good (11)**
2:14;3:18;6:14;
15:18;63:13;87:2;
90:22;104:10;105:21;
107:24,25
**grabbing (1)**
75:2
**grabs (1)**
73:22
**grandchildren (1)**
79:15
**Grasshopper (9)**
40:3,15;41:6,11,24;
42:7,14,17;56:25
**Great (4)**
45:20;52:7,9;
106:12
**greater (2)**
39:20;102:9
**grew (1)**
78:16
**GRHPR (1)**
40:13
**grow (1)**
72:15
**growing (1)**
88:13
**growth (1)**
80:6
**guarantee (1)**
70:3
**guess (2)**
22:23;75:18
**guys (1)**
70:11

**H**

**half (5)**
41:18;77:2;86:24;
99:1;104:22
**hall (1)**
82:5
**Haman (6)**
91:21,22;107:17,
19,23;108:23
**hampered (1)**
43:14
**hand (1)**
3:13
**handles (1)**
25:23
**hands (1)**
70:6
**Hank (1)**
103:17
**happened (5)**
32:1;57:24;64:25;
76:22;90:12
**happy (4)**
6:19,21;90:9;105:7
**hard (2)**
101:17,20
**head (3)**
21:7;23:13;68:22
**Health (3)**
41:7,7,10
**Healthcare (1)**
103:12
**hearing (2)**
94:8;107:2
**held (9)**
33:20;38:6,25;41:8;

42:5;54:10;66:25;69:23;103:14
**help (6)** 5:7,9;22:17;67:25;74:5;90:23
**helped (1)** 69:19
**helpful (1)** 73:12
**helping (1)** 96:11
**hey (1)** 68:16
**hidden (1)** 53:22
**hide (2)** 14:19;26:16
**higher (5)** 66:1;87:15;88:17;100:13;101:7
**history (1)** 71:12
**hit (2)** 38:15;43:3
**Hold (3)** 36:7;40:7;101:21
**Holding (6)** 35:21;36:12,12,17,18;56:18
**holds (2)** 40:22;41:3
**home (3)** 69:24;70:13;81:1
**honest (2)** 15:2;70:17
**Honor (13)** 2:14;5:10;26:10,17;66:12;74:5,14;91:16;107:12,20;108:23;109:2,6
**hope (1)** 108:13
**hopefully (2)** 2:7;75:16
**Horizon (9)** 41:7,8,10;46:8;102:25;103:3,5,6,25
**Horizontal (1)** 41:7
**horrible (1)** 33:12
**hospital (1)** 79:21
**hospitals (1)** 36:3
**hours (1)** 72:13
**house (4)** 43:23;64:4;81:22;97:2
**Huntington (36)** 3:24;8:14;16:15;20:4;32:8,18;51:5;52:8,24;53:11,15;54:12,21;55:1,2;63:21;65:18;70:20;72:19;78:18;79:1,2,4;95:1,3;101:25;102:7,10,16,17,19;105:11,11,13,17;106:8
**Huntington's (1)** 89:5
**hypothetical (1)** 32:16

## I

**idea (4)** 24:11;33:25;39:17;90:21
**identified (2)** 7:3;54:9
**identify (4)** 7:4,24;8:2;98:3
**IDI (1)** 97:13
**immediate (1)** 89:11
**impact (2)** 88:6,10
**important (3)** 20:9,25;26:23
**impossible (1)** 18:17
**improve (1)** 63:8
**improved (3)** 63:4,5,7
**improving (2)** 63:6,10
**include (1)** 97:9
**included (4)** 19:5;36:16;50:9;98:8
**includes (1)** 89:5
**Including (1)** 42:14
**income (25)** 35:14;39:25;57:15,17,20;62:9;66:10;67:14;85:18,20;86:7,10,15,22,23;87:13,20;88:2,6,10,17,20;96:4,9,12
**increase (3)** 68:23;69:10;76:10
**increased (1)** 76:7
**incurred (2)** 76:6;77:24
**indicates (2)** 36:8,12
**information (7)** 4:7;21:1;26:18;86:21,22;90:4,18
**initials (3)** 22:16;40:13;62:2
**in-Possession (1)** 108:2
**insolvent (1)** 52:16
**installments (2)** 77:11,12
**instead (2)** 62:3;70:12
**interest (23)** 31:2;33:19,21;34:6,20;35:6;36:24;41:14;42:6;44:24;45:24;46:22;47:17;48:5,8;49:18,23;56:3,9,9;73:24;96:11;98:1
**interesting (1)** 65:20
**interests (22)** 12:21;19:10;33:23;35:20;37:20;38:6,17,25;40:21,22;41:8;42:4;44:8;45:17;47:13;48:2,13,23;56:7;67:4;72:1;88:6
**interim (2)** 70:5;73:3
**interrupt (1)** 73:7
**into (32)** 10:8,17;11:5,17;12:2;17:16;19:19;20:5;26:21;28:19;47:13,17,22;48:2,5,8,13,23;54:24;58:21;66:6;69:4;77:7,14;78:12;79:10,18;82:5;87:1,21;92:23;93:3
**investment (1)** 77:5
**Investments (5)** 40:3;42:15,17;56:25;106:3
**Investors (1)** 83:8
**involve (1)** 78:4
**involved (2)** 14:9;94:10
**irrevocable (1)** 28:16
**IRS (6)** 14:8;17:19;19:4,21;25:22;92:19
**issue (6)** 7:20;20:9,25;21:4;75:16;105:11
**issues (3)** 17:13,20;97:24
**item (1)** 12:18
**Ivy (1)** 48:7

## J

**JOSEPH (3)** 3:16;92:2;107:22
**Judge (4)** 84:8;92:1;106:13,14
**judgment (14)** 52:2,3;53:11,15;73:1,9;74:2,22;75:6,15;76:1;89:7;102:8,20
**judgments (1)** 54:6
**June (10)** 8:22;9:15;13:19,23;48:19;49:22;50:12,20;63:21;81:3
**Justin (1)** 25:5

## K

**keep (6)** 43:5;58:15;63:6;88:12;89:16;99:15
**keeps (1)** 26:14
**Kentucky (1)** 83:12
**Kenwood (1)** 80:14
**kid (1)** 72:14
**kids (1)** 94:2
**kind (1)** 43:12
**kite (3)** 69:19;70:22;71:16
**kited (2)** 69:18;71:7
**kiters (1)** 71:12
**kiting (8)** 9:10;69:19;70:8,21,23;71:7,9,12
**knew (2)** 53:1;70:4
**Knoll (1)** 48:7
**knowledge (3)** 98:1,2;99:11

## L

**land (7)** 40:7;48:1,4;69:3;81:1;100:3;104:21
**Lanes (1)** 80:16
**language (1)** 74:13
**large (1)** 91:1
**largely (1)** 33:20
**largest (1)** 71:11
**last (10)** 5:20;6:13;7:1;16:16;65:4,7;67:7;81:3;85:17;88:18
**late (1)** 97:14
**lately (1)** 27:16
**later (3)** 16:18,19;106:4
**law (1)** 13:14
**laws (1)** 72:20
**lawsuit (10)** 9:4,7;41:13,15,16,17;103:4,16,21,25
**lawyer (3)** 71:3,4;92:12
**lawyers (7)** 9:20;10:10;17:2,3;23:3;28:9;90:14
**lease (1)** 64:20
**least (2)** 105:7;106:2
**leaving (1)** 43:23
**left (5)** 2:2;52:15,19;103:9;104:21
**legal (5)** 23:17,19;24:5;25:20;28:8
**lengthy (1)** 81:8
**less (3)** 39:24;58:22;65:17
**letters (2)** 22:16;30:12
**letting (1)** 71:16
**level (2)** 87:10;88:10
**liar (1)** 21:5
**liens (1)** 57:8
**life (20)** 9:21;16:2;20:18,24;23:9;29:14;30:6,20;33:23;52:13;56:12,14,15;58:7;64:11;75:14;82:17;95:14;

96:2,4
**likely (2)**
24:14;89:15
**line (5)**
5:20,21;23:6;90:21,23
**liquid (16)**
29:22;30:3;32:9,12,22,24;53:9;67:6,8,12,19,20;72:6,9;75:24;100:19
**liquidate (1)**
32:1
**liquidation (19)**
29:1,18;31:13,19;32:16;65:22;66:17;68:10,11,14,17;73:15;75:1;96:16;97:8,9;100:7,22;101:9
**list (3)**
47:21;62:7;67:5
**listed (8)**
9:16;12:19;30:6;44:4;93:20;97:7,24;99:12
**listened (1)**
72:19
**listeners (2)**
10:20,24
**listening (1)**
96:15
**listing (1)**
94:2
**lists (2)**
60:6;97:2
**little (1)**
72:14
**live (1)**
37:1
**lived (2)**
33:11;39:22
**Living (1)**
83:12
**LLC (19)**
36:12;40:3;56:25;68:5;80:14,22;81:17,20;82:3,9,11,23;83:2,4,6,14;99:18;103:25;104:1
**LLCs (5)**
20:17;37:3;70:15;78:8;98:3
**loan (6)**
16:16;32:20;77:15;102:21;105:21,25
**loans (3)**
76:21;78:4;80:2
**locate (1)**
5:9
**Lodge (1)**
69:4
**logistics (1)**
2:15
**long (5)**
14:5;19:24;27:9;55:9;78:9
**longer (2)**
60:14;61:6
**look (25)**
5:1,18,20,22;14:11;39:3;40:11;44:12,13;45:11;51:19;53:6;57:13;60:21;61:8;63:17;74:21;81:12;86:20;88:4;89:20;90:7;98:15,15;99:15
**looked (2)**
4:13;23:22
**looking (13)**
5:3;6:13;11:21;12:4;28:23;40:19;45:3;61:19,21,22;73:23;78:25;90:25
**looks (1)**
85:24
**Lose (1)**
72:11
**loss (1)**
86:4
**losses (2)**
80:4,6
**lost (2)**
86:23;108:20
**lot (15)**
3:3;16:1;20:2;28:8;29:3,13;33:24;34:1,5;35:3;36:5;53:24;54:9;63:14;92:6
**lots (1)**
36:15
**louder (1)**
58:1
**love (1)**
2:24
**lower (5)**
87:16,17,18,21;88:14
**Ltd (10)**
30:6,20;33:23;56:12,14;73:14;83:8;95:14;96:2,4
**lump (2)**
77:10;89:11
**Lynch (2)**
76:8;79:24

**M**

**Madison (4)**
64:6;69:3;81:16,20
**Maine (2)**
98:22,24
**making (1)**
71:16
**Mall (7)**
37:17;44:8,13,14,19,23;45:20
**managed (1)**
52:14
**Management (2)**
41:7,8
**manager (1)**
96:1
**manages (1)**
27:13
**many (4)**
22:6;24:23;71:12;78:4
**mark (1)**
99:16
**market (41)**
28:25;29:7,17;30:22;31:4,7,13,18,20,24;32:3,5,8,14,15,24;34:5;46:22;49:1;50:4,11;65:22;66:1,8;67:1,4,13;68:10,18,24;72:2,4;74:25;75:8,20,25;96:15;100:10,18;101:1,8
**marketable (2)**
65:12;76:8
**marketplace (4)**
29:23;31:24;34:4;63:18
**Mason (2)**
37:18;46:18
**Masonic (1)**
69:4
**match (1)**
60:20
**matches (2)**
75:5,11
**math (6)**
4:14;46:20;48:16;49:9;50:20;65:9
**matured (1)**
69:5
**May (9)**
3:12;9:11,12;26:21;84:19;98:4;107:21;109:3,4
**maybe (3)**
5:7;74:5;107:20
**mean (17)**
17:1;23:8;27:1;29:10,25;30:3;31:25;35:8;37:2;39:14;43:16;47:10;50:3;73:6;75:17,18;91:23
**meaning (1)**
31:7
**means (5)**
27:21;29:6;30:1;108:3,5
**meant (1)**
12:9
**meeting (2)**
92:11,23
**members (3)**
57:18;59:11;91:6
**membership (9)**
12:21;19:10;33:21;41:3;42:6;44:24;45:24;56:2,9
**mention (1)**
37:17
**Merrill (2)**
76:8;79:24
**methodology (3)**
66:7;68:22,23
**middle (6)**
39:7;44:20;52:2;62:15;64:5;75:15
**might (12)**
7:7;9:23;40:7;51:4,10;52:18;73:4;78:13;83:23;91:23;96:10;106:7
**million (93)**
5:5,25;6:2,8,9;20:2;32:9,10,12,13,20,22;33:1,10,14,15;34:9;35:8;37:24,25,25;38:11,11,11,11;39:5;41:18;53:10,12,20,23;54:4,5,7,13,20;58:22,25;60:9;62:13;65:17;66:5,15,16;67:1,9,18,21;68:1,19,25;69:13,13,14,14,16;70:22;71:1,4,8,9,20;72:2,5,18,24;73:5,20,20,21,23,23;74:1,11,12,22;75:4,10,13,14;76:9,11,17;78:16;80:1,5;89:5;101:16;105:23,24,25;106:2,5
**mind (4)**
7:11;11:22;32:16;91:14
**mine (2)**
25:5,6
**minor (3)**
7:6,13,13
**minute (8)**
10:20;58:6;69:1;84:6,10,12;90:2;97:6
**minutes (2)**
96:9,16
**missing (2)**
5:4;97:4
**Mm-hmm (1)**
2:23
**mode (1)**
87:1
**moment (4)**
49:21;87:14;91:16;106:13
**money (15)**
20:2;53:22,24;54:9;71:16;76:23,25;77:1,14;78:19,24;79:10;87:1;89:18;106:8
**money's (1)**
54:1
**Montclair (1)**
83:8
**months (1)**
70:23
**more (24)**
6:19,21;7:19;12:17;14:10;15:17;18:22;19:23;33:24;34:1;36:16;40:2;58:19;63:12;67:16;76:16;79:10;80:6;85:9;90:9;98:3;101:1;102:12,23
**morning (5)**
2:14;3:18;92:6;107:24,25
**mortgage (2)**
60:11;62:18
**most (5)**
9:19;20:25;24:14;89:15;107:19
**move (5)**
39:13;42:22,24;75:13;76:3
**moved (3)**
12:1;35:16;42:23
**moving (3)**
13:15;66:6;101:21
**much (7)**
16:18;53:25;58:12;66:20;87:18;89:14;105:22
**mud (1)**
71:21
**multiple (5)**
92:18;93:4;99:5;100:16;101:21
**music (2)**
10:23,24
**mute (2)**
10:21,25
**myself (2)**
11:10;101:19

**N**

**name (33)**
8:16,20;10:8,8,16,17;11:5,6,17;12:2,2,22;12,12,14;23:20;24:18;25:15;26:1,5;28:19;36:7;38:3;40:12;51:22;54:24;63:23;66:25;79:13,14;83:4;88:16;99:6;103:10
**names (7)**
22:8,11,14;25:4;26:12;93:20;94:3
**naturalization (2)**

84:24;85:2
**near (2)** 42:24;43:15
**nearly (1)** 50:17
**necessary (1)** 84:25
**need (15)** 8:3;18:14;21:6; 55:18;58:8,11;71:14; 74:16;80:4;84:2,23; 85:9;89:14;91:10; 98:13
**needed (5)** 17:13;76:24;77:12, 22;94:10
**needs (1)** 2:4
**net (2)** 53:3,8
**new (6)** 38:4,16;41:6,24; 80:1;106:15
**next (9)** 16:17;34:20;35:19; 45:21;48:4;65:2;73:2; 77:23;99:16
**night (2)** 6:13;7:1
**Nobody (2)** 28:14;55:22
**non- (1)** 65:11
**None (1)** 103:15
**non-marketable (3)** 30:25;50:17;66:25
**Nope (3)** 36:5;48:6;83:1
**normal (2)** 14:20;52:11
**normally (1)** 106:11
**North (1)** 83:14
**Northern (1)** 83:12
**notes (1)** 74:21
**November (1)** 105:19
**number (13)** 6:5,7;41:21;66:17; 67:22;72:21;75:1; 76:10,12;78:2,4; 89:23;101:14
**numbers (4)** 5:22;6:22;48:21; 50:7
**nursing (2)** 69:24;70:13

## O

**oath (2)** 2:11,12
**objection (1)** 107:10
**Obtained (3)** 5:22;53:11,15
**obviously (1)** 39:24
**occupied (2)** 35:16;63:2
**occurred (1)** 106:7
**off (16)** 16:25;17:1,3,5,6; 25:22;54:25;69:21, 22;70:6,7;71:7;93:20; 94:2,18;108:18
**offer (1)** 100:13
**office (8)** 24:8;48:1;60:25; 61:9,10,15,23;104:13
**officers (7)** 55:14,17;56:14,15, 17,22,24
**Ohio (2)** 80:17;104:18
**old (4)** 52:11;69:4;80:17; 104:2
**one (46)** 5:1,4,8;6:4,19;7:3; 11:10,10;12:17,18; 13:22;14:11;18:23; 25:19,19;26:20,21; 36:16;38:4;40:2; 41:18;44:14;45:21; 47:24,25;48:4;50:14; 51:7,12;58:24;59:1; 60:25;70:10;79:11; 81:22,23;82:21;83:3; 86:4;91:15,23;92:23; 104:1;106:13,17; 107:20
**One's (4)** 22:9,10;39:23;86:5
**one-third (1)** 41:14
**only (10)** 26:21;32:11,22,25; 49:20;73:21;89:25; 90:12;93:5;107:3
**operate (2)** 69:1;96:12
**operates (2)** 30:8;58:16
**operating (4)** 56:16;80:4;83:19; 101:20
**operation (1)** 33:16
**operational (2)** 43:6;83:24
**Operations (7)** 35:21;36:11;38:13; 49:13,20;50:14;56:18
**opinion (3)** 62:14;66:24;101:24
**opportunity (2)** 66:9;73:3
**opposing (1)** 74:16
**order (2)** 92:10,19
**ordinary (1)** 102:14
**Originally (3)** 95:13;100:6;104:22
**out (53)** 5:13;7:11,15,17; 10:8,16;12:1;14:12; 17:20;22:24;23:13; 24:4;26:11,22;29:1, 23;30:1;34:3;35:3; 41:13;42:12,22,23; 43:4;50:8;51:21,22; 54:1;57:8,21;59:2; 63:23;65:13;67:22; 71:3,13;72:10,21; 75:13;77:10;78:11, 19;80:9;81:9,14;86:6; 87:6;90:5,16;98:4; 103:4;104:19,20
**outside (2)** 38:20;55:20
**over (18)** 3:13;26:19;30:23; 37:6;69:6,11,25;70:7; 79:23;85:8;91:6; 92:18,24;93:5;95:17, 18;96:10;103:9
**overhead (4)** 2:19;3:2,4,4
**oversees (1)** 36:20
**owe (2)** 51:5;106:7
**owed (1)** 65:18
**owing (1)** 53:21
**own (13)** 30:15,20;36:18; 47:4;56:2,7,9;60:6; 62:23;64:13,14; 97:25;98:25
**owned (5)** 11:5;55:15,25; 64:12;102:9
**owner (3)** 83:9;95:14,19
**ownership (3)** 47:17;95:8,22
**owns (4)** 30:8;33:21;49:16; 56:4

## P

**package (1)** 17:6
**pads (1)** 104:21
**page (14)** 8:17,18,19,20,21; 28:2;44:11;61:8;65:4, 6,7;67:8;68:3;85:17
**pages (3)** 14:5;19:24;28:8
**paid (10)** 19:14;21:21,25; 22:1;28:10;57:17; 59:14,17,20;69:3
**Pan (1)** 25:16
**paper (1)** 33:15
**parents (1)** 85:1
**Part (17)** 8:9;9:14;20:22,23; 22:4;35:9;51:3,9,18; 52:6,15,18,23;63:9; 73:22;85:1;91:13
**particular (3)** 16:18;36:6;46:25
**parties (1)** 84:22
**partner (2)** 69:18;103:17
**partnership (1)** 106:10
**parts (3)** 24:23;43:5;101:21
**party (3)** 103:21,23;104:1
**passed (3)** 69:21,22;70:5
**past (2)** 83:21;84:22
**Patricia (3)** 22:12;24:16;93:13
**pause (2)** 10:19;72:23
**pay (20)** 18:25;19:17;21:23; 52:24;54:12,20,25; 55:2;57:21;67:25; 73:1,3,5;75:12,25; 76:1;89:2,19;102:17, 22
**payment (5)** 27:22;89:20;90:7, 18;91:1
**Pays (1)** 57:21
**people (11)** 9:19;42:22,22,23, 23;43:4,15,18,22,23; 85:9
**percent (29)** 44:8,14,18,23,24; 45:1,16,22,25;46:4,9, 12,14,16,18;47:13,17; 49:23;50:21,23; 51:12,14;83:9;88:5; 89:2;90:5,7;95:14,19
**percentage (3)** 44:10;95:8,21
**perfect (1)** 85:6
**period (7)** 13:24;81:8;89:19; 91:2;92:19,24;93:5
**permission (1)** 2:25
**person (1)** 57:12
**personal (24)** 3:20,20,21;4:8,11, 16,18,22,25;6:15,20, 25;7:4;23:4;33:4; 38:5;40:10;59:14,17, 20;85:15;88:5;108:7, 11
**pet (10)** 35:23;37:17,17; 44:8,13,14,19,23; 45:20;86:24
**PFS (1)** 47:7
**phone (1)** 10:25
**phones (2)** 10:20,21
**pick (1)** 75:17
**picked (1)** 83:15
**picking (1)** 10:21
**piece (7)** 10:13;18:20;33:15; 40:7;43:4;100:3; 104:21
**pinpoint (1)** 58:24
**Pittsburgh (2)** 70:10;71:11
**place (16)** 10:7;13:4,19;17:8, 11,23,23;18:3,6,7,24; 21:17;26:19;39:18; 69:8;90:14
**placed (2)** 30:25;39:4
**plaintiff (1)** 103:22
**plan (7)**

9:19;14:5;52:10; 89:2,21;90:5,8
**planning (13)** 8:7;9:14;10:6;13:7; 35:19;92:7,11,11; 95:18;102:5;105:10, 16;106:7
**plans (2)** 11:22,25
**pleading (1)** 54:3
**please (6)** 2:10;10:21;27:1; 65:3;84:15,18
**Plenty (2)** 23:10;105:20
**plus (2)** 73:23;106:1
**point (22)** 5:13;19:22;21:22, 24;22:1;26:20;28:18; 30:21;35:16;37:21; 57:21,23;59:8;60:19; 67:19,21;76:13;84:3; 92:5;94:13;102:7,24
**portion (1)** 95:9
**possible (2)** 13:18;83:17
**possibly (1)** 14:25
**pray (1)** 108:9
**preparation (1)** 97:10
**prepare (1)** 96:24
**prepared (4)** 94:23,25;96:22; 100:16
**presented (1)** 2:21
**preside (1)** 85:8
**pressing (1)** 26:14
**presume (1)** 83:5
**prevail (1)** 75:16
**previously (2)** 38:10;41:2
**price (1)** 100:13
**prior (4)** 15:23;18:10;62:9; 87:8
**prison (2)** 69:18;71:6
**probably (7)** 36:13;41:22;47:9; 62:6,20;81:12;83:19
**problems (1)** 35:3
**proceed (1)** 74:8
**proceeding (1)** 105:15
**proceedings (2)** 20:9;108:19
**proceeds (1)** 76:21
**process (7)** 10:6,14;35:12; 70:11;71:17;80:10; 95:18
**productive (1)** 73:13
**professional (1)** 22:17
**project (4)** 81:1;82:18,22; 83:21
**projects (6)** 80:10,15,23;81:17, 19;82:14
**proper (1)** 104:23
**properly (1)** 52:14
**properties (6)** 19:6,17;32:8,19; 75:20;97:10
**property (31)** 16:5;23:14;59:24, 24;60:8,13,24;61:5, 11,12,15,17;62:12,18, 23,25;63:8,23;64:1,5; 69:2;82:4;98:22,24; 100:2;102:14;104:13, 18,20;105:2,23
**propose (2)** 89:2;90:5
**prove (1)** 78:22
**provide (1)** 106:23
**provided (4)** 3:19;90:4;95:3; 102:21
**pull (1)** 28:19
**pulled (1)** 54:10
**pulling (1)** 78:18
**purchase (2)** 80:20;81:25
**purchased (1)** 80:18
**purpose (2)** 100:21;101:9
**purposes (3)** 15:11;16:23;18:14
**pursuant (1)** 84:19
**put (24)** 5:3;6:18;7:16;17:6; 22:24;23:14;50:7; 62:3,18;63:14,16,19; 72:13;77:14,15; 78:12,14,15;87:1; 89:21;98:11,16,17; 107:8
**puts (1)** 100:19
**putting (3)** 9:18;36:25;72:14

## Q

**quick (1)** 97:9
**quickly (1)** 75:2

## R

**raise (1)** 34:19
**range (1)** 59:4
**rates (3)** 34:6,20;35:6
**rather (8)** 3:1;15:2;27:9;52:7; 66:20;101:3,8;102:15
**Ray (3)** 87:14;95:14;103:22
**RAYMOND (7)** 3:16;22:13;24:16; 92:2;93:9;96:21; 107:22
**reach (1)** 51:22
**real (6)** 49:12,16;50:14; 60:6;75:2;101:21
**realize (1)** 78:17
**really (10)** 26:12;35:1;41:19; 52:6,9;58:8;75:19; 99:6,14;101:17
**realtor (2)** 34:24;63:18
**Realty (1)** 73:14
**reason (3)** 8:25;51:20;78:8
**reasonable (1)** 63:20
**recall (7)** 3:24;34:9,10;65:23; 92:14;103:11;105:22
**receive (3)** 27:21;88:7;93:22
**received (7)** 15:24;18:10;25:21; 59:6,8,11;86:7
**receiver (1)** 102:16
**recess (5)** 84:12,16,17,19,23
**reckoning (1)** 16:20
**recognize (1)** 8:5
**recollection (2)** 75:9;86:16
**recommence (1)** 84:21
**reconvene (1)** 84:25
**reconvened (1)** 84:19
**record (2)** 47:4;90:17
**records (2)** 77:19;79:5
**record's (1)** 27:20
**recover (1)** 91:7
**RED (33)** 12:16,17;30:9,10, 11;31:1,2;33:3,10; 35:20;36:11,16,19; 37:2,18,18;38:5,6,16, 25;46:12,14,16,18; 49:12,14;50:13; 56:17;76:24;77:1; 79:18,20;80:22
**redirect (2)** 91:20;92:2
**reduction (1)** 62:13
**re-energized (1)** 87:6
**referred (1)** 106:16
**referring (2)** 43:18;47:24
**reflects (1)** 95:21
**regarding (2)** 92:5;104:4
**regular (1)** 77:6
**regulations (1)** 92:20
**reinvested (1)** 76:21
**remain (2)** 108:6,18
**remember (8)** 3:25;23:23;82:18; 92:16,17;100:4; 104:12;105:3
**remind (3)** 2:10,11;84:22
**remodeled (1)** 82:4
**rented (1)** 30:18
**renters (1)** 30:19
**repay (1)** 101:25
**repeat (2)** 66:22;67:2
**replacements (1)** 88:19
**report (1)** 53:7
**reported (1)** 53:3
**request (2)** 20:22;84:8
**required (1)** 17:11
**reside (1)** 36:24
**resort (1)** 35:23
**respond (1)** 27:1
**rest (1)** 11:24
**retail (1)** 48:10
**review (2)** 6:25;7:19
**reviewed (1)** 16:1
**revocable (1)** 28:15
**Ridge (3)** 64:6;69:3;98:19
**Right (177)** 2:6;3:22;4:9,11,15, 23;5:6,17,19,21,24; 6:7,24;7:1,22,24;8:8, 10,13,17,21;9:11; 10:7,15;13:3;14:18; 16:1,4,6,7,14;17:8; 18:14,16;19:8;21:14, 18;22:25;23:16;24:3, 21,23,25;25:4,9,15, 25;27:18,20;31:4; 32:20;33:2,22;35:18; 37:5,16;38:2,9;39:3; 40:1,25;41:5,20;42:4, 14;43:24;44:7,12,17, 25;46:20,24;47:6,10, 20;48:9,11,16;49:1,5, 6,21;50:8;51:4;54:17; 55:23,25;56:11,24; 58:5,9,12;59:23;60:1, 13;62:13,21,25;63:11, 14,25;64:7,24;65:2,9, 13,15,20;66:2,7;67:3, 11,20;68:3,12,16,21, 22;69:8,10,13;70:17, 20;71:1,18,23;72:8,

22;73:12;74:4;76:9, 11,11,14,17;77:23; 78:3,6,23;79:5,24; 80:13,19;81:4;82:1; 84:21;85:3,11;86:8,9; 88:4,9,9,23;89:14; 90:3,11,11,22;91:3, 25;93:8,13,24;95:25; 96:14;97:15;98:15; 99:14;100:6,9,21; 105:6;106:15;107:13, 17;109:3
**rights (1)** 27:12
**Ringo (1)** 80:16
**rise (2)** 84:15,18
**Road (11)** 64:6;69:3;80:14; 81:16,20;82:9,11,23, 24;83:6,14
**roll (1)** 45:14
**rules (2)** 15:13;27:24
**run (5)** 58:11;69:25;70:24; 74:14;108:11
**running (2)** 25:11;71:2
**runs (2)** 26:22;93:21

## S

**safe (2)** 92:22;101:5
**salary (2)** 88:2,3
**sale (4)** 35:5;97:9;101:3; 102:16
**same (23)** 4:20;25:5,5;27:4; 33:8;38:15;41:21; 44:25;45:25;46:2,6; 48:7,10;62:5;74:12; 75:6;78:8;80:22; 81:17;82:3;87:15; 98:19,20
**sat (1)** 23:2
**satisfy (1)** 92:19
**Saugus (3)** 38:5,6;46:16
**saw (2)** 9:8;108:13
**saying (23)** 6:7;13:8,20;14:1; 16:22,25;32:15; 36:10;43:8;47:2,3; 54:4;61:5,10,12,15, 17,25;66:13;67:8; 79:21;88:20;103:1
**Schedule (29)** 30:24;33:5;37:8,11, 12,16;40:11;43:25; 44:4,13,17;45:6,11, 15;48:22;60:2,3,4,21; 61:2,3,6,10,14,21,22; 62:3,4;99:12
**schedules (6)** 97:14,16;98:8,11, 17;100:17
**Schneider (44)** 2:4,9;3:16,18,18; 8:13;11:4;14:3;20:1; 21:9;22:6,12,13; 24:16;25:5,6;26:25; 56:19;71:18,23; 72:17,22;73:6;76:5; 80:8;85:14;87:15; 91:17;92:2,4;93:9,14; 94:23;95:14;96:21; 98:10;99:18;101:18; 103:17,22;107:22,24; 108:1;109:4
**Schneider's (1)** 109:8
**SCHUELLER (39)** 2:14,18,21,24;3:12, 15,17;5:16;11:2; 26:17;27:11;37:11, 13,15;64:21,23;66:20, 23;74:7,14,19,24; 75:3,4,22;76:2,4;84:2, 4,7,14;85:11,12,13; 91:15;103:1;104:6; 107:12;109:2
**Schueller's (1)** 27:1
**scintilla (1)** 51:7
**seated (1)** 84:20
**second (5)** 5:20;8:19,20;21:13; 72:23
**secure (1)** 99:10
**secured (3)** 76:6;77:25;79:25
**securities (5)** 30:25;50:17;65:12; 66:25;76:8
**seeking (1)** 94:8
**self (7)** 40:3;43:9,13,16,19, 21;45:25
**sell (9)** 30:4;31:18;32:4; 35:5;66:10;68:17,18; 70:12;101:2
**selling (1)** 34:6
**sense (3)** 9:21;27:4;62:2
**sent (4)** 9:12;25:22;26:3; 70:7
**Senzer (1)** 25:6
**S-E-N-Z-E-R (1)** 25:7
**separate (1)** 74:9
**September (3)** 39:7;61:18;63:4
**service (2)** 36:5,6
**services (2)** 28:11;39:24
**set (4)** 19:2,8;35:20;87:14
**settlement (5)** 94:25;95:4;96:25; 100:22;101:9
**seven (1)** 79:15
**Seventy (1)** 79:16
**Several (4)** 14:5;92:24;97:4; 99:5
**share (2)** 32:6;90:10
**shift (1)** 55:23
**Shore (1)** 83:14
**shorthand (1)** 40:15
**show (5)** 5:8;76:15;79:18; 88:2;98:24
**showed (1)** 108:21
**shown (1)** 66:16
**shows (3)** 11:21;67:15;98:23
**shy (1)** 101:16
**sign (7)** 17:5;25:22;26:1,5, 6;70:2;94:18
**signed (4)** 16:25;17:1,3,6
**significance (1)** 14:3
**signs (1)** 25:20
**similar (1)** 86:11
**sister (2)** 103:19,20
**sit (8)** 34:4;39:14;54:12; 62:23;77:9,20;83:20; 89:23
**sitting (7)** 20:10,11;32:21; 41:13;53:24;70:7; 81:22
**six (4)** 25:17;26:20;93:20; 104:2
**skip (1)** 46:8
**Small (1)** 30:12
**smoother (1)** 3:3
**sold (6)** 52:1;66:15;72:10; 73:20,20;102:14
**solution (1)** 94:8
**Somebody (2)** 26:6;71:14
**somehow (1)** 23:14
**someone (5)** 69:21,22;70:7;79:3; 106:23
**Sometimes (1)** 6:18
**Somewhere (1)** 106:1
**son (1)** 56:20
**sorry (21)** 9:9;36:11;41:16; 44:18;47:15;48:21; 53:5;56:6;60:8;61:3, 20;65:3;66:18;81:19; 93:18;96:6,17;97:22; 98:5,23;109:5
**Sosna (4)** 9:10;102:9,14; 106:3
**sound (7)** 46:24;47:5,10;49:6; 65:13;76:11;86:8
**sounds (2)** 6:24;86:9
**source (1)** 88:20
**sources (1)** 85:17
**speak (1)** 85:4
**specific (7)** 13:16;14:10;15:17; 16:5,7;76:12;93:3
**specifically (1)** 78:12
**speculate (1)** 12:5
**spend (1)** 96:16
**spent (3)** 9:20;92:6;97:12
**Springdale (1)** 41:25
**ST (1)** 70:10
**staff (3)** 63:18;78:10;90:24
**stagnant (1)** 86:25
**stakeholders (1)** 108:16
**stand (3)** 2:5,10;28:25
**standpoint (1)** 75:21
**stands (1)** 61:15
**start (3)** 23:13;79:22;90:21
**started (11)** 9:18;11:14,23; 12:12;13:5;22:22; 24:13;71:7;74:21; 80:25;92:7
**state (7)** 7:20;15:19;54:2; 67:17;78:17;104:18; 108:5
**statement (15)** 3:20,21,21;4:16,18, 22,25;6:20;22:24; 33:4;35:11;38:5; 40:11;85:15;88:5
**statements (9)** 4:8,12,13;6:16,25; 7:5,12;30:23;104:14
**static (1)** 10:22
**step (3)** 2:4;109:3,4
**steps (2)** 17:22;18:13
**still (16)** 2:11,12;33:16; 38:24;39:9,10;54:24; 55:2;64:13,14;72:14; 96:1,1,4,11;98:3
**stopped (1)** 70:23
**Storage (11)** 12:17;40:4;42:20; 43:9,13,16,19,21; 45:25;86:24;99:8
**stream (3)** 89:20;90:7,18
**street (1)** 72:12
**strike (5)** 40:21;68:23;95:6; 97:19;98:6

**structure (1)** 14:22
**struggling (1)** 98:3
**stuff (4)** 7:6;28:8;37:3;70:15
**subject (1)** 79:6
**subsidiaries (6)** 30:20;36:8,9,13,14;40:8
**Substantially (1)** 102:12
**successful (3)** 37:22;39:9,15
**sudden (1)** 70:8
**sue (2)** 91:5;104:22
**sufficient (2)** 101:24;102:17
**sum (2)** 77:10;89:11
**summaries (2)** 95:6,7
**summarize (1)** 43:25
**support (1)** 81:14
**sure (19)** 10:1;17:4;25:18;26:14;27:14;40:7;43:1;45:3,5;47:25;60:17,18,19;77:8,12;79:12;84:9;95:13;106:17
**surprise (1)** 101:19
**suspicious (2)** 51:10,19
**swag (1)** 92:15
**switched (1)** 43:12
**system (1)** 71:13

## T

**talk (12)** 56:11,13;59:23;63:18;72:17;76:5;80:22;93:21;96:15;97:7;104:6;105:1
**talked (5)** 69:22;70:2,5;71:6;99:25
**talking (9)** 11:25;13:7;23:16;70:12;74:10,11,12;87:13;102:25
**talks (1)** 85:17
**tax (5)** 15:11;16:23;18:9;19:1;26:3
**taxes (7)** 18:25;19:14,17;21:21,23,25;22:2
**taxpayer (1)** 22:1
**team (2)** 23:14;69:9
**Techwoods (1)** 82:23
**telling (4)** 14:16;35:14;55:8,13
**tells (1)** 34:25
**tenants (1)** 63:3
**Tesla (2)** 64:12,25
**testified (11)** 4:7;9:9;26:18;35:7;64:7;66:15;67:3;74:24;76:7,20;89:1
**testify (1)** 5:12
**testifying (2)** 92:6;93:2
**testimony (19)** 3:19;13:3;26:11;31:12;65:23;71:24;72:4;74:23;75:2,8,9;77:23;79:6;92:5;93:16;100:23;104:25;105:9;109:8
**them's (1)** 86:4
**therefore (1)** 106:6
**third (2)** 41:18;105:14
**though (4)** 21:21,25;90:17;96:10
**thought (5)** 12:9;31:10;39:15;100:6,13
**three (14)** 6:15;7:18;12:16;26:13;29:19,19;37:16,22;38:9;57:2;62:22;70:23;95:7;106:4
**three-page (1)** 6:17
**throughout (1)** 108:7
**throwing (1)** 26:11
**thrown (2)** 71:21;72:21
**Tied (6)** 15:12;67:23,24;80:23;82:6,14
**Tiffany (1)** 98:19
**times (3)** 26:13;42:25;78:13
**timing (2)** 51:10;68:1
**title (10)** 10:16;11:4;12:18;13:8,9;18:17;20:15;21:9;36:23;96:20
**titles (1)** 99:10
**today (34)** 20:10;21:1;33:17,23;34:22;38:24;39:10,14,14,15,18;40:23;41:9;42:5,8;54:12,21,25;55:3;56:1;57:3;62:23;63:11,16;67:1;70:18,25;71:14;72:5;73:16;77:20;83:19;89:24;108:13
**tody (1)** 71:22
**together (20)** 5:4;6:18;7:16;9:18;17:6;18:21;23:14;43:5;47:4;48:22;49:3;69:23;72:14,15;78:14;89:21;90:9;97:13;98:11,16
**told (4)** 50:13;53:24;58:6;63:17
**tomorrow (1)** 79:17
**took (16)** 7:16;9:22;13:4,18;18:3;21:16;32:11;49:1;70:16;73:21,21;76:20;101:2;102:7;104:19;107:19
**Tools (1)** 81:25
**top (2)** 31:5;47:25
**tore (2)** 81:13;104:20
**total (5)** 65:4;67:18;85:20;101:12,14
**totally (1)** 54:22
**totals (1)** 48:17
**tough (1)** 43:2
**toward (1)** 77:1
**town (1)** 81:1
**track (2)** 30:22;37:6
**trailer (1)** 64:5
**transaction (1)** 17:24
**transactions (1)** 77:21
**transfer (18)** 11:12;12:14;18:12,17;21:16;47:3,22;48:2,4,7,13,23;50:25;51:4;57:5;63:22;88:8;92:23
**transferred (31)** 9:16,24;10:16;11:5,9,15,16,17;13:8,9,23,24;19:19;20:16;44:8,22;45:1,16,22;46:9,22;47:12,17;49:22;50:11,16,22;54:24;87:21;88:4;96:10
**transferring (2)** 51:21;92:18
**transfers (9)** 13:18;20:5;50:9;51:10;52:16,20,25;92:24;93:4
**trap (1)** 7:10
**trapped (2)** 58:21;59:3
**tried (1)** 7:9
**trouble (1)** 87:9
**true (2)** 4:9,12
**truly (1)** 102:20
**trust (81)** 10:17;11:6,7,18,19;12:2,14;13:14;17:7;18:22;19:23,23,25;23:4;24:5,15,17,19;25:20;26:2,6;27:13,15;28:1,7,15,16;33:20;36:24;38:7;39:1,11;40:22;41:3,4,9;42:5;44:9,23;45:2,17,23;46:10,12,14,16,18,22;47:13,18,22;48:2,5,8,14,24;49:13,19,24;50:12,23;56:4;57:18,18,19;58:3;92:15,24;93:4,8,9,14,19,21,23,23;94:9,15,17,19;95:23
**trusted (1)** 28:9
**trustee (23)** 24:17,21,22;25:13,22;26:1,4,5,8,13,21;28:10;55:22;64:19;72:10;93:21;94:4,10,12,14,17;100:20;108:10
**trustees (7)** 24:15,25;25:2,9,17;26:20;93:19
**trustee's (1)** 72:12
**trusts (43)** 9:17;10:2,9;11:10;12:23;13:1;17:17;18:18;19:19;20:6;21:10;22:6,14,21;24:4,9;25:8,11;26:9,22;27:16,17;28:1;37:21;38:18,20;50:18,25;51:5;54:24;55:15;56:1,7;57:11,15,25;59:9,12,14;63:23;87:22;91:5;92:18
**truth (3)** 15:2;27:10;55:9
**try (8)** 7:17;23:7;24:3;67:16;73:7,10,25;74:4
**trying (25)** 7:10,11,14;14:19;15:1;24:4;26:16,19,22;27:6;43:14;51:16;58:2;67:22;71:2;72:23;74:22,24;75:7;78:21;81:9;82:18;90:5;94:4;104:6
**turn (16)** 4:17,20,24;8:4,14,17;30:24;33:2;35:18;40:10;41:23;43:24;60:2;65:4;67:7;85:14
**turned (1)** 69:4
**two (23)** 7:17,17,19;11:10;16:17,19;22:7,25;25:8;26:9;31:16;34:23;35:1;61:25;68:3;72:7;77:2;86:2;87:8;88:18;104:20;106:17;107:20

## U

**ultimately (2)** 15:10;50:22
**unable (1)** 93:2
**under (5)** 2:11,12;4:3;27:23;72:9

**understood (2)**
66:13,19
**unfortunate (1)**
26:15
**unfortunately (2)**
6:6;9:21
**units (2)**
42:20;43:9
**unless (1)**
13:25
**unreasonable (1)**
52:19
**up (34)**
2:4;5:23;6:6,10;7:14;10:21;23:22;26:20;42:10;46:21,23;47:9;48:17;49:5;60:20;63:19;65:11;66:17;67:15;69:5,14;74:20;75:18;81:12;84:23;86:15,18;87:4;88:12;97:13;101:11;102:7,19;108:21
**updated (1)**
98:16
**upon (1)**
93:23
**use (9)**
2:19;39:23;66:7;68:22,24;78:9,10;100:18,22
**used (12)**
6:20;15:10,14;16:16,20,23;19:22;64:4;100:19;101:9;103:12;107:3
**using (2)**
74:3;101:1
**usually (1)**
34:24

**V**

**Vail (1)**
98:20
**valuation (11)**
14:4;15:21;19:2;29:4,8,24;33:22;34:3;71:23;72:25;104:23
**value (116)**
10:4;15:20;16:5,20;28:25;29:1,7,17,18,22,22,25;30:2,3,22,25;31:4,8,10,13,18,20,24,25;32:3,4,8,9,12,13,14,15,17,22;33:3,14;34:7,21,22;35:1,6,10,13,15;37:6;39:17;42:10;46:23;47:2,5;49:1;50:3,5,11,21;53:9;60:8;61:13,18;62:7,11,14,25;63:11,16;65:10,11,11;66:1,8,13,14,17;67:1,4,6,8,12,13,19,20,21;68:10,10,13,14,17,19,24;69:5,5,10;72:2,4,6;73:15;74:25,25;75:1,8,24;96:15,16;97:8,9;98:7;99:19,21;100:18,19,22;101:1,8;102:9;104:7,17
**valued (9)**
11:11;31:1;32:19;33:6,10;41:17;47:3;48:19;72:1
**values (23)**
19:5,8,12,13,15,18;28:22,25;29:19;30:1;32:5;37:24;38:10;39:4;40:25;48:18;63:14,17,19;65:22,22;97:7;101:7
**value's (1)**
35:11
**valuing (2)**
100:25;104:5
**variety (1)**
88:11
**vehicles (4)**
97:4;99:5,6,12
**versus (2)**
75:1;96:15
**voted (1)**
27:15
**voting (1)**
27:12

**W**

**waiting (3)**
53:25;73:8;81:22
**walk (3)**
23:1;69:15;72:25
**wall (1)**
71:21
**warehouse (1)**
48:1
**way (12)**
9:24;11:9;13:14,22;14:7;56:13;73:7,11,11,25;74:4;83:24
**ways (1)**
106:17
**wealth (1)**
50:17
**Wednesday (20)**
2:3;3:19;9:10;31:12;34:8,14,15;35:7;64:8;65:21;66:24;67:3,21;68:16;71:24;75:3;76:7,20;77:24;105:1
**week (3)**
34:20;72:13;90:13
**weeks (1)**
8:11
**weren't (2)**
39:12;43:23
**Westchester (1)**
46:9
**wetlands (1)**
100:12
**what's (11)**
7:11;29:23;34:22;62:25;65:2;67:12;82:10,10,12;96:20;103:9
**Whenever (1)**
83:23
**whole (3)**
10:6;24:23;71:17
**who's (4)**
25:6;57:17;69:18;71:3
**whose (1)**
38:25
**wife (7)**
11:10;22:9;24:16,22;28:3;59:18;98:25
**wife's (2)**
14:16;22:12
**wind (1)**
74:22
**wish (1)**
43:6
**within (2)**
7:16;72:20
**without (2)**
12:4;61:4
**WITNESS (19)**
2:13,25;3:12;5:9,11,14;10:23;27:3,6;64:22;66:22;75:12,23;85:1,4,9;91:19;107:16;109:5
**wonderful (1)**
85:7
**word (2)**
37:1;108:20
**words (1)**
79:7
**work (11)**
23:5,7;69:9;72:13,13;85:10;89:12,17;90:15,16,16
**worked (2)**
14:8;51:23
**working (3)**
82:19;90:14;99:10
**works (1)**
25:25
**world (3)**
35:4;63:5;72:20
**world's (1)**
63:7
**worry (1)**
106:9
**worse (1)**
43:11
**worth (15)**
31:11;33:23;34:9;35:8;53:3,8;66:4;74:11,12;75:20;100:7,7,10,14;101:17
**wow (1)**
51:19
**wrong (4)**
52:4,5;64:17;71:15
**wrote (1)**
52:21

**Y**

**year (5)**
7:21;12:8;24:11;89:19;91:2
**years (24)**
6:21;7:17,18;16:17,19;30:23;37:7;52:11;62:1,22;71:6;73:2;77:3;83:11,22;87:8;88:18;89:15;95:18;99:8;100:4;104:2,20;106:10
**Yep (8)**
44:16,20;46:5;60:23;61:3;65:8;94:1;100:9
**yesterday (4)**
2:22;9:9;79:17;97:12

**Z**

**Zero (2)**
73:17;83:5
**Zoom (1)**
98:14

**1**

**1 (6)**
39:7;48:19;49:22;50:12,20;61:18
**1,500 (1)**
69:25
**1/25/18 (1)**
31:3
**1:30 (2)**
84:23,23
**10 (1)**
51:13
**10:57 (1)**
84:17
**100 (4)**
44:18;89:2;90:5,7
**11 (2)**
47:12,16
**11:00 (1)**
84:16
**11:09 (1)**
84:17
**11:41 (1)**
109:8
**12 (1)**
100:4
**12/19/20 (1)**
24:14
**15 (3)**
44:4;47:20;100:4
**17 (1)**
83:24
**18 (14)**
11:14,23;12:12;13:6;14:25;19:21;22:22;24:13;35:11;37:22;79:2,2;83:24;106:10
**19 (24)**
10:5,12;11:11,15,15;14:4,25;15:20;16:8,11,23;17:9,12;18:1,18;19:18;21:17;35:12;70:21;76:15;79:3;81:10;83:15;104:5
**1968 (1)**
69:25
**19th (1)**
47:7

**2**

**20 (4)**
11:16;12:10;15:1;83:11
**2000 (4)**
12:6,8,9,10
**2015 (1)**
12:11
**2018 (21)**
3:19;4:16,18;9:18;12:15;13:9;15:4,15;16:15;23:2;32:20;38:4;40:10,17;41:20;85:20;86:7,18;87:15;88:5;92:7
**2019 (36)**
3:20;4:21;11:18;13:4;15:6,15;33:4;41:21;47:4;48:19;49:22;50:12,21;60:9;76:6,9;77:23;80:2,5,11,15,24;81:5,18;82:1,7,14,15,18;85:15;86:10;87:4,8;93:9;104:7,17
**2020 (34)**
8:22;9:4,7,11,15,23;10:5,12;11:12;12:9,13;13:6,19,23;14:4;15:8,14,20;16:8,11,24;17:9,12;18:1,19;19:18;21:17;

22:23;51:1,24;57:12;63:21;86:13;93:6
**2021 (19)**
3:21;4:25;39:4,7,12,21;42:11;44:13;45:4;53:3;60:14;61:18;62:8,15;63:4;86:18,22;104:7,17
**2022 (8)**
53:18,19;87:4,15,21;88:7,10,17
**2023 (1)**
39:16
**21 (4)**
35:12;76:15;79:3;104:5
**22 (1)**
53:12
**25 (1)**
6:20
**250 (2)**
19:24;28:8
**26 (1)**
9:12
**27 (2)**
73:8;75:5
**275 (1)**
104:19

**3**

**3:00 (2)**
84:23,25
**30 (1)**
105:19
**300 (1)**
72:11
**32 (1)**
104:19

**4**

**4 (2)**
32:19;106:20
**49 (1)**
85:5

**5**

**5 (3)**
8:22;9:15;16:15
**5.8 (1)**
80:1
**50 (1)**
51:14
**5027 (3)**
81:16,20,24
**5055 (3)**
81:16,20,24
**5150 (2)**
82:9,11
**54 (1)**
73:14

**6**

**6 (4)**
9:18;23:2;24:13;80:1
**619 (2)**
5:15;60:7
**66 (1)**
79:25
**69 (1)**
52:12

**7**

**7 (1)**
108:10
**70 (7)**
20:17,24;23:22;52:12;70:15;78:8;79:14
**72 (2)**
51:23;52:11
**747 (4)**
68:5;99:18,24;107:4

**8**

**8.42 (1)**
95:19
**80 (2)**
72:13;95:14

**9**

**9:09 (1)**
2:1
**90 (8)**
50:21,23;88:5;99:17,21;101:12;106:16,20
**91 (6)**
99:23;101:6;106:16;107:3,5,7
**9617 (1)**
80:13
**99 (16)**
44:8,22,24;45:1,16,22,25;46:4,9,12,14,16,18;47:12,17;49:22