# "EXHIBIT JJ"

IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

| | |
|---|---|
| RAYMOND SCHNEIDER, as an individual, and derivatively on behalf of EUCLID HEALTHCARE, INC., KENWOOD TERRACE HEALTHCARE CENTER, INC., SOUTHBROOK HEALTHCARE CENTER, INC., and BEECHWOOD TERRACE CENTER, INC., | CASE NO. A2300849 |
| Plaintiffs, | Judge Christian A. Jenkins |
| vs. | |
| THE HUNTINGTON NATIONAL BANK, GARRETT VETTER, AMY BECKER, SUZANNE MEYERS, TROY JONES, DAVE EMIG, MIKE VIREN, DAVID WECHTER, JAMES R. GENTRY, ANGIE QUATTRONE, MARIA STEINER, MARINA KRIVENKO and CHRIS HOFFMAN, | |
| Defendants. | |

Videotaped deposition of RAYMOND SCHNEIDER, a plaintiff herein, taken by the defendants as upon cross-examination, pursuant to the Ohio Rules of Civil Procedure and pursuant to Notice of counsel as to the time and place and stipulations hereinafter set forth, at the offices of Litigation Support Services, 11811 Mason Montgomery Road, Cincinnati, Ohio, at 9:28 a.m., Tuesday, March 25, 2025, before Stacey J. Murrin, a Court Reporter and Notary Public, within and for the State of Ohio.

\- - -

APPEARANCES

FOR THE PLAINTIFFS: JAMES R. CUMMINS, ESQ.
REBECCA S. RHEIN, ESQ.
(Via phone.)
Cummins Law, LLC
312 Walnut Street
Suite 1530
Cincinnati, Ohio 45202

FOR THE DEFENDANTS: CHRISTOPHER P. SCHUELLER, ESQ.
KELLY M. NEAL, ESQ.
Union Trust Building
501 Grant Street
Suite 200
Pittsburgh, PA 15219

ALSO PRESENT: Brittian Daudelin, Videographer

S T I P U L A T I O N S

It is stipulated by counsel for the respective parties that the videotaped deposition of RAYMOND SCHNEIDER, a plaintiff herein, may be taken at this time by the defendants as upon cross-examination and pursuant to the Ohio Rules of Civil Procedure and Notice of counsel to take deposition, all other legal formalities being waived by agreement; that the deposition may be taken in stenotype by the Notary Public-Court Reporter and transcribed by her out of the presence of the witness; that the transcribed deposition was made available to the witness for examination and signature and that signature may be affixed out of the presence of the Notary Public-Court Reporter.

INDEX


| WITNESS | DIRECT | CROSS | RE-DIRECT | RE-CROSS |
|---|---|---|---|---|
| RAYMOND SCHNEIDER BY MR. SCHUELLER: | | 6 | | |

| EXHIBIT IDENTIFIED | PAGE |
|---|---|
| Defendants' Exhibit 110 | 88 |
| Defendants' Exhibit 111 | 115 |
| Defendants' Exhibit 1 | 145 |
| Defendants' Exhibit 112 | 249 |
| Defendants' Exhibit 113 | 250 |
| Defendants' Exhibit 114 | 252 |
| Defendants' Exhibit 115 | 255 |
| Defendants' Exhibit 116 | 259 |
| Defendants' Exhibit 117 | 263 |
| Defendants' Exhibit 118 | 264 |
| Defendants' Exhibit 119 | 273 |
| Defendants' Exhibit 120 | 275 |
| Defendants' Exhibit 121 | 277 |
| Defendants' Exhibit 69 | 277 |
| Defendants' Exhibit 122 | 280 |
| Defendants' Exhibit 123 | 283 |
| Defendants' Exhibit 124 | 286 |
| Defendants' Exhibit 125 | 294 |
| Defendants' Exhibit 126 | 297 |
| Defendants' Exhibit 127 | 300 |
| Defendants' Exhibit 98 | 302 |
| Defendants' Exhibit 128 | 303 |
| Defendants' Exhibit 129 | 307 |
| Defendants' Exhibit 130 | 311 |
| Defendants' Exhibit 131 | 313 |
| Defendants' Exhibit 80 | 316 |
| Defendants' Exhibit 132 | 321 |
| Defendants' Exhibit 133 | 329 |
| Defendants' Exhibit 134 | 343 |

| OBJECTIONS | PAGE | LINE |
|---|---|---|
| MR. CUMMINS: | 8 | 7 |
| MR. CUMMINS: | 8 | 13 |
| MR. CUMMINS: | 9 | 9 |
| MR. CUMMINS: | 9 | 19 |
| MR. CUMMINS: | 10 | 18 |
| MR. CUMMINS: | 11 | 3 |
| MR. CUMMINS: | 11 | 8 |
| MR. CUMMINS: | 11 | 19 |

| | | |
|---|---|---|
| MR. CUMMINS: | 12 | 5 |
| MR. CUMMINS: | 21 | 6 |
| MR. CUMMINS: | 22 | 19 |
| MR. CUMMINS: | 25 | 14 |
| MR. CUMMINS: | 26 | 10 |
| MR. CUMMINS: | 31 | 7 |
| MR. CUMMINS: | 34 | 5 |
| MR. CUMMINS: | 34 | 11 |
| MR. CUMMINS: | 41 | 20 |
| MR. CUMMINS: | 42 | 8 |
| MR. CUMMINS: | 43 | 9 |
| MR. CUMMINS: | 43 | 17 |
| MR. CUMMINS: | 44 | 11 |
| MR. CUMMINS: | 45 | 16 |
| MR. CUMMINS: | 47 | 6 |
| MR. CUMMINS: | 47 | 13 |
| MR. CUMMINS: | 51 | 1 |
| MR. CUMMINS: | 53 | 18 |
| MR. CUMMINS: | 54 | 9 |
| MR. CUMMINS: | 55 | 4 |
| MR. CUMMINS: | 57 | 9 |
| MR. CUMMINS: | 58 | 18 |
| MR. CUMMINS: | 61 | 12 |
| MR. CUMMINS: | 63 | 7 |
| MR. CUMMINS: | 74 | 15 |
| MR. CUMMINS: | 76 | 9 |
| MR. CUMMINS: | 82 | 18 |
| MR. CUMMINS: | 84 | 1 |
| MR. CUMMINS: | 87 | 23 |
| MR. CUMMINS: | 98 | 11 |
| MR. CUMMINS: | 120 | 13 |
| MR. CUMMINS: | 120 | 17 |
| MR. CUMMINS: | 128 | 9 |
| MR. CUMMINS: | 152 | 4 |
| MR. CUMMINS: | 153 | 18 |
| MR. CUMMINS: | 172 | 25 |
| MR. CUMMINS: | 183 | 19 |
| MR. CUMMINS: | 207 | 14 |
| MR. CUMMINS: | 220 | 20 |
| MR. CUMMINS: | 239 | 2 |
| MR. CUMMINS: | 291 | 25 |
| MR. CUMMINS: | 292 | 2 |
| MR. CUMMINS: | 314 | 24 |

| QUESTIONS MARKED | PAGE |
|---|---|
| | 215 |

THE VIDEOGRAPHER: We are on the record here today. The date is March 25th, 2025. The time is 9:28 a.m. Will the court reporter, please, swear in the witness.

RAYMOND SCHNEIDER,

a plaintiff herein, of lawful age, having been first duly sworn as hereinafter certified, was examined and testified as follows:

THE WITNESS: I do.

THE COURT REPORTER: Thank you.

CROSS-EXAMINATION

BY MR. SCHUELLER:

Q. Mr. Schneider, I'm gonna mention two entities, Euclid Healthcare Center, Inc. and Stiegler Road Realty. Are you familiar with those entities?

A. Yes.

Q. Have you ever held an ownership interest in these entities?

A. Yes.

Q. Is that ownership interest in your name personally or in the name of an another entity you own?

A. I'm not sure.

Q. When did you first obtain an ownership interest?
A. 1999.
Q. How did you obtain an ownership interest?
A. We purchased it.
Q. And what was the purchase price?
A. I don't remember.
Q. Who did you purchase it from?
A. A healthcare facility in Columbus, Ohio.
Q. What percentage did you own at first?
A. Fifty percent.
Q. Who owned the other 50 percent?
A. Harold Sosna.
Q. Did that ownership percentage change over time?
A. No.
Q. Do you still own this percentage?
A. I don't understand the question.
Q. Do you still own 50 percent of these entities?
A. I'm not sure.

Q. Do you own any percentage of these entities?
A. I'm not sure.
Q. What was the value of your ownership interest in these entities when you first obtained that ownership interest?
MR. CUMMINS: Objection as to form. You may answer.
A. I owned 50 percent of the entities.
Q. What was that 50 percent valued at in 1999?
MR. CUMMINS: Objection as to the form.
A. I have no idea.
Q. Do you know what the value of that 50 percent ownership interest has been at any time?
A. If I look at the appraisal, then I would know.
Q. And what appraisal are you referring to?
A. There was three appraisals.
Q. When were they generated?
A. '18, '19 and '20.

Q. Do you have copies of those appraisals?
A. I believe so.
Q. Who commissioned the appraisals?
A. Huntington Bank.
Q. How in your view is the best way to determine the value of your ownership interest in Euclid and Stiegler?
MR. CUMMINS: Objection as to form.
A. It's on the title.
Q. What do you mean by that?
A. There's a title that shows the ownership interest.
Q. I know. I'm talking about the value, though. What in your view is the best way to determine the value of your ownership interest in Euclid and Stiegler?
MR. CUMMINS: Objection as to the form. You may answer if you can.
A. It's usually on the appraisal.
Q. Anything else?
A. What the highest bidder would bid.
Q. What do you mean by highest

bidder would bid?
A. If someone was interested in it, that you'd have a sale, and on that sale that's what the value would...
Q. Do you believe that the value of your interest in Euclid and Stiegler changed over time?
A. Yes.
Q. How so?
A. Inflation, management, results.
Q. How did inflation change the value of Euclid and Stiegler over time?
A. The asset value of healthcare beds have gone up due to the limited availability.
Q. How much had asset value for beds gone up?
MR. CUMMINS: Objection as to the form.
A. I don't know today.
Q. How did management impact the value of Euclid and Stiegler over time?
A. Improved the asset.
Q. What do you mean by "improved"?
A. Management, renovations, quality

of service.
Q. Who managed Euclid and Stiegler?
MR. CUMMINS: Objection as to the form.
A. Premier.
Q. Did anyone else manage Euclid and Stiegler?
MR. CUMMINS: Objection to form.
A. I don't know.
Q. Did you ever manage Euclid and Stiegler?
A. No.
Q. Did any entity you own or control manage Euclid or Stiegler?
A. I'm not sure of the question you're asking.
Q. Did any entity you own or control manage Euclid or Stiegler?
MR. CUMMINS: Objection as to form.
THE WITNESS: Can you repeat the question?
(Record read by Reporter.)
THE WITNESS: No.
BY MR. SCHUELLER:

Q. How did results change the value of Euclid and Stiegler over time?
A. Increased census.
Q. How did census change?
MR. CUMMINS: Objection as to form. Over what period of time?
Q. Any period of time during your ownership.
A. It improved by the quality of services.
Q. What is census?
A. It's the resident that comes in for services.
Q. And so is it the number of residents?
A. Number of residents or percentage.
Q. Percentage of what?
A. The total.
Q. Total of what?
A. Bed licenses.
Q. Okay. And how did census then change over time?
A. When we improved services, when the opportunity came, residents came and our

census grew.
Q. Were Euclid and Stiegler ever profitable?
A. I can't remember.
Q. Were Euclid and Stiegler ever unprofitable?
A. I don't remember.
Q. I'm gonna mention two more entities to you, Kenwood Terrace Care Center, Inc., and Keller Road Realty, LLC. Are you familiar with those entities?
A. Yes.
Q. Have you ever held an ownership interest in these entities?
A. Yes.
Q. Is that ownership interest in your name personally or in the name of another entity you own?
A. My interest is in my name.
Q. When did you first obtain an ownership interest?
A. I don't remember.
Q. Was it over ten years ago?
A. I don't remember.
Q. Do you think it was over

20 years ago?
A. I believe so.
Q. How did you obtain an ownership interest?
A. We acquired it.
Q. Who was the seller?
A. The Glass family.
Q. What did you pay to obtain the ownership interest?
A. I don't remember.
Q. What percentage did you own?
A. Fifty percent.
Q. Who owned the other 50 percent?
A. Harold Sosna.
Q. Has your percentage ownership interest changed over time in Kenwood and Keller?
A. No.
Q. Do you still own this percentage?
A. Yes.
Q. What was the value of your ownership interest in these entities when you first obtained the ownership interest?
A. I don't know.

Q. What in your view is the best way to determine the value of your ownership interest in those entities?
A. Through an appraisal.
Q. Anything else?
A. What someone would pay for it.
Q. Were Kenwood Terrace and Keller Road ever profitable?
A. I don't know.
Q. Were these entities ever unprofitable?
A. I don't know.
Q. I'm gonna mention two different entities to you, Southbrook Healthcare Center, Inc., and Seminole Ave. Realty, LLC. Are you familiar with those entities?
A. Yes.
Q. Have you ever held an ownership interest in those entities?
A. Yes.
Q. Is that ownership interest in your name personally or in the name of another entity you own?
A. I held it in my name.
Q. When did you first obtain an

ownership interest?
A. Whenever we acquired it.
Q. And when was that?
A. I'm not sure.
Q. Was it over 20 years ago?
A. I believe so.
Q. Did you pay anything to obtain this ownership interest?
A. Yes.
Q. What did you pay?
A. I don't know.
Q. What percentage did you own?
A. Fifty percent.
Q. Who owned the other 50 percent?
A. Harold Sosna.
Q. Did your ownership percentage change over time?
A. No.
Q. Do you still own this percentage?
A. Yes.
Q. What was the value of your ownership interest in these entities when you first obtained an ownership interest?
A. I don't know.

Q. How do you determine in your view the value of your ownership interest?
A. It starts with an appraisal.
Q. Anything else?
A. No.
Q. Did the value of your interest in Southbrook Health and Seminole Ave change over time?
A. No.
Q. Were these entities ever profitable?
A. I don't know.
Q. Were they ever unprofitable?
A. I don't know.
Q. I'm gonna mention another entity to you, 54 Realty LTD. Are you familiar with that entity?
A. Yes.
Q. Have you ever held an ownership interest in that entity?
A. Yes.
Q. Is that ownership interest in your name personally or in the name of another entity you own?
A. Can you repeat that question?

Q. Is the ownership interest in 54 Realty in your name personally or in the name of another entity you own?

A. I took ownership in my name.

Q. When did you first obtain an ownership interest?

A. I don't know.

Q. Was it over 20 years ago?

A. I don't remember.

Q. Do you think it was over ten years ago?

A. Yes.

Q. Did you pay anything to obtain the ownership interest?

A. Yes.

Q. What did you pay?

A. I don't know.

Q. Who did you buy it from?

A. I don't remember.

Q. Was it Harold Sosna?

A. No.

Q. Was it any entity owned by Harold Sosna?

A. No.

Q. What percentage did you own in

54 Realty?
A. Fifty percent.
Q. Who owned the other 50 percent?
A. Harold Sosna.
Q. Has that percentage changed over time?
A. No.
Q. Did you still own this percentage?
A. Yes.
Q. What was the value of your ownership interest in these entities -- this entity, 54 Realty, when you first obtained an ownership interest?
A. I don't know.
Q. What in your view is the best way to determine the value of 54 Realty?
A. Either appraisal or a sale value.
Q. Did your ownership interest in 54 Realty change in value over time?
A. Yes.
Q. How so?
A. Somebody bought it for more money than the appraisal.

Q. When did the sale of 54 Realty take place?
A. I believe April of 2021.
Q. Who purchased 54 Realty?
A. The current tenant.
Q. Who is that?
A. I don't remember their name.
Q. What was the sale price?
A. $9 million.
Q. Is this an entity in which Harold Sosna owned a 50 percent interest?
A. Yes.
Q. How were the sale proceeds distributed from that sale?
A. They went into a receivership for Huntington Bank.
Q. And so all the sale proceeds were paid to Huntington Bank?
A. And paid to the receiver.
Q. And then to Huntington?
A. I don't know.
Q. Did you receive any proceeds from the sale of 54 Realty?
A. Absolutely not.
Q. What was the appraised value of

54 Realty?
A. $5 million.
Q. Do you have a view as to why the property sold for in excess of the appraised value?
MR. CUMMINS: Objection as to form.
A. I believe all the appraisals were too low.
Q. What appraisals are you referring to?
A. The ones that were done for the bank.
Q. The ones in 2018, '19 and 2020?
A. I believe so.
Q. So there are three appraisals as far as you know?
A. That I -- I'm sure there were more before, but those were the current ones.
Q. Have you ever seen those appraisals?
A. Yes.
Q. And you formed the opinion that the appraisals are too low?
A. The 54 is an example, yes.

Q. And why do you think the appraisals are too low?
A. My experience, the bank usually wants an appraisal to fit in their -- according to their loan.
Q. Do you have any other reason to believe the appraisals were too low?
A. Yes, from my years of experience.
Q. So based on your years of experience, how did you arrive at the conclusion that the appraisals were too low?
A. I've had view of over a hundred appraisals, and they usually come out exactly where the bank wants it to.
Q. So how were these appraisals deficient in their analysis of value in your view?
MR. CUMMINS: Objection as to the form.
THE WITNESS: Can you repeat the question?
MR. SCHUELLER: Go ahead.
THE WITNESS: I'm sorry.
(Record read by Reporter.)

THE WITNESS: I base it on the sale that occurred with 54.
BY MR. SCHUELLER:
Q. Was 54 sold within any other properties?
A. No.
Q. So 54 was a standalone sale?
A. Yes.
Q. So other than the results of the sale, do you have any other specifics as to how you formed the view that the Huntington appraisals were too low?
A. My experience reading appraisals.
Q. Okay. And as you read this appraisal, what was it about the appraisal that caused you to believe the appraised values were too low?
A. My years of experience in the business.
Q. What I'm trying to drive at is, was there something about the numbers, something about the comparables, something about the cap rate, what -- what about those appraisals caused you to say that's too low?

A. My experience in the industry.
Q. Anything else?
A. No.
Q. Was 54 Realty ever profitable?
A. Yes.
Q. Was it always profitable?
A. I don't know.
Q. Was 54 Realty profitable in 2018?
A. Yes.
Q. And 2019?
A. Yes.
Q. And 2020?
A. Yes.
Q. What was the business of 54 Realty?
A. It was a 75-bed healthcare facility.
Q. And was 54 Realty the operator of that facility or the owner of the real estate?
A. Owner of the real estate.
Q. Who was the operator of that facility?
A. I don't remember.

Q. But it was different from 54 Realty?
A. Yes.
Q. All right. And in these nursing homes or assisted living home ownership structures, is it fair to say that there's a real estate entity and an operating entity for each site?
A. Yes.
Q. Where does the value lie in that arrangement, does it lie at the operating company level or at the real estate company level?
MR. CUMMINS: Objection as to form.
A. Both.
Q. Both. And is there more value in the real estate company or more value in the operating company?
A. I can't say.
Q. Is it equal; do you think?
A. I can't say.
Q. Do you know if the operating company tied to 54 Realty was also sold?
A. No.

Q. No you don't know or, no, it wasn't sold?
A. No, it wasn't sold.
Q. Okay. Do you know why it wasn't sold?
A. It's an existing entity.
Q. What's an existing entity?
A. The operator of 54.
Q. How profitable was 54 Realty?
MR. CUMMINS: Objection as to form.
A. I don't have any paperwork to tell you.
Q. And what's your definition of profitable?
A. I take out more than I put in.
Q. Was 54 entity ever unprofitable?
A. I don't think so.
Q. I'm gonna mention another entity to you, 72 Ventures. Are you familiar with that entity?
A. Yes.
Q. Have you ever held an ownership interest in that entity?
A. Yes.

Q. Was that ownership interest in your name personally or in the name of another entity you own?
A. I purchased it with my name.
Q. When did you first obtain your ownership interest?
A. 1999.
Q. Did you pay anything to obtain that ownership interest?
A. Yes.
Q. What did you pay?
A. I don't know.
Q. What percentage did you own?
A. Fifty percent.
Q. Who owned the other 50 percent?
A. Harold Sosna.
Q. Did those ownership percentages change over time?
A. No.
Q. Do you still own this percentage?
A. No.
Q. When did you -- when -- strike that.
So did you sell your ownership

interest?
A. Yes.
Q. When did you sell it?
A. I don't know.
Q. Was it before 2018?
A. Yes.
Q. What was the nature of this business?
A. It was a healthcare facility.
Q. What was the name of that facility?
A. Bryden.
Q. Who did you sell it to?
A. I don't know.
Q. Was it Harold Sosna?
A. No.
Q. Was it any entity owned by Harold Sosna?
A. No.
Q. What was your -- the value of your ownership interest in 72 Ventures when you first obtained your ownership interest?
A. I don't know.
Q. How do you believe is the best way to determine the value of your ownership

interest in 72 Ventures?
A. Through an appraisal.
Q. Anything else?
A. That's typically what I use.
Q. Did the value in Bryden change over time?
A. Yes.
Q. How so?
A. It lost its license.
Q. When did it lose its license?
A. Prior to '18.
Q. What was the sale price for 72 Ventures?
A. I don't know.
Q. How were the sales proceeds from 72 Ventures distributed?
A. I believe it went into Premier.
Q. Did anyone else receive sale proceeds from 72 Ventures other than Premier?
A. I don't know.
Q. But you did not receive any sale proceeds from 72 Ventures?
A. No.
Q. Why not?
A. I believe that the sales went

into Keller Road, so...
Q. So Keller Road purchased the 72 Ventures?
A. No, I don't believe.
Q. So I'm not totally clear. So why didn't you receive any proceeds from the sale of Bryden?
A. It was managed by Premier, and I believe it went into the Keller Road entity.
Q. All the sale proceeds went into Keller Road?
A. I don't know.
Q. Why would you allow all the sale proceeds to go into Keller Road?
A. That was the overriding entity.
Q. Keller Road was the overriding entity?
A. Well, it was the name of the group of homes that you've been talking about.
Q. Is Keller Road a real estate company or an operating company?
A. I don't know.
Q. So the sale proceeds from Bryden went into Keller Road and you owned

50 percent of Keller Road?
A. Yes.
Q. Okay. Was Bryden ever profitable?
A. Yes.
Q. When was it profitable?
MR. CUMMINS: Objection as to form.
A. I believe from day one.
Q. Was it always profitable?
A. Yes.
Q. How profitable?
A. I don't know.
Q. Was 72 Ventures ever unprofitable?
A. I don't know.
Q. I'm gonna mention an entity to you, Beechwood Terrace Care Center, Inc. Are you familiar with that entity?
A. Yes.
Q. Have you ever held an ownership interest in that entity?
A. Yes.
Q. Was that ownership interest in your name personally or in the name of

another entity you own?
A. I purchased it with my name.
Q. When did you first obtain an ownership interest?
A. I can't remember.
Q. Was it more than 20 years ago?
A. I don't remember.
Q. Was it more than ten years ago?
A. Yes.
Q. Did you pay anything to obtain your ownership interest?
A. Yes.
Q. What did you pay?
A. I don't know.
Q. Who did you purchase it from?
A. I don't know.
Q. Was it Harold Sosna?
A. No.
Q. Was it from any entity owned or controlled by Harold Sosna?
A. No.
Q. What percentage did you own?
A. Fifty percent.
Q. Who owned the other 50 percent?
A. Harold Sosna.

Q. Did that percentage change over time?
A. No.
Q. Do you still own 50 percent of this entity?
A. Yes.
Q. What was the value of your ownership interest in Beechwood when you first obtained your ownership interest?
A. I don't know.
Q. What in your view is the best way to determine the value of your ownership interest in Beechwood?
A. The appraisal.
Q. Did the value of your ownership interest in Beechwood change over time?
A. I don't know.
Q. Who else -- strike that.
Was Beechwood ever profitable?
A. I don't know.
Q. Was Beechwood ever unprofitable?
A. I don't know.
Q. Did you ever own any other entities with Sosna, any entities that I haven't mentioned?

A. No.
Q. Were you ever a corporate officer in the entities you co-owned with Sosna?
MR. CUMMINS: Objection as to the form.
A. I believe I was the vice president.
Q. Were you the vice president of all the entities you co-owned with Sosna?
MR. CUMMINS: Objection as to form. Could you repeat --
A. I don't know.
MR. CUMMINS: Wait. Can I have that question read back, please?
(Record read by Reporter.)
THE WITNESS: I don't know.
MR. CUMMINS: I'm sorry. I thought I heard you say -- read it one more time, will you? I misheard it.
(Record read by Reporter.)
MR. CUMMINS: Oh, co-owned. I'm sorry. I misheard co-owned. Sorry.
BY MR. SCHUELLER:
Q. But you were vice president of

some of the entities you co-owned with Sosna?
A. I believe so.
Q. Were you ever a director in the entities you co-owned with Sosna?
A. I don't believe so.
Q. Who are the corporate officers of the entities you co-owned with Sosna today?
A. I don't know.
Q. Who are the directors of the entities you co-owned with Sosna today?
A. I don't know.
Q. Were board meetings ever held for the entities you co-owned with Sosna?
A. No.
Q. Were minutes -- oh, strike that.
Did you have any role in the day-to-day operations of the entities you co-owned --
A. No.
Q. -- with Sosna?
A. No.
Q. Who managed the day-to-day operations of the entities you co-owned with Sosna?

A. Premier.
Q. Were you ever authorized to act on behalf of the entities you co-owned with Sosna?
A. No.
Q. Were you ever authorized to handle bank transactions for the entities you co-owned with Sosna?
A. No.
Q. Did you have any role in managing the accounting or finances of the entities you co-owned with Sosna?
A. No.
Q. Who did?
A. Premier.
Q. And who at Premier?
A. I don't know.
Q. Did you ever communicate with Premier about the accounting or finances of the entities you co-owned with Sosna?
A. No.
Q. Did you ever communicate with Sosna about the accounting or financial performance of the entities you co-owned with Sosna?

A. A few times.
Q. How many times?
A. I have no idea.
Q. When you say "a few times," what do you mean?
A. Over time we met a few times.
Q. And I'm just trying to figure out what you mean by few. So can you quantify that in some way?
A. More than three and probably less than eight.
Q. And that's since 1999?
A. Yeah.
Q. Do you recall anything about these discussions you had with Sosna?
A. I don't remember.
Q. Do you remember when these three to eight communications took place?
A. When?
Q. Yes.
A. I don't remember.
Q. Do you know if it was like in the past ten years or past two years, or any way to --
A. In the last ten years.

Q. In the last 10 years, three to eight times. All right.
Which individuals were authorized on behalf of the entities you co-owned with Sosna to handle loan issues with banks?
A. I don't know.
Q. Do you think it included Harold Sosna?
A. He ran Premier.
Q. Right, he did run Premier. But was he authorized to, as far as you know, handle loan issues with banks on behalf of the entities you co-owned with Sosna?
A. Yes.
Q. Any other individuals you can think of that were so authorized?
A. I don't know.
Q. Were all these individuals, as far as you know, part of Premier?
A. I presume.
Q. Were any of the individuals in the entities you own on your own authorized to handle loan issues on behalf of the entities you co-owned with Sosna?

A. At one time, I had an employee who just paid a mortgage bill.
Q. Anything else?
A. No.
Q. Did you or anyone on your behalf at any time ever inspect the physical locations of the businesses you co-owned with Sosna?
A. I think I went to visit once or twice.
Q. Each facility or one facility or --
A. I believe after Kenwood got remodeled, I went to see it. After Madeira got remodeled, I went to see it.
Q. Anything else?
A. Nope.
Q. When was Kenwood remodeled?
A. I don't remember.
Q. Was it more than ten years ago?
A. No.
Q. When was Madeira remodeled?
A. I don't remember.
Q. Was it more than ten years ago?
A. I don't believe so.

Q. Did you have any voice in the management of the entities you co-owned with Sosna?
A. No.
Q. Did you have any voting or consent rights on any specific issues with respect to the entities you co-owned with Sosna?
A. Can you repeat the question, please?
MR. SCHUELLER: Why don't you read it. I don't know if I can redo that one.
(Record read by Reporter.)
THE WITNESS: I don't know.
BY MR. SCHUELLER:
Q. Do you recall ever exercising voting or consent rights?
A. I don't believe so.
Q. Were you ever paid any salary by the entities you co-owned with Sosna?
A. No.
Q. Did you ever receive any distributions or other payments from the entities you co-owned with --

A. Yes.
Q. -- Sosna? When?
A. I don't remember.
Q. What were these payments for?
A. My investment.
Q. Was it a -- like a dividend, or what was the payment?
A. I don't remember.
Q. How much did you receive?
A. I don't remember.
Q. What determined the amount of the payment?
A. I presume when I had the funds, it paid in dividends.
Q. Was it the same dividend payment, or did it change?
A. I don't remember.
Q. Were all your dividend payments captured by K-1s?
MR. CUMMINS: Objection as to the form.
A. I believe it would.
Q. Would you have received any payments that were not recorded in a K-1?
A. No.

Q. Are you aware that the K-1s were provided to Huntington?
A. I don't know.
Q. Well, we reviewed the K-1s, and it looked to us as if you only received distributions from Keller Road Realty and Stiegler Road Realty. Does that sound right?
MR. CUMMINS: Objection to form. Do you have any of those documents for him to look at?
MR. SCHUELLER: No.
A. I don't know what you're talking about. I never talked to Huntington Bank ever.
BY MR. SCHUELLER:
Q. No. I'm trying to refresh your recollection. And so --
A. So my recollection is I have never, ever, ever talked to anybody at Huntington, so I have no idea what they got and what they didn't get.
Q. No. So I'm just trying to figure out which entities paid you a dividend.
A. I don't know.

Q. Okay. And I'm saying to you we reviewed the K-1s. The only entities we saw that paid a dividend to you were Keller Road Realty and Stiegler Road Realty.
And then my question to you is, does that refresh your recollection, were those the only two entities that paid you dividends?
MR. CUMMINS: Objection as to the form.
A. I don't know who "we" is, and I don't know the answer.
Q. Okay. We also saw that it looked to us as if Schneider and Sosna each received $10,000 a month from Keller Road and Stiegler Road. Does that make sense to you?
MR. CUMMINS: Objection to form.
A. I don't have anything in front of me.
Q. So you don't know if there was a uniform payment of $10,000 a month from these entities to you at any time?
A. If I got any dividends, it would have been put in my office. And then my K-1s are done by my accountant.

Q. Do you think you were paid a dividend by all the entities you co-owned with Sosna?
A. I don't know.
Q. Do you think there were some entities you co-owned with Sosna that never paid you a dividend?
A. I don't know.
Q. What triggered a dividend payment to you?
MR. CUMMINS: Objection as to the form.
A. I don't know.
Q. Was there like a profitability metric that had to be achieved before you received a dividend?
A. I don't know. Here, is it an objection?
MR. CUMMINS: No. If you thought I said something, it was not -- it wasn't meant to be.
Q. Are you aware that Sosna sent borrowing base compliance certificates to Huntington with respect to the Huntington loan to the borrowers you co-owned with

Sosna?
A. What was the borrowing base?
Q. Do you know what a borrowing base compliance certificate is?
A. I do now know that.
Q. Okay. What is it?
A. It's the bank has allowed -- wants to size those entities to get a letter of credit and borrow money against it. And he had to have enough equity to borrow that.
What I've learned, it all tied into unbilled receivables and that borrowing base was never something I was aware of.
Q. When did you first become aware of the borrowing base?
MR. CUMMINS: Objection to the extent that this may involve any communications between your -- you and your counsel, I would ask you to consider that it may be privileged. And if you want to talk about it, we'll take a break. It's up to you. Would you repeat the pending question, please?
Q. When did you become aware of Sosna sending borrowing base compliance

certificates to Huntington?
A. After the due diligence came my way.
Q. And what due diligence is that?
A. The information we ask of the bank.
Q. After the litigation was commenced?
A. After the assets were put in the receivable -- in the receiver's hands.
Q. And that was in June of 2020?
A. June 2nd of 2020.
Q. So prior to June 2nd of 2020, you were not aware that Sosna sent borrowing base compliance certificates to Huntington?
A. I wasn't aware of what it was at all.
Q. And so -- just so I'm completing this line of questioning, did you ever ask to review compliance certificates before they were sent to Huntington?
A. I was never aware that there was a line of credit, and the borrowing base was tied to a line of credit that was attached to one of Sosna's specific homes that I was not

aware of.

Q. Did you ever review any financial information that was presented to Huntington before it was presented at Huntington?

MR. CUMMINS: Objection as to form.

A. I don't believe so.

Q. So just to tie this down, Harold and Premier never sent you bank reporting before it actually went to the bank?

A. No.

MR. CUMMINS: Objection. If you'll read the question, I think his answer is not exactly what he means, but if you read the question again.

MR. SCHUELLER: Okay.

MR. CUMMINS: I'm not gonna tell him --

MR. SCHUELLER: Yeah.

MR. CUMMINS: -- what to say. It's just that you maybe have a negative in there that he didn't --

MR. SCHUELLER: I think you're right. Would you mind reading it?

(Record read by Reporter.)
THE WITNESS: I have no idea what went to the bank.
BY MR. SCHUELLER:
Q. Okay. Let me maybe ask it a different way.
Did Harold or Premier ever send you bank reporting information before that information went to the bank?
A. Again, I don't know what went to the bank, and I didn't get reporting information.
Q. Did you ever request to receive from Sosna or Premier any financial reporting with respect to the entities you co-owned with Sosna?
A. Can you say that again?
Q. Did you ever request to receive from Sosna or Premier any financial reporting with respect to the entities you co-owned with Sosna?
A. It usually came at the end of the year.
Q. What did you receive at the end of the year?

A. I have no idea.
Q. Did you ever review it?
A. I don't know.
Q. Did anyone on your behalf review it?
A. I don't know.
Q. Did you receive any financial reporting from Sosna or Premier other than that annual reporting?
A. I can't recall.
Q. So it's possible you did?
A. I can't recall.
Q. So then I guess it's possible you did?
A. That's not what I said.
Q. Well, if you can't recall, you can't say one way or another, right?
A. You're putting words in my mouth.
Q. I'm just trying to figure out whether it's possible you received reporting other than on an annual basis.
A. It's possible I had an accident coming here today, but it didn't happen, so I don't know.

Q. Did you ever request to receive any reporting other than the annual reporting?

A. I can't recall.

Q. Did anyone on your behalf review the financial reporting from Sosna and Premier?

A. I don't know.

Q. Do you know if anyone spent any time on your behalf reviewing the financial information from Sosna or Premier?

A. I don't recall.

Q. Did anyone ever generate any reports to you with any findings from any review of the financial information provided by Sosna or Premier?

A. I don't know.

Q. If that happened, would they have been written reports or verbal reports?

A. I don't know.

Q. Did you or anyone representing you ever independently examine the accounting and financial books and records of the entities you co-owned with Sosna to verify their accuracy?

MR. CUMMINS: Objection as to form. Other than documents or information obtained by the plaintiff in this litigation; is that what you mean?
MR. SCHUELLER: Correct.
A. You talking about after all this happened.
BY MR. SCHUELLER:
Q. So let me ask it again. Before this litigation, did you or anyone representing you ever independently examine the accounting and financial books and records of the entities you co-owned with Sosna to verify their accuracy?
A. I don't believe I hired anybody to.
Q. Did you, prior to this litigation or anyone representing you, ever independently examine the banking records of the entities you co-owned with Sosna?
A. Are you saying after this all fell apart?
Q. No. So before -- before the receivership.
A. I didn't hire anybody, but there

were -- I know there was an accountant that he used.

Q. I'm asking if you or anyone representing you ever independently examined the banking records of the entities you co-owned with Sosna?

A. No.

Q. What steps, if any, did you take to ensure the accuracy of the financial information provided by Sosna or Premier?

A. I didn't hire anybody to do that.

Q. All right. Did you take any steps to ensure the accuracy of the financial information provided by Sosna or Premier?

A. I figured the bank was reviewing it, and I trusted the bank.

Q. Any other steps?

A. Nope.

Q. What steps, if any, did you take to ensure the accuracy of the banking records provided by Sosna or Premier?

A. I relied on, again, the bank.

Q. Any other steps?

A. Not that I recall.

Q. Did Harold or Premier ever refuse to provide you or anyone acting on your behalf with financial information which had been requested?
A. I don't know.
Q. Did you ever ask Huntington directly for Huntington to provide any financial information about the entities you co-owned with Sosna?
A. I did not.
Q. Did you ever ask Huntington directly for any bank deposit statements of the entities you co-owned with Sosna?
A. Can I hear that question, again?
Q. Did you ever ask Huntington directly for any bank deposit statements of the entities you co-owned with Sosna?
MR. CUMMINS: Objection as to form. You mean with respect to activities prior to the initiation of this litigation or the -- any other pieces of litigation that your firm and your bank been involved with against --
MR. SCHUELLER: Yes.
MR. CUMMINS: -- the plaintiff?

MR. SCHUELLER: So prior to the receivership. Thank you.

A. No.

BY MR. SCHUELLER:

Q. Did you ever ask Huntington directly about any aspect of the loan relationship between Huntington and the entities you co-owned with Sosna?

MR. CUMMINS: Objection to form. Other than circumstances related to the litigation; is that what you mean?

MR. SCHUELLER: Yes.

A. No.

MR. CUMMINS: Excuse me. We've been going for about an hour. Is this a good place to stop or do you want to keep going a little bit. I think --

MR. SCHUELLER: I have just five more questions or so, and it will just wrap up this line of questioning.

MR. CUMMINS: Perfectly fine.

THE WITNESS: That's fine.

BY MR. SCHUELLER:

Q. Okay. As you sit here today, can you think of any way you could have done

a better job monitoring the financial performance of the entities you co-owned with Sosna?

MR. CUMMINS: Objection as to the form.

A. Relied on Huntington more -- more often.

Q. Anything else?

A. I had an expectation that the bank would have called me.

Q. Anything else?

A. Not now.

Q. As you sit here today, can you think of any way you could have done a better job monitoring the bank deposit records of the entities you co-owned with Sosna?

A. That's not my job.

Q. All right. But, again, I'm just asking as you sit here today, can you think of any way you could have done a better job monitoring the bank deposit records of the entities you co-owned with Sosna?

A. Only my expectations of Huntington Bank.

Q. Anything else?

A. As a public entity.
Q. Anything else?
A. Hindsight's always better than...
Q. Correct. I'm asking you to exercise your hindsight. What -- what could you have done better?
A. Nothing right now.
Q. Did Sosna or Premier ever provide you or anyone acting on your behalf copies of the bank deposit records for the entities you co-owned with Sosna?
A. No.
Q. As you sit here today, can you think of any way you could have done a better job monitoring the operations of the entities you co-owned with Sosna?
A. Just to rely on Huntington Bank.
Q. Anything else?
A. That's big enough.
Q. So nothing else?
A. Not now.
Q. Did anything -- strike that.
As you sit here today, can you think of any way you could have done a better

job monitoring the accuracy of the borrowing base certificates which Premier sent to Huntington?

A. As I said earlier, I never knew about borrowing bases.

Q. So I suppose one way would be that you would have known about the borrowing base certificates?

MR. CUMMINS: Objection as to form.

A. If Huntington would have explained it to me. It wasn't part of my entities. Huntington gave Pleasant Ridge a line of credit, and I didn't have a line of credit prior to this loan.

Q. Did you ever speak to Huntington prior to the receivership?

A. Nope.

MR. SCHUELLER: I think this is a good time to take a break.

THE VIDEOGRAPHER: We are off the record.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record. The time is 10:51 a.m.

BY MR. SCHUELLER:
Q. Mr. Schneider, are you aware that Harold Sosna owned entities -- oh, hold on a second.
Mr. Schneider, are you aware that Harold Sosna owned entities in addition to the entities you co-owned with him?
A. Yes.
Q. Are you aware that some of these entities are borrowers on the Huntington loan?
A. Yes.
Q. Premier Healthcare Management was a borrower on the Huntington loan?
A. Yes.
Q. Pleasant Ridge Care Center, Inc. was a borrower on the Huntington loan?
MR. CUMMINS: I'm gonna object. By borrower, do you mean -- I don't understand the concept here. Borrower, you mean the person or the entity that signed as, quote, the borrower or a borrower on a document?
MR. SCHUELLER: Yes.
MR. CUMMINS: So could we maybe

just put up the document and then the answer will be there. It's not a test of whether he remembers who signs the document, correct?

MR. SCHUELLER: No. I'm not trying to trick him, but I'm just trying to move through I think basic issues without, you know, having to mark exhibits.

MR. CUMMINS: Okay. But I think it's a little bit beyond his scope to testify as to who signed as a borrower on a document that's centered to this.

I mean, if you have it quickly or if you ask -- I have no idea how to approach this, okay, other than to try to help get the record to be accurate.

All we're doing here is testing -- I'm sorry. I don't mean to make speeches. I'm gonna object as to form and you have the sense of what I'm trying to get to.

THE WITNESS: I'll answer when you ask the question again.

BY MR. SCHUELLER:

Q. Was Pleasant Ridge Realty, LLC a borrower on the Huntington loan?

A. I don't know.
Q. Was JZB Realty Holding Company, LLC?
A. I don't know.
Q. Was Hoffman Healthcare, Inc. a borrower?
A. I don't know who Hoffman is.
Q. How about F&H Holding Company, LLC?
A. I don't know F&H.
Q. How about Ivy Healthcare Inc.?
A. I've heard of it.
Q. Was it a borrower?
A. I don't know.
Q. Do you use nomenclature for the borrowing entities with Huntington that you did not have an ownership interest in?
A. I never spoke to Huntington, so I can't answer that.
Q. I'm just trying to figure a way that we can refer to all these entities at once. Do you have a preferred way that you would refer to those entities?
A. My entities were in the Keller Group.

Q. Okay. And what about the Sosna entities?
A. I didn't know anything about them.
Q. No. How did you refer to them?
A. Sosna's Group.
Q. Sosna Group. Okay. I'll use that same nomenclature then.
Were you entitled to receive any financial reporting with respect to Sosna's Group?
MR. CUMMINS: Objection as to form.
A. I don't know.
Q. Did you ever receive any financial reporting with respect to Sosna's Group?
A. No.
Q. Did you ever ask for financial reporting with respect to Sosna's Group?
A. Yes.
Q. When?
A. Early '18.
Q. Any other times?
A. No.

Q. Why did you ask for financial reporting with respect to Sosna's Group in early 2018?
A. I asked him how he's doing. That's all.
Q. Why did you ask for that?
A. I don't remember.
Q. What did he say?
A. I don't remember.
Q. Did he provide you with any financial reporting with respect to Sosna's Group in early 2018?
A. No.
Q. Did that bother you at all?
A. No.
Q. Was that suspicious in any way to you?
A. I didn't own it. I didn't have rights to any of that.
Q. But they were borrowers on the loan that you had with Huntington, correct?
A. No. There was no Huntington loan at the time.
Q. Did you or anyone representing you ever independently examine the books and

records of the Sosna Group to verify their accuracy?

A. No.

Q. Did you or anyone representing you ever independently examine the backing records of the Sosna entities?

MR. CUMMINS: Objection. Without respect to the litigation that's proceeding in this case, right?

MR. SCHUELLER: Correct.

A. No.

BY MR. SCHUELLER:

Q. What steps did you or anyone acting on your behalf take to ensure the accuracy of the financial reporting of the Sosna entities?

A. Can you repeat that, please?

Q. What steps did you or anyone acting an on your behalf take to ensure the accuracy of the financial reporting from the Sosna entities?

A. I had no interest in the Sosna entities.

Q. So there was no steps taken?

A. That was his information, not

mine.

Q. Okay. I'm asking what steps did you or anyone acting on your behalf take to ensure the accuracy of the financial reporting of the Sosna entities?

A. I had no interest in his entities.

Q. Got it. And so you took no steps to verify the accuracy?

A. I had no reason to.

Q. Did Harold or Premier ever refuse to provide you with information which you requested with respect to the Sosna entities?

A. Never. No.

Q. Did you ever ask Huntington directly for Huntington to provide any financial information about the Sosna entities?

A. I had no reason to.

Q. Did you ever ask Huntington directly for any bank deposit statements of the Sosna entities?

A. Again, I have never spoken to Huntington.

Q. Did you ever ask Huntington directly about any aspect of the loan relationship between Huntington and the Sosna entities?
A. Again, I never spoke to anybody at Huntington.
Q. As you sit here today, can you think of any way you could have done a better job monitoring the business records of the Sosna entities?
A. No.
Q. As you sit here today, can you think of any way you could have done a better job monitoring the bank deposit records of the Sosna entities?
A. No.
Q. As you sit here today, can you think of any way you could have done a better job monitoring the operations of the Sosna entities?
A. No.
Q. Did you know prior to the receivership that the Sosna entities were receiving cash at various times from the entities you co-owned with Sosna?

A. No.
Q. Prior to the receivership, did you know that the Sosna entities were paying cash at various times into the entities you co-owned with Sosna?
A. No.
Q. Are you aware that Harold and Faye Sosna are co-obligors on your loan with Huntington?
A. No.
Q. Did you ever ask for any financial reporting with respect to the personal finances of Harold and Faye Sosna?
A. Not allowed to have those.
Q. What do you mean by that?
A. It's called personal financial statements.
Q. So you never asked?
A. No.
Q. I'm sorry. I should -- I asked that in a negative.
Did you -- so did you ever ask for any financial reporting with respect to the personal finances of Harold and Faye Sosna?

A. No.
Q. Did you ever receive any financial reporting about Harold and Faye Sosna prior to the receivership?
A. No.
Q. Prior to the receivership, did you or anyone representing you ever independently examine the bank deposit records of Harold and Faye Sosna?
A. No.
Q. Prior to the receivership, did you or anyone acting on your behalf take steps to ensure the accuracy of the personal financial reporting of Harold and Faye Sosna?
A. No.
Q. Did Harold and Faye Sosna ever refuse to provide you with personal financial information which you requested?
A. No.
THE COURT REPORTER: In which you what?
MR. SCHUELLER: Requested.
BY MR. SCHUELLER:
Q. Did you ever ask Huntington directly for Huntington to provide any

financial information about Harold and Faye Sosna?
A. Never talked to anybody there.
Q. Did you ever ask Huntington directly for any bank deposit statements of Harold and Faye Sosna?
A. Again, never talked to Huntington.
Q. Did you ever ask Huntington directly about any aspect of the loan relationship between Huntington and Harold and Faye Sosna?
A. Never talked to Huntington.
Q. As you sit here today, can you think of any way you could have done a better job monitoring the personal financial records of Harold and Faye Sosna?
A. No.
Q. As you sit here today, can you think of any way you could have done a better job monitoring the bank deposit records of Harold and Faye Sosna?
A. No.
Q. Did you know that Harold Sosna was receiving cash at various times from the

entities you co-owned with Sosna?
A. I was unaware.
Q. Are you aware that Premier managed entities in addition to the entities you co-owned with Sosna?
A. I don't know.
Q. Have you ever heard of the Social Row entities?
A. No.
Q. Have you ever heard of the Wexford entities?
A. Yes.
Q. What are the Wexford entities?
A. It's another one of his facilities.
Q. Did you own the Wexford entities at one time?
A. Please? What was your question?
Q. Did you own the Wexford entities at one time?
A. I was a co-owner.
Q. When did you first acquire your ownership interest in the Wexford entities?
A. I never did.
Q. How did you become an owner of

the Wexford entities?
A. I never was.
Q. Did a company you owned or controlled ever own the Wexford entities at any time?
A. No.
Q. So you've never had a direct or indirect ownership interest in the Wexford entities?
A. I owned -- co-owned the property before he acquired it.
Q. Before Sosna acquired it?
A. Yes.
Q. Okay. That's what I'm trying to get at.
When did you own -- when did you obtain your ownership interest in the property?
A. It was a family business and owned it since 1968.
Q. And just so I'm clear on this, this is The Wexford Place, Inc. and Wexford Care Center, Inc.; is that right?
A. I don't know what he called it.
Q. Okay. What did you call it?

A. East Galbraith.
Q. What were the entities that owned East Galbraith when you had an ownership interest?
A. East Galbraith and East Galbraith Healthcare Center.
Q. I see. When did you sell your interest in East Galbraith to Sosna?
A. I don't remember.
Q. Was it in 2018?
A. Before that.
Q. Was it in 2017?
A. I believe it was before that.
Q. You said East Galbraith was a family business. Who -- who owned interest in East Galbraith?
A. There were two other partners.
Q. Who were they?
A. Henry Schneider and Marilyn Zembovoch.
Q. Are Harry (sic) and Marilyn related to you by family?
A. Yes.
Q. What was the sale price of East Galbraith to Sosna?

A. I don't remember.
Q. Was East Galbraith ever profitable?
A. Yes.
Q. Was it profitable at the time you sold it to Sosna?
A. Yes.
Q. Was East Galbraith ever unprofitable?
A. I don't remember.
Q. Who managed East Galbraith when you owned it?
A. I had a management company.
Q. What was the name of that management company?
A. I can't remember.
Q. But it was a management company you owned?
A. No.
Q. Who owned it?
A. I don't remember.
Q. Was it a family member?
A. No.
Q. Okay. So it was a third-party management company?

A. Yeah.
Q. Was the sale of East Galbraith to Sosna tied in any way to the Huntington refinancing in 2018?
A. No.
Q. Now, Harold Sosna in his sentencing allocution referred to East Galbraith as too long neglected, poorly operated facilities that needed to be gutted and renovated; is that an accurate description?
A. No.
Q. Sosna said the properties, quote, turned into a money pit. Do you agree that those properties were a money pit?
A. Nope.
Q. What is your basis for that conclusion?
A. It was operated by someone for ten years, and it wasn't a money pit that I knew of.
Q. So it wasn't a money pit that you knew of when it was owned by Sosna?
A. I don't know.
Q. You don't know if it was a money

pit after Sosna bought it?
A. I don't know what happened after he bought it.
Q. Okay. So it could have been a money pit?
A. I didn't say that.
Q. Okay. You don't know one way or another what the performance of East Galbraith was after Sosna acquired it?
A. I do not know anything, no.
Q. Were you ever entitled to receive any financial reporting with respect to the Social Row entities or the Wexford entities?
MR. CUMMINS: Objection as to form.
A. I didn't know anything of either one.
Q. Okay. Did you ever receive any financial reporting from the Social Row or Wexford entities?
A. I never heard of them before.
Q. And just so I tie this down in the record, so did you or anyone representing you ever independently examine the books and

records of the Social Row or Wexford entities to verify their accuracy?
A. I have no idea.
Q. You may have?
A. No. I didn't.
Q. Okay. Just so the record is clear, did you or anyone representing you ever independently examine the books and records of the Social Row and Wexford entities to verify their accuracy?
A. They weren't mine and I didn't do anything.
Q. Okay. Did you or anyone representing you ever independently examine the banking records of the Social Row and Wexford entities?
A. I didn't know Social Row at all, so I -- I wouldn't have gone after anything.
Q. What steps did you or anyone acting on your belief take to ensure the accuracy of the financial reporting of the Social Row and Wexford entities?
A. I don't know Social Row, so I wouldn't have done anything.
Q. Did Harold Premier or the

Social Row or Wexford entities ever refuse to provide you with financial information which you requested with respect to the Social Row and Wexford entities?

A. I'll give you the same answer, I don't know those entities.

Q. Okay. So they never refused; is that right?

MR. CUMMINS: Objection. That's not his answer.

MR. SCHUELLER: I know. It's a different question.

MR. CUMMINS: I'm sorry.

A. All right. Well, I gave you the answer.

BY MR. SCHUELLER:

Q. So they never refused to provide you with financial information?

A. I said I don't know those entities.

Q. Right. But I'm not asking about your knowledge of the entities, I'm asking --

A. I would never have asked for something I don't know anything about.

Q. Okay. So you never refused --

they never refused to provide you with financial information?

A. I'll go around in circles. I don't know anything about them. I wouldn't have asked for something that I don't know anything about.

Q. Did you ever ask Huntington directly for Huntington to provide any financial information to you about the Social Row and Wexford entities?

A. Never talked to Huntington.

Q. Did you ever ask Huntington directly for any bank deposit statements of the Social Row and Wexford entities?

A. Never talked to Huntington.

Q. Did you ever ask Huntington directly about any aspect of the loan relationship between Huntington and the Social Row and Wexford entities?

A. Never heard of Social Row. Never talked to Huntington.

Q. As you sit here today, can you think of any reason why you should have done a better job monitoring the financial performance of the Social Row and Wexford

entities?
A. Never talked to Huntington, didn't know anything about Social Row, and that wasn't my responsibility.
Q. Did you know that the Social Row and Wexford entities were receiving cash at various times from the entities you co-owned with Sosna?
A. I didn't co-own those properties, and I don't know.
Q. So let me ask that question again. Okay.
Did you know that the Social Row and Wexford entities were receiving cash at various times from the entities you co-owned with Sosna?
A. No.
Q. Did you know that the Social Row and Wexford entities were paying cash at various times into the entities you co-owned with Sosna?
A. No.
Q. When was the first time you became aware that any of the entities you co-owned with Sosna were in financial

trouble?
A. I never knew.
Q. You never knew before the receivership?
A. No.
Q. What was -- well, what was the first time that you became aware that there was a problem?
A. May 26th, 2020.
Q. What happened on that day?
A. Sosna's attorney sent an e-mail.
Q. What did the e-mail say?
A. That he was arrested.
Q. What else did it say?
A. I don't remember.
Q. What -- when you say Sosna's attorney, which attorney?
A. Jill McGrail.
Q. What -- well, strike that.
Did you then contact Jill or Harold to find out what was going on?
A. No.
Q. Okay. What did you do after you received this information that Harold had been arrested?

A. I don't remember.
Q. At some point in time, though, you came to realize that the arrest was tied to financial trouble at the entities you co-owned with Sosna?
A. I did not know at the time.
Q. Right. But at some point in time, you realized there was financial trouble at the entities you co-owned with Sosna, correct?
A. Can you pinpoint the time you're talking about?
Q. Well, I'm asking you the question. Like, when -- when did you come to the realization for the first time that there were financial troubles at the entities you co-owned with Sosna?
A. When I got that text message -- or e-mail.
Q. But the e-mail just said he had been arrested, correct?
A. Correct.
Q. Did it say anything else that you recall?
A. I don't recall.

Q. So, again, I'm trying to find out, what about that e-mail caused you to believe there was financial trouble at the entities you co-owned with Sosna?
A. I didn't say that.
Q. Okay.
A. I said I got that first notification there was trouble when he got arrested.
Q. What are MCA lenders?
A. I didn't know anything about them.
Q. Do you know anything about them as you sit here today?
A. Yes.
Q. What are they?
A. They're money cash advance, part of the Mafia.
Q. And why do you say they're part of the Mafia?
A. I've done a lot of understanding of what they're all about.
Q. And what are they about?
A. They buy your future earnings.
Q. And are they known for charging

high interest rates?
A. Yes.
Q. Okay. And by "high," I mean very high, correct?
A. It's ridiculous.
Q. Yeah, ridiculously high. And they're often referred to as loan sharks. Have you heard that before?
A. I've heard all this.
Q. Yeah. And as you said, it's like doing a deal with the Mafia, the interest rates are so high?
A. It's ridiculous.
Q. Yeah. When was the first time you became aware that Sosna or the entities you co-owned with Sosna had obtained loans from MCA lenders?
MR. CUMMINS: Objection. I'm gonna caution this witness to -- by all means answer it if you can, but do not disclose anything or any communication between you and your counsel.
A. The first time was -- there was a lawsuit that Huntington went after. I read the lawsuit.

Q. So it was after June 2nd of 2020?
A. Yes.
Q. What was the amount of the MCA loans to the entities you co-owned with Sosna?
A. Can you say that, again, please?
Q. Yes. What was the amount of the MCA loans to the entities you co-owned with Sosna?
A. I don't know the amounts, but the lawsuit brought out some numbers.
Q. And would you agree with me that there were dozens of MCA loans?
A. I would agree that I read there were exorbitant amount of MCA loans.
Q. Now, the receiver compiled an accounting of all the MCA loans in 2020 alone. Are you aware of that?
A. The receiver did?
Q. Yes.
A. No.
Q. Okay. And the receiver concluded that there were over $43 million in MCA loans?

MR. CUMMINS: Objection. He says he's unaware of it. Are you representing there's a professional matter that that's what the receiver's document reports?

MR. SCHUELLER: Just let me finish the question. I was about to ask the question.

MR. CUMMINS: Please.

BY MR. SCHUELLER:

Q. Do you have any reason to believe that number is inaccurate?

A. I don't know what the number is.

Q. In excess of $43 million?

A. All I can tell you is I read the lawsuit that you guys had against the MCAs.

Q. Okay. And do you have any independent knowledge of what the amount of the MCA loans were to the entities Sosna owned in whole or in part?

A. I knew nothing about MCAs. Never heard about them until all this happened, and I have no idea.

Q. Would you agree with me that the payments Harold made to MCA lenders exceeded

the amount of the loans he received from them?

A. I don't have any paperwork to say either way.

Q. Okay. When was the first time you became aware that Sosna had been kiting checks?

A. On May 26th, 2020. Well, I got to take that back. May 26th I heard he was arrested. I didn't understand why.

Q. And so does this refresh your recollection as to when was the first time you became aware that Sosna had been kiting checks?

A. That isn't the time I was aware other than when he got arrested he said something about it. I didn't know what kiting was.

Q. And he said something. Did you have a conversation with him after May 26th, 2020?

A. I've talked to Harold once in six years since then.

Q. So you've talked to him once after May 26th, 2020?

A. In the bankruptcy court, that's it.
Q. Okay. No other times?
A. Never.
Q. Okay. Would you agree that Sosna kited checks to cover his MCA loans?
A. I don't know. I never talked to him.
Q. So you don't know one way or another?
A. I don't know.
Q. Would you agree that the MCA lending increased in 2020?
A. I don't know. I wasn't involved.
Q. As you sit here today, can you think of any way you could have done a better job to discover the MCA lending prior to May 26th, 2020?
A. I relied on my bank to be aware of the banking that was going on.
Q. Anything else?
A. No.
Q. As you sit here today, can you think of any way you could have done a better

job to discover the check-kiting earlier than May 26th, 2020?

A. I wasn't aware of it, so I couldn't have done anything.

Q. Did you know that Sosna claimed to have made personal loans to the entities you co-owned with Sosna?

A. I wasn't involved in that accounting.

Q. Did you ever see any of those personal loans from Sosna in the financial reporting Sosna provided you?

A. No.

Q. Do you know today that he made personal loans to the entities you co-owned with him?

A. I do not know.

Q. And just to tie down the record, did you or anyone acting on your behalf ever realize that Sosna's personal loans to the entities you co-owned with him were growing in number and size over 2019 and 2020?

MR. CUMMINS: Objection as to form.

A. I was not aware.

Q. Did you know prior to May 26th, 2020, that Sosna was hiding loans from the MCA lenders from discovery on his books and records?
A. I was never aware of any of it.
Q. Did you know that Sosna hid these MCA loans under personal loans from Sosna to the entities you co-owned with Sosna?
A. Again, I was never aware of any of that.
Q. Prior to May 26th, 2020, were you aware that Sosna refused to allow MCA lenders to make any UCC filings in order to hide the existence of the MCA lenders?
A. I wasn't aware of any of it.
MR. SCHUELLER: 8/4/22.
MS. NEAL: Do you want me to mark it?
MR. SCHUELLER: Yes, please. (Handed.) Oh, sorry, Jim.
MR. CUMMINS: It's okay.
(Defendants' Exhibit 110 was marked.)
BY MR. SCHUELLER:
Q. Mr. Schneider, I'm showing you

what we've marked as Defendants' Exhibit 110. Do you recognize this document?
MR. CUMMINS: You -- you may take time to take a look at these.
A. Yeah, let me -- I've seen a lot of documents lately.
MR. CUMMINS: For the purpose of the record, this contains an exhibit stamp of Defendants' Exhibit 110. Is that the sequential number in this case?
MS. NEAL: Yes.
MR. CUMMINS: Okay.
A. So I could have read this at some point in time.
BY MR. SCHUELLER:
Q. So, Mr. Schneider, if I could direct your attention to page 7, which is the last page. Is that your signature?
A. It's my signature.
Q. All right. And it's dated August 4th, 2022?
A. Yeah.
Q. All right. And so then back to the first page of the document, this is an affidavit you signed, correct?

A. I believe so.
Q. All right. I'm gonna direct your attention to paragraph 5. And that paragraph states, Despite my repeated requests, I was not provided with financial information about the companies in the Keller Group. Do you see that?
A. I see that.
Q. And then it continues, which required me to assert a claim against Sosna. Do you see that?
A. Yes.
Q. And then there's a case mentioned there. Do you see that?
A. Yes. Uh-huh.
Q. And then it concludes, for, among other things, failure to permit inspections of company records. Do you see that?
A. I do.
Q. Now, earlier I thought you testified that you never asked for information about companies in the Keller Group, but here it says you had repeated requests. So what is the correct answer?

A. I might have asked repeatedly, maybe twice, but the Keller Group had been around for 20 years.
Q. So in this affidavit in paragraph 5, you say repeated requests? You're referring to just two requests?
A. I'm referring that I might have asked for requests.
Q. How many times?
A. I don't remember.
Q. When were the requests made?
A. I don't remember.
Q. Were the requests verbal or written?
A. Probably verbal.
Q. When did you stop making the requests?
A. I don't know.
Q. So according to paragraph 5, you asked for financial information about the companies in the Keller Group, and the Keller Group are the entities you co-owned with Sosna, correct?
A. The units that I owned, yep.
Q. With Sosna?

A. With Sosna.
Q. Okay. And according to this affidavit, Sosna refused to provide you that financial information, correct?
A. I can't say he refused, but I didn't get them.
Q. And it says here that he refused or he -- it says here that he failed to permit inspections of the records of Keller Group; is that accurate?
A. Where does it say that?
Q. In the last sentence, last part of that sentence in paragraph 5.
A. I never -- I don't remember if I asked for the records to go to his office.
Q. Well, is this paragraph 5 accurate?
A. I can't say that it's accurate and I can't say that it's not accurate.
Q. Well, you swore to it under oath, so I would hope it was accurate.
A. Well, just like anything else, people don't have the records right away so I'd ask and probably ask again. I didn't know if I actually went to his -- to go to

his office and go through his files.
Q. Is it possible this sworn statement in paragraph 5 is not accurate?
A. I can't say that.
Q. So it is accurate?
A. I can't say that.
Q. Did it concern you at all when Harold failed to give you financial information about the Keller Group?
A. I got information from the Keller Group sporadically.
Q. Well, you sued Harold for not providing you with information; isn't that correct?
A. I believe I sued him for running the business and not giving me information that could have given me more information that I needed.
Q. So you sued him for failing to provide financial information then?
A. Is this my bankruptcy suit?
Q. No, this is a state court action, Hamilton County.
A. This is --
MR. CUMMINS: This is -- the

caption is Huntington National Bank vs. Harold Sosna.

A. Did I do the suit? It looks like Huntington Bank did the suit.

Q. Well, let's go to paragraph 5 and there's a reference there to a case Schneider vs. Sosna. Do you see that?

A. Yes.

Q. And so you sued Sosna, correct?

A. I went -- is this a bankruptcy lawsuit? I don't know numbers without seeing something.

Q. No. You'll see it says Hamilton County, Ohio. Do you see that --

A. Yeah.

Q. -- in paragraph 5? So it's not a bankruptcy suit.

THE WITNESS: Branch is the bankruptcy judge; isn't it?

MR. CUMMINS: No. She's a Common Pleas --

THE WITNESS: Okay.

MR. SCHUELLER: Thank you.

MR. CUMMINS: -- Court judge.

A. Okay. So I don't remember this

case, but if I went after him, it was to get information.
BY MR. SCHUELLER:
Q. Okay. And you sued him because he failed to permit inspections of the company records?
A. I don't remember the specific lawsuit.
Q. When did Harold refuse to permit you to inspect company records?
A. I don't remember.
Q. But clearly that happened, correct?
A. I don't remember.
Q. So you're not willing to stand behind your sworn statement in paragraph 5?
A. I can't be specific to time or how often, but I might have asked for records.
Q. It says repeated requests. So I believe you said earlier that was how many times?
A. I didn't say any times. I said I didn't know how many times.
Q. Oh, I thought you said twice.

It would indicate certainly more than once, correct?
A. Yeah. I was a partner for 22 years.
Q. Okay. Why did you ask him for financial information about the Keller Group?
A. I don't remember.
Q. Well, you were co-owner in the Keller Group companies, correct?
A. Yes.
Q. So wouldn't it be important for you to know how your investment is developing?
A. I would get a statement each year and that gave me the information at the time.
Q. But clearly you asked for this financial information, as reflected in paragraph 5, because you wanted to know how your investment was going, correct?
A. I don't remember.
Q. What possible reason could there be otherwise?
A. I don't know at this point. Twenty-two years we were a partner.

Q. I know. But in, let's see, August of 2022, you swore to the court that you made repeated requests for financial information and never got the information.
And I'm trying to figure out the details of that. Why would you have asked for that information?
A. I usually have to do a tax return, so I might have asked under that circumstance.
Q. Any other reasons?
A. I don't remember.
MR. CUMMINS: Counsel, do you have a copy of the Complaint in that case? That may answer all the questions that you're asking and we can move on real quickly.
MR. SCHUELLER: We might. We might get to that.
MR. CUMMINS: Can you show us?
MR. SCHUELLER: We might get to that.
MR. CUMMINS: So you have a copy?
MR. SCHUELLER: We have a copy.
MR. CUMMINS: Okay. Could you

show it to the --
MR. SCHUELLER: Well, I want to examine the witness.
MR. CUMMINS: Excuse me?
MR. SCHUELLER: I want to examine the witness on the affidavit.
BY MR. SCHUELLER:
Q. So repeated requests, that indicates to me a lot of requests, but how many requests are you referring to here?
MR. CUMMINS: Objection as to form.
A. I didn't put any words in my mouth, I just don't remember.
Q. Do you think it was more than five times?
A. I didn't say that.
Q. I know. I'm not trying to trick you. I'm just trying to find out was it more than five times?
A. I don't remember.
Q. Could it have been a hundred times?
A. It probably wasn't.
Q. Could it have been 50 times?

A. It was more than once.
Q. And less than?
A. Ten million.
Q. Okay.
A. I don't know. I don't remember, you know. If you ask once, then I remember I asked.
Q. Well, again, I'm just trying to refresh your recollection. So you said it's definitely less than a hundred and ten million?
A. My recollection didn't change because of your requests. I don't remember.
Q. Right. Was it less than 50?
A. I don't remember.
Q. So it could have been more than 50 times?
A. I don't remember.
Q. Could it have been more than 70 times?
A. I don't remember.
Q. Could it have been more than 20 times?
A. I don't remember.
Q. More than ten times?

A. I don't remember. I wasn't counting.
Q. But it was enough times that you sued him, correct?
A. This lawsuit was in '22 after this thing fell apart.
Q. Yes. But it was enough requests that you sued him over them, correct?
A. I don't remember.
Q. All right. In paragraph 6 of your affidavit you state, I was not involved in Sosna's efforts to locate and secure Premier's replacement financing with the Huntington National Bank, and I did not have any involvement in the discussions or negotiations of the Premier loan. Is that an accurate statement?
A. I don't remember.
Q. Did you have any negotiations with Huntington about the loan?
A. Never spoke to him.
Q. All right. So the answer would be no?
A. Right.
Q. So then this paragraph would be

accurate?
A. I know that Harold and I may have spoken about some of my financing. I don't know if that's a hundred percent accurate because I didn't know that we had to replace Huntington's loan.
Q. So paragraph 6 is not a hundred percent accurate?
A. I don't remember from the timing that this may or may not have been accurate.
Q. Okay. I'll direct your attention to paragraph 8. You say, Prior to signing the guaranty, a representative from HNB never contacted me and disclosed the following material facts, which were known to HNB and not available to me, and demonstrate the eroding financial conditions of the JBZ Group, Sosna and Premier. Do you see that?
A. Yes.
Q. So would you agree with me that this is referring to the time Huntington provided a loan to the entities you co-owned with Sosna?
A. I did not go on those properties that it spells out here.

Q. Okay. So the Huntington loan closed at the end of November of 2019, correct?
A. No.
Q. Okay. End of 2018?
A. No.
Q. When? When did it close?
A. November 30th of '18.
Q. '18. Okay. And so that's when you signed the guaranty, correct?
A. That's when I signed the piece of paper, yes.
Q. Okay. And so it says, Prior to signing the guaranty in paragraph 8, and then it continues and says that there was an eroding financial condition at JBZ Group, Sosna and Premier. Do you see that?
A. I see that.
Q. Is that an accurate statement?
A. I don't know. I didn't have anything to do with Sosna's properties.
Q. Well, you're saying here, sir, in paragraph 8 that there was an eroding financial condition, but Huntington never told you about it; is that right?

A. This was done in '22. After I got to examine the stuff that Huntington knew and the recommendations of an outside third party, and I did not know this information until after the fact.

Q. But there was an eroding financial condition of the JBZ Group, Sosna, and Premier as of November of 2018, correct?

A. I don't know. I wasn't privy to that.

Q. I understand. Just so I'm clear, I'm not asking if you knew about it, I'm asking whether it actually existed. Do you understand the difference?

A. I can only explain what exists if I know, and I don't know.

Q. Okay. But here --

THE VIDEOGRAPHER: Excuse me, counsel. I'm sorry. We are off the record.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record with the start of Disc 2. The time is 11:47 a.m.

BY MR. SCHUELLER:

Q. So back to your affidavit,

Mr. Schneider, paragraph 8, you refer to material facts. Do you see that?
A. Yeah.
Q. And then you say those facts were known to Huntington and not you, correct?
A. Correct.
Q. So the facts existed, correct?
A. I don't know. I just know that -- what I read.
Q. Okay. So what's the JBZ Group?
A. I believe it's something that Sosna had.
Q. Well, it's your affidavit. What did you mean by JBZ Group?
A. I can only refer to what I learned after the facts. So I learned JBZ is a company that he and his wife owned.
Q. Okay. And let's look at subparagraph A, Sosna's personnel debt was rapidly increasing and he had a significant cash flow problem. Do you see that?
A. Yes.
Q. Is that a fact as of November of 2018?

A. I can only refer after the fact when I read it somewhere else.
Q. Okay. But do you believe that was -- that is an accurate reflection of the facts?
A. I don't know. I can only tell you what I read, but that fact is, it was legit, that's when I learned about it.
Q. Is it legit?
A. From when I look back, I believe it was.
Q. Okay. And what did you mean here when you said his personal debt was rapidly increasing in 2018 and he had a significant cash flow problem?
A. I can only tell you what I read and learned about it, and I don't know if I'm gonna get in trouble because --
MR. CUMMINS: Well, you are instructed not to disclose any confidential information -- or conversation that you had with your counsel.
A. So I learned this after November -- May 26th of 2020.
Q. All right. And how was Sosna's

personal debt rapidly increasing and he had significant cash flow problems in November of 2018?

A. I don't know how it did. I just know that I read he was warned -- the bank was warned about it.

Q. But you don't know any of the details?

A. I do not.

Q. And then in subparagraph B, Although Sosna had $8 million invested in his personal residence, in addition to a $4 million mortgage, but the property was only appraised at approximately $2 million. Do you see that?

A. I did.

Q. Is that an accurate summary of the facts?

A. From an e-mail that I read from the bank, yes.

Q. Okay. And then subparagraph C it says, The JBZ Group was experiencing a decline in quarterly performance in early 2018 when HNB was seeking to become the new lead agent and increase its participation in

the Premier loan. Do you see that?
A. Yes.
Q. Is that accurate?
A. It's what I read in due diligence.
Q. What was the decline in quarterly performance in early 2018?
A. I don't know. That's all I read.
Q. Subparagraph D, Premier was not covering the payment of its current bills or paying vendors. Do you see that?
A. Yes.
Q. Is that a true fact in November of 2018?
A. Only from what I read.
Q. So you say yes?
A. I know what I read.
Q. Okay. So do you believe that that is an accurate description of the true facts?
A. It's an accurate description of what I read.
Q. All right. I understand what you read. But I'm asking -- you're making a

factual statement here in an affidavit, are -- is this description of the facts accurate?
A. If it was accurate, I repeated it, yes.
Q. Okay. So it was accurate?
A. I wasn't there. I don't know. I wasn't in the middle of that. I'm only repeating what I read.
Q. Okay.
A. And if it was discovered by somebody, then --
MR. CUMMINS: (Coughing.) Excuse me.
Q. What did you read?
A. What it says there.
Q. No. What did you read to conclude that Premier was not covering the payment of its current bills or paying vendors?
A. From my due diligence of the Huntington e-mails.
Q. All right. And how many vendors were being paid out of terms?
A. I don't know.

Q. Were any vendors being paid outside normal terms?
A. I don't know. I wasn't involved.
Q. Then how can you know if this fact is accurate?
A. It's what I read. If what e-mails I read from Huntington are accurate, these are accurate.
Q. Subparagraph E, Premier was, quote, "holding checks" totaling hundreds of thousands of dollars because of, quote, "cash flow issues." Do you see that?
A. Yes.
Q. What were the cash flow issues?
A. Only from what I read, he was not able to pay his bills.
Q. Do you have any other details?
A. There was a third party that brought that out in the due diligence I found.
Q. Do you have any details about the cash flow issues?
A. No.
Q. Subparagraph F, Sosna was

drawing significant sums of money from the Keller Group in February 2018 to pay down Premier's line of credit at Fifth Third Bank. Do you see that?
A. Yes.
Q. How much was being drawn from the Keller Group?
A. I have no idea.
Q. Subparagraph G, MainSource Bank removed Premier's line of credit availability in May 2018 because Premier had overdrawn on its line of credit and the loan was out of compliance. How was the loan out of compliance?
A. I don't know. It was the bank's responsibility. So I didn't -- I didn't get the details in that particular case.
Q. How much was Premier overdrawn on its line of credit?
A. I needed to ask MainSource, which is First Financial Bank.
Q. Did you ask?
A. I wasn't aware of it. Why would I ask something I don't know anything about?
Q. I'm saying as you wrote this

affidavit, how -- you had to have known that the amount that the account was overdrawn, correct?
A. No. This happened in May 2018. Fifth Third had the loan with Huntington and First Financial Bank.
Q. But in 2022 after you had completed your investigation, you wrote this affidavit, correct?
A. I read it. It was information that I got in the due diligence that Huntington had given us.
Q. Right. And I'm asking you how much was the line of credit overdrawn?
A. I don't believe I knew.
Q. Could it be a penny?
A. Well, it was big enough to stop lending a letter of credit.
Q. Okay. But you don't know how much?
A. I don't think it was my job to do that.
Q. And then in subparagraph H it says, Sosna was not properly disclosing where revenue was coming from.

In what way was he failing to disclose where revenue was coming from?

A. I don't know.

Q. So would you agree with me based on your investigation after May of 2020 that the financial distress of the JBZ Group, Sosna, and Premier existed as far back as November of 2018?

A. Only from what I've read.

Q. I understand that's how you obtained information, but would you agree with that?

A. From what I read, I agree.

Q. And you didn't know about this financial stress on the JBZ Group, Sosna, and Premier back in 2018, correct?

A. No.

Q. Or at any time prior to May of 2020, correct?

A. What was the question, again?

Q. Or at any time prior to the May of 2020?

A. No.

Q. In paragraph 11 of your affidavit you say, Sosna falsely stated to me

that the Keller Group did not have sufficient value to support its portion of the Premier loan and HNB would not approve the Premier loan unless I signed a guaranty for the entire $71 million credit agreement. Do you see that?
A. I see that.
Q. Is that an accurate statement of fact?
A. Yes.
Q. Paragraph 13 you say, Because Sosna was in complete control of the financial statements for the JBZ Group and the Keller Group, I did not know Sosna's statements about the value of the companies were false and misleading. Do you see that?
A. Yes.
Q. So did you as of November of 2018, did you ever receive any financial statements for the JBZ Group and the Keller Group?
A. I got for the Keller Group. I didn't have any knowledge or anything for JBZ.
Q. How were the financial

statements false and misleading?
A. Now that I got to look back, they weren't accurate.
Q. How?
A. He -- I don't know at this point. It's been a while ago.
Q. Paragraph 18, HNB never corresponded with me about the Premier loan and the heightened risk presented by the eroding financial condition of Sosna, the JBZ Group, and Premier in any manner whatsoever; is that an accurate statement?
A. Yes.
Q. And -- all right. In paragraph 19 you state, I would not have signed the guaranty and reaffirmation had NHB disclosed to me the adverse facts that it was aware of relating to the eroding financial condition of Sosna, the JBZ Group, and Premier. Do you see that?
A. Yes.
Q. Is that accurate?
A. Yes.
(Defendants' Exhibit 111 was marked.)
BY MR. SCHUELLER:

Q. All right. Let's do the -- Mr. Schneider, I'm showing you what we've marked as Defendants' Exhibit 111. Do you recognize that document?
A. It could have been in the privy (sic) of all the stuff I've looked at.
MR. CUMMINS: Okay. I'm sorry, what was the question?
MR. SCHUELLER: Do you recognize this document?
MR. CUMMINS: And what was your answer? What was your answer?
THE WITNESS: It could have been in all the documents I've looked at.
MR. CUMMINS: Okay. I'm sorry. I'm distracted.
BY MR. SCHUELLER:
Q. Well, what is the document?
A. I'm not sure.
Q. Well, go ahead and look at it, and then see if you can answer it.
MR. CUMMINS: Do you want to take a break? We've been going for an hour or so, do you want to take a break?
MR. SCHUELLER: Whatever you

want. Whatever you want.

THE WITNESS: Yeah.

MR. CUMMINS: Okay. Can we?

MR. SCHUELLER: Absolutely.

THE VIDEOGRAPHER: We are off the record.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:53 p.m.

BY MR. SCHUELLER:

Q. Mr. Schneider, back to Defendants' Exhibit 111, page 2 of that document says it's a Complaint at the top. Do you see that?

A. Uh-huh.

Q. And this is a Complaint you filed against Harold Sosna and others, correct?

A. Page 2 doesn't have the word Complaint on it.

Q. That's page 3. If you go back one page.

MR. CUMMINS: The other way.

MS. NEAL: Yeah.

MR. CUMMINS: You had to turn it

to defendants.
A. Oh. Where is -- I didn't see the word Complaint on here.
BY MR. SCHUELLER:
Q. On the right-hand side?
A. Jury Demand Endorsed Hereon? Oh, Complaint for the breach of fiduciary duty. You guys see these documents all the time. Okay. I see it, Complaint.
Q. So this is a Complaint you filed against Harold Sosna and others, correct?
A. Correct.
Q. All right. Did you review this Complaint before it was filed?
A. I don't remember.
Q. Do you typically review the complaints before they're filed on your behalf?
A. I can't remember.
Q. I'm turning to page -- let's go to paragraph 5 and it says here Sosna is the managing member of each of the real estate companies and oversees and directs their day-to-day operations. Do you see that?
A. Yes.

Q. Is that an accurate statement?
A. Yes.
Q. And in paragraph 6 it says, Schneider and Sosna are co-directors of the operating companies, but Sosna has maintained an exclusive control and oversight over all day-to-day operations of the operating companies. Do you see that?
A. Yes.
Q. So you were a co-director of the operating companies?
A. I'm not sure what a director's title entails, but that's what it says here.
Q. Have you ever been a director of a company before?
A. Yes.
Q. All right. And so you were a director of the operating companies then?
A. It wasn't the -- he maintained all operations.
Q. I understand that, but were you a director of the operating companies?
A. I don't believe so.
Q. So this allegation in this Complaint is inaccurate?

A. I didn't say it was inaccurate. I just said as a director, you would be directing, and I wasn't directing.
Q. Well, as a director, I'm talking about the position of a director. Do you understand what that is?
A. There's a lot of terms here. Director to me means that I'm the person managing it. I'm not.
Q. You've served as a director in a company before, correct?
A. I served all kinds of positions.
Q. And that included being on a board of directors?
A. No.
Q. You've never been on a board of director of any company?
A. No.
Q. And you were never on the board of directors for the operating companies?
A. I would consider being on the board.
Q. And it was a board of?
A. Harold and myself.
Q. And they are called?

A. Partners.
Q. Directors, right?
A. Call it whatever you need.
Q. I'm trying to find out if you were a co-director of the operating companies, were you?
A. I would have been an operator of the board of directors, yes. I would be an equal if we were 50/50, yes.
Q. Were you a director of the operating companies?
A. It says a co-director.
MR. CUMMINS: I'm gonna object to this --
A. Okay. That means I'm one of two people. Yeah. Sorry, go ahead.
MR. CUMMINS: I'm gonna object to this line of questioning. All you have to do is produce minutes of this entity and show it to him and then he'll know if he was a director by election or not.
But to make this a memory test on a position that has a vague name of director is not useful and he's doing the best he can to try to describe the problem

between knowing what an official minute elected director is and a person who has charge of operations.

That's what he's trying to do. I think it's clear, but I don't know what else you need to do other than show him the minutes and then he'll be able to tell you who was elected. Thank you for your patience.

BY MR. SCHUELLER:

Q. So you understand there's a position of a director, and then there's a separate person who can control operations. Do you understand that?

A. I'm not sure of the division that clearly.

Q. All right. Well, the division is in this paragraph 6. Does that help you at all?

A. It says co-director of the operating companies.

Q. Were you a co-director of the operating companies?

A. I was on the -- I was one of the two owners, yes.

Q. I didn't ask you if you were an owner.
A. I don't know the definition of co-director. So if you're trying to define it any closer, then have something that I can look at.
Q. What does director mean to you then when you said you were a director of a company before, you sat on a board before --
A. No, I said I didn't sit on a board before and I -- I directed my own companies.
Q. Okay. But you understand there's an office called a director, correct?
A. There's an office called director? I don't know about that. I don't have -- we didn't have minute -- minute meetings or meeting minutes, whatever you want to call it, but we owned the business together.
Q. So --
A. And he was elected to be the person to operate it.
Q. All right. But my separate question is, did you sit on the board of

directors for the operating companies?
A. I'm not sure we had a board of directors.
Q. Okay. And in paragraph 7 you say, Sosna misrepresented the financial condition of the operating companies and real estate companies, misrepresenting the value of the real estate companies and operating companies, failed to disclose and misrepresented the financial condition of the other entities and businesses that Sosna owned, failed to disclose and misrepresented the reason that Schneider was required to execute a personal guaranty for loans on properties in which he did not have an interest, and failed to advise Schneider that the operating companies and real estate companies are in default on various loans; is that accurate?
A. Yes.
Q. Okay. So how was it that Sosna misrepresented the financial condition of the operating companies and real estate companies?
A. Because the way he operated it.

Q. Who did he misrepresent that to?
A. To myself.
Q. All right. And when did he do that?
A. From my discovery after this failure, he did it pretty much from the time that Fifth Third had the loan and then Huntington took it over.
Q. How many times did he misrepresent the financial condition of the operating companies and real estate companies to you?
A. All I needed was one time.
Q. Okay. But how many times did he misrepresent?
A. Throughout the whole period.
Q. Okay. How did he misrepresent it?
A. My discovery through due diligence was that early 2018 third party discovered that there were some financial problems.
Q. What were the problems?
A. From what I read, Huntington hired a CPA and that CPA warned Huntington

there were some financial problems.
Q. Okay. And then Sosna misrepresented those financial problems to you?
A. By not telling me, yes.
Q. Okay. So did he ever misstate to you the financial condition of the operating companies and real estate companies?
A. I don't remember.
Q. But it says that in the Complaint. Does that help you recall?
A. Well, you're asking for a specific. I know that generally that was the -- that it was all misrepresented now that I get to look back.
Q. All right. And so I'm trying to figure out -- well, how many times did Sosna misrepresent the financial condition of the companies to you?
A. I never counted.
Q. But was it like more than ten times?
A. Well, I said I didn't count, so one misrepresentation is enough.

Q. Right. I'm just trying to get a ballpark idea. Do you think it was more than ten times?
A. And I told you I don't know.
Q. Was it more than 20 times?
A. I have the same answer, I don't know.
Q. More than 50 times?
A. Whatever you want to put on the record, but I don't know.
Q. I'm just trying to find out information from you. So it's possible it was more than 50 times?
A. It only needed to be one time, and that's what it was.
Q. So it was only once or was it more than once?
A. It was more than once.
Q. Okay. So was it more than a hundred times?
A. It was more than once.
Q. That's not my question. My question was, was it more than a hundred times?
A. Like I said, I don't know.

Q. So it could have been?
A. I didn't put that in my record. I don't know.
Q. So if you don't know, it's possible it was more than a hundred times?
A. I don't want you to put words in my mouth. That's not what I said. I don't know. It -- it was a failure on his part. I discovered it later on. And, unfortunately, others knew about it and should have informed me.
Q. Was it a million times?
A. I can tell you the other side of the coin, it was million times they didn't tell me.
Q. That Sosna didn't tell you?
A. No, that the people that knew didn't tell me.
Q. Who are they?
A. Huntington Bank.
Q. Who else?
A. His attorney, all the employees at Huntington, and can go on and on and on.
Q. But it says Sosna misrepresented, so I'm trying to find out

how Sosna --
A. You asked me how I would know, and that's how I'd know, going back to the people who did the investigation and knew about it.
Q. So did Sosna misrepresent the financial condition of the companies to you a million times or more?
MR. CUMMINS: Objection.
A. I'm not gonna repeat myself.
MR. CUMMINS: Excuse me. I don't -- I don't think the answer is gonna get any better or more acceptable to you if he uses a million, a million one, a million five, just go on with it -- the examination.
Okay. Because if you ask it one more time, I'm gonna give him one more time and see if you like that ask. And if you ask it a second time, I'm just gonna instruct him not to answer because you're just harassing this witness.
MR. SCHUELLER: Well, I think the witness is being obstructive. Asked and answered is not a proper objection for a deposition. You can make any objections and

any instructions you want, but he could certainly say one way or another whether it was more or less than a million times.

THE VIDEOGRAPHER: Excuse me, sir. Can you try to get the -- you're drowning out the mic a little.

THE WITNESS: Oh, I apologize. You know, it got cold in here. Now it's gotten warmer. So I can take off my jacket. It got cold at the end, so...

THE VIDEOGRAPHER: It's just when you're crossing your arms.

THE WITNESS: I apologize. Okay. Go ahead. Ask your question, Chris.

MR. SCHUELLER: I'll just wait for you to get comfortable.

THE VIDEOGRAPHER: Thank you.

BY MR. SCHUELLER:

Q. How many times did Sosna misrepresent to you the financial condition of the operating companies and real estate companies?

A. I don't know.

Q. Was it more than a million times?

A. I don't know.
Q. So it's possible it was more than a million times?
A. I didn't say that.
Q. Well, if you don't know one way or another, it's possible; isn't it?
A. I won the lottery this morning because I brought a ticket, but that's possible, but I don't know if I won it yet.
Q. I don't understand that.
A. The same reason I don't understand your question. I told you it was more than once, and I don't know how often.
Q. Okay.
A. I can't answer a better answer from me.
Q. How many times did Sosna misrepresent the value of the companies to you?
A. More than once.
Q. Any other detail you can give us how many times?
A. No, I just know it was misrepresented.
Q. How was it misrepresented to

you?
A. I wasn't aware of the situation.
Q. No. But what did he say was the value to you that was false?
A. He didn't say the value. It's the operations from what I discovered was misrepresented.
Q. So he never made a representation to you as to the value of the companies?
A. No.
Q. All right. So then that aspect of paragraph 7 is wrong, correct?
A. That's not what I said. He didn't misrepresent. I learned that he misrepresented.
Q. So he did misrepresent then?
A. I discovered that, yes, later on.
Q. All right. What did he say was the value that was false?
A. The unknown that I didn't know. So he didn't say it. It's what he didn't say was the problem.
Q. So did he ever give you a value

of what he thought the companies were worth?
A. No.
Q. Okay. Okay. It says here further that Sosna failed to disclose and misrepresented the financial condition of the other entities and businesses that Sosna owned. Is that a true statement?
A. Yes.
Q. How did he misrepresent the financial condition of those other entities to you?
A. Because they were never cushioned, and I didn't know anything about it.
Q. Did you ever ask him for information?
A. No.
Q. Did he ever give you information --
A. No.
Q. -- on the financial condition of the other entities?
A. No.
Q. It says here Sosna failed to disclose and misrepresented the reason that

Schneider was required to execute a personal guaranty. Is that an accurate statement?
A. Yes.
Q. When did he make that misrepresentation?
A. The day before the loan closed.
Q. And what did he say to you?
A. They were closing tomorrow.
Q. And what was the misrepresentation?
A. That there were problems with the loan.
Q. And what information did he give you that was incorrect?
A. The troubles that I discovered after the fact.
Q. Okay. The allegation in that paragraph is that Sosna misrepresented the reason that Schneider was required to execute a personal guaranty. What did he say to you about you being required to execute a personal guaranty?
A. He said the loan was closing tomorrow and we needed to -- we needed to close.

Q. Did he say your personal guaranty was required?
A. No.
Q. Did you know that the loan was -- with Fifth Third was ever in default?
A. Yes.
Q. When did you first learn of that?
A. I don't know.
Q. Was it before you closed on the refinancing with Huntington?
A. Yeah, I believe so.
Q. What were the defaults under the Fifth Third loan?
A. I think there was a property that we had together that had a problem, and I only found out about it months later.
Q. And what was that?
A. That the tenant did something wrong and Fifth Third wanted to get out.
Q. And so the tenant did something wrong and that triggered a default under the Fifth Third loan?
A. I believe so.
Q. Were there any other defaults?

A. Not that I know of.
Q. Okay. Paragraph 8 says, Schneider did not learn about the defaults until he obtained a copy of a lawsuit Huntington filed against Sosna and the operating companies and real estate companies.
Is that a reference to a default under the Huntington loan?
A. I believe Huntington was in the loan with Fifth Third.
Q. Okay. When did you first learn about defaults under the Huntington loan?
A. May 26th, 2020.
Q. So you did not know of a default prior to that date?
A. I did not know anything.
Q. So paragraph 11 says, As a result of Sosna's misrepresentations and failure to disclose material information to Schneider, Schneider has been harmed. Is that an accurate statement?
A. Had a fiduciary duty and, yes, that's accurate.
Q. So paragraph 25, here we have

that language again, Despite his repeated requests, Schneider has not been provided with financial information about these businesses from Sosna on a regular basis. Is that an accurate statement?
A. What's the time period you're talking about? I was with him for 22 years.
Q. Well, it was before this Complaint was filed on September 25th, 2020?
A. So then I was a partner with him for 21 years.
Q. Okay. So did you make repeated requests during that period of time for financial information on a regular basis and you did not receive that information?
A. I would ask regularly, occasionally I got it.
Q. All right. And what did you mean by "regularly"?
A. I don't know, 21 years, it's a lot of time.
Q. Was it monthly --
A. No.
Q. -- or annually or --
A. Whenever.

Q. Whenever you felt like it?
A. Whenever it was time for me to ask, I asked.
Q. And when would that time be?
A. I don't know. I don't remember.
Q. Was it multiple times in a year?
A. I don't remember.
Q. But you certainly asked for information and did not receive it on a regular basis, correct?
A. I asked for information at times.
Q. And you did not receive it?
A. I did at times.
Q. And you did not at times?
A. Sometimes it takes time to get your information, yes.
Q. But eventually did you receive all the information you had requested?
A. Not all the information.
Q. And it says in paragraph 25 that Sosna never advised you of the default on the Huntington loans. Is that -- is that an accurate statement?
A. Yes.

Q. Paragraph 26 says, In 2018, one of Sosna's responsibilities was to locate and secure replacement financing. Is that a true statement?
A. Yes.
Q. And did you have any responsibilities in that regard?
A. I was involved with the other loan, you know. I wasn't aware, you know, that he'd taken it upon himself to do that.
Q. You were not aware that he sought refinancing?
A. I was aware, yep.
Q. When were you first aware?
A. Early '17.
Q. Then it says in paragraph 27, Schneider was not involved in Sosna's efforts to locate and secure financing for the operating companies and real estate companies; is that accurate?
A. Yes.
Q. Now, paragraph 32, picking it up in the middle of that paragraph it says, Sosna represented to Schneider that (a) the operating companies and real estate companies

that Schneider owned with Sosna did not have sufficient value to support their portion of the loans. Is that a true statement?
A. I would like to read the whole thing.
Q. Sure.
A. He did mention that -- that the bank wanted -- at the last minute, he mentioned to me that the bank asked to -- to sign on the whole loan, otherwise they wouldn't give us the loan.
Q. So is that subparagraph A there accurate?
A. No.
Q. How is it inaccurate?
A. He mentioned the whole loan.
Q. Did Sosna explain why you had to guaranty the entire loan?
A. No.
Q. Did he ever say to you that the value of the real estate companies and operating companies were insufficient to support the loan without a full guaranty from you?
A. No.

Q. Did he ever tell you Huntington would not approve the loan unless you signed the guaranty?
A. Yes.
Q. Paragraph 33 says, Because Sosna was in complete control of the financial statements for the operating companies and real estate companies, he knew that his statements about the value of the operating companies and real estate companies were false and misleading; is that accurate?
A. Yes.
Q. And what are these statements of value?
A. Whatever the bank got.
Q. So whatever Sosna provided to the bank?
A. I gather.
Q. Did he provide any statements of value to you that were false and misleading?
A. Yes.
Q. When did he do that?
A. I don't know. I discovered it after this, the failure of this loan.
Q. Right. But when did he provide

the false and misleading statements?
A. When he provided it to the bank.
Q. So before November of 2018?
A. You don't get a loan until it's before a loan, yes.
Q. And then on page 36 -- or, sorry, paragraph 36 it says, Schneider relied upon false and misleading financial information and valuations provided to him by Sosna. Is that an accurate statement?
A. Yes.
Q. And how did you rely?
A. I relied on the bank because they provided a loan.
Q. No. So, I mean, how did -- how did you rely upon the false and misleading financial information from Sosna?
A. Because he was able to get a loan from Huntington.
Q. Okay. And then at paragraph 37 there's a reference there to an indemnification agreement. Did you ever enter into an indemnification agreement with Sosna?
A. After the loan I asked him, you

know, I don't know anything about your companies, and he said he would indemnify it.
Q. All right. And so did you enter into an indemnification agreement with him?
A. I got a piece of paper that got a better place to go.
Q. Yeah. But you did sign an agreement with him for indemnification?
A. No, he signed it. I didn't.
Q. You never signed it?
A. No.
Q. So you never had an indemnification arrangement with Sosna?
A. I didn't say that. I said he gave me a document that he would indemnify.
Q. Okay. Did he sign it?
A. I presume. It's been a long time ago.
Q. Did you ever sign it?
A. I can't remember.
Q. Okay. So I'm gathering from this Complaint that Sosna made a lot of false statements to you over the years; is that accurate?
A. Yes.

Q. And it sounds like he tricked you into signing the guaranty; is that what you're saying?
A. I signed a guaranty.
Q. Right. But he induced you to do it by giving you false information?
A. Yes.
Q. Okay. So paragraph 50 it says, In accordance with paragraph 3 of the indemnification agreement on July 13, 2020, Schneider, through counsel, requested that Sosna indemnify and hold Schneider harmless against all losses as defined in the indemnification agreement.
So does that refresh your recollection as to whether you had a signed indemnification agreement?
A. I don't think that's what it says.
Q. Okay.
A. It doesn't say that I signed anything.
Q. Okay. Paragraph 62 it says, Schneider has made numerous reasonable and proper demands upon Sosna and his attorney

for full and truthful information about the financial affairs of the operating companies. Do you see that?

A. Yes.

Q. Was that true?

A. What time period?

Q. Well, prior to September 25th, 2020?

A. Well, the attorney was his attorney, so I might have asked.

Q. Is paragraph 62 accurate?

A. Like I said, the time period?

Q. Prior to September 25th, 2020.

A. Yes.

Q. Okay. And in paragraph 63 it says, To date, Sosna has failed to provide the requested books and records other than some financial documents of the operating companies. Do you see that?

A. Yes.

Q. Is that accurate?

A. Depends upon the time period.

Q. Is it accurate as of September 25th, 2020?

A. I believe that was asking

afterwards.
(Defendants' Exhibit 1 was marked.)
BY MR. SCHUELLER:
Q. All right. I'm gonna show you what we've marked Exhibit 1. All right. And on the first page, this says First Amended Complaint. Do you see that?
A. Yes.
Q. And you're the listed plaintiff?
A. I am.
Q. And the defendants are Huntington and some others, correct?
A. Correct.
Q. And so this is your lawsuit against Huntington that we're here today on, correct?
A. Yes.
Q. Okay. Now, if you go to the second to last page?
A. What page number is that?
Q. It doesn't have a page number, but it's got your signature page.
A. This page --
Q. Yes.
A. -- okay.

Q. So you signed a Rule 23.1 verification on April 26th, 2023, correct?
A. I put my signature there.
Q. All righty. And you were -- you stated that the allegations in this Complaint to the best of your personal knowledge are true; is that correct?
A. I believe so.
Q. Okay. Are you aware of any allegations in this Complaint that are false or inaccurate?
A. I don't know.
Q. You don't know of any?
A. It's a big document. I read a lot of stuff.
Q. Okay. Let's go to paragraph 20. It says, In August of 2017, Fifth Third had declared Sosna's primary loan in default due to Sosna's imperiled financial situation after a Columbus care facility owned by him closed. Do you see that?
A. Yes.
Q. So how was the loan -- strike that.
How was Sosna's financial

situation imperiled in August of 2017?
A. When the business went in default, Fifth Third is a financial situation.
Q. When did you first learn of the financial peril?
A. I don't remember.
Q. Was it before November of 2018?
A. Yes.
Q. What is this Columbus care facility?
A. Bryden Place.
Q. Did you ever own an interest in Bryden?
A. I did.
Q. When did you own that interest?
A. 1999.
Q. Okay. Why did that facility close?
A. The tenant created a problem.
Q. What was the problem?
A. A repetitive problem with Medicare.
Q. So what happened in August of '17?

A. I believe Fifth Third called the loan in default.
Q. And did the facility close at that point?
A. I don't know when it closed.
Q. Okay. Did it close ever?
A. Yes.
Q. And do you know what Harold did with the facility after it was closed?
A. I believe he sold it.
Q. Do you know when he sold it?
A. No.
Q. Did he sell it before November of 2018?
A. Yes.
Q. Do you know who he sold it to?
A. No.
Q. Do you know what he received?
A. Nope.
Q. Do you know if he sold it for a loss?
A. Yes.
Q. What was the loss?
A. There was no licensed beds with it.

Q. And so what was the financial loss to Harold?
A. I don't know what it was to Harold, but to the two of us it was no loss. It was whatever it sold for.
Q. So did you own Bryden at the time it was sold?
A. Yes.
Q. I see. And so you both sustained a loss on that sale?
A. Yes.
Q. And was it a multimillion dollar loss or --
A. I don't remember.
Q. Did you record that -- report that loss in your tax returns?
A. I believe so.
Q. Okay. After the default on the Fifth Third loans, did you or anyone on your behalf examine the financial books and records of the entities you co-owned with Sosna?
A. No.
Q. Did you believe at the time the Fifth Third loan was in effect that the Sosna

entities were mismanaging operations in any way?
A. I didn't know.
Q. So the refinancing with Huntington closed at the end of November of 2018, correct?
A. November 30th, 2018.
Q. And as a result of that closing, you were paid over $900,000, correct?
A. No.
Q. Okay. Were you -- was there ever a swap breakage on the Fifth Third loan?
A. Yes.
Q. Was -- were the borrowing entities and the money as a result of that swap breakage?
A. As two owners, yes.
Q. And then were you paid a portion of the payment from Fifth Third connected to that swap breakage?
A. It was a portion was paid to us and a portion was kept by Huntington.
Q. And $900,000 was paid to you, correct?
A. No.

Q. How much was paid to you?
A. I don't remember but it wasn't 900.
Q. Okay. So in paragraph 31 you refer to yourself as passive investor in the businesses. What do you mean by that?
A. What line?
Q. Paragraph 31, the first line.
A. The first line, I agree.
Q. Right. I'm just trying to figure out what you mean by passive investor. What does that mean to you?
A. It means that Sosna and Huntington collectively managed this new account or this new loan and I relied on the two of them.
Q. That's what passive investor means to you?
A. Passive investor means that you're not doing the day-to-day.
Q. Okay. And it's the day-to-day management?
A. Day-to-day activities, yes.
Q. Okay. And in this paragraph you note that all bank accounts were controlled

as a practical matter by Sosna.
Why in your view was that the case?
MR. CUMMINS: Objection as to form.
A. You asked two questions. Can I answer them one at a time?
Q. Sure.
THE WITNESS: Can you repeat the questions, please?
(Record read by Reporter.)
THE WITNESS: Yes.
BY MR. SCHUELLER:
Q. My question is why did you believe that Sosna controlled the bank accounts?
A. That was his responsibility.
Q. Okay. Anything else?
A. Nope.
Q. Did you have any personal responsibility with the bank accounts?
A. No.
Q. Now, if you were a member of the board of directors of the entities you co-owned, so if you were, do you think you

had any responsibility to monitor the day-to-day operations of the entities you co-owned with Sosna?
A. No.
Q. What, in your view, if you were a director of these entities, what in your view would have been your responsibilities as a director?
A. To learn about the business and to receive the tax returns at the end of the year.
Q. Anything else?
A. Not that I can think of.
Q. Do you think that as a shareholder you had a right to review the bank statements of the entities you co-owned with Sosna?
MR. CUMMINS: Objection. Could you repeat -- can I have that question reread, please?
(Record read by Reporter.)
THE WITNESS: I'm not sure what you mean by right.
BY MR. SCHUELLER:
Q. Now in this paragraph you allege

that Sosna and Huntington participated in a check-kiting and fee scheme; is that accurate?
A. What line is that?
Q. Five into six.
MR. CUMMINS: Of what paragraph?
A. Of what paragraph?
Q. Paragraph 31.
A. Oh.
Q. We're still on paragraph 31.
A. So fifth line.
MR. CUMMINS: I think -- I think you may have misread --
A. The scheme resulting in tens of millions of dollars in losses to plaintiff, and third-party banks left holding the bag. Is that what you're asking me?
Q. Here, I'll back up. So there's a sentence there that says, Many months after the above guaranty agreement was executed, and completely without Mr. Schneider's knowledge, Mr. Sosna, using bank accounts in Sosna's name, the names of the Sosna facilities, and the names of the businesses participated in an elaborate check-kiting and

fee generation scheme with Huntington as detailed more fully below. Is that an accurate statement?
A. Very much so.
Q. What is check-kiting?
A. It's a form of lending that the bank gives to the person writing the checks.
Q. Is it illegal?
A. Well, it's a loan with no money behind it, so I guess it's illegal.
Q. Okay. And the checks here were kited through the bank deposit accounts of the entities co-owned by you and Mr. Sosna?
A. There were lots of them, so I can only say the part that I knew of.
Q. Well, again, my question is, were the checks here that were kited through the bank deposit accounts of the entities co-owned by you and Sosna?
A. What do you mean by "here"?
Q. In this Complaint you're referring to checks that were kited, correct?
A. There was kiting going on at five banks: Huntington, First Financial, S&T, Fifth Third, and later GE. They were

kiting, as I found out, in 2021.
Q. And so my question is, were those kited checks through the bank deposit accounts of entities co-owned by you and Sosna?
A. What I discovered later on, yes.
Q. Okay. Do you know the total amount of checks that were kited through the bank deposit account of entities co-owned by you and Sosna?
A. It was billions of dollars of kiting. Huntington did $209 million of kiting. Fifth Third did $550,000 -- $550 million, and First Financial Bank did $950 million. Do want to know the total?
Q. Sure.
A. 2.2 billion dollars that floated through five institutions.
Q. When did the check-kiting through the Huntington accounts stop?
A. I don't know.
Q. When did the check-kiting scheme collapse?
A. I guess when he got arrested by the FBI.

Q. Were any checks being kited through the Huntington accounts at the time the check kite scheme collapsed?
A. Yes.
Q. How much?
A. I don't know.
Q. Are you aware of any evidence that suggests that when the kite collapsed, checks were being kited through Huntington accounts?
A. I don't know.
Q. Now, you started to read a portion of paragraph 31, which talks about third-party banks being left, you know, quote, holding the empty bag.
Are you trying to recover in this litigation any damages on behalf of these third-party banks?
A. Nope.
Q. Okay. What is the fee generation scheme that you refer to in paragraph 31?
A. That the banks that kited with the criminal allowed the kiting to go on and got paid for floats, fees for overdrafts, and

all the other expenses that they collected during the kiting scheme.
Q. How much was paid on floats?
A. I have no idea. I wasn't involved.
Q. Are you aware of any evidence of the bank being paid on floats?
A. I think due diligence will show that.
Q. But I'm just asking, are you aware of any evidence?
A. Yes.
Q. Okay. What is that evidence?
A. What I will show in due diligence.
Q. No. But I'm asking you, what is that evidence? Do you have it now?
A. I didn't bring it with me, no.
Q. Okay. But is it in your possession at someplace?
A. Somebody has it.
Q. Somebody has it. Did you have it at the time you filed this Complaint?
A. No.
Q. What about the overdraft

expenses, how much was paid?
A. Doesn't matter. It was paid, but that's -- that's the crime.
Q. But what was the amount?
A. I don't know.
Q. Did you know what it was at the time you filed the Complaint?
A. I knew there was something there.
Q. What was your basis for that conclusion; what evidence?
A. What I read in the paper.
Q. So there was a news article that said Huntington was being paid for overdraft expenses?
A. No. There was a lawsuit that one of your syndicate banks was involved that identified $238,000 for one month's worth of overdraft fees and Huntington -- I did not have specifics because we've been trying to get due diligence.
Q. So $238,000 in overdraft fees were paid to whom?
A. First Financial Bank.
Q. Was Huntington paid any of those

fees?
A. They were separate with Huntington.
Q. Okay. That's what I'm trying to get at. What were the overdraft fees that you claim were paid to Huntington?
A. I don't know.
Q. Is it your view that Huntington's participation in the check-kiting scheme was intentional?
A. As time has gone by, I'd call that a blind's (sic) eye to what was going on.
Q. What do you mean by that?
A. I mean, they were aware of it and never stopped it.
Q. And what is your basis for saying that Huntington was aware of a check-kiting scheme and failed to stop it?
A. They were aware of the default in the first quarter, second quarter, all the way through the loan. And when they discovered the kiting in August, they never shut it down.
Q. Why do you believe the kiting

started in August?
A. Because of the due diligence I've received or I read.
Q. And this is August of 2019?
A. Yes.
Q. And what evidence are you basing this allegation on?
A. E-mails.
Q. All right. What -- what e-mails?
A. E-mails that I've seen.
Q. Okay. Who sent the e-mails and who received the e-mails?
A. I don't know right now.
Q. Now, Sosna himself said the check-kiting started in October of 2019, but you're saying it started in August of 2019?
A. I believe the bank was aware of it and what -- what Sosna says I can't trust.
Q. And what about these e-mails, do you recall, like what was said that caused you to believe Huntington knew a check-kiting scheme was underway?
A. I believe the amount of bankers that got involved.

Q. Okay. Anything else?
A. I don't have it right now.
Q. Would you agree with me that anyone knowingly participating in a check fraud kiting scheme has committed a crime?
A. Yes.
Q. So is it your position that Huntington committed a crime?
A. I believe a crime was committed.
Q. By Huntington?
A. I'm not saying that.
Q. How about the other defendants, the Huntington employees, is it your position they committed a crime?
A. I believe a crime was committed.
Q. Did they commit the crime?
A. Time will tell.
Q. But you don't know as you sit here today?
A. I'm not a lawyer.
Q. To your knowledge, have Huntington or its employees ever been charged by the government for a crime in connection with the Sosna check-kiting scheme?
A. I'm not allowed to know that.

Q. Do you have any other evidence that you're aware of that shows Huntington intentionally participated in the check-kiting scheme and fee scheme?
A. I just know how long it was going on.
Q. So no other evidence?
A. I didn't bring any paperwork with me.
Q. But you can't recall any as you sit here today?
A. All I know is that there was ongoing for a long time.
Q. Any other evidence?
A. No. All I got is the paperwork in front of me.
Q. All right. You sued Garrett Vetter in this case, correct?
A. Yes.
Q. What was Garrett Vetter's job duties at the bank?
A. I don't know until I got the due diligence and read some of the documents, but he was involved with the financial decisions of the bank.

Q. And how did Garrett Vetter intentionally participate in the check-kiting and fee scheme?
A. I think it's in his deposition.
Q. What's in his deposition?
A. The information you're asking.
Q. But can you articulate for me today how Garrett Vetter intentionally participated in the check-kiting and fee scheme?
A. I apologize but there have been 25 deposition on the Huntington Bank. I can't remember every single one of them.
Q. In your view, did Garrett Vetter collude with Sosna to implement the check-kiting and fee scheme?
A. I believe there was a blind's eye going on.
Q. Did Garrett Vetter collude with Sosna?
A. I think there was a large member of Huntington Bank's employees that took a blind's eye to what was going on.
Q. Well, I'm talking about one bank employee, Garrett Vetter, who you've accused

of committing a bank crime.
And so I would like to know if you believe Garrett Vetter colluded with Sosna?
A. Do you have his deposition? I can read it and tell you that. I never talked to Mr. Vetter. Mr. Vetter never talked to me.
Q. Do you know, as you sit here today, whether Sosna colluded with Garrett Vetter in any way?
A. From my understanding, Huntington Bank colluded to allow kiting to go on an extraordinary amount of time. He just happened to be part of the employees within the bank.
Q. Right. But you sued him, and I want to know why you sued him. Why did you use him?
A. Because it was an enterprise inside of Huntington that colluded to allow kiting to go on for an extraordinary amount of time.
Q. Why did you sue Garrett Vetter?
A. Because he was a group of the

enterprise that was involved in the kiting scheme.

Q. Well, how was he involved?

A. If I could read his deposition, I would give you the specifics.

Q. But you have no other answer to that?

A. That's a good enough answer that I can give you at this point in time.

Q. How about Amy Becker, how did she intentionally participate in the check-kiting and fee scheme?

A. She brought Mr. Sosna in. She was responsible as the portfolio manager and knew about it and passed it off to other employees in the bank.

Q. So you're saying Amy Becker knew about the check-kiting?

A. At some point, yes.

Q. When?

A. Sometime during '19.

Q. Okay. What your basis for that conclusion?

A. Some of the due diligence that was forwarded in the depositions that I read.

Q. When you filed this Complaint, did you have any evidence that Amy Becker intentionally participated in a check-kiting scheme?

A. When I knew there was a check-kiting scheme, she was the person that brought him in would know the most. Never spoke to me, so she knew what was going on.

Q. But what is your basis for concluding she knew there was a check-kiting scheme in 2019?

A. Once the due diligence was given to us, it's in her deposition.

Q. So you didn't have it at the time you filed the Complaint?

A. I didn't know about the crime until I had to get the evidence or my lawyers got the evidence. A crime was committed without me knowing.

And if that crime was being committed, it was done within the bank. And when I -- when we had the time to go look at the evidence, that's what we have.

Q. Did Amy Becker have any conversations with Sosna that you're aware

of --
A. Yes.
Q. -- to implement the check-kiting and fee scheme?
A. She had understanding of Sosna. I can't point that kiting words came out of her mouth.
Q. Did Amy Becker have conversations with other bank employees to strategize on how to implement the check-kiting and fee scheme?
A. I believe so.
Q. Okay. And when did that happen, and what is your evidence of that?
A. It happened in '19 and there's plenty of evidence.
Q. What is that evidence?
A. It's all in the depositions.
Q. Did you have that evidence when you filed the Complaint?
A. I knew there was an enterprise going on and it had to be from the beginning to the end.
Q. But did you know specifically that Amy Becker was part of that enterprise?

A. She would know. She knew Mr. Sosna. She brought him into the bank. Her job was to keep an eye on him.
Q. How about Suzanne Meyers, why did you sue her?
A. Part of the enterprise.
Q. What did she specifically do as part of the enterprise?
A. If you give me her deposition, I'll tell you.
Q. You can't give a different response than that today?
A. Today I'm telling you what my response is. If I have the deposition, I'll give you the specifics.
Q. Is there any other source of evidence other than her deposition for her involvement in the enterprise?
A. All the other depositions.
Q. Okay. Is there any other source?
A. That's to be determined.
Q. Okay. What was Suzanne Meyers' job duties at the bank?
A. I don't recall.

Q. How did Suzanne Meyers intentionally participate in the check-kiting and fee scheme?
A. She took a blind's eye along the rest of the enterprise.
Q. What's your evidentiary basis for that?
A. The deposition.
Q. What in the deposition?
A. If you give me the deposition, I'll give you the specifics.
Q. Okay. Did Suzanne Meyers collude with Sosna to implement the check-kiting and fee scheme.
A. I believe the blind's eye was enough to collude.
Q. Do you have any evidence that she had a quote, blind's eye?
A. Yes.
Q. What is the evidence?
A. The deposition.
Q. Were there conversations between Suzanne Meyers and Sosna to strategize on how to implement the check-kiting and fee scheme?
A. I wasn't there. I wouldn't

know.
Q. Was the coordination between Suzanne Meyers and Sosna to implement the check-kiting and fee scheme?
A. I wasn't there.
Q. Did Suzanne Meyers collude with other bank employees to implement the check-kiting and fee scheme?
A. That will be determined.
Q. Were there conversations between Suzanne Meyers and other bank employees to strategize on how to implement the check-kiting and fee scheme?
A. That will be determined.
Q. Was there coordination between Suzanne Meyers and any other bank employee to implement the check-kiting and fee scheme?
A. I believe you'll find that in the depositions.
Q. Do you have any other response to that?
A. I'm telling you what I know.
Q. What evidence exists to show that Suzanne Meyers intentionally participated in the check-kiting and fee

scheme?
A. For the length and how long it took and who was involved.
Q. Any other evidence?
A. I just needed evidence.
Q. Okay. I just asked if there was anything else?
A. Once you commit a murder, you're a murderer. It doesn't matter how many times you commit murder. You're still a murderer.
Q. Okay. How was Suzanne the murderer here; what specifically did she do?
A. She was part of the enterprise.
Q. How?
A. Give me the deposition.
Q. But you can't answer it today, can you?
A. I don't need to. I don't have it. You didn't give me the deposition. I can't -- you're trying to put me in a corner that I'm not involved.
Q. Well, you sued 12 people accusing them of a crime, I would hope you would have that information with you today.
MR. CUMMINS: Objection. Ask

him a question --
THE WITNESS: Yeah. That's --
MR. CUMMINS: -- don't yell at him. Okay.
THE WITNESS: Totally inappropriate.
MR. CUMMINS: Wait.
MR. SCHUELLER: I withdraw that.
MR. CUMMINS: Excuse me, I'll do the objections.
THE WITNESS: Yeah, sorry about that.
BY MR. SCHUELLER:
Q. What was the duties of Troy Jones at the bank?
A. I learned that he was part of the syndicate.
Q. How did Troy Jones intentionally participate in the check-kiting and fee scheme?
A. He was part of the enterprise.
Q. How?
A. Took a blind's eye.
Q. How?
A. Well, close your eyes, you're

blind.
Q. What evidence do you have to support --
A. The depositions.
Q. Anything else?
A. That's what I have to say today.
Q. Did Troy Jones collude with Sosna to implement the check-kiting and fee scheme?
A. I don't know.
Q. Were there conversations between Troy Jones and Sosna to strategize on how to implement the check-kiting and fee scheme?
A. I wasn't there. I wouldn't know.
Q. Was there coordination between Troy Jones and Sosna to implement the check-kiting and fee scheme?
A. I think he was the communicator of the syndicate.
Q. The question was, was there coordination between Troy Jones and Sosna to implement the check-kiting and fee scheme?
A. I wasn't there at the time.
Q. Did Troy Jones collude with

other bank employees to implement the check-kiting and fee scheme?
A. I wasn't there.
Q. Were there conversations between Troy Jones and other bank employees to strategize on how to implement the check-kiting and fee scheme?
A. I'm not one of the employees, so I wouldn't know.
Q. Was the coordination between Troy Jones and any other bank employee to implement the check-kiting and fee scheme?
A. I wasn't there.
Q. What evidences exists to show that Troy Jones intentionally participated in the check-kiting and fee scheme?
A. I wasn't there.
Q. What was the duties of Dave Emig at the bank?
A. I'm not sure.
Q. How did Dave Emig intentionally participate in the check-kiting and fee scheme?
A. I believe he was part of the enterprise.

Q. How?
A. I don't have it. I think there was a deposition.
Q. Did Dave Emig collude with Sosna to implement the check-kiting and fee scheme?
A. I wasn't there.
Q. Were there conversations between Dave Emig and Sosna to strategize on how to implement the check-kiting and fee scheme?
A. I wasn't there.
Q. Was there coordination between Dave Emig and Sosna to implement the check-kiting and fee scheme?
A. Again, I wasn't there.
Q. Did Dave Emig collude with other bank employees to implement the check-kiting and fee scheme?
A. Again, I wasn't there.
Q. Were there conversations between Dave Emig and the other bank employees to strategize on how to implement the check-kiting and fee scheme?
A. Again, I wasn't there.
Q. Was there coordination between Dave Emig and any other bank employee to

implement the check-kiting and fee scheme?
A. I wasn't there.
Q. What evidence exists to show that Dave Emig intentionally participated in the check-kiting and fee scheme?
A. I wasn't there.
Q. What were the duties of Mike Viren at the bank?
A. I don't know.
Q. How did Mike Viren intentionally participate in the check-kiting and fee scheme?
A. I don't know.
Q. Did Mike Viren collude with Sosna to implement the check-kiting and fee scheme?
A. I wasn't there.
Q. Were there conversations between Mike Viren and Sosna to strategize on how to implement the check-kiting the fee scheme?
A. I wasn't there.
Q. Was there coordination between Mike Viren and Sosna to implement the check-kiting and fee scheme?
A. I wasn't there.

Q. Did Mike Viren collude with other bank employees to implement the check-kiting and fee scheme?

A. I wasn't there.

Q. Were there conversations between Mike Viren and the other bank employees to strategize on how to implement the check-kiting and fee scheme?

A. Again, I wasn't there.

Q. Was there coordination between Mike Viren and any other bank employee to implement the check-kiting and fee scheme?

A. I wasn't there.

Q. What evidence exists to show that Mike Viren intentionally participated in the check-kiting and fee scheme?

A. I don't have it. It's in the deposition.

Q. What were the duties of Dave Wechter at the bank?

A. I learned later he was the asset recovery guy.

Q. How did Dave Wechter intentionally participate in the check-kiting and fee scheme?

A. He was brought as soon as they all discovered it.
Q. And how did he intentionally participate in the check-kiting and fee scheme?
A. He took over the loan.
Q. And what did he do as part of the enterprise?
A. He was the asset recovery guy.
Q. But how did he advance the enterprise of the check-kiting?
A. I don't know. I don't run the bank, I don't know.
Q. Did Dave Wechter collude with Sosna to implement the check-kiting and fee scheme?
A. I don't know.
Q. Were there conversations between Dave Wechter and Sosna to strategize on how to implement the check-kiting and fee scheme?
A. I wasn't there.
Q. Was there coordination between Dave Wechter and Sosna to implement the check-kiting and fee scheme?
A. I wasn't there.

Q. Did Dave Wechter collude with other bank employees to implement the check-kiting and fee scheme?
A. I believe he was part of the enterprise.
Q. How so?
A. An enterprise is made up of several folks and they all knew about it.
Q. And how did Dave Wechter collude with other bank employees?
A. I don't think he was totally independent.
Q. Independent of what?
A. Doing things by himself.
Q. Do you have any evidence that Dave Wechter colluded with other bank employees to implement the check-kiting and fee scheme?
A. It's in the depositions.
Q. Any other response?
A. I don't need anymore.
Q. Were there conversations between Dave Wechter and the other bank employees to strategize on how to implement the check-kiting and fee scheme?

A. Yes.
Q. When did these conversations take place?
A. I understood it started in -- in August.
Q. And how many conversations were there?
A. I wasn't there.
Q. What was said during these conversations?
A. I wasn't there.
Q. Well, then how do you know there were conversations between Dave Wechter and other bank employees?
A. From the depositions of the employees.
Q. So the depositions of the other employees provided evidence that Wechter strategized on how to implement the check-kiting and fee scheme?
A. If the depositions are accurate, yes.
Q. But you can't recite any of those specific facts here today?
A. They're hard evidence. They're

in another place. I don't know where they're at.

Q. Was there any coordination between Dave Wechter and the other bank employees to implement the check-kiting and fee scheme?

A. I wasn't there.

Q. What evidence exists to show that Dave Wechter intentionally participated in the check-kiting and fee scheme?

A. It's in the depositions.

Q. All right. Maybe we can try and do these in bulk. There's one, two, three, four, five left.

So I'm gonna talk about James R. Gentry, Angie Quattrone, Maria Steiner, Marina Krivenko, and Chris Hoffmann. And I'm guessing the responses will be the same for all of them, but if I'm wrong, just please let me know. Okay?

A. They're gonna be wrong, but go ahead.

Q. Okay. I mean, I can go through each one individually?

MR. CUMMINS: Why don't we try

it in your way by group.
MR. SCHUELLER: Okay.
MR. CUMMINS: And if it doesn't work, we're just happy to sit here and let you go through five.
MR. SCHUELLER: Very good.
BY MR. SCHUELLER:
Q. So I'm gonna refer to these five employees as the Gentry Group. Okay. So, again, we've got James Gentry, Angie Quattrone, Maria Steiner, Marina Krivenko, Chris Hoffmann. Are you with me so far?
A. Yeah.
Q. Okay. That's the Gentry Group. How did the Gentry Group intentionally participate in the check-kiting and fee scheme?
MR. CUMMINS: I'm gonna object to the question.
MR. SCHUELLER: Okay. Fine.
MR. CUMMINS: That doesn't work. I'm sorry.
MR. SCHUELLER: That's fine. That's fine.

MR. CUMMINS: You're gonna have to go through them one at a time.
MR. SCHUELLER: Yeah, that's fine.
MR. CUMMINS: Because they're not -- it will take forever to do it your way. It will take slightly less than forever to do it the way you want to do it. I'm gonna go with you.
MR. SCHUELLER: Very good.
MR. CUMMINS: So you'll have to do it one at a time. He'll ask you the questions. Okay?
THE WITNESS: That's fine because one no or yes affects all of them.
MR. SCHUELLER: Yeah, you're right. You're right. I'm done with that.
BY MR. SCHUELLER:
Q. All righty. What were the duties of James Gentry at the bank?
A. He had some financial duties.
Q. And he --
A. He was the auditor for the bank.
Q. Okay. How did James Gentry intentionally participate in the check-kiting

and fee scheme?
A. He discovered the default of the loan in the first quarter, second quarter, and it never left that particular loan.
Q. And that's your evidence that he participated in the check-kiting and fee scheme?
A. No. You asked me what his job was and I told you.
Q. No. I asked you how did James Gentry intentionally participate in the check-kiting and fee scheme?
A. He was part of the enterprise.
Q. How?
A. Once they understood about the default, there were members of the enterprise that learned, and he was the auditor internally for the bank.
Q. When did James Gentry learn about the check-kiting?
A. I presume when everybody else did.
Q. When was that?
A. Sometime in August.
Q. And you presume that, but do you

have any evidence specifically that James Gentry was aware of the check-kiting in August of 2019?

A. I think if we go to the depositions, which I don't have in front of me.

Q. Do you have any other evidence as you sit here today?

A. I don't need anything else.

Q. Did James Gentry collude with Sosna to implement the check-kiting and fee scheme?

A. I don't know.

Q. Were there conversations between James Gentry and Sosna to strategize on how to implement the check-kiting --

A. I wasn't there.

Q. -- and fee scheme?

A. I don't know.

Q. Was there coordination between James Gentry and Sosna to implement the check --

A. I wasn't there.

MR. CUMMINS: Wait. You're -- let him finish his question because you're --

THE WITNESS: Oh, I'm sorry.
MR. CUMMINS: You're anticipating --
THE WITNESS: Well, he's got five people he's got to go through.
BY MR. SCHUELLER:
Q. So was there coordination between James Gentry and Sosna to implement the check-kiting and fee scheme?
A. I don't know.
Q. Did James Gentry collude with other bank employees to implement the check-kiting and fee scheme?
A. I wasn't there.
Q. Were there conversations between James Gentry and other bank employees to strategize on how to implement the check-kiting and fee scheme?
A. I wasn't there.
Q. Was there -- or, strike that.
What evidence exists to show that James Gentry intentionally participated in the check-kiting and fee scheme?
A. I wasn't there.
Q. What were the duties of

Angie Quattrone at the bank?
A. I'm not sure.
Q. If I told you she was an administrative assistant, would that help refresh your recollection?
A. I didn't know her. I wasn't there.
Q. Do you think that an administrative assistant or secretary could have participated in the check-kiting and fee scheme?
A. As an enterprise, yes.
Q. How did Angie Quattrone intentionally participate in the check-kiting and fee scheme?
A. As I said, I wasn't there, and they were all part of the enterprise.
Q. How was she?
A. She was involved in the loan.
Q. How?
A. I don't know.
Q. Did Angie Quattrone collude with Sosna to implement the check-kiting and fee scheme?
A. I don't know. I wasn't there.

Q. Were there conversations between Angie Quattrone and Sosna to strategize on how to implement the check-kiting and fee scheme?
A. I wasn't there.
Q. Was there coordination between Angie Quattrone and Sosna to implement the check-kiting and --
A. I wasn't there.
Q. -- fee scheme?
MR. CUMMINS: Let him finish his question because the court reporter --
THE WITNESS: Oh, I'm sorry.
MR. CUMMINS: -- can't do two at once.
THE WITNESS: Put ditto.
BY MR. SCHUELLER:
Q. Did Angie Quattrone collude with other bank employees to implement the check-kiting and fee scheme?
A. I don't know.
Q. Were there conversations between Angie Quattrone and the other bank employees to strategize on how to implement the check-kiting and fee scheme?

A. I wasn't there.
Q. Was there coordination between Angie Quattrone and any other bank employee to implement the check-kiting and fee scheme?
A. I don't know.
Q. What evidence exists to show that Angie Quattrone intentionally participated in the check-kiting and fee scheme?
A. I wasn't there.
Q. What were the duties of Marie --
MS. NEAL: Maria.
Q. -- Maria Steiner at the bank?
A. I don't remember.
Q. How did Maria Steiner intentionally participate in the check-kiting and fee scheme?
A. I think she was an executive in the loan.
Q. And how did she intentionally participate in the check-kiting and fee scheme?
A. I wasn't there.
Q. Did Maria Steiner collude with Sosna to implement the check-kiting and fee

scheme?
A. Again, I wasn't there.
Q. Were there conversations between Maria Steiner and Sosna to strategize on how to implement the check-kiting and fee scheme?
A. I wasn't there.
Q. Was there coordination between Maria Steiner and Sosna to implement the check-kiting and fee scheme?
A. I wasn't there.
Q. Did Maria Steiner collude with other bank employees to implement the check-kiting and fee scheme?
A. Again, I wasn't there.
Q. Were there conversations between Maria Steiner and the other bank employees to strategize on how to implement the check-kiting and fee scheme?
A. I don't -- I wasn't there.
Q. Was there coordination between Maria Steiner and any other bank employee to implement the check-kiting and fee scheme?
A. I wasn't there.
Q. What evidence exists to show that Maria Steiner intentionally participated

in the check-kiting and fee scheme?
A. The depositions.
Q. Anything else?
A. She was part of the loan.
Q. How so?
A. I don't remember what her title was, but she was an executive.
Q. And how did she participate in the scheme?
A. I wasn't there.
Q. So you don't know?
A. I wasn't there. You don't have to be there if there's an enterprise.
Q. What were the duties of Chris Hoffmann at the bank?
A. I can't remember.
Q. How did Chris Hoffmann intentionally participate in the check-kiting and fee scheme?
A. I believe he was part of the loan.
Q. Did Chris Hoffmann collude with Sosna to implement the check-kiting and fee scheme?
A. I wasn't there.

Q. Were there conversations between Chris Hoffmann and Sosna to strategize on how to implement the check-kiting and fee scheme?
A. Again, I wasn't there.
Q. Was there coordination between Chris Hoffmann and Sosna to implement the check-kiting and fee scheme?
A. Again, I wasn't there.
Q. Did Chris Hoffmann collude with other bank employees to implement the check-kiting and fee scheme?
A. Again, I wasn't there.
Q. Were there conversations between Chris Hoffmann and other bank employees to strategize on how to implement check-kiting and fee scheme?
A. I wasn't there.
Q. Was there coordination between Chris Hoffmann and any other bank employee to implement the check-kiting and fee scheme?
A. I wasn't there.
Q. What evidence exists to show that Chris Hoffmann intentionally participated in the check-kiting and fee scheme?

A. The deposition.
Q. Anything else?
A. Not at this point in time.
Q. Can you point to any specific facts in the depositions?
A. I don't have them in front of me.
Q. So the answer is no?
A. The answer is the answer I gave you, which I don't have something to look at and point to.
Q. In paragraph 33 the first sentence says, Sosna's financial condition became more and more dire. Short on cash, he resorted to a check-kiting scheme in October of 2019.
Do you see that sentence there in paragraph 32?
A. I do.
Q. Is that a true and accurate statement?
A. I will --
MR. CUMMINS: Which paragraph are you reading?
MR. SCHUELLER: 33.

A. From what I've read since this all ended, yes.

Q. All right. So the check-kiting started in October of 2019, not August of 2019?

A. I saw evidence that the bank got involved in money movement in August.

Q. But my question is, did the check-kiting start in October of 2019 or August of 2019?

A. I'm not a lawyer, and I'm not a judge. I just know that what I've seen, evidence inside the bank was in August.

Q. Well, your own Complaint says he resorted to a check-kiting scheme in October of 2019; is that accurate or not?

A. This was filed, I needed to get depositions, my lawyers did. And since then, I can tell you what I've seen. This was filed with what I knew at the time, which is what Harold said he said to the bank and to the judge.

So all I gave you is what I heard. And I had to go out and get evidence through my lawyers, and that's what I'm

telling you.
Q. And you believe the check-kiting started in August of 2019?
A. I believe it started in 2019.
Q. In August of 2019?
A. I believe that there were evidence in the bank that they saw money moving improperly.
Q. In August of 2019?
A. That's what I just said; didn't I? August of 2019.
Q. Right. Did any check-kiting take place prior to August of 2019 in your view?
A. I believe so.
Q. Well, what evidence do you have of that?
A. When the CPA warned Huntington Bank prior to the loan, he already had checks that were insufficient funds.
Q. That's not a check-kite, though?
A. Well, when they warned you not to do the loan and put together a reserve and nothing was done, it began the kiting because -- I wasn't there, but if he didn't have

money and the banks warn not to do this loan without a reserve and then you gave them an extra million dollars, I believe that's when it started. The crime that we're talking about started in August of '19.

Q. Okay. But --

MR. CUMMINS: I'm sorry to interrupt. Could you read the question that was just answered?

(Record read by Reporter.)

MR. CUMMINS: Did you complete your answer?

THE WITNESS: For right now, yes.

MR. CUMMINS: You don't -- you don't have to give more.

THE WITNESS: No, for right now --

MR. CUMMINS: I just wanted to know if it was complete.

THE WITNESS: No, I tried to answer what I knew.

MR. CUMMINS: Okay. Okay.

BY MR. SCHUELLER:

Q. All right. Do you know how many

checks were kited through the Huntington deposit accounts in August of 2019?
A. I don't know the number that went through Huntington, but I do have a sheet that could count them.
Q. Okay. But you can't provide that information today without looking at that sheet?
A. Well, the kiting scheme that I was able to see had 3,300 checks in the kiting scheme.
Q. And what is this sheet that you were referring to?
A. Evidence from whatever size those books were that were given.
Q. And it was on one sheet?
A. No. I created one sheet just so I could figure it out.
Q. Okay. When did you create that sheet?
A. Probably five, six months ago.
Q. Now, on paragraph 34 of the Complaint you refer to exorbitant fees charged for the float. What was the amount of the exorbitant fees?

A. I don't know.
Q. Now, in paragraph 35, you state that there was dramatic change in account activity. What is that dramatic change?
A. He used to have maybe a hundred, $200,000 in his checking accounts, and somehow or another it got up to $22 million.
And the business only did five million a year for all of it, so it went from a hundred thousand to multitudes of millions.
Q. And when you say the business only did $5 million a year, what business are you referring to?
A. The nursing homes we're talking about.
Q. The ones you co-owned with Sosna?
A. The ones I co-owned.
Q. Any others?
A. Once the receiver was involved, I coordinated that number from there.
Q. No. I'm just saying you said that the business only did five million a year, I'm just trying to confirm what business you're talking about.

Are you only talking about the entities you co-owned with Sosna?
A. No. It was the entities I co-owned and the entities that he owned.
Q. Okay. And when you said they did five million a year, what do you mean did five million a year?
A. When I looked at the receiver after all the stuff happened, it averaged between five and five and a half million dollars a month.
Q. In gross revenues?
A. In revenues.
Q. Gross?
A. Gross revenues.
Q. Okay. So roughly 60 million a year in gross revenues?
A. Give or take.
Q. Okay. And you're saying for that business Sosna typically had $200,000 in his deposit accounts for all those entities?
A. No. You asked a question, I was trying to answer that question. The average accounts were a hundred, $200,000 on an average. And then you asked did it -- did

you see something grow? And I said, yes, it grew to the point where there were tens -- tens of millions of dollars in deposits in the account.

Q. And so the hundred to 200,000, is that for all the businesses or a portion of the businesses, or what -- what are you referring to there?

A. I don't remember. I don't have the paperwork in front of me.

Q. So in all these businesses, did the amount on deposit never exceed $200,000?

A. No, I didn't say that. I said they averaged.

Q. Okay.

A. Meaning that money goes in, money goes out.

Q. Okay.

A. So you add up 30 days and you get an average.

Q. All right. And then you're saying that there's a dramatic change in that. When did that dramatic change take place?

A. The end of '19.

Q. And when you say end, what do you mean end?
A. The latter part.
Q. So like December?
A. Ahh, probably a little before that.
Q. November to December?
A. I don't know the exact date.
Q. I'm just trying to figure out what you mean by end. So you mean --
A. The last four months. How's that?
Q. The last four months. And when you're talking about the amount on deposit, are you talking about the amount on deposit with Huntington or with other lenders as well?
A. Huntington, and then I discovered others, too.
Q. So collectively with all these banks?
A. No, just Huntington.
Q. Just Huntington it was 200,000 on average --
A. Yeah.

Q. -- in your review? Okay.
And you didn't know that at the time, but it was after the receivership that you learned this; is that right?
A. Correct.
Q. Okay. In paragraph 39, you state that Huntington wanted to do all it could to keep the entire loan/kiting/fee-generation operation from collapsing.
Do you have a view as to why you think Huntington wanted to perpetuate that crime?
A. Only that the loan was in default in the first part a month after it was in place. And when the kiting came, they never shut it down.
Q. Do you have any other view as to why the bank might be motivated to commit such a widespread crime?
A. To avoid a downgrade.
Q. Okay. Now, loans go in default all the time at Huntington. Was there something unique about this loan that would cause 12 people to commit bank fraud?
A. Oh, I think there was an

enterprise, and I think that the bank worked in silos, and nobody took care of it.

Q. No. But my question is, was there something in your view that made this loan so unique that it motivated all these 12 people to commit a bank crime?

A. I'll repeat my answer. In the enterprise, they operated in silos and no one told each other the problems that were going on and that's why they kept it going.

Q. Right. But I'm trying to see if you have a view as to why -- what their motivation was?

A. I believe it was the same answer again. It was an enterprise. They knew about the default and people didn't take care of the problems and it got into kiting and the kiting was another problem and it was leading to a downgrade, and they held on as long as they could.

Q. Well, like -- okay. Let's just talk about Garrett Vetter. Do you have a view as to what his motivation could have been for risking going to prison over this check-kiting?

A. Outside of the prison, it was all fee-generated bonuses.
Q. So he wanted the bonuses and he was willing to commit a crime to get those bonuses; is that your testimony?
A. No. My testimony is this whole thing was fee-generated. And the other half of your question I have no answer for.
Q. Yeah. So I'm just trying to figure out like what could possibly motivate 12 people to commit bank fraud on a massive scale, and I'm just wondering if you have any evidence as to their motivations. Do you?
A. If you're asking me a question, I'll give you my answer.
Q. I just did, so please give it to me.
A. So the bank worked in silos. The bankers knew about the problems and they didn't do anything about it. They earned fees, bonuses, and everything like that, and they didn't talk to each other.
So when they didn't talk to each other, the crime just kept on going on and on until someone saw a downgrade to Huntington

Bank, they decided to get it -- kick them out of the bank.
Q. Okay. And so is it your testimony that it was a financial motivation?
A. Absolutely.
Q. Okay. And the financial motivation was to earn fees?
A. Yes.
Q. And what else?
A. Bonuses.
Q. And bonuses?
A. Yes.
Q. Okay. Anything else?
A. Silence is golden.
Q. Okay. What fees and bonuses did Garrett Vetter receive from the scheme?
A. I don't know his, but everything was put in a pool, and then they got their bonuses with their bosses telling them what they would get at the end of the year.
Q. How much was put into a pool?
A. I think Huntington hasn't shared that yet with us.
Q. Okay. Well, then how do you know there was a financial motivation here if

you don't have the information?
A. I have it in the depositions. And it worked all the way up the ladder.
Q. All right. So what -- what bonuses and fees did Garrett Vetter receive? He was -- he was already deposed.
A. I know several people that got bonuses. In a default loan, you don't get bonuses. And when you got crimes being committed, you don't get bonuses and there were bonuses given.
Q. Okay. But what did Garrett Vetter receive --
MR. CUMMINS: Objection.
Q. -- as a bonus?
A. I don't have the depositions, so I can't answer that.
Q. Okay. What did Amy Becker receive as a bonus?
THE WITNESS: Can I say?
MR. CUMMINS: I think you've heard this more than once that he's testified if you have the depositions and the exhibits, he can answer that question accurately.
So the implication is the

evidence appears from his testimony, my view, to be in the depositions, which you haven't presented to him. That's what I think he's trying to say, but you can ask any question you want to clarify that, but I think that's what he's trying to say.

MR. SCHUELLER: Okay.

BY MR. SCHUELLER:

Q. What bonuses did Amy Becker receive as a result of the check-kiting scheme?

A. She was involved in this loan for nine months and she got over a hundred thousand dollars.

Q. And that was from this loan she got a bonus of a hundred thousand dollars?

A. Well, the loan was 95 percent of her annual requirements, so it must have been.

Q. Okay. What about Suzanne Meyers, what bonuses did she receive as a result of this?

A. As my attorney said, if I could have the depositions, I can be more specific.

Q. What about Troy Jones, what

bonuses did he receive?
A. I'll give you the same answer.
Q. What about Dave Emig?
A. All of them are the same answer.
Q. Okay. But then you said we haven't given you the information yet earlier. So why would I look in the depositions if you don't have the information on the bonuses yet?
A. Well, I'll go to my simple answer, if you're a murderer and you kill one person, you're a murderer.
You can't -- and all those folks had given that evidence that there were bonuses given. And we still are looking for our sixth request of information from the court.
Q. And you have no other response to that question?
A. I don't need another response. I think that's the answer I gave you, that it's in the depositions. If you can show it to me, I can be more specific.
MR. CUMMINS: You keep right on going, but this might be a good time for a

break unless you have --

MR. SCHUELLER: Sure.

MR. CUMMINS: -- 22 more employees to ask about. I'm just teasing you. We've been going an hour, I think we should take some time.

MR. SCHUELLER: Okay. Absolutely. Let's take a break.

THE VIDEOGRAPHER: We are off the record.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:50. This is the start of Disc 3.

BY MR. SCHUELLER:

Q. Mr. Schneider, you've said in this Complaint in paragraph 43 that Huntington made a strategic decision to leave another bank holding the bag. Who made this strategic decision?

A. Huntington and the employees there, I presume.

Q. Which employees?

A. It was within Huntington Bank. I wasn't there.

Q. Do you know which employees?
A. My loan was with Huntington Bank, not an employee.
Q. Well, human beings have to exercise the decisionmaking process. So which human beings at Huntington made this decision?
A. The enterprise.
Q. All of them?
A. All of the people that were involved in the enterprise.
Q. They all colluded to end the check-kite at a certain period of time?
A. From my discovery, there were 250 employees at Huntington that didn't do a thing.
Q. Okay. But, again, somebody made a decision here, according to your Complaint, to, quote, leave another bank holding the bag. Who made that decision?
A. Well, I -- when I run my company, it's the president of the bank. It's the president of my company when you make decisions that big.
Q. Do you have evidence that the

president was involved in this decision?

A. I believe he was involved in this loan and, hopefully, I'll know that soon.

Q. But I'm trying to figure out who made the decision at the bank to leave another bank holding the bag?

A. My evidence is I've never talked to anybody at the bank. And when they did that, I still wasn't inside the bank.

And I don't have the evidence because we're still waiting for some of the due diligence that hasn't come our way. When I get that, I know that I'll tell the truth.

Q. So you don't have the evidence right now?

A. Well, the evidence is that Huntington Bank kicked Premier out and put it in a receivership. That's evidence I can tell you as I sit here.

Q. But who at the bank made the decision to leave another bank, quote, holding the bag?

A. Some high-end executive is my guess.

Q. But you don't know who it is?
A. When I get the next three depositions, we'll tell you.
Q. But you don't know it yet?
A. The reason I filed this Complaint is to get discovery. The discovery we need hasn't been given to us by Huntington. And if you're asking me a specific question, when I get the specific answer, I'll give it to you.
Q. So when you filed this Complaint, you didn't know who at the bank decided to cause another bank to hold the bag?
A. As a business person, I sued the enterprise of the folks that I knew that touched the loan when I did this. Since then, I've learned a lot.
The executives of the bank were the decisionmakers. And until I get the depositions of the executives, I can't give you that specific answer that you're asking as I sit here today.
Q. Well, then, why did you make the allegation in paragraph 43?

A. Because this is how you work in the legal system. You go and ask for discovery, and then you get all the good answers. And then when we sit in front of a judge, I can answer that question to him.
Q. So you didn't have the facts when you filed the Complaint?
A. Huntington has not been willing to give the facts. I'm on the sixth request for facts that we asked for a year and a half ago, and those facts still haven't come our way.
You're asking me a specific question and I'll give you a specific answer, when I get all the stuff from Huntington, I will be able to give you a specific answer for your question.
Q. Okay.
A. That's fair.
Q. Now, you state in paragraph 43 that Huntington and its employees profited handsomely from the check-kiting scheme, which employees profited handsomely?
MR. CUMMINS: If you could -- hold that question -- could you mark the

deposition for the two or three minutes in some way so I can get that portion of the transcript. Just any way you have. It's 2:56. Does that help you find it?

THE COURT REPORTER: I'll try.

MR. CUMMINS: Okay. After this is over, if you can't mark it, then I'll come and work with you, okay, to get it marked. Fair enough. I know how to do it. I just didn't know if your machine did it.

THE COURT REPORTER: I put a check in there.

MR. CUMMINS: Okay. Thank you. I'm sorry to interrupt but I didn't want to lose track of it.

BY MR. SCHUELLER:

Q. Which employees profited handsomely from the scheme?

A. From the information we note today, anybody who touched this loan profited.

Q. All right. And how did they profit?

A. Through their bonus program.

Q. Any other way?

A. They got to keep their jobs. They didn't downgrade the Huntington Bank loan. There were many other ways.

Q. What are those other ways?

A. They didn't go to court over this. They continued to keep their jobs, and I'm here three and a half years later.

Q. Which employee had a risk of losing their job if they didn't support the check-kite?

A. I'm not a banker. I'm not in the Huntington Bank. I can just tell you when a loan goes in default in the first year, you usually don't get a bonus for that. You usually get a demerit.

Q. Is that for -- true for all the individual defendants you've sued?

A. Like I said, I still don't have all the due diligence that we need, so I can't answer that.

Q. Now, I think you've deposed 20-plus people, nothing in there helped answer that question?

A. Well, there's 25 documents that I need before I can answer that.

Q. What are those documents?
A. The ones that you have not brought to this deposition.
Q. What 25 documents?
A. Depositions that were already done of the 25 you mentioned.
Q. No. You said that you couldn't answer the question about whose jobs were at risk without getting 25 documents.
A. It's in the depositions of who was involved and who got their bonuses and who knew what.
Q. All right. Can you name one instance of one employee whose job was at risk if they didn't participate in a check-kite?
A. I would guess Amy Becker --
Q. Okay.
A. -- to start with and all the people behind her.
Q. And who would those be?
A. I don't have that in front of me. I apologize.
Q. So your view is that it was better to check-kite than to have the loan be

downgraded?
A. I did not say that.
Q. I know. I'm asking is that your view?
A. The question was who would have lost their job if they helped kiting, and I told you who helped the kiting because they didn't do their job.
Q. Is it your view that it was better for these employees to check-kite than to have the loan downgraded?
A. That's not what I said, and that's not what I'm saying. I'm saying if someone brought a bad loan into the bank, they shouldn't have got a bonus.
And had they done a bad loan, there's a good probability I would have fired my employee because this was over a hundred-million-dollar project.
Q. Is it your view that it was better to gain a bonus by check-kiting?
A. I think that you gain a bonus when you don't tell anybody that you know something.
Q. Do you think there would be any

negative ramifications to an employee who participated in a check-kiting scheme?

A. I think that there is in the federal register that if you bring a bad loan in, you shouldn't get a bonus and you should tell someone when there's a crime being committed.

Q. Well, let's see. I think you said it earlier, if somebody in your company participated in check-kiting, you would fire them, correct?

A. Oh, I believe there's a lot of employees at Huntington that are no longer there.

Q. Who?

A. Amy Becker for one.

Q. And you think she was fired?

A. Well, I don't think the record shows that, but she's no longer there.

Q. Okay. Who else was fired because of the check-kiting?

A. Well, I believe there's a lot of people involved in this case that are no longer at the bank, and I'll leave it at that.

Q. Well, no, I'm asking you, who was fired because they participated in the check-kiting?
A. Well, when you give me all the due diligence, I will tell you.
Q. But you can't, as you sit here today?
A. If you give me all the due diligence that we should have had from a year and a half ago, I will tell you what you're asking.
Q. And my question is, and you can't tell me today, correct?
A. It's not my job to tell you today what I don't know.
Q. Okay. Would you agree with me that anybody participating with a check-kiting scheme intentionally can be charged with a crime?
MR. CUMMINS: Asked and answered.
A. I'm not a --
MR. CUMMINS: We've already done this.
A. I'm not a criminal. I'm not a

judge.
Q. Well, you know Harold Sosna was convicted for check-kiting, correct?
A. I believe the FBI caught him check-kiting.
Q. Yeah. So you know that if somebody participates in check-kiting, they can be charged with a crime, correct?
A. No, I don't know that.
Q. Okay. So do you think all these employees risked going to prison to keep this check-kiting afloat?
A. I didn't say that anybody that check-kited should go to prison. I just said that Harold Sosna check-kited and he went to prison.
Q. I know. I'm asking you that question. I'm not asking you about prior responses.
A. Yeah.
Q. I'm asking you the question.
A. If you can give me the policies and procedures of Huntington, I'll tell you what the answer is.
Q. What does that have to do with

my question?
A. I'm not the boss at Huntington. I'm just the borrower who's in the middle of this.
And Huntington has a policy and procedure, and those people would have been taken care of the way the Huntington Bank policies and procedures tell them.
Q. So is it your position that these employees risked being charged with a crime to perpetuate this check-kiting scheme?
A. I'll tell you today, I don't have a position.
Q. Okay. Now, in paragraph 54 of the Complaint, you state that Huntington breached its duties of good faith and ordinary care, and it's under your count called Negligence. Do you see that?
A. Fifty-four?
Q. Yes.
A. Yes, I do.
Q. In your view, how was Huntington negligent?
A. They were aware of the kiting, the MCAs, and the money going through the

accounts in Huntington.

Q. Anything else?

A. More to come. I don't know what it is yet.

Q. Okay. So they were negligent because they were aware of the kiting. How were they negligent by being aware of the kiting?

A. Well, I think the negligence began when they never informed me of what they knew about this loan. And then the negligence -- they didn't do anything about it.

And in banking there's an underlying rule that says fair dealing, and I don't think that was fair.

Q. You said that bank was negligent because it was aware of the MCAs. When, in your view, was the bank aware of the MCAs for the first time?

A. I don't know when they were first aware, but they were aware.

Q. Now, you heard the testimony of Jill McGrail and Harold Sosna, correct?

A. Which testimony?

Q. The deposition testimony.
A. Whose deposition?
Q. Jill McGrail and Harold?
A. The one that Jim did?
MR. CUMMINS: He's asking who -- who was taking the deposition.
A. What time -- what period of time are you talking about? There were many of them that Harold had.
Q. In this case.
A. Oh, okay. What was the question again? I'm sorry.
Q. So you sat through those depositions, correct?
A. I did.
Q. All right. And both of them testified that Harold hid the MCAs from Huntington. Do you recall that?
A. I believe that they were both afraid of giving an answer. I can tell you that.
Q. So you think they were lying?
A. I didn't say they were lying. I said they were afraid to give the answer, the correct answer.

Q. So they lied?
A. I didn't say that.
MR. CUMMINS: You took the deposition. They asserted their rights under the Fifth Amendment, but you probably counted it, but a lot -- that's what I think he's referring to.
Q. Well, no, but I know they did at certain things. But for the MCAs, do you recall them testifying that they would not allow an MCA to record a UCC?
A. If they said that, I've got evidence that they did.
Q. That they did what?
A. Record a UCC, as did Huntington.
Q. Okay. Do you recall Jill McGrail testifying that Harold hid the loans to the MCAs on the financial statements under personal loans from Harold?
A. Could have. I don't remember that.
Q. So if Sosna hid the MCAs from Huntington, how could Huntington be negligent?
A. They went through the Huntington

Bank accounts.
Q. Okay. Any other basis?
A. Yeah, that there are a lot of accounts in Huntington.
Q. Do you have any other negligence claims against Huntington in this case?
A. I will.
Q. But you don't at the present time?
A. At the present time, I do not. Until I get the due diligence asked for, I can't answer that.
Q. Have you asserted any negligence claim against Huntington to date with respect to loan origination?
A. I don't think that's part of this case.
Q. Okay. Would you agree with me that Harold is a cause of the check-kiting?
MR. CUMMINS: I'm sorry. Did you ask the case or a cause?
MR. SCHUELLER: A cause.
MR. CUMMINS: A cause.
A. Oh, I think there were several people that were a cause.

BY MR. SCHUELLER:
Q. Was Harold a cause?
A. I think he was part of another enterprise, yeah.
Q. So just so the record is clear, are you saying, yes, Harold was a cause of the check-kiting?
A. I said he was part of the cause and several people were involved.
Q. Okay.
MR. SCHUELLER: I'm sorry. Could you just read his response? I'm just not sure if he answered it.
(Record read by Reporter.)
BY MR. SCHUELLER:
Q. Okay. Would you agree that the entities controlled by Harold are a cause of the check-kiting?
A. No.
Q. Why not?
A. Because Harold was in charge.
Q. Right. But he acted through those entities, correct?
A. I think he did that through Premier.

Q. All right. So would you agree that Premier was a cause of the check-kiting?
A. No. I think Harold was the cause.
Q. Who controlled the entities that you co-owned with Harold?
A. Harold was in charge of the day-to-day.
Q. And he used those entities to check-kites through them, correct?
A. There were multiple uses of check-kiting.
Q. Right. But he controlled the entities that you co-owned with him when he kited checks through those entities?
A. I think he and the MCAs controlled it and Huntington was observing it.
Q. Okay. So, again, my question is, did the entities controlled by Harold, which were co-owned by you, participate in any way in the check-kiting?
A. I think the entities were titles. The entities had checking accounts at Huntington and other banks, and I believe

that the check-kiting went through Huntington and other banks at the same time.
Q. And it was through the deposit accounts of the entities that you co-owned with Harold --
A. No --
Q. -- correct?
A. -- they were only part of it.
Q. So there were no checks kited through the bank accounts for the entities you co-owned with Harold?
A. That is not what I said.
Q. Okay.
A. I said they weren't the only ones. There were other entities. Huntington had 30 bank accounts and some of them that weren't in with this account or this loan that were part of the check-kiting, that were participants in the check-kiting.
Q. So I understand there were other participants, but I'm asking you, were the entities that you co-owned with Harold participants in the check-kiting?
A. They weren't participants. Their checking accounts were used when the

Premier and Harold did check-kiting.
Q. Doesn't that make them participants?
A. They were just LLCs, entities that had checking accounts at Huntington.
Q. And Harold controlled them, correct?
A. Harold was in control.
Q. And he used them to kite checks, correct?
A. I think he used Huntington's accounts to kite checks.
Q. The accounts for the entities you co-owned with him, correct?
A. There were several accounts that he kited.
Q. Including the accounts of the entities you co-owned with him?
A. They were part of the whole check-kiting scheme.
Q. Okay. Would you agree with me that cash shortages in the companies owned by Harold was a cause of the check-kiting?
A. I don't know what caused the check-kiting.

Q. Well, Harold was check-kiting for a reason, correct?
A. I don't know. I didn't know Harold. He wasn't a relative. He was a business partner.
Q. Well, you've heard his testimony, haven't you? He said he was losing money and he kited checks because of that?
A. No. You read the testimony like I did, so that's the answer.
Q. Is that a fair answer? Do you think it's right?
A. I don't know what his personal life was going through.
Q. Right. That's not my question. It's not a question about his personal life.
Would you agree with me that cash shortages in the companies owned by Harold and you were a cause of the check-kiting?
A. I know there was check-kiting going on. I don't know what the cause was.
Q. Okay. Harold also blamed losses on the Wexford entities on his need to kite

checks. Do you think that was a cause of the check-kiting?

A. I wasn't involved in the check-kiting, so I don't know what the cause was.

Q. Harold said that the MCA lending caused him to check -- kite checks. Do you think that's accurate?

A. I believe the MCAs came into his life and there were 52 of them and they lent him $30 million and went home with $73 million that went through my accounts in Huntington and other accounts in other banks.

Q. And that was a cause of the check-kiting, correct?

A. I don't know what the cause was.

Q. How about --

A. All I know was the results.

Q. How about COVID, did that cause cash shortfalls for the entities you co-owned with Sosna?

A. I don't know.

Q. Well, you remember the COVID crisis, correct?

A. We all do.

Q. Yeah. And it hit your industry pretty hard, didn't it?
A. I only know my own business.
Q. All right. Well, do you think COVID impacted the cash flows of the businesses you co-owned with Sosna in any way?
A. I didn't manage day-to-day, so I don't know.
Q. Okay. Do you think anyone else was a cause of the check-kiting?
A. I wouldn't know. I wasn't involved in it.
Q. Do you think you're at fault in any way for the check-kiting?
A. Can you put this in all cap -- capital letters? Absolutely not.
Q. Do you think you were at fault in any way for failing to detect billions of dollars in check-kiting through companies you co-owned with Harold Sosna?
A. I can't do something -- I can't see something I don't know, and I didn't know anything about it. And I learned all of this after the fact.

Q. But don't you think you should have known something about this extensive fraud in companies you co-owned?

A. Only if Huntington could have told me.

Q. You could have inspected the books and records yourself, right?

A. Huntington knew there was a problem and neglected in the duty to tell me, and they didn't do that. That's why we're sitting here today.

Q. No. My question for you, though, is you could have independently examined the books and records, correct?

A. You know, yesterday I bought a lottery ticket and I could have won, but I didn't know that the winning ticket was yesterday. So I didn't know anything about this either.

Q. No.

A. I learned about all of this later on. Had Huntington, who knew that defaults that were there before the loans started and shared that with me and told me about the shortcomings that Harold had, I

would never have done this loan.

And I didn't know anything about it. So that's where your duty and negligence is that Huntington had knowledge, was warned and proceeded to go through this loan to allow some of the employees to make some sizable bonuses.

And through this whole thing, they knew there was a default, they never called me. There was kiting going on, they never called me. There was MCAs going through the bank account.

They were in large deposits that were evident to anybody who had common sense. So as I sit here today, I absolutely had no knowledge of anything, and I absolutely did not know anything about the kiting, and I never knew anything about MCAs until this all showed up.

MR. CUMMINS: Could you repeat the question, please?

A. Sorry. That was too long. Sorry.

(Record read by Reporter.)

MR. CUMMINS: Did you answer the

question?
A. No. I could look back and say lots of things. I didn't do that.
Q. Don't you think you're better situated as an owner to have detected the check-kiting as opposed to Huntington?
A. Not at all. Huntington dealt with Premier every day. And my 22 years with Harold was normal. What happened at Huntington and Sosna and Premier was not normal.
Q. What are you seeking as damages in this litigation?
A. I think that will come in the future.
Q. You don't know as you sit here today?
A. Well, I've leave it at this, I spent 25 years -- I spent 35 years putting this together, and I don't have it today, and it wasn't caused by me.
Q. So what are your losses?
A. Everything that's happened to me since the negligence of Huntington.
Q. No. How much money have you

lost?

MR. CUMMINS: He already answered that.

A. I gave you an answer.

Q. Well, I'm sorry. What was the amount?

MR. CUMMINS: Not as he sits here today. He didn't give you the amount.

MR. SCHUELLER: Oh.

BY MR. SCHUELLER:

Q. All right. Then tell me how you were injured?

A. My 25, 30 years of experience and putting my life's work into my businesses, which was -- this was a major one, got taken away from me for no reason at all, that could have been stopped, and could have protected my credit risk that went out the door.

And had I been knowledgeable, all the things that I'll share down the road will show you how heavily damaged I've been.

Q. So have you -- are you saying that you've lost your equity interest in the entities that you co-owned with Sosna?

A. I lost my entities. I lost my name. I lost some of my businesses due to the fact that Huntington neglected telling me what was going on.
Q. So, again, my question is, are you seeking damages for the loss of your equity interest in the entities?
A. I think my damages will show up one day.
Q. Well, that day is today. You can't articulate it today?
A. I can. When I get all the due diligence and have the three depositions we're waiting for, Dave Wechter, Dan Storer, and Steve Steinour, and the rest of the due diligence material we asked for, I can give you a good answer, but right now I don't have that.
Q. But none of those witnesses know your damages. You know your damages. We -- I can't calculate damages from Dave Wechter. You're the one --
A. They do know my damages.
Q. What are your damages?
A. It's a lot more than you want to

hear.

MR. CUMMINS: He's asking -- I think we've answered the question that he's not in a position today to testify as to the method and amount of damages he's incurred.

I mean, you can debate on your own time, but right now why don't you move to the next question.

Q. How has your reputation been damaged?

A. I don't have enough time here to tell you. It's been damaged because of the activities that have caused me to be here today.

Q. What is the economic loss you've sustained because of your loss of reputation?

A. As I said earlier, when I get the three depositions that have been requested and the rest of the due diligence that's been asked, I believe that I will have a better answer.

Q. All right. Then can we agree you need to be deposed again on this issue?

MR. CUMMINS: No.

A. That's not the question.

MR. CUMMINS: Wait. Excuse me. I'm your lawyer.
THE WITNESS: Oh, sorry, you talk.
MR. CUMMINS: Right. If you want me to keep going as your lawyer, let me just make a statement. Okay?
THE WITNESS: Okay, please.
MR. CUMMINS: Okay.
THE WITNESS: Sorry.
MR. CUMMINS: The process of developing the damage is underway. It involves expert testimony and -- and it involves likely the testimony of the three witnesses who we'll be taking, we presume, next week, unless somehow you don't want to put them up.
So short of that, we can always come to you when we've got that compilation and make a demand. And then you'll know the damage claim, and then we'll go from that point. How's that?
MR. SCHUELLER: Okay.
BY MR. SCHUELLER:
Q. In paragraph 55 of the

Complaint, if you go down to the fifth line there's a sentence that begins Further, do you see that sentence?

A. It says Further?

Q. Paragraph 55.

MR. CUMMINS: Over toward the right side.

A. I'm at 55.

Q. Five lines down.

A. Where's the word Further?

MR. CUMMINS: See, it's right there (indicating).

THE WITNESS: Oh, over on the right side.

MR. CUMMINS: Yeah.

THE WITNESS: Further, at a minimum, the check-kiting and fee-generation scheme allowed the businesses and the Sosna facilities to illegitimately continue operations for many months, during which time the value of the businesses and Sosna's facilities dropped precipitously.

BY MR. SCHUELLER:

Q. So is that a true statement?

A. I think it covers it.

Q. Are those your damages here?
A. No.
Q. How long, in your view, did the businesses illegitimately continue operations?
A. From the time the bank called the default.
Q. Until?
A. The end of this trial.
Q. And how did the value of the businesses and the Sosna facilities drop precipitously?
A. I don't know about his facilities, but they dropped because of the negligence and the duty that didn't happen.
Q. And what value did they have at the beginning and then how far did the value drop?
A. Well, I remember an appraisal in '18 before the loan was somewhere shy of $90 million. The next one was in the low 90s. And then the syndicate in the bank sat down on May 30th and valued it at $99 million.
Q. May 30th of what?

A. 2020.

Q. And what is your basis for saying that the bank valued the enterprise --

A. Called the appraisals. That's how the bank gets the value.

Q. It's an appraisal?

A. They use a third party to tell them what to do.

Q. Okay.

A. And I will remind you appraisals are only for the bank. They're usually less than what they really are.

Q. Okay. And there was a process run to sell the entities; isn't that right?

A. I believe that Dave Wechter pushed them into the court for a receiver.

Q. And the entities were sold through the receivership?

A. They were sold through the bank -- through the court with Huntington's approval.

Q. Okay. And were there any defects in how that sale process in your view unfolded?

A. Absolutely.

Q. What were the defects?
A. I offered to buy it for more money than the sale price.
Q. Do you have financing to support that offer?
A. Now that I know what the thing ended up, yes.
Q. Did you have the financing when you made the offer?
A. When I made the offer, I didn't, but when the offer got accepted, I did.
Q. Who accepted the offer?
A. The court and Huntington.
Q. So you had financing lined up to back up your offer at some point?
A. I was kicked out of the offer after I made a legitimate deposit and tried to buy it.
Q. Who was willing to provide the financing?
A. Several of my banks.
Q. Did they give you a commitment letter?
A. No. I didn't need it, I had the cash.

Q. Well, then you didn't need financing, right?
A. You needed cash to get the equity. The way it was set up, you had to have cash, and it only limited certain people to take it, take the loan.
Q. Did you have cash for the full purchase price?
A. No. Neither did the buyer.
Q. So you needed financing to support your offer?
A. Not everybody has $70 million cash.
Q. All right. So you needed financing, correct?
A. I think that that was the key to getting the deal done, but it was all-cash offer as it was set up.
Q. Did you ever obtain the financing?
A. I was kicked out of the deal. I couldn't get -- I didn't need it. After I got my offer in, I got kicked out of the deal.
Q. Who -- did you -- what banks did

you pursue the financing with?
A. First Merchant in Indianapolis and a couple others.
Q. Do you remember the names of the others?
A. Just my banks that I usually talk to, and they were willing to put something together.
Q. Who -- who are those --
A. I only had a limited time, so you only wanted something that was on that day.
Q. Who are those banks?
A. I just roughly talked to them.
Q. I know. Who are they?
A. They don't matter. They don't matter.
Q. Well, no, you said you talked to them about getting financing.
A. It doesn't really matter. I didn't get the offer to be able to buy it, so I don't need to bring anybody else into this deal that's not part of this lawsuit.
Q. Could you, please, just tell me who the other banks were that you talked to?

A. I don't believe I need to. It has nothing to do with this deposition.
Q. All right.
A. When I went to the receiver, it was in the court's hand.
MR. CUMMINS: Excuse me, why don't we take a five-minute break? I'll confer with my client.
MR. SCHUELLER: Okay. Thank you.
THE VIDEOGRAPHER: We are off the record.
(Off the record.)
THE VIDEOGRAPHER: We are back on the record. The time is 3:41 p.m.
MR. CUMMINS: A statement for the record. Part of the hesitation that you heard from the witness was that he had concerns about certain privileged matters that were involved during the course of the receiver solicitation of offers and of the deponent's response to that solicitation.
I think he's prepared now to answer elements of the -- substantially all of the information that you were trying to

get to. And if you want to repeat the pending question, that's fine.

The -- as I understand the question, it's related to his activity in response to the receiver soliciting bids for the property that's the subject matter of this litigation.

You can rephrase it, but that's the subject matter of where I think he's able to testify to with some -- and I'm gonna be careful about privilege, but you won't be interrupted, I don't think.

BY MR. SCHUELLER:

Q. Thank you. So what banks did you contact to finance the purchase of that receivership?

A. So the receiver set some rules. I brought in three and a half million dollars cash to be an official bidder.

My bid -- the question was, did I have the cash at the time? And I was negotiating working on that. And the offer of who was gonna help me was White Oak, and I had a conversation I said with First Merchant, and that bank is no longer there.

But those were the efforts that I made to buy and the offer that got accepted was 16 million less than what my offer was.

(Defendants' Exhibit 112 was marked.)

BY MR. SCHUELLER:

Q. All right. Thank you. I'm gonna show you what we've marked as Exhibit 112. And this is an e-mail you can see at the top from Jill McGrail to you and some others. Do you see that?

A. I see Jill McGrail at the top.

Q. And it's dated Friday, February 9th, 2018. Do you see that?

A. Yep.

Q. All right. And then in the middle of this first page, there's a reference to a set of HNB term sheets. Do you see that?

A. Yes.

Q. And so is it fair to say that as early as February 8th, 2018, there were discussions going on between Huntington and Harold about a refinancing?

A. Yes.

Q. And then in that same paragraph

that I just referenced, it refers to you getting 915,000. Do you see that?
A. No, I don't see 915,000.
Q. I'm sorry. It says $872,252 (sic) for the swap break. Do you see that?
A. At the time, that's what it was supposed to be.
Q. All right.
MR. CUMMINS: It's right here.
THE WITNESS: No, I got it. He read it wrong. It's $877,252.
(Defendants' Exhibit 113 was marked.)
BY MR. SCHUELLER:
Q. All right. I'm gonna show you what we've marked as Exhibit 113. And this is another e-mail from Jill McGrail to you. And it's -- actually, strike that.
This is an e-mail from you to Jill on November 28th, 2018, correct?
MR. CUMMINS: Wait, I think we may have -- are you at 113?
MR. SCHUELLER: Yes. I have Jill to Ray. And I just tossed back -- is that --
MS. NEAL: I grabbed it, yeah.

MR. CUMMINS: But I think -- I got two 113s, now this 113.

MS. NEAL: I think that's just -- this is just the fourth copy.

MR. CUMMINS: Okay. This is from Jill to Ray at the top.

MR. SCHUELLER: Correct. So go to the e-mail below --

MR. CUMMINS: Can we go off the record for a second?

MR. SCHUELLER: Yeah.

MR. CUMMINS: Okay. Let me just lean over.

THE VIDEOGRAPHER: We are off the record.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:46 p.m.

BY MR. SCHUELLER:

Q. All right. And so then below that there is e-mail from you to Jill. Do you see that?

A. Correct.

Q. All right. And then is it fair to say that Jill responded to your e-mail in

caps?

A. Yes.

Q. And down in paragraph 8 Jill writes, I will keep you apprised of the swap funds and its release when the benchmarks are met. Do you see that?

A. Yes.

Q. And so it is fair to say that you received some swap funds at the time the Fifth Third loan was refinanced, correct?

A. Yes, we were in the money.

(Defendants' Exhibit 114 was marked.)

BY MR. SCHUELLER:

Q. Okay. I'm showing you what we've marked as Defendants' Exhibit 114. And this is an e-mail from you to Jill McGrail dated November 28th, 2018, correct?

A. Yes.

Q. And you say, Dear Jill, I need to begin getting the P&L balance sheets and statements of cash flows every month. Since I am guaranteed on everything, I must have statements monthly on our properties along with the quarterlies, which the bank gets to release our swap funds. Do you see that

language?
A. Yes.
Q. And why did you send this to Jill?
A. Because at the last minute when I signed this, I realized that he had information I knew nothing about.
Q. Okay. And so you wanted information on profit and loss balance sheets and cash flows every month?
A. I wanted to know what his business was because the bank changed the loan to a hundred percent, yes.
Q. And was this for just the entities you co-owned with Harold or --
A. No. These were the things I didn't know anything about.
Q. Which would be the Sosna entities?
A. Yes.
Q. All right. And were you also asking for reporting on the entities you co-owned?
A. I don't remember.
Q. Is there a reason you would have

excluded those entities?
A. I don't know.
Q. But you clearly wanted some financial reporting regularly from Harold going forward, correct?
A. I did not know that information. It was helpful.
Q. And you wanted the information going forward, correct?
A. That's what that says.
Q. All right. And it's because of the financial risk to you on the guaranty, correct?
A. It's for what I didn't know.
Q. Right. And you wanted to monitor the finances because of your risk on your guaranty, correct?
A. I wanted to know what I didn't know.
Q. Because you wanted to protect yourself from the risks on the guaranty?
A. I needed to know. That's what I asked for.
Q. Well, you said since I am guaranteed on everything, I must have

statements. So is it fair to say that because of your risk on the guaranty, you wanted financial reporting going forward?

A. Yes. I wanted to know what I didn't know.

Q. Because of the risks to you?

A. Well, I wanted to know something and I'm looking at it as a possible responsibility I wanted to know.

Q. Okay. Because you were on the hook for a loan obligation, correct?

A. I signed a guaranty with the bank and that guaranty had expectations, so I wanted to read that.

(Defendants' Exhibit 115 was marked.)

BY MR. SCHUELLER:

Q. Okay. I'm showing you what we've marked as Exhibit 115.

MR. SCHUELLER: (Handed.) Sorry.

MR. CUMMINS: That's okay.

BY MR. SCHUELLER:

Q. All right. In the middle of this there is an e-mail from Jill to you dated November 30th, 2018. Do you see that?

A. Yes.
Q. And in paragraph 2 it says, $915,000 will be wired to your Bank of America account on Monday. Do you see that?
A. I see that.
Q. And was that tied to the swap?
A. No.
Q. Okay.
A. Part of it, I believe, was.
Q. I see, and so it says here that Fifth Third was holding a million 830 for the Bryden beds. Do you see that?
A. Yes.
Q. And because the Fifth Third loan was refinanced, you received $915,000 personally?
A. That's what it says. I don't remember it.
Q. And did that happen?
A. I don't remember.
Q. All right. Would you be surprised if it didn't happen?
A. No.
Q. So you think you left a million dollars on the table and didn't say anything

about it?
A. I left $3 million with Huntington, and I kept on waiting for that money.
Q. Okay. But you stood to potentially receive $915,000 because of the refinancing on the Fifth Third loan, correct?
A. It's the first I knew about it. I don't know if I got that. I know I got the money from the swap.
Q. But you stood to receive $915,000 because of the Bryden beds, correct?
A. That's what it says on this statement.
Q. Is that accurate?
A. I don't know because Jill didn't give me everything accurate.
Q. Well, is it fair to say you were entitled to receive $915,000 from the Bryden beds?
A. Well, I was unaware of that. So if it said it, I should have got it, but I don't know that I did or didn't.
Q. I know. My question, though, is were you entitled to receive the $915,000?

A. If there was that money sitting at Fifth Third, yes.
Q. Okay. And the swap break was -- ended up being a total of 1 -- $3,199,200, correct?
A. Correct.
Q. And of that, $3 million was sent to a restricted account at Huntington?
A. Correct.
Q. All right. And that's the swap break from the Fifth Third loan, correct?
A. Yes.
Q. And then there's a balance of $199,200 that was paid to you and Harold personally, correct?
A. Somebody sent it to me.
Q. Okay. And why was the division of those funds 71.6 percent and 28.4 percent to you?
A. Because I only owned 25 percent of this loan.
Q. The Fifth Third loan?
A. Both loans.
Q. Okay.
A. The assets that Fifth Third had

were the assets that Huntington had.
Q. And with the swap breakage if -- was it your understanding that if the EBITDA -- that's E-B-I-T-D-A -- benchmarks are hit, that you would have received 28.4 percent of that $3 million?
A. That's what Harold told me.
(Defendants' Exhibit 116 was marked.)
BY MR. SCHUELLER:
Q. Okay. I'm showing you what we've marked as Exhibit 116. And at the top there's an e-mail from Regina Sams to Jill Brown dated April 2nd, 2019. Do you see that?
A. Yep.
Q. Who is Jill Brown?
A. She was an assistant.
Q. Assistant to whom?
A. To me in the office.
Q. Is she still your assistant?
A. No.
Q. When did she stop being your assistant?
A. Three years ago.
Q. Would you agree with me that

Regina Sams sent you financials on April 2nd, 2019?

A. I don't know. In looking at this, in the attachment, I can say from the attachment that's what it says.

Q. Well, I guess back on the first page, there's an e-mail from Jill to Regina saying, Do you have the finances for November 2018? Ray is applying for a loan. Do you see that?

A. Yep.

Q. And then Regina responds and says, Here you go. Do you see that?

A. I don't see here you go.

Q. At the top.

A. Yeah.

Q. So it is fair to say that Regina sent the financials to Jill on April 2nd, 2019?

A. That's what the e-mail says.

Q. And the financials attached as part of Exhibit 116 are balance sheets; is that right?

A. What's that question?

Q. So the financials attached to

Exhibit 116 are balance sheets?
A. Okay. That's what it says at the top.
Q. All right. And --
MR. CUMMINS: Would you mind identifying the Bates numberings of that set.
MR. SCHUELLER: RS11601.
MR. CUMMINS: Through?
MR. SCHUELLER: RS11608.
MR. CUMMINS: Okay. Thank you.
BY MR. SCHUELLER:
Q. All right. And these are financials. It looks like there's six columns here for six different entities, does that -- is that right?
A. There are six columns. I see that.
Q. And at the top there's Keller, KTTC, Stiegler, MHCC, Seminole, and SEEC. Do you see that?
A. Yes.
Q. All right. Is that what you would typically receive financial reporting on, these -- these six entities?
A. I usually get it as the Keller

Group.
Q. I see. So every entity in the Keller Group, you would receive financials on?
A. I would have got a Keller Group summarization, yep.
Q. All right. And on the last page there's a line item at line 372 for Total Capital. Do you see that?
A. Uh-huh.
Q. You just have to say yes?
A. Yes. I'm sorry. I apologize.
Q. And that's owner's equity?
A. Total Capital, I presume that's capital that is identified. I'm not sure if it's owner's or not.
Q. Okay. Whose else would it be?
A. Premier managed it, so I don't know.
Q. Okay. Would you agree with me that in Column D the aggregate equity value in the Keller entities was a negative $1.3 million?
A. I see that.
Q. So you -- you agree with me that

that's what the books and records show to be the equity value of the Keller Group --
A. No.
Q. -- as of that date?
A. So balance sheet ties into your tax. And at times we did cost segregation. So you have an asset that's got a value no matter what. But if it's negative, it's because of a tax or accounting issue.
Q. Yeah. I'm just saying that the books and records reflected a negative value. I'm not talking about anything else.
A. Well, it could mean someone took more capital out. It could mean depreciation, amortization, all the things that go on in accounting.
(Defendants' Exhibit 117 was marked.)
BY MR. SCHUELLER:
Q. Okay. I'm gonna send -- send you -- show you Deposition Exhibit 117, do you -- well, strike that.
Okay. This is an e-mail from Jill to Jill at the top. Oh, I see. It's from Jill at Circle Development to Jill McGrail. Who was the Jill at Circle

Development?
A. That was Jill Brown.
Q. Jill Brown. All right. And so Jill Brown asked Jill McGrail in that e-mail at the top, Would you send me contact information for Randy Gentry? Ray wants to contact him. Do you see that?
A. Yes.
Q. Why did you want to contact Randy Gentry?
A. I don't know.
Q. Did you ever contact Randy Gentry?
A. I don't believe so.
Q. Okay. Did you ever receive the contact information from Randy Gentry?
A. I don't believe so.
(Defendants' Exhibit 118 was marked.)
BY MR. SCHUELLER:
Q. Okay. I'm showing you here --
MR. CUMMINS: That's the follow-up question.
BY MR. SCHUELLER:
Q. Okay. I'm showing you what we've marked as Exhibit 118 and this is from

Regina Sams to Jill Brown dated June 13th, 2019. Do you see that?
A. I see that.
Q. And it would appear that a number of financials were attached to that e-mail, correct?
A. I don't know what that is, but I'm gonna listen to you.
Q. All right. And then these were documents you produced. And then there are financials attached to this e-mail, correct?
A. Is that what's below there? (Witness looking.)
Q. All right. So is it fair to say that you received financials from Premier on June 13th, 2019?
A. I got something from Sams, yes.
Q. Okay. And those were the February and January financial reports for 2019?
A. I believe they were February 28th statements.
Q. Okay. And now back to page 1?
MR. CUMMINS: Excuse me, counsel, could you just make sure that the

record reflects properly what -- you've described these as financial statements, but it's not. It's a balance sheet only. I don't see an income statement here.

MR. SCHUELLER: Okay.

MR. CUMMINS: Agreed?

MR. SCHUELLER: Yes, agreed.

MR. CUMMINS: Okay.

MR. SCHUELLER: Yeah. Thank you.

BY MR. SCHUELLER:

Q. Now back to page 1. There's an e-mail at the very bottom of the chain from Jill at Circle Development to Regina, and it's dated June 12th, 2019.

A. Is that on the first page?

Q. Yes. Do you see that, that e-mail at the bottom that's June 19th, 2019. Do you see it?

A. Yeah.

Q. Okay. And it says, Ray is about to go out of town for two and a half weeks, so he is freaking out about everything. Do you recall what you were freaking out about?

A. Yes.

Q. What were you freaking out about?
A. That I'm leaving town.
Q. Anything else?
A. Yeah, it's a tough time to leave town.
Q. Okay. Was it tied to the financials in any way?
A. I have no idea.
Q. And then the e-mail continues, I can't seem to find any 2019 financials. Would you send them to me so I can put them on a stick so he can look at them while on vacation. LOL. Do you see that?
A. Yes.
Q. And is that something you liked to do, get financials so you could look at them on vacation?
A. I never seem to stop.
Q. Okay. And then in the e-mail above that on June 13th, 2019, this is from Regina to Jill Brown, she says, Hi, Jill, Here is year to date March 2019. April should be coming very soon. Do you see that?
A. No. Oh, this right here. Here

is year to date March 19th. April should be coming very soon.

Q. So would you agree with me that Premier had provided you year to date March 2019 financials as of June 13th, 2019?

MR. CUMMINS: I'm sorry --

A. No, I don't say that just because she wrote to me Regina was part of the enterprise of Harold.

MR. CUMMINS: I'm sorry, counsel, could I direct your attention -- for clarity of the record --

MR. SCHUELLER: Yeah.

MR. CUMMINS: -- this looks to me like it's a balance sheet only as of February 28th, 2019.

MR. SCHUELLER: Right.

MR. CUMMINS: So whoever is calling them the March financials, whatever it is, mischaracterized it.

MR. SCHUELLER: I think there's two things. There's an e-mail that says financials in the header, and then she says here's year to date March 2019. But there's a separate --

MR. CUMMINS: Right.
THE WITNESS: But that's not here.
MR. SCHUELLER: I understand that. I understand that. And so -- and then there's a separate provision of the January and February financials on June 13th with a separate e-mail, which is attached.
THE WITNESS: It is?
MR. SCHUELLER: Yeah, the balance sheet is attached.
MR. CUMMINS: I'm sorry. Could you --
THE WITNESS: I only have February 28th. I apologize.
MR. CUMMINS: No, wait. So just run through that again. What's your explanation again?
MR. SCHUELLER: So it doesn't matter what I think. So let's just say --
MR. CUMMINS: Yeah, it does. I mean, just tell me what it is and then we're good to go. Are you -- are you trying to explain why there aren't an income statement or why this doesn't have the March 2019

financials attached to it?

MR. SCHUELLER: Right. There's two e-mails.

MR. CUMMINS: Yes.

MR. SCHUELLER: And one says here is year to date March 2019. The other says here are February and January. The February and January is a balance -- balance sheet.

MR. CUMMINS: Okay. So can I just show you what my confusion is?

MR. SCHUELLER: Okay.

MR. CUMMINS: Okay. And you -- you may have a perfectly good explanation, but -- and I'm not trying to do anything with the witness here. But the attach -- the June 13th of 2019 at the top attaches certain financial information, okay, there's a January '19, or there's -- it says that there's attached January '19, January '19, right?

Then Jill writes back and says, February and January, please. Okay. And then Regina writes to Jill saying here -- at the bottom saying, Here are the March year to

date, but that's not what's attached.

MS. NEAL: Follow up then.

MR. CUMMINS: Okay. If I start at the bottom, Jill is saying to the reader here are the March 2019 financials, but that's not what's attached. What's attached are the February 28th, 2019s.

Okay. Then if go up one and it says -- I'm sorry, Jill -- Jill says February and January please. And then Regina on June 13th sends Jill another e-mail that purports to be sending January and February, but those are not attached to your exhibit on 118.

Okay. So is there -- I think it may be important to make sure that the document is complete. And are you handing me something that will complete it?

MR. SCHUELLER: No. No, I'm just letting you finish and then I'm gonna move to another exhibit.

MR. CUMMINS: Okay. So is there some way we could get you to provide --

MS. NEAL: These are your documents that you produced --

MR. CUMMINS: Okay, right.

MS. NEAL: -- so you have this e-mail. Whether this is complete or not, you produced it to us.

MR. CUMMINS: Okay. Oh, good. Is there -- no, time out. So is there some way that you can look at your records to see whether your client received this whole tag log of financials or not?

MS. NEAL: From -- from you?

MR. CUMMINS: Yeah, or from anyplace. Okay. What I'm concerned about only is there are January and February financials provided by Sosna to Jill, and that was in June of 2019.

I'm looking for those. They weren't in what we were able to produce, but I'm reasonably sure that these are exactly the financials that Mr. Gentry and Mr. Vetter had a long interchange about the calculations, so...

MR. SCHUELLER: Jim, I'm sorry to interrupt you. I really just got to move on from this exhibit. We're spending too much time on it.

MS. NEAL: Can we talk about this after?
MR. SCHUELLER: Yeah, let's talk about it later. Yeah. We're happy to help you after.
MR. CUMMINS: Okay.
MR. SCHUELLER: All right.
MR. CUMMINS: I just don't want this -- I don't want this witness to think that he's looking at January financials.
MR. SCHUELLER: I'm moving on.
MR. CUMMINS: Okay. These are February 28th apparently a balance sheet only.
MR. SCHUELLER: It's in the rearview mirror. Moving on.
MR. CUMMINS: Okay. And for the record, I would ask you to look to see if you can produce what's at the top. Okay?
MR. SCHUELLER: Understood.
(Defendants' Exhibit 119 was marked.)
BY MR. SCHUELLER:
Q. All right. Now, I've shown you, Mr. Schneider, what we've marked as Exhibit

119. And that is an e-mail from Jill McGrail --

MR. CUMMINS: Don't ever -- excuse me, don't mark on exhibits.

MR. SCHUELLER: Oh, do you need a -- here.

THE WITNESS: Oh, I'm sorry.

MR. CUMMINS: Wait. I'm looking for 118. Is this 118?

MR. SCHUELLER: Yeah.

THE WITNESS: I got 119.

MR. CUMMINS: No, no. Okay. Here's a fresh 118, no marks.

THE WITNESS: Okay.

MR. CUMMINS: I have a 118. Thank you.

THE WITNESS: Well, that's the one we just looked at and argued over, 18 and he said --

MR. CUMMINS: Okay. Thank you.

THE WITNESS: -- put it away, right?

MR. SCHUELLER: Yep.

THE WITNESS: Then you handed me 19?

MR. SCHUELLER: Yes.
THE WITNESS: Is that correct?
MR. SCHUELLER: Yes.
MR. CUMMINS: Okay. Sorry.
BY MR. SCHUELLER:
Q. All right. So there's an e-mail at the top from Jill McGrail to Jill Brown dated June 13th. Do you see that?
A. Uh-huh.
Q. That's a yes?
A. Yes, and I apologize.
Q. And Jill McGrail provided Jill Brown Randy Gentry's contact information. Do you see that?
A. Yes.
Q. Now, does that refresh your recollection? Did you ever receive Randy Gentry's contact information from Jill Brown?
A. I don't know.
Q. Did you ever contact Randy Gentry?
A. I don't believe so.
(Defendants' Exhibit 120 was marked.)
BY MR. SCHUELLER:

Q. So I'm showing what we've marked as Exhibit 120.
A. This is the one I was out of town.
Q. And this is from Regina -- it's an e-mail from Regina Sams dated June 19th, 2019, to Jill Brown. Do you see that?
A. From Regina to Jill Brown.
Q. All right. And then below that there's an e-mail from Jill Brown to Regina Sams on June 19th. Do you see that?
A. There's one from Jill to Regina.
Q. And Jill Brown asks, When you send Kathleen the monthly statements, would you copy me? Communication here is not good. Who is Kathleen?
A. She worked in the accounting office.
Q. Okay. And do you know what Jill would have meant by communication here is not good?
A. We reached out to Regina Sams often and almost had to fight to get the information.
Q. I see. So she's saying

communication from Premier is not good?
A. Correct.
Q. I see. All right.
(Defendants' Exhibit 121 was marked.)
BY MR. SCHUELLER:
Q. I'm showing you what we've marked as Defendants' Exhibit 121. And this is an e-mail from Regina Sams to Jill Brown dated August 15th, 2019. And in the Subject line it says, May and June statements. Do you see that?
A. Uh-huh.
Q. You just have to say yes?
A. Yes. I'm sorry.
Q. And so I don't have attachments here, but it would appear that there were attachments that were the May and June statements, correct?
A. There's a May, a May, a June, and June. Are the attachments here?
Q. No.
A. I don't know. What they wrote sometimes isn't what matched up.
(Defendants' Exhibit 69 was marked.)
BY MR. SCHUELLER:

Q. Okay. I'm showing you what we've marked as Exhibit 69, and this is an e-mail from Jill McGrail to Harold Sosna dated October 25th, 2019. Do you see that?
A. Who wrote this?
Q. Jill McGrail to Harold Sosna.
A. What about it?
Q. All right. It says, Hi, Mike, Schneider is tapped out. He is always tapped out. He has always lived on the edge. Is that an accurate statement?
A. No.
Q. Do you know what she meant by that?
A. Yeah, keep me out of it.
Q. Keep you out of what?
A. Discussing anything with the bank.
Q. Okay.
A. Who's Mike?
Q. Well, at the bottom it says Mike Ginnever, G-I-N-N-E-V-E-R.
A. Who's that?
Q. Blue Mark Capital?
A. I never heard of them.

Q. Okay. And then Jill says that you, Mr. Schneider, were constantly asking Harold when his share of the $3 million escrow will be released because he really needs the cash. Is that -- yep, yep, yep.
A. Oh, I got a cramp.
Q. Yep, yep, just walk it off.
MR. CUMMINS: Is that a cramp?
THE WITNESS: Yes.
MR. SCHUELLER: Okay. We'll go off. We'll go off.
THE VIDEOGRAPHER: We were off the record.
(Off the record.)
THE VIDEOGRAPHER: We are back on the record. The time is 4:21 p.m.
THE WITNESS: So I think my question is who's Mike.
BY MR. SCHUELLER:
Q. Yeah. And you said you didn't know Mike Ginnever at Blue Market Capital?
A. I don't know who Blue Mark Capital or Mike is.
Q. I'm sorry?
A. I don't know either one, Mike or

the Blue Capital.
Q. Is this a true statement that you wanted the $3 million escrow money to be released because you really needed the cash?
A. Everybody needs cash.
Q. So it was true?
A. It's true that I wanted the money. It was sitting there. I was promised by Harold and Jill McGrail. So when I keep on asking -- you know, you ask.
Q. At any time in 2019 or 2020, did Harold ask you to make a capital contribution to any of the businesses you co-owned with him?
A. No.
MR. CUMMINS: Wait a minute. I have to get it marked. I'm sorry --
THE WITNESS: It's marked.
MR. CUMMINS: This isn't marked but -- you're blue, right?
MR. SCHUELLER: It's just 69. It had been marked previously.
MR. CUMMINS: Oh, okay. I'm sorry. Okay. This is --
(Defendants' Exhibit 122 was marked.)

BY MR. SCHUELLER:
Q. I'm showing you what we've marked as Exhibit 122. And let's go to the e-mail at the bottom. It's from Jill Brown to Brenda Iannitti, it's dated January 15th, 2020. Do you see that?
A. January 15th, 2020.
Q. And Jill says, Good Afternoon, I am Ray Schneider's assistant. Usually Regina sends me the monthly income statement/balance statements for the entities Harold and Ray own together. The last report I received was June. Is it possible for one of you to catch me up? Do you see that?
A. Yes.
Q. Is that an accurate state of facts that there had been a gap of six months when Premier had failed to send the monthly income statement and balance sheets to you?
A. I believe that's what it says.
Q. Okay. And that's accurate?
A. I believe so.
Q. And then the -- there's an e-mail that same day back from Brenda Iannitti, and she sends what she says

are the reports you requested. Do you see that?

A. I see two reports in September for September.

Q. Okay. But do you see she says, I have attached the reports you requested?

A. It says that but there are no reports attached.

Q. I understand. But I'm just -- the question I have for you is, did Brenda Iannitti provide the reports that Jill requested?

A. I don't know.

Q. Okay. Were you concerned at all that Premier had failed to share balance sheets and income statements with you for six months?

A. I probably was.

Q. Okay. Did you do anything about it?

A. I had Jill write.

Q. Six months later?

A. I think there might have been stuff along the way.

Q. Did you think you needed to

investigate further into the financial situation of Premier because Premier had failed to provide financial statements for six months?
A. There were always gaps.
Q. Was six months an unusually long gap?
A. I don't remember.
Q. Do you think that in January of 2020 because you hadn't received financial statements for six months, you should have taken more steps to find out what was happening at the company level?
A. I expected the documents and then I reached out.
Q. Okay. I mean, would you consider that the failure to provide financial statements for six months is a red flag that something negative might be happening at the company?
A. I didn't take it as a red flag at the time.
(Defendants' Exhibit 123 was marked.)
BY MR. SCHUELLER:
Q. All right. I'm showing you what

we've marked as Exhibit 123.

MR. SCHUELLER: (Handed.) Oh, sorry.

BY MR. SCHUELLER:

Q. Oh, this is a continuation of that e-mail chain. And at the top it's an e-mail from Jill Brown to Brenda Iannitti dated January 16th, 2020. And Jill says, I need -- I need August also. Do you see that?

A. Uh-huh.

Q. You have to say yes?

A. Yes. I'm sorry.

Q. And then she says, Just to be safe, the October, November, and December statements are not available, and I will receive them when they are.

So is it fair to say that as of January of 2020, Premier had not produced any financial statements for October, November, and December of 2019?

A. You said any, and then you gave me three dates, so I'm gonna stick with the three dates.

Q. Okay. So is it fair to say --

A. It's something that happens in

our business, at the end of the year you have to do cost reports so sometimes things take a little longer.

Q. So you were not concerned with that?

A. The cost reports really bring out a lot of it.

Q. And what are cost reports?

A. When you get money from the government, you have to report what your costs are.

Q. And how often are the cost reports generated?

A. Annually. Wait, I don't remember.

Q. And did you --

A. It used to be annually, but I've been out of the business to know.

Q. And did you ever receive cost reports from Premier?

A. It wasn't a regular thing because that was to get the reimbursement, but I might have. I don't know off the top of my head.

Q. And you said those are very

important and that's because -- because why?
A. Because you have to do it.
Q. You do it for who?
A. For your reimbursement of your Medicaid/Medicare.
Q. I see. So these are reports that are sent to the government?
A. Yes.
Q. And that was important information for you to know the health of a -- of the company?
A. No. It's the accountant puts together a report usually after the year is done and it accumulates the government's requests to give you your cost report reimbursement.
Q. Do those cost reports provide any guidance as to the economic health of an entity?
A. No.
(Defendants' Exhibit 124 was marked.)
MS. NEAL: This one. Hold on one second. What file are you supposed to be there?
MR. SCHUELLER: Just mark it up

again.
MR. CUMMINS: You can have your phone.
THE WITNESS: Can I tell him I'm not gonna make it?
MR. CUMMINS: Sure. What time are you supposed to be there, 4:30?
THE WITNESS: 4:30.
MR. CUMMINS: You -- you didn't make it.
THE WITNESS: I know that now.
MR. CUMMINS: You should be able to tell.
THE WITNESS: I'm just texting him.
BY MR. SCHUELLER:
Q. Mr. Schneider, I'm showing you a document we've marked as Exhibit 124. And this is a letter from Dave Wechter at Huntington to Harold Sosna on February 25th, 2020. Do you see that?
A. Yes.
Q. All right. And in this letter, there's a reference to a meeting between the bank --

MR. CUMMINS: Do you need to take a minute?
THE WITNESS: Can I take one --
MR. SCHUELLER: Yes.
THE WITNESS: I was supposed to meet someone at 4:30.
MR. SCHUELLER: Yeah, please.
THE WITNESS: I just want to tell him, no, I can't make it.
MR. SCHUELLER: Yeah.
THE VIDEOGRAPHER: We are off the record.
(Off the record.)
THE VIDEOGRAPHER: We are back on the record. The time is 4:32 p.m.
BY MR. SCHUELLER:
Q. All right. This is a letter from David Wechter to Huntington dated February 25th, 2020, correct?
A. Yes.
Q. And in this letter, there's a reference in the second paragraph to a meeting that day between the bank and Harold. Do you see that?
A. That's what it says.

Q. Were you at that meeting?
A. No.
Q. Were you told in advance of that meeting that the meeting was going to take place?
A. Absolutely not.
Q. All right. When was the first time you learned that this meeting took place?
A. In the deposition -- when the due diligence material showed up.
Q. So after the receivership?
A. Yes.
Q. And the first sentence of the second paragraph says, This letter shall memorialize your discussion at today's meeting that the bank has discontinued providing ZBA services to the company due to a manipulation of funds availability by the company, among other reasons. Do you see that?
A. Yes.
Q. Now, what are ZBA services?
A. I have no idea.
Q. Okay. And let's go to the next

sentence. As such, any items written on or presented against any particular sub-account will only be honored if sufficient, fully collected, good and available funds are in such account at the time of presentment. Do you see that?

A. Yes.

Q. And so at this point in time, Huntington discontinued the company's use of a float, correct?

A. That's what it says.

Q. All right. Now, did anyone from Premier advise you prior to the receivership that Huntington had discontinued the ability of the company's to use a float?

A. I'd like to make a correction. I don't know what the float that Huntington had, but you asked me that question about ZBA and I did not know what that meant. There's no word in here that says float.

Q. Right. Okay. So I'm talking about the second sentence.

A. Okay.

Q. It says that --

A. As such, any items --

Q. Any items will only be honored if sufficient, fully collected, good and available funds are in such account at the time of presentment.
A. Is that the float you're talking about?
Q. Correct.
A. Okay. Well, I wasn't aware of a float.
Q. Okay. So my question is, at this point in time, all funds had to be collected to be used by the companies, correct?
A. I do that every day.
Q. Right. But I'm talking about the companies at this point in time?
A. Well, that's what this says, yes.
Q. All right. And so there was no float?
A. I don't know what float was in this context.
Q. Well, the float is the check-kite, right?
MR. CUMMINS: Objection.

A. I didn't say that.
MR. CUMMINS: Objection.
Q. Okay. What -- what -- do you have any understanding as to what a float is?
A. Yes.
Q. All right. What is your understanding?
A. A float is when a bank gives an extra loan to a customer and they don't have the money in the bank.
Q. Okay. And is it possible to -- in your view to kite checks when there's no float permitted?
A. I think when there's no float, it's very hard.
Q. Okay. It's, in fact, impossible, right?
A. It's usually caught right away, but a float usually lets you play games.
Q. Right. But I'm saying if there's no float, there cannot be check-kiting, correct?
A. No, I don't agree.
Q. All right. And what about that statement is wrong, how can you kite

checks --
A. The float was made within five banks, and just the way I saw the pattern this thing was made, the bank kept on honoring his checks.
Q. All right. So if Huntington does not allow a float, would you agree with me that checks could no longer be kited through the Huntington accounts?
A. Past this date, there was still kiting going on in the bank.
Q. In Huntington?
A. Yes.
Q. How is that possible if there's no float?
A. They wrote checks and they moved money through the bank.
Q. All right. Well, Harold Sosna said the float and the check-kiting stopped at the Huntington accounts in February of 2020 and so did Brenda Iannitti --
A. I thought he said it ended in April.
Q. -- and so did Sams.
A. I thought it ended in April.

Q. So all of those witnesses said there was no check-kiting through the Huntington accounts after February 25th, 2020. So would you agree with me that that's accurate?
A. No.
Q. And why not?
A. Because it was another letter written because it was continuing.
Q. The check-kiting was continuing?
A. I presume that's what this letter was about.
Q. The float was continuing?
A. There was another letter after this letter.
Q. Okay.
MR. CUMMINS: And if you need to talk to me, we'll go off just.
THE WITNESS: I'm just showing you.
MR. CUMMINS: You're being recorded so everything that you -- right.
(Defendants' Exhibit 125 was marked.)
BY MR. SCHUELLER:
Q. Mr. Schneider, I'm showing you

what we've marked as Defendants' Exhibit 125. And this is an e-mail exchange between Dennis Packer and Jill McGrail on March 9th and March 10th of 2020, correct?

A. The top says March 10th, 2020.

Q. And Dennis Packer is your attorney?

A. He's an attorney that I use.

Q. Okay. So he's your attorney?

A. He's one of my attorneys that I use.

Q. Okay. And then it would appear that Dennis asked questions and then Jill responded in red. Do you agree with me on that?

A. I believe that's what I'm looking at.

Q. Okay. And then at the bottom of the page, there's a question from Dennis saying, Ray would like copies of the 2019 year-end and year-to-date financials for both the real estate and operating entities for the four nursing homes he owns with Harold. Do you see that?

A. Uh-huh.

Q. You have to say yes?
A. Yes. I'm sorry.
Q. And Jill responded, The 12/31/2019 financials are in process and are not -- yet finished. I will send to you and Ray as soon as they are available. Do you see that?
A. Yes.
Q. All right. So is it fair to say that as of March 10th, 2020, you had not received the 2019 financials for the companies?
A. That's what she wrote.
Q. Is that accurate?
A. Yes.
Q. And then at the bottom Jill states that the division of the $3 million in escrow would be if it was paid out broken down to 2.2 million going to Harold and 800,000 to you?
A. If I had gotten it.
Q. If you had gotten it, right. So that's what the division would have been?
A. Correct.
Q. Okay.

A. Plus or minus.

Q. So if you received $915,000 from the closing on the Huntington refinancing from the Bryden beds, and then you received this additional $800,000, you would have received $1.7 million or so because of the Huntington refinancing?

A. That's not what happened.

Q. Right. But that's what you stood to gain?

A. No. I stood to gain a lot more, but, yes.

Q. Okay.

(Defendants' Exhibit 126 was marked.)

BY MR. SCHUELLER:

Q. Now, throughout 2019 and 2020 until May of 2020, Premier generated daily cash need reports. Did you know that?

A. No.

Q. Had you ever seen prior to the receivership any daily cash need reports generated by Premier?

A. Nope.

Q. Were you aware prior to the receivership that these daily cash reports

had -- were being generated?
A. No.
Q. I'm showing what we've marked as Exhibit 126. It's a letter from Dave Wechter at Huntington dated March 24th, 2020, to Harold Sosna. Do you see that?
A. Yes.
Q. All right. Is this that second letter you were referencing where you thought that the float continued after February of 2020?
A. I believe the kiting was continuing.
Q. Okay. But you said there was a letter, is this -- is this the letter?
A. This is the letter.
Q. Okay. This is the letter. All right. Now, in the second paragraph Dave Wechter states that he had asked Harold on February 26th, 2020, to move all his deposit accounts to another institution no later than April 15th, 2020.
Do you have any reason to believe that request was never made?
A. I believe the request was made.

Q. Okay. And when was the first time you learned of this request?
A. Well, I wasn't cc'd on this, so I never saw these letters. I got a -- I got a call that Harold was opening some other accounts.
Q. All right. All right. So on page 2, there is a -- the first full paragraph says, For the surviving accounts, after April 15th, 2020, the bank will only present wires and ACH payments from the surviving accounts to a depository account at another financial institution identified by the company; and two, will not pay any overdrafts, honor any checks or accept any deposits other than those identified above.
Do you have any reason to believe this state of facts is inaccurate?
A. No. I think it agrees with what I learned --
Q. Okay.
A. -- that there was still kiting going on.
Q. Well, what in that indicates there was kiting?

A. I believe the way they described they're not gonna do this any more. For the surviving accounts, after April 15th, the bank -- after April 15th only permit wires, ACH payments from the surviving accounts to a depository account at another financial institution identified by the company will not pay any overdrafts -- that's the float you're talking about, the kiting that I referred to -- honor any checks, or accept any deposits other than from those identified above.

I don't know what Hoffman-Resident is. I don't know who Hoffman is or was. And I don't believe those are all the accounts at Huntington.

(Defendants' Exhibit 127 was marked.)

BY MR. SCHUELLER:

Q. I'm showing you what we've marked as Exhibit 127. And this is an e-mail from Harold Sosna to Suzanne Meyers at Huntington dated March 24th, 2020. Do you see that?

A. Yes.

Q. And have you seen this e-mail

before?
A. Only after the receiver closed out the business.
Q. Okay. But would you agree with me that at this point in time Harold was disputing that there was any irregularities in his deposit accounts with Huntington?
A. I think he wrote to Suzanne Meyers that he wasn't happy.
Q. Yeah. And at the end of the second paragraph he says, I get accused of fabricated BS irregularities that have no basis in fact -- absolutely no basis in fact. None.
So it fair to say at this time he was disputing that there had been any irregularities in the deposit accounts?
A. Is this -- this sentence says, But, hey, you guys got your bonuses and commissions. Congrats. I'm happy for you. The fact is that you guys all sold me a bill of goods. All of you. I get accused of some fabricated BS irregularities that have absolutely no basis in fact. Is that the one you're asking?

Q. Yes.
A. What about the question again?
Q. He said the alleged irregularities in the deposit accounts were BS. Would you agree with me?
A. That's what it says.
Q. Yeah. So he was disputing the fact that there had been anything improper in the bank accounts?
A. It looks like he was celebrating and then arguing about the bank accounts.
Q. Right. And he was arguing and saying there was no irregularities in the bank accounts, correct?
A. That's what his e-mail says.
Q. Okay.
(Defendants' Exhibit 98 was marked.)
BY MR. SCHUELLER:
Q. All right. I'm showing you what we've marked as Exhibit 98. And this is an e-mail dated March 24th, 2020, from David Wechter to Harold Sosna. Do you see that?
A. I believe so.
Q. And there's a reference here to

efforts by Harold to obtain refinancing at this time. Were you aware of any of these refinancing efforts?
A. No.
Q. When was the first time you learned of these refinancing efforts?
A. After the receiver took over -- after the sale of the properties.
(Defendants' Exhibit 128 was marked.)
BY MR. SCHUELLER:
Q. I'm showing you what we've marked as Exhibit 128. And let's go to the second e-mail from the top, it's from Jill McGrail to Jill Brown March 30th, 2020. Do you see that?
A. What's the -- what's the date?
Q. March 30th, 2020.
A. What's the time on that?
Q. 8:49 a.m.
A. Okay.
Q. And Jill McGrail says, Hope you and yours are doing well. I am sorry to pester you, but could you please send me a copy of Ray's driver's license for GECU? I need to send it to GECU this morning, so your

help is appreciated. Do you see that?
A. Yes.
Q. Was this in connection with the transfer of the deposit relationships at Huntington to GECU?
A. I don't know.
Q. Okay.
A. I was told they were gonna open new accounts.
Q. And so down at the bottom there's an e-mail from Jill McGrail to Jill Brown at Circle Development on March 26th, 2020. Do you see that?
A. Yep.
Q. And she says, Hello again, Jill. We were moving the treasury management from HNB to GECU. GECU has provided me a long list of needed items. As Ray is one of the owners, I need to supply them with the following for Ray. Do you see that?
A. Yes.
Q. So is it fair to say that you knew as of March 26th, 2020, that the treasury management accounts were going to be moved from Huntington to GECU?

A. Treasury management, in my mind, was savings accounts.
Q. And you knew that they were being -- going to be moved --
A. That's what it says.
Q. -- to GECU? Okay.
A. They said they were going to open new accounts.
Q. All right. Did you ask why?
A. No.
Q. Did you find anything suspicious about that?
A. No.
Q. Did you find anything disconcerting about that?
A. Not at the time.
Q. Okay. Did you know that Huntington required the deposit accounts to be maintained at Huntington under the loan documents?
A. Under the loan documents, that's what it said.
Q. Yeah. And so wouldn't that cause alarm to you that all of a sudden some -- Huntington wanted to move the

accounts over the GECU?
A. I understood that treasury management, he was moving that over to GE.
Q. Right. Which would be in contravention of the loan documents, correct?
A. Well, I don't know what treasury management dealt with in this loan.
Q. Okay. Well, did you ask them about it?
A. I just thought it was the deposits that he had.
Q. I know. But my question is, did you ask Premier about it?
A. No.
Q. You didn't investigate why the accounts were being moved?
A. I didn't know the accounts were being moved. He said he was opening some savings accounts.
Q. Well, it says at the bottom, We are moving the treasury management from HNB to GECU. That indicates some accounts are being move to GECU, correct?
A. Well, I remember in the very beginning of the loan Huntington was trying

to get his personal accounts and his savings accounts, so that's what I thought treasury management meant.

Q. Okay. But you knew accounts were being moved from Huntington to GECU, correct?

A. It was accounts that he was involved with, yes.

Q. And you didn't investigate that further?

A. I did not.

(Defendants' Exhibit 129 was marked.)

BY MR. SCHUELLER:

Q. This one doesn't have stickers. Okay. Mr. Schneider, I'm showing you what we've marked as Exhibit 129. And this is an e-mail from Jill McGrail to Harold Sosna and Dennis Ringer on April 28th, 2020. Do you see that?

A. I see the names. I don't know who Dennis Ringer is.

Q. Okay. And Jill says, Getting back to you on the questions raised late yesterday. In terms of their MCAs and their accounting and how getting them out of the

picture impacts Premier.
And then underneath that Jill says, The MCAs are not reflected on Premier's income statements. Do you see that?
A. It's important, yes.
Q. And is that accurate that they were not reflected on the income statements?
A. Yeah, I did not see them.
Q. So that's accurate, the MCAs were not reflected?
A. I don't know. I don't remember the statements. I don't have it in front of me.
Q. Okay. So you don't know one way or another?
A. I don't know one way or the other.
Q. And then it says that the MCAs are reflected on the balance sheet. Each MCA is recorded as an AR to Mr. Sosna, in other words, it is recorded as a loan for Mr. Sosna, individually, to a facility. Do you see that?
A. Help me out because I was reading something else. Where's the to a

facility?
Q. It's that, I guess, third paragraph that begins with the MCAs.
A. It says, The daily payments, then reduce the AR --
Q. Right before that.
A. -- to Ms. Sosna. It says, Just on the balance sheets. Each MCA is recorded as an AR to Mr. Sosna, in other words, it is recorded as a loan for Mr. Sosna, individually, to a facility, Sosna owns -- to a facility, Sosna loans -- that doesn't make sense. The daily payments, then reduce the AR owed to Mr. Sosna.
Why would an AR reduce if it's an AR from him? As there is no impact on the income statement, the Sosna loans are only reflected on Premier's balance sheets.
Well, I don't get Premier's balance sheets. It should also be noted the lion's share of the Sosna loans fall on the FFB -- that's the other syndicate -- Wexford Place and the Wexford Care Center, collectively the Wexfords, that was intentionally done as the Wexfords have

accounted for a significant portion of the cash needs and have been the facilities that have operated at the greatest loss. Although allocated to the First Financial Bank facilities, taking the MCAs out of the equation would naturally improve cash flow overall for Premier.

Why didn't the FFB talk to Huntington because they were syndicates together?

Q. So are all these facts accurate?

A. I think it's missing some facts.

Q. But are the facts presented accurate?

A. I don't know. I never saw these documents.

Q. Did -- do you think that Sosna hid the existence of the MCAs from his balance sheet and income statements?

A. I don't know. I don't see the statements to verify that.

Q. Well, you did receive statements, didn't you? We just went through a bunch of e-mails where you received statements.

A. And I also said I don't see the statements. The ones I saw, it wasn't on those, and those were the last ones I got was the end of '19.

Q. Would you agree with me that Mr. Sosna hid the existence of the MCA loans from you?

A. He hid them from me. I will agree.

Q. Yeah. And he hid them from Huntington?

A. That I can't tell you.

Q. Okay.

(Defendants' Exhibit 130 was marked.)

BY MR. SCHUELLER:

Q. I'm showing you what we've marked as Exhibit 130. This is an e-mail from Jill Brown to Regina Sams dated May 27th, 2020.

And Jill states, Would you see if there are some financials for 2020 you could send? I have none so far.

Is that accurate that you did not have any 2020 financials as of May 27th, 2020?

A. I'm sure that was meaning the end of 2020.
Q. Well, this e-mail was sent May 27th, 2020, correct?
A. I mean, yeah.
Q. All right. And so for the first five months of 2020, you did not receive any financial statements from Premier, correct?
A. I think she was asking for them so I could look at them.
Q. Right. So you didn't receive them for five months in 2020, correct?
A. I didn't receive them at that point in time.
Q. Okay. And did that cause any concern on your part?
A. That's why Jill went and wrote and asked for them.
Q. Okay. Did you suspect there was any financial stress at the company because they weren't providing you with financials in 2020?
A. I didn't.
Q. Okay.
MR. CUMMINS: Want to take a

short break?

THE WITNESS: No. I think he's done or close to it.

MR. CUMMINS: No.

MR. SCHUELLER: We can take a break if you want.

MR. CUMMINS: See that box. When that box is empty, then he's done.

THE VIDEOGRAPHER: It's a good time actually. We are off the record.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record with the start of Disc 4. The time is 5:20 p.m.

THE WITNESS: Can you hear me?

MR. CUMMINS: Yeah.

(Defendants' Exhibit 131 was marked.)

BY MR. SCHUELLER:

Q. Mr. Schneider, I'm showing you Defendants' Exhibit 131, which is a letter dated May 29th, 2020, to a number of different entities, and if we go to the last page, the letter is from David Wechter at Huntington. Would you agree with me on that?

A. David Wechter cc'd to

Christopher Schueller, Jill McGrail, and Alan Statman.
Q. And --
A. And all the borrowers along with that.
Q. -- would you agree with me that this is a letter agreement?
A. I don't know what a letter agreement is.
Q. Well, there's -- it says, Agreed to the above, on the last page. And then below that it says, All the borrows individually and collectively including without limitation, and it lists all the borrowers and it's signed by Harold Sosna. Do you see that?
A. Yep.
Q. So that is --
A. May 29th, yeah.
Q. So that's an agreement, wouldn't -- wouldn't you say?
A. No.
Q. Okay.
MR. CUMMINS: Objection. Is your copy signed by Wechter?

MR. SCHUELLER: No. This is the only copy I have.

MR. CUMMINS: Are you making a professional representation that this is an agreement when it's not signed by one of the parties?

MR. SCHUELLER: Sure. It's an agreement from the party to be charged.

THE WITNESS: It's not an agreement with --

MR. CUMMINS: Okay. Fine. We can -- that's a good one. We'll take that one up. I didn't mean to interrupt, but I'm happy to argue with you about it on another occasion.

MR. SCHUELLER: I understand.

BY MR. SCHUELLER:

Q. Did you authorize Harold Sosna to sign this letter?

A. I don't know.

Q. Did you instruct Dennis Packer to authorize Harold Sosna to sign this letter?

A. I don't remember.

Q. Do you recall in May of 2020

that the borrowers could not make payroll after the check-kite was discovered?
A. I discovered that after the assets were sold.
(Defendants' Exhibit 80 was marked.)
BY MR. SCHUELLER:
Q. Well, let me show you what we've marked as Exhibit 80. And let's go to the second page at the bottom, there is an e-mail from Dennis Packer to Jill McGrail dated Friday, May 29th. Do you see that?
A. Christopher Schueller, there's one. Jill McGrail and Dennis.
Q. The page prior.
A. Oh, okay. There's -- e-mails are kind of goofy.
Q. At the bottom.
A. And there's from Dennis Packer on Friday the 29th at 4:46 p.m. --
Q. Yes.
A. -- to Jill McGrail?
Q. Yes. And Dennis Packer is your attorney?
A. He represented me at the time.
Q. Okay. And Jill represented

Harold?
A. I'm not sure who she represented.
Q. Did she represent Harold or the companies?
A. I gathered she was involved.
Q. Did she represent you?
A. If she did, that was illegal.
Q. Okay. Now, at the bottom here it says, Jill, Pursuant to our respective and joint conversation with Ray, Ray has instructed me to inform you that he authorizes Harold to sign the document attached to your e-mail below on behalf of the jointly held entities who are borrowers. Do you see that?
A. I see that.
Q. Do you recall this conversation that took place between you, Jill, and Dennis?
A. I don't recall it.
Q. Was it a conversation about this letter that we've marked as Exhibit 131?
A. It's attached to it. I don't know.

Q. All right. So is it fair to say that you authorized Dennis Packer to sign Exhibit 131 on behalf of the entities jointly owned by you and Harold?

A. I don't believe Dennis signed anything.

Q. Oh, I'm sorry. Yeah. Is it -- is it fair to say that Dennis authorized Harold to sign Exhibit 131 on behalf of the entities that were jointly owned by you and Harold?

A. I forget why, but it's what this thing says.

Q. Okay. And do you know why Harold through Jill would have sought your approval to sign Exhibit 131?

A. What exhibit is 131? This says Exhibit 80.

Q. (Indicating.)

A. Oh. Why?

Q. Yeah. Why would they need your consent?

A. Because I owned 45 percent of the real estate.

Q. Okay. Any other reason?

A. I think there was a pressure going on somehow.
Q. Was it required under, as far as you know, any corporate agreements?
A. I'm not aware.
Q. Did Harold ever ask for your permission to sign any other documents at any time on behalf of the entities you co-owned with him?
A. I didn't talk to Harold during any of that period.
Q. No. I'm just talking about in the past, was this a regular event where Harold would seek your approval to sign documents on behalf of the entities you jointly --
A. No.
Q. -- owned? Had he done it prior to May 29th, 2020 in any context?
A. I don't recall.
MR. CUMMINS: Counsel, I'm sorry to interrupt, is there some language in Exhibit 80 that can definitively indicate that your Exhibit 79 was the attachment that the authorization has been given for?

MR. SCHUELLER: I think he just testified that that was the letter.

MR. CUMMINS: Other than his testimony, which may or may not be accurate. I just don't see it because -- I don't see the connection.

MR. SCHUELLER: Well, we -- I guess we could see, you know, what document was attached to that e-mail.

MR. CUMMINS: If you could, because there are two. The reason I raise this is up on this top of Exhibit 80, there are three documents attached. Okay.

And then when you look at document -- I'm sorry -- and then there's a reference to I think it was Packer saying here's authority to sign the agreement attached, but it's been redacted out, or whatever you call that with Xs and the gray.

So I'm gonna assume that you'll be able to connect it. Okay?

MR. SCHUELLER: Okay.

MR. CUMMINS: And if not, let's defer it for another discussion. And just for the record, I'll put it on the record.

MR. SCHUELLER: Okay.
(Defendants' Exhibit 132 was marked.)
BY MR. SCHUELLER:
Q. Oh, I'm sorry. I didn't mark this. Could you bring that back to me? I'll mark it for. Mr. Schneider, could I have that? I'll just mark it for you. Thank you.
THE VIDEOGRAPHER: Jim, if you could put your mic on when you get a chance to.
MR. CUMMINS: It was saving your ears.
THE VIDEOGRAPHER: Thank you.
MR. CUMMINS: A little bit more.
BY MR. SCHUELLER:
Q. Mr. Schneider, I'm showing you what we've marked as Exhibit 132. Do you recognize that document?
A. From what it says when they went into my phone, this might be a piece of that.
Q. All right. And so these are text messages between you and Harold; is that right?
A. If you don't mind, I'd like to read it.

Q. Yes. Go right ahead.
A. (Witness reading.) Okay.
Q. And these are text messages between you and Harold?
A. It looks like it.
Q. And from February 9th, 2018?
A. Early part of '18, yes.
Q. All right. And at the beginning Harold says, Jill gave you -- gave your list of what you want to agree to the cross. What was that list; do you remember?
A. I do not recall.
Q. And he says to you, I don't care if we refinance or not. I'll give you all the info you want.
Do you know what information he's referring to there?
A. He said that he put money in and I never saw it.
Q. Okay. And he says, Here's what I'll offer on the personal indemnification. So is it fair to say that as of February of 2018, you were talking about an indemnification arrangement between you and Harold?

A. We were talking about he said he was refinancing.
Q. And that's the refinance of the Fifth Third loan?
A. I believe so.
Q. And then you were discussing with Harold a personal indemnification arrangement as part of that deal?
A. If this were to occur, yes.
Q. Okay. And is it fair to say Harold was not pleased with that request?
A. He was never pleased, yes.
Q. Okay. And he says Southbrook has lost millions over the years; is that accurate?
A. I don't know.
Q. And which entities owned Southbrook?
A. The Keller Group.
Q. Keller Group. He says it has finally turned around; is that accurate?
A. It was making money.
Q. As of February 2018?
A. According to him.
Q. Okay. Was that factually

accurate, though, was it making money then?
A. I couldn't tell you that. I don't have the documents.
Q. He says, In fact, census should hit 100 today. What does that mean?
A. That means that the business is actively making money and census is the beds that are full.
Q. Is that a hundred beds, do you know, or is that a hundred percent or what is that?
A. A hundred beds.
Q. Okay. And how many beds were part of Southbrook?
A. I don't remember if it's 110 or 120.
Q. Did you ever receive reporting on bed census?
A. I'm sure at a time or two I did.
Q. But, I mean, throughout your entire relationship with Harold on the entities you co-owned with him, did you ever receive reporting on census?
A. I could have.
Q. Was it a regular thing?

A. Obviously not.
Q. Okay. Is that an important piece of information to monitor the health of these entities?
A. I relied on him to manage them.
Q. Right. But is the census an important piece of information to evaluate the financial health of these entities?
A. Usually tells you what you're doing.
Q. So that's important?
A. It's part of the whole amount of information.
Q. What if there are unpaid bed taxes; is that a sign of trouble?
A. Yes.
Q. Okay. And was there ever a time when the entities you co-owned with Harold had unpaid bed taxes?
A. I don't know.
Q. Did you ever ask for reporting from Harold on unpaid bed taxes?
A. I never specifically said that. I didn't know what I didn't know.
Q. Then he goes on, he says,

Madeira lost a couple of million, I believe. And is Madeira part of the Kenmore (sic) group?

A. No, part of the Keller Group.

Q. Keller Group, rather. It's not part of that?

A. It is part of the Keller Group.

Q. It's part of the Keller. Okay. Is that accurate that Madeira lost a couple million dollars?

A. I don't know.

Q. And Harold said he has never made a cash call on you; is that accurate?

A. I don't believe he did.

Q. He said he's carried the losses; is that accurate?

A. If there were losses that he carried, yes.

Q. And so he says, So here's what I'll offer. I will indemnify you on the cross if you sign a personal note for the millions and millions you owe me. I will send you that number next week.

Did you owe him millions and millions of dollars as of February of 2018?

A. I was unaware.
Q. And then later he says in this text he says, You saw year after year massive losses at Southbrook. You used the losses on your tax returns; is that accurate?
A. I took the tax return he gave me. There was always losses because you did cost segregation or you did -- you know, you can create losses when you want to.
Q. And so that's accurate, you used the losses on your tax returns?
A. I did my tax return according to what he gave me.
Q. And you used the losses on your tax returns?
A. I did my taxes as I always have.
Q. I know. But my question is, did you use the losses on your tax returns?
A. If there were losses, they were in my tax return.
Q. Okay. And then below that he says, And by the way, I can't get paid from Medicare until you file the cost reports. I'm informed you have all the information. Not sure why we closed before you did those.

What's referencing there?
A. I have no idea. I didn't do the cost reports.
Q. What's the closing?
A. The closing was November 30th, 2018.
Q. No, I mean --
A. I mean, yeah.
Q. -- what do you understand to be closing referenced in this text in February of 2018?
A. I don't know. What's the date on that e-mail.
Q. February 9th, 2018?
A. The only closing I know was one in '16 and one in the end of '18.
Q. And do you know what this references then to cost reports?
A. Well, you take money from the government, you got a file a cost report.
Q. Okay. But he's saying he can't file without information you have. Why would you have the information?
A. Probably just my name or my Social Security Number. I don't have

anything to do with the cost report.
Q. But he says, I can't get paid for Medicare until you -- you, Ray -- file the cost reports.
Do you know what he meant by that, you were supposed to file the cost reports?
A. No.
Q. Have you ever filed cost reports for the entities you co-owned with Harold?
A. No.
(Defendants' Exhibit 133 was marked.)
BY MR. SCHUELLER:
Q. I'm showing you what we've marked as Deposition Exhibit 133. These are text messages between you and Jill McGrail. Do you see that?
A. That's what I see at the top, yes.
Q. All right. If you turn to the second page, there's a text from Jill, January 24th, 2018. She says, Morning, Ray. Here's what I need to talk to you about, Harold say no more on the life safety. Do you know what she's talking about there?

A. No.
Q. Do you know why she would be talking to you about life safety on anything?
A. There's a thing in the healthcare facility that you had to have your building -- what the life safety rules were.
Q. Okay. And she says, You've known about the issue since last year, and he's not gonna do it -- do this at the 11th hour. Do you know what she's referring to there?
A. Nope. Do you know what the reference to any of this is?
Q. No. I'm asking you.
A. Well, Jill was involved with Harold, and then she did the Wexford. She did the entities with your loan, and I don't know what this reference is.
And at that time of the year, it was probably the other facility.
Q. What other facility?
A. The Wexford that she was helping him out with.
Q. Why would she talk to you about Wexford?

A. Because there was a payment due, that final payment I think from the -- oh, it was the cost report. It was a cost report for Wexford. That's what that's about.
Q. I see. And you're referring to Exhibit 132, the cost report; is that what you're saying that dealt with Wexford?
A. Now that I recollect -- hold on one second -- yes.
Q. Okay. Got it. When did you sell the facilities that we were reading to Wexford to Harold?
A. Sometime before the e-mails with Jill.
Q. Okay. And so was this just a carryover thing you had to do for those entities, you had to file cost reports?
A. You had to file a final cost report when you transfer ownership.
Q. Okay. And then back to our Exhibit 133, there's a text from Jill to you 1/24/2018, Hi, Ray, Harold wants to confirm he'll get his 975 on Friday. When can you and I talk? What is that 975 she's referencing?

A. That's the money that we talked about earlier that came through the Wexford, I believe. I don't have any reference on that.
Q. That came through Wexford?
A. Harold wants to confirm that he'll get his 975 on Friday. When can you and I talk? 1/24/18. I'm not sure what it is.
Q. Okay. But then you say below that 1:20, still don't have funds. What does that mean, 1:20?
A. That's at 1:20, I presume there's no funds.
Q. Do you owe Harold $975,000?
A. Nope.
Q. Now, on -- if you turn a couple of pages to January 26th, 2018, at 7:08 a.m.?
A. 7:08 a.m.? Yeah, okay.
Q. You text Jill, Okay, I'll call this morning. How early works? And then below that 7:10 a.m. you say, That is not okay to escrow my management fees. I'm not signing if that goes out. What -- what is that referencing?

A. I have no idea.
Q. And so on February 4th, 2018, at 12:58 p.m. -- could you turn to that?
A. What date?
Q. February 4th, 2018.
A. February 4th, 2018. What time?
Q. 12:58 p.m.
A. 12:58.
MR. CUMMINS: It's page 19471.
A. Is this page 9?
Q. 472.
A. I don't have -- I don't have a 12:58.
MR. CUMMINS: What, 72?
Q. February 4th, 2018.
A. February 4th.
MR. CUMMINS: What's the Bates page?
MR. SCHUELLER: RS19472.
MR. CUMMINS: Okay.
THE WITNESS: 19472.
Q. Yeah.
A. Okay. And what's the time you were referring to?
Q. 12:58 p.m.

A. 12:58.
MR. CUMMINS: At the top. 12:58.
A. Oh, up here. Okay. I'm sorry. You tell them about relationships going on.
Q. And so you're asking Jill at that point when there will be a closing with Huntington; is that right?
A. That's what it's asking.
Q. Okay. So is it fair to say at that point in time the companies were pursuing refinancing with Huntington?
A. I would probably say, yes.
Q. All right. We're gonna make a big jump to RS19492.
A. 19492. Page 31?
Q. Yes. Oh, I forgot that one. I'll go back. Now, on January 31st, 2020, Jill texts you at 5:48 p.m. --
A. Wait. Tell me where you're at.
Q. 19492.
A. 19492. And then give me the context?
Q. January 31st, 2020, at 5:48 p.m.
A. 5:48. Okay. Got it.

Q. And Jill tells you that she's working on a refinance of the portfolio. Do you see that?
A. Yep.
Q. So is it fair to say that in -- as of January 31st, 2020, you knew that Jill and Harold were working on a refinancing of the Huntington loan?
A. I'm not sure what that is because no Harold on that message, and I don't know without a reference what that is.
Q. What do you think the portfolio is?
A. I'm not sure.
Q. What -- what are the possibilities?
A. I own about 40 pieces of real estate. Unless you're specific, I couldn't tell you.
Q. Well, Jill doesn't represent you on all those deals, right?
A. No. She represents Harold and things. She represents, I'm sure, other clients, but I'm not sure what that is.
Q. And so don't you think she's

referring to the portfolio of companies you jointly owned with Harold?

A. I don't know. There's no reference there.

Q. Well, let's go back a few pages to page 27 at the bottom. Would you review that page and confirm for me that the $915,000 from the Bryden beds were received by you?

A. I don't know where you're at. Sorry. I'm on page 27, 19488, but I'm not sure where you're at.

Q. Yeah. So my -- will you review this and my question to you is, will you just confirm that you received the $915,000 from the Bryden beds on December 6th, 2018?

A. What's your question, again?

Q. Did you receive the $915,000 from the Bryden beds?

A. I don't know, but that's what that says.

Q. Well, you said you received the money, right?

A. Received the deposits. Not everything came exactly as they told me.

Q. Okay. Well, she says at 2:48 p.m. on December 4th, 2018, Hi, $915,000 has been wired to your BOA account. Let me know when the funds hit your account. Then you respond, Let you know. Thanks.

And then she responds with some type of emoji, like a dancing person, and then you respond, Received the deposits. And then she says, Yay. So can we agree you received the $915,000?

A. No, I can agree I got a deposit. I don't know what the number was.

Q. Okay. All right. Page 34 --

MR. CUMMINS: I'm gonna reconnect Rebecca. Does this thing time out after three hours?

THE VIDEOGRAPHER: We are off the record.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record. The time is 5:51.

BY MR. SCHUELLER:

Q. All right. So at the top of page 34, there's a text from you to Jill at 6:40 p.m. on March 18th, 2020. And you say,

Thanks, sorry. I have stayed away and need the finish to this. Update on loans? I've asked for 12/31/19 number and promised this week! All bankers are coming at me prior to this week's problems. Hope things are okay with you. Do you see that?

A. Yes.

Q. All right. What -- what do you mean here when you say you need to finish this?

A. When -- the end of the year, bankers want to get information.

Q. I see. So you needed the 12/31/19 final numbers to report to your other banks?

A. Uh-huh. Yes. I'm sorry. Yes. My fault again.

Q. All right. And so you hadn't received those numbers as of March 18th, 2020?

A. That's what it says, yeah.

Q. And then it says, All bankers are coming at me prior to this week's problems. What problems are you referencing there?

A. I don't know. I have a large organization and things happen, and I don't know what was going on at this particular point in time.
Q. All right. And so the next page, page 35, there's a message from Jill to you at 8:46 a.m. on March 30th, 2020. Do you see that?
A. What time?
Q. 8:46 a.m.
A. 8:46 p.m. Oh, there. Yeah, sorry.
Q. And Jill says to you, Would you be able to text me or e-mail me a copy of your driver's license? We are moving the treasury management to GECU. And as you are an owner, they require a copy of your license. Do you see that?
A. I do.
Q. And then you respond at 9:25 p.m. and you say, I'll send it. Can you call and explain GECU tie in. So you had a question about why the accounts were being moved, correct?
A. No. I was asking a question why

you needed my driver's license.

Q. Okay. Well, what did you mean when you said explain GECU tie in?

A. She was taking -- a need to open some accounts, and I wanted to know why.

Q. Why they were being moved to GECU?

A. No, I didn't say it was moved. I said I wanted to know why you're opening them.

Q. Well, she says in her text, We are moving the treasury management to GECU. And so you wanted to know why, correct?

A. So treasury management to me and it's at my other banks are -- when you have a savings account, treasury management wants to hold those. And so it was cash that was in the account, so...

Q. And then on March 30th, 2020, at 10:01 a.m. Jill says to you, In anticipation of the refi, Harold is moving treasury management to GECU. Been getting all the new accounts set up. Do you see that?

A. Yep.

Q. So is it fair to say that you

knew there were refinancing efforts taking place as of March 30th, 2020?
A. That's what it says.
Q. Now, Jill never tells you that Huntington demanded that Harold move the accounts, does she?
A. Not that I recall.
Q. And so at this time frame in March of 2020, did she ever tell you that Huntington had demanded that Harold move the accounts to GECU?
A. I don't believe so.
Q. Okay. And so that's deceptive; wouldn't you agree?
A. She should tell me whatever it was all about.
Q. Yeah. She deceived you, correct?
A. She told me what she told me. That's all I can tell you.
Q. Well, she didn't give you the real reason why the accounts were being moved, did she?
A. Now that I look back, no.
Q. Okay. So she deceived you?

A. Now that I look back, no.

Q. She did not deceive you?

A. Well, explain deceive.

Q. She lied to you.

A. No. She just didn't tell me the whole story.

Q. Well, wouldn't you say that's a lie?

A. I'll keep my mouth shut.

Q. Look, I mean, I think you're a victim here. You -- you -- she lied to you. Why can't you say she just lied to me?

MR. CUMMINS: He just doesn't seem able to do that. Do you have another question?

Q. All right. At the bottom of page 37 Jill says to you at 12:41 p.m. on May 27th, 2020, Hello, Ray, Pat O'Malley with DSI will be calling you sometime later this afternoon.

Who is Pat O'Malley with DSI?

A. I have no idea.

Q. So as of May 27th, 2020, did you know that check-kite had collapsed?

A. No.

Q. Okay. Was it after May 27th, 2020, that you learned that?
A. I learned about the check-kiting when Harold got arrested on May 26th.
Q. Okay. So you knew as of May 27th that Harold had been arrested for check-kiting?
A. On May 26th, yes.
Q. Did you talk to Jill at all about his arrest?
A. No.
Q. All right. And so on the next page it looks like you asked Jill to call you, and she said no. So that's consistent with what you just said, so she never talked to you about it?
A. That's what I said and that's what that says.
Q. Okay. All right.
(Defendants' Exhibit 134 was marked.)
BY MR. SCHUELLER:
Q. All right. So on page 5 of Exhibit 134 there's a series of text messages between you and Harold. Would you agree with me?

A. I haven't looked at it yet.
Q. Okay.
A. (Witness reading.) Okay. Yes.
Q. And so on page 5 it looks like Harold sent you the Huntington term sheet on September 4th, 2018?
A. I don't believe he ever sent me anything. At some point, Jill might have sent it.
Q. Oh, okay. So was it sent to you on February -- excuse me, September 4th, 2018?
A. I don't know. It usually went to Dennis.
Q. Well, Harold says, Just sent you the HNB term sheet. Please review and get back to me ASAP. They are going to committee Thursday for commitment. They are pushing to close this month.
Does that refresh your recollection, did you receive a term sheet in --
A. I don't recollect.
Q. Okay. And then your response is interesting. You say, How's your census at

Wexford? Why did you respond by asking about the census at Wexford?
A. Because that money that he owed was depending on him.
Q. What money that he owed you?
A. The money that was held back at the sale.
Q. I see. The sale of the entities that ultimately were renamed Wexford?
A. Yes.
Q. Did you delete any text messages you had with Harold?
A. Nope.
Q. Did you delete any text messages you had with Jill?
A. Nope.
Q. Okay. Are all your e-mails for your business stored at Circle Development?
A. That's where my -- Circle Dev -- yes.
Q. And is there a policy at Circle Development for how long you retain e-mails?
A. I didn't get involved with that. The IT people took care of that.
Q. Do you know if e-mails were

deleted on a regular basis?
A. I'm not that technically inclined. I don't know.
Q. Who would know?
A. The IT company.
Q. What IT company is that?
A. At the time, it would have been Nexigen. Well, I don't know what the name of the company at the time. What -- what time are you referring to?
Q. Well, let's say from January 1st, February 18 through June 2nd, 2020?
A. And the only name I remember is Nexigen.
Q. Okay. And are you currently storing documents for the entities that you co-owned with Harold Sosna?
A. He had all the documents. Mine would have been just my e-mails.
Q. Well, did the receiver deliver boxes of documents to you?
A. Oh, I've got some boxes, yes.
Q. Okay. How many boxes?
A. Probably 60.

Q. Where are those stored?
A. In a storage unit.
Q. A storage unit. And you responded to document requests from Huntington in this case, correct?
A. Correct.
Q. And did you or someone on your behalf search all those boxes for responsive documents?
A. I believe Dennis went through as much as he could find.
Q. Okay. Anyone else?
A. Not that I remember.
Q. Do you know how much time he spent going through those documents?
A. No.
Q. Could we --
A. We got them from the receiver, so the receiver had them for the whole time she was operating the business.
MR. SCHUELLER: Okay. Let's just take a break for a little bit. I want to talk to Kelly and we're very close here to being done. Thank you.
THE WITNESS: Okay.

THE VIDEOGRAPHER: We are off the record.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record. The time is 6:26 p.m.

MR. SCHUELLER: Okay. Got about 5, 10 minutes.

MR. CUMMINS: Oh, that's what I told your colleague. I said I had four minutes left, and he wouldn't let me go. Do you remember that? Shall I let him go?

THE WITNESS: Wait a second, I'm way past that limit.

MR. CUMMINS: It doesn't matter. We're just gonna get this done.

THE WITNESS: We'll get it done.

MR. CUMMINS: That's the way we do it.

BY MR. SCHUELLER:

Q. Mr. Schneider, are you, as we sit here today, an officer or director of any of the entities that you co-owned with Harold Sosna?

A. What's the question?

MR. SCHUELLER: Do you want to

read it?

THE COURT REPORTER: I didn't get the ending.

MR. CUMMINS: You never asked a question.

MR. SCHUELLER: Oh, I didn't? Oh, okay. I thought I did.

MR. CUMMINS: I thought he did.

THE WITNESS: Oh, what was the question then? Sorry. Could you repeat the question?

BY MR. SCHUELLER:

Q. So as we sit here today, who are the officers and directors of the entities you co-owned with Harold Sosna?

A. As we sit here today, I have the rights to all of those entities.

Q. Are you the officer and director of those entities?

A. I don't know what that title is, but I own the rights to them.

Q. And why do you say you own the rights to them?

A. Because they're still active.

Q. But does Harold own any part of

those entities?

A. No.

Q. So do you own a hundred percent of those entities now?

A. Yes.

Q. Did he transfer his ownership interest to you?

A. He transferred the rights to them.

Q. Was there an agreement that reflected that transfer?

A. I don't know.

Q. All right. Well, we'll ask your attorney to produce that agreement, if it exists.

If you were to prevail in a lawsuit and collect money from Huntington, do you have to share any of the proceeds with Harold?

A. No.

Q. Did you, at the time you filed this lawsuit, seek Harold's consent to file the Complaint?

A. No.

MR. SCHUELLER: All right.

I'll, again, just ask for you to produce that agreement, and that's all I have. Thank you.

THE WITNESS: Thank you.

MR. CUMMINS: We are going -- before we go off the record, I have your request. It's not a document that we had any role in, but I think I know the lawyer who dealt with that. It was like a work out of some ancillary litigation, but I'll take it on as an assignment.

MR. SCHUELLER: Okay. Thank you.

THE VIDEOGRAPHER: No further questions? That concludes our deposition here today. The time is 6:30 p.m. We are off the record.

______________________
RAYMOND SCHNEIDER

* * *

(DEPOSITION CONCLUDED AT 6:30 P.M.)

* * *

C E R T I F I C A T E

STATE OF OHIO
: SS
COUNTY OF WARREN

I, Stacey J. Murrin, the undersigned, a duly qualified notary public within and for the State of Ohio, do hereby certify that RAYMOND SCHNEIDER was by me first duly sworn to depose the truth and nothing but the truth; foregoing is the deposition given at said time and place by said witness; deposition was taken pursuant to stipulations hereinbefore set forth; deposition was taken by me in stenotype and transcribed by me by means of computer; that the transcribed deposition was made available to the witness for examination and signature and that signature may be affixed out of the presence of the Notary Public-Court Reporter. I am neither a relative of any of the parties or any of their counsel; I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D) and have no financial interest in the result of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal of office at Cincinnati, Ohio this 7th day of April, 2025.

My commission expires: Stacey J. Murrin
August 17, 2025, Notary Public - State of Ohio

NOTARY PUBLIC
STATE OF OHIO