# “EXHIBIT QQ”

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - - - -

In Re: :

Raymond J. Schneider, : Case No. 25-12607

Debtor. :

- - - - -

DEPOSITION OF RAYMOND J. SCHNEIDER
VOLUME 1

- - - - -

Taken at Allen Stovall Neuman & Ashton LLP
10 West Broad Street, Ste. 2400
Columbus, OH 43215
September 22, 2026, 9:04 a.m.

- - - - -

Spectrum Reporting LLC
400 South Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

A P P E A R A N C E S

ON BEHALF OF DEBTOR:

Allen Stovall Neuman & Ashton LLP
10 West Broad Street, Ste. 2400
Columbus, OH 43215
By James A. Coutinho, Esq.

ON BEHALF OF CREDITOR HUNTINGTON BANK:

Buchanan, Ingersoll & Rooney PC
50 S. 16th Street, Ste. 3200
Philadelphia, PA 19102
By Mark Pfeiffer, Esq.
Timothy P. Palmer, Esq.

Tuesday Morning Session

September 22, 2026, 9:04 a.m.

\- - - - -

S T I P U L A T I O N S

\- - - - -

It is stipulated by counsel in attendance that the deposition of Raymond J. Schneider, the Debtor herein, called by the Creditor for cross-examination, may be taken at this time by the notary pursuant to notice; that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

# I N D E X


| Examination By | Page |
|---|---|
| Mr. Pfeiffer - Cross | 6 |

| Exhibits | | Page |
|---|---|---|
| Exhibit 3 | - Global Notes Regarding Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs | 17 |
| Exhibit 5 | - Monthly Operating Report | 183 |
| Exhibit 17 | - 2022 Tax Return | 188 |
| Exhibit 32 | - Personal Financial Statement, 4/1/2021 | 195 |
| Exhibit 33 | - Personal Financial Statement, 10/1/2025 | 195 |
| Exhibit 38 | - Raymond Schneider Financial Statement as of November 30, 2024 | 242 |
| Exhibit 39 | - Personal Financial Statement, 10/2/2025 | 241 |
| Exhibit 40 | - Irrevocable Trust Agreement between Raymond Schneider as Settlor and Patricia B. Schneider as Trustee | 113 |
| Exhibit 41 | - Transfer on Death Designation Affidavit | 59 |
| Exhibit 42 | - Irrevocable Trust Agreement between Patricia B. Schneider as Settlor and Raymond Schneider as Trustee | 130 |

I N D E X (CONT'D)


| Exhibits | | Page |
|---|---|---|
| Exhibit 43 - | Raymond and Patricia Schneider 2020 Gifting Program Closing Binder | 136 |
| Exhibit 47 - | Operating Agreement of Red Dog Operations Holding Company LLC, an Ohio Limited Liability Company, January 1, 2020 | 168 |
| Exhibit 61 - | The Ray Schneider Trust 2019 Balance Sheet as of 7/31/2024 | 73 |


(Original exhibits returned to Mr. Pfeiffer.)

RAYMOND J. SCHNEIDER

being first duly sworn, testifies and says as follows:

CROSS-EXAMINATION

BY MR. PFEIFFER:

Q. Mr. Schneider, I am Mark Pfeiffer. We've met in the lobby and in Bankruptcy Court. I represent Huntington National Bank. With me is my colleague, Tim Palmer, who you met in the lobby.

You've been deposed before, correct?

A. Yes.

Q. So you know the general idea of the deposition, correct?

A. Correct.

Q. I ask you questions and you're supposed to answer them to the best of your ability?

A. I agree.

Q. Okay. And you just nodded your head before you said "I agree." Because we have a court reporter, we need verbal answers, which is what you did, but just make sure that it's not uh-huh or things like that. The court reporter only can take down words, all right?

A. I hope to remember that. In my

business tradition, I might not have that, so I will.
Q. I am going to ask you questions. I'm not going to ask you about any communications with your counsel. Your answers may require disclosure of information with counsel. And if you think you have to disclose information about your communications, tell us: Hold on, take a break, this might involve disclosure of attorney-client privilege.
We'll allow you to communicate with your counsel, okay?
A. Okay.
Q. But do not disclose communications between yourself and your counsel unless your counsel tells you, okay?
A. I'm not sure what you just said.
Q. Don't tell us anything that your counsel has told you or any communications between yourself and counsel.
A. Okay.
Q. Unless he instructs you to -- unless your counsel instructs you to.
A. Fine.

Q. Okay. And that goes for any other lawyers, not just Mr. Coutinho.
A. Okay.
Q. Lawyers who represent you, okay?
A. If I found a document that I got through a lawyer that was handed to them, am I allowed to talk about that?
Q. It's only communications with your counsel, not documents that you necessarily --
A. Okay.
Q. -- get with counsel. But if you have questions, you should say: Can we take a timeout? Can I discuss whether this is privileged or --
A. No problem.
Q. -- whether you can answer.
I'm going to ask you questions. Sometimes I ask you inartful questions. I'm not trying to confuse you or trick you. If at any point you don't understand my questions, let me know and I'll try to rephrase it, all right?
And if you don't let me know and you answer, I'm going to assume your answers are true and correct and that you understand the question. Is that okay?

A. Yes.
Q. Okay. And at any point in time if you feel the need to correct a prior answer or elaborate on a prior answer or change a prior answer, you can just stop me in the middle and say: Timeout, can I go back to a prior answer? I want to fix it.
A. That's fine.
Q. Okay. You filed two bankruptcy cases now, correct?
A. Correct.
Q. One other one was in 2023, correct?
A. Yes.
Q. Can we refer to that as the first bankruptcy case?
A. Yes.
Q. And then the second bankruptcy case was in 2025?
A. Correct.
Q. Can we refer to that as the second bankruptcy case?
A. Yes.
Q. Okay. Why did you file the second bankruptcy case?

A. The Ohio Supreme Court overruled the Appellate Court's decision of me being a surety and didn't have knowledge, and that's a requirement in a contract. And so then the Ohio Supreme Court said the bank had no obligation to a guarantor and they left the door open.

Q. And when you talk about the Ohio Supreme Court in that case, you're talking about the case between Huntington National Bank and yourself, correct?

A. So I was -- in my first bankruptcy, I appealed it and won in the Appellate Court as a surety. I did not get the knowledge that the bank knew. The bank filed with the Supreme Court in 2024. And in 2025, the Supreme Court took the case. And they claimed I was a sophisticated developer, which has nothing to do with the case, and that they only could follow the rules of the first trial, and so they agreed that the bank had no obligation to me.

Q. Okay. So my question is -- and I want you to listen to the question. The question that I asked was: That case that you're talking about was Huntington suing you as the guarantor,

correct?
A. Correct.
Q. Okay. And so when the Supreme Court ruled -- Ohio Supreme Court ruled, why did that -- why did you need to file a bankruptcy after that?
A. The Supreme Court said they go back to the -- they disagreed with the Appellate Court so it goes back to the original state court. And that court said that I owed supposedly money to Huntington. And they reinstated their, whatever you call it, and that created a necessity for me to fight to prove that I did not owe the bank anything. So I wound up protecting myself by filing a second bankruptcy.
Q. Okay. And is one of the purposes of the second bankruptcy to prove that you don't owe any money to Huntington?
A. It's to prove that documentation that we need to make this a complete record of the case, which we don't have at this point in time.
Q. Okay. Was there any other purpose for the bankruptcy filing?
A. Just to protect myself in the midst of the argument.

Q. And --
A. And to protect my estate.
Q. And what do you mean by your "estate"?
A. Everything I've done since the day I was born to protect it. I created an opportunity that I got, and that opportunity allowed me to have assets that I used in this case. And Huntington in their case against me says I owe them money. And I believe that there's -- when I get the complete record, the Court will decide how we are in this argument, how we fit.
Q. When you filed your bankruptcy case, the second bankruptcy case, do you remember filing bankruptcy schedules and statements?
A. I remember my attorneys -- yes.
Q. Okay. And did you have any problems in filing those bankruptcy schedules and statements?
A. Not to my knowledge at this point.
Q. Who was involved in preparation of those bankruptcy schedules and statements?
A. For the most part, I know Jim Coutinho.
Q. Anybody else?
A. Some folks at the office. I'm sure I added some and stuff that I had originally dealt

with.
Q. Who are the folks at the office?
A. Would have been the accounting department and my attorney.
Q. Mr. Coutinho?
A. No. Dennis Packer.
Q. And when you say "at the office," what do you mean by "at the office"?
A. I run a business in Cincinnati, Ohio with several companies. I use my accounting department and the folks that I've brought in to help me develop what I've done so far.
Q. Who are the folks in the accounting department who helped prepare your schedules?
A. Currently Jenny Whitaker. At one point my assistant Abby Smith.
Q. Smith?
A. Smith. Just like the --
Q. Okay.
A. Dennis Packer, and others that I don't remember at this point in time.
MR. COUTINHO: Do you mind if I interject just to add one more name?
Greg was still there.

A. Oh, yes. I had a gentleman that worked for me for a few years. His name is Greg Lund, L-U-N-D. If they're gone, I don't try to remember them.
Q. So you said Jenny Whitaker is now, I think you said?
A. Correct.
Q. Is she new? Was she involved in the preparation of these bankruptcy schedules?
A. No. She answered questions where my companies were at the time we filed.
Q. Okay. So she was employed by one of the companies at the time you prepared these bankruptcy schedules?
A. Yes.
Q. Okay. And same question for Abby Smith?
A. Yes.
Q. Is Dennis Packer employed by one of the companies?
A. As an outside consultant, yes.
Q. And what was Greg Lund's position?
A. I brought him in to help me run my companies and to help me with some development.

Q. Did he have a title?
A. I don't remember. Yes, but I don't remember.
Q. Who was he employed by?
A. I think it was Circle Development.
Q. And who is Jenny Whitaker employed by?
A. Circle Development.
Q. Same question for Abby Smith?
A. The same.
Q. And which of the companies hired Mr. Packer as an outside consultant?
A. He's been with me like a dozen years. I would guess it's the same.
Q. Does he have a physical office located in your office?
A. No. He uses an office that we have. He works part-time.
Q. Okay. Where's his office located?
A. Somewhere in Sharonville, if he's still there.
Q. And you said that's an office that you have.
Do you own that location?
A. No.

Q. Does one of your companies own that location?
A. No.
Q. There's two binders in front of you. They have labels -- high-tech labels on them that say one and two.
Can you go to binder one?
A. My granddaughter made that one.
Binder one, yes.
Q. Yep. And you see there's side tabs on them?
A. Yes.
Q. I'm going to go to side tab 3.
MR. PFEIFFER: Can we go off the record?
(A discussion is held off the record.)
Q. All right. We just had a discussion off the record. And I think we are going to mark the documents that I refer to in the binders as the exhibit that corresponds with the tabs on the binders.
For instance, I just asked the witness to go to tab 3, so the tab 3 will be marked as Exhibit 3. And we'll follow that protocol for the

rest of the deposition.
Is that okay with counsel?
MR. COUTINHO: That's okay with me.
- - - - -
Thereupon, Exhibit 3 is marked for purposes of identification.
- - - - -
Q. Do you recognize this document, sir?
A. I remember looking at it.
Q. When was the last time you looked at it?
A. The first page, this weekend; the rest, a while ago.
Q. Okay. When approximately is "a while ago"?
A. Maybe ten days ago.
Q. Okay. What was the purpose of looking at it ten days ago?
A. That it might be brought up today.
Q. Prior to looking at it ten days ago, did -- when was the last time you looked at it, approximately?
A. Probably right after it came out the end of last year.

Q. Okay. So if you notice at the -- would you agree this is -- these are your bankruptcy schedules in the second case? Schedules and statements?
A. I don't know that. I presume that this document is tied to that.
Q. Okay. And if you look at the top, it says filed 11/14/25.
Is that approximately when you last reviewed these in detail before ten days ago?
A. Sometime around that date.
Q. Okay. Do you recognize that your notes to the statement of -- to the bankruptcy say that you operated a business -- operated as a business owner with the ability to transfer funds as needed to meet personal, business and future business needs?
A. Yes.
Q. What does that mean to you?
A. I grew up and started businesses when I was a kid. I have built a portfolio, and I operated the way I know best to deal with it.
Q. And how is that?
A. There's a whole series of events to get

a business started and built.
Q. What did you mean by: Transferring funds as needed to meet personal, business and future needs -- future business needs?
A. So I've been able to build my businesses by internalizing borrowings from one company to another.
Q. And who keeps track of those borrowings from one company to another?
A. Hopefully my accounting department.
Q. Okay. And I don't know if I asked you this, do you have a chief financial officer or a controller in your accounting department?
A. I have a lady that came in to become that. I am waiting to see if I can call her that.
Q. Okay. And what is her name?
A. Jennifer Whitaker.
Q. And who is in charge of the accounting department now?
A. She is.
Q. Is she a CPA?
A. I believe she is.
Q. When did she -- when did you bring her in?

A. July of last year.
Q. Is that around the same time Mr. Lund left?
A. No.
Q. Okay.
MR. COUTINHO: Can I interject real quick? Last year was 2025.
THE WITNESS: She's only been with me for a year or less.
MR. COUTINHO: All right. Just making sure you meant July 2025.
THE WITNESS: Last year. This is '26, for the record.
A. Yes, in 2025, July.
Q. Okay. And prior to Ms. Whitaker being the head of the accounting department for your companies, who was the head of the accounting department?
A. Greg Lund was over her for the period he was with us. He helped her. She helped him. Prior to that, I had three or four other individuals.
Q. Okay. And when did Greg Lund come aboard?

A. He came twice. I don't remember.
Q. Who was the head of the accounting department during the first bankruptcy case?
A. A gentleman named John Merley.
Q. Can you spell that for the court reporter?
A. M-E-R, I think, L-E-Y.
Q. And your notes to the bankruptcy statement also include a statement: In addition, the debtor has had certain financial transactions with his business entities that may not yet have been characterized or may have been improperly characterized, including characterizations such as whether funds provided to a company were for capital contributions or loans or whether funds paid to the debtor were draws or loans.
Do you remember that being included in your --
A. Yes.
Q. -- bankruptcy statements?
What did you mean by that statement?
A. I hired -- or we hired someone, actually hired before me -- John Merley and his assistant Lori, I'm not sure her last name. And

between the two of them, they disrupted my accounting department in a very nonfunctional way, and that caused the issues that that statement talks about.
Q. Since filing these bankruptcy schedules and including that statement, have you or anybody on your behalf gone back and tried to figure out whether any changes to the schedules should be made?
A. Yes.
Q. And who's done that for you?
MR. COUTINHO: Can I just make -- for the record, are you talking changes to the schedules or changes to the accounting records?
MR. PFEIFFER: Both.
Q. Well, first of all, changes to the accounting records.
A. Yes.
Q. Okay. Who has done that for you?
A. Jennifer.
Q. And has Jennifer determined that any changes to the accounting records should be made?
A. Yes.
Q. And have those changes to the

accounting records been made?
A. To the best of her ability.
Q. Okay. And has anybody determined whether the bankruptcy schedules or statements should be changed? Has any --
A. Well, the schedules were put together at a point in time, and my businesses are always ongoing.
Q. So the question was: Has anybody looked to see whether there should be changes to the bankruptcy schedules or statements?
A. I know there's changes because, like I said, November 14th of 2025, we filed them. And since then, I've not stopped working.
Q. So these schedules and statements show -- you're right, they show a snapshot at a certain point in time, and that's the bankruptcy petition date in the second case, right?
A. Correct.
Q. Has anybody determined or tried to determine whether any changes should be made to the bankruptcy schedules to reflect more accurate or complete information as of the petition date in the second bankruptcy case?

A. Yes.
Q. And who did that?
A. We're in discussion to have the stuff that's changed adopted to a new schedule.
Q. Okay. Who has investigated whether changes should be made?
A. Myself.
Q. Anybody else?
A. Just the schedules made with Jim and myself -- Jim Coutinho and myself. And we've had a discussion, I've had an asset sold or moved in its position, so there will be changes.
Q. So to be clear, things that happen after the petition date don't get necessarily reflected in the schedules and statements. The schedules and statements are a snapshot in time as of the petition date.
Has anybody looked to determine whether these schedules and statements were full, complete, and accurate as of the petition date?
A. To our best ability, yes.
Q. And who has done that?
A. Jim, myself.
Q. Anybody else?

A. No.
Q. And have you determined that there should be changes to these schedules and statements?
A. Yes.
Q. Okay. And what changes?
A. Like I said, my business continues. And with the multi-business acumen that I have, something's changing all the time, so there's things that have happened. One asset got sold in the meantime. Another one -- I can't remember everything, but I didn't stop from July 24th -- or November 24th of '25. I've continued doing my business. This was a request of the Court and we filed the best we could at the time.
Q. What asset was sold in the meantime?
A. A company called The Gatherings.
Q. So can you identify any of the items in your schedules and statements in front of you that should be changed?
A. How much time do I get? Like I said, I'm a business person who manages my business, my employees, the regulators, the bankers and everything else that comes my way. I don't

remember every single thing with 40-plus companies. I deal with it every day and I can't recall this minute. If you want me to go through the 80 pages, I will.
Q. I think we're talking past each other. I think you're talking about things -- changes that would be required because of events that occurred after the bankruptcy petition date?
A. Isn't that what you just asked me?
Q. No. I'm asking you: These are supposed to be a snapshot, these statements --
A. Correct.
Q. -- of your assets, liabilities, income and financial affairs as of the petition date?
A. Correct.
Q. Okay. It's a historic document. It doesn't necessarily get updated for current events or transactions.
A. Didn't you just ask me that? To tell you what has changed.
Q. No. I'm asking you about what should be changed so that these schedules and statements are accurate as of the bankruptcy petition date.
A. I don't know at this point in time.

Q. Okay. Have you made any determination -- have you done any investigation to determine whether these are accurate as of the petition date?
A. With the volume of stuff that I have and everything, I can't tell you that one or two might have been off by a couple dollars. But at that point in time, I believe they were accurate.
Q. Okay. The question is: Have you done any investigation or has somebody on behalf of you done any investigation to determine whether these are accurate?
A. Not that I know of.
Q. Okay. And when I talk about the "petition date," I think you recognize that that's the shorthand for the day you filed the bankruptcy, right?
A. We filed it quickly to take care of our necessities in the Bankruptcy Court.
Q. Do you understand my terminology when I say "petition date," though?
A. Do you mind repeating it the way you said it?
Q. I'm referring to petition date as the

date you filed for bankruptcy.
A. That's the date we knew what we knew and we did what we could.
Q. Okay. So is that your understanding of the term "petition date"?
A. I'm going to use the word petition as the day we filed.
Q. Okay. And in your bankruptcy statements in Exhibit 3, you state: The debtor, meaning you, may nevertheless have improperly characterized, classified, categorized, designated, or omitted certain items.
Do you remember that?
A. Could you repeat that? That was pretty lengthy.
Q. Yeah. The debtor may nevertheless have improperly characterized, classified, categorized, or designated or omitted certain items.
A. Yes.
Q. What does that mean to you?
MR. COUTINHO: Can I get a reference to where you're reading from?
MR. PFEIFFER: Paragraph 12 of the global notes.

A. Part 12?
Q. Yeah. Paragraph 12 of the global notes under a paragraph that's headed --
A. Where's the word "paragraph" so I can know what you're talking about?
MR. COUTINHO: He's looking at this part over here.
THE WITNESS: Oh.
Q. Under the heading that says Recharacterization.
A. Agree to that statement.
Q. Okay. What does that statement mean to you in, like, plain language?
A. That I have a very confusing business to remember everything in one swoop, meaning that I run several businesses and I rely on a lot of people. And in that reliance, I have to be able to understand what -- everything that I've been given is accurate and correct.
Q. As of the time these bankruptcy schedules are filed, did you maintain regular financial records of your personal income?
A. No.
Q. Do you maintain regular financial

records of your personal income now?
A. The same that I always did. It usually comes through my office. That's where most of the income comes from.
Q. So the question is: Do you currently maintain regular financial records of your personal income?
MR. COUTINHO: Can we clarify off the record what you mean by "financial records"? Are you talking financial statements like balance sheets and cash flows, or are you just talking about, like, the monthly operating?
Q. Well, when you filed your schedules and statements in question 4 to the specific disclosures, on page 6 you said: As an individual, the debtor does not maintain regular financial records of his personal income other than through his tax filings.
A. That's accurate.
Q. Okay. What did you mean by "financial records" in that statement?
A. My records are in several locations. And trying to capture it is what I tried to do to do my personal financial records.

Q. Is it fair to say that -- well, let me back up.
Have you filed tax returns for 2025 -- federal income tax returns for 2025?
A. So I'll give you my history so then you can go after that.
Because of several businesses I own, several businesses I'm partners with, and several requirements of people give me records, they're supposed to have them to me by the end of February and I'm supposed to file on April 15th. I don't believe I've ever filed on April 15th as of the amount of records that I have to get. So I get an extension.
Almost every year it's been October. September is the partnerships. And I did file for my partnerships on September 15th, and I will be filing my tax return on October 15th.
Q. Your personal tax return on October 15th?
A. I believe so.
Q. Okay. Did you file a 2024 personal tax return?
A. No.

Q. Why not?
A. Because of what I told you earlier. I had a very dysfunctional accounting. And to get the records -- they did not go to my tax attorney -- tax filer. And the records were needing to be cleaned up, and they have. And we're trying to include that in my filing.
Q. And who filed the -- for the -- did you have an accountant file for the extension for the 2025 return?
A. Candy Salazar.
Q. Okay. I've also seen reference to her being Candace Salazar?
A. Yes, you're correct. I've never called her that.
Q. We can call her Candy. I have no problem with that. I'm --
A. You can correct me any way you want. I try to remember everybody's name. I try to remember what's going on in life. And I'm not a computer. That's all I can tell you.
Q. Okay. And who is Ms. Salazar employed by?
A. She's currently employed by herself and

her son.
Q. Okay. At her own accounting firm?
A. Yes.
Q. And is she a CPA?
A. Yes.
Q. Okay. And who has retained her? One of your companies, I'm assuming, has retained her?
A. I retained her to take care of all my companies.
Q. Okay. Did you retain her personally?
A. I don't know the record.
Q. Who is paying her?
A. My companies.
Q. But she's also doing work for you individually?
A. Everything I have eventually adds up to that in some way or another.
Q. Okay. So have you -- is she responsible for preparing your personal tax returns?
A. Yes.
Q. Have you filed a motion in the Bankruptcy Court to retain Ms. Salazar as your accountant?

MR. COUTINHO: Answer if you know.
A. I don't know. I've been signing a lot of papers.
Q. Is Ms. Salazar presently working to prepare your tax returns now?
A. Yes.
Q. And how long has she been working to prepare your individual tax returns?
A. 24 years.
Q. Okay. Is she working to prepare your 2024 tax return?
A. She's waiting for Jenny to give her what she has cleared up.
Q. And "Jenny" is Jennifer --
A. Jennifer.
Q. -- Jenny Whitaker?
A. Yes.
Q. And Jennifer Whitaker is the head of your accounting department?
A. Correct.
Q. Okay. So is the reason your 2024 tax return is not filed is because of your delays by your internal accounting department at your companies?

A. That's what caused it.
Q. And do you know what information Ms. Salazar is waiting for --
A. No.
Q. -- for the 2024 tax return?
A. Just the clearing up of the errors that were done at the time.
Q. And what were those errors generally?
A. They weren't categorized in the right area.
Q. What wasn't categorized in the right area?
A. I can give you an example. A payment that was a capital improvement went into an expense and things weren't categorized properly. Everything was done accurately, but not correctly. So things were filed, but not filed accurately.
Q. So are you saying things were recorded but they were misclassified?
A. I'll agree to that.
Q. Okay. Any other examples of things that are delaying your 2024 tax return?
A. No, not that I know of.
Q. So it's just one item that is delaying

your 2024 tax return?
A. The number "one" doesn't work in this situation with having 40 different companies. They each had accounting issues that they needed to resolve, which is a month to month and proper filings. And because of that, there's more than one issue.
Q. So are you saying the accounting records for your companies are not accurate to your satisfaction?
A. I didn't say that.
Q. Okay. Well, are they accurate to your satisfaction?
A. No. That's why I'm waiting to get everything accurate.
Q. If you could go down to -- in Exhibit 3, you'll see -- after page 7, you'll see a summary of your assets and liabilities and certain statistical information.
A. Page 4 or -- whatever -- the page after 7?
Q. Page after 7. It should have at the top -- Mr. Coutinho could --
MR. COUTINHO: Yeah, page 8 of 24, so

Summary of Liabilities.
A. Sorry, it's covered up with a black mark.
Q. Okay. Do you see the line where it says total of all property on Schedule A and B, and it has $66,897,683.31?
A. I see that.
Q. Okay. Is that an accurate representation of your assets or the value of your assets?
A. It's an estimate value at the time.
Q. Okay. And have you, at any point since the bankruptcy, provided any financial statements to any creditor or potential creditor or potential lender that reflects values that are more significant than that?
A. I believe that is a net value, correct? Versus the asset value.
Q. What do you mean by "net value"?
A. If you took estimated value and you take away the collateral against it, which is a loan, then you have a net value or an appraised value, depending on what ended up.
Q. I think these statements are supposed

to be the actual estimated value of the property, the gross value.
A. I don't believe they're the gross value. I believe they were the net value.
Q. Okay.
MR. COUTINHO: Just for the purpose of the clarity of the record, I guess it really depends on what kind of asset you're talking about, because different schedules ask different things as to the value of the property of the portion you own versus an equity interest, what's the equity interest worth.
Q. Do you see above the $66 million figure that's a figure for $63 million? 63,164,108?
A. Yes.
Q. For all total of personal property?
A. Yes.
Q. Okay. Do you believe that is a gross or a net number?
A. I don't know at this point.
Q. Since the bankruptcy case, have you provided any lender or third party or potential lender with any financial statements that the value of your assets exceed $100 million?

A. I don't know as I sit here.
Q. Do you remember providing -- or did you provide any lender or third party or potential lender with any financial statements, personal financial statements following the filing of your second bankruptcy case?
A. I can't remember at this time.
Q. And if you look on that same page, it asks you to summarize your income and expenses.
And do you see in the schedules it says your combined monthly income is $88,903.80?
A. I see that.
Q. What does that monthly income represent?
A. I presume it reflects another page.
Q. Okay. So what are your sources of income?
A. Currently some of my businesses that have provided me a positive.
Q. Do you have -- do you take out any salary or wages from any of your businesses?
A. I do at times.
Q. Okay. Since the bankruptcy case, have you taken any salaries or wages?

A. I don't remember at this time.
Q. Okay. And as of the time that you filed these bankruptcy schedules and statements, were -- was any salary or wages included in that $88,000 number?
A. It would have been possibly part of it.
Q. And what company do you think it may have been?
A. I don't recall right now.
Q. So in the past five years, what companies have you taken salaries or wages from?
A. I need to see the records. I can't tell you at this point.
Q. And to your knowledge, is the $88,000 -- $88,903.80 a reasonable estimate of what your monthly income was at the time you filed these bankruptcy schedules?
A. I'm going to say that was my best estimate.
Q. Okay. And was it a best estimate as of the petition date of the second bankruptcy case?
A. That's what this is filed as.
Q. Okay. What real estate do you own individually?

A. I have to go to my records to look at it.
Q. Well, do you have a primary house?
A. Yes.
Q. Okay. 3515 Tiffany Ridge is your primary address?
A. You got it right.
Q. Okay. And your bankruptcy schedules say that you own that property with another person, or another person or entity; is that correct?
MR. COUTINHO: If you turn to the next page.
A. Yes.
Q. Who are the owners of that property?
A. Patricia Schneider, my wife.
Q. Is that in her individual capacity and not as a trustee?
A. Yes.
Q. Does anybody else have an interest in that property?
A. Yes.
Q. Who else?
A. The lender.

Q. And you have a property at 2 Fort Lane, Kennebunkport, Maine?
A. Yes.
Q. Okay. And, again, it says it's owned with another person or another entity?
A. Yes.
Q. And who is that?
A. My wife.
Q. Anybody else?
A. The bank.
Q. When did you buy this property?
A. 2020.
Q. Do you know what month?
A. I was negotiating for a while. Somewhere right as COVID hit.
Q. March 2020, approximately, is that what you're saying?
A. I had a contract in January and renegotiated over time, so I don't remember when I closed.
Q. And then you have real estate at 2409 Chamonix Road in Vail, Colorado?
A. Yes.
Q. Okay. And that one is owned by you

individually only, right?
A. Yes.
Q. Okay. Why isn't your spouse on that one?
A. I just never got there.
Q. Okay. And for the record, your spouse is Patricia Schneider?
A. Like I said early on, my old girlfriend is now my wife, Patti Schneider, yes.
Q. Okay. Patricia is her --
A. Patricia for you -- your sake, Patti for the last 45 years. Sorry.
Q. And does she have a middle name or middle initial?
A. B.
Q. B as in boy?
A. B as in Becker.
Q. Okay. And is that her middle name, Becker?
A. That's what she uses, yes.
Q. Okay.
A. It's Patricia Ann.
Q. Okay. So her maiden name was Becker?
A. Yes.

Q. And her actual middle name would be Ann?
A. Correct.
Q. But she used Patricia B. --
A. Correct.
Q. -- Schneider as her name?
A. Correct.
Q. And in paragraph 3.8 of these schedules, it says you have a Wolf Lucky 2022 scooter.
A. Yeah. Wait, 3 point what? 8?
Q. 3.8.
A. Yep.
Q. When did you purchase that scooter?
A. 2022.
Q. Okay. And who is paying the insurance -- well, is that scooter insured?
A. Yes.
Q. And who is paying the insurance on that?
A. It's in my insurance policy.
Q. Okay. And what's the insurance policy?
A. Chubb insurance.
Q. Okay. And who pays the Chubb insurance

policy?
A. I don't know.
Q. And is the Chubb insurance policy a motor vehicle policy, or is it more encompassing than that?
A. I think it's just liability. The thing's not worth a lot.
Q. Okay. But do you have motor vehicle insurance on this?
A. I don't know.
Q. Okay. Is the Chubb policy a personal policy or does it cover your companies as well?
A. I don't know.
Q. Who is your insurance agent?
A. SP Agency.
Q. Where are they located?
A. Cincinnati, Ohio.
Q. SB as in Sam Becker?
A. Sam Paul.
Q. Oh, Sam Paul?
A. SP Agency.
Q. Okay. And you have two dogs?
A. I have two dogs.
Q. Okay.

A. Are they in this case?

MR. COUTINHO: We listed them.

Q. They're listed?

A. Oh, yeah.

Q. What are their names?

A. Tessie named after the mascot in Boston for the Red Sox. And Fenway named after the Green Monster, because it had a green scarf when we were picking out the litter.

Q. Okay.

A. You want to know how much fun they are? Do you want to know why I have them?

Q. No. But your plan provides that -- your bankruptcy plan provides that if you're going to liquidate your assets, are you going to sell your dogs?

A. I'm going to cut in half. My wife gets the other half and I get the front half.

Yes, that is something I love and care for.

Q. Okay. Are you going to sell your dogs?

A. Never.

Q. I take it you're a Red Sox fan?

A. I am a father that has three children

that live in Boston with a set of eight grandchildren that love their Cincinnati sports but live in Boston.
Q. Okay.
A. Fun living -- loving grandfather who visits to the best of his ability due to these issues.
Can I ask you questions?
MR. COUTINHO: No.
Q. No.
In paragraph 18, you list bonds, mutual funds, and publicly traded stocks. And you list three Merrill Lynch accounts?
A. Yes.
Q. And two of those accounts say they're subject to a Bank of America lien.
Do you know how much is outstanding on that lien?
A. At what time?
Q. Currently.
A. Yes.
Q. Approximately how much?
A. Shy of $19 million.
Q. Do any of your businesses have any

Merrill Lynch accounts?
A. Do any of my businesses have any Merrill Lynch accounts? I don't think so.
Q. How about any trusts associated with it, do they have any Merrill Lynch accounts?
A. Will you rephrase that?
Q. You have certain trusts, correct?
A. I do.
Q. Associated with you?
A. Yes.
Q. Whether you were the grantor or a beneficiary of those trusts?
A. Correct.
Q. Or a trustee of the trusts even?
A. Yep.
Q. Okay. So do any of those have Merrill Lynch accounts?
A. There might be one there or more than one account, so I can't remember right off the top of my head.
Q. And which one are you thinking about?
A. So in the trust is one of the companies that is in the Merrill Lynch that I know of.
Q. In which trust?

A. I get confused at times because -- well, there's two trusts, Patti and Raymond Schneider. I think it's Patti's trust.
Q. So what trust do you have in which -- or what trust are there in which you're either a settlor, a beneficiary or a trustee?
A. That's three questions. I'll answer one at a time.
Q. Okay.
A. Do you mind phrasing them one at a time?
Q. Sure.
Which trusts do you have -- have you settled?
A. What do you mean by "settled"?
Q. Created.
A. Patti Schneider's gift trust and Raymond Schneider's gift trust.
MR. COUTINHO: Ray, did you create both of those in your name? You named your wife's trust.
A. My wife's separate trust and mine is a separate trust.
Q. Okay. So I think there's a little bit

of a term of art that I'll give you.
I think when you create the Raymond Schneider Gift Trust, you're the settlor.
A. Okay.
Q. Patti, when she creates the Patti Schneider Gift Trust, she is the settlor, okay?
MR. PFEIFFER: And, Counsel, am I --
MR. COUTINHO: That's fine. Yeah. That's right.
Q. That's like an entire semester of law school class that's very generalized, okay?
A. I took two and a half years to do it.
Q. So there's a Patti Schneider Gift Trust?
A. Yes.
Q. And that was created when, 2020?
A. Hers is 2019. Does settled mean when it was signed or when it was started? To me there's a difference.
Q. Okay. So what's the difference in your mind?
A. The purpose of the trust was to prevent the courts to take over my assets if I pass away. And Donald Trump, in his first presidency, set up

a change in gift trusting to the year of 2020- -- I forget, 4, something like that.

So I was getting older, and the activities that I was dealing with in being a smart adult, I put together a trust so that down the road the gift is thought out and placed in -- so that it could fall into that timetable.

I've got three kids and eight grandchildren, and I wanted to protect all my work that I've done over the years by doing the right thing while I was alive.

Q. What is your birth date?

A. 5/2/50.

Q. So that makes you 76 now?

A. Correct.

Q. So when was Patti's trust actually created?

A. It was created in the sitdown in 2017. And to do a proper trust, you have to get third parties to put together the values, the accounting, the legalese. And it took that long from 2017 to 2019 when it finally got signed. I started mine in July of 2017 and mine got settled in 2020 or signed --

MR. COUTINHO: Are you sure about the year? I think you have it backwards on which year was Patti's and which is yours.
THE WITNESS: I could be backwards. Is mine '19?
MR. COUTINHO: That's what it's called.
A. Mine's '19 for the correction of the Court, and my wife's is 2020 with correction for the Court.
Q. See, that's an example of something you can correct when you realize it's wrong. I'm okay with that.
A. My life is positive. And I use others to help me because I can't remember everything. I don't remember what I had for lunch last Wednesday, so I hopefully have the outside sources to help me correct things.
Q. And when you say it was created in the sitdown in 2017 -- I think that's the phrase you used?
A. Yep.
Q. What do you mean by that?
A. That's when the decision was made to do this. I gathered the legal company to put this

together, and over time, they brought the parties together, did the evaluations through appraisals and the accounting and helped put it together in a professional way. And the time it got signed ultimately was when the documents are ready.
Q. Okay. And "sitdown" implies that you sat down with somebody else?
A. Yes.
Q. Okay. And who did you sit down with?
A. Vorys Sater, Emily Pan and her team.
Q. You would agree that pursuant -- that your bankruptcy schedules indicate that you're insolvent, correct? Let me back up.
A. What do you mean by "insolvent"?
Q. Insolvent in this context means that you have more liabilities than assets.
A. I have more liabilities that I might have been part of, but I believe if they were all sold, that they would be solvent.
Q. If you sold all of your assets, you believe that you could pay all of your liabilities?
A. Depends on what you call liabilities.
Q. Liabilities are debts that are owed to

creditors.
A. Well, there's one creditor in this case that I don't think is what's on the back of my mind. And if you ask that question am I solvent or not, once that becomes apparent, I think I'm solvent.
Q. What creditor is it?
A. Huntington National Bank.
Q. Okay. And how much do you think Huntington is claiming right now? Do you have an idea about that?
A. No. Because it's a moving target, and we have no accountability of any of those numbers at this point in time. There's an incomplete record to what the numbers account for.
Q. Going back to the trusts.
Do you have any other trusts in which you're the settlor, meaning you created the trust?
A. No.
Q. Do you have any other trusts in which you are a beneficiary?
A. Yes.
Q. And what trusts are they?
A. My parents, before they died, they put

a trust together as a -- what I suspect was a gifting trust.
Q. Do you have a copy of that trust document?
A. No.
Q. Do you get statements from the trust document?
A. Once in a while.
Q. Do you know what's in that trust now?
A. No, because it's tied to the market. And I would guess, the last time I saw it, it was a little over $500,000.
Q. Okay. Do you ever receive distributions from that trust?
A. Not me personally.
Q. Who's the trustee?
A. I think I might be.
Q. Okay. So you're a trustee and a beneficiary potentially?
A. You know, I have never truly understood. I always gave it away as a gift trust and didn't realize that if I'm a -- am I allowed to take anything from it? I never recognized that.

Q. Okay. And who have you been giving it away to?
A. Charity.
Q. Okay. And not your children or --
A. No.
Q. -- any family members?
A. No.
Q. What charities?
A. I would have to go look at them.
Q. Generally do you have an idea?
A. The place I worship, functions that I go to. If you want a list, I would have to go to my records, but they're all 501(c)(3)s or contributions to a nonprofit.
Q. Okay. Do you know if there are any other beneficiaries besides yourself?
A. Not in that trust.
MR. COUTINHO: Do you know, Ray, for sure whether --
THE WITNESS: In that particular trust?
MR. COUTINHO: In your parents'?
A. So my parents gave each of the three children their own trust, so that's -- that's what I remember.

Q. Okay. And when did you -- they give you your trust -- that trust?
A. I'm going to say somewhere around 2020 -- well, my father passed away in 2010.
Q. I'm sorry?
A. Or 20- -- yeah, 2016. Ten years ago. And he lived to be 100. And then mom was part of that, and she passed away in 2000. So sometime before she passed away, they put that together.
Q. 2000 or 2020 for your --
A. 2000. She passed away 26 years ago.
Q. Oh, okay. So was that -- your parents' trust, was that listed or disclosed anywhere in your bankruptcy schedules to your knowledge?
A. I don't know because I always looked at it as something separate from me. I didn't look at it as value to me. So it wasn't -- I mean, the things I put down on paper is things that I had value to.
Q. Have you created or settled any other trusts?
A. Not that I can remember. I don't think so.
MR. COUTINHO: Ray, what about your

insurance trust? Are you the settlor of that one?
THE WITNESS: Oh. Is that a separate trust or is it part of the trust?
MR. COUTINHO: I believe so. I'm sorry, can we go off the record for just a moment?
(A discussion is held off the record.)
A. Okay. Well, I'll give you what I know. We can go back on the record.
I don't realize it as a trust. It's an insurance policy that is in one of the trusts.
Q. And do you know the name of that trust?
A. It's a Lincoln Life Insurance policy. That's all I know.
Q. Is it referred to as the Schneider family insurance trust to your knowledge?
A. Could be somewhere in that range. It's last to die.
Q. Are you the settlor or created any other trust?
A. Not that I know of.
Q. How about a 2018 trust, does that ring a bell?
A. I didn't put a trust together then other -- maybe that insurance trust. But I did my

two trusts all through '17, '18, '19 and '20.
Q. If you could go to the second binder of exhibits. Right there. Tab 41, which we'll call Exhibit 41.

- - - - -

Thereupon, Exhibit 41 is marked for purposes of identification.

- - - - -

Q. Do you see this document titled Transfer on Death Designation Affidavit?
A. I see it.
Q. Did you sign that document on the second page?
A. Can you explain that document?
Q. I'm going to ask you questions about it. The question is: Did you sign that document on the second page?
A. I presume I have, yes.
Q. Okay. And do you see in paragraph 3 it talks about name of beneficiary?
Do you see that?
A. Yeah.
Q. Can you read what it says the name of the beneficiary is?

A. Patricia B. Schneider.
Q. Is there a reason you're not reading the rest of that?
A. "And her successors as successor Trustee of The Raymond Schneider Trust dated December 18, 2018, as the same may be amended."
Q. So the question was: Is there a reason you didn't read the rest of that?
A. It was in front of me. I didn't think I needed to read it. You didn't ask me to. So you asked me one question, I gave you an answer.
Q. Is there a Raymond Schneider Trust dated December 18, 2018?
A. I don't know.
Q. None of your children are named Raymond Schneider, are they?
A. No.
Q. No other family members are named Raymond Schneider?
A. No.
Q. So Raymond Schneider in the context of this document is -- would be you, right?
A. Yes.
Q. Okay. Have you disclosed the Raymond

Schneider Trust dated September 18, 2018 in your bankruptcy schedules?
MR. COUTINHO: He just answered. He didn't even know if it exists, so...
MR. PFEIFFER: I would prefer counsel -- the deponent answer.
A. I don't know.
Q. Other than Ms. Pan, did you have any lawyers or any professionals help you with any other trusts, the creation of any other trusts?
A. I don't know at this -- as we sit here. This date was right before I finished my trust. So my trust was finished in '19 and this is the end of '18, so it was in the midst of putting it all together.
Q. And so that document that you just referred to, 41 -- Exhibit 41, what's the date of that document that it was recorded?
A. Looks like '19, 1/7 of '19, the year that my trust got settled.
Q. January 7th of '19 -- 2019, correct?
A. Correct.
Q. Okay. And your trust didn't get settled until I believe December of 2019; is that

correct?
A. All the work that needed to be done eventually got signed --
Q. Okay.
A. -- in '19.
Q. So the question was: The trust was settled sometime in December of 2019; is that correct?
A. I believe.
Q. Do you know of anything called a Defense Trust?
A. What's the question?
Q. Are you aware of something -- a trust called the Defense Trust?
A. That's the first I've heard of it.
Q. Do you have any -- you -- well, are you aware of any trust that's being used for your defense in any matter?
A. Can I talk to my counsel?
Q. No.
A. Okay. There is not.
Q. Let's go back to the insurance trust. How much is the Lincoln policy for?
A. $10 million.

Q. And you said it's a last-to-die policy?
A. Yes.
Q. Okay. Can you explain what that means?
A. It means they bet on my wife and I paying them a lot of money so that both of us pass away, that's when they pay the policy. And because of our health, the policy is out there for two people. If one passes away, nothing happens; the second one, they pay when they pass.
Q. So unlike a traditional life insurance policy, they don't pay when the first person dies?
A. Correct.
Q. They pay when both people die?
A. Last to die, yes.
Q. And who are the beneficiaries of that policy?
A. I believe the trust.
Q. Which trust?
A. Oh, I believe if I read this -- I don't know. I don't have the policy in front of me, so I don't know.
Q. Do you think the beneficiaries would be your children?
A. I don't want to believe. I don't have

the trust document in front of me.
Q. Okay. So the question's not about the trust, it's about the policy.
A. The policy is for the trust.
Q. Okay. So who are the beneficiaries of the policy?
A. I don't know. I don't have the document in front of me.
Q. And you said that the insurance company is making a big bet that you pay them a lot of money, and the bet is that you'll pay enough money that they'll be okay?
A. I don't know insurance companies. I just know you pay insurance so you can protect an asset later on.
Q. And how old is your spouse Patricia?
A. 74.
Q. And what is the annual premium?
A. $160,000.
Q. Okay. And who pays the annual premium?
A. I don't remember.
Q. Who's the trustee of that trust?
A. Like I said, I don't know which trust it's in.

Q. I've seen correspondence indicating that Ms. Pan is the trustee of that trust.
Does that ring a bell to you?
A. That does. We're in the midst of moving it to an attorney -- different attorney.
Q. Okay. And what attorney are you moving that to?
A. Richard Wayne.
Q. And is he at the same firm as Ms. Pan?
A. No.
Q. What firm is he at?
A. Strauss Troy.
Q. And why is that move being made?
A. He's going to be the trustee of my trusts so that whatever goes on, he's part of the trust decisions.
Q. Has Ms. Pan resigned?
A. They're in the midst of doing that.
Q. Okay. Did you request that she resign?
A. No. It was a business decision that if someone's going to be the trustee of the trust and that's the trust beneficiary, then that should be all in one.
Q. Who -- who proposed the person at

Strauss Troy?
A. To be the trustee? My -- Patricia and Raymond Schneider.
Q. Okay. Is Ms. Pan still involved in your estate planning work?
A. She hasn't resigned from that, and I haven't used her lately.
Q. When was the insurance policy trust created?
A. I'm not going to guess, but it was early on before -- before I even started the trust. I think it's more than ten years old.
Q. And did you and your spouse create that trust?
A. That trust was put together for the benefit of us and the kids, or whoever's going to survive us.
Q. Do you know what assets are in that trust?
A. The insurance.
Q. Anything else?
A. In that trust? That's it.
Q. Have any insurance premium payments been made since you filed the second bankruptcy

case?
A. I filed in October -- I don't know, because payments are around that time.
Q. The last premium payment that was made, do you know where those funds came from?
A. I do not.
Q. Is it possible that those funds came out of your Merrill Lynch account?
A. It's a possibility.
Q. What did you do to investigate whether you should disclose either the existence of the insurance policy trust or any premium payments or transfers for premium payments that were made as part of your bankruptcy schedules and statements -- let me rephrase that, please.
A. Could you rephrase that?
Q. I promised you earlier that I was going to ask confusing questions, which I've confused myself.
A. I'm going to ask you to fix that one.
Q. Yeah.
Did you make any investigation whether you should disclose in your bankruptcy schedules or statements the existence of that trust or

payments that were related to the insurance policy premium?
A. It's a two-part question.
Q. So take it however parts you want to.
A. I'm going to say no, because you gave me a two-part question and it's not a solid answer.
Q. What do you mean by that?
A. You asked two different questions in one question, and I'm not going to answer a question that has too many parts to it.
Q. Have you ever determined -- or did you do an investigation to determine whether you should disclose in your bankruptcy schedules or statements the existence of that trust?
A. I don't -- I don't know the answer to that.
Q. Have you done an investigation to determine whether you should disclose in your bankruptcy schedules or statements any payments that were made in connection with the premium for that insurance policy?
A. I believe at the time -- I don't know. I don't know if it's in there or not, to be honest

with you.
Q. Do you remember doing any investigation like that?
A. I don't know.
Q. Is there any cash surrender value related to that Lincoln $10 million second-to-die policy?
A. I don't know.
Q. Do you know who has a copy of that policy now? Do you have records with policies?
A. I have a lot of records. I don't know all the records I have. I don't have that policy that I know I can go to.
Q. Who would you go to to get a copy of that policy?
A. Probably Emily Pan.
Q. The decision to not use Ms. Pan, was that a mutual decision? Was it prompted by you? Prompted by Ms. Pan?
A. It was prompted, as I told you earlier, that there's a trustee that's going to be part of the trust, and it all should be managed by the same trustee.
Q. And that trustee, the potential

replacement trustee, I'm sorry, what was his name?
A. Richard Wayne.
Q. And when did you meet Mr. Wayne?
A. 2020.
Q. Did you know him socially or was it a business?
A. Both.
Q. And has he or his firm done any work for you or your companies in the past?
A. Yes.
Q. Okay. What type of work?
A. Defended Huntington National Bank's claim against me. Went to the Ohio Supreme Court and defended me. They've done other work over time, so they've been in -- we knew Ricky and his past experience. And one of my social friends recommended him for this case -- put it, that case.
Q. If you could go back to Exhibit 3 again. In your --
MR. PFEIFFER: Can we go off the record so that I can -- I don't think I have the timestamps on this.
(A discussion is held off the record.)

Q. So off the record, I've directed the witness to part 4 of his Schedule A in Exhibit 3, paragraph No. 19, which is the nonpublicly traded stock and interests and incorporated and unincorporated businesses, including an interest in an LLC partnership and joint venture.
Can you go -- you've listed a number of entities. Can you tell us which of these entities any of either the Patti gift trust or Ray gift trust have an interest?
A. A lot of entities. So I don't see any of them that are in the gift trust.
Q. Well, let me ask you this: The Patricia Schneider Gift Trust, what does that own?
A. I don't have the record in front of me to tell you.
Q. Do you have a general idea?
A. No.
Q. You're the trustee of the Patricia Schneider Gift Trust, correct?
A. Yes.
Q. And are you the only trustee of that gift trust?
A. Yes.

Q. Do you have a general idea of what is in the Raymond Schneider Gift Trust?
A. No.
Q. Do you have a ballpark figure about the value of the assets in the Raymond Schneider Gift Trust?
A. No.
Q. Do you think they're worth more than $10 million or less than $10 million?
A. I would need the documents. I don't know.
Q. Okay. How about more than $100 million or less than 100 million?
A. What they're worth and what they're -- I don't know.
MR. PFEIFFER: Can we go off the record?
MR. COUTINHO: Sure.
(A recess is taken.)
MR. PFEIFFER: Back on the record.
Q. We were talking about the Raymond Schneider Trust. And that's a trust that you created, right?
A. Yeah.

Q. Okay. Do you remember what you put into that trust when you created it, or even after you created it?
A. No. I would have to see what it was, because you're allowed to put in $11 million of value up to. And I didn't exceed it on either one, or Patti didn't exceed hers. And what went in it, I don't know.
Q. So the 11 million of value limitation, that's -- that was the gift tax limit, federal gift tax limit?
A. Yes.

- - - - -

Thereupon, Exhibit 61 is marked for purposes of identification.

- - - - -

Q. Okay. And you have in front of you and what's been marked as Exhibit 61, a document that says Ray Schneider Trust 2019 Balance Sheet as of July 31st, 2024.
Do you see that?
A. Yep. Where did this come from?
MR. COUTINHO: Right here.
A. July? Okay. I just want to know

because there's things that go behind everything. Okay.
Q. And is To Life in the trust?
A. I think -- is To Life the RED?
Q. Is To Life the RED, or are you asking me?
A. I don't know. This might sound -- I'm trying to do clarity. With all that I have, no human being can do everything, so I rely on my experts. While Greg Lund was here, we put together a map, and then I could see where everything was.
Once I have done something, I move on to the next compounding. And I've accomplished stuff that I know of. I don't know everything, and then I go back to my resources. So I can't tell you without looking at a document.
Q. So let's start with basics.
Is this document that's in front of you a balance sheet for the trust, or a balance sheet for To Life Limited?
A. I don't know where you got this from, so -- this might have been one of the owners of an asset in the trust, and that's why it was put

together. Because each of the financial institutions, the creditors in my cases, all want documents on a regular basis. And I don't know if this was done for Aegon, one of my creditors, which it looks like it probably was, they need to justify their existence.
Q. Can you spell Aegon for the court reporter?
A. I'm hoping to do it right. I think it's A-E-G-O-N.
MR. COUTINHO: That's correct.
Q. Okay. And that's a lender for who?
A. That's the lender for the RED Apartments complex.
Q. And was there a dispute with Aegon? Was there a default or a dispute at some point?
A. Yes.
Q. Can you tell me what that dispute was?
A. When someone files bankruptcy, that's considered default. So with my positive attitude, the executives at the top decided they can make more money, so they came after me under the default of filing bankruptcy. In their documents, that says 30 days you get out. And then they do

interest on top of that, so they came after me to put up a lot of money because of the default interest and everything. And it was very, very, very, very sizable. And they got it down to something manageable. And I've written to every one of the executives that I put my pants on just like you do. I didn't do anything wrong. And the purpose of the bankruptcy was not doing anything financial, it was all about protection of my assets.
Q. So -- well, that was the purpose of the trust, too, right, to protect your assets?
A. To do the right thing as a smart businessman while you're alive.
Q. Okay. And the right thing would be to protect your assets, right?
A. To know what the rules are in today's world, yes.
Q. Okay. And why would you need to protect your assets?
A. For the same reason we talked earlier, the government has their hands in everything.
Q. Did you say you were protecting your assets when you filed the first bankruptcy?

A. Yes.
Q. And who were you protecting your assets from in the first --
A. Huntington National Bank --
Q. Okay.
A. -- in the court.
Q. Were you protecting your assets from any creditors when you created the trusts?
A. No.
Q. Were you protecting your assets from any of the creditors when you transferred --
A. No.
Q. The other thing is -- the other instruction that I didn't give you is --
A. Oh, you didn't finish. I apologize.
Q. Yeah. Yeah.
A. It's a long day.
Q. -- you let me finish the question.
A. I'm sorry.
Q. And I'll try to let you finish the answer. Sometimes people talk over each other. That's normal.
A. Okay.
Q. Okay. Were you protecting your assets

from creditors when you transferred assets to the trust?
A. No.
Q. So who owns The Blue development?
A. What date are you thinking of?
Q. Today.
A. Today the trust owns it.
Q. Which trust?
A. Whoever owns the RED.
Q. And what company owns the RED?
A. The RED Apartments in the trust.
Q. Okay. Is there a particular -- is there a particular company that owns the actual project?
A. No. It's in the -- in the trust. The trust owns it.
Q. What does To Life Limited own?
A. I have to look at my records.
Q. What does Circle Development of Cincinnati, LLC own?
A. I don't know. I have to see the records.
Q. What does Corporate Park Investors Limited own?

A. I'm a small investor in that, so I don't know what they own.
Q. What does Delhi Plaza Associates Limited -- that's D-E-L-H-I Plaza Associates Limited own?
A. I don't know. I'm no longer part of that.
Q. When did you no longer become part -- when were you -- terminate your interest in that?
A. When they sold it.
Q. When did they sell it?
A. I have no idea.
Q. What does Executive Park Investors Limited own?
A. I'm a small investor, maybe 5 percent.
Q. So what did -- what does that entity own?
A. Real estate.
Q. Where?
A. Somewhere in Cincinnati.
Q. What does Grasshopper Investments II, LLC own?
A. I would need to go to the records.
Q. What does Grasshopper Investments, LLC

own?
A. I would have to go to my records.
Q. What does Hamilton II, LLC own?
A. I'm a small investor. It's a -- I have no idea.
Q. What does HRM Realty Holding Limited own?
A. It owns a lawsuit and I think a piece of real estate.
Q. A lawsuit against who?
A. The previous tenant.
Q. Who's the previous tenant?
A. A company out of Cleveland called -- I can't remember who's the CPA. His firm leased it from us.
Q. What does Hyde Park Circle, LLC own?
A. I would have to go to my records.
Q. What does IF2, LLC own?
A. I need to go to my records.
Q. So you don't know -- when you say you need to go to your records, you don't know what they own, these entities?
A. No. As I sit here today, no. I need to go to the records.

Q. Okay. What does KPT7 Holding Company, LLC own?
A. Can you repeat the title?
Q. KPT7 Holding Company, LLC. And in this case, 7 is not a Roman numeral, it's just the number.
A. In this case, they own some real estate.
Q. Where is the real estate located?
A. Cincinnati and Boston.
Q. What does R&T Development, LLC own?
A. Today, I believe it owns nothing.
Q. What does RH Real Estate Investments, LLC own?
A. I would need to go to the record.
Q. What does Schneider-Grasshopper, Inc. own?
A. Definitely have to go to the record.
Q. What does To Life III, LLC own?
A. I would have to go to the record.
Q. What does Topco America, LLC own?
A. A very, very small percentage of a company called U.S. Range.
Q. And what does Waldorf Partners --

W-A-L-D-O-R-F, Partners LP own?
A. It's a partnership that I own a small percentage of.
Q. What does the partnership own?
A. I think it's an apartment complex.
Q. Where's the apartment complex?
A. Cleveland, Ohio.
Q. Are you anticipating receiving any tax refunds for 2025 or 2024?
A. No.
Q. What projects have been transferred to either the Patricia B. Schneider Gift Trust or the Raymond Schneider Gift Trust?
A. Like I said, I would have to go to the record.
Q. Do you know if The Blue project has been transferred to one of the gift trusts?
A. The Blue is being sold to the gift trust.
Q. You said "being" implying it's either currently or in the future going to get sold?
A. Oh, it's -- it's been sold and it's part of the gift trust.
Q. And were you involved in that sale

transaction?
A. Yes.
Q. What did you do in connection with that sale transaction?
A. I sold it to the trust.
Q. And when did that occur?
A. I don't have the documents.
Q. Approximate? Can you give me an approximate date?
A. This past year.
Q. And why was that sold to the gift trust?
A. Because I filed bankruptcy. And to protect what I started, the gift trust owns the RED. And that would be a perfect avenue for them to be able to own it and potentially develop it.
Q. And what was the sales price, approximately?
A. I don't know.
Q. Was the sales price paid in cash?
A. No. It's a note.
Q. And a note from who to who?
A. From the trust to me.
Q. Okay. And do you have a copy of that

note?
A. Somewhere I'm sure.
Q. Okay. And your spouse Patricia is the trustee of that trust?
A. If that's where the RED's at, yes.
Q. And would it ring a bell that the -- well, where is The Blue development located?
A. Blue Ash, Ohio.
Q. Okay. And what street?
A. Kenwood and Cooper.
Q. Is it that triangular piece of land sort of?
A. It's a rectangle.
Q. Rectangle?
A. Are you familiar with it?
Q. Only from Google Earth.
A. Okay.
Q. Okay. And how much was that parcel of land acquired for?
A. So the history is that I bought the land in different parcels over the past eight years. I acquired a bowling alley and the oldest restaurant in Blue Ash and worked on that development over that period of time.

Q. And the bowling alley is in Blue Ash?
A. The bowling alley is gone. Was in Blue Ash. It was on this parcel.
Q. Okay. So you tore down the bowling alley?
A. I tore down the bowling alley.
Q. How about the restaurant?
A. I tore that down.
Q. Was that Blue Ash Chili?
A. Yes.
Q. And approximately how much did it cost to tear down those two businesses?
A. I had employees do that for me, so I don't know.
Q. Employees of what company?
A. Circle Development.
Q. Did Circle Development charge The Blue Development Company for that teardown project?
A. I don't know.
Q. Do you have an estimation of approximately how much you spent to acquire the real estate for that development?
A. The price of the assets?
Q. Uh-huh.

A. The land and the buildings, or the price that I have in it less the mortgages?
Q. Let's talk about the assets, the land and the buildings first.
A. Okay. I think cumulative between the two, I think I spent $4 million, which included the mortgage.
Q. Cumulative between the two what?
A. The Ringo and the Blue Ash Chili.
Q. Ringo is the bowling alley?
A. Sorry. It's a bowling alley called Ringo.
Q. Okay.
A. Was.
Q. And was there -- how about the other parcels?
A. Those are the only two parcels I controlled.
Q. Okay. Are there any other parcels that you don't control associated with that development?
A. Well, when I was not in bankruptcy, the city of Blue Ash was selling me the land on the corner. And within bankruptcy, no government

agency wants to work with you, so I lost the opportunity there.

And I was working with the Port Authority and I lost the opportunity there. So my bankruptcy is to protect my an assets, and that was an asset that was under development for eight years.

Q. And what was the opportunity with the Port Authority?

A. They were going to be able to save me money over time.

Q. How?

A. They were going to own and -- own the property for a period of time and then you get some tax breaks down the road.

Q. And when do you anticipate The Blue development to be completed?

A. In my current situation, I don't have any clue.

Q. Okay. And what is The Blue development? What type of project?

A. A unique development of mixed use.

Q. Sometimes called a lifestyle center? No?

A. No.
Q. Okay.
A. It's called a mixed-use development.
Q. Okay. And can you give me what a mixed-use development is? Residential partially and commercial?
A. There's a commercial aspect, there's an office aspect, there's a parking aspect, and an apartment aspect.
Q. And how many apartment units, approximately, are planned?
A. My approved drawings were 235 apartments, 80,000 of retail and office, and 365 structured parking.
Q. And when you say 80,000 and 365, you're talking square feet?
A. Square feet.
Q. 365,000 square feet?
A. No. This was well over half a million square feet.
MR. COUTINHO: Parking spaces?
A. The parking spaces were 365 structured parking. Like where you parked here -- well, I don't even know if you drove. But if you're in a

parking garage, that's a parking space.
Q. So when you mention "365," are you talking about 365,000 square feet?
A. No. 365 cars can park --
Q. Okay.
A. -- within the development.
Q. Got it.
And you talked about approved plans. What are your approved plans?
A. I had it approved to build and break ground until I had to file bankruptcy again.
Q. "Plans" imply that there's been an architect or engineering studies?
A. I have 18 building permits to break ground --
Q. Okay.
A. -- as soon as I could get that loan.
Q. So did you have architect designs?
A. I had everything from A to Z.
Q. Okay.
A. The acquisition of the assets, the teardowns, the environmental cleanup, the -- working with the city, getting zoning approval, designing the building with architects, engineers

and everybody to get a final product. It was a very gorgeous, great opportunity that I lost where I am today through this case.
Q. Who are the architects and engineer?
A. Reztark was the architect and the engineers were hired by them. And they were very high-end quality giving me security knowing they knew what they knew.
Q. How much did the architect and engineers cost?
A. Probably over a million and a half dollars.
Q. And when were -- when did you get approval -- zoning approval or city approval?
A. Before my second bankruptcy.
Q. Okay. At what point estimate --
A. After eight years of hard work.
Q. Estimate of the time when the approval occurred?
A. The approval occurred sometime, I think, in the latter part of '25.
Q. And when did -- or how much did you pay the -- I might have asked this. How much did you pay the architect and engineers?

A. You asked that.
Q. Okay.
A. I have the same answer.
Q. Can you give it to me again?
A. Somewhere around a million and a half dollars, give or take.
Q. And you said you did environmental cleanup?
A. I did.
Q. And what was the problem on the lot?
A. 38 years ago next to Blue Ash Chili was a little house and a Chinese dry cleaning was in there. And 38 years ago they left. But, quote/unquote, inside a title they saw dry cleaner. They had spilled their whatever outside the back door. And we captured it and moved it out, and it's a clean property.
Q. So how much did you spend to do the environmental cleanup?
A. Over $750,000.
Q. Does that include the testing that was done?
A. It included everything.
Q. Okay.

A. So far I think there's one more test.
Q. And when was the environmental cleanup completed?
A. A year and a half ago. It's never cleaned up. If you ever know anything about the environmental, they play games with you. They made me even go test across the street from a four-lane road on to someone else's property. Found nothing. And I'll get my letter probably the first of next year.
Q. And when did you retain the architects approximately?
A. My first time? In 2015.
Q. And when did the architects finalize their plans?
A. The plans to The Blue?
Q. Yes.
A. They -- they finalized them somewhere in the middle of last year. And then we went back to the city and we asked the city if we can expand the apartments and decrease the commercial entity because the world has changed. It's hard to get offices. And they were on the verbal of allowing us to build 285 apartments and bring down -- the

retail down to 25,000. Very, very, very exciting project.
Q. Have you been paying the architects over time from the inception of this project?
A. They've been paid.
Q. But have you been paying them over the -- over time?
A. Yes.
Q. Okay. And when was the environmental cleanup finished?
A. Like I said, there's one last test to get your "no further action" letter.
Q. When was the environmental begun?
A. Four years ago.
Q. Okay. And can you tell me what that process is? Like, I'm assuming it starts with a phase one, right?
A. There was a phase one, and, that, I learned just as I closed. I hired a very professional company so that it was clean. They discovered this title issue. They came in and they tested the ground.
Q. Approximately when did they test the ground?

A. Probably three and a half years ago.
And then they tore out a ten foot by fifteen foot -- fifteen feet down and moved that soil to Rumpke and to Michigan.
Q. When did that occur, approximately?
A. During this whole process. I don't -- I didn't do this. I had my staff do this.
Q. Okay. Was it in the last two years?
A. No. The last two years is pretty much just testing the waters.
Q. Okay. So what has happened in the last two years with respect to this project?
A. It was sold to the RED. I'll go backwards.
It was sold to the RED. It got building permits. Couldn't get a loan because of filing my bankruptcy. And then the city didn't want to deal with me. And I accomplished all the goals to break ground had I had the opportunity, except my bankruptcy took that away.
Q. What costs did you incur in the last two years?
A. I don't know. I don't sit there and look at that stuff.

Q. Was most of the development, like, the soft costs done prior to the last two years?
A. Yeah.
Q. How was the purchase price or the amount of the note determined?
A. I had an appraisal done by a third party.
Q. An appraisal of the land?
A. Appraisal of the project.
Q. Who's the third party?
A. I don't know the company, but it's Rebekah, she's out of Columbus somewhere. That's what she does.
Q. And when was that performed?
A. In the last six months. It was completed in the last six months.
Q. When was the project transferred into the trust?
A. In the last four or five months.
Q. So after your bankruptcy case it was transferred into the trust?
A. During the process of how I operate, which is I couldn't get a loan, so I needed to find a better option. And the trust is in that

business, and so I got a third party because I figured someone's going to look over my shoulder. And I got the value as it sat and used that as the value to sell it.
Q. Did the trust give you any security for that promissory note or is it unsecured? And if you -- do you understand what I mean by "security" and "unsecured"?
A. Yes. It's part of my case here, it's called collateral. Yes, their word.
Q. You said that the collateral is the trust's word?
A. Correct.
Q. Okay. Is there any other collateral?
A. At this point in time, no.
Q. Does somebody lease the Vail property?
A. No.
Q. Has there been anybody who's leased the Vail property?
A. Yes.
Q. Who's that?
A. Since 1995, I've had a tenant in the lower portion of the house.
Q. And who is that person?

A. I got a new guy in the last two months. Eric Perkins. You know him?
Q. No, I don't.
A. Neither do I.
Q. Who was prior to that person?
A. I've had, in the 30-some years, probably eight tenants.
Q. And you say "the lower portion of the house." Is the house divided into units?
A. It's a separate entrance. In vacation areas, they need employment housing, and it's one of the folks that works in the town.
Q. So the unit that you rent in the lower area is sealed off from the other portion of the house?
A. They don't go through my door, they go through their own separate door.
Q. Okay. Can they get into your portion of the house?
A. If they know my code.
Q. Okay. If they don't know your code, can they get into the other portion of the house?
A. If they want to become a robber, yes. Other than that, no, it's secure.

Q. Okay. And do you have either the Vail house or the Maine house ever listed on anything like Airbnb or any short-term rentals?
A. No.
THE WITNESS: What's for lunch?
MR. PFEIFFER: Thinking about that myself. How about we go ten minutes or so?
MR. COUTINHO: Yeah, go to noon? We've got 24 minutes to noon and pause then. It's a nice round number, or whenever you get to a good stopping point. Either way.
Q. Did you file tax returns -- personal tax returns with the state of Ohio for the last two years for 2024 and 2025?
A. I don't know.
Q. What credit cards do you have currently?
A. I lost them in my bankruptcy.
Q. You don't have an American Express card now?
A. I lost it in my bankruptcy.
Q. What do you mean by that?
A. You can't get credit from a creditor when you file bankruptcy.

Q. Well, in your last bankruptcy case, you continued to use American Express, correct?
A. Yes.
Q. Okay. Meaning the first bankruptcy case that you filed in 2023?
A. Correct.
Q. Okay. Are you saying that American Express has revoked your --
A. American Express has revoked my 25 years of using that card.
Q. So do you have any credit cards or any type of cards with you now as you sit here?
A. Yeah. I have a card that I picked up -- my kid left it at home and I picked it up, so I physically have one.
Q. Okay. Do you use that card?
A. I might have once, twice.
Q. Why do you think you might have once or twice?
A. Because I might have paid for their lunch or something of that sort.
Q. How about a -- any other credit cards that you had before the bankruptcy case?
A. I lost them all.

Q. Okay. What credit cards did you have before the bankruptcy case?
A. I had a U.S. Bank card. I had all the banks. I was comfortable living a normal life and I lost that.
Q. And did U.S. Bank send you a notice terminating your card?
A. They all did.
Q. Okay. How about Costco, do you have a Costco card?
A. I had one. No longer.
Q. That's been terminated?
A. I have a membership card, but I don't have a credit card.
Q. Does your spouse have an American Express card?
A. I think she might have one, yeah.
Q. How about any other credit cards?
A. I don't know.
Q. How about a Costco card?
A. I think she has a card to get in. She doesn't have a credit card there.
Q. How are you getting through, like, normal -- how do you purchase stuff online?

A. You won't believe this, I don't usually shop online. That's for other folks. I haven't shopped online -- maybe a couple things. I've been on Facebook maybe three times in my lifetime. I'm from old school. I do things the way we always did them.
Q. Do any of your companies have credit cards that you use?
A. I don't have any.
Q. My question is: Do any of your companies have credit cards that you use?
A. No.
Q. Do any of your companies have credit cards that your spouse uses?
A. I don't know.
Q. Who is Brad Sandler?
A. Brad Sandler was recommended to work out a deal with Huntington when I first started, because he knew Schueller and you guys. And he wrote a letter, and that's all he did. And he's trying to be an exceptionally large creditor out of it.
Q. Who recommended him?
A. A friend in the finance business.

Q. Who is that?
A. Steven Steiner.
Q. And who does Mr. Steiner work for?
A. He's retired.
Q. Who did he work for before he retired?
A. Himself.
Q. And how did you know Mr. Steiner?
A. From business. He made me money over time.
Q. Has Mr. Sandler represented you or any -- or represented any of your companies or trusts?
A. Nothing. The goal was a letter to -- in the beginning to settle this.
Q. Cummins Law LLC, that's Mr. Cummins. He represents you in litigation, correct?
A. James Cummins, yes.
Q. Have any of your companies paid any of Mr. Cummins' fees or his firm?
A. I don't know at this point.
Q. Do you know who Dorothy E. Dornbusch is? D-O-R-N-B-U-S-C-H.
A. Someone fighting for money from someone who has more than they have. It's a case that's

in one of my businesses that a lawyer's hungry. A lady was warned not to do something and she did it and she got harmed when she was warned. And they're trying to make a case out of something that had nothing to do with us.

Q. Who's the person who has more money than she does?

A. The company that she was going after.

Q. And what company is that?

A. Ivy Knoll.

Q. And why is she listed in your bankruptcy schedules?

A. She filed a suit.

Q. Did she file a suit against you?

A. I don't remember who it was, but it's -- it will cause, you know, need for some form of settlement at some point.

Q. Is her lawsuit covered by insurance?

A. Yes.

Q. Who's the insurance carrier?

A. I don't know. Someone else was taking care of that. My insurance company hired them.

Q. And you don't remember the insurance carrier?

A. I never deal with that stuff.
Q. Who deals with that stuff?
A. My insurance company.
Q. And who from your organization deals with insurance? Who deals with your insurance carrier?
A. My assistant would talk to them. My accountant would talk to them. My attorney would talk to them.
Q. Who's your assistant?
A. Abby Smith.
Q. And does Abby have any accounting background?
A. I think so.
Q. And who is your accountant?
A. Candace Salazar.
Q. Who is Henry Schneider?
A. My brother.
Q. And why is he listed as a creditor?
A. He lent me some money.
Q. Approximately how much did he lend?
A. I don't remember.
Q. Do you remember when that -- when he lent you money?

A. I think it was a couple few years ago.
Q. And what was the purpose of that loan?
A. I might have used it for my business somewhere.
Q. Did he loan you the money during your first bankruptcy case?
A. I don't remember.
Q. And your schedules say it's a loan and contribution claims. Do you know what contribution claims?
A. No.
Q. Have you ever heard of the company called Three Notes, LLC?
A. I think that might be the company that he has.
Q. Three Notes, LLC is his company?
A. I'm not sure.
Q. Do you know why you listed Three Notes, LLC in your bankruptcy schedules?
A. Like I said, I think it's the company he has or -- I don't know.
Q. Have you ever heard of Susan Argo or her law firm, Bricker Graydon?
A. Yes.

Q. Okay. In what context?
A. She was involved in suing S&T Bank and First Financial Bank in this case for -- First Financial for the kiting that was going on. And she also, I think, represents Henry Schneider and that's where I know her from.
Q. So when she said she was -- you said she was involved in suing S&T Bank?
A. Yes.
Q. Who did she represent?
A. First Financial Bank, one of the three other banks involved in this case.
Are you familiar with that case?
Q. Vaguely.
How did you become aware of Ms. Argo in connection with that lawsuit?
A. There was 18 and three-quarter million dollars through the kiting that ended up in Fifth Third Bank. The five banks involved in the kiting were Huntington Bank, First Financial Bank, Fifth Third Bank, GE Credit Union and S&T Bank.
And when the money was discovered that it landed in Fifth Third's account and didn't have a home and gave it to the Court, the Court had a

lawsuit trying to get the money. S&T was owed $59 million, and I don't know how much First Financial.

But when I learned about Judge Jenkins who was the judge, who turned out to be the chancellor of the court, saw that the kiting is not a loan, a loan is a loan. And kiting is a different form of a loan. He gave S&T 18 million of the 18 and three-quarters. Susan Argo's bill for First Financial was three-quarters of a million dollars, and conveniently there was three-quarters of a million dollars above the 18 million that went to her.

And as the chancellor of the court, he made a decision in the second trial of this case. And so I read everything that's going on in this case from the cases involving Huntington during my case. There were two cases there: Cyberco where Huntington paid in 2018, $32,000,000, and then another case in 2024 that Huntington paid $1.25 million for lack of transparency, for bookkeeping using personal items, very similar to my case.

So Cyberco was a case about

transparency, fraudulent transfers, taking a blind eye to what was going on, and in the Bankruptcy Court, they paid $32 million in 2018 when my case was going on. And the relevance of those two cases were both during the period of 2018, '19, and '20 that you're asking me about.

MR. PFEIFFER: This is probably a good time for a break.

MR. COUTINHO: Yeah. We can go to lunch.

\- - - - -

Thereupon, a luncheon recess is taken at 11:52 a.m.

\- - - - -

Tuesday Afternoon Session
September 22, 2026, 12:51 p.m.
- - - - -
BY MR. PFEIFFER:
Q. You had a business partner, a colleague, Harold Sosna, correct? At some point?
A. Yes.
Q. And much of your problems with Huntington relates to Mr. Sosna, right?
A. All my problems with Huntington.
Q. Okay. And you recognize that Mr. Sosna was engaged in his business in a check-kiting scheme, correct?
A. I read that after it all went down.
Q. Okay. So when -- and after it all went down, Huntington defaulted the loan of which you were a guarantor, right?
A. Huntington defaulted the loan after they discovered that -- they did their internal audit in July of 2019.
Q. Well, when did you determine -- find out that Huntington defaulted the loan?
A. I will repeat this over and over. Not one single person ever connected or contacted me

or anybody in my business that the loan was in default.
Q. So when did you find out from Huntington that the loan --
A. When they finally gave me documents when we requested it in our due diligence --
Q. Okay.
A. -- back in 2022.
Q. Let me finish the question.
A. Oh. Sorry.
Q. When did you find out from Huntington that the loan had been defaulted by Huntington?
A. Only when I got the due diligence documents in 2022.
Q. Did Huntington ever send you a default letter?
A. No.
Q. Did Huntington file a complaint against you?
A. Can you pick a time period for that?
Q. The first complaint -- when did Huntington file the first complaint against you?
A. I don't know what the first complaint was. The one I suspect you're asking about is

when they were sending this into a receiver and selling the asset.
Q. When did you become aware of that?
A. Right before they put it in receivership.
Q. And when was that?
A. June of 2020.
Q. Okay. And how did you find out?
A. I don't remember, but it was the beginning of what I learned about this whole case.
Q. And when you found out that they were putting it into a receivership, that, I'm assuming, caused concern to you, right?
A. I tried to buy my loan back.
Q. Okay. And why did you try to buy your loan back?
A. Because I'm not the type of person that defaults on anything. And if I have a problem, I fix it.
Q. Okay.
A. And no one told me there was a problem that they associated me with or had any evidence that I did anything in this case. Had they given me the time and the effort to do it, I would have

fixed it, just like I've done my whole life.
Q. Do you know when you offered to buy your loan back?
A. My attorney at the time wrote a letter, and we tried to fight it during the receivership. And David Wechter, in his deposition that we discovered, he told the employees do not work with me because I'm trying to buy my loan back.
Q. And the question is the timing of when you made the offer to buy the loan back.
A. Right after it went into receivership.
Q. So June or July of 2020?
A. June or July of 2020.
Q. Okay. And when you say "buy my loan back," what you're really talking about is the loan related to the --
A. I would like to take over my relationship with Huntington and do it the right way.
Q. Okay. So were you seeking to acquire the loan?
A. I was seeking to take over the loan and run the business, which I've done many, many times. I've been involved in 17 different nursing

homes from A to Z.
Q. Okay.
A. So I had experience, a license, and everything that a normal person would have.
Q. Could you go to binder two?
A. That's this one?
Q. This one.
A. Okay. Tell me the number.
Q. The number is 40. And I would like to mark Exhibit 40.

- - - - -

Thereupon, Exhibit 40 is marked for purposes of identification.

- - - - -

Q. Do you recognize this document?
A. I do. At least the front page.
Q. And if you look at the page -- well, what is that document?
A. Last page?
Q. Would you agree that this is a -- the Irrevocable Trust Agreement between Raymond Schneider as Settlor and Patricia B. Schneider --
A. From what I've looked at, yes.
Q. -- as Trustee?

A. Yes.
Q. Okay. And this is what we've been calling the Raymond Schneider Gift Trust or the Raymond Schneider --
A. Yes.
Q. -- 2019 Gift Trust?
A. Yes.
Q. Okay. And, again, if you -- I know I talk slow.
A. I know. Things happen.
Q. That's okay. It's human nature.
And if you go to page 31 of 32. Do you know who Bailey Renee Drexler is?
A. No.
Q. And is this the document that governs the Raymond Schneider Gift Trust?
A. I believe it says this is the Patti Schneider Trust. And on this -- oh, I'm not the settlor. Does that mean that it's my trust?
Q. If you look back to the front page, maybe it will give you a better understanding.
A. I'm the settlor and she's the trustee. Okay. It's my trust.
Q. Okay. And are there any amendments or

other documents that govern your trust?
A. I don't know.
Q. And you would agree that that was executed on December 20th, 2019?
A. Yes.
Q. Okay.
A. Well, is there a stamp?
Q. That's why I had you look at the notary.
A. There it is. December 20th, 2019.
Q. That's when this was executed?
A. Yeah.
Q. And what was the purpose of this trust?
A. As an intelligent business person, I've developed assets that I wanted to live on. When I pass away, the government takes 55 to 75 percent of it.
Knowing that there was a gift trust change in the IRS when Trump did his first presidency, he moved that up to $11 million maximum per person. And I felt that if I'm going to do it, I do it now.
So in 2017 in July, my first bill, that I sat down with Emily Pan from Vorys, I started a

trust to put together to protect my assets from the government.
Government's got their hand in everything. And if I was to make this thing work, the trust could continue the operation, because when it gets into Probate Court, it's ugly. And I provided a trust that gave a gift to my children and my wife.
Q. What's your understanding of the $11 million gift tax exemption? Is that annually or lifetime?
A. It's a lifetime, plus every year you can give something.
Q. Do you know how much you can give every year?
A. It's changed, so I don't have a good recollection of each year of the -- it goes up every year. I think the last time I heard it was, like, 18,000 a person.
Q. 18,000 a person. So it's something relatively modest compared to --
A. Correct.
Q. -- the $11 million?
A. Well, the 11 million was the opening of

a trust that I started way before I dealt with Huntington. And while I did that, I was doing all the paperwork that it took to put a trust together.
Q. Do you have any estimation of how much of the $11 million exemption you used?
A. Whatever is in the documents. They were appraised and valued and put together according to the IRS.
Q. Who did those appraisals?
A. Whoever Vorys hired.
Q. And, again, do you remember what assets went into the trust?
A. I believe that the apartment was under construction. I believe that pet business was sort of started early on. And I believe that the storage company was a lot smaller.
Q. So what apartment was under construction?
A. The apartment called the RED Apartments.
Q. Okay. And what storage company?
A. Circle Storage.
Q. And how many locations does Circle

Storage have?
A. What day? I'm a growing business. If you ask me a question, you need to give me exactly what you're asking.
Q. So today and back when this trust was developed.
A. I'm going to say when the trust was developed, it was four maybe. Possibly it could be five. I don't remember. Today I have seven growing locations.
Q. When did you buy your last location?
A. I built out one of my locations in 2020, at a bad time. So struggling for a while because no one went out of their house during COVID, so I was under construction then. I started in 2018. And around 2019 to 2020, I built two additional storage units.
Q. Okay. So my question was: How many did you have at 2019?
A. I've got to look at the records. I -- you know, if I'm lost in giving you answers, it's only because I have a volume of businesses that is very difficult to tie down the questions that you're asking me. If I can get the records in

front of me, I can do it.
Q. Okay. How many have you acquired since your first bankruptcy case? How many storage facilities?
A. I filed bankruptcy in '22?
Q. '23.
MR. COUTINHO: '23.
A. First one was '23? I didn't acquire -- I think I finished up two of them.
Q. Okay. And where were those two located?
A. One was in Blue Ash and one was in West Chester.
Q. West Chester, Ohio?
A. Yes.
Q. Okay.
A. They were part of an existing property.
Q. And for this Raymond Schneider 2019 Gift Trust, your spouse Patricia is the trustee, correct?
A. Yes.
Q. And do you know who the beneficiaries are?
A. Whatever the documents say. I think I

can go back in here and answer that for you, because I haven't really dwelled into this for the last seven years. You're probably more familiar with it than I am.

It looks like my three children --

Q. Okay.

A. -- and my wife.

Q. So can you turn to page 1 of that document? Not the cover page, but the page No. 1 of 32.

And do you see Article II?

A. Yes.

Q. Can you read Article II, Section 1 out loud?

A. The No. 1?

Q. Uh-huh.

A. Disposition of trust estate?

Q. Correct.

A. During the lifetime of my spouse, Patricia B. Schneider, the trustee shall hold, administer and dispose of the trust estate as set forth in this Article.

Q. And then can you read 2(a)?

A. Payment of net income and principal.

The trustee may pay to or for the benefit of my spouse from time to time such amounts of the net income and the principal of the trust estate as the trustee may determine to be appropriate for the health, education, maintenance and support of my spouse. Trustee shall accumulate such net income of the trust estate that is not distributed, and at the end of each calendar year the accumulation shall be treated as principal.

Q. So if I'm reading that correctly, and if you can give me your lay understanding, that means your spouse, Patricia, as the trustee, she can use the net income or principle of the trust for health, education, maintenance and support for herself, right?

A. No. For the -- yes, I'll say, from what I read.

Q. And do you recall what duties Patricia, the trustee, has under this trust?

A. She's dealing with the health, education, maintenance, and support of herself and whatever she decides.

Q. And if you go to page 20 of 32 under Article VII.

Can you read Section --
A. Oh, okay.
Q. -- 1(a)?
A. During my lifetime: During the joint lifetimes of my spouse, Patricia B. Schneider, and me, it is my intention that the trust will be taxed as a grantor trust under Section 672(e) of the Internal Revenue Code.
Q. And do you have an understanding of what that means?
A. Not as I sit here.
Q. Okay. Do you know what a grantor trust is?
A. I can't answer that right now.
Q. And can you read paragraph 1(b) of Article VII?
A. During my lifetime, I shall have the substitution power set forth in this subparagraph b.
Q. And can you read Roman numeral I under subparagraph b?
A. Where's I? I see (i), I don't see I.
MR. COUTINHO: (i).
Q. Roman numeral (i).

A. I'm just trying to get clarity.
Q. Yeah, okay.
A. I shall have the right, exercisable at any time and from time to time during my lifetime, to require that the trustee transfer to me any or all of the trust assets in exchange for assets of equivalent value. This substitution power shall be exercisable solely by me in a non-fiduciary capacity, and without the consent or approval of the trustee or any other person. In no event shall the trustee's cooperation with or completion of any substitution transaction with me be deemed a waiver of the right of the trustee to ascertain and determine, in the exercise of the trustee's fiduciary duties to the beneficiaries, the value to the trust assets against me with respect thereto after completion of the transaction.
Q. And what does that mean to you, that section?
A. I'm sitting here and I read it and I need to read it two more times before I can answer that.
Q. Okay. Can you do that?
A. Yes.

Q. Okay. So what's --
A. It means that if there's an asset in that, I can trade it for an equal value.
Q. Okay. And since your wife is the trustee, would you ever expect her to sue you if you traded it for an asset of unequal value?
A. Why don't you ask her. I'm not going to speak for her.
Q. Would you ever sue your wife under any circumstances, other than, like, a divorce?
A. I don't know. Definitely not.
Q. Why not? It's your spouse of 40-some years?
A. Because I know what love, trust and 45 years of marriage, that together we accumulated what we did and did hard work, whereas, others are very jealous of what I've done.
Q. Okay.
A. And that jealousy has turned into what I have had to defend my whole life.
Q. And would you expect your wife to have -- your spouse to have similar feelings of love, trust and the hard work -- respect for the hard work you've done over the 45 years?

A. She's really angry at me today because of not being able to go to Portugal for our 45th anniversary because of what Huntington's done to me between delays of court, cancellation and all the trials and tribulations that have come through this Bankruptcy Court that she has been very, very angry with what's been going on. So I don't think she would.

We were supposed to go travel three times this summer and everything that Huntington did screwed it up. Now I can't answer for her.

Q. Where else were you going to travel besides Portugal?

A. I have eight grandchildren and they're my love, and they live in Boston. My kids live in Boston. We're adventurous folks. We've done a lot to make ourself where we are today. And I can name eight things that I've written down that Huntington screwed in my life.

I got sick with food poisoning because of Huntington. I've lost my credit cards because of Huntington. I've lost my travel. I lost my age. I've lost my family's respect because they think that Huntington knows what they're doing.

And that respect is that they're tired of all the BS that I've been dealing with, because every time I want to do something, I have another hearing from you guys.

And I have to cancel -- my son's having a Bar Mitzvah, and everything that goes on in this case has been done around Jewish holidays and Jewish events. I have to come home early.

You guys have -- Huntington has, not you, Huntington has screwed up my life. And I've gotten incomplete documents to defend myself, and I intend to defend myself. And I expect Huntington to give me all the documents that have been asked of us so that we can prove all the issues that are at hand today.

Q. So the question was: What travel did you have to cancel this summer?

A. We were going to Portugal for our 45th anniversary. We've been there for our honeymoon. We've been there for our first anniversary. It was my present to my wife of 45 years. I missed the travel with my wife to my grandchildren. I missed my trip to vacations. I can list them at another time, but everything they can has been

ridiculous when they put a date and they cancel it two days before. And I'm in another lawsuit with Huntington, and they're doing the exact same thing in that case, too.
Q. So what vacation plans did you cancel?
A. Our honeymoon plans were six weeks ago. They were in June. We canceled going to Boston. I canceled -- my granddaughter is a dancer and she had some dancing recitals we wanted to go to.
Q. Where were they?
A. Boston. Not a walk in the park.
Q. So is it your position that this bankruptcy has inconvenienced your lifestyle?
A. In probably 500 different ways. I lost The Blue. I lost other projects that I've been in the middle of. I've lost my integrity. I've lost my ability to work with bankers because they have a dark shadow of opinion. They're all now on my side because they've seen the evidence. I've had -- the newspaper has been interested. Everybody's been interested in this. And I'm hoping to get all my documents so we can have a true complete record of this trial.
Q. How did you lose your integrity?

A. Because I've been able to do whatever I want. Everybody heard about bankruptcy. They think -- bankruptcy has a negative aspect. Mine is not financial. So until I explain to them that this is a bankruptcy to protect my assets and to do the right thing, they recognize that -- they turn that around.

But when someone's down in the dump, they try to come after you. And I've had several people try to buy my assets. When you're in bankruptcy, you're trying to sell everything and get whole. I'm whole.

Q. Why do you say your bankruptcy is not financial?

A. Because I filed it to prove what -- the Appellate Court was the only one so far that's been able to say the truth. The original case did not have documents that -- it had sixty, seventy thousand pages, and now we have two hundred thousand pages after that case.

And the Ohio Supreme Court that overturned the Appellate Court that recognized the new information, the accurate information, what Huntington's been hiding is the Ohio Supreme Court

could not look at those documents because they weren't given to us as a case when we asked for it. Both of my attorneys, in the bankruptcy and in the regular court, had a three-page document for everything and anything associated with this case.

In the last six months, I've gotten three sets of documents, over 30,000 pages, that were asked for three years ago and two years ago. So I can only tell you the facts. And it doesn't show up on the court reporter how upset we are that Huntington is not giving us a complete record. And that has screwed up my life because I am defending myself in that case, and I filed a case against Huntington for that reason.

Q. Now, you were -- well, let's go to -- actually, Exhibit 43 in the same binder.

Can we mark 43 as Exhibit 43?

\- - - - -

Thereupon, Exhibit 43 is marked for purposes of identification.

\- - - - -

Q. Actually, we'll come back to 43. Can we go to 42, and mark 42 as an exhibit?

- - - - -
Thereupon, Exhibit 42 is marked for purposes of identification.
- - - - -

Q. Do you recognize this as the Patricia B. --
A. Yes.
Q. -- Schneider Gift Trust?
A. Yes.
Q. Okay. And who's the trustee of that trust?
A. I am, Raymond Schneider.
Q. Okay. And are you allowed to use any of the trust for your benefit as the trustee?
A. I don't know in this trust, but the trusts were set up for the benefit if we needed it in our lifetime.
Q. So can you explain that answer to me? What do you mean by "if we needed it in our lifetime"?
A. The trusts were set up by each of us for our health, education or anything else around our normal course of living.
Q. So that the assets would be there to

help fund your health, education and normal course of living?
A. No. It was to protect it if it had a need at a future date.
Q. Protect it from who or what?
A. That it was -- it was protected so that there was an asset down the road.
Q. Protected from who or what, though?
A. If something ever happened to us, the other spouse would have something to survive on.
Q. Well, before the trusts were created, if something ever happened to one of you, the other spouse would presumably inherit the deceased spouse's assets?
A. I don't know what the government would do, so I did what was going on at the time, which is understanding that the gift trust was going to change. It was going to go back to $3 million. I did the right thing in July of 2017. I started to look at putting a trust together.
Q. Do you have a will?
A. I do.
Q. Do you know if that's been produced to us in this case?

A. I have no reason why you should get it.
Q. Okay. Does your wife Patricia have a will?
A. I believe she does, too.
Q. Okay. And does your will generally provide that your assets go to your spouse upon your death?
A. I don't know. I don't have the will in front of me. It was written 20 years ago.
Q. Okay. Do you know who wrote that will?
A. I think he's passed away.
Q. And who was it?
A. John, I don't remember his last name.
Q. Okay. Do you have a copy of the will?
A. I'm sure I do.
Q. And did your spouse do a will at the same time you did your will?
A. I think so.
Q. Okay. And do you have a copy of her will or does she have a copy of her will?
A. Probably.
Is that part of the bankruptcy?
Q. I'm just asking questions.
And if you could go to page 1 of 31 on

Exhibit 42. Article II, Section 2.
Can you read that?
A. Payment of net income and principal?
Q. Yep. Can you read that section?
A. The trustee may pay to or for the benefit of any one or more of my spouse and my issue from time to time such amounts of the net income and/or principal of the trust estate as the trustee may determine to be appropriate for the health, education, maintenance and support of such beneficiaries. It is not my intention that such payments be made equally to all such beneficiaries, but rather, only to such beneficiaries and in such amounts as the trustee, in the trust's sole discretion, may determine. Any action taken by the trustee shall be conclusive upon all beneficiaries.
Q. Okay. And are you a beneficiary of this trust?
A. Patti is the settlor, so it's her trust for the beneficiary of me.
Q. Okay. And your children are the secondary beneficiaries?
A. I believe so.

Q. Okay. And if you look at paragraph 16 of 31 -- or page 16 of 31.
Would you agree that --
A. Give me a chance to get there. Page 13? What's the --
Q. 16 of 31.
A. Oh, 16 of 31?
Q. Yeah.
A. And what issue?
Q. Section 8(a), Roman numeral I, so "I."
A. During my lifetime, I shall have the power to remove a trustee.
Q. And that would be Patti -- Patricia Schneider having the power to remove you as the trustee?
A. Yes.
Q. Okay. And if you go back to your trust, you have that same power, correct?
A. Yes. We do get sick, we do get ill, and that opened the door -- if you had to make a change, the door was open. And people do get sick, they get aged, and through this case, I've lost eight close friends.
Q. Now, you recognize that the Patricia

Schneider Gift Trust from 2020 has assets that formerly belonged to you, right? In it?
A. Now, as you said earlier, if I passed away, she would own equally my stuff, so then we own the assets together.
Q. So you were the co-owners of the business entities with your spouse?
A. Usually there's a co-ownership in marriage, yes.
Q. Do you recognize that there are assets in Patricia Schneider's 2020 gift trust that were previously titled in the name of you, in your name as the member or shareholder?
A. It could have.
Q. Okay. And do you recognize that, as part of the establishment of the Patricia Schneider Gift Trust, you had transferred certain assets to Patricia Schneider and that she then transferred assets to her gift trust?
A. That's a two-part question.
Q. Okay. Do you recognize that, as part of the creation or the establishment of her gift trust, that you transferred assets to Patricia Schneider?

A. We together gifted both trusts with assets that were titled, maybe in my name or our name, or in the act of doing this in the time period before Huntington was involved, yes.
Q. Do you recognize that, in establishing -- at the time that the Patricia Schneider Gift Trust was established, that you transferred assets that were titled in your name to Patricia Schneider?
A. Yes. I did a gift trust that came from me.
Q. So the assets from Patricia Schneider's Gift Trust came from you?
A. I don't know without looking at the documents.
Q. Okay. If you could go to tab 41, which I -- or 43, which I think we've marked as Exhibit 43.
Do you recognize what this document is?
A. Without going through the whole thing, I'm going to take a jab at it.
Q. Starts over there.
A. It says Raymond Schneider 2020 Gifting Program Closing Binder.

Q. Okay. Do you have any reason to believe that's an inaccurate description of these documents?
A. I'm looking at what I'm reading and that's what I read.
Q. Okay. Have you ever seen this document before?
A. I'm sure I saw this document when we put it together.
Q. And was this prepared by Emily Pan?
A. Her or her team.
Q. Okay. And if you can look on the third page of that exhibit at the top where it says -- move back.
A. This is the third page.
MR. COUTINHO: Look at this page number.
Q. So, yeah.
A. Where is there a page number -- oh, page 6 of 54.
Q. Yeah. Let me back up.
A. This piece?
Q. This -- that page, which at the top says Case 1:23-bk-10337, okay? Doc 97-1.

A. No problem. There's no number on that.
Q. 4 of 54 it says.
A. 3 of 54, is that the one you wanted or...
Q. I wanted you on 4 of 54.
A. 4 of 54? Okay.
Q. And under November 1, 2020, can you read the first bullet point?
A. Ray gifted 6,999 Class B Units non-voting in Red Dog Operations Holding Company LLC to Patti.
Q. And Patti is Patricia Schneider?
A. In this case it's my wife Patricia Schneider.
Q. And you are Ray?
A. And I am Raymond Schneider.
Q. Why did that transfer occur?
A. It was one of the transfers we made. The "why" would be that I did my gifting.
Q. Why was it gifted to Patti and not just to your own gift trust?
A. I was guided by my legal counsel.
Q. And can you read the next bullet point?
A. Which is December 31st?

Q. No. Under November 1st, 2020.
A. Ray gifted -- or the next one. As of November 1st, 2020, the members of Red Dog Operations Holding Company were as follows.
Q. And can you read the -- that --
A. Ray had 1,000 shares, Patti at 6,999 and Eric had 2,000.
Q. Okay. So under the line item that says "Ray," it says one Class A voting share --
A. That's what --
Q. -- voting unit?
A. Yes.
Q. And the next column under Class B Units, it says 1,000 for Ray?
A. Yes.
Q. Okay. Are there any other people or members who owned any voting shares other than yourself?
A. Not unless it's in the document, but I don't think so.
Q. Okay. Why did you retain one -- the sole voting unit?
A. I was led by my counsel. I don't know.
Q. Did you want to retain control of the

company?
A. I don't know. This is six years later, seven years later.
Q. Okay. Was it ever important for you to retain control of your companies?
A. I controlled the companies so that they got -- accomplished their operations as needed.
Q. And wouldn't you agree that, with all these transfers and gifting and the trust and everything, you still retain control of the companies?
A. This was a family business, and I was a good manager, and the manager's in control. And as the manager, I controlled what needed to happen.
Q. So with all these gifts and trusts, you are still the holder of controlling voting interests, right, for all the companies?
A. I can't say that. I don't know what the documents say. But this was all done in '17 through '20. And in a -- whatever.
Q. So for all of the companies that are in these trusts, either the Ray Schneider Gift Trust or the Patti Schneider Gift Trust, to your

knowledge, are there any companies that you are not the controlling member?
A. I have to read the documents. I don't know.
Q. Do you think you would remember ceding control of companies to your family?
A. As I sit here today, it's September 21st, I can't remember things that I did nine years ago in every fashion, so I go back to my documents, I look at what I did, and I did things the right way at the right time. And the statute of limitations says that I did this back early on, and at the end of '22 and the end of '24. This is all behind me.
Q. What statute of limitations are you talking about?
A. The issues that Huntington keeps bringing up that they think they should look at and take advantage of a trust that wasn't part of anything they were involved in. And it wasn't anything that they have access to because it's behind in the court for state and federal purposes. That's behind us at this point.
Q. So for bankruptcy purposes, are you

aware of the ten-year lookback?

A. I understand ten years ago you weren't around. I wasn't in bankruptcy. I haven't failed anything. And there might be a rule that's out there, but I think if a judge looks at this, they will see I did not hide anything, I didn't go anywhere, and this was all done prior to Huntington ever showing up in my life.

So the default happened under Huntington's guidance, and a creditor should not be able to collect against something they created or allowed.

Q. So the purpose of this bankruptcy from your perspective is to prohibit Huntington from collecting?

A. Absolutely not.

Q. Okay.

A. Absolutely what happened here is I'm an intelligent, smart person who recognized the rules of the government have changed. And as I become a citizen from day one, I followed the rules. The IRS had rules and the IRS rules changed. And because of that, you were allowed to gift more than $3 million. And that's what most of our

lifetime was all about. So I gifted something at the right time when the rules changed.

The rules were in 2026 -- or 2025, whichever it was, maybe it's '24, that the rules are going to change, and I had the -- I had the capacity to do this. Some people don't have that. And that's where some people are upset that I was able to put this together. My estate and part of my estate I gifted away, and I gifted it away before Huntington ever showed up.

Q. So the question was not about gifting or your trusts. It was: The purpose of your bankruptcy is to prohibit Huntington from collecting?

A. I'm not hiding anything. I'm an open book. I told you how I did this, why I did it, and there's nothing different. Because if you follow the record, you follow the documents, you follow everything -- you weren't even around. 2017 is my first legal bill that I sat down with my legal counsel and we started a trust. I did a will when I was getting into my 40s. I did everything as you do, a health power of attorney. I've done all the things that are correct in a

normal world, and this is a normal situation.

My family knew that I put this together as a gift, and I did it back in '17. And it took two and a half years to put it to the settlor's signature on a page. So the activity I did, if you follow it in a court, you'll see that this had nothing to do with what we're sitting here for.

Q. So the question is not about these trusts or the transfers. It is: The purpose of the bankruptcy is to prohibit Huntington from collecting, you would agree with that?

A. I absolutely disagree.

Q. Okay.

A. And I disagree and I disagree. Huntington's trying to discover something that's not true and you're trying to capture me into something that I haven't said or did. And the records show exactly what I did.

I proceeded to do what any other normal person who's successful in business, to put things away at the right time, and the gifting was at the right time. And I knew it took a while, so between the accountants, the lawyers and everything else, I did what any normal person

would do. This ten-year lookback is a joke. It's a court that allows it to be one of the objects they're working on, but it's all about intent. And the intent was exactly what's on paper.

Q. And after the first bankruptcy case, you knew that Huntington had -- well, during the first bankruptcy case, you knew that Huntington had filed a proof of claim for a large amount and was asserting a claim against you, right?

A. They asserted a claim with an incomplete record. And we could only go on that judge's decision, who ultimately became an Ohio Supreme Court Judge in a hurry to get this case behind her.

So without the records, without the information we had, you can't have a complete record. And we still don't have a complete record four years later. And I filed a second bankruptcy after I won the Appellate Court for doing the right thing and showing the Court what really facts are part of this case. And right now we don't have all the facts.

Q. Who was that judge who became a Supreme Court Judge?

A. Judge Shanahan.
She didn't give us the time it took to get the due diligence. And we don't -- we now have a couple hundred thousand extra pages, 31 depositions, 115 red flags, been in front of 15 judges, seven courts, and 31 depositions that tell the truth.
Q. You have a good memory, correct?
A. I have a memory that fits -- fits when it fits. And I'm getting older, so I can't have a perfect memory that you're trying to tell me I should have.
Q. Okay. At the time you filed your bankruptcy, the second bankruptcy --
A. March 2nd, 2023.
Q. That's the first bankruptcy.
A. That's the first bankruptcy.
Q. Do you know the date of the second bankruptcy filing?
A. Something to do around October of 2025.
Q. Okay. At the time you filed the second bankruptcy, were any creditors pursuing you, other than Huntington?
A. For collections?

Q. Yes.
A. No. That I remember.
Q. And going back to the document you were reading from, document 97 --
A. Page 4 of 54?
Q. Yeah.
A. 42 -- 43?
Q. Document 97-1 in the first bankruptcy case, page 4 of 54.
A. This document, Overview of 2020 Gifting Program?
Q. Yep.
A. Yep.
Q. Can you read the part under December 31st, 2020 effective at 11:59 p.m.?
A. Ray gifted 1,000 Class B Units non-voting in Red Dog Operations Holding Company LLC to Eric.
Patti gifted 6,999 Class B Units non-voting in Red Dog Operations Holding Company to the Patricia B. Schneider 2020 Gift Trust.
This is a grantor trust with respect to Patti and Ray as the trustee.
Q. And can you read the next one?

A. As of 11:59 p.m. on December 31st, 2020, the members of the Red Dog Operations Holding Company were as follows.
Q. And under Ray it says one Class A Unit (voting)?
A. Yes.
Q. And for the Patricia B. Schneider 2020 Gift Trust, it says 6,999 under Class B Units (non-voting)?
A. Yes.
Q. And for Eric it says 1,000 Class B Units (non-voting) and 2,000 Class C Units (profits interests)?
A. Yes.
Q. Okay. And I don't think we've established yet. Eric is your son, right?
A. Eric's my son.
Q. And what other children do you have?
A. Justin Schneider and Danielle Senzer.
Q. Okay. I almost --
A. What's that? You want me to spell that?
Q. Yeah, you can spell it.
A. S-E-N-Z-E-R.

Sorry, I forget sometimes whether it's a Z or an S.
Q. So before these two transactions, were -- the transactions spelled out on this page, it looked like you had all of the Class A voting units, right?
A. I had one.
Q. Which is one of the only one, right?
A. I don't know.
Q. Who do you think might have the other voting unit?
A. I don't know. I have to go through that.
Q. Okay. But these charts say that, as of the particular dates, that's what it was, right?
A. That's what I'm reading, yes.
Q. Okay. Do you have any reason to believe these charts are inaccurate?
A. No.
Q. Okay. And at the end of the day, you retained that one Class A voting unit?
A. As of that date, yes.
Q. And at the end of the day, Patti -- the Patricia Schneider 2020 Gift Trust wound up with

6,999 Class B non-voting units, right?
A. Same she had before.
Q. Well, not the same she had on October 31st before these transactions, right? Because that gift trust --
A. I don't know. I would have to go back and look at the record.
Q. You would agree that you gifted the 6,999 shares to the Patricia trust?
A. Whatever the document says, I agree.
Q. Okay. So you're saying this chart is accurate?
A. I guess I'm relying on that, yes.
Q. Okay. And why were those series of transactions done on those two days?
A. So to show that I'm a smart business person, I had an employee that had been with me for -- at the time, I'm going to say five or six years and helped grow the business. They were allotted ownership as time passed to produce and get bonuses. And when I couldn't pay the bonuses, they got a larger percentage of the opportunity if something changed.
Q. Who is that, Eric?

A. Eric Schneider.
Q. Okay.
A. He's been with me 12 years running the business.
Q. So before these transactions, Eric had 2000 Class C Units, which were profit interest, right?
A. I believe that's -- yes.
Q. And after the transactions, he had this profit interest plus 1,000 non-voting, right?
A. Yes.
Q. And before the transactions, you had the sole voting plus 6,999 of the non-voting, right?
A. I only show on this page 1,000. Patti had the 69 both times.
Q. If you go over to the next page. Do you see the document that says assignment of Class B Units?
A. Yes.
Q. Okay. And did you execute this document?
A. I believe we did.
Q. And it was executed on November 1st,

2020?
A. I thought it was 12/31.
Q. If you look --
A. It says November 2020 effective date.
Q. Okay. So when you say "effective date," does that mean it was signed on that date or just that's the date you chose it to become effective?
A. That's the date that he earned his ownership interest, and then it was signed on December 31st, 2019.
Q. And the document says assignment of Class B Units.
Do you see the recitals?
A. You're talking about on page 4? Oh. Which one are you -- okay. Signer owns 7,999 Class B in the company, which are subject to a certain operating agreement dated January 1st, 2020, the operating agreement.
Q. Okay. So let's read recital one first. Can you -- Recital A first.
A. Assignor is a member of the Red Dog Operations Holding Company, an Ohio limited liability company, the company.

Q. And you are the assignor?
A. Yes.
Q. And can you read Recital B?
A. Assignor owns 7,999 Class B Units in company, which are subject to a certain operating agreement dated July -- January 1st, 2020, the operating agreement.
Q. And can you read Recital C?
A. For estate planning purposes and pursuant to this agreement, assignor desires to transfer and assign 6,999 Class B Units in the company (the units) to assignee as a gift.
Q. And the assignee is your spouse?
A. Yes.
Q. And because it's a gift, you didn't receive anything in return for it, correct?
A. Can you give me the definition of a "gift"?
Q. What's your definition of a gift?
A. I gave something to somebody. When I buy a present for my grandchildren, I don't expect anything in exchange, just what's normal love and appreciation.
Q. Did you get anything in exchange for

this assignment from your spouse?
A. Yes. Another five years.
Q. Can you explain that?
A. I live with trust, love and appreciation for what you do. And a gift is what you do for those type of things for people you believe in and trust.
Q. So did you receive anything of monetary value in exchange --
A. I don't --
Q. -- for this assignment?
A. I don't recall. But any gift, I don't have to have someone pay back. A gift is a gift is a gift.
Q. And typically a gift -- you don't get anything in exchange for a gift, right?
A. Sometimes you do. It's called the politics in the system we live in. And I believe that sometimes a gift enhances things that you like.
Q. And did this gift enhance anything that you liked?
A. Yeah, my wife.
Q. And it made her the owner of 6,999

shares of Red Dog Operations Holding Company LLC, right?
A. That's a gift.
Q. And the Red Dog Operations Holding Company LLC was basically the Red Dog pet business, right?
A. The operations of the pet business.
Q. Okay. How much did you sell that pet business for?
A. I've got to go back to the documents.
Q. Do you remember?
A. Not really.
Q. More than a million dollars?
A. Absolutely.
Q. Less than 50?
A. How much?
Q. Less than 50 million?
A. Yes.
Q. Less than 20 million?
A. Yes.
Q. How about 18 million?
A. It was somewhere close to that, because that's not exactly what transpired, but yes.
Q. Okay. So why was it close -- what

changed about how it transpired?
A. That $10 bill you have in your pocket is probably worth $6 in 2020. So if you took that $6 and invested it and worked hard at growing it, someone pays you more for that $10 bill than it's worth.
Q. So --
A. So when I -- when you look at all these documents, they're a moving target. And the target is you can pick a time and space when you buy something. And with inflation and good hard work, the labor of getting a good customer and creating a brand name and all that stuff, it enhanced itself from 2020.
And that was done because of Eric's hard work and achievements that gave Patti's value in the trust much bigger than the date that you're looking at a document because it wasn't worth as much.
Q. So what did your spouse do to enhance the value of the Red Dog pet business?
A. She kept Eric as the manager who created the value.
Q. Well, your spouse was not the voting

shareholder -- or voting unit holder, was she? At any point in time?
A. That has nothing to do with it. These are ownership. These aren't activities going on day to day.
Q. Who -- what owner had the right to keep Eric as the manager or get rid of Eric as the manager?
A. It's in the operating agreement.
Q. That would be you, right?
A. Patti, who had the trust, me, I had a voting share inside the trust. And Eric, because he wanted to work and stay with us. He could have gone somewhere else.
Q. Well, your voting share was maintained in your own individual name, right?
A. That one share of voting is in my name, yes.
Q. Okay. And you ultimately entered into a sale agreement with Kindred Pet Services, right?
A. Yes.
Q. And the purchase price of that business was $18 million, right?
A. Some number close to that.

Q. Okay.
A. But that was in 2024. Do you know what I bought in 2020? I bought a business and it turned out to be worth five times what it was. I bought a share of stock in 2020, and it's worth 250 times what I paid for it. It's all about the timing, the value, and what goes on between the time you start something and the time you finish it.
The value of my assets that were at Huntington were worth $99 million. They were worth a lot more than when I started with Huntington. And that proved itself in an appraisal. And that's not what we started with, because they started with an $84 million value.
So how did that happen? It happened because people who work earn a living to fight for a bonus and a property that can grow.
Q. How much did you get out of the $18 million?
A. I didn't get anything because it was the operations that sold.
Q. Who -- who got --
A. The trust.

Q. Okay. So how much was the split between the trust and Eric?
A. Eric's ownership was somewhere in the 30 percent of the sale, and then the other three kids got the rest.
Q. So out of the 18 million, Eric got 30 percent of the 18 million?
A. Yes.
Q. And when you say Eric's ownership, this 30 percent, how are you calculating that?
A. From the time he started to the 12 years he enhanced the business, he was given 5,000 -- or he was given 5 percent of the ownership from the day we started. He earned 20 or 25 percent because that was over four or five years. And then he did not get his bonuses, and that was in exchange he got a higher percentage.
Q. Did you have an agreement to give him shares of stock?
A. Yes.
Q. Or shares of units, I guess?
A. I think there was something.
Q. A written agreement?

A. Something that was written down.
Q. Okay. Was this an agreement that was written down at the inception of Eric working for the company?
A. No.
Q. When was it written down? When was the agreement executed?
A. When he was ready to move on and find another job. And he was good at what he did and he enhanced everything, so he improved the asset. Just like I do other bonuses to employees over time, they earn it. I've got an employee leaving, he's going to get a nice bonus. He took the time to make me better than what I am today.
Q. So when -- at what point in time -- do you have an estimate of the date when this written agreement occurred?
A. I do not, because I don't want to be entrapped with something that I don't know as I sit here.
Q. Do you know if it was between your first bankruptcy and the second bankruptcy?
A. It would be way before that.
Q. Did you effectively transfer ownership

percentage to Eric at any point during the interim between the first bankruptcy and the second bankruptcy?
A. I don't know. I would have to look at the documents. You're asking questions that are not the first thing on my page. This case is the first thing on my page, and the rest of my business I'm trying to keep alive. And I don't know the dates until I see it on a document, but it was way before the first bankruptcy. It was way before Huntington created the default that I was in.
Q. The $18 million sale, give or take, to Kindred Pet Services, that was the operations but not the real estate --
A. Correct.
Q. -- is that correct?
And you or your family or the trust retained the real estate, right?
A. Raymond Schneider retained it.
Q. And did you enter into -- you personally or one of your companies?
A. One of my companies.
Q. The wholly owned companies retained it?

A. An LLC.
Q. Okay. And does that LLC have leases with the new buyer?
A. Yes.
Q. Okay. Do you know the name of that LLC?
A. There's three of them.
Q. What are they?
A. I would have to look at the documents because I have a lot of names. Do you have a list of my assets?
Q. Well, I'm just asking if -- you have a list of the assets you've disclosed --
A. So I don't know --
Q. -- in Exhibit 3.
A. -- in what document I'm going to look at to find it, because I didn't bring any documents with me.
Q. Your bankruptcy schedules are in Exhibit 3, and they should have a list of all your companies.
A. These are all the minor companies or issues that have been brought back, so -- I'll look through here.

MR. COUTINHO: The list of your companies on Schedule A/B.
A. It's the front end? Sorry.
Okay. Well, that's not in there. Does it show my active stuff? Yeah. Boston RD, LLC. Mason RD, LLC, and North Shore RD, LLC.
Q. What property does Boston RD, LLC own, or properties?
A. An asset in Boston, Massachusetts.
Q. Do you know the address or street?
A. Southampton. And I don't remember the -- well, here, it should be on here. The address isn't on there.
I don't remember -- with 75 different addresses that I have to look at, I don't remember everything, but it's Southampton is the name of the street. It's in south Boston. And I can look it up if you need it.
Q. How about Mason RD, LLC, do you know what properties that owns?
A. It's right near Kings Island or the amusement park. I don't know the address. I can get it for you if you want it.
Q. In what town?

A. Mason, Ohio.
Q. Okay. How about North Shore RD, LLC?
A. That's in Saugus, Mass, and that's on Highway 1.
Q. Prior to the sale to Kindred Pet Services or in connection with the sale, did you contribute any entities to a holding company?
A. No. Wait, there were two animal hospitals as part of it inside -- one was inside the business. Did I create a holding company? I don't think so.
THE WITNESS: Did you have one? I don't remember.
MR. COUTINHO: I don't remember.
A. No. The holding company you're reading is the operations.
Q. Have you ever heard of a company abbreviated as SM, LLC.
A. No, never heard of it. Is it in my documents?
Q. I'm just asking if you have heard of the initials or abbreviation SM, LLC.
A. Never heard of it. You know what it stands for?

Q. That's what I was asking you.
A. Never heard of it.
Q. And you talked about your son Eric getting some of the proceeds from the Red Dog sale, right?
A. Yes.
Q. And then you talked about your other children getting some of the proceeds?
A. Yes.
Q. Tell me about how your other children got some of the proceeds.
A. Some of the proceeds were reinvested into Kindred and the balance is sitting in the trust.
Q. Were any distributions made to your two other children other than Eric?
A. Yes.
Q. How much?
A. I forget. Somewhere north of half a million dollars.
Q. Half a million dollars each?
A. Yep.
Q. And when did the sale of the Red Dog to Kindred occur?

A. November 15th, 2024.
Q. And what did your children -- your other two children, besides Eric, do to earn the half a million dollars each?
A. They are part of the trust. The trust was a gifting trust.
Q. So it was a gift to them?
A. As part of the gifting in the trust.
Q. And how much did you personally get from the sale of Red Dog?
A. Nothing.
Q. And do you know how much money is still in the trust -- in the Patricia Schneider Trust --
A. I don't know.
Q. -- from the sale of the Red Dog?
A. I don't know.
Q. Do you know how much the Patricia Schneider Trust received from the sale of the Red Dog?
A. I would have to look at documents. I don't know.
Q. Would it be fair to say that it would be somewhere around the $18 million minus what Eric received, which is about 30 percent, minus

the 500,000 to the two other children?
A. Well, they reinvested some of the money into Kindred, and then they paid a lot of bills. And part of my 2024 difficulties were our companies' shared expenses, so some of those expenses got cleared up.
Q. So some of the money went to your companies?
A. Some of the moneys went to pay the loans that were given to help that business.
Q. Okay. So your companies would loan money back and forth between your companies?
A. The companies I controlled, several did lend money to other entities, Kindred being one of them -- or KPT7 being one of them.
Q. And KPT7 is the company that got formed that you contributed funds to, right? Or contributed entities to?
A. That was the selling entity that -- yes.
Q. Did you ever have an equity interest in Red Dog Management Company, LLC?
A. I can't remember.
Q. What do you remember about Red Dog

Operations Holding Company?
A. I would have to read what the operating agreement says. I don't remember.
Q. When was KPT7 Holding Company, LLC formed?
A. Some period during the discussion of possibly selling.
Q. And what was it formed for?
A. Having an entity after they purchased the name.
MR. PFEIFFER: You know what, can we take a five-minute break?
MR. COUTINHO: Sure.
(A recess is taken.)
Q. If you could go to Exhibit 47 in the binders.
A. No. 47?
Q. Yep. No. 47?
A. That would be book two?
Q. Book two.

- - - - -

Thereupon, Exhibit 47 is marked for purposes of identification.

- - - - -

Q. And you'll agree this is the operating agreement for Red Dog Operations Holding Company LLC?
A. January 1, 2020.
Q. Yep. Do you agree that's what this document is?
A. If that's what you've got. I haven't read it.
Q. Okay. Can you look at page 6, Section 3 or -- yeah, Section 3. And Section 3.1 in particular.
A. I'm looking at it.
Q. Dealing with Capital Contributions?
A. Yep.
Q. And what was your personal capital contribution?
A. All the equity that went into it.
Q. Okay. The contributed subsidiaries as that's defined?
A. Myself or the companies.
Q. And do you know what -- what you contributed -- what subsidiaries you contributed?
A. If I go back 17 years, I could.
Q. Well, this is the Red Dog business. It

doesn't go back 17 years, does it?
A. I opened my first one in 2007.
Q. Okay.
A. So it does. All my businesses preceded these dates.
Q. And do you know what subsidiaries you contributed?
A. I didn't say I contributed subsid- -- the -- I contributed equity to make them work.
Q. Okay. Do you know what equity you contributed?
A. I would be a genius if I could tell you. I have to go back to taxes, P&Ls, way back to 2005 when I started putting this thing together. So the answer is I have no idea.
Q. I'm going to read you a list of what I think the contributed subsidiaries are, and you tell me if you think that I'm wrong with respect to any of them, okay?
A. Well, I -- I will clarify my answer when I understand what you're asking.
Q. Okay. Do you think you contributed the Boston Animal Hospital, LLC equity?
A. I started the business when it was a

warehouse.
Q. Okay. But with respect to the Red Dog Operations Holding Company LLC, do you think you contributed the Boston Animal Hospital, LLC equity to that entity?
A. I did equity there. I can't tell you what it is.
Q. Okay. Did you contribute to the Red Dog Operations Holding Company LLC the equity in Boston Red Dog Pet Resort & Spa, LLC?
A. What was the title of that?
Q. Boston Red Dog Pet Resort & Spa, LLC.
A. I'm sure I did, because every business starts off at a loss.
Q. Okay. How about the West Chester Pet Resort & Spa, LLC?
A. What is it?
Q. West Chester Pet Resort & Spa, LLC.
A. That's no longer around.
Q. Okay. Do you think you may have contributed it?
A. Yes.
Q. Okay. How about Red Dog Resort & Spa, LLC?

A. Yes.
Q. Mason Red Dog Pet Resort & Spa, LLC?
A. I built that off of a ground of dirt.
Q. Okay. Do you think you contributed it to the holding company?
A. I did.
Q. Okay.
A. Oh, I don't know. I don't know specific to the holding company, but I did to Red Dog.
Q. Okay. Red Dog Operations Holding Company?
A. Possibly that was the operating company. And everything I've ever started starts with a loss, except for the things that are operating when I took them over.
Q. How about North Shore Red Dog Pet Resort & Spa, LLC?
A. That was an auto mechanic shop that I turned into a pet resort.
Q. Did you contribute that pet resort to the Red Dog?
A. It was part of the Red Dog.
Q. How about Atlanta Red Dog Pet Resort &

Spa, LLC?
A. Tried to make that work in Atlanta and it didn't work.
Q. Did you contribute it to the Red Dog --
A. It's gone. It was gone. Didn't make any money.
Q. But was it contributed to the Red Dog?
A. At the time I contributed to try to keep it alive.
Q. Okay. How about Springdale Red Dog Pet Resort & Spa, LLC?
A. Yes. That's a lease that's out there.
Q. And do you remember how many units you received?
A. No. But I'm sure you'll show me.
Q. If you look at Exhibit A --
A. On what page?
Q. -- of that operating agreement.
MR. COUTINHO: Just look at mine.
A. All right. I'll look at this one.
This is January 1, 2020?
Q. Uh-huh.
A. Okay. We were talking about that earlier.

Q. So this Exhibit A to the operating agreement in Exhibit 47 says that you contributed the entire membership interest of each of the contributed subsidiaries at an agreed fair market value of $6,269,000, correct?
A. Apparently on that date.
Q. And the contributed subsidiaries are on Exhibit B as -- on the next page.
A. Yes.
Q. Okay. And you received one Class A Unit?
A. I got one Class A Unit.
Q. Okay. And, again, that's the only voting unit, correct?
A. In the trust, that's what we have.
Q. In this company -- in this limited liability company?
A. This company is in the trust.
Q. And you received 799 -- 7,999 Class B Units, right?
A. Yes.
Q. And your capital account balance was $6,269,000?
A. Yes.

Q. And how -- and you received 80 percent ownership interest?
A. Yes.
Q. And your son, Eric Schneider, received 20 percent ownership interest?
A. On that date, yes.
Q. Okay. Composed of 2,000 Class C Units, right?
A. Yes.
Q. And how much did your son Eric pay for those 2,000 Class C Units that represented 20 percent ownership interest?
A. If I read it off this document, it says 530 plus his time and effort in future...
Q. Where does it say "plus his time and effort in future"?
A. I think it's going to rain today, so I don't know where I have that.
Q. The question is: Where does it say in this operating agreement that he was contributing his future time and effort?
A. This is the beginning of 2020. Just to back up history. Do you know what happened in February of 2020?

Q. The question is: Where does it say --
A. It says it after the fact. When COVID hit and my world drowned into hell and I needed to fix it, Eric spent his whole time. We spent our time trying to get us out of there. And things changed. And that document was done before COVID.
Q. Okay. So where does it say in this document that Eric was contributing his future time and effort?
A. I do things point in time. At the time, that's what we did.
Q. At the time, the only contribution he --
A. I'm not agreeing to what the document says.
Q. At the time, Eric's only contribution was $538.87, right?
A. As the document for the trust, yes.
Q. This is for the operating agreement.
A. Okay. In the operating agreement, it was part of the --
Q. Okay.
A. -- trust.
Q. And for that $538.87, he received

20 percent of the company, right?
A. At the time, that's what he got.
Q. And you had contributed membership interest in eight companies with a value of 6.2 plus million dollars and received 80 percent?
A. That's what it says.
Q. Okay. Do you agree that there's a disparity between what you contributed and you received versus what Eric contributed and what he received?
A. No.
Q. Why not?
A. Because it was a family business. And I don't always write every single piece. I didn't tell my wife that I went to the store and bought her a gift. I don't tell everything I do because I just do it. And in this case, we did this to develop the trust, and along the way after this, times changed.
Q. If a court ultimately determines that your claim against Huntington is not valid, in that you owe Huntington whatever Huntington claims, would you be willing to sue Eric or your other family members or your spouse or your spouse

as trustee to undo these transactions that we've talked about?

MR. COUTINHO: Objection to the form of the question. Presumes that the transactions are voidable.

A. I think you asked too many questions in one question. I'm not going to say yes, and I'm not going to say no.

Q. Would you ever sue your spouse?

A. Why should I?

Q. If you determined that there was a --

A. I determined that I have enough assets, and I've shown Huntington several years ago that I have enough to cover the original claim. Their claim was put down with incomplete records. You can't have a case without complete records. And currently, six years later, I still don't have complete records. And we will be asking for them because we need a complete record to have a good trial.

And I have enough money, enough assets, to cover anything that's going to come forward.

Q. Can you ever envision yourself suing your spouse?

A. I don't have to envision that.
Q. If it is determined that there were voidable transfers made by you to your spouse or your spouse's trust, would you sue your spouse to recover those?
A. I'm not doing ifs, ands or buts. I'm not there, so I don't have to think that way.
Q. Well, you've proposed a liquidating plan of reorganization, haven't you?
A. I think when the Appellate Court proved that Huntington had documents that nobody else could look at, I won. They've had 28 emergencies to tell me what I need to know in the court, and they lost all of those. They've changed courts. They've done everything to protect themselves. And now when I get the complete record, you can tell me that I don't need to sue anybody.
Q. If you lose all of those cases and it's determined that there may be a voidable transfer that can be unwound by you suing your spouse or the trust, would you do that?
A. I don't have to do that because there is nothing unethical and did everything in the proper timing. And it's all about in the court

what you really did, not what you said you did.
Q. So are you saying that you would not sue your spouse?
A. I never said that. I said I don't need to go there, so -- I've got enough assets. I've got enough regulations that Huntington has not provided in the court system. Until we get to the complete record, I don't have to think that way.
This is what Huntington's hoping that I would do, but Huntington has never proven that I owe them the money. With incomplete records, there is more money that Huntington lost than -- and the key to this whole thing, a creditor cannot collect a loss if they created it and they enhanced it.
Q. Would you ever sue your spouse to collect an asset of the bankruptcy estate?
A. I have no interest in answering that question.
Q. Are you declining to answer that question?
A. No. It's not a question that I need to answer at this point in time.
MR. PFEIFFER: Counsel, can you

instruct your client to answer?

MR. COUTINHO: You're asking him a hypothetical that conflicts with his plan provisions. So, I mean, he's proposed a liquidating agent that's going to be appointed to handle estate actions. So I'm not sure that -- I'm not sure it's a hypothetical you should be asking or be asked.

MR. PALMER: Can we go off for a minute?

MR. PFEIFFER: Can we go off and can we talk?

(A discussion is held off the record.)

Q. Let me restate the question.

We've had a discussion off the record and I think counsel's going to object to the question and I think the witness is going to answer.

But the question is: Would you ever sue your spouse to recover assets of the bankruptcy estate?

A. My answer is --

MR. COUTINHO: Objection. Hold on.

Objection to the form and substance of

the question.
But go ahead.
A. My answer is no.
Q. Okay. And I'm assuming you want the same question: Would you sue the trust or any of your children to recover assets?
A. No.
MR. COUTINHO: Same objection.
Q. Okay. So the -- you indicated that when the Red Dog business was sold, the operations, that was eventually folded into -- let me -- the Red Dog operations were folded into KPT7 at some point, correct?
A. No.
Q. Okay.
A. They bought shares into KPT7.
Q. Red Dog operations bought shares of KPT7?
A. Yes.
Q. Okay. And KPT7 owns the real estate?
A. No.
Q. Okay.
A. The companies all own the real estate.
Q. Okay. So when the Red Dog sale

occurred, Eric received 30 percent?
A. He got his proportion at the time it sold.
Q. I'm sorry?
A. He got his proportion when the thing sold.
Q. Okay. But this Exhibit A on the operating agreement says he has 20 percent?
A. The operating agreement that you're reading -- you're trying to capture me to say something that's not true -- was written and published on January 1, 2020. The company was much, much, much smaller. The activities that went on for the next four and a half, five years contributed to the sale.
Q. If you look at Exhibit 4 -- which I would ask you to mark.

\- - - - -

Thereupon, Exhibit 5 is marked for purposes of identification.

\- - - - -

Q. In the first binder.
A. Exhibit 4? Book one.
Q. I'm sorry, Exhibit 5.

Do you agree these are the monthly operating reports in your second bankruptcy case?
A. I have no idea. I've never seen them before.
Q. Okay. If you look through, can you tell me if you signed these documents?
A. I signed this? Where's the signature page?
MR. COUTINHO: It's going to be before all of the --
THE WITNESS: Before that one?
MR. PFEIFFER: Mr. Coutinho, do you want to stipulate that these are the monthly operating reports?
MR. COUTINHO: Yes, I would like to stipulate. Except for I just want to make sure, there was an amended one filed for May. Is that in here?
MR. PFEIFFER: If it's not, I think that would speak for itself.
MR. COUTINHO: Okay. Just want to make sure. I think that's the only one we amended.
And these are your monthly reports that you --

A. Okay. These are my monthly reports, so -- I usually have someone that helps me. So when I don't spend time like you do on it, I won't be able to say yes right away, so...
Q. Well, before we get to these, your spouse, Patricia, does she have employment?
A. She does.
Q. Okay. Where does she work?
A. She works with the companies.
Q. What's her job?
A. Marketing and other functions as needed.
Q. How much time does she work for the companies on a weekly basis?
A. I don't know. Sometimes she works at home.
Q. How much time does she spend at home working?
A. I don't know. I don't keep an eye on all my employees.
Q. Okay. And does she have an email address at the companies?
A. No. Not everybody at the company has company emails.

Q. Do you know what email she uses?
A. The one I give her a hard time about.
Q. Which is?
A. She's still got AOL. Stop laughing.
Q. You might need to give her a hard time about that.
A. Oh, God, sometimes you can't talk to your family, what can I tell you.
Q. How much is she paid by the companies?
A. I have no idea. I don't take care of payroll. I don't take care of a lot of the details.
Q. Who hired her?
A. The company.
Q. Okay. But who made a -- who at the company made the decision to hire her?
A. Most likely it was me, because I know her.
Q. And when was that?
A. 45 years ago.
Q. When was the decision to hire her made?
A. When I -- when I married her.
Q. When was the decision to provide her with a salary?

A. She's been getting a salary off and on.
Q. You agree that in your 2023 personal tax returns, she's listed as being retired?
A. She's come in and out of retirement many times.
Q. Okay.
A. She wasn't old enough to permanently retire.
Q. Besides working for the companies, did she ever, during your marriage, work anywhere else?
A. Yes.
Q. Where?
A. Nordstrom's. She was a Realtor. She helped take care of the kids, maintained the house, and provide sustenance to all the companies.
Q. Okay. And how did she provide sustenance to all the companies?
A. A woman with a brain who came and supported or had decisions that ultimately changed.
Q. When was the first time she was employed by the companies?

A. I would have to go back to my records that are 55 years old.
Q. Okay. When was the first time after -- after 2023 that she was employed by the companies?
A. I would have to go to the records. I don't know.
Q. Do you know how much she made in 2023?
A. I can look at my tax return or go look at the records and I could tell you. 2023?
Q. Could you go to Exhibit 17, which is in the second binder.
A. Oh.

- - - - -

Thereupon, Exhibit 17 is marked for purposes of identification.

- - - - -

Q. Do you agree this is your 2022 federal income tax return?
A. It looks like it would have been. Pretty complicated.
Q. And if you can look at the second page of the 1040 form. Do you mind if I help you move to it?
A. You can do anything you want.

Q. If you look at the first page, you're identified as the taxpayer, right?
A. My 1040, yes.
Q. Yep. So you --
A. Along with my wife.
Q. You're the first taxpayer and she is the second taxpayer, right?
A. There's only two lines, so yes.
Q. Okay. And on the next page, it asks for your occupation and you put real estate professional?
A. That's a good term. I'm a real estate developer.
Q. And for her occupation, it's retired, right?
A. Where is it? I don't see that.
Okay.
Q. Spouse's occupation says retired, right?
A. On 10/12/23, yes.
Q. Okay.
A. That's the date we signed this. The day before, she could have been working.
Q. And did you file a tax return for 2023,

a personal tax return?
A. I believe we did.
Q. Okay.
A. First time I had ever filed one was 2024. I've filed it for the last 55 years.
Q. Do you know how much your wife's compensation was -- wages were in 2023?
A. I told you earlier that I don't know.
Q. Would it surprise you if I told you it's listed on her tax -- on your tax returns as $418,654 in wages for your spouse in --
A. Wages or income?
Q. Wages --
A. Okay.
Q. -- for your spouse in 2023?
A. No.
Q. Okay. So do you know where she received -- who paid those wages?
A. That was four years ago. I don't know.
Q. Okay. Did she have any job outside the company to receive those wages?
A. I don't remember.
Q. Okay. Who works more for the company, you or your spouse? Who puts in more time?

A. We both do. I work at home a lot. It's where she helps me also.
Q. How does she help you at home?
A. Keeps my sanity from the Huntington lawsuits.
Q. Any other way?
A. Many other ways. I don't have enough time to tell you all the other ways.
Q. Can you tell me the big-picture items?
A. We talk about the business. We talk about what's going on. Talk about ideas and how to improve the business. We talk about how to increase our income. How to manage the people we have trouble with. I can go on and on and on. It's any owner of any company, there is no set time.
Q. Why don't you take any wages from the companies?
A. I've always done that.
Q. You've never taken wages from the company?
A. Seldom. I usually take dividends, I'll call it, or a payback or whatever. I run my company like Raymond Schneider runs his company

and it's successful. Success doesn't come in any special order. It doesn't come in a CliffsNotes. It doesn't come in a classic class. Doesn't come in Huntington's view of what I have to do to make a dollar.
Q. So do you take your compensation when you determine you want to take your compensation?
A. In many different ways. I don't know.
Q. Well, when does your compensation come to you?
A. Depends on what the companies do. Depends on the time of the year. Depends on what the needs are. Depends on a lot of things.
Q. Who makes the determination as to what compensation you receive either through a dividend or an owner's draw or whatever it might be?
A. Could be myself. It could be my lawyers. It could be my accountant. It could be my employees. We all make decisions in that regard.
Q. How do your employees determine what you get compensated?
A. By making me more money.
Q. Any other way?

A. Yeah. Discussion, where we are, where we're going, what we need for tomorrow. You know, if I need money to help fix a business, I get the money and I fix it.
Q. Do either your employees, your accountants or your lawyers make the ultimate determination as to what compensation you are receiving?
A. I can't answer that.
Q. Okay. Well, isn't it true that you are the person who decides?
A. I'm one of the persons, yes.
Q. Is there anybody who vetoes you?
A. Yes.
Q. Who?
A. Some of my employees veto me sometimes. You know, sometimes my wife. We always have a plus and a minus in our lives. You know, there's decisions made every single day, sometimes ten times a day.
Q. Are there any documents or agreements that give your lawyers, your accountants or your spouse or your employees the right to determine or veto what your compensation is?

A. I don't believe that I have a written document.
Q. Are you in control of the companies?
A. I'm part of the companies, yes. I don't do all -- I can't do all of this without my employees. That's why, through all of this, it's made it really hard.
Q. Yeah, but you're the boss, right? You're the person at the top?
A. I'm probably the guy that has the best decisions out of everybody.
Q. I'm not talking about the best decisions, I'm -- you're where the buck stops, right?
A. Depends if that's an only solid, single decision, no.
Q. Are you in control of the companies?
A. I have controlling rights at times.
Q. Who else has controlling rights?
A. If the employees make a decision, they have control. When I get information from my accountants, I have control. When I talk to my bankers, they have control. Everybody has control. Ultimately someone's got to maneuver

whatever that might be.
Q. Can you look at -- one sec.
Can you look at Exhibit 32?
- - - - -
Thereupon, Exhibit 32 is marked for purposes of identification.
- - - - -
Q. You would agree this is a personal financial statement?
A. It's a financial statement that I accumulated, yes.
Q. That you provided to Synovus?
A. Yes.
Q. And what is the date of this financial statement?
A. 4/1/21.
Q. Okay. And can you tell me what the total assets are at the bottom?
A. 101,027,250.
Q. And can you look at Exhibit 33?
- - - - -
Thereupon, Exhibit 33 is marked for purposes of identification.
- - - - -

Q. What is this document?
A. It's the bank I use in Boston.
Q. Personal financial statement that was supplied to the bank you used in -- use in Boston?
A. 10/1/25.
Q. Is it the personal financial statement that you --
A. It's an accumulation of records to help the bank make a decision, yes.
Q. And the title of it says Personal Financial Statement, correct?
A. It is a statement of my finances.
Q. The question is: Does the title say Personal Financial Statement?
A. It says the records that I put together for the bank, and it's titled Personal Financial Statement.
Q. And if you look at page 3 of 3, you signed this on October 28th, '25, correct?
A. Correct.
Q. And when -- what was the date of your bankruptcy filing in this case?
A. October 15th of '25.
Q. Okay.

MR. COUTINHO: For the record, it was the 17th.
THE WITNESS: 17th.
Q. So you signed this document after you filed bankruptcy?
A. Yes. But if I may say, this document was probably sent by one of my employees because it's a copy.
Q. Okay. But that's your signature, right?
A. That is my signature to get a document so they can loan money.
Q. And because you were asking a bank to loan you money based, in part, on this document, do you believe that this document is actually correct?
A. I can't verify that as I sit here today, but I believe it was accurate to the best of my abilities. And it did not have everything I have.
Q. If you look on page 2, it says Schedule B Non-Marketable Securities, right?
A. Uh-huh.
Q. And the first column says Control,

right?
A. Yep.
Q. And 100 percent?
A. Yep.
Q. What did you mean to convey with 100 percent control?
A. If they had a question about it, I can get them 100 percent answer.
Q. It's not a -- you're not saying that you control these companies 100 percent?
A. Well, I have the ability to get 100 percent answer for verifying these numbers.
Q. So then if it's dealing with your ability to get 100 percent answer, why did you use the word "Control"?
A. I've used this document for 35 years, maybe 40 years. I don't change anything. I add to what I gave the last time. And like I said, this is -- these are two different documents into one. So I know my previous personal assistant used a copy and pasted it. I did any adjustments that I could at the time, or I knew.
Q. So you've been using a column that said Control for, what, 35 years; is that what you're

saying?
A. No. I said I use the PowerPoint for 35 years, and these are the fill-ins that I do in that PowerPoint.
Q. Okay. And has the Control column been in there for many years?
A. Yes.
Q. How many years?
A. I don't know, because that title has changed.
Q. Okay. And, in fact, if you look back to Exhibit 32, Schedule B Non-Marketable Securities, there's not a column that says Control, it says Number of Shares Face Value.
A. So I did change it.
Q. Uh-huh.
A. Right.
Q. So then when you come to October 28, 2025, you include a column that says Control 100 percent, right?
A. Right.
Q. Which was not on the 2021 financial statement, right?
A. Right. I would say I make adjustments

every time I do it.
Q. Okay. And your testimony is that the word "Control" doesn't actually mean control, it means your ability to get answers?
A. Yes.
Q. And as you sit here under oath, you're standing by that --
MR. COUTINHO: Objection to form.
Q. -- that answer?
A. Can you rephrase that question?
Q. You realize you're under oath in this --
A. Yes.
Q. -- deposition?
A. I do.
Q. Okay. And you're testifying under oath that the column that says Control actually means your ability to get answers?
A. That's part of my control, yes. There's a narrow sentence to fill everything in. If you look at it, they're one-word titles for me to answer anything the bank asks for so they feel comfortable they can loan money knowing what I have developed or have ownership or have control

or whatever.
Q. What voting control do you have with respect to the first item, American Heart, Circle Development?
A. I have -- American Heart is owned by Circle Development and American Heart is planned to be -- was purchased by the RED.
Q. Do you control 100 percent of the voting interest of Circle Development?
A. Yes.
Q. And the next one, Boston Pet Hotel & Spa, it says GRHPR.
Is that for Grasshopper?
A. That's for Grasshopper.
Q. Do you own 100 percent of the voting control of Grasshopper?
A. Of the real estate.
Q. The real estate related to Boston Pet Hospital & Spa?
A. Yes.
Q. Okay. If you go through all of these items where it says "in the name of" for each of these different entities, are you the 100 percent controlling interest -- voting controlling

interest in each of these?
A. No.
Q. Which ones are you not?
A. I have to go through them separately. Some of them the kids own. Some of them is in the trust.
So American Heart was purchased for the RED. Boston I -- I own the building. Amelia is Circle Storage in the trust. Harrison is in the trust. Blue Ash is in the trust. Circle Colerain is in the trust. Springdale is in the trust. West Chester is in the trust. Ivy Knoll -- it's Ivy Knoll, LLC. Cincinnati Red Dog Real Estate, the realty company. The RED is in the trust.
Let's see. What's next? Saugus is the real estate. Red Corner is the Red Corner, LLC. Oaklawn's a house on its own. Ringo Lane was -- the original purchase for The Blue retail isn't a retail center. Gatherings is Gatherings. Roselawn is a piece of land. Grasshopper is a piece of land and part of Circle Storage. And Mason Red Dog is -- the operations is in the trust.
Q. Okay. So where it says trust

Grasshopper, GH -- GRHPR, which trust is that?
A. Which one did you say? The Mason?
Q. No. For instance, Amelia.
A. That's part of the Circle Storage company.
Q. And the next column says Trust-GRHPR.
A. The trust, which was purchased under the name Grasshopper at the time.
Q. Which trust is that in?
A. Whoever has the Circle Storage.
Q. And you don't know which one that is?
A. As I sit here, no. I have to look it up.
Q. Okay. Isn't it true that when you put stuff into these trusts, you retain voting control of these entities?
A. I'm the manager of all the entities.
Q. Are there any other managers of the entities?
A. Whoever I put in place for that. Some of the employees are managers.
Q. Are there any entities in which -- other than Boston Pet Hospital & Spa, which we talked about, are there any entities in which

there is somebody else who is -- has a voting interest?
A. Everything that's in the trust -- no.
Q. Okay. Let's go back to Exhibit 5.
Can you point to any items in your monthly operating reports in the second bankruptcy case which show the purchase of any food since the bankruptcy started?
A. I don't know if it's in there. My wife does most of it. We each have our own responsibilities.
Q. Does your wife ever give you -- do you have a debit card?
A. No. Never have.
Q. How do you get the pocket cash?
A. Some I had. I live very thrifty. That's how I got to where I am today.
Q. Okay. But you do have to spend money. You have a car, right?
A. I have a car.
Q. And you have to buy gas for the car?
A. No, I don't.
Q. Electric?
A. It's electric.

Q. Okay. Do you have expenses where you have to pay cash out of pocket?
A. I've had expenses like that.
Q. Okay. Where do you get the cash from to pay cash out of pocket?
A. I have it there, or it's in my records. When I get money here, I've taken money out to spend.
Q. Does your spouse ever give you any funds?
A. I'm sure she has.
Q. Are they reflected -- can you show me in the monthly operating reports where it is reflected that your spouse gives you funds?
A. I don't know if it's in there.
Q. Okay.
A. I don't keep a record of it. If we go out to eat and she buys dinner, what can I tell you?
Q. Do you ever get cash from your companies?
A. Not that I can recall right now.
Q. Do you ever use credit cards belonging to your companies?

A. I don't use them. I don't have any.
Q. Your Merrill Lynch statements reflect that on September 11th, 2025, the sum of $712,331.69 was transferred out of a Merrill Lynch account.
Do you know where that went?
A. I have no idea.
Q. The Merrill Lynch records indicate on August 27th, 2025, the sum of $1 million even was transferred out of your Merrill Lynch accounts.
Do you know what that was for?
A. My lawyer bills.
Q. On August 27th, 2025, the Merrill Lynch statements say that $250,000 was transferred out of your Merrill Lynch account.
Do you know what that was for?
A. I have no idea.
Q. And when you say the million dollars was for your lawyer bills, which lawyers?
A. The lawyers for this case.
Q. Did you pay a retainer to your lawyers for this case?
A. They all start off with a retainer.
Q. Was the million dollars for a retainer

or for --
A. No. I was past that already.
Q. Was the million dollars for fees incurred to date?
A. I don't know. The date you told me, I don't know that particular transaction. And I know I kept my bills up as best I can.
Q. Okay. And when you say "the lawyers for this case," are you talking about the bankruptcy case or the litigation between yourself and Huntington?
A. They're all the same case in my mind, so to pay my lawyers to defend myself.
Q. So did the million dollars go to your bankruptcy counsel or your litigation counsel?
A. I couldn't tell you as I sit here.
Q. Within a couple weeks of when the first bankruptcy case was dismissed, your Merrill Lynch statement show a $1.25 million transfer out on March 1st, 2024.
Do you know what that's about --
A. No.
Q. -- related to?
A. I have probably 150 to 250 transactions

going on in a month, and I don't know what they are.
Q. How many transactions in a month do you have that are over a million dollars?
A. Well, if you look in my personal financial statement, I've got a lot of companies that are worth more than that, so it's part of the process of keeping things going.
Q. So you think this may have been a transfer from yourself to one of your companies?
A. I don't know. If I had my documents -- you're reading off something you're looking at and I have no idea. This is all not in front of me. I don't know.
Q. Would you ever sue one of your companies to recover assets for the bankruptcy estate?
MR. COUTINHO: Objection to form.
A. No.
Q. Do you know how much your companies may owe you?
A. No. We're trying to figure that out.
MR. PFEIFFER: Off the record.
(A discussion is held off the record.)

Q. Are you going to liquidate your Merrill Lynch account if your bankruptcy plan is confirmed to make payments to creditors?
A. I don't expect to pay, so I don't think I'm going to be doing that.
Q. Did you ever have a trust at PNC Bank for a trust that had accounts at PNC Bank?
A. I don't know, because through the bankruptcy, I know I had to close things down. I don't remember.
Q. I'm particularly talking about August of 2020.
A. I don't know. If you're looking at a document, if you show it to me, I can answer you.
Q. Do you own a strip mall at Eastgate?
A. No.
Q. Have you ever owned a strip mall at Eastgate?
A. No.
Q. How about a strip mall at Mazunte, M-A-Z-U-N-T-E?
A. Yes.
Q. Have you -- do you own one there?
A. Yes. Strip mall made of two stores.

Q. Okay. And where are those stores located?
A. Adjacent to the RED.
Q. And do you own them individually or through a company?
A. Through the retail company.
Q. What's the retail company?
A. I think it's called Retail, LLC. I'm not sure the name. It's been around since I bought the land in 2005.
Q. Who are the tenants at that strip mall?
A. Mazunte.
Q. Uh-huh.
A. And a lady who does Botox.
Q. Did you ever have a joint account at Merrill Lynch with your daughter, Danielle Senzer?
A. I believe there was a time.
Q. And do you know if you were ever removed from that joint account?
A. I was the adult and she wasn't an adult at the time, so I think that's why that was there.
Q. Okay. Can I finish my question?
Were you ever removed from that account?

A. I gave her the account to be on her own.
Q. Okay. And when was that?
A. Whenever I did it. I don't know. She's 41 now.
Q. Do you know if it was around March of 2023?
A. If that's what you want to tell me. I don't know.
Q. Would you have any reason to believe it wasn't around March 9th of 2023?
A. I'm not going to answer without the knowledge of a document.
Q. Do you know how much was in that account when you took your name off of it?
A. No. I know that I invested for her.
Q. And so are we talking a couple hundred dollars? Are we talking thousands, or tens of thousands, or hundreds of thousands or more?
A. We made her very happy because I gave her that money 20-some years ago, and then it's grown since then.
Q. Okay.
A. Whatever it was, it's all stocks and

bonds.
Q. And why did you agree to take your name off the account?
A. I do things when the time comes. It was to get her to manage her own stuff.
Q. Did it have anything to do with your first bankruptcy case?
A. Had absolutely nothing to do with it.
Q. Do you know if it occurred during your first bankruptcy case?
A. Didn't matter to me. It wasn't anything to do with bankruptcy. It was my daughter's money.
Q. Would it -- do you think it may have occurred during your first bankruptcy case?
A. I don't know. Didn't really matter in my world. It wasn't my money.
Q. I saw a reference about the proceeds from the Red Dog sale going into three new trusts.
Do you have any idea where that reference might be and what it might be -- or do you have any idea what that reference is talking about?
A. The sale of the operations went into

the trust.
Q. Three new trusts?
A. No. They got titled so they had their own whatever funds in there.
Q. Your children's --
A. There's no pocket of anything. Everything has some form of I.D.
Q. Are there three new trusts for your children?
A. It's in the trust. I don't think so.
Q. Have you ever heard of the Becker Trust, B-E-C-K-E-R?
A. Yeah. My in-laws died and left my wife some money.
Q. Okay. And how much did they leave to her?
A. I don't think that has anything to do with this.
MR. COUTINHO: You can still answer.
THE WITNESS: Huh?
MR. COUTINHO: Answer it.
A. I know it was over $2 million.
Q. Okay. And when was that?
A. I'm not part of it, so I don't know

that much.
Q. When did your in-laws die?
A. Her mother died, gosh, two, two and a half years ago, and her father died ten years ago.
Q. And I think you testified earlier that, you know, kind of the assets that are yours are also your spouse's assets?
A. In legal terms, if we earned them in our lifetime, I know that to be the case. At least that's what I've learned.
When you got a gift from your parents separate from you, it has nothing to do with you. I know two friends that got a divorce and they taught me that lesson. And what's mine is mine and what's hers is hers to the extent that that was a gift from her parents through their trust.
Q. Did you sell Ivy Knoll sometime in 2024?
A. No.
Q. 2025?
A. No.
Q. Have you sold Ivy Knoll?
A. If I'm lucky, it could be this year.
Q. Approximately how much do you think

you're going to get for that?
A. My portion or what's going to come if everything works out?
Q. If everything works out, the total purchase price.
A. Purchase price would be somewhere close to four-point-some million dollars. And DSES owns 15 percent of it.
Q. What is DSES?
A. It's a partnership of my kids.
Q. And what percentage do you own of the Ivy Knoll entity?
A. What's left over after the mortgage and all the bills? I might get 80 -- 85 percent of whatever the number is.
Q. When did your kids acquire -- when did DSES acquire the interest in Ivy Knoll?
A. When we purchased it.
Q. And when was that?
A. Nine years ago -- actually, nine and a half years ago.
Q. So when I talked -- asked you about the disbursement of $712,331.69 on or about 9/11/2025 from the Merrill account, do you remember picking

that check up from Merrill Lynch?
A. No.
Q. Have you ever gone to Merrill Lynch to pick up a check?
A. I've been with Merrill Lynch for 35 years.
Q. The question is: Have you ever gone to Merrill Lynch to pick up a check?
A. Yes.
Q. Under what circumstances would you go to pick up a check instead of just having them send it to you?
A. Depending on the day's needs. Every day and everything is so different, I can't give you one solid answer.
What's the date on that check?
Q. September 11th, 2025.
A. I wasn't in bankruptcy then.
Q. And you don't know what that 700-some thousand dollar check was related to?
A. Not as I sit here.
Q. Do you know of a company called Omni Drug Development?
A. So I don't know what that's titled for,

but Omni is a piece of land I have in Eastgate. It's on Omni Drive.
Q. Is it developed land or undeveloped?
A. It's got left over from the government taking my land. There's six storage offices made up of 10 by 12s. And an office that we ran the business, and a two-bedroom apartment that I can barely get anything out of.
Q. And what do you mean the government taking your land? Can you explain that to me?
A. So I had an active self-storage business. And through eminent domain, they changed the 275/32 interchange and they took land from me. And then they gave me back two of the acres. And those buildings weren't in their way, so they didn't take those, but they took everything else and I lost my business.
And what I get out of that business is exactly pay the taxes and all my bills. That's about it.
Q. If you could go back to Exhibit 33.
And at the same time -- it's good it's got two different binders -- if you could go to Exhibit 3, because I would like you to compare.

MR. PALMER: Did you say 33, Mark?
MR. PFEIFFER: 33 and 3.
MR. PALMER: Okay.
Q. And the part of Exhibit 3 that I'm going to ask you to go to is the sum of your assets and liabilities, which is 46.
A. The first page? That one?
Q. Correct.
How much does Exhibit 3, your bankruptcy schedules in the bankruptcy case, say the total amount of your assets are?
A. Total -- say the question again, please.
Q. How much does Exhibit 3, the summary of your assets and liabilities, say the total amount of your assets are?
A. 66,897,683.31.
Q. Okay. And that's composed of your real estate of 3.7 million, roughly, and your personal property of 63 million, correct?
A. I would think that's made up of anything that I currently have.
Q. Okay. And you said when we talked about this earlier that you weren't sure if these

numbers were net or not, correct?
A. I know the difference between the bankruptcy evaluation and my personal financial statements do not match because they're two different purposes.
Q. Okay. What are the two different purposes?
A. One is an outline of what I'm letting a bank see for the assets, and then the bankruptcy, it's what the value is if I sold it. Major difference. You know the difference?
Q. Well, can you tell me the difference?
A. If I had to sell it today what that value would be. And if it has a value, that's appraised value. It's a different value.
Q. So do your bankruptcy schedules reflect the appraised values?
A. So I'll give you an example that all comes together very simply.
I appraised Ivy Knoll for -- when you asked me when I sold it -- and I didn't sell it -- but it was at $7 million. And I have an offer that's now at $5 million.
So is it valued at 7 million or is it

valued at 5? And each one of those are in a different time zone for the same asset.
Q. Do you have appraisals that support the $115 million that are in assets that are listed in Exhibit 33?
A. Absolutely not.
Q. Okay.
A. Those are a point of time, an estimate, and I don't have an appraisal every time I do a personal financial statement. I do it when I get a loan. The bank does it. And then I'm aware of it because I pay for it.
Q. Where does it say in your bankruptcy schedules that these values are at liquidation value?
MR. COUTINHO: Objection.
A. They're the value if I had to sell all these things and pay -- if I owe some money to a creditor.
Q. So are you saying that the bankruptcy schedules are listed at liquidation value as opposed to fair market value?
A. Well, I'll give you a simple example that you asked about. I have a Wolf scooter.

When I got it, it was $2,200. It's now used. It has a whole different value, and I had to estimate what someone would give me if I had to sell it for the Bankruptcy Court.

Now, what's it worth in today's world? I don't know. But I did an estimate because I've been in business for almost 58 years and I've estimated every chance I get to do or start or finish a project.

Q. Okay. So if you flip over on Schedule 3 to your Schedule A/B.

A. Which one's that?

Q. That's your list of --

A. What page of 17?

Q. It's 1 of 17.

A. 1 of 17?

Q. Yep.

It talks about the current value of the entire property for Tiffany Ridge.

Do you see that?

A. Yes.

Q. And you have $788,050?

A. As my estimate.

Q. And the heading says Current Value.

Did you try to figure out whether the bankruptcy form was requiring you provide your liquidation value or the fair market value?
MR. COUTINHO: Objection.
A. I did not -- there's -- whenever this was put together in November, I think that value went up, and it was an estimate at the time. Value went up because housing is at a low stock, so I did the value that came off of my tax return -- not my tax return, my taxes and/or what was going on in the street.
Q. With all these items where you put down the current value, in your mind, was the current value that you were estimating the liquidation value or the fair market value?
A. Fair market value.
Q. And you -- your items for the fair market value are the values reflected -- let me back that up.
So are you saying the values reflected in your bankruptcy schedules are your estimation of fair market value?
A. Yes.
Q. Okay. So when you go to Exhibit 33,

what do the values on Exhibit 33 reflect?
A. The market value.
Q. How does the market value differ than the -- from the fair market value?
A. Well, I'll give you my house value that we came up with is $394,000. If you sold it for 788, I had a debt on it, and that's what I think I was going to get for the difference if I had to sell it. Since I've lived there for 39 years.
Q. Let's go over to the RED.
A. Where's the RED?
Q. On Exhibit 33. It's under banks where credit has been obtained.
A. Banks where credit has been obtained. And the RED is -- yes.
What about it?
Q. Okay. Hold on a sec.
Let's go back to the prior page, non-marketable securities.
Do you see that on Exhibit 33?
A. Yes.
Q. How much is the total amount of your -- the market value of your non-marketable securities on Exhibit 33?

MR. COUTINHO: Objection to form and foundation.

A. I've got it as non-marketable securities. If I own it or have a value that -- I mean, marketable securities means I can sell it tomorrow.

Q. For the section entitled non-marketable securities -- do you mind if I point to it?

MR. COUTINHO: Oh, yeah. Go ahead, please.

A. I knew what you were saying.

Q. Okay.

A. Non-marketable in my mind are things that I can't pay a bill tomorrow.

MR. COUTINHO: He's asking you to read that number, Ray.

Q. Yeah.

A. You want me to read the number?

Q. Yeah. What's the market value --

A. Oh.

Q. -- under non-marketable securities?

A. I've got it at $115 million.

Q. Okay. So your market value is actually higher than the amount that's listed on your

schedules, correct?
MR. COUTINHO: Objection to form and foundation.
A. Wait, ask the question so I can answer it properly.
Q. Well, you're showing $115 million market value on your financial statement provided to Rockwood that you signed on October 28, 2025.
Do you agree with that?
A. Yes.
Q. And the total value of all of your assets listed in your schedules as of the petition date, which was right around that same time, the schedules have a total value of $66 million and change?
A. That's funny. The document you're looking at says 69 million and this document says 66. Looking at the same documents. This says this is what it's worth when you take the liabilities away. This shows you when the liabilities are taken out. They both equal the same.
I don't understand. It's $3 million difference. And it's a total of several months'

difference.
Q. Your bankruptcy schedules are asking you for the $66 million --
A. Yes.
Q. -- in the summary of your assets; that's your total value of all property, right? 66 million?
A. Yes.
Q. Okay. Your liabilities are the next part, and you're showing liabilities of 166 million?
A. Right.
Q. Okay. And on Exhibit 33, you're showing liabilities of 89 million, right?
MR. COUTINHO: Where are you looking?
MR. PFEIFFER: First page.
A. Yes.
Q. Bottom right-hand side.
A. Yes.
Q. Okay. So what's the difference between the 166 million in liabilities that you have on your bankruptcy schedules versus the 89 million in liabilities that you have on your --
A. Liability is my guarantee and the RED I

can't get off because of my bankruptcy from that liability.
Q. So isn't it true you're reporting about $97 million less in liabilities to Rockland Bank than you are reporting in your --
A. No.
Q. -- bankruptcy schedules?
MR. COUTINHO: Objection to form and foundation.
A. Depends on how you look at what I did and how I did it, okay? Rockland just needed a statement. I gave them what I had. It identifies that my liabilities that I have my name attached to and assets that I own are different.
So the RED, I'm still liable on that note. Because of my bankruptcy, I can't get off that note. I had -- I was about to get relieved of personal, but because of the bankruptcy, I now have to stay on there. So that's -- that's the difference. And there's several others just like that.
Q. So you're saying the difference between the 166 million in liabilities that you're showing on your assets and liabilities in the bankruptcy

case and your bankruptcy schedules, and the 69 million that you're showing to Rockland Bank in your financial statements is your guarantee liability?

MR. COUTINHO: Objection.

A. I've got to hear you say that again. I didn't catch that.

Q. What is the difference between the 166 million that you're showing in your bankruptcy schedules as far as liabilities and the 89,000 [sic] in liabilities that you disclosed to Rockland?

A. So on my liabilities I showed the bankruptcy is everything that I have. And in that, I gave them what I owe according to the time. And that I don't believe I'm going to owe the money for the RED, because the RED has equity. And I know I've signed that agreement, and that's part of some of those obligations because of bankruptcy.

Q. You signed what agreement for the RED?

A. That I had an agreement to take care of the loan. And I can't get off of it now because of the bankruptcy.

Q. Well, you signed these financial statements after the bankruptcy, right?
A. Yeah.
Q. And tell me what is the difference between 159 million in assets that you're showing on the -- to Rockland Bank versus the 66 million in assets that you're showing on your bankruptcy schedules?
MR. COUTINHO: Same objection.
A. I don't have everything on an equal sign. I gave them the stuff that I had, and I gave the bankruptcy the accurate stuff that I knew at the time we did it.
Q. So which of these documents are accurate?
MR. COUTINHO: Objection.
A. The bankruptcy and the other document.
Q. They're both accurate?
A. For -- they don't match. I'll leave it at that.
Q. So with the Rockland Bank financial statement, you're showing $69 million of net worth, right?
A. Yep. And I show $66 million in the

Bankruptcy Court.
Q. That is of assets.
If you take the 66 million in assets and $166 million of liabilities, you have --
A. This is my net assets.
Q. What's your net assets?
A. $66 million dollars. If I have to pay Huntington in the court case, I have enough assets to cover it.
Q. So let's talk about the net assets.
In Exhibit 3, your bankruptcy schedules, the $3.7 million you can see comes from line 55, right?
A. Yes.
Q. Schedule A/B. Let's go on 55, Schedule A/B.
A. You have to direct me.
Q. Okay. That's part 8. That's page 26 of 124.
A. 24?
MR. COUTINHO: You're looking at this page number. You're going to go to page 26.
THE WITNESS: Page 26?
Q. See line 55?

A. Yes.
Q. That's the $3.733 million number?
A. Yes.
Q. Okay. And that comes from total real estate line 2 of part 1?
A. Yes.
Q. So it's like a tax return, unfortunately, you have to go back to part 1.
A. It says 3 million something to match that? I agree.
Q. Yep.
A. Those are my personal houses.
Q. They are your personal houses?
A. With my name only and my wife. That's the same number. I didn't look at it because you're moving pages.
Q. Well, that 3.733 is the total of your one-half interest of Tiffany Ridge, which is 394,000, your one-half interest of Kennebunkport or Kennebunk, Maine, which is 1.16 million, and your half interest of -- or your full interest of Vail, which is 2.179 million?
A. Does that equal the 37?
Q. I believe so.

A. So that's what I was saying.
Q. Okay. So when you say it's at net, what do you mean by it's "at net"?
A. That's the numbers that equal my portion.
Q. Okay. So it's net of your spouse's portion for the first two properties?
A. Right.
Q. Okay. So if you go back to the summary again, if you flip one page back. It has your personal property of 63 million, correct? 36 million and change, right?
A. Does it say my personal property or property that I'm involved in?
Q. Line 1(b) --
A. Dollar value of the portion you own for all your entities. Okay.
Q. 1(b) personal property. And instead of going all the way to line 62, I can tell you that it's really the total of the personal property section.
Let me -- that 63 million is the total of parts 2, 3, 4, 5, 6 and 7, okay? So let's go to Schedule A/B, part 2, which is on page 12 of

124.
For the Airstream camper, the current value is a thousand dollars?
A. Yep. You should see it, it looks good. It's got no tires. It has no insides. And it used to be used in a carnival as a pizza oven.
Q. So the --
A. You asked for everything I own. That's one of the things I own.
Q. I didn't ask for everything you own; the Bankruptcy Court requires you to disclose it.
MR. COUTINHO: Objection.
A. Well, I figure you were representing it.
Q. So the BMW, the value is 7,147,000?
A. No, $7,147.
Q. Okay.
A. It's a 15-year-old 1, if you know anything about the car.
Q. So are these two numbers, the 1,000 for the Airstream and the 7,147 for the BMW, are they at net --
A. Yeah.
Q. -- of anything?

A. I don't owe anything on either one.
Q. Okay. Is there anyplace in these schedules in part 2 that deals with how much you owe?
A. I can't answer that. I don't know.
Q. Okay. By the way, how many motor vehicles do you have?
A. I don't know. They're all listed in there.
Q. You would agree you have an Airstream?
A. It's not a motor vehicle, but I have an Airstream that does nothing.
Q. Okay. Two BMWs?
A. Yes.
Q. You have a Ford T-Bird?
A. Yes.
Q. A 1957 Ford T-Bird?
A. Stuck in a garage with no tires and --
Q. Okay.
A. It's -- you want to buy it? It's for sale.
Q. No.
That's pretty much the year for Ford T-Birds, though, isn't it?

A. Yeah, but you need to fix it.
Q. Okay.
A. And do you know what a 70-year-old car costs to fix?
Q. And it's like the car in American Graffiti?
A. It hasn't been driven since I got married.
Q. Okay. It's like the car in American Graffiti?
A. It's a '57. It's a hot car at the time. But to own it, you have to work on it, put it that way.
Q. You have a 1957 VW, right?
A. No. I have a replica of a -- oh, '57 VW?
Q. Uh-huh.
1959 Porsche replica, it says.
A. Yeah. Yeah.
Q. Okay. You have a 1966 VW Kombi, K-O-M-B-I, right?
A. Yep. Is there anything wrong with owning something?
Q. No.

And you have a Wolf Lucky scooter?
A. I do.
Q. And if you go to part 3 where it talks about your household goods or furnishings, there's no place for you to deduct -- it's asking for the value you own, not the value you own minus your liabilities associated?
A. I don't have any liabilities on any of this.
Q. Okay.
A. That's if I had to remodel my house, that's what the junk would go out the door on marketplace, whatever.
Q. Okay. And part 4, your financial assets, right?
A. Yep.
Q. And do you see the column to the right on part 4 where it says current value of the portion you own?
Do you see that?
A. Yep.
Q. What does it say immediately under that?
A. Do not deduct secured claims or

exemptions.
Q. So you would agree that, if this were accurate, you would not be deducting any debt that was associated with these assets?
MR. COUTINHO: Objection.
A. I don't know. There's a lot to work on, so I can't answer that specifically.
Q. So if the bankruptcy statements and schedules are supposed to be -- the values are supposed to be reflected at fair market value without deducting the debt, how do you reconcile the discrepancy between the disclosed assets in the bankruptcy schedules of 66-and-change million versus the disclosed assets in the Rockland financial statements of 159 million and change?
MR. COUTINHO: Objection.
And don't answer that. Because I don't think you established the premise of your question correctly.
Are you talking about secured debt against assets owned by the real estate, or secured debt against his membership interest, which is what's listed on the schedules?
MR. PFEIFFER: I'm talking about what's

disclosed in his bankruptcy schedules versus what's disclosed in his personal financial statements.

MR. COUTINHO: Right. But I guess when you're pointing to the instructions on part 4, do not deduct secured claims or exemptions, what secured claims are you talking about? Claims against his membership interest, or claims against the real estate owned by the entity and not him personally?

Q. When you see that column that says do not deduct secured claims or exemptions, what does that mean to you?

A. Anybody who owns any part of it. Exemptions are any exemptions.

Q. Okay. And you previously testified that you thought that the disparity between the total assets on the financial statements applied to Rockland, and the value in your bankruptcy schedules was because they were net. And I asked you net, what do you mean by net? And you correctly pointed out --

A. That if I had to sell it today, that's what it would be.

Q. No. I think you said, in addition to that, excluding parts that are owned by other people, like how your spouse owns Kennebunkport and your main house with you. And then you also said it was the amount of the claims against the asset.

MR. COUTINHO: Objection.

A. That was a long statement. Do you mind repeating it?

Q. Why don't you tell me what you think the reason is for the difference between the 159 million in assets and the 66 million in assets disclosed in your bankruptcy schedules.

A. These are assets that I have a guarantor, responsibility on, which includes the RED that I don't own.

Q. And you're referring to the financial statements provided to Rockland?

A. Specifically that's what you brought up.

Q. And what's the difference between those and the bankruptcy statements?

A. The bankruptcy is where I am today. And that is a point in time, like I said. These

are not the same -- these do not come together. If you look at it, two different typesets.
Q. If you look at the bottom -- well, first of all, these were produced by you. Do you see the bottom it says RS 0041797? That's what's known in the trade kind of as a Bates stamp.
A. Right.
Q. All right. And these are in sequence.
A. Well, you can look at it and see that I'm telling you the truth. They're two different documents. They were together. And what I'm saying is someone sent this along with this.
Q. In Exhibit 33, it has page numbers at the bottom, 1 of 3.
Do you see that on the first page?
A. I do.
Q. 2 of 3.
Do you see that on the second page?
A. Yep.
Q. 3 of 3.
Do you see that on the third page?
A. Yep.
Q. And your -- why do you think that they are different documents?

A. I -- looking at the typeset, they're totally different.
Q. Well, the first two pages were not signed by you, correct?
A. Correct.
Q. The third page was signed by you?
A. Correct.
Q. Is it possible that they were printed out separately and put together?
A. Yes.
Q. Are you disputing that the entire package went to Rockland Bank?
A. I don't know.
Q. Exhibit -- can you go to Exhibit 39, which I would like marked.

- - - - -

Thereupon, Exhibit 39 is marked for purposes of identification.

- - - - -

Q. Is this your personal financial statement that was submitted to Warsaw Bank?
A. What's the title on it?
Q. Personal Financial Statement.
Do you see that?

A. I don't see Warsaw on it.
Q. No. Exhibit 39.
A. Oh, I looked at 39, but it was the front end of it.
Okay. What's the question?
Q. Was this your personal financial statement that was submitted to Warsaw Bank?
A. Yes.
Q. And the date on it is -- the date you signed it is, again, 10/25/25?
A. Yes.
Q. And, again, the total assets is the $159 million number?
A. Yes.
Q. And if you look at -- let's mark Exhibit 38.

\- - - - -

Thereupon, Exhibit 38 is marked for purposes of identification.

\- - - - -

A. Oh. I went to 38 -- okay.
Q. Do you agree that this is a financial statement that you signed on January 8, 2025?
A. Yes.

Q. And does -- what is the total asset value on this financial statement?
A. 121 million.
Q. Okay. And that's your signature on it?
A. Yes.
Q. And the as-of date for this statement is November 30th, 2024?
A. Yes.
Q. And can you read the --
A. Net equity?
Q. Can you read the paragraph under your signature?
A. Okay. Greg Lund wrote this. This -- you want me to read it out loud?
Q. Can you read it out loud for the court reporter?
A. These financial statements are prepared by management and are considered to be accurate. We believe these statements are free of material and intentional misstatement. However, due to significant transactions that occur throughout the year, they are subject to change, often based on the advice of tax preparers. The information contained in this report is strictly confidential

and may not be reproduced, provided to any other person or used for any other purpose without the prior written permission of Raymond Schneider in his absence and sole discretion. Entities in which Raymond Schneider does not own a controlling interest or are materially insignificant are not included in this report.

Q. And how much in net equity are you telling Merrill Lynch -- well, first of all, is -- do you know who you submitted this to?

A. No.

Q. How much is the net equity that's listed on this?

A. $68,773,007.

Q. And there's an asset value column, a liabilities column, and a net equity column, right?

A. Yes.

Q. Okay. Did you list any of the liabilities for Huntington in this schedule?

A. I don't think I did.

Q. How could --

A. Was it a liability at the time? I don't know.

MR. PFEIFFER: Do you mind if we take a 30-second break?

MR. COUTINHO: Sure.

(A recess is taken.)

MR. PFEIFFER: We've discussed with counsel. It is now 4:35. We're probably not going to finish today and we've agreed to adjourn this to continue to a later date. Is that accurate?

MR. COUTINHO: Yeah, that's accurate.

THE WITNESS: Can you give me an idea how much more time it will be?

MR. PFEIFFER: I will off the record.

MR. COUTINHO: He'll read.

(Signature not waived.)

\- - - - -

Thereupon, the foregoing proceedings concluded at 4:35 p.m.

\- - - - -

State of Ohio : C E R T I F I C A T E
County of Franklin: SS

I, Mary Bradley, RPR, a Notary Public in and for the State of Ohio, certify that Raymond J. Schneider was by me duly sworn to testify to the whole truth in the cause aforesaid; testimony then given was reduced to stenotype in the presence of said witness, afterwards transcribed by me; the foregoing is a true record of the testimony so given; and this deposition was taken at the time and place specified on the title page.

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, the witness and/or the parties have not waived review of the deposition transcript.

I certify I am not a relative, employee, attorney or counsel of any of the parties hereto, and further I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Columbus, Ohio, on September 28, 2026.



Mary Bradley, RPR, Notary Public - State of Ohio
My commission expires September 19, 2029.

Witness Errata and Signature Sheet
Correction or Change Reason Code
1-Misspelling 2-Word Omitted 3-Wrong Word
4-Clarification 5-Other (Please explain)

| Page/Line | Correction or Change | Reason Code |
| --- | --- | --- |
| ________ | ____________________ | ________ |
| ________ | ____________________ | ________ |
| ________ | ____________________ | ________ |
| ________ | ____________________ | ________ |
| ________ | ____________________ | ________ |
| ________ | ____________________ | ________ |
| ________ | ____________________ | ________ |
| ________ | ____________________ | ________ |
| ________ | ____________________ | ________ |
| ________ | ____________________ | ________ |
| ________ | ____________________ | ________ |
| ________ | ____________________ | ________ |
| ________ | ____________________ | ________ |
| ________ | ____________________ | ________ |
| ________ | ____________________ | ________ |

I, Raymond J. Schneider, have read the entire transcript of my deposition taken in this matter, or the same has been read to me. I request that the changes noted on my errata sheet(s) be entered into the record for the reasons indicated.

Date__________Signature______________________________

Ref: Mb318688rs

**Exhibits**

**318688 Exhibit 003** 4:5 16:24 17:5 28:9 36:17 70:19 71:2 162:15,20 217:24 218:4,9,14 230:11
**318688 Exhibit 005** 4:8 183:19,24 204:4
**318688 Exhibit 017** 4:9 188:10,14
**318688 Exhibit 032** 4:10 195:3,5 199:12
**318688 Exhibit 033** 4:11 195:20,22 217:21 220:5 222:24 223:1,12,20, 24 226:13 240:13
**318688 Exhibit 038** 4:13 242:16,18
**318688 Exhibit 039** 4:15 241:14,17 242:2
**318688 Exhibit 040** 4:16 113:10,12
**318688 Exhibit 041** 4:19 59:4,6 61:17
**318688 Exhibit 042** 4:20 130:2 133:1
**318688 Exhibit 043** 5:3 129:17,18, 20 136:18
**318688 Exhibit 047** 5:5 168:15,22 174:2
**318688 Exhibit 061** 5:7 73:14,18

**$**

**$1** 206:9
**$1.25** 107:21 207:19
**$10** 62:24 69:6 72:9 156:2,5
**$100** 38:24 72:12
**$11** 73:5 115:20 116:10,23 117:6
**$115** 220:4 224:22 225:6
**$159** 242:13
**$160,000** 64:19
**$166** 230:4
**$18** 157:23 158:20 161:13 166:23
**$19** 47:23
**$2** 213:22
**$2,200** 221:1
**$250,000** 206:14
**$3** 131:18 142:24 225:23
**$3.7** 230:12
**$3.733** 231:2
**$32** 108:3
**$32,000,000** 107:19
**$394,000** 223:6
**$4** 86:6
**$418,654** 190:11
**$5** 219:23
**$500,000** 55:12
**$538.87** 176:17,24
**$59** 107:2
**$6** 156:3,4
**$6,269,000** 174:5,23
**$63** 38:14
**$66** 38:13 225:14 226:3 229:24 230:7
**$66,897,683.31** 37:6
**$68,773,007** 244:14
**$69** 229:22
**$7** 219:22
**$7,147** 233:16
**$712,331.69** 206:4 215:23
**$750,000** 91:20
**$788,050** 221:22
**$84** 158:15
**$88,000** 40:5, 15
**$88,903.80** 39:11 40:15
**$97** 227:4
**$99** 158:11

**(**

**(i)** 122:22,23, 24

**0**

**0041797** 240:5

**1**

**1** 120:8,9,13, 15 132:24 138:7 164:4 169:4 173:21 183:12 221:15,16 231:5,8 233:18 240:14
**1(a)** 122:3
**1(b)** 122:15 232:15,18
**1,000** 139:6, 14 147:16 148:11 151:10,15 233:20
**1.16** 231:20
**1/7** 61:19
**10** 217:6
**10/1/25** 196:5
**10/12/23** 189:20
**10/25/25** 242:10
**100** 57:7 72:13 198:3, 6,8,10,12,14 199:20 201:8,15,23
**101,027,250** 195:19
**1040** 188:22 189:3
**11** 73:9 116:24
**11/14/25** 18:8
**115** 146:5
**11:52** 108:13
**11:59** 147:15 148:1
**11th** 206:3 216:17
**12** 28:23 29:1,2 151:3 159:12 232:24
**12/31** 152:2
**121** 243:3
**124** 230:19 233:1
**12:51** 109:2
**12s** 217:6
**13** 134:5
**14th** 23:13
**15** 146:5 215:8
**15-year-old** 233:18
**150** 207:24
**159** 229:5 237:15 239:11
**15th** 31:11, 12,17,18,20 166:1 196:23
**16** 134:1,2,6, 7
**166** 226:10, 21 227:23 228:8
**17** 59:1 112:24 140:20 144:3 169:23 170:1 188:10,14 221:14,15, 16
**17th** 197:2,3
**18** 47:11 59:1 60:6,13 61:1,14 89:14 106:17 107:8,9,12 155:21 159:6,7
**18,000** 116:19,20
**19** 52:5,7 59:1 61:13, 19,21 62:5 71:3 108:5
**1957** 234:17 235:14
**1959** 235:18
**1966** 235:20
**1995** 96:22
**1:23-bk-10337** 137:24
**1st** 139:1,3 151:24 152:18 153:6 207:20

**2**

**2** 42:1 133:1 197:21 231:5 232:23,24 234:3 240:17
**2(a)** 120:23
**2,000** 139:7 148:12 175:7,11
**2.179** 231:22
**20** 59:1 108:6 121:23 132:9 140:21 155:19 159:14 175:5,12 177:1 183:8
**20-** 57:6
**20-some** 211:21
**2000** 57:8,10, 11 151:6
**2005** 170:14 210:10
**2007** 170:2
**2010** 57:4
**2015** 92:13
**2016** 57:6
**2017** 51:18, 22,23 52:19 115:23 131:19 143:20
**2018** 58:21 60:6,13 61:1 107:19 108:3,5 118:16
**2019** 50:17 51:22 61:21, 24 62:7 73:19 109:20 114:6 115:4, 10 118:16, 19 119:18 152:11
**2020** 42:12, 16 50:16 51:24 52:8 57:4,10 70:4 111:7 112:12,13 118:13,16 135:1,11 136:23 138:7 139:1, 3 147:10,15, 21 148:2,7 149:24 152:1,4,19 153:6 156:3, 14 158:3,5 169:4 173:21

175:22,24 183:12 209:12
**2020-** 51:1
**2021** 199:22
**2022** 44:9,15 110:8,14 188:17
**2023** 9:12 99:5 146:15 187:2 188:4, 7,9 189:24 190:7,15 211:7,11
**2024** 10:15 31:22 34:11, 21 35:5,22 36:1 73:20 82:9 98:14 107:20 158:2 166:1 167:4 190:5 207:20 214:18 243:7
**2025** 9:18 10:15 20:7, 11,14 23:13 31:3,4 32:10 82:9 98:14 143:3 146:20 199:19 206:3,9,13 214:20 216:17 225:8 242:23
**2026** 109:2 143:3
**20th** 115:4, 10
**21st** 141:8
**22** 109:2 119:5 141:13
**23** 119:6,7,8
**235** 88:12
**24** 34:9 36:24 98:9 141:13 143:4 230:20
**2409** 42:21
**24th** 25:12, 13
**25** 25:13 90:21 99:10 159:15 196:19,23
**25,000** 93:1
**250** 158:6 207:24
**26** 20:12 57:11 230:18,22, 23
**275/32** 217:13
**27th** 206:9, 13
**28** 179:12 199:18 225:8
**285** 92:24
**28th** 196:19
**2nd** 146:15

**3**

**3** 16:13,23,24 17:5 28:9 36:17 44:11 59:19 70:19 71:2 138:3 162:15,20 169:10 196:18 217:24 218:2,4,9,14 221:11 230:11 231:9 232:23 236:3 240:14,17, 20
**3.1** 169:10
**3.7** 218:19
**3.733** 231:17
**3.8** 44:8,12
**30** 75:24 159:4,7,10 166:24 183:1
**30,000** 129:8
**30-second** 245:2
**30-some** 97:6
**30th** 243:7
**31** 114:12 132:24 134:2,6,7 146:4,6
**31st** 73:20 138:24 147:15 148:1 150:4 152:11
**32** 114:12 120:10 121:23 195:3,5 199:12
**33** 195:20,22 217:21 218:1,2 220:5 222:24 223:1,12,20, 24 226:13 240:13
**35** 198:16,24 199:3 216:6
**3515** 41:5
**36** 232:11
**365** 88:13,15, 22 89:2,4
**365,000** 88:18 89:3
**37** 231:23
**38** 91:11,13 242:16,18, 21
**39** 223:9 241:14,17 242:2,3
**394,000** 231:19

**4**

**4** 30:14 36:20 51:2 71:2 138:2,5,6 147:5,9 152:15 183:16,23 232:23 236:14,18 238:5
**4/1/21** 195:16
**40** 36:3 113:9,10,12 198:17
**40-plus** 26:1
**40-some** 124:12
**40s** 143:22
**41** 59:3,4,6 61:17 136:16 211:5
**42** 129:24 130:2 133:1 147:7
**43** 129:17,18, 20,23 136:17,18 147:7
**45** 43:12 124:15,24 126:21 186:20
**45th** 125:2 126:18
**46** 218:6
**47** 168:15,17, 18,22 174:2
**4:35** 245:6, 18

**5**

**5** 79:15 159:13 183:19,24 204:4 220:1 232:23
**5,000** 159:13
**5/2/50** 51:13
**50** 155:15,17
**500** 127:14
**500,000** 167:1
**501(c)(3)s** 56:13
**530** 175:14
**54** 137:20 138:2,3,5,6 147:5,9
**55** 115:16 188:2 190:5 230:13,15, 24
**57** 235:11,15
**58** 221:7

**6**

**6** 30:15 137:20 169:9 232:23
**6,999** 138:9 139:6 147:19 148:8 150:1, 9 151:13 153:11 154:24
**6.2** 177:4
**61** 73:14,18
**62** 232:19
**63** 218:20 232:11,22
**63,164,108** 38:14
**66** 225:18 226:7 229:6 230:3 239:12
**66,897,683.31** 218:17
**66-and-change** 237:13
**672(e)** 122:7
**69** 151:16 225:17 228:1

**7**

**7** 36:17,21,22 81:5 219:24 232:23
**7,147** 233:21
**7,147,000** 233:15
**7,999** 152:16 153:4 174:19
**70-year-old** 235:3
**700-some** 216:19
**74** 64:17
**75** 115:16 163:14
**76** 51:14
**788** 223:7
**799** 174:19
**7th** 61:21

**8**

**8** 36:24 44:11 230:18 242:23
**8(a)** 134:10
**80** 26:4 175:1 177:5 215:14
**80,000** 88:13, 15
**85** 215:14
**89** 226:14,22
**89,000** 228:11

**9**

**9/11/2025** 215:23
**97** 147:4
**97-1** 137:24 147:8
**9th** 211:11

**A**

**A-E-G-O-N** 75:10
**a.m.** 108:13
**A/b** 163:2 221:11 230:15,16 232:24
**abbreviated** 164:18
**abbreviation** 164:22
**Abby** 13:16 14:16 15:8 104:11,12
**abilities** 197:19
**ability** 6:16 18:15 23:2 24:21 47:6 127:17 198:11,14 200:4,18
**aboard** 20:24
**absence** 244:4
**absolutely** 142:16,18 144:12 155:14 212:8 220:6

**access** 141:21
**accomplished** 74:14 94:18 140:7
**account** 48:19 54:15 67:8 106:23 174:22 206:5,15 209:2 210:15,19, 24 211:1,15 212:3 215:24
**accountability** 54:13
**accountant** 32:9 33:24 104:8,15 192:18
**accountants** 144:23 193:6,22 194:22
**accounting** 13:3,10,13 19:10,13,18 20:16,17 21:2 22:2, 14,17,22 23:1 32:3 33:2 34:19, 23 36:4,8 51:21 53:3 104:12
**accounts** 47:13,15 48:1,3,5,17 206:10 209:7
**accumulate** 121:6
**accumulated** 124:15 195:11
**accumulation** 121:9 196:8
**accurate** 23:22 24:20 26:23 27:3, 8,12 29:19 30:19 36:9, 12,15 37:8 128:23 150:12 197:18 229:12,15, 18 237:3 243:18 245:9,10
**accurately** 35:16,17
**achievements** 156:16
**acquire** 85:21 112:20 119:8 215:16,17
**acquired** 84:19,22 119:2
**acquisition** 89:21
**acres** 217:15
**act** 136:3
**action** 93:12 133:16
**actions** 181:6
**active** 163:5 217:11
**activities** 51:4 157:4 183:13
**activity** 144:5
**actual** 38:1 44:1 78:13
**acumen** 25:8
**add** 13:23 198:17
**added** 12:24
**addition** 21:9 239:1
**additional** 118:17
**address** 41:6 163:10,13, 22 185:22
**addresses** 163:15
**adds** 33:16
**Adjacent** 210:3
**adjourn** 245:7
**adjustments** 198:21 199:24
**administer** 120:21
**adopted** 24:4
**adult** 51:5 210:20
**advantage** 141:19
**adventurous** 125:16
**advice** 243:23
**Aegon** 75:4, 7,15
**affairs** 26:14
**Affidavit** 59:10
**Afternoon** 109:1
**age** 125:23
**aged** 134:22
**agency** 45:15,21 87:1
**agent** 45:14 181:5
**agree** 6:17, 19 18:2 29:11 35:20 53:11 113:20 115:3 134:3 140:8 144:11 150:8,10 169:1,5 177:7 184:1 187:2 188:17 195:8 212:2 225:9 231:10 234:10 237:2 242:22
**agreed** 10:19 174:4 245:7
**agreeing** 176:14
**agreement** 113:21 152:18,19 153:6,7,10 157:9,20 159:19,24 160:2,7,17 168:3 169:2 173:18 174:2 175:20 176:19,20 183:8,9 228:18,21, 22
**agreements** 193:21
**ahead** 182:2 224:9
**Airbnb** 98:3
**Airstream** 233:2,21 234:10,12
**alive** 51:11 76:14 161:8 173:9
**alley** 84:22 85:1,2,5,6 86:10,11
**allotted** 150:20
**allowed** 8:7 12:6 55:22 73:5 130:13 142:12,23
**allowing** 92:23
**Amelia** 202:8 203:3
**amended** 60:6 184:17, 22
**amendments** 114:24
**America** 47:16 81:21
**American** 98:19 99:2, 7,9 100:15 201:3,5,6 202:7 235:5, 9
**amount** 31:13 95:5 145:8 218:11,15 223:22 224:24 239:5
**amounts** 121:2 133:7, 14
**amusement** 163:22
**and/or** 133:8 222:10
**ands** 179:6
**angry** 125:1, 7
**animal** 164:8 170:23 171:4
**Ann** 43:22 44:2
**anniversary** 125:3 126:19,20
**annual** 64:18,20
**annually** 116:10
**answering** 180:18
**answers** 6:20 7:5 8:22 118:21 200:4,18
**anticipate** 87:16
**anticipating** 82:8
**anyplace** 234:2
**AOL** 186:4
**apartment** 82:5,6 88:9, 10 117:14, 18,20 217:7
**apartments** 75:14 78:11 88:13 92:21, 24 117:21
**apologize** 77:15
**apparent** 54:5
**Apparently** 174:6
**appealed** 10:12
**Appellate** 10:2,12 11:7 128:16,22 145:19 179:10
**applied** 238:18
**appointed** 181:5
**appraisal** 95:6,8,9 158:14 220:9
**appraisals** 53:2 117:10 220:3
**appraised** 37:22 117:8 219:15,17, 20
**appreciation** 153:23 154:5
**approval** 89:23 90:14, 18,20 123:9
**approved** 88:12 89:8, 9,10
**approximate** 83:8,9
**approximately** 17:14,22 18:9 42:16 47:22 83:18 85:11,21 88:11 92:12 93:23 94:5 104:21 214:24
**April** 31:11, 12
**architect** 89:13,18 90:5,9,24
**architects** 89:24 90:4 92:11,14 93:3
**area** 35:10, 12 97:14
**areas** 97:11
**Argo** 105:22 106:15
**Argo's** 107:9
**argument** 11:24 12:11
**art** 50:1
**Article** 120:11,13, 22 121:24 122:16 133:1
**as-of** 243:6
**ascertain** 123:13
**Ash** 84:8,23 85:1,3,9

86:9,23 91:11 119:12 202:10
**asks** 39:9 189:9 200:22
**aspect** 88:7, 8,9 128:3
**asserted** 145:10
**asserting** 145:9
**asset** 24:11 25:10,16 37:18 38:8 64:15 74:24 87:6 111:2 124:2,6 131:7 160:10 163:9 180:17 220:2 239:6 243:1 244:15
**assets** 12:7 26:13 36:18 37:9,10 38:24 46:15 50:23 53:16, 20 66:18 72:5 76:10, 12,16,20,24 77:2,7,10,24 78:1 85:23 86:3 87:5 89:21 115:15 116:1 117:12 123:6,16 128:5,10 130:24 131:14 132:6 135:1, 5,10,18,19, 23 136:2,8, 12 158:10 162:11,13 178:12,21 180:5 181:20 182:6 195:18 208:16 214:6,7 218:6,11,15, 16 219:9 220:4 225:12 226:5 227:14,24 229:5,7 230:2,3,5,6, 8,10 236:15 237:4,12,14, 21 238:18 239:12,14 242:12
**assign** 153:11
**assignee** 153:12,13
**assignment** 151:18 152:12 154:1,11
**assignor** 152:22 153:1,4,10
**assistant** 13:16 21:24 104:7,10 198:20
**Associates** 79:3,4
**assume** 8:22
**assuming** 33:7 93:16 111:13 182:4
**Atlanta** 172:24 173:2
**attached** 227:13
**attitude** 75:20
**attorney** 13:4 32:5 65:5,6 104:8 112:4 143:23
**attorney-client** 7:9
**attorneys** 12:15 129:3
**audit** 109:20
**August** 206:9,13 209:11
**Authority** 87:4,9
**auto** 172:19
**avenue** 83:15
**aware** 62:13, 17 106:15 111:3 142:1 220:11

**B**

**B-E-C-K-E-R** 213:12
**back** 9:6 11:6,8 22:7 31:2 53:13 54:3,16 58:8 62:22 70:19 72:20 74:16 91:16 92:19 110:8 111:14,16 112:3,8,10, 15 114:20 118:5 120:1 129:23 131:18 134:17 137:14,21 141:9,12 144:3 147:3 150:6 154:13 155:10 162:23 167:12 169:23 170:1,13 175:23 188:1 199:11 204:4 217:14,21 222:19 223:18 231:8 232:9, 10
**background** 104:13
**backwards** 52:2,4 94:14
**bad** 118:13
**Bailey** 114:13
**balance** 30:10 73:19 74:20 165:13 174:22
**ballpark** 72:4
**bank** 6:8 10:5,9,13, 14,19 11:12 42:10 47:16 54:8 77:4 100:3,6 106:2,3,8, 11,19,20,21 196:2,4,9,16 197:13 200:22 209:6,7 219:9 220:11 227:4 228:2 229:6,21 241:12,21 242:7
**Bank's** 70:12
**bankers** 25:23 127:17 194:23
**bankruptcy** 6:7 9:9,15, 17,21,24 10:11 11:5, 14,16,22 12:12,13,14, 17,20 14:9, 14 18:2,13 21:3,8,20 22:5 23:4, 11,17,22,24 26:8,23 27:17,19 28:1,8 29:20 33:23 37:13 38:21 39:6, 23 40:3,17, 21 41:8 46:14 53:12 57:14 61:2 66:24 67:14, 23 68:14,20 75:19,23 76:8,24 83:13 86:22, 24 87:5 89:11 90:15 94:17,20 95:20 98:18, 21,24 99:1, 4,23 100:2 103:12 105:6,19 108:2 119:3, 5 125:6 127:13 128:2,3,5, 11,13 129:3 132:22 141:24 142:3,13 143:13 144:10 145:5,7,18 146:14,16, 17,19,22 147:8 160:22 161:2,3,10 162:19 180:17 181:21 184:2 196:22 197:5 204:6, 8 207:10,15, 18 208:16 209:2,9 212:7,10,12, 15 216:18 218:10 219:3,9,16 220:13,20 221:4 222:1, 21 226:2,22 227:1,7,16, 18,24 228:1, 9,14,20,24 229:2,7,12, 17 230:1,11 233:11 237:8,13 238:1,19 239:13,22, 23
**banks** 100:4 106:12,19 223:12,14
**Bar** 126:6
**barely** 217:8
**based** 197:14 243:22
**basically** 155:5
**basics** 74:18
**basis** 75:3 185:14
**Bates** 240:6
**Becker** 43:17,19,23 45:18 213:11
**beginning** 102:14 111:10 175:22
**begun** 93:13
**behalf** 22:7 27:10
**bell** 58:22 65:3 84:6
**belonged** 135:2
**belonging** 205:23
**beneficiaries** 56:16 63:15, 22 64:5 119:22 123:15 133:11,13, 14,17,23
**beneficiary** 48:12 49:6 54:21 55:19 59:20,24 65:22 133:18,21
**benefit** 66:16 121:1 130:14,16 133:6
**bet** 63:4 64:10,11
**big** 64:10
**big-picture** 191:9
**bigger** 156:17
**bill** 107:9 115:23 143:20 156:2,5 224:14
**bills** 167:3 206:12,19 207:7 215:14 217:19
**binder** 16:7,9 59:2 113:5 129:17 136:24 183:22 188:11
**binders** 16:4, 19,21 168:16 217:23
**birth** 51:12
**bit** 49:24
**black** 37:2
**blind** 108:1
**Blue** 78:4 82:16,18 84:7,8,23 85:1,2,9,17 86:9,23 87:16,20 91:11 92:16

119:12 127:15 202:10,18
**BMW** 233:15, 21
**BMWS** 234:13
**bonds** 47:11 212:1
**bonus** 158:18 160:13
**bonuses** 150:21 159:16 160:11
**book** 143:16 168:19,20 183:23
**bookkeeping** 107:22
**born** 12:5
**borrowings** 19:6,8
**boss** 194:8
**Boston** 46:6 47:1,3 81:10 125:15,16 127:7,11 163:5,7,9,17 170:23 171:4,10,12 196:2,4 201:11,18 202:8 203:23
**Botox** 210:14
**bottom** 195:18 226:18 240:3,5,14
**bought** 84:20 158:3, 5 177:15 182:16,17 210:10
**bowling** 84:22 85:1, 2,4,6 86:10, 11
**boy** 43:16
**Brad** 101:16, 17
**brain** 187:20
**brand** 156:13
**break** 7:8 89:10,14 94:19 108:8 168:12 245:2
**breaks** 87:15
**Bricker** 105:23
**bring** 19:23 92:24 162:17
**bringing** 141:18
**brother** 104:18
**brought** 13:11 14:23 17:19 53:1 162:23 239:19
**BS** 126:2
**buck** 194:13
**build** 19:5 89:10 92:24
**building** 89:14,24 94:16 202:8
**buildings** 86:1,4 217:15
**built** 18:21 19:1 118:12, 16 172:3
**bullet** 138:8, 23
**business** 7:1 13:9 18:14, 16 19:1,3,4 21:11 25:7, 14,22 29:14 65:20 70:6 96:1 101:24 102:8 105:3 109:5,12 110:1 112:23 115:14 117:15 118:2 135:7 140:12 144:20 150:16,19 151:4 155:6, 7,9 156:21 157:22 158:3 159:12 161:8 164:10 167:10 169:24 170:24 171:13 177:13 182:10 191:10,12 193:3 217:7, 12,17,18 221:7
**businesses** 18:20 19:6 23:7 29:16 31:7,8 39:18,21 47:24 48:2 71:5 85:12 103:1 118:22 170:4
**businessman** 76:14
**buts** 179:6
**buy** 42:11 111:14,15 112:2,8,10, 14 118:11 128:10 153:21 156:11 204:21 234:20
**buyer** 162:3
**buys** 205:18

**C**

**calculating** 159:10
**calendar** 121:8
**call** 11:11 19:15 32:16 53:23 59:3 191:23
**called** 25:17 32:14 52:6 62:10,14 80:13 81:23 86:11 87:23 88:3 96:10 105:13 117:20 154:17 210:8 216:22
**calling** 114:3
**camper** 233:2
**cancel** 126:5,17 127:1,5
**canceled** 127:7,8
**cancellation** 125:4
**Candace** 32:13 104:16
**Candy** 32:11, 16
**capacity** 41:17 123:9 143:6
**capital** 21:15 35:14 169:13,15 174:22
**capture** 30:23 144:16 183:10
**captured** 91:16
**car** 204:19, 20,21 233:19 235:3,5,9,11
**card** 98:19 99:10,13,16 100:3,7,10, 13,14,16,20, 21,22 204:13
**cards** 98:16 99:11,12,22 100:1,18 101:8,11,14 125:21 205:23
**care** 27:18 33:8 46:19 103:22 186:10,11 187:15 228:22
**carnival** 233:6
**carrier** 103:20,24 104:6
**cars** 89:4
**case** 9:15,17, 21,24 10:8, 9,16,17,23 11:20 12:7, 8,12,13 18:3 21:3 23:18, 24 38:21 39:6,23 40:21 46:1 54:2 67:1 70:17,18 81:5,7 90:3 95:20 96:9 99:1,5,23 100:2 102:24 103:4 105:6 106:3,12,13 107:15,17, 18,20,23,24 108:3 111:10,23 119:3 126:7 127:4 128:17,20 129:2,6,14, 15 131:24 134:22 137:24 138:13 145:5,7,13, 21 147:9 161:6 177:17 178:16 184:2 196:22 204:7 206:20,22 207:9,10,12, 18 212:7,10, 15 214:9 218:10 228:1 230:8
**cases** 9:9 75:2 107:17, 18 108:5 179:18
**cash** 30:11 69:5 83:20 204:15 205:2,4,5,20
**catch** 228:7
**categorized** 28:11,17 35:9,11,15
**caused** 22:3 35:1 111:13
**ceding** 141:5
**center** 87:23 202:19
**Chamonix** 42:22
**chance** 134:4 221:8
**chancellor** 107:6,14
**change** 9:4 51:1 115:19 131:18 134:21 143:5 198:17 199:15 225:15 232:12 237:15 243:22
**changed** 23:5 24:4 25:20 26:20, 22 92:22 116:16 142:20,22 143:2 150:23 156:1 176:6 177:19 179:14 187:22 199:10 217:13
**changing** 25:9
**characterizations** 21:13
**characterized** 21:12,13 28:11,17
**charge** 19:18 85:17
**charities** 56:8
**Charity** 56:3
**chart** 150:11
**charts** 149:14,18
**check** 216:1, 4,8,11,16,20
**check-kiting** 109:12
**Chester** 119:13,14 171:15,18 202:12
**chief** 19:12
**children** 46:24 56:4, 23 60:15 63:23 116:7 120:5

133:22 148:18 165:8,10,16 166:2,3 167:1 182:6 213:9
**children's** 213:5
**Chili** 85:9 86:9 91:11
**Chinese** 91:12
**chose** 152:7
**Chubb** 44:23,24 45:3,11
**Cincinnati** 13:9 45:17 47:2 78:20 79:20 81:10 202:13
**Circle** 15:5,7 78:19 80:16 85:16,17 117:23,24 201:3,6,9 202:9,10,21 203:4,10
**circumstances** 124:10 216:10
**citizen** 142:21
**city** 86:23 89:23 90:14 92:20 94:17
**claim** 70:13 145:8,9,10 177:21 178:14,15
**claimed** 10:16
**claiming** 54:10
**claims** 105:9,10 177:23 236:24 238:6,7,8,12 239:5
**clarify** 30:8 170:20
**clarity** 38:7 74:8 123:1
**class** 50:11 138:9 139:9,13 147:16,19 148:4,8,11,12 149:5,21 150:1 151:6,18 152:13,17 153:4,11 174:10,12,19 175:7,11 192:3
**classic** 192:3
**classified** 28:11,17
**clean** 91:17 93:20
**cleaned** 32:6 92:5
**cleaner** 91:15
**cleaning** 91:12
**cleanup** 89:22 91:8,19 92:2 93:10
**clear** 24:13
**cleared** 34:13 167:6
**clearing** 35:6
**Cleveland** 80:13 82:7
**client** 181:1
**Cliffsnotes** 192:2
**close** 134:23 155:22,24 157:24 209:9 215:6
**closed** 42:20 93:19
**Closing** 136:24
**clue** 87:19
**co-owners** 135:6
**co-ownership** 135:8
**code** 97:20,21 122:8
**Colerain** 202:10
**collateral** 37:21 96:10,11,14
**colleague** 6:9 109:6
**collect** 142:11 180:14,17
**collecting** 142:15 143:14 144:11
**collections** 146:24
**Colorado** 42:22
**Columbus** 95:12
**column** 139:13 197:24 198:23 199:5,13,19 200:17 203:6 236:17 238:11
244:15,16
**combined** 39:11
**comfortable** 100:4 200:23
**commercial** 88:6,7 92:21
**communicate** 7:11
**communications** 7:4,8,14,19 8:8
**companies** 13:10 14:11,13,20,24 15:10 16:1 20:17 26:2 33:7,9,13 34:24 36:3,9 40:11 45:12 48:22 64:13 70:9 101:7,11,13 102:11,18 140:5,6,11,18,22 141:1,6 161:22,23,24 162:21,22 163:2 167:8,11,12,13 169:20 177:4 182:23 185:9,14,22 186:9 187:9,17,19,24 188:4 191:18 192:11 194:3,4,17 198:10 205:21,24 208:6,10,16,20
**companies'** 167:5
**company** 19:7,9 21:14 25:17 40:7 52:24 64:9 78:10,13 80:13 81:1,4,23 85:15,18 93:20 95:11 103:8,9,22 104:3 105:12,14,16,20 117:17,22 138:10 139:4 140:1 147:17,20 148:3 152:17,23,24 153:5,12 155:1,5 160:4 164:7,10,15,17 167:16,22 168:1,4 169:2 171:3,9 172:5,9,12,14
174:16,17,18 177:1 183:12 185:23,24 186:14,16 190:21,23 191:15,21,24 202:14 203:5 210:5,6,7 216:22
**compare** 217:24
**compared** 116:21
**compensated** 192:22
**compensation** 190:7 192:6,7,9,15 193:7,24
**complaint** 110:18,21,22,23
**complete** 11:19 12:10 23:23 24:20 127:22 129:12 145:16,17 178:16,18,19 179:16 180:8
**completed** 87:17 92:3 95:16
**completion** 123:11,17
**complex** 75:14 82:5,6
**complicated** 188:20
**composed** 175:7 218:18
**compounding** 74:14
**computer** 32:21
**concern** 111:13
**concluded** 245:18
**conclusive** 133:17
**confidential** 243:24
**confirmed** 209:2
**conflicts** 181:3
**confuse** 8:18
**confused** 49:1 67:18
**confusing** 29:14 67:18
**connected** 109:24
**connection** 68:21 83:3 106:16 164:6
**consent** 123:9
**considered** 75:20 243:18
**construction** 117:15,19 118:15
**consultant** 14:21 15:11
**contacted** 109:24
**contained** 243:24
**context** 53:15 60:21 106:1
**continue** 116:5 245:8
**continued** 25:13 99:2
**continues** 25:7
**contract** 10:4 42:18
**contribute** 164:7 171:8 172:21 173:4
**contributed** 167:17,18 169:18,22 170:7,8,9,11,17,22 171:4,21 172:4 173:7,8 174:2,4,7 177:3,8,9 183:15
**contributing** 175:20 176:8
**contribution** 105:9,10 169:16 176:12,16
**contributions** 21:15 56:14 169:13
**control** 86:20 139:24 140:5,10,13 141:6 194:3,17,21,22,23,24 197:24 198:6,10,15,24 199:5,14,19 200:3,17,19,24 201:2,8,16 203:15
**controlled** 86:18 140:6,14 167:13
**controller**

19:13
**controlling** 140:17 141:2 194:18,19 201:24 244:5
**conveniently** 107:11
**convey** 198:5
**Cooper** 84:10
**cooperation** 123:11
**copy** 55:3 69:9,14 83:24 132:14,19, 20 197:8 198:21
**corner** 86:24 202:16
**Corporate** 78:23
**correct** 6:10, 13,14 8:23 9:3,10,11, 12,19 10:10 11:1,2 14:7 23:19 26:12, 15 29:19 32:14,18 34:20 37:17 41:11 44:3, 5,7 48:7,13 51:15 52:11, 17 53:13 61:21,22 62:1,8 63:12 71:20 75:11 96:13 99:2,6 102:16 109:6,13 116:22 119:20 120:18 134:18 143:24 146:8 153:16 161:16,17 174:5,14 182:13 196:11,19, 20 197:16 218:8,20 219:1 225:1 232:11 241:4,5,7
**correction** 52:7,8
**correctly** 35:16 121:10 237:19 238:22
**corresponde nce** 65:1
**corresponds** 16:20
**cost** 85:11 90:10
**Costco** 100:9,10,20
**costs** 94:21 95:2 235:4
**counsel** 7:5, 6,12,15,16, 19,20,23 8:9,11 17:2 50:7 61:6 62:19 138:22 139:23 143:21 180:24 207:15 245:6
**counsel's** 181:16
**couple** 27:7 101:3 105:1 146:4 207:17 211:17
**court** 6:7,20, 22 10:1,5,8, 12,14,15 11:3,4,6,7,8, 9 12:10 21:5 25:14 27:19 33:23 52:8,9 70:13 75:7 77:6 106:24 107:6,14 108:3 116:6 125:4,6 128:16,21, 22,24 129:4, 11 141:22 144:6 145:2, 13,19,20,24 177:20 179:10,13, 24 180:7 221:4 230:1, 8 233:11 243:15
**Court's** 10:2
**courts** 50:23 146:6 179:14
**Coutinho** 8:2 12:21 13:5, 22 17:3 20:6,10 22:12 24:10 28:21 29:6 30:8 34:1 36:23,24 38:6 41:12 46:2 47:9 49:19 50:8 52:1,6 56:18,21 57:24 58:4 61:3 72:18 73:23 75:11 88:21 98:8 108:9 119:7 122:23 137:16 163:1 164:14
168:13 173:19 178:3 181:2, 23 182:8 184:9,12,15, 21 197:1 200:8 208:18 213:19,21 220:16 222:4 224:1, 9,15 225:2 226:15 227:8 228:5 229:9,16 230:21 233:12 237:5,16 238:4 239:7 245:3,10,14
**cover** 45:12 120:9 178:14,22 230:9
**covered** 37:2 103:18
**COVID** 42:15 118:15 176:2,6
**CPA** 19:21 33:4 80:14
**create** 49:19 50:2 66:13 164:10
**created** 11:11 12:5 49:16 50:16 51:17,18 52:18 54:18 57:20 58:18 66:9 72:23 73:2,3 77:8 131:11 142:11 156:23 161:11 180:14
**creates** 50:5
**creating** 156:13
**creation** 61:10 135:22
**credit** 98:16, 23 99:11,22 100:1,14,18, 22 101:7,11, 13 106:21 125:21 205:23 223:13,14
**creditor** 37:14 54:2,7 98:23 101:21 104:19 142:10 180:13 220:19
**creditors** 54:1 75:2,4 77:8,11 78:1
146:22 209:3
**CROSS-EXAMINATIO N** 6:4
**Cummins** 102:15,17
**Cummins'** 102:19
**cumulative** 86:5,8
**current** 26:17 87:18 221:18,24 222:13 233:2 236:18
**customer** 156:12
**cut** 46:17
**Cyberco** 107:18,24

**D**

**D-E-L-H-I** 79:4
**D-O-R-N-B-U-S-C-H** 102:22
**dancer** 127:8
**dancing** 127:9
**Danielle** 148:19 210:16
**dark** 127:18
**date** 18:11 23:18,23 24:14,17,20 26:8,14,23 27:4,15,21, 24 28:1,2,5 40:21 51:12 61:12,17 78:5 83:9 127:1 131:4 146:18 149:22 152:4,6,7,9 156:17 160:16 174:6 175:6 189:22 195:14 196:21 207:4,5 216:16 225:13 242:9 243:6 245:8
**dated** 60:5, 13 61:1 152:18 153:6
**dates** 149:15 161:9 170:5
**daughter** 210:16
**daughter's** 212:13
**David** 112:6
**day** 12:4 26:2 27:16 28:7 77:17 118:2 142:21 149:20,23 157:5 159:14 189:23 193:19,20 216:14
**day's** 216:13
**days** 17:16, 18,20 18:10 75:24 127:2 150:15
**deal** 18:22 26:2 94:18 101:18 104:1
**dealing** 51:4 121:20 126:2 169:13 198:13
**deals** 104:2, 4,5 234:3
**dealt** 12:24 117:1
**death** 59:10 132:7
**debit** 204:13
**debt** 223:7 237:3,11,20, 22
**debtor** 21:10,16 28:9,16 30:16
**debts** 53:24
**deceased** 131:13
**December** 60:6,13 61:24 62:7 115:4,10 138:24 147:15 148:1 152:11
**decide** 12:10
**decided** 75:21
**decides** 121:22 193:11
**decision** 10:2 52:23 65:20 69:17, 18 107:15 145:12 186:16,21, 23 194:16, 20 196:9
**decisions** 65:16

187:21 192:19 193:19 194:11,13
**declining** 180:20
**decrease** 92:21
**deduct** 236:5,24 238:6,12
**deducting** 237:3,11
**deemed** 123:12
**default** 75:16,20,23 76:2 110:2, 15 142:9 161:11
**defaulted** 109:16,18, 22 110:12
**defaults** 111:18
**defend** 124:20 126:11,12 207:13
**defended** 70:12,14
**defending** 129:14
**defense** 62:11,14,18
**defined** 169:19
**definition** 153:17,19
**delaying** 35:22,24
**delays** 34:22 125:4
**Delhi** 79:3
**Dennis** 13:6, 20 14:19
**department** 13:4,11,14 19:10,13,19 20:16,18 21:3 22:2 34:19,23
**depending** 37:23 216:13
**depends** 38:8 53:23 192:11,12, 13 194:15 227:10
**deponent** 61:6
**deposed** 6:10
**deposition** 6:13 17:1 112:6 200:14
**depositions** 146:5,6
**description** 137:2
**designated** 28:12,18
**Designation** 59:10
**designing** 89:24
**designs** 89:18
**desires** 153:10
**detail** 18:10
**details** 186:12
**determination** 27:2 192:14 193:7
**determine** 23:21 24:18 27:3,11 68:13,19 109:21 121:4 123:14 133:9,15 192:7,21 193:23
**determined** 22:21 23:3, 20 25:2 68:12 95:5 178:11,12 179:2,19
**determines** 177:20
**develop** 13:12 83:16 177:18
**developed** 115:15 118:6,8 200:24 217:3
**developer** 10:17 189:13
**development** 14:24 15:5,7 78:4,19 81:11 84:7, 24 85:16,17, 18,22 86:21 87:6,17,21, 22 88:3,5 89:6 95:1 201:4,6,9 216:23
**die** 58:17 63:13,14 214:2
**died** 54:24 213:13 214:3,4
**dies** 63:11
**differ** 223:3
**difference** 50:19,20 219:2,11,12 223:8 225:24 226:1,20 227:20,22 228:8 229:4 239:11,21
**difficult** 118:23
**difficulties** 167:4
**diligence** 110:6,13 146:3
**dinner** 205:18
**direct** 230:17
**directed** 71:1
**dirt** 172:3
**disagree** 144:12,14
**disagreed** 11:7
**disbursement** 215:23
**disclose** 7:7, 14 67:11,23 68:14,19 233:11
**disclosed** 57:13 60:24 162:13 228:11 237:12,14 238:1,2 239:13
**disclosure** 7:5,9
**disclosures** 30:15
**discover** 144:15
**discovered** 93:21 106:22 109:19 112:7
**discrepancy** 237:12
**discretion** 133:15 244:4
**discuss** 8:13
**discussed** 245:5
**discussion** 16:16,17 24:3,11 58:6 70:24 168:6 181:13,15 193:1 208:24
**dismissed** 207:18
**disparity** 177:8 238:17
**dispose** 120:21
**Disposition** 120:17
**dispute** 75:15,16,18
**disputing** 241:11
**disrupted** 22:1
**distributed** 121:8
**distributions** 55:14 165:15
**divided** 97:9
**dividend** 192:15
**dividends** 191:22
**divorce** 124:10 214:13
**Doc** 137:24
**document** 8:5 17:8 18:6 26:16 55:4,7 59:9, 12,14,16 60:22 61:16, 18 64:1,8 73:18 74:17, 19 113:15, 18 114:15 120:9 129:4 136:19 137:6,8 139:19 147:3,4,8,10 150:10 151:18,22 152:12 156:18 161:9 162:16 169:6 175:13 176:6,8,14, 18 194:2 196:1 197:4, 6,11,14,15 198:16 209:14 211:13 225:16,17 229:17
**documentation** 11:18
**documents** 8:9 16:19 53:5 72:10 75:3,23 83:7 110:5,14 115:1 117:7 119:24 126:11,13 127:22 128:18 129:1,8 136:15 137:3 140:20 141:3,10 143:18 155:10 156:9 161:5 162:9,18 164:20 166:20 179:11 184:6 193:21 198:19 208:11 225:18 229:14 240:11,24
**Dog** 138:10 139:3 147:17,20 148:2 152:22 155:1,4,5 156:21 165:4,23 166:10,15, 19 167:22, 24 169:2,24 171:2,9,10, 12,23 172:2, 10,11,17,22, 23,24 173:4, 7,10 182:10, 12,17,24 202:13,22 212:19
**dogs** 45:22, 23 46:16,21
**dollar** 192:5 216:20 232:16
**dollars** 27:7 90:12 91:6 106:18 107:11,12 155:13 165:20,21 166:4 177:5 206:18,24 207:3,14 208:4 211:18 215:7 230:7 233:3
**domain** 217:12
**Donald** 50:24
**door** 10:6 91:16 97:16, 17 134:20, 21 236:12
**Dornbusch** 102:21
**Dorothy** 102:21
**dozen** 15:12
**draw** 192:16
**drawings**

88:12
**draws** 21:16
**Drexler** 114:13
**Drive** 217:2
**driven** 235:7
**drove** 88:24
**drowned** 176:3
**Drug** 216:23
**dry** 91:12,14
**DSES** 215:7, 9,17
**due** 47:6 110:6,13 146:3 243:20
**duly** 6:2
**dump** 128:8
**duties** 121:18 123:15
**dwelled** 120:2
**dysfunctional** 32:3

E

**earlier** 32:2 67:17 69:20 76:21 135:3 173:24 190:8 214:5 218:24
**early** 43:8 66:11 117:16 126:8 141:12
**earn** 158:17 160:12 166:3
**earned** 152:9 159:14 214:8
**Earth** 84:16
**Eastgate** 209:15,18 217:1
**eat** 205:18
**education** 121:5,14,21 130:22 131:1 133:10
**effective** 147:15 152:4,5,8
**effectively** 160:24
**effort** 111:24 175:14,16, 21 176:9
**elaborate** 9:4
**electric** 204:23,24
**else's** 92:8
**email** 185:21 186:1
**emails** 185:24
**emergencies** 179:12
**Emily** 53:10 69:16 115:24 137:10
**eminent** 217:12
**employed** 14:12,19 15:4,6 32:22,24 187:24 188:4
**employee** 150:17 160:12
**employees** 25:23 85:13, 15 112:7 160:11 185:20 192:19,21 193:5,16,23 194:6,20 197:7 203:21
**employment** 97:11 185:6
**encompassing** 45:4
**end** 17:24 31:10 61:14 121:8 141:13 149:20,23 163:3 242:4
**ended** 37:23 106:18
**engaged** 109:12
**engineer** 90:4
**engineering** 89:13
**engineers** 89:24 90:6, 10,24
**enhance** 154:21 156:20
**enhanced** 156:14 159:12 160:10 180:15
**enhances** 154:19
**enter** 161:21
**entered** 157:19
**entire** 50:10 174:3 221:19 241:11
**entities** 21:11 71:8, 11 80:22 135:7 164:7 167:14,18 201:23 203:16,17, 19,22,24 232:17 244:4
**entitled** 224:7
**entity** 41:10 42:5 79:16 92:21 167:19 168:9 171:5 215:12 238:9
**entrance** 97:10
**entrapped** 160:19
**environmental** 89:22 91:7, 19 92:2,6 93:9,13
**envision** 178:23 179:1
**equal** 124:3 225:21 229:10 231:23 232:4
**equally** 133:12 135:4
**equity** 38:11, 12 167:21 169:17 170:9,10,23 171:4,6,9 228:17 243:10 244:8,12,16
**equivalent** 123:7
**Eric** 97:2 139:7 147:18 148:11,16 150:24 151:1,5 156:22 157:7,12 159:2,6 160:3 161:1 165:3,16 166:3,24 175:4,10 176:4,8 177:9,23 183:1
**Eric's** 148:17 156:15 159:3,9 176:16
**errors** 35:6,8
**established** 136:7 148:16 237:18
**establishing** 136:6
**establishment** 135:16,22
**estate** 12:2,3 40:23 42:21 66:5 79:18 80:9 81:8,9, 13 85:22 120:17,21 121:3,7 133:8 143:8, 9 153:9 161:15,19 180:17 181:6,21 182:20,23 189:10,12 201:17,18 202:13,16 208:17 218:19 231:5 237:21 238:9
**estimate** 37:11 40:15, 19,20 90:16, 18 160:16 220:8 221:2, 6,23 222:7
**estimated** 37:20 38:1 221:8
**estimating** 222:14
**estimation** 85:20 117:5 222:21
**evaluation** 219:3
**evaluations** 53:2
**event** 123:10
**events** 18:24 26:7,17 126:8
**eventually** 33:16 62:3 182:11
**everybody's** 32:19 127:20
**evidence** 111:22 127:19
**exact** 127:3
**examples** 35:21
**exceed** 38:24 73:6,7
**exceptionally** 101:21
**exchange** 123:6 153:22,24 154:9,16 159:17
**exciting** 93:1
**excluding** 239:2
**execute** 151:21
**executed** 115:4,11 151:24 160:7
**Executive** 79:13
**executives** 75:21 76:6
**exemption** 116:10 117:6
**exemptions** 237:1 238:6, 12,15
**exercisable** 123:3,8
**exercise** 123:14
**exhibit** 16:20,24 17:5 28:9 36:17 59:4,6 61:17 70:19 71:2 73:14, 18 113:10, 12 129:17, 18,20,24 130:2 133:1 136:18 137:13 162:15,20 168:15,22 173:16 174:1,2,8 183:7,16,19, 23,24 188:10,14 195:3,5,20, 22 199:12 204:4 217:21,24 218:4,9,14 220:5 222:24 223:1,12,20, 24 226:13 230:11 240:13 241:14,17 242:2,16,18
**exhibits** 59:3
**existence** 67:11,24 68:15 75:6
**existing** 119:17
**exists** 61:4
**expand** 92:20
**expect**

124:5,21 126:12 153:21 209:4
**expense** 35:15
**expenses** 39:9 167:5,6 205:1,3
**experience** 70:16 113:3
**experts** 74:10
**explain** 59:14 63:3 128:4 130:18 154:3 217:10
**Express** 98:19 99:2, 8,9 100:16
**extension** 31:14 32:9
**extent** 214:15
**extra** 146:4
**eye** 108:2 185:19

F

**Face** 199:14
**Facebook** 101:4
**facilities** 119:4
**fact** 176:2 199:11
**facts** 129:10 145:21,22
**failed** 142:3
**fair** 31:1 166:22 174:4 220:22 222:3,15,16, 17,22 223:4 237:10
**fall** 51:7
**familiar** 84:15 106:13 120:3
**family** 56:6 58:15 60:18 140:12 141:6 144:2 161:18 177:13,24 186:8
**family's** 125:23
**fan** 46:23
**fashion** 141:9
**father** 46:24 57:4 214:4
**February** 31:10 175:24
**federal** 31:4 73:10 141:22 188:17
**feel** 9:3 200:22
**feelings** 124:22
**fees** 102:19 207:3
**feet** 88:16, 17,18,20 89:3 94:3
**felt** 115:21
**Fenway** 46:7
**fiduciary** 123:15
**fifteen** 94:3
**fight** 11:12 112:5 158:17
**fighting** 102:23
**figure** 22:7 38:13,14 72:4 208:22 222:1 233:13
**figured** 96:2
**file** 9:23 11:5 31:11,16,22 32:9 89:11 98:12,24 103:14 110:18,22 189:24
**filed** 9:9 10:14 12:12 14:11 18:8 23:13 25:15 27:16,18 28:1,7 29:21 30:13 31:3, 12 32:8 33:22 34:22 35:17 40:3, 16,22 66:24 67:2 76:24 83:13 99:5 103:13 119:5 128:15 129:14 145:8,18 146:13,21 184:17 190:4,5 197:5
**filer** 32:5
**files** 75:19
**filing** 11:14, 22 12:13,17 22:5 31:18 32:7 39:5 75:23 94:17 146:19 196:22
**filings** 30:18 36:6
**fill** 200:20
**fill-ins** 199:3
**final** 90:1
**finalize** 92:14
**finalized** 92:18
**finally** 51:22 110:5
**finance** 101:24
**finances** 196:12
**financial** 19:12 21:10 26:14 29:22, 24 30:6,9, 10,17,20,24 37:13 38:23 39:4,5 75:1 76:9 106:3, 4,11,20 107:3,10 128:4,14 195:9,10,14 196:3,6,11, 14,16 199:22 208:6 219:3 220:10 225:7 228:3 229:1,21 236:14 237:15 238:2,18 239:17 241:20,23 242:6,22 243:2,17
**find** 95:24 109:21 110:3,11 111:8 160:8 162:17
**fine** 7:24 9:8 50:8
**finish** 77:15, 18,20 110:9 158:8 210:22 221:9 245:7
**finished** 61:12,13 93:10 119:9
**firm** 33:2 65:9,11 70:8 80:14 102:19 105:23
**fit** 12:11
**fits** 146:9,10
**five-minute** 168:12
**fix** 9:7 67:20 111:19 176:4 193:3, 4 235:1,4
**fixed** 112:1
**flags** 146:5
**flip** 221:10 232:10
**flows** 30:11
**folded** 182:11,12
**folks** 12:23 13:2,11,13 97:12 101:2 125:16
**follow** 10:18 16:24 143:18,19 144:6
**food** 125:20 204:7
**foot** 94:2,3
**Ford** 234:15, 17,23
**foregoing** 245:17
**forget** 51:2 149:1 165:19
**form** 103:17 107:8 178:3 181:24 188:22 200:8 208:18 213:7 222:2 224:1 225:2 227:8
**formed** 167:16 168:5,8
**Fort** 42:1
**forward** 178:22
**found** 8:5 92:9 111:11
**foundation** 224:2 225:3 227:9
**four-lane** 92:8
**four-point-some** 215:7
**fraudulent** 108:1
**free** 243:19
**friend** 101:24
**friends** 70:16 134:23 214:13
**front** 16:4 25:19 46:18 60:9 63:20 64:1,8 71:15 73:17 74:19 113:16 114:20 119:1 132:9 146:5 163:3 208:13 242:4
**full** 24:19 231:21
**fun** 46:11 47:5
**functions** 56:11 185:11
**fund** 131:1
**funds** 18:15 19:3 21:14, 15 47:12 67:5,7 167:17 205:10,14 213:4
**funny** 225:16
**furnishings** 236:4
**future** 18:16 19:4 82:21 131:4 175:14,16, 21 176:8

G

**games** 92:6
**garage** 89:1 234:18
**gas** 204:21
**gathered** 52:24
**Gatherings** 25:17 202:19
**gave** 55:21 56:22 60:11 68:5 106:24 107:8 110:5 116:7 153:20 156:16 198:18 211:1,20 217:14 227:12 228:15 229:11,12
**GE** 106:21
**general** 6:12 71:17 72:1
**generalized** 50:11
**generally** 35:8 56:10 132:5
**genius** 170:12
**gentleman** 14:1 21:4
**GH** 203:1
**gift** 49:17,18 50:3,6,13 51:1,6 55:21 71:9,12,14,

20,23 72:2,5 73:10,11 82:12,13,17, 18,23 83:11, 14 114:3,6, 16 115:18 116:7,10 119:19 130:8 131:17 135:1,11,17, 19,22 136:7, 10,13 138:21 140:23,24 142:23 144:3 147:21 148:8 149:24 150:5 153:12,15, 18,19 154:5, 12,13,14,15, 16,19,21 155:3 166:7 177:16 214:11,16

**gifted** 136:1 138:9,20 139:2 143:1, 9 147:16,19 150:8

**gifting** 55:2 136:23 138:19 140:9 143:11 144:21 147:10 166:6,8

**gifts** 140:16

**girlfriend** 43:8

**give** 31:5,9 34:12 35:13 50:1 57:1 58:7 77:14 83:8 88:4 91:4,6 96:5 114:21 116:13,14 118:3 121:11 126:13 134:4 146:2 153:17 159:19 161:13 186:2,5 193:22 204:12 205:9 216:14 219:18 220:23 221:3 223:5 245:11

**giving** 56:1 90:7 118:21 129:12

**global** 28:24 29:2

**goal** 102:13

**goals** 94:19

**God** 186:7

**good** 98:10 108:7 116:16 140:13 146:8 156:11,12 160:9 178:19 189:12 217:22 233:4

**goods** 236:4

**Google** 84:16

**gorgeous** 90:2

**gosh** 214:3

**govern** 115:1

**government** 76:22 86:24 115:16 116:2 131:15 142:20 217:4,9

**Government's** 116:3

**governs** 114:15

**Graffiti** 235:6,10

**grandchildren** 47:2 51:9 125:14 126:22 153:21

**granddaughter** 16:8 127:8

**grandfather** 47:5

**grantor** 48:11 122:7, 12 147:22

**Grasshopper** 79:21,24 201:13,14, 16 202:20 203:1,8

**Graydon** 105:23

**great** 90:2

**green** 46:7,8

**Greg** 13:24 14:2,22 20:19,23 74:10 243:13

**grew** 18:20

**GRHPR** 201:12 203:1

**gross** 38:2,3, 18

**ground** 89:11,15 93:22,24 94:19 172:3

**grow** 150:19 158:18

**growing** 118:2,10 156:4

**grown** 211:22

**guarantee** 226:24 228:3

**guarantor** 10:6,24 109:17 239:15

**guess** 15:13 38:7 55:11 66:10 150:13 159:22 238:4

**guidance** 142:10

**guided** 138:22

**guy** 97:1 194:10

**guys** 101:19 126:4,9

**H**

**half** 46:17,18 50:12 88:19 90:11 91:5 92:4 94:1 144:4 165:19,21 166:4 183:14 214:4 215:21 231:21

**Hamilton** 80:3

**hand** 116:3 126:15

**handed** 8:6

**handle** 181:6

**hands** 76:22

**happen** 24:13 114:10 140:15 158:16

**happened** 25:10 94:11 131:9,12 142:9,18 158:16 175:23

**happy** 211:20

**hard** 90:17 92:22 124:16,23, 24 156:4,11, 16 186:2,5 194:7

**harmed** 103:3

**Harold** 109:6

**Harrison** 202:9

**He'll** 245:14

**head** 6:18 20:16,17 21:2 34:18 48:20

**headed** 29:3

**heading** 29:9 221:24

**health** 63:7 121:5,14,20 130:22 131:1 133:10 143:23

**hear** 228:6

**heard** 62:15 105:12,22 116:18 128:2 164:17,19, 21,23 165:2 213:11

**hearing** 126:3

**Heart** 201:3, 5,6 202:7

**held** 16:16 58:6 70:24 181:13 208:24

**hell** 176:3

**helped** 13:14 20:20 53:3 150:19 187:15

**helps** 185:2 191:2

**Henry** 104:17 106:5

**hide** 142:6

**hiding** 128:24 143:15

**high-end** 90:7

**high-tech** 16:5

**higher** 159:17 224:24

**Highway** 164:4

**hire** 186:16, 21

**hired** 15:10 21:22,23 90:6 93:19 103:22 117:11 186:13

**historic** 26:16

**history** 31:5 84:20 175:23

**hit** 42:15 176:3

**hold** 7:8 120:20 181:23 223:17

**holder** 140:17 157:1

**holding** 80:6 81:1,4 138:10 139:4 147:17,20 148:3 152:23 155:1,4 164:7,10,15 168:1,4 169:2 171:3, 9 172:5,9,11

**holidays** 126:7

**home** 99:14 106:24 126:8 185:16,17 191:1,3

**homes** 113:1

**honest** 68:24

**honeymoon** 126:19 127:6

**hope** 6:24

**hoping** 75:9 127:21 180:9

**Hospital** 170:23 171:4 201:19 203:23

**hospitals** 164:9

**hot** 235:11

**Hotel** 201:11

**house** 41:3 91:12 96:23 97:9,15,19, 22 98:2 118:14 187:16 202:17 223:5 236:11 239:4

**household** 236:4

**houses** 231:12,13

**housing**

97:11 222:8
**HRM** 80:6
**human** 74:9 114:11
**hundred** 128:19 146:4 211:17
**hundreds** 211:19
**hungry** 103:1
**Huntington** 6:8 10:9,24 11:10,17 12:8 54:8,10 70:12 77:4 101:18 106:20 107:17,19, 20 109:9,10, 16,18,22 110:4,11,12, 15,18,22 112:18 117:2 125:10,19, 21,22,24 126:9,10,13 127:3 129:12,15 136:4 141:17 142:8,14 143:10,13 144:10 145:6,7 146:23 158:11,13 161:11 177:21,22 178:13 179:11 180:6,10,12 191:4 207:11 230:8 244:20
**Huntington's** 125:3 128:24 142:10 144:15 180:9 192:4
**hurry** 145:13
**Hyde** 80:16
**hypothetical** 181:3,7

**I**

**I.D.** 213:7
**idea** 6:12 54:11 56:10 71:17 72:1 79:12 80:5 170:15 184:3 186:10 206:7,17 208:13 212:20,22 245:11
**ideas** 191:11
**identification** 17:6 59:7 73:15 113:13 129:21 130:3 168:23 183:20 188:15 195:6,23 241:18 242:19
**identified** 189:2
**identifies** 227:12
**identify** 25:18
**IF2** 80:18
**ifs** 179:6
**II** 79:21 80:3 120:11,13 133:1
**III** 81:19
**ill** 134:19
**immediately** 236:22
**implies** 53:6
**imply** 89:12
**implying** 82:20
**important** 140:4
**improperly** 21:12 28:10, 17
**improve** 191:12
**improved** 160:10
**improvement** 35:14
**in-laws** 213:13 214:2
**inaccurate** 137:2 149:18
**inartful** 8:17
**inception** 93:4 160:3
**include** 21:9 32:7 91:21 199:19
**included** 21:17 40:4 86:6 91:23 244:7
**includes** 239:15
**including** 21:13 22:6 71:5
**income** 26:13 29:22 30:1,4,7,17 31:4 39:9, 11,13,17 40:16 120:24 121:3,7,13 133:3,8 188:18 190:12 191:13
**incomplete** 54:14 126:11 145:11 178:15 180:11
**inconvenienced** 127:13
**incorporated** 71:4
**increase** 191:13
**incur** 94:21
**incurred** 207:4
**indicating** 65:1
**individual** 30:16 34:8 41:17 157:16
**individually** 33:15 40:24 43:1 210:4
**individuals** 20:22
**inflation** 156:11
**information** 7:6,7 23:23 35:2 36:19 128:23 145:16 194:21 243:23
**inherit** 131:13
**initial** 43:14
**initials** 164:22
**inside** 91:14 157:12 164:9
**insides** 233:5
**insignificant** 244:6
**insolvent** 53:13,14,15
**instance** 16:22 203:3
**institutions** 75:2
**instruct** 181:1
**instruction** 77:14
**instructions** 238:5
**instructs** 7:22,23
**insurance** 44:17,19,21, 22,23,24 45:3,9,14 58:1,10,12, 15,24 62:22 63:10 64:9, 13,14 66:8, 20,23 67:12 68:1,22 103:18,20, 22,23 104:3, 5
**insured** 44:17
**integrity** 127:16,24
**intelligent** 115:14 142:19
**intend** 126:12
**intent** 145:3, 4
**intention** 122:6 133:11
**intentional** 243:20
**interchange** 217:13
**interest** 38:11,12 41:20 71:5, 10 76:1,3 79:9 151:6, 10 152:10 167:21 174:3 175:2, 5,12 177:4 180:18 201:9,24 202:1 204:2 215:17 231:18,19, 21 237:22 238:8 244:6
**interested** 127:20,21
**interests** 71:4 140:18 148:13
**interim** 161:1
**interject** 13:23 20:6
**internal** 34:23 109:19 122:8
**internalizing** 19:6
**invested** 156:4 211:16
**investigate** 67:10
**investigated** 24:5
**investigation** 27:2,10,11 67:22 68:13, 18 69:2
**Investments** 79:21,24 81:13
**investor** 79:1,15 80:4
**Investors** 78:23 79:13
**involve** 7:9
**involved** 12:19 14:8 66:4 82:24 106:2,8,12, 19 112:24 136:4 141:20 232:14
**involving** 107:17
**Irrevocable** 113:21
**IRS** 115:19 117:9 142:22
**Island** 163:21
**issue** 36:7 93:21 133:7 134:9
**issues** 22:3 36:4 47:7 126:15 141:17 162:23
**item** 35:24 139:8 201:3
**items** 25:18 28:12,18 107:22 191:9 201:22 204:5 222:12,17
**Ivy** 103:10 202:12,13 214:17,22 215:12,17 219:20

**J**

**jab** 136:21
**James** 102:17
**January** 42:18 61:21 152:18 153:6 169:4 173:21 183:12 242:23

**jealous** 124:17
**jealousy** 124:19
**Jenkins** 107:4
**Jennifer** 19:17 22:20, 21 34:14,15, 18
**Jenny** 13:15 14:5 15:6 34:12,14,16
**Jewish** 126:7,8
**Jim** 12:21 24:9,10,23
**job** 160:9 185:10 190:20
**John** 21:4,23 132:13
**joint** 71:6 122:4 210:15,19
**joke** 145:1
**judge** 107:4, 5 142:5 145:13,23, 24 146:1
**judge's** 145:12
**judges** 146:6
**July** 20:1,11, 14 25:12 51:23 73:20, 24 109:20 112:12,13 115:23 131:19 153:6
**June** 111:7 112:12,13 127:7
**junk** 236:12
**justify** 75:6
**Justin** 148:19

K

**K-O-M-B-I** 235:21
**keeping** 208:8
**Kennebunk** 231:20
**Kennebunkport** 42:2 231:19 239:3
**Kenwood** 84:10
**key** 180:13
**kid** 18:21 99:14
**kids** 51:8 66:16 125:15 159:5 187:15 202:5 215:10,16
**kind** 38:8 214:6 240:6
**Kindred** 157:20 161:14 164:5 165:13,24 167:3,14
**Kings** 163:21
**kiting** 106:4, 18,19 107:6, 7
**knew** 10:14 28:2 70:15 90:8 101:19 144:2,22 145:6,7 198:22 224:11 229:12
**Knoll** 103:10 202:12,13 214:17,22 215:12,17 219:20
**knowing** 90:7 115:18 200:23
**knowledge** 10:3,13 12:18 40:14 57:14 58:15 141:1 211:13
**Kombi** 235:20
**KPT7** 81:1,4 167:15,16 168:4 182:12,16, 18,20

L

**L-E-Y** 21:7
**L-U-N-D** 14:3
**labels** 16:5
**labor** 156:12
**lack** 107:21
**lady** 19:14 103:2 210:14
**land** 84:11, 19,21 86:1, 3,23 95:8 202:20,21 210:10 217:1,3,5, 10,13
**landed** 106:23
**Lane** 42:1 202:17
**language** 29:13
**large** 101:21 145:8
**larger** 150:22
**last-to-die** 63:1
**laughing** 186:4
**law** 50:10 102:15 105:23
**lawsuit** 80:8, 10 103:18 106:16 107:1 127:2
**lawsuits** 191:5
**lawyer** 8:6 206:12,19
**lawyer's** 103:1
**lawyers** 8:2, 4 61:9 144:23 192:18 193:6,22 206:19,20, 21 207:8,13
**lay** 121:11
**learned** 93:19 107:4 111:10 214:10
**lease** 96:16 173:12
**leased** 80:14 96:18
**leases** 162:2
**leave** 213:15 229:19
**leaving** 160:12
**led** 139:23
**left** 10:6 20:3 91:13 99:14 213:13 215:13 217:4
**legal** 52:24 138:22 143:20,21 214:8
**legalese** 51:21
**lend** 104:21 167:14
**lender** 37:15 38:22,23 39:3,4 41:24 75:12,13
**lengthy** 28:15
**lent** 104:20, 24
**lesson** 214:14
**letter** 92:9 93:12 101:20 102:13 110:16 112:4
**letting** 219:8
**liabilities** 26:13 36:18 37:1 53:16, 17,22,23,24 218:6,15 225:20,21 226:9,10,14, 21,23 227:4, 13,23,24 228:10,11, 13 230:4 236:7,8 244:16,20
**liability** 45:6 152:24 174:17 226:24 227:2 228:4 244:23
**liable** 227:15
**license** 113:3
**lien** 47:16,18
**life** 32:20 52:13 58:12 63:10 74:3, 4,5,21 78:17 81:19 100:4 112:1 124:20 125:19 126:10 129:13 142:8
**lifestyle** 87:23 127:13
**lifetime** 101:4 116:11,12 120:19 122:4,17 123:4 130:17,20 134:11 143:1 214:9
**lifetimes** 122:5
**limit** 73:10, 11
**limitation** 73:9
**limitations** 141:12,15
**limited** 74:21 78:17,24 79:4,5,14 80:6 152:23 174:16
**Lincoln** 58:12 62:23 69:6
**lines** 189:8
**liquidate** 46:15 209:1
**liquidating** 179:8 181:5
**liquidation** 220:14,21 222:2,14
**list** 47:11,12 56:12 126:23 162:10,13, 20 163:1 170:16 221:13 244:19
**listed** 46:2,3 57:13 71:7 98:2 103:11 104:19 105:18 187:3 190:10 220:4,21 224:24 225:12 234:8 237:23 244:13
**listen** 10:22
**litigation** 102:16 207:10,15
**litter** 46:9
**live** 47:1,3 115:15 125:15 154:4,18 204:16
**lived** 57:7 223:9
**lives** 193:18
**living** 47:5 100:4 130:23 131:2 158:17
**LLC** 71:6 78:20 79:22, 24 80:3,16, 18 81:2,4, 11,14,19,21 102:15 105:13,16, 19 138:11 147:18 155:1,5 162:1,2,6 163:5,6,7,19 164:2,18,22 167:22 168:4 169:3 170:23 171:3,4,9, 10,12,16,18, 24 172:2,18 173:1,11 202:13,16 210:8

**loan** 37:22 89:17 94:16 95:23 105:2, 5,8 107:7,8 109:16,18, 22 110:1,4, 12 111:14, 16 112:3,8, 10,14,16,21, 22 167:11 197:12,14 200:23 220:11 228:23
**loans** 21:15, 16 167:10
**lobby** 6:7,9
**located** 15:14,18 45:16 81:9 84:7 119:11 210:2
**location** 15:23 16:2 118:11
**locations** 30:22 117:24 118:10,12
**long** 34:7 51:21 77:17 239:8
**longer** 79:6,8 100:11 171:19
**lookback** 142:1 145:1
**looked** 17:10,21 23:10 24:18 57:15 113:23 149:5 242:3
**Lori** 21:24
**lose** 127:24 179:18
**loss** 171:14 172:15 180:14
**lost** 87:1,4 90:2 98:18, 21 99:24 100:5 118:21 125:21,22, 23 127:14, 15,16 134:23 179:14 180:12 217:17
**lot** 29:16 34:2 45:7 63:5 64:10 69:11 71:11 76:2 91:10 117:17 125:17 158:12 162:10 167:3 186:11 191:1 192:13 208:6 237:6
**loud** 120:14 243:14,15
**love** 46:19 47:2 124:14, 23 125:15 153:22 154:4
**loving** 47:5
**low** 222:8
**lower** 96:23 97:8,13
**LP** 82:1
**lucky** 44:9 214:23 236:1
**lunch** 52:15 98:5 99:21 108:10
**luncheon** 108:12
**Lund** 14:2 20:2,19,23 74:10 243:13
**Lund's** 14:22
**Lynch** 47:13 48:1,3,5,17, 23 67:8 206:2,4,8, 10,13,15 207:18 209:2 210:16 216:1,3,5,8 244:9

**M**

**M-A-Z-U-N-T-E** 209:21
**M-E-R** 21:7
**made** 16:8 22:9,22 23:1,21 24:6,9 27:1 52:23 65:13 66:24 67:4, 13 68:21 92:7 102:8 107:15 112:10 133:12 138:18 154:24 165:15 179:3 186:15,16, 21 188:7 193:19 194:7 209:24 211:20 217:5 218:21
**maiden** 43:23
**main** 239:4
**Maine** 42:2 98:2 231:20
**maintain** 29:21,24 30:6,16
**maintained** 157:15 187:15
**maintenance** 121:5,14,21 133:10
**Major** 219:10
**make** 6:21 11:19 22:12 67:22 75:21 103:4 116:4 125:17 134:20 160:14 170:9 173:2, 5 184:16,21 192:4,19 193:6 194:20 196:9 199:24 209:3
**makes** 51:14 192:14
**making** 20:10 64:10 192:23
**mall** 209:15, 17,20,24 210:11
**manage** 191:13 212:5
**manageable** 76:5
**managed** 69:22
**management** 167:22 243:18
**manager** 140:13,14 156:22 157:7,8 203:17
**manager's** 140:13
**managers** 203:18,21
**manages** 25:22
**maneuver** 194:24
**map** 74:11
**March** 42:16 146:15 207:20 211:6,11
**mark** 6:6 16:18 37:3 113:10 129:18,24 183:17 218:1 242:15
**marked** 16:23 17:5 59:6 73:14, 18 113:12 129:20 130:2 136:17 168:22 183:19 188:14 195:5,22 241:15,17 242:18
**market** 55:10 174:4 220:22 222:3,15,16, 18,22 223:2, 3,4,23 224:19,23 225:7 237:10
**marketable** 224:5
**Marketing** 185:11
**marketplace** 236:13
**marriage** 124:15 135:9 187:10
**married** 186:22 235:8
**mascot** 46:6
**Mason** 163:6,19 164:1 172:2 202:22 203:2
**Mass** 164:3
**Massachusetts** 163:9
**match** 219:4 229:19 231:9
**material** 243:19
**materially** 244:6
**matter** 62:18 212:11,16
**maximum** 115:21
**Mazunte** 209:20 210:12
**meaning** 28:10 29:15 54:18 99:4
**means** 53:15 63:3,4 121:12 122:10 124:2 200:4, 17 224:5
**meant** 20:11
**meantime** 25:11,16
**mechanic** 172:19
**meet** 18:16 19:3 70:3
**member** 135:13 141:2 152:22
**members** 56:6 60:18 139:3,17 148:2 177:24
**membership** 100:13 174:3 177:3 237:22 238:8
**memory** 146:8,9,11
**mention** 89:2
**Merley** 21:4, 23
**Merrill** 47:13 48:1,3,5,16, 23 67:8 206:2,4,8, 10,13,15 207:18 209:1 210:16 215:24 216:1,3,5,8 244:9
**met** 6:7,9
**Michigan** 94:4
**middle** 9:5 43:13,14,18 44:1 92:19 127:16
**midst** 11:23 61:14 65:4, 18
**million** 38:13,14,24 47:23 62:24 69:6 72:9, 12,13 73:5,9 86:6 88:19 90:11 91:5 106:17 107:2,8,11, 12,13,21 108:3 115:20 116:10,23, 24 117:6 131:18 142:24 155:13,17, 19,21 157:23 158:11,15, 20 159:6,7 161:13 165:20,21

166:4,23 177:5 206:9, 18,24 207:3, 14,19 208:4 213:22 215:7 218:19,20 219:22,23, 24 220:4 224:22 225:6,14,17, 23 226:3,7, 11,14,21,22 227:4,23 228:2,9 229:5,6,22, 24 230:3,4, 7,12 231:2, 9,20,22 232:11,12, 22 237:13, 15 239:12 242:13 243:3

**mind** 13:22 27:22 49:10 50:21 54:4 188:22 207:12 222:13 224:8,13 239:8 245:1

**mine** 49:22 51:23 52:5 128:3 173:19 214:14

**Mine's** 52:7

**minor** 162:22

**minus** 166:23,24 193:18 236:6

**minute** 26:3 181:10

**minutes** 98:7,9

**misclassified** 35:19

**missed** 126:21,23

**misstatement** 243:20

**Mitzvah** 126:6

**mixed** 87:22

**mixed-use** 88:3,5

**modest** 116:21

**mom** 57:7

**moment** 58:5

**monetary** 154:8

**money** 11:9, 17 12:9 63:5 64:11 75:22 76:2 87:11 102:8,23 103:6 104:20,24 105:5 106:22 107:1 166:12 167:2,7,12, 14 173:6 178:21 180:11,12 192:23 193:3,4 197:12,14 200:23 204:18 205:7 211:21 212:13,17 213:14 220:18 228:17

**moneys** 167:9

**Monster** 46:8

**month** 36:5 42:13 208:1, 3

**monthly** 30:12 39:11, 13 40:16 184:1,13,23 185:1 204:6 205:13

**months** 95:15,16,19 97:1 129:7

**months'** 225:24

**mortgage** 86:7 215:13

**mortgages** 86:2

**mother** 214:3

**motion** 33:22

**motor** 45:4,8 234:6,11

**move** 65:13 74:13 137:14 160:8 188:22

**moved** 24:11 91:16 94:3 115:20

**moving** 54:12 65:5,6 156:9 231:16

**multi-business** 25:8

**mutual** 47:11 69:18

**N**

**named** 21:4 46:6,7 49:20 60:15,18

**names** 46:5 162:10

**narrow** 200:20

**National** 6:8 10:9 54:8 70:12 77:4

**nature** 114:11

**necessarily** 8:9 24:14 26:17

**necessities** 27:19

**necessity** 11:11

**needed** 18:15 19:3 36:4 60:10 62:2 95:23 130:16,19 140:7,14 176:3 185:12 227:11

**needing** 32:6

**negative** 128:3

**negotiating** 42:14

**net** 37:17,19, 22 38:4,19 120:24 121:2,6,13 133:3,7 219:1 229:22 230:5,6,10 232:2,3,6 233:22 238:20,21 243:10 244:8,12,16

**newspaper** 127:20

**nice** 98:10 160:13

**nodded** 6:18

**non-fiduciary** 123:8

**non-marketable** 197:22 199:12 223:19,23 224:3,7,13, 21

**non-voting** 138:10 147:17,20 148:9,12 150:1 151:10,13

**nonfunctional** 22:2

**nonprofit** 56:14

**nonpublicly** 71:3

**noon** 98:8,9

**Nordstrom's** 187:14

**normal** 77:22 100:4,24 113:4 130:23 131:1 144:1, 19,24 153:22

**north** 163:6 164:2 165:19 172:17

**notary** 115:9

**note** 83:21, 22 84:1 95:5 96:6 227:16, 17

**notes** 18:12 21:8 28:24 29:2 105:13, 16,18

**notice** 18:1 100:6

**November** 23:13 25:13 138:7 139:1, 3 151:24 152:4 166:1 222:6 243:7

**number** 36:2 38:19 40:5 71:7 81:6 98:10 113:8, 9 137:17,19 138:1 157:24 199:14 215:15 224:16,18 230:22 231:2,15 242:13

**numbers** 54:13,15 198:12 219:1 232:4 233:20 240:13

**numeral** 81:5 122:20,24 134:10

**nursing** 112:24

**O**

**Oaklawn's** 202:17

**oath** 200:6, 11,16

**object** 181:16

**objection** 178:3 181:23,24 182:8 200:8 208:18 220:16 222:4 224:1 225:2 227:8 228:5 229:9, 16 233:12 237:5,16 239:7

**objects** 145:2

**obligation** 10:5,20

**obligations** 228:19

**obtained** 223:13,14

**occupation** 189:10,14, 18

**occur** 83:6 94:5 138:17 165:24 243:21

**occurred** 26:8 90:19, 20 160:17 183:1 212:9, 15

**October** 31:15,18,20 67:2 146:20 150:4 196:19,23 199:18 225:8

**offer** 112:10 219:22

**offered** 112:2

**office** 12:23 13:2,7,8 15:14,15,16, 18,21 30:3 88:8,13 217:6

**officer** 19:12

**offices** 92:23 217:5

**Ohio** 10:1,4, 7 11:4 13:9 45:17 70:13 82:7 84:8 98:13 119:14 128:21,24 145:12 152:23 164:1

**older** 51:3 146:10

**oldest** 84:22

**omitted** 28:12,18

**Omni** 216:22 217:1,2

**one's** 221:12

**one-half** 231:18,19

**one-word** 200:21

**ongoing** 23:8
**online** 100:24 101:2,3
**open** 10:6 134:21 143:15
**opened** 134:20 170:2
**opening** 116:24
**operate** 95:22
**operated** 18:14,22
**operating** 30:12 152:18,19 153:5,7 157:9 168:2 169:1 172:13,16 173:18 174:1 175:20 176:19,20 183:8,9 184:2,14 204:6 205:13
**operation** 116:5
**operations** 138:10 139:4 140:7 147:17,20 148:2 152:23 155:1,4,7 158:22 161:14 164:16 168:1 169:2 171:3,9 172:11 182:11,12, 17 202:22 212:24
**opinion** 127:18
**opportunity** 12:5,6 87:2, 4,8 90:2 94:19 150:22
**opposed** 220:22
**option** 95:24
**order** 192:2
**organization** 104:4
**original** 11:8 128:17 178:14 202:18
**originally** 12:24
**ourself** 125:17
**outline** 219:8
**outstanding** 47:17
**oven** 233:6
**overruled** 10:1
**overturned** 128:22
**Overview** 147:10
**owe** 11:12,16 12:8 177:22 180:11 208:21 220:18 228:15,16 234:1,4
**owed** 11:9 53:24 107:1
**owned** 42:4, 24 139:17 161:24 201:5 209:17 237:21 238:9 239:2
**owner** 18:15 154:24 157:6 191:15
**owner's** 192:16
**owners** 41:15 74:23
**ownership** 150:20 152:10 157:4 159:3, 9,14 160:24 175:2,5,12 200:24
**owning** 235:23
**owns** 78:4,7, 9,10,13,16 80:8 81:12 83:14 152:16 153:4 163:20 182:20 215:7 238:14 239:3

**P**

**P&ls** 170:13
**p.m.** 109:2 147:15 148:1 245:18
**package** 241:12
**Packer** 13:6, 20 14:19 15:11
**pages** 26:4 128:19,20 129:8 146:4 231:16 241:3
**paid** 21:16 83:20 93:5 99:20 102:18 107:19,20 108:3 158:6 167:3 186:9 190:18
**Palmer** 6:9 181:9 218:1, 3
**Pan** 53:10 61:8 65:2,9, 17 66:4 69:16,17,19 115:24 137:10
**pants** 76:6
**paper** 57:18 145:4
**papers** 34:3
**paperwork** 117:3
**paragraph** 28:23 29:2, 3,4 44:8 47:11 59:19 71:3 122:15 134:1 243:11
**parcel** 84:18 85:3
**parcels** 84:21 86:16, 17,19
**parents** 54:24 56:22 214:11,16
**parents'** 56:21 57:12
**park** 78:23 79:13 80:16 89:4 127:11 163:22
**parked** 88:23
**parking** 88:8, 14,21,22,23 89:1
**part** 12:21 29:1,7 40:6 53:18 57:7 58:3 65:15 67:14 69:21 71:2 79:6,8 82:23 90:21 96:9 119:17 132:22 135:16,21 141:19 143:8 145:21 147:14 164:9 166:5, 8 167:4 172:23 176:21 194:4 197:14 200:19 202:21 203:4 208:7 213:24 218:4 226:10 228:19 230:18 231:5,8 232:24 234:3 236:3, 14,18 238:5, 14
**part-time** 15:17
**partially** 88:5
**parties** 51:20 53:1
**partner** 109:5
**partners** 31:8 81:24 82:1
**partnership** 71:6 82:2,4 215:10
**partnerships** 31:16,17
**parts** 68:4,11 232:23 239:2
**party** 38:22 39:3 95:7,10 96:1
**pass** 50:23 63:5,9 115:16
**passed** 57:4, 8,9,11 132:11 135:3 150:20
**passes** 63:8
**past** 26:5 40:10 70:9, 16 83:10 84:21 207:2
**pasted** 198:21
**Patricia** 41:16 43:7, 10,11,22 44:4 60:1 64:16 66:2 71:14,19 82:12 84:3 113:22 119:19 120:20 121:12,18 122:5 130:5 132:2 134:13,24 135:11,16, 18,23 136:6, 9,12 138:12, 13 147:21 148:7 149:24 150:9 166:13,17 185:6
**Patti** 43:9,12 49:2,17 50:5,13 71:9 73:7 114:17 133:20 134:13 138:11,12, 20 139:6 140:24 147:19,23 149:23 151:15 157:11
**Patti's** 49:3 51:16 52:3 156:16
**Paul** 45:19, 20
**pause** 98:9
**pay** 53:21 63:6,9,11,13 64:10,11,14 90:22,24 121:1 133:5 150:21 154:13 167:9 175:10 205:2,5 206:21 207:13 209:4 217:19 220:12,18 224:14 230:7
**payback** 191:23
**paying** 33:12 44:16,19 63:5 93:3,6
**payment** 35:13 67:4 120:24 133:3
**payments** 66:23 67:3, 12,13 68:1, 20 133:12 209:3
**payroll** 186:11
**pays** 44:24 64:20 156:5
**people** 29:17 31:9 63:8,13 77:21 128:10 134:21 139:16 143:6,7 154:6 158:17 191:13 239:3
**percent** 79:15 115:16 159:4,7,10,

13,15 166:24 175:1,5,12 177:1,5 183:1,8 198:3,6,8, 10,12,14 199:20 201:8,15,23 215:8,14
**percentage** 81:22 82:3 150:22 159:18 161:1 215:11
**perfect** 83:15 146:11
**performed** 95:14
**period** 20:19 84:24 87:14 108:5 110:20 136:4 168:6
**Perkins** 97:2
**permanently** 187:7
**permission** 244:3
**permits** 89:14 94:16
**person** 25:22 41:10 42:5 63:11 65:24 96:24 97:5 103:6 109:24 111:17 113:4 115:14,21 116:19,20 123:10 142:19 144:20,24 150:17 193:11 194:9 244:2
**personal** 18:16 19:3 29:22 30:1, 7,17,24 31:19,22 33:19 38:16 39:4 45:11 98:12 107:22 169:15 187:2 190:1 195:8 196:3, 6,10,14,16 198:20 208:5 218:19 219:3 220:10 227:18 231:12,13 232:11,13, 18,20 238:2 241:20,23 242:6
**personally** 33:10 55:15 161:22 166:9 238:10
**persons** 193:12
**perspective** 142:14
**pet** 117:15 155:5,7,8 156:21 157:20 161:14 164:5 171:10,12, 15,18 172:2, 17,20,21,24 173:10 201:11,18 203:23
**petition** 23:18,23 24:14,17,20 26:8,14,23 27:4,15,21, 24 28:5,6 40:21 225:12
**Pfeiffer** 6:5,6 16:14 22:15 28:23 50:7 61:5 70:21 72:16,20 98:6 108:7 109:4 168:11 180:24 181:11 184:12,19 208:23 218:2 226:16 237:24 245:1,5,13
**phase** 93:17, 18
**phrase** 52:19
**phrasing** 49:10
**physical** 15:14
**physically** 99:15
**pick** 110:20 156:10 216:4,8,11
**picked** 99:13,14
**picking** 46:9 215:24
**piece** 80:8 84:11 137:22 177:14 202:20,21 217:1
**pizza** 233:6
**place** 56:11 203:20 236:5
**plain** 29:13
**plan** 46:13, 14 179:9 181:3 209:2
**planned** 88:11 201:6
**planning** 66:5 153:9
**plans** 89:8,9, 12 92:15,16 127:5,6
**play** 92:6
**Plaza** 79:3,4
**PNC** 209:6,7
**pocket** 156:2 204:15 205:2,5 213:6
**point** 8:19 9:2 11:20 12:18 13:15, 21 23:7,17 26:24 27:8 37:12 38:20 40:13 44:11 54:14 75:16 90:16 96:15 98:11 102:20 103:17 109:6 138:8, 23 141:23 157:2 160:15 161:1 176:10 180:23 182:13 204:5 220:8 224:8 239:24
**pointed** 238:22
**pointing** 238:5
**poisoning** 125:20
**policies** 69:10
**policy** 44:21, 22 45:1,3,4, 11,12 58:10, 12 62:23 63:1,6,7,11, 16,20 64:3, 4,6 66:8 67:12 68:1, 22 69:7,10, 12,15
**politics** 154:18
**Porsche** 235:18
**Port** 87:3,9
**portfolio** 18:21
**portion** 38:11 96:23 97:8,14,18, 22 215:2 232:5,7,16 236:19
**Portugal** 125:2,13 126:18
**position** 14:22 24:12 127:12
**positive** 39:19 52:13 75:20
**possibility** 67:9
**possibly** 40:6 118:8 168:7 172:13
**potential** 37:14 38:22 39:3 69:24
**potentially** 55:19 83:16
**power** 122:18 123:7 134:12,14, 18 143:23
**Powerpoint** 199:2,4
**preceded** 170:4
**prefer** 61:5
**premise** 237:18
**premium** 64:18,20 66:23 67:4, 12,13 68:2, 21
**preparation** 12:19 14:9
**prepare** 13:14 34:5, 8,10
**prepared** 14:13 137:10 243:17
**preparers** 243:23
**preparing** 33:19
**present** 126:21 153:21
**presently** 34:4
**presidency** 50:24 115:20
**presume** 18:5 39:15 59:18
**Presumes** 178:4
**pretty** 28:14 94:9 188:20 234:23
**prevent** 50:22
**previous** 80:11,12 198:20
**previously** 135:12 238:16
**price** 83:17, 20 85:23 86:2 95:4 157:22 215:5,6
**primary** 41:3,6
**principal** 120:24 121:3,9 133:3,8
**principle** 121:13
**printed** 241:8
**prior** 9:3,4,6 17:20 20:15, 21 95:2 97:5 142:7 164:5 223:18 244:3
**privilege** 7:10
**privileged** 8:13
**Probate** 116:6
**problem** 8:14 32:17 91:10 111:18,21 138:1
**problems** 12:16 109:8, 10
**proceeded** 144:19
**proceedings** 245:17
**proceeds** 165:4,8,11, 12 212:18
**process** 93:16 94:6 95:22 208:8
**produce** 150:20
**produced** 131:23 240:4
**product** 90:1
**professional** 53:4 93:20 189:11
**professional s** 61:9
**profit** 151:6,

10
**profits** 148:13
**Program** 136:24 147:11
**prohibit** 142:14 143:13 144:10
**project** 78:14 82:16 85:18 87:21 93:2,4 94:12 95:9, 17 221:9
**projects** 82:11 127:15
**promised** 67:17
**promissory** 96:6
**prompted** 69:18,19,20
**proof** 145:8
**proper** 36:5 51:19 179:24
**properly** 35:15 225:5
**properties** 163:8,20 232:7
**property** 37:5 38:1, 10,16 41:9, 15,21 42:1, 11 87:14 91:17 92:8 96:16,19 119:17 158:18 163:7 218:20 221:19 226:6 232:11,13, 14,18,20
**proportion** 183:2,5
**proposed** 65:24 179:8 181:4
**protect** 11:23 12:2,5 51:9 64:14 76:12,16,20 83:14 87:5 116:1 128:5 131:3,5 179:15
**protected** 131:6,8
**protecting** 11:13 76:23 77:2,7,10,24
**protection** 76:9
**protocol** 16:24
**prove** 11:12, 16,18 126:14 128:15
**proved** 158:13 179:10
**proven** 180:10
**provide** 39:3 132:6 186:23 187:16,18 222:2
**provided** 21:14 37:13 38:22 39:19 116:7 180:7 195:12 225:7 239:18 244:1
**providing** 39:2
**provisions** 181:4
**publicly** 47:12
**published** 183:12
**purchase** 44:14 95:4 100:24 157:22 202:18 204:7 215:5, 6
**purchased** 168:9 201:7 202:7 203:7 215:18
**purpose** 11:21 17:17 38:6 50:22 76:8,11 105:2 115:13 142:13 143:12 144:9 244:2
**purposes** 11:15 17:6 59:7 73:15 113:13 129:21 130:3 141:23,24 153:9 168:23 183:20 188:15 195:6,23 219:5,7 241:18 242:19
**pursuant** 53:11 153:10
**pursuing** 146:22
**put** 23:6 51:5,20 52:24 53:3 54:24 57:9, 18 58:23 66:15 70:17 73:1,5 74:10,24 76:2,6 111:4 116:1 117:3, 8 127:1 137:9 143:8 144:2,4,20 178:15 189:10 196:15 203:14,20 222:6,12 235:12 241:9
**puts** 190:24
**putting** 61:14 111:12 131:20 170:14

**Q**

**quality** 90:7
**question** 8:23 10:21, 22 14:16 15:8 23:9 27:9 30:5,14 54:4 59:16 60:7,11 62:6,12 68:3,6,10,11 77:18 101:10 110:9 112:9 118:3,18 126:16 135:20 143:11 144:8 175:19 176:1 178:4, 7 180:19,21, 22 181:14, 17,19 182:1, 5 196:13 198:7 200:10 210:22 216:7 218:12 225:4 237:18 242:5
**question's** 64:2
**questions** 6:15 7:3 8:12,16,17, 19 14:10 47:8 49:7 59:15 67:18 68:9 118:23 132:23 161:5 178:6
**quick** 20:7
**quickly** 27:18
**quote/ unquote** 91:14

**R**

**R&t** 81:11
**rain** 175:17
**ran** 217:6
**range** 58:16 81:23
**Ray** 49:19 56:18 57:24 71:9 73:19 138:9,15 139:2,6,9,14 140:23 147:16,23 148:4 224:16
**Raymond** 6:1 49:2,18 50:2 60:5, 12,15,19,21, 24 66:3 72:2,5,21 82:13 113:21 114:3,4,16 119:18 130:12 136:23 138:16 161:20 191:24 244:3,5
**read** 59:23 60:8,10 63:19 107:16 109:14 120:13,23 121:17 122:1,15,20 123:20,21 133:2,4 137:5 138:8, 23 139:5 141:3 147:14,24 152:20 153:3,8 168:2 169:8 170:16 175:13 224:15,18 243:9,11,14, 15 245:14
**reading** 28:22 60:2 121:10 137:4 147:4 149:16 164:15 183:10 208:12
**ready** 53:5 160:8
**real** 20:6 40:23 42:21 79:18 80:9 81:7,9,13 85:22 161:15,19 182:20,23 189:10,12 201:17,18 202:13,16 218:18 231:4 237:21 238:9
**realize** 52:11 55:22 58:9 200:11
**Realtor** 187:14
**realty** 80:6 202:14
**reason** 34:21 60:2,7 76:21 129:15 132:1 137:1 149:17 211:10 239:11
**reasonable** 40:15
**Rebekah** 95:12
**recall** 26:3 40:9 121:18 154:12 205:22
**receive** 55:13 153:16 154:8 190:21 192:15
**received** 166:18,24 173:14 174:10,19 175:1,4 176:24 177:5,9,10 183:1 190:18
**receiver** 111:1
**receivership** 111:5,12 112:5,11
**receiving** 82:8 193:8
**recess** 72:19 108:12 168:14 245:4
**Recharacteri zation** 29:10
**recital** 152:20,21 153:3,8
**recitals** 127:9 152:14

**recognize** 17:8 18:12 27:15 109:11 113:15 128:6 130:5 134:24 135:10,15, 21 136:5,19
**recognized** 55:23 128:22 142:19
**recollection** 116:17
**recommended** 70:17 101:17,23
**reconcile** 237:11
**record** 11:19 12:10 16:15, 16,18 20:13 22:13 30:9 33:11 38:7 43:6 54:15 58:5,6,8 70:21,24 71:1,15 72:17,20 81:15,18,20 82:15 127:23 129:13 143:18 145:11,17 150:7 178:19 179:16 180:8 181:13,15 197:1 205:17 208:23,24 245:13
**recorded** 35:18 61:18
**records** 22:14,17,22 23:1 29:22 30:1,6,9,17, 21,22,24 31:9,13 32:4,5 36:9 40:12 41:1 56:13 69:10, 11,12 78:18, 22 79:23 80:2,17,19, 21,24 118:20,24 144:18 145:15 178:15,16, 18 180:11 188:1,5,9 196:8,15 205:6 206:8
**recover** 179:5 181:20 182:6 208:16
**rectangle** 84:13,14
**red** 46:7,23 74:4,5 75:13 78:9,10,11 83:15 94:13, 15 117:20 138:10 139:3 146:5 147:17,20 148:2 152:22 155:1,4,5 156:21 165:4,23 166:10,15, 18 167:22, 24 169:2,24 171:2,8,10, 12,23 172:2, 9,11,17,22, 23,24 173:4, 7,10 182:10, 12,17,24 201:7 202:8, 13,14,16,22 210:3 212:19 223:10,11, 15 226:24 227:15 228:17,21 239:16
**RED's** 84:5
**refer** 9:14,20 16:19
**reference** 28:21 32:12 212:18,21, 22
**referred** 58:14 61:17
**referring** 27:24 239:17
**reflect** 23:22 206:2 219:16 223:1
**reflected** 24:15 205:12,14 222:18,20 237:10
**reflects** 37:15 39:15
**refunds** 82:9
**regard** 192:20
**regular** 29:21,24 30:6,16 75:3 129:4
**regulations** 180:6
**regulators** 25:23
**reinstated** 11:10
**reinvested** 165:12
167:2
**related** 68:1 69:6 112:16 201:18 207:23 216:20
**relates** 109:9
**relationship** 112:18
**relevance** 108:4
**reliance** 29:17
**relieved** 227:17
**rely** 29:16 74:9
**relying** 150:13
**remember** 6:24 12:13, 15 13:21 14:3 15:2,3 17:9 21:1,17 25:11 26:1 28:13 29:15 32:19,20 39:2,7 40:1 42:19 48:19 52:14,15 56:24 57:22 64:21 69:2 73:1 80:14 103:15,23 104:22,23 105:7 111:9 117:12 118:9 132:13 141:5,8 147:2 155:11 163:11,14, 15 164:13, 14 167:23, 24 168:3 173:13 190:22 209:10 215:24
**remodel** 236:11
**remove** 134:12,14
**removed** 210:19,23
**Renee** 114:13
**renegotiated** 42:19
**rent** 97:13
**rentals** 98:3
**reorganization** 179:9
**repeat** 28:14 81:3 109:23
**repeating** 27:22 239:9
**rephrase** 8:20 48:6 67:15,16 200:10
**replacement** 70:1
**replica** 235:15,18
**report** 243:24 244:7
**reporter** 6:20,22 21:6 75:8 129:11 243:16
**reporting** 227:3,5
**reports** 184:2,14,23 185:1 204:6 205:13
**represent** 6:8 8:4 39:14 106:10
**representation** 37:9
**represented** 102:10,11 175:11
**representing** 233:13
**represents** 102:16 106:5
**reproduced** 244:1
**request** 25:14 65:19
**requested** 110:6
**require** 7:5 123:5
**required** 26:7
**requirement** 10:4
**requirements** 31:9
**requires** 233:11
**requiring** 222:2
**Residential** 88:5
**resign** 65:19
**resigned** 65:17 66:6
**resolve** 36:5
**resort** 171:10,12, 16,18,23 172:2,18,20, 21,24 173:11
**resources** 74:16
**respect** 94:12 123:16 124:23 125:23 126:1 147:22 170:18 171:2 201:3
**responsibilities** 204:11
**responsibility** 239:15
**responsible** 33:19
**rest** 17:1,12 60:3,8 159:5 161:7
**restate** 181:14
**restaurant** 84:23 85:7
**retail** 88:13 93:1 202:18, 19 210:6,7,8
**retain** 33:10, 23 92:11 139:21,24 140:5,10 203:15
**retained** 33:6,7,8 149:21 161:19,20, 24
**retainer** 206:21,23, 24
**retire** 187:8
**retired** 102:4,5 187:3 189:14,18
**retirement** 187:4
**return** 31:18, 19,23 32:10 34:11,22 35:5,22 36:1 153:16 188:8,18 189:24 190:1 222:10 231:7
**returns** 31:3, 4 33:20 34:5,8 98:12,13 187:3 190:10
**Revenue** 122:8
**reviewed** 18:10
**revoked** 99:8,9

**Reztark** 90:5
**RH** 81:13
**Richard** 65:8 70:2
**Ricky** 70:15
**rid** 157:7
**Ridge** 41:5 221:19 231:18
**ridiculous** 127:1
**right-hand** 226:18
**rights** 194:18,19
**ring** 58:21 65:3 84:6
**Ringo** 86:9, 10,12 202:17
**road** 42:22 51:6 87:15 92:8 131:7
**robber** 97:23
**Rockland** 227:4,11 228:2,12 229:6,21 237:14 238:19 239:18 241:12
**Rockwood** 225:8
**Roman** 81:5 122:20,24 134:10
**Roselawn** 202:20
**roughly** 218:19
**round** 98:10
**RS** 240:5
**rule** 142:4
**ruled** 11:4
**rules** 10:18 76:17 142:19,21, 22 143:2,3,4
**Rumpke** 94:4
**run** 13:9 14:23 29:16 112:23 191:23
**running** 151:3
**runs** 191:24

**S**

**S&t** 106:2,8, 21 107:1,8
**S-E-N-Z-E-R** 148:24
**sake** 43:11
**salaries** 39:24 40:11
**salary** 39:21 40:4 186:24 187:1
**Salazar** 32:11,13,22 33:23 34:4 35:3 104:16
**sale** 82:24 83:4 157:20 159:4 161:13 164:5,6 165:5,23 166:10,15, 18 182:24 183:15 212:19,24 234:21
**sales** 83:17, 20
**Sam** 45:18, 19,20
**Sandler** 101:16,17 102:10
**sanity** 191:4
**sat** 53:7 96:3 115:24 143:20
**Sater** 53:10
**satisfaction** 36:10,13
**Saugus** 164:3 202:15
**save** 87:10
**SB** 45:18
**scarf** 46:8
**schedule** 24:4 37:5 71:2 163:2 197:21 199:12 221:10,11 230:15 232:24 244:20
**schedules** 12:14,17,20 13:14 14:9, 14 18:3 22:5,8,14 23:4,6,11, 15,22 24:9, 15,16,19 25:3,19 26:22 29:21 30:13 38:9 39:10 40:3, 17 41:8 44:9 53:12 57:14 61:2 67:14, 23 68:14,20 103:12 105:8,19 162:19 218:10 219:16 220:14,21 222:21 225:1,12,14 226:2,22 227:7 228:1, 10 229:8 230:12 234:3 237:9, 13,23 238:1, 20 239:13
**scheme** 109:13
**Schneider** 6:1,6 41:16 43:7,9 44:6 49:3 50:3,6, 13 58:14 60:1,5,12, 16,19,21 61:1 66:3 71:14,20 72:2,5,22 73:19 82:12, 13 104:17 106:5 113:22 114:3,4,16, 18 119:18 120:20 122:5 130:8, 12 134:14 135:1,17,18, 24 136:7,9, 23 138:12, 14,16 140:23,24 147:21 148:7,19 149:24 151:1 161:20 166:13,18 175:4 191:24 244:3,5
**Schneider's** 49:17,18 135:11 136:12
**Schneider-grasshopper** 81:16
**school** 50:11 101:5
**Schueller** 101:19
**scooter** 44:10,14,17 220:24 236:1
**screwed** 125:11,19 126:10 129:13
**sealed** 97:14
**sec** 195:2 223:17
**second-to-die** 69:6
**secondary** 133:23
**section** 120:13 122:1,7 123:19 133:1,4 134:10 169:9,10 224:7 232:21
**secure** 97:24
**secured** 236:24 237:20,22 238:6,7,12
**securities** 197:22 199:13 223:19,23 224:4,5,8,21
**security** 90:7 96:5,7
**seeking** 112:20,22
**Seldom** 191:22
**self-storage** 217:11
**sell** 46:15,21 79:11 96:4 128:11 155:8 214:17 219:13,21 220:17 221:3 223:9 224:5 238:23
**selling** 86:23 111:2 167:19 168:7
**semester** 50:10
**send** 100:6 110:15 216:12
**sending** 111:1
**sentence** 200:20
**Senzer** 148:19 210:16
**separate** 49:22,23 57:16 58:2 97:10,17 214:12
**separately** 202:4 241:9
**September** 31:16,17 61:1 109:2 141:7 206:3 216:17
**sequence** 240:8
**series** 18:24 150:14
**Services** 157:20 161:14 164:6
**Session** 109:1
**set** 47:1 50:24 120:21 122:18 130:16,21 191:15
**sets** 129:8
**settle** 102:14
**settled** 49:14,15 50:17 51:23 57:20 61:20, 24 62:7
**settlement** 103:17
**settlor** 49:6 50:3,6 54:18 58:1,18 113:22 114:19,22 133:20
**settlor's** 144:4
**seventy** 128:18
**shadow** 127:18
**Shanahan** 146:1
**share** 139:9 157:12,15, 17 158:5
**shared** 167:5
**shareholder** 135:13 157:1
**shares** 139:6,17 150:9 155:1 159:20,22 182:16,17 199:14
**Sharonville** 15:19
**sheet** 73:19 74:20
**sheets** 30:11
**shop** 101:2 172:19
**shopped** 101:3
**Shore** 163:6 164:2 172:17
**short-term** 98:3
**shorthand** 27:16
**shoulder** 96:2

**show** 23:16 129:11 144:18 150:16 151:15 163:5 173:15 204:7 205:12 207:19 209:14 229:24
**showed** 143:10 228:13
**showing** 142:8 145:20 225:6 226:10,14 227:23 228:2,9 229:5,7,22
**shown** 178:13
**shows** 225:20
**Shy** 47:23
**sic** 228:11
**sick** 125:20 134:19,22
**side** 16:10, 13 127:19 226:18
**sign** 59:12, 16 229:11
**signature** 144:5 184:7 197:9,11 243:4,12 245:15
**signed** 50:18 51:22,24 53:4 62:3 152:6,10 184:6,7 189:22 196:19 197:4 225:8 228:18,21 229:1 241:4, 6 242:10,23
**Signer** 152:16
**significant** 37:16 243:21
**signing** 34:2
**similar** 107:22 124:22
**simple** 220:23
**simply** 219:19
**single** 26:1 109:24 177:14 193:19 194:15
**sir** 17:8
**sit** 39:1 53:9 61:11 80:23 94:23 99:12 122:11 141:7 160:20 197:17 200:6 203:12 207:16 216:21
**sitdown** 51:18 52:19 53:6
**sitting** 123:20 144:7 165:13
**situation** 36:3 87:18 144:1
**sixty** 128:18
**sizable** 76:4
**slow** 114:9
**SM** 164:18, 22
**small** 79:1, 15 80:4 81:22 82:2
**smaller** 117:17 183:13
**smart** 51:5 76:13 142:19 150:16
**Smith** 13:16, 17,18 14:17 15:8 104:11
**snapshot** 23:16 24:16 26:11
**social** 70:16
**socially** 70:5
**soft** 95:2
**soil** 94:4
**sold** 24:11 25:10,16 53:19,20 79:10 82:18, 21,22 83:5, 11 94:13,15 158:22 182:10 183:3,6 214:22 219:10,21 223:6
**sole** 133:15 139:22 151:13 244:4
**solely** 123:8
**solid** 68:6 194:15 216:15
**solvent** 53:19 54:4,6
**someone's** 65:21 96:2 128:8 194:24
**something's** 25:9
**son** 33:1 148:16,17 165:3 175:4, 10
**son's** 126:5
**sophisticated** 10:16
**sort** 84:12 99:21 117:16
**Sosna** 109:6, 9,11
**sound** 74:7
**sources** 39:16 52:16
**south** 163:17
**Southampton** 163:11,16
**Sox** 46:7,23
**SP** 45:15,21
**Spa** 171:10, 12,16,18,23 172:2,18 173:1,11 201:12,19 203:23
**space** 89:1 156:10
**spaces** 88:21,22
**speak** 124:8 184:20
**special** 192:2
**specific** 30:14 172:9
**specifically** 237:7 239:19
**spell** 21:5 75:7 148:21, 23
**spelled** 149:4
**spend** 91:18 185:3,17 204:18 205:8
**spent** 85:21 86:6 176:4
**spilled** 91:15
**split** 159:1
**sports** 47:2
**spouse** 43:3, 6 64:16 66:13 84:3 100:15 101:14 119:19 120:19 121:2,6,12 122:5 124:12,22 131:10,13 132:6,16 133:6 135:7 153:13 154:1 156:20,24 177:24 178:9,24 179:3,4,20 180:3,16 181:20 185:6 190:11,15, 24 193:23 205:9,14 239:3
**spouse's** 131:14 179:4 189:18 214:7 232:6
**Springdale** 173:10 202:11
**square** 88:16,17,18, 20 89:3
**staff** 94:7
**stamp** 115:7 240:6
**standing** 200:7
**stands** 164:24
**start** 74:18 158:8 206:23 221:8
**started** 18:20 19:1 50:18 51:23 66:11 83:14 101:18 115:24 117:1,16 118:16 131:19 143:21 158:12,14, 15 159:11, 14 170:14, 24 172:14 204:8
**starts** 93:16 136:22 171:14 172:14
**state** 11:8 28:9 98:13 141:22
**statement** 18:13 21:9, 21 22:3,6 29:11,12 30:21 195:9, 10,15 196:3, 6,11,12,14, 17 199:23 207:19 208:6 220:10 225:7 227:12 229:22 239:8 241:21,23 242:7,23 243:2,6
**statements** 12:14,17,20 18:4 21:20 23:4,11,15 24:15,16,19 25:4,19 26:11,22 28:9 30:10, 14 37:13,24 38:23 39:4,5 40:3 55:6 67:14,24 68:15,20 206:2,14 219:4 228:3 229:2 237:8, 15 238:3,18 239:18,22 243:17,19
**statistical** 36:19
**statute** 141:11,15
**stay** 157:13 227:19
**Steiner** 102:2,3,7
**Steven** 102:2
**stipulate** 184:13,16
**stock** 71:4 158:5 159:20 222:8
**stocks** 47:12 211:24
**stop** 9:5 25:12 186:4
**stopped** 23:14
**stopping** 98:11
**stops** 194:13
**storage** 117:17,22, 23 118:1,17 119:3 202:9, 21 203:4,10 217:5
**store** 177:15
**stores** 209:24 210:1
**Strauss** 65:12 66:1
**street** 84:9 92:7 163:10, 17 222:11

**strictly** 243:24
**strip** 209:15, 17,20,24 210:11
**structured** 88:14,22
**struggling** 118:13
**Stuck** 234:18
**studies** 89:13
**stuff** 12:24 24:3 27:5 74:15 94:24 100:24 104:1,2 135:4 156:13 163:5 203:15 212:5 229:11,12
**subject** 47:16 152:17 153:5 243:22
**submitted** 241:21 242:7 244:10
**subparagraph** 122:19,21
**subsid-** 170:8
**subsidiaries** 169:18,22 170:6,17 174:4,7
**substance** 181:24
**substitution** 122:18 123:7,12
**Success** 192:1
**successful** 144:20 192:1
**successor** 60:4
**successors** 60:4
**sue** 124:5,9 177:23 178:9 179:4, 17 180:3,16 181:20 182:5 208:15
**suing** 10:24 106:2,8 178:23 179:20
**suit** 103:13, 14
**sum** 206:3,9 218:5
**summarize** 39:9
**summary** 36:18 37:1 218:14 226:5 232:9
**summer** 125:10 126:17
**supplied** 196:4
**support** 121:5,14,21 133:10 220:3
**supported** 187:21
**supposed** 6:15 26:11 31:10,11 37:24 125:9 237:9,10
**supposedly** 11:9
**Supreme** 10:1,5,8,14, 15 11:3,4,6 70:13 128:21,24 145:13,23
**surety** 10:2, 13
**surprise** 190:9
**surrender** 69:5
**survive** 66:17 131:10
**Susan** 105:22 107:9
**suspect** 55:1 110:24
**sustenance** 187:16,19
**swoop** 29:15
**sworn** 6:2
**Synovus** 195:12
**system** 154:18 180:7

**T**

**T-BIRD** 234:15,17
**T-BIRDS** 234:24
**tab** 16:13,23 59:3 136:16
**tabs** 16:10, 20
**takes** 115:16
**taking** 103:21 108:1 217:5, 10
**talk** 8:7 10:7 27:14 62:19 77:21 86:3 104:7,8,9 114:9 181:12 186:7 191:10,11, 12 194:22 230:10
**talked** 76:21 89:8 165:3,7 178:2 203:24 215:22 218:23
**talking** 10:8, 23 22:13 26:5,6 29:5 30:10,11 38:8 72:21 88:16 89:3 112:15 141:16 152:15 173:23 194:12 207:9 209:11 211:17,18 212:22 237:20,24 238:7
**talks** 22:4 59:20 221:18 236:3
**target** 54:12 156:9,10
**taught** 214:14
**tax** 30:18 31:3,4,18, 19,22 32:4,5 33:19 34:5, 8,11,21 35:5,22 36:1 73:10,11 82:8 87:15 98:12,13 116:10 187:3 188:8, 18 189:24 190:1,10 222:9,10 231:7 243:23
**taxed** 122:7
**taxes** 170:13 217:19 222:10
**taxpayer** 189:2,6,7
**team** 53:10 137:11
**tear** 85:12
**teardown** 85:18
**teardowns** 89:22
**telling** 240:10 244:9
**tells** 7:16
**ten** 17:16,18, 20 18:10 57:6 66:12 94:2 98:7 142:2 193:19 214:4
**ten-year** 142:1 145:1
**tenant** 80:11, 12 96:22
**tenants** 97:7 210:11
**tens** 211:18
**term** 28:5 50:1 189:12
**terminate** 79:9
**terminated** 100:12
**terminating** 100:7
**terminology** 27:20
**terms** 214:8
**Tessie** 46:6
**test** 92:1,7 93:11,23
**tested** 93:22
**testified** 214:5 238:16
**testifies** 6:2
**testifying** 200:16
**testimony** 200:2
**testing** 91:21 94:10
**thereto** 123:17
**thing** 26:1 51:11 76:13, 15 77:13 116:4 127:3 128:6 131:19 136:20 145:20 161:6,7 170:14 180:13 183:5
**thing's** 45:7
**things** 6:22 24:13 25:10 26:6 35:15, 17,18,21 38:10 52:17 57:18 74:1 101:3,5 114:10 125:18 141:8,10 143:24 144:20 154:6,19 172:15 176:5,10 192:13 208:8 209:9 212:4 220:18 224:13 233:9
**thinking** 48:21 78:5 98:6
**Third's** 106:23
**thought** 51:6 152:2 238:17
**thousand** 128:19,20 146:4 216:20 233:3
**thousands** 211:18,19
**three-page** 129:4
**three-quarter** 106:17
**three-quarters** 107:9,10,12
**thrifty** 204:16
**tie** 118:23
**tied** 18:6 55:10
**Tiffany** 41:5 221:19 231:18
**Tim** 6:9
**time** 9:2 11:20 13:21 14:11,13 17:10,21 20:2 23:7,17 24:16 25:9, 15,21 26:24 27:8 29:20 35:7 37:11 39:7 40:1,2, 16 42:19 47:19 49:8, 11 53:1,4 54:14 55:11 67:3 68:23 70:15 84:24 87:11,14 90:18 92:13 93:4,7 96:15 102:9 108:8 110:20 111:24 112:4 116:18 118:13 121:2 123:4

126:2,24 131:16 132:17 133:7 136:3, 6 141:11 143:2 144:21,22 146:2,13,21 150:18,20 156:10 157:2 158:8 159:11 160:12,13, 15 173:8 175:14,15, 21 176:4,5, 9,10,11,12, 16 177:2 180:23 183:2 185:3, 13,17 186:2, 5 187:23 188:3 190:4, 24 191:8,16 192:12 198:18,22 200:1 203:8 210:17,21 212:4 217:22 220:2,8,9 222:7 225:13 228:16 229:13 235:12 239:24 244:23 245:12

**timeout** 8:12 9:6

**times** 39:22 49:1 101:4 112:24 123:21 125:10 151:16 158:4,6 177:19 187:5 193:20 194:18

**timestamps** 70:23

**timetable** 51:7

**timing** 112:9 158:7 179:24

**tired** 126:1

**tires** 233:5 234:18

**title** 15:1 81:3 91:14 93:21 171:11 196:10,13 199:9 241:22

**titled** 59:9 135:12 136:2,8 196:16 213:3

216:24

**titles** 200:21

**today** 17:19 78:6,7 80:23 81:12 90:3 118:5,9 125:1,17 126:15 141:7 160:14 175:17 197:18 204:17 219:13 238:23 239:23 245:7

**today's** 76:17 221:5

**told** 7:19 32:2 69:20 111:21 112:7 143:16 190:8,9 207:5

**tomorrow** 193:2 224:6, 14

**top** 18:7 36:23 48:19 75:21 76:1 137:13,23 194:9

**Topco** 81:21

**tore** 85:4,6,8 94:2

**total** 37:5 38:16 195:18 215:4 218:11,12, 15 223:22 225:11,14, 24 226:6 231:4,17 232:20,22 238:18 242:12 243:1

**totally** 241:2

**town** 97:12 163:24

**track** 19:8

**trade** 124:3 240:6

**traded** 47:12 71:3 124:6

**tradition** 7:1

**traditional** 63:10

**transaction** 83:1,4 123:12,17 207:6

**transactions** 21:10 26:18 149:3,4 150:4,15 151:5,9,12

178:1,4 207:24 208:3 243:21

**transfer** 18:15 59:10 123:5 138:17 153:11 160:24 179:19 207:19 208:10

**transferred** 77:11 78:1 82:11,17 95:17,21 135:17,19, 23 136:8 206:4,10,14

**Transferring** 19:2

**transfers** 67:13 108:1 138:18 140:9 144:9 179:3

**transparency** 107:21 108:1

**transpired** 155:23 156:1

**travel** 125:9, 12,22 126:16,22

**treated** 121:9

**trial** 10:19 107:15 127:23 178:20

**trials** 125:5

**triangular** 84:11

**tribulations** 125:5

**trick** 8:18

**trip** 126:23

**trouble** 191:14

**Troy** 65:12 66:1

**true** 8:22 127:22 144:16 183:11 193:10 203:14 227:3

**Trump** 50:24 115:19

**trust** 48:22, 24 49:3,4,5, 17,18,21,22, 23 50:3,6, 14,22 51:5, 16,19 54:18 55:1,2,3,6,9, 14,21 56:17,

20,23 57:2, 13 58:1,3,9, 11,15,19,21, 23,24 60:5, 12 61:1,12, 13,20,23 62:6,11,13, 14,17,22 63:17,18 64:1,3,4,22, 23 65:2,16, 21,22 66:8, 12,14,15,19, 22 67:12,24 68:15 69:22 71:9,10,12, 14,20,23 72:2,6,22 73:2,19 74:3,20,24 76:12 78:2, 7,8,11,15,16 82:12,13,19, 23 83:5,12, 14,23 84:4 95:18,21,24 96:5 113:21 114:3,6,16, 18,19,23 115:1,13,18 116:1,5,7 117:1,3,13 118:5,7 119:19 120:17,21 121:3,7,13, 19 122:6,7, 12 123:6,16 124:14,23 130:8,11,14, 15 131:17, 20 133:8,19, 20 134:18 135:1,11,17, 19,23 136:7, 10,13 138:21 140:9,23,24 141:19 143:21 147:21,22 148:8 149:24 150:5,9 154:4,7 156:17 157:11,12 158:24 159:2 161:18 165:14 166:5,6,8, 13,18 174:15,18 176:18,23 177:18 179:4,21 182:5 202:6, 9,10,11,12, 14,23,24 203:1,7,9 204:3 209:6, 7 213:1,10, 12 214:16

**trust's** 96:12 133:15

**Trust-grhpr** 203:6

**trustee** 41:18 48:14 49:6 55:16,18 60:5 64:22 65:2,14,21 66:2 69:21, 23,24 70:1 71:19,22 84:4 113:24 114:22 119:19 120:20 121:1,4,6, 12,19 123:5, 10,13 124:5 130:10,14 133:5,9,14, 16 134:12, 15 147:23 178:1

**trustee's** 123:11,14

**trusting** 51:1

**trusts** 48:4,7, 12,14 49:2, 13 54:16,17, 20,23 57:21 58:10 59:1 61:10 65:15 77:8 82:17 102:12 130:16,21 131:11 136:1 140:16,23 143:12 144:9 203:15 212:19 213:2,8

**truth** 128:17 146:7 240:10

**Tuesday** 109:1

**turn** 41:12 120:8 128:7

**turned** 107:5 124:19 158:4 172:20

**two-bedroom** 217:7

**two-part** 68:3,6 135:20

**type** 70:11 87:21 99:12 111:17 154:6

**typeset** 241:1

**typesets** 240:2

**typically** 154:15

**U**

**U.S.** 81:23 100:3,6
**ugly** 116:6
**uh-huh** 6:22 85:24 120:16 173:22 197:23 199:16 210:13 235:17
**ultimate** 193:6
**ultimately** 53:5 145:12 157:19 177:20 187:21 194:24
**understand** 8:19,23 27:20 29:18 96:7 142:2 170:21 225:23
**understanding** 28:4 114:21 116:9 121:11 122:9 131:17
**understood** 55:21
**undeveloped** 217:3
**undo** 178:1
**unequal** 124:6
**unethical** 179:23
**unincorporated** 71:5
**Union** 106:21
**unique** 87:22
**unit** 97:13 139:11,22 148:4 149:11,21 157:1 174:11,12, 14
**units** 88:10 97:9 118:17 138:9 139:14 147:16,19 148:8,12 149:6 150:1 151:6,19 152:13 153:4,11,12 159:22 173:13 174:20 175:7,11
**unlike** 63:10
**unsecured** 96:6,8
**unwound** 179:20
**updated** 26:17
**upset** 129:11 143:7

**V**

**vacation** 97:10 127:5
**vacations** 126:23
**Vaguely** 106:14
**Vail** 42:22 96:16,19 98:1 231:22
**valid** 177:21
**valued** 117:8 219:24 220:1
**values** 37:15 51:20 219:17 220:14 222:18,20 223:1 237:9
**vehicle** 45:4, 8 234:11
**vehicles** 234:7
**venture** 71:6
**verbal** 6:20 92:23
**verify** 197:17
**verifying** 198:12
**versus** 37:18 38:11 177:9 226:22 229:6 237:14 238:1
**veto** 193:16, 24
**vetoes** 193:13
**view** 192:4
**VII** 121:24 122:16
**visits** 47:6
**voidable** 178:5 179:3, 19
**volume** 27:5 118:22
**Vorys** 53:10 115:24 117:11
**voting** 139:9, 11,17,22 140:17 148:5 149:5, 11,21 151:13 156:24 157:1,12,15, 17 174:14 201:2,9,15, 24 203:15 204:1
**VW** 235:14, 16,20

**W**

**W-A-L-D-O-R-F** 82:1
**wages** 39:21, 24 40:4,11 190:7,11,12, 13,18,21 191:17,20
**Wait** 44:11 164:8 225:4
**waiting** 19:15 34:12 35:3 36:14
**waived** 245:15
**waiver** 123:13
**Waldorf** 81:24
**walk** 127:11
**wanted** 51:9 115:15 127:9 138:3, 5 157:13
**warehouse** 171:1
**warned** 103:2,3
**Warsaw** 241:21 242:1,7
**waters** 94:10
**Wayne** 65:8 70:2,3
**ways** 127:14 191:7,8 192:8
**Wechter** 112:6
**Wednesday** 52:16
**weekend** 17:12
**weekly** 185:14
**weeks** 127:6 207:17
**West** 119:12, 14 171:15, 18 202:12
**whichever** 143:4
**Whitaker** 13:15 14:5 15:6 19:17 20:15 34:16, 18
**whoever's** 66:16
**wholly** 161:24
**wife** 41:16 42:8 43:9 46:17 63:4 116:8 120:7 124:4,9,21 126:21,22 132:2 138:13 154:23 177:15 189:5 193:17 204:9,12 213:13 231:14
**wife's** 49:20, 22 52:8 190:6
**Wolf** 44:9 220:24 236:1
**woman** 187:20
**won** 10:12 145:19 179:12
**word** 28:6 29:4 96:10, 12 198:15 200:3
**words** 6:23
**work** 33:14 36:2 51:9 62:2 66:5 70:8,11,14 87:1 90:17 101:17 102:3,5 112:7 116:4 124:16,23, 24 127:17 156:12,16 157:13 158:17 170:9 173:2, 3 185:8,13 187:10 191:1 235:12 237:6
**worked** 14:1 84:23 156:4
**working** 23:14 34:4, 7,10 87:3 89:23 145:3 160:3 185:18 187:9 189:23
**works** 15:17 97:12 185:9, 15 190:23 215:3,4
**world** 76:18 92:22 144:1 176:3 212:17 221:5
**worship** 56:11
**worth** 38:12 45:7 72:8,14 156:3,6,18 158:4,5,11, 12 208:7 221:5 225:19 229:23
**wound** 11:13 149:24
**write** 177:14
**written** 76:5 125:18 132:9 159:24 160:1,3,6,16 183:11 194:1 244:3
**wrong** 52:11 76:7 170:18 235:22
**wrote** 101:20 112:4 132:10 243:13

**Y**

**year** 17:24 20:1,7,9,12 31:15 51:1 52:2 61:19 83:10 92:4, 10,19 116:12,15, 17,18 121:8 192:12 214:23 234:23 243:22
**years** 14:2 15:12 34:9 40:10 43:12 50:12 51:10 57:6,11 66:12 84:22 87:7 90:17 91:11,13 93:14 94:1, 8,9,12,22 95:2 97:6 98:14 99:10 105:1 120:3 124:13,15, 24 126:21 129:9 132:9 140:2,3 141:9 142:2 144:4 145:18 150:19 151:3 154:2 159:12,16 169:23 170:1 178:13,17

183:14
186:20
188:2 190:5,
19 198:16,
17,24 199:3,
6,8 211:21
214:4
215:20,21
216:6 221:7
223:9

**Z**

**zone** 220:2

**zoning** 89:23
90:14